# Affidavit Of Martin Gottesfeld   18cv10836

I, Martin S. Gottesfeld, do hereby affirm that the following is true and accurate to the best of my knowledge, information and belief on this 11th day of March, 2019:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-15-19

1. My name is Martin S. Gottesfeld.

2. I am an inmate in the West Special Housing Unit (SHU) of MDC Brooklyn and my federal registration number is 12982-104.

3. I have been in general population at 3 different federal detention facilities, including MDC Brooklyn. During that time I had full access to all the same computer and telephone resources as the other inmates.

4. I have never been charged with an inmate disciplinary infraction by the Federal Bureau of Prisons.

5. I have never been involved in any incident which resulted in any disciplinary proceedings being carried out against any federal inmate or federal prison employee.

6. I have never asked for protective custody (P.C.).

7. I have never been advised of any administrative detention hearing nor administrative detention order regarding the over 100 days and nights which I have now spent in the Special Housing Units (SHUs) at MCC New York (81 days from the night of Monday, November 14th, 2016 through the morning of Saturday, February 4th, 2017) and MDC Brooklyn (23 days and counting from the night of Friday, February 15th, 2019 through the present).

8. I am a journalist who often covers DOJ malfeasance and prison conditions.

9. I have published dozens of articles as a contributor to HuffPost, many if not most of which were featured prominently on its front page. HuffPost is one of the most-read political publications in the country and its website is ranked in the top-100 most-viewed nationwide.

10. I have published dozens of articles at RedState.com, many of which were featured prominently on its front page. RedState.com is a widely-read national political publication.

11. InfoWars has prominently featured dozens of my articles from FreeMartyG.com on its front page. InfoWars is one of the largest and most-read political publications in the country. Its website is ranked in the top-1000 most-viewed nationwide and I believe that is artificially low.

12. Recently I became a reporter for The Intercept. The Intercept is one of the most-influential political publications in the nation.

13. The Western Journal and WND.com each occasionally publish my writing. The Western Journal is one of the 4 most-viewed conservative publications online and its website is ranked in the top-300 most-viewed nationwide. WND.com is also one of the largest and most-read political publications in the country and its website is ranked in the top-1000 most-viewed nationwide. Parts of my story have also appeared at Rolling Stone, Newsweek, The National Review and on television in over 100 countries.

14. Near the end of 2016, HuffPost published an open letter of mine to then-Attorney-General Loretta Lynch and Inspector General Horowitz regarding conditions in the SHU at MCC New York, leading to some redress.

15. On or about January 24th, 2017, HuffPost published an open letter of mine to then-Acting-Attorney-General Sally Yates further reporting on both conditions in the SHU at MCC New York, leading to the removal therefrom of a mentally-ill man, and a recent scandal at MDC Brooklyn. This letter predicted problems like the recent blackout at MDC Brooklyn and called for random unannounced inspections of all FBOP facilities in the region.

16. In February 2017, The Daily Mail published my reports on the conditions in the SHU at MCC New York. The Daily Mail is one of the most-read English-language publications in the world.

17. On February 3rd of this year, The Intercept published an article of mine on the instant case and conditions in the SHU at MCC New York. The editor added a note about the recent blackout at MDC Brooklyn, which ended that night.

18. On Friday, February 15th, 2019, I was transferred to MDC Brooklyn as a newly-sentenced federal prisoner.

19. My initial intake paperwork indicated that I was designated for general

population and the "GA" unit, where I had been before without incident in March 2016.

20. However, I was quickly separated from the group with which I had gotten off the bus and directed to a small office.

21. Two men told me that I was designated for a facility with a "Communications Management Unit." They asked for my thoughts as to why I had been so designated.

22. I answered that I felt it was because of my journalism and cited examples, including my recent article at the Intercept.

23. One of them said to me, "Or maybe it has to do with what you used to do for a living." I believe he was referring to my career in Information Technology.

24. I reiterated truthfully that I had been in general population for the vast majority of the nearly 3 years since my arrest and that I had never been charged with any disciplinary infraction by the Bureau of Prisons. I also truthfully stated that I had access to TRULINCS (the inmate computer system) at MDC Brooklyn in 2016 without incident.

25. The two men told me that nonetheless I had been "flagged for a captain's review" and that I would be put in the SHU unless and until the captain approved me for general population. They also told me that the captain wouldn't be in until Tuesday, as it was a holiday weekend.

