UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| USDC SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC # |
| DATE FILED: 8-12-19 |

Martin S. Gottesfeld, pro se,
            Plaintiff
        - against -
Hugh J. Hurwitz, et al.

Case No.: 18-cv-10836-PGG

## MOTION FOR A DECLARATORY JUDGMENT PROTECTING PLAINTIFF'S RIGHT TO PUBLISH

Plaintiff Martin S. Gottesfeld (herein "plaintiff"), acting pro se, hereby moves The Honorable Court to issue a declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201 protecting his right to publish the series of news article provided herewith, pursuant to Fed. R. Evid. 201(c)(2), as Exhibit 1 hereto, as a bylined reporter without fear of reprisal from the instant defendants and their officers, agents, servants, employees, attorneys, contractors, designees, and others in active concert or participation with the instant defendants (herein collectively "opposing entities"). The plaintiff moves The Honorable Court to take judicial notice of Exhibit 1 hereto, pursuant to Fed. R. Evid. 201(c)(2). The plaintiff hereby moves The Honorable Court to declare in its judgment that it would be unlawful for the opposing entities to unduly interfere in the publication process of Exhibit 1 hereto by, among other things, preventing the inmates named in Exhibit 1 from lawfully communicating with editors and fact-checkers and others involved in the publication process, threatening, coercing, or punishing anyone who takes part in the publication process, introducing undue delay into the publication process by arbitrarily delaying correspondence, failing to seal properly envelopes bearing correspondence regarding the publication process, and any other acts that The Honorable Court, through its wisdom and experience, deems fit to enumerate in its judgment.

The plaintiff notes that the rights of non-prisoners both involved in the publication of Exhibit 1 hereto and the readership thereof are involved in the

instant matter and he anticipates that motions to intervene on a limited basis will be filed pursuant to Fed. R. Civ. P. 24(a)(2) by Mrs. Dana E. Gottesfeld, the Managing Editor of FreeMartyG, and Mr. Benjamin Brown, Esq., a potential interested reader, as the plaintiff has declared under penalty of perjury in Exhibit 2 hereto, Affidavit of Martin S. Gottesfeld. The plaintiff moves The Honorable Court to take judicial notice of Exhibit 2 hereto pursuant to Fed. R. Evid. 201(c)(2).

As also noted in Exhibit 2 hereto, the plaintiff anticipates that motions to intervene on a limited basis may be filed by incarcerated inmates named in Exhibit 2 hereto and the plaintiff assents to such motions.

The plaintiff believes that the facts presented in Exhibit 2 hereto make clear the rights of himself, the inmates named in Exhibit 1 hereto, the public, and publishers to see the exhibited work published and that certain acts or omissions by the opposing parties would be unreasonable, unlawful, unjust, and unconstitutional. The plaintiff believes the law on these matters is clear and irrefutable. Should The Honorable Court be left with any questions through unintentional omissions by the plaintiff, however, then the plaintiff requests an evidentiary hearing as soon as The Honorable Court deems appropriate.

The plaintiff further notes he is including the full inmate handbook and institutional supplement for the FCI Terre Haute CMU as Exhibit 3 hereto.

Respectfully mailed and thereby filed pursuant to <u>Houston v. Lack, 487</u> <u>U.S. 266 (1988)</u>, first-class mail postage pre-paid, on Monday, August 5th, 2019, in an envelope provided to Ms. J. Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of the defendants, bearing U.S. Postal Service tracking number 9114 9023 0722 4293 0876 98,

Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808


<u>CERTIFICATE OF SERVICE</u>

I, Martin S. Gottesfeld, hereby certify that I mailed a copy of the fore-going document to counsel for the defendants by providing such copy to Ms. J. Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent for the defendants in an envelope bearing sufficient first-class postage pre-paid.

Martin S. Gottesfeld, pro se

Exhibit 1

<u>Inside the Black Sites Where Obama, Clinton, and Holder Buried
Their Secrets--Part 1 of the CMU Series</u>

Tagline: Obama's DOJ Is Still Holding Political Prisoners In America

¶[Embed: Look for a photo of Robert David Neal (he was high up in the
insurance industry in the Dallas/Fort Worth area). There may be one of him in
a blue suit, white shirt, dark tie; attribution as appropriate; caption:
Former [insert title] Robert David Neal was murdered by a radical-Islamic
militant inside of a DOJ "black site" in Terre Haute, Indiana, last November,
but few found out until now.]

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at FreeMartyG.com
[link to part 1 at FMG] and FreeSchaeffer.com[link to part 1 at FS] under the
latest Creative Commons by-attribution commercial-use-permitted share-alike
no-derivatives license[link to the license text].

¶Former-U.S.-Army-soldier--turned--radical-Islamic-fighter Rodney Hamrick took
68-year-old former insurance executive Robert David Neal hostage inside of a
federal facility. He bound Neal's hands behind his back, as well as his feet,
then executed him, ISIS-style, nearly severing his head.
¶Next, Hamrick rushed 77-year-old Richard Warren and stabbed him a dozen times
before his cry for help led Kurt Johnson, a fellow Christian, to run into the
room and save his life.
¶Hamrick's rampage took place in November, 2018. But few found out about it
until now, due to a DOJ cover-up.
¶Warren ran an international bond market years earlier, and he was in a
position to expose an illegitimate multi-million-dollar exchange between the
CIA and a Southeast-Asian dictatorship. Johnson went after lenders for runaway
mortgage fraud years before the 2008 financial crisis brought the world's
banking system to the verge of total collapse.

¶[Embed: Cropped photo showing just Kurt and Richard; attrib.: Photo by
unnamed/Public domain (2018); caption: Kurt Johnson (left) and Richard Warren
(right), inside the DOJ's hard-to-reach "communications management unit," or
"CMU," in Terre Haute, Indiana]

¶Donald Reynolds was also present for Hamrick's rampage. A decade or so
earlier though, Reynolds had a successful distribution deal with Universal
Records--until the IRS and the DOJ set him up during the botched and now-
infamous "Operation Fast and Furious." Eric Holder then used Reynolds as his
own minority fall guy, as hypocritical as that may seem.

¶[Embed: Cropped photo of just Reynolds's face; attrib.: Photo by
unnamed/Public domain (2019); caption: Donald Reynolds in 2019]

¶Francis Schaeffer Cox, one of the reporters who wrote this series, was a
conservative political organizer and a pro--Second-Amendment politician when
he uncovered a government-backed drug-trafficking and child-sex-abuse ring in
his home state of Alaska. The Anchorage U.S. attorney's office and FBI then
went after him in a readily-apparent effort to protect themselves and their
allies from being exposed. Meanwhile, they were also engaged in "Operation
Polar Pen," a DOJ-backed initiative in Alaska that gave democrats a
filibuster-proof 60-vote supermajority in the Senate in 2009, when every vote
was crucial for the passage of ObamaCare and the rest of Obama's legislative
agenda.

¶[Embed: Photo of Cox (try to use the same one from the HealthImpact News



Rex        Johnson        Warren  " Mab"   Cox

story by Rudy Davis, but take it from FreeSchaeffer.com); attrib.: Cox
family/FreeSchaeffer.com (2011); caption: Francis Schaeffer Cox with his
family⌋

¶And Martin "MartyG" Gottesfeld, the other reporter, interceded on behalf of
a 15-year-old girl named Justina Pelletier when smug Harvard-affiliated
doctors tortured, crippled, and nearly killed her, rather than admit that
they'd been wrong about her case of mitochondrial (pronounced <i>might-toe-
conn-dree-uhl</i>) disease. Without hurting a soul, he single-handedly
knocked Obama's $36-billion Ivy-League alma mater off of the Internet during
an online mega-fundraiser, bruising a lot of very sensitive egos at Harvard
while helping to save Justina's life.

¶[Embed: Photo of MartyG (use one of Dana's favorites); attrib.:
FreeMartyG/Creative Commons ([year]); caption: Martin "MartyG" Gottesfeld⌋

¶Now, what do each of these men and their stories share in common, other than
embarrassing the well-oiled political machine operated by Obama, Clinton,
Holder, Lynch, Comey, and others?
¶Well, most people don't know that the DOJ still funds a pair of covert "black
site" facilities, dedicated to hiding people and potentially-scandalous cases
like these, which the former leaders of the Justice Department seem to fear.
And unlike other U.S.-government–funded black sites abroad, these 2 are
hidden in plain view, on sprawling but otherwise-unremarkable federal
compounds right in the central United States, where they operate under the
authority of Obama-DOJ--holdover Hugh Hurwitz.

¶[Embed: Photo of Hurwitz; attrib. as approp.; caption: Hugh J. Hurwitz may be
an Obama-DOJ--holdover, but he still firmly controls department "black sites"
more than 2 years into the Trump administration.⌋

¶"[Try to get a quote about how the CMUs are lurking right under people's
noses, first from Indiana U.S. Senator Todd Young, but if he can't/won't
speak, then try Larry Pratt of Gun Owners of America (both are already aware
of Cox's case), next try Michelle Malkin then Ryan Grim. If no luck, and no
other ideas, then skip this ¶]," said [insert title/org|description of
person⌋, [insert name].
¶As obvious as the locations of these black sites may be though, their true
purpose is perhaps equally secretive, counterintuitive, and devious. So much
so, that just a few short years ago, during the Obama administration, it might
have proved impossible to pierce the veil of misinformation that the DOJ has
woven around its clandestine "communications management unit," or "CMUs," in
Marion, Illinois, and Terre Haute (pronounced like <i>teh-ruh hoe-ght</i>),
Indiana. Managing to publish the whole truth about what--and whom--can be
found here would've been another challenge entirely.
¶But the recently-departed top brass of the DOJ just got caught in perhaps the
lie of the century, one that they used disingenuously for years in order to
mask many of their similar operations as supposed efforts to protect the
American democratic process and bust the bad guys. So, in light of this
freshly-uncovered deception, now might be an appropriate time for the public,
the press, and the federal judiciary each to examine, quite carefully, the
facade[cedilla if poss.⌋ that has long covered over these largely-secret and
little-known facilities before anyone else is brutally murdered at one of them
due to religious hatred.

¶[Embed: Side-by-side (2-in-1) photo of USP Marion and FCI Terre Haute;
attrib.: as approp.; caption: The DOJ's 2 domestic communications management
units (CMUs) are located on the grounds of the United States Penitentiary

(USP) Marion, Illinois (left), and the Federal Correctional Institution (FCI) Terre Haute, Indiana (right).⌋

¶"They're the excuse," begins Cox, referring to the group of convicted Jihadi fighters who call the DOJ's communications management units "home," and whom--at least on paper--serve as a continuing justification for the existence of these concealed and very expensive facilities.

¶"But we're the real reason," finishes Cox, referring to his own smaller group, consisting mostly of Republicans.

¶Like Cox, they too were arrested on dubious federal charges, largely during the Obama years. And they're here, it seems, to be swept under the rug. Indeed, hardly anyone knows they're in the CMUs in the first place, and the DOJ and its allies in the courts and the media appear to like it that way.

¶A lot fewer questions are asked about what happens in the CMUs due to their media moniker, "Gitmo North," and the misperception that the DOJ uses these black sites only to lock up radical Muslims, like the recently-released FCI Terre Haute CMU inmate John Walker Lindh.

¶[Embed: Photo of Lindh; attrib. as approp.; caption: "American Taliban" member John Walker Lindh was recently released from the FCI Terre Haute communications management unit (CMU).⌋

¶In reality, however, there are about 80 people in the CMUs at any given time, and most of them aren't Jihadis. Word on the grape vine is that the DOJ is now planning to expand the CMUs by about 20 percent as well, to a capacity of 95.

¶And the cases the majority of the media doesn't cover from the CMUs are more scandalous than those they do.

¶So, Cox and his group are held hundreds or even thousands of miles away from their nearest kin, and their communications with the outside world are tightly restricted under the threat of brutal revenge by the Justice Department, even as a new attorney general now takes the reins and as an increasing number of people on the outside are recognizing them as political prisoners.

¶Click here to read <i>How the IRS and DOJ Set Up Donald Reynolds Using Dubious Firearms Charges--Part 2 of the CMU Series</i>.[link to part 2]

How the IRS and DOJ Set Up Donald Reynolds Using Dubious Firearms Charges--Part 2 of the CMU Series

Tagline: From "Operation Fast and Furious" To Slow and Spurious?

¶[Embed: Full (uncropped) photo of Donald Reynolds, MartyG, and Cox; attrib.: Photo by unnamed/Public Domain (2019); caption: Obama-era political prisoners Donald Reynolds (left), Martin "MartyG" Gottesfeld (center), and Francis Schaeffer Cox (right), inside the central corridor of the DOJ's hard-to-reach "communications management unit," or "CMU," in Terre Haute, Indiana, in 2019]

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at FreeMartyG.com [link to part 2 at FMG] and FreeSchaeffer.com[link to part 2 at FS] under the latest Creative Commons by-attribution commercial-use-permitted share-alike no-derivatives license[link to the license text].

¶<i>This is part 2. Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series.[link to part 1]</i>

¶On June 19th, 2008, Donald Reynolds was one of a very small number of African-Americans in Tennessee to have "class-3 federal stamps." The stamps allowed him to keep silenced fully-automatic firearms without hassle from law enforcement, at least theoretically.

¶Reynolds had passed an extensive multi--federal-agency background check in order to qualify for the stamps. His name and fingerprints were then entered into a federal database that easily allows federal agents to browse lists of such weapons and their owners--almost as if they are window shopping.

¶Twenty-nine-year-old Reynolds kept his record spotless his entire life in order to maintain his eligibility to remain in that federal database too.

¶"They knew I was 100 percent legitimate," Reynolds points out now.

¶He adds that his entire family was background checked on a regular basis due to his father's security clearance and work at Oak Ridge National Laboratory.

¶Yet Reynolds's perfect record and his family's history of national service didn't seem to matter on that fateful pre-summer[fact check when summer officially started in 2008] day in 2008. Federal agents, led by IRS employee Brian Grove and Assistant U.S. Attorney Tracee Plowell, along with the local Knoxville, Tennessee, Police Department, still swarmed Reynolds's home and that of his parents nearby. They claimed they would find a large quantity of drugs.

¶Grove, Plowell, and their team didn't find any controlled substances or piles of dirty cash on Reynolds that day though--and they never would.

¶But that didn't seem to matter then either. They still seized all of Reynolds's lawfully-obtained and federally-authorized fully-automatic firearms and Reynolds hasn't seen them since, except in photographs.

¶Later, similar (if not the same) weapons were recovered from the blood-stained hands of violent drug-cartel members south of the U.S.-Mexico border, however, in the aftermath of the Justice Department's poorly-thought-out "Operation Fast and Furious."[link to a reputable article about the op going bad, innocent people getting killed, and how it was a bad idea from the start]

¶DOJ planners named the operation after the popular street-racing movie franchise--and it was, perhaps, an even less-realistic concept.

¶[Embed: Pic from the film "2 Fast 2 Furious" of protagonist Brian Walker jumping his Nissan Skyline from a raised drawbridge over another car; attrib. as approp.; caption: Some ideas, perhaps, should stay in the movies.]

¶⌊Fact check op. details⌋The idea was for federal agents to sell firearms, including high-capacity fully-automatic weapons like Reynolds's, to arms smugglers who were suspected of supplying violent Mexican-drug-cartel members, and then for the authorities to trace the weapons across the border and through to their delivery on the other side.

¶The operation turned into a disaster instead, and a full-blown public-relations nightmare for the DOJ. Innocent victims, like U.S. Border Patrol Agent Brian A. Terry and Immigration and Customs Enforcement (ICE) Special Agent Jaime Zapata, were mowed down by cartel members using the weapons before they were recovered. Others, like ICE Special Agent Victor Avila, were seriously wounded.

¶⌊Embed: 3-in-1 photo of Terry, Zapata, and Avila; attrib. as approp.; caption: American casualties of the DOJ's "Operation Fast and Furious" include: U.S. Border Patrol Agent Brian A. Terry (left), Immigration and Customs Enforcement (ICE) Special Agent Jaime Zapata (center), and ICE Special Agent Victor Avila (right), who were each shot by drug-cartel members using weapons supplied by the U.S. Department of Justice.⌋

¶The truth eventually came out, that the killers only obtained the firearms thanks to the Justice Department.

¶Even before then though, the Obama/Holder DOJ seemed to consider it an imperative to keep Reynolds quiet. But that wouldn't be a simple matter.

¶Reynolds, who still maintains that he did nothing wrong, steadfastly refused to stay silent and work for the feds as an informant/distributor, or to back down in court and take a plea deal that would've branded him a confessed drug dealer for life. He says his bail was revoked under a contrived scenario when he turned down the final such offer.

¶Reynolds then had no choice but to prepare for trial behind bars.

¶⌊Embed: Photo of weapons from "Operation Fast and Furious," or if no photo of the actual weapons is avail., then a photo of the same make(s), model(s), and pref. quantity; attrib. as approp.; caption: Weapons ⌊that|like these⌋ were sold to arms merchants by the DOJ as part of its failed "Operation Fast and Furious," and then used by Mexican-drug-cartel members to slaughter innocent people along the U.S.-Mexico border.⌋

¶Reynolds planned to rely on his family and his connections to the music industry in order to get the word out about what happened--and how he was being set up by the Justice Department as a minority fall guy.

¶In November, 2007, Reynolds signed a distribution deal--not with the feds or a drug cartel--but with Universal Records. Vegas Style Entertainment and its leader, Vince Carol, helped broker the deal. Reynolds hoped that his cousin, Jermany⌊spelling is correct⌋ Victor James, who used the stage name <i>Dirtbag</i> and performed with legends like Sean "P. Diddy" Combs⌊sp?⌋, would get high-profile musicians involved.

¶⌊Embed: Photo of Jermany Victor James on stage or in a music video with P. Diddy and D.J. Cali⌊sp?⌋. Look for a still frame with as many big names as possible from his first music video, "Violators"; attrib. as approp.; caption: Jermany Victor James (⌊left|right|...⌋) in his break-through music video, "Violators," with Sean "P. Diddy" Combs (⌊posit.⌋), ⌊continue list⌋⌋

¶Reynolds now believes the feds threatened his cousin and others, including his employees, in order to stop them from providing evidence and testifying in his defense. He says James could've shown he legitimately earned the income that Grove claimed was drug money, among other things, and his employees could've backed up his alibi.

¶Reynolds also says he went through no fewer than 10 defense attorneys, but none were willing to confront the DOJ and the corruption permeating his case head-on. Instead, he says, they each started out strong, but then mysteriously started pushing him to accept a plea deal that seemed more in their best interest than his, or the public's.

¶Adding to this mystique, Reynolds reports that Eric Holder personally attended some of his pre-trial hearings.

¶[Embed: Photo of Holder; attrib. as approp.; caption: Former--U.S.-Attorney-General Eric Holder left office after "Operation Fast and Furious," and a number of other scandals, but before the end of the Obama administration.]

¶The judge in Reynolds's case in U.S. District Court for the Eastern District of Tennessee was Thomas A. Varlan. Like any judge trying any case, Varlan was supposed to be neutral and detached. The record reflects, however, that Varlan represented the Knoxville Police Department in federal court before he became a judge[link to the decision of Miler v. Taylor, 877 F.2d 469 (6th Cir. 1989)], and this was the same police department that participated in the raids on Reynolds and his family.

¶The trial transcripts from <i>United States v. Donald Reynolds</i>, perhaps unsurprisingly, exude a bias on the part of Judge Varlan, one that lay people perceive, in favor of the prosecution.

¶Reynolds says Varlan barred him from presenting evidence that contradicted prosecutors, and thereby prevented him from mounting an adequate defense for the jury. When prosecutors alleged that Reynolds used drug money for purchases, for example, Reynolds says Varlan blocked him from showing bank statements refuting those claims. And when the DOJ told the jury about the money-counting machines seized from Reynolds's home, he says Varlan prevented him from showing that he used the counters to handle in-person ticket sales at legitimate live events like concerts and parties.

¶[Embed: Photo of Scribble Jam 1997 of Eminem v. Juice (from Chicago); attrib. as approp.; caption: Juice ([left|right]) bested Eminem ([left|right]) at Scribble Jam '97 before Donald Reynolds signed Juice to a record deal.]

¶Reynolds's trial transcripts also reveal a treasure trove months before the truth came out about "Operation Fast and Furious," perhaps because at that point prosecutors had less to hide.

¶Across days of testimony in early 2010, for example, numerous undercover informants, including cartel-smuggler and star-witness Joshua Correa, detailed running assault rifles to Mexico, orchestrating hits, bringing thousands of kilos of cocaine, heroin, and other drugs across the border to Texas, and more. Reynolds reports that he knew nothing about these activities before his trial, though he had done business with the legitimate auto-trading shop where Correa worked as a cover to mask his illicit income.

¶Most of the government witnesses had signed cooperation agreements and were testifying against Reynolds in hope of receiving lighter sentences for themselves. They would've been scared for their lives, it seems from their testimony, to take the stand against cartel members. Perhaps testifying against Reynolds was a safer alternative for them.

¶Further, while Reynolds was standing trial from jail, Correa testified against him while out on bail, even though Correa was closely associated with the notoriously-violent Zeta cartel and personally helped order a hit on U.S. soil. When Reynolds's attorneys asked to see the order U.S. District Court Judge Marcia A. Crone of the Eastern District of Texas issued allowing Correa to stay free pending sentencing despite his criminal history, the DOJ didn't provide it and Judge Varlan refused to order prosecutors to turn it over for

use cross-examining Correa.

¶⌊Embed: 2-in-1 photo of Varlan and Crone, if avail.; attrib. as approp.; caption: Federal judges Thomas A. Varlan (left) and Marcia A. Crone (right)⌋

¶Correa also mentioned that his cartel had been looking for a "cop killer," i.e. a firearm capable of penetrating standard U.S.-police--issued body armor, and that someone told him Reynolds could get such weapons. But not all the dots were visible to Reynolds until much later.

¶Only when "Operation Fast and Furious" made headlines, would Reynolds put it together; the testimony about running "cop killer" weapons down to Monterey, Mexico, about the Zetas, the plea deals for Correa and others, Correa⌊s bail pending sentencing, Placido Benitez (a name Reynolds had never before heard), paid hits, and so-called "life debts."

¶In the meantime, he was fighting for his freedom in front of a judge he didn't know had represented the police, against a drug-trafficking charge that was unsupported by the seizure of any drugs from him at any time, with lawyers who tried desperately to quit his case and coerce him into taking a plea deal he didn't want.

¶Yes, according to the prosecution's own witnesses, all of Reynolds's firearms were legitimately purchased and properly permitted. No, most people who actually import hundreds of kilos of cocaine, as he was accused of doing, don't also jump through every state and federal hoop to register their weapons. That's like a bank robber running out mid-heist to top off a parking meter.

¶But, in the end, common sense isn't so common--especially in federal court. The prosecution put on its show for weeks. Reynolds's defense attorneys rested his case after just 1 day.

¶"Guilty," came the verdict.

¶Life plus 75 years came the sentence from Judge Varlan--some 45 years longer than Joaquin "El Chapo" Guzman Loera⌊add accents⌋   later, received as an actual cartel kingpin. And Reynolds was a non-violent first-time offender. The DOJ charged him with importing 300 kilos of cocaine though, while Correa, the trafficking mastermind who helped order a hit on American soil for the Zetas, was allowed to plea to trafficking 34 kilos instead of the 1,000+ kilos he admitted to bringing across the border. Correa was then allowed to "earn" a further reduction to his sentence by testifying against Reynolds, a man whom, by all accounts, he'd never met.

¶To the DOJ and many federal judges like Varlan, this is justice.

¶⌊Embed: 3-in-1 pic of Plowell, Lewen, and Weddle; attrib. as approp.; caption: The federal prosecutors who targetted Reynolds: Assistant U.S. Attorney (AUSA) Tracee Plowell (left), AUSA David P. Lewen (center), and AUSA D. Gregory Weddle (right)⌋

¶When Reynolds heard about "Operation Fast and Furious" much later, it dawned on him. He would've been the ideal straw-man weapons purchaser for the DOJ during its operation. He was young, well-connected, trusted in the hip-hop community, and he ran legitimate businesses that would've made an effective front. If any of his firearms were recovered, they would've traced back to him, giving his would-be handlers plausible deniability.

¶Wiser, but still undeterred, Reynolds kept trying to get his story out. And once he got to the FCI Terre Haute communications management unit (CMU), he started accumulating prison disciplinary charges due to those efforts, the First Amendment notwithstanding.

¶"It feels like there's really no such thing as the Constitution; like it's an illusion for the public to believe in, until it happens to them too--heaven

forbid," Reynolds remarks now.

¶Reynolds also learned his actions as an inmate hidden inside a CMU can have dramatic consequences for his loved ones still at home.

¶Reynolds tried to send a letter some weeks ago, for one possible example, to the new chairman of the House Committee on Oversight and Government Reform, Elijah Cummings (D-MD). Cummings's office previously helped curtail some potentially-unlawful government activity against Reynolds when he reached out from another facility during his ill-fated appeal.

¶A little while after Reynolds tried to send this more recent message, however, a joint DOJ/local SWAT team went on a paramilitary-style raid of his mother's house mere minutes before Reynolds was scheduled for one of his two 15-minute-long live-monitored weekly telephone calls home.

¶When Reynolds greeted his mom on the phone that day, an assault rifle had just been pointed in her face from point-blank range.

> ¶[Block quote:]This continued interference by the DOJ agents is only being carried out to impede on my rights and the facts that were not presented in my case. They are so determined not to have the public, nor the overseers in the House, such as Elijah Cummings, become aware of their misconduct--to avoid an investigation into years of government abuse of power used for their own personal benefit. It's not a coincidence that my placement in the CMU is being used by these rogue government agents to identify and attack anyone who tries to aid in my liberty. If exposed, the results would show that my case and many others were knowingly created based on the lies of these agents in order to steal and subject Americans like me to losses of life, liberty, and property. It's no different from the time of King George III. What was the purpose of the Declaration of Independence? And the Bill of Rights?
> ¶--Donald Reynolds from the FCI Terre Haute "black-site" CMU

¶Representative Cummings's office apparently never got the letter Reynolds recently sent, detailing how the DOJ tried to recruit him for "Operation Fast and Furious," how it obtained his weapons, which would've traced back to him instead of the Justice Department if not for the unexpected media revelations much later about the failed operation--and how he was railroaded by the IRS and the Obama/Holder DOJ in order to cover their tracks.

¶As one might expect, it's rather normal for correspondence addressed to elected officials, which would otherwise be subject to special mail protections[link to FBOP Program Statement 5265.14 (pref. right to "10. Special Mail" therein)] if it were sent by prisoners elsewhere, to go missing when, instead, it's sent from inside a CMU, where all such outgoing mail gets reviewed[link to 28 CFR §540.203] by the Federal Bureau of Prisons (FBOP) before it's allowed to leave.

¶[Embed: Photo of Cummings; attrib. as approp.; caption: Letters sent from inmates in CMUs to Congressional representatives like House Committee on Oversight and Government Reform Chairman Elijah Cummings (D-MD) (pictured), often appear not to make it into the mail.]

¶And while their families may face suppression efforts on the outside, the inside of a CMU can be an even more dangerous place for non-violent political prisoners like Reynolds.

