Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Office of the Pro Se Clerk
U.S. District Court
The Southern District of New York
500 Pearl St.
New York, NY 10007

Thursday, September 12th, 2019

In re: <u>18-cv-10836-PGG filing of letter declaration (non-motion)</u>

To Whom It May Concern:

    I hope that my correspondence finds you well.

    May I please ask the Office of the Pro Se Clerk to file the enclosed as a letter declaration (non-motion) on the docket of the case <u>18-cv-10836-PGG</u>? May I please also ask that the Office of the Pro Se Clerk use <u>the enclosed self-addressed stamped envelope (SASE)</u> to mail me a copy of the PACER receipt from this filing?

    With appreciation,

Martin S. Gottesfeld, pro se



- Page 1 of 1 -

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

The Honorable Paul G. Gardephe
U.S. District Court Judge
The Southern District of New York
500 Pearl St.
New York, NY 10007

Thursday, September 12th, 2019

In re: Loc. R. Civ. P. 1.5(b)(5) and N.Y. R. Prof. Conduct

Dear Honorable Judge Gardephe:

    I hope that my letter finds Your Honor well.

    Pursuant to Loc. R. Civ. P. 1.5(b)(5) and N.Y. R. Prof. Conduct 3.3(a)(3), 3.4(a)(4), and 4.1 (22 NYCRR 1200.0), please find the enclosed, a letter/declaration that may be relevant to United States v. Stefan Irving, S3 03 Crim. 0633 (LAK) in The Southern District of New York. Please see also In re Gilly, 976 F.Supp.2d 471 (S.D. N.Y. 2013).

    Additional material provided in the enclosed is relevant to my pending motion for a TRO protecting my right to publish.

    With appreciation,

Martin S. Gottesfeld, pro se



Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Senator Charles Schumer
Honorable Senate Minority Leader
C/O Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
By first-class U.S. mail, tracking number: 9114 9023 0722 4072 3908 72

CC: Senator Chuck Grassley
Honorable Chairman
Senate Armed Services Committee
C/O Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
By first-class U.S. mail, tracking
number: 9114 9023 0722 4072 3908 72

Mr. William Barr
Honorable U.S. Attorney General
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001
By first-class U.S. mail, tracking
number: 9114 9023 0722 4293 0885 03

The Honorable Paul G. Gardephe
U.S. District Court Judge
The Southern District of New York
500 Pearl St.
New York, NY 10007
By first-class U.S. mail, tracking
number: 9114 9023 0722 4072 3908 58

Ms. Katherine Hawk Sawyer
Acting Director, FBOP
320 First St. NW
Washington, D.C. 20534
By first-class U.S. mail, tracking
number: 9114 9023 0722 4072 3900 70

Tuesday, September 10th, 2019

In re: **FCI Terre Haute communications-management unit (CMU)**

Dear Senator Charles Schumer, Honorable Senate Minority Leader:

I hope that this letter finds you well, sir, and pursuant to 28 U.S.C. §1746, I declare that this letter is true and correct under penalty of perjury.

I am thankful both to you and to your office for your recent inquiry as to my status and wellbeing here inside the Federal Bureau of Prisons (FBOP) "communications-management unit," or "CMU," at the Federal Correctional Institution (FCI) Terre Haute, Indiana. By now, Warden B. Lammer probably told your office that I declined its request to authorize the FBOP to release information relevant to its inquiry. If so, then as I explain below, that wasn't exactly true.

First, however, you and the American public should know that this CMU is not what its operators purport it to be. Indeed, these operators, who include former--Complex-Warden Jeffrey E. Krueger, former--FCI-Warden Jesse R. Bell, current--Complex-Warden T.J. Watson, current--FCI-Warden B. Lammer, FBOP non-attorney--spokesperson Katherine Siereveld, and former--Acting-FBOP-Director Hugh J. Hurwitz, have thus far very successfully covered up radical-Islamic militant Rodney Curtis Hamrick's (federal registration number: 01192-087) coldblooded, premeditated, murder of Mr. Robert David Neal (federal registration number: 15151-180) that took place here in November, 2018, as well as Hamrick's contemporary attempted murder and multiple stabbing of another man, Mr. Richard Eugene Warren. These operators maintained this coverup all throughout the clamorous release from this CMU into the American public of Hamrick's fellow radical John Walker Lindh. They have thus far also maintained this facade through the fallout arising from the recent death of Jeffrey Epstein under what--at the risk of understatement--I can only describe

objectively as highly-suspicious circumstances reminiscent of those that happened here in November and were covered-up.

I believe that you and the American public will find quite illuminating the transcript of Mr. Warren's sworn testimony about November's events in the FCI Terre Haute CMU, which he provided as a witness in support of the man who saved his life, Mr. Kurt Johnson, at the September 5th, 2019, sentencing hearing held in the case 4:18-cv-40043-JPG in The Honorable U.S. District Court for The Southern District of Illinois.

Why didn't the American public at large learn of these Jihadi acts prior to Walker Lindh's release from this same CMU? And how has Mr. Neal's murder by Hamrick, aka Abdul Lateef, remained largely unknown after the similarly-preventable and high-profile death of Jeffrey Epstein, especially in consideration of the strikingly-similar and unlikely apparent unavailability of standard evidence even though both incidents occurred inside FBOP facilities that are supposedly tightly monitored and well documented at great taxpayer expense? It is my sincere hope, Senator Schumer, both as a proud American and as a credentialed journalist, that the Senate will convene hearings to obtain answers to these and related questions. I believe that your Honorable Senate colleague Mr. Chuck Grassley is already somewhat familiar with the deceptive practices the DOJ employs around its clandestine CMUs. It is therefore my hope that bipartisan support exists for a formal inquiry.

I believe that the public needs such an inquiry in light of the DOJ's withholding of crucial information during and after Walker Lindh's release, and that such an inquiry would firmly establish the real reason for the existence of the CMUs--which in light of the above, clearly do not exist to protect the American public. So far as I am able to see from my one hundred and sixty-three (163) consecutive days thus far embedded here as both a reporter for The Intercept and a frequent contributor to Info Wars, their true purpose is to allow the very worst and most corrupt holdovers inside the Executive and Judicial branches to cover for each other and to evade public accountability--including Congressional oversight.

The operators of these units and their parties in privity elsewhere in the Executive branch and in the Judicial branch misappropriated the banner of "counter-terrorism" long ago during the George W. Bush administration and ever since they've used it for camouflage by preying on taxpayers' fears. Instead of countering terrorism though, like the kind that cost Mr. Neal his life, these operators effectively cover for it, thereby protecting themselves from the consequences of their own negligence and arrogance, like November's events here, at the risk of your constituents and Americans elsewhere during times like Walker Lindh's release.

You see, Senator Schumer, they have created at the cost of tens of millions of taxpayer dollars per year unnecessary powder kegs and fertile recruitment grounds in the CMUs by mixing hard-core convicted Jihadi fighters with previously--non-violent inmates, many of whom are in reality inconvenient political prisoners. They use the Jihadis to justify draconian communications restrictions that they then leverage illegitimately as a cudgel against the political prisoners in violation of the Constitution, not to protect the public, but to stop the public from learning the truth about many of the most scandalous abuses of power carried out by federal agencies and judges. The result is quintessentially unamerican, as I and my coauthor Mr. Francis Schaeffer Cox detailed in The CMU Series, found in docket entry (D.E.) 69 Exhibit 1 of my pending case 18-cv-10836-PGG in The Honorable U.S. District

Court for The Southern District of New York.

The CMUs thus emerged as breeding grounds for violent extremists because they facilitate the confinement in close quarters of those eager to spread their violent ideologies alongside those vulnerable to such pressure. Before Hamrick converted to radical Islam here, for example, he was a U.S. Army soldier. And before Hamrick came to the CMU, he'd already killed another inmate prior to Mr. Neal, albeit for different reasons. As can be seen in United States v. Hamrick, 43 F.3d 877 (4th Cir. 1993), Hamrick had also mailed a letter-bomb he somehow made in prison to a U.S. attorney and threatened the life of President Reagan. It's hard to imagine a curriculum vitae more impressive and desirable to radical-Islamic groups for recruitment than Hamrick's, and rather than find themselves separated in prison from such a promising prospective member, the U.S. Department of Justice delivered Hamrick directly to them in confined close quarters. It seems that only in the federal agency known as "F[remainder of expletive deleted]ing Backwards On Purpose" could such an arrangement be considered anything other than sheer lunacy.

Speaking of lunacy, the CMUs also ensure that rather than face the FBOP's administrative maximum-security facility in Florence, Colorado, where Joaquin "El Chapo" Guzman Loera and several other non-Jihadis currently reside, or the necessity of assimilation into a larger, more diverse, and less-vulnerable general inmate population elsewhere, convicted Jihadis are instead concentrated here in the CMUs, where their numbers and their role justifying the salaries and bonuses of the CMUs' operators give them leverage that is counterproductive to the stated goals of the CMUs as the units are sold to the public at its great expense.

Right now, for example, Mr. Leon Davis has spent more than one (1) month in "the hole" here because he renounced violent radical Islam, and yet, rather than segregate the unrepentant violent extremists who would do him harm as an apostate, the CMU's administration lets these violent extremists "drop notes" on Mr. Davis like petty jailhouse snitches--even though they greatly outnumber him. By "dropping" these notes, these violent extremists get the CMU administrators to do their bidding like puppets on strings against Mr. Davis. They placed Mr. Davis in "the hole" under these illegitimate circumstances, thereby punishing him and disincentivizing his brave, difficult, and commendable choice to cut ties with his violent former associates--the exact choice that instead the FBOP should encourage and positively reinforce. Please see part four (4) of The CMU Series, Senator Schumer, for details of the shocking conditions and human-rights violations that Mr. Davis endures for an increasing and prolonged period as a result of his effort inside the FBOP to give up violence.

Indeed, the arbitrary and capricious operation of the CMUs was already noted by a panel of federal appellate judges more than three (3) years ago in Aref v. Lynch, 833 F.3d 242, 257 (D.C. Cir. 2016). The U.S. Court of Appeals said in that case that placement in a CMU is "atypical" and "indefinite," and that, "even though several thousand inmates could be designated to CMUs based on their commitment offenses, only a handful are placed under these [CMU] restrictions." This, of course, leads to the obvious question of how and why-- and based upon what criteria--this "handful" of inmates are actually targeted for placement here. The lower court, perhaps tellingly, has now let the above case languish on its docket for more than three (3) years ever since the higher court reversed its clearly-erroneous summary judgment in favor of the CMUs' operators.

In partial answer to the lingering questions above, however, I believe that The CMU Series speaks for itself. The full, true, stories of myself and my coauthor Mr. Cox in parts five (5) and six (6)--and our efforts to protect American children like Justina Pelletier and Paula Roberds from dangerously-- well-connected moneyed influencers like Ioana Simona Bujoreanu, Jeffrey Epstein, and Bill Allen--provide necessary background on the corrupt and immoral prosecutions that resulted in our placement here alongside many similary-situated individuals while those guilty of child torture and sexual predation upon children enjoy above-the-law status for far too long in the face of stunningly-conclusive evidence of their misconduct, like Epstein, Bill Allen, and Justina Pelletier's tormentors.

I want to state for the record as well, Senator Schumer, that even the heavily-conflicted U.S. district court judge assigned to my case ruled in limine to preclude the similarly-conflicted prosecutors from using the word "terrorist" and similar language against me. That's the extent of the obviousness of the true nature and circumstances of my efforts to save Justina Pelletier and notorious former--U.S.-Attorney Carmen Ortiz's office was unable to convince my jury that my efforts so much as potentially affected the care of a single one (1) of the vulnerable children that assistant U.S. attorneys David J. D'Addio and Seth B. Kosto shamelessly and sycophantically used as pawns and props in their immoral sideshow prosecution of me while the one (1) true victim, Justina Pelletier, thanked me in Rolling Stone for helping her. Please see the following articles: The Huffington Post, This Federal Prosecutor Is Building A Career Indicting The Good Guys, July 2016, by Ryan Grim and Daniel Marans; The Huffington Post, The Wrong Ortiz Retires In Boston, October 2016, by Martin Gottesfeld; Rolling Stone, The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison, June 2017, by David Kushner; and The Daily Wire, 'Guardian Hacktivist' Martin Gottesfeld Convicted; Faces Up To 15 Years In Prison, August 4th, 2018, by Frank Camp.

I also want you to know, Senator Schumer, that Mr. Donald Reynolds, whose tragic story is told fairly for the first time in part two (2) of The CMU Series, continues to suffer outrageous Constitutional violations here in the CMU evincing of only one (1) true purpose--the continued coverup of the Bush/Obama-era Operation Fast and Furious "gun walking" program at the illegitimate cost to Mr. Reynolds of his inalienable rights to life, liberty, and the pursuit of happiness. Just as the DOJ framed your late Senate colleague Ted Stevens, those responsible for Operation Fast and Furious wove an elaborate hoax to make Mr. Reynolds appear culpable. This ruse, however, is a proverbial house of cards. It will take but a small breeze of truth for it to collapse.

So, faced with the inevitable dissemination of that truth, the FCI Terre Haute CMU administration simply falsifies records against Mr. Reynolds in order to block his communications and frustrate his Constitutionally-protected efforts to exonerate himself. Enclosed with this letter, for example, is a copy of an FBOP incident report as it currently exists in the official agency record, as well as, in contrast, a copy of the documentation as it was originally provided by Mr. Reynolds for placement in that record pursuant to his right to present evidence in his own defense. It's plain to see, Senator Schumer, that Mr. Reynolds's version rigorously refutes the retaliatory incident report. Only by illegitimately excising key material--and thereby falsifying the federal record--could FBOP Disciplinary Hearing Officer (DHO) Jason Bradley cover for his unconstitutional finding against Mr. Reynolds.

Bradley, it turns out, has a history of conspiring to defeat justice in blatant violation of 42 U.S.C. §§ 1985(3) and 1986. Also enclosed is another FBOP incident report in which Bradley interrupted his colleague and refused to follow his own Bureau's policies, federal regulation, and U.S. Supreme Court case law in order to punish me for helping Mr. Cox assert his innocence in a federal court pursuant to a valid federal-court order. Bradley's exact words to me and his FBOP colleague, i.e. my staff representative, when he thought that he was acting with total impunity, were, "I don't care about your case law."

Two (2) U.S. district courts subsequently backed up Bradley by refusing on erroneous jurisdictional grounds to curb his unlawful conduct. And now the FBOP won't provide me with Bradley's statement of his findings in support of the unlawful acts he and others took under color of federal authority. This leaves me unable to appeal Bradley's decision within the Bureau and therefore unable to address the merits of the issue in the local federal courts, where jurisdiction is inarguable. You see, Senator Schumer, Bradley and his coconspirators are hard-pressed to falsify documents in this second FBOP incident report because true copies were filed in multiple federal courts.

I also wrote several times to the Office of the Inspector General (OIG) for the U.S. Department of Justice (DOJ) about these and a variety of other matters. Enclosed for your review, Senator Schumer, are some of my past letters to the OIG. I never heard back though, so I must assume either that the OIG didn't receive my correspondence intact, which I find very likely based upon my own experiences and those of many others in the CMUs, or, far less likely, that the OIG too is in on the funny business that goes on around here. If you or your staff could inquire with the OIG and confirm that it received my mail, I would appreciate it.

In the meantime, Senator Schumer, I hope that you can see why the expression here in the CMUs is that our prize for winning is that we get to see them cheat. Further, under the circumstances detailed here, in The CMU Series, and in the enclosed documents, I hope that you and the public will understand that I cannot engage in any social correspondence whatsoever from inside a CMU so long as Bradley, Katherine Siereveld, Todd Royer, Warden Lammer, and their coconspirators control this unit in total disregard for the Constitution and the American way, and in the total absence of effective oversight. My efforts to vindicate our Constitutional rights in federal court from this CMU have already lengthened my bogus sentence for the non-crime of saving a tortured girl in a wheelchair when I didn't harm a soul. This sentence was imposed by U.S. District Court Judge Nathaniel M. Gorton, of the "Trust the Gorton's Fisherman" family, whose business, Slade Gorton & Co., Inc., where Judge Gorton lists himself as a shareholder and director, benefits directly from industry research carried out by the perpetraitors who crippled that very same girl in question. Please see the 2015 annual report of The Seafood Nutrition Partnership and my previous writing in addition to part six (6) of The CMU Series for confirmation of these conflicts of interest.

Moreover, please see 28 U.S.C. §455(a), where Congress legally mandated, "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably by questioned."

In light of what I've seen and documented in my work, I know that this straightforward legal requirement is not heeded as Congress intended--even though it was enacted after its predecessor statute also proved ineffective at

the same simple goal of preserving the integrity of the judicial system due to "judicial gloss." Therefore, stronger legislative safeguards are in order to protect and better impliment The Due Process Clause.

Judge Gorton, it's worth noting, also presided over the calamity that was United States v. Aaron Swartz--a case that culminated in oversight hearings in both Houses of Congress and a case that I hope the legislature hasn't forgotten while America awaits the passage of both Aaron's Law and Justina's Law. Please understand the great risk that I take, Senator Schumer, by attempting to send this response to your inquiry given what we've already seen happen to Mr. Neal, Mr. Warren, and many others in the FBOP, as well as to Aaron Swartz. The corrupt forces that I expose already killed repeatedly, either directly, through deliberate omission, or both.

They are indeed so brazen, Senator Schumer, that they've apparently made Robert Kenneth Decker (federal registration number: 51719-074) their main operative inside this CMU. Based upon Robert Kenneth Decker's own statements directly underneath a FBOP microphone in the FCI Terre Haute CMU law library this past Friday about his time in the late 1990s and early 2000s in Acapulco, Mexico, Robert Kenneth Decker seems to be the same Robert Decker who used the fake name Roberto Compos Lopez and ran Castillo Vista Del Mar, a hotel south of the border for predatory American pedophiles, similar perhaps to Epstein's private "pedophile island." There, after Robert Decker was already a convicted child molester, he and his coconspirator Timothy Joe Julian forcibly raped at least one (1) juvenile male. When the jig was up, it seems that Robert Decker then testified against Julian and a pedophile former-pediatrician who visited Castillo Vista Del Mar named Stefan Irving so that Robert Decker could save himself, even though Robert Decker was clearly the ringleader and operational manager of Castillo Vista Del Mar, and as such he likely belonged as the head of the indictment. Please see United States v. Julian, 427 F.3d 471 (7th Cir. 2005) and United States v. Irving, 432 F.3d 401 (2d Cir. 2005) and 452 F.3d 110 (2d Cir. 2006).

Based upon Robert Kenneth Decker's open bragging here in the FCI Terre Haute CMU about buying pounds of cannabis in Michigan for the very specific price of $1,300 each, it also appears that he is the same Robert Decker who cut a deal to save himself and testified in Weissert v. Palmer, 2015 U.S. Dist. LEXIS 130397 (W.D. Mich. 1:10-cv-851 July 31, 2015).

The DOJ is well aware of Robert Kenneth Decker's violent nature, as can be seen in the federal court record documenting his past assault on FBOP staff in Robert K. Decker v. J.E. Krueger, 2019 U.S. Dist. LEXIS 55411 (S.D. Ind. 2:18-cv-00257-WTC-MSD, April 1, 2019). Perhaps tellingly, despite the seriousness of that offense, the U.S. attorney's office took just one (1) day to decline to criminally prosecute Robert Kenneth Decker. Since it seems quite unlikely that any serious investigation could have been concluded so quickly, Senator Schumer, it's as if there are no circumstances under which the DOJ would press charges against Robert Kenneth Decker for an assault on its own staff.

And this is despite the DOJ's knowledge that Robert Kenneth Decker is a risk for bloodborne and sexually-transmitted diseases like Hepatitis C, as documented in Robert K. Decker v. David Lukens, 2019 U.S. Dist. LEXIS 49783 (S.D. Ind. 2:18-cv-00185-WTL-MJD, March 26, 2019).

But perhaps worst of all, Senator Schumer, these DOJ employees know or should know that Robert Kenneth Decker attempted to defraud the very same federal courts where their own department apparently brought him and insisted

on multiple occasions that he is a reliable witness. You see, Robert Kenneth Decker tried to entrap a young male inmate here who has a significant mental-health history into intentionally filing a falsified document in a federal court in The Fourth Circuit. Robert Kenneth Decker appears to have been grooming this young male inmate in a manner reminiscent of the character Tea Bag from the popular television show Prison Break, after this young male inmate arrived here in a vulnerable position following an assault he endured at the other CMU and a resultant transfer. Had this young male inmate fallen into Robert Kenneth Decker's apparent trap, set within earshot of the microphone in the FCI Terre Haute CMU law library last week, then Robert Kenneth Decker could have leveraged his ability to testify against him in order to coerce sexual favors out of him.

Yet, the CMU operators allow Robert Kenneth Decker to do all of this in the relative open, Senator Schumer, while they appear to afford him special treatment. For example, Robert Kenneth Decker got caught less than one (1) month ago abusing the already-onerous attorney-client telephone procedures here to place unmonitored calls for God knows what purpose(s). Based on his past behavior though, it's very possible he was trying to introduce controlled substances into the facility, as he did in Robert Decker v. J.E. Krueger, 2018 U.S. Dist. LEXIS 175076 (S.D. Ind. 2:18-cv-00031-JMS-MJD, October 11, 2018) and the separate cases of Robert K. Decker v. J.E. Krueger, 2019 U.S. Dist. LEXIS 90477 (S.D. Ind. 2:18-cv-00249-JMS-MJD, May 30, 2019) and Robert K. Decker v. J.R. Bell, 2019 U.S. App. LEXIS 18613 (7th Cir. 18-3330 and 18-3331, June 21, 2019).

When he was caught, however, Robert Kenneth Decker spent less than five (5) days in the special-housing unit (SHU) here, when it seems likely that any of the rest of us would be locked up back there for months or longer for far-less-offensive conduct, as detailed in The CMU Series part four (4).

So why the apparent special treatment for the predator pedophile, a la Bill Allen in part five (5) of The CMU Series? I may have just answered my own question, Senator Schumer. You see, Robert Kenneth Decker seems to be their rat-in-chief. And it seems that as long as he tells the DOJ what its staff want to hear, he can go around here threatening to put holes in people, as he did in the FCI Terre Haute CMU law library this past Friday evening, right under one (1) of the many microphones that canvas this CMU. This means that either the DOJ knows about Robert Kenneth Decker's beligerence, his grooming behavior, and his attempted fraud upon the court, and they encourage his actions, or, the tens of millions of federal tax dollars that the House and the Senate appropriate to run these two (2) small CMUs are not spent to monitor the expensive audio-surveillance system for which the taxpayers also were billed top dollar.

Is Robert Kenneth Decker the next Rodney Curtis Hamrick? Or worse? After all, Hamrick isn't a sexual predator, and he didn't target the young, the impressionable, and the mentally ill.

Based on Robert Kenneth Decker's conspiracy to defraud the court recorded by a DOJ microphone in a DOJ facility, will the Justice Department notify the courts or the defendants in any of the above cases where Robert Decker was presented by federal prosecutors as a truthtelling witness? Somehow, Senator Schumer, I doubt it.

For the record, Robert Kenneth Decker denies that he testified against anyone. He insists that Robert Decker is a common name. When asked about Castillo Vista Del Mar, Robert Kenneth Decker said, "I don't know what you're

[expletive deleted] talking about!"

That's a likely story, given the above and the distinguishing treatment Robert Kenneth Decker seems to receive in the CMUs.

And this is not to say that I am without sympathy for Robert Kenneth Decker. He openly reports that he's a survivor of childhood clergy sexual abuse. Based upon his age and history of substance addiction, it's also possible that Robert Kenneth Decker is the same Robert Decker from <u>Williamson v. Fla. Dep't of Corr., 805 F.3d 1009 (11th Cir. 2015)</u>.

That Robert Decker returned home from dinner with his dad on Friday, November 4th, 1988, to a robbery for drugs and money gone horribly wrong. That Robert Decker, his father Clyde, and his 2-year-old son Carl were each shot in the head. They all miraculously survived.

Robert Decker's wife Donna wasn't so lucky. She was stabbed to death.

Authorities arrived to find her already deceased, clutching the phone she used to summon the help that saved her husband, child, and father-in-law.

For years, the only witness able to identify Dana Williamson as the murderer wouldn't come forward for fear of Williamson's threats that night that if identified, he'd torture and kill the witness and his family. Eventually though, the witness did come forward and testify.

Williamson was sentenced to death. The Eleventh Circuit upheld Williamson's conviction and death sentence.

Whomever Robert Kenneth Decker is--or isn't--the U.S. Department of Justice and its Federal Bureau of Prisons should be working to get him the help that he needs, and not using him as a pawn in their sick games in the CMUs. There is no treatment here, Senator Schumer, not for substance abuse, not for past psychiatric trauma like childhood sexual abuse and PTSD, and not for predators. As messed up as this situation surely is, Senator Schumer, I'd rather sit down to eat in the same room with Robert Kenneth Decker than with the DOJ's CMU administrators who take advantage of him in order to take advantage of others.

And I don't want to leave the CMU until whatever necessary action(s) have been taken in the three (3) branches of our government to ensure that units like these are not used to silence political prisoners. So, please don't try to have them move me unless and until that happens. I wouldn't feel right leaving; however long it takes.

Besides, when award-winning journalist Barrett Brown wrote that the FBOP is "an unspoiled journalistic paradise of poorly concealed government corruption and ham-firsted cover-ups," he'd never seen the CMUs.

