

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Martin S. Gottesfeld, pro se,
          Plaintiff
        - against -
Hugh J. Hurwitz, et al.

Civil No.: 18-cv-10836-PGG

SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING
PLAINTIFF'S RIGHT TO PUBLISH

Plaintiff Martin S. Gottesfeld (herein "plaintiff"), acting pro se,
hereby supplements his previous MOTION FOR A TEMPORARY RESTRAINING ORDER
PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 68) and his previous MOTION FOR
A DECLARATORY JUDGMENT PROTECTING THE PLAINTIFF'S RIGHT TO PUBLISH (D.E. 69).
In support of the plaintiff's motions, he provides the following exhibits
herewith and requests that The Honorable Court take judicial notice of each
pursuant to Fed. R. Evid. 201(c)(2):

• Exhibit 1 (2 pages), "Copout response" and corresponding written
request to FCI Terre Haute CMU Unit Team/Legal Dept. requesting permission to
send Senate Minority Leader Charles Schumer (D-NY), Senator Chuck Grassley
(R-IA), U.S. Attorney General William Barr, and Acting FBOP Director Katherine
Hawk Sawyer a letter detailing the FBOP coverup of the ISIS-inspired murder of
FCI Terre Haute CMU inmate Robert David Neal;

• Exhibit 2 (6 pages), print-out of 28 CFR Part 540 Subpart J--
Communications Management Housing Units (28 CFR §§ 540.200-540.205);

• Exhibit 3 (15 pages), FBOP Program Statement 5214.02--Communications
Management Unit, April 1, 2015;

• Exhibit 4 (11 pages), excerpt from Federal Register / Vol. 80, No. 14 /
Thursday, January 22, 2015 / Rules and Regulations--Communications Management
Units;

• Exhibit 5 (1 page), USA Today, Congress: US prison misconduct regularly

'covered up', January 7th, 2019; and

•  Exhibit 6 (1 page), Declaration of Martin S. Gottesfeld, September
16th, 2019.

The plaintiff notes that the restriction the FBOP is enforcing to prevent
him from using the names of other CMU inmates in his correspondence to
legislative overseers in a co-equal branch of government, and thereby to stop
the plaintiff and others from reporting the FBOP's coverup of the ISIS-
inspired murder of Mr. Robert David Neal and other Executive misconduct, is
not found in the relevant federal regulations for the CMUs (Exhibit 2), the
FBOP's program statement for the CMUs (Exhibit 3), or the section of the
Federal Register announcing the regulations for the CMUs (Exhibit 4). This
rule is similarly not found in the FCI Terre Haute CMU handbook (D.E. 69 at
69-95). Nor is it found in the FCI Terre Haute CMU Institutional Supplement
(D.E. 69 at 96-98). Upon further inspection, it appears that three (3) pages
from the FCI Terre Haute CMU Institutional Supplement do not appear in D.E.
69; page 2, page 3, and Attachment A. The plaintiff will include a copy of
these missing pages as Exhibit 7 (3 pages) hereto and he requests that The
Honorable Court take judicial notice of this exhibit too pursuant to Fed. R.
Evid. 201(c)(2).

The plaintiff further notes that the U.S. Court of Appeals disagrees with
some of the assertions in the Federal Register. Specifically, The Court held
in Aref v. Lynch, 833 F.3d 242, 247 (D.C. Cir. 2016) that confinement in a CMU
is atypical and meets the requirements to establish a liberty interest under
Sandin v. Conner, 515 U.S. 472; 115 S.Ct. 2293; 132 L.Ed.2d 418 (1995).

The plaintiff further notes that the enforcement of this unwritten rule
to prevent him from reporting the incident in question and the names of those
involved to the Senate Minority Leader demonstrates that there are no

alternatives available to the plaintiff for him to exercise his First-Amendment rights. The defendants and their parties in privity wish to control what the plaintiff can and can't say to elected legislators through the Office of Senate Legal Counsel after a particular Senator inquired upon the plaintiff. This is potentially relevant to the instant motions.

The plaintiff asserts that since the Constitutional rights of those who are not prisoners are affected by the plaintiff's right to publish, including the plaintiff's publishers, such as Ms. Michelle Malkin, The Intercept, InfoWars, WorldNetDaily (WND), The Western Journal, and Red State, the plaintiff's readership, and the plaintiff's family and friends, including his wife and his nephew, that the strict-scrutiny test of Procunier v. Martinez, 416 U.S. 396, 413-414; 40 L.Ed.2d 224; 94 S.Ct. 1800 (1974) applies to the instant motions (as well as to the plaintiff's right to correspond with U.S. Senators, who invoke their own non-prisoner interest in oversight of the FBOP and that of their constituents).

If, however, The Honorable Court were to disagree and decline to apply the strict-scrutiny test from Procunier v. Martinez, then the non-availability of alternative options for him to exercise his First-Amendment rights is relevant to the four-(4)-prong test elucidated by the Supreme Court in Turner v. Safley, 482 U.S. 78, 89-91; 107 S.Ct. 2254; 96 L.Ed.2d 64 (1987) as applied by The Second Circuit in Burns v. Martuscello, 890 F.3d 77, 86 (2d Cir. 2017).

The defendants, moreover, have not and cannot demonstrate a valid penological interest in preventing the plaintiff from publishing. Please see McGowan v. United States, 825 F.3d 118, 122 (2d. Cir. 2016)(citing Jordan v. Pugh, 504 F.Supp.2d 1109, 1124 (D. Colo. 2007)).

Further, The Honorable Court had personal and subject-matter jurisdiction to grant the requested order at the time the plaintiff filed the instant case seeking exactly such an order, among other things. Therefore, no transfer of

the plaintiff by the defendants can defeat The Court's jurisdiction. Please see J.G. v. Mills, 995 F.Supp.2d 109, 121 (E.D.N.Y. 2010)(citing Friends of the Earth, Incl) v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 189; 120 S.Ct. 693; 145 L.Ed.2d 610 (2000)(noting that a federal court is not deprived of jurisdiction by a defendant's voluntary cessation of challenged conduct unless it is clear that the allegedly wrongful behavior could not reasonably be expected to resume) and Olson v. Wing, 281 F.Supp.2d 476, 484 (E.D.N.Y. 2003)(stating that "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur")(internal quotation marks omitted)).

Here, The Honorable Court has and had jurisdiction to adjudicate the instant complaint, making the same allegations of the same interference in the publication process, as noted by the plaintiff in his previous motion. Rather than voluntarily cease the challenged conduct, the instant exhibits and motions make it absolutely clear that the instant defendants have continued the challenged conduct. The case of Jiminian v. Nash, 245 F.3d 144 is inopposite to the plaintiff's instant claims, moreover, because--unlike Jiminian--relief under §2241 was unavailable to the instant plaintiff at the time he filed the instant case.

While there cannot be any valid penological interest in preventing the plaintiff from publishing, Exhibit 5 clearly demonstrates that the FBOP, as found by Congress, "covered up on a regular basis" the "bad behavior" of its "high-ranking officers," and thus the interest of the FBOP in hindering or entirely nullifying the plaintiff's ability to publish is, in fact, penfolgically invalid. It is worth noting that while Exhibit 5 was published after the plaintiff's January 2017 open letter to then--Acting-U.S.-Attorney-

General Sally Yates calling for random unannounced surprise audits and inspections of all FBOP facilities in the New York region, it was nonetheless published before the January-February 2019 blackout at MDC Brooklyn, the plaintiff's public announcement of the instant case on February 3rd, 2019, the recent death of Jeffrey Epstein at MCC, and the eventual publication of the details of the murder of Mr. Neal at FCI Terre Haute. Each of these subsequent events intensifies the FBOP's motive to continue its "regular" coverups and speaks towards the invalidity of that illegitimate purpose.

The plaintiff hereby reincorporates all of his previous arguments in his previous motions for temporary relief pursuant to Fed. R. Civ. P. 65 by reference and he reiterates his request for a hearing should The Honorable Court be left with any questions before it grants the relief requested.

The plaintiff hopes that The Honorable Court has received his previous filings, without which this filing would seem disjointed, particularly his NOTICE OF LIKELY SHENANIGANS mailed and filed (pursuant to Houston v. Lack, 487 U.S. 266 (1988)) with 2 exhibits thereto on September 4th, 2019, in an envelope bearing U.S. Postal Service (USPS) tracking number 9114 9023 0722 4072 3901 79 and his letter declaration (non-motion) mailed and filed (pursuant to Houston v. Lack) on September 12th, 2019, in an envelope bearing USPS tracking number 9114 9023 0722 4072 3908 58. Should these filings fail to appear, then the plaintiff notes that he would suspect foul play and request a hearing.

Respectfully mailed on Monday, September, 16th, 2019, and filed threat in accordance with Houston v. Lack, in an envelope bearing sufficient pre-paid first-class U.S. postage affixed and handed to Ms. J. Wheeler of the FCI Terre Haute CMU Unit Team for mailing to The Court in her official capacity as an agent of the defendants, bearing USPS tracking number 9114 9023 0722 4072 3908 27,

Martin S. Gottesfeld, pro se
Federal Registration Number 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, certify that on Monday, September 16th, 2019, I mailed a copy of the foregoing document to counsel for the defendants in the above-captioned case by handing said copy in an envelope bearing sufficient pre-paid first-class U.S. postage to Ms. J. Wheeler of the FCI Terre Haute CMU unit team for mailing in her official capacity as an agent for the defendants pursuant to Houston v. Lack, 487 U.S. 266 (1988),

Martin S. Gottesfeld, pro se

Exhibit 1 - 2 pages

Copout response

Gottesfeld, M. 12982-104


You must first take out all of the information about other inmates and then you can write to the Senator.  You cannot include other inmates' names and register numbers.

To: CMU Unit Team/Legal Dept.
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Thursday, September 12th, 2019
Subject: Correspondence to fed. officials and 1st Amendment

Salutations CMU Unit Team and FCI Terre Haute Legal Dept.,

    I hope that you are well.

    May I please send copies of the attached letter to Senate Minority Leader Charles Schumer, Senator Chuck Grassley, Attorney General Barr, and Acting FBOP Director Katherine Hawk Sawyer without being punished or facing other retaliatory or negative consequences from the U.S. Department of Justice? I note the copies to the senators would be sent care of the Office of Senate Legal Counsel.

    Thanks for your consideration,

Martin S. Gottesfeld

- Page 1 of 1 -

Exhibit C pages
28 CFR Part 540

## Subpart J--Communications Management Housing Units

### § 540.200 Purpose and scope.

(a) Purpose of this subpart. This subpart defines the Federal Bureau of Prisons' (Bureau) authority to operate, and designate inmates to, Communications Management Housing Units (CMUs) within Bureau facilities.

(b) CMU. A CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. Additionally, CMUs may contain a range of cells dedicated to segregated housing of inmates in administrative detention or disciplinary segregation status.

(c) Purpose of CMUs. The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.

(d) Application. Any inmate (as defined in 28 CFR 500.1(c)) meeting criteria prescribed by this subpart may be designated to a CMU.

(e) Relationship to other regulations. The regulations in this subpart supersede and control to the extent they conflict with, are inconsistent with, or impose greater limitations than the regulations in this part, or any other regulations in this chapter, except 28 CFR part 501.

[80 FR 3168, 3177, Jan. 22, 2015]

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

CFR                                              1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 540.201 Designation criteria.

Inmates may be designated to a CMU if evidence of the following criteria exists:

(a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

(b) The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community;

(c) The inmate has attempted, or indicates a substantial likelihood that the inmate will contact victims of the inmate's current offense(s) of conviction;

(d) The inmate committed prohibited activity related to misuse or abuse of approved communication methods while incarcerated; or

(e) There is any other substantiated/credible evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

[80 FR 3168, 3177, Jan. 22, 2015]

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

## § 540.202 Designation procedures.

Inmates may be designated to CMUs only according to the following procedures:

(a) Initial consideration. Initial consideration of inmates for CMU designation begins when the

CFR                                          2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Bureau becomes aware of information relevant to the criteria described in § 540.201.

(b) Assistant Director authority. The Bureau's Assistant Director, Correctional Programs Division, has authority to approve CMU designations. The Assistant Director's decision must be based on a review of the evidence, and a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protection of the public.

(c) Written notice. Upon arrival at the designated CMU, inmates will receive written notice from the facility's Warden explaining that:

(1) Designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting. The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart;

(2) General conditions of confinement in the CMU may also be limited as necessary to provide greater management of communications;

(3) Designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration. Inmates in CMUs continue to earn sentence credit in accordance with the law and Bureau policy;

(4) Designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate will be provided an explanation of the decision in sufficient detail, unless the Assistant Director determines that providing specific information would jeopardize the safety, security, and orderly operation of correctional facilities, or protection of the public;

(5) Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates;

(6) The inmate may challenge the CMU designation decision, and any aspect of confinement therein, through the Bureau's administrative remedy program.

