UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10-1-19

| Martin S. Gottesfeld, pro se, |
| Plaintiff |
| - against - |
| Hugh J. Hurwitz, et al. |

Civil No.: 18-cv-10836-PGG

SECOND SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER
PROTECTING PLAINTIFF'S RIGHT TO PUBLISH

Plaintiff Martin S. Gottesfeld (herein "plaintiff"), acting pro se,
hereby supplements his previous MOTION FOR A TEMPORARY RESTRAINING ORDER
PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 68), his previous MOTION FOR A
DECLARATORY JUDGMENT PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 69), and
his previous SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING
PLAINTIFF'S RIGHT TO PUBLISH (mailed and filed pursuant to Houston v. Lack,
487 U.S. 266 (1988) on Monday, September 16th, 2019, in an envelope bearing
U.S. Postal Service (USPS) tracking number 9114 9023 0722 4072 3908 27). The
plaintiff hereby reincorporates by reference all of his previous arguments
from all of his previous motions for relief pursuant to Fed. R. Civ. P. 65.

In support of the plaintiff's motions, he provides the following three
(3) exhibits herewith and he requests that The Honorable Court take judicial
notice of each pursuant to Fed. R. Evid. 201(c)(2):

• Exhibit 1 (3 pages), Declaration of Martin S. Gottesfeld;

• Exhibit 2 (5 pages), BP-9 FBOP REQUEST FOR ADMINISTRATIVE REMEDY form,
marked "Sensitive," and dated November 21st, 2018, redacted; and

• Exhibit 3 (5 pages), BP-9 FBOP REQUEST FOR ADMINISTRATIVE REMEDY form,
additional, also marked sensitive and dated November 21st, 2018, redacted.

As noted in Exhibit 1, the existence of Exhibit 2 and Exhibit 3 and the
allegations therein speak to the illegitimate purposes of the defendants'
unconstitutional obstruction of the plaintiff's right to publish and the lack
of available alternatives for the plaintiff to exercise his First-Amendment

rights, as do the very recent events detailed in the FCI Terre Haute CMU in Exhibit 1.

Should The Honorable Court be left with any questions before it grants the relief requested, then the plaintiff respectfully renews his motion for a hearing.

Respectfully mailed on Sunday, September 22nd, 2019, pursuant to Houston v. Lack, in an envelope bearing sufficient pre-paid first-class U.S. postage affixed and handed to Ms. J. Wheeler of the FCI Terre Haute CMU Unit Team for mailing to The Court in her official capacity as an agent of the defendants, bearing USPS tracking number 9114 9023 0722 4072 3908 89,

Martin S. Gottesfeld, pro se
Federal Registration Number 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, certify that on Sunday, September 22nd, 2019, I mailed a copy of the foregoing document to counsel for the defendants in the above-captioned case pursuant to Houston v. Lack, 487 U.S. 266 (1988) by handing said copy in an envelope bearing sufficient pre-paid first-class U.S. postage affixed to Ms. J. Wheeler of the FCI Terre Haute CMU Unit Team for mailing in her official capacity as an agent for the defendants,

Martin S. Gottesfeld, pro se

Exhibit 1

## Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 22nd day of September, 2019, and I declare that the following is true and correct pursuant to 28 U.S.C. §1746:

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case of 18-cv-10836-PGG pending before The Honorable U.S. District Court for The Southern District of New York (hereafter "the case").

2. On Friday, September 20th, 2019, after the FCI Terre Haute Legal Dept. read my letter declaration to Senate Minority Leader Charles Schumer and others and responded thereto as detailed in my previous SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING PLAINTIFF'S RIGHT TO PUBLISH, Mr. Leon Davis, who is mentioned in my letter declaration, was let out of the SHU and lasted mere minutes before he was "sucker punched" by a violent Muslim extremist who considers him an apostate.

3. Mr. Davis was taken out of the CMU for medical care and returned to the FCI Terre Haute CMU SHU later Friday night.

4. These events were easily foreseeable, and, indeed, explicitly foreseen in my letter declaration to Senator Schumer, in which I noted that Mr. Davis is outnumbered, that multiple extremists would do him harm as an apostate, and that rather than segregate such violent actors, the CMU administrators are punishing Mr. Davis by holding him in the SHU here for over a month.

5. Prior to releasing Mr. Davis from the SHU here, only one (1) of the group of potentially-violent radical Muslim extremists who foreseeably would have wished to harm Mr. Davis was segregated. The others--intentionally--were not.

6. It thus appears--and I now believe--that Mr. Davis was set-up by FBOP administrators to be attacked even though FBOP administrators knew beforehand of the dangers to which they subjected him.

7. Mr. Davis could have been killed, as indeed happened to Mr. Robert David Neal here last November--less than a year ago.

