UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| Martin S. Gottesfeld, pro se, Plaintiff — against — Hugh J. Hurwitz, et al. |

Civil No.: 18-cv-10836-PGG-GWG

## THIRD SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING PLAINTIFF'S RIGHT TO PUBLISH

Plaintiff Martin S. Gottesfeld (herein "plaintiff"), acting pro se, hereby supplements his previous MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 68), his previous MOTION FOR A DECLARATORY JUDGMENT PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 69), his previous SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 79), and his SECOND SUPPLEMENTAL MOTION FOR A TEMPORARY RESTRAINING ORDER PROTECTING PLAINTIFF'S RIGHT TO PUBLISH (D.E. 80). The plaintiff hereby reincorporates herein by reference all of his previous arguments from all of his previous motions for relief pursuant to Fed. R. Civ. P. 65.

In support of this motion, the plaintiff herewith provides and requests pursuant to Fed. R. Evid. 201(c)(2) that The Honorable Court take judicial notice of each of the following:

• Exhibit 1 hereto: Declaration of Martin S. Gottesfeld (2 pages);

• Exhibit 2 hereto: marked excerpts of Sharyl Attkisson, Stonewalled (12 physical pages, images of 24 8½x11 pages, some 2x2;

• Exhibit 3 hereto: Martin Gottesfeld, FBI Director Wray's Dirty Secret? Part 8 of the CMU Series (8 pages);

• Exhibit 4 hereto: April 27th, 2017, affidavit of Troy M. Plante, Case No.: 18-10726 (11th Cir. February 26, 2018) at 21, and July 14th, 2005, affidavit of Troy M. Plante, Id. (3 pages);

- Page 1 of 3 -

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-29-19

• Exhibit 5 hereto: excerpts from January 25th, 2009, hearing in 97-cr-496-ODE (N.D. Ga.) (3 pages)

• Exhibit 6 hereto: March 13th, 2015, letter from Federal Public Defender's office for The Southern District of Illinois to Robert Ethan Miller, reflecting unavailability of Miller's indictment and that Christopher Asher Wray was a prosecutor on the case (5 pages);

• Exhibit 7 hereto: February 20th, 2018, affidavit of Troy M. Plante (1 page of 2x2 mini. 8½x11 images);

• Exhibit 8 hereto: Contact info for Alain A. Veira and May 13th, 2017, affidavit of Tzegai Hinson (1 page of 2x1 mini. 8½x11 images);

• Exhibit 9 hereto: Brief in support of petition for a writ of habeas corpus, Case 3:13-cv-01307-DRH-CJP ECF No. 32-1 (S.D. Ill. January 13th, 2014) (4 pages of 2x2 mini. 8½x11 images);

• Exhibit 10 hereto: March 2nd, 2006, letter from the Law Office of Susan G. James and Associates to Robert Ethan Miller (1 page of 3 mini. 8½x11 images);

• Exhibit 11 hereto: SCOTUS cert. petition for Robert Ethan Miller, No. 08-8525 (3 pages, containing 11 2x2 mini. 8½x11 images);

• Exhibit 12 hereto: May 31st, 2017, affidavit of Alain A. Veira (5 pages of 2x1 mini. 8½x11 images);

• Exhibit 13 hereto: March 20th, 2009, letter from Susan G. James, Esq., to Robert Ethan Miller (1 page);

• Exhibit 14 hereto: Unnumbered FBOP Incident Report, June 5th, 2019, 3:30 p.m., against Donald Reynolds for allegedly trying to comply with the IRS; and

• Exhibit 15 hereto: Electronic message from Janice Reynolds to Donald Reynolds, July 16th, 2019, 9:47:42 A.M., describing likely mail tampering in Mr. Reynolds's outgoing mail from the FCI Terre Haute CMU; and

○ Exhibit 16 hereto: Picture of the plaintiff and Robert Miller—(1 photo plus 1 page, 8½ x 11).

The plaintiff notes that the above further demonstrate the invalid motives of the defendants and are relevant to a potential analysis under Turner v. Safley, 482 U.S. 78 (1987).

Respectfully mailed on Sunday, October 20th, 2019, and filed thereat in accordance with Houston v. Lack, 487 U.S. 266 (1988), in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and U.S. Postal Service tracking number 9114 9023 0722 4293 0882 37, handed to Ms. J. Wheeler in her official capacity as a member of the FCI Terre Haute CMU unit team and agent of the defendants at my next opportunity,

by: _____
Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Total pages: 55 physical pages plus one photo.

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, hereby certify that in accordance with Houston v. Lack, 487 U.S. 266 (1988), I mailed a copy of the foregoing document to counsel for the defendants in the above-captioned case by handing such copy to Ms. J. Wheeler of the FCI Terre Haute CMU unit team for mailing in her official capacity as an agent for the aforementioned defendants on Sunday, October 20th, 2019, or my next opportunity thereafter since there is no freestanding prison mailbox in the FCI Terre Haute CMU,

by: _____
Martin S. Gottesfeld, pro se

- Page 3 of 3 -

Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 19th day of October, 2019, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case 18-cv-10836-PGG-GWG pending before The Honorable U.S. District Court for The Southern District of New York (hereafter "the case").

2. It recently came to my attention that Representative Cummings passed away. My inability to communicate necessary changes to my team for part two (2) of The CMU Series further demonstrate that without injunctive relief from The Court I have no viable alternative option to exercise my First Amendment rights.

3. For instance, I would like to tell my team--but I cannot--that D.E. 69 at 13 should be updated so that "some weeks ago" now reads "some months ago," and "the new chairman" reads "then-chairman."

4. For another example, I would like to tell my team to insert a section just before "¶And while their families..." saying:

¶When Cummings passed away, which was months after Reynolds's quote, mentioning him above, Reynolds's hope for help from Washington seemed to dim.
¶But Reynolds had just read <i>Stonewalled</i>[link to the book] by former-<i>CBS News</i> journalist Sharyl Attkisson. Months after his trial, Attkisson broke the story on <i>Fast and Furious</i> at <i>CBS</i>. Her coverage won awards[link to award(s), I think Emmys].
¶The Obama White House resisted bitterly, asserting executive privilege[link to news of the assertion of executive privilege] to keep documents secret. A top administration official had a brother who [is|was] a top <i>CBS</i> executive. And Attkisson's computers and telephones started behaving strangely.
¶Multiple digital forensic teams confirmed Attkisson was the target of state-sponsored hackers[link to CBS statement about Attkisson's devices being accessed]. They found classified documents embedded deep in her computer's operating system, which later could've been used to charge her criminally for unauthorized access.
¶Rather than back Attkisson, CBS seemed to back away from supporting her. She eventually left the network.
¶Many questions remain about <i>Fast and Furious</i>. And Reynolds's case seems to fit like a missing puzzle piece.
¶After <i>Stonewalled</i>, Attkisson sued Eric Holder along with other unnamed agents of the Obama administration. Her allegations of unlawful interference echo Reynolds's, and she's now had her own experience going up against the DOJ in federal court. Her suit was dismissed without discovery, triggering a spirited dissent this May from U.S. Circuit Judge Andrew Wynn Jr.[link to Attkisson v. Holder, 925 F.3d 606 (4th Cir. 2019), pref. right to the dissent that starts at page 628], who wrote, "Attkisson never got a meaningful opportunity to pursue her claims because the government did everything in its power to run out the clock."
¶Reynolds now hopes The Intercept, Michelle Malkin, David Knight, RT, and others will interview Attkisson and ask her about being <i>Stonewalled</i> by the Obama administration and not supported by fellow journalists.

- Page 1 of 2 -

¶"I hope they ask her what she thinks happened to my family," Reynolds says.

5. I note in regards to part eight (8) of The CMU Series, that the July 14th, 2005, affidavit of Troy Plante is authenticated and verified by United States v. Miller, 2008 U.S. Dist. LEXIS 130785, 1:97-cr-496-ODE (N.D. Ga. August 25, 2008), and in regards to the allegation therein that Mr. Miller had a cellmate sign an earlier version of this affidavit instead of Mr. Plante, I find Mr. Miller objectively credible when he says: "Everything they said was a lie. None of that is accurate. They were trying to concoct a timeline to bar me from presenting Plante's recantation. I want people to understand that I'm tired of having to answer every lie these monsters make up. They stole my whole life with this stuff and for twenty (20) years I've had to answer every lie that they make. It's exhausting and I'm through with it. We should now be assuming that they're lying. Look at the record."

6. The record to which Mr. Miller refers includes the transcript of the relevant hearing leading to the above decision, wherein Mr. Miller told the truth knowing it was to his detriment when he could have tried to lie to get out of prison.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 19th, 2019.

Martin S. Gottesfeld

7. I would also tell me team that while it would be nice to have The Intercept copublish The CMU Series, if that process appears to come to a standstill, then I think they should coordinate with the other publishers and set a primary publication date and a rain-date, with either copublication or follow-up coverage from as many as possible out of RT, The Daily Mail, Michelle Malkin, Info Wars, The Western Journal, Red State, WND, The Daily Caller, The Daily Wire, The New American, Shadowproof Press, CRTV, Yahoo News, The Wilkow Majority, Fox 25, and local Terre Haute, Indiana, outlets, as well as any others about which I do not yet know. On-air coverage from David Knight and his colleagues would be very much appreciated, as it would be from RT and Michelle Malkin and The Wilkow Majority and CRTV and Fox 25.

MSG
2019-10-20

8. I would also tell my team that I have reconsidered my previous recommendation to publish the entire series all on the same day, and while a short timespan would still be preferable to protect sources, if it is proving impracticle, then the next-best thing would be to publish the series over a week or two (2).

MSG
2019-10-20

F. C. I. LIBRARY

# CHAPTER 2

## | Fast and Furious Redux |

*Inside America's Deadly Gunwalking Disgrace*

It's Sunday night. I'm sitting on my bed with my laptop computer open, papers strewn about, and my phones next to me. Personal BlackBerry. CBS smartphone. Home phone. The television's on but it's just white noise. I'm not listening. I'm trying to solve a puzzle. For the fifth time tonight, I look at the phone number I've scratched on the back of an envelope. I'm deciding whether to call it.

I've spent nearly every night for weeks, often until the early hours of the morning, trying to piece together what would become the biggest investigative news story of the year: the *Fast and Furious* gunwalking story. I've already aired my first report, but it only scratched the surface.

That story revealed a scheme that sounded nothing short of crazy. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) had, in essence, helped supply Mexico's killer drug cartels with fearsome weapons. Why would an agency that's supposed to do the opposite—stop the flow of weapons—engage in this kind of dangerous behavior for any reason? I've been able to speak to many sources, including six veteran ATF agents and executives who don't want to be quoted by name for fear of retaliation. They told me that ATF secretly enlisted the help of licensed gun dealers in Arizona and encouraged them to do the unthinkable: sell AK-47–type semiautomatic assault rifles, 50-caliber guns capable of taking down an elephant, and other firearms to suspected traffickers for the cartels. Instead of intercepting the weapons or the suspects, ATF intentionally allowed the criminal operations to proceed unimpeded. ATF knew the guns would hit the streets and be used in crimes both north and south of the border. That was part of the plan. It's called letting guns "walk," and as an unintended consequence, people were dying.

Supposedly, the idea was that all this would lead ATF to dangerous cartel leaders in Mexico ... the "Big Fish." The Big Fish could then somehow be arrested and brought to swift justice, though nobody could ever say how that would have really worked since the bad guys are on foreign soil and, under international law, the United States can't exactly march into Mexico and just take them. In the end, it didn't matter because they never caught any Big Fish anyway.

But innocent people were killed. Once U.S. law enforcement agents did the unthinkable and let guns onto the streets and into the hands of criminals, the weapons were used by cartel members in shoot-outs with Mexican police. They were used by cartel gangs who shot at a Mexican federal police helicopter. They were used by cartel thugs in fights with the Mexican military. And they were used by criminals on the U.S. side of the border. A single gun can be used to kill over and over again. The *Fast and Furious* weapons will be turning up in crimes on both sides of the border for decades to come. That's why in law enforcement one of the cardinal rules is: never, ever let guns walk.

As part of my initial contact with insider sources in January 2010, I learned that some ATF agents questioned the wisdom of letting guns walk, only to be rebuffed and marginalized by their supervisors. The "time to crime" was both astonishing and frightening. Sometimes, it was just a few days after being sold in Arizona that *Fast and Furious* weapons surfaced at crime scenes in Mexico. One ATF agent told

F.C.I. LIBRARY

me the strategy was "insane." I asked where the name *Fast and Furious* came from but nobody seems to know. The title was apparently pulled from a street racing action movie by the same name that hit theaters in 2009 because some of the initial suspects raced cars and worked at an auto repair shop, like the film's star. I know just how significant the story is when several inside sources say they think it's the biggest scandal ever to hit the beleaguered federal agency. Bigger, they say, than ATF's deadly assault on the Weaver family at Ruby Ridge, Idaho, in 1992. Bigger than ATF's controversial siege of a religious cult's compound in Waco, Texas, in 1993, which almost caused Congress to decimate and dissolve the agency.

Things might still be going along just that way today, with guns surfacing at Mexican crimes and the U.S. government publicly risk-tasking over the evil U.S. gun shops selling all those weapons to drug cartels, if it hadn't been for what happened on December 14, 2010. On that date, U.S. Border Patrol agent Brian Terry was gunned down in the dark Arizona desert night by Mexican "rip crew" bandits who'd crossed into the United States illegally.

Rip crews are considered more dangerous than your average, everyday smugglers. They prey upon the drug mules and others who cross the border illegally. It's one of the little-discussed ironies about Brian Terry's demise: he didn't die protecting Americans. He died on a mission to protect illegal, foreign smugglers from worse illegal, foreign smugglers.

The rip crew that shot Terry used at least two AK-47-type rifles trafficked by *Fast and Furious* suspects. With Terry's tragic murder, all hell broke loose inside ATF. The agency had been on the verge of arresting a group of gun-trafficking suspects in the *Fast and Furious* case and making a big publicity deal out of it. Attorney General Eric Holder himself was considering making the trip to Phoenix to appear in front of the television news cameras for the case announcement.

But with Terry's murder, the Phoenix ATF group, as well as their superiors at headquarters in Washington, knew that they could be in deep trouble. That is, if the connection between Terry's murder and their gunwalking scheme got out. Could they count on agents who disagreed with the strategy to keep their mouths shut? Some agents were so distraught over Terry's death and the truth behind it that they risked their careers to talk outside the protection of their government walls.

I first heard about the story when someone anonymously sent my producer a copy of a letter that Senator Charles Grassley had written to the Justice Department outlining the alleged facts and asking about the controversy. ATF insiders were confidentially giving Grassley information. We called Grassley's office several times but nobody would speak with us about the case. How could I find out more? If the facts in Grassley's letter were true, then we were looking at a story with incredible impact on both sides of the border.

Grassley is a grandfatherly, plain-talking Republican from Iowa. His claim to fame came in the 1980s when he exposed the ridiculous waste of tax dollars by the Defense Department, such as the Pentagon buying a toilet seat for $750 and paying $695 for an ashtray for air force planes. There's no better clearinghouse than Grassley's office for whistleblowers on most any topic and—an added bonus—he and his investigators aren't afraid to upset members of their own party.

We found that a lot of the background regarding this emerging controversy was anonymously posted by ATF insiders on the blogs of gun rights activists Mike Vanderboegh of Sipsey Street Irregulars and David Codrea of Examiner.com. So my producer and I contacted Vanderboegh and Codrea, who were in direct contact with some of the principal players. We asked the bloggers to pass along my name and number in hopes that their sources would be willing to talk to me. After a few days passed with no luck, I registered with the forums of the

blogs and posted a public notice. It said that I was interested in pursuing a possible story for CBS News and needed insiders to contact me. It worked.

Meanwhile, the Justice Department, which oversees ATF, responded to Grassley's inquiry, in writing, and insisted that no one in the government would ever let guns walk. This is a wildly false claim they would later recant once the evidence became irrefutable.

When I first propose the *Fast and Furious* story to *CBS Evening News* executive producer Rick Kaplan, he's fascinated.

"Who approved the strategy? What were they thinking?" he asks. It's his job to prompt reporters with the questions any viewer would want answered.

"I don't know," I tell him. "We don't have the answers. But this first story will shake the tree and we'll get closer to some answers."

Kaplan is sold. I'm lucky he's from the school of *follow-the-story-where-it-is-going-and-how-it-ends-and-then-we'll-decide-if-the-public-should-know*. This is how real news is committed.

Instead of giving me the typical length of about two minutes' time to tell my story, Kaplan does something bold and unusual. He tells me to write it the way it needs to be written. When I'm finished, it's five minutes long. Almost unheard-of on an evening news broadcast. But Kaplan airs it as is. Without this kind of time and commitment, the story would be over before it ever got started. The complexities and nuances of *Fast and Furious* would be lost in a story if it were half the length. It would have very little lasting impact.

The five-minute-long report airs on the February 22, 2011, edition of the *CBS Evening News* and makes an instant splash. Viewers are intrigued, colleagues pepper me with questions about what else I know, and I receive calls of interest from congressional staffers, both Democrats and Republicans.

One colleague approaches me and says he has a close contact inside ATF.

"He says your reporting is right on target," he tells me. "And they're rooting for you inside ATF. He says keep going."

But as outrageous and remarkable as the allegations are, most of the media don't pick up on the story. They're steering clear. I know from my sources within the Justice Department and on Capitol Hill that other reporters are calling them, wanting to know about *Fast and Furious*. But these reporters say that they can't get their own stories published. The bosses don't want them. And with a few exceptions, the beat reporters who have regular access to Attorney General Holder choose not to press for answers, much to the delight of the government.

*Fast and Furious* provides a prime example of the syndrome I've described in which federal agencies use public information officials—paid by your tax dollars—as private PR agents advancing the agendas of their bosses rather than serving the public. Exhibit One is an internal memo written by ATF's chief of public affairs, Scot Thomasson, in response to my initial *Fast and Furious* report. Thomasson dispatches the memo to other public affairs officers inside ATF and a source supplies it to me. The purpose of the memo, Thomasson explains to his public affairs staff, is to "lessen the coverage of such stories in the news cycle by replacing them with good stories about ATF."

When potentially damaging news stories loom, the federal government seems to magically produce positive news stories calculated to counteract or even replace the negative ones. Often, it works. Our federal contacts call us and breathlessly announce a hastily called news conference. They tantalize us with a few details and advise in hushed tones, "*You'll want to have a camera there,*" as if they're imparting secretive, valuable information. We alert our managers. News is about to happen! And thanks to our well-placed sources, *we've got*

F.C.I. LIBRARY

98 | STONEWALLED |

the heads-up! We divert our cameras from whatever they're doing and rush to the "news" conference, grateful and puffed up with pride that we have such important contacts in the federal government.

For example, in October 2011 Holder was revealed to have given inaccurate testimony about his knowledge of *Fast and Furious* and Congress hit him with a subpoena: suddenly Holder announces a major, dangerous international terror plot is busted. Good news! ABC, NBC, CBS, FOX News, *USA Today*, the *Washington Post*, the *Wall Street Journal* . . . just about everyone runs with the headlines.

A week later, amid furor over FBI evidence discrepancies in the Brian Terry murder—more good news!—ATF invites reporters along on a giant illegal cigarette bust!

In June 2012, just as an historic House contempt vote against Holder was scheduled and widely reported by news organizations, the attorney general announces $111 million in tax-dollar funding for law enforcement agencies to hire military veterans. The *Huffington Post*, Reuters, the *Chicago Tribune*, and many local news outlets in markets receiving the funding write up the good news, helping counteract the negative publicity surrounding the scheduled contempt vote.

More recently, amid questions about the Justice Department's controversial decision to seize telephone records of journalists with the Associated Press, Holder announced a giant Medicare fraud strike force crackdown.

I'm not saying the aforementioned cases aren't worthy of coverage. But what if federal officials wait to reveal them until they're needed to bump negative news out of the headlines? The timing may be purely coincidental, but in light of Thomasson's ATF memo, we have every reason to be cynical.

The Thomasson memo directs ATF's public information officers to "[p]lease make every effort in the next two weeks to maximize coverage of ATF operations/enforcement actions/arrests at the local

*Fast and Furious Redux* .99

and regional level" to try to drown out the "negative coverage by CBS News. . . . The bureau should look for every opportunity to push coverage of good stories."

The memo goes on to note: "Fortunately, the CBS story has not sparked any follow up coverage by mainstream media and seems to have fizzled." The subjects of negative news are always relieved when a story remains confined to one or two outlets. And if one of them is FOX News, all the better. The administration knows that some in the media reject, out of hand, stories that FOX News follows closely, regardless of merit. So if it's a FOX story, half the battle is already won.

But the Obama administration is particularly worried when the story appears on CBS News. They can attempt to pin a right-wing label on me, but CBS itself can hardly be portrayed as a bastion of conservatism. And my record of reporting on mischief within both parties makes my stories credible, and therefore dangerous.

Thomasson's memo reiterates, "ATF needs to proactively push positive stories this week, in an effort to preempt some negative reporting. . . If you have any significant operations that should get national media coverage, please reach out to the Public Affairs Division for support, coordination and clearance."

Think about it. Your tax dollars are paying the salary of an ATF manager who's using taxpayer time and resources to direct his teams of taxpayer-supported public affairs officials to "push" propaganda in order to drown out an important, truthful story of public interest.

So here I am, sitting on my bed, laptop computer open, with the first *Fast and Furious* story under my belt, contemplating the next step. I need a good source to go on camera. The Justice Department is counting on the fact that I won't get that. They're telling other reporters that my unnamed sources are lying.

But I have a lead.

Just a few days before, I had received a call at my office.

5

F.C.I. LIBRARY

The voice on the other end sounds hesitant. It's a woman.

"My boyfriend wants to talk to you," she tells me. "He has information about the story you've been working on."

She won't give his name. Or hers. I don't yet know whether this source will bear fruit or is just another in a long list of people who, in the end, have no real information that I can use. I instinctively look at the caller's telephone number displayed on my phone and scribble it on the back of an envelope.

The woman goes on to explain that her boyfriend isn't with her at home right now because he's attending a conference. She says he needs to get approval from congressional investigators to speak to me. But he wants to talk. The mention of Congress elevates his potential importance, as I know that several bona fide whistleblowers are in contact with Senator Grassley.

I thank the woman for calling and tell her I'm very interested in speaking to her boyfriend. I don't press too hard. As badly as I need the information, potential sources need to be handled gingerly and respectfully. They're easily scared off. Get too aggressive and they may never call back.

The importance of handling sources delicately should become clear when I tell you that, while I may have broken a lot of *Fast and Furious* news, I wasn't actually the first network news reporter following the trail. Early on, when my producer and I contacted the bloggers Vanderboegh and Codrea, they told us that an investigative reporter from NBC had already called them. But he ticked them off.

"He's an asshole," Vanderboegh told me more than once. "He demanded our contacts' names and phone numbers. Hell no, we're not handing over names and phone numbers to some asshole, pardon my French!"

I realize that the bloggers could well be saying the same thing about me pretty soon. The gun rights crowd is, by nature, mistrustful

of reporters. So are the ATF agents whose confidence I need to gain. You can't lie to them. You can't mislead them. They can smell insincerity a mile off. And you most certainly can't cold-call them and demand names and numbers of their confidential contacts.

But if you do your research and show that you genuinely want to understand the facts, and if you're blessed with a little bit of luck, you might end up with the goods.

So I hang up from the call with the anonymous woman with the well-placed boyfriend who's talking to Congress, and I hope to hear from him later that day.

But he never calls.

Several days later, I decide it's time to try that phone number on the envelope. My hope is that the woman will answer the phone and tell me more or even let me speak to her boyfriend. On the other hand, it's entirely possible that she'll freak out over the fact that I even have her phone number and go dark on me entirely.

I punch the eleven digits into the phone and hold my breath. She answers.

"Hi, it's Sharyl Attkisson. You called me the other day and said your boyfriend might be willing to speak to me?"

She hesitates. I think she's trying to figure out how I got her number. But she doesn't hang up. She says her boyfriend still wants to talk to me but he doesn't want to mess up the investigation. And Senator Grassley's office hasn't given the okay.

But then she says her boyfriend is right there next to her!

"Can you give him the phone?" I ask her. "He doesn't have to say anything, he can just listen if he wants. I have a lot of information I haven't reported yet. I've confirmed some of it with people whose names I can't use. It always helps to run the information by additional sources. See if your boyfriend will get on the phone and just listen."

F. C. I. LIBRARY

I hear a rustling noise and then a tentative but polite male voice on the other end.

"Hello, ma'am."

I do the talking, telling him pieces of what I know, and he provides additional bits of confirmation. He calls me "ma'am" at the end of almost every sentence. He must be from the South.

After a few minutes, I ask if he's a member of ATF's Group VII in the Phoenix, Arizona, office. That's the group assigned to *Fast and Furious*.

"Yes, ma'am," he tells me.

That narrows it down.

I've managed to piece together the names of the agents on the team with a good deal of confidence through insider sources who've contacted me as a result of my having posted my name and phone number on the gun rights blogs. I'm fitting together the puzzle pieces. You have to be patient and just gather a tiny bit of information at a time, if that's all you can get. Even if you don't know what the final picture is going to look like. When my sources initially contacted me, they often wanted to remain anonymous. But I'd ask, *Who's on the team? Who objected to the gunwalking?* I'd get a lead here, a name there . . . pretty soon I had a list.

There's ATF's Phoenix Special Agent in Charge Bill Newell.

Assistant Special Agents in Charge George Gillett and Jim Needles.

Group VII Supervisor David Voth.

Lead case agent Hope MacAllister.

Case agent Tonya English.

All of them are gung ho on *Fast and Furious*.

Then there are Group VII Special Agents Olindo "Lee" Casa, John Dodson, and Larry Alt.

Not gung ho.

Based on a bit of deduction, I believe it's Alt and Dodson who are talking to Senator Grassley.

"I think I know who you are," I tell the male voice on the phone. I'm taking a chance in trying to identify him. It might scare him off. But I don't have a lot of time to waste and if I don't make progress now, who knows if I'll ever speak with him again. My instincts tell me to try.

"Okay . . ." he says.

"You're either Larry Alt or John Dodson."

Sounding taken aback, he says: "I'm John Dodson, ma'am."

Special Agent Dodson seems relieved to be identified. He's lived with the secret of *Fast and Furious* for many tortured months. He's internally raised objections with his supervisors over what he views as the foolhardy strategy of gunwalking, only to feel retaliated against and marginalized. One of Dodson's bosses brushed off his concerns about innocent people getting hurt by saying, "If you're going to make an omelet, you've got to break some eggs."

"We just knew it wasn't going to end well." Dodson told me. "There's just no way it could."

One source had told me that, at one point, infighting over the gunwalking was so fierce, "it got ugly." Another said there was "screaming and yelling." A third said he warned: "This is crazy; somebody is gonna get killed."

But Dodson had asked the most chilling question of all when arguing with a superior: "Are you prepared to go to the funeral of a federal officer killed with one of these guns?" He says he got no reply.

In light of the gunwalking, every time there was a shooting near the border, the ATF agents would collectively hold their breath, "hoping it wasn't one of 'our' guns." When a madman shot Arizona congresswoman Gabrielle Giffords in January 2011, the tension at ATF could be cut with a knife. Nobody rested easy until the attack

F. C. I. LIBRARY

weapon was traced and found not to have been walked in *Fast and Furious*.

But for Dodson, the final straw came on that December night in 2010 when Border Patrol agent Brian Terry was shot. According to Dodson, a colleague approached him and said, "Did you hear about the border patrol agent?" And I said, "Yeah." And they said "Well, it was one of the *Fast and Furious* guns." There's really not much you can say after that," Dodson told me.

After Dodson and I talk on the phone for a few minutes, the door is opened for a possible interview. It may be unprecedented: an on-camera interview with a sitting federal agent, criticizing a major government law enforcement initiative.

When I hang up with Dodson, I finally get Grassley's office to engage with me and work out details so that I can quickly interview both the senator and Dodson. I make the arrangements to travel to Phoenix to meet up with Dodson. I don't need to clear it with my executive producer Kaplan. He'll want this story.

A few days later, my plane touches down in Arizona. My producer and I are early for our interview with Dodson, which we've scheduled to take place at a Phoenix area hotel, and we order food at the bar. I'm watching the door for Dodson. When he strides into the bar, I know who he is even though I've never seen him. Police, law enforcement type. Short brown hair. Goatee. Dark pinstripe suit, blue shirt, blue tie, blue eyes.

"Hello, ma'am," he says and I stand up to shake hands. I ask if he needs to eat and he declines. He's nervous. We look around. We assume that either he's being followed or I'm being followed or we're both being followed. I don't ask a lot of questions before the interview. I want to hear his entire story for the first time as it's recorded on camera.

An hour later, we're wrapping the interview. The content of it and the passion with which it's delivered are nothing short of incredible.

Dodson is intelligent, sincere, and convincing. His interview wholly undercuts the Justice Department's attempts to claim *Fast and Furious* never happened.

A few days later, on March 4, 2011, the *CBS Evening News* airs our second report in the series. This one is longer than the first. Five and a half minutes. I'm watching from the Washington, D.C., control room when it airs. I glance around to find the other producers, correspondents, and technicians staring at the monitor with rapt attention. It's a tough crowd. If they're showing this much interest, I know Dodson and his story have captured our audience.

ATKISSON    "You were intentionally letting guns go to Mexico?"

AGENT DODSON    "Yes, ma'am, the agency was. I'm boots on the ground in Phoenix telling you we've been doing it every day since I've been here. *Here I am.* Tell me I didn't do the things that I did. Tell me you didn't order me to do the things I did. Tell me it didn't happen. Now you have a name on it. You have a face to put with it. Here I am. Someone, now, tell me it didn't happen."

*Fast and Furious* has just become an undeniable reality.