26. I asked for a BP-8 but was instead given an "Inmate Request to Staff," or "cop-out" form.

27. Though I filled out the mental health screening paperwork, I was taken to the SHU without any physical medical screening, not even the likely-otherwise-unavoidable TB test.

28. Shortly after my entry into the reception area of the West SHU, a man who I would later learn was the Officer-In-Charge of the West SHU, Mr. K. LeCount, asked me upon our initial meeting, "You the activist?"

29. I replied in the affirmative. I hadn't yet used the term "activist" to describe myself to anybody at MDC Brooklyn. Rather, I had instead self-identified as a "journalist" and an "alleged member of the group Anonymous."

30. A short time later, when I learned ~~that the~~ met my new

cellmate, Mr. Johnell Turner, I learned that the government had recently successfully convinced U.S. District Court in Manhattan that Mr. Turner is a credible and reliable witness in a prior proceeding related to the murder of Mr. Turner's cousin.

31. Mr. Turner told me and has sworn an affidavit to the same effect under penalty of perjury that prior to our meeting for the very first time, the same Officer-In-Charge K. LeCount told Mr. Turner that I am "an activist" and that my situation is "political."

32. Almost immediately upon entry to my cell in the SHU, I noted that the 1.4oz (39.7g) tubes of Ora-Line "Fresh Mint Flavor Toothpaste" issued to SHU inmates by MDC Brooklyn do not contain flouride. Rather, the list of ingredients on these toothpaste tubes reads in its entirety: "INGREDIENTS: SORBITOL, HYDRATED SILICA, DI WATER, GLYCERIN, PEG-12, SODIUM LAURYL SULFATE, CELLULOSE GUM, TITANIUM DIOXIDE, FLAVOR, SODIUM BENZOATE, DISODIUM PHOSPHATE, SODIUM SACCHARIN."

33. It has been some time since I took chemistry, but I do believe that sorbitol and sodium saccharin are artificial sweeteners, the latter of which is no longer in common use after a series of decades-old studies raised red flags with regards to its safety and likely-cancer-causing effects; that "hydrated silica" is a fancy way of saying "wet sand," likely meant to hide the compound's true nature as an abrasive; DI Water is short for deionized water; sodium lauryl sulfate is the primary active ingredient in many, if not most, hair shampoos; titanium dioxide is an ingredient in many underarm deodorants; and that sodium benzoate is a preservative.

34. Ironically perhaps, it seems that the toothpaste which MDC Brooklyn issues to SHU inmates contains many of the ingredients one might expect to find in other bathroom-cabinet products, but not the one ingredient one should expect to find in toothpaste: flouride.

35. I was never advised by MDC Brooklyn of the importance of flouride in toothpaste or that I had been issued toothpaste without flouride. Neither had Mr. Turner, who has sworn an affidavit to this effect under

penalty of perjury.

36. Inmates in the SHU are not provided with any dental-flossing products or mouthwash. Mr. Turner also knows this to be true and has sworn an affidavit to this effect under penalty of perjury. The lack of both flossing and mouthwash products presents serious issues for my periodontis which I would not have in general population.

37. The following Tuesday, February 19th, 2019, I was allowed to make a social telephone call to my wife without the real-time monitoring required for CMU inmates. This call was largely journalistic in nature. Parts of it have been published. Though prison conditions and the recent blackout at MDC Brooklyn as well as prison reform were topics of conversation, this call was in no way a "threat to the continuing operation of the institution," as would be necessary to justify my designation to a CMU.

38. I did not speak to a captain on that day nor on any other. I have never been informed of any administrative detention hearing(s) nor administrative detention order(s).

39. On the morning of Wednesday, February 20th, 2019, I heard Mr. Travers, the current head of medical at MDC Brooklyn, tell another SHU inmate that he and all other SHU inmates do not get "routine medical care" by policy while they are in the SHU. Mr. Travers did not differentiate between administrative segregation (Ad. Seg.) and disciplinary segregation (D.S.) inmates in his blanket policy statement nor upon any other type of status, such as potential risks to staff. Mr. Turner heard Mr. Travers as well and has sworn an affidavit to this effect under penalty of perjury.