¶Click here to read An ISIS-Inspired Murder and DOJ Coverup In the CMU--Part 3 of the CMU Series</i>.[link to part 3]

An ISIS-Inspired Murder and DOJ Coverup In the CMU--Part 3 of the CMU Series

Tagline: DOJ's "Radicalize-and-Release Program" Drives Former U.S.-Army Soldier To Convert To Radical Islam

¶[Embed: Photo of Rodney Hamrick, if one can be found; attrib. as approp.; caption: Former--U.S.-Army-Soldier Rodney Hamrick converted to radical Islam inside the FCI Terre Haute communications management unit (CMU), then went on a rampage.]Embed: Photo of a question mark; attrib. as approp.; caption: No photographs of former--U.S.-Army-Soldier--turned--radical-Islamic-militant Rodney Hamrick appear to be available, possibly due to a DOJ coverup.]

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at FreeMartyG.com [link to part 3 at FMG] and FreeSchaeffer.com[link to part 3 at FS] under the latest Creative Commons by-attribution commercial-use-permitted share-alike no-derivatives license[link to the license text].

¶<i>This is part 3. Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series[link to part 1] or click here to read How the IRS and DOJ Set Up Donald Reynolds Using Dubious Firearms Charges--Part 2 of the CMU Series[link to part 2].</i>

¶Robert David Neal was dead and partially wrapped in a sheet on the floor before anyone got medical attention. The 68-year-old insurance expert was killed by a much younger former U.S.-Army soldier named Rodney Hamrick after Hamrick converted to radical Islam inside of the FCI Terre Haute communications management unit (CMU).

¶To some here in the FCI Terre Haute CMU, Neal and his friend, Richard Warren, were casualties of a religious dispute over alleged noise during a time of Muslim prayer--a noise dispute that started in a heavily-trafficked communal area of the unit and that seems to have quickly turned into a violent Jihad right inside the CMU itself.

¶For long-time political prisoner Francis Schaeffer Cox though, it was just the latest development in his now-8-year odyssey through what he calls the DOJ's "radicalize-and-release program" for Jihadi fighters. This past March, Cox wrote:

> ¶[Block quote:]Less than a year ago, the Muslims over at [the DOJ's other CMU in] Marion[, Illinois,] tried to kill me for "evangelizing." I narrowly escaped, and was transferred over here[, to the CMU at FCI Terre Haute, Indiana]. Then in November, the Muslims over here put a hit out on all the Christians in the unit. My good friend [Robert David Neal] was taken hostage, his hands were tied behind his back, he was stabbed in the heart, then his head was sawed off with a wire [garrote] while he was still alive. Getting his head all the way off was harder than expected, so once he was dead, the job was left unfinished and the next victim[, Richard Warren,] was attacked. He got stabbed 12 times before another Christian man[, Kurt Johnson,] could get to him and block the Jihadi. If we hadn't circled the wagons and stopped the killing like we did, I'd have been next, along with two other friends of mine.
> ¶Why all this bloodshed? Because we sang some hymns. Because we wouldn't convert to Islam. Because we were Christians. The chaplain wears body armor when he comes down here [to the CMU]. And I'm walking around in a T-shirt. This isn't flag football, or summer camp, or Facebook. Not everyone comes home from this.

¶Do you know how many people I've seen convert to Islam in this ⌊CMU⌋? Most of them! And it doesn't matter if they are Christians, Jews, Catholics, secular, Odinist, or whatever. Almost everyone converts to Islam shortly after arriving here. Why? Because they don't want to face the persecution. I've been here 7 years. I'm one of the few who has held fast.

¶Cox originally omitted the names of those involved from his message above, for fear of brutal retaliation by the DOJ and its subdivision, the Federal Bureau of Prisons (FBOP), which oversees the CMUs. There is an unwritten and unpublished rule that bars CMU inmates like Cox from using the names of their fellow inmates in their correspondence with the outside world.

¶In the end, the message above got out, but Cox appears to have paid dearly for it--far more than Hamrick did for murdering one person and attempting to murder another.

¶Many here feel that Hamrick, as a recent convert, carried out his attacks on Neal and Warren in order to prove himself to his new cohorts.

¶"If you don't follow their beliefs to a T, then they'll shun you," said a Moorish-American CMU inmate who was accustomed to a more tolerant Islam.

¶"They take the Hadiths literally, and out of context," he added, referring to the collection of sayings and customs of Muhammad and his companions. "They claim themselves to be scholars without any formal religious education, which will lead to more violence."

¶Others feel that Hamrick did what he did in order to get transferred out of the CMU. He was moved after the incident and now resides at ⌊insert his location from inmate tracker⌋.

¶Additionally, there are those here in the FCI Terre Haute CMU who believe Neal and Warren weren't originally Hamrick's intended targets. Rather, they say a correctional officer (CO) named Weber was marked for death as a higher priority, but that he unexpectedly took the day off after Hamrick had already performed his pre-attack religious rituals.

¶Weber, who isn't known to hide his Christianity, is regarded as a "by-the-book" CO, which can, at times, engender hostility. Weber also isn't known to be unfair or sadistic, however, and he has a reputation of applying his "by-the-book" standards evenly and to the benefit of inmates when policy dictates.

¶Kurt Johnson was recognized by the FBOP for his part saving Warren's life. On January 4th, 2019, his inmate account was credited the sum of $51.20 by the Bureau as a reward for his selfless heroism.

¶"Now I know what a life is worth around here ⌊in the CMU⌋, I guess," Johnson recently remarked.

¶⌊Embed: Cropped photo from part 1 of Kurt and Richard; attrib.: Photo by unnamed/Public domain (2018); caption: Kurt Johnson (left) and Richard Warren (right), before the attack last November by former--U.S.-Army-Soldier Rodney Hamrick⌋

¶When asked about what happened on that fateful November day, Johnson, who is a helpful man of few words (and a 6-foot-5-inch 220-pound former--semi-pro boxer), answered, "I heard Rich ⌊Warren⌋ yell, 'help!'"

¶"When I came in ⌊the cell⌋, it looked like Rodney ⌊Hamrick⌋ was hitting him. I said, 'That's enough!'"

¶"He stopped and went to go ditch the knife, I think. I didn't know that Neal was already dead. Things might have been different if I had."

¶When asked if he was scared to go up against a former U.S.-Army soldier like Hamrick, Johnson replied, "That didn't concern me. Rich was a good guy. I'm glad I saved his life."

¶Richard Warren also ran the $100-million-per-transaction TAB, or The

Associated Bond Market, based in Germany.

¶There are different TABs, according to Johnson, and each handles a different dollar value of transaction. Someone turned over control of the $100-million-per-transaction such market to Warren, he says.

¶"Everything about the TAB is for humanitarian purposes," Johnson added. "They compete with the ⌊International Monetary Fund (IMF)⌋. Rich is trying to help these ⌊developing⌋ countries, while the IMF, that's another story."

¶"Rich is a total boy scout," agrees Cox, who was himself a long-time boy scout.

¶⌊Embed: Photo of Cox, MartyG, and Johnson; attrib.: Photo by unnamed/Public domain (2019); caption: Kurt Johnson (left), Francis Schaeffer Cox (center), and Martin "MartyG" Gottesfeld (right), inside the cafeteria of the FCI Terre Haute CMU in Indiana⌋

¶The International Monetary Fund (IMF), for the unfamiliar, is theoretically a multi-national development aid organization that provides financing to developing countries in exchange for agreements from them to reform economic and other aspects of their governments. It has become a lightning rod, however, for critics who question both its motives and its effects. Many feel the IMF really pursues the goals of its principal sponsors, including the Federal Reserve Bank of the United States. They accuse the IMF of predatory lending practices meant to subjugate whole nations while delivering up their natural resources, almost as if they were annexed by force.

¶According to Reynolds and others who knew Warren before he was transferred in the wake of Hamrick's rampage, he alleged he was targetted by the DOJ after the CIA tried to use his bond market for an illicit transaction involving a Southeast-Asian dictatorship. If so, he wouldn't be the first person with a case involving the CIA to end up in one of the DOJ's black-site communications management units. But perhaps those are other stories (like this one⌋link to John Kiriakou's write-up about CMUs while Marty was at MDC⌋).

¶Johnson, for his part, reports that he and his business partner, Dale Heineman, founded the Dorean Group in 2004 to help people secure their homes from predatory lenders. He says they helped about 2,000 people do exactly that in the years before the 2008 global financial crisis.

¶Things went wrong for him, he says, when he sued Wells Fargo and a group of other banks on behalf of clients who were in imminent danger of losing their homes. Somehow all 15 cases got assigned to U.S. District Court Judge William H. Alsup--even though federal cases are usually assigned randomly.

¶Alsup worked for a firm called Morrison & Foester⌊spelling is correct⌋ before he was a judge, and it further turns out Morrison & Foester often represented Wells Fargo and other big banks, like J.P. Morgan Chase, in cases against their consumer clients in the Northern District of California (part of the federal Ninth Circuit).

¶⌊Embed: Photo of Alsup, if avail.; attrib. as approp.; caption: U.S. District Court Judge William H. Alsup worked for the firm Morrison & Foester, LLP., prior to ruling in favor of the firm's banking clients in the run up to the 2008 global financial crisis.⌋

¶Not only did Alsup dismiss the lawsuits that Johnson and Heineman filed against predatory lenders on behalf of everyday Americans in 2004, but he fined the attorney who represented the borrowers in federal court and referred Johnson and his partner to the DOJ for criminal prosecution. Ironically, perhaps, years before the 2008 crisis, Alsup accused Johnson and Heineman of peddling the bogus theory that the loans were issued using what Alsup dubbed "vapor money."

¶Obviously though, if anybody was peddling "vapor money" in 2004, it seemed to be large financial institutions.

¶"They didn't really issue loans with 'vapor money,'" clarified Johnson, however, who steadfastly rebuts the "vapor money" theory. "There is no such thing as 'vapor money.' What they did was issue loans using vapor assets."

¶"⌊Reach out to former Tennessee Congerssman Larry Bates, who testified at Johnson's trial for a quote about what Alsup/the government did with Johnson's case. If he doesn't/won't respond, then skip this ¶⌋," said Larry Bates, a former Tennessee Congressman and the former owner of ⌊name of bank⌋, who testified in Johnson's defense.

¶In any event, Alsup wasn't done.

¶Somehow, he got assigned to the criminal case the DOJ initiated against Johnson based on his own referral--even though, according to Johnson, another judge was first randomly assigned to it. Johnson's subsequent effort to have Alsup removed from the case due to his role in its genesis was unsuccessful.

¶Johnson claims that during his trial, Alsup was clearly a political rather than a judicial figure, and that he wanted to silence the Dorean Group, which had exposed the banking industry's fraud. Johnson feels that was partly because government-sponsored entities (GSEs), namely Fannie Mae and Freddie Mac, were responsible for initiating the industry's mortgage-fraud practices.

¶As one might expect, Johnson was found guilty.

¶Alsup sentenced him to 25 years.

¶"The federal courts almost never ruled in favor of borrowers before 2008. They were pretty much there to protect the banks," says Johnson, who is now 14 years into his sentence. "If I had gone to trial a year later, things might have been different."

¶⌊Embed: Photo of Kurt from before his arrest, if avail., there might be a YouTube channel with imagery; attrib. as approp.; caption: Kurt Johnson, prior to his arrest⌋

¶Things also might have been different in November, 2018, if Neal's warnings were heeded. He unsuccessfully tried to alert the DOJ that religious tension was brewing in the FCI Terre Haute CMU. But he was apparently ignored until his predictions came true.

¶On the night of Neal's death, as COs removed his lifeless corpse from his cell and called out for medical personnel on the radio, Hamrick bragged from behind his cell door that it was too late for his first victim.

¶Neal's body was left lying on the ground less than 10 feet away from Cox's cell, where Cox could see him. Cox says Neal was only wrapped in a bed sheet later, to make it easier to move his body downstairs.

¶Immediately following the incident, the FCI Terre Haute CMU was locked down for weeks. Inmates rarely, if ever, left their cells during that time.

¶The FBI eventually arrived to investigate. The FBOP, however, largely obstructed that effort, fearful of what the outside investigators might find. And in a place where almost all conversations are recorded in high fidelity by an overlapping mesh of conspicuous microphones, there had likely been ample warning that an attack was being planned.

¶Yet the FBI apparently wasn't able to review the relevant audio.

¶The FBOP is further said to have told the FBI that the video footage from that day was too dark to be useful, despite the array of expensive high-tech cameras canvassing the unit around the clock. Cox and many others find this claim doubtful based on their own experiences in the FCI Terre Haute CMU. It also seems decidedly convenient for those who may have wanted to end the FBI's inquiry quickly and quietly.

¶⌊Embed: Pic of a high-tech camera, perhaps at MCC NY; attrib. as approp.; caption: The FBOP employs expensive high-tech cameras at many of its facilities, including ⌊facility name⌋ (pictured) and the CMUs.⌋

¶The FBI, moreover, didn't speak to many of the inmates here. And most of those interviewed were leery of speaking with agents for too long, because the FBOP was easily able to monitor the duration of each on-site interview as its staff marshaled the inmates to and from those meetings. In fact, some of the inmates report that they asked the FBI for rainchecks, citing exactly such concerns.

¶Later, the FBOP didn't allow the CMU inmates to contact the FBI directly. The FBOP instead told them to relay information to the FBI through the FBOP's staff on the CMU unit team. These instructions didn't match what the agents said in person, and the CMU inmates found this to be very suspicious because it obviously meant the FBOP's personnel would hear everything before the FBI. So, the FBOP would know who tried to say what, and also be able to exercise veto power over anything it didn't want to reach the FBI's investigators.

¶Powerless to contact the FBI on their own—especially from inside a CMU—the inmates were without options. To many of them, it felt like the FBI's investigation never got off the ground.

¶Now, 8 months after Hamrick's spree, the apparent de-facto Jihadi leader is still here in the FCI Terre Haute CMU.

¶The chaplain mentioned by Cox is no longer wearing body armor to perform his small Christian services in the CMU. But in addition to his Bible, he now sports a can of concentrated pepper spray, or "OC," strapped to his hip like a sidearm.

¶⌊Embed: Photo of a can of OC, pref. the same make/model used by the FBOP; attrib. as approp.; caption: Concentrated pepper spray, also known as "OC," is not usually a tool in a pastor's collection.⌋

¶Richard Warren is no longer in the FCI Terre Haute CMU. He is both missed and fondly remembered by his friends here.

¶Cox and the other surviving Christians are still singing hymns--in their T-shirts--and without Neal's guitar accompanyment. They are not loud--and they likely never were.

¶Johnson points out that under the newly-passed First Step Act, Neal would soon be eligible for release if he were still alive.

¶Hamrick doesn't appear to have faced many consequences. He was already serving a life sentence and it appears very unlikely federal prosecutors, who work for the DOJ, will seek the death penalty against anyone for murdering a CMU inmate.

¶Plus, for the DOJ, such a high-profile prosecution would almost certainly bring unwanted attention to the CMUs. Any resulting testimony would provide the public with insights into the realities of daily life here that the DOJ would likely find undesireable. So, even though President Trump would no doubt be happy to continue locking up John Walker Lindh, the recently-released former FCI Terre Haute CMU inmate, and without a real investigation there is no way to know if he was involved in a conspiracy to commit murder, Obama-DOJ--holdover Hugh Hurwitz, who still heads the FBOP, seems free to cover up for his subordinates at the CMUs.

¶⌊Embed: Pic of Hurwitz; attrib. as approp.; caption: Obama-DOJ--holdover Hugh J. Hurwitz continues to head the Federal Bureau of Prisons (FBOP) more than 2 years into the Trump administration, thereby helping to keep a lid on likely Clinton-era and Obama-era scandals.⌋

¶Political prisoners like Reynolds, Cox, and Johnson, meanwhile, face consequences inside the CMUs that would likely shock the conscience of reasonable outside observers. At times, they appear to disturb some of the unit's own line staff and administrators too. This is especially true when CMU inmates try to relay news or instructions to their attorneys or other outside advocates in the hope they will, in turn, go to the courts, the media, or elected representatives for help or oversight.

¶Click here to read <i>The DOJ's "Torture Chamber" In Indiana--Part 4 of the CMU Series.</i>[link to part 4]

The DOJ's "Torture Chamber" In Indiana--Part 4 of the CMU Series

Tagline: Homemade For Use Against Political Prisoners

¶⌊Embed: Intimidating photo of a federal SHU; attrib. as approp.; caption: The special housing unit (SHU) at ⌊insert full name of federal facility⌋ (pictured) likely falls far short of what's hidden inside the FCI Terre Haute CMU.⌋

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at FreeMartyG.com ⌊link to part 4 at FMG⌋ and FreeSchaeffer.com⌊link to part 4 at FS⌋ under the latest Creative Commons by-attribution commerical-use-permitted share-alike no-derivatives license⌊link to the license text⌋.

¶<i>This is part 4. Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series⌊link to part 1⌋ or click here to read An ISIS-Inspired Murder and DOJ Coverup In the CMU--Part 3 of the CMU Series⌊link to part 3⌋.</i>

¶"We have our own SHU here..." Evelyn Keller customarily warned new inmates at the FCI Terre Haute CMU. "And it's not a place where you want to go."
¶SHU (pronounced like "shoe") stands for special housing unit, which is itself a euphemism for what is more commonly called, simply, "the hole." Nearly all U.S. prisons have such punishment zones, which are (in)famous thanks to films like <i>The Shawshank Redemption</i> and <i>Murder In the First</i>.
¶But Keller knows about the FCI Terre Haute CMU special housing unit (SHU) almost as well as the inmates. She was the intelligence research officer (IRO) for that CMU until she transferred to Florence, Colorado, on April 5th, 2019. And as the former IRO, Keller was "responsible for all investigations conducted within the unit, as well as, all Unit Team matters in the absence of the Case Manager," according to the "FCC-Terre Haute, Indiana Communications Management Unit HANDBOOK⌊link to the handbook as an embedded Google doc at FMG/FS⌋⌊sic⌋," which is provided to incoming inmates upon arrival here.

¶⌊Embed: Pic of front cover of the CMU handbook; attrib.: U.S. Department of Justice/2019; caption: According to official DOJ documents, Evelyn Keller was the second in command of the FCI Terre Haute CMU.⌋

¶It's telling, perhaps, that "the hole" within the FCI Terre Haute CMU isn't the same place the institution torments other inmates from units elsewhere in the facility. And it didn't seem lost on Keller that it's different than other SHUs in the Federal Bureau of Prisons (FBOP).
¶Indeed, political prisoners like Cox, Reynolds, and Johnson face barbaric degradation that is unique across the nationwide federal prison system and almost certainly qualifies as cruel and unusual punishment under the Eighth Amendment, not to mention as torture under U.S.-ratified international human-rights conventions the U.S. uses to critisize other nations for similar or lesser conduct.
¶"I've done a lot of SHU time at a lot of places, and nothing's like 'the burrito cooker' here," assures Cox, referring to the SHU in the FCI Terre Haute CMU. "I spent about a month there recently, after I told my lawyer about the murder ⌊of Robert David Neal⌋ and he started asking questions."
¶Cox isn't alone either. Multiple other survivors credibly and uniformly detail inhumane conditions during their extended stays in the FCI Terre Haute CMU's "special housing unit," including extreme heat, lack of ventilation, insect infestation, sleep deprivation due to constant loud noise, and contaminated drinking water that is known to cause convulsive vomiting and

dangerously-dehydrating diarrhea.

¶Without a single exception, these survivors all also describe being deprived of their legal work, writing impliments, paper, and postage stamps, thus leaving them unable to reach the courts despite sometimes facing imminent filing deadlines. They feel this is ordered by the off-site staff who monitor nearly all correspondence between the inmates and the outside--including to and from the courts.

¶⌊Embed: Pic of Andy Dufraine⌊sp?⌋ sitting on the ground with unkempt facial hair after weeks in "the hole" in The Shawshank Redemption; attrib. as appr.; caption: Movies like The Shawshank Redemption (pictured) have helped popularize what's now common knowledge about "the hole" in prisons.⌋

¶These survivors inside the FCI Terre Haute CMU are adamant their suffering was ordered by these outside monitors for political and litigation-related reasons. In some cases, line staff have conceded such to be the case. Other times, CMU inmates have strong circumstantial evidence supporting their claims, evidence that's likely far sturdier than that used to secure many criminal convictions in federal courts.

¶In contrast to the off-site monitors, these same concerned line staff, who work inside the FCI Terre Haute CMU, are in many, if not most, instances, the first to warn new inmates about some of the deplorable conditions in the unit's SHU. The concerns they've expressed appear genuine and compassionate to these reporters, who each received such warnings as new inmates at this CMU.

¶"The SHU here is built directly over a steam pipe, so it gets really hot and loud in there," a correctional officer (CO) warned on at least one such occasion.

¶"They put people in there for nothing," meaning for little or no reason, warned another CO on a different day.

¶But those facts alone seem to fall far short of adequately describing the horrors of "the hole" at the FCI Terre Haute CMU.

¶"We've cooked burritos ⌊using only the heat⌋ on the floor in the room next to that SHU," Cox augments. "It gets too hot to even stand on the floor in there. You could fry an egg on it if you wanted."

¶Other inmates also tell the burrito-cooking story and spontaneously interject that an egg would fry using just the heat from the concrete floor.

¶Further, while inmates elsewhere in the FBOP system would rarely, if ever, be thrown in "the hole" for discussing their cases or the conditions of their confinement, political prisoners in the FCI Terre Haute CMU routinely spend weeks, months, or more than a year in "the burrito cooker" over speech that seems to qualify for First-Amendment protection, even behind bars⌊link to the text of Jordan v. Pugh, 504 F.Supp.2d 1109 (D. Colo. 2007)⌋, like Cox's messages following the death of Robert David Neal, as well as, very possibly, this series of articles too.

¶But the Constitution and its protections can seem very far away in a CMU, where--as each of these reporters both witnessed and experienced--mail sent to U.S. courts (especially mail that the FBOP might find inconvenient) often arrives late, altered, incomplete, empty, or not at all, similar to how Reynolds's letter to Representative Cummings's office went missing. Adding to this, the off-site staff who monitor communications to and from the CMUs often enforce unwritten rules <i>ex post facto</i> and punish political prisoners for alleged violations of rules that were long ago struck down by federal courts as unconstitutional. The CMUs are thus effectively Due-Process dead-zones.

¶⌊Embed: Still frame from the movie Murder In the First, with Kevin Bacon's character in the hole; attrib. as approp.; caption: Fact, Hollywood fiction,

or both?⌋

¶Those in the CMUs, moreover, cannot confidentially contact the Office of the Inspector General (OIG). The OIG is the internal watchdog for the DOJ, so the inability of CMU inmates to send reports to the OIG without the FBOP pre-screening them presents serious issues and conflicts of interest. Indeed, federal inmates elsewhere can send private electronic messages to the OIG instantaneously, but not those in the CMUs.

¶This lack of nearly all accountability seems responsible for enabling some particularly cruel and unusual extrajudicial punishments. Multiple witnesses report, for one example, that Clint Swift, the former case manager for the FCI Terre Haute CMU,      told an inmate his mother had died  only to reveal about 4 days later  that she hadn't really passed away.

¶Cox met Swift shortly after he was transferred from the CMU in Marion to the FCI Terre Haute CMU in May, 2018. He remembers Swift confronting him over a lawsuit he filed in Marion that was still pending when he arrived in Terre Haute.

¶"I noticed that you're suing over our mail policy. Our SHU here is not some place you want to be," Cox recounts Swift emphasizing to him ominously. "It is extremely hot because of the steam pipes that run under there to the ⌊nearby prison⌋ camp. So, keep that in mind if you're thinking about trying to fight the system, because the CMU is not the place to challenge the way we do things."

¶"I'm just saying, do what you want. But you'll drop those lawsuits if you know what's good for you," Cox recalls Swift coercing him. "You're gonna learn that if you make people look bad, your life will become unbearably difficult."

¶Remembering similar experiences at the USP Marion CMU, Cox dropped his suit rather than risk "the burrito cooker."

¶⌊Embed: Photo of Clint Swift, if avail., if not just do a floating quote; attrib. af/as approp.; caption: "You're gonna learn that if you make people look bad, your life will become unbearably difficult." --Former FCI Terre Haute CMU Case Manager Clint Swift⌋

¶Yet, perhaps no one has spent more time in the special housing units at both the DOJ's black-site CMUs than Scott Lewis Rendelman.

¶Before his time in prison, Rendelman was a concert-quality pianist, a whiz at chess, and--by nearly all accounts--a fastidious accountant. Some call him a savant. And given his readily-apparent difficulty maintaining eye contact during conversations and other tendencies, which, alone, could be taken to indicate OCD, it's distinctly possible that Rendelman is on the autism spectrum.

¶In any event, Rendelman was sent to federal prison in the 1980s, following a dispute over some money he invested for a client in Maryland. He maintained his innocence and refused to take a plea deal that likely would've allowed him to avoid prison all together. He asserted that he hadn't done anything wrong or illegal, and the client in question later reportedly forgave him, attributing the criminal case against Rendelman to an overreaction about a small amount of money.

¶⌊Embed: Photo of Rendelman, if avail.; attrib. as approp.; caption: Scott Lewis Rendelman in ⌊year⌋, before he was sent to federal prison⌋

¶People who know Rendelman agree he is pure-hearted, honest, and kind.

¶Rendelman's prison experience, in contrast, has been such a nightmare that many details have to be omitted in print for a general audience. Suffice to say though, he was brutally and repeatedly raped by prison gangs and suffered a nervous breakdown. As one might expect from decades of such abuse, he was

traumatized severely enough that he's apparently never recovered.

¶"He was totally non-violent," Cox adds solemnly. "He never even punched back while they were raping him."

¶In the 1980s, decades before the passage of the Prison Rape Elimination Act, or PREA, guards simply looked the other way as vulnerable inmates like Rendelman were victimized.

¶It seems that partly due to his mental condition and as a way to escape the sexual violence he experienced in general population, Rendelman took to writing vulgar--but oddly-childish--letters to U.S. presidents and other high-ranking officials, threatening them with absurd-yet-highly-detailed sexual violence as apparent payback for sending him to prison where he "got raped instead of rehabilitated." One such letter involved then--President-Obama's rectum, a Snickers® bar, a waterboard, and "buckets of prison [expletive deleted] [ejaculate]." Rendelman threatened to "pee in the attorney general's tropical fish tank and kill all the fish," in another.

¶While likely laughable coming from a 5-foot-2-inch 150-pound man whose acquaintances say he sounds like Pigglet from <i>Winnie the Pooh</i>, the DOJ and the federal courts still considered Rendelman's messages threats--even though most of them never left federal prison in the mail.

¶Rendelman's letters had real-world effects though, which appeared two-fold. First, the FBOP put him in solitary confinement under nearly-perpetual investigation. And, second, the DOJ stacked a seemingly-ever-increasing pile of federal felony charges against Rendelman, resulting in more prison time.

¶Rendelman could stay in the SHU where he didn't get raped, however, so long as he kept writing so-called "nastygrams" to the president and others. But his original sentence ballooned, little by little, from months into over 40 years--an apparent result of the FBOP's indifference to the ongoing institutionalized sexual violence he endured and the knee-jerk fixation of the DOJ and federal courts to the letters Rendelman composed as a result.