My thanks to you and your office, Senator Schumer; to all of the real-news journalists who've helped get the truth out; and my love to my family, especially my darling wife Dana,

Martin "MartyG" Gottesfeld
• Journalist • Rolling-Stone--featured human-rights advocate

P.S. They won't let me keep a copy of your office's request to release my information, and with them already falsifying documents, I won't sign anything when they won't let me keep copies of all the relevant documentation in case I

have to challenge some bogus concoction of theirs later. I'm also enclosing other relevant information that you and your office should see. If copies of this letter aren't received everywhere I indicated on the first page, then that likely indicates--at best--that the enclosed requests to send them without being punished did not lead to affirmative responses.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Tuesday, September 10th, 2019.

Martin S. Gottesfeld



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

DONALD RAY REYNOLDS JR, 32349-074
TERRE HAUTE FCI   UNT: CMU   QTR: D04-051L
4200 BUREAU ROAD NORTH
TERRE HAUTE, IN 47808

☐ Institution  ☒ Region  ☐ Central

CMU _____ Unit

## Receipt of
## Administrative Remedy

| Inmate Name: | Reynolds Jr | Reg. No.: | 32349-074 |
|---|---|---|---|
| Administrative Remedy No.: | 986334-R1 | | |

Received on this __6th__ day of __Sep__, 2019.

_R. E_____ CSW_
Signature/Title of Staff

If Administrative Remedy is allowed to be resubmitted, it is due to a Unit Team staff member by _____, 2019.

Edits received by Unit Team on this _____ day of _____, 2019.

_____
Signature/Title of Staff

# Inmate Copy

---

...ment of Justice
...reau of Prisons
...ntral Regional Office

**Regional Administrative Remedy Appeal**
**Part B - Response**

...dministrative Remedy Number:   986334-R1

This is in response to your Regional Administrative Remedy Appeal received on July 30, 2019, regarding the decision of the Discipline Hearing Officer (DHO). You were found to have committed the prohibited act of Code #197, Use of the Phone for Illegal Purpose. You appeal this decision stating the incident report was falsified in order to impede your access to the courts. You state you and your staff representative presented documentary evidence at the DHO hearing, but the DHO refused to accept and consider it. You further state the DHO noted in the DHO report you have a history of engaging in this type of misconduct, which is not true. You request the incident report be expunged.

In accordance with Program Statement, 5270.09, Inmate Discipline Program, the discipline process starts when staff witness or reasonably believe that you committed a prohibited act. A staff member will issue you an incident report describing the incident and the prohibited act you are charged with committing. The incident report was written based upon a phone conversation you had with your mother, where staff documented you provided instructions to file a frivolous tax return. There is no evidence the report was falsified in an attempt to impede your access to the courts.

According to your DHO report, the DHO considered documents that you had mailed to your mother. It was confirmed by the DHO these were the documents you presented as documentary evidence at your DHO hearing. Your documentary evidence was refused as the discipline packet already contained these documents. As this information was addressed in your DHO report, the DHO report has been amended. A copy of the amended DHO report is attached for your records. If you disagree with the amendment, you may include this in your appeal for the next level.

On appeal your history of misconduct was reviewed. It was noted you do have a history of attempting to file fraudulent tax returns. The DHO appropriately weighed and considered your history.

The DHO considered the reporting officer's documented report, the recorded phone call, copy of documents mailed to your mother, your history of like misconduct, and your defense. Although, you continue to deny the charge, the DHO sufficiently explained why the greater weight of the evidence supports the charge. The discipline process was conducted in accordance with Program Statement 5270.09.

Based on the above information, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

8-9-19
Date

J. E. Krueger, Regional Director

---

**DISCIPLINE HEARING OFFICER REPORT**

...MENT OF JUSTICE                                          FEDERAL BUREAU PRISONS
...AMENDED PURSUANT TO ADMINISTRATIVE REMEDY #986334-R1

...tion: FCC Terre Haute              Incident Report number: 3237478

OF INMATE: REYNOLDS, Donald          REG. NO.: 32349-074   UNIT: CMU

...te of Incident Report: 03-24-2019          Offense Code: 197

Date of Incident: 03-24-2019

Summary of Charges: Phone Abuse-Illegal Proposes

I.   NOTICE OF CHARGE(S):

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) 03-27-2019 at (time) 0941 (by staff member) Lott.

B. The DHO Hearing was held on (date) 05-03-2019 at (time) 1100.

C. The inmate was advised of the rights before the DHO by (staff member): Thomas on (date) 04-02-2019 and copy of the advisement of rights form is attached.

II.  STAFF REPRESENTATIVE

A. Inmate waived right to staff representative. Yes ____ No X .

B. Inmate requested staff representative and Harvey appeared.

C. Staff representative statement:
They let him send the paperwork out. On the phone call I can't tell if anything fraudulent is said.

D. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: (New Staff Representative Name) _____ was selected.

E. Staff representative _____ was appointed.

III. PRESENTATION OF EVIDENCE

A. Inmate ____(admits) X (denies) ____(neither) the charge(s).

B. Summary of inmate statement:
"They have to file tax returns for me."

C. Witnesses:
1. Inmate waived right to witness. Yes ____ No X

2. The following persons were called as witness at this hearing and appeared (Each witness name and statement listed below):

3. The following persons requested were not called for the reason(s) given (Each witness name and statement listed below): Internal Revenue Service as a witness. No individual witnesses were requested.

4. Unavailable witnesses were requested to submit written statements and those statements received were considered (Each witness name and statement listed below).

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following:

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

IV.  FINDINGS OF THE DHO

X A. The act was committed as charged.     C. No prohibited act was committed: Expunge according to Inmate Discipline PS.

B. The following act was committed:

1

| Inmate: ...OLDS, Donald | Reg. No. 32349-074 | Hearing Date: 05-03-3019 |
|---|---|---|

... SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.):

You were advised of your rights before the Discipline Hearing Officer and stated that you understood those rights. You requested a staff representative and you were provided with one.

Administrative notice is given to your attempt to give the DHO copies of your correspondence as documentary evidence. However, the DHO did not accept the copies of the correspondence due to having copies in the incident report packet.

Administrative notice is given to there being a delay in the investigation and UDC of this incident Report. Specifically the incident report process was suspended pending the referral of an inmate criminal matter for investigation on March 24, 2018, and released for administrative processing on March 27, 2019. The inmate did not provide any evidence that this delay hindered his ability to provide a defense.

The DHO finds that beginning on March 24, 2018, you committed the prohibited act of Code 197: Phone Abuse-Illegal Proposes.

The DHO considered the Incident Report which the reporting officer states, "On March 24, 2019 at approximately 2:30 p.m., inmate Reynolds, Donald, Reg. No. 32349-074, placed a telephone call to his family at 865-773-8127, and the call was being monitored. During the monitoring of the call, it was found inmate Reynolds was using the telephone for an illegal purpose, specifically by instructing his family members to file a false and fraudulent tax return in an attempt to steal money from the Internal Revenue Service and the United States Treasury. Inmate Reynolds instructed his mother and "Cisco" to file an IRS 1040 form as well as an IRS Form 56, Notice of Fiduciary form using his name and social security number."

The DHO considered your staff representatives statement, "They let him send the paperwork out. On the phone call I can't tell if anything fraudulent is said."

The DHO concedes that the IRS would state inmates can file tax returns.

The DHO conducted a review of your disciplinary history, which reveals you have history of engaging in this type of misconduct.

The DHO reviewed the recorded phone call, which reaffirms the reporting officer's statement that you were instructing others to file a false and fraudulent tax return.

The DHO reviewed your outgoing mail to reaffirm that you were following through with your plan to have others file a false and fraudulent tax return.

The DHO considered your silence to the investigating Lieutenant, your silence was used as an adverse inference against you.

The DHO considered your statement to the UDC stating, "Inmate states listen to the phone conversation."

The DHO considered your statement to the DHO stating, ""They have to file tax returns for me."

2

---

| Inmate: ...OLDS, Donald | Reg. No. 32349-074 | Hearing Date: 05-03-3019 |
|---|---|---|

The DHO considered your statement and denial to the charge against you, but was not convinced. You provide the defense that through your outside contacts you have the right to file taxes. The DHO agrees that inmates can file taxes. However, inmates are to follow the Blue Bag Program (BBP) procedures for filing legitimate tax returns. You were not attempting to file legitimate tax returns. You were trying to circumvent these program procedures to file false and fraudulent tax returns. You have been incarcerated since 2010. You have not worked to file a legitimate tax return. Therefore, you were using the telephone for fraudulent activity. Thus, meeting the elements of the prohibited act. In addition, you have an extensive misconduct history of engaging in fraudulent activity while incarcerated. The DHO based the decision on the greater weight of the evidence. Greater weight is given to the incident report, recorded phone call, outgoing mail, and to your disciplinary history.

Therefore, based on the greater weight of the evidence the DHO finds you committed the prohibited act of Code 197: Phone Abuse-Illegal Proposes.

VI.    SANCTION OR ACTION TAKEN (List each prohibited act with respective sanctions for that act):

Code 197:
180 Days Loss of Phone
$50.00 Fine
($200.96 balance as of 05-03-2019)

VII.    REASON FOR EACH SANCTION OR ACTION TAKEN:

The action on the part of any inmate to use the telephone in an unauthorized manner poses a serious threat to the ability of staff to control the use of the telephone and monitor whether inmates are making calls for prohibited or illegal purposes. It is indicative of the intent to participate in unauthorized activities that could lead to disruptive behavior. The use of telephones is a privilege for inmates to maintain contact with their family and to maintain ties with them and not for criminal use. The sanctions imposed by the DHO were taken to express the gravity of the infraction and let the inmate know that he, and he alone, will be held responsible for his actions at all times.

VIII.    APPEAL RIGHTS:    X    The inmate has been advised of the findings, specific evidence relied on action and reasons for the action. The inmate has been advised of the right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.    Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| J. Bradley DHO | [signature] | Original 06-14-2019 <br> Amended 08-06-2019 |

DHO The Original DHO Report was delivered on 07-12-2019. This DHO Report was amended pursuant to Administrative Remedy #986334-R1. This amendment does not restart the inmate's appeal timeframe. If the inmate disagrees with the amendment, he may include this in his appeal at the next level.

Prescribed by P5270      Replaces BP-A0304 of AUG 11

3

---

...114 9014 9645 1828 1184 42

Regional Administrative Remedy Appeal

...point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted.

| REYNOLDS, DONALD , R | 32349-074 | D | THA-FCI (CMU) |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

...A —REASON FOR APPEAL The DHO hearing and report is based on fraud, un-supporting facts, conflict of interest, retaliation for attempting to bring legal action inviolation of the First Amendment to the Const of the U.S, and inviolation of Program Statement 7740.02. and 3420.11. The Sanction of Code 197 (Phone Abuse-Illegal Purpose) was the loss of Phone for 180 days and a $50.00 fines, which should be suspended and the fine credited back to the trust account. This incident should be expunged completely for the following reasons:
On March 24, 2019, Jason Simmons, (PMB- Field staff), located at 796 N. Foxcroft Ave, Suite 201, Martinsburg, W.V. 25401, knowingly and maliciously falsified a (BP-A0288) incident report outside his given authority in accordance with Program Statement 7740.02. He knowingly claimed that REYNOLDS instructed his family members to file a false and fraudulent tax return,specifically in an attempt to steal some unknown amount of money from the Internal Revenue Service and the United State Treasury. Without J. Simmons having any knowledge about REYNOLDS case nor the fact that he was the CEO and owner of 4 corporations prior to being confined within the BOP, nor the fact that his family and former board members had his Power of Attorney and they continued to pay REYNOLDS property fees each year, Simmons assumed that REYNOLDS must be like most prisoner's and did not own anything based on his ethnicity of African descent. J.Simmons,racist mentality and behavior has caused injury and lost of REYNOLDS right to freedom in connection to his Writ of Habeas Corpus being denied for continue interfearance.

| July 23, 2019 | (see continue page 2) | By: | Dodd-P Royldo-Bey | Agent |
|---|---|---|---|---|
| DATE | | | SIGNATURE OF REQUESTER | |

Part B—RESPONSE

JUL 26 2019

---

| DATE | REGIONAL DIRECTOR |
|---|---|

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE      CASE NUMBER: 986334-R1

Part C—RECEIPT

CASE NUMBER:

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT:

July 23, 2019

DHO 7/12/19

BP-10 Regional ks

To challenge incident report
3237478

Mailed Mon July 22, 2019 to Region

U.S.P.S TRACKER  9114 9014 9645 1928 1184 42

---

Regional Administrative Remedy Appeal

U.S Department of Justice

Part A—REASON FOR APPEAL  The DHO hearing and report is based on Fraud, un-supporting facts,
conflict of interest, retaliation for attempting to bring legal action involation of the
First Amendment to the Const of the U.S, and involation of Program Statement 7740.02, and
3420.11.  The Sanction of Code 197 (Phone Abuse-Illegal Purpose) was the loss of Phone for
180 days and a $50.00 fine, which should be suspended and the fine credited back to the trust
account.  This incident should be expunged completely for the following reasons:
On March 24, 2019, Jason Simmons, (PMB- Field staff), located at 796 N. Foxcroft Ave, Suite 201,
Martinsburg, W.V. 25401, knowingly and maliciously falsified a (BP-A0288) incident report
outside his authority in accordance with Program Statement 7740.02.  He knowingly claimed
that REYNOLDS instructed his family members to file a false and fraudulent tax return,specifical
in an attempt to steal some unknown amount of money from the Internal Revenue Service and the
United State Treasury.  Without J. Simmons having any knowledge about REYNOLDS case nor the fact
that he was the CEO and owner of 4 corporations prior to being confined within the BOP, nor the
fact that his family and former board members had his Power of Attorney and they continued to
pay REYNOLDS property fees each year, Simmons assumed that REYNOLDS must be like most prisoner's
and did not own anything based on his ethnicity of African descent. J.Simmons,racist mentality
and behavior has caused injury and lost of REYNOLDS right to freedom in connection to his
Writ of Habeas Corpus being denied for continue interference.
   July 23  2019       (see continue page 2)  By: /s/ Todd P. Reynolds-Bey    Agent
_____
        DATE                                        SIGNATURE OF REQUESTER
Part B—RESPONSE

LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION
REYNOLDS, DONALD R        32149-074        D    7WA-PCT (CMU)

_____
        DATE                                    REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar
days of the date of this response.
ORIGINAL RETURN TO INMATE                                   CASE NUMBER:_____

Part C—RECEIPT
                                                            CASE NUMBER:_____
Return to:_____
          LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION
SUBJECT:_____

---

Page 2 of DHO report IRN# 3237478

...s has been continuously interfered with by BOP staff and now these PMB-Field staff
...as working for a contractor outside the Department of Justice.  Due to the continuous
...erence with blocking Access to the Courts involation of the First Amendment; the Fourth
...ment seizure and search of evidence, which is not being allowed to be sent to REYNOLDS nor
...he court from REYNOLDS has caused on February 2018, for REYNOLDS's 2255 to be denied.
...REYNOLDS wasn't able to report his taxes, which is apart of his case. see EXHIBIT B-1 ; B-2
REYNOLDS is being denied his right to continue his legal activities involation of Program
Statement 1315.07.
...  Jason Bradley (DHO) and Jason Simmons (PMB-Field Staff) and others has conspired with one
...another, in retaliation, inorder to impede REYNOLDS filed civil action against Jason Simmons
...and others within the Eastern District of Tenn (Knoxville), for a declaratory and injunction
...order for their interference with REYNOLDS right to Access the Courts without interference.
...he staff continue review and judgment of REYNOLDS documents, such as Form 56 and his
...request to family, via telephone and mail communications, is invalid based on the Supreme Court
...ruling in Ex parte Hull (1941) 312 US 546, recognition of the right to access to the court
...In this case documents to initial approval by prison authorities before they could be directed
...to the court was invalid, in that it constituted an improper abridgment or impairment of an
...inmates right to apply to a federal court for a writ of habeas corpus.  The court found that
...whether a petition for a writ of habeas corpus addressed to a federal court is properly drawn
...and allegations must be contained in it are questioned for the court alone to determine.

Jason Simmons, knowingly created a falsified record, outside his authority, inorder to impede
...n REYNOLDS Access to the Courts to bring action against him and others, who have conspired
...ith each other to subject REYNOLDS to an illegal conviction and sentence involation of Due
...rocess of the Constitution for the United States.  The communication between REYNOLDS and
...is mother does not state anything concerning a false and fraudulent tax return nor any attempt
...o steal money from the IRS and the U.S. Treasury.  Jason Simmons, conduct was involation of
...rogram Statement 3420.11, Conflict of Interest, where his responsibilities as a public servant
...ffect, or are affected by his private interests.  see February 2019 civil action Eastern Dist.
...enn case 3:08-cr-143 Doc 463

REYNOLDS, chose S. Harvey, as his staff representative for the incident report dated 3-24-2019.
... Harvey, reviewed the March 24, 2019, 2:30 p.m phone call and agreed with REYNOLDS that he
...id not state anything about filing a 1040 tax form nor trying to recieve money from a tax
...eturn inorder to attempt to steal money from the IRS or the United States Treasury as alledged
...y J.Simmons.  REYNOLDS, had E. Keller to retrieve a copy of his mail sent out to his family
...o use for the DHO hearing as evidence, which this letter instructed REYNOLDS family what they
...ust submit to his CPA inorder to comply with his back taxes need for court in his case and
...lso to report for payment on his property.  However, Jason Bradley(DHO), refused to allow
...EYNOLDS nor his staff Representative to talk and he used REYNOLDS evidence as apart of his
...laim to support the falsified incident report not based on facts!  see EXHIBIT A-1  (S. Harvey
...emorandum May 23, 2019)

...he DHO report has numerous error within.  Jason Bradley (DHO) stated that REYNOLDS did not
...resent no documentary evidence on his behalf, which the evidence of his mail used by Bradley
...as retrieve by REYNOLDS from E. Keller and given to Bradley to support REYNOLDS position.
...EYNOLDS disciplinary history, as claimed by Jason Bradley (DHO) states that REYNOLDS have
...history of engaging in this type of misconduct, which is not true.  "Professional" and
...gnorant staff members who do not know about corporations nor tax forms created false incident
...gainst REYNOLDS who is a CEO and corporate owner.  REYNOLDS has a college background in business
...nagement which includes taxes and forms.  plus he has a CPA, corporate attorney and associates
...o are Internal revenue service agents.  The DHO claims that he reviewed REYNOLDS outgoing
...il, which was retrieve by REYNOLDS as his evidence, to reaffirm that their was no proof found
...han to have others file a false and fraudulent tax return.  Jason Bradley (DHO) claimed
...at REYNOLDS was silent when the investigating Lieutenant gave him the incident report, which
...EYNOLDS's silence was used against him.  This is not true as the Lt. Lotz did not
...vestigate nor asked any questions.  He simply delivered the incident report and left.
...erefore, with the support of staff representative and other document evidence, this false
...cident alleged without supporting facts and involation of policy and U.S Const should be
...punge immediately and all ...

---

A T T A C H M E N T

* DHO Report #3237478
  Phone Abuse-Illegal Propeses
DHO Hearing Date 5-03-2019 @ 11:00
Jason Bradley DHO acting officer.
* Incident Report copy

D-51

# DISCIPLINE HEARING OFFICER REPORT

**DEPARTMENT OF JUSTICE**                                                      **FEDERAL BUREAU PRISONS**

| Institution: FCC Terre Haute | Incident Report number:3237478 | |
|---|---|---|
| Name OF INMATE: REYNOLDS, Donald | REG. NO.: 32349-074 | UNIT: CMJ |
| Date of Incident Report: 03-24-2019 | | Offense Code: 197 |
| Date of Incident: 03-24-2019 | | |

Summary of Charges: Phone Abuse-Illegal Proposes

I.   NOTICE OF CHARGE(S)

   A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) 03-27-2019 at (time)  0941   (by staff member)  Lots.

   B. The DHO Hearing was held on (date) 05-03-2019 at the (time) 1100.

   C. The inmate was advised of the rights before the DHO by (staff member):
   Thomas on (date) 04-02-2019  and copy of the advisement of rights form is attached.

II.  STAFF REPRESENTATIVE

   A. Inmate waived right to staff representative. Yes ____ No _X_

   B. Inmate requested staff representative and  Harvey   appeared.

   C. Staff Representative statement:
   "They let him send the paperwork out. On the phone call I can't tell if anything fraudulent is said.

   D. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: (New Staff Representative Name) _____ was selected.

   E. Staff representative _____ was appointed.

III. PRESENTATION OF EVIDENCE

   A. Inmate _____ (admits) _X_ (denies) _____ (neither) the charge(s).

   B. Summary of inmate statement:
   "They have to file tax returns for me."

   C. Witnesses:
   1. Inmate waived right to witness. Yes _____ No _X_

   2. The following persons were called as witness at this hearing and appeared (Each witness name and statement listed below):

   3. The following persons requested were not called for the reason(s) given (Each witness name and statement listed below): Inmate requested the Internal Revenue Service as a witness. No individual witnesses were requested.

   4. Unavailable witnesses were requested to submit written statements and those statements received were considered (Each witness name and statement listed below).

   D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents: Recorded Phone Call, Inmate Mail.

   E. Confidential Information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

IV.  FINDINGS OF THE DHO

   _X_ A. The act was committed as charged.      ___ C. No prohibited act was committed:
                                                          Expunge according to Inmate Discipline PS.

   ___ B. The following act was committed:

INMATE COPY                                                                                          1

---

# DISCIPLINE HEARING OFFICER REPORT

**DEPARTMENT OF JUSTICE**                                                      **FEDERAL BUREAU PRISONS**

| Name Inmate: ...OLDS, Donald | Reg. No.: 32349-074 | Hearing Date: 05-03-2019 |
|---|---|---|

V.   SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.):

you were advised of your rights before the Discipline Hearing Officer and stated that you understood those rights. You requested a staff representative and you were provided with one. You presented no documentary evidence on your behalf.

Administrative notice is given to there being a delay in the investigation and UDC of this incident Report. Specifically the incident report process was suspended pending referral of an inmate criminal matter for investigation on March 24, 2018, and released for administrative processing on March 27, 2019. The inmate did not provide any evidence that this delay hindered his ability to provide a defense.

The DHO finds that beginning on March 24, 2018, you committed the prohibited act of Code 197: Phone Abuse-Illegal Proposes.

The DHO considered the Incident Report which the reporting officer states, "On March 24, 2019 at approximately 2:30 p.m., inmate Reynolds, Donald, Reg. No. 32349-074, placed a telephone call to his family at 865-773-8127, and the call was live monitored. During the monitoring of the call, it was found inmate Reynolds was using the telephone for an illegal purpose, specifically by instructing his family members to file a false and fraudulent tax return in an attempt to steal money from the Internal Revenue Service and the United States Treasury. Inmate Reynolds instructed his mother and "Cisco" to file an IRS 1040 form as well as an IRS Form 56, Notice of Fiduciary form using his name and social security number."

The DHO considered your staff representatives statement, "They let him send the paperwork out. On the phone call I can't tell if anything fraudulent is said."

The DHO concedes that the IRS would state inmates can file tax returns.

The DHO conducted a review of your disciplinary history, which reveals you have history of engaging in this type of misconduct.

The DHO reviewed the recorded phone call, which reaffirms the reporting officer's statement that you were instructing others to file a false and fraudulent tax return.

The DHO reviewed your outgoing mail to reaffirm that you were following through with your plan to have others file a false and fraudulent tax return.

The DHO considered your silence to the investigating Lieutenant, your silence was used as an adverse inference against you.

The DHO considered your statement to the UDC stating, "Inmate states listen to the phone conversation."

The DHO considered your statement to the DHO stating, ""They have to file tax returns for me."

INMATE COPY                                                                                          2

---

# DISCIPLINE HEARING OFFICER REPORT

**DEPARTMENT OF JUSTICE**                                                      **FEDERAL BUREAU PRISONS**

| Name Inmate: ...OLDS, Donald | Reg. No.: 32349-074 | Hearing Date: 05-03-2019 |
|---|---|---|

The DHO considered your statement and denial to the charge against you, but was not convinced. You provide the defense that through your outside contacts you have the right to file taxes. The DHO agrees that inmates can file taxes. However, inmates are to follow the Blue Bag Program (BBP) procedures for filing legitimate tax returns. You were not attempting to file legitimate tax returns. You were trying to circumvent these program procedures to file false and fraudulent tax returns. You have not worked to file a legitimate tax return. Therefore, you were using the telephone for fraudulent activity. Thus, meeting the elements of the prohibited act. In addition, you have an extensive misconduct history of engaging in fraudulent activity while incarcerated. The DHO based the decision on the greater weight of the evidence. Greater weight is given to the incident report, recorded phone call, outgoing mail, and to your disciplinary history.

Therefore, on the greater weight of the evidence the DHO finds you committed the prohibited act of Code 197: Phone Abuse-Illegal Proposes.

VI.  SANCTION OR ACTION TAKEN (List each prohibited act with respective sanctions for that act):

Code 197:
180 Days Loss of Phone
$50.00 Fine
($200.96 balance as of 05-03-2019)

VII. REASON FOR EACH SANCTION OR ACTION TAKEN:

The action on the part of any inmate to use the telephone in an unauthorized manner poses a serious threat to the ability of staff to control the use of the telephone and monitor whether inmates are making calls for prohibited or illegal purposes. It is indicative of the intent to participate in unauthorized activities that could lead to disruptive behavior. The use of telephones is a privilege for inmates to maintain contact with their family and to maintain ties with them and not for criminal use. The sanctions imposed by the DHO were taken to express the gravity of the infraction and let the inmate know that he, and he alone, will be held responsible for his actions at all times.