[80 FR 3168, 3177, Jan. 22, 2015]

CFR                                          3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

## § 540.203 Written correspondence limitations.

(a) General correspondence. General written correspondence as defined by this part, may be limited to six pieces of paper (not larger than 8.5 x 11 inches), double-sided writing permitted, once per calendar week, to and from a single recipient at the discretion of the Warden, except as stated in (c) below. This correspondence is subject to staff inspection for contraband and for content.

(b) Special mail. (1) Special mail, as defined in this part, is limited to privileged communication with the inmate's attorney.

(2) All such correspondence is subject to staff inspection in the inmate's presence for contraband and to ensure its qualification as privileged communication with the inmate's attorney. Inmates may not seal such outgoing mail before giving it to staff for processing. After inspection for contraband, the inmate must then seal the approved outgoing mail material in the presence of staff and immediately give the sealed material to the observing staff for further processing.

(c) Frequency and volume limitations. Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities:

(1) U.S. courts;

(2) Federal judges;

(3) U.S. Attorney's Offices;

(4) Members of U.S. Congress;

(5) The Bureau of Prisons;

(6) Other federal law enforcement entities; or

CFR                                                                      4

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



(7) The inmate's attorney (privileged communications only).

(d) Electronic messaging may be limited to two messages, per calendar week, to and from a single recipient at the discretion of the Warden.

[80 FR 3168, 3177, Jan. 22, 2015]

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

## § 540.204 Telephone communication limitations.

(a) Monitored telephone communication may be limited to immediate family members only. The frequency and duration of telephone communication may also be limited to three connected calls per calendar month, lasting no longer than 15 minutes. The Warden may require such communication to be in English, or translated by an approved interpreter.

(b) Unmonitored telephone communication is limited to privileged communication with the inmate's attorney. Unmonitored privileged telephone communication with the inmate's attorney is permitted as necessary in furtherance of active litigation, after establishing that communication with the verified attorney by confidential correspondence or visiting, or monitored telephone use, is not adequate due to an urgent or impending deadline.

[80 FR 3168, 3177, Jan. 22, 2015]

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

## § 540.205 Visiting limitations.

CFR                                    5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



(a) Regular visiting may be limited to immediate family members. The frequency and duration of regular visiting may also be limited to four one-hour visits each calendar month. The number of visitors permitted during any visit is within the Warden's discretion. Such visits must occur through no-contact visiting facilities.

(1) Regular visits may be simultaneously monitored and recorded, both visually and auditorily, either in person or electronically.

(2) The Warden may require such visits to be conducted in English, or simultaneously translated by an approved interpreter.

(b) Attorney visiting is limited to attorney-client privileged communication as provided in this part. These visits may be visually, but not auditorily, monitored. Regulations and policies previously established under 28 CFR part 543 are applicable.

(c) For convicted inmates (as defined in 28 CFR part 551), regulations and policies previously established under 28 CFR part 543 are applicable.

[80 FR 3168, 3177, Jan. 22, 2015]

[EFFECTIVE DATE NOTE: 80 FR 3168, 3177, Jan. 22, 2015, added Subpart J, effective Feb. 23, 2015.]

CFR                                                                6

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 3 — 15 pages

**OPI:**      **CPD/ICT**
**NUMBER:**  **5214.02**
**DATE:**    **4/1/15**
**SUBJECT:**  **Communications Management Unit**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program

# Statement

OPI:    CPD/ICT

NUMBER:   5214.02

DATE:   April 1, 2015

## Communications Management Units

/s/

*Approved*:  Charles E. Samuels, Jr.

Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

**§ 540.200  Purpose and scope.**

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**(a)  Purpose of this subpart.  This subpart defines the Federal Bureau of Prisons' (Bureau) authority to operate, and designate inmates to, Communications Management Housing Units (CMUs) within Bureau facilities.**

**(b)  CMU.  A CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. Additionally, CMUs may contain a range of cells dedicated to segregated housing of inmates in administrative detention or disciplinary segregation status.**

**(c)  Purpose of CMUs.  The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community.  The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public.  The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.**

**Federal Regulations from 28 CFR are shown in this type.**

Implementing instructions are shown in this type.

**(d)  Application.  Any inmate (as defined in 28 CFR § 500.1(c)) meeting criteria prescribed by this subpart may be designated to a CMU.**

**(e)  Relationship to other regulations.  The regulations in this subpart supersede and control to the extent they conflict with, are inconsistent with, or impose greater limitations than the regulations in this part, or any other regulations in this chapter, except 28 CFR part 501.**

The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communications with persons in the community to protect the safety, security, and orderly operation of Bureau facilities, and protect the public.

CMU designation is non-punitive and may be appropriate for any inmate meeting the referral criteria in Section 2.

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

a. **Program Objectives.**  The expected results of this program are:

```
    Inmates who meet the criteria for designation to a CMU will be
referred for redesignation.
    CMU inmates will be monitored and redesignated when
appropriate.
    Safe and orderly environments at institutions will be enhanced
by the operation of CMUs.
    Increased monitoring of communications with persons in the
community will protect the safety, security, and good order of
institutions, staff, inmates, and the public.
    Inmates designated to a CMU will be provided due process as
described in this policy.
```

b. **Pretrial/Holdover/Detainee Procedures.**  This Program Statement applies to all inmates.

## 2. REFERRAL SOURCES

Designation to a CMU may be considered for any inmate whose interaction with persons in the community requires greater management to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public.  Referrals may come from any source, such as, but not limited to, the following:

```
    Counter Terrorism Unit (CTU) communication monitoring and
intelligence gathering.
    The Designation and Sentence Computation Center (DSCC), as
part of the initial and re-designation processes.
    Individual institutions or regional offices, based upon an
inmate's behavior or activities.
    Recommendations from other law enforcement agencies or courts.
```

## 3. DESIGNATION PROCEDURES

## § 540.202  Designation procedures.

**Inmates may be designated to CMUs only according to the following procedures:**

**(a)  Initial consideration.  Initial consideration of inmates for CMU designation begins when the Bureau becomes aware of information relevant to the criteria described in § 540.201.**

b.  **Referral.**  Designations to a CMU are coordinated by the Counter Terrorism Unit (CTU). The CTU reviews the following information:

```
    Pre-Sentence Investigation Report (PSR).
    Judgment in a Criminal Case (J&C).
    Statement of Reasons (SOR).
```

pro!

**3**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

    DHO reports relevant to referral, such as
communication-related misconduct.
    Relevant SIS reports, PC investigations, etc.
    Memos, letters, etc., from courts, United States Attorneys'
Offices, law enforcement officials, etc., relating to the
referral.
    Any other information or intelligence related to the referral.
CTU staff may draw upon sensitive information and the expertise of other law enforcement and
intelligence agencies during the CMU review process.

All material utilized during the review and referral process is ordinarily delivered to recipients in
electronic format, except classified material that must be handled in accordance with prescribed
handling procedures.

c. **Review.**  The CTU completes the necessary CMU referral documentation, including the *Notice
to Inmate of Transfer to a* **_Communications Management Unit_** (BP-A0944), and forwards a
copy to the Office of General Counsel (OGC) for review.

d. **Decision.**  After OGC completes its review of the referral, the packet is returned to the CTU,
which then forwards it to the Assistant Director, Correctional Programs Division (CPD).

e. **Assistant Director Authority**

**§ 540.202(b)**  **Assistant Director authority.**  **The Bureau's Assistant Director,
Correctional Programs Division, has authority to approve CMU designations. The
Assistant Director's decision must be based on a review of the evidence, and a
conclusion that the inmate's designation to a CMU is necessary to ensure the
safety, security, and orderly operation of correctional facilities, or protection of
the public.**

Only the Assistant Director (or acting Assistant Director), Correctional Programs Division, has
the authority to designate an inmate to a CMU.  CMU designation approval authority may not be
delegated below this level.

f. **Designation Criteria**

**§ 540.201  Designation criteria.**

**Inmates may be designated to a CMU if evidence of the following criteria exists:**

**(a)  The inmate's current offense(s) of conviction, or offense conduct, included
association, communication, or involvement, related to international or domestic**

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

terrorism;

**(b)  The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community;**

**(c)  The inmate has attempted, or indicates a substantial likelihood that the inmate will contact victims of the inmate's current offense(s) of conviction;**

**(d)  The inmate committed prohibited activity related to misuse or abuse of approved communication methods while incarcerated; or**

**(e)  There is any other substantiated/credible evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.**

Approval or denial by the Assistant Director, CPD, is reported to the CTU.  The CTU then notifies a Designator at the DSCC, who notes the decision in SENTRY on the inmate's "CIM Clearance and Separatee Data," and also loads the initial designation or redesignation.  Once the designation is loaded into SENTRY, movement of the inmate through the prisoner transportation system can be initiated.

g.  **Notice to CMU Inmates.**  Upon arrival at the designated CMU, inmates are provided the form BP-A0944, *Notice to Inmate of Transfer to a **Communications Management Unit**,* from the facility's Warden as follows:

**§ 540.202(c)   Written notice.   Upon arrival at the designated CMU, inmates will receive written notice from the facility's Warden explaining that:**

**(1)   Designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting.  The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart;**

**(2)   General conditions of confinement in the CMU may also be limited as necessary to provide greater management of communications;**

**(3)  Designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration.  Inmates in CMUs continue to earn sentence**

pro\

**5**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**credit in accordance with the law and Bureau policy;**

**(4)   Designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public.   The inmate will be provided an explanation of the decision in sufficient detail, unless the Assistant Director determines that providing specific information would jeopardize the safety, security, and orderly operation of correctional facilities, or protection of the public;**

**(5) Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates;**

**(6) The inmate may challenge the CMU designation decision, and any aspect of confinement therein, through the Bureau's administrative remedy program.**

## 4.   CENTRAL INMATE MONITORING (CIM) ASSIGNMENTS

CIM assignments regarding CMU candidates are finalized before assignment to a specific CMU. This ensures the most appropriate placement of each CMU inmate.   Inmates who are CIM "separatees" for any reason may not be housed in the same CMU housing unit.

## 5.   CONDITIONS OF CONFINEMENT

All Federal regulations (rules) apply to CMU inmates and cannot be waived.   Additionally, all Bureau of Prisons policies and national directives apply to inmates in CMUs unless specifically provided differently in this policy. Waivers from any Bureau policy or national directive must be processed according to the Program Statement **Directives Management Manual**.

a.   **Minimum Conditions.**   Except as provided above, minimum conditions of confinement for CMU inmates are as follows and in accordance with the Program Statement **Occupational Safety, Environmental Compliance, and Fire Protection**, and other policies referenced in this Program Statement.

(1)   **Environment.**   Living quarters are well ventilated, adequately lighted, appropriately heated, and maintained in a sanitary condition.

(2)   **Cell Assignments.**   Living quarters ordinarily house only the number of occupants for which they are designed.   The Warden, however, may authorize additional occupants as long as adequate standards can be maintained.   The unit contains cells dedicated to segregated housing

pro

**6**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

for inmates being placed in administrative detention or disciplinary segregation status.

(3) **Bedding.** Inmates receive a mattress, blankets, a pillow, and linens for sleeping. They have opportunities to exchange linens.

(4) **Clothing.** Inmates receive adequate institution clothing, including footwear. They have opportunities to exchange clothing or have it washed.

(5) **Personal Hygiene.** Inmates have access to a wash basin and toilet. They receive personal hygiene items. Showers are available daily. Inmates have access to hair care services.

(6) **Meals.** Inmates receive nutritionally adequate meals provided by the institution.

(7) **Education/Recreation.** National education policies are implemented. Inmates have access to library services per 28 CFR part 544, and the Program Statements **Education, Training, and Leisure Time Program Standards**, and **Recreation Programs, Inmate**.

Inmates are ordinarily permitted to leave their cells and recreate daily during regular institution hours of operation as directed by the Warden, except during counts.

Ordinarily, outdoor exercise areas are available for inmate use, weather and resources permitting. These areas will be available to inmates unless compelling security or safety reasons dictate otherwise. Inmates are provided various passive and active recreational activities in accordance with institution procedures, as well as hobbycraft opportunities. Televisions are available in unit common areas. Movies are shown using closed-circuit televisions.

(8) **Personal Property.** Inmates may have reasonable amounts of personal property. Personal property may be limited for reasons of fire safety, sanitation, or available space.

(9) **Commissary.** Inmates have access to the commissary similar to the institution general population, as determined by the Warden.

(10) **Legal Activities.** Inmates may perform legal activities per 28 CFR part 543, and the Program Statement **Legal Activities, Inmate**. The use of assistants by attorneys to perform legal tasks, as provided in the Program Statement **Legal Activities, Inmate**, applies to inmates in the CMU.

(11) **Religion.** Inmates may pursue religious beliefs and practices per 28 CFR part 548, and the Program Statement **Religious Beliefs and Practices**.

(12) **Medical Care.** Health Services staff provide sick call in the unit. Medications will also be delivered and administered in the unit. Specialized services may be provided in the institution's main health services units, under conditions that ensure inmates' lack of contact with non-CMU

prop

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

inmates.  Emergency medical care is available either at the institution or from the community.