8. Mr. Davis now remains in the SHU while other violent extremists who wish him harm move about freely in the CMU.

9. I am not sure why the CMU administration did what it did on Friday to Mr. Davis, but there are several possible motives, any one or combination of which, as well as others unknown to me, could've been operative.

10. The CMU administration could have been trying to justify its original placement of Mr. Davis in the SHU--as opposed to those who would attack him--with the intention of omitting its omission to overseers, i.e. by saying that they have now tried to release Mr. Davis from the SHU and that they did segregate the known risk but that he was nonetheless attacked anyway, when in reality they chose not to segregate most of the known dangers.

11. The CMU administrators could have been "horse trading," so to speak, by waiting to see who actually attacked Mr. Davis so that they could then have a documented reason to transfer additional inmates to ease possible conflicts in orders to keep specific inmates separated since it is not always possible to honor all such orders with two (2) CMUs.

12. The CMU administration could have been retaliating against Mr. Davis.

13. The CMU administration could have been trying to dissuade me from future advocacy on behalf of Mr. Davis and others.

14. The inmate who "sucker punched" Mr. Davis recently won his direct appeal and had a likely-meritorious lawsuit for the time he served on a now-vacated sentence. Now, however, he can be charged with a separate crime that would likely frustrate that lawsuit while Mr. Davis is likely being stopped from timely filing the BP-8 he would need to preserve his later access to the courts to litigate the assault that he just endured since CMU SHU inmates are denied access to their legal work and writing impliments as a matter of course here.

15. The CMU administration could have hoped to convince Mr. Davis to do whatever they may like him to do in order to get them to protect him, in which case I feel they are proverbially barking up the wrong tree with Mr. Davis.

16. It now appears that the high-level FBOP administrators, including those named in the beginning of my letter declaration to Senator Schumer, are trying to scapegoat lower-level administrators for the failure to segregate properly the multiple inmates who would harm Mr. Davis, and I note the federal-employee whistleblower-protection laws that should protect any such possible scapegoats from the consequences of their superiors' actions and omissions: 5 U.S.C. §§ 2302(b)(8), 2302(b)(9), 2302(b)(10), 2302(b)(13), 2302(c)(1)(B), 2302(c)(2)(C), 2302(c)(3), 2302(c)(4), 2302(f)(1), 2302(f)(2), and the footer-text of 2302(b); 5 U.S.C. §§ 2301(b)(4) and 2301(b)(9); and 5 U.S.C. §1221.

17. The BP-9 forms exhibited as Exhibit 2 and Exhibit 3 of this filing were lodged after the murder of Mr. Neal last November. Their author practices neither Christian nor Muslim faith.

18. While clearly nothing can excuse the conduct of Mr. Hamrick, Exhibit 3 perhaps helps to explain its genesis.

19. There is good-faith disagreement as to whether the Muslim inmates were intentionally being disruptive to the Christian service mentioned in Exhibit 3, but it was objectively unreasonable to allow the schedules of the two (2) services to overlap--especially in this environment.

20. In light of Exhibit 3 and other information brought to the coauthors' attention, part 3 of The CMU Series should be amended as follows in paragraphs twenty-one (21) through twenty-four (24) inclusive below.

21. D.E. 69 at 17, "if Neal's warnings were heeded" should instead read, "if Neal's warnings and those of at least 1 other inmate were heeded."

22. D.E. 69 at 17, "He unsuccessfully tried to alert the DOJ" should instead read, "They unsuccessfully tried to alert the DOJ".

23. D.E. 69 at 17, "But he was apparently ignored until his predictions came true" should instead read, "But they were apparently ignored until their predictions came true."

24. Just prior to the paragraph found on D.E. 69 at 18 that starts, "¶The chaplain mentioned by Cox..." a new section should be inserted that reads, "¶There is some disagreement as to what ignited the violence, with an inmate who is neither Muslim nor Christian attributing it to the intentional and unnecessary scheduling overlap of the Christian and Muslim services and a confrontation between the chaplain mentioned by Cox--who controlled that schedule--and the leader of the Muslim prayer group over its volume level.

Others back the chaplain, saying that the participants in the Muslim service were intentionally disruptive and aggressive, and that for a long time Hamrick and possibly others had been planning violence for Veterans' Day in hope of making the news. They say the chaplain was advocating for respect between faiths.¶The Christians, the secular inmates, and the non-radical Muslims agree though that nothing could justify either the scheduling overlap of the religious services or Hamrick's acts. Clearly, however, the scheduling overlap itself did not physically harm anyone."

25. Based upon my experience as a journalist, I believe that the events detailed above and the documents exhibited in this filing as Exhibit 2 and Exhibit 3 speak to the illegitimate purposes of the defendants in the case in their obstruction of my ability to publish.