*If ever there's a story that transcends politics,* I think, *surely this is the one.*

But on this point, I'm incredibly mistaken.

When a story makes major news, members of Congress often take an interest. Perhaps it's an issue of importance to their district. Maybe it affects their constituents. They might also see it as a way to raise their political profile.

Congressional interest can be a good thing. Congress has the power to hold hearings and issue subpoenas. I lack that authority but

F.C.I. LIBRARY

| 106 . | STONEWALLED |

can use the information they obtain. Sometimes, though, congressional interest isn't such a good thing. Invariably, one party takes up the issue, the other adopts an opposing view, and matters of substance drown amid political posturing.

Congressional staffers and members from both parties privately tell me they agree that the ATF gunwalking is a travesty. But they're still trying to calculate how the story will play among their constituents.

For a time, it's Senator Grassley alone who's banging this drum. And there's only so much he can do. His Republican Party is in the minority in the Senate. They don't have subpoena power and can't call hearings. But on the other side of the Capitol, in the House, Republicans hold the majority. And the GOP chairman of the House Oversight and Government Reform Committee, Darrell Issa, has become interested in *Fast and Furious*.

Issa is a former CEO and a self-made millionaire from California. A dominant personality, quick study, and insanely confident, Issa is one of the most powerful members of Congress. He'll need that heft as his party leaders, Speaker John Boehner and Majority Leader Eric Cantor, are widely said to be slow-walking the *Fast and Furious* investigation behind closed doors.

Issa's interest becomes a double-edged sword. Oversight Committee chairmen are attack dogs on behalf of their parties and are thus polarizing and controversial. Issa's no different. And being a Republican, he's viewed even more harshly by some in the news media.

When Democrat Henry Waxman chaired this important committee from 2007 to 2009, and prior to that, as its top Democrat, he went after many Republican causes. I broke news on several stories that jibed with Waxman's interests, including the energy company Enron's fraudulent practices, and contract abuses in Iraq. Back then, there was no chorus from my colleagues or broadcast managers saying

---

Fast and Furious *Redux* . 107

*that's all just politics.* They didn't accuse me of being a Democratic mouthpiece. They just liked the stories.

But, Substitution Game, Issa's involvement in *Fast and Furious* is treated much differently. Issa's name evokes obvious distaste among some of my colleagues. They imply that he's incapable of raising legitimate concerns on any issue: that he's purely political theater. These colleagues wish to view the story as nothing more than a political dispute between Issa and the Obama administration, which is exactly how the administration wishes to portray it. Issa's engagement becomes the excuse that opponents will use from that day forward to officially label *Fast and Furious* a phony, Republican scandal.

The fact that I don't think that way makes me Public Enemy No.1 among partisan Democrats and President Obama's most ardent supporters. And it gets me a special caseworker inside the White House.

Eric Schultz is a former spokesman for New York senator Charles Schumer. More recently, Schultz headed communications for the Democratic Senatorial Campaign Committee. He's no political ingénue and no stranger to scandal and controversy. He was deputy campaign manager for Al Franken's contentious 2008 Senate campaign in Minnesota, and before that, he headed the press shop for John Edwards's 2008 run for president, fielding the onslaught of questions about Edwards's extramarital affair and illegitimate child.

In May 2011, the Obama White House chooses Schultz, to be paid with your tax dollars, to handle press on *Fast and Furious*.

Our relationship is courteous enough. As far as I'm concerned, it largely consists of Schultz trying to discredit those who could harm the administration, and advancing story lines and ideas to help his boss. He seems to have a pretty well-organized network of support. For example, Schultz might suggest to his media contacts that they

(continued on back flap)

1114

9.

F.C.I. LIBRARY

do a story dissecting controversies in Issa's background. It could be an editorial or blog written by party loyalists, an article penned by a like-minded reporter, or a favorable piece in the left-wing propaganda blog Media Matters. Schultz then circulates the resulting "story" to the rest of us in the media, sprinkled with his commentary. The strategy counts on the tendency of many bloggers and reporters to copy and codify each other's work. If things go according to plan, the story is regurgitated and excerpted by so many outlets that it appears, to the uninitiated, to be prevailing thought. It's self-fulfilling and self-legitimizing. Pretty soon, the theme bleeds into real news organizations and the cycle is complete. The message being delivered, of course, is that there's no real story behind *Fast and Furious*. Just a Republican vendetta.

It's not only liberals who operate this way. Conservatives do it, too. But their propaganda blogs are less likely to get treated as "news" by the regular media.

Along with Schultz, Media Matters is in touch with me about *Fast and Furious* and things start out friendly enough. They recently received a $1 million donation from George Soros, the multibillionaire funder of left-wing causes. On one occasion, they call to peddle the idea of a story that discredits *Fast and Furious* blogger Vanderboegh for his militia ties and other perceived transgressions. It's a propaganda campaign to divert from the damaging facts: *controversialize critics to try to turn the focus on personalities instead of the evidence.*

Media Matters emails me the summary of an extensive investigation their researchers have done on Vanderboegh's personal life. It's pretty impressive for the time and effort they've put into it. Propaganda groups know if they do all the work and make it easy, some writers will print a version of their story. With Media Matters' proposed Vanderboegh story, all a writer really needs is a few comments from relevant players and it's ready to go.

But it's not journalism and it's not how I operate.

It's not that I mind getting the idea. Good ideas can come from almost anywhere. Special interests can contribute valuable information for a story. But they shouldn't be researching and writing it for you. The *Huffington Post* and *Mother Jones* are among those that ultimately do publish stories about Vanderboegh. I wonder if it's because of a spark planted by Media Matters. Maybe it's just coincidence.

When I prove to be noncompliant, and continue covering stories considered potentially damaging to the Obama administration, Media Matters will strike me from their list of valuable media contacts—and make me a target of their aggressive campaign to smear and controversialize with false information. If one were to believe the liberal blog, in an overnight transformation, I went from being a trusted journalist whom they wanted on their side, to a shoddy reporter. Fortunately, few are swayed by the narrative.

As for me, I'm just focused on trying to solve the primary puzzle of *Fast and Furious*.

What was the real purpose?

Whose idea was it?

Who knew, how high up?

As the weeks progress, evidence mounts and the Justice Department's spin proves embarrassingly incorrect time and time again. As quickly as one of the administration's claims is contradicted, the Justice Department revises and reissues its position, only to be disproven once again. The missteps provide a textbook example of why journalists with any awareness of the track record simply cannot immediately accept the official government line as the truth. Too often, it proves not to be.

Perhaps the Justice Department's biggest blunder was its February 4, 2011, letter to Congress, which falsely stated that ATF doesn't let guns walk. Specifically, Holder's assistant attorney general Ronald

10.

F.C.I. LIBRARY

Weich wrote that the allegation that ATF "'sanctioned' or otherwise knowingly allowed the sale of assault weapons to a straw purchaser who then transported them into Mexico—is false," and ATF "makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico."

Ten months later, when it's clear even to the Obama administration's fiercest supporters that guns *did* walk, the Justice Department formally retracts its earlier statement but implies there was no intent to deceive.

*Blanket-deny everything and hope the news media doesn't come up with proof to refute the denials. If they do, modify your position.*

In the coming months, Republicans ask for internal emails and other documentation to discover exactly how false information made it into the original letter to Congress, but the Justice Department refuses to turn over the material. Eventually, President Obama steps in and exerts executive privilege for the first time of his administration to keep the documents secret.

Once Justice Department officials are forced to acknowledge the gunwalking, the next story they tell is that rogue ATF agents in Phoenix are solely to blame, and that nobody higher up was aware that the strategy was being employed. But Congress manages to get its hands on internal documents that prove that's not true: officials at ATF headquarters in Washington were well aware of the gunwalking. So the Justice Department changes its story again and claims that all knowledge was isolated at the ATF level: the Justice Department was kept in the dark. But Congress receives documentation showing Justice Department officials very well knew about *Fast and Furious*. The department even approved wiretaps for the case, which involved criminal division officials reading detailed affidavits that explained exactly what was going on. For the first time, there's direct evidence leading to Holder's men.

(continued on back flap) 1114

It's about this time that the *CBS Evening News*'s interest goes from hot to cold.

It's the weekend and I see Katie Couric's name pop up on my BlackBerry as the sender of an email. She compliments my work so far on *Fast and Furious*. She wants to know if I've asked Holder for an on-camera interview. Yes, I reply, I've asked several times through the Justice Department press office, but it's a no-go. Couric knows Holder and his wife. She types back saying maybe she'll ask him for an interview. Is that okay with me? I tell her it's a good idea. Holder isn't going to talk to me. Maybe he'll talk to her. Couric is a good interviewer. We'll brainstorm on questions and she can do the job.

Holder never does the interview. But after that weekend email exchange, nothing is the same at work.

First, my next *Fast and Furious* report is inexplicably cut short. It's an exclusive interview with a second ATF official who has a very different piece of the story to tell. Special Agent Rene Jaquez was stationed in Juarez, Mexico, the most dangerous city in the world. He tells me, on camera, that he's outraged that, as he risked his life, facing daily brushes with death on assignment in Juarez, his own agency was helping arm the bad guys. Jaquez tells me he has family—uncles, aunts, a father, and a sister—living in Mexico and "any one of them could have been shot with one of those guns."

The idea that two active ATF agents are stepping forward to criticize the government initiative on camera is remarkable. But inside CBS, official interest has suddenly gone gray.

Then, my next story is killed from the *Evening News* entirely. It's a devastating, exclusive interview with ATF's lead official in Mexico City, attaché Darren Gil. I'd worked for weeks to convince Gil to go on camera.

As I continue to push for CBS to cover ongoing developments, one broadcast producer tells me, "The thing is, you've done such a great

11.

F.C.I. LIBRARY

job covering this story, you were so far ahead of everybody else, you've reported everything. There's really nothing left to say."

In fact, we've barely begun to peek through the door.

I end up publishing many follow-ups online at CBSNews.com, where, unlike the broadcasts, there's the time and appetite for a diverse range of stories. Colleagues email me privately and ask why we're not airing these developments on television. Some view the story as more serious than Watergate because people have died. Others whisper, where my friends can hear, that I must have some sort of *agenda*.

It's pointless to explain that I'm just following the story where it leads. Deep down, they know it. They simply don't like where it's going.

Online, my *Fast and Furious* reports develop a following of tens of thousands who are thirsty for the news. Most are devoted conservatives. But I also hear from many liberals who think *Fast and Furious* is a horror story that crosses political lines. As for me: I don't view it as a gun control story. It's about corruption, cover-ups, and government misdeeds.

I've spent hundreds of hours researching leads. Internal ATF emails written in 2010 at the height of *Operation Fast and Furious* are leaked to me by sources or handed over to Congress. They portray the excitement among ATF managers, rather than the horror one might expect, as weapons turn up at crime scenes south of the border. In their view, it's Mission Accomplished.

*But what, really, is the mission?*

The whiteboard and poster I'm using to organize and cross-reference my leads become crowded with an ever-expanding network of cases with shades of gunwalking and unresolved questions. The cases have catchy titles. *White Gun. Operation Wide Receiver. Operation Castaway. Operation Head Shot. Too Hot to Handle.* Some are simply named after one of the defendants: *Ramos. Osorio. Hernandez.*

*Medrano. Bazan. Kingery.* There are still more cases connected to a gun shop in Houston: Carter's Country. So far, I've found evidence or allegations of gunwalking in Phoenix; Tucson; Dallas; Houston; Tampa; Evansville, Indiana; and Columbus and Albuquerque, New Mexico. I'm making a list of other federal agencies participating in or aware of the ATF cases, based on legal filings or press accounts. They include the Internal Revenue Service, Drug Enforcement Administration, FBI, Immigration and Customs Enforcement, the Border Patrol, the Department of Homeland Security, the U.S. Marshals Service, and the Justice Department's U.S. attorneys. Remembering that the Justice Department tried to portray the gunwalking as the brainchild of a few Phoenix ATF agents, I'm thinking that, on my whiteboard, it sure looks a lot more like a coordinated interagency strategy.

We know that cartel firearms traffickers do a lot of their shopping along the border in Texas, California, Arizona, and New Mexico. The feds commonly claim that up to 90 percent of the weapons used by the Mexican drug cartels are sold over the counter in the United States. But when that figure is cited before Congress to make the case for additional gun control, gun rights advocates ask: Where's the proof? They correctly argue that only a fraction of firearms seized from criminals in Mexico are submitted to ATF for tracing: the ones that the Mexicans conclude are most likely to have come from the United States. The rest are presumed untraceable for reasons such as missing serial numbers, or Mexican officials believe they came from other countries. Yes, of the traced guns, almost 90 percent come from the United States. But the fact that most of them *aren't* traced at all messes up that math and a fundamental gun control argument. It means that most of the weapons found in Mexico technically are *not* traced back to the United States.

But let's imagine a scenario in which a greater percentage of guns from Mexican crime scenes are traced in a fairly short, defined period

12.

F.C.I. LIBRARY

of time, and hundreds—no, thousands of them—are discovered to have come from the United States.

Gun control advocates could have their checkmate.

But how to make that happen?

A simple three-step strategy could do the trick. ATF could:

1. Work with licensed gun dealers in a scheme to encourage and monitor sales to suspicious characters and known traffickers, entering the serial numbers into ATF's Suspect Gun Database on the front end so that tracings later are easy.
2. Let the guns sold to these suspicious characters and known traffickers "walk."
3. Wait, sometimes an incredibly short "time to crime," as the weapons are recovered at crime scenes in Mexico and their serial numbers easily trace back to their American origins.

There's just one big flaw with using such a strategy to argue that most guns used in Mexican crimes are from America: it's all a setup.

But maybe the public will never have to know that.

Whatever the true purpose of the gunwalking program, and whoever thought of it, it runs counter to the whole mission of U.S. law enforcement, which is to protect the public—and federal agents. The twisted logic for the indefensible strategy goes something like this: To protect the public, we need to prevent guns from flowing across the border. To prevent guns from flowing south, we need to stop gun traffickers. To stop gun traffickers, we need to prove that their guns are used in Mexican cartel crimes. To get proof, we need to let crooks freely traffic weapons so that they're used by the cartels to injure and kill. We then trace the weapons back to the U.S. source, arrest the traffickers and cartel kingpins, and stop the guns.

(continued on back flap) 1114

*Wait a minute.* The federal agents' ultimate duty is to protect the public—but to do so, they're feeding violence that hurts people?

ATF managers note, apparently with no intended irony, that as more guns from *Fast and Furious* flow into Mexico, the violence there escalates. An internal ATF email states, "Our [*Fast and Furious*] subjects purchased 359 firearms during March alone, including numerous Barrett .50 caliber rifles" and notes, "958 killed in March 2010 . . . most violent month since 2005."

In my February 2011 interview with Special Agent Dodson, I asked, "Did you feel that ATF was perhaps partly to blame for the escalating violence in Mexico and on the border?"

"Yes, ma'am," Dodson answered. "I even asked [my supervisors] if they could see the correlation between the two: the more our [*Fast and Furious* suspects] buy, the more violence we're having down there."

Setting aside the human consequences, letting weapons flow freely into Mexico could be viewed as beneficial to certain political motives. For example, it could nicely tee up a new gun control initiative being pushed by the Obama administration called "Demand Letter 3."

"Demand Letter 3" was a very controversial proposal that sought to require certain U.S. licensed gun dealers to report to the feds when someone buys multiple rifles or "long guns." It would be the third ATF program demanding that gun shops report tracing information.

The two sides in the gun debate have long clashed over whether gun dealers should have to report multiple rifle sales. The feds argue that a large number of semiautomatic, high-caliber rifles from the United States are being used by violent cartels in Mexico. They believe more reporting requirements would help ATF crack down. Gun rights advocates say the reporting mandates are unconstitutional, and would not make a dent in Mexican cartel crimes.

Two earlier demand letters were initiated in 2000 under the Clinton administration. They added reporting requirements for a relatively

13

small number of targeted licensed gun dealers. Demand Letter 3 promised to be much more sweeping, specifically targeting rifles and shotguns, encompassing 8,500 firearms dealers in four Southwest border states: Arizona, California, New Mexico, and Texas. It sought to require additional reporting for gun dealers who sell two or more long guns to a single person within five business days, if the guns are semiautomatic, greater than .22 caliber, and can be fitted with a detachable magazine. But gun rights advocates saw it as a backdoor gun registration scheme. They say the government has no business tracking rifle purchases made by law-abiding citizens.

According to email evidence, some federal officials viewed *Fast and Furious* as an opportunity to help justify Demand Letter 3. On July 14, 2010, after ATF headquarters in Washington, D.C., received an update on the *Fast and Furious* case in progress, prior to its public exposure, Field Operations Assistant Director Mark Chait emailed ATF Phoenix Special Agent in Charge Newell.

"Bill, can you see if these guns were all purchased from the same [licensed gun dealer] and at one time. We are looking at anecdotal cases to support a demand letter on long gun multiple sales. Thanks."

As I research the federal government's push for Demand Letter 3, I begin to wonder about a yearlong investigation conducted by the *Washington Post* for a series of articles published in December 2010, just before *Fast and Furious* broke. The takeaway message from the article was: *Gun Shops Bad; More Gun Control Needed.* The *Post* named the U.S. licensed dealers that were doing the biggest business with Mexican cartel traffickers. I'll call the gun shops the "Dirty Dozen" because there are twelve of them and they sure don't look clean in the article.

The funny thing is, I now recognize two of the top three gun stores listed in the article—four in all—as names that were secretly cooperating with ATF in selling guns to the bad guys. Well before

(continued on back flap) 1114

F.C.I. LIBRARY

Brian Terry's murder, months before the rest of the country learned of *Fast and Furious*, some of the cooperating gun dealers had privately raised objections about the gunwalking strategy that ATF wrapped them up in. They felt pressure to go along with the feds, who regulate them and inspect their shops. But they were reluctant.

For example, in April 2010, one dealer writes to Phoenix ATF officials, "We just want to make sure we are cooperating with ATF and that we are not viewed as selling to the bad guys." He's worried about potential liability. "[W]e were hoping to put together something like a letter of understanding to alleviate concerns of some type of recourse against us down the road for selling these items." But *Fast and Furious* group supervisor David Voth assures him there's nothing to be concerned about. Voth tells the dealer that ATF is "continually monitoring these suspects using a variety of investigative techniques which [*sic*] I cannot go into detail."

Two months later, the same dealer grows more agitated and his warnings become an eerie premonition: "I wanted to make sure that none of the firearms that were sold per our conversation with you and various ATF agents could or would ever end up south of the border or in the hands of the bad guys. I guess I am looking for a bit of reassurance that the guns are not getting south or in the wrong hands. . . . I want to help ATF with its investigation but not at the risk of agents [*sic*] safety because I have some very close friends that are US Border Patrol agents in southern AZ as well as my concern for all the agents [*sic*] safety that protect our country."

Apparently none of this was known by the *Post*, which gives no hint of this crucial backstory and seems to lay blame at the feet of the gun stores alone for selling to shady characters. No mention that the gun stores, in some cases, were doing exactly as ATF had instructed.

"All of the stores among the top 12 have had double-digit traces of 'crime guns' to their stores from Mexico," reads the article, "a statistic

14.

that can be a red flag for investigators." The owners of a Dirty Dozen gun shop in Texas called Carter's Country give an interview to the *Post* but don't reveal their confidential cooperation with ATF even as they're vilified. And, apparently, nobody in the government offers up this basic information. So in December 2010, the *Washington Post* report stands as a strong case for more gun regulation.

In a twist of fate, just two days after the *Post* series begins, Border Patrol agent Brian Terry is gunned down. Within hours of his tragic death, Holder's U.S. attorney in Arizona, Dennis Burke, notifies Holder's then deputy chief of staff Monty Wilkinson that the guns used to kill Terry are from *Fast and Furious.*

"The guns found in the desert near the murder [of the Border Patrol] officer connect back to the investigation we were going to talk about," Burke writes Wilkinson in an email.

"I'll call tomorrow," Wilkinson replies.

I reread the *Post* article several months later, in the context of what we now know about *Fast and Furious* gunwalking. I notice that the *Post*'s government sources used phrasing that's remarkably similar to what the Justice Department and others are now using to defend the gunwalking program. They say that laws backed by the gun lobby make it difficult to bring criminal cases against U.S. gun dealers who knowingly sell to criminals. The implication is that ATF agents have their hands tied and have to get creative with their strategies to do their job.

Around the same time the *Post* article is distributed to American readers, the Justice Department is preparing at last to round up the *Fast and Furious* suspects and do a victory lap for the media. In an internal email on January 4, 2011, ATF's Newell writes that the case will provide "another time to address Multiple Sale on Long Guns issue."

On January 25, 2011, ATF's Special Agent in Charge Newell

(continued on back flap) 1114

F.C.I. LIBRARY

steps to the podium in Phoenix to lead the news conference. A cache of rifles is laid out on display for reporters to photograph. Newell announces the interagency effort called *Operation Fast and Furious*, which has resulted in the indictment of twenty suspects who bought scores of weapons from U.S. gun stores. There's talk of the escalating drug violence in Mexico as more American guns head south. New gun regulations are sorely needed, say the feds.

But the unspoken fly in the ointment is the inconvenient matter of Agent Brian Terry's murder forty-one days before. Apparently, there's been a decision within the Justice Department to keep its link to *Fast and Furious* guns quiet and hope that nobody is the wiser.

So the Newell press conference includes no talk of Terry. No disclosure that the rifles used by Terry's killers were trafficked by *Fast and Furious* suspects whom ATF had watched and allowed to operate week after week, month after month. Reporters aren't told that ATF had encouraged the sales then let the guns disappear, untracked, onto the mean streets of Nogales, Sonora; San Dimas, Durango; Tepic, Nayarit; San Miguel, Guerrero; Culiacan, Sinaloa; and Juarez.

Still, whispers of scandal are beginning to blow softly in the dry Arizona breeze. As the news conference wraps up, a local reporter asks Newell if his agents intentionally let guns walk. "Hell, no!" answers Newell, knowing full well that he'd led the effort. The reply isn't captured on videotape but it quickly makes the rounds of the media rumor mill and soon becomes legendary among the hardest-core followers of the scandal. (Two years later, in a private off-camera meeting, Newell would tell me, in his defense, that he didn't think *Fast and Furious* qualified as "gunwalking" under his own personal definition.)

Later, we learn that Attorney General Holder considered attending the news conference to thrust it further into the national spotlight. Just twelve hours before Brian Terry was murdered, on December

14, 2010, U.S. Attorney Burke emailed colleagues that Holder's office was "now expressing interest in the [attorney general] coming out" to speak to the press at the upcoming news conference.

But after Terry's murder came a change of heart. On December 21, 2010, Burke emailed Holder's deputy, Wilkinson. "I would not recommend the [attorney general] announce this case. I can explain in detail at your convenience."

Even with Holder a no-show at the press event, there's still hope among ATF managers that the indictment of *Fast and Furious* suspects will serve to advance gun control interests. A day after the press conference, Chait, at ATF headquarters, emailed Newell in Phoenix: "Bill—well done yesterday. . . . [I]n light of our request for Demand letter 3, this case could be a strong supporting factor if we can determine how many multiple sales of long guns occurred during the course of this case."

That optimism evaporates after Agent Dodson's March 4 interview with CBS News. After that, it's all about denial and damage control.

Later, many would refer to *Fast and Furious* as a "botched sting operation" in which agents "lost track" of weapons. The case may have been ill-advised, but it wasn't botched and it wasn't a sting. Nor did ATF agents lose track of the guns. They let them go on purpose.

On February 15, 2011, exactly two months after Terry is gunned down, I'm in the Washington, D.C., newsroom when one of my sources calls.

"Did you hear about the ICE shooting?" he asks.

"No," I answer.

"Two ICE agents ambushed in Mexico by drug cartels," he tells me. "One of them is dead. Headquarters is in a panic. They think that the guns the bad guys used might have been walked."

Before long, the news of the murder crosses the wire services. The

F.C.I. LIBRARY

two Immigration and Customs Enforcement agents, Jaime Zapata and Victor Avila, were traveling on assignment along a notorious Mexican highway controlled by drug bandits. Without warning, cartel bandits had cut off their vehicle and ambushed them. Zapata was killed, Avila seriously injured. Traveling without the usual escort, outnumbered and outgunned, they never had a chance.

At CBS, some of my superiors are paying so little attention to what I've reported, they're confused.

"Is this a separate shooting? Or is Zapata the same agent you've been reporting on?" one of them asks me. He's confusing Brian Terry's murder two months earlier with the Zapata murder that just happened. I'm taken aback. For the first time, I realize that certain managers have tuned out the whole story. Made up their mind without even knowing the broad-brush basics. They're making the editorial decision that developments in the *Fast and Furious* story don't qualify as "news," without bothering to learn the basic facts. They haven't thoroughly read the many notes I've circulated. They haven't read the stories I've published on our own website.

"They're two different shootings two months apart," I explain. "The first is a Border Patrol agent named Brian Terry in Arizona. This one is an ICE agent named Jaime Zapata in Mexico. But we need to find out if the firearms used against Zapata were also part of an ATF case."

As it turns out, they are.

It takes time and investigation to sort out the relationship, but through my sources, I'm able to obtain case files that show ATF had watched—and failed to arrest—suspects who trafficked two of the guns used in the ICE ambush. These ATF cases are not part of *Fast and Furious*. It further confirms that the federal government is using gunwalking strategies far and wide.

One of the traffickers had sent ten WASR-10 semiautomatic rifles

to the Zeta drug cartel several months before Zapata was shot with one of them. Records show that ATF recorded a phone call in which the suspect "spoke about the final disposition of . . . firearms to Mexico and also about the obliterating of the serial numbers before they were trafficked." But even with that evidence in hand, the feds allowed him to continue operating his illegal trade for four more months. A warrant for his arrest was finally issued, coincidentally, the day before Zapata's murder.

New information is coming almost every day and it's hard to keep up with it. Insiders or, in some cases, the Justice Department under congressional demand are providing important internal emails and notes. The information unravels the story line that the Justice Department, attorney general, and White House knew nothing of *Fast and Furious.*

A huge blow to the administration comes at a congressional hearing on July 26, 2011. ATF Special Agent in Charge Newell testifies that he discussed the case with White House National Security Director for North America Kevin O'Reilly as early as September 2010. At that time, ATF managers were proud of their effort and saw it as something that headquarters in Washington, D.C., encouraged. O'Reilly emailed Newell asking if he could share information about ATF's efforts to combat cross-border gun trafficking, including the case that would become *Fast and Furious*, with other White House staffers. The two men also indicated they'd spoken on the phone about the subject.

It seems doubtful that Newell's discussion of *Fast and Furious* would fail to disclose the gunwalking strategy that was the heart of the case and, at the time, was perceived as vital to its success. Case briefings, complete with maps and charts, clearly delineated gun recoveries in Mexico and how federal officials tracked the weapons from the point of purchase to their endpoints. Wouldn't anyone with

16

F.C.I. LIBRARY

half a brain be able to deduce that this would only be possible if ATF were letting guns go?

Add the fact that American law enforcement officials were facilitating delivery of illegal weapons into a foreign, sovereign nation, where it's virtually illegal for private citizens to carry guns in public. Logic dictates that ground-level ATF officials would never be allowed to launch a major cross-border operation without knowledge and approval at high levels in the U.S. government. Such an operation, one would think, should pique high-level interest from a national security and international political standpoint. Federal law enforcement officials often won't do an interview with the media or put out simple facts on a case before navigating a mind-boggling bureaucracy to obtain upper-level approvals. Yet we're asked to believe that an international law enforcement initiative spanning over a year and reaching into almost every branch of federal law enforcement escaped all meaningful scrutiny. That nobody of any importance knew anything important.

Isn't the administration's story line, if true, a bona fide scandal of its own? That rogue ATF agents were able to spend millions of tax dollars on a secret, controversial, dangerous cross-border operation undetected, under their bosses' noses, without approval—and nobody had noticed?

After Newell's bombshell testimony that at least one White House national security staffer, O'Reilly, knew about *Fast and Furious*, a White House spokesman denies it. The spokesman claims that O'Reilly only spoke to Newell about other gun-trafficking efforts, not *Fast and Furious*. When asked why Newell would say otherwise, the White House spokesman says flatly, "I don't know."

By late summer of 2011, there's a full-scale meltdown inside the government. ATF's director Kenneth Melson resigns under pressure.

Congressional investigators are demanding to know what information was shared with whom at the White House beyond O'Reilly

17.

F.C.I. LIBRARY

and how far did it go. They're insisting that the White House turn over relevant documents and they want to interview O'Reilly. The White House responds that O'Reilly isn't around. It seems he's been tasked to the State Department, then sent out of the country to Iraq on assignment. He's "unavailable." I ask a congressional staffer who's trying to reach O'Reilly for an interview the obvious: *Don't they have telephones in Iraq?*

On Friday, September 2, 2011, I'm up at 4 a.m. to do a live shot for *The CBS Early Show.* My story covers newly obtained documents showing the U.S. attorney's office allegedly plotted to cover up the link between Brian Terry's death and *Fast and Furious.* Assistant U.S. Attorney Emory Hurley had sent an email the day after the murder indicating that the connection would be kept on the down low. "This way we do not disclose [*Fast and Furious*] or the Border Patrol shooting case," Hurley wrote.

After my live shot at 7 a.m., I head over to the White House. I have a special invitation.

During *Fast and Furious*, the Obama administration has improperly used its powers to ban me from the Justice Department building, where it was presumed I'd ask uncomfortable questions. On one occasion, a background briefing related to *Fast and Furious* was hastily scheduled for selected members of the media at the Justice Department. No sooner do I leave the office to attend than I get a call from Justice Department spokeswoman Tracy Schmaler.

"Don't bother to come," she says. "Only the regular Justice Department reporters are allowed." She tells me she won't clear me through security to come into the building.