40. On or about Sunday, February 24th, 2019, more than 1 full week after my arrival into BOP custody at MDC Brooklyn, I was taken for my initial medical screening, including my TB test. At that point I requested to see a dentist and notified the facility of my periodontis, which had gone entirely untreated for more than 2 years at the Plymouth County Correctional Facility. I was told that I would be put on a list to see a dentist.

41. Thus far without exception my incoming legal mail from my 1st Circuit appellate attorney and the Clerk of Courts for the 1st Circuit have

been opened (and likely read) outside my presence by MDC Brooklyn.

42. Unbeknownst to me, an attorney attempted to visit me and check on my well-being on Tuesday, February 26th, 2019 - 3 weeks after the blackout ended. She was made to wait for 3 hours before she gave up. MDC Brooklyn never informed me that an attorney had tried to visit that day and being in the SHU there was no immediate or prior way for anyone to tell me that she was coming in advance nor of this unfortunate outcome. I learned of the incident days later through another attorney who was allowed to visit me and check on me.

43. I have also learned that journalists from various national political outlets including The New American, The Daily Wire, InfoWars, and the Intercept have inquired on my status with the BOP. These journalists wish to speak to me to gather and report the news and I wish to speak to them in order to share it.

44. Journalism has always been a very time-sensitive field and it is more so today than ever. Minutes matter. And there is no likelihood whatsoever that there will be a reversal of this trend towards immediate reporting.

45. On the morning of Wednesday, February 27th, 2019, myself and Mr. Turner each heard the head of medical at MDC Brooklyn, Mr. Travers, answer an inmate by saying that SHU inmates do not receive "routine dental care," but that they do receive "emergency dental care." Once again, Mr. Travers did not differentiate between SHU inmates based on any status or risk level. Mr. Turner has sworn an affidavit to this effect under penalty of perjury.

46. It thus appears that under the leadership of Mr. Travers, SHU inmates at MDC Brooklyn are issued non-flouride toothpaste without being informed of what this signifies as well as no dental-flossing nor mouthwash products before then being denied routine dental care which might detect and mitigate the resulting issues. This shocks my conscience as going beyond deliberate indifference as I doubt that it was easy or accidental to find and order non-flouride toothpaste on the market nowadays and I expect that

the relevant state licensing board would share my assessment.

47. The warden of MDC Brooklyn, Mr. H. Quay, makes his own weekly rounds through the West SHU in the same group as Mr. Travers and it is more likely than not that he has heard these or effectively-identical comments to inmates by Mr. Travers. Mr. Turner shares this common-sense assessment and has sworn an affidavit to this effect under penalty of perjury.

48. On the same morning of Wednesday, February 27th, 2019, I spoke to Mr. Quay personally regarding my situation during his weekly rounds through the West SHU. I told him that I had been told that I was in the SHU for over a week pending a "captain's review," but that I had not spoken with any captain, that I had never requested protective custody, never been charged with a BOP infraction, had not received an administrative detention order nor been to any administrative detention hearing and that I was in the SHU against my wishes. Mr. Quay checked a paper printout and informed me that I would be in the SHU for the remainder of my stay at MDC Brooklyn. Mr. Quay attempted to justify this by saying, "We have security concerns." At no point did Mr. Quay or any other MDC Brooklyn staff member tell me that I was in the SHU pending classification or on holdover status, the two exceptions to the administrative detention procedures set forth in the CFR. Mr. Turner was present in my cell for this conversation, heard the above, and has sworn an affidavit to this effect under penalty of perjury.

49. Over the following week, my top-left wisdom tooth began to hurt. There's been a cavity in it since before my arrest more than 3 years ago which I intended to address but had not yet due to the yearly limit on my former dental insurance plan. However, it had never been that painful. I was hoping to have it filled when I am released from custody since jails tend to only pull teeth and not to fill them. However, as the pain became unbearable (likely because I was eating food with real sugar and other otherwise-welcomed but symptomatic ingredients for the first time in 2 years at MDC Brooklyn), I requested many times in writing to see a dentist and have it

pulled. Mr. Turner witnessed me submit these written requests and has sworn an affidavit to this effect under penalty of perjury. Though I believe, but am not sure, that by CFR inmates who are new to BOP custody are supposed to see a dentist within 2 weeks, my requests were fruitless and I still have not seen a dentist in over 3 weeks.