¶A thorough search for Rendelman's name in the federal case law from both his home state of Maryland and the locations of the CMUs using the FBOP's subscription to LexisNexis® yields many results describing his letters and the court-ordered mental-health evaluations that deemed him "competent" to stand trial. But curiously there is not a single mention of the word "rape" in any of those judicial decisions. The odds of such consistent omissions being unintentional seem low.

¶Then, in 2003, nearly 20 years into Rendelman's incarceration, Congress passed the Prison Rape Elimination Act (PREA), mentioned earlier. A string of high-profile lawsuits followed, holding the FBOP legally responsible for its systemic inaction in cases like Rendelman's. Rather than help Rendelman, however, the FBOP's top brass quickly appears to have identified him as a multi-million-dollar legal liability and a public-relations nightmare.

¶The FBOP then buried Rendelman in the CMUs, and more specifically, it held him for years at a time in the SHUs therein. The bureau likely assumed that the press, attorneys, and advocacy groups like Autism Speaks would never uncover him there. But starting now, any such assumption by the FBOP would be wrong.

¶"[Try to get a quote from Autism Speaks, about what happened to Rendelman, and what they plan to do to help him, if neither they nor any other similar group will respond, then skip this paragraph]," said [insert name/title] when told about Rendelman's now-nearly-40-year plight.

¶Given the past, however, it still might be very difficult for advocates to help Scott Rendelman.

¶"I once tried to tell my mother about what happened to Scott Rendelman," says Cox. "I thought maybe we could find him a lawyer. But I didn't get 2 words

into the call before the outside monitor cut the phone line and 3 COs rushed
me. They pressed me up against the wall and told me that I'd strayed from the
'approved topic' of conversation."
¶Scott Rendelman's life may have become a nightmare, consisting of nearly 30
years of sexual violence and bureaucratic indifference followed by
institutionalized malevolence and untreated nervous breakdowns, but Cox says
that when he dreams, "He dreams of going home."

¶Click here to read <i>How the DOJ Protected Pedophiles and Got Away with
Election Meddling In Alaska--Part 5 of the CMU Series</i>.[link to part 5]

<u>How the DOJ Protected Pedophiles and Got Away With Election</u>
<u>Meddling In Alaska--Part 5 of the CMU Series</u>

Tagline: "Prosecutors Actually Determined the Outcome of the Balance of Power
          In the U.S. Senate By Their Misconduct," Former U.S. Attorney Says

¶[Embed: [Photo of Cox with Ted Stevens, if avail.|2-in-1 photo of Ted Stevens
and Cox]; attrib. as approp.; caption: Affected by "Operation Polar Pen:"
Former U.S. Senator Ted Stevens (R-AK) ([left|right]) and former political
organizer Francis Schaeffer Cox (R-AK) ([left|right])]

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

<u>PLEASE NOTE:</u> The authors have made this series available at <u>FreeMartyG.com</u>
[link to part 5 at FMG] and <u>FreeSchaeffer.com</u>[link to part 5 at FS] under the
<u>latest Creative Commons by-attribution commercial-use-permitted share-alike</u>
<u>no-derivatives license</u>[link to the license text].

¶<i>This is part 5. <u>Click here to read Inside the Black Sites Where Obama,</u>
<u>Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series</u>[link to
part 1] or <u>click here to read The DOJ's "Torture Chamber" In Indiana--Part 4</u>
<u>of the CMU Series</u>[link to part 4].</i>

¶"What do you mean, you 'don't have a plan?![interrobang]'" Bill boomed.
¶In attack mode, he propelled his 6-foot-tall frame over the countertop at my
friend Les and me.
¶Bill was enraged. And drunk. His face flushed red beneath his flat-top
haircut as the crowded room of my supporters fell silent.
¶Bill grabbed the knife from his belt and he put it to Les's neck.
¶"I'll slit your throat and bleed you out at my feet, you [fucking|[expletive
deleted]] son of a [bitch|[expletive deleted]]! It's go time!"
¶I've thought a lot about that moment over the years. But I didn't know then
what I know now.
¶Bill, it turned out, was a highly-motivated undercover FBI
informant/provocateur on a mission--a political operation. And he and his
handlers, it seems, weren't just after me.
¶The DOJ had altered the balance of power in the U.S. Senate with its
"Operation Polar Pen," based in my home state of Alaska. Federal prosecutors
from the DOJ's "Public Integrity Section" used a trial in U.S. District Court
about 2 years earlier to sideline elder-statesman Ted Stevens, a popular
incumbent GOP senator whom I had endorsed from the podium at many grass-roots
rallies packed with thousands of supporters. The democrats then enjoyed a
filibuster-proof supermajority with exactly 60 votes in the Senate.
¶"In nearly 25 years on the bench," fumed Judge Emmet G. Sullivan once some of
the underlying details of the Stevens prosecution emerged, "I've never seen
anything approaching the mishandling and misconduct that I've seen in this
case."
¶Sullivan appeared eager to distance himself from what had happened in his own
courtroom in Washington, D.C. His ritual tongue-lashing went on for about 14
minutes in front of a gallery packed with reporters and he took the
[nearly-]unprecedented step of appointing an independent attorney to
investigate the prosecutors. He'd already held 3 of them in contempt of court.
¶By the time Eric Holder, the new attorney general, was personally all but
forced to drop the charges, even he, <u>the seemingly-shameless revolving-door</u>
<u>bankster</u>[link to an article about Holder going back to work in the financial
services sector after not indicting bankers in 2009], came across embarrassed.

¶[[Embed: Pic of Judge Sullivan; attrib. as approp.; caption: U.S. District

Court Judge Emmet G. Sullivan ordered an investigation into the federal prosecutors in the Ted Stevens case.⌋|[Embed: Pic of Holder; attrib. as approp.; caption: Former U.S. Attorney General Eric Holder had little choice when it came to dropping the Ted Stevens case.⌋

¶Stevens, himself a former federal prosecutor, vowed to run for office again, and to spearhead comprehensive reform legislation to ensure the DOJ divulges evidence indicating that a defendant is innocent--the type of evidence it unlawfully withheld in his case, and, later in mine. Such a law would help rein in runaway federal prosecutors and serve as a serious check on the DOJ's power. The DOJ opposed it vehemently.
¶Then, Stevens died in a mysterious plane crash.

¶[Embed: Pic of the crash site, if avail.; attrib. as approp.; caption: Ted Stevens (R-AK) died in this plane crash after he proposed reform legislation that the DOJ strenuously opposed.⌋

¶Important navigational/safety equipment called the terrain awareness warning system (TAWS)--equipment designed to prevent exactly such a crash[use this § if no response from Cooper below:] and equipment that no right-thinking pilot would likely shut off in Alaska[end §]--inexplicably was disabled prior to takeoff[link to an article about TAWS being shut off in Stevens's plane].
¶"[Reach out to former AUSA Steve Cooper, who is an Alaskan pilot and who testified for Cox's defense, for a quote about it being odd/unbelievable that TAWS was disabled in the Stevens plane (if he doesn't/won't answer then skip this ¶ and use the § above)⌋[,|?]" [says|explains|wonders] licensed Alaskan pilot and former federal prosecutor Steve Cooper, who worked far away from the Stevens investigation, in the U.S. attorney's office in Fairbanks.
¶Nick Marsh, a federal prosecutor from the Stevens case, was found hanging from a makeshift noose in his own basement about 6 weeks later. He'd been positioned to take the likely and seemingly-inevitable fall for the Stevens case, though it's possible he could've implicated higher-ups in the DOJ too.
¶I believe that Marsh worked on my case as well, but that the DOJ hid his involvement after Judge Sullivan hired an independent lawyer to look into prosecutorial misconduct against Stevens.
¶First responders found blood stains across Marsh's basement. Both his wrists were slit. Authorities promptly ruled his death a suicide and closed their investigation into his death. But his demise didn't hide everything.

¶[Embed: Pic of Bill Allen, if avail.; attrib. as approp.; caption: Bill Allen (pictured) was the owner of VECO before the Ted Stevens case.⌋

¶That's Bill Allen, the billionare former owner of VECO, a construction and oil-pipeline service company in Alaska (and a different Bill than the one who held a knife to my friend Les's throat). He was also the "star witness" against Stevens.
¶Allen testified that VECO completed about $250,000 in renovations on Stevens's home in Girdwood, Alaska. Prosecutors from the "Public Integrity Section," including Marsh, as well as others from the U.S. attorney's office in Anchorage who later worked on my case, like Joseph Bottini, presented fake accounting records and knowingly withheld evidence from Stevens's defense showing that the records were bogus.
¶Allen billed Stevens, his supposed friend, about $165,000 for the work, an apparent difference of $85,000 that the "Public Integrity Section" claimed was an unreported and illegitimate gift meant to curry political favor.
¶Allen, however, seems to have been no real friend to Stevens, and he'd actually overbilled him. But the DOJ withheld Allen's candid admission that

the fair value of the work his company did on Stevens's home was closer to $80,000. And, as a general contractor in Alaska myself, I probably would've done the job on Stevens's modest home for under $30,000.

¶The prosecution also had Allen testify that a request Stevens sent him, asking explicitly for an invoice so he could comply with Senate ethics rules, was merely an effort to produce a phony paper trail and "cover his ass." Allen, however,   told the DOJ otherwise before he took the stand.

¶And  if anyone was covering someone's ass, then it seems the DOJ was doing so for Allen. Unbeknownst to Stevens and his defense team, the Anchorage Police Department was investigating Allen for possible human trafficking, prostitution with a minor, and obtaining a false sworn statement from that minor, thereby suborning perjury from her.

¶Allen was just the proverbial tip of the iceberg too, at least if my grass-roots experience canvassing Alaska door-to-door was worth anything. Over and over again, folks raised concerns about the sexual exploitation of children by powerful people in moneyed positions of influence—like Allen and convicted-rapist Josef Boehm, the since-deceased owner of Alaska Industrial Hardware, one of the biggest suppliers of large-scale physical components for Alaska's massive oil industry. Inuit children and those from other native tribes seemed at particular risk. Honest local law enforcers felt stymied in their efforts to hold power brokers accountable. Arrests were unheard-of.

¶Records reflect that prosecutors felt Allen would become "unglued" at the prospect of facing public pedophilia charges. They used that leverage to motivate Allen to make the charges go away.

¶With Allen then testifying for Marsh and Bottini in contradiction of his own earlier statements about Stevens, the DOJ told the Anchorage police to put their investigation of Allen on ice[link to http://www.adn.com/article/ 20100820/federal-officials-wont-prosecute-bill-allen-sex-charges-aug-22-2010 (Alaska Dispatch News, Aug. 22, 2010, Federal officials won't prosecute Bill Allen on sex charges (Aug. 22, 2010), by Richard Mauer]. To me, the DOJ's "Public Integrity Section" accused Senator Stevens of a corrupt quid pro quo, when, in reality, the only corrupt quid pro quo was its own agreement to sell out Allen's victims in exchange for his false testimony against Stevens. And, then they didn't want me telling stadiums full of people about their dirty deals.

¶[Embed: Photo of Joseph Bottini, if avail.; attrib. as approp.; caption: Federal prosecutor Joseph Bottini (pictured) may have struck a deal to spare a billionare pedophile in order to use his false testimony to wrongfully convict then-Senator Ted Stevens (R-AK).]

¶Except for Judge Sullivan's public admonishment after the Stevens jury returned a guilty finding and he lost his Senate seat, the DOJ basically got away with it. With Marsh dead, the independent investigation Sullivan ordered was ultimately toothless.

¶"Had things been different, Stevens would have been [re]elected. Prosecutors actually determined the outcome of the balance of power in the U.S. Senate by their misconduct," said Joseph diGenova, former U.S. attorney for Washington, D.C., in an interview with <i>Washington Lawyer</i>[link to http://www.dcbar. org/bar-resources/publications/washington-lawyer/articles/october-2009-ted-stevens.cfm (Washington Lawyer, October 2009, A Cautionary Tale: The Ted Stevens Prosecution, by Anna Stolley Persky)].

¶Most people, meanwhile, seem unaware that former-President Obama and the DNC can credit the filibuster-proof 60-vote supermajority they enjoyed in the Senate in 2009 to the gross prosecutorial misconduct and other abuses of power carried out by the supposed "Public Integrity Section" of the Justice

Department and that the Obama administration later promoted many of those staff to key positions.
¶The DOJ wasn't done in Alaska either.
¶A few months after the knife-wielding antics of Bill, the undercover FBI informant/provocateur, in front of a room of my supporters in Fairbanks, he managed to single-handedly derail the 2010 U.S. Senate campaign of my friend Joe Miller. Surprising many, Miller had upset incumbent-GOP-rival Lisa Murkowski in that year's primary, making him seem like a sure thing to take her place.
¶Beneath it all, the DOJ, or more specifically, its "Public Integrity Section," seemed to have figured out an interesting aspect of Congressional mechanics: there were [under|about] [number as of general election 2008] registered voters in Alaska in 2008, and the state is largely ignored in national news and politics.
¶So, with relatively little effort and scrutiny, it was theoretically possible to snag 2 seats in the Senate and 1 in the House of Representatives, all with about the same amount of political elbow grease required to sway a local city-mayor's race elsewhere in America. It's worth noting that after his trial, Stevens, a 6+-term incumbent, lost to democrat Mark Begich by less than 10,000 votes.

¶[Embed: Pic of a good visual representation of the ratio of Alaskans to its 2 senate seats as compared to the ratio of population to senate seats elsewhere; attrib./caption as approp.]

¶But, I wasn't thinking about voter-to-senator ratios when Les, my white-haired 67ish-year-old friend, stumbled backwards away from Bill's blade, all the way to the wall, and the uneasy quiet in the room was broken by my 1-and-a-half-year-old son Seth crying in my arms.
¶At that point, Steven Gibson, a military policeman (M.P.) stationed at nearby Fort Wainwright, hadn't yet warned me that authorities were trying to use Seth as a pretense to shoot me and claim "self-defense," less than 2 years after the Stevens crash and Marsh's death.
¶The feds had filed a bogus complaint against me with state social services, a common tactic to gain entry into a private home without establishing probable cause. The state would later determine that the complaint was "baseless." And in my case it seems something more nefarious was afoot than warrantless entry.
¶M.P. Gibson later testified that a deputy U.S. marshal told him, "Whatever the problem was with Schaeffer Cox, if he was killed with [social services] attempting to take his son, then obviously anything that had to do with him wouldn't matter anymore."
¶But I digress.
¶"Lead the charge and attack the government, or we'll kill you guys ourselves to get you out of the way!" Bill declared, reiterating an ultimatum that he'd issued to Les and me a minute or so earlier, purportedly on behalf of himself and his out-of-town paramilitary buddies. "You think I'm [fuckin'|[expletive deleted]] around?![interrobang] Try me!"
¶Supposedly, Bill was faking it, at least that's what he claimed later. Supposedly, he wasn't going to hurt anybody that night. Supposedly, he was still in control of himself despite bringing a 12-pack of IPA and then drinking nearly 6 Heinekens in the roughly 90 minutes prior, as he later wrote. By his own account, he "knew" that he would "blow a DUI badly if it came down to it" that night.
¶But Bill's foggy-goggle narrative aside, I know what really happened--and why he was really there. He was on a mission, hell-bent to corner, terrify, and coerce me into uttering a hasty-but-nonetheless-admissible statement that his

handlers could then quote out of context in order to make a federal conspiracy case against me.

¶You see, they desperately needed to justify their out-of-control "investigation" into my Second-Amendment rallies, where I endorsed GOP politicians like Stevens and Miller, and Alaska's Congressman Don Young, whom I know they were also trying to topple. They had trawled their bogus dragnet through my life for years at taxpayer expense, trying to snare me in something, without ever uncovering anything criminal. I was a well-known and peaceful Second-Amendment political organizer, and my family was put through hell, with the DOJ hoping that I'd verbally lash out and say I was going to hurt those responsible, which I never did.

¶Indeed, a panel of federal prosecutors had reviewed the evidence they'd gathered thus far, and concluded that I had "not crossed the line between First-Amendment-protected speech and actionable offense."[link to the corresponding document and check quote; if not avail. then remove quotation marks and link but leave text] But the politically-minded investigation-in-search-of-a-crime pressed forward anyways. I had no idea how alone I wasn't.

¶"[Reach out to former AUSA Steve Cooper from Fairbanks for a quote here about why he rejected the case against Cox due to Constitutional concerns, but how others like Bottini didn't seem to care about the Constitution. If he doesn't/won't comment, then skip this ¶]," [says|explains] former Fairbanks Assistant U.S. Attorney Steve Cooper, a friend of mine who was familiar with my political work.

¶[Embed: Pictures of Aaron Schock, Steve Stockman, Joe Miller, Ted Stevens, Pete Kott, Vic Kohrieg, Bruce Weyhrauch; attrib. as approp.; caption: Guilty until proven innocent? GOP political voices who were targetted by the DOJ include [list names/photo positions].]

¶Thus, Bill and his handlers hadn't been thrust innocently into a "[C]onstitutional minefield," as he later indicated. No, they'd defiantly stormed right into one. But, as usually happens when the DOJ goes overboard, it took years for the truth to come out, for Judge Sullivan to appoint an independent investigator, for that investigator to submit his 525-page report, and finally for the DOJ "task force" targetting Republicans in Alaska to be defunded just days after Trump took office.

¶By then, it was too late for Stevens, Miller, and me.

¶I've since learned that this (mis)conduct wasn't limited to "Operation Polar Pen" and Alaska. In 2016, for example, road-warrior GOP campaigner Aaron Schock (R-IL) left office in apparent disgrace like Stevens, and, like Stevens again, over 100 felony charges that were brought against Schock during an overzealous federal prosecution were eventually thrown out. There's also former-Congressman Steve Stockman (R-TX). He too apparently made the mistake of demanding accountability out of the DOJ, only to end up in its crossheirs. Marty and I wish him the best of luck[fact check on the latest on Stockman and omit this last part if there is good reason to do so].

¶Now, I should also mention that Bill has his own version of these events in Alaska. Clouded by alcohol and fueled by the kind of gung-ho juvenile aggression that can cause a man to pound 18 beers in 90 minutes and then pull a knife in a room full of NRA members, Bill's book is littered with sentence fragments, like, "Fuck. Rolling Pin. Whack."

¶Three levels of editing/proofreading and the help of a co-author weren't enough to save Bill's self-serving compilation of plot holes from its inevitable 1-star rating on Amazon.

¶[Embed: Heavily-redacted photo of Bill's book on Amazon, with all identifying aspects of the book blacked out, including its cover image; leave only "Bill"

as the first name of 1 of the authors, black out his surname and the full name
of his co-author, and show the 1-star rating clearly; attrib.:
FreeSchaeffer.com/Creative Commons (2019); caption: Bill's book isn't winning
many literary awards...]

¶I'm not saying Bill's book is fake. I'm saying Buzzfeed's Jason Leopold says
it's real. As a reminder, Leopold is the reporter who kept pushing a phony
story about the Mueller investigation, even after Mueller's office refuted it
publicly[link to an article about the phony story and how Buzzfeed and Leopold
stuck with it and insisted that they'd be vindicated]. He also left Vice after
basically admitting that he falsified another story [there[at [place]][link to
an article about Leopold's admission circa 2016].

¶So, maybe it's not all that surprising that while Bill described himself as
"a self-taught bouncing specialist" in his book, Leopold "salute[d] Bill" on
its back cover, describing him as a mix between Richard North Patterson and
Hunter S. Thompson (noted author  of <i>Fear and Loathing in Las Vegas</i>,
among other famous works).

¶That comparison, of course, seems unfair to the late Thompson. Unlike Bill,
he could drink while still writing in complete sentences, and he didn't have
the benefit of the colored underlinings in Microsoft Word® to help him avoid
publishing apostrophe-free gems like, "First things first."

¶Was Bill merely 1 pen stroke over the line when he wrote his book? That poor
fool. Wait until he sees those damned bats[check exact quote from the opening
of Fear and Loathing in Las Vegas, but do not say "god-damned," even if that's
the exact quote. Just say "damned."].

¶[Embed: Photo from Fear and Loathing of Depp with the fly-swatter and the
bats in the air; attrib. as approp.; caption: Bill's book is bat country!]

¶And while Thompson wrote about being afraid of getting reported <i>to</i>
"some outback Nazi law-enforcement agency," Bill actually reported people in
the outback of Alaska to the local FBI, like some sort of secret policeman,
and strong-armed people with death threats.

¶As for Leopold, I guess: fake reporter, fake news, fake book review, but real
1-star belly flop in front of real disappointed readers--go figure.

¶Further, while Thompson was actually a journalist, and he wrote about being a
journalist, Bill once handcuffed a journalist at a town-hall campaign event,
causing MSNBC's Keith Olbermann to name him the "Worst Person In The World."

¶That incident, it seems, was part of the DOJ's efforts to turn Alaska blue.
Though, perhaps as one would expect, Bill and his handlers have never admitted
it.

¶You see, Bill ran a military-surplus store in Anchorage that catered mostly
to conservatives, complete with a big scary poster of Obama as the Joker from
<i>Batman</i> in the front window. He'd also been a Ron Paul delegate in 2008
and he headed a local crew of bail-bond bounty hunters.

¶All of this kept up appearances for Bill as an undercover operative, and gave
him the public stature to weasel his way into local GOP campaigns. And weasel
he did.

¶But, while Bill says he's married to a woman he met at a strip-club
bachelorrete party, when her friends were stuffing dollars into his g-string,
Bill went home at night and secretly obsessed over his "other girl," Rachel
Maddow.

¶[Embed: Pic of Chris Farley as a Chip N' Dale dancer from SNL, shirtless,
superimpose Maddow looking on in disgust if possible; attrib.:
FreeSchaeffer.com/Creative Commons (2019); caption: Rachel Maddow is yet to
comment publicly about Bill labelling her his "other girl."]

¶As both an FBI informant/provocateur and the head of security for the 2010 Joe Miller for Senate campaign, however, Bill pounced in a room full of reporters, ostensibly trying to place the founding editor of <i>The Alaska Dispatch</i> under citizen's arrest.

¶When the actual cops got there, they refused to take Bill's quarry into official custody, and released him.

¶The fallout was immediate and intense. It was game over for Miller's campaign. And Bill's "other girl" publicly denounced him on her show.

¶"[Reach out to Joe Miller for a comment on what it's like to now know that the incident that likely cost him the 2010 race was caused by an undercover FBI informant/provocateur during Polar Pen. If he doesn't/won't respond, then skip this ¶]," [says|explains] Miller now.

¶Yet, the democrats didn't win that election either. Alaskan voters had lived through the Stevens prosecution and the plane crash. They weren't about to fall for the same trick twice, it seemed. Surprising many out-of-staters, Lisa Murkowski won the general election by 5,200 votes with a write-in campaign, even though she lost the primary to Miller and her name wasn't on the ballot.

¶"[Reach out to Murkowski for comment on what she thinks changed in Alaskan elections as a result of Polar Pen and the Stevens case and how that may have helped carry her to victory in 2010. If she doesn't/won't respond, then skip this ¶]," [says|explains] [Murkowski|a spokesperson for Murkowski's office].

¶I might have had similar luck with my trial at the local federal courthouse in Fairbanks, where people knew me and knew all too well what the DOJ had been doing with taxpayer resources.

¶[Embed: Photo of the Obama as the Joker poster; attrib. as approp.; caption: Methinks Bill doth protest too much...]

¶Indeed, I'm likely still alive because a bystander from the area happened to notice SWAT teams staging themselves around the corner on the day of my arrest and warn me. This caused them to have to spring their trap early--and with a neutral witness around.

¶According to Bill, the FBI was sure to arm those SWAT teams with ammunition that would penetrate body armor. They were going to shoot to kill, it seems, as M.P. Gibson warned me and as he later testified.

¶But with a witness around, they couldn't shoot me in cold blood and then claim "self-defense."

¶I thank God that bystander was there that day when 10 or so men carrying M-4 assault rifles, dressed in olive-green fatigues, surrounded me with their safeties off.

¶At the time of my arrest, on March 10th, 2011, my wife, my son, our newborn baby girl Bri, and I had been hiding in an attic for 21 days. We were terrified of what Bill and his handlers were going to do. We were trying to flee the country to save our lives.

¶That day, a truck driver was supposed to take us into Canada and away from it all.

¶But there was no truck driver. It was all a ploy by prosecutors. They manufactured the threats, like Bill's, and the would-be solution too.

¶[Embed: Photo of Ron Paul 2008 campaign sign; attrib. as approp.; caption: Delegate or delator? Bill associated himself with the 2008 Ron Paul campaign.]

¶Despite the millions of federal tax dollars the feds had likely spent on my case, the DOJ backed off once I was in custody. They let the local district attorney's office prosecute me, as I'm told the DOJ commonly does to avoid embarrassment when a case has been assessed as weak, or when federal prosecutors don't want their methods to come under much scrutiny, or both.

¶With the help of my friend, a local attorney named Robert John[link to his website], every single state charge was dismissed on Constitutional grounds.
¶But we weren't out of the woods. And I never left custody.
¶The DOJ then brought the same charges in federal court. It's normal[link to a write-up about the recent SCOTUS opinion upholding successive state and federal prosecutions. Opinion was by Alito] for federal judges to allow this notwithstanding the 5th Amendment double-jeopardy clause[link to text of 5th Amendment]. Thus, federal prosecutors get another bite at the apple; an opportunity to shore up their case after taking a test-run in state court, like a dress rehearsal.
¶And when the truth didn't seem good enough for federal prosecutors Steve Skrocki and Joseph Bottini to make their case against me in the much more prosecutor-friendly federal court either, they did what they often do, i.e. the same things they did to Ted Stevens and Aaron Schock--they lied, withheld evidence, and fully leveraged their home-court advantage--knowing ahead of time they'd get away with it.

¶[Embed: Photo of Skrocki; attrib. as approp.; caption: Federal prosecutor Steve Skrocki has a chequered past.]

¶"This has built up over years--the people at [the DOJ] have come to believe that they are immune, that nobody can touch them, and that judges will ignore their prosecutorial misconduct," warned former U.S. Attorney diGenova on the heels of the Stevens case in 2009.
¶Indeed, the definitive work on "Operation Polar Pen," written by former federal prosecutor Sidney Powell, is aptly entitled <i>Licensed to Lie</i> (and it was a #1 Bestseller on Amazon with a good rating[link to Amazon page of the book]).
¶Federal prosecutors have further come to believe that they can bury inconvenient defendants like me in the CMUs, and thereby stop the press from picking up on their out-of-control prosecutorial misconduct after the fact.
¶But first thing was first. They'd have to convict me.
¶Now, Bill, it turned out, recorded his 2 violent confrontations with Les and me. Those recordings show what Bill said and did--and what I didn't. They'd be devastating to the DOJ's claim that I was planning to murder federal officials. And, under the rules, federal prosecutors Steve Skrocki and Joseph Bottini were supposed to fork over those recordings to my defense counsel.
¶Instead, they claimed that the DOJ turned over all of the recordings to Bill and that he destroyed them--every single copy. So, my jury never heard what I actually did and didn't say, and the court wouldn't let me tell my jury my version of what was on those recordings.
¶After testifying to his own destruction of those recordings, Bill has since tweeted one of them. He also claimed on the witness stand that the FBI hadn't paid him, going so far as to include a doodle in his book of him denying he received compensation during my trial. I've since learned, however, that the FBI offered Bill $160,000 if I was convicted.
¶The illustration in Bill's book thus might more accurately be drawn like this.