VIII. APPEAL RIGHTS: _X_ The inmate has been advised of the findings, specific evidence relied on action and reasons for the action. The inmate has been advised of the right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.  Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| J. Bradley DHO | | 06-14-2019 |

DHO report delivered to Inmate by: DHO Sec

| Printed Name (Staff) | Signature | Date and Time: |
|---|---|---|
| M. Prouse | | 7/12/19 1000 |

Prescribed by P5270                                    BP-A0304 of AUG 11
INMATE COPY                                                                                          3

---

INMATE COPY                                                                                          4

DEPARTMENT OF JUSTICE | Part I – Incident Report | FEDERAL BUREAU OF PRISONS

| 1. Institution: PCI Terre Haute | | | |
|---|---|---|---|
| 2. Inmate's Name: Reynolds, Donald | 3. Register Number: 32349-074, | 4. Date of Incident: 03-24-2019 | 5. Time: 2:30 PM |
| 6. Place of Incident: PCI Terre Haute | 7. Assignment: CMU Barber | | 8. Unit: D Unit |
| 9. Incident: Phone Abuse, Criminal | | 10. Prohibited Act Code (s): 197 | |

11. Description of Incident: 03-24-2019, Time: 2:30 p.m. Staff became aware of incident:
On March 24, 2019 at approximately 2:30 p.m., inmate Reynolds, Donald, Reg. No. 32349-074, placed a telephone call to his family at 865-773-8127, and during the call, it was found inmate Reynolds was using the telephone for an illegal purpose, specifically by instructing his family members to file a fraudulent tax return in an attempt to steal money from the Internal Revenue Service and the United States Treasury. Inmate Reynolds instructed his mother and "Cisco" to file a IRS 1040 form and as well as an IRS Form 56, Notice of Fiduciary form using his name and social security number.

| 12. Typed Name/Signature of Reporting Employee: J. Simmons | 13. Date and Time: - 03-24-2019 3:00 p.m. |
|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature): R. Harrell 5/5 | 15. Date Incident Report Delivered: 3-25-19 | 16. Time Incident Report Delivered: 8:00 am |

Part II – Committee Action

17. Comments of Inmate to Committee Regarding Above Incident: 3/27/19

18. A. It is the finding of the committee that you:
Committed the Prohibited Act as charged;
Did not Commit a Prohibited Act.
Committed Prohibited Act Code (s).

B. _____ The Committee is referring the Charge(s) to the DHO for further Hearing.
C. _____ The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days.

19. Committee Decision is Based on Specific Evidence as Follows:

20. Committee action and/or recommendation if referred to DHO (Contingent Upon DHO finding inmate committed prohibited act):

21. Date and Time of Action: _____ (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings).

Chairman (Typed Name/Signature); _____ Member (Typed Name); _____ Member (Typed Name);

INSTRUCTIONS: All items outside of heavy rule are for staff use only. Begin entries with the number 1 and work up. Entries not completed will be voided by staff.
Distribute: Original-Central File Record; COPY-1-DHO; COPY-2-Inmate after UDC Action; COPY 3-Inmate within 24 hours of Part I Preparation

PDF | Prescribed by P5270 | Replaces BP-A0288 of AUG 11

---

EXHIBITS

A-1 Memorandum by S. Harvey acting as Staff Representative
A-2 Program Statement CPD/CPB 5265.14 (Correspondence) Under General Correspondence d(4) %6
B-1 Letter to CIU about taxes for 2007-2008 and other supporting information
B-2 Court Document Evidence about REYNOLDS LACK OF Record for Taxes and corporation Timeless Entertainment Inc. Case No. 3:08-cr-143 Doc 2009

---



UNITED STATES GOVERNMENT

MEMORANDUM
FCC TERRE HAUTE

Date: May 23, 2019

Attn Of: S. Harvey

Subject: Inmate Reynolds, Donald #32349-074

To: Regional DHO.

I Officer S. Harvey was chosen by inmate Reynolds to be his staff Representative for the incident report dated 3-24-2019, after reviewing the phone call that inmate Reynolds was accused of telling his mother and Cisco to "Steal money from the Internal Revenue Service" I was unable to reach the same conclusion as the staff composing the Incident Report. I conducted an investigation and found Inmate Reynolds was allowed to previously send a form 56 out through the unit monitored mail, I was also able to acquire a photo copy of the outgoing monitored mail that was referenced in the Incident Report. Myself and inmate Reynolds attempted to show the material during the hearing and it was rejected by the DHO Officer.
The DHO Officer then concluded the hearing finding inmate Reynolds guilty and promptly dismissed inmate Reynolds without directly letting him know that the sanctions of loss of phone privileges were immediate. Inmate Reynolds received another Incident report for phone abuse dated 5-5-2019, had inmate Reynolds been told of the immediate phone loss he would not have tried to use the phones to make a call. Please note the phones are electronically controlled through Truelinks and any sanction should have been loaded into the system and would have prevented inmate Reynolds from accessing the phone.

EXHIBIT A-1

---

(4) Direction of an inmate's business (See § 541.13, Prohibited Act No. 408). An inmate, unless a pre-trial detainee, may not direct a business while confined.

This does not, however, prohibit correspondence necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment. Thus, for example, an inmate may correspond about refinancing an existing mortgage or sign insurance papers, but may not operate a mortgage or insurance business while in the institution.

EXHIBIT A-2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1 | [pro]

CMU: RE: Taxes for 2007-2006

D. Reynolds June 7, 2019

To Whom it Concerns:

In 2008 I had my Tennessee CPA file for an extension for the 2007 tax year on my personal and 4 corporations.
Inorder to close out the 2007 tax year, I was scheduled to fly to my corporate office in Las Vegas, Nevada, on June 19, 2008 to meet with NCH CPA's.
This June 19, 2008 date, was the date of the illegal Search and Seizure Warrant executed on my residence. During this Search and Seizure Warrant, without probable cause, my financial records was removed,
This made it impossible for me to comply to my requested extension deadline due for lack of records.
I was later indicted before I was able to file all 4 corporations and personal taxes for the 2007 tax year. Because of this nonfiling, I was charged in multiple counts and found guilty. However, the court did not know the reason why I could not file taxes was because it's agents had my files and records in their possession, along with all corporate books.
It is my responsibility as the former CEO to complete my obligations.
This is the matter that I am addressing to the court, which is relevant to my case and conviction, prior to being placed in the FBOP.
During this time in the FBOP, I have received 1099 A and C forms from banks and credit card agencies against my accounts held by them. These were outstanding debts, which was caused by my placement in jail during pre-trial, without having the chance and opportunity to settle and close all my accounts.
The BOP staff is unfamiliar with the proper use of these tax forms. (1099 A, C, OI.D, INT, MISC, B, etc) used by individuals and corporations.

I have continued to be mistreated and accused of illegal criminal activity based on what other non credit card holders, bank accounts, or other prisoners who have never experience nor managed corporations and other financial assets have done and filed with these form receipts.
I have been receiving 196 + 199 incident reports by your staff on more than one occasion about this issue.
I am seeking to overturn the conviction, which the continue interference by staff has blocked Access to Court because of their misunderstanding.
I must complete my obligation concerning my taxes for 2007-2006 year.
I am seeking assistance from you to be able to proceed without any more interference.
I hope that this letter clears up any misunderstanding in my communication for you and your staff.
Believe me, this is a headach for me too!
However, if it was not for the amount of time, I would be in the camp ~~[illegible]~~ and not be judged by the environment or classification wrongly placed by inexperience individuals.
Please assist me with this matter and provide instructions on how I can accomplish my obligations.

Thank You.

by: D. R, Agent

EXHIBIT B-1

... Photograph of open compartments
376 X X Photograph of currency
W IRS GLORIA JACKSON
484 X X Reynolds Lack of Record 2001-2003; 2007
485 X X Reynolds 2004 IRS Form 1040
486 X X Reynolds 2005 IRS Form 1040
489 X X Timeless Entertainment IRS Form 1120 for 2005
487 X X Reynolds 2006 IRS Form 1040
490 X X Timeless Entertainment IRS Form 1120 for 2006
488 X X Timeless Entertainments Lack of Record 2001-2004; 2007
W OFFICER MARK FROST, Kingsville, TX
562 X X Map of Kingsville, Tx
377 X X Photograph of white Range Rover
378 X X Photograph of wheel compartment
379 X X Photograph of density reader
380 X X Photograph of wheel well
381 X X Photograph of closed compartment

EXHIBIT B-2

BP-A0288
JAN 17
**U.S. DEPARTMENT OF JUSTICE**

**INCIDENT REPORT**

**FEDERAL BUREAU OF PRISONS**

**Part I - Incident Report**

| 1. Institution: THA CMU | | Incident Report Number: | |
|---|---|---|---|
| 2. Inmate's Name:<br>GOTTESFELD, Martin | 3. Register Number: 12982-104 | 4. Date of Incident:<br>April 19, 2018 | 5. Time:<br>8:40 am est |
| 6. Place of Incident:<br>D Unit | 7. Assignment:<br>Unassigned/Institution A&O | | 8. Unit:<br>D Unit |
| 9. Incident: Use of mail for abuses other than criminal activity<br>circumventing mail monitoring procedures... | | 10. Prohibited Act Code(s)<br>296 | |

11. Description of Incident (Date: 04/19/2019   Time: 200 p.m. Staff became aware of incident):
On April 19, 2019 at 2:00 pm est, a review was conducted of inmate Martin Gottesfeld's Reg. No. 12982-104 outgoing TRULINCS e-mails. The review revealed that inmate Gottesfeld authored an e-mail to Dana Gottesfeld, his wife at DanaBarach@gmail.com titled, "Service of Process?" In the e-mail to Dana Gottesfeld, inmate Gottesfeld attempted to employ her to conduct a surface check to see if she could track down the addresses of some individuals to be processed served (court summons from inmate Schaeffer Cox Reg. No. 16179-006) on the behalf of Angela Clemons. Specifically, the e-mail to Dana Gottesfeld stated, "I believe that Angela Clemens is having trouble tracking down a few people to be able to serve process on them. I know that you are obviously very busy and that this weekend is most certainly 'go time' for us. However, if you were to have an extra 15 or 20 minutes over the weekend just to have a surface check performed to see if you can track down the current addresses for some folks, I believe that Angela would really appreciate it. It might actually be a fun challenge for you and some of the researchers we know."

Inmate Gottesfeld's request to Dana Gottesfeld is an attempt to utilize her as a conduit to provide a service through Angela Clemons for inmate Cox. Inmate Gottesfeld's request to Dana Gottesfeld to conduct research to locate individuals on behalf of Angela Clemons and inmate Schaeffer Cox, does not represent a concrete object of value, but to provide a beneficial and favorable outcome for Clemons and Cox. Further, even though the requested services are not tangible, it still meets the standards outlined in BOP prohibited acts policies.

Worth noting, inmate Cox has implored Clemons to find a way to identify the addresses of three individuals in the community before the court imposed deadline of April 25, 2019. The court ordered that it was inmate Cox's responsibility to locate and serve the individuals he's attempting to sue in the state of CO, before the abovementioned date.

| 12. Typed Name/Signature of Reporting Employee:<br>*Byrne* | | 13. Date And Time:<br>April 22, 2019 2:00 pm est | |
|---|---|---|---|
| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature) *R. Forsyth, LT* | 15 .Date Incident Report Delivered:<br>4-25-19 | 16. Time Incident Report Delivered:<br>12:28 p.m. | |

**Part II - Committee Action**

17. Comments of Inmate to Committee Regarding Above Incident:

_____
_____
_____
_____

| 18. A. It is the finding of the committee that you: | B. | The Committee is referring the Charge(s) to the DHO for further Hearing. |
|---|---|---|
| _____ Committed the Prohibited Act as charged.<br>_____ Did not Commit a Prohibited Act.<br>_____ Committed Prohibited Act Code(s). _____ _____ | C. | The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days. |

19. Committee Decision is Based on Specific Evidence as Follows:

_____
_____

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):

_____
_____
_____

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Gottesfeld, Dana
SUBJECT: Service of Process
DATE: 04/19/2019 08:40:25 AM

My Darling Dana,

I believe that Angela Clemens is having trouble tracking down a few people to be able to serve process on them.
I know that you are obviously very busy and that this weekend is most certainly "go time" for us. However, if you were to have
an extra 15 or 20 minutes over the weekend just to have a surface check performed to see if you can track down the current
addresses for some folks, I believe that Angela would really appreciate it. It might actually be a fun challenge for you and some
of the researchers we know.

My Love Always,
Marty
This message was sent at approximately 8:41 A.M. on Friday, April 19th, 2019.

Fri May 3 1100

BP-A0288
JAN 17

# INCIDENT REPORT

U.S. DEPARTMENT OF JUSTICE — FEDERAL BUREAU OF PRISONS

## Part I - Incident Report

| | | | |
|---|---|---|---|
| 1. Institution: THA CMU | | Incident Report Number: 3249329 | |
| 2. Inmate's Name: GOTTESFELD, Martin | 3. Register Number: 12982-104 | 4. Date of Incident: ~~April 19, 2018~~ April 19, 2019 KA | 5. Time: 8:40 am est |
| 6. Place of Incident: D Unit | 7. Assignment: Unassigned/Institution A&O | | 8. Unit: D Unit |
| 9. Incident: Use of mail for abuses other than criminal activity circumventing mail monitoring procedures... | 10. Prohibited Act Code(s) 296 | | |

11. Description of Incident (Date: 04/19/2019 Time: 200 p.m. Staff became aware of incident):
On April 19, 2019 at 2:00 pm est, a review was conducted of inmate Martin Gottesfeld's Reg. No. 12982-104 outgoing TRULINCS e-mails. The review revealed that inmate Gottesfeld authored an e-mail to Dana Gottesfeld, his wife at DanaBarach@gmail.com titled, "Service of Process?" In the e-mail to Dana Gottesfeld, inmate Gottesfeld attempted to employ her to conduct a surface check to see if she could track down the addresses of some individuals to be processed served (court summons from inmate Schaeffer Cox Reg. No. 16179-006) on the behalf of Angela Clemons. Specifically, the e-mail to Dana Gottesfeld stated, "I believe that Angela Clemens is having trouble tracking down a few people to be able to serve process on them. I know that you are obviously very busy and that this weekend is most certainly 'go time' for us. However, if you were to have an extra 15 or 20 minutes over the weekend just to have a surface check performed to see if you can track down the current addresses for some folks, I believe that Angela would really appreciate it. It might actually be a fun challenge for you and some of the researchers we know."

Inmate Gottesfeld's request to Dana Gottesfeld is an attempt to utilize her as a conduit to provide a service through Angela Clemons for inmate Cox. Inmate Gottesfeld's request to Dana Gottesfeld to conduct research to locate individuals on behalf of Angela Clemons and inmate Schaeffer Cox, does not represent a concrete object of value, but to provide a beneficial and favorable outcome for Clemons and Cox. Further, even though the requested services are not tangible, it still meets the standards outlined in BOP prohibited acts policies.

Worth noting, inmate Cox has implored Clemons to find a way to identify the addresses of three individuals in the community before the court imposed deadline of April 25, 2019. The court ordered that it was inmate Cox's responsibility to locate and serve the individuals he's attempting to sue in the state of CO, before the abovementioned date.

| | | |
|---|---|---|
| 12. Typed Name/Signature of Reporting Employee: R. Blythe [signature] | | 13. Date And Time: April 22, 2019 2:00 pm est |
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature): [signature] LT | 15. Date Incident Report Delivered: 4-25-19 | 16. Time Incident Report Delivered: 12:28 AM. |

## Part II - Committee Action

17. Comments of Inmate to Committee Regarding Above Incident:
the report is still untimely - see written statement and unconstitutional - see statement written

18. A. It is the finding of the committee that you:

___ Committed the Prohibited Act as charged.
___ Did not Commit a Prohibited Act.
___ Committed Prohibited Act Code(s). ______ ______

B. X The Committee is referring the Charge(s) to the DHO for further Hearing.

C. ___ The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days.

19. Committee Decision is Based on Specific Evidence as Follows:
Ref to DHO

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):
Ref to DHO

KHart / [signature] 4/29/19 1330 KH

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

| From: e Gottesfeld, Martin, S. | 12982-104 | FCI-THA-CMU | FCI-TH |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL** SENSITIVE BP-10/STAFF MISCONDUCT: I had a DHO hearing in the CI-THA-CMU with DHO Bradley on Friday, May 3rd, 2019 at approx. 10:30AM. DHO radley became agitated and belligerent briefly into my statement regarding Inciden eport # 3249328 (attached hereeto). He would not let me finish my statement and h lso interrupted my staff representative, not allowing him to finish either. Mr. radly irritably said, "I don't care about your case law." He chose to reach his ecision and mete out sanctions before he had examined all of the applicable info a nd to preempt pending motions before The Honorable US District Court for The istrict of Colorado and The Southern District of New York. He also refused to ccept a copy of the original, unmodiffed incident report from me for the record, hough he did purport to accept my written statement and attachments. If Mr. Bradle annot or will not maintain his composure, examine all of the facts and documents, nd consider U.S. Supreme Court case law, then he is not qualified to be a DHO. He as unprofessional and did not conduct himself in such a manner as to preserve ualified immunity for the FBOP. I would like a new hearing before a qualified and ompetent DHO. Please see D. Col.,Case 18-cv-02328 for emergency ex-parte motion fo TRO and both D. Col. 18-cv-02328 and S. D. NY 18-cv-10836-PGG for motions for eclaratory judgements. They are pre-existing open cases for similar violations.

| _____ May 3rd, 2019 | _____ |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

| _____ | _____ |
|---|---|
| DATE | REGIONAL DIRECTOR |

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                                    CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: _____

| _____ | _____ | _____ | |
|---|---|---|---|
| USP LVN | DATE | SIGNATURE, RECIPIENT OF REGIONAL APPEAL. | |

Previous editions not usable

BP-230(13)
APRIL 1982

Affidavit of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, do hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 4th day of May, 2019:

1. My name is Martin S. Gottesfeld and my federal registration number is 12982-104.

2. I am a federal inmate in the communications management unit (CMU) of the Federal Correctional Institution (FCI) Terre Haute, Indiana.

3. On April 19th, 2019, I lawfully tried to assist another inmate in the FCI Terre Haute CMU properly fill out a USM-285 form by asking my wife to have our team perform a surface check to see if we could find accurate service addresses for some defendants who had effectively dodged service for some time.

4. I neither requested nor received anything of value in exchange for my help.

5. I was subsequently charged with an inmate disciplinary infraction by Mr. Richard Blythe, who explicitly noted in the then-unnumbered BP-A0288 Incident Report that my conduct was pursuant to a court order.

6. The original incident report was clearly dated, "April 19, 2018" (emphasis added).

7. On Friday, April 26th, 2019, I submitted an Inmate Request to Staff (cop-out) to Ms. Seireveld of the FCI Terre Haute legal department which included copies of both the original BP-A0288 Incident Report and the email which I had tried to send to help another inmate fill out his USM-285s.

8. My cop-out to Ms. Seireveld explicitly mentioned the topic of qualified immunity as well as the U.S. Supreme Court precedents of Johnson v. Avery, Wolff v. McDonnell, Bounds v. Smith, and the 7th Circuit decision of Williams v. Lane, 851 F.2d 867 (1988).

9. My cop-out to Ms. Seireveld also mentioned the date discrepency, and that even if the report's author had meant to date it "April 19, 2019," then the report was still not signed in a timely fashion (on April 22nd, 2019) nor delivered to me in a timely fashion (on April 25th, 2019).

10. Ms Eisele accepted my cop-out to Ms. Seireveld after another staff member refused to do so, and Ms. Eisele agreed to deliver it to Ms. Seireveld.

11. There is every reason to believe that Ms. Eisele did in fact deliver my cop-out to Ms. Seireveld and no reason at all to believe that she didn't.

12. On Monday, April 29th, 2019, a unit discipline committee (UDC) convened to reach a finding on the aforementioned incident report.

13. The UDC is supposed to be a neutral fact-finding body and inmates are supposed to have due process before the UDC.

- Page 1 of 8 -

14. Nonetheless, UDC member K. Hart modified the Incident Report on behalf of Mr. Blythe to correct field 4, "Date of Incident," to say "April 19, 2019," instead of "April 19, 2018."

15. Ms. K. Hart also numbered the report 3249328, as it had been unnumbered prior to the UDC meeting.

16. Ms. K. Hart held the UDC meeting in a coercive and intimidating manner and this seemed to be intentional.

17. It is against FBOP policy for staff like Ms. K. Hart to hold UDC meetings in coercive and intimidating manners.

18. Ms. K. Hart held the UDC meeting in the unit barber shop.

19. The unit barber shop is usually locked and only open at certain times when inmates are getting hair cuts.

20. The unit barber shop is also one of the only places in the FCI Terre Haute CMU where microphones do not record nearly all conversations in high fidelity and it is more likely than not that Ms. K. Hart knew this and chose that setting for that reason.

21. Ms. K. Hart broke FBOP policy by not displaying her name tag during this UDC meeting.

22. When I politely asked Ms. Hart for her first initial, she refused to provide it and instead referred me to the partially-illegible handwriting she scrawled on the amended incident report.

23. At the UDC meeting, I specifically and explicitly noted that the Incident Report violated well-known and clearly-well-established Constitutional rights and that it was still untimely despite Ms. K. Hart's modifications.

24. I specifically mentioned that FBOP staff should not expect to receive qualified immunity for liability arising from their adjudication of the Incident Report.

25. I also mentioned that I had previously requested on many occasions for a list of the communications rules in the CMU but that I had never received them.

26. Ms. K. Hart told me that the rules are located in the inmate handbook which I had received.

27. I politely informed Ms. K. Hart that the rules were not in fact located in the inmate handbook and she reacted in an irrational fashion which reflected very poorly on the FBOP.

28. On a previous occasion, on Thursday, April 18th, 2019, I had a conversation with Ms. Seireveld of the FCI Terre Haute legal department in which I also asked for a written set of "the rules of the road" for CMU communications.

29. Ms. Seireveld admitted in that conversation that there was no such list of rules.

30. This conversation was recorded by the microphones in the FCI Terre Haute CMU and I have requested that this audio be

preserved for future litigation.

31. The aforementioned conversation between myself and Ms. Seireveld took place around 10:00 A.M. on Thursday, April 18th, 2019, in the main hallway just outside of the FCI Terre Haute CMU law library.

32. During the UDC meeting, Ms. K. Hart told me that I could not elect Ms. Seireveld as my staff representative in the discipline process and I chose Correctional Officer (CO) Harvey instead.

33. There are about 30 inmates in the FCI Terre Haute CMU at any given time and about half are Caucasian gentiles (non-Jews).

34. Only two other inmates from the FCI Terre Haute CMU also had open BP-A0288 Incident Reports while I did; one was African-American and the other was Latino.

35. I come from a mixed Jewish and Bangladeshi heritage and my surname is Gottesfeld.

36. The Latino inmate only had a single Caucasian staff member present during his unit discipline committee (UDC) meeting meeting despite the FBOP regulation which requires that at least two (2) staff members be present.

37. Both of the two staff members who were present for the UDC meeting regarding my incident report were Caucasians.

38. The African-American inmate had one African-American and one Caucasian staff member present for his UDC meeting.

39. Thus, four fifths (80%) of the staff members present for these UDC meetings were Caucasian and all--100%--of the people charged weren't Caucasian gentiles.

40. A senior FBOP employee named Ms. Stewart, who worked in the trust fund department here, transferred to another FBOP facility due, at least in part, to racial tension.

41. Ms. Stewart is African-American.

42. On a previous occasion, the African-American inmate mentioned above had been warned by a concerned African-American staff member not to have his family come visit him here, as an adjacent neighborhood can be a dangerous place for African-Americans after dark.

43. The African-American inmate took this warning very seriously, and as a result, he has never, in fact, had his family come visit him here at FCI Terre Haute in the nearly 2 years that he has been here.

44. According to the 1991 Edition of The World Book Encyclopedia Volume 11 (J-K) (Libray of Congress Catalog Card Number 90-70596) on page 390: "The [Ku Klux Klan] grew rapidly and by the mid-1920's had more than 2 million members throughout the country. Some Klan members burned crosses and whipped, tortured, and murdered people whose activities angered them, but most relied on peaceful means. By electing public officials, the Klan became a powerful political force throughout the South and

also in many Northern and Western states, including Colorado,
Indiana, Kansas, Maine, Ohio, and Oregon." (Emphasis added.)

45. Despite my statement about qualified immunity (or the
likely lack thereof), the incident report written by Mr. Blythe
was nonetheless modified post-hoc by Ms. Hart and referred to
Discipline Hearing Officer (DHO) Bradley for future adjudication.

46. On Tuesday, April 30th, 2019, I handed my staff
representative, CO Harvey, a 2-page typewritten letter asking him
to present various Due Process, policy, regulatory, and other
Constitutional issues to the legal department here at FCI Terre
Haute, as well as to have the audio of my conversation with Ms.
Seireveld on Thursday, April 18th, 2019, preserved for the DHO
and for future litigation.