(13)  **Mental Health Care.**  For newly committed inmates, a Psychology Services initial intake evaluation is completed within 14 calendar days of the inmate's arrival at the institution.  For inmates transferring from another Bureau institution, a transfer intake screening is completed within 30 calendar days of the inmate's arrival at the institution.  In addition, if an inmate has been out of the institution for more than 30 continuous calendar days, e.g. hospitalized in the community for an extended period of time, returning from a lengthy federal or state writ, a Transfer Intake Screening is completed within 30 calendar days of the inmates return to the institution.

(14)  **Sanitation.**  CMU inmates are responsible for sanitation in their living areas.

(15)  **Work Assignments.**  Work assignments include orderlies for unit sanitation, food service, and recreation, and are assigned by the Unit Team.

b.   **Admission and Orientation/Classification and Reviews.**  Inmates will participate in an institution and unit admission and orientation (A&O) program as outlined in the policy on A&O. The goal of the CMU A&O program is to provide inmates with information regarding institution operations and program availability.  Classification and reviews of CMU inmates occur per the Program Statement **Classification and Program Review of Inmates**.

c.   **Contact With Persons in the Community**.  The purpose of the CMU is to provide increased monitoring of communications of assigned inmates.  By operating a self-contained housing unit, staff regulate and monitor all communications between inmates and persons in the community. Contact between CMU inmates and persons in the community occurs according to the Program Statement   **Visiting Regulations**, with necessary adjustments indicated herein.   Privileged attorney-client communications are not monitored, consistent with the Program Statements **Legal Activities, Inmate** and **Visiting Regulations**.

(1) **Written Correspondence Limitations**

**§ 540.203  Written correspondence limitations.**

**(a)  General correspondence.  General written correspondence as defined by Part 540, may be limited to six pieces of paper (not larger than 8.5 x 11 inches), double-sided writing permitted, once per calendar week, to and from a single recipient at the discretion of the Warden, except as stated in (c) below.  This correspondence is subject to staff inspection for contraband and for content.**

Incoming and outgoing written general correspondence is ordinarily reviewed by CTU staff before delivery  to  the  inmate  or  further  processing  to  the  post  office.    All  foreign-language

pro

**8**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

correspondence is translated before delivery to the inmate or further processing to the post office.

Unless specifically restricted, inmates will ordinarily be allowed to communicate through general correspondence consistent with the Program Statement **Correspondence**. However, the Warden may impose limitations based on safety and security needs of the institution.

**(b) Special mail.**

**(1)   Special mail, as defined in this part, is limited to privileged communication with the inmate's attorney.**

**(2)   All such correspondence is subject to staff inspection in the inmate's presence for contraband and to ensure its qualification as privileged communication with the inmate's attorney.  Inmates may not seal such outgoing mail before giving it to staff for processing.  After inspection for contraband, the inmate must then seal the approved outgoing mail material in the presence of staff and immediately give the sealed material to the observing staff for further processing.**

**(c)   Frequency and volume limitations.  Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities:**

**(1)  U.S. courts;**

**(2)  Federal judges;**

**(3)  U.S. Attorney's Offices;**

**(4)  Members of U.S. Congress;**

**(5)  The Bureau of Prisons;**

**(6)  Other federal law enforcement entities; or**

**(7)  The inmate's attorney (privileged communications only).**

Only privileged communication with the inmate's attorney will be handled as special mail.  All other types of correspondence do not receive special handling and will be treated as general correspondence.  This includes, but is not limited to, media representatives and those entities listed in (c) above.

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**(d)  Electronic messaging may be limited to two messages, per calendar week, to and from a single recipient at the discretion of the Warden.**

CMU inmates are permitted electronic messaging where available, but can be limited in frequency and volume as indicated above.  Additionally, the policy on TRULINCS electronic messaging applies to inmates in the CMU.

Incoming and outgoing electronic messaging is ordinarily reviewed by CTU staff before delivery to the inmate or further processing to the electronic post office.  All foreign-language correspondence is translated before delivery to the inmate or further processing to the electronic post office.

(2)  **Telephone Communication Limitations**

**§ 540.204  Telephone communication limitations.**

**(a)  <u>Monitored telephone communication</u> may be limited to immediate family members only.  The frequency and duration of telephone communication may also be limited to three connected calls per calendar month, lasting no longer than 15 minutes.  The Warden may require such communication to be in English, or translated by an approved interpreter.**

Telephone communications between inmates and persons in the community (except properly placed, unmonitored legal calls) are:

```
Conducted using monitored ITS phone lines.
Ordinarily live-monitored by CTU staff.
Subject to recording.
Translated for foreign-language conversations.
```

Unless specifically restricted, inmates will be allowed two 15-minute monitored telephone calls per week.  Calls may be placed Monday through Friday, except holidays, between 8:00 a.m. and 8:00 p.m., local time.  On Sundays and holidays, telephone calls may be placed between 8:00 a.m. and 2:30 p.m., local time.  No telephone calls will be permitted on Saturdays.

**(b)  <u>Unmonitored telephone communication</u> is limited to privileged communication with the inmate's attorney.  Unmonitored privileged telephone communication with the inmate's attorney is permitted as necessary in furtherance of active litigation, after establishing that communication with the verified attorney by confidential correspondence or visiting, or monitored telephone use, is not adequate due to an urgent or impending deadline.**

(3)  **Visiting Limitations**

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 540.205  Visiting limitations.

(a)  Regular visiting may be limited to immediate family members.  The frequency and duration of regular visiting may also be limited to four one-hour visits each calendar month.  The number of visitors permitted during any visit is within the Warden's discretion.   Such visits must occur through no-contact visiting facilities.

(1)  Regular visits may be simultaneously monitored and recorded, both visually and auditorily, either in person or electronically.

(2)   The Warden may require such visits to be conducted in English, or simultaneously translated by an approved interpreter.

(b)   Attorney visiting is limited to attorney-client privileged communication as provided in this part.  These visits may be visually, but not auditorily, monitored. Regulations and policies previously established under 28 CFR part 543 are applicable.

(c)  For convicted inmates (as defined in 28 CFR part 551), regulations and policies previously established under 28 CFR part 543 are applicable.

Visiting between inmates and persons in the community (except properly scheduled, unmonitored legal visits) is:

```
    Conducted using non-contact facilities (i.e., secure
partitioned rooms, telephone voice contact).
    Ordinarily live-monitored by CTU staff.
    Subject to recording.
    Translated for foreign-language conversations.
```

Inmates will ordinarily be allowed up to eight hours of visiting time per month.  Visits may be scheduled in increments up to four hours at the discretion of the institution.  No single visit (visiting day) may be scheduled for a period longer than four hours.  Visits will be permitted

Sunday through Friday, during regular institution visiting hours.  Visits may be scheduled on Federal holidays; however, no visits will be scheduled on Saturdays.

## 6.  REDESIGNATION

a.  **Redesignation Criteria.**  Reviews for continuing CMU designation are done in a manner consistent with sound correctional judgment and security threat management practices.  Unit Team staff, in conjunction with the CTU, review the status of an inmate in a CMU to determine the inmate's readiness for transfer.  The decision to transfer reflects the Unit Team and CTU's

pro

11

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

judgment that the inmate can function in another facility in a manner in which he/she is not likely to be a threat to others, or to the institution's orderly operation. CTU staff may draw upon sensitive information and the expertise of other law enforcement and intelligence agencies during the review process.

Review of inmates for continued CMU designation will be conducted by the Unit Team in connection with regularly scheduled program reviews. Inmates are provided at least 48 hours prior notice of scheduled program reviews, are expected to attend, and can personally raise questions and concerns with Unit Team regarding their placement in the CMU.

In determining whether continued CMU placement is necessary, the Unit Team will consider whether the original reasons for CMU placement still exist, including whether:

```
    The inmate's current offense(s) of conviction, or offense
conduct, included association, communication, or involvement,
related to international or domestic terrorism.
    The inmate's current offense(s) of conviction, offense
conduct, or activity while incarcerated, indicates a propensity
to encourage, coordinate, facilitate, or otherwise act in
furtherance of illegal activity through communication with
persons in the community.
    The inmate has attempted, or indicates a propensity, to
contact victims of his/her current offense(s) of conviction.
    The inmate committed prohibited activity related to
misuse/abuse of approved communication methods while
incarcerated.
    There is any other evidence of a potential threat to the safe,
secure, and orderly operation of prison facilities, or protection
of the public, as a result of the inmate's unmonitored
communication with persons in the community.
```
Additional information to be considered includes whether the inmate can safely function in a less restrictive unit without posing a risk to institutional security and good order, posing a risk to the safety and security of staff, inmates, or others, including the inmate him-/herself, or posing a risk

to public safety. Ultimately, it must be staff's assessment that the inmate does not require the degree of monitoring and controls afforded at a CMU.

Unit Team staff forward their recommendations to the Warden. With the concurrence of the Warden, recommendations are then forwarded to the Bureau's Counter Terrorism Unit (CTU) for review of individual inmate cases. The CTU forwards the recommendation to the Assistant Director, Correctional Programs Division (CPD). The Assistant Director, Correctional Programs Division, has final authority to approve an inmate's redesignation from a CMU.

pro

**12**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Only the Assistant Director (or acting Assistant Director), Correctional Programs Division, has the authority to redesignate an inmate from a CMU. CMU redesignation approval authority may not be delegated below this level.

All material utilized during the review and referral process is ordinarily delivered to recipients in electronic format, except classified material that must be handled in accordance with the prescribed handling procedures.

Inmates denied re-designation from a CMU are notified in writing by the Unit Team of the reason(s) for continued CMU designation. Inmates not satisfied with the re-designation decision, or any other aspect of confinement in the CMU, can appeal the decision or situation through the administrative remedy program. The inmate's Unit Team can provide the necessary form(s).

Once redesignation from a CMU is approved, CTU staff prepare a referral packet for the DSCC. The packet contains:

> `Request for Redesignation Memorandum (drafted by the CTU).`
> `Approval memo signed by the Assistant Director, Correctional`
> `Programs Division.`

Inmates approved for transfer from a CMU are ordinarily redesignated to the general population in the institution where the CMU is located, for a period of no less than 6 months, as a step-down process from the CMU, if they meet security and custody classification requirements for a medium security facility.

Inmates requiring placement in a high security institution are ordinarily redesignated to an appropriate facility for no less than 6 months, as a step-down process from the CMU.

Approval or denial by the Assistant Director, CPD, is reported to the CTU. The CTU then notifies a Designator at the DSCC, who notes the decision in SENTRY on the inmate's "CIM Clearance and Separatee Data," and also loads the initial designation or redesignation.

During the initial 6-month step-down period, the inmate's communications continue to be monitored by the CTU.

Should the inmate continue to program appropriately after transfer from a CMU, he/she can be considered eligible for transfer to another appropriate security level facility.

## 7. INMATE APPEAL OF TRANSFER TO A CMU

Inmates appeal their transfer to a CMU through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19.

## 8. INSTITUTION SUPPLEMENT

13

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Each institution with a CMU must develop an Institution Supplement that addresses local operations and procedures. The Institution Supplement is reviewed for legal sufficiency by Regional Counsel before implementation.

## 9. AGENCY ACA ACCREDITATION PROVISIONS

American Correctional Association Standards for Adult Correctional Institutions, 4th Edition: 4-4287, 4-4288, 4-4290, 4-4295, 4-4296, 4-4297, 4-4299, 4-4300, 4-4301, 4-4305, 4-4428

American Correctional Association Performance Based Standards for Adult Local Detention Facilities, 4th Edition: 4-ALDF-2A-28, 4-ALDF-2A-30, 4-ALDF-2A-31, 4-ALDF-5A-01

American Correctional Association Standards for Administration of Correctional Agencies, 2nd Edition: 2-CO-4B-03, 2-CO-4B-04, 2-C0-4E-01, 2-CO-4F-01

## REFERENCES

*Program Statements*

P1221.66   Directives Management Manual (7/21/98)

P1315.07   Legal Activities, Inmate (11/5/99)

P1330.18   Administrative Remedy Program (1/6/14)

P1600.09   Occupational Safety, Environmental Compliance, and Fire Protection (10/31/07)

P5100.08   Inmate Security Designation and Custody Classification (9/12/06)

P5180.05   Central Inmate Monitoring System (12/31/07)

P5230.05   Grooming (11/4/96)

P5264.08   Inmate Telephone Regulations (1/24/08)

P5265.13   Trust Fund Limited Inmate Computer System (TRULINCS) – Electronic Messaging (2/19/09)

P5265.14   Correspondence (4/5/11)

P5267.08   Visiting Regulations (5/11/06)

P5270.09   Inmate Discipline Program (7/8/11)

P5270.10   Special Housing Units (7/29/11)

**14**

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

P5290.14   Admission and Orientation Program (4/3/03)

P5300.21   Education, Training and Leisure Time Program Standards (2/18/02)

P5322.13   Inmate Classification and Program Review (5/16/14)

P5360.09   Religious Beliefs and Practices (12/31/04)

P5370.11   Recreation Programs, Inmate (6/28/08)

P5521.05   Searches of Housing Units, Inmates, and Inmate Work Areas (6/30/97)

P5580.08   Personal Property, Inmate (8/22/11)

P5803.08   Progress Reports (2/27/14)

P6031.04   Patient Care (6/3/14)

P6340.04   Psychiatric Services (1/15/05)

*BOP Forms*

BP-A0944      Notice to Inmate of Transfer to a **Communications Management Unit**

*Records Retention Requirements*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**3168** Federal Register / Vol. 80, No. 14 / Thursday, January 22, 2015 / Rules and Regulations



209; fax: (972) 248–3321; Internet: *http://mu-2aircraft.com*.