26. Without the intervention of a U.S. court, there are no available alternatives for me to exercise my First-Amendment rights and this is obviously the unconstitutional design of the defendants in the case and their parties in privity.

27. It's now been almost a year since Mr. Neal's murder and little has happened as a result. The FBOP personnel, including defendant Hurwitz, who are most responsible for allowing that murder to occur are highly motivated to keep it that way, the Constitution notwithstanding.

28. It has come to my attention that prior to the release of John Walker Lindh from the FCI Terre Haute CMU, the off-site CMU administrators likely leaked documents regarding the likelihood he would re-offend while at the same time they were suppressing from the public all knowledge of Mr. Neal's murder on their watch.¶ This too illustrates the illegitimate purpose of the unwritten rules/ex-post-facto enforcement employed by the defendants in the case and their parties in privity in order to curtail my ability to publish about these events and the lack of alternative options for me to exercise my First-Amendment rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Sunday, September 22nd, 2019.

Martin S. Gottesfeld

Exhibit 2



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

☑ Institution   ☐ Region   ☐ Central
*CMU* _____ Unit

# Receipt of
# Administrative Remedy

Inmate Name: [Name Redacted] _____    Reg. No.: [Reg. No. Redacted]

Administrative Remedy No.: [Admin. Rem. No. Redacted]

Received on this ___29___ day of ___JAN___, 2019.

EKeller / _____ IRS

Signature/Title of Staff

If Administrative Remedy is allowed to be resubmitted, it is due to a Unit Team staff
member by _____, 2019.

Edits received by Unit Team on this _____ day of _____, 2019.

_____

Signature/Title of Staff

**Inmate Copy**

[Name and Reg. No. Redacted]
TERRE HAUTE FCI     UNT: CMU     QTR: D04-040L
4200 BUREAU ROAD NORTH
TERRE HAUTE,  IN 47808

Remedy No.: ~~█████████~~                          FCC Terre Haute, IN

---

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted November 28, 2018, in which you allege staff misconduct. As relief, you request the staff member be removed from their position and charged criminally.

All staff are held to a high standard of treating inmates fairly, impartially, and humanely. Mistreatment of inmates is not tolerated.  Therefore, this matter will be thoroughly reviewed and if it is determined staff acted inappropriately, this issue will be forwarded to the proper investigative authority.  However, you will not receive information regarding the outcome of any staff investigation.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Tower II, Suite 800, Kansas City, Kansas 66101.  Your appeal must be received within 20 calendar days of the date of this response.


_1-25-19_
Date

J. R. Bell, Warden

U.S. DEPARTMENT OF JUSTICE   *Sensitive*   REQUEST FOR ADMINISTRATIVE REMEDY

Federal Bureau of Prisons

*Type or use ball-point pen. If ~~~~~ are needed, submit four copies. Additional instructions on reverse.*

| From: [Name Redacted] | [Reg. No. Redacted] | CMU/D | FCI Terre Haute |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST**  On 10 November 2018, one inmate was murdered and another was wounded by a third inmate, all housed in CMU Terre Haute. This incident is a direct result of the mixing of custody levels and Unit Manager Thomas' failure to act on information received nearly six months prior. Information that would have prevented this tragic loss of life.

Between four and six months previously (May-July), I, concerned at the high levels of tension and hostility within CMU, notified, in writing and verbally, Unit manager Thomas that something needs to be done to ease the pressure building in the unit. That conversation included a list of easily implemented options. I specifically stated that the situation was so dire that if no actions was taken, then it was an absolute certainty that an inmate or staff member would be murdered by years end. It was a thorough analysis of the situation at the time and its inevitable outcome.

See attached

| 21 Nov 2018 | [Signature Redacted] |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B- RESPONSE**

RECEIVED
NOV 2 8 2018

| DATE | WARDEN OR REGIONAL DIRECTOR |
|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                                CASE NUMBER: ▓▓▓▓▓▓▓▓

                                                          CASE NUMBER: ▓▓▓▓▓▓▓▓

**Part C- RECEIPT**

Return to: _____
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) | |
|---|---|---|

USP LVN                        PRINTED ON RECYCLED PAPER                    BP-229(13)
                                                                            APRIL 1982

Sensitive    BP-9

Whether through negligence or incompetence, the result was the same. One dead inmate. With actionable intelligence in hand and ample time to impliment any positive course of action, there is is no excuse reasonable enough to justify Unit manager Thomas' failure to perform her primary duty: to ensure the safety and security of the staff, facility, and the inmates.

As a remedy, it is strongly recommended that Unit manager Thomas be removed from her current position of authority.