My presence isn't a security issue. I'm a credentialed journalist who's gone through FBI background checks and had clearance to travel on jets with presidents and their families. Administration officials may not like me, but I'm pretty sure they know I'm not a ter-

rorist. The Justice Department is flexing its power not for legitimate safety reasons but to control who in the news media covers their story.

But on this day, September 2, I'll get into the White House because I'm invited. A taxi drops me off on the corner of Pennsylvania and Sixteenth Street, where I make my way to the West Gate entrance. Reporters from the *Los Angeles Times*, the *New York Times*, and the *Washington Post* are there, too.

After clearing security, we're led through a maze of twists, turns, and hallways to a conference room in the Old Executive Office Building, adjacent to the White House.

White House spinmeister Schultz is offering us an advance look at some *Fast and Furious* documents the White House plans to turn over under demand from Grassley and from the House Oversight Committee. We get this preview in exchange for listening to their take on the material, which we're happy to do. As part of the deal, we're not allowed to report on the documents before the White House gives them to Congress. I don't know how long such arrangements have been taking place in Washington. I'm not usually among the journalists selected to attend any administration's invitation-only events.

We're each provided a folder containing printouts of selected White House emails. I scan my set to see if it reveals anything new. I ask, are these *all* the communications about *Fast and Furious*?

*No,* say the officials who are briefing us, *but they're "representative."* I ask why, then, can't we see the rest if they're just more of the same? They repeat that the documents we have are "representative." The problem is, they're supposed to turn over all the documents to Congress, not a representative sample. And for all the journalists present, the trust meter is running a bit low, considering the administration's track record to date.

After the special briefing, three weeks pass and the White House

18.

F.C.I. LIBRARY

fails to meet a September 2[illegible] deadline to turn over the documents to Congress. Then, on September 30, 2011, comes a famous Friday Washington Document Dump. We know the drill. When the feds have to turn over potentially damaging documents, they like to do it late on a Friday when members of Congress are headed to their home districts and journalists are dreaming of our first icy cold beer of the weekend. And by Monday, the administration calls it "old news." After all, it's been out for *days*!

At exactly 4:28 p.m., Schultz emails me that the White House has finally turned over the documents to Congress. He indicates there's nothing particularly newsworthy in them. They're more of the same type of material we reviewed earlier in the month. At least that's what he says.

I obtain copies of the documents and start sorting through them. There are about one hundred pages of communications involving three White House national security staffers: O'Reilly, Senior Director Dan Restrepo, and counterterrorism and counternarcotics official Greg Gatjanis. Other administration names are copied on some emails: Jeffrey Stirling. Sarah Kendall.

Far from proving that the White House knew nothing at all, the documents show keen interest in the efforts of ATF's Gun Runner Impact Teams, or GRIT for short. GRIT was a surge in personnel and efforts from May 1 through August 6, 2010, to fight trafficking of firearms to Mexican drug cartels. In Phoenix, GRIT included eighty-four special agents, industry operations investigators, and support staff from around the country. And the largest case that GRIT had going—in fact, the biggest case of its kind in the country—was the one that would become *Fast and Furious.*

One of the relevant White House emails is dated the summer of 2010 and mentions John Brennan, who was then assistant to the president for Homeland Security. (At about this time in 2010, Brennan's

name was being circulated as being "behind the witch hunts of investigative journalists learning information from inside the beltway sources." He would later be promoted to director of the CIA.) According to the House Oversight Committee, Brennan made a trip to Phoenix on June 28, 2010, to announce an Obama administration initiative described as a "multi-layered effort to target illicit networks trafficking in people, drugs, illegal weapons and money." National security staffers and Justice Department officials accompanied Brennan on the trip. Wouldn't this trek have necessarily included discussion of the biggest gun-trafficking case going at the time?

A month later, on July 28, 2010, the White House's O'Reilly emailed ATF's Newell that he wanted to share with his White House colleagues Restrepo and Gatjanis some of the gun-trafficking information that Newell had provided. About a month after that, on September 1, 2010, Newell emailed O'Reilly to say that he has "great stats and investigative stories to tout" on the subject of Southwest border firearms trafficking. O'Reilly answers, "Great-thanks. We want John Brennan well-prepared to talk GRIT with the Mexicans next Wednesday." An email from the White House's Stirling to O'Reilly the same day refers to preparing a PowerPoint presentation for a "high level" meeting coming up on October 5. It's clear that White House officials are paying attention to ATF's gun-trafficking cases.

Two days later, internal emails show, Newell sends more gun-trafficking case information and documents to his White House friend O'Reilly with the caveat, "You didn't get these from me." Attached are statistical charts and a map of the Mexican locations where suspect weapons were destined or "ended up." Newell is going around his ATF command chain in emailing directly to O'Reilly in the White House. Then, possibly referring to *Fast and Furious*, Newell writes, "Also, not mentioned in these docs but VERY relevant to Mr. Brennan's meeting next week is the fact that we and the [U.S.

F.C.I. LIBRARY

attorney] were going to announce the indictment of a dozen 'straw purchase' cases addressing firearms trafficking by 30 individuals."

After reviewing all of these email exchanges provided by the White House in the Friday document dump to Congress, I have some questions. I go to the White House's Schultz for answers. He claims that because the emails don't explicitly discuss gunwalking, they *prove* that nobody in the White House knew of the controversial tactic.

It's a flawed leap in logic. It requires dismissing the unknown content of other emails and communications that the White House hasn't released. It requires forgetting about the phone conversations Newell acknowledged having with O'Reilly in testimony to Congress, for which no record is provided. On the question of who knew exactly what, the emails are definitively—inconclusive.

I also want to ask Schultz what did Brennan tell "the Mexicans" in his briefing referenced in the September 1 email. To what, exactly, was O'Reilly referring in another email on September 3, 2010, when he asked Newell about "last year's [Texas] effort"? And was the referenced upcoming indictment of a dozen "straw purchase" cases with thirty firearms traffickers actually *Fast and Furious*?

Schultz isn't happy with my questions. He begins arguing that the emails I'm asking about are "old news"—the common PR refrain—because I'd reviewed them at the White House four weeks before. I compare the two sets and tell him no, there are new ones in today's batch. And that's hardly the point. None of these emails had been reported on before.

We end up on the telephone to talk it out. After some editorial conversation, Schultz erupts into a middle school meltdown.

"Goddammit it, Sharyl! The *Washington Post* is reasonable, the *L.A. Times* is reasonable, the *New York Times* is reasonable, *you're the only one who's not reasonable*!"

He's screaming now. The tirade continues for several minutes,

during which time I push a button and put him on speakerphone. A producer two doors down hears the outburst, walks to the doorway of my office, and mouths, *What the hell?*

"So, Sharyl Attkisson is the only reporter who knows what she's doing?" Shultz continues, sarcastically. "Nobody else thinks this is a story. Just you. You're the only one. Sharyl Attkisson is right and everybody else is wrong? God*dam*mit it!"

It's hard to know if Schultz is really that out of control or if he's just trying to be intimidating. It's not uncommon for administration officials to be sarcastic or even bully, berate, and raise their voices. But this full-blown screaming, cursing tirade does stand apart, in my experience. When Schultz takes a breath, I tell him he's clearly too upset to have a civil conversation and he should put anything else that he wants to say in an email. He accuses me of not being willing to listen. He threatens to call my bureau chief. I tell him to go ahead. He hangs up and that's the last time I can remember that we ever speak on the phone.

A couple of days later, I get the anger treatment from Justice Department flack Schmaler. She hasn't contributed one good piece of information in the months that I've covered the story. Ideally, as a public information officer paid with your tax dollars to answer questions from the press, her job is to facilitate interviews and release information in the public interest. But if that's ever how federal press officials saw their job, those days are long gone. Today, they're coopted as personal press agents for their political bosses. Their goal is not to provide information, but to find out as much as they can about what *you* know.

Schmaler is obviously tasked with deflecting and denying. ATF refers my questions to her, then she refers me right back to them. I'm sent on an infinite loop that never produces coherent answers. When she talks to me at all, instead of answering my questions, she poses

20.

F.C.I. LIBRARY

her own. For instance, early on, when I request interviews with Justice Department officials and ask who was involved in the case, Schmaler answers, "Who do your sources say was involved? And I can't believe you're listening to a bunch of disgruntled agents." When I ask if she'll confirm my information that Criminal Division chief Lanny Breuer authorized wiretaps in *Fast and Furious*, which were accompanied by lengthy affidavits explaining everything about it, Schmaler only asks, "Just because someone's signature is on an authorization, does it mean he read it?"

Her agency's spin has morphed from calling the whistleblowers liars, to acknowledging the gunwalking happened but saying it was the work of renegades in Phoenix, to admitting that ATF headquarters knew of it but that nobody at the Justice Department did, to conceding that people at Justice were involved but insisting the attorney general was kept in the dark. She bobs, she weaves, she shifts—and afterward pretends it's all consistent.

Based on the track record, I know that I can't count on getting the truth from Schmaler. But I still have to ask.

On this particular day in October, I'm asking about a statement Attorney General Holder made before the House Judiciary Committee on May 3, 2011. He was making his first round of congressional appearances since the *Fast and Furious* scandal broke. He'd testified to everyone's shock that he never heard of *Fast and Furious* until long after the public controversy erupted.

"When did you first know about the program officially I believe called *Fast and Furious*?" Representative Issa asked Holder.

"I'm not sure of the exact date, but I probably heard about *Fast and Furious* for the first time over the last few weeks," said Holder, then blinking his eyes in rapid succession.

The testimony seems incredible. The attorney general is telling Congress and the American public that nearly five months after Ter-

ry's death, four months after Senator Grassley began asking about the case, three months after the CBS News reports, he only just heard of *Fast and Furious* in the last couple of weeks?

Unfortunately for Holder, it wasn't long after his testimony that we obtained internal documents showing he was actually sent weekly briefings on *Fast and Furious* as early as July 2010, ten months before. The briefings came from the director of the National Drug Intelligence Center and from Holder's own Assistant Attorney General Breuer.

When I ask Schmaler to comment on the discrepancy, she, like Schultz, acts as though it's not the government's story that's out of whack, but the fact that I'm asking the question. First, she insists there's no inconsistency. When I persist, Schmaler grows irritated and locks in on an explanation: Holder didn't understand the question Congress asked.

I, for one, think Holder's a pretty smart guy. Schmaler's account would have us believe that the nation's top law enforcement manager, an attorney, misunderstood a simple, straightforward question posed by Congress. A question that everybody else seemed to understand. For clarity's sake, I ask her to put her explanation in writing. If I try to characterize what she's just told me, and it receives a poor reaction from the public, there's every chance she'll deny having said it or claim that I misunderstood her.

Schmaler doesn't want to put anything in writing. We go back and forth on the point. She's yelling now. Eventually, she reaches the position that Holder *did* know about *Fast and Furious* much sooner than he'd told Congress, but she says he didn't know the details about the gunwalking. (The Justice Department also later says that Holder never read any of the briefings that his deputies directly sent him regarding the case.)

The next day, I have an interview about *Fast and Furious* with

F.C.I. LIBRARY

## CHAPTER 3

## | Green Energy Going Red |

*The Silent Burn of Your Tax Dollars*

<u>FBI Director Wray's Dirty Secret? Part 8 of the CMU Series</u>

Tagline: What Trump and the Senate Didn't Know Before Wray Got the Job...

¶[Embed: Pic of Robert Ethan Miller and Martin Gottesfeld; attrib.: Photo by unnamed/Public domain (October, 2019); caption: Robert Ethan Miller (left) and Martin "MartyG" Gottesfeld (right), inside the recreation cage at the DOJ's semi-secret "communications-management unit" (CMU) in Terre Haute, Indiana, on or about October 1st, 2019, as they discuss Miller's former life as part-owner and operational manager of The Gold Club in Atlanta.]

Byline: By Martin Gottesfeld

<u>PLEASE NOTE</u>: The author has made this part of the CMU Series available at <u>FreeMartyG.com</u>[link to part 8 at FMG] under the <u>latest Creative Commons by-attribution commercial-use-permitted share-alike no-derivatives license</u>[link to the license text].

¶<i>This is part 8. <u>Click here to read Inside the Black Sites Where Obama, Clinton, and Holder Buried Their Secrets--Part 1 of the CMU Series</u>[link to part 1] or <u>click here to read Abandon All Hope, Ye Who Enter Here--Part 7 of the CMU Series</u>[link to part 7].</i>

¶FBI Director Christopher Wray and his colleagues framed Robert Ethan Miller in the 1990s and he's been in federal prison ever since, according to 3 witnesses who confess to following Wray's instruction to lie under oath during Miller's trial. Miller was the operational manager and part-owner of The Gold Club on Atlanta's busy Piedmont Road when Wray indicted him on charges of counterfeiting and conspiracy to kill a federal witness.

¶It's the DOJ, however, that seems to be engaged in an ongoing conspiracy to cover for Wray, one that prevented the White House and the Senate from learning about Miller's case in 2017, when the White House vetted Wray for the role of FBI director and the Senate convened confirmation hearings.

¶Miller's case appears reminiscent of a scandal that broke during Robert Mueller's tenure as FBI director. In 2007, Boston-based federal judge Nancy Gertner (since retired) ruled that multiple FBI directors and other top brass, indeed, "The entire FBI hierarchy," going as far back as 1967, "was implicated" in the framing of 4 innocent men for a murder carried out by "Top Echelon" FBI informants. Gertner also found that the FBI engaged in a decades-long coverup, even after its chief trial witness, Joseph "The Animal" Barboza, had a crisis of conscience and tried to recant his false testimony.

¶[Embed: Pic of Barboza, if possible; attrib. as approp.; caption: Joseph "The Animal" Barboza had a crisis of conscience--unlike his FBI handlers--and tried to recant his false testimony after it was used to frame 4 innocent men.]

¶The new case started when Miller (not to be confused with Mueller) refused Wray's demand to testify falsely against the Gambinos and the Gottis in 1997, says Miller. The DOJ has now held Miller nearly-incommunicado for over a decade and interfered with his court filings due to his efforts to prove that he's innocent; until today, his first chance to clear the air in a media interview about his experiences with Wray.

¶"I was told to say what they wanted to hear or I'd get 35 years," Miller reports.

¶Miller and the 3 informants who helped convict him now stand firm against the DOJ and allege that Wray knowingly used bogus evidence and false sworn testimony to trick a federal judge and jury into sending Miller to federal prison to serve a three-and-a-half--decade sentence for made-up crimes. Miller

has been locked up ever since--for what is now 22 years--while documents from his trial, including his indictment and sentencing transcript, have conspicuously gone missing from the federal-court record.

¶Miller has spent much of that time in the DOJ's communications-management units (CMUs), where department personnel, particularly CMU administrator Katherine Siereveld, pre-emptively screen and block nearly all of his attempts to correspond with attorneys, the courts, family, friends, journalists, and the DOJ's internal "watchdog," the office of the inspector general (OIG). Miller reports that he only felt this scrutiny intensify after Wray was named to replace James Comey as FBI director.

¶[Embed: Pic of Wray, pref. at his confirmation; attrib. as approp.; caption: The Senate confirmation of FBI Director Christopher Wray (pictured) may have intensified the DOJ's desire to keep Wray's past in the past.]

¶Records show that the DOJ spends tens of millions of tax dollars each year on its CMUs in order to keep a constant eye on about 80 of its roughly 175,000 federal prisoners[check stat. using Jeremy Gordon[sp?]'s latest fed. prison population report and link (use archive.org if necessary to pin link to date of publication)]. Or put another way, Miller is among the 0.05%[check stat. using 80 as the numerator and dividing by Jeremy Gordon's up-to-date figure from above] of the nationwide federal prison population whose communications most concern the upper echelons of the DOJ. Indeed, the DOJ seems less concerned by correspondence to and from record-setting Ponzi-schemer Bernie Madoff, because, unlike Miller, the DOJ never put Madoff in a CMU[fact-check: I believe Madoff went to FMC Butner].

¶And the DOJ's apparent obsession with Miller's communications seems to have little to do with organized crime--at least of the Italian-Mafia variety. Instead, Siereveld and the DOJ are blocking Miller from conferring with Wray's other accusers, the men who now swear under penalty of perjury, with nothing apparent to gain for themselves, that Wray similarly threatened them with 30-year federal-prison sentences if they refused to say what he wanted.

¶Thus, Miller is perhaps the latest stark reminder of an important lesson that seems to have been scorned repeatedly by FBI directors from J. Edgar Hoover to Robert Mueller, James Comey, and his replacement Christopher Wray: the ends of political advancement can't always justify the means.

¶In the earlier example from the heyday of the "old" Boston FBI, decades before Wray allegedly was investigating the Gambinos and the Gottis, crooked agents who were supposed to be working to bring to justice La Cosa Nostra (LCN), i.e. the Italian Mafia, instead knowingly used lying murderer/informant Joseph "The Animal" Barboza to frame 4 scapegoats, Enrico Tameleo, Louis Greco, Joseph Salvati, and Peter Limone, for the murder of a man named Edward Deegan, whom in reality was killed by the FBI's own "Top Echelon" informants. Salvati got life. Tameleo, Greco, and Limone were sentenced to die in the electric chair.

¶[Embed: Pic of the 4 innocent men or 2-by-2 square of photos, from 1967-68 if possible; attrib./caption as approp.]

¶That was 1968. In 1972, the Supreme Court struck down the sentencing procedure that was regularly used in death-penalty cases[link to Furman v. Georgia, 408 US 238; 33 L. Ed. 2d 346; 92 S. Ct. 2726 (1972)], and the 3 electrocutions were commuted to life imprisonment. (Four years later the Supreme Court approved a different sentencing procedure used today for death-penalty cases[link to Jurek v. Texas, 428 US 262; 49 L. Ed. 2d 929; 96 S. Ct. 2950 (1976)] that requires a separate penalty phase, but death sentences that

were already commuted, including the 3 in the Deegan case, didn't change back.)

¶Regardless, Tameleo died in prison after 18 years. And Greco died behind bars a decade later--after he served 28 years--and after both men and their families first stared down the possibility they'd die for a crime they knew they didn't commit, by absorbing 1,000+ volts of electricity, awake, strapped down, and fully conscious in the electric chair.

[¶"['Reach out to the one wrongfully-convicted man who's still alive and/or the surviving family members of any of the 4, pref. the family members awarded damages by name in Gertner's decision. If none will comment, then skip this ¶]," said [name][, [describe relationship to the wrongly-convicted, i.e. [name]'s wife]], when asked what it was like to face [a life|an electric chair] sentence [knowing he'd|imposed on a loved one [he|she] knew had] been framed.]

¶"I literally was not committing crimes," Miller says now, referring to the 1990s when he was operator and minority-owner of Atlanta's The Gold Club, which was well-known as the biggest club in the city and for its adult entertainment.

¶[Embed: Pic of The Gold Club, if avail.; attrib. as approp.; caption as approp., with detail, i.e. "The front doors of The Gold Club, circa 1997"]

¶It was then, Miller says, that Wray, who at the time was an assistant U.S. attorney, demanded he testify against the Gambinos and the Gottis (who are of no known relation to reporter Martin Gottesfeld).

¶"They gave me a 3-ring binder full of information and said, 'Let us know what you know and everything will be good,'" Miller recounts, noting the agent's poor grammar.

¶The procedure of giving potential witnesses information first, <i>before</i> asking what they know, is a commonly-reported tactic to get unscrupulous informants to testify to whatever agents want to provide them.

¶"Secret Service Agent Donna James told me, 'I know you're innocent Mr. Miller. I don't want to see you go to prison for 35 years. But this is how the system works,'" Miller says.

¶A decade or so earlier, Miller's father <i>may</i> have been "a made man" when he was murdered. Miller, whose family and friends call him Bobby, was 13 and had only recently started to get to know his dad at age 11.

¶Miller's uncle was also murdered under <i>similar</i> circumstances when he was a boy.

¶Then, at age 18, Miller says he was attacked by 2 men, whom he shot in self-defense. He doesn't believe the incident was related to the earlier murders. And state prosecutors seemed to credit Miller's version of events. Charges were dropped as part of an agreement in which he enlisted in the U.S. Navy.

¶"I wanted to become a SEAL," Miller says. "Two years in though, they wouldn't give me my rating and send me to       the training program for Navy SEALs. So, I exercised an opt-out clause in my enlistment agreement. It gave me an honorable discharge if they hadn't sent me to SEAL training by that point."

¶Miller says he would've rather taken the SEAL training and stayed in the Navy, but after 2 years of getting the run-around, the chances of that seemed slim.

¶Miller was 19 when he left the Navy in 1989.

¶"I was below the drinking age," Miller reflects.

¶The Gambino family <i>may</i> have wanted to "make me," as Miller puts it.

¶"It's not like the movies," however, Miller says. "Not everybody wants to be made and wants to be a boss. I chose to get away from that life."

¶Miller feels that in light of the murders of his father and his uncle, anyone who <i>may</i> have wanted him to follow in their footsteps would've understood his decision to leave the Northeast and get far away from that lifestyle. And he <i>may</i> have chosen well. Miller's younger brother was later murdered, while he <i>may</i> have been becoming "a made man."
¶Fresh out of the Navy, Miller says he was presented with other options. One of them <i>may</i> have been assuming operational management and minority-ownership of The Gold Club in Atlanta, where Miller had acquaintances.
¶Rumiel Robinson,      Miller's friend from their time together at the noteworthy Ringe & Latin School[sp?] in Cambridge, Massachusetts, was drafted to the NBA in the first round by the young Atlanta Hawks franchise, after Robinson scored the winning free throws for the University of Michigan Wolverines in their 80-79 overtime victory against Seaton Hall for the 1989 men's NCAA--Division-I championship.

¶[Embed: Pic of Robinson, pref. in the 1989 championship game; attrib. as approp.; caption as approp., i.e. "Rumiel Robinson throws the game-winning foul shot for Michigan in the 1989 NCAA--Division-I championship."]

¶"Glenn Rice was on that Wolverines team too," pointed out Miller, who is an avid sports fan.
¶Miller soon found others drawing him to Atlanta as well, including Jennifer Ashford.
¶Asked if he was in love with Ashford, Miller quickly turned bashful. In a flash, 20 years of age seemed to disappear from his face as he gave in to a boyish smile and answered unequivocally, "Yes."
¶There were no ifs, ands, or <i>mays</i> about Miller's answer.
¶Soon, Miller and Ashford learned they were expecting a son.
¶Though Miller and Ashford later separated, Miller remained a dedicated father.
¶"I coached my son's Pop-Warner[sp?] football team, his baseball team, and his basketball team," says Miller. "I was part of the PTA."
¶That was before Miller met Wray, and before the CMUs.
¶"They've destroyed that whole relationship," Miller now says regarding the longterm effect of the CMUs on him and his now--29-year-old son, who is older today than Miller was when Wray entered their lives.
¶Others also find it tough to maintain family ties in the CMUs. A federal appeals court in Washington, D.C., noted more than 3 years ago in a case[link to Aref v. Lynch, 2016 U.S. App. LEXIS 15320 (pref. at page 31-32]] brought by the Manhatten-based Center for Constitutional Rights (CCR)[link to CCR], that CMU inmates like Miller, "may spend years denied contact with their loved ones and with diminished ability to communicate with them. The harms of these deprivations are heightened over time, as children grow older and relationships with the outside become more difficult to maintain."
¶The U.S. Court of Appeals then quoted a lower federal court in Louisiana, reflecting on similar conditions[link to Wilkerson v. Stalder, 639 F. Supp. 2d 654 (M.D. La. 2007), pref at page 684], "With each passing day its effects are exponentially increased, just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones."
¶By the time the indictments started dropping and Miller's name entered the news cycle in 1997, he had a new fiance[accent]. He'd met Katherine Miller while he was out and about in Atlanta. Their common surname was just a coincidence and they quickly established that they weren't relatives. This coincidence, however, would prove important after the authorities arrested Miller.

¶Katherine stood by Miller, who asserted that he was innocent while many in media labeled him "John Gotti, Jr."

¶"She stood by me the whole time," Miller says. "When I got to the CMU, they blocked her. She comes from a great family."

¶Miller's fiance[accent] was adopted by James B. Miller, the source of her surname, and the founder and president of Fidelity National Bank, headquartered on Piedmont Road.

¶"I was engaged to marry into a banking family, why would I counterfeit $2,500?" asks Miller, referring to the small amount of cash Wray initially alleged he counterfeited. "That makes no sense. Then, after I refused to lie, they hit me with the witness-tampering charge to raise the stakes."

¶"They sent a lot of people into my cell block to inform on me," Miller recalls. "One of them stole my mail from Katherine to see if there was anything he could use. Since Katherine and I have the same last name, he assumed we were married when we were not."

¶[Embed: Photo of the Cobb County Jail in Georgia; attrib. as approp.; caption: The Cobb County Jail in [town], Georgia, where informants say the plot to frame Robert Miller got off the ground]

¶The man who grabbed Miller's mail has since admitted that he helped Wray frame Miller on the witness-tampering charge.

¶"He said that he was willing to testify that I offered to pay him to kill my wife," Miller says, "which is ridiculous because I didn't have a wife. He just assumed that I did based on my mail from 'Katherine Miller.'"

¶That narrative later changed, Miller says, to accuse him of plotting to kill Ashford, the mother of his son. Regardless, Miller's supposed coconspirator is now adamant that in reality he and Miller never planned to harm anyone.

¶"In fact, Robert Ethan Miller, Jr., at no time mentioned any desire or intention to kill [Ashford]," the informant declared under penalty of perjury on July 14th, 2005, some 12 years before Wray was named FBI director.

¶"When I told this to Mr. Wray he told me that if I have told anyone else, I was going to jail for 30 years," he declared again in 2018. "I was terrified by the threats made to me by Mr. Wray."

¶"I don't victimize people," Miller says today. "I've never victimized people."

¶The question now seems to be, can the same be said of FBI Director Wray?

¶One possible answer, taken from a sworn affidavit: "Mr. Wray's office stole the lives of several families, while judges did all they could to cover up the fact that Mr. Miller was innocent, to keep the corruption out of public eyes."

¶These and other documents from Miller's case are available here[link to FMG landing page with links/embeds to/of the documents].

¶At the end of the interview, Miller listens to the following introduction from Judge Gertner's 287-page decision[link to Limone v. U.S., 497 F. Supp. 2d 143 (D. Mass. 2007)] vindicating the 4 innocent men the FBI framed 3 decades before his similar experience.

¶Afterwards, Miller notes that what Gertner found is commonplace in today's federal-justice system.

¶"Why aren't they correcting more people's cases?" he asks. "How do you still have my case after that?"

¶[Block quote:]Despite the complexity of the record, this decision is far, far, longer than I would have wished. It has taken much more time to complete than I had predicted. But there was no other alternative. The conclusions that the plaintiffs have asked me to draw--that government agents suborned perjury, framed four innocent men, conspired to keep them in

jail for three decades--are so shocking that I felt obliged to analyze this complex record with special care in order that the public, and especially the parties, could be fully confident of my conclusions.

¶I have concluded that the plaintiffs' accusations that the United States government violated the law are proved. In the pages that follow, I will describe why in detail. This introduction summarizes some of those findings.

¶The plaintiffs were convicted of Deegan's murder based on the perjured testimony of Joseph "The Animal" Barboza ("Barboza"). The FBI agents "handling" Barboza, Dennis Condon ("Condon") and H. Paul Rico ("Rico"), and their superiors--all the way up to the FBI Director--knew that Barboza would perjure himself. They knew this because Barboza, a killer many times over, had told them so--directly and indirectly. Barboza's testimony about the plaintiffs contradicted every shred of evidence in the FBI's possession at the time--and the FBI had extraordinary information. Barboza's testimony contradicted evidence from an illegal wiretap that had intercepted stunning plans for the Deegan murder before it had taken place, plans that never included the plaintiffs. It contradicted multiple reports from informants, including the very killers who were the FBI's "Top Echelon" informants.

¶And even though the FBI knew Barboza's story was false, they encouraged him to testify in the Deegan murder trial. They never bothered to tell the truth to the Suffolk County District Attorney's Office. Worse yet, they assured the District Attorney that Barboza's story "checked out."

¶The FBI knew Barboza's testimony was perjured because they suborned that perjury. They met with Barboza long before the state authorities ever did. They coddled him, nurtured him, debriefed him, protected him, and rewarded him--no matter how much he lied. When Barboza told them he *would not* accuse the man they knew to be one of Deegan's killers, his friend and FBI informant, Jimmy Flemmi, they urged Barboza to testify nonetheless. And when he announced that he *would accuse* four men who had never been linked to this murder, they were undaunted. They continued to press for his testimony. Indeed, they took steps to make certain that Barboza's false story would withstand cross-examination, and even be corroborated by other witnesses.

¶In word and in deed, the FBI condoned Barboza's lies. FBI agent Dennis Condon even told the Deegan jury that he was "always concerned with the purity of testimony on the part of" his witnesses, referring to Barboza, the perjurer. When Tameleo, Greco, and Limone were sentenced to death, Salvati to life imprisonment, the FBI did not stand silently; they congratulated the agents for a job well done.

¶Nor did the FBI's misconduct stop after the plaintiffs were convicted. The plaintiffs appealed, filed motions for a new trial, one even took and passed a polygraph test on public television--over and over again protesting their innocence. They sought commutations, appeared before parole boards, seeking clemency from the governor, even appealing to the press. On each occasion, when asked about the plaintiffs, on each occasion when the FBI could have disclosed the truth--the perfidy of Barboza and their complicity in it--they did not. This was so even as more and more evidence surfaced casting more and more doubt on these convictions. In the 1970s, for example, Barboza tried to recant his testimony, not in all cases in which he had participated, but only  as to the plaintiffs in this case--the very men the FBI knew to be innocent. In the 1980s, Agent Rico was found by a court to have suborned the perjury of another witness under similar circumstances. Yet, there was still no FBI investigation, no searching inquiry to see if an injustice had been done in this case.