50. On the morning of Wednesday, March 6th, 2019, I spoke to the head of medical, Mr. Travers, about my wisdom tooth. I told him it was an emergency as it was affecting my ability to eat. Contradicting his own prior statement from the previous week, Mr. Travers told me, "There's no such thing as a dental emergency," but that he'd tell dental that I was looking for them. Once again, Mr. Turner heard this conversation and has sworn an affidavit to this effect under penalty of perjury. I imagine that the American Dental Association would not share Mr. Traver's view that, "There's no such thing as a dental emergency." I still have not seen a dentist, though thankfully the pain largely subsided a few days after I began chewing only on the other side of my mouth.

51. The following evening, Thursday, March 7th, 2019, I received my once-monthly 15-minute social call from the SHU for the month of March. Again, none of the real-time monitoring typically required for CMU inmates took place. Again the call was largely journalistic in nature. And again, while prison reform, prison conditions and my tooth were topics of discussion, the call was in no way whatsoever a "threat to the continuing operation of the institution."

52. On the same evening, I received through the mail a printed copy of an email which my newly-appointed appellate attorney on another case, Ms. Virginia Villa, Esq. had sent to my wife. Among other things, Ms. Villa told my wife, "As to phone calls at MDC, I have tried to contact clients there before, when I have really needed to speak to them. It is like pulling teeth to get through to a client at MDC. Unless it is a life-or-death situation (which it has been in some cases), I will not be able to get through. There are a number of reasons for this, but let's just say that in the 30 years of experience I have had with the BOP, it takes a life-or-death

scenario to get to call a client at MDC-Brooklyn."

53. The following evening, Friday, March 8th, 2019, I received a priviledged letter from Attorney Villa, who had marked the envelope "Attorney-Client Privileged Material Open in Presence of Inmate Only." However, MDC Brooklyn nonetheless opened the letter outside my presence and stamped, "THIS MAIL DOES NOT MEET LEGAL MAIL REQUIREMENTS PER BOP P.S. 5800.16" on the envelope. Among other things, Ms. Villa told me, "...I would appreciate hearing from you so that we can discuss appellate strategy. I really want to hear from you. I need to know what you think went wrong in your case. Your input will be immensely helpful in my review of the record and formulating our appellate strategy. As noted, I have deadlines. The sooner I hear from you the better. If you have access to Corrlinks, that is the best and fastest way for us to communicate. I have included my email address above. I look forward to hearing from you soon." (Emphasis in original.)

54. In the SHU, I have no access to Corrlinks, which is the inmate electronic messaging system. Mr. Turner also knows this to be true and has sworn an affidavit to this effect under penalty of perjury.

55. The following day, Saturday, March 9th, 2019, my previous written request was honored after some time to use the electronic law library — which is a networked computer service. Mr. Turner knows this to be true and and has sworn an affidavit to this effect under penalty of perjury.

56. Staff were well aware of my charges prior to my use of this networked computer service because they asked me about my case and my placement in the SHU, and I answered them in no uncertain terms that I am a "journalist" and "allegedly a member of the hacking group Anonymous." They advised me not to try to hack the computer and I assured them that I would not. I was then left alone to operate the computer unsupervised for approximately 40 minutes. Nothing bad happened. I made no attempt to hack anything. I promptly logged off as instructed when my term was over and was returned to my cell.

57. In the time that I have been in the West SHU at MDC Brooklyn

under the healthcare leadership of Mr. Travers I have never once seen nor heard mental health staff make rounds. Mr. Turner has sworn an affidavit to similar effect under penalty of perjury. I believe — though I do not know and I am not sure — that under federal regulations, such rounds are supposed to be made on a daily basis.

58. SHU inmates, even those who supposedly aren't being punished (Ad. Seg.) are not allowed contact visits at MDC Brooklyn while inmates in general population are allowed to hug and kiss their loved ones. Mr. Turner knows this to be true and has sworn an affidavit to this effect under the penalty of perjury. I have not had an opportunity for a contact visit with my wife in over 2 years. However, my wife and I had multiple contact visits at each of FPC Miami and MCC New York without any result at "threat to the continuing operation of the institution."