¶[Embed: Crop the top picture from page 246 of Bill's book and add a Pinochio nose to Bill on the stand (making the drawing fair use); attrib.: FreeSchaeffer.com/Creative Commons (2019); caption: Perjury: Bill's other, "other girl?"]

¶"It's very troubling that [the Justice Department] would utilize records that [it] knows were false," Judge Sullivan remarked during a hearing for the Stevens case involving some of the same federal prosecutors.

¶Yet it was my word against theirs and a parade of government witnesses, some paid, some testifying under deals to avoid or to minimize their own charges, or both. None of them seemed to have the slightest fear of perjury so long as they said what the prosecutors wanted to hear.

¶The court wouldn't let me show my jury proof that I was trying to flee to Canada because my family and I were terrified of what Bill and the DOJ were going to do. That would've shown that my plans weren't violent and that I was desperate to avoid confrontation.

¶The DOJ told the jury that I was lying, and the court went along with it.

¶The jury found me guilty having never heard the truth.

¶After the jury phase, however, the DOJ asked the court to lengthen my sentence, because, prosecutors then argued, I had obstructed justice by fleeing to Canada after all.

¶There's more too[link to FreeSchaeffer.com]. Of course, it's far too much to include here.

¶Again, a jury in Fairbanks, where I lived, might've seen through some of the smoke in mirrors. But they moved my trial at the last minute, to Anchorage, some [insert number] miles ([insert number] kilometers) away. The juror demographics there were much more favorable to the DOJ.

¶Distance-wise, it was like moving the trial from [check distance as the bird flies:]Washington, D.C., to Charlestown, South Carolina--if the space between those 2 cities were filled with icy tundra, where run-of-the-mill car trouble could kill you. The DOJ's people and witnesses, like Bill, all had their airfare and lodging prepaid by the government. Many of my witnesses could no longer afford to come.

¶[Embed: Pic of Alaska stretched over the lower 48 states, with marks on Fairbanks and Anchorage; attrib. as approp.; caption: Alaska is the nation's largest state and a motor vehicle breakdown in between cities can be fatal.]

¶Steven Cooper, the federal prosecutor from Fairbanks, still made it to Anchorage though--to testify in my defense. He could've told everybody how I went to him to report Bill and his violent friends and asked for his advice on how to handle the situation. But when Cooper took the stand, Skrocki and Bottini erupted in an incoherent fit of frantic objections. They succeeded in keeping the truth from the jury then as well.

¶At some point during the Polar-Pen fiasco, then--Attorney-General Eric Holder took some criticism over these shenanigans and issued a statement[link to Holder's statement on not charging Allen], basically reassuring the American public that he and his subordinates weren't sparing Bill Allen for corrupt reasons while prosecuting political figures like Stevens and me. [I'm sure he would've said something similar|He said something similar[link to such a statement by Holder if one exists]] about the decision not to prosecute people from the financial sector in the wake of the global financial crisis. But I'm no Wall Streeter, and the case against me for harming nobody pressed on.

¶I was sentenced to over 25 years in prison.

¶In 2018, however, some 7 years into my sentence, with my son Seth age 9 and Bri age 7, the U.S. Court of Appeals for the Ninth Circuit cleared me of the most serious felony charges that Skrocki and Bottini manufactured. The appellate judges ruled that no rational jury could've found me guilty of them in the first place.

¶The remaining charges sound like something from a <i>Mad Max</i>/<i>Road Warrior</i> dystopian future. They were summed up by the DOJ saying that if there was ever "Stalinesque martial law, mass arrests, and purges, at some undetermined and unknown point in the future, Schaeffer Cox, would be compelled to take up arms against the government, be sufficiently armed and

equipped to sustain a take-over of the 'government', or become a new government in the event of a 'government' collapse."

¶I'm not making that up.[link to the actual indictment in U.S. v. Cox (that contains that quote and check quote)] Though, for my own sake, and for that of my family, I wish that I were.

¶Obviously, it's ridiculous. Though it's also how the DOJ can make up a thought crime in order to lock up any real-world pro--Second-Amendment political figure[link to Gun Owners of America/Larry Pratt statement, "When Justice is Blind - The Story of Francis Schaeffer Cox," Sept. 8th, 2014, by Larry Pratt] who tries to hold them accountable today.

¶["[Reach out to Larry Pratt of Gun Owners of America for a quote about why Americans who don't support gun ownership should still support Cox in light of the corruption and the larger dangers of federal prosecutors run amok]," says Larry Pratt, executive director emeritus of Gun Owners of America.][if Pratt doesn't/won't respond:]Larry Pratt, executive director emeritus of Gun Owners of America, wrote that my case is of broad importance, because, "When a government decides what we can eat, what we must buy and what we are allowed to think, we no longer have life."]

¶And I'm here to add, "Just ask Ted Stevens."

¶Click here to read <i>Harvard Is Not God, Discredited Skeptics Say--Part 6 of the CMU Series</i>.[link to part 6]

<u>Harvard Is Not God, Discredited Skeptics Say--Part 6 of the CMU Series</u>

Tagline: My Mandatory Essay From a DOJ Reeducation Center

¶[Embed: Black & white photo of SCOTUS justices with the ones from Harvard in color with a red "H" superimposed on their black robes; attrib.: FreeMartyG/Creative Commons (2019); caption: Harvard v. The U.S. Constitution: another 5-4 decision?]

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at <u>FreeMartyG.com</u> [link to part 6 at FMG] and <u>FreeSchaeffer.com</u>[link to part 6 at FS] under the <u>latest Creative Commons by-attribution commercial-use-permitted share-alike no-derivatives license</u>[link to license text].

¶<i>This is part 6. <u>Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series</u>[link to part 1] or <u>click here to read How the DOJ Protected Pedophiles and Got Away With Election Meddling In Alaska--Part 5 of the CMU Series</u>[link to part 5].

¶Harvard isn't the center of the universe.
¶But good luck telling its faithful that. Some of the university's true believers punish heretics for reminding people that not everything revolves around Harvard--I'm living proof.
¶According to a bunch of Harvard alums at the DOJ, I'm also the big, bad, scary Anonymous hacker who single-handedly knocked their $36-billion[check figure] Ivy-League alma mater off the Internet by overwhelming its external network communications with more digital junk than the feds had ever seen transmitted at once. It's called a "distributed denial of service," or "DDoS" (pronounced either dee-dauce or dee-dee-oh-ehs). Here's a clip about how it works from the documentary <i>We Are Legion</i>:

¶[Embed: We Are Legion (whole film) queued, try to include civil-rights §]

¶I launched this DDoS to save a 15-year-old girl named Justina Pelletier. A group of Harvard medical researchers brutalized her and left her without her pain medications in round-the-clock agony for 16 months. They reduced Justina from a competitive figure skater, as seen in the video below, to being unable to push her own wheelchair, because, it seems, they were too proud to admit they misdiagnosed her.

¶[Embed: Justina skating in a blue dress in Dec. 2012]

¶And why would they admit it? Harvard, after all, basically owns the U.S. Justice Department, the courts, and much of the media. This is especially obvious in my native Boston. But, I'd wager that if you look into the federal judges and last few <u>U.S. attorneys</u>[link to page explaining what a U.S. attorney is/does] in your area, as well as your local Associated Press and Reuters bureaus, you'll see Harvard's influence on them too, even if you live far away from Massachusetts, in a politically dissimilar part of the nation.
¶Still, I'm fortunate that despite Harvard's influence, the basic story of how I got locked up for protecting children like Justina from institutionalized abuse has spread fairly well thanks to <u><i>Rolling Stone</i></u>[link to RS], <u>Michelle Malkin</u>[link to Nat. Rev.], <u><i>RT</i></u>[link to best RT segment], and <u>others</u>[link to FMG In the News]. So, I'll provide a brief summary before breaking some new ground, and for those who'd like to know more, I'll leave a comprehensive history below that will also help set the record straight on a bunch of false claims and intentionally-omitted facts that have become common

sources of confusion thanks to Harvard, the DOJ, and their doting allies elsewhere in the media.

¶My name is Martin Gottesfeld (pronounced Gott-ehs-feld). My friends and family call me Marty, and I go by "MartyG" online.

¶For 3 years now, I've been an investigative reporter[link to MuckRack], involuntarily embedded behind bars. The feds have transferred me 8 times across 5 of their facilities, as well as a private detention center in Rhode Island and a county jail in Massachusetts. I've racked up [insert sum of miles from my 4 flights as the bird flies: 1) Miami to Okl. City, 2)Okl. to Brooklyn, 3)Brooklyn to Okl., and 4)Okl. to Terre Haute] miles on ConAir, if only it had a frequent flier program...

¶[Embed: Pic of the Travelocity Gnome sitting in an airplane seat handcuffed, possibly with my face superimposed if it looks good; attrib.: FreeMartyG/Creative Commons (2019); caption: I've been everywhere man...]

¶Along the way, I've exposed corrupt prosecutors[link to IW/Red S. on Timothy Cruz (I think from around the time of the MA GOP convention)] and judges[link to IW/Red S. on Kimba Wood], child abuse[link to 1 of my troubled-teen industry articles] and other human-rights violations[link to ACA open letter at HuffPost], as well as lying politicians[link to article on Geoff Diehl, the vets and Saudi Arabia], at HuffPost[link to my HP profile], WND[link to Google results for "site:wnd.com Gottesfeld"], Red State[link to my Red S. profile], InfoWars[link to Google results for "site:infowars.com MartyG"], and The Intercept[link to my profile there]. Before I transformed myself into a journalist behind bars, I was a human-rights activist on the outside, focused on protecting chilren who are separated from their families in all kinds of residential settings, like Justina Pelletier.

¶Here is a PBS interview about what happened to Justina. It aired on Emily Rooney's old show <i>Greater Boston</i>:

¶[Embed: Lou on Greater Boston, queued to part about pain]

¶A twist of fate (more on that in the comprehensive history below) sent Justina to Harvard's $2-billion primary pediatric research and teaching facility, Boston Children's Hospital (BCH), instead of to one of Harvard's competitors across town, Tufts University Medical Center. She and her older sister had successfully been treated at Tufts for a condition that often runs in families called mitochondrial (pronounced might-toe-conn-dree-uhl) disease, or mito for short.

¶Yet a neurologist 7 months out of medical training named Jurriaan Peters and a non-MD psychologist named Ioana Simona Bujoreanu at BCH apparently convinced themselves and BCH's administration that the renowned mito specialists at Tufts were wrong about Justina. Minutes after first meeting her, they instead insisted that she was suffering from a psychological condition called somatoform (pronounced like psycho<u>somat</u>ic) disorder, which Bujoreanu had a grant[link to info on her grant] to study from the NIH. For days, Peters and Bujoreanu tried to get Justina's mom and dad, Linda and Lou Pelletier, to agree to stop her mito therapies. They steadfastly refused.

¶Lou Pelletier then tried to discharge Justina to bring her back to Tufts, but the new Harvard practitioners wouldn't take no for an answer. Lou was quickly surrounded by hospital security guards. They'd blocked every exit.

¶Naively, perhaps, Lou Pelletier called the Boston police for help.

¶Unbeknownst to Lou, you see, BCH had already reported him and Linda to the state social-services agency, the Massachusetts Department of Children and Families (DCF). The child-protection team at BCH, led by an increasingly-controversial doctor named Alice Newton, accused the Pelletiers of child

abuse/neglect for rejecting the new Harvard diagnosis and trying to return Justina to her original doctors at Tufts.

¶The governor of Massachusetts at the time (under whose purview DCF operated) was Deval Patrick, and he's an alumnus of both Harvard Law School and Harvard's undergrad program. The chair of the Massachusetts Board of Registration In Medicine, Dr. Candice Lapidus Sloane, [finish sentence with her BCH/Harvard affiliation(s)]. The commissioner of the state Department of Public Health (DPH) was Cheryll Bartlett, a Harvard nurse[fact check]. Meanwhile, BCH provided free consultations to DCF on child-abuse cases and DCF had few medical staff and no [full-time] doctors of its own.

¶Adrift in this sea of Harvard bureaucrats, it seemed the Pelletiers never had a chance. DCF immediately took custody of Justina, making her a ward of the state. The agency then signed off on BCH's psychological treatment plan over the Pelletiers' objections, and, at BCH's insistence, DCF also steadfastly refused to let other specialists evaluate Justina and offer second opinions. Thus, BCH and DCF locked out Justina's original mito doctors at Tufts.

¶[Embed: 3-by-1 photo array; attrib. as approp.; caption: Neurologist Jurriaan Peters (left), Psychologist Ioana Simona Bujoreanu (center), and Pediatrician Alice Newton (right) were involved in the Pelletier case at BCH.]

¶A state family-court judge named Joseph F. Johnston was assigned to the complaint against the Pelletiers and he hired somebody who was supposed to be "an independent medical expert" to help him decide it. That expert, it turned out though, was affiliated with BCH.

¶Thereafter, BCH seemed upset the Pelletiers were talking with Beau Berman, a reporter from their local Fox Connecticut station. And Judge Johnston issued a gag order, specifically forbidding the Pelletiers from talking with the press.

¶[Embed: Floating quote of Johnston's gag order. I'll paraphrase, but the wording as issued from the bench should be avail.: "I'm issuing a gag order. Nobody is to discuss this case with the media, whether that's reporters here [in Massachusetts] or local to the family in Connecticut." --Massachusetts Juvenile and Family Court Judge Joseph F. Johnston]

¶Lou Pelletier eventually risked being sent to jail and broke that gag order to report that Justina's life was in danger. He told the world that Justina was smuggling notes to her family hidden in art projects, writing what she didn't dare say during their single 20-minute censored weekly phone call and hour-long in-person weekly visit, which was monitored by armed guards. Then, Lou Pelletier published one of Justina's notes, embedded below. Written in her handwriting and in seemingly-obvious distress, it said, "they hurt me all the time," "thay don't let me sleep vary much," "I say it (torcher stop) then they say nuthang and kepe pushing me and goes on and on!" "[they] laff at me when I'm falling," and "Hury!"

¶[Embed: Justina's note; attrib. as approp.; caption: The Pelletiers reported that Justina smuggled them notes like this one, hidden in art projects.]

¶A lot of prominent people had stood up for Justina and her family by then. Harvard's distinguished law professor emeritus Alan Dershowitz made news the month before[timeline check] by announcing that from what he'd seen, the law supported Justina's family and not his university's hospital. Here's a clip of Dershowitz on [channel and/or program]:

¶[Embed: Dersh. on local news discussing Justina's case and his pro-bono work]

¶The longest-serving director of the Massachusetts Society for the Prevention of Cruelty to Children, a former federal prosecutor named Barry Pollock,

stated publicly[link to his open letter], and "Due to, among other things, arrogance, professional mediocrity, and a rush to judgment," the locked psych ward where BCH held Justina against her will "appears virtually synonymous with abuse for many children.[check quotes]"

¶A former nurse from that psych ward named Kathleen Higgins published an open letter[link to Higgins's letter], saying that she'd reviewed Justina's medical records and, "It would be more appropriate to call the 'treatment' being forced on Justina by its more proper term: 'torture'.[check quote]"

¶And [timeline check (use 1 or the other that follow depending on whether Lyons's statement was before or after the DDoS)][State Representative Jim Lyons made this impassioned plea for Justina's life on the floor of the Massachusetts Statehouse:¶[Embed: Lyons on the floor, queued]|#FreeJustina trended on Twitter repeatedly thanks to thousands of people.]

¶Yet none of these high-profile actions brought Justina home. It had been over a year. The situation seemed dire.

¶Then, 3 days after[timeline check] Lou Pelletier published Justina's note--imploring "Hury!"--I knocked BCH off the Internet during its largest annual online fundraiser. News outlets knew about it beforehand from this video I posted weeks earlier, when I was still gathering the resources needed to knock BCH, a $2-billion entity with gigabits of bandwidth, off the World-Wide Web:

¶[Embed: #OpJustina Press Release Video]

¶Now, the media collectively loses its mind over hackers, and this was no different. The story went international. Donors noticed[link to article (I think it was CBS Boston) about the lady who threw a benefit for BCH that night and her guests couldn't donate].

¶I wasn't aware at the time, but according to the DOJ, the deluge of digital junk I sent didn't just knock BCH offline, but the rest of Harvard too. So, the university noticed in a profound way as well.

¶I made it known that I'd be back if BCH didn't let Justina go:

¶[Embed: Tweet or pic of tweet from @AnonMercurial or @AnonMercurial2 circa April 21st, 2014, saying to the effect: @BostonChildrens Where is your humility, humanity, and compassion? Here's ours: [Pic of green board] #OpJustina #FreeJustina; attrib.: FreeMartyG/Creative Commons (2019); caption: [use tweet text as caption]]

¶The next month Justina was suddenly transferred to a facility in her home state of Connecticut--a move that DCF previously insisted was impossible[link to a reputable article where DCF is quoted saying that, I think one is cited in my U.N. report]. The restrictions put in place at BCH's insistence that prevented Justina's family from talking with her about her treatment and care, as well as from filming her, were lifted. The armed guards who monitored their visits were gone too.

¶Finally, Justina could speak for herself.

¶Wasting no time, one of the Pelletier sisters recorded this cell-phone video of Justina in her wheelchair, pleading with Governor Patrick and Judge Johnston to let her go home with her family:

¶[Embed: Justina's plea]

¶It went viral. And it demolished the wall of patient confidentiality that BCH spokesperson Rob Graham used for a long time to dodge questions about Justina's condition. The video demonstrated the stark effect that BCH's psychological treatment plan and the deprivation of Justina's mito therapies was having on her physical health.

¶Judge Johnston reversed his ruling days later. Neither he nor BCH admitted any fault.

¶But Justina could go home. After more than a year without her mito treatments though, she couldn't walk. So Lou carried her. She remains crippled today.

¶[Embed: Pic of Lou carrying Justina into their house; attrib. as approp.; caption: Justina Pelletier was unable to walk when Judge Johnston reversed his ruling, so her father Lou Pelletier carried her into their home.]

¶Justina then gave her first in-person interview to Beau Berman, confirming her experiences under the BCH treatment plan:

¶[Embed: Justina with Beau, queued]

¶Berman won back[link to 2013 award vid]-to-back[link to 2014 award vid] Edward R. Murrow awards for his continuing coverage of Justina's saga, and it was the most-viewed story in the history of Fox Connecticut's website[for fact check, this was mentioned by Beau in one of his emails to the CT Gov's office that appeared in a later article with results from his CT FOIAs].

¶Justina spoke in Washington, D.C., and she received a standing ovation. "Justina's Law" was introduced in the House of Representatives and 32 Congersspeople cosponsored it, including then-Representative Mike Pompep (who is now the secretary of state). The goal was to ban entities like BCH from using federal funds to conduct medical experiments and research on wards of the state without their consent when they don't stand to benefit directly from the results. Justina's Law, however, died in committee, and what happened to Justina and her family continues happening to others at BCH and elsewhere.

¶Meanwhile, the Boston FBI and the local U.S. attorney's office got involved, under the leadership of Carmen Ortiz, the controversial top federal prosecutor in Massachusetts.

¶[Embed: Pic of Ortiz; attrib. as approp.; caption: After mentoring under a Harvard Law School professor, Carmen M. Ortiz (pictured) was appointed as U.S. attorney for Massachusetts during the Obama administration and she remained in office there after 61,000 people signed an online petition to fire her.]

¶But the feds weren't investigating Harvard's flagship children's hospital for civil rights violations against Justina and her family, nor for healthcare fraud for billing the federal Medicaid program hundreds of thousands of dollars to treat a ward of the state for a condition that at some point its practitioners likely realized she didn't have.

¶Ortiz, it turns out, mentored under Harvard Law Professor Philip[check spell. It appears with 1 "l" and 2, but 1 appears more common in case law] Heymann. Later, then-Senator Ted Kennedy (of the Harvard Kennedy School clan) recommended her to [his fellow][fact check] Harvard [Law] grad Barrack Obama for the role of U.S. attorney on Harvard's home turf in Massachusetts. Of course, Kennedy was no apparent stranger himself to receiving special treatment from law enforcement and it seems he expected no trouble from Ortiz. The Harvard Kennedy School, moreover, was one of the first places Ortiz showed up with her hand out years later when she left office at the end of the Obama administration.

¶Harvard rejected Ortiz though, and she resorted to her safety school, Boston College, after the U.S. Court of Appeals humiliated her for interfering in local politics. For years, she charged people she seemed not to like for misdeeds that the high court and others found to be non-crimes.

¶Further, Ortiz accused local political figures of nepotism while Steve Heymann, the son of her Harvard mentor, was her division chief for cybercrime prosecutions--an arrangement that resulted in the younger Heymann using--and

many say abusing--his power to bully child prodigy and trailblazing Internet innovator/entrepreneur Aaron Swartz to suicide under the threat of dubious federal charges[link to blog by expert witness] and possible sentencing by a perhaps more dubious federal judge.
¶After Swartz hanged himself, Ortiz repeatedly told the public that she and her office had no idea they were having such an effect on him, and if only they'd known, she claimed they'd have behaved differently. Emails reveal, however, that Swartz's lawyers explicitly told Heymann that he was making Swartz suicidal and Heymann responded by piling on, "Fine, we'll lock him up."
¶Swartz was 26 years old[check age]. His alleged non-violent crime was meant to benefit the public without him pocketing anything for himself.

¶[Embed: Pic of Swartz; attrib.: Creative Commons (201[#]); caption: Aaron Swartz before Carmen Ortiz's office knowingly drove him to suicide]

¶Some 61,000 people demanded that Obama fire Ortiz[link to petition] in the wake of Swartz's death. Obama, however, refused to fire his fellow Harvard affiliate. Ortiz, in turn, refused to fire the son of her Harvard mentor. Under obvious pressure though, she did appoint a new cybercrime division chief.
¶Thus, it seems the feds in Boston would never raid a building full of their fellow Branch Harvidians[spelling intentional], even if a child's life <i>actually</i> depended on it. After all: Thou shalt not embarrass Harvard.
¶And thou shalt certainly not cyber-depants Harvard on the altar of the world stage during its ritualistic human sacrifice of a young girl like Justina as as offering to its own supernatural ego.

¶[Embed: If possible, meme-style photo illustrating the depantsing using Harvard imagery for the altar and the guy doing the sacrifice, with my face and Justina's superimposed approp. and the Harvard guy looking embarrassed; attrib.: FreeMartyG/Creative Commons (2019); caption: Thou shalt not depants Harvard.]

¶So, I guess it makes sense that the feds weren't getting involved to seek justice for Justina, but rather to ensure that no one would again do what's necessary to save a child like her at the expense of Harvard's reputation. Further, Ortiz and her new cybercrime chief, Harvard [Law] grad Adam Bookbinder, would have inside help from the federal bench.
¶In September 2014, Bookbinder sought out U.S. Magistrate Judge Marianne "Mimi" Bowler--who is a former Harvard Medical School research assistant, as well as a [former trustee|trustee|trustee emerita] of Harvard-partnered New England Baptist Hospital, a member of the Visiting Committee on Neuroscience at Harvard's largest teaching hospital (Massachusetts General), a former director of The Boston Foundation (TBF), which donates millions of dollars to Harvard and its hospitals, including at least $[# from final suppression motion] to BCH that year (the final year Justina was under its care), and the wife of Dr. Marc Pfeffer (who is, as Bowler seemingly reminds everybody, the Dzau Professor of Cardiology[check title] at Harvard Medical School and a senior cardiologist at Harvard-affiliated Brigham and Woman's Hospital (BWH), where his department works closely with its counterpart at BCH[link to page on that], which in turn apparently stopped Justina's heart medicine).
¶Maybe all of these connections explain how Bowler granted a search warrant for my home on September 29th, 2014, when another magistrate judge was primarily responsible for issuing such warrants that month and when the very first page of the affidavit sworn under penalty of perjury in support of that warrant by FBI Special Agent Michael Tunick was dated the following day, September 30th, 2014:

¶Regardless, I knew the fix was in shortly after the Boston FBI raided my home. On that day, Special Agent [first name] Hughes promised he'd put me in touch with people who could investigate the torture that befell Justina and that was revealed by our own Government Accountability Office (GAO) happening to other kids in this sworn Congressional testimony:

¶[Embed: Kutz litany and add the part where McKeon is asking why nobody is in jail for murder afterwards]

¶The only subsequent efforts I saw Agent Hughes, Agent Tunick, and the notorious Boston FBI take though, were to terrorize my wife Dana and me. It's hard for me to imagine how any law-enforcement officer confronted by Justina's case or the video above could choose to protect the torturers of those kids and still deserve to walk around America as a free person in a position of authority. But that's what Ortiz, Bookbinder, Tunick, Hughes, and their colleagues were doing and there was no one to rein them in.

¶So, at a time when I wasn't charged with any crime and when I wasn't subject to any travel restrictions, Dana and I took a 23-foot boat to Cuba and sought political asylum away from Harvard's allies in the federal government. Ortiz, Bookbinder, Bowler, and their Harvard crew had chased me to the ends of the Earth, as had happened to Cox on the opposite corner of the continent[link to part 5].

¶Cuba then denied my asylum claim after its military spent 4 weeks moving us from safe house to safe house on the island. On the day [before][timeline check] Obama landed in Havana to normalize air travel between the 2 nations, I was assured that Raul Castro himself had given the order to put Dana and me back on my boat and that the boat had been properly maintained in good working order at the marina where we'd come ashore.

¶The boat, however, broke down not even 50 miles into the trip back to Florida. I put out a distress call, and as shown in the video below, we were rescued by Disney Cruises:

¶[Embed: Video of the rescue]

¶I was formally arrested when we returned to port in Miami.

¶Bowler later needed no queue to refer to BCH simply and spontaneously as "Children's,[for fact check, see SW affidavit and detention hearing transcript to see that no one else called it "Children's" followed by Bowler's detention order where she starts doing so]" the affectionate name reflexively used by many of BCH's allies. It was as if Harvard's rules overpowered the laws passed by Congress, like 28 U.S.C. §455(a)[link to statute text], which mandates, "Any justice, judge, or magistrate [judge] of the United States shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned."

¶Thus, by failing to take herself off my case, Bowler basically proved what I told the Cuban government about the unlawful retaliation and political show trial I faced in my native country. The only thing I was fleeing was injustice. But the ironic vindication of my asylum claim was of little comfort on the way back to my cell when Bowler labeled me a "flight risk" and denied me bail.

- Page 6-7 -

¶In comparison, unlike me, [insert name of Wasserman-Schultz aide] had a passport and he was arrested trying to use it to board an international flight at the airport. Yet, he went home on bail with a GPS-monitoring bracelet.

¶And Bowler herself sent Robel Phillipos, a suspected accomplice of Boston-Marathon bomber Dzhokhar Tsarnaev, home on a GPS bracelet. <i>The New American</i> picked up on this disparity in an article about Bowler and my case in its December 2017 print edition, entitled, "Save a Girl's Life, Get Treated Worse Than a Terrorist[link to article at FMG]."