47. CO Harvey did in fact later deliver this letter to Ms.
Seireveld and secure the audio in question for DHO Bradley's
review.

48. Despite our previous conversation, her failure to
provide a set of written rules (and thus to provide due process),
and being presented with the aforementioned evidence and case
law, Ms. Seireveld maintained that I had "messed up," and the
legal department here did not intervene on my behalf.

49. Ms. Seireveld is Caucasian.

50. On Wednesday, May 1st, 2019, I submitted a sensitive
BP-9 for staff misconduct, specifically citing 28 CFR §543.11(f)
(1), FBOP policy statement 1315.07(10), Johnson v. Avery, Bounds
v. Smith, Wolff v. McDonnell, and Williams v. Lane.

51. I attached a draft version of my future discipline
hearing statement to my sensitive BP-9, which explicitly
mentioned qualified immunity, the retaliatory nature of the
incident report, the pending emergency ex-parte motion for a
temporary restraining order filed in The District of Colorado,
the pending motions for declaratory judgements in The District of
Colorado  and The Southern District of New York, the illegitimate
nature of Mr. Blythe's use of a BP-A0288 when he is not--in
fact--authorized to file such a form due to his role as "PMB-
Field Staff" under FBOP Program Statement, 7740.02, the untimely
nature of Mr. Blythe's Incident Report, the Due-Process issues
arising from Ms. K. Hart's post-hoc modification of the incident
report when she was supposed to be a neutral member of the unit
team and not act on behalf of the complaining staff member but,
in fact, did so anyways, Ms. K. Hart's violations of FBOP
policies regarding her failure to display her name tag, provide
her first initial, or conduct the hearing in a neutral and
detached manner as opposed to an intimidating and coercive one,
and the untimeliness of the modified report notwithstanding the
changes made by Ms. K. Hart.

52. I first attempted to deliver my aforementioned BP-9 to
Ms. Wheeler of the FCI Terre Haute CMU unit team, but she refused
to accept it, citing that she was new to the team and did not yet
feel comfortable getting involved with administrative remedies.

53. It seems doubtful that any inmate in the FCI Terre Haute

CMU would ever be afforded the ability to deviate so much as an iota from their obligations under FBOP regulations in a similar manner to the way that Ms. Wheeler refused to do her duty as a unit team member and accept my administrative remedy.

54. I was later able to deliver my BP-9 to Ms. Eisele on the afternoon of Wednesday, May 1st, 2019, and she accepted it.

55. On Thursday, May 2nd, 2019, I completed the final draft of my statement for the disciplinary hearing and provided a copy to CO Harvey.

56. The final draft of my statement elaborated on all of the aforementioned issues and included pages from 28 CFR §543.11(f)(1), FBOP Program Statement 1315.07 ("Legal Activities, Inmate"), FBOP Program Statement 5214.02 ("Communications Management Units"), and FBOP Program Statement 7740.02 ("Oversight of Private Secure Correctional Facilities"), all supporting the legitimacy of my conduct or the lack thereof of the report.

57. On the morning of Friday, May 3rd, 2019, myself and the other two inmates with pending incident reports all had hearings before Discipline Hearing Officer (DHO) Bradley.

58. In an affidavit sworn on April 26th, 2019, and already filed, I swore, "Many inmates inform me that the current Discipline Hearing Officer for the FCI Terre Haute CMU, a Mr. Bradley, routinely ignores the Constitution, federal statutes, and FBOP regulations to rule against inmates no matter what. This means that once charged, inmates suffer brutal and barbaric sanctions as a mere result of being charged, and that even if later exonerated, it is too late to avoid unconscienable suffering. Basically, even when people like the aforementioned report's author, a Mr. R. Blythe, eventually "lose," it doesn't really matter because they have already succeeded in having the inmate punished and could clearly do so in the exact same manner again."

59. During my discipline hearing, DHO Bradley would not hear me out.

60. Despite my polite instistance, DHO Bradley became irritated and irrational when I tried to read my statement, starting when I mentioned Supreme Court cases and the pending motions in the district courts.

61. DHO Bradley explicitly stated in no uncertain terms, "I don't care about your case law."

62. DHO Bradley did not examine the CFR or FBOP Program Statements.

63. When CO Harvey then tried to explain my requests on many previous occasions to be provided with a written set of communications rules for the CMU (which had been witnessed by CO Harvey), DHO Bradley interrupted him too.

64. DHO Bradley repeated the same untrue assertion as Ms. K. Hart, that the rules were located in the inmate handbook which is provided to new arrivals.

65. When I tried to explain that the communications rules for the CMU are not, in fact, contained in the inmate handbook, DHO Bradley began marking me guilty on the paperwork in front of him without any further hesitation or consideration.

66. I was sanctioned with 30 days loss of electronic messaging and the loss of 27 days of good time credit--far harsher sanctions than inmates in other institutions often receive for violent incidents in which people got hurt.

67. CO Harvey agrees that DHO Bradley did not, in fact, hear me out.

68. DHO Bradley refused to accept a copy of the unmodified BP-A0288 Incident Report from me for the record, but he did at least purport to accept a copy of my prepared statement and its attachments to annotate the record.

69. A thorough review of the "FCC-Terre Haute, Indiana Communications Management Unit HANDBOOK[sic]" quickly reveals that many of the policies which are commonly alleged to have been violated in communications-related incident reports issued against FCI Terre Haute CMU inmates are not found written therein and a similar review of FBOP Program Statement 5214.02, "Communications Management Units," reveals that they are not to be found there either.

70. For instance, and for purposes of illustration and by no means limitation, there is an unwritten rule/policy which prohibits FCI Terre Haute CMU inmates from mentioning the names of other FCI Terre Haute CMU inmates in their social communications and this unwritten rule/policy is nowhere to be found in either the inmate handbook or FBOP program statement.

71. For another example, there is an unwritten rule/policy which prohibits FCI Terre Haute CMU inmates from receiving financial and tax documents. This rule has interfered with critical filings and inmates have been found guilty based on inbound mail which was sent to them from the outside and which they never, in fact, saw. This rule is not in the inmate handbook or FBOP program statement.

72. In another instance, there is an unwritten rule/policy which prohibits FCI Terre Haute CMU inmates from sending or receiving third-party messages, i.e. a CMU inmate may not tell their mother, "say 'hi' to Dad for me," without risking being found guilty of a serious disciplinary infraction. This rule is not in the inmate handbook or FBOP program statement.

73. Again, my request to Ms. Seireveld of the FCI Terre Haute legal department for a list of all of these rules and policies has been fruitless.

74. The recorded audio from my Thursday, April 18th, 2019, discussion with Ms. Seireveld will reveal that I explicitly asked her for the "rules of the road," only to be told that the institution can't have a written set of rules because FCI Terre Haute CMU inmates would find new mischievous things to do with their communications which weren't prohibited yet by policy.

75. Thus, a member of the FCI Terre Haute legal department told me, in effect, that the institution reserves the ability to punish inmates for previously-non-existent rules ex post facto.

76. The description for offense code 296, for which DHO Bradley summarily found me guilty without hearing out either myself or my staff representative, is listed in the inmate handbook with the following description, "Use of the mail for abuses other than criminal activity which circumvent amil[sic] monitoring procedures (e.g., use of the mail to commit or further a High category prohibited act, special mail abuse; writing letters in code; directing others to send, sending, or receiving a letter or mail through unauthorized means; sending mail for other inmates without authorization; sending correspondence to a specific address with directions or intent to have the correspondence sent to an unauthorized person; and using a fictitious return address in an attempt to send or receive unauthorized correspondence)."

77. DHO Bradley would not let me explain that it's quite clear from the narrative text of the incident report that mail monitoring procedures had not been circumvented since it is manifestly obvious that Mr. R. Blythe knew exactly what was going on, nor that I had neither requested nor intended for my correspondence itself to be forwarded to anybody else, nor that I had not used any unauthorized means, nor that Ms. Clemons was, in fact an authorized person who had already been approved in my inmate contact list.

78. While none of the unwritten rules noted above can be found in the inmate handbook or FBOP program statements, page 12 of the CMU inmate handbook explicitly states that an inmate has "the right to expect that as a human being you will be treated respectfully, impartially, and fairly by all personnel."

79. Page 12 of the CMU inmate handbook also says that inmates "have the right to be informed of the rules, procedures, and schedules concerning the operation of the institution."

80. Page 12 of the CMU inmate handbook also says that inmates "have the right to visit and correspond with family members, and friends, and correspond with members of the news media in keeping with Bureau rules and institution guidelines."

81. DHO Bradley did not hear out the other two minority inmates who had discipline hearings on Friday, May 3rd, 2019, in the FCI Terre Haute CMU either.

82. One of those inmates was sanctioned with a $50 fine, 180 days loss of phone privileges, and forfeiture of 47 days of good time for--in reality--asking his parents to fill out and file a 1099A form on his behalf.

83. The other inmate was sanctioned with 90 days loss of electronic messaging and 27 days of lost good time because his child's mother sent him a message from his child's account and he asked her not to do that, ironically, for fear of being punished by DHO Bradley.

84. None of the three incidents for which myself and the

other 2 minority inmates are being punished are violations of the <u>actual</u> and <u>written</u> FBOP rules and policies as I understand them.

85. DHO Bradley violated the rights of all three of the inmates whose incident reports he adjudicated on Friday, May 3rd, 2019, as I understand those rights from the published inmate handbook.

86. These and other experiences in the FCI Terre Haute CMU leave me unsure about future communications due to the ex post facto application of unwritten and unpublished rules by a discipline hearing officer (DHO) who does not maintain his composure, does not act in a respectful and professional manner, and gives every impression of being partial and unfair as opposed to neutral and detached, and who, when told that their are pending motions in federal court, openly declares with apparent impunity, "I don't care about your case law."

87. It is believed that the Ku Klux Klan maintains an active presence in Indiana, and especially close to FCI Terre Haute.

88. Not caring about case law may not be the only thing which DHO Bradley and the local KKK members have in common.

89. It has come to my attention that there are multiple COs with the surname Harvey here at FCI Terre Haute and that the first initial of my staff representative is "S."

Signed under penalty of perjury,

Martin S. Gottesfeld, Reg. No.: 12982-104

To: CMU Unit Team
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Tuesday, September 3rd, 2019
Subject: Following up on pending items--part 2

Salutations CMU Unit Team,

    As always, I hope that you are well.

    This is a continuation of the "part 1" follow-up cop-out I handed to Ms. Eisele earlier today (Tuesday). Please find attached more open items upon which I would like to inquire for a status. In the case of the BP-10s, should I move on to BP-11s?

    My thanks for your insights,

Martin S. Gottesfeld

- Page 1 of 1 -

Attachment 1

FCC Terre Haute

Administrative Remedy – Informal Resolution

| Inmate Name: Gottesfeld | Register #: 12982-104 |
|---|---|
| Unit: Unit-J | Date Submitted: June 25th, 2019 |

**Section 1: NOTICE TO INMATE** - Be advised, normally prior to filing a Request for Administrative Remedy, BP-229 (13), you must attempt to informally resolve your complaint through your Correctional Counselor.

Section 1a: Briefly state your specific single complaint: I have not received DHO Jason Bradley's written report of Incident number 3249328, which was heard by him on May 3rd, 2019. This is making the administrative remedy process unavailable to me as I cannot appeal his finding without his written report. According to BOP Program Statement 5270.09 Ch. 5 §(h) (page 34), "The DHO gives the inmate a written copy of the decisions and disposition, ordinarily within 15 work days of the decision." DHO Bradley's decision was made on May 3rd and the sanctions were enforced immediately. That was 36 "work days" ago. Please give me a copy of DHO Bradley's report so that I can file an appeal with regional.

Section 1b: Briefly state the resolution you request: Please give me a copy of DHO Jason Bradley's May 3rd, 2019, decision regarding incident report number 3249328 so that I can file an administrative remedy with regional and so that administrative remedy is available to me.

| Inmate Signature: | |
|---|---|
| Counselor Printed Name/Signature: | |

**Section 2: Department Assigned:**

| Date Assigned: | | Date Due: | |
|---|---|---|---|
| ☐ Food Service | ☐ Unit Mgmt | ☐ Unicor | ☐ Education |
| ☐ Psychology | ☐ Medical | ☐ Chaplain | ☐ Recreation |
| ☐ Trust Fund | ☐ Custody | ☐ Facilities | ☐ Safety |
| ☐ ISM/Mailroom | ☐ Admin. | ☐ SIS | |

**Section 3: Department Head Response:**

| | Issue Resolved Comments: |
|---|---|
| | Issue Un-resolved Comments: |
| | Unable to Address Issue Comments: |

| Inmate Signature if Resolved: | | Date: |
|---|---|---|
| Staff Signature: | | Date: |

**Section 4: Tracking:**

| | BP-8 issued to inmate | BP-8 returned to Counselor | BP-9 issued to inmate | BP-9 returned to Unit Team | To Admin Remedy Clerk | Returned as Rejected |
|---|---|---|---|---|---|---|
| Date | 6-24-19 | | | | | |
| Time | 1:50 pm | | | | | |
| Staff | R. Eisele | | | | | |

To: Ms. Eisele
From: Martin S. Gottesfeld, Reg. No.: 12982-104
Date: Tuesday, April 23rd, 2019
Subject: Transfer of Funds From Previous Institutions

Salutations Ms. Eisele,

I hope that you are well.

I have been told that you can help me arrange to have the funds in my inmate accounts from prior institutions transferred to the Federal Bureau of Prisons (FBOP). If so, your help would be greatly appreciated. In one instance, it has literally taken my team multiple efforts over the past 2½ years to try to secure the transfer of funds from one such institution and I don't feel that we are any close to success today than we were at the outset.

I was at The Donald W. Wyatt Detention Facility from March 2016 through November 14th, 2016. As I recall, there should be funds left in both my commissary account there as well as in my pre-paid phone account, which may be managed by Global Tel-Link rather than by the facility itself. I tried to look up the address of the facility in the law library for you, but I was unable to find it. I believe the following partial information is at least close:

     D.W.W.D.F.
     950 High St.
     Central Falls, RI

I also should have a balance in my inmate account at The Plymouth County Correctional Facility (PCCF), where I was held from the morning of Saturday, February 4th, 2017, through the morning of Friday, February 15th, 2019. The address for PCCF is:

     PCCF
     Attention: Inmate Accounts
     26 Long Pond Rd.
     Plymouth, MA 02360

If you need me to sign or otherwise authorize anything in order to secure these transfers, then please just let me know and I will be happy to do so promptly.

If I am mistaken and my request is outside of your purview, then I apologize for the misunderstanding and I kindly request that you just let me know.

As always, my thanks in advance for your attention to this matter,

Martin S. Gottesfeld, Reg. No.: 12982-104

- Page 1 of 1 -

---

Regional Administrative Remedy Appeal

U.S. Department of Justice

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: Gottesfeld, Martin, S.          12982-104        CMI       FCI-THA
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.        UNIT      INSTITUTION

Part A—REASON FOR APPEAL    I am appealing the rejection of the BP-9 which follows. I was not provided with a date by which to resubmit at the institutional level and I do not believe that it is being rejected in good faith. A specific request has been made at the BP-8 level, and clearly it was understood. That request was reiterated at the BP-9 level, and it strains credulity beyond its breaking point to assert that it is "without a specific request or specific resolution." All non-continuation pages are attached herewith attachments and continue to be provided in quadruplicate, as required.

INMATE'S SPECIFIC REQUEST: I wish for my administrative remedy to be accepted for filing and to be moved to a facility commensurate with my status as a non-violent first-time offender who is 35 years old with a high-school diploma, located within 500 miles of my wife in Somerville, MA 02143, and with contact visits.

June 10th, 2019          [signature]
DATE                     SIGNATURE OF REQUESTER

Part B—RESPONSE

_____
DATE                                              REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.
ORIGINAL: RETURN TO INMATE                         CASE NUMBER: _____

Part C—RECEIPT
                                                   CASE NUMBER: _____
Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION
SUBJECT: _____
                                                              BP-DIR-10

---

SENSITIVE BP-10/STAFF MISCONDUCT
U.S. Department of Justice                    Regional Administrative Remedy Appeal
Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: S. Gottesfeld, Martin, S.     12982-104      FCI-THA-CMU    FCI-TH
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.        UNIT      INSTITUTION

Part A—REASON FOR APPEAL  SENSITIVE BP-10/STAFF MISCONDUCT: I had a DHO hearing in the FCI-THA-CMU with DHO Bradley on Friday, May 3rd, 2019 at approx. 10:30AM. DHO Bradley became agitated and belligerent briefly into my statement regarding Incident Report # 3249328 (attached hereto). He would not let me finish my statement and he so interrupted my statement, not allowing him to finish either. Mr. Bradly irritably said, "I don't care about your case law." He chose to reach his decision and mete out sanctions before he had examined all of the applicable info and to preempt pending motions before The Honorable US District Court for The District of Colorado and The Southern District of New York. He also refused to accept a copy of the original, unmodified incident report from me for the record, though he did purport to accept my written statement and attachments. If Mr. Bradley can not or will not maintain his composure, examine all of the facts and documents, and consider U.S. Supreme Court case law, then he is not qualified to be a DHO. He is unprofessional and did not conduct himself in such a manner as to preserve qualified immunity for the FBOP. I would like a new hearing before a qualified and competent DHO. Please see D. Col., Case 18-cv-02328 for emergency ex-parte motion for FRO and both D. Col. 18-cv-02328 and S. D. NY 18-cv-10836-PGG for motions for preliminary judgements. They are pre-existing open cases for similar violations.

[date]  May 3rd, 2019       [signature]
DATE                     SIGNATURE OF REQUESTER

Part B—RESPONSE

_____
DATE                                              REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.
ORIGINAL: RETURN TO INMATE                         CASE NUMBER: _____

Part C—RECEIPT
                                                   CASE NUMBER: _____
Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION
SUBJECT: _____
                                                              BP-DIR-10

---

U.S. Department of Justice                    Regional Administrative Remedy Appeal
Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR(13) including any attachments must be submitted with this appeal.

From: Gottesfeld, Martin, S.          12982-104        CMI       FCI-THA
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.        UNIT      INSTITUTION

Part A—REASON FOR APPEAL   I am requesting to receive my subscription to The Wall Street Journal, which I ceased receiving more than 2 months ago, as well as any other subscriptions in a timely manner as they are time-sensitive publications and I regularly do not receive The Hill until it is weeks old. I request an extension of the filing deadline both because I did not receive my BP-9 back from the FCI-THA remedy clerk until after June 27th, 2019 (as indicated in the cover page of the BP-9 included herewith) and also due to the July 4th holiday, which left me, as a CMU inmate, unable to mail this BP-10 from the evening of July 4th, 2019, until today.

Friday, July 5th, 2019       [signature]
DATE                        SIGNATURE OF REQUESTER

Part B - RESPONSE

_____
DATE                                              REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.
ORIGINAL: RETURN TO INMATE                         CASE NUMBER: _____

Part C - RECEIPT
                                                   CASE NUMBER: _____
Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION
SUBJECT: _____

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

TO:
The Office of the United States Postmaster General
475 L'Enfant Plaza SW
Washington, DC 20260

CC:
The Office of the Inspector General
United States Department of Justice
950 Pennsylvania Ave. NW, Room 4322
Washington, DC 20530

The Honorable Paul G. Gardephe
United States District Judge
500 Pearl St.
New York, NY 10007

The Honorable Marcia Krieger
Chief United States District Judge
901 19th St.,. Room A-105
Denver, CO 80294

Wednesday, May 29th, 2019

In Re: Strange Occurences Affecting Mail to Federal Courts

To Whom It May Concern:

I hope that this letter finds you well. My name is Martin S. Gottesfeld and I am an inmate in the communications management unit (CMU) of the Federal Correctional Institution (FCI) Terre Haute, Indiana. My federal registration number is 12982-104.

I am writing because I have noticed odd happenings with United States Postal Service (USPS) mail between the FCI Terre Haute CMU and U.S. federal courthouses. In multiple instances, these have affected the filing of important legal documents. So, this is obviously a very serious issue.

Thus, may I inquire as to whether or not it is a practice of the USPS to cancel postage stamps on flat (Manila) envelopes by having a person manually mark across them using a black permanent marker? I do not believe such to be the case due to the heavy volume of mail which is efficiently handled by the USPS and the time-consuming, labor-intensive, and monotonous nature of such a practice. If I am correct that the USPS does not do such, then I believe that the reader of this letter will agree that the United States Postmaster General may be quite interested to see some of the documents which are available on PACER in the case of Gottesfeld v. Hurwitz, et al., (S. D. NY 1:18-cv-10836-PGG). Specifically, docket entry (D.E.) 40 at page 19, D.E. 49 at page 5, and D.E. 50 at page 29 each show flat (Manila) envelopes as they were received at the U.S. District Court in Manhattan, and in each instance it is obvious that somebody manually marked across the postage stamps with a black permanent marker.

These can be compared to, ibid., D.E. 2 at page 18 (mailed from a different facility), D.E. 43 at page 21 (a much-less-sensitive filing from the perspective of the Federal Bureau of Prisons (FBOP)), and D.E. 45 at page 7 (also a much-less-sensitive filing from the FBOP's perspective).

A similar document, also showing the manual cancellation of U.S. postage stamps with a black permanent marker, is available on PACER in the docket of the case of Cox v. Dodd, et al., (D. Colo. 1:18-cv-02328-CMA-NYW). Please see D.E. 94 at page 10 therein.

- Page 1 of 2 -

Additionally, I have witnessed such mail, which was properly addressed to the U.S. District Court at 901 19th St., Room A-105, Denver, CO 80294-3589, be returned here to the FCI Terre Haute CMU recently with stamps cancelled in precisely the same fashion and with "Postage Due $1.16" (emphasis in original) handwritten on the envelope in black permanent marker without the usual ink stamp from the USPS.

Inmates here at the FCI Terre Haute CMU do not have such black permanent markers. Also, it is worth noting that inmates here in the FCI Terre Haute CMU cannot seal their own mail to U.S. federal courts like inmates elsewhere in the FBOP system (please see Gottesfeld v. Hurwitz, et al., D.E. 45 at page 3 ¶10). Instead, we must rely on FBOP staff to do that for us (please see ibid. ¶9). And, perhaps not too surprisingly, our mailings regularly arrive to courts and attorneys unsealed, empty, or not at all (please see ibid. ¶10).

Now, in this letter I am prevented from disclosing to your office the various national political publications for which I write due to a former FBOP policy which was struck down by the Honorable U.S. District Court for the District of Colorado as unconstitutional (please see Jordan v. Pugh, 504 F. Supp. 2d 1109 (D. Colo. 2007)) and later rescinded by the FBOP (please see McGowan v. United States, 825 F. 3d 118 (2d Cir. 2016)). I believe that this unconstitutional and rescinded former policy is still being enforced in order to undermine my ability to have issues like those mentioned above taken seriously by offices such as that of the U.S. Postmaster General and the Inspector General of the U.S. Department of Justice. However, I do believe that I am permitted to ask you to Google my name, and that if you were to do so, you would find the results illuminating.

Similarly, I am told that I may not inquire with your office for comment prior to publication due to the same unconstitutional and rescinded former FBOP policy. I believe then that I can say, though, that a great many Americans may be very interested to know what is happening with these mailings and to see the Office of the United States Postmaster General get to the bottom of this matter expeditiously, as I am sure that it is more than able to do.

If you have any questions for me, then please do let me know. I would be happy to be of assistance in resolving this problem.

Finally, may I ask that your office kindly acknowledge this message so that I can be sure that it arrived intact? I believe this to be a prudent precaution given the nature of the events in controversy.

Sincerely,

Martin S. Gottesfeld
Rolling-Stone-Featured Human Rights Activist

- Page 2 of 2 -

Exhibit 1

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Office of the Inspector General
United States Justice Department
950 Pennsylvania Ave NW, Room 4322
Washington, DC 20530

Monday, July 1st, 2019

In Re: <u>PREA Violations At FCI Terre Haute Communications Management Unit (28 CFR §115.6)</u>

To Whom It May Concern,

It is my duty to inform the Office of the Inspector General for the United States Justice Department of violations of the Prison Rape Elimination Act (PREA) inside the communications management unit (CMU) of the Federal Correctional Institution (FCI) Terre Haute, Indiana, which occurred during the week of June 23rd to June 29th, 2019. Please see the declaration enclosed herewith and <u>28 CFR §115.6</u>.

I would include more documentation, but my correspondence with the OIG is <u>not</u> treated as confidential by the FCI Terre Haute legal department, which deliberately violates <u>28 CFR §115.51(b)</u> (see enclosed declaration ¶¶ 26-27 and 31-38). Any attempt(s) by me to include the other documentation which I believe is relevant would, at best, be unsuccessful and delay the receipt of this letter, and would at worst result in me being placed in a SHU in conditions which violate the 8th Amendment (see enclosed declaration ¶¶ 39-41) for longer than I am already likely to face as a result of my report.

If the Office of the Inspector General is reading this letter, than it is doing so only after the staff who run the FCI Terre Haute CMU have already done so.

I will attempt to make a fuller filing on the docket of <u>S.D. NY 18-cv-10836-PGG</u> in a second <u>MOTION FOR EXTENSION OF TIME TO FILE</u> which I also plan to mail today, as I believe that such a showing will be necessary in the interests of justice.

Should the Office of the Inspector General be left with any questions which it feels I can answer, then I would be happy to do so.