(4) You may view this service information at the FAA, Small Airplane Directorate, 901 Locust, Kansas City, Missouri 64106. For information on the availability of this material at the FAA, call (816) 329–4148.

(5) You may view this service information that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal-register/cfr/ibr-locations.html*.

Issued in Kansas City, Missouri, on December 30, 2014.

**Robert Busto,**

*Acting Manager, Small Airplane Directorate, Aircraft Certification Service.*

[FR Doc. 2015–00007 Filed 1–21–15; 8:45 am]

**BILLING CODE 4910–13–P**

---

# DEPARTMENT OF JUSTICE

## Bureau of Prisons

**28 CFR Part 540**

**[BOP Docket No. 1148–F]**

**RIN 1120–AB48**

## Communications Management Units

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Bureau of Prisons (Bureau) finalizes regulations that establish and describe Communications Management Units (CMUs) by regulation. The CMUs regulations serve to detail the specific restrictions that may be imposed in the CMUs in a way that current regulations authorize but do not detail. CMUs are designed to provide an inmate housing unit environment that enables staff monitoring of all communications between inmates in a Communications Management Unit (CMU) and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public. These regulations represent a "floor" beneath which communications cannot be further restricted. The Bureau currently operates CMUs in two of its facilities. This rule clarifies existing Bureau practices with respect to CMUs.

**DATES:** This rule is effective on February 23, 2015.

**FOR FURTHER INFORMATION CONTACT:** Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 307–2105.

**SUPPLEMENTARY INFORMATION:** This final rule codifies and describes the Bureau's procedures for designating inmates to, and limiting communication within, its CMUs. Currently, the Bureau operates two CMUs, separately located at the Federal Correctional Complex (FCC), Terre Haute, Indiana (established in December 2006), and the United States Penitentiary (USP), Marion, Illinois (established in March 2008). A proposed rule was published on April 6, 2010 (75 FR 17324). We received 733 comments during the 2010 comment period. We later reopened the comment period on March 10, 2014, for 15 days (79 FR 13263). We received an additional 443 comments during the 2014 comment period. Similar issues were raised by most of the commenters. We respond below to the issues raised.

### Designation to a CMU Is Not Discriminatory or Retaliatory

Several commenters felt that there exists in CMUs an "overrepresentation of Muslim and political prisoners, showing that CMUs are not designed for legitimate purposes, but rather to discriminate and remove and isolate politically active members of society."

The Bureau does not use religion or political affiliation as a criterion for designation to CMUs. 28 CFR 551.90 states the Bureau's non-discrimination policy: "Bureau staff shall not discriminate against inmates on the basis of race, religion, national origin, sex, disability, or political belief. This includes the making of administrative decisions and providing access to work, housing and programs." Further, § 540.201, which describes the designation criteria, must be read in tandem with § 540.202, particularly subparagraph (b), which states that after the Bureau becomes aware of one or more of the criteria described in § 540.201, the Bureau's Assistant Director for the Correctional Programs Division must conduct a review of the evidence found and make a finding that designation to the CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities or protection of the public. An inmate cannot, therefore, be designated to a CMU based upon religious or political affiliation, both because neither are part of the stated criteria, and because it is also necessary to have credible evidence of a threat to the safety, security, and good order of the institution or protection of the public to support designation to a CMU.

Instead, an important category of inmates that might be designated to a CMU is inmates whose current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism. Past behaviors of terrorist inmates provide sufficient grounds to suggest a substantial risk that they may inspire or incite terrorist-related activity, especially if ideas for or plans to incite terrorist-related activity are communicated to groups willing to engage in or to provide equipment or logistics to facilitate terrorist-related activity. The potential ramifications of this activity outweigh the inmate's interest in unlimited communication with persons in the community.

Communication related to terrorist-related activity can occur in codes that are difficult to detect and extremely time-consuming to interpret. Inmates involved in such communication, and other persons involved or linked to terrorist-related activities, take on an exalted status with other like-minded individuals. Their communications acquire a special level of inspirational significance for those who are already predisposed to these views, causing a substantial risk that such recipients of their communications will be incited to unlawful terrorist-related activity.

The danger of coded messages from prisoners has been recognized by the courts. *See Turner* v. *Safley*, 482 U.S. 78, 93 (1987) ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); *United States* v. *Salameh*, 152 F.3d 88, 108 (2nd Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); *United States* v. *Johnson*, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); *United States* v. *Hammoud*, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); *United States* v. *Moncivais*, 401 F.3d 751, 757 (6th Cir. 2005) (noting that seemingly nonsensical conversations could be in code and interpreted as indicative of drug dealing activity). Also, an Al Qaeda training manual contains the following advice regarding communications from prison: "Take advantage of visits to communicate with brothers outside prison and exchange information that may be helpful to them in their work outside prison. The importance of mastering the art of hiding messages is self-evident here."

There have been cases of imprisoned terrorists communicating with their followers regarding future terrorist activity. For example, after El Sayyid Nosair assassinated Rabbi Kahane, he was placed in Rikers Island, where "he began to receive a steady stream of visitors, most regularly his cousin El-Gabrowny, and also Abouhalima, Salameh, and Ayyad. During these visits, as well as subsequent visits once Nosair was at Attica, Nosair suggested numerous terrorist operations, including the murders of the judge who sentenced him and of Dov Hikind, a New York City Assemblyman, and chided his visitors for doing nothing to further the jihad against the oppressors. Nosair also tape recorded messages while in custody . . ." *United States* v. *Rahman,* 189 F.3d 88, 105–06 (2d Cir. 1999). Imprisoned, Sheikh Abdel Rahman had urged his followers to wage jihad to obtain his release. Violent attacks and murders followed. *United States* v. *Sattar,* 314 F.Supp.2d 279, 288–89 (S.D.N.Y. 2004).

To minimize the risk of terrorist-related communication and other similar dangerous communication to or from inmates in Bureau custody, this regulation clarifies the Bureau's current authority to limit and monitor the communication of inmates in CMUs to immediate family members, U.S. Courts, federal judges, U.S. Attorney's Offices, Members of U.S. Congress, the Bureau, other federal law enforcement entities, and the inmate's attorney. The Bureau allows communication with these individuals to help inmates maintain family ties, and protect inmates' access to courts and other government officials. This permits inmates to raise issues related to their incarceration or their conditions of confinement, while minimizing potential internal or external threats.

The presence of Muslim inmates in CMUs does not indicate discrimination, especially given the alternative explanations for designation of inmates to the CMU in § 540.201. In *Ashcroft* v. *Iqbal,* 129 S.Ct. 1937 (2009), the plaintiffs alleged that former FBI Director Mueller and Attorney General Ashcroft engaged in "invidious discrimination" against Muslims because the FBI "arrested and detained thousands of Arab Muslim men" following the 9/11 attacks. *Iqbal,* 129 S.Ct. at 1951. "Taken as true, the Court found these allegations are consistent" with Plaintiffs' claim that the men were detained "because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose." *Id.* In particular, the Court found that the "obvious

alternative explanation" for the arrests was that they were a response to legitimate security concerns following the 9/11 attacks. *Id.* As the Court concluded, in the face of this explanation, "the purposeful, invidious discrimination respondent asks us to infer . . . is not a plausible conclusion." *Id.* at 1951–1952.

The Bureau, acting on a case-by-case basis, may designate an inmate to a CMU for heightened monitoring for any of the reasons articulated in § 540.201. This valid legitimate penological purpose negates a claim of a Bureau-wide conspiracy to discriminate against Muslims.

**Assignment to a CMU With Notice Upon Arrival Does Not Violate the Due Process Clause**

Several commenters, either inmates in CMUs or friends or relatives of inmates in CMUs, stated that the inmates were placed there without prior notice, and that such placement is in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.

*Written notice.* As indicated in the proposed rule, upon arrival at the designated CMU, inmates receive written notice from the Warden of the facility in which the CMU exists of the inmate's placement. The written notice explains that:

(1) Designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting. The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart;

(2) General conditions of confinement in the CMU may also be limited as necessary to provide greater management of communications;

(3) Designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration. Inmates in CMUs continue to earn sentence credit in accordance with the law and Bureau policy;

(4) Designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate will be provided an explanation of the decision in sufficient detail, unless the Assistant Director determines that providing specific information would jeopardize the safety, security, and orderly operation of

correctional facilities, and/or protection of the public;

(5) Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates; and

(6) The inmate may challenge the CMU designation decision, and any aspect of confinement therein, through the Bureau's administrative remedy program.

Through the written notice, inmates are informed that designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate is provided an explanation of the decision in sufficient detail, unless providing specific information would jeopardize the safety, security, or orderly operation of the facility, or protection of the public.

Continued placement in CMUs may not be necessary and will be reviewed regularly by the inmate's Unit Team, as described above. Conditions may change and allow inmates to be transferred out of the CMUs. For instance, an inmate's behavior and conduct may change. Another example of an altered circumstance is that the heightened security risk or threat to the safety, security and good order of the institution or protection of the public may have changed in some way. For instance, if an inmate communicates about the possibility of a disruption at a particular public event, and the event timeframe passes, the security threat may be diminished.

*The requirements of due process.* The due process clause protects persons against deprivations of "life, liberty or property without due process of law." U.S. Const. Amend. V. A constitutionally-protected liberty interest can arise under the Constitution itself or be created by the State.

If a court were to conclude that inmates had a constitutionally-protected liberty interest in avoiding transfer to a CMU, the process that would have to be afforded an inmate would depend on the particular situation's demands. *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972) (stating that the requirements are "flexible"). Determining what procedural due process demands in a given situation requires balancing of three factors. *Mathews* v. *Eldridge,* 424 U.S. 319 (1976). They are: (1) The private interest affected; (2) the risk of erroneous deprivation of a liberty

interest as a result of procedures used, and the probable value, if any, of any alternative safeguards; and (3) the government's interest. *Id.* at 335.

*No private liberty interest is affected.* An inmate's liberty interest in avoiding conditions of confinement can arise from the Constitution itself. *Vitek v. Jones,* 445 U.S. 480, 493–94 (1980) (finding liberty interest in avoiding psychiatric treatment against an inmate's will). However, the Constitution does not give rise to a liberty interest in avoiding a transfer to an institution that is "much more disagreeable than another." *Meachum v. Fano,* 427 U.S. 215, 225 (1976); *see also Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005). This includes institutions with "more severe rules" as long as the inmate is still within the normal limits or range of custody authorized by the conviction. *Id.* "Transfers between institutions . . . are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate." *Meachum,* 427 U.S. at 225.

Since the Constitution does not give rise to a liberty interest when the issue is avoiding a transfer to an institution that is less favorable or more restrictive than another, inmates do not have a liberty interest that should be protected from transfer to a CMU.

In *Wilkinson* v. *Austin,* the Supreme Court held that a liberty interest arises when an inmate is transferred to a maximum security prison where, among other restrictions, "almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell." *545 U.S. 209,* 223–24 (2005); *id.* at 224 (noting that the inmates were placed in the facility for indefinite duration and were disqualified for parole consideration during their placement). Because the conditions imposed "an atypical and significant hardship," the Court found a state-created liberty interest in that case. *Id.* at 223.

However, unlike the situation in *Wilkinson,* there is no state-created liberty interest based upon the facts of confinement in a CMU. Inmates are subjected to an "atypical and significant hardship" if the hardships are more egregious than the "ordinary incidents of prison life." *Sandin* v. *Conner,* 515 U.S. 472, 484 (1995). The restrictions imposed on inmates in CMUs are not atypical of the ordinary incidents of prison life. Restrictions on communication are common and are within the discretion of the prison authorities to regulate. *See Overton* v. *Bazzetta,* 539 U.S. 126, 132 (2003).

Current regulations that apply to general population inmates allow the warden of a particular facility to impose heightened restrictions on inmates' communications with the public. (28 CFR 540.15; § 540.43; § 540.100.)

The conditions at a CMU are not like those at issue in *Wilkinson;* indeed, they are not significantly different from the ordinary incidents of prison life. Inmates in the CMU operate as a general population unit, where they participate in all educational, recreational, religious, unit management and work programming within their unit.

The communications restrictions possible in the CMU do not rise to the level that implicates violation of a liberty interest. To effectively and efficiently allow monitoring and review of the general correspondence communications of inmates in CMUs, those communications may be limited in frequency and volume as follows:

• Written correspondence may be limited to six (expanded from the proposed rule limitation to three) pieces of paper, double-sided, once per week to and from a single recipient (in addition, electronic messaging may be limited to two messages, expanded from the proposed rule limitation of one, per calendar week, to and from a single recipient at the discretion of the Warden);

• Telephone communication may be limited to three completed calls (expanded from the proposed rule limitation to one call) per calendar month for up to 15 minutes; and

• Visiting may be limited to four one-hour visits (expanded from the proposed rule limitation of one one-hour visit) each calendar month.

Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities: U.S. courts, Federal judges, U.S. Attorney's Offices, Members of U.S. Congress, the Bureau of Prisons, other federal law enforcement entities, or, as stated earlier, the inmate's attorney (privileged, unmonitored communications only). Correspondence with these entities is not limited under these regulations in furtherance of inmates' access to courts and their ability to defend in litigation.

Even assuming that inmates have a liberty interest in this context, inmates have been afforded sufficient process and will continue to be afforded due process by these regulations, under the *Mathews* standard. Inmates are afforded post-placement due process in the form of written notice under § 540.202(c)

upon arrival, which includes information on how to appeal the designation decision.

*There is little risk of erroneous deprivation of a liberty interest.* The second factor addresses the possibility that an inmate could be erroneously assigned to the wrong unit. Inmates placed in the CMU are given notice of their transfers under the regulations (§ 540.202(c)) and their opportunity to appeal. The notice delineates the specific reasons for their designation within this program unless the Assistant Director determines that providing the information would jeopardize the safety, security, and orderly operation of correctional facilities, and/or protection of the public. If information in the notice is inaccurate, inmates may appeal regarding the inaccuracy of the information contained in the notice, the CMU designation decision, and any other aspect of confinement therein, through the Bureau's administrative remedy program. *See* 28 CFR 542.10–542.19 and § 540.202(c)(6). The procedures thus offer an inmate notice and an opportunity to appeal the decision. *See Wilkinson,* 545 U.S. at 226 ("Our procedural due process cases have consistently observed that [notice of the factual basis leading to consideration for placement and a fair opportunity for rebuttal] are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations.") This procedure allows for the review of an inmate's claim that he has been erroneously placed in the CMU.

Further, continued designation to the CMU is regularly reviewed by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates. *See id.* at 227 (review 30 days after assignment to facility "further reduces the risk of erroneous placement"). These procedures, therefore, afford sufficient protection from the risk of erroneous deprivation of any liberty interest.

*The government's interest is significant.* The final *Mathews* factor is the governmental interest in placing inmates in a CMU; this interest is a "dominant consideration." *Wilkinson* at 227. The interest of protecting the security of the facility is a legitimate penological interest that has been consistently acknowledged by the Supreme Court. *Sandin* v. *Conner,* 515 U.S. 472, 484 (1995); *Block* v. *Rutherford,* 468 U.S. 576, 586 (1984). Particularly, with regard to the CMUs, the government's interest in protecting

the security of the facility and the public is furthered by allowing the government to concentrate monitoring resources, thereby increasing the probability of detecting and deterring dangerous communications and reducing potential security issues.

By limiting the frequency and volume of the communication to and from inmates identified under this regulation, the Bureau reduces the amount of communication requiring monitoring and review. Reducing the volume of communications helps ensure the Bureau's ability to provide heightened scrutiny in reviewing communications, thereby increasing both internal security within correctional facilities, and the security of members of the public.

As we explained in the proposed rule, the Bureau has determined that in the context of inmates in CMUs, the restrictions authorized by the CMUs regulations are the most appropriate means of accomplishing the Bureau's legitimate goal and compelling interest to ensure the safety, security, and orderly operation of Bureau facilities, and protection of the public. We stated the following in the preamble to the proposed rule:

"The CMU concept allows the Bureau to monitor inmates for whom such monitoring and communication limits are necessary, whether due to a terrorist link or otherwise, such as inmates who have previously committed an infraction related to mail tampering from within an institution, or inmates who may be attempting to communicate with past or potential victims. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protect the public. The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart."

**Restricting Inmates' Telephone and Visiting Privileges Does Not Violate the Due Process Clause**

Several commenters stated that CMU restrictions on visiting and telephone calls violate the Due Process Clause and the rights of inmates in CMUs.

*Substantive Due Process.* In analyzing whether the communication restrictions violate substantive due process, the proper inquiry is whether the prison regulation or policy "is reasonably related to legitimate penological interests." *Turner* v. *Safley,* 482 U.S. 78, 89 (1987); *Overton* v. *Bazzetta,* 539 U.S. 126, 132 (2003). Several factors are relevant to the reasonableness inquiry;

*Turner* identified four factors, the first of which has been described as the most important: There must be a "valid, rational connection" between the regulation and the objective set forth to justify it. *Turner,* 482 U.S. at 89; *Beard v Banks,* 548 U.S. 521, 532 (2006) (describing the particular importance of this factor, explaining that in a given case, the second, third, and fourth Turner factors may "add little, one way or another, to the first factor's basic logical rationale.").

Here, analysis of this factor demonstrates that the regulation is reasonably related to legitimate interests. The regulation is designed to ensure the safety, security, and good order of Bureau institutions and protection of the public. Security of the facility has been cited as a valid primary interest in not permitting contact visitation for pretrial detainees. *Sandin* v. *Conner,* 515 U.S. 472, 484 (1995); *Block* v. *Rutherford,* 468 U.S. 576, 586 (1984). The regulation furthers this legitimate penological interest by effectively monitoring the communications of high-risk inmates. The regulation and the penological interest are, therefore, rationally related.

*Procedural Due Process.* The limitations on telephone use and visitation do not violate the procedural due process rights of inmates in CMUs because they do not implicate a protected liberty interest. These restrictions are ordinary incidents of prison life. Such restrictions do not rise to the level which the Supreme Court has determined is outside the normal boundaries of confinement needed to trigger a liberty interest under the Due Process Clause. *See Vitek* v. *Jones,* 445 U.S. 480, 493–94 (1980) (transfer to mental hospital); *Washington* v. *Harper,* 494 U.S. 210, 221–22 (1990) (involuntary administration of psychotropic drugs); *Wilkinson* v. *Austin,* 545 U.S. 209 at 224 (2005) (indefinite transfer to solitary confinement). Courts have recognized that similar limitations do not threaten a protected liberty interest. *See Searcy* v. *United States,* 668 F.Supp.2d 113, 122 (D.D.C. 2009) (internal quotation marks omitted) ("An inmate has no right to unlimited telephone use.'"); *Perez* v. *Federal Bureau of Prisons,* 229 Fed. Appx. 55, 58 (3d Cir. 2007) ("[L]imits on telephone usage are ordinary incidents of prison confinement," and their restriction "do[es] not implicate a liberty interest protected by the Due Process Clause.").

There is also no liberty interest protected by the Due Process Clause that is implicated by the rules governing the scheduling of visits or phone calls in the

CMU. In fact, not only are the CMU restrictions well below the level necessary to trigger a liberty interest, but they also are within the scope of restrictions authorized by the Bureau's current regulations. 28 CFR 540.100 and 540.101(d) indicate that inmate telephone use may be limited as necessary to protect institutional security and the safety of the public. Further, 28 CFR 540.51(h)(2) indicates that restrictions on contact visiting, for example, are permitted if necessary for security reasons. Also, the restrictions imposed upon attorney visiting are within the current visiting parameters: As stated in § 540.205(b), "Regulations and policies previously established under 28 CFR part 543 are applicable."

However, in response to public comment, the final regulations provide new limitations which would be more consistent with the Bureau's resources for monitoring communications. Again, the limitations in the regulation serve as the minimum requirement. Further access may be granted as resources allow, in the discretion of Bureau staff, on a case-by-case basis. The CMUs regulations serve to detail the specific restrictions which may be imposed in the CMU in a way that current regulations authorize but do not detail.

**Restrictions on Unmonitored Communication With Members of the Media Are Not Unconstitutional**

The regulations allow communication with news media (via telephone or writing) "only at the discretion of the warden." Several commenters argued that this language authorized a "complete ban on communication with news media, a result that is unconstitutional under existing case law."

First, we note that the regulations in § 540.203 do not restrict with whom a CMU inmate may correspond. The only restriction in the regulation related to correspondence is as follows: The regulations state that "[s]pecial mail, as defined in Part 540, is limited to privileged communication with the inmate's attorney." § 540.203(b). This means that any correspondence with representatives of the news media will be subject to the level of inspection given to other general mail correspondence. There will be no unmonitored communication with news media representatives.

Second, it is true that inmates in CMUs may not have unmonitored telephone communication with news media representatives. The regulation states that "[u]nmonitored telephone communication is limited to privileged communication with the inmate's

attorney. Unmonitored privileged telephone communication with the inmate's attorney is permitted as necessary in furtherance of litigation, after establishing that communication with the verified attorney by confidential correspondence or visiting, or monitored telephone use, is not adequate due to an urgent or impending deadline." § 540.204(b).

Contrary to the commenters' assertions, prison officials are not required to permit and accommodate confidential, unmonitored communication between inmates and news media representatives. Previous case law has not afforded news media any greater right of access to inmates than that of the general public. *See, e.g., Houchins* v. *KQED,* 438 U.S. 1, 16 (1978) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. . . . [T]he media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally."); *Saxbe* v. *Washington Post Co.,* 417 U.S. 843 (1974) (upholding regulation prohibiting face-to-face interviews with certain inmates); *Pell* v. *Procunier,* 417 U.S. 817 (1974) (regulation imposing conditions for press interviews of inmates did not unconstitutionally interfere with rights of inmates or the media) ; *Johnson* v. *Stephan,* 6 F.3d 691 (10th Cir. 1993). Rather, as made clear in these cases, news media representatives are entitled to no greater prisoner access than the general public. Inmate communications with news media representatives are governed by regulations in 28 CFR part 540, subpart E.

### The Regulation Contains No "Absolute Ban" on Communication With Clergy, Consular Officials, or Non-Immediate Family Members

Some commenters stated that the proposed regulation's limitations on communication with clergy and other religious communications violate the Religious Freedom Restoration Act, 42 U.S.C. 2000bb (2006) (hereinafter "RFRA"); others suggested that restrictions on visitation violated inmates' due process rights. These and other commenters also stated that the regulations impose an "absolute ban" on communications with clergy and non-immediate family members. One commenter also stated that these regulations violate Article 36 of the Vienna Convention on Consular Relations (1969), which gave "consular officers" the "right to visit a national of

the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention . . ." The same commenter likewise stated that the regulations impose a "total ban" on communication with "most family members," citing 28 CFR 540.44(a), which defines immediate family members as being "mother, father, step-parents, foster parents, brothers and sisters, spouse, and children."

There is no such "absolute ban". inmates in CMUs are not prohibited outright by these regulations from communicating with clergy, consular officials, or non-immediate family members. These regulations represent a "floor" beneath which communications cannot be further restricted. Communication restrictions are tailored to the security needs presented by each CMU inmate, on a case-by-case basis. The regulations contain no ban on written correspondence with these groups, nor any outright ban on telephone calls or visits with these groups, only stating that "monitored telephone communication *may* be limited to immediate family members only" (§ 540.204(a)), and that "regular visiting *may* be limited to immediate family members" (§ 540.205(a)) (emphasis added), not that it will, in fact, be so limited in every case.

Any such restrictions imposed on an inmate's access to clergy do not violate RFRA. RFRA "provides that government may substantially burden a person's exercise of religion only if it demonstrates that the burden is in furtherance of a compelling governmental interest, and is the least restrictive means of furthering that interest." 42 U.S.C. 2000bb–1 (2006). The interest of protecting the security of the facility is a legitimate penological interest that has been consistently upheld by the Supreme Court. *Sandin* v. *Conner,* 515 U.S. 472, 484 (1995); *Block* v. *Rutherford,* 468 U.S. 576, 586 (1984). The Senate Report on RFRA also recognized security of the institution as an interest of the "highest order." S. Rep. 103–111, S. Rep. No. 111, 103rd Cong., 1st Sess. 1993, 1993 U.S.C.C.A.N. 1892, 1899, 1993 WL 286695, 10 (Leg. Hist.) The Bureau has a compelling interest to ensure the safety, security, and orderly operation of Bureau facilities, and protection of the public.

Also, inmates in CMUs are provided the services of Bureau chaplains upon request, per 28 CFR 548.12, for religious care and counseling, thus providing inmates in CMUs an opportunity to

engage in communications with clergy. As discussed below, inmates in CMUs are permitted to engage in religious practices and services. Any limitation on the access to clergy is, therefore, not unduly restrictive and satisfies RFRA.

In comments on the restrictions on visiting, some commenters suggested that the restrictions violated the inmates' due process rights, citing *Overton* v. *Bazzetta,* 539 U.S. 126 (2003). In that case, the Supreme Court concluded that there was no violation even though the inmates in that case were denied visiting in certain circumstances because the restrictions were related to penological interests and alternatives were available. *Id.* at 135–36 (noting that telephone and letter communication were available alternatives). Although telephone and visiting contact *may* be limited to immediate family members in these regulations, written correspondence is not limited in this way. Therefore, even if an inmate were to have such restrictions on telephone and visiting contact with the above-mentioned groups, that inmate may correspond in writing with them, within the limits of current regulations, as an alternative method of communication.