Given that her negligence or incompetence has resulted in the loss of life, making her complicit, if not culpable, in a murder, it is further recommended that consideration be given to the criminal charge of negligent homicide being levied against Unit manager Thomas.

Exhibit 3



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

| ☑ Institution | ☐ Region | ☐ Central |
|---|---|---|
| _CMU_ Unit | | |

# Receipt of
# Administrative Remedy

Inmate Name: [Name Redacted]          Reg. No.: [Reg. No. Redacted]

Administrative Rem   [Admin. Rem. No. Redacted]

Received on this ___29___ day of ___JAN___, 2019.

_Ehaller / Ehallee   IRS_
Signature/Title of Staff

If Administrative Remedy is allowed to be resubmitted, it is due to a Unit Team staff member by _____, 2019.

Edits received by Unit Team on this _____ day of _____, 2019.

_____
Signature/Title of Staff

# Inmate Copy

[Name and Reg. No. Redacted]

TERRE HAUTE FCI        UNT: CMU      QTR: D04-040L
4200 BUREAU ROAD NORTH
TERRE HAUTE,   IN 47808

Remedy No.: ~~████████~~                    FCC Terre Haute, IN

---

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted November 28, 2018, in which you allege staff misconduct. As relief, you request the staff member be barred from the Communication Management Unit and charged criminally.

All staff are held to a high standard of treating inmates fairly, impartially, and humanely. Mistreatment of inmates is not tolerated. Therefore, this matter will be thoroughly reviewed and if it is determined staff acted inappropriately, this issue will be forwarded to the proper investigative authority. However, you will not receive information regarding the outcome of any staff investigation.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Tower II, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.


_____1-25-19_____                    _____
Date                                 J. R. Bell, Warden

**U.S. DEPARTMENT OF JUSTICE**         *Sensitive*            **REQUEST FOR ADMINISTRATIVE REMEDY**
Federal Bureau of Prisons

*are needed, submit four copies. Additional instructions on reverse.*

From: [Name Redacted]                    [Reg. No. Redacted]   CMU/D   FCI Terre Haute
　　　　LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.         UNIT      INSTITUTION

**Part A– INMATE REQUEST**   On 10 November 2018, Chaplain Wood instigated a religious conflict that resulted in the death of one inmate, the wounding of another, and the lock down of the entire unit.

Earlier in the year, Chaplain Wood shifted the time of the saturday Christian service. On 03 Nov 2018, the clocks shifted back one hour for daylight savings time. This resulted in the Muslim Dhur prayer shifting back one hour, putting it in line with the Christian service.

The Chaplain service contracted by the BoP is required to manage schedules for the various religious faiths in a way that minimizes overlapping services. Chaplain Wood was not ignorant of his duty to deconflict the scheduled services, yet through malice or neglect, he failed to do so.

　　　　　　　　　　　See attached

21 Nov 2018                              [Signature Redacted]
　　DATE                                  SIGNATURE OF REQUESTER

**Part B– RESPONSE**

RECEIVED
NOV 2 8 2018
TERRE HAUTE

_____                    _____
　　　DATE                              WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                    CASE NUMBER:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
　　　　　　　　　　　　　　　　　　　　　　　　CASE NUMBER:

**Part C– RECEIPT**
Return to: _____
　　　　　　LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____        ⊕        _____
　　　DATE                        RECIPIENT'S SIGNATURE (STAFF MEMBER)          BP-229(13)

Sensitive          BP-9

At the end of Christian service, on 10 Nov 2018, Chaplain Wood made comments to some of his congregation about the disrespect the Muslims displayed by praying to loudly during the Christian service. The Christian service was seated directly in front of the Muslim service and seperated by approximately ten feet. After both services were ~~concl~~ concluded, Chaplain Wood confronted the man that was leading the Muslim prayer, about his alleged disrespect to the Christians.

CMU houses religious fanatics from multiple faiths. Many inmates are housed here specifically because of their fanaticism. Facts that Chaplain Wood is not ignorant of.

As a direct result of his actions and encouragement, the deceased and the wounded inmate, both known Christian fanatics and religious antagonists, made disparaging comments about Islam and its prophet to at least ~~of~~ one of its followers.

Simply shifting the saturday Christian service back to its original time or not encouraging a confrontation between fanatical Christians and Muslims, would have prevented this tragic incident.

As a remedy, due to his fanatical Christian views and unhidden distain for non-Christians, it is recommended that Chaplain Wood be barred from providing religious services in CMU.

Furthermore, given his direct involvement in the death of an inmate, a consideration should be made to the criminal charge of negligent homicide levied against Chaplain Wood.



9114 9023 0722 4072 3908 89

U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

Sunday, September 22nd, 2019, Houston v. Lack, 487 U.S. 266 (1988)