¶Rather, while Salvati and Limone languished in jail for thirty-odd years, and Greco and Tameleo died in prison, Barboza and his FBI handlers flourished. The FBI agents were given raises and promotions precisely for their extraordinary role in procuring the Deegan convictions. Even when Barboza, the "poster boy" for the new federal witness protection program, committed yet another murder, three federal officials testified--now for the second time--on his behalf.  FBI officials up the line allowed their employees to break laws, violate rules and ruin lives, interrupted only with the occasional burst of applause.

¶The FBI knew Barboza's testimony was false, that the plaintiffs' convictions had been procured by perjury, that critical exculpatory information had been withheld--but they did not flinch. After all, the killers they protected--Jimmy Flemmi, along with Barboza, and Jimmy's brother, Stephen--were providing valued information in the "war" against the Italian Mafia, La Cosa Nostra ("LCN"). The pieties the FBI offered to justify their actions are the usual ones: The benefits outweighed the costs. Put otherwise, in terms that are more recently familiar, these four men were "collateral damage" in the LCN war. To the FBI, the plaintiffs' lives, and those of their families, just did not matter. As Agent Rico put it in his testimony before the United States House of Representatives Committee on Government Reform, when asked if he had any remorse that four innocent men went to prison, he replied: "Would you like tears or something?"

¶[Embed: YouTube of Rico's testimony queued to the start of the above question; no caption]

¶[Continue block quote:]Now is the time to say and say without equivocation: This "cost" to the liberty of four men, to our system of justice is not remotely acceptable. No man's liberty is dispensable. No human being may be traded for another. Our system cherishes each individual. We have fought wars over this principle. We are still fighting those wars.

¶Sadly, when law enforcement perverts its mission, the criminal justice system does not easily self-correct. We understand that our system makes mistakes; we have appeals to address them. But this case goes beyond mistakes, beyond the unavoidable errors of a fallible system. This case is about intentional misconduct, subornation of perjury, conspiracy, the framing of innocent men. While judges are scrutinized--our decisions made in public and appealed--law enforcement decisions like these rarely see the light of day. The public necessarily relies on the integrity and professionalism of its officials.

¶It took nearly thirty years to uncover this injustice. It took the extraordinary efforts of [another] judge, a lawyer [Victor Garo], even a [news] reporter [Dan Rea of CBS4 Television Stations, who relentlessly pursued the cause of Salvati's innocence], to finally bring out the facts. Proof of innocence in this democracy should not depend upon efforts as gargantuan as these.

¶<i>White House spokesperson Hogan Gidley[sp?] [released the following statement in response to a request for comment as to whether the White House knew about the above information during Wray's confirmation|did not immediately respond to a request for comment prior to publication as to whether the White House knew about the above information during Wray's confirmation].</i>

¶<i>Senate Judiciary Chairman Lindsay Graham [released the following statement |did not immediately respond] to a request for comment prior to publication as to whether the White House knew about the above information during Wray's

confirmation.</i>
¶<i>Francis Schaeffer Cox did not contribute to this part of the CMU Series due to an anticipated scheduling conflict.</i>
¶[Attributative italics]

---

¶[Add a link to part 8 at the end of part 7, consistent with the links at the bottom of the other parts].

## AFFIDAVIT

I, TROY M. PLANTE, having first been sworn, do hereby depose and state as true the following:

1. I testified as a witness in a case styled United States of America v. Robert Ethan Miller, Jr., United States District Court Northern District of Georgia Atlanta Division, Case Number 1:97-CR-496-01-ODE(e).

2. I am currently incarcerated in the Florida Department of Corrections at New River Correctional Institution "O" unit.

3. My inmate number is V00070 and my date of birth is May 10, 1968.

4. I am currently serving a minimum mandatory sentence of three (3) years for the offense of possession of firearm by a convicted felon.

5. I first became acquainted with Robert Ethan Miller, Jr. while incarcerated in Cobb County, Georgia.

6. Mr. Miller and I were placed in the same cell, which was shared by a number of other persons.

7. At the time of my incarceration in Cobb County, I was charged with grand theft.

8. I indicated contact with the United States Secret Service through my court appointed attorney, whom I advised that Mr. Miller had been making certain statements and overtures to me in the county jail.

9. I met with agents of the Secret Service and advised them that Mr. Miller had attempted to procure my services to kill Jennifer Diane Ashford, who was or had been his girlfriend and was the mother of his child.

10. After advising the United States Secret Service that Mr. Miller had requested that I cause the death of Jennifer Diane Ashford, I was released from the Cobb County jail and at various times I was requested to wear a wire or other recording equipment and record conversations with Mr. Miller and others.

11. To the best of my knowledge the recordings never revealed any information other than circumstantial or tangential to the attempt/solicit of murder charges.

Affidavit of Troy M. Plante
In Re: Robert Ethan Miller, Jr.
Page 1 of 5

---

## AFFIDAVIT IN TRUTH

I, TROY PLANTE, do solemnly swear under penalty of perjury that the following statements are true:

1. In 1998 I testified in the trial of Robert Miller.

2. I did so under duress. I had tried not to testify and even told the prosecutor this before the trial. I told the prosecutor that I had fabricated the story against Robert Miller and I was told that if I didn't stick to my initial story I would be given 30 years myself. This is as stated in my 2005 recantation affidavit and in my live testimony in support on the District Court record, case no. 1:97-cr-00401-ODE.

3. I have read or been conveyed statements made by Tzegai Hinson, which stated that prior to Miller's 1998 trial I solicited both him and others, some in the Cobb County jail, to lie with me against Miller, and I admit to that. I did write a letter to Mr. Hinson at an Atlanta address because I believed I would be caught lying and I feared more perjury charges if Miller won his trial. I did not trust the prosecutor and I'd already told his more support (or my story that I would be caught lying and I feared I'd be caught) and if I didn't I feared the prosecutor and I'd already told his more support (or my story that I would be caught lying and I feared).

4. While in the Cobb jail I talked with several people, but the one name I remember is Alain Vera because he was a black kid from the Virgin Islands with a slight accent and a name I'd never heard of so I wrote his name down. So, yes he (Alain) and Hinson did possess letters I had written that would've proved I was lying at Miller's trial, and if Miller's attorney had approached me before the trial, especially with the facts Alain had told him about me I would've confessed then because I really never wanted to testify, I was forced to lie and I said the same on January 25, 2008 at Miller's appeal hearing.

5. I affirm Hinson's statements that I wrote him a letter before Miller's trial stating I was lying and trying to coerce him to lie to save ourselves from jail time.

6. I also affirm that I picked up Mr. Hinson's car in 1998 to drive used to Savannah GA or rather that is what Hinson and Miller believed at first because that was the only thing Miller planned with me, and the only reason Hinson gave me his car.

7. I also left a voice mail with Miller's trial attorney before the trial because I wanted to see if I could work out a way to not testify (lie) on Miller and not have it be my fault so the prosecutor would not retaliate as he threatened.

8. If Hinson or Alain or Miller's attorney had come forward with the letters, notes, or even the plans before or during Miller's trial I would have confessed to the truth as I am now. The first time I was ever asked by Miller, in 2005, to tell the truth I did. At no time did Miller ever ask me to hurt or kill anyone. I swore to this in 2005. Again in January 2008 on the stand, and now.

In absence of a notary, Title 28 USC §1746, I swear the above stated is true, on this 27 day of April, 2017.

TROY M. PLANTE

T.M.P.

CERTIFIED UNDER APOSTILLE (#USS30u) ATTACHED HEREON

EXHIBIT A-11

Case: 18-10726    Date Filed: 02/26/2018    Page: 22 of 45

12. Pursuant to my representations to the various United States Secret Service and the United States Attorney's Office, Mr. Miller was charged for a solicitation to commit murder and attempt to commit murder.

13. Mr. Miller paid for or arranged the payment for the bond which was required for my release from the Cobb County Jail. The Secret Service allowed my/worked to keep the bond money for my personal use.

14. Subsequent to my release from the Cobb County Jail, I relocated to the State of Florida in the St. Augustine area.

15. At the time of trial, the US Government paid for my transportation to Atlanta and my lodging there.

16. During the course of my trip to Atlanta, the U.S. Government arranged for payment of several hundred dollars per day during my stay.

17. Upon demand of the government, I traveled to Georgia approximately two (2) weeks prior to the scheduled trial.

18. During that time, on approximately ten (10) to fifteen (15) occasions, I was transported to the U.S. Attorney's Office and instructed to listen to my previously recorded statement in order to refresh my memory in preparation for trial, so that there not be a deviation in my testimony from the statements given on the recording.

19. At trial, I testified in a manner consistent with my recorded statement and followed the instructions of the U.S. Attorney to not deviate or depart from the substance of the recorded statement.

20. My testimony at the trial was that Robert Ethan Miller, Jr. did solicit or attempt to solicit my participation in the murder or unlawful killing of Jennifer Diane Ashford. I was to perform the killing and disposal of the body.

21. The statement given to the United States Secret Service and its agents, the grand jury, and the U.S. Attorney, where incorrect, misleading, and fabricated.

22. In fact, Robert Ethan Miller, Jr., at no time mentioned any desire or intention to cause bodily injury to or kill Jennifer Diane Ashford.

23. This statement and these statements contained to this allegation were fabrications on my own part.

24. These fabrications were relayed to the various United States officials because I saw an opportunity to conceal a story which I believed by the government might result in a reduction of sentence or some consideration concerning my grand theft charge.

25. My child and the mother were living on the street and needed the help I could provide if released from custody.

26. I believed at the time that I was facing three (3) years incarceration for the grand theft charge that was pending against me.

27. Ultimately, following my cooperation with the government, I received probation for the grand theft charge. The probationary sentence was a reward for my incriminating testimony against Mr. Miller.

28. One of the items of evidence that I provided to the government as corroboration for my story was a map showing where the alleged intended victim, Jennifer Diane Ashford, was located.

29. Mr. Miller did in fact provide information concerning her whereabouts and the place which she could be located, but this information was not provided in connection with any plot, attempt, effort, or desire on the part of Mr. Miller to cause or anyone else to cause harm to Ms. Ashford.

30. Mr. Miller provided the location information and I drew the map. My testimony that he drew the map was untrue.

31. Mr. Miller had requested that I perform certain tasks for him which would entail contact with Ms. Ashford, and that was the purpose for the directions or map.

32. To the best of my knowledge, in fact, Ms. Ashford visited Mr. Miller while he was incarcerated at the Cobb County Jail.

33. Mr. Miller did discuss with me performing certain actions, such as moving stolen property and drugs in exchange for which he would pay my bond and, ultimately, after all the tasks where completed, the sum of $5,000.00.

34. While it is true that Mr. Miller requested my involvement in certain other criminal activity, in my estimation, the disclosure to the government of such overtures would not be sufficient to interest the government in using me as an informant.

_Re: None Ashford_

Affidavit of Troy M. Plant
In Re: Robert Ethan Miller, Jr.
Page 2 of 5

Affidavit of Troy M. Plant
In Re: Robert Ethan Miller, Jr.
Page 3 of 5

T.M.P.

A

(3)

CERTIFIED VIA APOSTILLE (#44530d)

EXHIBIT A@2

Case: 18-10726   Date Filed: 02/26/2018   Page: 23 of 45

35. Accordingly, I distorted some of the facts to fit into a fabrication of solicitation to commit murder.

36. For example, I testified that the duffle bag would be used to dispose of Ms. Ashford's body. In fact, the purpose of the duffle bag would have been for the transportation of marijuana.

37. However, none of these activities contemplated any violence or harm to any person, including Jennifer Diane Ashford.

38. Prior to the time of trial, I expressed my reluctance to the government to testify as a witness in this case. My reluctance was based in large part on the fact that my testimony was untrue as the same related to the contemplation of or commission of murder or causing the death, or injury to any person.

39. The response of the government to my reluctance was that if I failed to testify in accordance with my previous statements, I would be sentenced to prison on the grand theft charges and would be charged as a co-conspirator in the contemplated and/or attempted murder of Jennifer Diane Ashford.

40. In addition, to the previously mentioned sums paid, the government provided one over $300.00 to obtain clothing for the trial.

41. I was instructed to purchase outfits which would make the look like a "street person" or a killer. The outfits were to be cut so that my tattoos would be prominently displayed for the jury. I have tattoos on my arms, upper arms and torso which the government said would cause the jury to believe that I was a likely accomplice in a criminal endeavor.

42. I continued the fabrication of my story because I did not want to be charged as a co-defendant with Mr. Miller, nor be sent to prison on the original charge of grand theft in Cobb County.

43. At no time was I interviewed by Mr. Miller's attorney or investigator prior to trial.

44. At no time did I offer the U.S. Government a statement to the genuine truth.

45. Despite attempts by the U.S. Government, no other person in their cell could or did corroborate my fabricated story.

46. I am making this statement freely, knowingly, and voluntarily. I understand that the attorney that has prepared this affidavit represents Mr. Miller and does not represent me, and that I have the right to independent counsel and representation, which I waive for the purpose of making this affidavit.

47. No representation has been made to me by the attorney drafting this affidavit, or by any other person, that my legal position will not be adversely affected or impacted in making these statements, or that I cannot be charged in connection therewith.

48. My motives in executing this affidavit include the following:

A. I wish to clear my conscience in that my false testimony has caused Mr. Miller to serve a lengthy prison sentence for acts or actions which he did not commit; and

B. The fact that he was given a significant sentence for the charges involving the contemplated death of Jennifer Diane Ashford have caused a separation between him and his child, the mother of whom is Jennifer Diane Ashford.

49. Further affiant sayeth not.

STATE OF FLORIDA
COUNTY OF Brevard

I have read the foregoing and under penalties of perjury it is accurate and complete to the best of my knowledge and belief.

_____
TROY M. PLANTE

Affirmed before me, on 7-4-05 _____ by TROY M. PLANTE:
[ ] who is personally known to me, or
[√] who produced the following identification: Doc. ID

TROY M. PLANTE personally appeared before me at the time of notarization, and, after being given the oath, acknowledged signing the foregoing document.

_____
Notary Public
Notary Stamp:

JOHN E. MOSLEY IV
Notary Public, State of Florida
Commission # DD 155888
Expires October 12, 2005

Affidavit of Troy M. Plante
In Re: Robert Ethan Miller, Jr.
Page 5 of 5

Affidavit of Troy M. Plante
In Re: Robert Ethan Miller, Jr.
Page 4 of 5

*[handwritten annotations:]* Troy M. Affidavit — CERTIFIED VIA AFROSTILE (#4553OU) — EXHIBIT A03 — T.M.P.

EXHIBIT A-T4 CERTIFIED VIA APOSTILLE (#4553D4)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ROBERT ETHAN MILLER,

DEFENDANT.

DOCKET NO. 1:97-CR-494
ATLANTA, GEORGIA
JANUARY 25, 2000

VOLUME 3
TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE ORINDA D. EVANS,
UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:

FOR THE GOVERNMENT: RICHARD LANGWAY, ASSISTANT U. S. ATTORNEY

FOR THE DEFENDANT: SUSAN JAMES

COURT REPORTER: ANDY ASHLEY, 1919 U. S. COURTHOUSE, ATLANTA, GEORGIA 30303-3361, (404) 215-1478

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT PRODUCED BY COMPUTER.

---

111

CAUSED ME PAUSE IN HIS EARLIER TESTIMONY AND I THINK THAT WE NEED TO CLEAR THAT UP.

THE COURT: OKAY. GO AHEAD.

THE CLERK: YOU'RE REMINDED YOU ARE STILL UNDER OATH.

THE WITNESS: YES, MA'AM.

ROBERT ETHAN MILLER,

HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION (CONTINUED)

BY MS. JAMES:

Q. WOULD YOU STATE YOUR NAME AGAIN FOR THE RECORD?

A. ROBERT MILLER.

Q. ARE YOU THE DEFENDANT IN THIS CASE?

A. YES, MA'AM.

Q. DO YOU RECALL SOME MONTHS AGO TESTIFYING IN A PROCEEDING IN THIS COURT RELATIVE TO YOUR 2255?

A. YES.

Q. AND DO YOU RECALL THAT I SHOWED YOU A LETTER THAT YOU IDENTIFIED, I THINK IT WAS DEFENDANT'S EXHIBIT 2, A LETTER THAT YOU HAD WRITTEN AS WITH REGARDS TO MR. PLANTE?

A. YES.

Q. AND THERE WAS SOME REFERENCE IN THE LETTER TO, I THINK, EXTORTION, AND I CAN'T RECALL WHO ASKED YOU THE QUESTION, POSSIBLY THE PROSECUTOR OR THE COURT, BUT YOU WERE ASKED IF MR. PLANTE HAD BEEN -- IN SUBSTANCE HAD MR. PLANTE BEEN GIVEN ANY

---

112

OF MONETARY BENEFIT FOR THE RECANTATION.

DO YOU REMEMBER SOME QUESTION TO THAT EFFECT?

YES.

Q. AND I BELIEVE THAT YOUR RESPONSE WAS NO?

A. RIGHT.

Q. WERE YOU TELLING THE TRUTH AT THAT TIME WHEN YOU SAID NO?

A. YES.

Q. TO YOUR KNOWLEDGE HAS HE EITHER -- HAS HE RECEIVED ANY OF COMPENSATION OR MONEY FROM ANYONE OTHER THAN YOU?

WELL SINCE WE SPOKE ABOUT IT --

Q. ARE YOU SAYING WE, ME AND YOU?

A. YES, MA'AM. JUST THE ATTORNEY THAT WE SPOKE ABOUT [illegible] OR SOMETHING, YOU REMINDED ME OF HIS NAME, BUT I KNOW THAT'S CONSIDERED COMPENSATION THEN, YES, BUT IT WAS THE ATTORNEY.

EXPLAIN THAT FOR THE RECORD WHEN YOU SAY UPPERMAN, WHAT YOU TALKING ABOUT?

WELL, PLANTE WAS TALKING ABOUT BEING FRIGHTENED THAT THE GOVERNMENT WAS GOING TO THREATEN HIM AS THEY HAD IN THE PAST, [illegible] TEN YEARS AGO DURING THE TRIAL, AND HE WAS CONCERNED HE WAS GOING TO END UP SERVING TIME FOR PERJURY --

MR. LANGWAY: YOUR HONOR, WE HAD A LOT OF TESTIMONY ABOUT THIS BEFORE, AND, IN FACT, AS I RECALL THE TESTIMONY THE ONLY COMMUNICATIONS THAT WERE BETWEEN MR. MILLER AND MR. PLANTE WERE IN THESE LETTERS, SOME LETTER.

(6-9)

---

2008

115

TROY MARIN PLANTE,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

THE CLERK: IF YOU WILL HAVE A SEAT, PLEASE, AND STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME ALSO.

THE WITNESS: TROY MARIN PLANTE.

MS. JAMES: MAY I PROCEED?

THE COURT: YES.

DIRECT EXAMINATION

BY MS. JAMES:

Q. MR. PLANTE, WHERE DO YOU PRESENTLY RESIDE?

A. I'M IN THE DEPARTMENT OF CORRECTIONS, STATE OF FLORIDA.

Q. ARE YOU SERVING A SENTENCE?

A. I'M SERVING A TEN-YEAR SENTENCE.

Q. HAVE YOU PREVIOUSLY TESTIFIED IN THIS COURT?

A. YES, MA'AM.

Q. AND IN WHAT CASE WAS THAT?

A. THE STATE VERSUS ROBERT MILLER IN 1998, I BELIEVE IT WAS.

Q. WERE YOU A WITNESS FOR WHICH SIDE?

A. FOR THE STATE.

Q. WHEN YOU SAY THE STATE, DO YOU MEAN THE FEDERAL GOVERNMENT?

A. YES, MA'AM.

Q. AND DID YOU OFFER TESTIMONY AGAINST MR. PLANTE?

A. MA'AM?

A

---

117

Q. I'M SORRY. DID YOU OFFER TESTIMONY AGAINST MR. MILLER?

A. YES, MA'AM.

MR. LANGWAY: YOUR HONOR, HERE WE GO, YOU KNOW, SHE'S PUTTING WORDS IN HIS MOUTH AND HE'S JUST SAYING YES, YES, YES.

MS. JAMES: I'LL TRY TO BE MORE DIRECT, YOUR HONOR.

THE COURT: ALL RIGHT.

BY MS. JAMES:

Q. HAVE YOU SUBSEQUENT TO GIVING THAT TESTIMONY GIVEN AN AFFIDAVIT?

A. YES, MA'AM.

MR. LANGWAY: YOUR HONOR, AGAIN THAT'S A LEADING QUESTION. WE KNOW THAT.

THE COURT: OVERRULED AT THIS TIME.

MS. JAMES: MAY I APPROACH THE WITNESS?

THE COURT: YES.

BY MS. JAMES:

Q. I'M GOING TO SHOW YOU WHAT'S NOW IN EVIDENCE AS DEFENDANT'S EXHIBIT 1 AND ASK YOU IF YOU CAN IDENTIFY THAT.

TELL THE COURT WHAT IT IS?

A. YES, MA'AM. THIS IS THE AFFIDAVIT I WROTE WHILE I WAS IN PRISON PRIOR TO THE ONE SENTENCE I'M SERVING NOW. I WAS RELEASED. SO THIS WAS ABOUT THREE YEARS AGO. I WAS IN THE DEPARTMENT OF CORRECTIONS IN THE STATE OF FLORIDA, AND I HAD A LAWYER COME LET ME DO THIS AFFIDAVIT.

Q. OKAY. HOW DID THAT COME ABOUT, WHY?

---

118

A. I WAS FEELING GUILTY ABOUT PUTTING SOMEBODY BEHIND BARS FOR SO LONG FOR SOMETHING THEY DIDN'T REALLY DO.

Q. TAKE A LOOK AT THE CONTENT OF THAT AFFIDAVIT. DOES THAT APPEAR TO BE YOUR SIGNATURE ON THERE?

A. YES, MA'AM, SURE IS.

Q. DOES IT APPEAR TO BEAR YOUR INITIALS ON EACH PAGE?

A. YES, MA'AM.

Q. DOES THAT APPEAR TO BE THE SAME AFFIDAVIT OR A COPY OF THE AFFIDAVIT THAT YOU SIGNED?

A. YES, MA'AM, IT IS.

Q. AND WERE THE STATEMENTS CONTAINED THEREIN TRUE OR FALSE?

A. IT'S TRUE.

THE COURT: I KNOW YOU SAID THE EXHIBIT NUMBER. WOULD YOU STATE IT AGAIN?

MS. JAMES: ONE, YOUR HONOR, DEFENDANT'S EXHIBIT 1.

BY MS. JAMES:

Q. NOW HAVE YOU -- SINCE HAVING SIGNED THAT AFFIDAVIT, HAVE YOU BEEN INTERVIEWED BY THE SECRET SERVICE?

A. NO, MA'AM, THEY APPROACHED ME IN THE ORANGE COUNTY JAIL, THE ORLANDO UNIT AND TOLD ME TO CONTACT A NUMBER, BUT I NEVER CALLED THE NUMBER.

Q. OKAY. SO YOU'VE NOT HAD ANY CONTACT WITH ANYONE FROM THE FEDERAL GOVERNMENT SINCE, IS THAT WHAT YOU'RE SAYING, SINCE YOU SIGNED THAT?

A. I HADN'T HAD NO CONTACT WITH THE FEDERAL GOVERNMENT SINCE

---

120

Q. WERE YOU COERCED IN ANY WAY INTO MAKING THAT AFFIDAVIT?

A. NO, MA'AM.

MS. JAMES: MAY I HAVE JUST ONE MOMENT?

(PAUSE IN THE PROCEEDINGS.)

BY MS. JAMES:

Q. I THINK YOU SAID THAT YOU WERE NOT -- YOU COULDN'T REMEMBER THE LAWYER'S NAME WHO CAME TO YOU WITH THE AFFIDAVIT?

A. RIGHT.

Q. WHAT CITY DID YOU SAY HE WAS FROM?

A. IT WAS LAKEWOOD, FLORIDA I BELIEVE.

Q. OKAY. SUBSEQUENT TO THAT HAVE YOU HAD ANOTHER FLORIDA LAWYER REPRESENT YOU?

A. FOR THIS CASE?

Q. YES.

A. NO, MA'AM, THAT WAS THE LAWYER THAT DID THE NOTARIZATION.

Q. OKAY. I'M SAYING SINCE THEN HAVE YOU HAD ANY LAWYER WORKING ON YOUR BEHALF RELATED TO THIS CASE?

A. NOT RELATED TO THIS CASE, NO, MA'AM.

MS. JAMES: THAT'S ALL. THANK YOU.

CROSS-EXAMINATION

BY MR. LANGWAY:

Q. ALL RIGHT, MR. PLANTE, MY NAME IS RICHARD LANGWAY. I'M AN ASSISTANT UNITED STATES ATTORNEY. GOOD MORNING, SIR.

A. GOOD MORNING.

Q. YOU'RE HERE ON A WRIT, IS THAT CORRECT?

(10-13)

---

121

A. ON A WRIT?

Q. ON A WRIT OF HABEAS CORPUS FROM WHERE YOU'RE PRESENTLY INCARCERATED?

A. I GUESS THAT'S WHAT THEY CALL IT. YOU GOT ME ON THAT ONE.

Q. YOU DON'T KNOW ABOUT THAT?

A. UNH-UNH (NEGATIVE).

Q. DO YOU KNOW WHY YOU'RE HERE TODAY?

A. I'M HERE TO TESTIFY FOR MR. MILLER'S BEHALF.

Q. EXCUSE ME.

A. I AM HERE TO TESTIFY ON MR. MILLER'S BEHALF AS FAR AS I KNOW.

Q. WHAT KIND OF TESTIMONY ARE YOU TALKING ABOUT?

A. THE TESTIMONY THAT I GAVE A FALSE STATEMENT TEN YEARS AGO IN THIS COURTROOM.

Q. AND DO YOU HAVE ANY IDEA OR EXPECTATION AS TO WHAT WOULD HAPPEN IF YOUR TESTIMONY WAS BELIEVED BY THIS COURT?

A. NO, SIR, I DON'T.

Q. AND YOU SAY YOU'RE HERE TO GIVE TESTIMONY FAVORABLE TO MR. MILLER; IS THAT CORRECT?

A. YES, SIR.

Q. AND, AGAIN, DO YOU KNOW WHAT THE PURPOSE OF THIS HEARING HERE TODAY; DO YOU KNOW THE PURPOSE OF THE HEARING?

A. NO, NOBODY CAME AND TOLD ME ANYTHING. THIS IS THE FIRST TIME I'VE HEARD ANYTHING TODAY.

Q. SO YOU HAVEN'T SPOKEN TO ANYBODY ABOUT THIS HEARING?

EXHIBIT A-15 CERTIFIED VIA APOSTILLE (#4553D4)

A. NO, SIR.
Q. [illegible], IS THAT CORRECT?
A. NO, SIR.
Q. CORRECT?
A. CORRECT.
Q. YOU'RE FAMILIAR WITH THE WORD 2255?
A. 2255? NO, SIR.
Q. YOU DON'T KNOW WHAT THAT MEANS?
A. NO, SIR.
Q. DO YOU KNOW WHAT A HABEAS CORPUS IS TO BE RELEASED FROM PRISON, DO YOU KNOW ANYTHING ABOUT THAT?
A. UH-UH (NEGATIVE).
Q. HAVE YOU SPOKEN --
THE COURT: I'M SORRY. WHAT WAS YOUR RESPONSE?
THE WITNESS: NO, SIR.
BY MR. LANGWAY:
Q. SINCE 1995 HAVE YOU HAD ANY CONVERSATIONS WITH MR. MILLER ABOUT YOUR TESTIMONY?
A. JUST A COUPLE OF LETTERS BACK AND FORTH. I APOLOGIZED FOR DOING WHAT I DID AND I TOLD HIM I WOULD BE WILLING TO COME BACK TO COURT FOR HIM IF HE NEEDED ME.
Q. AND OTHER THAN THE [illegible] -- ANY OTHER TELEPHONE CONVERSATIONS, EITHER FACE-TO-FACE OR BY PHONE?
A. I NEVER HAD A FACE-TO-FACE PHONE CONVERSATION.
Q. WHEN DID THE FIRST TIME DID YOU HAVE A WRITTEN

COMMUNICATION BETWEEN YOU AND MR. MILLER ABOUT --
A. PROBABLY THE BEGINNING OF 2005.
Q. [illegible]
A. I WAS FEELING GUILTY ABOUT WHAT HAPPENED.
Q. SO YOU HAD SEEN --
A. I BASICALLY HAD THE SAME THING HAPPEN TO ME THAT HAPPENED TO HIM, AND I KIND OF FELT WHERE IT REALLY AFFECTS SOMEBODY [illegible].
Q. SO WHEN WAS THAT THAT SOMETHING HAPPENED TO YOU SIMILAR TO THIS?
A. I'VE HAD SOMEBODY TESTIFY AGAINST ME IN STATE COURT, AND I GOT FOUR YEARS OUT OF IT. THREE YEARS OF IT MANDATORY.
Q. WHEN WAS THAT?
A. 2002.
Q. 2002. OKAY. SO YOU KNEW ABOUT THAT IN 2002 BUT YOU WAITED UNTIL 2005 --
A. BECAUSE ME, IT TOOK ME TO 2005 TO FIGURE OUT WHERE IT WAS.
Q. OKAY. DO YOU KNOW ANY OTHER PEOPLE WHO ASSOCIATED WITH HIM ON THE OUTSIDE, HIM BEING MR. MILLER?
A. NO, SIR.
Q. ANY OF HIS RELATIVES?
A. I THINK HIS MOTHER WROTE ME ONE LETTER A LONG TIME AGO ASKING ME -- TELLING ME THANK YOU FOR WHAT I'M DOING, YOU KNOW, BECAUSE HER SON DIDN'T DO WHAT HE WAS ACCUSED OF, ALONG THOSE LINES.
Q. WHO IS THAT?