59. Federal inmates in general population are allowed up to 300 minutes of phone calls per month and can make calls throughout the day. SHU inmates, even those who supposedly aren't being punished (Ad. Seg.) are only allowed to make a single social phone call per month of up to 15 minutes. Mr. Turner knows this to be true and has sworn an affidavit to this effect under penalty of perjury.

60. Again, federal inmates in general population can use electronic messaging throughout the day while SHU inmates cannot use the system at all. Again, Mr. Turner knows this to be true and has sworn an affidavit to this effect under penalty of perjury.

61. Inmates at MDC Brooklyn can usually only order 20 1-ounce Forever postage stamps every 2 weeks. I am prose on this and another civil action and I also have an appeal open with the First Circuit. I send my wife 10 letters every 2 weeks (minus postal holidays), some of which require more than 1 stamp. I am told that my written requests for authorization to purchase more stamps will be approved, but keeping up with my legal actions and personal correspondence has been impossible in the meantime. I cannot send all the mail which I would like, as I am supposed to be able to do under federal regulation. Mr. Turner knows about the 20-stamp

per 2 weeks limit and has sworn an affidavit to this effect under penalty of perjury.

62. The Bureau of Prisons has never placed me on "restricted correspondence," nor has my correspondence ever provided a prudent reason to do so.

63. Being in the SHU for these extended periods is irreparably harming my mental and physical health, including my dental health; my access to attorneys; my ability to make copies and serve process; my family and other social bonds, including my marriage; my ability to do legal research to pursue civil actions, including this one; my pending appeal; my prospects for clemency and a pardon; and my ability to defend myself in the court of public opinion, all to the benefit of the defendants.

64. There are general population units at MDC Brooklyn where I could be (and in the past have been) housed just as easily and without undue risks to myself, the institution or the public.

65. After I began drafting this affidavit, on the morning of Monday, March 11th, 2019, I was seen by a dentist at MDC Brooklyn who confirmed my periodontis and the problem with my wisdom tooth. He has scheduled me to have the tooth pulled on Friday, March 22nd, 2019. This is satisfactory to me, as I've stated I have been able to temporarily address the issue by chewing on the other side, and I am grateful. However, I believe that this outcome was greatly expedited and likely only possible because of my real-time communication with my wife and the press on last Thursday's phone call (March 7th, 2019), which fortunately just happened to come close to the time the symptoms were near their worst. Further, I believe discovery and depositions would validate this theory.

66. I am unable to serve process on the defendants from the SHU at the present time as I wasn't allowed to bring my legal work with me to Brooklyn, which included the relevant addresses; and my limited time on the law library computer only allowed me to verify the clerk's address (which I have since now also received recently in the postal mail) and to pull an appropriate case for citation. Further, in the SHU I am unable to make copies quickly, and I total likely

lack the postage stamps to serve so many defendants.

67. Prior to my recent social calls at MDC Brooklyn I had made social calls without the strictures of a Communications Management Unit for more than 3 years at 4 different BOP facilities, including MDC Brooklyn in 2016, as well as the private Donald W. Wyatt Detention Facility in Central Falls, Rhode Island and the Plymouth County Correctional Facility in Plymouth, Massachusetts without ever posing a "threat to the ongoing operation of the institution."

68. The line staff in the West SHU have been courteous, conscientious, diligent and professional. I do not believe any of the aforementioned issues to be due to them, but rather to have been caused and exacerbated by the facility's management.


Signed under penalty of perjury,

/s/ G

Martin S. Gottesfeld, Federal Registration Number 12982-104

February 27, 2019 letter to Martin Gottesfeld

transcripts of a couple of motion hearings that have not yet been transcribed and which were not included in your Transcript Order Forms. I am enclosing a copy of one of your Transcript Order Forms, as I cannot decipher your writing and do not know which hearing you are referring to in this document. Please clarify which hearing you would like transcribed.

I notice that you or your wife directly filed a number of documents directly with the district court. Rather than being surprised by any further direct filings with the Court, I would appreciate hearing from you so that we can discuss appellate strategy. I really want to hear from you. I need to know what *you* think went wrong in your case. Your input will be immensely helpful in my review of the record and formulating our appellate strategy.

As noted, I have deadlines. The sooner I hear from you, the better. If you have access to Corrlinks, that is the best and fastest way for us to communicate. I have included my email address above. I look forward to hearing from you soon.

Sincerely,

VIRGINIA G. VILLA

Encl.