¶[Embed: Pic of Bowler, attrib. as approp.; caption: U.S. Magistrate Judge Marianne "Mimi" Bowler granted bail to a suspected accomplice in the Boston Marathon bombing but not to me when I was accused of helping Justina Pelletier.]

¶"This whole case smells of a personal vendetta," <i>The New American</i> noted. "Bowler's allegiance appears divided between justice and Harvard, with justice getting the short end of the stick."

¶Hiding the indecency of what the Harvard feds were doing while also shielding BCH from the implications of its behavior, they avoided using Justina's name. To them, she was merely "Patient A," a faceless subject of what they euphemistically called a "custody dispute," and not a child whose rights as an American citizen and a human being were violated. The Harvard feds insisted that BCH was the real victim, not Justina in her wheelchair, recounting the "torture" she endured and demanding that her tormentors "get what they deserve."

¶On the political right, however, Justina's case was emblematic of the dangers of government interference with family rights and of government-run nanny-care. Meanwhile, there were those on the left--especially at <i>The Huffington Post</i>, <i>Newsweek</i>, and <i>Rolling Stone</i>--who remembered what Ortiz did to Swartz and to other good people.

¶And I wouldn't go quietly. Too much was at stake for too many kids like Justina and too many freedom fighters like Swartz. As a survivor of child abuse myself, I was compelled to fight against any effort to relabel victimizers as victims.

¶Yet, as a prisoner, there was little I could do. So, I followed the only plan that came to mind. With the help of fellow inmates, many of whom survived institutionalized child abuse as wards of the state, I began discreetly piling on empty carbs and gaining weight. I was up about 30 pounds (13.63kg) in 7 months.

¶With coverage from <i>The Huffington Post</i>[link to hunger strike announ.] and an agreement with <i>Rolling Stone</i> that would put the back story in front of over a million people, I launched my hunger strike on October 3rd, 2016--just over a month before the presidential election. My 2 demands were: a pledge from the candidates to order federal law enforcement to go after the individuals and institutions that abuse kids like Justina, and a pledge from Ortiz to stop her well-established pattern of political prosecutions against people like Swartz and me.

¶About 3 weeks in (and just before the election), Associated Press (AP) reporter Denise Lavoy[check name] started responding to our inquiries and we set up an interview. It should've been a seminal moment.

¶Back then, I trusted AP more than the federal government. And it's hard to imagine a more vulnerable source than I was as an imprisoned activist weeks into a hunger strike speaking to AP over a phone line that was monitored by my prosecutors.

¶My AP interview seemed to go well, especially since, as embedded below, it ended with Lavoy assuring me that she intended to include the details required

to understand what happened to Justina, Swartz, and me in her article (which I knew newspapers all over the world would reprint from AP's <u>wire service</u>[link to an article about what a wire service is/does]):

¶[Embed: Audio of my 2016 AP interview with Denise Lavoy, not queued]

¶Yet the article AP put out functioned like a DOJ press release. Despite Lavoy's spoken assurances, there were no mentions of Justina's pain and suffering, nor of the suffering of other institutionalized children. There wasn't any mention of Harvard either, and none of the essential information that I provided was present to explain the nature of my hunger strike.
¶But AP did include several misleading tidbits that very likely came from Ortiz's office. Thus, AP's real goal, it seemed, was to discredit me, and AP apparently didn't think twice about deceiving me on the record to do so.
¶I later came to accept that AP and its counterpart Reuters function largely as public-relations firms for the DOJ. Reporters like Lavoy, as well as her colleague Alana Durkin Richer[check spelling] and Reuters storyteller Nate Raymond (who both covered later developments in my case with the same apparent bias), rely on leaks and <u>illegitimate tip-offs from federal prosecutors</u>[link to Popat on Raymond]. Such people are unlikely to bite the hands that feed them in order to shed light on abused children and imprisoned human-rights activists, lest their sources at the DOJ blacklist them.
¶So, sources outside the DOJ are well-advised to listen to Lavoy in my interview above and contrast her words therein to what AP actually published. If AP broke its word to me, and if AP and Reuters whitewash over tortured children for the DOJ, can they really be trusted as objective gatherers and reporters of the news?

¶[Embed: 3-by-1 photo array (or however many avail.); attrib. as approp.; caption: Journalists or unofficial press agents for the DOJ? Denise Lavoy of the Associated Press (AP) (left), Alana Durkin Richer of AP (center), and Nate Raymond of Reuters (right)]

¶I went on though, hoping that <i>Rolling Stone</i> would publish during my hunger strike and help clear the air. But <i>Rolling Stone</i>'s article was delayed over and over again due to circumstances beyond anyone's control. The media largely hadn't expected Trump to win and there was heavy competition in the news cycle afterward.
¶I ended my strike at the 100-day mark on January 10th, 2017, after Ortiz announced her resignation. I lost 50 pounds (22.7kg). <i>Rolling Stone</i> published "<u>The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison</u>[link to RS again]" 6 months later.
¶Now, there were some factual issues in <i>Rolling Stone</i>'s coverage too. For instance, Dana and I weren't ready to discuss our time in Cuba. So, <i>Rolling Stone</i> was in the dark on that topic and kind of glanced over it, making it sound like the boat broke down on the way there, instead of after we'd been missing for 4 weeks. The soul of the story, however, is intact. Unlike Levoy, Richer, and Raymond at AP and Reuters, and some others elsewhere, David Kushner put the issues in my case on display front row center at <i>Rolling Stone</i> and vindicated that my DDoS endangered no one.
¶In the months before <i>Rolling Stone</i> published though, my father died. I moved for bail on a temporary emergency basis to attend his funeral, but Bowler said no.
¶She never disclosed anything about her connections to my case from her personal life outside the courtroom, as seemed to be required by the <u>Code of Conduct for United States Judges</u>[link to the code, pref a link showing Canon 3(D), "Remittal of Disqualification," talking about disclosure]. But we knew a

lot by then without Bowler coming clean. This led the <i>DailyWire</i> to publish "[insert headline of Bandler's first article][link to Bandler's 1st]."

¶[Embed: Pic of DailyWire's first headline; attrib. as approp.; caption: The DailyWire published "[insert headline]" on [insert date].]

¶When <i>Rolling Stone</i> asked me about missing the last year of my dad's life, his death, and his funeral, I thought about how happy he would've been to hold my first child the way he held me, and how my wife and I could've given him that experience if not for Bowler, Ortiz, and their Harvard team. I told <i>Rolling Stone</i> that the price I paid for saving Justina was heavier than I expected, but that I don't regret it.

¶My dad survived institutionalized child abuse in the years following the Great Depression at the Hebrew National Orphan Home in New York. He refused to talk about it, as many survivors do. But one of his fellow survivors named [insert name] wrote a memoir called <i>[Insert full title with tagline of Deja Views (the book about the Hebrew National Orphan Home in Yonkers I believe)][link to the book on Amazon or similar]</i>. I was shocked when I read it.

¶[Embed: Pic of my dad and I (try to use a better one than Rolling Stone did); attrib. as approp.; caption: Survivor and son: Jay G. Gottesfeld ([left| right]) and Martin S. Gottesfeld ([left|right]) during Martin's childhood in Andover, Massachusetts]

¶And I'd like to think that my dad understood my absence in his final days.
¶When he grew up in Brooklyn and was put in "the home," when he pulled himself up by his bootstraps, earned a scholarship to Brooklyn College, became a Bridge champion with my mom Gloria, who majored in math like he did (but at a time when women just didn't major in math), and when they each took on a heavy course load and graduated a year early with their bachelor's degrees to cut expenses still further, future--U.S.-District-Court-Judge Nathaniel Matheson Gorton was born an heir to the Gorton's seafood brand then followed his older brother to Dartmouth as a legacy admission before following him to Columbia Law School too.
¶When Nathaniel Gorton became an unremarkable lawyer whose name scarcely appears in federal case law and when Mimi Bowler wined, dined, and married her way into the Harvard crowd without attending Harvard herself, my dad became an American rocket scientist on his own merits during the Cold War. While future-Senator Slade Gorton Jr., Nathaniel's older brother, parlayed his privileged birth, my dad worked on the reactor design for America's first nuclear attack submarine, then on various parts of the Apollo Project, including the Lunar Excursion Module (LEM).
¶Later, after Senator Slade Gorton Jr. campaigned with George H.W. Bush in 1988, and after Bush nominated Nathaniel to the federal bench for life even though it seems he never litigated a single federal criminal case, I made my own way into Phillips Exeter Academy a year before Mark[sp?] Zuckerberg. Like Aaron Swartz, I made my own professional contacts too. I sold my own computer programs at the ripe old age of 12.
¶The help I received from my father started when I was 3, when he held me as he typed FORTRAN code and had me hit the Enter key for him at the end of each line; when he taught me about algorithms and subroutines. My inheritance was of a different sort than Nathaniel Gorton's. It's more like that of Aaron Swartz, who became a Harvard research fellow as a college dropout. (Yes, Swartz was a victim of what some might call Harvard cannibalism.)
¶Further, while my dad was getting ready for America's first manned moon mission in December 1968, more than 40 years before Nathaniel Gorton became the federal trial judge for both Swartz and me (magistrates like Bowler can't

try federal felony cases without the consent of the defendant), Gorton's father Slade Sr. had his own blast-off when he tried using 5-6 pounds of dynamite to blow up a 78-plus-ton monolithic block of reinforced concrete inside a tar-roofed wooden building he'd just purchased for his family's seafood business.

¶Despite the main wall that was some 6 feet or so away from the 9-by-9-by-10-foot rock solid monstrosity, somehow Slade Sr. expected the blast would only cause minor damage to the surrounding structure.

¶The explosion totaled the building instead though, as many folks who've never run a corporate enterprise, but who have watched <i>Loony Toons</i>, might've expected.

¶[Embed: Pic of Daffy Duck with his beak blown to the back of his head after an explosion backfires on him, superimpose Slade Gorton Sr.'s head/face over Daffy's, but leave the beak on the back of Slade Sr.'s head/face; attrib.: FreeMartyG/Creative Commons (2019); caption: "Dwats!"]

¶When the dust settled, the Pheonix Insurance Company had the gall to deny Slade Sr.'s claim. Records reveal something may have been said about his policy not covering him "blowing up his own building."

¶For his part, Slade Sr. seemed as undeterred by common sense, mockery, and potential insurance fraud charges as he'd been before the blast. So, he and his family seafood business filed a federal lawsuit about 20 years before Nathaniel became a federal judge in the same district of Massachusetts.

¶Yet, it was me who Judge Gorton later accused of hubris and sentenced to 10 years for daring to humble Harvard so I could save Justina. And Judge Gorton seemed like a chip off the old block at that hearing when it became apparent he could hardly define the word hubris, even with the help of one of his cheat-sheets. Though, it isn't too much of a surprise that Nathaniel Gorton would try (and also screw up) such a pedantic display of legal hocus-pocus, pretentious moral posturing, and academic elitism, a[accent] la the snobbish Harvard antagonist in the famous bar scene from <i>Good Will Hunting</i>, nor that he would place the reputation and power of the Harvard-centric aristocracy that coddles him over the life and human rights of a middle-class learning-disabled child like Justina.

¶[Embed: Pic from Good Will Hunting of Will (Matt Damon), saying, "How do you like dem apples?" and holding Skylar's phone number up to the window, superimpose Judge Gorton's head/face over the Harvard antagonist, Marty's head/face over Will's, a pic of Justina Pelletier in her wheelchair over the paper Will is holding up, and add a meme-style dialogue bubble coming from Marty, saying, "I saved her life. How do you like dem apples?"; attrib.: FreeMartyG/Creative Commons (2019); caption: "I saved her life. How do you like dem apples Judge Gorton?"]

¶You see, it turns out that the cardiology department at Harvard-affiliated Brigham and Woman's Hospital (BWH), where Bowler's husband works, announced that it would pilot 4 "Eating Heart Healthy" studies to benefit the Gorton family seafood business in September 2014[link to SNP annual report at FMG]. That was the same month Bowler issued the search warrant for my home--a day ahead of the date on the front page of its application.

¶Before we discovered these clinical trials, we ... asked Judge Gorton for a hearing in order to call Bowler's husband to the stand and question him about his research and what Bowler knew about that research as of September 2014, when she issued the warrant. Rather than disclose his own connection to Harvard and to Bowler's husband though, Gorton simply denied us the ... suppression hearing.

¶We've since found other conflicts of interest too. For example, BCH's donor list for the year I helped save Justina includes the Gorton family business, Slade Gorton & Co., Inc., and according to Judge Gorton's required annual financial disclosures, he's a "Stockholder, Clerk/Secretary, and Director" of that family business. That list of donors, moreover, is located on the very same website      I knocked offline[link to BCH's 2014 donor list].
¶The conflicts go further, and include an accountant who was on my jury and who worked at one of BCH's partners, where Judge Gorton listed himself as a "Member of the Corporation."

¶Nowadays though, Judge Gorton seems to consider himself above the laws that mandate his disqualification from my case. But 20 years before Gorton became a federal judge, his family lost its lawsuit against the Pheonix Insurance Company, leaving behind an official record[link to Gorton, et al. v. The Pheonix Insurance Company, 339 F.Supp. 241 (D. Mass. 1972)] almost as spectacular as the explosion itself:

   ¶[Block quote:]¶I find that [Slade Gorton Sr.] had no intention of "blowing up his own building"...
   ¶My difficulty with the plaintiffs' arguments stems from the special character of the act, namely the use of dynamite in a single indoor explosion, to demolish a massive block of concrete containing metal particles.
   ¶--U.S. District Court Judge Levin H. Campbell, finding for the defendant in <u>Gorton, et al. v. The Pheonix Insurance Company, 339 F.Supp. 241 (D. Mass. 1972)[no link, just underline if possible, if not, no worries]</u>

¶The Gorton family business didn't bother appealing, it seems, but one may wonder how the case would've turned out if Nathaniel had already been on the bench. That modicum of collective discretion aside too, Judge Nathaniel Gorton might be too much of a buffoon to understand the hypocrisy of a legacy Ivy-Leaguer like himself accusing Harvard's critics of arrogance. I know I'm not the only one to notice the bewildered soul-dead look in the eyes of Judge Gorton's clerks when it becomes starkly apparent     their judicial Emperor Palpatine is wearing no clothes, so to speak.
¶After spending nearly 3 decades as a federal judge, Gorton also shamelessly professes his ignorance of well-known Supreme Court decisions like Houston v. Lack[link to text of Houston v. Lack, 487 U.S. 266 (1988)] when his proceedings drift away from the prepared scripts he can be seen reciting like <i>Anchorman</i> character Ron Burgundy clinging to a TelePrompTer®.

¶[Embed: Pic of Burgundy at a news desk with his polka-dot boxers showing under the desk (the image from the DVD box I think), superimpose Nathaniel Gorton's head/face over Burgundy's and pref. a black robe from the waist up; attrib.: FreeMartyG/Creative Commons (2019); caption: "[Expletive deleted]  you, truth and justice!"]

¶And for reasons detailed below, it seems the Pelletiers, like most parents, had about as accurate an impression of what happens inside Boston Children's Hospital as the Pheonix Insurance Company had of what Slade Gorton Sr. was about to do in the fragile building it had just underwritten for him. Those who've been followed my writing or     followed Justina's case closely, however, may have already encountered this information     and might want to click here to read Abandon All Hope, Ye Who Enter Here--Part 7 of the CMU Series[link to part 7].
¶For the unfamiliar and for those reading about my case with an open mind after the DOJ and its allies at AP and Reuters misled them, let me say first

that nothing I did endangered anybody. Justina was the only hurt child in my case and she suffered at the hands of Boston Children's Hospital and its overseers at Harvard.

¶This immutable truth notwithstanding, Harvard's feds seemed desperate to paint me as the bad guy. That was likely due to the power of Justina's voice, coming from the wheelchair where they helped put her by ignoring her federal civil rights. They relied on their control of reporters like Levoy, Richer, and Raymond and the fact that most people aren't technology experts to concoct an inaccurate but sensationalized media narrative that buried Justina's pain and ongoing immobility and misrepresented my efforts to save her.

¶It's a fact that my DDoS affected BCH's external Internet communications without in any way targeting its medical devices and equipment. It's a fact that the DOJ tried and failed to convince my jury that anything I did even <i>potentially</i> affected the care of a single patient[link to DW post-jury-finding article]. And it's a fact that my jurors wrote to Judge Gorton saying they were deadlocked.

¶Indeed, they only returned a verdict after Judge Gorton repeated his dubious instruction to them that my intent to save Justina's life was legally irrelevant. I guess the industry research Harvard-affiliated BWH conducted for Gorton's family business in the department where Bowler's husband works was more important to Gorton than Justina's life.

¶Prosecution witness after prosecution witness, moreover, including BCH's own doctors, confirmed under oath that no patients were affected.

¶Yet, federal prosecutors David J. D'Addio and Seth B. Kosto made it seem like I cyberattacked pacemakers and NICUs in the drive-by media. Long after they failed to convince my jury that a single patient was potentially affected, they continued to act like thousands of children nearly died. But here's something AP and Reuters didn't cover and my jury didn't hear: Kosto's wife Stacey Eisenberg[sp?] did her residency at BCH[link to supporting doc.]. For his part, D'Addio donates to [insert name], a BCH-aligned legal group, and his parents [insert father's name] and Regina D'Addio are doctors. Perhaps these connections help explain the prosecutorial misconduct and false filings D'Addio and Kosto made in my case[link to DW article on torture].

¶[Embed: 2-by-1 photos; attrib. as approp.; caption: Federal prosecutors Seth B. Kosto (left) seems like BCH's brother-in-law and David D'Addio (right) seems like an ardent suitor.]

¶And if I seem remarkably sure that my DDoS didn't affect any patients, that's because I did business continuity[link to a page on what business continuity planning is/entails] and disaster recovery[link to a page about what disaster recovery planning is/entails] planning at the company that makes the software used by one of the 5 largest transplant tissue banks in the United States to track human organs for transplantation. Quite frankly, I planned for much scarier contingencies in the healthcare sector than a brief Internet outage. And I find particularly distasteful the dishonest way D'Addio and Kosto preyed on people's fears to distract the public from the impunity with which Harvard's feds let Harvard's doctors torture Justina.

¶In reality though, here's a headline you never see: "Internet Outage Kills 12." Simply put, since Internet outages are unavoidable, hospitals and medical devices are designed to function without the Internet. Otherwise major catostrophes would happen on a daily basis in healthcare settings. BCH had Internet outages before my DDoS and it's almost certainly had at least 1 since as well. Indeed, no hospital incapable of handling an Internet outage would achieve acredidation in the first place.

¶Would you bring a loved one to any place where an Internet outage might

endanger them?

¶The only life at stake in my case was Justina's. My trial only further proved this.

¶Now, it's also quite telling that the same reporters who misrepresented the supposed danger to other innocent children also chose to omit from their coverage of my case Justina's very real suffering and the very real danger <i>to her life</i>. How can such an explicit misrepresentation and such a simultaneous omission be honest? To me, anyway, it's clear that this combination was both intentional and anything but objective. AP's deception, caught on the audio recording of its own reporter misleading me, was the final nail in the coffin of the legitimacy of AP's coverage. Clearly AP knew what it was doing.

¶Further, if the DOJ is telling the truth and if Bowler and Gorton have nothing to hide, then why restrict my ability to publish in a "communications management unit?" Wasn't moving me here an outright admission of their guilt?

¶Yet, there's actually more to it.

¶⌊Embed: Pic of Epstein in a Harvard sweatshirt; attrib. as approp.; caption: Jeffrey Epstein isn't the only convicted pedophile to graduate from Harvard.⌋

¶The recent arrest of Jeffrey Epstein, you see, isn't the only apprehension of a Harvard-affiliated pedophile. It's just the earlier arrests were largely of pedophile pediatricians who graduated from Harvard Medical School and then practiced for decades at Harvard-affiliated Boston Children's Hospital.

¶Most parents, however, likely don't know about these pedophile pediatricians when they bring their kids to Boston Children's Hospital, nor that BCH was accused of discreetly shuffling one of them to UNC Medical Center, where he abused more kids. They're also likely unaware that BCH declined to comment as to whether or not it would notify parents after police caught another one of its pedophile pediatricians with a sizeable stash of sexually-explicit images of unidentified children in his bedroom.

¶History reflects though, that the world-famous former chief of ambulatory pediatrics at Boston Children's Hospital, Melvin Levine, voluntarily surrendered his medical license in 2009⌊check year⌋, when the North Carolina Board of Medicine⌊check exact name of board⌋ said it was prepared to prove he conducted unnecessary and improperly-documented genital exams on young boys dating back to his arrival from BCH in the 1980s. The Rhodes Scholar and Harvard Medical School ⌊honors⌋ graduate never practiced medicine again.

¶⌊Embed: Pic of Levine; attrib. as approp.; caption: Melvin Levine was a Rhodes Scholar, a Harvard Medical School graduate, and the former chief of ambulatory pediatrics at Boston Children's Hospital before he gave up his medical license amid a number of well-founded pedophilia allegations.⌋

¶But, publicly, Levine defiantly denied wrongdoing. Instead, he shot himself in the head⌊link to an article about his suicide⌋ the day ⌊after 40⌋⌊check timeline and number⌋ of his former Boston Children's Hospital patients sued him for groping, fondling, sexually battering, and performing oral sex on them ⌊link to suit⌋ when they were kids. At least 1 of the plaintiffs told a reporter⌊link to story by Globe where the architect/victim mentioned this⌋ that Levine may have fled to North Carolina to avoid complaints in Boston.

¶About 10 of Levine's former UNC Medical Center patients then filed suit against Boston Children's Hospital⌊link to article announcing the NC suit⌋. They claimed that Boston Children's Hospital shirked its legal responsibility to report Levine to the authorities. The suit claimed that instead Boston Children's Hospital engaged in a conspiracy to keep Levine's pedophilia quiet.

¶If Boston Children's Hospital took the appropriate actions when it employed Levine in the 1960s, 70s, and 80s, the plaintiffs said, then he never would've

been able to get his medical license in North Carolina and sexually abuse them.
¶Similar suits were of course   brought ⌊against|regarding⌋ the local Boston Archdiocese⌊fact check but note "regarding" and "against" are both possible⌋, followed by sustained press coverage. And doctors in Massachusetts, unlike religious figures, are required by state law⌊link to mandated reporter law⌋ to report suspected child abuse to the authorities.
¶Massachusetts Superior Court Judge Merita A. Hopkins, however, seemed to ⌊differentiate the Levine lawsuit from the Roman Catholic Church cases|disagree⌋⌊fact check that there were similar suits⌋. She dismissed the suit brought by the North Carolina survivors, thereby effectively sheltering Boston Children's Hospital from its failure to report Levine. The hospital never accepted responsibilty for Levine's move.

¶⌊Embed: Pic of Hopkins; attrib. as approp.; caption: Merita A. Hopkins had what some might consider a chequered past before she became a judge and tossed out a high-profile pedophilia lawsuit against Harvard-affiliated Boston Children's Hospital in 2011⌊check year⌋.⌋

¶The state's highest court later upheld Hopkins's dismissal, which is an appellate decision my team and I are investigating for potential conflicts of interest. Anyone with relevant information is encouraged to contact us⌊link to relevant page/info⌋.
¶In any event, however, it's likely worth noting that prior to becoming a judge, Hopkins was the Boston city attorney. Boston Children's Hospital, in turn, brings in hundreds of millions of dollars to the city and state via the federal funding it receives for research and Medicaid, as well as perceived prestige, which is fragile. And that's not to mention Harvard's clout in local legal circles.
¶Other shadows also hang over Hopkins's legal career. She was a member of the Boston FBI's now-infamous Organized Crime Task Force⌊check exact name⌋ in the 1980s, while it oversaw James "Whitey" Bulger⌊check sp.⌋ as one of its criminal informants. Later, she married James Ring, who was the agent-in-charge of that squad.
¶Thus, thanks to a former city attorney/member of the "old" Boston FBI, it seems that justice eluded the North Carolina survivors who sued Boston Children's Hospital, just as the "new" Boston FBI refused to help Justina. Even with the North Carolina suit squashed though, Harvard's public-relations personnel and its consorts in law enforcement and the press would barely have time to catch their breath, it seemed, before the other shoe dropped.
¶The year after Levine "took the coward's way out," as multiple uninvolved observers phrased it, police busted Boston Children's Hospital pediatric endocrinologist Richard Keller with between 60 and 100 DVDs of child pornography and 500 sexually-explicit "high-gloss" still photographs of unidentified children in his suburban home.

¶⌊Embed: Pic of Keller; attrib. as approp.; caption: Richard Keller was a pediatric endocrinologist at Boston Children's Hospital before he became a convicted level-3 sex offender for life⌊check level⌋.⌋

¶Keller's work history at BCH dates back to the 1980s, when he graduated from Harvard Medical School ⌊with honors⌋, and almost exactly to the time Levine left Boston Children's Hospital for UNC. Keller later admitted he harbored a sexual interest in adolescents that entire time.
¶The public never found out if Keller's stash, much of which was found in his bedroom, included images of his Boston Children's Hospital patients. Boston Children's Hospital declined to comment as to whether it would contact

the parents of Keller's patients who didn't have upcoming appointments. Boston Children's Hospital thus seems to have decided that some roads are best left untraveled.

¶Keller cried at his sentencing and called himself a hypocrite. He got 7.5 years--some 2.5 years less that I got in the same federal courthouse from Judge Gorton for saving Justina's life. And no one sent Keller to a CMU. ⌊He's scheduled to be⌉He was⌋ released on ⌊insert date from inmate tracker⌋.

¶Maybe <i>The New American</i>'s next headline will be, "Save a Girl's Life, Get Treated Worse Than a Pedophile Pediatrician."

¶And as shameless as Judge Gorton seems to be, I'd still like to think that some other events at Boston Children's Hospital would make even him blush.

¶Within months of Levine's suicide, for example, and around the time police raided Keller's home, Boston Children's Hospital attending psychiatrist Raymond Kam became convinced one of his adolescent patients "was influenced ⌊by⌋, spoke with, and being <i>physically</i> hurt by evil spirits" (<i>emphasis</i> added), according to documents filed by the Massachusetts Board of Registration In Medicine.

¶And Kam wasn't alone. Boston Children's Hospital senior attending psychiatrist Enrico Mezzacappa, Kam's former mentor, later joined him. Together, along with an as-yet-unnamed psychiatry trainee and a Boston Children's Hospital chaplain, they came up with a plan to "address" their patient's alleged spiritual issues.

¶Kam offered to become the girl's "spiritual mentor." He took her to his church, gave her a cross to wear in exchange for a different religious symbol she was wearing, and let her stay over at his home on a few occasions when her father kicked her out. Kam later failed to report her claims of abuse when she told him her mother knocked her down a flight of stairs and tried to asphyxiate her.

¶Authorities, however, eventually found out anyway. The statement of ⌊...⌋ allegations filed against Kam by the Massachusetts Board of Registration In Medicine is available here⌊link to doc. at FMG⌋ and the consent order signed by Mezzacappa  reprimanding his medical license is available here⌊link to doc. at FMG⌋.

¶The board's actions were not without apparent irony. Kam's privileges to practice medicine were suspended pending his own psychiatric evaluation. BCH fired him immediately.