Sincerely,

Martin S. Gottesfeld
Rolling-Stone--Featured Human-Rights Activist

P.S. To be clear, I am requesting an external investigation of this matter by the Office of the Inspector General and <u>not</u> an "internal investigation" by the S.I.S. department here at FCI Terre Haute as such investigations have been questionable in the past.

Affidavit of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, do hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 27th day of June, 2019, and I do so declare the following pursuant to 28 U.S.C. §1746 (see LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999)):

1. My name is Martin S. Gottesfeld and I am an inmate in the communications management unit (CMU) of the Federal Correctional Institution (FCI) Terre Haute, Indiana.

2. My federal registration number is 12982-104.

3. Today I became at least the third FCI Terre Haute CMU inmate in about as many days to be sexually abused, as defined by 28 CFR §115.6, "(8) Voyeurism," by an unidentified employee of the Federal Bureau of Prisons (FBOP).

4. The aforementioned incident of sexual abuse happened while I was alone in my cell (cell 41) of the FCI Terre Haute CMU at approximately 10:00 A.M. Eastern Time and the FBOP employee should have been video and audio recorded outside my cell, though such records have a common tendency to become unavailable or degraded when the FBOP might desire such.

5. I was sitting on my toilet defecating at the time of the incident.

6. The FCI CMU unit team (which is separate from the correctional officers (COs) on the unit's custody team) is entirely female, so male inmates in the FCI Terre Haute CMU traditionally cover the windows in their cell doors temporarily while defecating, and this has become an accepted practice, to the point where a correctional officer (CO) was once reprimanded by a lieutenant for telling inmates to uncover the windows in their cell doors while using the facilities.

7. In order to meet the institutional need for inmate safety, staff on rounds who encounter a covered window in a cell door typically verbally confirm from the outside that the inmate inside of the cell is alright and then continue their rounds.

8. This unidentified staff member had harassed at least two (2) other FCI Terre Haute CMU inmates in the 48 hours prior while they too were defecating by ordering them in a disrespectful, coercive, and unprofessional manner to take down their window covers over their understandable objections.

9. When this unidentified male staff member came upon my cell (and I do not know why this previously-unknown staff member has been in the unit this week in the first place), he barked, "Why is this window covered again?"

10. I had never seen this man before and he had never, so far as I know, in fact encountered a cover on my window previously.

11. I attempted to answer his question in a respectful, albeit obvious, manner.

12. He did not like my answer and became more rude.

13. He ordered me to uncover my window and I got up partially in order to do so, as awkward as that was.

14. Before I could uncover my window myself, this unaccompanied male staff member opened my cell door, reached his arm into my cell, and thus broke

the plane of entry, then took down the shirt that was covering my window.

15. This unaccompanied male staff member proceeded to stare at my exposed genitals, obviously and awkwardly.

16. After standing there for longer than was necessary, this staff member barked, "Don't cover this window again."

17. Most FBOP staff members whom I have encountered go out of their way, understandably, to avoid seeing inmates defecate.

18. This unaccompanied male staff member appears to go out of his way to see inmates defecate and to react negatively to obstacles which obstruct his view, based on the frequency and intensity of the incidents like the above which have occurred over the past 72 hours or so in the FCI Terre Haute CMU.

19. Contrary to FBOP policy, this unaccompanied male staff member was not displaying a visible name tag (see FBOP Program Statement 3300.03, "Employment," §19(8), "NAME TAGS AND OTHER ADORNMENTS").

20. Contrary to FBOP policy, this unaccompanied male staff member spoke in a deliberately coercive, disrespectful, and unprofessional manner during this incident (see FBOP Program Statement 3420.11, "Standards of Employee Conduct," §5, "PERSONAL CONDUCT").

21. I do not have access to the official Correctional Services Manual (FBOP Program Statement 5500.11), which dictates mandatory procedure(s) for entering inmate cells, but I do believe that no FBOP staff member is allowed to enter a cell occupied by an inmate without backup present, and that this procedure is required in order to protect both staff and inmates.

22. Except for dire emergencies, it is hard to imagine a valid reason for an FBOP employee to enter an occupied cell without backup, and it is worth noting that in November of last year, inmate Rodney Hamrick killed inmate Robert David Neal in a cell in this very same unit and stabbed inmate Richard Warren a dozen or so times inside another cell here.

23. I believe it is also considered explicitly inappropriate for an FBOP employee to enter an area knowingly while alone when he or she has reason to believe that an inmate who they are not legitimately strip searching might be naked and defecating, and this unaccompanied male staff member had very good reason to believe that I and the other inmates he has similarly harassed were naked and defecating.

24. If this FBOP staff member violated policy by opening and entering my cell alone while he knew that I was likely naked and defecating, then such conduct would not be related to his official duties.

25. In part, 28 CFR §115.6 reads, "Sexual abuse of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:... (8) Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions..."

26. All FBOP inmates are supposed to be able to send confidential reports to the Office of the Inspector General (OIG) for the United States Justice Department and to have access to PREA hotlines (see 28 CFR §115.51(b)).

27. Because FCI Terre Haute CMU inmates like me do not have access to PREA hotlines nor any methods to contact the OIG confidentially, I am unable to report the aforementioned incident directly and confidentially to the appropriate independent authorities as I should be able to do according to 28 CFR §115.51(b).

28. Unlike inmates elsewhere in the FBOP, those in the FCI Terre Haute CMU cannot send sealed mail confidentially to the courts (see 28 CFR §540.203(b)(1)).

29. I am unable to report the aforementioned incident directly and confidentially to any court from inside the FCI Terre Haute CMU.

30. It has come to my attention that the previous Unit Manager here at the FCI Terre Haute CMU, Mr. Clint Swift, was transferred following one or more PREA complaints lodged against him for entering occupied cells without backup for non-official reasons.

31. I believe that the lack of access to PREA hotlines and to the OIG from inside the FCI Terre Haute CMU is the deliberate work of Katherine Siereveld.

32. Katherine Siereveld is a member of the FCI Terre Haute legal department.

33. Katherine Siereveld routinely presents herself as an attorney, including to courts.

34. However, it has come to my attention that Katherine Siereveld may not be licensed to practice nor admitted to the bar in Indiana nor Illinois, the locations of the FBOP's two (2) CMUs.

35. I have previously reported the lack of access to PREA hotlines and to confidential filing with the OIG to Diane Lee, the "Certified PREA Auditor" for the FCI Terre Haute CMU, in a written letter to her at her business address, 11820 Parklawn Dr., Suite 240, Rockville, MD 20852, which I gave to FBOP staff to mail on May 17th, 2019, in an envelope bearing United States Postal Service (USPS) tracking number 9114 9014 9645 1762 0787 72.

36. I was not allowed to seal my own letter to Diane Lee and it was read, scanned, and preserved by the FBOP before it was sent, if it was in fact sent at all as opposed to an empty envelope.

37. According to the USPS tracking system, my letter to Diane Lee's office was delivered thereto on May 28th, 2019, but again I do not know if it was received empty or altered due to the actions and inactions of the FBOP.

38. Today marks thirty (30) days since my letter was reportedly delivered to Diane Lee and I have not received any response from her office.

39. Due to reports from other inmates which I find credible based upon my experience as a Rolling-Stone--featured human-rights activist and as an investigative journalist, I find it likely that the agents, employees, contractors, and other entities acting under the control of Acting FBOP Director Hugh J. Hurwitz, including Katherine Siereveld, will retaliate against me for reporting the above incident of sexual abuse by an FBOP employee working inside of the FCI Terre Haute CMU, and that this retaliation will seriously impede my litigation against Mr. Hurwitz and others in the case of Gottesfeld v. Hurwitz, et al. (S.D. NY 18-cv-10836-PGG).

40. I believe that such unlawful retaliation will consist of further such

acts of voyeurism and that I will be placed in the "special housing unit," or SHU, here at the FCI Terre Haute CMU in a deliberate effort to get me to withdraw my complaint in order to secure my exit from the SHU.

41. The FCI Terre Haute CMU SHU is regarded as a torture chamber by the inmates here, who consistantly report enduring extreme temperatures, drinking water which causes convulsive vomiting and dangerously-dehydrating diarrhea, sleep deprivation, a floor that becomes too hot for them to stand in their tiny punishment cells, withholding of writing impliments, postage, envelopes, and other items necessary to contact the outside world and to pursue litigation in the courts, and more (see S.D. NY 18-cv-10836-PGG D.E. 42 at 2 ¶¶ 6-7, and at 3 ¶¶ 14-15).

42. The unaccompanied male staff member from the incident above was a ~~_____~~ grey-haired caucasian male wearing a grey shirt today, June 27th, 2019.

43. It has subsequently come to my attention that the surname of the unaccompanied male staff member in question may be "Royer" or something similarly spelled. MSG 6/28/19

44. It has subsequently come to my attention that the unaccompanied male staff member in question has taken down mandatory placards bearing Diane Lee's name and address, and I believe that this is also a policy violation. MSG 6/28/19

45. A fourth victim has subsequently come to my attention. MSG 6/28/19

46. The unaccompanied male staff member has subsequently threatened other victims with retaliatory disciplinary action for reporting his non-official activities. MSG 6/28/19

47. It has recently come to my attention that the first initial of the unaccompanied male staff member in question may be "T." MSG 6/28/19

48. On Friday, June 28th, 2019, I was approached by two (2) members of the S.I.S. (or internal investigations) department of FCI Terre Haute who wanted to speak to me about a "PREA" matter about which they had heard from a "third party." I declined to speak with them and advised them that I would be filing a report with the Office of the Inspector General, as is my prerogative under federal regulations. This conversation took place in the lobby of the CMU around 2:45 P.M. Eastern Time. MSG 6/28/19

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on Thursday, June 27th, 2019.

Martin S. Gottesfeld

49. About 4 hours after I spoke with S.I.S., a victim whom "T. Royer" had threatened received a disciplinary charge, written, but not delivered by, "T. Royer." Thus, FCI Terre Haute is allowing Royer to retaliate against victims for reporting him, in violation of 28 CFR §115.67. In the report, Royer claims to have been on "PREA rounds." However, he didn't notice the violations of 28 CFR §115.51(b) cited above and rather he took down placards with Diane Lee's address. Royer may also be the backup disciplinary hearing officer (DHO) for FCI Terre Haute, and he appears to use this status to offend with impunity and to intimidate and coerce his victims further.

- Page 4 of 4 -



USPS TRACKING #

9114 9023 0722 4293 0876 81

UNITED STATES
POSTAL SERVICE®

Label 400  Jan. 2013
7690-16-000-7948

Martin J. Whitehead
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

<> 12982-104 <>
Inspector General
950 Pennsylvania AVE NW
Room 4322
Washington, DC 20530
United States

July 1st 2019
Exhibit 11

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Office of the Inspector General
United States Department of Justice
950 Pennsylvania Ave. NW, Room 4322
Washington, D.C. 20530

Sunday, August 25th, 2019

In re: <u>Possible waste at DOJ's FCI Terre Haute CMU</u>

To Whom It May Concern:

    I hope that this letter finds you well.

    My name is Martin Gottesfeld and I am including some examples of my writing from The Intercept and RedState. A quick Google of my name will also pull up my writing at a variety of other publications including HuffPost, Newsweek, InfoWars, The Western Journal, The Daily Mail, and others.

    I am writing to inform the Office of the Inspector General (OIG) for the U.S. Department of Justice (DOJ) of potential waste at the department's communications-management unit (CMU) at the Federal Correctional Institution (FCI) Terre Haute that may cost taxpayers hundreds of thousands of dollars. I believe that the OIG has the authority, the duty, and the appropriate tools to investigate matters of waste within the department pursuant to <u>5 U.S.C. app. 3, §§ 2, 4, and 6.</u>

    It has come to my attention and has since been published on an open docket that a DOJ employee eligible under the Federal Employee Compensation Act (FECA) and the Public Safety Officer Benefit (PSOB) Program was the original target of an assassination attempt here at the FCI Terre Haute CMU. This employee, a correctional officer (CO) named Travis Weber, inadvertently avoided the assassin by taking the day off. A contingency target wasn't so lucky that day.

    In November 2018, former U.S. Army soldier Rodney Hamrick killed Mr. Robert David Neal here instead of Travis Weber. Hamrick also stabbed another victim, Mr. Richard Warren, several times. Please see docket entry 69 in the case of <u>Gottesfeld v. Hurwitz, et al. (S.D. NY 18-cv-10836-PGG)</u> at 14-15 for details.

    Now, to be clear: there is no specific concrete threat against DOJ employee Travis Weber of which I am aware at the current time. Yet, CO Travis Weber is still assigned many shifts in the FCI Terre Haute CMU, including many overtime shifts during which he may be fatigued and therefore off his own guard. It additionally seems unlikely that Travis Weber currently meets the physical requirements for his position that are meant to ensure his safety and that of others, as detailed in FBOP Program Statement 3000.03 §339.1(3)(b), specifically §339.1(3)(b)(3) Seeing a human figure at a distance of one-fourth of a mile; §339.1(3)(b)(4) Seeing a target at a distance of 250 yards; §339.1(3)(b)(9) Running an extended distance; §339.1(3)(b)(10) Dragging a body an extended distance; and possibly other subsections thereof as well.

    If something were to happen to CO Travis Weber, or be allowed to occur due to his physical inability to stop it, the taxpayers, meanwhile, would have fidicuary responsiblities to compensate him, his family, or both under FECA, the PSOB Program, or both. In the current moment, moreover, the FBOP's negligence in preventing an easily-foreseeable loss of life is a matter of

international scrutiny following the recent preventable death of Jeffrey Epstein in FBOP custody after clear warning signs.

As a possible result of the above-docketed information entering the publication process, CO Travis Weber on Friday potentially undermined one of his FBOP colleagues in a situation with Yours Truly. Now, I am a non-violent human-rights advocate, as can be seen in Rolling Stone's feature of my work. Other inmates, however, might not always react to CO Travis Weber's behavior as I do. Indeed, he's already been targetted once prior to my arrival here.

Of course, life is paramount to dollars. The OIG's jurisdiction and duties in this particular situation, however, may lie in its role as a fiduciary watchdog for taxpayers.

In conclusion, may I inquire as to what, if anything, the DOJ's OIG intends to do in order to prevent an unnecessary and avoidable loss to taxpayers through FECA, the PSOB Program, or both, when there are indeed plenty of other duty assignments CO Travis Weber could fill just as easily without any negative effects for his career that would keep him away from a unit where he was the intended target of an assassination once before?

Please let me know,

Martin S. Gottesfeld
Rolling-Stone--featured human-rights advocate

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808





**UNITED STATES POSTAL SERVICE®**

**USPS TRACKING #**

9114 9023 0722 4293 0880 39

⇔12982-104⇔
Inspector General
950 Pennsylvania AVE NW
Room 4322
Washington, DC 20530
United States

March 1, 2010/Jonathan Correa/Direct

1  drug trafficking organization?
2  A.  I conspired to distribute cocaine throughout
3  the Eastern District of the United States.
4  Q.  And according to the statement of facts, what
5  else did you attempt to do?
6  A.  I also transported AR-15 rifles and other
7  weapons from the United States to Mexico.
8  Q.  Who received AR-15s?
9  A.  Placido Benitez.
10 Q.  Was part of this plea agreement you would in
11 fact plead guilty?
12 A.  Yes.
13 Q.  Did you also give testimony?
14 A.  Yes.
15 Q.  If you are found to have lied or falsely
16 implicated someone who is not truly involved?
17 A.  Yes, perjury charges and my plea agreement
18 would be yanked.
19 Q.  Sir, have you been sentenced in this case yet?
20 A.  Yes, I have.
21 Q.  What sentence did you receive?
22 A.  I received 292 months.
23 Q.  How many years is that?
24 A.  24 years, four months.
25 Q.  What do you understand your obligation to be

181

March 1, 2010/Jonathan Correa/Direct

1  under the plea agreement?
2  A.  To tell, give truthful testimony.
3  Q.  What do you understand the obligation of the
4  United States to be under your plea agreement?
5  A.  The obligation is for them to relate back to
6  my sentencing judge any cooperation that I have given
7  Q.  And other than that communication to your
8  sentencing judge, has the United States offered you any
9  other promises in exchange for your testimony here
10 today?
11 A.  No.
12 Q.  Have you been given any direction by either
13 myself, Assistant United States Attorney Weddle or
14 Special Agent Brian Grove as to what you are supposed to
15 say or how you are supposed to say it?
16 A.  No.
17 Q.  Despite having been sentenced to 292 months in
18 your case, Mr. Correa, do you still intend to abide by
19 the terms of your plea agreement?
20 A.  I do.
21 Q.  Are you hoping to receive a reduction in your
22 sentence?
23 A.  Yes, I am.
24 Q.  Can you please tell the jury who makes that
25 determination of whether or not you receive any

102

March 1, 2010/Jonathan Correa/Direct

1   A.  What we are looking at here is the face of the
2   trap from this area here where the Bondo has been broken
3   away.
4   Q.  What is Bondo?
5   A.  Bondo is a type of auto repair paste that is
6   used to hide dents and things of that nature.
7   Q.  And how is Bondo used with regard to the
8   traps?
9   A.  We would seal them with, we could seal the
10  entrances with Bondo and paint them in order to have a
11  seamless opening where you can't tell where the opening
12  to the trap was, unless you knew where it was.
13  Q.  What is this up here?
14  A.  That is the carpet rolled back.
15  Q.  Now, this floor, is that the factory floor
16  that came from Chevy?
17  A.  No, that is not the factory floor.  It's very
18  similar to the factory floor.  It replicates it.  That
19  is not the original floor.  The original floor is down
20  in this, down here.
21  Q.  Is this what was done in Los Angeles?
22  A.  Yes.
23  Q.  Showing you what has been marked for
24  identification as Government Exhibit 397.  Do you
25  recognize that?

195

March 1, 2010/Jonathan Correa/Direct

1   (Exhibit No. G-397 was marked for
2   identification.)
3   A.  Yes.
4   Q.  What is it?
5   A.  It's the open trap.  It's the open door to the
6   trap.
7   MR. LEWEN:  Move to admit 397.
8   THE COURT:  So admitted.
9   (Exhibit No.  G-397 was received
10  in evidence.)
11  BY MR. LEWEN:
12  Q.  Now, tell us is that the original retrofit
13  from Los Angeles, is that how that opening was supposed
14  to work for that trap?
15  A.  Yes, that is how that opening was supposed to
16  be opened and accessed.
17  Q.  Now, how far does that trap go?
18  A.  It goes from the very back of the second row
19  right where the second row is at all of the way to the
20  edge of the tailgate to where that door is at.
21  Q.  Can you give us an approximate dimension?
22  A.  Three and a half foot or so.
23  Q.  What was put in that trap?
24  A.  We would put cocaine kilos in there and then
25  we would put also money and weapons.

196

March 1, 2010/Jonathan Correa/Direct

1  Q.  Which hotel was that?
2  A.  LaQuinta Inn.  We would instruct the drivers
3  to park the bus at the rear of the facility which is, I
4  mean, literally just on the outside of the fence of the
5  storage facility.  At a given time we would take the ice
6  chests and walk them into the storage facility.
7  Q.  And where would the bus go?
8  A.  It could stay there.  It would stay there.
9  Q.  And let's talk about 352 that has already been
10  admitted.  What else is in there?
11      (Exhibit No. G-352 in evidence was
12       referenced.)
13  A.  Two pistol-type AR-15s.
14  Q.  What were those doing there?
15  A.  We had transported them up there with the
16  marijuana in order for potential sale.
17  Q.  Who was the potential sale for, do you know?
18  A.  Through conversations I had learned that D was
19  a fanatic.
20      MR. SCHWARTZ:  We object to conversations.
21  Seriously.
22  BY MR. LEWEN:
23  Q.  Who did you have the conversation with,
24  Mr. Correa?
25      MR. LEWEN:  I am sorry.  My response is I

223

March 1, 2010/Jonathan Correa/Direct

1  am going to ask him if he spoke with another
2  coconspirator about this conversation.
3      THE COURT:  Go ahead.  Ask the question.
4  BY MR. LEWEN:
5  Q.  Who were you speaking with?
6  A.  Carlos Betancourt.
7  Q.  Is Carlos involved in this conspiracy?
8  A.  Yes.
9  Q.  Did Carlos respond to your question about who
10  the guns were for?
11  A.  Yes.
12      MR. SCHWARTZ:  Objection.  Hearsay.
13      THE COURT:  I will overrule the objection
14  based on previous rulings and subject to appropriate
15  findings at the close of the government's case.
16  BY MR. LEWEN:
17  Q.  Again, the guns were for who?
18  A.  D.
19  Q.  What is all this stuff here, these packages?
20  A.  Those are hydro marijuana.
21  Q.  Who is the marijuana for?
22  A.  They were taken up there for D to sell.
23  Q.  I want to have you walk us through this
24  storage unit.  It's been admitted as 358.  Working from
25  the cooler over, would you please tell us, for example,

224

March 1, 2010/Jonathan Correa/Direct

1   admitted. What is this chair for?
2            (Exhibit No. G-357 in evidence was
3            referenced.)
4       A. You know, you do get tired and we do get hot
5   in there. We would use it to sit down and take a
6   breather, watch one of the other guys work for a minute.
7       Q. All right. What is this?
8       A. Denatured alcohol.
9       Q. What do you use denatured alcohol for?
10      A. Denature alcohol is real good to clean up
11  silicone. Anybody knows you don't take a bead of
12  silicone and wipe it down with water. Denatured alcohol
13  it cuts it and smoothes it just gas you want it. It also
14  is a good agent to remove fingerprints. You pour it
15  over things and it completely dissolves any fingerprints
16  in tight spots.
17      Q. Finally, what is this item right there?
18      A. That is our heavy duty jack.
19      Q. We have the red jack in the corner?
20      A. Uh-huh.
21      Q. The blue jack in the corner. How do you use
22  both those jacks at the same time?
23      A. We have one on each side of the facility just
24  because we always left it ready for when we back the
25  vehicle up it would be cramped so we have one on each

229

March 1, 2010/Jonathan Correa/Cross

1   side so we can roll it over underneath the axle and just
2   pick up the vehicle.
3       Q. Did you ever know the defendant, D, to have
4   guns?
5       A. Yes.
6       Q. How did you know about that?
7       A. Through phone calls and conversations that I
8   overheard with Carlos Betancourt.
9       Q. Did you ever discuss with Carlos a specific
10  gun?
11      A. There was one particular weapon that Carlos
12  Betancourt relayed to me that D had.
13      Q. Can you describe that for the jury.
14      A. It was a machine gun type gun that was mounted
15  on a turret that he had on a tripod that he had that was
16  military style.
17              MR. LEWEN: May I have a moment, Your
18  Honor?
19              THE COURT: Yes.
20              MR. LEWEN: Nothing further, Your Honor.
21              THE COURT: Thank you. Cross-examination.
22                  CROSS EXAMINATION
23  BY MR. HARRISON:
24      Q. Mr. Correa, do you recall testifying on direct
25  examination when you made your first trip to Knoxville?

230

March 1, 2010/Jonathan Correa/Cross

1  A.  Yes, I was aware of some, of most of these
2  cities here.
3  Q.  It's not some situation that the government
4  painted before the jury just a moment ago that we are
5  all concentrating on Knoxville, Tennessee and that's all
6  that's on our minds.  What we do is in Knoxville,
7  Tennessee.  What we are seeing, what kind of vehicles we
8  are seeing in Knoxville, Tennessee.  What kind of, what
9  different people were seeing in Knoxville, Tennessee.
10  It is in addition to just staying at the LaQuinta Hotel
11  in Knoxville, Tennessee.  It's a lot bigger picture than
12  that isn't it?
13  A.  Yes.
14  Q.  Okay.  Let me show you what has been
15  introduced as 352.  It's your testimony you are
16  responsible for bringing that Igloo to Knoxville,
17  Tennessee?
18  A.  Yes, it is.
19  Q.  It's your testimony that Donnie Reynolds
20  needed some firearms.  That you are bringing these
21  firearms to Donnie Reynolds?
22  A.  These weapons were being transported, were
23  transported up from Dallas to Knoxville.
24  Q.  For Donnie Reynolds?
25  A.  For Donnie Reynolds.