### No-Contact Visitation in the CMU Is Constitutional Under the First Amendment

Several commenters stated that the CMU's no-contact visitation policy has significantly impacted the ability of inmates in CMUs to maintain close and personal relationships with family members, which results in emotional hardships and psychological issues for both the inmate and the visitor(s). These commenters believe that the no-contact visitation policy violates the inmates' right to free association contained in the First Amendment.

*First Amendment rights.* Generally, claims of violation of First Amendment rights must be analyzed in light of the policies and goals of the prison. *Pell* v. *Procunier,* 417 U.S. 817, 822 (1974) ("[C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."). A prison regulation or policy that "impinges on an inmates' constitutional rights . . . is valid if it is reasonably related to a legitimate penological interests." *Turner* v. *Safley,* 482 U.S. 78, 89 (1987); *Overton* v. *Bazzetta,* 539 U.S. 126, 132 (2003).

As described above, several factors are relevant to the reasonableness inquiry:

First, there must be a "valid, rational connection" between the regulation and the objective set forth to justify it. *Turner*, 482 U.S. at 89. A second factor to consider is whether the inmate has an alternative means of exercising the restricted right. *Id.* at 90. A third factor to consider is the impact of accommodating the asserted right on prison staff, other inmates, and prison resources. *Id.* Last, courts should consider whether the restriction is an "exaggerated response" that ignores alternatives that accommodate the inmate's constitutional rights at a de minimis cost to legitimate penological interests. *Id.* at 90–91. The Supreme Court has recognized the particular importance of the first of these factors, explaining that in a given case, the second, third, and fourth *Turner* factors may "add little, one way or another, to the first factor's basic logical rationale." *Beard* v. *Banks*, 548 U.S. 521, 532 (2006).

*There Is a Rational Connection between the Regulation and Its Objective*

The purpose of the limitation on contact visits is to effectively monitor the communications of high-risk inmates in order to ensure the safety, security, and good order of Bureau institutions and protection of the public. Security of a facility has been recognized as a valid interest in not permitting contact visitation for pretrial detainees. *Block* v. *Rutherford*, 468 U.S. 576, 586 (1984) ("[T]here is no dispute that internal security of detention facilities is a legitimate governmental interest . . . That there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion."). Deference is given to the judgment of prison authorities in devising the policies and practices that further legitimate penological interests. *Id.* at 589.

In *Block* v. *Rutherford,* the Supreme Court addressed a due process challenge to a ban on contact visits between pretrial detainees and their family members and friends. 468 U.S. 576, 578 (1984). Because the case arose in the context of a challenge brought by pretrial detainees, who may not be "punished prior to an adjudication of guilt in accordance with due process of law," the Court asked whether the restriction on contact visits was punitive. *Id.* at 583–84 (internal quotation marks omitted). In making this determination, the Court considered whether the restriction was "reasonably related to a legitimate governmental objective," because if so, "it does not,

without more, amount to punishment." *Id.* (internal quotation marks omitted).

The Court found the ban on contact visits helped to prevent the introduction of contraband and reduced the possibility of violent confrontations during visits, and as a result, promoted the legitimate governmental objective of maintaining the internal security of the prison. *Id.* at 586. Once the Court decided that the restriction on contact visits did not qualify as punishment, its analysis ended, as there was no suggestion that the Constitution might independently provide a right to contact visits. Rather, the Court held "the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility." *Id.* at 589.

In *Overton* v. *Bazzetta*, 539 U.S. 126 (2003), the Supreme Court rejected a claim that restrictions on visitation violated the right to association of prisoners and their families under the Due Process Clause and First Amendment. The inmates who challenged the restrictions were all subject to no-contact visitation. *Id.* at 130. The prisoners were required to "communicate with their visitors through a glass panel," and had no opportunity for any physical contact. *Id.* The Third Circuit has explained that "nothing in *Overton* suggests that non-contact visitation is, by itself, constitutionally suspect; to the contrary, the Court upheld additional restrictions affecting those subject to non-contact visitation." *Henry* v. *Dep't of Corrections*, 131 Fed. Appx. 847, 850 (3rd Cir. 2005). The *Overton* decision is also consistent with the Supreme Court's previous holding in *Block* v. *Rutherford* that upheld a blanket ban on contact visits for pretrial detainees. 468 U.S. 576, 578, 586 (1984).

By limiting the contact visits of inmates housed in the CMU, the Bureau seeks to balance First Amendment rights with its correctional mission and the special mission of the CMU. The Bureau has made a judgment that communications between the inmates housed in the CMUs and their visitors must be strictly monitored because the inmates meet one or more of the designation criteria listed in § 540.201. The reasoning for the restrictions is rationally related to the legitimate governmental interest in preserving security, as communications could be easily passed without strict monitoring through a no-contact visit.

*There Are Alternative Means of Exercising the Restricted Right*

Addressing the second *Turner* factor, we note that the alternatives to contact visitation are other forms of First Amendment expression. The *Turner* Court looked at whether the inmates were deprived of "all means of expression." *Turner*, at 92. Inmates in the CMU, however, are granted no-contact visitation privileges for at least 4 one-hour visits each month (expanded from the proposed four limitation of one one-hour visit). Further, inmates are permitted to maintain relationships through mediums other than visiting, such as through monitored correspondence, including carefully monitored email (which we have increased from one per calendar week in the proposed rule to two per calendar week), and telephone calls (which we have increased from one per month to three per month). These alternatives are sufficient forms of communication that meet the *Turner* test.

*There Is a High-Risk Impact of Accommodating the Asserted Right on Prison Staff, Other Inmates, and Prison Resources*

The third *Turner* factor directs us to examine the impact of permitting the exercise of the asserted right and analyzing its impact. Permitting contact visiting would create a security threat to the staff and the public as a whole. The inmates housed in CMUs are segregated from the rest of the general population and are housed there for a specific reason. The CMUs are general population units designed to closely monitor inmates for whom such monitoring and communication limits have been determined necessary. Such inmates include those for whom communication limits are necessary due to a terrorist link, and also for those who are engaged in activities that threaten the security of the institution or endanger the public. Contact visiting would provide inmates who are at risk for communication threats with opportunities for passing along unauthorized communications.

*Alternatives Were Considered*

Finally, the fourth *Turner* factor requires consideration of whether alternatives have been considered. Some commenters suggested alternatives to no-contact visiting. The suggested alternatives did not adequately serve the legitimate penological purpose of ensuring the safety of the institution and the public. Some commenters suggested contact visitation in the attorney-client room so that the visit could be live

monitored and recorded at a small cost to the prison. This is not an adequate alternative to the no-contact visitation. No-contact visitation is crucial to carefully monitor the transfer of information between the inmates and their visitors. The visitor and the inmate communicate through a telephone apparatus which is connected to the Bureau-wide inmate telephone system. This system, which records the communications and maintains the recordings, is used in all Bureau facilities and maintains records of all inmate telephone calls. This system is a reliable and powerful tool in the detection and prevention of criminal activities and disciplinary infractions. Monitoring via this system also permits correctional officials to immediately terminate communication taking place on the phone, whereas it is harder to immediately stop a prohibited communication during a contact visit.

Also, the inmate telephone system consists of digital recordings which accurately store the conversations. These digital recordings are easily maintained, retrieved, and used for law enforcement purposes and the detection of disciplinary infractions. Attorney-client visits, however, are *not* audio-monitored and attorneys and their clients do not communicate through the use of a telephone. An alternative means to record the communications between inmates and their visitors would not be as reliable as the inmate telephone system already in place. In addition, no-contact visitation eliminates the danger of introduction of contraband, including drugs and weapons, into the institution.

The CMU restrictions satisfy the *Turner* test. The CMU regulation is rationally related to the governmental interest of preserving the orderly running of the institution and protection of the public by allowing the Bureau to monitor inmate communications with members of the public, while providing inmates with the means to maintain their ties to the community.

### A Prohibition on Contact Visitation Does Not Violate the Eighth Amendment

Some commenters stated that no-contact visiting constitutes "cruel and unusual punishment" in violation of the Eighth Amendment of the U.S. Constitution. U.S. Const. amend. VIII.

A punishment violates the Eighth Amendment when it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958). For instance, the Eighth Amendment is violated if there is "deliberate indifference to serious

medical needs of prisoners," *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976); when the conditions are "grossly disproportionate to the severity of the crime warranting imprisonment," *Rhodes* v. *Chapman*, 452 U.S. 337, 347 (1981); or when inmates are deprived of basic human needs. *Hutto* v. *Finney*, 437 U.S. 678 (1978). As the Supreme Court has explained,

Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes*, at 347.

The conditions of confinement present in the CMUs are not grossly disproportionate to the crimes committed by the inmates assigned to it. In fact, the inmates are placed in the CMU specifically because their offense of conviction, offense conduct, disciplinary record or other verified information raised serious concerns about their communications with members of the public and close monitoring of those communications was needed in order to preserve the security of the Bureau institutions and protect the public. As we stated in the proposed rule, under the regulation, inmates may be designated to a CMU if:

• The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

• The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a substantial likelihood to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;

• The inmate has attempted, or indicates a substantial likelihood, to contact victims of the inmate's current offense(s) of conviction;

• The inmate committed a prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or

• There is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

Ultimately, the inmates are not being deprived of basic human needs by not permitting them to have physical contact with family or community members. The inmates are permitted to have visitors, although it is through no-contact visits, write letters, and make telephone calls to their family members, albeit under closer monitoring. Inmates are not completely deprived of all contact with family or community members.

The no-contact visitation policy is a reasonable communication restriction that is within the discretion of prison authorities to implement. It does not approach the level of a cruel and unusual condition of confinement proscribed by the Eighth Amendment.

### Conditions of CMU Confinement Are Not "Atypical and Significant"

Several commenters stated that conditions of confinement in the CMU were "atypical and significant," thereby creating a liberty interest protected by the Due Process Clause.

As discussed above, even where the Due Process Clause does not itself create a liberty interest, the government may create one where a prison restriction imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. In *Sandin*, the Court found that the disciplinary transfer of an inmate for 30 days to solitary confinement "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." 515 U.S. at 486–87; *id.* at 494 (Breyer, J., dissenting) (describing conditions of confinement.) This is because the punishment "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* at 486.

Based on *Sandin*, the D.C. Circuit has sought to define the "ordinary incidents of prison life" for purposes of creating a baseline that can be used to determine whether a particular restriction is atypical and significant. In *Hatch* v. *District of Columbia*, the D.C. Circuit rejected treating the conditions of prison life in the general population as the appropriate baseline. 184 F.3d 846, 856–58 (D.C. Cir. 1999). Instead, *Hatch* explains that the conditions that are imposed in administrative segregation should be used in determining what constitutes the "ordinary incidents of prison life." *Id.* at 855–85.

Accordingly, the determination of what is atypical and significant should be made in comparison with the "most restrictive confinement conditions that prison officials, exercising their

administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences.'' *Id.* at 856. In making this determination, the nature of the restriction and its duration should both be considered. *Id.* at 858.

Under *Sandin* and *Hatch*, the loss of contact visits and reduced time for visits and telephone calls do not constitute an ''atypical and significant'' deprivation. While the Bureau's visiting regulations only require four hours of visitation per month (28 CFR 540.43), inmates in CMUs have been allowed as much as eight hours of visits per month—above the CMU proposed rule's one-hour ''floor'' (which the final rule changes to conform to the current visiting regulation limit of four one-hour visits per month). And consistent with the Warden's authority to ''restrict inmate visiting when necessary to ensure the security and good order of the institution,'' 28 CFR 540.40, Bureau regulations expressly contemplate the possibility that inmates will lose contact visitation privileges based on security concerns. *Id.* § 540.51(h)(2) (noting that ''[s]taff shall permit limited physical contact . . . unless there is clear and convincing evidence that such contact would jeopardize the safety or security of the institution). As described above, the Bureau has made a determination that threats to the security of its facilities and/or the public justify the imposition of no-contact visits.

Inmate telephone use ''is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public,'' and requires only that an inmate who is not on discipline receive one three minute telephone call each month. *Id.* § 540.100(a)–(b); § 540.101(d); *id.* § 540.100(a) (stating that ''[t]elephone privileges are a supplemental means'' of communicating with persons in the community). In contrast, some inmates in CMUs have received more telephone minutes than is required under the agency's regulations. Also, the final rule expands the telephone limitations from one call per month to three calls per month.

In short, the CMU's communication restrictions do not constitute the kind of ''extraordinary treatment'' required to find a government-created liberty interest. *Smith* v. *U.S.*, 277 F.Supp.2d at 113 (no ''atypical and significant'' deprivation due to prison transfer because prisoner was not subject to any extraordinary treatment, but instead transfer was an issue within the ''day-to-day management of prisons.'') (quoting *Franklin* v. *District of*

*Columbia,* 163 F.3d 625, 634–35 (D.C. Cir. 1998)).

## Religious Activities for Inmates in CMUs Are Permitted in the Same Manner as Religious Activities for Inmates Who Are Not in CMUs

Some commenters stated that inmates in CMUs are prohibited from certain religious activities, such as congregational prayers, designated chapel space, limited recognition of voluntary religious fasting, and religious studies.