[illegible] OF MARCH, SOMEWHERE IN THERE.
THE COURT: DO YOU HAVE ANY RECOLLECTION OF WHAT WAS [illegible] THAT?
THE WITNESS: JUST I FELT MY CONSCIENCE.
THE COURT: SO ARE YOU TELLING ME THERE WAS NOTHING IN PARTICULAR THAT MADE YOU DO IT AT THAT PARTICULAR TIME?
THE WITNESS: NO, I WAS JUST TRYING TO GET RELEASED FROM PRISON. SO I FIGURED WHEN I GOT OUT OF PRISON I COULD DO IT, BUT I ENDED UP GETTING IN CONTACT WITH HIM RIGHT BEFORE I GOT OUT.
THE COURT: TELL ME AGAIN WHEN YOU GOT OUT?
THE WITNESS: I GOT OUT IN 2005, SEPTEMBER THE 1ST OF 2005.
THE COURT: THAT WOULD HAVE BEEN A LONG TIME AFTER THE BEGINNING OF 2005.
THE WITNESS: AFTER I SIGNED THIS AFFIDAVIT, IT WAS LIKE A YEAR LATER I GOT OUT, MAYBE A LITTLE OVER A YEAR.
BY MR. LANGWAY:
Q. SO YOU DECIDED SOMETIME IN EARLY 2005 THAT YOU WANTED TO RECANT. DID YOU COMMUNICATE THAT DESIRE TO ANYONE?
A. WHAT DO YOU MEAN HOW DID I COMMUNICATE IT?
Q. DID YOU TELL ANYBODY --
A. I WROTE MR. MILLER A LETTER AND TOLD HIM. THAT'S THE ONLY PERSON, AND THEN I HAD THE LAWYER ASKED TO COME DO THE AFFIDAVIT.

AGAIN.
Q. WHY DID YOU GUESS THAT?
A. BECAUSE THAT'S THE ONLY WAY I WOULD HAVE KNOWN THAT IS THERE. IF YOU'RE TRYING TO GET ME UP HERE TO LIE, TO SAY I'M LYING OR SOMETHING, WHATEVER, MAN, BUT I'M JUST HERE TO LET YOU KNOW WHAT I SAID TEN YEARS AGO WAS FALSE IN THIS COURTROOM.
IF YOU'RE GOING TO STAY HERE AND TRY TO CONTRADICT WHAT I'M SAYING, YOU CAN DO THAT, BUT I'M NOT GOING TO SIT HERE AND JUST KEEP ANSWERING THESE QUESTIONS.
IF YOU WANT ME TO SAY WHAT I SAID TEN YEARS AGO IS TRUE OR FALSE, I'LL DO THAT FOR YOU, BUT, YOU KNOW, IF YOU'RE GOING TO SIT HERE -- I REALLY DON'T HAVE TIME FOR ALL THIS. SEND ME BACK WHERE I CAME FROM.
Q. YOU'LL BE GOING BACK THERE FOR SURE.
A. I KNOW. I'M READY.
Q. WE'RE TALKING ABOUT [illegible], 2005?
A. OKAY. I KNOW WHERE YOU ARE.
Q. WHAT PROMPTED YOU TO WRITE THIS LETTER?
A. I WROTE THIS LETTER BECAUSE WHAT I SAID AGAINST MR. MILLER TEN YEARS AGO WAS FALSE. I LIED TO THE SECRET SERVICE AND I TOLD THEM STUFF THAT WASN'T TRUE. HE HAS GOT TO [illegible] OF IT, AND I FEEL GUILTY ABOUT THAT IF THAT'S NOT BAD ENOUGH.
Q. AND SO I ASK YOU AGAIN IF YOU COULD TRY TO ANSWER THE QUESTION I'D APPRECIATE IT.
A. I'LL TRY TO ANSWER YOUR QUESTION. BUT, YOU KNOW, IF

A. I WROTE AND TRIED TO THE SECRET SERVICE COMING TO TELL ME THEY WOULD HAVE TO CONTACT THEM, BUT THEY SAID NOTHING ABOUT A FEDERAL HEARING.
Q. WHEN WAS THAT, WHEN DID THE SECRET SERVICE COME TO YOU?
A. THAT WAS IN PROBABLY THE SAY OCTOBER OF 2007 AT THE ORANGE COUNTY JAIL.
Q. SO A SECRET SERVICE AGENT CAME --
A. FROM THE ORLANDO FIELD OFFICE AND GAVE ME A 404 AREA CODE IN ATLANTA TO THE SECRET SERVICE AGENT TO CONTACT BUT I NEVER CONTACTED THE NUMBER.
Q. WHO WAS THE AGENT THAT DID THAT; DO YOU KNOW?
A. I HAVE NO IDEA WHAT THE AGENT'S NAME WAS. IT WAS A FEMALE.
Q. A FEMALE AGENT. DID SHE -- DID YOU TALK TO HER?
A. SHE DIDN'T REALLY TALK TO ME. SHE JUST HANDED ME A PAPER, SHE HANDED ME SOME PAPER SAYING I NEEDED TO CALL THIS NUMBER AND SOMETHING ABOUT THEY WANTED TO INTERVIEW ME UP IN ATLANTA, GEORGIA BUT I WAS INCARCERATED SO THERE WAS NO WAY I COULD DO THAT.
Q. SO YOU DIDN'T CALL?
A. I DIDN'T CALL.
Q. [illegible] INTERVIEWED?
A. NO.
Q. DID YOU EVER TALK [illegible] INTERVIEWED BY THE SECRET SERVICE?

(14-17)

A

2005.
A. YES, SIR.
Q. AND, AGAIN, IS IT YOUR TESTIMONY TODAY THAT EVERYTHING THAT'S STATED IN THIS AFFIDAVIT IS TRUE AND CORRECT?
A. YES, SIR.
Q. IS THERE ANYTHING THAT'S MISSING FROM THIS AFFIDAVIT?
A. NOT TO MY KNOWLEDGE.
Q. NOW IF YOU WOULD, SIR, WHEN YOU DECIDED TO RECANT YOUR TESTIMONY, YOU UNDERSTAND WHAT I MEAN WHEN I SAY RECANT, DO YOU?
A. YES, SIR, I UNDERSTAND.
Q. YOU KNOW WHAT THAT MEANS. WHAT DOES IT MEAN?
A. IT MEANS TO REDO MY TESTIMONY BASICALLY, CHANGE MY TESTIMONY.
Q. AND YOU MADE THIS DECISION SOMETIME IN EARLY 2005?
A. YES, SIR.
Q. ALL RIGHT. HOW DID YOU COMMUNICATE --
THE COURT: JUST A MINUTE. WHEN DID YOU MAKE THAT DECISION IN 2005?
THE WITNESS: I REALLY WAS THINKING ABOUT IT EVER SINCE I DID IT. IT WAS ON MY CONSCIENCE EVERY DAY, BUT 2005 IS WHEN I DECIDED TO TRY TO GET IN CONTACT WITH MR. MILLER.
THE COURT: DO YOU REMEMBER WHEN IT WAS IN 2005?
THE WITNESS: I COULDN'T REMEMBER THE EXACT DATE. I KNOW IT WAS AROUND THE BEGINNING OF 2005. IT COULD HAVE

YOU'RE GOING TO SIT HERE AND CONTRADICT ME AND TRY TO CATCH ME IN LIES. I HAVE NO REASON TO SIT HERE AND LIE.
THE COURT: HOLD ON JUST A MINUTE. MR. PLANTE, WAIT FOR THE NEXT QUESTION. GO AHEAD.
BY MR. LANGWAY:
Q. THE QUESTION IS YOU MET WITH MR. MAINES IN FEBRUARY OF 2005, CORRECT?
A. YES, I DID.
Q. AND AN AFFIDAVIT WAS PREPARED AFTER THIS TAPE-RECORDED INTERVIEW, CORRECT?
A. YES, I DID.
THE COURT: NOW, I DON'T RECOGNIZE WHAT WAS -- BRING ME UP TO SPEED. WHEN WAS THE TAPE-RECORDED INTERVIEW?
THE WITNESS: I DON'T HAVE ANY IDEA. I JUST KNOW IN 2005 I MET WITH MR. MAINES. HE CAME AND BROUGHT ME THE TAPE RECORDER, I MADE THE AFFIDAVIT, I SIGNED THE AFFIDAVIT. IT COULD HAVE BEEN TWO OR THREE MONTHS LATER, A MONTH LATER. I DIDN'T KEEP TRACK OF IT.
MR. LANGWAY: YOUR HONOR, WE HAVE IN EVIDENCE GOVERNMENT'S EXHIBIT 81 WHICH IS THE TAPE-RECORDED INTERVIEW FEBRUARY 8TH, 2005 MADE BY MR. MAINES OF HIS INITIAL MEETING WITH --
THE WITNESS: SO IT WAS FEBRUARY WHEN I MADE THE TAPE.
BY MR. LANGWAY:

(15-18)

Q. HE HAD A TAPE RECORDER WITH HIM AND YOU BASICALLY SIGNED [illegible] IT, CORRECT?
A. YES, SIR.
Q. SO YOU DID THAT. THAT WAS IN FEBRUARY, FEBRUARY 8TH, 2005. WHAT HAPPENED BETWEEN FEBRUARY 8TH, 2005 AND JUNE 11TH, 2005 THAT CAUSED YOU TO WRITE THIS LETTER TO MR. MILLER OR MR. MAINES SAYING THIS WILL COME AS A SURPRISE TO MR. MAINES AND MR. MILLER BUT PLEASE COME AGAIN; WHAT MADE THAT HAPPEN?
A. BECAUSE I FOUND OUT, YOU KNOW, I WAS BEING TOLD BY CERTAIN PEOPLE THAT IF I DID THAT I WOULD GET PERJURY CHARGES, AND I FOUND OUT THAT THEY REALLY COULDN'T PUT PERJURY CHARGES ON ME BECAUSE I WAS UNDER DURESS WHEN I MADE THE TESTIMONY TEN YEARS AGO, AND AROUND JUNE I FINALLY DECIDED AND WENT TO THE LAW LIBRARY AND LOOKED UP THE STATUTE OF LIMITATIONS FOR PERJURY AND IT'S ONLY FIVE YEARS AND THE CASE IS PAST FIVE YEARS.
SO I WENT AHEAD AND WROTE THE LETTER, BECAUSE I HAD ALREADY WROTE MR. MILLER AND TOLD HIM I WAS HAVING SECOND THOUGHTS ABOUT DOING THIS AFFIDAVIT BECAUSE I DIDN'T WANT TO GET PERJURY CHARGES BROUGHT AGAINST ME.
SO WHEN I WROTE THAT LETTER I SAID IT WILL BECOME A SURPRISE TO MR. MILLER BECAUSE HE DIDN'T THINK I WAS GOING TO DO THIS FOR HIM BECAUSE I WAS SCARED OF PERJURY CHARGES, BUT I NO LONGER HAVE THAT CONCERN BECAUSE I FOUND OUT THE STATUTE OF LIMITATIONS WAS FIVE YEARS ON PERJURY CHARGES.
Q. OKAY. SO GOING TO THIS [illegible] --

A

EXHIBIT A-16 CERTIFIED VIA APOSTILLE (#455304)

A. [illegible] BECAUSE THE GOVERNMENT [illegible] TO SAY WHAT I SAID.

Q. PRIOR TO, THIS IS JUNE [illegible], [illegible], DID YOU EVER HAVE ANY COMMUNICATIONS WITH MR. MILLER ABOUT YOUR CONCERNS ABOUT PERJURY OR PROSECUTION?

A. [illegible]

Q. MR. [illegible]. BETWEEN FEBRUARY [illegible], [illegible] AND JUNE [illegible], [illegible] DID YOU HAVE ANY COMMUNICATIONS WITH ANYONE ABOUT YOUR CONCERN OF MAKING AN AFFIDAVIT BECAUSE YOU MIGHT BE PROSECUTED FOR PERJURY?

A. I WAS [illegible] THE AFFIDAVIT, AND THEN THAT [illegible] CONCERN CAME ABOUT FOR THE PERJURY. BECAUSE SOMEBODY IN THE LAW LIBRARY AT THE PRISON I WAS AT TOLD ME THERE WAS A POSSIBILITY THAT I COULD BE CHARGED WITH PERJURY.

Q. WHEN WAS THAT?

A. THAT WAS IN [illegible] AFTER I WROTE THE AFFIDAVIT.

[illegible], I [illegible] THAT, BUT WHEN WAS THIS PERSON IN THE LAW [illegible] TELLING YOU THIS?

I COULDN'T TELL YOU THE EXACT DATE. I DON'T SIT THERE AND [illegible] EVERYTHING I DO.

[illegible] THIS IN THE [illegible]. [illegible] BEFORE THAT [illegible] --

IT WAS RIGHT AFTER I DID THE AFFIDAVIT WHICH WAS YOU SAID [illegible], SO SOMETIME AT THE END OF FEBRUARY [illegible] OF MARCH RIGHT AFTER I DID THE AFFIDAVIT.

[illegible]

[illegible] ANY OTHER [illegible]?

NO, SIR.

[illegible] THAT YOU WERE [illegible] TO GET [illegible] MR. MILLER WAS RELEASED FROM HIS SENTENCE IN THIS [illegible] IF YOU PROVIDED THE INFORMATION [illegible]?

NO, SIR.

[illegible] TO GET ANY MONEY FROM ANYONE, EITHER FROM [illegible] OR [illegible] AS A RESULT OF [illegible] [illegible] AT THIS TIME?

NO, SIR. I [illegible] MY OWN [illegible] AND HAVE MY OWN FINANCIAL [illegible].

YOU [illegible] WHAT IS THAT?

[illegible] IN [illegible], FLORIDA.

[illegible] THAT IN YOUR [illegible]?

[illegible]

[illegible] YOU [illegible] ANY MONEY. [illegible] TO [illegible]?

NO, SIR, I [illegible] ANY MONEY.

[illegible] DID YOU EVER TELL MR. MILLER IN WRITING THAT YOU [illegible] TO GET SOME MONEY FROM HIM FOR THIS?

NO, SIR.

[illegible] THE END OF [illegible] AND [illegible]?

[illegible] UNDERSTAND THAT [illegible]

[illegible] THE QUESTION. DID THAT [illegible] MONEY FROM MR. MILLER OR [illegible]

(19 - 22)

A. [illegible] I SIGNED THE AFFIDAVIT THAT'S WHEN HE WAS WITH ME. I KNOW WHEN HE FINALLY GOT THE AFFIDAVIT AFTER I SIGNED THEM AND HAD THEM NOTARIZED, THEY WENT TO HIM THROUGH THE MAIL, BUT HE DID COME OUT TO THE PRISON TO SEE ME TO GET THE SIGNATURES AND STUFF.

Q. HE DIDN'T TAKE THEM WITH HIM WHEN HE LEFT?

A. NO, HE DID NOT TAKE THEM WITH HIM WHEN HE LEFT. THEY WERE SENT TO HIM IN THE MAIL.

Q. ALL RIGHT. NOW HAVE YOU EVER ASKED ANYBODY FOR ANY MONEY TO PREPARE THE AFFIDAVIT, TO DO AN AFFIDAVIT?

A. HAVE I EVER ASKED ANYBODY FOR MONEY?

Q. YES.

A. NO, SIR.

Q. DID YOU EVER ASK MR. MILLER FOR MONEY?

A. NO, SIR.

Q. FOR ANY REASON?

A. NO, SIR.

Q. DID YOU EVER RECEIVE ANY MONEY FROM MR. MILLER?

A. NO, SIR.

Q. DID YOU EVER RECEIVE -- FOR THE AFFIDAVIT OR FOR ANY PURPOSE?

A. NO, SIR.

Q. DID YOU EVER RECEIVE ANY MONEY FROM ANYBODY ELSE ON MR. MILLER'S BEHALF WITH RESPECT TO THIS RECANTATION?

A. NO, SIR.

SOMEONE ON HIS BEHALF TO DO THIS?

A. I REMEMBER ONE TIME IN A CONVERSATION I THINK THAT I DID ASK MR. MILLER IF HE COULD HELP MY WIFE AND KIDS WITH SOME MONEY, BUT I DON'T THINK HE EVER DID.

Q. THIS IS IN A CONVERSATION?

A. THAT WAS BACK IN [illegible] SOMETIME IN A CONVERSATION.

Q. BEFORE YOU DID THE AFFIDAVIT?

A. BUT IT WAS NOTHING TO DO WITH THE AFFIDAVIT.

Q. WHAT DID MR. MILLER SAY TO YOU IN RESPONSE TO THAT?

A. HE SAID THAT HE WOULD RATHER NOT DO THAT BECAUSE, YOU KNOW, IT WOULD LOOK LIKE HE WAS TRYING TO GIVE ME MONEY FOR THE AFFIDAVIT AND I AGREED THAT THAT WAS TRUE. THAT'S WHY I THINK HE NEVER SENT THE MONEY TO MY GIRLFRIEND AND KIDS.

Q. DID YOU EVER DISCUSS WITH MR. MILLER THE PERJURY LAWS?

A. WE DISCUSSED THE PERJURY LAW WITH ME ONE TIME. HE'S THE ONE WHO THOUGHT THAT THE STATUTE OF LIMITATIONS MIGHT HAVE BEEN PAST FIVE YEARS. THAT'S WHAT MADE ME START REALLY LOOKING INTO IT, BUT THEY DIDN'T HAVE A LAW LIBRARY FOR FEDERAL CASES AT THE PRISON WHERE I WAS AT. THAT'S WHY IT TOOK ME SO LONG TO GET THE INFORMATION.

THEY ONLY HAVE A STATE LAW LIBRARY FOR THE STATE OF FLORIDA LAW, AND I THINK I DID ASK HIM SINCE HE WAS IN FEDERAL PRISON IF HE COULD FIND OUT THROUGH THE LAW LIBRARY IN THE FEDERAL PRISON WHAT THE STATUTE OF LIMITATIONS WERE.

Q. DID YOU EVER TELL MR. MILLER IN WRITING OR ORALLY WORDS TO

THE EFFECT I'M GETTING OUT OF PRISON, I'M BROKE, IF I HAVE TO DO TIME FOR PERJURY, I'M GOING TO NEED THIS AND THAT AND THE OTHER THING?

A. I MIGHT HAVE SAID SOMETHING LIKE THAT. I CAN'T RECOLLECT. LIKE I SAID THAT WAS LONG AGO. WHEN I CAME OUT OF PRISON I WASN'T REALLY BROKE.

Q. DID YOU EVER TELL MR. MILLER YOU WANTED MONEY BECAUSE YOU WERE BROKE AND YOU WERE GETTING OUT OF PRISON PRIOR TO THE TIME YOU EXECUTED THE AFFIDAVIT, SIR?

A. NOT THAT I CAN RECOLLECT.

Q. HOW AFTER YOU SIGNED THIS AFFIDAVIT DID YOU ATTEMPT TO GET MONEY FROM MR. MILLER?

A. ATTEMPT?

Q. YEAH, DID YOU ASK HIM OR ANYONE ELSE TO GIVE YOU MONEY, NOW I'VE SIGNED THE AFFIDAVIT, I NEED SOME MONEY, DID YOU EVER DO THAT?

A. NO, NOT TO MY RECOLLECTION, NO.

Q. DO YOU KNOW WHAT THE TERM EXTORTION MEANS?

A. I KNOW WHAT THE TERM EXTORTION MEANS.

Q. DID YOU EVER EXTORT MONEY FROM MR. MILLER?

A. DID I EVER EXTORT MONEY FROM MR. MILLER?

Q. DID YOU EVER ATTEMPT TO EXTORT MONEY FROM MR. MILLER?

A. NO, SIR.

Q. WERE YOU EVER SUCCESSFUL IN EXTORTING MONEY FROM MR. MILLER?

A. NO.

Q. YOU NEVER GOT ANYTHING FROM MR. MILLER?

A. FROM MR. MILLER?

Q. YEAH.

A. NOT THAT I CAN RECOLLECT.

Q. OR THE DEFENDANT'S MOTHER MARY MILLER, DID YOU EVER GET ANYTHING FROM HER?

A. [illegible] LIKE I SAID [illegible]. I DIDN'T EVEN KNOW MARY MILLER WAS HIS MOTHER UNTIL RECENTLY.

Q. AND YOU KNOW THAT HOW?

A. FROM A LETTER. I TOLD YOU AT THE BEGINNING OF THIS CONVERSATION SHE WROTE ME A LETTER THANKING ME FOR DOING IT.

Q. DID YOU EVER TELL ANYBODY YOU EXPECTED TO GET PAID OR COMPENSATED IN ONE FORM OR ANOTHER BY MR. MILLER OR THE DEFENDANT RODNEY MILLER?

A. NO, SIR.

Q. YOU NEVER TOLD ANYBODY THAT?

A. NO, SIR.

Q. DID YOU EVER HAVE ANY DISCUSSIONS WITH ANYONE ABOUT WHERE THE MONEY MIGHT COME FROM THAT YOU MIGHT RECEIVE FROM MR. MILLER OR HIS ASSOCIATES?

A. NO, SIR.

Q. WHAT WAS THAT?

A. NO, SIR.

Q. YOU NEVER HAD A CONVERSATION WITH ANYBODY TO THAT EFFECT?

(23 - 26)

A. [illegible]

Q. [illegible]

A. YOU JUST ASKED ME DID I EVER TRY TO EXTORT AND I SAID NO, SO WHY WOULD I BE SUCCESSFUL IN EXTORTING IF I NEVER TRIED TO EXTORT?

Q. DID MR. MILLER EVER WRITE YOU A LETTER SAYING I'M NOT GOING TO BE [illegible] OR [illegible] BY [illegible]

A. NOT THAT I CAN REMEMBER. I DIDN'T GET THAT MANY LETTERS FROM HIM. LIKE I SAID WE MIGHT HAVE WROTE EACH OTHER BACK AND FORTH THREE TO FOUR OR FIVE LETTERS AT THE MOST OVER THAT PERIOD OF TIME.

Q. PERIOD OF TIME BEING WHAT?

A. BECAUSE MY PRISON WON'T LET ME GET LETTERS FROM OTHER PRISONERS. [illegible] A LETTER FROM HIM WOULD BE [illegible] SIR.

Q. DID YOU EVER GET ANY THIRD-PARTY LETTERS, DO YOU KNOW WHAT I'M TALKING ABOUT?

A. WHAT DO YOU MEAN?

Q. SOMEBODY PUTS A LETTER INSIDE AN ENVELOPE AND SENDS IT TO YOU, BUT WHO IS NOT A PRISONER, A PERSON FROM THE OUTSIDE. YOU KNOW WHAT I'M TALKING ABOUT, RIGHT?

A. NO.

Q. YOU DON'T KNOW THAT?

A. I KNOW WHAT YOU'RE SAYING BUT NO.

Q. YOU NEVER RECEIVED ANYTHING LIKE THAT?

C-E-R-T-I-F-I-C-A-T-E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, [illegible] G. ASHLEY, DO HEREBY CERTIFY THAT I AM A U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA, THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND ACCURATE TRANSCRIPTION OF MY STENOTYPE NOTES AS TAKEN AFORESAID.

IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON THIS [illegible] DAY OF APRIL, [illegible].

[signature]

[illegible] G. ASHLEY
OFFICIAL COURT REPORTER
NORTHERN DISTRICT OF GEORGIA

# FEDERAL PUBLIC DEFENDER

## SOUTHERN DISTRICT OF ILLINOIS

PHILLIP J. KAVANAUGH
FEDERAL PUBLIC DEFENDER

TELEPHONE: (618) 482-9050
FAX: (618) 482-9057

March 13, 2015

650 MISSOURI AVENUE, SUITE G10A
EAST ST. LOUIS, ILLINOIS 62201

401 WEST MAIN STREET
BENTON, ILLINOIS 62812

Mr. Robert Ethan Miller - Reg. #48707-019
USP Marion
U.S. Penitentiary
P. O. Box 1000
Marion, IL   62959

Re: ROMAN, Erick

Dear Mr. Robert Ethan Miller:

The Office of the Federal Public Defender has been appointed to represent Mr. Erick Roman on a charge which is pending in the United States District Court for the Southern District of Illinois. As part of that representation, we must obtain information and conduct interviews in order to prepare for various hearings.

Mr. Roman has requested that we interview you as part of preparation in his case. Please call me at our office, collect, to advise of your decision. We would appreciate hearing from you by Tuesday, March 31, 2015.

Our office phone number is 618.482.9050; our office hours are from 8:00 a.m. - 4:30 p.m., Monday through Friday.

Thank you for your time.

Sincerely,

Brenda A. Tripp
Investigator

c: Thomas C. Gabel, AFPD
   file

## WITNESS LIST

| NAME | BOP LOCATION | FEDERAL DISTRICT/OFFENSES | SENTENCE/RELEASE DATE |
|---|---|---|---|
| Melvin Fagan (B/M; 44) #08072-027 | USP - Marion | SD/IN: Access Device Fraud Conspiracy; Access Device Fraud; Aggravated Identity Theft; Attempted Access Device Fraud | 60 months (ct. 1); 77 months (ct. 2); 77 months (ct. 3), cc; 25 months (ct. 4, cs) 101 months total - sentence cs to any previous sentence release date: 10/26/2026 |
| Jorge Ignacio Figueroa (W/M; 55) #44617-066 | USP - Marion | ED/NY: Conspiracy to Import Cocaine; Conspiracy to Distribute Cocaine; Cocaine Importation; Cocaine Distribution; Cocaine Importation; Cocaine Distribution; Cocaine Distribution; [Escobar drug cartel] | Life release date: n/a |
| Michael C. Finton aka Talib Islam (W/M; 35) #17031-026 | USP - Marion | CD/IL trf to SD/IL: Use of Certain Weapons of Mass Destruction [attempted to blow up federal building in Springfield, IL] | 336 months |
| Derrick Menter (B/M; 42) #63205-050 | FCI Terre Haute | NJ: Conspiracy to Murder [conspired from jail to murder NJ Chief Judge Garrett Brown, Jr.] | Life release date: 2/13/2034 |
| Robert Ethan Miller (W/M; 45) #48707-019 | USP - Marion | MD/FL: Conspiracy to Possess Marijuana with Intent to Distribute, Traffic in Contraband Articles as a Federal Inmate ✳(indictment unavailable) | Life release date: n/a |
| Kirksey McCord Nix (W/M; 71) #20921-077 | USP - Terre Haute | | ✳ 36 months, consecutive to prior federal sentence release date: ' |
| El Sayyid Nosair | | | Life release date: n/a |

2

Montgomery , AL 36104
334-269-3330
Email: sgjamesandassoc@aol.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:471.F UTTERS COUNTERFEIT OBLIGATIONS (1) | Administratively Dismissed |
| | IMPR by CUSBP for a term of: 110 mos on ct.1, 110 mos on ct. 2; 240 mos on ct. 3, and 240 mos on ct. 4, the sentence on ct. 1, 2 and 3 shall run cons to ea other, the sentence on ct. 4 shall run conc with the sentence imposed on ct. 1, 2 and 3. The s entence shall run consec to any previously imposed state sentence. Supv'd rel. 3 YRS. The Court recommnds that the Bureau of Prisons designate a maximum security facility outise the Atlanta, Georgia area. The deft is remanded to the CUSMS. Spec Assmt $400.00. Restitution: $1,100.00 to be paid with co-deft Gary Clinton McWhorter. |
| 18:471.F UTTERS COUNTERFEIT OBLIGATIONS (1s) | |
| 18:473.F DEAL IN COUNTERFEIT OBLIGATIONS AND SECURITIES (2) | Administratively Dismissed |
| | IMPR by CUSBP for a term of: 110 mos on ct.1, 110 mos on ct. 2; 240 mos on ct. 3, and 240 mos on ct. 4, the sentence on ct. 1, 2 and 3 shall run cons to ea other, the sentence on ct. 4 shall run conc with the sentence imposed on ct. 1, 2 and 3. The s entence shall run consec to any previously imposed state sentence. Supv'd rel. 3 YRS. The Court recommnds that the Bureau of Prisons designate a maximum security facility outise the Atlanta, Georgia area. The deft is remanded to the CUSMS. Spec Assmt $400.00. Restitution: $1,100.00 to be paid with co-deft Gary Clinton McWhorter. |
| 18:473.F DEAL IN COUNTERFEIT OBLIGATIONS AND SECURITIES (2s) | |



18:373-1500.F AGGRAVATED OR
FELONIOUS
(3s)

IMPR by CUSBP for a term of: 110
mos on ct.1, 110 mos on ct. 2; 240 mos
on ct. 3, and 240 mos on ct. 4, the
sentence on ct. 1, 2 and 3 shall run cons
to ea other, the sentence on ct. 4 shall
run conc with the sentence imposed on
ct. 1, 2 and 3. The s entence shall run
consec to any previously imposed state
sentence. Supv'd rel. 3 YRS. The Court
recommnds that the Bureau of Prisons
designate a maximum security facility
outise the Atlanta, Georgia area. The
deft is remanded to the CUSMS. Spec
Assmt $400.00. Restitution: $1,100.00
to be paid with co-deft Gary Clinton
McWhorter.

IMPR by CUSBP for a term of: 110
mos on ct.1, 110 mos on ct. 2; 240 mos
on ct. 3, and 240 mos on ct. 4, the
sentence on ct. 1, 2 and 3 shall run cons
to ea other, the sentence on ct. 4 shall
run conc with the sentence imposed on
ct. 1, 2 and 3. The s entence shall run
consec to any previously imposed state
sentence. Supv'd rel. 3 YRS. The Court
recommnds that the Bureau of Prisons
designate a maximum security facility
outise the Atlanta, Georgia area. The
deft is remanded to the CUSMS. Spec
Assmt $400.00. Restitution: $1,100.00
to be paid with co-deft Gary Clinton
McWhorter.