¶But he's since regained his medical license. Currently, he's listed as a practicing psychiatrist at South Cove Community Health Center in Boston.

¶⌊Embed: 3-by-1 photo array, Kam, Mezzacappa, and a question mark; attrib. as approp.; caption: Former Boston Children's Hospital attending psychiatrist Raymond Kam (left), current Boston Children's Hospital senior attending psychiatrist Enrico Mezzacappa (center); and an as-yet-unnamed psychiatry fellow embarked on a spiritual treatment plan, resulting in the suspension of Kam's license pending his own psychiatric evaluation.⌋

¶But what Boston Children's Hospital didn't do was perhaps the most incredible aspect of this real-life cross between <i>One Flew Over the Cuckoo's Nest</i> and <i>The Exorcist</i>.

¶"The disciplinary action taken by the ⌊Board of Registration In Medicine⌋ against Dr. Mezzacappa does not affect his ability to practice at Boston Children's Hospital and he remains a member in good standing in the Department of Psychiatry," a Boston Children's Hospital spokesperson told the Boston Globe⌊link to archive.org of the story⌊(it's in the ML)⌋⌋about 4 months before ⌊timeline check⌋ the Boston Children's Hospital Psychiatry Department came up with perhaps an equally-dubious and somewhat-spiritual diagnosis for Justina.

¶But the Pelletiers likely never heard about Levine, Keller, Kam, and Mezzacappa, nor of Ioana Simona Bujoreanu, before they brought Justina to Boston Children's Hospital. Most of the media didn't report on them, and the little coverage was fleeting compared to the focus on the Roman Catholic Church scandal. Now, why was that? Aren't pedophile pediatricians just as scandalous as pedophile priests? It's estimated, after all, that Levine saw 5,000 young boys at Boston Children's Hospital before he moved to North Carolina and he was far more famous than any of the pedophile priests[link to NYT article mentioning all of Levine's prior accolades] in the Boston area.

¶Yet the <i>Boston Globe</i> latched onto one scandal but not the other. Well, word is that was because the <i>Globe</i> didn't care so much about the victims of these scandals as it did about weakening the political power of the Roman Catholic Church in Massachusetts, the most Catholic state in the union. That was, after all, the principal effect of the <i>Globe's Spotlight</i> coverage on the pedophile priests. And, in turn, that paved the way for Harvard to supplant the Catholic church as the most powerful political entity in the state. This change in local political power, many locals believe, was the <i>Globe's</i> real goal, and that of its backers.

¶Had Justina's parents known about any of this, they likely would've made different treatment choices. And my reporting helped inform others of these topics before the DOJ moved me to a CMU.

¶[Embed: Side-by-side pics of my headlines about Kam/Mezzacappa at HuffPost in April 2017 and my Marathon Monday 2018 Press Release statement about Levine and Keller at Info Wars; attrib. as approp.; caption: I published articles about the skeletons in Boston Children's Hospital's closet at HuffPost (left) and Info Wars (right) on back-to-back Marathon Mondays in 2017-2018 before the DOJ sent me to a CMU ahead of Marathon Monday 2019.]

¶Justina wasn't the first child either, it turns out, to go through this kind of trauma at Boston Children's Hospital. Cases like hers are common enough that BCH has a name for them. You see, in medicine, the procedure to remove the tonsils is called a tonsillectomy (pronounced like <i>tawn-sill-ekt-tah-mee</i>), the procedure to remove the appendix is called an appendectomy (pronounced like <i>app-penn-dekt-tah-mee</i>), and the surgery to remove the the larynx is called a laryngectomy (pronounced like <i>lair-ingh-ekt-tah-mee</i>). Boston Children's Hospital calls what it did to Justina a parentectomy (pronounced like parent<i>-ekt-tah-mee</i>).

¶Further, BCH's history of parentectomies dates back at least 20 years before Justina ever set foot inside the Harvard hospital. Pati Mele's case appears to be the oldest published. Her now-grown son was born with mito in the 1990s.

¶Just as happened to Justina, BCH immediately resisted the mito diagnosis in the Mele case and called social services to report Pati. Mele, however, had a trump card. It turned out she worked for the state social-services department as a case reviewer.

¶The man the state sent to knock on Mele's door knew her. Mele says he chose not to take her son. He thoroughly investigated the case instead, and dropped it.

¶"[Insert first part of Mele's long quote to TheBlaze about how MA DCF has 'graduated' to accusing moms of Munchausen and holding kids hostage, stripping them of a mito diagnosis, and treating them for something else]," Mele told TheBlaze[link to Blaze story with Mele and the Hilliards from end 2013] around the time Judge Johnston issued the gag order in the Pelletier case. "[insert 2nd part of quote, if applic.]."

¶Mele also posted to the FreeMartyG Facebook page[link to the FB page (not to any particular post)], saying that based on her personal and professional

experiences, "⌊insert:quote from Mele about how I saved Justina's life, posted just after Rolling Stone ran⌋."

¶⌊Embed: Pic or the post using its embed code by Mele; attrib.: FreeMartyG/ Creative Commons (2019); caption: "⌊quote from Mele⌋." --Former MA social-services case reviewer and mito Mom Pati Mele⌋

¶Indeed, Norwegian child Sindre Hylland died on Christmas Eve 2004⌊check year⌋ after Boston Children's Hospital overrode his parents to perform a costly surgical procedure they viewed as unnecessary and risky⌊link to Beth Pulsifer-Anderson's write-up at archive.org⌋.

¶BCH later went to the state again in 2007 to strip Kimberly Castro of custody of her daughter, magnet-school honors-student Chelsey Cruz. Castro objected to BCH's off-label use of the chemotherapy drugs CellCept® and Cytoxan® to treat Chelsey's case of lupis nephritis. The side-effects had proved devastating to Chelsey.

¶But BCH insisted it knew best.

¶Chelsey, always eloquent despite years of fighting her horrific illness, wrote the following letter in February, 2008⌊check month/year⌋, to the state family-court judge overseeing her case:

¶⌊Block quote:⌋Dear Your Honor,

¶It was of great importance that I speak to you. Since I was denied the request to speak to you in person, I'm taking the opportunity to address my concerns about this matter.

¶The first thing I would like to mention is that I believe that this time I have been separated from my family has taken an emotional toll on me. To be separated from the family I know and love, that have been my only true advocate and support was in no way beneficial to me because at a time like this is when I need my family the most. My parents have truly been there for me since the beginning and besides me, they know more about me than anyone else. They have been the only one that has been listening to how I feel about my illness and the effect of the treatments that I have been receiving. The conflict that I am having is that according to the law my parents are supposed to have the right to be making all decisions for my medical care.

¶Now if this is true and I have been telling my parents how I feel and they address my concerns to the doctors but the doctors ignore how the treatments are affecting my body and my life, as a result my parents are being penalized for voicing my concerns and respecting the fact that I do know how these treatments are affecting me and the everyday struggles I endure because of them. For example, since starting these treatments I'm very fatigue⌊d⌋ most of the time because of constant diarrhea. I used to have so much hair that I couldn't even put it into a ponytail and now it's so thin, that I can see my scalp. Not to mention the infections that I get often due to my suppressed immune system that is caused by the prednisone and cellcept. Even though I have expressed to the doctors my concerns as well as I needed to be hospitalized because of the complications to these treatments they continue to keep giving them to me. It's as though they are ignoring me. They continue to force these treatments on me and they don't care what happens to me. I feel that without my parents who are my advocates, I now have no one to advocate for me properly.

¶In a few months I will be 16 years old and I feel that I am able to make a sound decision about the medical treatment and physician that I would like to choose. I feel that I have carefully thought about and weighed the pros and cons of the treatment for lupus. I have already tried what the doctors

consider to be standard care for the past 5 years. I have experienced the horrifying side effects of them and realized that they have not helped me in any way in fact I feel I have gotten worse and now require dialysis. In light of this, I no longer want to use them. The reason why I can say this is because I know that I have tried a lot of their recommended medications and treatments and they keep changing which means the doctors are still looking to try to see what will work. I have read about Dr. Fuhrman and found he has successfully treated many lupus patients in fact he has treated a girl my age with lupus or renal disease. This gives me a lot of hope that he can help me get better so I can go on living a normal life. I would also like to be back with my mom and brothers without interference from any agency. I hope that you reading this letter gives you a better understanding of me and my situation and I'm optimistic that you will make the right decision.

¶Sincerely,
¶Chelsey Cruz

¶Chelsey died 31 days later. She and her mom never got to try the other treatments they wanted.
¶"Even if lupus would kill her, why take her away from me, and not let me spend the last days with my child?" a grieving Castro rhetorically asked <i>The Hartford Courant</i>. "I was the best mother to my child."
¶The law that Chelsey referenced in her letter and that Dershowitz later cited in his interview above about Justina includes a decades-old Massachusetts family-court decision in <i>Sevigny's Case⌊insert the remainder of the case citation from one of the Lifting the Veil articles or one of my letter non-motions to Gorton regarding the gov's motion in limine⌋</i>. The court held, "⌊insert exact language, I'll paraphrase: It is not for the courts to decide which side is right in a scientific dispute when each side is supported by reason and logic⌋."
¶It thus does not appear the Pelletiers, Castro, and other parents were wrong as a matter of law. Rather, it seems they were wrong in assuming the law matters when it comes to Harvard, absent extraordinary circumstances.

¶⌊Embed: Floating quote: "⌊Insert section of Sevigny's case from above⌋"
--Sevigny's case, ⌊rest of citation⌋⌋

¶And for every BCH parentectomy case that appears online, an unknown number of others were suppressed due to gag orders like the one Judge Johnston used to silence Linda and Lou Pelletier, until Lou bravely disobeyed it. Despite a motion to hold Lou in contempt of court for speaking out on Fox News, Judge Johnston never did so and in fact he disolved his gag order rather than enforce it--likely because it was manifestly unlawful in the first place and the proverbial jig was up due to the unprecedented intensity of the public scrutiny the Pelletiers were able to bring to bear.
¶No other family enjoyed such support in its struggles against Boston Children's Hospital. And yet no amount of publicity was enough to get Harvard's hospital to admit it was mistaken about Justina's mito. Rather BCH seemed to unleash an army of trolls to try to turn the tide of public opinion.
¶All kinds of accusations against the Pelletiers started popping up, mostly in the comments sections of online articles, leveled by unnamed accusers with poor spelling and grammar who claimed to possess inside information. In reality though, they appeared to be outsourced cyber disinformation agents with a poor grasp of English. They would use, for example, the wrong "its" or "it's," the wrong "there," "their," or "they're," etc.

¶[Embed: Pic of an exchange from the comments section of an article about Justina. There should be a perfect one in the VFs somewhere in which the troll claims inside information, gets combative with another commenter, and the other commentator points out the troll used the wrong "its"/"it's."; attrib. as approp.; caption: Inside information or disinformation?]

¶Very little of what these trolls said got any traction or had much staying power, except for one deceptively simple false propaganda argument. Since Justina entered BCH in a wheelchair, the trolls claimed, it's not accurate to blame BCH for Justina's continued reliance on a wheelchair today. The truth, however, is slightly more complicated. Most media outlets, further, have gotten these events wrong in their coverage.

¶It's important to note that Justina entered BCH with the flu. That was, in fact, the whole reason she was hospitalized. The flu, you see, is known to cause severe complications for mito patients. This reality also torpedoes another logical fallacy that was used to undermine the accuracy of the mito diagnosis from Tufts.

¶The trolls implied, without reference to Justina's influenza and the well-known complications it caused for her due to her mito, that the very fact Justina was having trouble eating and walking when she arrived at BCH showed that the Tuft's treatment was ineffective and the mito diagnosis was wrong. In reality though, Justina's symptoms were consistent with mito plus the flu.

¶Justina, moreover, should've gotten better when the flu subsided, rather than still be confined to a wheelchair today. It seems likely she would still be skating now  if her treatments for mito--which is often degenerative, progressive, and fatal, especially when it's left untreated--weren't stopped for 16 months.

¶Another fallacy stated that the supposed ineffectiveness of the Tufts mito therapies led Justina's family to bring her to BCH. The truth, however, is that Justina only went to BCH because her gastroenterologist Dr. Alejandro Flores moved his practice there the month before.

¶Flores had operated on Justina and treated her successfully for more than a year at Tufts up until that point and Justina was having trouble eating and keeping food down with the flu. Since mito is a metabolic condition, i.e. one that affects the body's ability to process food into chemical energy, Justina's difficulty       eating was causing a double-whammy by starving her already-troubled cellular metabolism. Here's a video about how mito affects the body:

¶[Embed: Video primer on mito]

¶The Pelletiers brought Justina to BCH hoping that Flores would get her eating again, and thereby mitigate her flu complications. BCH never allowed her to see Flores though.

¶Now, BCH never admitted that it experimented on Justina or used her for research. The 32 Congresspeople who co-sponsored <i>Justina's Law</i>[link to text of the bill], however, didn't seem fooled based on the language of the bill. Mark Korson, the leader of the Tufts mito team, didn't seem fooled either. The following text from one of his emails appeared on screen in this video:

¶[Embed: Text of Korson's email about the experimental nature of BCH's plan]

¶Now, given the information and misinformation above, why do you think Obama-DOJ--holdover Hugh J. Hurwitz ordered me placed in a CMU?

¶Click here to read <i>Abandon All Hope, Ye Who Enter  Here--Part 7 of the CMU Series</i>.[link to part 7]

Abandon All Hope, Ye Who Enter Here--Part 7 of the CMU Series

Tagline: America's Due-Process Dead-Zones

¶⌊Embed: Side-by-side pics of a Chinese "reeducation center" and either the old death house/current Terre Haute CMU or the entrance of USP Marion, try to leave no indication of which is which, like signs in the local languages; attrib. as approp.; caption: Which is the entrance to an American CMU and which is the entrance to a Chinese "reeducation center?" Read more to find out.⌋

Byline: By Martin Gottesfeld and Francis Schaeffer Cox

PLEASE NOTE: The authors have made this series available at FreeMartyG.com [link to part 7 at FMG] and FreeSchaeffer.com[link to part 7 at FS] under the latest Creative Commons by-attribution commercial-use-permitted share-alike no-derivatives license[link to the license text].

¶<i>This is part 7. Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series[link to part 1] or click here to read Harvard Is Not God, Discredited Skeptics Say--Part 6 of the CMU Series[link to part 6].</i>

¶"The difference between prisoners and hostages is that prisoners have lawyers and can file in court," says Cox, standing beside a sizeable pile of mail. ¶The letters in that pile came from lawyers and were marked as attorney-client privileged. But the DOJ opened, read, scanned, and digitally preserved them anyway. Cox says that in 1 instance, his outgoing legal mail was returned to him inadvertantly by the FBI in the envelope below rather than sent on to his attorney after the FBI illegitimately opened it in transit.

¶⌊Embed: Pic of envelope to Cox from the FBI; attrib.: FreeMartyG/Creative Commons (2019); caption: Cox, rather than his lawyer, received his own outgoing legal mail back from the FBI in this envelope, Cox says.⌋

¶"On the first day of my trial, ⌊federal prosecutor Joseph⌋ Bottini walked up to my attorney with a shoe box full of privileged letters I'd tried to send him in order to prepare my defense," Cox recounts. "Bottini handed it to my attorney and said, 'Here's the letters your client sent you.'"
¶On top of the DOJ having read the confidential strategic and factual insights contained in Cox's letters long ahead of his trial, Cox notes, "My lawyer needed those letters well before my trial started. They were useless to us that late in the case because he could no longer subpoena documents and witnesses."
¶And for every 1 piece of legal mail that reaches Cox, he says, an unknown number are blocked. He often learns after filing deadlines have passed that lawyers tried to contact him but were turned away by CMU administrators.
¶Adding to this, CMU staff refuse to mail some filings to court and other mail arrives at courthouses and law offices with obvious signs of tampering, like this envelope shard, which is all that remains of a thick package of legal mail Cox tried to send to his attorney earlier in 2019:

¶⌊Embed: Pic of razor-cut envelope shard marked "LEGAL MAIL" that was addressed to Michael Filipovic; attrib.: FreeSchaeffer/Creative Commons (2019); caption: This razor-cut shard from an envelope is all that remains of a piece of legal mail Cox tried to send to his attorney.⌋

¶Further, there's no way for CMU inmates to know ahead of time if what they write or say, either in their court filings or social correspondence, will



$ 003.270

MAR 06 2019
MAILED FROM ZIP CODE 22802

MEDIA MAIL

U.S. Department of Justice
Federal Bureau of Investigation
170 Marcel Drive
Winchester, VA 22602

MR. FRANCIS AUGUST SCHAFFER COX
***16179-006
FCI TERRE HAUTE
POST OFFICE BOX 33
TERRE HAUTE, IN 47808



Francis Schuster Cox
16179-006
PO Box 33
Terre Haute, IN 47808

⇔16179-006⇔
Michael Filipovic
Attorney AT LAW
1601 5TH AVE
Suite 700
Seattle, WA 98101
United States

LEGAL
MAIL

US OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300

ZIP 47802
02 1W
0004387589   $ 000.00

INMATE
IDENTIFICATION
CONFIRMED

MEDIA MAIL RAT

trigger a harsh response. That's because there's no written set of communications rules for the Justice Department's "communications management units."

¶Katherine Siereveld speaks on behalf of the Federal Bureau of Prisons legal department and she admitted on multiple occasions that the CMUs don't have written communications rules because, she claimed, then CMU inmates might innovate unforeseen ways of saying things the FBOP doesn't like without being punished.

¶Yet, every passing first-year law student likely knows that due process doesn't work that way. Rules must be established in definite form before they are enforced. It's impossible, after all, to challenge an indefinite rule in court when one doesn't know it exists or can't offer its text into evidence. To some degree though, that may be the point of how the CMUs can operate inside a department that otherwise claims it protects free speech.

¶Indeed, it seems that in order to maintain appearances, the FCI Terre Haute CMU handbook falsely insists that CMU inmates have the right to be informed of all the rules in the unit:

¶[Embed: Pic of 2 pages of the CMU handbook, the cover page and page 12, i.e. "INMATE RIGHTS AND RESPONSIBILITIES §541.12," with a red box around inmate right #2; attrib.: U.S. Justice Department (2019); caption: CMU inmates have the right to know all the rules in the unit, according to official documents.]

¶In reality, however, there are many unwritten, inconsistently-enforced rules in the CMU. One such rule, for example, prohibits CMU inmates from using the names of other inmates in their social correspondence. Another prohibits them from filing their taxes. Still another forbids them from identifying themselves as journalists for particular publications. And new rules are regularly conjured up and then enforced after the fact.

¶As confusing and arbitrary as this is for the inmates in the CMUs though, outsiders find themselves on perhaps shakier ground trying to communicate with their loved ones inside since there's no written set of rules for their inbound communications either. Further, they are almost inevitably less familiar than the inmates with the obstacles they'll likely face.

¶For undisclosed reasons, for instance, Siereveld's crew blocked all communications from the head of Cox's legal-defense fund for a full calendar year. The fact that this same person also carried Cox's limited power of attorney made no apparent difference to Siereveld.

¶"They wouldn't give her a reason [why they blocked her] because then she could've more easily challenged it in court," Cox says.

¶The CMU inmates resoundingly agree that Siereveld is the main force behind this lack of due process in the CMUs. They recount her blocking their access to loved ones, attorneys, courts, notaries, the press, and the DOJ's own Office of the Inspector General (OIG).

¶Yet rather than architect the CMUs as due-process dead-zones, Siereveld seems to have merely implimented the decades-old thought-reform program that controversial psychologist Edward Schein presented to the FBOP in 1961 under the title <i>Man Against Man</i>. It's also known in some circles as "the asklepieion program" (pronounced like <i>ask-klep-ee-onn</i>). It's a 24-point plan.

¶Number 18, taken [fact-check:][directly] from Schein's list, consists of "Placing individuals into new ambiguous situations for which the standards are kept deliberately unclear and then putting pressure on them to conform to what is desired in order to win favor and reprieve from the pressure." Thus, the lack of due process in the CMUs appears to be an intentional technique.

¶Number 11 is the "Systemic withholding of mail."
¶Here is the full list:

¶⌊Embed: Pic or block quote of the full 24 points of asklepieion⌋

¶International human-rights accords prohibit such techniques. The United
States, further, has ratified some of those human-rights treaties, including
⌊fact check:⌋The Geneva Convention and The Convention Against Torture.
¶To Siereveld, however, the ends seem to justify the means, even if they
amount to breaking international law⌊skip this next § if Siereveld turns out
to be a member of the relevant bar association:⌋ and commiting fraud upon
domestic courts.
¶You see, even though Siereveld graduated from law school and may have once
been licensed to practice in Kentucky, currently she isn't a member of the bar
associations in Indiana and Illinois, i.e. the 2 locations of the DOJ's CMUs
⌊fact check bar membership⌋. This arrangement may help the FBOP dodge some
degree of responsibility for Siereveld's actions and inactions while it also
ensures she isn't personally subject to the same ethical requirements as
licensed lawyers. A licensed attorney, for example, is expected to understand
the fundamental requirements of due process, and would, therefore, be hard-
pressed to claim qualified immunity⌊link to primer on qual. imm., Reason mag.
had a good one recently, entitled, "Qualified Immunity Is an Unqualified
Disaster," or similar⌋ for certain actions.
¶Siereveld's arrangement as a non-attorney spokesperson/advisor for the FBOP
legal department, however, also seems to prohibit her from presenting herself
as a practicing lawyer. Yet, she does so anyway, as shown in this letter that
Siereveld sent to a state court in Vigo County, Indiana, looking to quash a
subpoena in a case filed by CMU inmate Robert Miller:

¶⌊Embed: Letter from Siereveld to Vigo County Circuit Court regarding a
subpoena; attrib. as approp.; caption: Not licensed: despite Katherine
Siereveld's self-representation in this letter as a "Sr. Attorney," the
Indiana state bar association confirmed that FBOP employee Katherine Siereveld
is not licensed to practice law in Indiana.⌋

¶The Vigo County Circuit Court in Indiana ⌊indicate response or lack thereof
to request for comment as to whether Vigo County Circuit Court feels Siereveld
may have committed fraud upon the court, whether there will be an
investigation, and/or what steps it's taking to follow-up on the revelation
that Siereveld wasn't a licensed lawyer at the time of her misrepresentation
above⌋ ⌊end § on Siereveld not being licensed⌋.
¶Inmates, attorneys, and others experienced with the CMUs, moreover, believe
that federal prosecutors use the CMUs to sabotage appeals in cases they fear
they may lose. This is especially true, many believe, in politically-sensitive
cases.
¶Many find it striking that only about 80 out of the nationwide federal prison
population of approximately 180,000 are sent to the CMUs. That's roughly
0.04%. Critics point out that meanwhile, a large share of this miniscule
minority have politically-sensitive cases like Cox, Reynolds, Johnson, and
Warren.
¶FBI documents like the below further reveal that the FBOP proactively sends
information about Cox to the FBI, including copies of his privileged legal
mail. These documents also show that the FBI had what it called "a concern
related to COX's direct appeal of his conviction."

¶⌊Embed: FBI "(U) Update review of communications" dated "09/30/2013",
highlight the Synopsis § showing "Synopsis: (U) The purpose of this document

RAMOS P1



**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Complex*

_____

Office of the Complex Warden          *4700 Bureau Road South*
                                      *Terre Haute, Indiana 47802*

December 10, 2018

Clerk, Vigo Superior Court 1
33 South 3rd Street
Courthouse
Terre Haute, IN 47807

RE:   *Robert E. Miller v. David W. Sullivan*
      Case No:84D01-1807-CT-005360

Dear Clerk:

This is in response to the Subpoena Duces Tecum issued to the United States Penitentiary at
Marion, Illinois (USP Marion). Pursuant to 28 C.F.R. ¶ 16.22, et seq., we are in receipt of your
request for production of documents in connection with the assault on inmate Robert Miller,
Federal Register Number 48707-019.

As you are aware, an employee of the United States Department of Justice[1] is prohibited from
producing any material or testimony regarding any material contained in the files of the Department
of Justice or acquired as a part of the performance of that person's official duties or status without
the prior approval of the proper Department official. 28 C.F.R. § 16.22. Therefore, this response is
being provided to you following a review of responsive documents by the United States Attorney's
Office for the Southern District of Indiana.

If you have any questions, please do not hesitate to contact me at (812) 238-3476.

Sincerely,

Katherine Siereveld
Senior Attorney

Enclosures

_____

[1] The Bureau of Prisons is a component of the United States Department of Justice which is an
executive agency of the United States. *See* 5 U.S.C. § 101, 105.

b7E -3

FD-1057 (Rev. 5-8-10)

UNCLASSIFIED



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

Title:  (U) Update review of communications          Date:  09/30/2013

From:  ANCHORAGE

                                                                                                          b6 -1
        Contact:                                          b7C -1
                                                                                    b7E -1, -2, -3

Approved By: SSA

Drafted By:

Case ID #:                        (U) COX, FRANCIS, AUGUST SCHAEFFER –


Synopsis:  (U) The purpose of this document is to update the review of
COX's communications by the writer and to document a concern related to
COX's direct appeal of his conviction.

                                              08/23/2010

Details:                                                                  b7E -1

    The Anchorage Division receives copies of COX's correspondence from
the Bureau of Prison (BOP).  This correspondence was requested by
Anchorage to determine if COX represented a threat to any government
witnesses or members of the prosecution team.  The correspondence from
BOP consists of copies of the audio of COX's phone calls and visits,
copies of his sent and received emails, and copies of his sent and
received mail (excepting the contents of privileged mail).


    The writer has reviewed COX's correspondence that Anchorage has
received from BOP for the months of March through August, 2013.  The
writer has identified no threats to any persons while reviewing COX's
correspondence.



UNCLASSIFIED

is to... document <u>a concern related to COX's direct appeal of his conviction.</u>" (Red box around whole synopsis, red underline of text indicated above); attrib.: U.S. Department of Justice (2019);<-document was created in redacted form in 2019 in answer to FOIA; caption: This FBI document reveals that the bureau had what it called, "a concern related to COX's direct appeal of his conviction."⌋

¶As noted in <i>How the DOJ Protected Pedophiles and Got Away With Election Meddling In Alaska--Part 5 of the CMU Series</i>[link to part 5], Cox largely won his appeal, despite the disadvantages he faced in the CMUs.

¶Cox's experiences in the CMUs also obviously seem to refute the assertion in the above FBI document, which was released voluntarily in response to a federal Freedom of Information Act (FOIA) request, that the FBI doesn't receive the "contents of ⌊Cox's⌋ privileged mail." As does the FBI document below, showing that the FBOP in fact sent the FBI a privileged piece of Cox's attorney-client correspondence. The FBI also admits therein that it knew Cox sent the letter in question to his attorney, but that it read parts of it anyway, supposedly, "to determine if there was a reason why the letter was copied and provided" by the FBOP. Finally, the FBI admits, "the letter seemed to be discussing privileged communication regarding the defense strategy and addressing allegations about members of the prosecution team."