233

March 1, 2010/Jonathan Correa/Cross

1  Q.  Obviously you weren't here Thursday or you
2  never went to his home at Alameda and saw all these
3  weapons that the government has introduced as being part
4  of Donnie Reynolds' collection.  He needed a couple of
5  more from you, when you came up from Dallas, didn't he?
6  It's your testimony -- let me rephrase it,
7  that these two firearms were being brought by you or
8  your organization to Donnie Reynolds because he needed
9  some firearms, correct?
10  A.  Not just needed, but I mean --
11  Q.  Needed?  What else is there?  Wanted?
12  A.  Yes.
13  Q.  Okay, he wanted.
14  A.  Yes.
15  Q.  He wanted weapons.  He wanted and needed
16  firearms?
17  A.  He wanted weapons.
18  Q.  Okay he asked you to bring him some weapons?
19  A.  We brought two weapons, two AR-15 pistol-type
20  weapons he wanted for that purpose.
21  Q.  And it's because he requested those weapons?
22  A.  Yes.
23  Q.  To a coconspirator, an alleged coconspirator?
24  A.  The decision to taking the weapons up to
25  Knoxville was done by Joshua Correa, Joshua Correa, and

234

March 1, 2010/Jonathan Correa/Cross

1 that was relayed to me to take them up for the purpose
2 of selling to Donnie Reynolds.
3 Q. Did the cartel actually sell some firearms to
4 Donnie Reynolds?
5 A. These are the two first weapons that were sent
6 up.
7 Q. Did you sell them or give them to Donnie
8 Reynolds?
9 A. They are still in the container.
10 Q. Okay, because.
11 A. Because they were still in the container for
12 pick up.
13 Q. Because the search warrant was executed and
14 these firearms were taken by the police?
15 A. Yes.
16 Q. Were you going to sell the firearms or give
17 them to Donnie Reynolds because he needed them?
18 A. That was up to Joshua to take care of that.
19 Q. You had no idea?
20 A. That was not information that was, that was
21 not my decision making.
22 Q. Just out of curiosity, Mr. Correa, how do you
23 know that's your storage bin?
24 A. Because the bent latch in the center. On
25 occasion I had to bend that latch in order to open the

235

March 1, 2010/Jonathan Correa/Cross

1 lock.
2 Q. Have you been and inspected all of these
3 fronts of the storage facilities?
4 A. Not all of them, no. I haven't been to
5 inspect them, no.
6 Q. How do you know there's not any other bent
7 handles to open up the doors of the storage facility?
8 A. I have not inspected, no.
9 Q. My question is, how do you know this is your
10 storage facility?
11 A. This is very similar to the way my latch, the
12 latch for the storage facility that I used -- that, I
13 mean, I did this. I bent that latch in order to gain
14 access to that container in order to bring in a vehicle
15 in there with drugs.
16 Q. Did someone tell you this was your storage
17 facility?
18 A. No. I recognized it.
19 Q. You recognized it?
20 A. Yes.
21 Q. Okay. How do we know there is marijuana
22 inside this Igloo, when you testified the Igloo was used
23 to transport cocaine?
24 A. It's not just that one Igloo that is used.
25 This one had the black spray paint over the top. We had

236

March 1, 2010/Jonathan Correa/Cross

1  cocaine to Knoxville?
2      A.  It's possible.
3      Q.  The sixth trip that you may have brought
4  approximately 35 kilograms of cocaine to Knoxville,
5  correct?
6      A.  Yes.
7      Q.  The seventh trip approximately 20 kilograms of
8  cocaine to Knoxville.  Is that beyond the realm of
9  imagination?
10     A.  No, it's not beyond the realm.
11     Q.  So if we take those seven trips -- I am sorry,
12 let me get to the eighth trip.  Approximately ten
13 kilograms of cocaine to Knoxville?
14     A.  Sure.
15     Q.  And on the ninth trip approximately 15
16 kilograms of cocaine to Knoxville?
17     A.  Okay.
18     Q.  The tenth trip approximately 20 kilograms?
19     A.  It's not beyond the realm of possibility.
20     Q.  The eleventh trip, approximately 20 kilograms?
21     A.  It's not beyond the realm of possibility.
22     Q.  If we add all these numbers up we are talking
23 about over 11 trips, not including the trips, bus trips,
24 that you brought over 250 kilos of cocaine to Knoxville
25 over a period of time, fair to say?

243

March 1, 2010/Jonathan Correa/Cross

1      A.  Fair to say.
2      Q.  That's to Knoxville.  That's not counting to
3  Washington DC, Lumberton, North Carolina Atlanta and
4  places such as that?
5      A.  Correct.
6      Q.  Right.  Let's talk about your change of plea
7  or your plea agreement.  I direct your attention to
8  Paragraph 1.  The government asked you -- you pled
9  guilty to these charges didn't you?
10     A.  Uh-huh.
11     Q.  You just came in and pled guilty.  That is not
12 exactly true is it?  You know what a change of plea is?
13     A.  I understand what a change of plea is.
14     Q.  Is a change of plea when you first say you
15 didn't do anything and then you come back in to court
16 and say, well, government I want to plead now?
17     A.  Isn't that standard procedure when you come in
18 and get indicted?
19     Q.  .I don't know.  I am asking you.  I have never
20 been indicted by the federal government.  Did you
21 initially say I am not guilty?
22     A.  Yes.
23     Q.  Okay.  You initially said I am not guilty?
24 didn't do any of this.  Then you come back in later and
25 say I want to plead.  Correct?

244

March 1, 2010/Jonathan Correa/Cross

1   A.  Right.
2   Q.  That gave rise to the authoring of this plea
3   agreement.  Fair enough?
4   A.  Okay.
5   Q.  All right.  You didn't come in immediately and
6   want to plead guilty.  You had some things to go through
7   and then you ultimately changed your mind, is that
8   correct, to plead guilty?
9   A.  The exact way it was done was by my lawyer.
10  On his instructions I did things accordingly.  That is
11  why I have a lawyer.
12  Q.  You had discussions between the time you
13  initially pled not guilty and the time that you changed
14  your plea, as referenced here, did you have discussions
15  through your lawyer or yourself to the government in the
16  Eastern District of Texas?
17  A.  Yes.
18  Q.  All right.  Through those discussions it was
19  decided by you and your lawyer that it would be in your
20  best interest to change your plea to guilty?
21  A.  Yes.
22  Q.  All right.  Let me show you paragraph 7, and
23  see if you and your attorney went over this, entitled
24  substantial assistance.  Do you know what a Rule 35(b),
25  is, Mr. Correa?

245

March 1, 2010/Jonathan Correa/Cross

1   A.  I know what a Rule 35 is.
2   Q.  In other words, if you substantially assist
3   the government, the government may file a motion with
4   the court, a Rule 35 motion, to reduce your sentence.
5   Do you understand that?
6   A.  Yes, I understand that.
7   Q.  Part of substantially assisting the government
8   is coming here today to testify, would it not be?
9   A.  Yes, sir.
10  Q.  Is that fair?
11  A.  Yes, sir.
12  Q.  All right.  How many times prior to your
13  testimony here today have you had an opportunity to
14  speak to government authorities about just what you are
15  going to testify to here today?
16  A.  Here today, how many times for this
17  particular --
18  Q.  Uh-huh.
19  A.  We have met twice.
20  Q.  Who is we?
21  A.  Me and the --
22  Q.  The government attorneys?
23  A.  Sure.
24  Q.  Agent Grove?
25  A.  Yes.

246

March 1, 2010/Jonathan Correa/Cross

```
 1   Q.  Did Agent Grove met with you too?
 2   A.  The prosecutor, yes.
 3   Q.  All right.  Agent Grove, the IRS agent.  You
 4   have seen him before today?
 5   A.  Yes, I have seen him.
 6   Q.  You have seen these two governments attorneys
 7   before today?
 8   A.  I have seen one of them, yes.
 9   Q.  Which one?
10   A.  The one on the right.
11   Q.  Where did you see them at?
12   A.  We met at -- they came to see me at the jail.
13   Q.  The Knox County jail?
14   A.  The Knox County Jail and then also at the
15   yard.
16   Q.  What yard?
17   A.  The prison I was housed at.
18   Q.  Where is that?
19   A.  In Texas.
20   Q.  In government attorney Lewen came to Texas to
21   talk to you?
22   A.  Yes.
23   Q.  Okay.  Although you have already been
24   sentenced in the Eastern District of Texas, the
25   government can still after you have been sentenced at
```

247

March 1, 2010/Jonathan Correa/Redirect

```
 1   any time file a Rule 35(b) motion to help you in getting
 2   your sentence reduced?
 3   A.  Yes.
 4   Q.  Whether it's the Eastern District of Tennessee
 5   or the Eastern District of Texas, it's the same
 6   government.  Would you not agree?
 7   A.  Yes.
 8   Q.  All right.  Now, did you ever personally give
 9   drugs to Mr. Reynolds here?
10   A.  I never personally, no.
11   Q.  Did you ever personally receive money from
12   Mr. Reynolds?
13   A.  I never personally received money from him.
14        MR. HARRISON:  That is it, Your Honor.
15   Thank you.
16        THE COURT:  Redirect?
17        MR. LEWEN:  Briefly, Your Honor.
18                REDIRECT EXAMINATION
19   BY MR. LEWEN:
20   Q.  Earlier on direct you mentioned some of the
21   names of other drivers who drove drugs from Dallas to
22   Knoxville and money from Knoxville to Dallas.  Who were
23   some of those drivers?
24   A.  Chris Holland, Marco Garcia, the two bus
25   drivers, then Mario Sanchez.
```

248

Eastern District Of Tennessee Case # 3-08-cr-143
U.S. v. Reynolds

March 2, 2010/Parish/Direct

1  General Manager of Coal Creek Armory here in Knoxville.
2  Q.  What kind of business is Coal Creek Armory?
3  A.  We sell firearms, firearm accessories and
4  ammunition.  We also have an indoor shooting range,
5  etcetera.
6  Q.  You mentioned you are the General Manager?
7  A.  That is correct.
8  Q.  How long have you held that position?
9  A.  Two years now.
10  Q.  And what are your duties as general manager of
11  Coal Creek Armory?
12  A.  To oversee the purchase and sale of firearms
13  as well as the employees that we hire there.
14  Q.  Okay.  Are you familiar with the inventory and
15  invoices and records that are kept there?
16  A.  Of course.
17  Q.  Do you know the defendant?
18  A.  I do.
19  Q.  Do you see him in the courtroom today?
20  A.  I do.
21  Q.  Can you please identify him by an article of
22  clothing?
23  A.  He is wearing a maroon blazer.
24  Q.  How is it you know the defendant?
25  A.  He was a customer of ours.

81

March 2, 2010/Parish/Direct

1  Q.  What was the time period of his patronage to
2  Coal Creek Armory?
3  A.  Mr. Reynolds first came in April of 2005 and
4  ceased doing business in May of 2008.
5  Q.  Over that time period how much money did the
6  defendant spend at Coal Creek Armory?
7  A.  $67,601.
8  Q.  Given that dollar amount, how would you rate
9  the defendant as a customer of Coal Creek Armory?
10  A.  I would say Mr. Reynolds is in the top ten,
11  absolutely.
12  Q.  Mr. Parish, would you be able to recognize
13  some of the guns that he bought from your store?
14  A.  Sure.
15  Q.  Showing you what is marked for identification
16  as Government Exhibit 553.  Do you recognize that?
17       (Exhibit No. G-553 was marked for
18       identification.)
19  A.  Yes, I recognize a couple of guns that we sold
20  as well as some custom work that we did for
21  Mr. Reynolds.
22       MR. LEWEN:  Move to admit 553, Your Honor.
23       THE COURT:  So admitted.
24       (Exhibit No. G-553 was received in
25       evidence.)

82

March 2, 2010/Parish/Direct

```
 1                   referenced.)
 2        A.   Yes, I do.
 3        Q.   Can you please hold those up for the jury and
 4   tell us what they are?
 5        A.   This particular firearm was -- I have
 6   identified it by the serial number.  It was purchased by
 7   Mr. Reynolds.  It is a 5.7 also known as an F & Herstal
 8   manufactured in Belgium by Fabric Nationale.  It's 5.7
 9   millimeter.  This is the 5.7 ammunition along with a 20
10   round magazine.  This holds 20 rounds of ammunition you
11   see here.
12        Q.   I am showing you what has been admitted as
13   475a.  What does this receipt pertain to?
14            (Exhibit No. G-475a in evidence
15            was referenced.)
16        A.   This receipt shows the specific serial
17   numbered gun, the one we are speaking of is this one
18   right here.  It looks like Mr. Reynolds purchased this
19   February 22nd, 2008.
20        Q.   Is that the date right there?
21        A.   That is the date.
22        Q.   And so would that be the date that he walked
23   out of the store?
24        A.   It is.
25        Q.   What is this?  It looks like there are two.
```

87

March 2, 2010/Parish/Direct

```
 1        A.   There are two.
 2        Q.   What did he purchase that day?
 3        A.   Mr. Reynolds purchased two of these firearms
 4   on the same day.
 5        Q.   What address does Mr. Reynolds have on file
 6   with Coal Creek Armory for this purchase?
 7        A.   1001 Crooked Springs Road, Knoxville,
 8   Tennessee 37923.
 9        Q.   Are you familiar with that particular handgun,
10   Mr. Parish?
11        A.   I am very familiar.
12        Q.   Familiar with what it is commonly referred to
13   as?
14        A.   I am.
15        Q.   What is that?
16        A.   On the streets they are known as "cop
17   killers."
18        Q.   Do you know why they have got that moniker?
19        A.   The velocity does suggest it will be able to
20   penetrate bullet proof vests.  Normal law enforcement
21   are issued a level type 2a vest.  It will not withstand
22   anything over 2000 feet per second giving an X amount of
23   grain weight, this grain weight being 115 grains.  These
24   are only about 40 grains, but they have 2,350 feet per
25   second when fired from this weapon.  Independent tests
```

88

March 2, 2010/Parish/Cross

```
 1   A.  Yes.
 2   Q.  Which one?  Both?
 3   A.  Both.
 4   Q.  And you have to show them your records and you
 5   have to show your sale of those guns to legitimate
 6   people don't you?
 7   A.  Yes, that's correct.
 8   Q.  What is the purpose of that?
 9   A.  To show the legitimacy of the firearm
10   purchases, you must keep a record according to the
11   Alcohol, Tobacco, Firearms & Explosives.  We keep these
12   records in accordance.  We also keep ATF bound books to
13   show where the purchases or where the firearms are
14   coming in and leaving.
15   Q.  What is the reason that they insist on you
16   doing that?
17   A.  To make sure that there are no, there is
18   nothing illegal going on in the way of, you know, gun
19   running, illegal gun transactions and that there is a
20   background check to ensure these guns aren't going into
21   the hands of criminals.
22   Q.  Can't sell guns to criminals can you?
23   A.  No.
24   Q.  They have to have a background check to buy
25   one of these guns don't they?
```

103

March 2, 2010/Parish/Cross

```
 1   A.  That is correct.  Every time.
 2   Q.  Every time, right?
 3   A.  Every time.
 4   Q.  Every time I walk in there or every time
 5   Mr. Reynolds walked in there.  Every time Mr. Reynolds
 6   bought a gun from you he had to have a background check
 7   to buy one of those didn't he?
 8   A.  That is correct.
 9   Q.  He never had a problem with that did he?
10   A.  No.
11   Q.  How many guns did he buy?
12   A.  25.
13   Q.  Okay.  And there were pistols and these
14   whatever different kind of carbines and did he ever buy
15   an AR-15 from you?
16   A.  Yes.
17   Q.  How many?
18   A.  I show two total.  One would have been due to
19   the serial number it's a stripped lower receiver for an
20   AR.  The other one is a full AR.
21   Q.  What is a full AR?
22   A.  I am sorry.  A full AR is fully built.  It's
23   something -- normally what people do is they actually
24   buy a lower and build it themselves out of the parts.
25   When I say full AR, it is a working AR off the shelf.
```

104

March 2, 2010/Parish/Cross

```
 1          MR. SCHWARTZ: I want that to be
 2   introduced as Exhibit 6a to Mr. Parrish's testimony.
 3          THE COURT: 6a I think that is what we
 4   decided. 6a and b, that's fine.
 5          (Exhibit No. D-6a-b was received
 6           in evidence.)
 7   BY MR. SCHWARTZ:
 8      Q. I marked this one as 6b right here. I am
 9   going to turn it. Which one is that gun, Mr. Parish?
10      A. That is the full length AR.
11      Q. And when was that sold to Mr. Reynolds?
12      A. On 14 August, 2007.
13      Q. Now, some of these guns, some of the guns are,
14   some of the automatic guns I guess is the right way,
15   have to have special permits, is that right?
16      A. They do. Each one requires a federal tax
17   stamp.
18      Q. Okay. Can you buy these guns, can you sell
19   these guns to someone that doesn't have the federal tax
20   stamp?
21      A. No.
22      Q. How do you get a federal tax stamp?
23      A. You have to go through a pretty lengthy
24   process. It takes about four months to get the
25   paperwork back. You have fingerprints, certificate of
```

107

March 2, 2010/Parish/Cross

```
 1   compliance as well as ATF Form 4 designating exactly
 2   what you are purchasing along with two passport photo
 3   identifications.
 4      Q. Do you do that paperwork for a customer?
 5      A. We do.
 6      Q. Assist them?
 7      A. We hand them the paperwork. It's up to them
 8   to complete it.
 9      Q. Did Mr. Reynolds ever make any paperwork to do
10   these kind of things?
11      A. Yes, sir.
12      Q. I am going to hand you some things that were
13   taken by search warrant. I am going to ask you about
14   the items I just handed you. Those are copies of items
15   seized by the government pursuant to a search warrant of
16   a safety deposit box of Mr. Reynolds. Tell me what that
17   is in front of you?
18      A. A Form 4, ATF Form 4.
19      Q. Once again, tell the jury, if you would, what
20   an ATF Form 4 was?
21      A. In order to fill out Form 4, it's basically a
22   federal government tracking for a specific firearm,
23   specifically a Class III item short-barrelled rifle, any
24   type of rifle cut down less than 16 inches or less than
25   24 inches overall length. Also any destructive device.
```

108

March 2, 2010/Parish/Cross

1   legally purchased from your place of business. Anyone
2   here today could buy this gun, correct?
3           (Exhibit No. G-26 in evidence was
4           referenced.)
5   A.  Correct.
6   Q.  It looks -- I don't know what you use it for.
7   What I am trying to say to you, anyone could buy it, if
8   I want it?
9   A.  That's correct.
10  Q.  You sell these guns, right?
11  A.  Yes.
12  Q.  How many of these guns you sell in a year?
13  A.  I would say more than 20 a year.
14  Q.  More than 20 a year?
15  A.  Sure.
16  Q.  Okay, more than 20 a year. Thank you.
17      Now, 475a talks about a gun which you
18  characterized as a cop killer, 275a, the nickname of the
19  gun. This again is a gun that he bought, it was bought
20  in your store, a pistol bought in your store?
21          (Exhibit No. G-275a in evidence
22          was referenced.)
23  A.  Yes.
24  Q.  It's really the ammunition that makes it
25  violent, is that right, or the gun itself?

127

March 2, 2010/Parish/Cross

1   A.  Well, they have to be used in conjunction with
2   one another.
3   Q.  How many of these would you sell in a year?
4   A.  Not as many. I would say less than 15.
5   Q.  Okay. You are selling somewhere between ten
6   and 15 of these a year. That is not an unusual thing,
7   once a month?
8   A.  Right.
9   Q.  What was the gross sales in your armory last
10  year?
11  A.  The gross sales?
12  Q.  Gross sales at your place of business for the
13  year 2009?
14  A.  The gross sales was just a shade north of 2.4
15  million.
16  Q.  Coal Creek Armory located off Lovell Road here
17  in Knoxville sold 2.4 million dollars worth of guns and
18  ammunition in Knox County last year?
19  A.  Well, cumulatively guns, ammunition, range
20  time, handgun carry permit courses, gunsmithing.
21  Q.  I forgot about the range.
22  A.  A very large operation.
23  Q.  It is a large operation. It's a lot of guns,
24  right?
25  A.  Yes, sir.

128

Eastern District of Tennessee Case 3:08-cr-143
(U.S. v. Reynolds)

March 3, 2010/Correa/Direct

1  A.  Off of that depending on what part of the
2  country, it depends on supply and demand. Washington
3  D.C. I can charge a lot more because you go further.
4  Knoxville, Tennessee it costs because we are so far away
5  from Dallas also. California it costs money. The
6  further I go away from Dallas, the more it costs.
7  Q.  Give us an example. If it costs you 17
8  wholesale, what are you going to sell it for in
9  Washington, all other things being equal in terms of
10  supply and demand and all that?
11  A.  Approximately 20 to 21,000 or 22,000 in
12  Washington.
13  Q.  Knoxville?
14  A.  Knoxville I was selling it 18,000, 19,000.
15  Q.  Okay. The person that you would sell it to in
16  Knoxville, if they sold it to someone else, would they
17  sell it for 18 or 19?
18  A.  No, they would sell it for more.
19  Q.  Now, have you been cooperating with the
20  government since your arrest in February of '08?
21  A.  Yes, I have.
22  Q.  And as part of that cooperation have you been
23  communicating with agents of the government during this
24  time?
25  A.  Yes, I have.

35

March 3, 2010/Correa/Direct

1  Q.  How have you been communicating with agents?
2  A.  They have either called me or I have called
3  them on the cell phone. We have met at their office or
4  in my office and also through e-mail. I have e-mailed
5  them and, of course, I will get a corresponding answer
6  through e-mail also.
7  Q.  Mr. Correa, has any agent of the government
8  ever guaranteed you that you were going to get a
9  sentencing reduction in exchange for your cooperation?
10  A.  No, they have not.
11  Q.  Have you received any threats against your
12  life during the course of your cooperation?
13  A.  Yes, I have.
14  Q.  From who?
15  A.  From the organization itself. That they would
16  send someone to kill me.
17  Q.  And who were they going to send? From what
18  group?
19  A.  From the Zetas.
20  Q.  Who are the Zetas?
21  A.  The Zetas is a group that is part of the gulf
22  cartel in Mexico. They are the enforcement side of the
23  cartel.
24  Q.  Have you been offered witness protection?
25  A.  Yes, I have.

36

March 3, 2010/Correa/Direct

```
1    Q.  Did you take it?
2    A.  No, I did not.
3    Q.  Where are you from originally?
4    A.  Dallas.
5    Q.  Now, you said you worked for this organization
6    in Mexico.  Who was it that you were reporting to in
7    Mexico?
8    A.  Placido Benitez.
9    Q.  I am showing you what has been admitted as
10   Government Exhibit 304.  Do you recognize that?
11          (Exhibit No. G-304 in evidence was
12          referenced.)
13   A.  Yes.
14   Q.  What is it?
15   A.  That is a picture that I took of Placido
16   Benitez.
17   Q.  Can you tell us the date that you took this
18   picture?
19   A.  December 4th, 2006.
20   Q.  2006.  When were you arrested again?
21   A.  February of 2008.
22   Q.  How did you take this picture?
23   A.  I took that picture using my mobile PDA phone.
24   Q.  Where were you when you took this picture?
25   A.  We were sitting at a little town called
```

37

March 3, 2010/Correa/Direct

```
1    Reynosa which is right across the border from McAllen.
2    We were waiting for another driver to show up.
3    Q.  Did this guy, Placido, know you were taking
4    his picture?
5    A.  No, not at all.
6    Q.  Why were you taking this picture?
7    A.  I was starting to deal with a guy that was
8    dealing a lot of drugs.  The reason I took that picture
9    was pretty much for protection for myself.  If anything
10   went wrong, I had a picture of the guy I was dealing
11   with or if I ever had to enforce anything.  I always had
12   a picture of who was I dealing with.
13   Q.  Why is having a picture important?
14   A.  Normally you will send someone else in front
15   of you to enforce whatever problems you have.  Having a
16   picture you can just give a picture to a guy and say,
17   hey, this is the guy I am having a problem with.
18   Q.  What type of enforcement measure are you
19   referring to?
20   A.  Well, if he sends bad drugs or if he -- the
21   enforcement measures are to the extreme where you go
22   rough the guy up or you send somebody to kill them.
23   Q.  Did you take a risk by taking this picture
24   without him knowing it?
25   A.  Yes, I did.
```

38

March 3, 2010/Correa/Direct

1   Q.  Why was it important you to convey to him that
2   you know, I hope you understand that you are responsible
3   for this.  What do you mean by that?  What were you
4   conveying to him?
5   A.  I was conveying to him that hey, I did my
6   part.  You asked me to bring them to Dayton, Ohio.  That
7   is my end of the deal.  From that point on I don't care
8   what he does or what he does with the drugs or who he
9   sells them to.  I just want my money back.
10      When we are in Dayton, Ohio now he's asking me
11  to bring them down to Knoxville.  Well, I am not
12  responsible any more for that.
13      If the drugs would have got popped between
14  Dayton, Ohio coming to Knoxville, I would have looked at
15  Carlos and said it's not really my problem.  You still
16  owe me the money.
17  Q.  That was his part of the bargain?
18  A.  Correct.
19  Q.  What happens if people don't fulfill their
20  respective roles in this organization?
21  A.  If they don't fulfill they, I mean, they get
22  dealt with.  What I mean by that is you go talk to them,
23  you make them understand at the end of the day we are
24  all human beings, you make them understand real fast
25  that is a problem.  If not, you know, everybody sees the

March 3, 2010/Correa/Direct

1   news.  There is a lot of problems, people get killed.
2   Q.  Now, at this time after the deals fall through
3   in Dayton, Ohio does Carlos mention to you who his buyer
4   is in Knoxville?
5   A.  In Dayton, Ohio?
6   Q.  Yeah, in or around that time when you come to
7   find out who his buyer is?
8   A.  At that time he is -- I know he was telling me
9   he was selling to some black people in Dayton.  That's
10  all he mentioned.  He hadn't brought up who his buyer
11  was yet.
12  Q.  In Knoxville?
13  A.  In Knoxville.
14  Q.  Okay, can you tell us, do you have to do
15  anything before you take on a new city like Knoxville.
16  Do you have to lay any groundwork?
17  A.  The groundwork starts back in Dallas or starts
18  wherever I meet with the individual who I am going to
19  sell the drugs to.
20      In this case Carlos.
21  A.  Carlos.  The groundwork was laid back in like,
22  for example, was laid in Ohio at that time.
23      We agree upon a price, it's going to get
24  delivered at a certain time, a certain day.  When I come
25  like to Knoxville I have to secure a -- I don't know

March 3, 2010/Correa/Direct

1  firsthand heard the guy that was buying the drugs. He
2  heard it firsthand say, hey, we are complaining about
3  the drugs. They are not what you are saying you are
4  sending. It took the awkwardness away from me, but my
5  uncle right away said, hey, something, somebody is doing
6  something to them, but it is not from us.
7  Q. Okay. Did you know how the defendant's
8  purchasers of the cocaine that you were supplying, how
9  were they using the cocaine? Do you know?
10  A. Carlos was, Carlos told me and I know that
11  they were, they call it dumping it in the water. I am
12  not real sure what they do or how the process works
13  after I leave the cocaine, after I sell the cocaine.
14  You know, Carlos was telling me that instead of getting
15  one hundred percent or one hundred percent of the
16  product they were only getting 80 percent or 85 percent
17  of the product back.
18  Q. Do you know what that is, putting the cocaine
19  in the water? What is that?
20  A. What I know they do is I mean what I know is
21  they are trying to I guess create meth or crystal meth,
22  or they are changing the drug up.
23  Q. Have you ever heard of crack?
24  A. Yes.
25  Q. During this trip were weapons discussed?