Inmates in CMUs are permitted to pursue religious activities, including prayers, fasting, and studies, to the extent that it does not threaten the safety, security, or good order of the facility or protection of the public. Policies regarding religious practices are the same in the CMUs as for all other Bureau facilities, as outlined in 28 CFR 548.10–20 and the Bureau's policy on religious beliefs and practices.

Inmates in CMUs are permitted to hold several types of prayer in a similar manner as general population inmates. Congregate prayers are allowed in the CMU. Group prayers led by inmates are subject to constant staff supervision. Those who engage in additional prayers, such as individual prayers for Muslims (the five daily prayers) are permitted to do so in their own cells or in a previously designated area while at work or education or may pray independently at their work station. These inmates are provided an area out of the way, so as to not interfere with other operations or be disturbed themselves.

Also, policy recognizes certain fasts as part of the religious practice and others as personal choice. There is a distinction to be made between fasts which are part of religious practice and those that are personal choice. Fasts which are part of religious practice are recognized as a routine practice in the religion; whereas fasts undertaken by personal choice, or to meet personal religious goals, are sporadic or non-routine fasts that are not recognized as routine practice as part of the religion. Inmates are permitted to fast as they see fit to meet their personal religious goals.

A concern among the commenters was that inmates were not allowed to retain food in their cells from scheduled meals in order to eat the food later after their personal fasts. Bureau national policy on food service prohibits inmates, whether in CMUs or in general population, from removing food from the dining hall, except maybe one piece of whole fruit, due to health concerns and to avoid the spoiling of food items. Inmates have been informed if they

choose to engage in a personal fast, then they choose to skip the scheduled meal(s) and cannot retain food in their cells from the dining hall. However, inmates in the CMU who raise this issue have been informed that they may purchase food items at the institution commissary for retention and later consumption in their cells.

## The Authority of the Assistant Director, Correctional Programs Division, To Approve CMU Designations May Not Be Delegated

Some commenters were concerned that the authority to approve CMU placement might be delegated below the level of Assistant Director.

The Bureau's Assistant Director, Correctional Programs Division, has authority to approve CMU designations. The Assistant Director's decision must be based on a review of the evidence, and a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protection of the public. There is no provision in the regulation that allows for delegation of the Assistant Director's authority.

## Additional Issues Raised During the 2014 Comment Period

The following additional miscellaneous issues were raised during the 2014 comment period.

One commenter requested that we ''[e]dit the language of 540.200(b) to include 'Vocational Technical Training, Unicor (FPI),' after 'unit management,' and before 'and work programming,' in order to incorporate these programs with programs already offered to CMU inmates.'' Section 540.200(b) of the proposed rule states that a CMU ''is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU.'' Vocational technical training is included in this phrase, as part of ''all'' educational and work programming activities. Because it is already included in the general list, we will not include this specific reference.

The same commenter requested that we ''[r]eplace the language of 540.203(a) with 'General Correspondence. General written correspondence as defined by part 540, may be limited to three pieces of handwritten correspondence (8.5 X 11 inches or smaller), double-sided, once per calendar week to and from any party on the inmate's approved contact list and an unlimited amount of typed or computer generated correspondence

mailed to or from any party on the inmate's approved contact list.' The Bureau of Prisons has the ability to scan all written correspondence." Our proposed rule stated that general written correspondence "may be limited to three pieces of paper (not larger than 8.5 x 11 inches), double-sided writing permitted, once per calendar week, to and from a single recipient at the discretion of the Warden, except as stated in (c) below. This correspondence is subject to staff inspection for contraband and for content." In response to comments received requesting expansion of the three-page limitation, in the final rule we double the limitation to six pieces of paper.

Subsection (c) of this regulation refers to the absence of a volume limitation on mail to and from certain listed correspondents. The commenter would substantively alter this provision to remove "at the discretion of the Warden" in favor of "any party on the inmate's approved contact list." We do not make this change because the Warden may choose to temporarily suspend communications with someone that may be on the inmate's approved contact list for a certain period of time due to a time-sensitive threat, so it is more accurate to say that it is in the Warden's discretion. The commenter would also alter this provision to add inmate electronic correspondence. While we currently allow inmates in CMUs access to electronic correspondence in the same manner permitted for general population inmates, electronic correspondence is not specifically mentioned by regulation because it is currently included under the authority of "general mail" correspondence. We therefore do not make this edit to the regulations.

One inmate stated that "the designation criteria described in section 540.201, sections (a) and (b) permit the BOP to confine and [sic] inmate to a CMU merely on the basis of his offense of conviction. This is unwise policy because, as in my case, an inmate's offense alone provides a very limited glimpse of that individual and what level of security measures he may require." The inmate also stated that the criteria listed in the proposed rule are unlawful "because 18 U.S.C. Sec. 3621(b) requires the BOP to consider five factors when designating a prisoner's place of confinement; these include the offense of conviction, but also, *inter alia*, the history and characteristics of the prisoner and the sentencing court's recommendation." We do not designate an inmate to the CMU solely on the basis of the criteria described in § 540.201. Rather, if a

factor listed in § 540.201 is found to be present, the Bureau's Assistant Director, Correctional Programs Division, is required to conduct a review of the evidence, and make a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protection of the public. This procedure is described in § 540.202(b). The use of the criteria listed in § 540.201 does not preclude consideration of the five factors in 18 U.S.C. Sec. 3621(b); rather, it supplements or details that consideration process. The Assistant Director must consider the inmate's circumstances as a whole, not rely solely on the presence of one criteria listed in § 540.201.

The same commenter stated that "[t]he responsibility for designation of inmates for SAMs or SAMs-like restrictions should remain with the Attorney General or FBI and not with the BOP." As we stated in the 2010 proposed rule, this regulation will be applied differently from regulations in 28 CFR part 501, which authorize the Attorney General to impose special administrative measures (SAMs). Under the CMUs regulations, the Bureau would impose communication limits based on evidence from the FBI or another federal law enforcement agency, or if Bureau information indicates a similar need to impose communication restrictions but does not constitute evidence which rises to the same degree of potential risk to national security or acts of violence or terrorism which would warrant the Attorney General's intervention through a SAM. Further, while SAMs potentially restrict communication entirely, CMUs regulations delineate a floor of limited communication beneath which the Bureau cannot restrict unless precipitated by the inmate's violation of imposed limitations, and then only as a disciplinary sanction following due process procedures in 28 CFR part 541.

Several commenters requested that we exempt inmates with ties to animal rights causes from CMU consideration. We will not favor a group of inmates based upon political affiliation or membership in a group, just as we do not discriminate based upon such factors. We will not make these edits.

One commenter stated that the CMU restrictions violate Article 3 of the Geneva Convention. This article applies "in the case of armed conflict not of an international character", which is not applicable in the situation of inmates in CMUs, and refers to "violence to life and person, in particular, murder of all kinds, cruel treatment and torture",

which, also, is inapplicable in this situation. If the commenter's concern is that CMU restrictions are cruel treatment or torture, our analysis of the Eighth Amendment of the U.S. Constitution earlier in this document applies.

One commenter suggested that "a review panel of 9 to 13 members whose majority are U.S. citizens not affiliated with the prison or any federal, state, or county agency (including law enforcement agencies) should be put in place to approve or disapprove of the initial assignment of a prisoner to a CMU and of the continuation of a prisoner's assignment to a CMU after each 28 days spent in a CMU." This suggestion is impracticable because the Bureau does not use, nor is it statutorily authorized to use, citizen groups for federal inmate designation. Two commenters suggested that "CMUs should be required to keep a secure log of all CMU-assignment and CMU-release decisions and the rationale for each decision regarding prisoner assignment or release from a CMU." The Bureau currently maintains such assignment, release and rationale information securely, although not in the "log" form that the commenter suggests. The commenters also suggest that such information about inmates in CMUs "should be made available upon request to family members of the prisoner or to attorneys working on behalf of the prisoner." The commenters would also request that, "[e]ach month a statistical summary of the number of prisoners in CMUs or the number of prisoners moved to or released from a CMU should be made available publicly on an Internet site." Information regarding inmates is protected by the Freedom of Information Act and Privacy Act, and is accessible through procedures authorized by those statutes under 28 CFR part 513, regarding access to records.

Finally, a large number of commenters mistakenly believed that the proposed rule would permit "experimentation" on inmates in CMUs. This is simply untrue. As stated in § 540.200(c), "[t]he purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community." Neither the proposed rule nor the preamble to the proposed rule mention experimentation on inmates, nor does the Bureau intend to conduct experiments on inmates in CMUs.

For the aforementioned reasons, the Bureau finalizes the regulations

proposed on April 6, 2010 (75 FR 17324), with minor changes.

## Executive Order 13563 and Executive Order 12866

This regulation falls within a category of actions that the Office of Management and Budget (OMB) has determined to constitute "significant regulatory actions" under section 3(f) of Executive Order 12866 and, accordingly, it was reviewed by OMB.

The Bureau of Prisons has assessed the costs and benefits of this regulation as required by Executive Order 12866 Section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs. There will be no new costs associated with this regulation. CMUs are set up in currently existing facilities, utilizing currently existing staff and resources, and no new staff and resources are required to implement these regulations. In fact, placing inmates who require communication restrictions together in a CMU decreases costs related to translation, technology use, and use of other such monitoring resources that had previously been spread throughout the Bureau in order to enable communication restrictions on inmate's in general population facilities. CMUs enable the Bureau to pool such resources and concentrate them in the CMU locations. This regulation benefits public safety by minimizing the risk of dangerous communication to or from inmates in Bureau custody. This regulation clarifies the Bureau's current authority to limit and monitor the communication of inmates in CMUs, but maintains the ability of these inmates to maintain family ties and access to courts and other government officials. This permits inmates to raise issues related to their incarceration or their conditions of confinement, while minimizing potential internal or external threats.

## Executive Order 13132

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, under Executive Order 13132, we determine that this regulation does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

## Regulatory Flexibility Act

The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this regulation and by approving it certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This regulation pertains to the correctional management of offenders and detainees committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

## Unfunded Mandates Reform Act of 1995

This regulation will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This regulation is not a major rule as defined by § 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This regulation will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## List of Subjects in 28 CFR Part 540

Prisoners.

**Charles E. Samuels, Jr.,**

*Director, Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C. 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we amend 28 CFR part 540 as follows:

## PART 540—CONTACT WITH PERSONS IN THE COMMUNITY

■ 1. The authority citation for 28 CFR part 540 continues to read as follows:

**Authority:** 5 U.S.C. 301; 551, 552a; 18 U.S.C. 1791, 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

■ 2. Add a new subpart J, to read as follows:

**Subpart J—Communications Management Housing Units**

Sec.

540.200    Purpose and scope.
540.201    Designation criteria.
540.202    Designation procedures.
540.203    Written correspondence limitations.
540.204    Telephone communication limitations.
540.205    Visiting limitations.

## Subpart J—Communications Management Housing Units

### § 540.200   Purpose and scope.

(a) *Purpose of this subpart.* This subpart defines the Federal Bureau of Prisons' (Bureau) authority to operate, and designate inmates to, Communications Management Housing Units (CMUs) within Bureau facilities.

(b) *CMU.* A CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. Additionally, CMUs may contain a range of cells dedicated to segregated housing of inmates in administrative detention or disciplinary segregation status.

(c) *Purpose of CMUs.* The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.

(d) *Application.* Any inmate (as defined in 28 CFR 500.1(c)) meeting criteria prescribed by this subpart may be designated to a CMU.

(e) *Relationship to other regulations.* The regulations in this subpart supersede and control to the extent they conflict with, are inconsistent with, or impose greater limitations than the regulations in this part, or any other regulations in this chapter, except 28 CFR part 501.

### § 540.201   Designation criteria.

Inmates may be designated to a CMU if evidence of the following criteria exists:

(a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

(b) The inmate's current offense(s) of conviction, offense conduct, or activity

while incarcerated, indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community;

(c) The inmate has attempted, or indicates a substantial likelihood that the inmate will contact victims of the inmate's current offense(s) of conviction;

(d) The inmate committed prohibited activity related to misuse or abuse of approved communication methods while incarcerated; or

(e) There is any other substantiated/credible evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

§ 540.202  **Designation procedures.**

Inmates may be designated to CMUs only according to the following procedures:

(a) *Initial consideration.* Initial consideration of inmates for CMU designation begins when the Bureau becomes aware of information relevant to the criteria described in § 540.201.

(b) *Assistant Director authority.* The Bureau's Assistant Director, Correctional Programs Division, has authority to approve CMU designations. The Assistant Director's decision must be based on a review of the evidence, and a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protection of the public.

(c) *Written notice.* Upon arrival at the designated CMU, inmates will receive written notice from the facility's Warden explaining that:

(1) Designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting. The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart;

(2) General conditions of confinement in the CMU may also be limited as necessary to provide greater management of communications;

(3) Designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration. Inmates in CMUs continue to earn sentence credit in accordance with the law and Bureau policy;

(4) Designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate will be provided an explanation of the decision in sufficient detail, unless the Assistant Director determines that providing specific information would jeopardize the safety, security, and orderly operation of correctional facilities, or protection of the public;

(5) Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates;

(6) The inmate may challenge the CMU designation decision, and any aspect of confinement therein, through the Bureau's administrative remedy program.