18:1512A.F TAMPER W/WITNESS
VICTIM, INFORMANT (IF DEATH
RESULTS)
(4s)

<u>Highest Offense Level (Opening)</u>
Felony

<u>Terminated Counts</u>                    <u>Disposition</u>
None

<u>Highest Offense Level (Terminated)</u>
None

<u>Complaints</u>                          <u>Disposition</u>
None

<u>Plaintiff</u>

USA

represented by **Bernita Malloy**
Office of United States Attorney
Northern District of Georgia
75 Spring Street, S.W.
600 United States Courthouse
Atlanta , GA 30303
404-581-6052
Email: Bernita.Malloy@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Asher Wray**
Office of United States Attorney
Northern District of Georgia
75 Spring Street, S.W.
600 United States Courthouse
Atlanta , GA 30303
404-581-6000
*TERMINATED: 07/20/2006*
*LEAD ATTORNEY*

**Richard M. Langway**
Office of United States Attorney
75 Spring Street, S.W.
600 United States Courthouse
Atlanta , GA 30303
404-581-6000
Email: richard.langway@usdoj.gov
*TERMINATED: 06/22/2009*



This Presentment is Accepted and returned in exchange for value and closure of this accounting, and closure of this accounting. sworn on the commercial liability, certified, Authorized Representative as true, correct, and complete, with all related endorsements, front, and back. Pre-paid, exempt from lien, Adjust the account and release the orders to the authorized Representative immediately

Date:

/s/

Exemption No. Account No. 0275675U8

A-17

### A F F I D A V I T

I, Troy M.Plante, per 28 U.S.C. 1746, under penalty of perjury in the absence of a notary hereby depose and state as follows:—

1. I testified in a federal case styled United States V. Bobby Miller, USDC, NDGA. Case No 1:97-cr-496-01-ODE.

2. I fabricated my entire testimony in that case and caused an innocent man to receive 40 years in prison, with Mr.Miller already serving over 20 years.

3. In about April of 2005, I have executed a recantation Affidavit, because I was feeling guilty for what I have done. I believed that, me admitting that I have lied would correct my wrong, but I underestimated, how corrupt and criminal the " justice " system is.

4. I was approached by the U.S.Secret Service shortly after. I admitting to lying on Mr.Miller at his trial. I refused to speak to them. I was then approached by the U.S.Attorneys office who questioned me at a 2008 hearing for Mr.Miller. I was threatened " again " to not to testify for Mr.Miller and that, I had better not say a word about any U.S. Attorney or they's make sure, I never again made parole in Florida as I was in Florida state prison at that time.

5.These threats by the U.S.Attorney in 2007-2008 caused me to hold back information, again as I did in Miller 1998 trial.

6. I am coming out now, because ever since, I lied on Miller my life has been horrible. I have been in and out of prison, the entire 20 plus Miller has been in because of my lies. I believe that, the only way to fix this is to risk my own life and come clean will everything no matter, what the consequences may be, at least they will be for telling the truth.

7. After, I tell these facts, I do not under any circumstances want the secret services, FBI, U.S.Attorney's office, or any other Government or State agent(s) or law and enforcement persons to approach me—under any circumstances.If any government—ment or State person(s), agent(s) or U.S.Attorney(s) for contacts me in any way I will take it as a threat, and as proof that, I am being threatened, intimiated, or coerced, once again, lie- for the Government, to keep an innocent man in prison.

8. I will only speak to Mr.Miller or his attorney.If I am subpoened or taken on writ back to an Atlanta Federal Court again, where I an again harassed by a U.S. Attorney, I will go to the Media, hire counsel, and sue over being forced to lie, and know U.S.Attorney Mr.Chris Wray ( hereinafter "Mr.Wray" ) paid me in 1998 with money and several get out of jai free passes.Mr.wray ruined my life and when I did

Page 1 of 4

all I could to correct my wrong, Mr.Wray's office stole the lives of several families, while judges did all they could to cover up the fact that, Mr.Miller was innocent,to keep the corruption out of the Puolicz zyes. I will move forward and push to prosecute Mr.wray for his criminal threats against me that forced me to lie on Mr.Miller after, I repeatpedly told Mr.Wray, prior to my 1998 testimony against Mr.Millar, I had made it all up, that my story was a lie.

9. I never before told Mr.Miller or anyone what I am about to share now, because I was terrified by the threats made to me by Mr.Wray, the governments prosecutor.I explicitly told Mr.Wray before Mr.Miller's trial that, I made up the whole story.I told Mr.Wray, about how, I have learned small details about Mr.Miller, by stealing his mails, when he went to visitacion in the Cobb County Jail and how, I had solicited others in the Jail to lie with on me on Mr.Miller.I told Mr.Wray how, I got the idea to lie from a T.C.,Hinson, Mr.Miller's friends who was paying me to tell lie, so he could stay in Mr.Miller's money that was in Hinson's possession.I told Mr.wray that, Mr.Hinson paid me $5000.00 to lie, and supplied me with other informations, about Mr.Miller to create a more believable story. I gave Mr.Wray, letters from Mr.Hinson showing Mr.Hinson's directions to me as to what to tell the Government.

10. When I told this to Mr.wray he told me that if I have told anyone else, I was going to jail for 30 years, federal, after he made sure that I got the maximum on my new Cobb county felony, plus the Georgia and Florida probation violations. I was witnessing Mr.Wray indicting an innocent man for stories I made up so of course, I believed Mr.Wray could easily keep me in prison for 40-50 years. Look at Mr.Miller's 21 years.

11. After scaring me to death while repeatedly telling me to stick to my original story, or else, Mr.Wray promised me no jail, plus the new Cobb County Grand theft auto charges, and I was given money for travel expenses from Florida to Atlanta hundreds of Dollors for clothes, hundreds of dollars a day for food, and money for other stuffs. I was forced to listen to my initial statement over and over and not not deviate from the script. I was told that, if I went off my story, or decided to tell any other version to Mr.Miller or the Jury that he would ( Mr.Wray ) make sure, I got 40-50 years.That I'd go to prison with a pregnant girl friend and come out with them being 50 years old.I was scared so, I told the story. Mr.Wray ordered me to.

12. I told this to wray prior to testifying for the Grand Jury. NOTHING I told the Grand Jury about Mr.Miller was true, and Mr.Wray forced me to lie to the Grand Jury to indict Mr.Miller on charges he ( Mr.Wray ) positively and explicitly knew

Page 2 of 4

that, Mr. Miller was not guilty of. How can judges that are supposed to be about honor, truthful, be in support of the U.S.Constitution, leave a man in prison 13 years "after" they discover, that I have lied about everything on this man?If I have to, I will go to the media, congress, senate, Black lives matter, the players coalition, which fights injustices that disproportionately affect African Americans. I know the co-founder NFL player, Malcom Jenkins, personally, if that is what the court of Appeals for Atlanta wants.It is the time to correct this 21 years mistake that has ruined so many lives, and you have the new evidence to that now.

13. I have never before told anyone this, how viciously Mr.Wray threatened me.How Mr.Wray hid and concealed evidence of Mr.Miller's innocence.How Mr.Wray forced me to lie, how to lie, what to lie about, subtleties that moved jurors he said. I remember like it was yesterday, as it destroyed my life, and Mr.Miller and our families.If something is not done, I will expose all persons involved in this cover up, it may take time, but time is all I have.The courts have used their B.S. prosecutors to manipulate this case to leave an innocent man in prison.I believe the courts advised Mr.Miller's appeal lawyer to file his appeal late on purpose, just as the U.S.Attorney offered to help me get out of prison in 2007-2008 if I changed my recantation against Mr.Miller.If I am again forced to go back to court to testify to this Affidavit, I will expect to be paid a Million dollar per day for my private rate, and this shall be notice of any fee rate, per person.

14. If the appeals court again circumvent " justice" and tries to cover up this clear case of prosecutorial misconduct, material to Mr.Miller's conviction that, I will immediately take independent action on all the interested parties and expect to be compensated at a rate of $1 Million per year for every year, I was forced to bear the burden of judicially keeping an innocent man because an alleged defender of the constitution forced me to lie.I never told anyone, I told U.S. Government; prosecutor Mr.Wray. prior to Miller's trial, I was lying on Mr.Miller but I do now. I've been in jail all my life what can be done to me now and I no longer care. I'd rather deal than. live with this any longer.

15. All I know is if you want to get me back in court you'd better bring Mr.Wray and be ready for the media, and be ready to charge this monster for what he has done.I want this over but it can't be over for me until, I fix what I did to that man.

16. Those analyzing this affidavit have no more excuses.This is the truth.You all know it.You got 21 years out of him.I won't stand for it anymore.I can no longer live withit,and if something isn't done.I am going to expose how unjust. fake, phony corrupt, etcetra. the Federal appeals courts are. I am going to expose the Judges U.S.Attorneys. sworn to uphold the constitution. who are supposed to enforce justice and Truth, yet cover for corrupt prosecutors who have assisted me in lying on

Page 3 of 4

Mr.Miller.

17. I am coming clean now for Mr.Miller, for his family. and I pray to God I will one day be forgiven for what I have done.Anyone who doesn't fix this is the devil, and can forget about Heaven.My past is done.it is up to the Appeals court Judges to be just now.

I Troy M.Plante, endorse this  Affidavit on the 20th day of February 2018 and I a am placing this in mail to Mr.Miller on the following day, the 21st day of February 2018. at a Federal Penitentiary in Kentucky and that the above is true so helps me god.

I Troy M.Plante verify/Declrare under penalty of perjury that the foregoing are True and Correct.

Executed on 02/20/2018.

Almost forgot- In 2008 I planned on testifying that Chris Wray forced me to lie on Miller. What prevented me was the other prosecuter Langway told me just prior to me taking the stand for Miller was that if I tried to use alegations against Wray that he'd make sure I maxed out my FL state sentence I was serving.I again witheld info to save myself. Plus evidence was seized that showed Langway that threats by Secret Service delayed my signing of the affidavit and I was told to not bring it up and his office would help me get parole. So I kept quiet.

I swear to the above as true on same day as above shown.

Troy Plante
Troy M. Plante

Page 4 of 4

A-17

A-18

# AFFIDAVIT

I, TZEGAI HINSOM, do hereby swear under penalty of perjury pursuant to 28 USC 1746 that the following is true to the best of my personal knowledge:

1. I testified at Robert Miller's 1998 trial, case no. 1:97-cr-406-01-DDE, but was intimidated, coerced and even threatened to not defend the innocence of Robert Miller which I knew to be true.

2. I withheld the fact that I knew Troy Plante was lying because I knew that Robert Miller had only solicited Troy Plante to transport marijuana to Savannah GA where Plante alleged he had connections.

3. I withheld the fact that Plante solicited me to lie against Miller, and at the time of the trial I possessed a letter Plante had written to me, from Florida if I recall correctly, detailing the story he would later tell against Miller at trial, and how it is our only way to get out of our own legal problems, that he doesn't like lying either but if the truth comes out (which was we knew he was lying, were both aware or related to a weed conspiracy and if the story changed now we'd both go to jail for something) we were both in trouble. Plante had probation in Florida and a new felony in Georgia. I was on probation in GA, had a pending D.U.I., and my first child on the way.

4. My testimony of the facts about Plante, in conjunction with the letter I possessed from Plante, in his handwriting, with his fingerprints on it, in an envelope that Plante licked leaving his DNA on it, no doubt would have destroyed the testimony of Plante, and no other evidence existed, because Plante was supposed to transport a relatively small amount of weed that Jennifer Ashford held at the Herb Shop which is the only reason her name or the Herb Shop ever came into the equation.

5. I was also contacted, prior to Miller's trial, by a man with a semi-Jamaican accent, who said he had been in the same jail pod as Plante and Miller who was trying to help Miller, because he too knew what Plante was up to because Plante had solicited him to lie on Miller in the same or similar way he did me, and had also given him handwritten notes to study so their stories would be consistent. The man told me he had met with Miller's trial counsel and told him the whole story about Plante's lies, his plans to lie in Miller to gain considerations for his own unrelated charges, and said he gave the attorney copies of all the notes Plante had written him about Miller.

6. At that time I had every intention to tell the truth and exonerate Miller, but my own attorney told me, or strongly advised me, otherwise, as the prosecutor said I would be indicted as an accomplice, and even though I could've proven my innocence, as well as Miller's, I would've went to jail on probation violation for the charge, and I also had the open D.U.I. still pending. The guilt of taking an innocent man's life has been burdensome but I had to put my daughter and family first, so I accepted immunity contingent upon my not testifying for Miller.

I have stated the foregoing under penalty of perjury attesting to its truth under oath, so help me God!

DATED: _____, 20___

STATE OF GEORGIA
COUNTY OF COBB

_____
TZEGAI HINSOM

---

PeopleSmart - Report                                     Page 1 of 2

 PeopleSmart

**Contact Information**

### Alain A Veira

Current Phone : No records found
Current Address : 1185 Collier Rd Nw, Apt 2F
Atlanta, GA 30318
Email Address: No records found

**Address History**

1185 Collier Rd. Nw. Atlanta, GA
30318                    CURRENT ADDRESS

**Phone Numbers**

There are currently no phone numbers on record.

https://www.peoplesmart.com/member/person-report-print?CachedReportKey=5f59bd84-0...   10/6/2017

PeopleSmart - Report                                     Page 2 of 2

**Relatives**

There are currently no relatives on record.

https://www.peoplesmart.com/member/person-report-print?CachedReportKey=5f59bd84-0...   10/6/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRIC OF ILLINOIS

EAST ST. LOUIS DIVISION

ROBERT E. MILLER, JR.,

    Petitioner

Cause No. ~~13-cv-01307-DRH-CJP~~

V.

L. J. W. HOLLINGSWORTH, WARDEN,

    Respondent

BRIEF IN SUPPORT OF WRIT OF
HABEAS CORPUS PETITION #2241

Re: GROUNDS FOR RELIEF

Comes Now, the Petitioner, Robert E. Miller, Jr. by Counsel Paul Jungers, and submits
the following brief in support of *Writ of Habeas Corpus*:

## MATERIAL FACTS, LAW AND EVIDENCE IN SUPPORT OF GROUND ONE;
## ACTUAL INNOCENCE:

Actual innocence means that the Petitioner was convicted of a nonexistent offense.
Petitioner was convicted of solicitation to kill and attempted murder of a government witness
("solicitation and A-murder") convictions. The facts and new evidence submitted with this brief
will clearly establish that Petitioner is innocent of the offense itself and has "actual innocence".
See in re: Davenport, 197 F. 3d 605, 609-11 (7ᵗʰ Cir. 1998).

"To establish actual innocence, petitioner must demonstrate that, in light of all the
evidence, it is more likely than not that no reasonable juror would have convicted him" *Bousley
v. United States*, 523 U.S. 614,623 (1998). The Petitioner's claim is supported by the evidence
submitted to this Court. Troy M. Plante was the primary witness introduced against the

1

---

Petitioner at his trial. Mr. Plante has recanted his testimony against Petitioner on multiple
occasions. The first being the recantation affidavit (EXH. 1, 5 pgs.) and the second time being
at the evidentiary hearing (EXH. 2) dated January 25, 2008. These documents are extreme
importance for the Court to take notice of because they are evidence of the Petitioner's actual
innocence.

In *Bousley v. United States*, the Supreme Court reaffirmed that a habeas petitioner may
overcome a procedural default by showing that he is "actually innocent" of the offense for which
he was convicted. 523 U.S. 614, 622, 623 (1998) (citing *Murray v. Currier*, 477 U.S. 478, 485
(1986)) Evidence submitted to this Court supports Petitioner's actual innocence going "beyond
the "Bousley requirement". It is not only more likely than not that no reasonable juror "would"
have convicted Petitioner had these reasonable jurors seen all the evidence (emphasis Petitioner's
EXH.1 & EXH. 2), but no reasonable juror "could" have convicted this petitioner. Had the juror
been sent to deliberate with all the evidence (EXHIBITS 1 and 2), the government's
argument would have fallen well short of the burden of proof. They would be left with, for
"evidence to deliberate on", the Government arguing that petitioner solicited Plante to kill a
federal witness and attempted to hire Plante to murder the same federal witness with no physical
or material evidence to support such. There was no actual murder or attempt to murder, no
victim claiming that someone attempted to murder them or even harm them; no victim, person,
or witness claiming that someone threatened them to not testify in any federal case; and no one
corroborating any of these allegations, charges or offenses. Plante and Petitioner both assert that
none of these conversations, alleged plans, or any sort of violence were ever discussed at any
time. As a result, no reasonable juror would have convicted petitioner upon consideration of all
the evidence.

2

---

Another standard for demonstrating actual innocence in an attempt to overcome
procedural hurdles, this was addressed by the U.S. Supreme Court in *Schlup v. Delo*, 513 U.S.
298 (1995), The standard is almost verbatim with *Bousley*. The Petitioner is thus required to
make a stronger showing than that needed to establish prejudice; at the same time, the showing
of "more likely than not" imposes a lower burden of proof than the "clear and convincing"
standard, Schlup at 811.

Under this standard, the Habeas Corpus Court must make its determination based upon
all the evidence, thus requiring, "The District Court to make probabilistic determination about
what a reasonable juror would do". *Id* at 814. Furthermore, in its consideration of the
petitioner's innocence, The Court must recognize that "actual innocence does not required
innocence in the broad sense of having led an entirely blameless life…such earlier criminal
activity has no bearing on weather or nor the accused is actually innocent…" *Id* at 815.

Petitioner asserts that under this standard, the instant case satisfies the "more likely than
not" analysis. The Government presented a solicitation to kill a federal witness, and an
attempted murder of a federal witness case to a jury, that was solely (100%) predicated upon the
trial testimony of Troy M. Plante. There was no victim, only the alleged victim as testified to by
Plante and no one else. There was absolutely no physical evidence, except an alleged map that
accounted for nothing of consequence or relevance and would not satisfy the burden of proof
alone. This was presented by the Government to support their prosecutorial theory that it did not
solely (100%) rely upon Plante's testimony thou in actuality Plante's story stood alone,
uncorroborated, and unsupported by any material evidence. The jury was persuaded by Plante,
and Plante alone, to convict petitioner of solicitation and A-murder based on his [now admitted]
fabrications. Plante's concocted story was purely false testimony and these perjured statements

3

---

convicted and actual innocent man of nonexistent offenses. This is a gross violation of
petitioner's guaranteed constitutional rights. *Brown V. Pool* 337F3d 1155,1161-62 (9ᵗʰ Cir.
2003) *Fay v. Noia* 372 U.S. (1962).

Plante, in hindsight, was found to be a sophisticated career criminal, he had testified
against others in the states of Illinois and Florida for the same reasons he did against petitioner,
to gain a reduction in time, or more, in his other unrelated charges. Plante, when he concocted
this story to present to the Government, was on probation on Florida, he had two new felony
charges, one in Georgia, one in Florida, and he faced an automatic probation violation in Florida.
Plante, in exchange for his lies, received no jail time; his Georgia felony was dismissed (he was
caught driving a stolen conversion van in Cobb County, GA); his Florida charges were reduced
from robbery and gun possession by a felon, and to extended probation that was reinstated
instead of violated.

Petitioner asserts that that deal is a substantial motivating factor for Plante or anyone to
say whatever they needed to say to get the deal. Facts that further support Petitioner's claim of
actual innocence were also admitted by Plant under oath. Plante discussed how he was called up
to Atlanta, from Florida, about 2-3 weeks prior to Petitioner's 1998 trial, put in a hotel and given
$300-$400 per diems throughout the entire trial. He was given over $1,000 in bond money that
was actually Petitioner's money, and he was given $400 during the trial and told to go buy some
thug-like clothing to make himself look more like a murderer. Plante also swore, in his affidavit,
that the Government forced him to listen and re-listen to his "initial statement" and to not deviate
from it. Plante stated he listened to the statement about 15 times, and he was taken to the witness
stand to "practice" his testimony. Plante also swore that prior to his perjured trial testimony,
when he found out he was getting a man 30-40 years for lies he told the Government that he lied

4

about the "murder stuff". The Government told him that if he did not "stick to his initial statement" that he'd be federally indicted, and they'd make sure that he got 10 years for the Cobb County, GA auto theft, and time for his Florida charges, and a probation violation. Plante testified to this at the January 25, 2008 evidentiary hearing (EXH. 2). Plante stated on the record that he was forced by the Government to testify, and at that point he was under duress.

Plante took bits and pieces of information from Petitioner when they were briefly together in the Cobb County jail. Plante would read Petitioner's mail when petitioner went to visitation. Plante would try to sit near the phone when petitioner talked to family, friends, his attorney. Petitioner needed a federal attorney for his counterfeiting charges. Petitioner's friend, Tregwi Hinson, needed a "driver", to take marijuana to Savannah, where it sold for more. Hinson told Petitioner that if he knew someone, he'd pay for the federal attorney. Petitioner casually mentioned it to Plante. Plante said he'd love to do it and that if Hinson would bond him out, and give him a little money to get back to Florida he'd do it. The alleged victim, Jennifer Ashford, was on Hinson's payroll, and was the manager of the "herb shop". Hinson worked for Airborne Express, was from Los Angeles, and would intermittently fly to Los Angeles and mail, via Airborne Express, 40 to 50 pounds of marijuana to the Atlanta Herb shop managed by Ashford. Hinson could track his own package thru his job and "know" first hand if it was "tagged" by law enforcement. Fragrant herbs were not suspicious where Ashford worked, and she'd take the 10-pound individually wrapped compressed blocks of marijuana, wrapped in a trash bag, coated with mustard, inside another trash bag, then surrounded by dryer sheets for filler. This is why Plante needed to take Hinson's car, and go to Ashford's job (and have a rough map of rooms, so he could know exactly where the marijuana was); people will lie when $15-$30,000 is involved. Plante turned this information into an absurd story about how he was to kill

5

this witness, who was one of ten (10) witnesses in a counterfeiting case that was a 20 month sentence at a federal camp with no weapon in the vicinity of where the "attempted murder" was to take place. Plante initially stated he was to "sneak out" a 5'6" victim, (in a highly populated area), and drive the "body" to Savannah, GA. That is a six (6) hour round trip plus additional time to hide the "body". Plante then stated he was the hide the "body" in Savannah, though he is unfamiliar with Savannah or Atlanta, Georgia; Plante is from Florida. Next when Plante returned back to Atlanta, after being gone for 8 hours (the herb shop was only open from 9-5 (8hours)) he was supposed to pick up the victim's car at the scene of the crime and then take the victim's car and "hide" it at the Atlanta airport, one of most surveyed places in Atlanta, and possibly the entire state. Regardless of the testimony put forth at trial, Plante has admitted that it was a fallacy in exchange for a reduced sentence.

At trial Petitioner's counsel persuaded him not to testify by telling petitioner if he testified he'd be successful against the solicitation and attempted murder, but that he'd get ten 10 years for the marijuana, and five 5 years on the counterfeiting, or 15 years total; and if he didn't testify petitioner would probably only get 5 years for the counterfeiting, because the Government had no evidence except Plante.

Plante has now recanted and he withstood a vigorous cross examination by United States Attorney Langway on January 25, 2008 (EXH. 2) when doing so.

Plante's testimony was too detailed to be anything but the truth. He didn't have to listen to a recorded statement 15 times, or practice his testimony. He came straight from prison, where he's been 3-4 times since petitioner's 1998 trial, and sat on the stand 10 years later and told the truth.

6

John Maines affidavit, sworn true on Court record, as signed and notarized in the same January 25, 2008 hearing (see EXH 8), states how he believed Plante's story to be true because it was too detailed and precise to be one that he made up.

Susan G. James (Exhibits 6 and 7) sates the same, in regards to her belief that petitioner is innocent and that's an injustice that he's still in prison due to a procedural mistake.

Plante was precise on detailing the methodology of his offering of false testimony and trial. Plante testified for the court in (EXH. 2) said hearing for the motivation for his lies, from the get out of jail free passes, to the thousands of free dollars, to the threats by the Government. The fabricated story was explained and it not only made sense, but it solidified Petitioner's statements since the beginning. Plante explained his reasons for coming forward. Someone had lied on him and got him 5 years. His false testimony got Petitioner 40 years and is weighed on his conscience. The key to considering innocence here is that word "reasonable" as it applies to jurors who would be trying the case. The word "reasonable" is not left undefined in the "more likely that not" standard of proof analysis. It must be assumed that a reasonable juror would (1) consider fairly all the evidence presented; and (2) conscientiously obey the trial courts in strict ions requiring proof beyond a reasonable doubt. Schlup at 815.

"To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Schlup, 513 U.S. at 324. The affidavit of Plant and his hearing testimony in 2008 must meet this requirement. Petitioner has gone as far as the Court will allow with this new evidence yet he is still incarcerated, and a fundamental miscarriage of justice has resulted. The "fundamental miscarriage of justice" exception applies only in the "extraordinary" case in

7

which the petitioner has presented new evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" Schlup v. Delo, 513 U.S. 298, 316, 324 (1995). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). If actual innocence prevails, the Petitioner has clearly suffered violations of his 14th Amendment Constitutional right to due process as well as his 8th Amendment right to protect him from cruel and unusual punishment.

U.S. Court of Appeals for the 11th Cir., order dated July 07, 2010, herein attached to this Petition as EXHIBIT 4 confirms that Petitioner satisfied the First Prong of the Slack v McDaniel [test], 529 U.S. 473,484,120 Sct. 1595,1604,146 L.Ed. 2d 542 (2000); 28 U.S.§ 2253( c) (2) evidencing that he [in his actual innocence claim] is stating a valid claim of the denial of a constitutional right, pg. 1, para. 2, lines 1-2 of Order, mirroring the necessary criteria to satisfy Bousley v. U.S., and savings clause issue (argued in Ground 4).

"A petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327. For this Court to find that Petitioner has failed to demonstrate his actual innocence it must find that a reasonable juror would convict the Petitioner of the charges against him with consideration of the new evidence. In light of the new testimony, the government's argument would have fallen well short of the burden of proof to convict the Petitioner.

8

## MATERIAL FACTS, LAW AND EVIDENCE IN SUPPORT OF GROUNDS TWO:
### STANDARD FOR NEW TRIAL AND THE NONEXISTENT OFFENSE:

There are five prongs to be met, or prerequisites which must ordinarily be met, to justify the grant of a new trial on the ground of newly discovered evidence: "(1) The evidence must be in fact newly discovered, that is, DISCOVERED SINCE THE TRIAL; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved, and (5) it must be of such nature that, on trial, a new trial that is, the newly discovered evidence would probably produce an acquittal". *United States V McColgin*, 535 F-2d 421,426 (8ᵗʰ Cir) cert. denied, 429 U.S. 853, 92 S. Ct. 145, 50 L. Ed. 2d128 (1976), citing *United States v. Rope*, 415 F.2d685,691(8ᵗʰ, Cir. 1969), cert. denied, 397 U.S. 950 905 Ct. 973, 25 L.Ed.del 132 (197).

Petitioner satisfies <u>all</u> five prerequisites, based on Plantes recantation (EXH. 1) and testimony in support thereof. (EXH. 2).

Petitioner understands that in most recantation cases it is axiomatic that they are looked upon with suspicion. *Dobbert v. Wainright*, 468 U.S. 1234,1233-34,105 5 ct. 34, 82 L.Ed. 2d 925 (1984)..."must merely impeach cumulative evidence rather than undermine confidence in the accuracy of the conviction". (see: *Dobbert*) Petitioner asserts, and the record reflects, there is no cumulative evidence. Plante's testimony constituted the Government's entire case for the solicitation and A-murder charges. Further, petitioner and Plante had/have totally unrelated charges and Plante did have something to lose. He could've been charged with perjury, but he felt strongly enough that he could escape perjury because of the Government's threats and coercions when he tried to back out of testifying in 1998.

9

This case meets the standard of truly extraordinary circumstances and under the 5 prong test in *United States V McColgin*, Petitioner is entitled to a new trial on the merits.

Plante's recantation (EXH.1) supported by his sworn open court testimony (EXH. 2) extracts all the substance from the Government's solicitation and A-murder charges. The Court can therefore reason that **the offenses charged are nonexistent.** Plante's perjured testimony was the only evidence that a crime ever took place.

For the reasons cited herein, and shown in section one, petitioner has clearly shown that the solicitation and A-murder charges are nonexistent, and that this petitioner remains imprisoned for them in re: *Davenport*, 142 F.3d 605,611 (7ᵗʰ Cir. 1998).

## MATERIAL FACTS, LAW AND EVIDENCE IN SUPPORT OF GROUND THREE:
### NO FEDERAL SUBJECT MATTER JURISDICTION

Petitioner adopts and incorporates by reference the above plead arguments.

Petitioner has plead and put before this Court facts to support his claim of actual innocence. In addition to the above made arguments, Petitioner pleads that the Court lacked federal subject matter jurisdiction because the crimes solicitation and A-murder of a **Federal** witness never existed except in Plante's mind.

The Federal Government has no jurisdiction in regards to murder, solicitation to kill, attempted murder, or otherwise crimes of violence, unless there is an element that permits Federal subject matter jurisdiction. In this instant matter, the **ONLY** element granting, allowing, permitting, or otherwise dangling on the precipice of Federal Jurisdiction was Plante's testimony that Petitioner solicited him to kill a Federal witness. Because Plante has come forward and

10

admitted that Petitioner never solicited him to kill a "Federal" witness, then the Federal Government never truly had jurisdiction to indict, try, convict, charge, or detain Petitioner on the solicitation and A-murder charges.