¶⌊Embed: FBI "SentToSentinel: 11/6/2013 2:15:12 AM" document, red box around, "I receive BOP content every month for Cox... 'over-collection' notice."; red underline "I read about a paragraph of the letter... prosecution team."; attrib.: U.S. Department of Justice (2019);<-document was created in redacted form in 2019 in answer to FOIA; caption: This FBI document reveals one example when the FBOP provided Cox's privileged legal correspondence to others in the DOJ.⌋

¶Cox says he never received anything "similar to an 'over-collection' notice," as the FBI document above seems to claim he would. That is, of course, unless the large stack of legal mail mentioned above that he says was returned to him in an FBI envelope constitutes such an "over-collection" notice. Indeed, Cox and others believe that he and a good number of his fellow CMU inmates were transferred here at the explicit request of federal prosecutors and judges, among other reasons, for the express purpose of such "over-collection" of privileged correspondence.

¶"If they can't break you, they still want to beat you," Cox says. "When I got to ⌊the CMU in⌋ Marion, ⌊Intelligence Research Officer (IRO) Kathy⌋ Hill threatened me. She told me I'd better just lay down and do my time or they'd make my life miserable and make sure I never saw my kids again."

¶Cox says he's seen his children once in 9 years and he attributes their lack of visits to his steadfast struggle asserting his innocence.

¶And Cox isn't alone in that regard. Reynolds also reports that his son is being threatened as a result of his work to exonerate himself. Indeed, all the inmates in the CMUs seem to face such threats and obstacles, especially for asserting their innocence and trying to help each other, the law notwithstanding.

¶"I don't care about your case law," the FBOP's Jason Bradley openly told one of these reporters when presented with binding U.S. Supreme Court precedent ⌊link to text of decision in Johnson v. Avery⌋ that forbids prison officials from interfering with legal assistance provided by inmates free of charge to other inmates.

¶Bradley is the disciplinary hearing officer (DHO) for the FCI Terre Haute CMU. He mettes out time in the unit's hot-box special housing unit (SHU) in

To:                 _____ (AN) (FBI) _____ (AN)(FBI)
Cc:                 _____ (AN) (FBI) _____ (AN) (FBI)
Subject:            CDC --- UNCLASSIFIED                                b6 -1
                                                                        b7C -1
                                                                        b7E -3
SentinelCaseId:     _____
SentToSentinel:     11/6/2013 2:15:12 AM

Classification: UNCLASSIFIED
============================================================
Sent for Approval for RECORD//Sentinel Case _____

I can't determine who is acting as CDC in ____ absence, so I am using the shotgun approach.

_____, if you are not an A/CDC, please forgive me. Somewhere in the back of my mind, I seem to recall
that you are/were.                                                       b6 -1
                                                                        b7C -1
_____                                                         b7E -3


I receive BOP content every month for Cox. This month, as I was reviewing the letters, I discovered that
BOP had copied and included a letter from Cox's attorney to Cox. Previously, all I have ever seen was
the front (and sometimes the rear) of the envelope. I read about a paragraph of the letter to try to
determine if there was a reason why the letter was copied and provided. From what I read, the letter
seemed to be discussing privileged communication regarding the defense strategy and addressing
allegations about members of the prosecution team. I closed the letter and am making notifications
similar to an "over-collection" notice.

I have notified the United States Attorney's Office (AUSA _____, but I did not disclose or discuss
what I had read.

Please let me know what else is required under FBI policy.

I will send this communication to the file.                             b6 -1, -6
                                                                        b7C -1, -6
                                                                        b7E -5


_____
Anchorage Division
Fairbanks RA
_____ Desk
_____ BB
_____


============================================================
Classification: UNCLASSIFIED


FBI(17-cv-611)-191

28 of 28

retaliation for alleged rule violations--including alleged violations of the previously-discussed unwritten rules. And if his attitude towards the highest court in the land seems cavalier, then it's likely worth noting that his indifference is not without apparent backing.
¶When Cox asked the federal U.S. District Court in Denver, Colorado, to enforce the decades-old rulings of the Supreme Court and to stop the CMU staff from interfering with his correspondence with attorneys and outside helpers, the magistrate judge handling his case--who is herself a former DOJ prosecutor--not only dismissed his motion, but she struck it from the record.

¶[ Same pic from the beginning of the Chinese reeducation center and the CMU; attrib. as approp.; caption: The facility on the left is a Chinese "reeducation center" and the facility on the right houses a U.S. Justice Department CMU.]

¶Thus, without serious intervention from high up in the nation's capital, the political prisoners in the nation's CMUs seem fated to remain hostages of the DOJ's due-process dead-zones. Now that their struggle has been revealed though, the question becomes, are the nation's leaders in Washington paying attention, and if not, then will anybody bring these cases to their attention?

Exhibit 2

<u>Affidavit of Martin S. Gottesfeld:</u>

I, Martin S. Gottesfeld, do hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 28th day of July, 2019, and I do so declare the following pursuant to <u>28 U.S.C. § 1746</u> (see <u>LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999)</u>):

1. My name is Martin S. Gottesfeld and I am a federal inmate in the communications management unit (CMU) at the Federal Correctional Institution (FCI) in Terre Haute, Indiana.

2. My federal registration number is 12982-104.

3. I am the sole plaintiff in the case of <u>18-cv-10836</u> in U.S. District Court for The Southern District of New York.

4. I am a national news journalist and my writing is regularly published by prominent national news outlets including Info Wars, WND, The Western Journal, and Red State.

5. One of my articles was published by The Intercept and The Intercept considers me one of its reporters.

6. I do not charge a fee for my writing and there are no quid pro quo financial arrangements between myself and any publication.

7. I co-authored <u>The CMU Series</u> I'll mail to U.S. District Court for The Southern District of New York for filing in the case of <u>18-cv-10836</u> on Monday, August 5th, 2019, as <u>Exhibit 1</u> to my MOTION FOR A DECLARATORY JUDGMENT PROTECTING PLAINTIFF'S RIGHT TO PUBLISH.

8. <u>The CMU Series</u> (herein "the series") will be made available in its final form to publishers under a Creative Commons license.

9. By making the work available under a Creative Commons license, I and the other coauthor make the work publishable without fee and prospective publishers need not even contact us to obtain our permission to use the work so long as they comply with the Creative Commons license.

10. I do not control what attributive italics my team may place at the bottom of the text of each article of the series and I have ceded final creative control to my team.

11. I do not control which images my team will or will not embed in each article of the series and my suggestions are neither mandatory nor exhaustive as once again I have ceded final creative control to my team.

12. I do not pay my team, they are all volunteers.

13. I plan to ask Info Wars and The Intercept to publish the entire series on the same day, along with whatever other news outlets may also copublish the entire series on that same day or later as they may do under the Creative Commons license.

14. I, however, do not have control over if and when The Intercept and Info Wars will publish the whole series, whether they will do so on the same or different days, nor whether they will publish the whole series at once or serialize it over many days or weeks.

15. I assent to any motion to intervene that The Intercept, Info Wars, and any other national or international news outlet(s) may file in the case of

18-cv-10836-PGG in U.S. District Court for The Southern District of New York seeking to publish the series.

16. I assent to any motion(s) to intervene in the case of 18-cv-10836-PGG in U.S. District Court for The Southern District of New York (hereafter "the case") filed by the other coauthor of the series, or Mrs. Dana E. Gottesfeld of Massachusetts, or Mr. Benjamin Brown, Esquire, of White Plains, New York.

17. I assent to any motion to intervene in the case filed by other FCI Terre Haute CMU inmates explicitly named in the series other than Mr. Rodney Hamrick (who is no longer a FCI Terre Haute CMU inmate regardless).

18. I specifically assent to any motion(s) to intervene in the case that may be filed by Mr. Francis Schaeffer Cox, Mr. Donald Reynolds, Mr. Kurt Johnson, Mr. Richard Warren, and Mr. Scott Lewis Rendelman.

19. The FCI Terre Haute CMU handbook states on page 12 that inmates, "have the right to... correspond with members of the news media in keeping with Bureau rules and institution guidelines."

20. In reality, however, FCI Terre Haute CMU inmates are effectively blocked from meaningful communications with members of the media.

21. FCI Terre Haute CMU inmates, for examples, are not allowed to send members of the media legal documents that may be necessary for fact-checking purposes, not allowed to mention the names of other CMU inmates in their correspondence with the public and the news media, not allowed to include corroborating documents from other inmates in correspondence with the news media, and not allowed to call into live broadcasts.

22. None of the policies/rules enumerated in paragraph 21 above appear to be written down anywhere yet they are enforced along with other yet-unknown ex-post-facto policies.

23. There is thus no other way for the information in the series to ever be published. There are no available alternatives.

24. Publication of the series implicates the Constitutional rights of non-inmates both on the side of publication and on the side of readership.

25. There is no other way for publishers and the reading public to inform themselves of many of the facts and events detailed in the series.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on July 28th, 2019 (Sunday).

Martin S. Gottesfeld

Exhibit 3

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

# *FCC-Terre Haute, Indiana*

# Communications Management Unit
# HANDBOOK



# TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . .   3

Admission, Orientation, Classification, and Unit Team . . . . . . 3-4

Disciplinary Procedures   . . . . . . . . . . . . . . . . . . . .   5

Daily Inmate Life . . . . . . . . . . . . . . . . . . . . . . . . 5-8

Programs and Services. . . . . . . . . . . . . . . . . . . . . . 8-9

Contact with the Community and Public . . . . . . . . . . . . . . 9-10

Access to Legal Services . . . . . . . . . . . . . . . . . . . . 10-11

Problem Resolution . . . . . . . . . . . . . . . . . . . . . . 11

Sexually Abusive Behavior Prevention and Intervention . . . . .12-27

**Introduction:** The purpose of this handbook is to provide incoming inmates with general information regarding the Communication Management Unit (CMU) operations, its programs, and the rules and regulations they will encounter during confinement. This is not a specific guide to the detailed policies of the Bureau (which are subject to change) or all procedures in effect at each Bureau location. That information will be made available during the institution's Admission and Orientation (A&O) Program. Rather, the material in this handbook will help new inmates understand what they will be encountering when they enter the CMU, and hopefully assist them in their initial adjustment.

The Communication Management Unit is a housing unit that allows greater management of communication with persons in the community through complete monitoring of telephone use, written correspondence, electronic messaging and visiting. The volume, frequency, and methods of contact with persons in the community may be limited as necessary to achieve the goal of total monitoring. The general conditions of confinement in this unit may also be limited as necessary to provide greater management of communications. Transfer to this unit is not punitive and, by itself, has no effect on the length of incarceration. Inmates will continue to earn sentence credit in accordance with law and Bureau policy.

**Admission & Orientation:** The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior, and programs available. As part of A&O, CMU inmates will receive a copy of the Complex A & O Handbook and the CMU Handbook.

Each inmate will ordinarily be interviewed by a Unit Team member within 24 hours after his commitment to the institution. Prior to classification, inmates will participate in various lectures, examinations, tests, and interviews. This information will be reviewed at the time of classification. Inmates will also have an opportunity to view a video of the institution's A&O lectures. The Unit Manager is responsible for administering the Admission and Orientation program (A&O) in compliance with national policy. All items on the A&O checklist will be covered and utilized for verification of participation.

Within four weeks following arrival, the Unit Team, composed of the Unit Manager and Case Manager, will review case information and develop programing goals.

## CMU UNIT STAFF

**Unit Manager:** The Unit Manager is the administrative head of the general unit and oversees all unit programs and activities. The Unit Manager is a department head at the institution and has a close working relationship with other departments and personnel. The Unit Manager is the "Chairperson," of the Program Review, reviews all team

decisions, and oversees the inmate's disciplinary process, as needed. The Unit Manager is the direct supervisor of the Case Manager and Intelligence Research Specialist.

**Case Manager:** The Case Manager is responsible for all casework services and prepares classification material, progress reports, release plans, correspondence and other materials relating to the inmate's confinement.  The Case Manager reports to the Unit Manager on a daily basis.  The Case Manager serves as a liaison between the inmate, the administration and the community, and is a frequent member of the Unit Discipline Committee (UDC).

**Intelligence Research Officer:** The Intelligence Research Officer will be responsible for all investigations conducted within the unit, as well as, all Unit Team matters in the absence of the Case Manager.

**Correctional Officers:** The Correctional Officers have direct responsibility for the day to day supervision of inmates and the enforcement of rules and regulations.  They have safety, security and sanitation responsibilities in the institution.  Unit officers are in regular contact with inmates in the unit and are encouraged to establish professional relationships with them, as long as, such interaction does not interfere with their primary duties.  Unit officers are jointly supervised by the Unit Manager and the Captain (the Chief Correctional Supervisor) during his/her unit assignment.

**Classification and Reviews:** The CMU's Unit Team includes a Unit Manager and Case Manager.  The Staff Psychologist, Education Advisor, and Unit Officer are also considered to be part of the Unit Team. Generally, the resolution of issues or matters of interest while at the institution are most appropriately initiated with the Unit Team. Unit Team members are available to assist in many areas, including parole matters, release planning, personal and family problems, counseling, and assistance in setting and attaining goals while in prison.

Classification and reviews of CMU placement will occur in accordance with national policy. Reviews for Continued CMU Placement will take place during regularly scheduled Program Reviews. Inmates will be provided notice and an opportunity to be heard, in accordance with Program Statement 5214.02, Communications Management Unit.  The review will be conducted in a manner consistent with sound correctional practice.  The inmate's current offense of conviction, offense conduct, activity while incarcerated and misuse/abuse of communication will be evaluated.  The Unit Team will also consider whether the original reasons for CMU placement still exist and whether the rationale for CMU designation has been mitigated.  Additionally, it is evaluated whether the inmate no longer presents a risk to the institution or public if their communications were unmonitored, and that they no longer require the degree of monitoring and controls afforded at a CMU.  After conducting the review, the Unit Team may recommend to the Warden for an inmate to be transferred.  A record of each review conducted shall be kept in the inmate's Central File.

Subsequent reviews will be conducted at six month intervals.

Additionally, within five calendar days of arrival, CMU inmates will be provided a "NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT" form indicating the reasons for their placement in the unit.

**Communications:** Unit staff are available Monday through Friday from 7:30 a.m. - 4:00 p.m., excluding federal holidays. The unit bulletin boards contain written communication of interest to inmates. A member of the Unit Team will ordinarily be available during mail call (12:00 p.m. - 1:00 p.m.), Monday through Friday.

**Cell Assignments:** CMU inmates will ordinarily be housed in single cells. However, based on population needs, double bunked cells may be utilized.

**Disciplinary Procedures:** It is the policy of the Bureau of Prisons to provide a safe and orderly environment for all inmates.

Violations of Bureau rules and regulations are heard by the Unit Discipline Committee (UDC). The Discipline Hearing Officer (DHO) will hear more serious rule violations. Inmates are advised upon arrival at the institution of the rules and regulations, and are provided with copies of the Bureau's Prohibited Acts, as well as, Rights and Responsibilities.

## DAILY INMATE LIFE

**Sanitation:** It is the inmate's responsibility to check his living area immediately after his assignment and to report all damage to the Correctional Officer, Unit Manager or Case Manager. An inmate may be held financially liable for any damage to his personal living area.

Each inmate is responsible for making his bed by 7:30 a.m., Monday through Friday. On weekends and holidays, the bed will be made prior to leaving your cell.

Each inmate is also responsible for sweeping and mopping their personal living area, and to remove trash daily, to insure it is clean and sanitary. Cardboard boxes and other paper containers are not to be used for storage due to their combustible nature. Lockers must be neatly arranged inside and out, and all shelving must be neat and clean. All inmate personal property must be stored in the assigned locker. Sexually explicit materials or featuring nudity is prohibited. Sexually suggestive pictures are not allowed to be displayed outside the assigned locker. Articles are not to be hung or placed on the windows. Writing or disfiguring the walls and door is prohibited. Toothpaste, toothbrushes, combs, razors, soap, and toilet paper are issued by the institution and are available in the housing units. Inmates may purchase name brand items through the commissary. Linen and other laundry may be washed in the laundry room.

**Smoking:** The CMU is a tobacco free environment.   Smoking, smokeless tobacco and tobacco products of any kind are prohibited and such items are considered contraband.

**Personal Property Limits:** Items which may be retained by an inmate are limited for sanitation and security reasons, and to ensure that excess personal property is not accumulated which would constitute a fire hazard or impair staff searches of the living area.   Inmates are referred to the Institution Supplement on Personal Property, Inmate, as to the type and quantity of allowable inmate personal property.

**Storage Space:** Storage space consists of an individual locker.   Locks may be purchased in the institution Commissary.   The amount of personal property allowed is limited to those items which can be neatly and safely placed in the inmate's assigned locker.

Under no circumstance will any materials be accumulated to the point where they become a fire, sanitation, security, or housekeeping hazard.   The following items, if maintained neat and clean, may remain outside the designated storage space:

Chaplain approved prayer rug, small religious statue, prayer beads or similar religious item, prescription eyeglasses and case, authorized medical equipment, family photo (framed), Bible, or Quran.

Locker tops, chairs, window ledges, and under beds are **NOT STORAGE AREAS**.   Any items found in those areas will be confiscated.

**Clothing:** Recreational clothing as listed in the FCC Terre Haute Institution Supplement on personal property is authorized. Institutional clothing will be issued by the Laundry Department.

**Duty Uniform:** The inmate population will be required to wear the approved duty uniform any time they are outside of their assigned cells.   The duty uniform must be worn to visits and when serving food items.   The duty uniform consists of brown, short sleeve t-shirt and khaki pants, work boots or approved recreation shoes.   All inmates are required to wear the shirt tucked into the pants.   If pants do not have an elastic waistband, a belt must be worn.   No hats are worn inside any building with the exception of inmates working in Food Service.   Religious Services approved headwear may be worn at all times.   "Do rags" may only be worn inside the inmate's assigned cell.  Inmates will be allowed to wear clothing articles purchased from the Commissary under their brown-t-shirts, and pants.   Inmates may wear appropriate clothing such as gray shorts, gray t-shirts, gray sweat pants/shirts under the following circumstances:   While inside their assigned cells, at the recreation yard, in route to the recreation yard, when going directly to and from the showers, and when utilizing recreation equipment within their housing unit.

**Special Purchase Items:** Special Purchase items will be authorized only to the point where they can be contained in the storage area

provided for personal property.

**Legal Materials:** Inmates will be allowed to maintain three cubic feet of legal materials needed for their active legal action, and legal reference materials (such as books), if not available in the institution legal library. Temporary additional space for active litigation material may be requested from the Unit Manager.

**Hobbycraft Materials:** Inmates are only permitted approved hobby craft items in the housing areas. Completed hobbycraft items cannot be mailed from the CMU. Completed hobbycraft items will be placed in storage until transferred from the CMU.

**Commissary Items:** Each inmate will be afforded the opportunity to purchase allowable items from the Commissary, if funds are available in the inmate's commissary account. Commissary purchase forms will be issued weekly on Tuesdays, and after completion of the forms they will be forwarded to the Commissary for processing by close-of-business on Wednesdays. The Commissary items will be delivered to the unit weekly by Commissary staff on Thursdays. Any special purchases must be approved by the Unit Manager. Commissary items will be neatly stored in the assigned locker ONLY. Under no circumstances are Commissary items to be stored on the floor.

**Food Storage:** Items not contained in their original container are considered contraband and will be confiscated. Original containers are to be disposed of when empty and will not be used for other purposes. Food Service items are not permitted outside of the Dining Room.

**Letters, Books, Photographs, Newspapers, and Magazines:** Inmates are limited to six magazines, ten books and newspapers for the previous seven days. Excessive collections of letters, books and newspapers must be disposed. Publications will be stored in the locker provided. This regulation will be strictly adhered to and there will be no exceptions.

Only 25 letters will be permitted for storage in the living quarters. Excessive letters can be sent home through the Mail Room at the inmate's expense or disposed of.

**Radios, MP-3s and Watches:** An inmate may not own or possess more than one approved radio, MP-3 player and/or watch at any one time. Proof of ownership, through appropriate property receipts, will be required. Headphones are required at all times. Watches with backs made of metal are not authorized. Inmates may not give any items of value to another inmate, i.e., radio, MP-3 player, watch, sneakers, and Commissary items.

**Jewelry:** Inmates may have a plain wedding band (without stones) and, with prior approval, a religious medal without stones.

**Contraband:** Contraband is defined as any item not authorized by the Warden or issued by the institution, received through approved channels, or purchased through the Commissary. All staff are alert

to the subject of contraband and make every effort to locate, confiscate and report contraband in the institution.   Each inmate is responsible for all items found in their assigned living area and should immediately report any unauthorized item to either Unit Staff or the Unit Officer.   Any item in an inmate's personal possession must be authorized, and a record of the receipt of the item should be kept in the inmate's possession.   Inmates may not purchase radios or any other items from another inmate; items purchased in this manner are considered contraband, will be confiscated, and the inmate may be subject to disciplinary action.

An altered item, even if approved or issued, is considered contraband. Anyone altering or damaging government property will be subject to disciplinary action and the cost of the damage will be levied against the violator.

**Sanitation:** CMU inmates are responsible for sanitation of the unit. Unit Orderly job assignments will be made by the Unit Manager.   Inmate showers will be available daily.   Clean, serviceable clothing will be issued to each inmate upon arrival to the unit.

CMU inmates are responsible for laundering their own personal clothing.   Barber services in the CMU will be conducted within the unit.

### PROGRAMS AND SERVICES

**Work Assignments:** Work assignments will include orderlies for unit sanitation, food service, Trust Fund, Education, Facilities, and Recreation, and will be assigned by the Unit Manager.

**Food Service:** All inmate meals will be served in and consumed in the unit dining area located within the CMU.   Any food item removed from the dining hall will be considered unauthorized and the inmate may be subject to disciplinary action.

**Education/Recreation Programs:** National education policies will be implemented in the CMU.   Inmates will be permitted to leave their cells and recreate in the unit daily from 6:00 a.m. - 9:15 p.m., except during counts.

Leisure and Law Library services will be provided to inmates daily. In accordance with institution procedures, inmates may copy materials necessary for research or legal matters.   A debit card copy machine is available in the unit for inmate use.   Individuals who have no funds and who can demonstrate a clear need for particular copies, may submit a written request for a reasonable amount of free duplication.

Inmates will be provided table games such as chess, checkers and cards. Hobby craft opportunities will also be provided.   Televisions are available in the unit common areas for viewing.   Movies will be shown using closed-circuit televisions.   The inside recreation rooms will contain various recreation activities to include stationary biking,

stair-stepping machines, treadmills and aerobic tapes.

**Religious Programs:** Religious Services opportunities will be provided in the unit.  Self-study, videos and literature are available in the multi-purpose room.  Inmates in the CMU will be allowed to engage in congregate prayer any time they are released from their cells. With the exception of scheduled services, inmates will only be allowed in groups of ten or less and will only utilize multi-purpose room #3 for congregate prayer.  Inmates are also allowed to pray two to a cell as long as one of the inmates is the occupant of the cell. Regardless of the reason, any time two inmates are in a cell, the door will be in the full open position.

**Health Services:** Health Services staff will provide sick call in the unit, seven days a week.  Medications will be delivered and/or administered in the unit twice daily.  Inmates may request to be seen by their MLP in the unit's private examination room.  Specialized services may be provided in the institution's main Health Services Department, as needed, under conditions which ensure CMU inmates' on not come into contact with non-CMU inmates.

**Mental Health Services:** Psychology staff will provide CMU inmates an initial psychological assessment within 14 days of arrival in the unit.  Mental health services thereafter will occur according to national policy.  Inmates may request to be seen by a psychology staff member.  The psychology staff may utilize the unit's Unit Team Office.

**Residential Reentry Centers (RRC):** The purpose of the Residential Re-Entry Centers is to provide a suitable residence, structured programs, job placement, and counseling while monitoring the offender's activities.  They also provide drug testing, counseling, alcohol monitoring, and treatment.  While in these programs, employed offenders are required to pay subsistence to help defray the cost of their confinement.  The inmates' payment rate during RRC residence is 25% of the inmate's income.  All inmates will be reviewed for RRC placement, 17-19 month's from release.

**Release Preparation Program (RPP):** The Release Preparation Program (RPP) is designed to assist inmates in preparing for release.  Inmates will be given aid in developing plans for their personal lives and future employment.  The program offers classes and informational seminars concerning the personal, social, and legal responsibilities of civilian life.

## CONTACT WITH THE COMMUNITY AND PUBLIC

**Telephone Communication:** All telephone communication between inmates and persons in the community (except properly placed, unmonitored legal calls) will be:

1. Conducted using monitored ITS phone lines.
2. Live-monitored by staff.
3. Subject to recording by staff.
4. Staff must be notified, when scheduling a call which

—9—

will be conducted in a language(s), other than English.

5. Limited to two (2), fifteen (15) minute telephone calls per week scheduled in advance with the person and telephone number appearing on the schedule. Only one number may be dialed, calls may last up to fifteen (15) minutes and scheduling will be made at thirty (30) minute intervals. Any variations must be approved by staff prior to the telephone call.

6. Scheduled Monday through Friday, excluding Federal Holidays, between the hours of 8:00 a.m. and 8:00 p.m., local time.

7. Scheduled Sunday and Federal Holidays, between the hours of 8:00 a.m. and 2:30 p.m., local time.

In the event of a staff terminated call, inmates may be subject to disciplinary action, and the person may be removed from the inmate's approved telephone list.

In no event will the frequency or duration of telephone calls placed by CMU inmates be limited to less than one (1) telephone call per month (28 C.F.R. § 540.100(b) of at least three (3) minutes duration (28 C.F.R. § 540.101(d). Unmonitored legal calls are not affected, and will continue to be managed according to National policy.

**Visiting:** All visiting between inmates and persons in the community (except properly scheduled, unmonitored legal visits) will be:

1. Conducted using non-contact facilities (i.e., secure partitioned rooms, telephone voice contact.)

2. Live-monitored by staff.

3. Subject to recording by staff.

4. Staff must be notified, when a visit will be conducted in a language other than English.

5. Nonverbal communication (i.e. hand signals, sign language) may result in termination of the visit.

6. Each inmate is authorized eight (8) hours of visiting each month, scheduled in increments not exceeding four (4) hours.

7. Scheduled Sunday through Friday, including Federal Holidays between the hours of 8:30 a.m. and 2:30 p.m., local time.

Persons for whom an inmate requests placement on the approved visiting list must complete the "Acknowledgment of Conditions for Visiting with Inmates in CMU, FCI Terre Haute," form, as proof of acknowledgment and acceptance of the visiting conditions.

## ACCESS TO LEGAL SERVICES

**Legal Correspondence:** Legal correspondence from attorneys will be treated as special mail if properly marked in accordance with national policy.

It is the responsibility of the inmate to advise the attorney about this policy. If legal mail is not properly marked, it will be opened as general correspondence.

**Attorney Visits:** Attorneys must make advance appointments for each visit.  Attorneys are to contact the Unit Team to make the appointment.  Attorney visits will be subject to visual monitoring, but not audio monitoring.

**Legal Material:** During attorney visits, a reasonable amount of legal materials may be allowed in the visiting area with prior approval from the Unit Team.  No material may be exchanged during the visit and all materials are subject to search.

**Attorney Telephone Calls:** In order to make an unmonitored telephone with an attorney, inmates must submit a written request to the Unit Team for approval.  Phone calls placed through the regular inmate telephones are subject to monitoring.