95

March 3, 2010/Correa/Direct

1  A. Yes, they were.
2  Q. Tell us about that.
3  A. As we're having conversations about some of
4  the -- me and my uncle on this trip are not really
5  talking. He understands who Carlos is a little bit. My
6  uncle is just talking as we are having small
7  conversation. My uncle is saying him knowing that we
8  are sending weapons down to Mexico at times, he's kind
9  of just told me he says I am looking for a cop killer
10  version of a weapon. What he meant by that, he wanted
11  some sort of a gun that would pierce through bullet
12  proof vests.
13  In that conversation Carlos kind of looked at
14  me and just kind of said, hey, I know someone that might
15  have a gun like that.
16  Q. Did you know who that someone was?
17  A. Carlos told me it was D that had a gun like
18  that.
19  Q. You mentioned a drug ledger earlier. Were
20  drug ledgers kept in this drug trafficking organization?
21  A. A drug ledger was kept -- in the beginning it
22  was not. I started keeping I would make one up on the
23  computer and send it down most of the time and, of
24  course, Placido Benitez would have one.
25  Q. Have you ever received a ledger from Placido

96

March 3, 2010/Correa/Direct

1  were looking at the previous, where there was a money
2  seizure --
3    Q.  From Carroll County?
4    A.  Correct.  That is a packet.  Like I explained
5  before, it was 13 packets.  Those 13 packets at that
6  time equaled $125,000.  Other things that you see here
7  is, for example, here if you see here on that trip going
8  to Monterey there was nine AR-15s that were also going
9  inside that compartment.  That one is also an AK-47
10  going to Mexico.  That vehicle on 1-9-08 was taking
11  money and guns to Mexico.
12        The next day, which is 1-10, it was coming
13  back from Monterey to Dallas with 44 kilos of cocaine.
14    Q.  Did you receive the 44 keys?
15    A.  Yes, I did.
16    Q.  What you to do with the 44 keys?
17    A.  The 44 keys were going to -- part of them were
18  going to Knoxville.  Then the other part was going to
19  other cities.
20    Q.  All right.  When would it have left Dallas --
21  the January 10th, 2008, is the day that it leaves
22  Monterey, Mexico?
23    A.  Yes.  The reason I pause here was I just want
24  to make sure you are clear.  January 9th, 2008, the
25  vehicle arrives in Monterey.  The next day it's the

101

March 3, 2010/Correa/Direct

1  vehicle is going from Monterey to Dallas.  Then within
2  two to four days it was going to Knoxville or other
3  cities.
4    Q.  Okay.  So two to four days after the 10th
5  would be approximately what date?
6    A.  12, 13th, 14th of January it was being here in
7  Knoxville.  When the drugs would arrive in Dallas, I
8  would hold them over for about a day or two and I wanted
9  to make sure once again, I wanted to arrive to a city
10  that had the money ready to pay for them.  When they
11  said, hey, Knoxville is ready or Washington D.C. is
12  ready, then that is when I would transport.  I was very
13  precise.  I didn't like showing up anywhere and hanging
14  around too long.
15    Q.  Fine.  What was the reason why you didn't like
16  hanging around too long?
17    A.  Exposure.  Law enforcement.  My guys are
18  exposed to law enforcement, if they are sitting.  I
19  would rather let them sit back where they are from,
20  Dallas, Texas area.  When they are into unknown cities,
21  I just want them to get it and get in and get out.
22    Q.  Okay.  Up to this point I just want to be
23  clear here because it's sort of out of order.  On
24  January 9th, '08, money and guns are being driven down
25  to Monterey?

102

March 3, 2010/Correa/Direct

1   Q.  In Mario Sanchez's possession?
2   A.  Correct.
3   Q.  What does that do to what you owe Placido,
4   when something like this happens?
5   A.  When something like this happens, I mean, we
6   got to sell more dope. We got to get the cycle back up.
7   We don't let this million dollars seizure or the other
8   million dollars seizure slow us down.
9   Q.  How did Mario Sanchez come to be transporting
10  drug proceeds that came from Knoxville?
11  A.  He was hired by Placido Benitez. He worked
12  for the organization years back. He took some time off
13  and then he was hired back on to drive. He lived in
14  Houston, Texas. All he did was drive back and forth
15  across the border from Monterey to Dallas and Dallas to
16  Monterey. That was it. That was his only role, to
17  drive.
18  Q.  Where was Mario Sanchez coming from that
19  January day, 2008, when he stopped in Kingsville?
20  A.  I had just met with him. I had just met with
21  him and my brother. I handed over the keys to the Range
22  Rover that had already been sealed up by us.
23  Q.  What is in the Range Rover?
24  A.  Over a million dollars. We had just the
25  previous night we worked all night and counted money and

107

March 3, 2010/Correa/Direct

1   packaged it. That morning when Mario Sanchez showed up
2   from Houston, he showed up to Dallas, we took his
3   vehicle and he took the Range Rover and he was destined
4   to Mexico.
5   Q.  Okay. Can you tell us -- what is this number
6   here, 384,435?
7   A.  That is the debt that I owe Placido Benitez
8   right now.
9   Q.  As you sit here?
10  A.  As I sit here right now. That is how much I
11  owe him.
12  Q.  Doesn't that debt get cancelled?
13  A.  I wish it did, but it doesn't.
14  Q.  Are you going to pay it back?
15  A.  Yes, I am.
16  Q.  Why?
17  A.  It's a debt that doesn't go away. It's a life
18  debt, as long as I am alive, as long as family members
19  are alive, that debt is always alive.
20  Q.  How are debts enforced in this organization?
21  A.  Debts are enforced by taking away anything or
22  everything that you have, going after family members, or
23  even going after your life to prove a point.
24  Q.  Showing you 384, again, from Mario Sanchez.
25  (Exhibit No. G-384 in evidence was

108

March 3, 2010/Correa/Direct

1  time.
2  Q.  Did the defendant ever want you to run his
3  credit cards?
4  A.  Yes.  Carlos told me that D wanted me to see
5  if I could run his credit card.
6  Q.  For what amount?
7  A.  $84,000.
8  Q.  What was that for?
9  A.  It was going to be to pay for some drugs.
10  That is what Carlos told me, that that is what it was
11  going to be for.
12  Q.  Okay.  Now, this Cedar Bluff self storage unit
13  do you know what happened to that?
14  A.  It got raided.
15  Q.  By who?
16  A.  Law enforcement.
17  Q.  Do you know approximately when?
18  A.  I want to say April or May of '08.
19  Q.  How did you become aware that this storage
20  unit had been hit by law enforcement?
21  A.  Carlos Betancourt contacted me and had said
22  that he wanted to meet me over at the construction site.
23  When I met him there he told me immediately, hey, there
24  is problems in Tennessee.  I asked him what kind of
25  problem.  He said well, D just called me and told me

113

March 3, 2010/Correa/Direct

1  that his mom called him.
2  Q.  Whose mom?
3  A.  D's mom had call him and told him, hey, I just
4  saw on the news that a storage unit was raided and they
5  found guns, drugs, some money in it.
6  Q.  What did you think about Carlos telling you
7  this information?
8  A.  Well, when Carlos told me this information it
9  bothered me.
10  Q.  Why?
11  A.  It bothered me that someone's mother was
12  calling a person.  That means there was more exposure
13  over what we were doing.
14  Q.  Showing you what has been already admitted as
15  Government Exhibit 352.  Do you recognize that?
16      (Exhibit No. G-352 in evidence was
17      referenced.)
18  A.  Yes, I do.
19  Q.  What is it?
20  A.  That is one of our ice chests.  Inside of it
21  is, of course, you got the clips here and then you got
22  the AR-15s and then these are the marijuana or hydro.
23  Q.  Is there anything missing from that cooler?
24  A.  There is, yeah, the cocaine that was supposed
25  to be there.

114

March 3, 2010/J. Correa/Cross

1 time.
2   Q.  They had been sitting there a long time?
3   A.  Yes.
4   Q.  I thought the whole goal of the cartel was to
5 move move move, be precise?
6   A.  It is.
7   Q.  That doesn't sound like it's being precise,
8 does it?
9   A.  I had purchased those drugs in Dallas.  It was
10 a deal that I did on the side, not as part of the whole
11 organization that Placido was involved or anybody else
12 was involved in.  If you notice, I dealt with cocaine.
13 This right here was marijuana, something that I really
14 don't get involved in.  I should have never got involved
15 with because, as you know, it sat there for a very long
16 time.  It was getting sold little by little.
17   Q.  If you are dealing with Placido and the cartel
18 and cocaine, the goal is to be precise and move move
19 move quick, but if you are going on a side job and doing
20 dope, marijuana on your own, you don't really care about
21 being quick quick quick?
22   A.  No.  I do care.  Once again, Knoxville when we
23 first came to Knoxville to sell drugs and the cocaine,
24 business, it was slow going.  After I had talked to
25 Carlos he got the process moving a whole lot faster.  He

117

March 3, 2010/J. Correa/Cross

1 then again told me, I will get rid of this marijuana
2 slowly, but we'll get the process going and you will be
3 fine.
4   Q.  Let me show you 393.
5       (Exhibit No. G-393 in evidence was
6       referenced.)
7   A.  Uh-huh.
8   Q.  That you have identified as your money,
9 correct?
10   A.  That is the money of the organization.
11   Q.  Okay.  353, that you have identified as money
12 of the organization?
13   A.  Correct.
14   Q.  How do you recognize those two photos?
15   A.  How do I recognize --
16   Q.  Doesn't all money look the same whether it's
17 cartel money or my money?  Does it all look the same?
18   A.  The money?
19   Q.  Money.
20   A.  Yes, it looks the same.  You don't carry
21 packets like that.  When we roll packets in that picture
22 like there, that is money how we package it.  Normal
23 people don't to that.
24   Q.  That's how you package it?
25   A.  That is how I roll it up right before we

118

March 3, 2010/J. Correa/Cross

1   Q.  You just wanted your money?
2   A.  Correct.
3   Q.  All right.  So, under that theory, if you,
4   let's say you give Carlos 30 keys.  Let's make it
5   simple, at 10,000, yeah, $10,000 a key for $300,000, is
6   that right?
7   A.  Correct.
8   Q.  All right.  Under that scenario, as soon as
9   you give that dope to Carlos, Carlos owes you $300,000?
10  A.  Right.
11  Q.  But you don't care if he sells the dope to
12  anybody in the courtroom or wherever he sells it you
13  don't care.  You just want the $300,000?
14  A.  Correct.
15  Q.  All right.  I assume since you operate that
16  way, Placido operates that way i.e., if Placido sends
17  you 44 keys, he don't care about Carroll County and he
18  don't care about Kingsville.  He wants his money from
19  you, right?
20  A.  Well.
21  Q.  Yes or no?
22  A.  Ask me the question again.
23  Q.  If Placido, if you give Carlos 30 keys at
24  $10,000 a key for $300,000 once you have given that
25  contraband to Carlos, you don't care what happens with

121

March 3, 2010/J. Correa/Cross

1   the drugs and Carlos.  You just want your $300,000 don't
2   you?
3   A.  Correct.
4   Q.  That is Carlos' problem to get you the money?
5   A.  Correct.
6   Q.  Right?
7   A.  Correct.
8   Q.  Now, under that theory, I would assume since
9   you are working in the same cartel with Placido, he is
10  your boss, isn't he?
11  A.  Yes.
12  Q.  All right.  Placido gives you 44 keys, gives
13  it to you.  He don't care about Carroll County, Georgia
14  or Kingsville, Texas, does he or St. Louis, Missouri?
15  A.  Placido would give me -- every time he would
16  send dope up to Dallas -- I want to explain this.  I
17  don't want to get anything confused.  Every time he
18  would send, Placido would send me dope and I would send
19  vehicles down, if you can see on the money ledger some
20  vehicles had $125,000 and they were loaded up with
21  nothing but guns.  I had credit with Placido.  It was
22  different.  My negotiations with myself and Placido was
23  different.  My negotiations between myself and the way I
24  carried it to anybody else was different.  I expected
25  the money immediately.

122

March 3, 2010/J. Correa/Cross

1    Placido had faith. I had credit with Placido.
2  There was times he would send me three or four loads and
3  he hadn't got a dollar for it. He knew what I was
4  doing. I would send the money later.
5    Q. How did you get that credit with Placido?
6  Over time?
7    A. No, just very immediately I got credit with
8  him.
9    Q. Immediately?
10   A. Yes.
11   Q. A drug lord or the head of the Mexican drug
12  cartel operating out of Monterey and you are in Dallas
13  and you go down to Monterey and you immediately get
14  credit with Placido?
15   A. I don't get it immediately credit to have 40
16  kilos, hey, here you go you got credit. It started out
17  with one, it started out with seven and then once he
18  noticed that, hey, this guy took the drugs, and brought
19  the money back right away immediately he asked for --
20   Q. Did you have to kill anybody for Placido?
21   A. No.
22   Q. You didn't?
23   A. No.
24   Q. Did you have to get somebody to kill somebody
25  for Placido?

123

March 3, 2010/J. Correa/Cross

1    A. Placido wanted someone killed. I talked to a
2  few people and someone was hired to kill somebody.
3    Q. Okay. So you are part of that little chain
4  weren't you?
5    A. Part of what chain?
6    Q. To get somebody killed for Placido?
7    A. Correct.
8    Q. Okay. Did you get credit for that?
9    A. No.
10   Q. Okay. May I withdraw 408. How many hits --
11  explain to the jury what a hit is?
12   A. A hit is the person that gots to be killed or
13  needs to die. That is a hit.
14   Q. Okay. Placido ordered a hit and you
15  facilitated the hit, is that your testimony?
16   A. No.
17   Q. Were you part of the chain to get the hit
18  done?
19   A. No, the hit that I facilitated, the guy that I
20  hired was stopped. Placido found another way to get him
21  killed. That was without me.
22   Q. Let me show you government 408. Pointing to
23  the amount that was seized in Kingsville, correct?
24       (Exhibit No. G-408 in evidence was
25       referenced.)

124

March 3, 2010/J. Correa/Cross

1  a line drawn from 10,000 pointing toward your

2  handwriting, correct?

3  A.  Correct.

4  Q.  And what does that say there?  What did you

5  write by the 10,000?

6  A.  "Money paid for hit that was ordered from Tino

7  Individual from Pleasant Grove."

8  Q.  Is that, if I digest this correctly, you paid

9  somebody $10,000, correct?

10  A.  Correct.

11  Q.  Or you received $10,000?

12  A.  No, I paid someone.

13  Q.  You paid someone $10,000 to kill somebody?

14  A.  That is true.

15  Q.  Okay.  Do we have a date on that?

16  A.  No.

17  Q.  You paid somebody $10,000 to kill somebody?

18  A.  Yes.

19  Q.  All right.  Then let's go down to --

20  A.  Can we go back to the $10,000?

21  Q.  No.  $400 right here I am pointing to.

22  A.  Correct.

23  Q.  There is a line drawn and you have written,

24  something out there.  What did you write?

25  A.  I loaned to Carlos' hit guy.

129

March 3, 2010/J. Correa/Cross

1  Q.  So you not only paid $10,000 for a hit, then

2  you loaned the hit guy $400, is that correct?

3  A.  That is correct.

4  Q.  Are you still walking around in this country

5  today?  Did you walk in here today to testify?

6  A.  Yes, sir, I did.

7  Q.  You are arrested in February of '08.  You

8  plead in April of '09, 14 months later.  Then we are

9  here about a year later from there and you haven't been

10  sentenced and you are walking around here.  You fly in

11  here from wherever and you testify that the government

12  had this information and gave to us that you have paid

13  for hits.  You have loaned hit men money.  You have

14  taken a picture of Placido Benitez and you are still not

15  in custody.  Are you in custody today?

16  A.  No.

17  Q.  Did you walk through those doors today to come

18  in and testify?

19  A.  I have already answered that, yes.

20  Q.  You going to walk out of those doors after you

21  get through testifying?

22  A.  Yes.

23  Q.  Catch a plane maybe?

24  A.  Hopefully, yes.

25  Q.  Did you catch a plane up here?

130

March 3, 2010/J. Correa/Cross

```
1    A.  Yes.
2    Q.  Who paid for that?
3    A.  Government.
4    Q.  Did you?
5    A.  No, I did not.
6    Q.  The government did, didn't they?
7    A.  Correct.
8    Q.  They are going to pay for you to fly back,
9  right?
10   A.  Right.
11   Q.  Fly back where?
12   A.  Dallas.
13   Q.  Okay. When you get to Dallas, are you going
14 to be ordered to put on an ankle bracelet or chains and
15 walk around?
16   A.  Ankle bracelet, yes.
17   Q.  Chains?
18   A.  A leg monitor.
19   Q.  A leg monitor?
20   A.  Correct.
21   Q.  Will that leg monitor prevent you from going
22 to Mexico? In other words, would it blow up when you
23 cross the border and you would die?
24   A.  I don't know because I haven't tried it.
25   Q.  Has anybody told you it would?
```

131

March 3, 2010/J. Correa/Cross

```
1    A.  There was restrictions to my bond. I followed
2  everything that I can on that bond.
3    Q.  Why do you do that? Because it's safer to be
4  in the United States than to be in Mexico?
5    A.  That was part of my bond agreement. They told
6  me to stay here. They have told me what areas or what
7  restrictions I had. I followed them.
8    Q.  Did they tell you you could come to Knoxville
9  and testify?
10   A.  Yes, sir.
11   Q.  Did they tell you you could go anywhere else
12 to testify?
13   A.  Yes.
14   Q.  And madam clerk, 406.
15       COURTROOM DEPUTY: Yes, sir.
16 BY MR. HARRISON:
17   Q.  Anywhere in Defense Exhibit 15 do you see
18 Donnie Reynolds' name on that document?
19   Q.  Can you make it smaller? I want to see the
20 whole thing.
21   Q.  I am sorry.
22   A.  What was the question again?
23   Q.  Anywhere on this document authored by you do
24 you see Donnie Reynolds' name on it?
25   A.  No, I don't.
```

132

March 3, 2010/J. Correa/Cross

```
1    Q.  Okay.  Two page plea agreement entered April
2    of '09, 14 months after you are arrested.  The
3    government talked and this is Government Exhibit 406 for
4    the record.  You do recognize this, correct?
5    A.  Yes.
6    Q.  The defendant agrees to plea.  Let me point
7    out Paragraph 1.  Defendant agrees to plead guilty to
8    Count 4 of the Indictment.  Correct?
9    A.  Correct.
10   Q.  That is in the Southern District of Texas,
11   McAllen Division?
12   A.  Correct.
13   Q.  And I believe you explained in Count 4 that
14   you are talking about five kilos that you are pleading
15   to?
16   A.  No.
17   Q.  What are you pleading to?
18   A.  Five or more and it says 34 kilograms.
19   Q.  You pled to 34 keys?
20   A.  Correct.
21   Q.  All right.  Paragraph 2.  The government will
22   recommend because you are pleading to those 34 keys a
23   two level reduction in your sentence, correct?
24   A.  Correct.
25   Q.  And the remaining counts will be dismissed,
```

133

March 3, 2010/J. Correa/Cross

```
1    2b, correct?
2    A.  2b, that is up to the judge at the time of my
3    sentencing.
4    Q.  The government will recommend at sentencing
5    that you receive a two level decrease because you pled
6    guilty and that the remaining counts of the Indictment
7    will be dismissed at the time of sentencing.  Correct?
8    A.  Correct.
9    Q.  All right.  How many counts were you charged
10   with, do you recall?
11   A.  Four counts.
12   Q.  Dismiss three counts, you plead to one count,
13   34 keys.  We'll give you a reduction for pleading
14   guilty, correct?
15   A.  Correct.
16   Q.  Do you know what a Rule 35(b) is, Mr. Correa?
17   A.  I am not very clear on that rule.
18   Q.  Where the government can recommend to the
19   judge that you have cooperated substantially and,
20   therefore, even after sentencing they can file what is
21   called a Rule 35(b) motion to get your sentence even
22   further reduced.  You understand that?  Has anybody,
23   your three lawyers ever told you about that?
24   A.  They have explained that to me.
25   Q.  And part of substantially cooperating is
```

134

March 3, 2010/J. Correa/Cross

1   testifying, is that correct?

2   A.   Correct.

3   Q.   And although Mr. Lewen says he doesn't have

4   any -- I am sorry, the government says he has no control

5   over your sentence, correct?

6   A.   Right.

7   Q.   They do have control over recommending a

8   sentence to a judge, don't they? Who else would

9   recommend a reduction to the judge, if it wasn't the

10  government?

11  A.   You are asking me who?

12  Q.   Who else but the government would recommend a

13  sentence reduction?

14  A.   Right.

15  Q.   So the government says we don't have anything

16  to do with you getting a reduction, do we? You say, no.

17  But they do have something to do with recommending to

18  the court in McAllen, Texas for you to get a reduction

19  because you have substantially cooperated. Fair enough?

20  A.   Fair enough.

21  Q.   Okay. What happened to Efren Garcia, the bus

22  guy?

23  A.   He is dead.

24  Q.   Okay. The subject of a hit?

25  A.   No.

135

---

March 3, 2010/J. Correa/Cross

1   Q.   How did he die?

2   A.   Natural causes.

3   Q.   What do you mean? Old age?

4   A.   No, he was very unhealthy. You can see on the

5   picture.

6   Q.   There he is fat.

7   A.   If that is what you want to call fat. I am

8   just saying he looks very unhealthy. I have known him

9   over the years. He had diabetes and other body issues.

10  Q.   It looks like he had just been arrested in

11  that photo, correct?

12  A.   Correct.

13  Q.   How many people take a good picture while

14  being in jail, do you know? Did you take one?

15  A.   Did I take one where?

16  Q.   A good picture when you got arrested in

17  February of '08? Do you recall? Have you ever seen

18  that?

19  A.   I don't picture very well. I look probably

20  just like him.

21  Q.   Let me ask you this, Mr. Correa. From your

22  direct testimony or the direct examination your

23  testimony was you met with Donnie Reynolds two times,

24  February of '07, when you sold him a car at Auto Link in

25  Dallas, correct?

136

To: CMU Unit Team/Legal Dept.
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Thursday, September 12th, 2019
Subject: Correspondence to fed. officials and 1st Amendment

Salutations CMU Unit Team and FCI Terre Haute Legal Dept.,

    I hope that you are well.

    May I please send copies of the attached letter to Senate Minority Leader Charles Schumer, Senator Chuck Grassley, Attorney General Barr, and Acting FBOP Director Katherine Hawk Sawyer without being punished or facing other retaliatory or negative consequences from the U.S. Department of Justice? I note the copies to the senators would be sent care of the Office of Senate Legal Counsel.

    Thanks for your consideration,

Martin S. Gottesfeld

# Federal Bureau of Prisons
## TRULINCS Account Transactions - Commissary
### Personal Inmate Information

**Inmate No: 13177081** **Inmate Name: JOHNSON, KURT F** **Available Balance: $228.02**

| Date | Reference # | Transaction Type | Sender Last name | Amount |
|------|-------------|------------------|------------------|--------|
| 01/31/2019 | TL0131 | TRUL Withdrawal | | -$2.00 |
| 01/30/2019 | 31 | Sales | | -$63.00 |
| 01/23/2019 | 30 | Sales | | -$56.50 |
| 01/23/2019 | 29 | Sales | | $0.00 |
| 01/21/2019 | 33319021 | Western Union | HARRIS | $50.00 |
| 01/16/2019 | 3 | Sales | | -$74.25 |
| 01/13/2019 | TL0113 | TRUL Withdrawal | | -$2.00 |
| 01/13/2019 | 70175102 | Lockbox - CD | LEFFEL | $100.00 |
| 01/08/2019 | 32 | Sales | | -$18.25 |
| 01/07/2019 | 70174603 | Lockbox - CD | CULLUM | $48.80 |
| 01/06/2019 | TL0106 | TRUL Withdrawal | | -$5.00 |
| 01/04/2019 | UIPP1218 | Payroll - IPP | | $51.20 |
| 01/04/2019 | TL0104 | TRUL Withdrawal | | -$5.00 |
| 01/04/2019 | TL0104 | TRUL Withdrawal | | -$5.00 |

TRULINCS  13177081 - JOHNSON, KURT F - Unit: MAR-I-A

--------------------------------------------------------------------------------

FROM: 13177081
TO: CMU
SUBJECT: ***Request to Staff*** JOHNSON, KURT, Reg# 13177081, MAR-I-A
DATE: 11/28/2016 06:00:37 PM

To: Unit Team, CTU, all dicision making administration
Inmate Work Assignment: n/a

Today November 28, 2016 you denied me sending out my legal materials to my lawyer. You also made it clear that you have adopted some new (and probably unlawful) definition of what can be sent to a lawyer. Upon your examination of one of my International Private Administrative Processes you said this is not legal mail. It is based upon a treaty to which the United States is a participating party. Further you do not and will not let me mail it out regular mail because you insist on making legal determinations about all documents mailed by the inmates even though non of you are qualified to make such legal determinations. You refuse to provide a clear and concise list of what is contraband and now refuse to provide a clear and concise list of what constitutes privileged communication between the client and lawyer. Only in this unit is it presumed you even have an authority to examine the content visually and comprehensively. So when I have no access to the remedy by which the treaty provided will you please explain to me how it can be effectuated. The demand is based upon the mail crimes you have already committed and based upon your self preservation lawlessness. What expectation can I have that the Postmaster General to whom it is directed will receive it if there is no way to redress my grievance without your tortious interference?