§ 540.203  **Written correspondence limitations.**

(a) *General correspondence.* General written correspondence as defined by this part, may be limited to six pieces of paper (not larger than 8.5 x 11 inches), double-sided writing permitted, once per calendar week, to and from a single recipient at the discretion of the Warden, except as stated in (c) below. This correspondence is subject to staff inspection for contraband and for content.

(b) *Special mail.* (1) Special mail, as defined in this part, is limited to privileged communication with the inmate's attorney.

(2) All such correspondence is subject to staff inspection in the inmate's presence for contraband and to ensure its qualification as privileged communication with the inmate's attorney. Inmates may not seal such outgoing mail before giving it to staff for processing. After inspection for contraband, the inmate must then seal the approved outgoing mail material in the presence of staff and immediately give the sealed material to the observing staff for further processing.

(c) *Frequency and volume limitations.* Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities:

(1) U.S. courts;
(2) Federal judges;
(3) U.S. Attorney's Offices;
(4) Members of U.S. Congress;
(5) The Bureau of Prisons;

(6) Other federal law enforcement entities; or

(7) The inmate's attorney (privileged communications only).

(d) Electronic messaging may be limited to two messages, per calendar week, to and from a single recipient at the discretion of the Warden.

§ 540.204  **Telephone communication limitations.**

(a) *Monitored telephone communication* may be limited to immediate family members only. The frequency and duration of telephone communication may also be limited to three connected calls per calendar month, lasting no longer than 15 minutes. The Warden may require such communication to be in English, or translated by an approved interpreter.

(b) *Unmonitored telephone communication* is limited to privileged communication with the inmate's attorney. Unmonitored privileged telephone communication with the inmate's attorney is permitted as necessary in furtherance of active litigation, after establishing that communication with the verified attorney by confidential correspondence or visiting, or monitored telephone use, is not adequate due to an urgent or impending deadline.

§ 540.205  **Visiting limitations.**

(a) *Regular visiting* may be limited to immediate family members. The frequency and duration of regular visiting may also be limited to four one-hour visits each calendar month. The number of visitors permitted during any visit is within the Warden's discretion. Such visits must occur through no-contact visiting facilities.

(1) Regular visits may be simultaneously monitored and recorded, both visually and auditorily, either in person or electronically.

(2) The Warden may require such visits to be conducted in English, or simultaneously translated by an approved interpreter.

(b) *Attorney visiting* is limited to attorney-client privileged communication as provided in this part. These visits may be visually, but not auditorily, monitored. Regulations and policies previously established under 28 CFR part 543 are applicable.

(c) For convicted inmates (as defined in 28 CFR part 551), regulations and policies previously established under 28 CFR part 543 are applicable.

[FR Doc. 2015–01024 Filed 1–21–15; 8:45 am]

**BILLING CODE 4410–05–P**

Exhibit 5 – 1 page

USA TODAY ▮ MONDAY, JANUARY 7, 2019 ▮ 3A



## ...ath

...Barnes in Houston

...hours after a rally ...ston Walmart that ...upporters for Jaz-ly. The rally took ...e of the shooting. ...ed after Black was ...ig to use a turn sig-...ange, the Houston ... Deputies search-...ot and soon deter-...ispect in Jazmine's ...aper reported.

...s right to remain si-...orities his story of ...vas shot. He said he ...een driving around ...l a car they thought ...rom earlier in the ... who allegedly fired ...s the pair drove by, ...alize they'd targeted ...until they saw news ...ronicle ' said,   citing

...he Associated Press

## om

# Congress: US prison misconduct regularly 'covered up'

**Kevin Johnson**
USA TODAY

WASHINGTON – Serious misconduct by senior federal prison officials is "largely tolerated or ignored altogether" under a culture in which some were shielded from discipline or even commended for their service by colleagues, according to a new congressional review.

"For high-ranking officers, bad behavior is ignored or covered up on a regular basis, and certain officials who should be investigated can avoid discipline," House investigators concluded in a nine-page report for the Committee on Oversight and Government Reform. The review is the latest rebuke of the Federal Bureau of Prisons where severe staffing shortages, persistent sexual harassment claims and inmate violence have shadowed operations for years.

The Bureau of Prisons did not immediately respond to a request for comment, citing the government shutdown.

In November, the Justice Department's inspector general cited numerous operational "challenges" confronting the sprawling agency as it detailed additional problems in managing its 12,567 female inmates.

"For the seventh consecutive year, the need to more effectively manage the federal prison system was included as a top challenge for the department," Inspector General Michael Horowitz told the same House panel. "Staffing and overcrowding present constant challenges for BOP in carrying out its mission to confine offenders in safe, humane and cost-efficient environments."

> "Documents and testimony also showed disciplinary action was delayed in some cases to allow senior leaders to retire unscathed."
> **Report on prison misconduct**

The congressional review went even further, offering a blistering account of a disciplinary process that often allowed wardens and other senior leaders to operate outside the agency's rules.

"The committee reviewed cases where some individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted or even allowed to retire with a clean record and full benefits before any disciplinary action could apply," the report concluded. "Documents and testimony also showed disciplinary action was delayed in some cases to allow senior leaders to retire unscathed."

Congressional investigators found that 12 misconduct cases against five wardens were opened and closed in one day. The allegations ranged from an assault on an inmate and falsifying records to embezzlement and harassment.

In every case, according to the congressional review, the complaining parties were never notified of the cases' resolutions.

The review cited two specific cases involving two wardens, one accused of "persistent" sexual harassment of a female subordinate and the other accused of protecting a top lieutenant from separate harassment allegations. Neither of the wardens was identified by name.

In one case, a prison psychologist reported that she was so "creeped out" by the repeated advances by a warden identified as "Employee A" that she appealed to a captain in 2017 to intervene.

The captain, according to investigators, reported the harassment to a regional director who ordered the captain to fly to her office where the director "berated him and defended the warden over the course of a two-hour meeting."

"I know everything, I see everything," the director reportedly told the captain. "(I am) aware that (the warden) has allegations of sexual harassment at all of the institutions that he has been to, and he is still sitting in the warden's chair! People need to realize that and get over it!"

## Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief, and I declare that the following is true and correct under penalty of perjury pursuant to 28 U.S.C. §1746 on this 16th day of September, 2019:

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case 18-cv-10836-PGG pending before The Honorable U.S. District Court for The Southern District of New York.

2. Today I received the "Copout response" exhibited as Exhibit 1 of this filing in answer to my previous written request to mail copies of the letter declaration that I already mailed to The Court on September 12th, 2019, to Senator Schumer, Senator Grassley, Attorney General Barr, and Acting Director Katherine Hawk Sawyer.

3. While unsigned, the response was most likely authored by or at the direction of Ms. Katherine Siereveld of the FCI Terre Haute Legal Department, to which department my original request was addressed and I say this based on my months of experience in the FCI Terre Haute communications-management unit (CMU).

4. There is no rule that has ever been presented to me in any section of CFR, FBOP program statement, section of United States Code, or binding federal court precedent that prohibits inmates--even CMU inmates--from using the names of other inmates in their correspodence and I have asked on multiple occasions for written copies of all such rules.

5. The print-out of 28 CFR Part 540 Subpart J included in this filing as Exhibit 2 was printed earlier today in the FCI Terre Haute CMU law library by me.

6. The "Copout response" exhibited as Exhibit 1 of this filing was handed directly to me earlier today by Ms. J. Wheeler of the FCI Terre Haute CMU unit team in her official capacity as an agent of the defendants in the above-mentioned case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Monday, September 16th, 2019.

Martin S. Gottesfeld

III.   **CONDITIONS OF CONFINEMENT:**

A.   **Minimum Conditions:**

1.   **Cell Assignments:** CMU inmates will ordinarily be housed in cells with double bunk capability. Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status. Cells numbered 8-13 are designated as segregation housing for CMU inmates placed in administrative detention status or disciplinary segregation status.

2.   **Personal Hygiene:** Inmate showers will be available daily. Clean, serviceable clothing will be issued to each inmate upon his arrival to the unit. Unit laundry service will be available for issued clothing on Monday, Wednesday, and Friday for inmates in CMU SHU only. CMU inmates are responsible for laundering their own clothing. Barber services in CMU will be conducted within the unit.

3.   **Meals:** All inmate meals will be served and consumed in the unit dining area. Food from the food service line may not be removed from the dining hall or stored in the inmate's cell.

4.   **Education/Recreation Services:** Inmates will ordinarily be permitted to leave their cells and recreate in the unit daily from 6 a.m. to 9:15 p.m., except during counts. A basic leisure and electronic law library are located within the unit. A photocopier has been provided for inmate use at their expense.

Inmates may only participate in one hobby craft category at a time, with no more than three (3) hobby craft projects under that category at a time. Inmates may store supplies sufficient to complete a current in cell project. Completed hobby craft items must be logged and stored in the provided storage area until the inmate is stepped out of, or released from, the CMU.

Earphones will be utilized when playing radios or watching television at all times. The inside recreation rooms will contain various aerobic exercise equipment.

5.   **Personal Property:** Inmate personal property must be stored inside their assigned locker. Inmates are allowed to maintain up to three cubic feet of legal material in their cell. Temporary additional space for active litigation material may be requested from the Unit Team.

6.   **Commissary/Trust Fund Operations:** Each inmate will be afforded the opportunity to purchase allowable items from the Commissary if funds are available in the inmate's commissary account. Commissary purchase forms will be issued on Tuesday of each week. After completion of the forms, they will be forwarded to the commissary for processing by close-of-business each Wednesday. Commissary items will be delivered to the

unit by commissary staff on Thursday of each week. Any special purchases (personal radios, etc.) must be approved by the Unit Manager. Commissary items will be neatly stored in the assigned locker ONLY. Under no circumstances are commissary items to be stored on the floor. Items not contained in their original container are considered contraband and will be confiscated. Original containers are to be disposed of when empty and will not be used for other purposes.

7. **Religious Services**: Religious service participation and study opportunities will be provided in the unit. All communication with religious services providers from the community will be monitored as indicated in Section (C) of this Institution Supplement, depending on the means of communication used. Inmates in the CMU will be allowed to attend scheduled services and activities in the Chapel, and to engage in congregate prayer in the Chapel, any time they are released from their cells. Inmates may not deliver a sermon or lead a class/study group unless authorized to do so through Religious Services. Two or more inmates are not authorized, for any reason, to be in a cell at the same time.

8. **Medical Care**: Health Services staff will provide sick call in the unit seven days a week. Medications will be delivered and/or administered in the unit twice daily. Inmates may request to be seen by a medical provider in the unit's private examination room. Specialized services may be provided in the institution's main health services units as needed, under conditions which ensure CMU inmates will not have contact with non-CMU inmates.

9. **Mental Health Care**: Psychology staff will provide CMU inmates an initial psychological assessment within fourteen (14) days of arrival in the unit. Mental health services thereafter will occur according to national policy. Inmates may request to be seen by a psychology staff member in the unit in a private area.

10. **Sanitation**: CMU inmates are responsible for sanitation of their living areas. Unit orderly job assignments will be assigned by members of the Unit Team.

11. **Work Assignments**: Work assignments will include orderlies for unit sanitation, food service, laundry, education, commissary, and recreation. Work assignments will be assigned by members of the Unit Team.

12. **Restrictive Housing**: The cells designated as "special housing" within the CMU will follow all policies and procedures in PS 5270.11, Special Housing Units.

B. **Admission & Orientation**: The Unit Manager is responsible for administering Admission and Orientation (A&O) in compliance with national policy. The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior and programs available. All items on the A&O

Attachment A
THX-5321.07C

## <u>Acknowledgment of Conditions for</u><br><u>Visiting with Inmates in D-Unit,</u><br><u>FCI Terre Haute</u>

_____, _____, an inmate housed in D-Unit at the Federal
   (Inmate Name)        (Reg. No.)

Correctional Institution (FCI), Terre Haute, Indiana, requests your name be placed on his
approved visiting list.

As a condition of being placed on this inmate's approved visiting list, you agree to the
following conditions:

(1)    All communication between you and the inmate during the visit will be subject to
        monitoring and recording by Bureau of Prisons staff;

(2)    Your conversations with the inmate during the visit will occur in English-only,
        unless previously scheduled for, and conducted through, simultaneous translation
        monitoring; and

(3)    Monitored conversations where either party speaks in non-English will be
        immediately terminated by the staff monitor unless previously scheduled and
        being conducted through simultaneous translation monitoring.   In such cases,
        inmates may be subject to disciplinary action, and you may be removed from the
        inmate's approved visiting list.

_____

Signature

_____

Date Signed

_____

Printed Name

ottesfeld
2982-104
rectional Institution

, IN 47808



TRACKING #

0722 4072 3908 27

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

Monday, September 16th, 2019, <u>Houston v. Lack, 487 U.S. 266 (1988)</u>





RECEIVED
OCT 01 2019
PRO SE OFFICE