Plante's statement was the only evidence admitted that Petitioner solicited or attempted to kill a federal witness. The Petitioner seeks from the Government jurisdictional authority, absent Plante's testimony. The Federal Government relied on Plante's lies, fabrications, and perjured testimony to acquire federal jurisdiction. "Subject matter jurisdiction cannot be waived by parties, conferred by consent, or ignored by the Court". *Babcock and Wilson v. Parsons Corp*. 430 F.2d 531 (1970). New evidence submitted to this Court proves there was no solicitation or attempt to kill federal witness, and thus, as a result, the federal government lacked subject matter jurisdiction over this case.

## MATERIAL FACTS LAW AND EVIDENCE IN SUPPORT OF GROUND FOUR:
### THE §2255 SAVINGS CLAUSE

Petitioner directs the Court to Exhibits 3, 4, and 5, and pleads that his §2255 remedy is inadequate or ineffective, fulfilling the prerequisite to pursue relief, via §2241, under the §2255 savings clause. In re: *Davenport*, 147 F.3d 605,611 (7ᵗʰ Cir. 1998);" A procedure for post-conviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense" *Id*. (See: above sections 1, 2, and 3)

Petitioner has filed, or attempted to, §2255's, and been denied as being untimely filed. Petitioner has <u>never</u> received a merits determination. Petitioner's initial §2255 was filed <u>119</u>

11

days late by his retained §2255 counsel, Susan James. Ms. James wrongly believe and informed Petitioner that she had until July 14, 2006 to file for relief under §2255 (See EXH. 6, ltr. Dated 03/02/06, pg. 2, last paragraph,. lines 2-3) because of her incorrect interpretation of the law.

In this same exhibited letter Ms. James leads Petitioner to believe his §2255 is being filed "immediately" by stating so. If this attorney had done what she assured Petitioner and his family she did Petitioner's §2255 would've been filed timely. In fact, when Petitioner's family contacted said §2255 Counsel on 03/04/06 they were told by the firm's assistant Ms. S. Exposito, that the §2255 was <u>filed</u> when in fact it wasn't filed for another <u>4</u> months. Due to errors by his previous Counsel Petitioner was time barred by the §2255 AEDPA provision, and he has <u>never</u> been granted a merits decision. Please also see Petitioner's Exhibit 7 and see how Petitioner's misleading counsel contradicts herself in a letter dated March 2009 as compared to her March 2006 letter. These letters, plus billing records that evidence Petitioner ordered her on 02/02/06 to file his §2255 immediately and which would've been timely filed at that point, show that Petitioner has **"extraordinary circumstances"**; and that this is one of those exceedingly rare cases in which §2255 is inadequate to test the legality or constitutionality of Petitioner's detention. *Gurza v. Lappin*, 253 F.3d, 918, 921 (7ᵗʰ Cir. 2001);

Petitioner <u>is not</u> rehashing trial; he <u>is not</u> re-litigating an already or previously decided issue. This newly discovered evidence (EXH. 1 and 2) was discovered AFTER Petitioner's 1998 trial, <u>not</u> on direct-appeal <u>not</u> in a §2255. Petitioner clarifies such to save the court time when the Government alludes to anything contrary, citing *U.S. v. Rowan*, 663 F. 2d 1034 (11ᵗʰ Cir. 1981) or *Olmstead v U.S.*, 55 F. 3d 316 (7ᵗʰ Cir. 1995). This Petitioner has <u>never</u> had his <u>one</u> entitled uncumbered opportunity to put these true facts and issues before a court, and receive decisions on the merits. *Potts V. U.S.*, 210 F.3d 770, 720 (7ᵗʰ Cir. 2000).

12

§2255's "Savings Clause" allows a prisoner to seek relief when §2255 is inadequate or ineffective to test the legality of the prisoner's detention. *Kramer v. Olson,* 342 F.3d 214,217 (7th Cir. 2003); however, only when the provisions of §2255 prevent a prisoner from ever having the opportunity to test the legality of his conviction or sentence or to demonstrate his actual innocence does the "savings clause" provision of 2255 have applicability *Taylor v Gilkey,* 314 F.3d 832,835 (7th Cir. 2002), **This is the case in Petitioner's Writ.** The Government will argue that the Petitioner had opportunity and failed to timely act on it, but as evidenced in this Brief and its Exhibits, Petitioner was denied opportunity by his previous Counsel, who mislead and misinformed him not only of the law, but of the status of his case and his filing. To deny the Petitioner a merits decision of the newly discovered evidence would be to deny Petitioner **justice.**

Petitioner satisfies all prerequisites, or other requirements, for him to proceed via §2241 and have the Hon. Court review all the evidence for a merits determination in his case.

#### PETITIONER'S RELIEF SOUGHT

On October 2, 1998, the day Petitioner was federally sentenced he was classified in the career criminal category. If this Petition succeeds Petitioner will no longer be that category once these violent offenses are stricken from the record, as Petitioner will have never been convicted of a violent felony, and will have only one drug conviction for marijuana on his record, USDS MDFL case no. 5:04-cr-24-oc-10GRJ. Petitioner plead to 36 months in that case, but Petitioner avers that he has served 16 total yrs., almost 12 years in federal custody due to Plante's perjury.

13

---

Plante's resulted in Petitioner having to serve a 4 year probation violation, not a new charge, (the 4 years was due to the convictions of violence.) Petitioner asks the Court to take all that into consideration when considering remedies for this *Writ.* Petitioner has more than paid his debt to society for the passing of counterfeit currency and that he has never denied. The only adjustments would be that Petitioner only saw and handled a few thousand dollars. No value and no physically evidenced amount was ever produced by the Government and Petitioner asks for a definitive calculation to be provided pursuant to the new rule of law released by the Supreme Court in *Allyne v U.S.*, 570 U.S.----,133 s.Ct. 2151,(2013).

Petitioner is entitled to be heard under the §2255 savings clause as herein evidenced and is entitled his one unencumbered opportunity to receive a merits decision *Potts V. United States,* 210 F.3d 720,710(7th Cir. 2000)

"We think that in a case, an extraordinary case, where a constitutional violation has PROBABLY resulted in the conviction of one who is actually innocent, a federal habeas court may grant the *Writ* even in the absence of a showing of cause for the procedural default. *Murray v. Carrier,* 477, U.S. 478,496 (1986);" This fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not result in the incarcerations of innocent persons". *Herrera v. Collins,* 506 U.S. 390,404-405 (1993).

"Conceptually, any habeas remedy "should put the defendant back in the position he would have been in if the ...[constitutional] violation never occurred". *Brown v. Poole,* 337 F.3d 1155, 1161-62(9th Cir. 2003); "the oldest purpose of the Great Writ is as 'a sift and imperative remedy in ALL CASES OF ILEGAL RESTRAING OR CONFINEMENT'". (quoting *Fay v Noia,* 372 U.S. 391, 400(1963). Petitioner was convicted on false testimony. This Court is now

14

---

in possession of the evidence proving so. The Government's only witness has admitted that he blatantly lied to the trial jury. This is an unconstitutional conviction, because the jury deliberated on perjured testimony and never got to hear the truth. Petitioner has not been able to get this before a Court with competent jurisdiction before now, due to a litany of procedural hurdles. Petitioner only prays to the Hon. Court for a swift and imperative remedy for the herein evidenced illegal restraint being unconstitutionally executed against this now proven innocent man; (see: *Fay v. Noia*).

That Petitioner asks that a court issue a writ, requiring that the prisoner be produced before the court at a particular place, date and time and for his detainers to produce evidence of the lawfulness of his detention so that Petitioner may challenge it or, in the alternative that Petitioner be granted a new trial. Petitioner wishes to seek a meritous decision in his case. If successful, Petitioner seeks to be put "back in the position he would've been in if the constitutional violation never occurred" (see: *Brown v. Poole*).

The above is a Brief in Support of the attached §2241, Petition for Writ of Habeas Corpus.

Executed this 13th day of January, 2014.

RESPECTFULLY SUBMITTED,

Paul Jungers
THE JUNGERS LAW FIRM
605Ohio Street
Suite 312
Terre Haute, IN 47807

15

---

Phone: (812) 235-8900
Fax:    (812) 235-8905

/s/ Paul Jungers
Paul Jungers (#29672-84)
Attorney for Petitioner

16

Law Office Of

**Susan G. James and Associates**

Susan G. James
Denise A. Simmons

March 2, 2006

Robert Ethan Miller
Reg No. 48707-019
Oklahoma City FTC
P. O. Box 898801
Oklahoma City, OK 73189

Dear Ethan:

I am in receipt of several successive letters from you wherein you make a wide range of complaints about lack of communication and how you were handled by my staff. First, let me say I understand your frustration and I would like to explain how things have reached this point. I do believe that you should allow me to file your 28 U.S.C. §2255 and I will be happy to further discuss with you the civil case which you continue to seek representation, as noted in your letter of February 23, 2006.

Frankly, I don't want to get into a "he said, she said" with you about the matters of which you complain. The tone of your last letter to me (personally) of February 23, 2006 seems to suggest that you still have some confidence in me and do still seek my legal counsel.

I realize that there has been a number of months since I was retained to represent you in this case. Quite frankly there have been intervening situations that have precluded my filing on your behalf before now. On a personal note I have had four deaths in my family since October 2005. Especially difficult was the death of my 87 year old aunt who had been like a mother to me since my mother died when I was 16. I don't offer this as an excuse for the delay but do tell you that I have had family circumstances ongoing that has distracted some of my attention from an already busy schedule.

Additionally, I was of the mind that your best chance for success in Atlanta was through the combining the 28 U.S.C. §2255 and the North Carolina matter. Despite the fact that we have Plante's affidavit, there is some baggage associated with that which could be turned against you by the government.[1] I thought the North Carolina matter might soften the government's

---

[1] Recantation of testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony

600 South McDonough Street . P. O. Box 198 . Montgomery, Alabama 36101-0198
334-269-3330 . Fax: 334-263-4888 . Email: sgjamesandassoc@aol.com



027067848

---

resistance to your post conviction efforts and as such your best chance for relief. I understand that you do not share that same view. I have been paid for my counsel and advice and based on close to 20 years experience I think this is the best way to go.

You previously shared your concerns over Plante. In your letter of June 24, 2005 you state **"Once the government is 100% alerted to the fact that Plante has recanted, they're going to sweep down upon him like vultures on carrion. They're going to threaten him and he's going to say whatever to save his own butt."**

Let me point out to you that all the problems with Michael and Plante which have been described in great detail by you and Michael may ultimately have an adverse impact on Plante's July 2005 willingness to "correct the record and admit perjury". The history leading up to the acquisition of Plante's affidavit and his vacillating positions certainly could skew the outcome of your efforts.

Initially I was not sure which approach would be best and which forum would be best. Therefore, I did some initial work and writing on a 28 U.S.C. §2241 (Exhibit A) and then after more careful deliberation decided that a 28 U.S.C. §2255 was your best approach. I know that you have indicated that you have spoken with other lawyers and they tell you that is not the best way for you go. I disagree.

I enclose herewith an excerpt from the Federal Rules regarding the one year time limitation on 28 U.S.C. §2255. (Exhibit B) Specifically it states "when your period of limitation shall apply to a motion under this section. The limitation shall run one year from (1) the date of which the judgement of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the constitution and laws of the United States is removed, if the Movant was prevented from making a motion by such government action; (3) the date on which the right was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting your claims or claims presented could have been discovered through the exercise of due diligence. (Emphasis added)

It is number 4 that I think is applicable in your case, particularly given that the Plante affidavit is dated July 14, 2005. In my opinion you have until July 13, 2006 to file within the applicable statute of limitations.

---

typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict". *Dobbert v. Wainwright*, 468 U.S. 1231; 105 S.Ct. 34; 82 L.Ed.2d 925 (1984).

---

I also remind you that Plante has indicated an unwillingness to testify until he is released from custody. Certainly your call is better than mine given that you know him but I think that he is such a dangerous witness that he could certainly sabotage your efforts for release.

I also enclose herewith the work that I have done on the 28 U.S.C. §2255. (Exhibit B) If after reviewing the material you are desirous of my filing the same, I will be happy to do so. If you plan to terminate my services then I will do an accounting of the work done your behalf and reconcile the account, if necessary. A chronology of work performed is also included for your review. (Exhibit D)

With regard to your feeling neglected and disrespected, I do offer an apology. I do represent a number of people and everyone's needs are different. Deadlines are beyond my control in most instances and oftentimes my practice is similar to running a legal emergency room.

I was very impressed with you when I met you. I feel the same way to date. Sorry about our communication problems and our inability to have readily available telephone conversations. This has created a strain on our professional relationship.

If Shannon in some way offended you, I am sorry for that as well. Our staff has had bad days just like you have bad days. You may very well have caught her on a bad day.

After reviewing this material let me know whether you want me to file. I am prepared to file a pro hac vice motion. (Exhibit E) Additionally, once you are secured at your new location, let me know and we will try to set up a legal call so that we can also discuss the status of your requested representation on your civil case. Contrary to your suggestion you only wanted my help on the civil case, you have always indicated your number one priority was getting out of jail and the civil case was second.

Again, I apologize for any undue stress placed on you by the circumstances outlined above. I hope we can rehabilitate this relationship to the point that I can see this thing through to try to obtain the ultimate goal of your release from prison and your return to your family. I think North Carolina is critical to your ultimate success.

With kindest regards, I remain

Truly yours,

Susan G. James

8

EXHIBIT 9

(9)

*Miller's Request for Certiorari to S. Ct.*

NO. 08-8525 (cert denied March 9, 2009)

IN THE SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 2008

ROBERT ETHAN MILLER,

PETITIONER,

V.

UNITED STATES OF AMERICA,

RESPONDENT.

———————

ON PETITION FOR WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————

PETITION FOR WRIT OF CERTIORARI

SUSAN G. JAMES
ATTORNEY FOR PETITIONER
600 S. MCDONOUGH STREET
MONTGOMERY, AL 36104
334/265-3330

---

## EQUITABLE TOLLING BASED ON EXTRAORDINARY CIRCUMSTANCES

Miller further contends that if the Court does not agree with his analysis in determining when the statute began for the timely filing of his 2255 that his petition is timely under an equitable tolling theory. This Court has held that equitable tolling is appropriate when a prisoner's § 2255 petition is untimely because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence. *Drew v. Dep't of Corr.*, 297 F.3d 1278, 1286 (11th Cir. 2002); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). Although equitable tolling applies only in truly extraordinary circumstances. *Jones*, 304 F.3d at 1039-40; *Drew*, 297 F.3d at 1286; and the movant bears the burden of establishing that he is entitled to this extraordinary relief. See *Helton v. Sec'y for Dep't of Corrs.*, 259 F.3d 1310, 1313-14 (11th Cir. 2001).

This case meets the standard of truly extraordinary circumstances given that Miller is actually innocent of the solicitation and attempted murder charges and the Government's only witness testified under oath at an evidentiary hearing that he lied as to material facts during Miller's trial resulting in a conviction and 240 month sentence.

## CONCLUSION

Petitioner Miller respectfully appeals to this Court's unique institutional competence to determine "what the law is," *Marbury v. Madison*, 5 U.S. 137 (1803), and to ensure that level of coherence among lower courts required by a nation governed by the rule of law, in requesting that the Court grant his petition for review in the instant case. Petitioner urges that the constitutional and cultural importance of a coherent law of what constitutes prima facie evidence for habeas petitions pursuant to 28 U.S.C. §2244(b)(3)(c). Society's interest in the finality of convictions should not override fundamental fairness when an innocent man is serving a 240 month sentence based on perjured testimony admitted seven years later by the Government's only witness.

"Finally, it is not insignificant that this is a criminal case. When a litigant is subject to the continuing coercive power of the Government in the form of imprisonment, our legal traditions reflect a certain solicitude for his rights to which the important public interests in judicial economy and finality must occasionally be accommodated. We have previously refused to allow technicalities that caused no prejudice to the prosecution to preclude a remand under 28 U.S.C. §2106 in the interests of justice." *Stutson v. United States*, 516 U.S. 163, 116 S.Ct. 600, 133 L.Ed 2d 571 (1996).

This Court's view of a decision that creates conflict between the Eleventh Circuit, and the Second Circuit, the Eighth Circuit, and the Tenth Circuit also promises socially desirable systemic benefits. While Petitioner is sensitive to the Court's institutional reluctance to issue mandates displacing legislation conventionally reserved to lower courts to fill gaps and resolve ambiguities in the law more organically, the position taken by the Eleventh Circuit in its adoption of the District Court's reliance on a District Court case to justify keeping an innocent man in jail is sufficiently acute to justify the Court's exercise of its institutional power in the interest of uniformity in an area of law with such high stakes for a criminal defendant. Moreover, the compelling considerations ordinarily incumbent upon this Court in its role as arbiter of conflicts among the lower courts is intensified by the urgent need for resolution of this legal controversy to free an innocent man and possibly others. The convergence of constitutional and institutional interests in resolution of the conflict dividing the law governing the burden of proof in 2255 cases and the triggering events relating to habeas statutes of limitations between the Eleventh and Second, Eighth, and Tenth Circuits, Petitioner urges the Court to review the questions presented by the instant case.

9

---

## THE PARTIES

The caption in this case contains the name of all parties.

---

*[handwritten]* when Dist. Court granted cert it confirmed that Pet. newly disc. evid. "as a whole, would be sufficient to establish by clear + convincing evidence that no reasonable factfinder would have found movant guilty of the defense." see 2255(4)(c)

## QUESTIONS PRESENTED

1.  Whether the holding by the Eleventh Circuit denying defendant's Certificate of Appealability on the dismissal of the 2255(4) is in direct conflict with the Second Circuit holding in *Hagwart v. United States*, 510 F.3d 350 (2nd Cir. 2007); the Tenth Circuit holding in *United States v. Pearson*, 203 F.3d; and the Eighth Circuit holding in *United States v. Ward*, 544 F.2d 975, 976 n.2 (8th Cir. 1976).

2.  Whether an unsworn affidavit meets the prima facie burden faced by habeas petitioners pursuant to 28 U.S.C. §2244(b)(3)(c).

*[handwritten]* USDC Granted COA; 11th Cir App. Ct. acknowledged valid claim of const. violation (Stricklandtest; Susan James believes an innocent 3 entries don't exist; see n.2) but John makes believe (whole entire pages). Section 2255's "savings clause" allows a prisoner to seek relief "when §2255 is inadequate or ineffective to test the legality of the prisoner's detention. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). However, only when the provisions of §2255 prevent a prisoner from ever having the opportunity to test the legality of his conviction or sentence OR TO DEMONSTRATE HIS ACTUAL INNOCENCE does the savings clause provision of §2255 have applicability. *Taylor v. Gilkey*, 314 F.3d 832,835 (7th Cir. 2002). Only if the "operation of the successive petition rule absolutely prevented the [prisoner] petitioner from ever having the opportunity to raise a challenge to the legality of his [conviction] sentence" does the savings clause of §2255 come into play. *Garcia v. Lappin*, 253 F.3d 918, 821 (7th Cir. 2001). "[A] prisoner is entitled to one unencumbered opportunity to receive a decision on the merits." *Potts v. U.S.*, 210 F.3d 770, 770 (7th Cir. 2003). A prerequisite to demonstrating per 2255... is petitioner demonstrating that "2255's remedy is inadequate or ineffective to redress [?] per support 147 F.3d 605, 611 (7th Cir. 1978)." "A remedy for post-conviction relief can truly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a non-existent offense." Id. Actual innocence means that "the defendant was convicted of a non-existent offense" v. Pence (which, is the case) or that the defendant is innocent of the clause itself (which is evident) In re Davenport, 147 F.3d 605, 600-11 (7th Cir. 1998). "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable [Circuit S.Ct. precise definition of what "reasonable" + ?] juror would have convicted him. *Bousley v. U.S.*, 523 U.S. 614, 623 (1998). *Schlup v. McDaniel*, 513 U.S. 473, 474, 130 s.ct. 851, 853 (1995), 146 L.Ed.2d 512 (3000); "Prong and... 1 standard 11th Cir. App. Ct. order dated 2-17-10 within states a valid claim of "No denial of a const. right; Schlup v. Delo, 513 U.S. 312, 113 s.ct. 851, 853 more likely than not that "no reasonable juror would have convicted his [Respondent]."

NO. 08-8525, Cert. denied March 9, 2009

iii

## STATEMENT OF THE CASE

Miller was convicted in a jury trial on two counts of manufacturing and distributing counterfeit currency; solicitation to kill a witness in violation of 18 U.S.C. §373 and 1512(a)(1)(A); and attempt to murder a witness in violation of 18 U.S.C. §1512(a)(1)(A)(2). The solicitation and attempted murder counts were added in a superceding indictment on information given by a fellow jailhouse inmate who Miller had befriended, Troy Plante. Miller was sentenced on October 1, 1998. He received 110 months for the counterfeiting charges and 240 months for the solicitation to commit murder and the attempted murder. The counterfeiting sentence was to run consecutive to the attempted murder and solicitation sentences of 240 months, which were run concurrently. As a result Miller has a sentence of 350 months.

Miller filed a timely notice of appeal on November 19, 1998. The Eleventh Circuit Court of Appeals affirmed Miller's conviction and sentencing in 1999 (202 F.3d 287). Miller did not file any other post trial motions. It was not until July of 2006 that Miller filed a 28 U.S.C. §2255(4) based on newly discovered evidence .

The District Court dismissed the 2255(4) on July 21, 2006 (Appendix F) A Certificate of Appealability was requested and granted by the District Court on October 25, 2006 (Appendix E). The Government urged the Eleventh Circuit to remand the case back to the District Court for further findings on the timeliness of the 2255(4). On April 7, 2007, the District Court certified the fact that if the case were remanded back and evidentiary hearing on the timeliness issue would be conducted. (Appendix D) The Eleventh Circuit entered an order on May 16, 2007 remanding the case back to the District Court for hearing and staying the appeal. (Appendix C)

Evidentiary hearings were conducted on August 3, 2007, October 5, 2007, and January 25, 2008. The timeliness issue was addressed. The Court allowed the recantation testimony also which formed the basis for the 2255(4).

The District Court dismissed the 2255(4) as untimely on August 25, 2008 (Appendix B). from the District Court which was denied on August 25, 2008. On November 9, 2008, the Eleventh Circuit denied the Certificate of Appealability. (Appendix A) This petition follows and is timely filed.

## FACTS MATERIAL TO THE QUESTIONS PRESENTED

After Miller's arrest on counterfeiting charges, he was confined in a Georgia County Jail where he met a career criminal whom he befriended, Troy Plante. Miller shared with Plante a scheme whereby Plante, would assist Miller with marijuana distribution and Miller would help him make a small release bond. Miller gave Plante instructions which included directions to a location where Miller's then wife worked. Plante, in an effort to gain favor with law enforcement and leniency on his pending criminal charges, approached law enforcement with a concocted murder for hire scheme allegedly hatched by Miller to kill Miller's wife.

Plante was successful in reducing his criminal liability in Georgia in exchange for his testimony, as the Government's only witness, against Miller in a federal solicitation and attempt to commit murder prosecution. Miller was convicted and received an additional 240 month consecutive federal sentence which he is now serving. Miller has always maintained his innocence disavowing the perjured testimony of Plante.

For many years Miller attempted to locate Troy Plante to ask him to tell the truth as Miller contended that Plante had been untruthful in his testimony at trial and that Miller had never associated Plante to kill Miller's wife. Plante was located in 2005 in a Florida prison on charges adding to his

2

## TIMELINESS

The District Court, in response to the 28 U.S.C. §2255, entered an order dismissing it as untimely. The undersigned filed a request for a Certificate of Appealability because the Court appeared to have ignored the rule set forth in 28 U.S.C. §2255(4). The District Court granted the Certificate of Appealability and the matter was then submitted to the Eleventh Circuit Court of Appeals for disposition. Counsel for Miller filed an opening brief in the Eleventh Circuit Court of Appeals, Case No. 06-15198-FF.

During the pendency of the appeal at the Eleventh Circuit, the United States Attorney's Office for the Northern District of Georgia filed numerous requests to the Court seeking remand of the case from the Eleventh Circuit to the District Court to have a hearing on the timeliness of the petitioner's 28 U.S.C. §2255(4). The Government in the process apparently uncovered the affidavit and correspondence sent to Miller's ex-wife and in-laws in March 2005 wherein Miller had his cell mate forge the affidavit of Troy Plante, without notarization.

It should be noted that at the evidentiary hearing on January 25, 2008 when Plante testified, the Government attempted to have Plante identify the signature on the forged affidavit as his own. However, on redirect the undersigned gave Plante the July 14, 2005 affidavit which was notarized by Maines and attested to by Attorney Maines as the affidavit that was signed by Plante and compared it to the March 2005 affidavit, disavowed the signature as his on the March 2005 affidavit and identified the signature on the July 14, 2005 affidavit as his own.

Despite the Government's efforts at the January 25, 2008 evidentiary hearing to suggest otherwise, it was made clear that Plante had only signed an affidavit in Maines presence on Maines last visit with him at the prison July 14, 2005. He acknowledged he may have received copies of the unsigned affidavit. However, it was not until he signed the affidavit and executed it in front of Maines in July 2005 that he ever signed and had the affidavit notarized.

At the evidentiary hearing when Attorney John Maines testified, his testimony was compelling and candid as relates to his interaction with Plante and the circumstances under which the authentic affidavit was obtained. Maines testified in substance that he did not think there was anything worthwhile to send on Miller's behalf to the undersigned for the inclusion in the 2255 until such time as he had a signed and notarized affidavit.

## RECANTATION

At the January 25, 2008 evidentiary hearing when Plante testified, his testimony was completely consistent with the affidavit prepared, which formed the basis of the 28 U.S.C. §2255 and request for new trial. Plante testified that he had limited communication with Miller prior to the 2255 litigation. Plante felt bad because someone had done the same thing to him in an unrelated case (tied), that his conscience got the best of him, and he wanted to clear the record. He also indicated he was concerned about coming forward earlier because of the statute of limitations wherein he might receive a perjury charge. He discussed the possibility of a perjury charge with Attorney Maines and he also did some research at the prison to determine that the statute of limitations on perjury had passed. Further, he had received information from Miller with regard to the five year statute of limitations. He felt comfortable after realizing the statute of limitations had expired on perjury and he finally came forward.

While Plante is obviously a sophisticated career offender, his testimony was unshakeable despite vigorous cross examination by AUSA Langway. The only thing that Plante appeared to

4

criminal resume. Plante admitted his lies and pressure placed on him by the Government to carry out his initial plot to frame Miller for a non-existing crime which secured Plante's earlier release from Georgia custody and dismissal of his charges.

Seven years after Miller's conviction, a friend of Miller's, Michael Mullen, became an intermediary between Plante and Miller. Mullen retained the services of a Florida lawyer, John Maines, to interview Plante and secure an affidavit from Plante as Plante had indicated that he was recanting his prior trial testimony and exonerating Miller of the attempted murder and solicitation to commit murder charges.

John Maines was contacted by Mr. Mullen. He set up a visit with Plante at the Florida Correctional Facility where Plante was being held as a Florida prisoner. Maines actually visited with Plante and took a recorded statement wherein Plante completely and candidly recanted his testimony against Miller at trial.

Maines returned to his office and prepared an affidavit as closely as possible to the verbal information that was given him by Plante. Maines prepared an affidavit for Plante's signature and Plante initially refused to sign the affidavit.

After Mullen, Miller, and Maines had come to the realization that Plante might never sign the affidavit, Miller unbeknownst to the undersigned until the first evidentiary hearing in this case, had a cell mate sign the prepared affidavit of Troy Plante, as Plante. The affidavit was not notarized. Miller forwarded the forged non-notarized affidavit to his mother for forwarding to his former in-laws and his former wife, who was the alleged victim of the attempted murder and solicitation to commit murder.

Miller testified at the evidentiary hearing that the signature on the affidavit offered into evidence by the Government as the March affidavit was not Plante's signature. He stated that he had his cell mate sign it at his prison. The reason behind it was he never anticipated Plante coming forward and doing the right thing by signing the affidavit prepared by Maines. He simply wanted his family to know that he was not guilty of the charges. Miller has a child with the alleged victim and wanted at some point and time, upon his release, to re-establish ties with his son.

After initially refusing to sign the affidavit, in a surprise move, Plante contacted Attorney Maines, and indicated that he was ready to sign the affidavit. Maines contacted Mullen for authorization to again visit the prison and for additional fees for the purpose of securing Plante's sworn signature on the affidavit. Mullens, in an email, authorized Maines to make one final visit to see Plante at the facility, but to assure Plante this would not happen again.

With Mullen's authorization, Maines returned to the correctional facility and presented Plante with the affidavit that he had prepared for him. Plante signed the affidavit. It was notarized by Maines and it was forwarded to undersigned counsel for inclusion in the 28 U.S.C. §2255(4). The evidence would reveal that the undersigned and Maines did not work together on this effort and the undersigned was only the recipient of the signed and sworn to affidavit. The affidavit was signed on July 14, 2005. Counsel for Miller then filed the 28 U.S.C. §2255(4). It was submitted to the Court within the one year filing deadline required under 28 U.S.C. §2255(4).

The sworn affidavit and the testimony of Plante during an evidentiary hearing revealed that he had lied during Miller's trial that Miller had sought his involvement in killing his ex-wife. Miller contended and maintains that he is actually innocent of the solicitation to commit murder and attempted murder charges. He is an innocent man and serving a 240 month sentence for a crime he did not commit.

3

hedge on were his unsuccessful attempts to extort money from Miller. Plante's testimony was on point with the matters contained within the 28 U.S.C. §2255. His testimony, as well as the statements represented in the affidavit, were far too detailed for him to be lying or have an ulterior motive.

## REASONS FOR GRANTING THE PETITION

Title 28 U.S.C. 2255(4) states in pertinent part: " A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of---- ... (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence".