**Notary Public:** Under the provisions of 18 U.S.C. § 4004, the Case Manager is authorized to witness inmate signatures for court purposes.  Inmates may make their own unsworn declaration on such documents by placing the following paragraph at the end of the document: "I declare (or certify, verify or state), under penalty of perjury, that the foregoing is true and correct. Executed on (date)." This declaration will suffice in Federal courts and other Federal agencies, unless specifically directed to do otherwise.

**Inmate Access to Central Files:** An inmate may request to review disclosable portions of their Central File through an Inmate Request to Staff should be submitted to the Case Manager to schedule an appropriate time for review.

<h2 style="text-align:center">PROBLEM RESOLUTION</h2>

**Inmate Requests to Staff Member:** Inmate Request to Staff Member, commonly called a, "cop-out", is used to make a written request to a staff member.  Any type of request can be made with this form.  "Cop-outs" may be obtained from the Unit Team.  However, requests may be made on any sheet of paper.  Additionally, "cop-outs," for any department may be submitted to Unit Team for distribution to the appropriate departments.

**Administrative Remedy Process:** The Bureau emphasizes and encourages the resolution of complaints on an informal basis.  An inmate can resolve a problem informally by contacting staff members via "cop-outs."  When informal resolution is not successful, a formal complaint can be filed as an Administrative Remedy.

Inmates may appeal their transfer to the CMU, or any conditions of confinement through the Bureau's Administrative Remedy Program, 28 C.F.R. § 542.10 through 542.19, and corresponding policy.  A member of the Unit Team will provide you with the necessary form upon request.

Please feel free to contact a member of the Unit Team, with any questions concerning the rules and regulations governing the operations of the Communications Management Unit.

INMATE RIGHTS AND RESPONSIBILITIES §541.12

| RIGHTS | RESPONSIBILITIES |
|---|---|
| 1. You have the right to expect that as a human being you will be treated respectfully, impartially, and fairly by all personnel. | 1. You have the responsibility to treat others, both employees and inmates, in the same manner. |
| 2. You have the right to be informed of the rules, procedures, and schedules concerning the operation of the institution. | 2. You have the responsibility to know and abide by them. |
| 3. You have the right to freedom of religious affiliation, and voluntary religious worship. | 3. You have the responsibility to recognize and respect the rights of others in this |
| 4. You have the right to health care, which includes nutritious meals, proper bedding and clothing, and a laundry schedule for cleanliness of the same, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles and medical and dental treatment. | 4. It is your responsibility not to waste food, to follow the laundry and shower schedule, maintain neat and clean living quarters, to keep your area free of contraband, and to seek medical and dental care as you may need it. |
| 5. You have the right to visit and correspond with family members, and friends, and correspond with members of the news media in keeping with Bureau rules and institution guidelines. | 5. It is your responsibility to conduct yourself properly during visits, not to accept or pass contraband, and not to violate the law or Bureau rules or institution guidelines through your correspondence. |
| 6. You have the right to unrestricted and confidential access to the courts by correspondence (on matters such as the legality of your conviction, civil matters, pending criminal cases, and conditions of your imprisonment.) | 6. You have the responsibility to present honestly and fairly your petitions, questions, and problems to the court. |
| 7. You have the right to legal counsel from an attorney of your choice by interviews and correspondence. | 7. It is your responsibility to use the services of an attorney honestly and fairly.] |

| **RIGHTS** | **RESPONSIBILITIES** |
|---|---|
| 8. You have the right to parti-cipate in the use of law library reference materials to assist you in resolving legal problems. You also have the right to receive help when it is available through a legal assistance program. | 8. It is your responsibility to use these resources in keeping with the procedures and schedule prescribed and to respect the rights of other inmates to the use of the materials and assistance. |
| 9. You have the right to a wide range of reading materials for materials for educational purposes and for your own enjoyment. These materials may include magazines and newspapers sent from the community, with certain restrictions. | 9. It is your responsibility to seek and utilize such materials for your personal benefit, without depriving others of their equal rights to the use of this material. |
| 10. You have the right to participate in education, vocational training and employment as far as resources are available, and in keeping with your interests, needs, and abilities. and in the community. | 10. You have the responsibility to take advantage of activities which may help you live a successful and law-abiding life within the institution You will be expected to abide by the regulations governing the use of such activities. |
| 11. You have the right to use your funds for commissary and other purchases, consistent with insti-tutuion security and good order, for opening bank and/or savings accounts, and for assisting your family. | 11. You have the responsibility to meet your financial and legal obligations, including, but not limited to, court-imposed assessments, fines, and restitution. You also have the responsibility to make use of your funds in a manner consistent with your release plans, your family needs, and for other obligations that you may have.] |

## INMATE DISCIPLINE

Inmates must have respect for the rights and property of others. Rules, regulations, and policies are made to maintain a healthy and peaceful climate and to ensure an orderly operation of this facility. Certain privileges are granted to eligible inmates provided the privileges are not abused. Violation of regulations may result in an Incident Report (BP-288) and imposition of sanctions, as outlined later in this handbook. In the event of misconduct, an incident report may be written by staff. Reports are first investigated by the lieutenant on duty and the results forwarded to your Unit team. The team meets as the Unit Disciplinary Committee (UDC) and may impose limited sanctions for most misconduct; for example, taking of privileges, removal from preferred quarters, job change, assigning extra duty, etc. For minor prohibited acts, staff may suspend disciplinary proceedings for a period of time not to exceed two weeks, while informal resolution is attempted. If informal resolution is unsuccessful, staff may reinstate disciplinary proceedings at the same stage they were suspended. The time requirements then begin again, at the same point in which they were suspended. If charges are more serious, the case may be referred to the Discipline Hearing Officer (DHO) who can impose more serious sanctions among which include: disallowance of good conduct time, forfeiture of good time, or recommendation of transfer to a higher level institution. Additionally, it should also be noted that at any stage of the disciplinary process, policy provides referrals to other outside law enforcement agencies (i.e., FBI, DEA, ATF, etc.) for further investigation and/or prosecution of any criminal activity if warranted. The internal disciplinary system is outlined in detail in Program Statement 5270.07, Inmate Discipline & Special Housing Units, which is available in the Law Library.

Investigating Officer. The term Investigating Officer refers to an employee of supervisory level who conducts the investigation concerning alleged charge(s) of inmate misconduct. The Investigating Officer may not be the employee reporting the incident, or one who was involved in the incident in question.] The Investigating Officer is ordinarily a Lieutenant, but the Warden at each institution may appoint another staff member to perform this function.

Unit Discipline Committee (UDC). The term Unit Discipline Committee (UDC) refers to one or more institution staff members delegated by the Warden the authority and duty to hold an initial hearing upon completion of the investigation concerning alleged charge(s) of inmate misconduct. The Warden shall authorize these staff members to impose minor sanctions (G through P) for violation of prohibited act(s).]

In institutions with Unit Management, the authority to hold initial hearings (UDC) and impose sanctions is ordinarily delegated to the staff members of the inmate=s Unit team. Wardens shall delegate two or more staff members the authority to hold initial hearings and impose minor sanctions. In emergency situations the Warden may delegate one staff member the authority to hold initial hearings and impose minor sanctions.

Discipline Hearing Officer (DHO). This term refers to a one person, independent, discipline hearing officer who is responsible for conducting Institution Discipline Hearings and who imposes appropriate sanctions for incidents of inmate misconduct referred for disposition following the hearing required by ∋ 541.15 before the UDC.]

## [TIME LIMITS IN DISCIPLINARY PROCESS

### TABLE 2



1.   **Staff becomes aware of inmate's involvement in incident.**

ordinarily maximum of 24 hours

2.      **Staff gives inmate notice of charges
by delivering Incident Report.**

maximum ordinarily of 5 work days from the
time staff became aware of the inmate's
involvement in the incident.  (Excludes
the day staff becomes aware of the inmate's
involvement, weekends, and holidays.)

3.      **Initial hearing (UDC)**

minimum of 24 hours
(unless waived)

4.   **Discipline Hearing Officer (DHO) Hearing**


NOTE: These time limits are subject to exceptions as provided in the rules.

   Staff may suspend disciplinary proceedings for a period not to exceed two calendar
weeks while informal resolution is undertaken and accomplished.  If informal
resolution is unsuccessful, staff may reinstitute disciplinary proceedings at the same
stage at which suspended.  The requirements then begin running again, at the same
point at which they were suspended.


## PROHIBITED ACTS AND AVAILABLE SANCTIONS

### Greatest Severity Level Prohibited Acts

100   Killing

101   Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for
      assaulting any person at this level is to be used only when serious physical injury has been
      attempted or accomplished).

102   Escape from escort; escape from any secure or non-secure institution, including community confinement; escape from unescorted community program or activity; escape from outside a secure institution.

103   Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of prohibited act of Greatest Severity, e.g., in furtherance of a riot or escape; otherwise the charge is properly classified Code 218, or 329).

104   Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, ammunition, or any instrument used as a weapon.

105   Rioting.

106   Encouraging others to riot.

107   Taking hostage(s).

108   Possession, manufacture, introduction, or loss of a hazardous tool (tool most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hacksaw blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, or other electronic device).

109   (Not to be used).

110   Refusing to provide a urine sample; refusing to breathe into a Breathalyzer; refusing to take part in other drug-abuse testing.

111   Introduction or making of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

112   Use of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

113   Possession of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

114   Sexual assault of any person, involving non-consensual touching by force or threat of force.

115   Destroying and/or disposing of any item during a search or attempt to search.

196   Use of the mail for an illegal purpose or to commit a further a Greatest category prohibited act.

197   Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act.

198   Interfering with a staff member in the performance of duties most like another Greatest severity prohibited act. This charge is to be used only when another charge of Greatest severity is not accurate. The offending conduct must be charged as "most like" one of the listed Greatest severity prohibited acts.

199   Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Greatest severity prohibited act. This charge is to be used only when another charge of Greatest severity is not accurate. The offending conduct must be charges as "most like" one of the listed Greatest severity prohibited acts.

## AVAILABLE SANCTIONS FOR GREATEST SEVERITY LEVEL PROHIBITED ACTS

A   Recommend parole date rescission or retardation.

B   Forfeit and/or withhold earned statutory good time or non-vested good conduct time (up to 100 %) and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B1  Disallow ordinarily between 50% and 75% (27-41 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C   Disciplinary segregation (up to 12 months).

D   Make monetary restitution.

E   Monetary fine.

F   Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).

G   Change housing (quarters).

H   Remove from program and/or group activity.
I   Loss of job.

J   Impound inmate's personal property.

K   Confiscate contraband.

L   Restrict to quarters.

M   Extra duty.

## HIGH SEVERITY LEVEL PROHIBITED ACTS

200   Escape from a work detail, non-secure institution, or other non-secure confinement, including community confinement, with subsequent voluntary return to Bureau of Prisons custody within four hours.

201   Fighting with another person.

202    (Not to be used)

203    Threatening another with bodily harm or any other offense.

204    Extortion; blackmail; protection; demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing.

205    Engaging in sexual acts.

206    Making sexual proposals or threats to another.

207    Wearing a disguise or a mask.

208    Possession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism, or procedure.

209    Adulteration of any food or drink.

210    (Not to be used).
211    Possessing any officer's or staff clothing.

212    Engaging in or encouraging a group demonstration.

213    Encouraging others to refuse to work, or to participate in work stoppage.

214    (Not to be used).
215    (Not to be used).

216    Giving or offering an official or staff member a bribe, or anything of value.

217    Giving money to, or receiving money from, any person for the purpose of introducing contraband or any other illegal or prohibited purpose.

218    Destroying, altering, or damaging government property, or the property of another person, having a value in excess of $100.00, or destroying, altering, damaging life-safety devices (e.g., fire alarm) regardless of financial value.

219    Stealing; theft (including data obtained through the unauthorized use of a communications device, or through unauthorized access to disks, tapes, or computer printouts or other automated equipment on which data is stored).

220   Demonstrating, practicing, or using martial arts, boxing (except for use of a punching bag), wrestling, or other forms of physical encounter, or military exercises or drill (except for drill authorized by staff).

221   Being in an unauthorized area with a person of the opposite sex without staff permission.

222   (Not to be used).
223   (Not to be used).

224   Assaulting any person (a charge at this level is used when less serious physical injury or contact has been attempted or accomplished by an inmate).

225   Stalking another person through repeated behavior which harasses, alarms, or annoys the person, after having previously been warned to stop such conduct.

226   Possession of stolen property.

227   Refusing to participate in a required physical test or examination unrelated to testing for drug abuse (e.g., DNA, HIV, tuberculosis).

228   Tattooing or self-mutilation.

229   Sexual assault of any person, involving non-consensual touching without force or threat of force.

296   Use of the mail for abuses other than criminal activity which circumvent mail monitoring procedures (e.g., use of the mail to commit or further a High category prohibited act, special mail abuse; writing letters in code; directing others to send, sending, or receiving a letter or mail through unauthorized means; sending mail for other inmates without authorization; sending correspondence to a specific address with directions or intent to have the correspondence sent to an unauthorized person; and using a fictitious return address in an attempt to send or receive unauthorized correspondence).

297   Use of telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act.

298   Interfering with a staff member in the performance of duties most like another High severity prohibited act. This charge is to be used only when another charge of High severity is not accurate. The offending conduct must be charged as "most like" one of the listed High severity prohibited acts.

299   Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another High severity prohibited act. This charge is to be used only when another charge of High severity is not accurate. The offending conduct must be charges as "most like" one of the listed High severity prohibited acts.

## AVAILABLE SANCTIONS FOR GREATEST SEVERITY LEVEL PROHIBITED ACTS

A    Recommend parole date rescission or retardation.

B    Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50 % or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B1    Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C    Disciplinary segregation (up to 6 months).

D    Make monetary restitution.

E    Monetary fine.

F    Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).

G    Change housing (quarters).

H    Remove from program and/or group activity.

I    Loss of job.

J    Impound inmate's personal property.

K    Confiscate contraband.

L    Restrict to quarters.

M    Extra duty.

## MODERATE SEVERITY LEVEL PROHIBITED ACTS

300    Indecent Exposure.

301    (Not to be used).

302    Misuse of authorized medication.

303    Possession of money or currency, unless specifically authorized, or in excess of the amount authorized.

304    Loaning of property or anything of value for profit or increased return.

305    Possession of anything not authorized for retention or receipt by the inmate and not issued to him through regular channels.

306    Refusing to work or to accept a program assignment.

307    Refusing to obey an order of any staff member (may be categorized and charged in terms of greater severity, according to the nature of the order being disobeyed, i.g. failure to obey an order which furthers a riot would be charges as 105, Rioting; refusing to obey an order which furthers a fight would be charged as 201, Fighting; refusing to provide a urine sample when ordered as part of a drug-abuse test would be charged as 110).

308    Violating a condition of a furlough.

309    Violating a condition of a community program.

310    Unexcused absence from work or any program assignment.

311    Failing to perform work as instructed by the supervisor.

312    Insolence towards a staff member.

313    Lying or providing a false statement to a staff member.

314    Counterfeiting, forging, or unauthorized reproduction of any document, article of identification, money, security, or official paper (may be categorized in terms of greater severity according to the nature of the item being reproduced, e.g., counterfeiting release papers to effect escape, Code 102).

315    Participating in an unauthorized meeting or gathering.

316    Being in an unauthorized area without staff authorization.

317    Failure to follow safety or sanitation regulations (including safety regulations, chemical instructions, tools, MSDS sheets, OSHA standards).

318    Using any equipment or machinery without staff authorization.

319    Using any equipment or machinery contrary to instructions or posted safety standards.

320    Failing to stand count.

321    Interfering with the taking of count.

322    (Not to be used).

323    (Not to be used).

324    Gambling.

325    Preparing or conducting a gambling pool.

326    Possession of gambling paraphernalia.

327     Unauthorized contacts with the public.

328     Giving money or anything of value to, or accepting money or anything of value from, another inmate or any other person without staff authorization.

329     Destroying, altering, or damaging government property, or the property of another person, having a value of $100.00 or less.

330     Being unsanitary or untidy; failing to keep one's person or quarters in accordance with posted standards.

331     Possession, manufacture, introduction, or loss of a non-hazardous tool, equipment, supplies, or other non-hazardous contraband (tools not likely to be used in an escape or escape attempt, or to serve as a weapon capable of doing serious bodily harm to others, or not hazardous to institutional security or personal safety) (other non-hazardous contraband includes such items as food, cosmetics, cleaning supplies, smoking apparatus and tobacco in any form where prohibited and unauthorized nutritional/dietary supplements).

332     Smoking where prohibited.

333     Fraudulent or deceptive completion of a skills test (e.g., cheating on a GED or other education or vocational skills test).

334     Conducting a business; conducting or directing an investment transaction without staff authorization.

335     Communicating gang affiliation; participating in gang related activities; possession of paraphernalia indicating gang affiliation.

336     Circulating a petition.

396     Use of the mail for abuses other than criminal activity which do not circumvent mail monitoring; or use of the mail to commit or further a Moderate category prohibited act.

397     Use of the telephone for abuses other than illegal activity which do not circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a Moderate category prohibited act.

398     Interfering with a staff member in the performance of duties most like another Moderate severity prohibited act. This charge is to be used only when another charge of Moderate severity is not accurate. The offending conduct must be charged as "most like" one of the listed Moderate severity prohibited acts.

399     Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Moderate severity prohibited act. This charge is to be used only when another charge of Moderate severity is not accurate. The offending conduct must be charges as "most like" one of the listed Moderate severity prohibited acts.

**AVAILABLE SANCTIONS FOR MODERATE SEVERITY LEVEL PROHIBITED ACTS**

A    Recommend parole date rescission or retardation.

B    Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 25% or up to 30 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B1    Disallow ordinarily between 25%  (1-14 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C    Disciplinary segregation (up to 3 months).

D    Make monetary restitution.

E    Monetary fine.

F    Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).

G    Change housing (quarters).

H    Remove from program and/or group activity.

I    Loss of job.

J    Impound inmate's personal property.

K    Confiscate contraband.

L    Restrict to quarters.

M    Extra duty.

**LOW SEVERITY LEVEL PROHIBITED ACTS**

400    (Not to be used).

401    (Not to be used).

402    Malingering, feigning illness.

403    (Not to be used).

404    Using abusive or obscene language.

405    (Not to be used).

406    (Not to be used).

407    Conduct with a visitor in violation of Bureau regulations.

408    (Not to be used).

409    Unauthorized physical contact (e.g., kissing, embracing).

498    Interfering with a staff member in the performance of duties most like another Low severity prohibited act. This charge is to be used only when another charge of Low severity is not accurate. The offending conduct must be charges as "most like" one of the listed Low severity prohibited acts.

499    Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Low severity prohibited act. This charge is to be used only when another charge of Low severity is not accurate. The offending conduct must be charged as "most like" one of the listed Lowe severity prohibited acts.

## AVILABLE SANCTIONS FOR LOW SEVERITY LEVEL PROHIBITED ACTS

B1    Disallow ordinarily up to 12.5% (1-7 days) of good conduct time credit available for year (to be used only where inmate found to have committed a second violation of the same prohibited act within 6 months); Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (to be used only where inmate found to have committed a third violation of the same prohibited act within 6 months) (a good conduct time sanction may not be suspended).

C    Make monetary restitution.

D    Monetary fine.

E    Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).

F    Change housing (quarters).

G    Remove from program and/or group activity.

H    Loss of job.

I    Impound inmate's personal property.

J    Confiscate contraband.

K    Restrict to quarters.

L    Extra duty.

NOTICE TO INMATES
INMATE COPAYMENT PROGRAM

Pursuant to the Federal Prisoner Health Care Copayment Act (FHCCA) of 2000 (P.L. 106-294, 18 U.S.C. § 4048), The Federal Bureau of Prisons and ____FCC Terre Haute____ provide notice of the Inmate Copayment Program for health care, effective October 3, 2005.

A.    **Application:**  The Inmate Copayment Program applies to anyone in an institution under the Bureau's jurisdiction and anyone who has been charged with or convicted of an offense against the United States, except inmates in inpatient status at a Medical Referral Center (MRC).  All inmates in outpatient status at the MRCs and inmates assigned to the General Population at these facilities are subject to copay fees.

B.    **Health Care Visits with a Fee:**

1.    You must pay a fee of $2.00 for health care services, charged to your Inmate Commissary Account, per health care visit, if you receive health care services in connection with a health care visit that you requested, except for services described in section C., below.

These requested appointments include Sick Call and after-hours requests to see a health care provider.   If you ask a non-medical staff member to contact medical staff to request a medical evaluation on your behalf  for a health service not listed in section C., below, you will be charged a $2.00 copay fee for that visit.

2.    You must pay a fee of $2.00 for health care services, charged to your Inmate Commissary Account, per health care visit, if you are found responsible through the Disciplinary Hearing Process to have injured an inmate who, as a result of the injury, requires a health care visit.

C.    **Health Care Visits with no Fee:**

We will not charge a fee for:

1.    Health care services based on health care staff referrals;
2.    Health Care staff-approved follow-up treatment for a chronic condition;
3.    Preventive health care services;
4.    Emergency services;
5.    Prenatal care;
6.    Diagnosis or treatment of chronic infectious diseases;
7.    Mental health care; or
8.    Substance abuse treatment.

If a health care provider orders or approves any of the following, we will also not charge a fee for:

- Blood pressure monitoring;
- Glucose monitoring;
- Insulin injections;
- Chronic care clinics;
- TB testing;
- Vaccinations;
- Wound Care; or
- Patient education.

Your health care provider will determine if the type of appointment scheduled is subject to a copay fee.

D.   **Indigency:**  An **indigent inmate** is an inmate who has not had a trust fund account balance of $6.00 for the past 30 days.

If you are considered indigent, you will not have the copay fee deducted from your Inmate Commissary Account.

If you are NOT indigent, but you do not have sufficient funds to make the copay fee on the date of the appointment, a debt will be established by TRUFACS, and the amount will be deducted as funds are deposited into your Inmate Commissary Account.

E.   **Complaints:**  You may seek review of issues related to health service fees through the Bureau's Administrative Remedy Program (see 28 CFR part 542).

## NOTICE TO ALL INMATES

The Federal Bureau of Prisons has established a centralized
processing facility for all incoming inmate funds.  **Effective
November 1, 2004 all funds for inmates must be sent to the
National Lockbox location at the following address:**

**Example:**

| | |
|---|---|
| Federal Bureau of Prisons | Federal Bureau of Prisons |
| Inmate Name | John Doe |
| Inmate Register Number | 12345-678 |
| Post Office Box 474701 | P.O. Box 474701 |
| Des Moines Iowa 50947-0001 | Des Moines Ia. 50947-0001 |

**Effective December 1, 2004 the institution mail room will no
longer accept funds received from any source outside the
institution. All funds received after that date will be returned
to the sender.**  Please notify all persons who send you mail that
they must send all funds to the national Lockbox mailing address
(above), and adhere to the following instructions:

> Only approved negotiable instruments will be accepted.  The
> following negotiable instruments are approved:
> Money orders; Government checks; Foreign negotiable
> instruments (U.S. Currency only); and Business checks.

**note:**   Personal checks are not an approved type of
negotiable instrument and will be returned to the sender.

All negotiable instruments must have the inmate's committed
name (no nick names) and register number printed on them.
The name and return address of the sender must appear in the
upper left hand corner of the envelope to ensure that funds
can be returned when necessary.
**No items other than the negotiable instruments will be accepted;
any enclosures received with the negotiable instruments
(letters, pictures, etc.) will be discarded.**

Any questions regarding these procedures should be directed
to the ISM department.



**U. S. Department of Justice**
Federal Bureau of Prisons

## INSTITUTION SUPPLEMENT

OPI      CMU Unit Manager
NUMBER  THX-5214.02A
DATE    October 25, 2016

**COMMUNICATIONS MANAGEMENT UNIT (CMU)**

*Approved:*    Charles A. Daniels
              Complex Warden

              S. Julian
              Warden

I.      **PURPOSE AND SCOPE**: Pursuant to Program Statement 5214.02, <u>Communications Management Units</u>, dated April 1, 2015, this Institution Supplement establishes local operations and procedures for the Communication Management Unit (CMU) in D-Unit, at the Federal Correctional Institution, Terre Haute, Indiana. If there is a conflict between this Supplement and another Terre Haute Supplement, this Supplement will take precedence for matters

II.     **SUMMARY OF CHANGES**: Institution Supplement was rewritten and renumbered to reflect issuance of Program Statement 5214.02, which governs the operation of the Communication Management Units

III.    **DIRECTIVES AFFECTED**

       **A.**    **Directives Referenced**:
             Program Statement 1315.07, <u>Legal Activities, Inmate</u>, dated 11/5/1999
             Program Statement 5214.02, <u>Communications Management Units</u>, dated 4/1/2015
             Program Statement 5264.08, <u>Inmate Telephone Regulations</u>, dated 1/24/2008

B.  **Admission & Orientation**: The Unit Manager is responsible for administering Admission and Orientation (A&O) in compliance with national policy.   The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior and programs available.   All items on the A&O checklist will be covered and utilized for verification of participation.   As part of A&O, CMU inmates will receive a copy of this Institution Supplement and an A&O Handbook.

C.  **Contact With Persons in the Community**:

   1.  **Written Correspondence**:   Mail call will ordinarily be held Monday through Friday between the hours of 10 a.m. and 12 p.m.   Mail will only be given to the addressee.   All written correspondence leaving the unit, including hand written notes and Inmate Requests to Staff, must be hand-delivered to unit management staff.

     Mail leaving the institution must contain a return address which includes the inmate's name and register number.   Outgoing mail must also be addressed using the inmate label program.   Legal and special mail will ordinarily be delivered by unit management staff. Outgoing legal mail (privileged communication to the inmate's attorney only) may be sealed and handed to unit management staff during mail call.

     Electronic Messaging:   Electronic messaging (TRULINCS) workstations and print stations are available in the CMU Law Library. They are ordinarily available between the hours of 6 a.m. and 9:15 p.m.

   2.  **Telephone Communication:**   Inmates must inform staff prior to any call if either party will speak in a language other than English.   If prior notification is not provided and either party speaks in a language other than English, the call will be immediately terminated by staff.   In the event of terminated calls, inmates may be subject to disciplinary action and the person may be removed from the inmate's approved telephone list.

     Approved unmonitored calls to an inmate's attorney are made available consistent with Program Statement 5264.08, Inmate Telephone Regulations.

   3.  **Visiting**: Persons for whom an inmate requests placement on the approved visiting list must complete the "Acknowledgment of Conditions for Visiting with Inmates in CMU, FCI Terre Haute," form included with this Institution Supplement as Attachment A, as proof of acknowledgment and acceptance of the visiting conditions. Any violations of regulation or policy may result in immediate termination of the visit.   Nonverbal communication (i.e. hand signals, sign

language) during a visit may result in termination of the visit.

Attorney visits are governed by Program Statement 1315.07, <u>Legal Activities, Inmate</u>.

V.     **ADMINISTRATIVE REMEDY PROGRAM**:  A member of the Unit Team will provide the inmate with the necessary form(s) upon request.

VII.     **RESPONSIBILITY:**  The CMU Unit Manager is responsible for the annual update and review of this Institution Supplement.

**DISTRIBUTION:**
Wardens
Department Heads
Law Library
Information Technology Manager
President AFGE