Please supply me the concise list of privileged communication before you steal my legal work which might be qualified. Also let me know if I send this Administrative Demand to the Postmaster General will I be able to communicate directly with Her about your crimes without your examination comprehensively. I am willing to seal the envelope and have your scan it but I feel based on all the retaliation and ignorance of the law practiced by you that it is not safe for me to send it with your reading and interpretation. Especially when there are no published standards by which you are regulated.

*Exhibit B*

BP-A0327       RETURNED CORRESPONDENCE   CDFRM
APR 10
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Sender-See Return Address) | FROM: (Institution) |
|---|---|
| Josiah Zodhiates<br>284 Shalom Rd<br>Waynesboro, VA 22980 | Federal Correctional Complex<br>PO Box 33<br>Terre Haute, IN 47808 |
| RE: (Inmate's Name and Register No.)<br><br>Cox, Francis, Reg. No. 16179-006 | DATE:<br><br>August 8, 2019 |

SUBJECT: Correspondence With Inmate Returned

   Your correspondence to the above named inmate is being returned.   This
correspondence was not delivered to the inmate because:

This correspondence is being rejected.  It was determined you attempted to mail
communications which threatens the safety, security, and good order of BOP
institutions.

The rejection of this correspondence is in accordance with the Federal Bureau of
Prisons policy on "Correspondence" as published in Title 28 Code of Federal
Regulations, Part 540 and in the Federal Bureau of Prisons Program Statement on
correspondence.  You have the right to appeal this rejection by writing the  Warden
in care of the above address.  The inmate to whom you addressed your correspondence
has been notified that this correspondence has been returned to you and of his or
her right to appeal the rejection.

                                B. Lammer, Warden

              (Printed or Typed Name and Written Signature of the Warden)

Record Copy - Addressee (with Correspondence); Copy - Inmate; Copy - File (with copy of
Correspondence)

WDP                              Prescribed by P5800       Replaces BP-327(58) of FEB 84

NAME: Francis Schlaeffer Cox
NUMBER: 16179-006
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

<>16179-006<>
Josiah Zodhiates
284 Shalom RD
Waynesboro, VA 22980
United States

Mailed 8-23-19

PURPLE HEART

FOREVER USA

TRULINCS  16179006 - COX, FRANCIS SCHAEFFE - Unit: THA-D-A

----------------------------------------------------------------------------------------

FROM: 16179006
TO: Clemons, Angela; Zodhiates, Josiah
SUBJECT: August 4 Page Copy
DATE: 08/06/2019 01:13:48 PM


~ SCHAEFFER COX ~

Dear____J̶o̶~~name~~____,

   I need to get some horrible things off my chest.

   My good friend was taken hostage when the Jihadi fighters in here attacked the Christians who wouldn't convert to Islam.

   His hands and feet were bound, then, while he was still alive, the terrorist started sawing his head off with a long piece of wire, executing him ISIS style.

   He must have hit bone or something. Because he couldn't get his neck completely severed.

   It was a gruesome death. He was a good man, soft spoken and kind. He played guitar for our bible studies. I could smell his life blood as he bled out on the floor of the cell. It smelled like a handful of wet pennies. __~~name~~__, the memory haunts me.

   As soon as the 1st target was dead, the ISIS terrorist moved on to attack my other friend, stabbing him 12 or 15 times.

   I don't know how he survived. But he did. He had holes all over his neck, chest, and torso. Afterwards, I put my finger in the wounds, utterly astonished.

   But what's even more astonishing is how the attack was stopped. A 3rd Christian friend of mine simply commanded the terrorist to stop. Just two words, calmly spoken to a man in a demonic stabbing frenzy. The terrorist froze instantly, knife in his fist, mid stroke, trembling as if held still by invisible hands. Then he put the knife in his pocket, turned, and walked away. It was like Jesus had told the waves to "be still."

   There's more I don't really want to talk about. I was next on the list to be killed, along with two other Christians. But the terrorist attack had been cut short.

   What happened next really shocked me. The Deep State bureaucrats who run this black-site prison (nicknamed "Little Guantanamo") went into overdrive trying to cover it up. They swept the whole terror attack under the rug. Would you know any of this if I hadn't written you this letter?

   The Deep State thinks it's better to give ISIS terrorists a free pass on martyring Christians in here, than risk bringing unwanted attention to this secret prison.

   ~~name~~ my friend who was taken hostage and executed ISIS style, was only a few months from finishing his sentence and getting out of prison. I wonder what his children were told by the prison? Surly not the truth. Probably just "No Comment," or "It's Under Investigation."

   Someday, if I get out of here, I'll have to go find his kids and tell them about their father. That he was a good man, who died for his faith.

   This black-site prison is really taking its toll on me. It's very strange to live in a cage with terrorists who want to kill all Americans; to pass in the hall the people who martyred one friend, wounded another, and meant to kill me. We never speak. We just try to stay out of each other's way.

   I'm starting to go numb from all the danger and injustice. But one thing I can't go numb to is the pain I know my two little children are feeling because I'm gone.

   I have the same horrible nightmare every night. I see my son, Seth, and my daughter, Bri. They are lost and looking for me. It's starting to get dark. Bri cries, and Seth holds her hand to comfort her. But they can't find me.

TRULINCS  16179006 - COX, FRANCIS SCHAEFFE - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

I bolt upright in my bed, frantic to go take care of my children. Only to see the prison bars, and the locked steel door to my cell, and realize I'm still in prison.

God of Mercy, it's awful. I've endured physical torture of the type that goes on at Guantanamo Bay and Abu Grab. But nothing compares to the anguish my heart feels for my children. I've been away from them too long. And if I don't get out of here, then they will NEVER know their father.

But now, thanks to YOU, I got some charges overturned, and I'm going back to court to get my sentence reduced. I owe you my life for making this possible. Your donation helped right a terrible wrong.

Can I count on you again?

The judge could possibly reduce my sentence enough to let me out right away. Or he could not reduce it much at all. He has broad discretion. So we need to show him evidence of my innocence.

But to have an investigator collecting that evidence full-time between now and when I get sentenced will cost $11,800.00 at a minimum.

The only way we can rise that much is if you respond back generously within the next two weeks.

If I don't hear back from you, I can go into resentencing blind and empty handed, and just hope for the best. But I'm scared to do that.

I'm embarrassed to ask you this, but I'm doing it for my children's sake: Could you possibly send a gift in the $300 to $500 range?

Let me confess; I'm afraid to get my hopes up. I know there is a very real possibility that if we present the evidence, I'll be set free. But I'm scared of what will happen if we drop the ball and go in to court unprepared. It feels good when you stand by me. Thank you.

Do you know how bad I want to send you a letter announcing that I'm free and making up for lost years with my little children?

We are so close to bringing this horror story to an end. We've come this far because of you. Now everything you and I have invested in is coming to a head, and I'm feeling overwhelmed. Does that make sense?

I'll either hold my children in my arms in real life, or have to see them lost and fatherless in my nightmares each night over and over again.

And why am I even here in the first place? Because Obama sent his dirty DoJ after his innocent political enemies -- like me -- and threw us in a secret prison full of ISIS Jihadi fighters who've been given a free pass by the Deep State to kill Christians. This doesn't even seem real! But everything they did to me, I see them now doing to Donald Trump: Fake warrants, imaginary crimes, witch hunts led by the FBI. It's exactly the same. EXACTLY!

Please don't think I'm ungrateful for your help. You rescued me, and may end up saving my whole family. Because of YOUR prayers and donations, we got some of my charges reversed and a chance to get out. Thank You! You're a hero to me, and especially to my two little children. It's just when you get this close to victory and the moment of truth is bearing down, the pressure becomes intense. Thank you for not abandoning me.

_____, a gift in the $300 to $500 range feels like a lot to me. Maybe you can't afford that right now. Or maybe God has blessed you to where you could could afford way more than that. But whatever the case may be, will you please be as generous as you are able to be? You've come so close to reuniting my family. Would $61 dollars be doable? What about $29?

Here is a picture of my whole family. Everyone's there but me. Everyone has their father except for Seth and Bri. Because Obama's DoJ put me in prison with lies.

Do you know what we just found out? The main witness in my case, Bill Fulton, is an ANTIFA thug. And the corrupt prosecutors offered him $160,000.00 for his testimony, CONTINGENT UPON IT RESULTING IN MY CONVICTION.

TRULINCS  16179006 - COX, FRANCIS SCHAEFFE - Unit: THA-D-A

----------------------------------------------------------------------------------------

That's not what they told the judge and jury at my trial. The prosecutor said Bill Fulton didn't get paid to testify, and he had no reason to lie. Turns out he had one hundred and sixty thousand reasons to lie.

We'll be showing this to the judge. But with your donation, we can collect the proof of my innocence. It's not enough that their star witness had a motive to lie. We have to prove I'm innocent.

Could you donate $160.00, just one one-thousandth of the bribe Obama's dirty FBI paid their liar-for-hire to take the stand and destroy my family because we were conservatives? You'd be an answer to prayer.

We only have two weeks, _____. Will you please invest in the completion of this undertaking you and I started together? Can I count on you to send your most generous support, right now, before you set down this letter and it slips your mind?

Please, for the sake of my children? To save a family? _____, you're a godsend for the good you've accomplished so far. Would you be our hero again?

-- Schaeffer Cox

PS:

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Ms. Diane Lee
Certified PREA Auditor
11820 Parklawn Dr. Suite 240
Rockville, MD 20852

Wednesday, May 15th, 2019

In Re: <u>Lack of Acess to Hotlines and OIG At FCI Terre Haute
Communications Management Unit (CMU)</u>

Salutations Ms. Lee,

I hope that this letter finds you well.

My name is Martin S. Gottesfeld and my federal registration
number is 12982-104. I am an inmate in the communications
management unit (CMU) at FCI Terre Haute.

I believe that you are the PREA auditor for this unit based
on a notice posted on the bulletin board in our cafeteria. If I
am mistaken, then please do let me know and I will endeavour to
find the appropriate person to whom to direct my correspondence.

I am writing because I wish to inform the appropriate
designated individual that here in the CMU (which is its own
self-contained unit within the FCI wherein inmates do <u>not</u> have
access to all of the same resources as those elsewhere in the
institution), we inmates have no access to PREA hotlines
whatsoever--nor access to hotlines of any other kind. For that
matter, we cannot contact the Office of the Inspector General
confidentially.

The one working inmate telephone in the CMU is generally
off throughout the day and is only turned on for pre-arranged and
pre-approved calls to pre-designated parties. Further, even if an
inmate wanted to try to gain pre-approval to call a PREA hotline,
no such numbers are publicly posted for that purpose. And such a
phone call would require that inmate to use one of their two
weekly 15-minute-maximum ~~weekly~~ social telephone calls, thereby
depriving them of that call with their family. Moreover, many
inmates are on phone restrictions here at any given time and thus
could not ~~ever~~ schedule such a call to a PREA hotline.

Obviously too, having to pre-schedule a call to a PREA
hotline through the same staff whom an inmate might need to
report presents serious issues and is manifestly untenable.

Further, CMU inmates have no direct and unmonitored means by
which to contact the Office of the Inspector General (OIG). The
button to do so via TRULINCS is simply disabled on the computers
here--it does not work. Then, any mail which inmates here wish to
send to the OIG (the address for which is not posted publicly) is
subject to discretionary review by the FBOP and its contractors
prior to being allowed out in the mail.

For just one example of such pre-screening, I recently was
told that I am not allowed to mail the OIG sworn affidavits from
other CMU inmates backing up my factual narrative.

Also, it should go without saying that many inmates might not feel comfortable trying to contact the OIG at all based on the knowledge that the FBOP and its contractors would read their mail days, if not weeks, before the OIG.

Ms. Lee, I consider these issues to be very serious and to require prompt resolution. I hope that you agree.

I am forbidden ~~by counsel~~ from listing the various national news publications for which I write, but I do believe that a quick Google search of the name "MartyG" would be quite illuminating. I am also forbidden from requesting a comment from you prior to publication, so your only response which I could note would be your actions in response to this disappointing information; actions which I do hope will be fast, decisive, and comprehensive.

Should you have any questions for me, please do let me know and I will do my best to answer them despite the wanton and unlawful interference from the FBOP and its contractors which I anticipate based on my recent past experiences.

Best Regards,

Martin S. Gottesfeld
Rolling-Stone--Featured Human Rights Activist

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

The Wall Street Journal
Attention: Customer Service
1155 Avenue of The Americas
New York, NY 10036

Wednesday, May 15th, 2019

In Re: Subscription of Martin S. Gottesfeld

To Whom It May Concern,

My name is Martin S. Gottesfeld and about 3 weeks ago I stopped receiving my subscription to The Wall Street Journal. I have pursued the matter with the institution's mailroom here at FCI Terre Haute and the staff there assure me that the problem is with the WSJ and not in any way their fault. They have asked me to inquire with the WSJ at this address in order to rectify the issue.

In order for me to receive the WSJ, it is very important that my name and federal registration number appear on the mailing label of each and every issue. My address should be specified on the mailing label as:

Martin Gottesfeld
Reg #: 12982-104
FCI Terre Haute
P.O. Box 33
Terre Haute, IN 47808

It is possible that instead my wife, Mrs. Dana E. Gottesfeld, may have specified an address on N. Bureau Road, which up until recently would have been fine, but now, due to a sudden change in policy, could result in the current difficulties. I had previously been receiving the WSJ here at FCI Terre Haute at the P.O. Box above, and I would like to continue doing so again.

Please let me know what is going on with my subscription, to which address it has been being delivered, and if there are any other steps which I need to take to resolve this problem.

Sincerely,

Martin S. Gottesfeld

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Mr. John Durham, Esq.
United States Attorney
157 Church St., 23rd Floor
New Haven, CT 06510

Thursday, May 16th, 2019

In Re: <u>Investigation Into FISA Abuse, Etc.</u>

Salutations U.S. Attorney Durham:

My name is Martin S. Gottesfeld. In 2014, I helped defend the life of Connecticut teenager Justina Pelletier while the Boston FBI and Massachusetts U.S. attorney's office indemnified her torturers. (Please see <u>The Brutal Battle Against Medical Kidnappers</u>, Michelle Malkin, The National Review, June 28th, 2017, and <u>The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison</u>, David Kushner, Rolling Stone, June 29th, 2017.)

I should also note, that unlike other inmates elsewhere in the Federal Bureau of Prisons (FBOP) system, I am not allowed to send U.S. attorneys such as yourself sealed legal mail. So, your office was most certainly not the first in the Justice Department to read this letter. (Please see <u>28 CFR §540.203(b)(1)</u>.)

Additionally, my correspondence to your office is subject to discretionary content-based review by the FBOP before it is allowed out into the mail. For example, I am told that I am not permitted to include signed affidavits from other inmates in my letters to your office and the Office of the Inspector General (OIG), notwithstanding the fact that there is no written policy which I can find anywhere enacting such a non-sensical limitation clearly aimed at dodging accountability.

For another example, I am told that I am not allowed to identify myself to your office as a reporter for the various widely-read national political publications for which I write, by name, even though the only applicable such FBOP policy was long ago struck down as unconstitutional by The Honorable U.S. District Court for The District of Colorado and then rescinded by the FBOP with mandatory guidance to its staff not to enforce this rescinded and unconstitutional former rule. So, suffice to say that I wrote much about the issues which your office is now investigating. In particular, your office may find my article, "<u>McCabe's GoFundMe A Gold Mine... For Investigators</u>" interesting.

The choice of the FBOP to try to silence my reporting by enforcing these unconstitutional former policies and by moving me to a communications management unit (CMU) may also be an interesting topic for your office to explore, especially considering that Mr. McCabe voluntarily shut down his aforementioned GoFundMe less than 24 hours after requests for

comment went out to your predecessor, Mr. John W. Huber, of The
Great State of Utah, following the publication of my article on
Mr. McCabe's fundraiser.

I also want to note that there are a great deal of cases
hidden by the FBOP's CMUs which may be relevant to the periphery
of your investigation. Unfortunately, another one of the
unwritten CMU policies, as best as I am able to understand it,
prohibits me from naming any of my fellow inmates. However, I
believe that I can say that some of the cases here are related to
"Operation Fast and Furious," the 2008 financial crisis, and
"Operation Polar Pen." Once again, I am told that I am forbidden
from asking your office to relay anything I say to any other
parties. However, I do believe that such would be unnecessary.

If I can answer any questions for yourself or any of your
colleagues, please do just let me know.

Sincerely,

Martin S. Gottesfeld

COX, Francis
16179-006
FCI-D04-045L
Page 1

### Notification of Electronic Mail Message Rejection

On April 3, 2019, you authored an Electronic Mail messages to
eliclem0607@gmail.com. Please be advised in accordance with
P.S. 4500.12, Trust Fund/ Deposit Fund Manual, your email has
been rejected. It was determined in your email correspondence
you directed the above referenced recipient to provide comments
and questions intended to be relayed to a third party.  Third
party communication are a violation of Bureau of Prisons Rules
and Regulation and can be detrimental to the safe and good
order of the institution.


Date 04/04/2019

                              J.R.Bell, FCI Warden

TRULINCS  16179006 - COX, FRANCIS SCHAEFFE - Unit: THA-D-A

------------------------------------------------------------------------------------------------

FROM: 16179006
TO: Clemons, Eli
SUBJECT: RE: RE: 3-20-19 Call
DATE: 04/03/2019 07:13:36 AM

I do have my calls set up this week. Tuesday and Wednesday at 6:30 pm Eastern, as usual.

     Ask Ammon Bundy for the name and contact info of a good attorney in Colorado. I think he knows one. Maybe his name is
Morgan Philpot, if I remember. Ask him if he wants to help me sue the guy (who is an informant) who stole my defense fund.
Point him to the 2328 case on PACER.

--Schaeffer

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Villa, Virginia
SUBJECT: Memorializing My Conversation with FCI Legal
DATE: 04/18/2019 11:48:43 AM

PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION                                    MSG-4/18/19

This message was sent at approximately 11:48 A.M. on Thursday, April 18th, 2019.

Hi Virginia,

You are Virginia Villa, Esq., attorney at law, and I am your client in The United States Court of Appeals for The First Circuit (case number 19-1107 and others), Martin S. Gottesfeld. This is an attorney-client privileged communication.

Yes, you may call me Marty and I am happy to call you Virginia.

May I ask you to please print and mail me a hard-copy of this letter and also to keep a printed hard-copy of this email in your records for my appeal. I believe in good faith that it may be relevant to the issue of disqualification as one of the ways inmates end up in CMUs is by referral from courts and I think it's plain to see that Judge Gorton would have had plenty of means, motive, and opportunity once the disqualification issue was briefed to want me in the CMU and that if he did make such a referral that would be relevant to the issue of disqualification on appeal.

Please also confirm that you have received this message and please let me know either way as to whether or not it's something that you can and will preserve.

I am writing to memorialize a conversation I just had with a member of the FCI Legal team, a Ms. Katherine Seireveld. It has now come to my attention that she is not an attorney licensed to practice in Indiana though, and that she advises the legal team here. I believe that the staff here intentionally had this conversation take place near one of the better microphones and cameras which are placed in the CMU and that therefore the FBOP has a copy of both the video and the audio from this conversation, which occurred in the hallway just outside the CMU law library after I was asked to leave the law library for this conversation.

I was present, as was Ms. R. Eisele, who is the CMU case manager, as well as ~~Kathryn~~ Katherine Seireveld, and three COs (one of them was Mr. Harvey and another was Mr. Eddie). A couple of inmates also witnessed large parts of it. It took place around 10:00 A.M. today, April 18th, 2019, just after the Mueller report press conference by Attorney General Barr.

MSG 11/18/19

That being said, it was not a particularly intimidating experience as either prison or journalistic experiences with bureaucrats can go.

This conversation was in regard to a pair of written inmate requests to staff, i.e. "cop-outs," which I had written asking for clarification of the communications rules here.

First, I wanted to know if I could continue working with my journalism team to publish an open letter to Mr. Kanye West and Mrs. Kim Kardashian West in The Daily Mail, which is one of the most-widely-read English-language publications in the world. The Daily Mail had already agreed to publish such an open letter prior to my transfer from Plymouth.

However, there is an unwritten rule disallowing CMU inmates from engaging in third-party communications. My cop-out asked if that applied to open letters published in major international papers and openly stated that I want to continue working on this open letter with my team.

The other cop-out was asking if, as a journalist, the third-party rule precludes me from having my team reach out to people and organizations for comment as part of articles. The example I used in today's meeting was for a hypothetical article in which I would ask Attorney General Barr to comment as to why a particular part of the Mueller report had been redacted.

Ms. Seireveld wanted to know if I get paid for publishing articles. I told her that I do not, which is true. (None of the FreeMartyG accounts are in my name and while people may donate when they see my articles, I do not accept a quid pro quo payment from any outlet for my published works.)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

She told me that I "do not have a team anymore," as I am in prison. While I do not agree with this assessment given the First Amendment and Turner v. Safely, I did not try to pre-litigate the issue with Ms. Seireveld at the time.

She asked for clarification on my written requests, which I explained, similar to how I just explained them above.

I asked, explicitly, whether there is a canonical set of communication rules for the CMU. Ms. Seireveld and Ms. Eisele referred me to the institutional supplement for the CMU published by FCI Terre Haute and the FBOP's program statement. In turn I informed them that I believe that I have read both, but that there was no list of communications rules in either. I told them that I have learned that most communications "SHOTs" (inmate discipline charges) are written under code 196, which is a catch-all charge, but that there do not appear to be specific codes for specific communications rules and I cited some examples, including that there is no specific offense code for violating the third-party communications rule.

Ms. Seireveld told me that they have no rules because "you guys," i.e. us in the CMU, are always "coming up with new things" on a frequent basis, i.e. "every week." I did not litigate the obvious Due Process issues of trying to enforce unwritten, arbitrary, ambiguous (and likely unconstitutional) communications rules.

After Ms. Seireveld seemed to be satisfied that she understood the nature of my inquiries, I asked her if I could issue requests for comment as a journalist through my team and whether or not I could publish open letters. I advised her that there will be other open letters after the one on which my team and I are currently working, which is addressed to Mr. West and Mrs. Kardashian West.

Ms. Seireveld answered that she felt that I "probably" could do both things, but that it was a "murky" area. She said that she wanted to run some things by some other people to be sure.

I asked for her to please answer me in writing. She said that she would do so, and I told her that I would await her answer.

I told her that, full disclosure, I have a pending case in The Southern District of New York and that her answer may be relevant to that case and litigated therein. She told me that she was already aware of that case.

I told her that I wasn't trying to ambush or bushwhack anybody by surprise.

Ms. Eisele responded, in good humor, "Except for the people you're requesting comment from."

I clarified that in some cases it is necessary for journalists to wait until just prior to publication to issue a request for comment in order to, for example, protect sources from retaliation.

Best Regards,
Marty

Affidavit of Martin Gottesfeld

I, Martin S. Gottesfeld, do hereby affirm that the foregoing electronic message to Ms. Virginia Villey, Esq., dated "04/18/2019 11:48:43 AM" is true and accurate to the best of my knowledge, information, and belief on this 17th day of April, 2019.

Signed under penalty of perjury,

Martin S. Gottesfeld, Reg-No.: 12982-104

<u>CERTIFICATE OF SERVICE</u>

I, Martin S. Gottesfeld, hereby certify that on Thursday, September 12th, 2019, I mailed a copy of the foregoing document to counsel for the defendants in the case of <u>18-cv-10836-PGG</u> in The Honorable U.S. District Court for The Southern District of New York pursuant to <u>Houston v. Lack, 487 U.S. 266 (1988)</u> by handing such copy in an envelope bearing sufficient pre-paid first-class U.S. postage affixed to Ms. J. Wheeler of the FCI Terre Haute CMU unit team for mailing in her official capacity as an agent of the defendants in the above-captioned case,

Martin S. Gottesfeld, pro se

- Page 1 of 1 -

orrectional Institution
33
te, IN 47808

USA
DOLLAR
USA
DOLLAR
USA
DOLLAR

D STATES
SERVICE®

S TRACKING #

3 0722 4072 3908 58

Label 400 Jan. 2013
7690-16-000-7948

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

PURPLE HEART
FOREVER USA

Thursday, September 12th, 2019, Houston v. Lack, 487 U.S. 266 (1988)

Priority Mail - Flat Rate

USM P3
SDNY

RECEIVED
SEP 27 2019
PRO SE OFFICE