### (A) Timeliness

The Government moved the Eleventh Circuit to withdraw the Certificate of Appealability and deny relief on the 28 U.S.C. §2255 arguing the 2255 was untimely. Under the Government's theory the acquisition of the information that Plante had lied and/or acquisition of an affidavit which was unsigned was in some way proper notice to Miller that Plante had recanted. Further, that he should have filed his 28 U.S.C. §2255 no later than March, 2005. Miller strenuously disagrees. Miller had no legal credible evidence to bring forward for purposes of a 28 U.S.C. §2255 until Maines secured the signed, sworn, affidavit of Plante dated July 14, 2005.

The Government's theory is that Miller should have filed his 28 U.S.C. §2255 the day that Plante first told his lies because Miller knew from the very beginning that Plante was lying. Incredulously, we are expected to believe that Miller would have sat in prison since 1998 knowing that Plante had fabricated his story with regard to the solicitation and attempt to commit murder, without previously filing any post conviction pleading. It was not until Plante had a change of heart and was willing to swear to his false and perjured testimony at Miller's trial that Miller had the hope of securing a new trial in this case. It was not until Miller actually had in hand the appropriately sworn affidavit from Plante dated July 14, 2005 that he had credible evidence to move forward with the litigation.

This Court should know that if Miller had submitted an unsigned, unsworn, affidavit and/or an affidavit from Attorney John Maines with regard to the recantation that was taped and given to him by Plante during the course of their first meeting at the Florida prison, the Government would have moved to dismiss indicating there was no credible evidence. As this Court could take judicial notice in 28 U.S.C. §2255 pleadings, summary judgment is normally the rule of thumb unless affidavits in support of positions are filed. Evidentiary hearings are rarely granted. Simple assertions are inadequate to defeat motions for summary judgement, as affidavits are required. This case should be no different.

Miller submits that he filed his 28 U.S.C. §2255(4) within one year of obtaining the newly discovered evidence, i.e., the sworn Plante affidavit of July 14, 2005. There is nothing in the rules or case law to require under 28 U.S.C. §2255(4) that Miller was obligated or required to file any sooner than the one year statute of limitations expiration, July 14, 2006.

### (B) Recantation

Although the remand from the Eleventh Circuit was for the limited purpose of determining the timeliness issue after repeated urging by the Government, the facts of this case as unfolded at the evidentiary hearing show that the statute of limitations pursuant to 28 U.S.C. §2255(4) was not triggered until Miller had the signed, sworn to, affidavit of Plante, dated July 14, 2005. In further support of the timeliness issue Miller now has the testimony of John Maines, a Florida lawyer, whose

5

testimony was absolutely uncontroverted with regard to Plante's candor and the information which was contained in the July 14, 2005 affidavit wherein Plante admitted his perjury.

There is also the testimony of Robert Ethan Miller, candid and forthright as to the timeliness issue. Miller now has the testimony of Troy Plante, who only testified as to the timeliness issue with regard to when he signed the affidavit, but also the recantation of his trial testimony admitting he had committed perjury at Miller's trial in relation to the attempted murder and solicitation to commit murder convictions for which Miller received a 240 month consecutive sentence.

— It is clear from Plante's testimony that he took some limited information about Miller wanting him to do some things for him on the outside after Plante would be released on bond involving marijuana distribution and expanded it into a murder for hire case. There was simply no information or urging on Miller's part, for Plante to kill his ex-wife or harm anyone.

Based on Plante's recantation it is clear that Miller's convictions for solicitation and attempt to commit murder were based on perjured testimony. Plante gave that testimony in exchange for leniency on his behalf and he came forward, seven years later, to correct the testimony because someone recently lied on him.

There is no way the lower Court should have ignored Plante's sworn affidavit, and now his sworn, live testimony consistent with his affidavit. As a result of his perjured testimony Miller was falsely convicted and is suffering severe punishment as a result.

Miller has now been in prison for over ten years. His 110 month sentence on the counterfeiting charge is complete. In fact, he has now served over the sentence that was required for the counterfeiting charge, minus good time credit. Miller's convictions as to the solicitation to commit murder and attempt to commit murder should be vacated and Miller should be released forthwith from custody. The issue of a new trial really should not be of issue because it was Plante, and Plante alone, who convicted Miller on the charges of solicitation and attempt to commit murder. Plante now confesses he lied at trial. Miller should be set free.

Question 1. Whether the holding in the Eleventh Circuit denying defendant's Certificate of Appealability on the dismissal of the 2255(4) is in conflict with the Second Circuit holding in *Haouari v. United States*, 510 P.3d 350 (2nd Cir. 2007); the Tenth Circuit holding in *United States v. Pearson*, 203 F.3d; and the Eighth Circuit holding in *United States v. Ward*, 544 F.2d 975, 976 n.2 (8th Cir. 1976).

After several hearings on remand, the District Court denied Miller's 28 U.S.C. 2255(4) as untimely relying upon the case of *United States v. Loudner*, 203 F. Supp. 1083, 1094-95 (Dist. S.D. 2001). In *Loudner*, the Court there found that under 2254(4) the one year time deadline for filing began at the moment petitioner obtained knowledge of the facts supporting his claim. (Order, p. 9)[1] The Eleventh Circuit's denial of Miller's Certificate of Appealability (without) opinion was wholesale adoption of the District Court's erroneous position that Miller's mere knowledge of Plante's recantation (March 2005)) triggered the time for filing the 28 U.S.C. §2255(4), not the receipt of Plante's sworn affidavit (July 2005). Miller contends that the deadline for filing a timely 28 U.S.C. 2255(4) began to run upon receipt of the properly executed affidavit from Plante on July 14, 2005 when it became a legally enforceable document.

[1]Under this rationale Miller upon the first Plante utterance of his murder for hire scenario, should have filed a pleading as he knew from the beginning that Plante was lying.

6

When newly discovered evidence is the ground for a § 2255(4) motion, the District Court should apply the same substantive test which governs a motion for a new trial under Fed.R.Crim.P. 33 premised upon the same ground. *Lindhorst v. United States*, 658 F.2d 598 (8th Cir. 1981) citing *Everitt v. United States*, 353 F.2d 532 (5th Cir. 1965).

There are five prerequisites which must ordinarily be met to justify the grant of a new trial on the ground of newly discovered evidence: "(1) the evidence must be in fact newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved, and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal." *United States v. McColgin*, 535 F.2d 471, 476 (8th Cir.), cert. denied, 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 128 (1976), citing *United States v. Pope*, 415 F.2d 685, 691 (8th Cir. 1969), cert. denied, 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 132 (1970).

Miller submits to this Court the analysis used in the Second Circuit in the case *Haquari v. United States*, 510 F.3d 350 (2nd Cir. 2007) in support of his position that the time for filing his 2255 began when the affidavit supporting Plante's recantation was legally effected on July 14, 2005.

In *Haquari*, the Court discusses the receipt of an unsworn letter in support of a successive 2255 petition as newly discovered evidence. There the Court found that the unsworn letter did not satisfy § 2255 prima facie standard under the context of a successive petition. The Court did find that "though information discovered subsequent to a criminal trial, that a witness's testimony was perjured, satisfies the prima facie showing of new evidence, ... the form in which the 'evidence' has been presented to us here is insufficient for us to certify the second part of the prima facie test..."

Further the Court went on to say that: "It is axiomatic that witness recantations "must be looked upon with the utmost suspicion." *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir.2003) (internal quotation omitted); *see also Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari) ("Recantation testimony is properly viewed with great suspicion."); *United States v. Ahern*, 612 F.2d 507, 509 (10th Cir. 1980) ("downright suspicion"); *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982); *United States v. Ward*, 544 F.2d 975, 976 (8th Cir. 1976); *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973); *United States v. Lewis*, 338 F.2d 137, 139 (6th Cir. 1964); *Newman v. United States*, 238 F.2d 861, 863 n. 2 (5th Cir.1956). This is because recantations "upset[ ] society's interest in the finality of convictions, [are] very often unreliable and given for suspect motives, and most often serve[ ] merely to impeach cumulative" evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert*, 468 U.S. at 1233-34, 105 S.Ct. 34.

These suspicions are supported by the fact that "[a]ttempts are numerous by convicted defendants to overturn their criminal convictions by presenting affidavits of recanting witnesses in support of a motion 2255 motion." *Kearney*, 682 F.2d at 219. And suspicions are even greater when, as here, the recanting witness is one who was involved in the same criminal scheme and, having received the benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting. *See Newman*, 238 F.2d at 862 (noting that a new trial will not automatically be granted based on the affidavits of recanting co-conspirators because "frequently [the affiants] who, as participants, co-conspirators, or actors in the criminal activity initially charged, might from a variety of base motives, or importunities, be impelled, by recantation, to come to the aid of a person whose conviction has

There was no cummulative evidence. Plante's testimony constituted the Government's case against Miller on the solicitation and attempted murder charges.

7

been brought about by their testimony"). Thus, it is through a lens of heightened skepticism and suspicion that we conclude that the form in which petitioner's "evidence" is presented in this motion is insufficient. Haouari's new "evidence" is a letter from co-conspirator Ressam to the U.S. Attorney's Office that is unsworn, and conclusory. Haouari has not brought to our attention any case in which an unsworn letter of a co-conspirator recanting sworn trial testimony was found to satisfy AEDPA's prima facie standard. And we have been unable to find such a case. On the other hand, cases involving different stages of habeas review and cases outside the habeas context amply support the view that a general, unsworn recantation of the sort presented here is insufficient to contradict sworn trial testimony. For instance, the Tenth Circuit, reviewing the denial of a motion for new trial based on the discovery of new evidence, held that an unsworn recantation is insufficient to warrant a new trial. *See United States v. Pearson*, 203 F.3d 1243, 1276 (10th Cir. 2000). The court found "it significant that [the] recantation was not made under oath" and noted that "[sworn trial testimony is generally not refuted by unsworn repudiation of that testimony." *Id.* at 1275.

Similarly, the Eighth Circuit has indicated "that a failure to produce or explain the absence of an affidavit of a recanting witness will result in the denial of a motion for new trial." *United States v. Ward*, 544 F.2d 975, 976 n. 2 (8th Cir. 1976).

In the habeas context, we have cautioned that, in order to warrant an evidentiary hearing in the district court on a first § 2255 petition, the "application must contain assertions of fact that a petitioner is in a position to establish by competent evidence ... Airy generalities, conclusory assertions and hearsay statements will not suffice ... ." *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987). Similarly, the D.C. Circuit, reviewing a district court's denial of a habeas petition, disregarded an unsworn witness recantation in light of the witness's former sworn testimony that was subject to extensive cross examination. *See Burns v. Lovett*, 202 F.2d 335, 346 (D. C. Cir. 1952).

The rationale of the foregoing cases holding that a specific, sworn recantation is necessary to contradict sworn trial testimony that has been subject to cross examination, together with the critical view that we take toward co-conspirator recantations, leads us to conclude that such unsworn recantations do not constitute "evidence" within the meaning of 28 U.S.C. § 2244(b)(2)(B), much less "clear and convincing" evidence. At the very least, before a recantation statement may qualify as competent evidence for habeas review, it must meet the requirement of an affidavit form, subject to penalty for perjury. We do not believe the requirement of an affidavit to be a difficult hurdle to clear. And without the possibility of a penalty for perjury, convicted co-conspirators, such as Ressam, have nothing to lose by writing letters attempting to free those who aided them in their criminal schemes. We therefore believe that an unsworn and uncorroborated letter of a criminal accomplice attempting to recant sworn testimony that has been subjected to cross examination, without more, cannot satisfy the prima facie burden of 28 U.S.C. § 2244(b)(3)(c)."

Question 2. Whether an unsworn affidavit meets the prima facie burden faced by habeas petitioners pursuant to 28 U.S.C. §2244(b)(3)(c).

Miller contends that under the rationale espoused above the unsworn affidavit he possessed in March 2005 was insufficient to meet the requirements to establish newly discovered "evidence" under 28 U.S.C. §2255(4) until it was properly effectuated in July 2005 and therefore under this analysis his 2255 petition was timely. If Miller had filed his 2255(4) in March 2005 without a sworn affidavit the Government would have made the argument that the defendant failed to meet the prima facie burden of 28 U.S.C. § 2244(b)(3)(c). Miller did not have competent evidence of Plante's recantation until his affidavit was signed and notarized in July 2005. He complied with the rule of 2255(4) and filed his petition within the year authorizing the filing as timely.

8

*Bobby, please copy your attorney, call me,*
*Alain*

EXH. A1 - A10

---

## AFFIDAVIT BY ALAIN A. VEIRA

FOR- ROBERT MILLER AS PROOF OF HIS INNOCENCE IN 1998 FED. TRIAL CASE NO. 1:97-cr-896 Atlanta, where lies of Trey Plante caused wrongful conviction.

I, Alain A. Veira, make this affidavit under penalty of perjury under 28 U.S.C. §1746 swearing the following statements to be true so help me God, to wit that:

1. I am of legal age and competent to testify in this matter which I will do when called to do in support of the innocent victim of the lies of Trey Plante who I know and can prove fabricated his entire 1998 trial testimony against Robert Miller where Plante lied and claimed that Miller hired him to kill a potential fed. witness.

2. I know Plante lied, knew in 1997-1998 because I and others in the same Cobb County Jail in late 1997 early 1998 were all part of the real plan Plante was involved with Miller. It is and it had nothing to do with killing or violence but with a plan for Plante to drive marijuana to Savannah GA from Atlanta, for a friend of Miller's with the last name Hinson. This is not only in Distrcal Court records but Plante himself has admitted this to his own recantation of trial testimony admissions showing Plante has admitted he lied on Miller during Miller's 1998 trial, but because Miller's appeal attorney filed Plante's admission he committed perjury against Miller, the federal courts failed to correct a miscarriage of justice and left an innocent man to rot in prison for his counsels late filing.

3. I am the new evidence that proves the innocence of Robert Miller who was wrongfully convicted in a 1998 Fed. trial in Atlanta because of the lies of Trey Plante.

PAGE 1 of 10

---

PG 2 of AFFIDAVIT BY Alain A. Veira

4. I was incarcerated with both Robert Miller and Trey Plante in the same Cobb County Jail from approx. late 1997 to early 1998, where all 3 of us formed an association.

5. Plante somehow found out Miller had pending fed. charges and later told me he read it in some of Miller's mail, he said had fallen on the floor between our beds as we all slept in the same area of the Cobb Jail together. Not only will jail records reflect this, but Miller 1997-1998 girlfriend Jodee Sanders who was called as a witness at Miller's 1998 trial can verify I was in the Cobb Jail with both Miller and Plante in 1997-1998 as can Miller's trial attorney, John Harbin, as can T.C. Hinson, who I only heard of as the guy Plante would drive the marijuana for, who I was told was a black dude living in Atlanta during this time frame and Miller's ex-roommate and best friend, as well as Ervin Helms. All except myself were part of Miller's trial. Harbin and I am sure his records for his representation of Miller will show and prove I was in jail at the same time with both and I was part of Trey Plante's and even Robert Miller's plans from the beginning when Miller, Plante and myself first met in the Cobb Jail in late 1997.

6. Prior to Miller's trial and after I met with Harbin about proving Miller's innocence with the evidence I had of Plante lying, I was approached and threatened by the U.S. Fed. Govt. Plante has admitted that he too was threatened by the U.S. Govt. where both of us were told that if we testified for or helped Miller in any way prior, during or after his 1998 trial that we'd, speaking for myself, I'd, end up in fed. Prison for a long stay.

EXHIBIT A

## Pg 3 of AFFIDAVIT By Alan A. Veira

7. I now swear that I will testify for Miller in any future hearing relating to these matters but I do not desire to speak with any fed. agents or other authorities, who I know want to silence me, hide the truth, threaten me again to prevail me from helping and freeing an inn-ocent man, or those who want to somehow intimidate me or scare me into retracting these herein sworn truths, and I ask to be subpoena so that I can speak in an open court where fed agents won't dare threaten me again. I ask whatever court Miller files his appeal in to protect me from such threats, retaliation, and if Miller has counsel or is appointed one I will speak to that counsel not the U.S. its agents or its counsel.

8. My present address is 1185 Collier Rd Apt 2F, Atlanta GA 30318 where I will comply with any subpoena, court order or contract by Miller or his attorney, and where I request pro-tection from harassment or intimidation from any fed. law enforcement officials, agents, officers, etc.

9. While in the Cobb County Jail with both Miller and Plante I made an agreement with Miller and witnessed Millers arrang-ement with Plante which was Miller with the help of his roommate Hinson would bond himself and Plante out of the Cobb County Jail and we in return would help Miller and Hinson by dri-ving marijuana to Savanna Ga that Hinson had but could not drive due to the feds following him around Atlanta.

---

EXHIBIT A

## Pg 4 of AFFIDAVIT of Alan A. Veira

10. Shortly after the 3-way deal between me, Miller and Plante I was approached by Plante with a once in a lifetime [so said Plante] deal, when Plante begged me to trust him and told me I had to promise I couldn't ever tell anyone, esp-ecially Miller, but if I kept my word he could get me out of jail with probation or dropped charges so I listened to Plante as he explained to me that he had spoke to his own attorney about Miller and his attorney told him that the U.S. Govt. offers a lot of help to people willing to help them. Plante said he told his attorney about the marijuana but his attorney said it had to be bigger then that and asked Plante if Miller ever spoke of killing anyone, or other acts of violence. Plante told me that he needed to find out more about Miller and asked if I would help him. I said I would but only to get away from Plante and out of the situation.

11. Days later in the same Cobb Jail, Miller as usual routines was called on the loud speaker to visitation. Plante called me to the windows where we could see who we assumed was Millers wife because Miller had said it was his girl and she had the last name Miller. As soon as Miller left for his visit Plante asked me to look out for him as he went through Millers mail, some from the same visiting wife, Miller woman, came from his attorney, etc. This was how Plante obtained names and personal data about Miller to use in the story he was concocting to use for his get-out-of-jail-free agenda.

EXHIBIT A-6

## PG 5 of AFFIDAVIT by Alain A. Veira

11. Only days later Plante came to me and said he had figured it out. He said that Miller's fed. charges were convictions and we could say Miller told us his wife, who we only know as the Mrs. Miller who visited him twice a week, who we all watched through the jail windows, was the only witness and without her the feds have no case. I told him that it was weeks, wouldn't work, etc...but Plante said his attorneys is already running with it and the feds want to meet with us. Plante said all I have to do is go along with his b.s. and it will be our word against Miller's. I told Plante I won't tell but I am not meeting with the feds. This led to Plante soliciting others, two I knew about because Plante told me in the 2 people later confirmed such to me, to lie with him on Miller if they wanted out of jail. Plante Really bragged about how he'd done this before how the system doesn't care if its true and how we are all naive if we don't do it.

13. Days after Plante met with the feds at the jail Miller was taken out of the jail dorm. I never saw or spoke or had any contact with Miller. Everyone in the Cobb County jail unit started orally talking about Plante lying on Miller and thats what happened to Miller, because Plante had tried to solicit several others in the jail dorm to back his lies on Miller.

EXHIBIT A-7

## PG 6 of AFFIDAVIT by Alain A. Veira

14. To protect myself in case Plante wanted to involve me or lie on me I kept numerous notes he gave me which showed Plantes handwriting instructions me on how to lie on Miller, what to say, what to say Miller told us, and even notes that joked about how shocked Miller would be when the feds fall him up about hiring a hitman, how gullible people are and how easy it is to play the system. I had several notes and ended up turning them over to Harbin, Millers trial attorney, when I met him in downtown Atlanta months prior to Millers 1998 trial.

15. I ended up getting out of the Cobb jail in the early months of 1998. I bumped into someone that knew Miller and I was told how this guy was Johns on himself so I asked the person to get me the contact information to Millers attorneys because I knew I could help Miller. I tried to not be involved, but when I heard Miller could face 30-40 years, when I personally knew and had proof that it was all a lie, I got involved. The person gave me the name and number of John Harbin. Harbin told me to meet him in Atlanta if I could. I did in early 1998.

16. When I met Harbin I told Harbin I can easily prove that Miller is innocent, that Miller was hiring us to drive marijuana not kill witnesses, that I would wear a recording device and talk to Plante myself and get it on tape that Plante made up the entire story. I told Harbin that two others still in the Cobb jail who were in the same dorm with me, Miller and Plante will attest that Plante tried to get them to

**Pg 7 of AFFIDAVIT by Alan A. Veira**

to back his lies that Miller tried to hire him to kill a witness in a Fed. case. I told Harbin he'd have myself and at least these two other Cobb Jail witnesses to use to prove Plante was lying on Miller. I saw Harbin's phone number, address, and even his work number and mothers number so Harbin would be able to reach me for when it was my time to testify for Miller. I was told by Harbin that I would be called upon as a witness for Miller's Fed. trial and that he would notify Miller that we met and that I could prove Plante was lying, etc –

17. I was never again contacted by Harbin even though I left dozens of messages at his Atlanta office, telling him on his answering machine that I'd spoken to Plante and he was willing to confess to the whole charade, but was scared because he'd tried to back out of testifying and the U.S. Gov. Prosecutor said he'd make sure Plante got 40 years if he didn't stick to his initial statement against Miller.

18. Shortly after this message to Harbin I was approached by U.S. Feds while in the DeKalb County Jail and threatened to stay away from Miller and Plante and if I tried to help Miller in any way they'd find ways to indict me. This was early 1998 or so. if I recall.

19. I never saw, spoke or communicated with Mr. Miller again until I saw something on the internet explaining why Miller is still in prison, how Plante admitted he lied on Miller, but that his appeals attorneys filed the evidence a few days late, etc. So my girlfriend said we should help, and I wanted to do the right thing, so in approx. May of 2017 we wrote Miller a letter explaining how I

**Pg 8 of AFFIDAVIT by Alan A. Veira**

one of the Jews in the Cobb County Jail with him in 1997-1998 with Trans-Plante, and asked Miller why he didn't tell me as a witness in his trial because I was his ace in the hole, how I and others would've proved Plante was lying because he tried to solicit us all to lie, and how we even had actual notes Plante wrote about his plans to lie. We told Miller that if I'd met with his attorney Harbin in Atlanta prior to Miller's trial and told Harbin I had proof Plante was lying, and asked why Miller never contacted me, etc.

19. A while later I was contacted by someone saying they hired a private investigator trying to help Miller prove his innocence and set Plante of prison and I was told Miller needs an affidavit of truth prepared by me.

20. The Private Investigator told me that Miller could not talk to me so that the US Gov't. saw people who threatened me, threatened Plante, forced Plante the lie per Plante's own admission, and not only let Miller be convicted on lies Plante has admitted to but have delivered Miller of Justice even after Plante has come forward recanting his 1998 Perjured trial testimony against Miller would not try to say I was coached by Miller or anyone. The only thing I was told was to send a copy of my affidavit to Sheba Halliburton in the Washington DC area, who would get it notarized by Washington DC notaries Public Brian K. Price and certified through some authentication process so it could be admitted into evidence in Fed. court to prove Mr. Miller's innocence.

EXH. A-1D

## Pg 9 of AFFIDAVIT by Alain A. Veira

21. I want to make this clear for our Federal Judge reading this affidavit. You are participating in treason and usurpation of the Constitution of the United States of America, if you refrain from correcting this obvious miscarriage of Justice. Miller is innocent of the charges associated with Plenta lies. All Miller's attorney in 1998, Harbin, had to do was call me as a witness, or tell Miller all I told him at our Pretrial meetings and I would've destroyed Plenta's lies to the extent that we can to get reasonable, as no unreasonable fact finder would have or could have found Miller guilty of allegedly trying to have one witness or someone killed.

22. I never testified for Miller of his 1998 trial be-cause Miller did not know about me of this trial. I notified through a letter my girl wrote around May 2017. That makes this newly discovered evidence and if the Judges reviewing this are about Justice and truth they-they will ensure a future hearing where I will testify under oath to these facts. I was told by Harbin I'd be called but was not.

23. Further, I am certain Harbin himself will not dare deny under oath or in an affidavit under penalty of perjury that he met with me PRIOR to Miller's trial, that I told him I could prove Plenta was lying on Miller and that I was never contacted again by Harbin, which is the issue at hand.

## Pg 10 of AFFIDAVIT by Alain A. Veira

24. Since I have proof I met with Harbin offering Proof of Miller's innocence prior to the 1998 trial Plenta lies, which Harbin does not deny. Both Miller and myself attest to not knowing any-thing about the contents of this affidavit, and obviously if Harbin had told Miller then, I would've been called as a witness because Miller originally made the real Plenta mari-wanna Plenta, with both Plenta and I. I am telling the review-ing Judges that Miller had no knowledge of this evidence until around May 2017.

25. If the Judges will now take another look at the recanta-tion affidavit of Ted Plenta where he admits he lied on Miller and his only place with Miller revolved around mariwanna, and now restrict the fact that I was initially a part in that Plenta and Plenta was the one who told me about his plan to lie on Miller and I stole this to Harbin only to be ignored. Then you would realize that you set 10 plus years of Miller for a crime that never oc-cured was never tried about never existed. Get Plenta back to court and Plenta will tell you the above is true. Plenta told me he would've confessed if Harbin had confronted him with me or the letters I gave Harbin that Plenta wrote.

I, Alain A. Veira, swear under penalty of perjury that the above 10 pages affidavit consisting of 25 Paragraphs is true and that Shaka Halliburton and/or Brian K. Price have my office of limited Power of Attorney to get this document certi-fied and authenticated with an 1441 District of Columbia Procedures to ensure this evidence is admissible because of Robert Miller as proof of his innocence.

Done and signed on this 31 day of May, 2017, by:

Alain A. Veira
1185 Collier Rd. NW
apt 6F
Atlanta, GA 30318

Law Office Of
## Susan G. James and Associates

Susan G. James

March 20, 2009

Robert Ethan Miller
48707-019
United States Penitentiary
P.O. Box 5500
Adelanto, California 92301

Dear Ethan:

Enclosed please find the Supreme Court's denial of Certiorari in your case. I am obviously disappointed. I hope that you will follow my suggestion in my last correspondence and that is to pursue a 28 U.S.C. §2241 in California. Maybe the Court there will appreciate the fact that you are not guilty.

Again, I wish you the best in your endeavors. With kindest regards, I remain

Truly yours,

Susan G. James



gh Street. P. O. Box 198 . Montgomery, Alabama 36101-0198
Fax: 334-263-4888 . Email:  sgjamesandassoc@aol.com



BP-A0288
JAN 17

INCIDENT REPORT

U.S. DEPARTMENT OF JUSTICE                                                          FEDERAL BUREAU OF PRISONS

**Part I – Incident Report**

| 1. Institution: FCI Terre Haute | | Incident Report Number: | |
|---|---|---|---|
| 2. Inmate's Name: Reynolds, Donald | 3. Register Number: 32349-074 | 4. Date of Incident: 5-20-2019 | 5. Time: 4:48 PM |
| 6. Place of Incident: FCI Terre Haute | 7. Assignment: D Orderly | | 8. Unit: D Unit |
| 9. Incident: Conduct, which disrupts or interferes most like Use of Mail for an illegal purpose. | | 10. Prohibited Act Code (s): 199 most like 196 | |

11. Description of Incident (Date: 06/05/2019 Time: 3:00 p.m. Staff became aware of incident):
On May 20, 2019 at approximately 4:49 PM, inmate Reynolds, Donald, Reg. No. 32349-074, authored an e-mail to his mother, Janice Reynolds, at 3212r@tds.net.  A review of this e-mail along with emails dated 5/26/2019, 5/28/2019, 5/30/2019, and 6/04/2019 determined Reynolds was instructing his mother to file an IRS Form 1099-A-Acquisition or Abandonment of Secured Property based on the redemption theory with the IRS.).  Reynolds did not specify an amount or instructions for completion of each section of the IRS form.  Copies of emails are attached.

| 12. Typed Name/Signature of Reporting Employee: Kevin Myers/ | 13. Date And Time: 06/05/2019  3:30 p.m. | |
|---|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature): | 15. Date Incident Report Delivered: 6-6-19 | 16. Time Incident Report Delivered: 12:05 P.M. |

**Part II – Committee Action**

17. Comments of Inmate to Committee Regarding Above Incident:

18. A. It is the finding of the committee that you:

☐ Committed the Prohibited Act as charged:
☐ Did not Commit a Prohibited Act.
☐ Committed Prohibited Act Code (s). _____

B. ☐ The Committee is referring the Charge(s) to the DHO for further Hearing
C. ☐ The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days.

19. Committee Decision is Based on Specific Evidence as Follows:

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):

21. Date and Time of Action:_____(The UDC Chairman=s signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings).

Chairman (Typed Name/Signature): _____   Member (Typed Name): _____   Member (Typed Name): _____

INSTRUCTIONS: All items outside of heavy rule are for staff use only.  Begin entries with the number 1 and work up.  Entries not completed will be voided by staff.
Distribute: Original-Central File Record; COPY-1-DHO: COPY-2-Inmate after UDC Action; COPY 3-Inmate within 24 hours of Part I Preparation

PDF                                          Prescribed by P5270                    Replaces BP-A0288 of AUG 11

TRULINCS  32349074 - REYNOLDS, DONALD RAY JR - Unit: THA-D-A

---------------------------------------------------------------------------------------------------

FROM: Reynolds, Janice
TO: 32349074
SUBJECT: Mail
DATE: 07/16/2019 09:47:42 AM

L received a package that has been tampered with there was no cover letter inside and it appears some information may be missing.
Common Law Copy Right.
The tracking No. 9114 9014 9645 1828 29 if possible resend package.
Authorities and postal inspectors are suppose to be investigating.





2013 OCT 29   AM 8: 43
S.D. OF N.Y.



Sunday, October 20th, 2019, Houston v. Lack, 487 U.S. 266 (1988)

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States



Label 400 Jan 2013
7690-16-000-7948

S TRACKING #

3 0722 4293 0882 37

D STATES
L SERVICE®

12982-104
rrectional Institution
83
e), IN 47808

808

