

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ Martin S. Gottesfeld, pro se,   │
│            Plaintiff             │
│         - against -              │
│   Hugh J. Hurwitz, et al.,       │
│            Defendants            │
└─────────────────────────────────┘
```

Case No.: <u>18-cv-10836-PGG-GWG</u>

<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS (D.E. 51-52) THE COMPLAINT (D.E. 2)</u>

Martin S. Gottesfeld
Pro Se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Sr. Systems Engineer
Rolling-Stone-- & Info-Wars--
Featured Human-Rights Advocate
Political Journalist

Filed by U.S. Postal Service Priority Mail®, pursuant to the prison-mailbox rule of <u>Houston v. Lack</u>, 487 U.S. 266 (1988), on Monday, November 18th, 2019, sufficient pre-paid U.S. postage affixed, handed to Ms. J. Wheeler of the FCI Terre Haute CMU unit team acting in her official capacity as an agent of the defendants, bearing U.S. Postal Service tracking number: 9114 9023 0722 4291 7452 31.



Table of Contents------------------------------------------------2
I.    INTRODUCTION------------------------------------------------5
      A. SCOPE OF THE PLAINTIFF'S OPPOSITION: THE DEFENDANTS'
         MOTION---D.E. 51-52---MUST BE DENIED IN ITS ENTIRETY WITH
         PREJUDICE.-----------------------------------------------5
      B. LEGEND---------------------------------------------------6
      C. EXHIBITS ONE HUNDRED ONE (101) AND HIGHER---------------7
II.   RELEVANT HISTORY------------------------------------------8
      A. FACTUAL BACKGROUND OF THE EVENTS IN CONTROVERSY DECLARED
         UNDER PENALTY OF PERJURY--------------------------------8
         1. Money Doesn't Make the Plaintiff's World Go 'Round.---8
         2. The Defendants' Attempted Suppression of the Truth Heard
            'Round the World-------------------------------------25
      B. ANNOTATED AND SUMMARIZED PROCEDURAL HISTORY-----------52
III.  ARGUMENTS--------------------------------------------------57
      A. LEGAL STANDARDS---------------------------------------57
         1. Legal Standards For Pro Se Complaints---------------57
            a. A Pro Se Complaint and Pleadings Must Be Read For Their
               Strongest Arguments.------------------------------57
            b. A Pro Se Plaintiff Must Be Granted Leave To Amend To
               Fix Non-Fatal Flaws.------------------------------58
         2. Local Civil Rule 56.1-------------------------------60
         3. Heck v. Humphrey------------------------------------61
         4. Fed. R. Evid. 201(c)(2) and Exhibits Hereto--------62
         5. The Role of the U.S. Attorney----------------------62
         6. The Appearance of Justice.-------------------------63
      B. THE PLAINTIFF EXHAUSTED THE AVAILABLE ADMINISTRATIVE REMEDIES.-----63
         1. The Defendants' Assertions and Admissions Show the
            Plaintiff Exhausted the Available Administrative Remedies.-----63
         2. The Defendants Must Be Estopped From Raising Non-Exhaustion.---67
         3. The Adminstrative-Remedy Procedures At MCC Are Opaque and
            Thus Unavailable.---------------------------------72
         4. Aassiddaa's Declaration (D.E. 52-1 and 52-2) Is
            Inadmissible.-------------------------------------73
      C. THE DEFENDANTS DEPRIVED THE PLAINTIFF OF PROTECTED LIBERTY
         INTERESTS.------------------------------------------74
         1. The Defendants Unconstitutionally Segregated the Plaintiff
            In the Special-Housing Unit (SHU).----------------75
         2. The Defendants Unconstitutionally Transferred the Plaintiff
            Far Away Into Harsh Conditions.-------------------77
         3. The Defendants Inflicted Cruel and Unusual Punishment Upon
            the Plaintiff Without Due Process of Law.---------81
         4. The Defendants Violated the Plaintiff's First Amendment
            Rights.-------------------------------------------85
            a. Prior Restraints-------------------------------85
            b. Retaliation-----------------------------------87
         5. The Defendants Stigmatized the Plaintiff and Restricted His
            Liberty, i.e. "Stigma-Plus."----------------------91
         6. The Defendants Denied the Plaintiff Access To His Counsel.-----93
      D. THE PLAINTIFF STATED CLAIMS FOR WHICH RELIEF MUST BE GRANTED.-----94
         1. Title 5 U.S.C. Sec. 701 Et Seq.-----------------97
         2. Title 42 U.S.C. Sec. 1985(3)--------------------101
         3. State Civil-Rights Violations-------------------

Table of Contents (Cont.):

III. ARGUMENTS (Cont.)
    D. THE PLAINTIFF STATED CLAIMS FOR WHICH RELIEF MUST BE GRANTED (Cont.).
       4. Implied Damages Under The U.S. Constitution (Bivens)-----------103
        a. Abbasi Did Not Neuter Bivens.-----------------------------------105
        b. Previous Constitutionally-Implied-Damages Cases Remain
          Good Law.---------------------------------------------------------106
        c. The Plaintiff's Constitutionally-Implied Damages Claims
          Are On Solid Legal Ground.---------------------------------------107
          i.   The Plaintiff's Fifth Amendment Implied-Damages
              Claims Rely on Tellier, Welch, and Palmer.-----------------107
          ii.  The Plaintiff's Sixth Amendment Implied-Damages
              Claims Rely on Marsh v. Kitchen and Doe v. United
              States Civil Service Com.----------------------------------107
          iii. The Plaintiff's Eighth Amendment Implied-Damages
              Claims Rely on Hernandez v. Lattimore, Gonzalez v.
              Hasty, and Gaston v. Coughlin.----------------------------109
        d. The Plaintiff's Constitutionally-Implied Damages Claims
          Must Continue To Be Recognized.---------------------------------109
          i and ii. The Ranks of the Officers Involved and the
              Constitutional Rights At Issue Are Not New.-------112
          iii. The Official Actions Have General and Specific
              Analogs In Case Law.--------------------------------------122
          iv.  The Officers Had Extensive Judicial Guidance As To
              the Problem To Be Confronted.-----------------------------123
          v.   The Officers Were Operating Under Familiar
              Statutory and Other Legal Mandates.-----------------------123
          vi.  There Is No Risk of Disruptive Intrusion By the
              Judiciary Into the Functioning of Other Branches.--------123
          vii. There Are No Potential Special Factors
              Unconsidered In Previous Constitutionally-Implied
              Damages Cases.----------------------------------------------126
        e. No "Special Factors" Counsel Hesitation.-----------------------126
        f. The Plaintiff's First Amendment Implied-Damages Claims
          Must Be Allowed To Proceed.--------------------------------------128
       5. The False Claims Act (FCA): Title 31 U.S.C. Sec. 3730(b)(1)-----130
    E. THE INSTANT DEFENDANTS MUST BE DENIED IMMUNITY.--------------------131
       1.  Immunity Is Inapplicable To Many of the Plaintiff's Claims.-----131
       2.  The Defendants Must Be Denied Immunity To the Plainitff's
          Title 42 U.S.C. Sec. 1985(3) Claims.---------------------------132
       3.  The Defendants Must Be Denied Immunity To the Plaintiff's
          State Civil-Rights Claims.-------------------------------------132
       4.  The Defendants Must Be Denied Immunity To the Plaintiff's
          Fifth Amendment Damages Claims.-------------------------------133
       5.  The Defendants Must Be Denied Immunity To the Plaintiff's
          Sixth Amendment Damages Claims.-------------------------------135
       6.  The Defendants Must Be Denied Immunity To the Plaintiff's
          Eighth Amendment Damages Claims.-----------------------------137
       7.  The Defendants Must Be Denied Immunity To the Plaintiff's
          Stigma-Plus Claims.-------------------------------------------137
       8.  The Defendants Must Be Denied Immunity To the Plaintiff's
          First Amendment Damages Claims.------------------------------138
       9.  The State of the Law In 1871 Would Not Have Conferred
          Immunity On the Instant Defendants.--------------------------140
      10. Qualified Immunity Is Now An "Unqualified Disaster."-----------142
      11. Qualified Immunity Unconstitutionally Usurps Legislative
          Power.--------------------------------------------------------145

Table of Contents (Cont.):

APPENDIX 1: LIST OF EXHIBITS AND PAGES OF FIRST APPEARANCE -----150
            I.  EXHIBITS ONE (1) THROUGH THIRTY (30)--------------------150
            II. EXHIBITS ONE HUNDRED ONE (101) THROUGH ONE HUNDRED
                HUNDRED FORTY-EIGHT (148)------------------------------151
APPENDIX 2: LIST OF "SENTRY" CASES ------------------------------------154

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:02:25 PM

I. INTRODUCTION

A. SCOPE OF THE PLAINTIFF'S OPPOSITION: THE DEFENDANTS' MOTION---D.E. 51-52---MUST BE DENIED IN ITS
ENTIRETY WITH PREJUDICE.

Through their common counsel, the defendants in this case (the "instant defendants") filed a motion, docket entry (D.E.)

51, and an accompanying memorandum in support thereof (D.E. 52), herein collectively "defendants' motion," on May 16th,

2019, seeking dismissal of the instant complaint, "pursuant to Federal Rules of Civil Procedure 12(b)(1) [lack of subject-

matter jurisdiction] and 12(b)(6) [failure to state a claim upon which relief can be granted], or, in the alternative, pursuant

to Federal Rule of Civil Procedure 56 [Summary Judgment]."

The defendants' motion:

* fails to comply with Local Civil Rule (Loc. Civ. R.) 56.1(a);

* misconstrues the plaintiff's causes of action;

* ignores the federal regulations relevant to the merits of the instant case;

* falsely claims that the plaintiff failed to exhaust the available administrative-remedy procedures as required by Title 42

of United States Code Section 1997e(a) (42 U.S.C. Sec. 1997e(a)) of the Prison Litigation Reform Act (PLRA);

* misconstrues the U.S. Supreme Court decisions of Ziglar v. Abbasi, 137 S. Ct. 1843 (2017) and Ashcroft v. Iqbal, 556

U.S. 662 (2009) when in reality those decisions are not contrary, i.e. not opposite, to the plaintiff's instant claims and

indeed supportive thereof;

* cites a cacophony of unpublished non-opposite opinions when binding and precedential decisions clearly apply (control),

including Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000), Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004), Welch v. Bartlett, 196

F.3d 389 (2d Cir. 1999), and Gaston v. Coughlin, 249 F.3d 156 (2d Cir. 2000); and

* ignores the opportunity that must be afforded to the unrepresented (pro se) instant plaintiff---if necessary---to amend

his complaint under Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795-96 (2d Cir. 1999).

The plaintiff, acting without an attorney (pro se), and seeking penalties from the defendants in both their official and

personal capacities on behalf of the government as well as himself (qui tam), hereby opposes the defendants' motion, and

for the reasons enumerated herein (infra), the defendants' motion must be denied in its entirety with prejudice.

- Page 5 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------

B. LEGEND

All emphasized text inside quotations is emphasized as in the original source unless otherwise indicated.

A double-indent and a vertical pipe (|) indicates a block quote:

   |This would be block-quoted text.

A single-indent and asterisks indicate a bulleted list:

This bulleted list consists of the following two (2) items:

* Item 1; and

* Item 2.

A double-hyphen ("--") indicates an en dash.

A triple-hyphen ("---") indicates an em dash.

Please note the following abbreviations used herein:

* D.E. is short for "docket entry."

* "Cf." is short for "confer." As a citation signal, it "directs the reader's attention to another authority or section of the work in which contrasting, analogous, or explanatory statements may be found." Black's Law Dictionary 260 (9th ed. 2009).

* RFA is short for "request(s) for admissions." The plaintiff notes his filing of his claim for mandatory judicial notice pursuant to Federal Rule of Evidence 201(c)(2), made simultaneously (pari passu) with this opposition. Where the plaintiff herein refers to "RFA [Number(s)]," this signifies the corresponding number or numbers of his requests for admissions.

* "Sec." is short for "Section."

* "Secs." is short for "Sections."

* "U.S.C." is short for "United States Code," i.e. "5 U.S.C. Sec. 701" signifies "Title 5 of United States Code Section 701."

* "C.F.R." and "CFR" are short for "Code of Federal Regulations," i.e. "28 C.F.R. Sec. 541.25" signifies "Title 28 of Code of Federal Regulations Section 541.25."

* "pg." is short for "page," i.e. "(pg. 5)" signifies "page 5."

* "at" usually signifies a page number, i.e. "D.E. 2 at 5" signifies "docket entry 2 at page 5."

* "p." is short for "paragraph(s)," i.e. "D.E. 2 at 5 (p. 2-7)" signifies "Docket Entry 2 at page 5 paragraphs 2 through 7 inclusive."

* "Fed. R. Civ. P." is short for "Federal Rule(s) of Civil Procedure," i.e. "Fed. R. Civ. P. 36" signifies "Federal Rule of Civil Procedure 36."

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

* "Fed. R. Crim. P." is short for "Federal Rule(s) of Criminal Procedure," i.e. "Fed. R. Crim. P. 18" signifies "Federal Rule of Criminal Procedure 18."

* "Fed. R. Evid." is short for "Federal Rule(s) of Evidence," i.e. "Fed. R. Evid. 201(c)(2)" signifies "Federal Rule of Evidence 201(c)(2)."

* "Loc. Civ. R." is short for "Local Civil Rule(s)," i.e. "Loc. Civ. R. 56.1" signifies "Local Civil Rule 56.1."

* "U.S. Const." is short for "U.S. Constitution."

* "art." is short for "Article," i.e. "U.S. Const. art. III" signifies "U.S. Constitution Article 3."

* "amend." is short for "Amendment," i.e. "U.S. Const. amend V" signifies "U.S. Constitution Fifth Amendment."

* "cl." is short for "Clause," i.e. "U.S. Const. art I, sec. 2, cl. 2" signifies "U.S. Constitution Article 1, Section 2, Clause 2."

## C. EXHIBITS ONE HUNDRED ONE (101) AND HIGHER

The Honorable Court already knows that the defendants unlawfully interfere with the instant plaintiff in order to stop him from litigating this case. The plaintiff regrets that the defendants entirely precluded him from coordinating with those outside the prison walls, and thereby stopped him from obtaining all of the exhibits necessary to support this opposition.

The plaintiff herewith provides the exhibits hereto that are in his custody and control, numbered ascending from one (1). The plaintiff titled from memory the exhibits that the defendants have prevented him from personally filing and numbered them ascending from one hundred one (101). Please see below APPENDIX 1: LIST OF EXHIBITS AND PAGES OF FIRST APPEARANCE.

The plaintiff notes his simultaneous MOTION FOR AN EXTENSION OF TIME TO FILE NECESSARY EXHIBITS and his good-faith belief that his next friend will complete the filing and service of process of exhibits one hundred one (101) and higher as soon as practical; most likely within fourteen (14) days of the appearance of this opposition on the docket; using Compact-Disc (CD) or Digital Versatile Disc (DVD) where needed for video. The plaintiff respectfully notes his desire for The Clerk of The Court to merge the docket entries of this opposition and the additional exhibits so that they appear in the record of the case as a single docket entry---as if the defendants had not stopped him from filing them all together.

The plaintiff has simultaneously moved The Honorable Court pursuant to Fed. R. Evid. 201(c)(2) to take mandatory judicial notice of all of the exhibits to this filing. Please see below Sec. III(A)(4).

## II. RELEVANT HISTORY

The refutation of the meritless arguments in the defendants' motion requires a thorough recitation of the events in controversy and the circumstances in which those events transpired, in order to establish the Constitutional, statutory,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------

regulatory, and procedural contexts relevant to the instant litigation and to demonstrate the proper construal of the instant

complaint.

   This section controls wherever the facts reported herein contradict any of the unsworn exhibits hereto from the media

numbered below one hundred one (101). The plaintiff assiduously noted any factual inaccuracies from these exhibits. Please

see Exhibit 1 hereto at 1 (p.2), Declaration of Martin S. Gottesfeld (November 15th, 2019). The plaintiff has not, however,

been able to review exhibits numbered one hundred one (101) or higher. Should The Honorable Court have any questions not

explicitly addressed by the plaintiff regarding the factual accuracy of those exhibits, the plaintiff would happily answer them.


## A. FACTUAL BACKGROUND OF THE EVENTS IN CONTROVERSY DECLARED UNDER PENALTY OF PERJURY

   The instant plaintiff is a proudly-patriotic thirty-five-(35)-year-old American-born autodidact (self-taught) computer-

security professional, human-rights advocate, and investigative journalist.


## 1. Money Doesn't Make the Plaintiff's World Go 'Round.

   The instant plaintiff, for reasons explained herein, is not financially motivated. The defendants thus misconstrue the

instant complaint as one focused on financial damages despite its clear, explicit, wording to the contrary. Please see D.E. 2

at 14 Sec. VI, "RELIEF," explicitly seeking prospective relief as opposed to retrospective money damages. Please also see

Exhibit 2 hereto at 3 (p.3), announcing the plaintiff's commencement of the instant case; Martin Gottesfeld; Inside El

Chapo's Confinement: Cockroaches, Frigid Temperatures, Tacos, and a Three-Lieutenant Escort; The Intercept (February

3rd, 2019, 9:11 A.M.):

   |Besides simply recovering my fees and costs, however, my goals aren't financial. Instead, I'm asking the court to force
   |MCC NY to respect human dignity, the First Amendment, federal regulations, and other human and civil rights.


And D.E. 12 at 2:

   |It follows that later monetary damages would be an inadequate remedy, as was reflected in plaintiff's complaint in the
   |instant case, seeking only the recovery of fees and costs incurred and a court order forcing corrective action rather than
   |money damages.


   Indeed, when Rolling Stone featured the instant plaintiff, it called him, "The Hacker Who Cared Too Much," and it did not

mean that money was his concern, as evidenced by its subtitle, "How a Crusade to Save Children Landed a Hacker in Prison."

Please see Exhibit 3 hereto; David Kushner; The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a

Hacker in Prison; Rolling Stone (June 29th, 2017).

   The instant complaint only makes two (2) indirect references to possible retrospective money damages. First, D.E. 2 at 12

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:05:37 PM

p.23 (emphasis added), "In addition to the above federal violations, the plaintiff also brings this complaint under Bivens."

And, second, <u>D.E. 2</u> at 14 Sec. VI:

|3. Such other damages/relief as the court deems just and proper, especially to ensure #1 above, i.e. that the FBOP,
|MCC, and USMS each adhere to 28 CFR [Secs.] 541.25, 541.26, 541.31(a), 540.2(b)(2), 540.2(c), and 540.20 as well as
|the 1st, 5th, 6th, and 8th Amendments of the U.S. Constitution and Article 1 of the New York Constitution.

Both of the above, however, are clearly meant to preserve rights and claims that would otherwise be lost, similar to

savings clauses. <u>Black's Law Dictionary 1461 (9th ed. 2009)</u>. And, as explicitly indicated above, they were only included so far

as necessary to preserve The Court's discretion to deter future misconduct by the instant defendants, i.e. "as the court

deems just and proper, especially to ensure [that this shouldn't happen to anyone else in the FBOP ever again]."

Such a construal is consistent with the facts and circumstances that gave rise to the instant case, including the plaintiff's

personal history.

The defendants noted the criminal case brought against the plaintiff (<u>D.E. 52</u> at 10 n. 4 and <u>D.E. 53</u> at 1), but they failed

to note the relevant controversial circumstances in which that case was brought. The plaintiff now remedies that omission.

The plaintiff sold his first computer program at the approximate age of twelve (12), in answer to a challenge from his

father, the late Jay G. Gottesfeld, a self-made American mathematician, bridge champion, pioneer computer programmer,

and senior aerospace engineer.

Jay Gottesfeld represented Combustion Engineering, Inc., as a member of the board that selected the winning reactor

design for America's first nuclear attack submarine. At AVCO Corporation (now Textron, Inc.), Jay Gottesfeld became one of

the first computer programmers and he worked on multiple components of the Apollo Project, including the Lunar Excursion

Module (LEM), as well as the design of the high-speed steam catapults used to launch planes from nuclear-powered U.S. Navy

aircraft carriers. History also reflects that during the Cold War, Jay Gottesfeld proposed funding the construction of a "large-

core" computer (a term of art that at the time referred a machine with a megabyte, or 1,048,576 bytes, of memory) in order

to use computer-simulations to test America's thermonuclear arsenal.

Jay Gottesfeld answered the draft during the Korean Conflict as well, and served stateside in the National Guard.

For decades, Jay Gottesfeld thus quietly contributed immensely to his country while seeking only a modest salary sufficient

to invest for his retirement and raise and educate his five (5) children, the youngest of whom is the plaintiff.

Throughout the plaintiff's childhood, Jay Gottesfeld seemed always to be working on something. His friends and family

knew that he tended to sleep at most four (4) hours per night and fill his waking time with productive pursuits. The plaintiff

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

is proud of Jay Gottesfeld's work, which continues to inform the plaintiff's perspective today.

   The plaintiff's introduction to computer science came as a toddler when Jay Gottesfeld held him and had him hit the Enter key at the end of lines of programming in the then--scientifically-dominant FORTRAN (FORmula TRANslation) computer-programming language. For a brief judicial description of computer programming as it was practiced approximately three (3) years into the plaintiff's solo experience as an autodidactic (self-teaching) amateur at the age of eight (8), please see The Honorable now-Senior U.S. Circuit Judge John M. Walker Jr.'s opinion in <u>Computer Assocs. Int'l v. Altai</u>, 982 F.2d 693, 697-98 (2d Cir. 1992)(Sec. "I. COMPUTER PROGRAM DESIGN...").

   The plaintiff took a deep, personal, and non-financial interest in Constitutional law, human-rights advocacy, and military service at a young age due to his membership in his local Unitarian-Universalist congregation and his affinity for <u>Star Trek: The Next Generation</u>, to which, in turn, he'd been attracted through his interests in computer science and aerospace technologies. The occupation later predicted for the plaintiff at age fourteen (14) by his peers and teachers, unbeknownst to him, as listed in his 1998 Doherty Middle School graduation yearbook, was "U.N. Ambassador/Computer Hacker."

   Though at the age of twelve (12) the plaintiff found a corporate client on the Internet that paid him one hundred twenty dollars per hour ($120/hour) for his computer-programming skills, by fourteen (14) years old the plaintiff dreamed of becoming a fighter pilot in the United States Air Force by way of the United States Air Force Academy. Towards that singular goal, the plaintiff studied the principals of flight, designed and built model rocket systems, competed in judo under the expert tutelage of 1996 Olympic bronze medalist and future world champion James "Jimmy" Pedro Jr., and became involved in the democratic process at the suggestion of Jay Gottefeld, who knew that the plaintiff had to secure a political appointment in order to attend any of the U.S. military service academies.

   The still--fourteen-(14)-year-old plaintiff volunteered for the 1998 reelection campaign of Barry Finegold, his local state representative in Andover, Massachusetts. It was a small campaign, and in addition to computer work, the plaintiff spent many afternoons, nights, and weekends the old-fashioned way, putting up lawn signs, holding campaign signs at busy intersections, and preparing mailings. The campaign also marked the first publication of the plaintiff's writing when his letter to the editor regarding the importance of involving youth in the electoral process was printed by the local Andover Townsman newspaper.

   In 1999, at the age of fifteen (15), the plaintiff was accepted to Phillips Academy (Andover), Tabor Academy, and Phillips Exeter Academy (herein also "Exeter") based on his test scores, essays, interviews, and recommendations from his teachers, judo coach, state representative, and others. The plaintiff matriculated to Exeter, furthering his progress towards his goal of attending the U.S. Air Force Academy.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------

At the end of that academic year, before the plaintiff left for Exeter, the Intel Corporation chose the plaintiff as a teacher's assistant for its continuing-education program for public-school teachers. The program aimed to facilitate the integration of technology into the classroom by training teachers. Intel normally chose two (2) students as teacher's assistants for each section of its class, but Intel hired only the plaintiff that year in Andover to fill the roles of two (2). Intel later gratefully wrote to the plaintiff, noting the positive feedback it received from the plaintiff's local public-school teachers praising the plaintiff's abilities as a teacher. While Intel did fairly compensate the plaintiff for his classroom hours, the plaintiff spent a good deal of additional time beyond the classroom for which he neither wanted nor asked to be paid, and he ensured that the local teachers would continue to have his support gratis (pro bono) after the continuing-education program ended and he left for Exeter.

That year also marked the plaintiff's introduction to open-source software and his first installation of GNU/Linux. In Wallace v. IBM, 467 F.3d 1104, 1105-06 (7th Cir. 2006), U.S. Circuit Judge Frank H. Easterbrook noted:

Authors who distribute their works under [the GNU General Public License ("GPL")], devised by the Free Software Foundation, Inc., authorize not only copying but also the creation of derivative works---and the license prohibits charging for the derivative work. People may make and distribute derivative works if and only if they come under the same license terms as the original work. Thus the GPL propagates from user to user and revision to revision: neither the original author, nor any creator of a revised or improved version, may charge for the software or allow any successor to charge. Copyright law, usually the basis of limiting reproduction in order to collect a fee, ensures that open-source software remains free: any attempt to sell a derivative work will violate the copyright laws, even if the improver has not accepted the GPL. The Free Software Foundation calls the result "copyleft."
One prominent example of free, open-source software is the [GNU/]Linux operating system, a derivative of the Unix operating system written by AT&T in the 1960s and now available without cost... Linux, initially the work of Linus Torvalds, is maintained by a large open-source community.

The plaintiff was an early adopter of GNU/Linux and ever since he has maintained a non-financial dedication to the open-source software movement.

(The plaintiff further notes for accuracy, that programmers may make software available under multiple licenses. This is often called "dual licensing." Thus, users may obtain a piece of software under the GPL and be bound by its terms, or try to reach a different arrangement if the author(s) are amenable, possibly an agreement allowing the customer to maintain full control of his or her or its subsequent derivative works. It is thus important to note that a computer programmer does not relinquish ownership of their intellectual property by choosing to make it available under the GPL. Also, not all open-source licenses require authors of derivative works to propagate open-source code. The open-source Berkeley Software Distribution (BSD) licenses, for instance, allow users to create proprietary derivative works; as Apple did; using FreeBSD---which is available under an open-source BSD license---as the starting point for its closed-source Mac OS X. This leads to the question as to whether a particular piece of open-source software is, "Free as in speech, or free as in beer?")

In 2000, the then--sixteen-(16)-year-old plaintiff affirmed his commitment to the protection of human life and was

- Page 11 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/15/2019 05:10:39 PM

certified by the American Red Cross as a lifeguard---skills through which he knew he would never gain financially---after a

months-long physically-intense training program wherein about half his fellow candidates failed certification. He won the

individual state judo championship in his age range and weight class that summer at the Bay State Games, thereby helping

his dojo win the first-place team trophy. The plaintiff was again mentioned briefly by the Andover Townsman, this time

alongside other winners. The plaintiff did not care that the Bay State Games does not award money prizes.

   The following academic year, the plaintiff became the first student in Exeter's two-hundred-(200)-plus-year history to

serve as a teacher's assistant. He taught college-level concepts in advanced-placement (AP) computer-science classes that

winter and spring as an unpaid volunteer. He scored a five (5), the highest possible rating, on the AP computer-science A/B

exam, and also became the youngest winner yet at that time of the school's highest award in computer science, The Phillips

Exeter Academy Prize for Achievement in Computer Science Beyond the AP Level. (The plaintiff understands and is proud

that younger students have since won the same prize.)

   The outgoing student-council vice president that year, Evan Rachlin, arranged for the plaintiff and one (1) other student,

Mr. Peter Gras, to be appointed---without election---as unpaid co-chairs of the student-council communications committee

for the following academic year because none of the incoming regularly-elected student-council members possessed the

wherewithal to oversee technology matters for the student council. Such duties included operation of "the online facebook,"

an intranet site created about a year before Mark Zuckerberg arrived at Exeter and about three (3) years before he went to

Harvard and met the so-called "Winklevi." The Phillips Exeter Academy "online facebook," with an internal universal resource

locator (URL) of http://student.exeter.edu/facebook was a creation of another Exeter student named Kris Tillery in or about

the year 2000---a fact underreported, if reported at all, by the press. Mr. Tillery chaired the Exeter student-council

communications committee before he was elected student-council president for the 2001-2002 academic year.

   Directly following the plaintiff's eleventh-(11th)-grade year, he attended the 2001 advanced-placement/early-admission

summer program in mathematics and computer science at Carnegie Mellon University---the first "CMU" where the plaintiff

found himself trapped. It was readily apparent in August 2001 that the plaintiff's heart was still set on the sky.

   September 11th, 2001, transpired days before the beginning of the plaintiff's senior year at Exeter. The plaintiff

understood the historical backdrop and did not want any part in the looming war in Afghanistan---a war against an

entrenched, non-invading, non-sovereignty after the disastrous attempted invasions of Afghanistan by the British and the

Soviets. Unhappily, the plaintiff parted ways with his dream of a commission in the Air Force. He remained and remains,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

however, firmly affixed to the ideals of service to his community.

Shortly into that academic year though, the plaintiff's resolve was tested when he became aware of a serious misconfiguration in the Exeter computer network. In effect, SAT scores, emails, instant messages, faculty--credit-union information, and other confidential data were broadcasted on a nearly-constant basis out every network jack on campus.

The plaintiff responsibly disclosed the nature of the issue to the chair of the mathematics department, Mr. Kaminski, who then scheduled a meeting with principal Tyler Tingley. In turn, Principal Tingley personally assured the plaintiff that the problem would quickly be resolved.

Some six (6) weeks later, however, the broadcast storms of confidential information continued. Rather than fix the issue, it seemed those responsible decided to eliminate the whistleblower. The plaintiff was selectively targeted by the academy's IT department and charged with non-compliance with the department's computer-network policies. Others engaged in the same conduct were left alone.

Approximately ninety (90) percent of students, faculty, and staff rated the academy network largely or wholly inadequate in an academy-wide survey around that time. Likely unknown to the majority of these survey participants though, this sorry state of affairs was not for a lack of funding.

Some had noticed, however, that aptitude and integrity appeared missing from the hiring criteria for the administrators and top staff of the academy's IT department---which was a separate entity of an administrative rather than academic nature, distinct from the academy's academically-focused and achievement-driven computer-science department. Based on the plaintiff's subsequent eighteen (18) years of industry experience and his Cisco computer-network industry certification, it is the plaintiff's professional assessment that the Phillips Exeter Academy IT department lacked the working knowledge of foundational computer-networking concepts required to comprehend and resolve what was a simple-to-fix problem.

The plaintiff was not allowed to attend the meeting of the seven-(7)-faculty-and-one-(1)-athletic-trainer discipline committee that heard his case.

Mr. Kaminski, the chair of the mathematics department, however, submitted a vigorous letter to the committee arguing for the plaintiff. He said it was "hard to overestimate" the good the plaintiff did with his responsible disclosure, that the plaintiff had not "deprived anybody of anything," that he "quietly contributed immensely" to the academy community, and that for the first time the academy had students like the plaintiff and others who knew far more about an academic subject than any of its faculty.

The last part was perhaps only true because in a similar incident at the end of the previous academic year, the IT department chased out Mr. Christian Day, the chair of the computer-science department, after Mr. Day stood up for Adam D'Angelo, the future first chief technology officer (CTO) and vice president of engineering of Facebook. That incident

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

appears to have resulted in MIT declining to admit Mr. D'Angelo despite his exemplary grades, SAT scores, and silver medal in the United States of America Computing Olympiad (USACO).

In closing his letter on behalf of the plaintiff to the Exeter disciplinary committee, Mr. Kaminski wrote that he hoped the procedures used to monitor the academy network were fair and democratic like traffic stops conducted by the police, i.e. not prone to targeting individuals. But he also noted evidence to the contrary from his personal experience at the academy and reminded the committee to the effect, "Remember, Marty disclosed big problems with the [academy] network."

The plaintiff's dorm head and faculty advisor, Mr. Hiza, made the nearly-unprecedented recommendation that the committee take no action against the plaintiff, reflecting that reasonable objective observers could see that the case was politically motivated.

The plaintiff was nonetheless found guilty in involuntary absentia by the disciplinary committee and sanctioned with "restrictions with review." This meant Exeter would not disclose the incident to any of the colleges to which the plaintiff applied---unlike what happened to Mr. D'Angelo with MIT---so long as the plaintiff wrote an essay satisfying the committee as to what he learned. It seemed they wanted an apology.

The plaintiff was disgusted. He had learned even then, for example, that one (1) of the faculty members responsible for this finding---a married man in the religion department---was having an extramarital affair with a female high-school student while he was enforcing discipline on others. It was also well known that a large group of students recently all together escaped formal discipline for a dangerous act of binge drinking because the academy did not want to put a large cross-section of the football and hockey teams through the disciplinary process for fear of affecting alumni fundraising.

The plaintiff left Phillips Exeter Academy in December of his senior year (2001) against the wishes of this family and friends---and against his own future financial interests as he then understood them---rather than write a disingenuous apology for what he and many others consider commendable conduct. He did not have a chance to work on "the online facebook" at Exeter, which Mr. Gras managed from the previous spring up through the plaintiff's departure and thereafter. The plaintiff graduated from the local public Andover High School in his hometown at the end of the 2001-2002 academic year.

In the interim, the information the plaintiff disclosed about the mishandling of the situation by the Exeter IT department and the rest of the academy administration became perhaps the most--widely-discussed topic that year in The Exonian, the oldest secondary-school newspaper in America. After the story's front-page debut in January 2002, The Exonian published a lengthy public statement by the plaintiff describing the network-security incident in easy-to-understand lay terms.

The head technical employee of the IT Department, Mark Richard Bodnar, left the academy at the end of the academic

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

year for a position at a less-prestigious prep school. To the plaintiff, the publication of the previously-detailed events by The

Exonian seemed essential to this development.

The plaintiff then briefly attended Drexel University in Philadelphia and continued contracting in the technology sector

from his dorm room. Within a few months, however, it was clear that the plaintiff's heart would never be satisfied in

academia. The plaintiff left college at the age of eighteen (18) and quickly found a fulltime job as the senior systems-

integrations engineer at one of his preexisting clients, Amnet Voice and Data Systems, located in Stamford, Connecticut.

The director of technology at Amnet, Terence Dalton, left less than a year later to found his own company and the plaintiff

filled his shoes at Amnet. The plaintiff's title changed to the senior engineer for the company. Though the company did not

replace the director of technology, its CEO would not officially promote the plaintiff to the role because, he said, he was

concerned the company would not be taken seriously with a nineteen-(19)-year-old director. History reflects, however, that

the plaintiff's clients frequently wrote to the CEO and praised the plaintiff's technical acumen, communication skills, and

work ethic, and that the plaintiff also successfully secured new business for the company when he represented the company

in pre-sales discussions against much older competitors.

The plaintiff hangs on his wall at home in place of his non-existent Exeter diploma and bachelor's degree a long line of

thankful correspondence from his clients and colleagues across his years in the technology industry, as well as the letter he

received from Intel after its continuing-education program for teachers, his computer-science prize from Phillips Exeter

Academy, and Mr. Kaminski's letter to the disciplinary committee. To the plaintiff, these items might as well be engraved in

solid gold.

In contrast to Exhibit 3 hereto at 6 (p.21), Mark Zuckerberg instant-messaged (IMed) the plaintiff out of the blue using his

AOL Instant Messenger (AIM) screen name zberg02 when Harvard took actions against Mr. Zuckerberg similar to those

Exeter took against the plaintiff and Adam D'Angelo. Mr. Zuckerberg informed the plaintiff of Harvard's unfortunate decision

and told the plaintiff that he was leaving Harvard to focus fulltime on Facebook. Neither the plaintiff nor Mr. Zuckerberg

brought up the possibility of collaboration. The plaintiff wished Mr. Zuckerberg well, but he was not in a position to offer

spontaneously to join him.

The plaintiff IMed Mr. Zuckerberg out of the blue years later in an effort to locate Adam D'Angelo so that Mr. D'Angelo

could examine a provisional-patent application (PPA) filed by the plaintiff on a mutating-key cipher he pioneered. A little

while later, Mr. D'Angelo IMed the plaintiff, noting that he received word the plaintiff was looking for him.

The plaintiff also messaged Mr. Zuckerberg much later, in the fall of 2013, to congratulate him on his success with

TRULINCS   12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:07:44 PM

Facebook and to let him know that the plaintiff, Jay Gottesfeld, and the future Mrs. Gottesfeld all owned stock in Facebook

and believed in him. Mr. Zuckerberg responded cordially to the plaintiff's message.

   In the years before 2013, the plaintiff continued in the technology industry and maintained his interests in Constitutional

law, open-source software, and human-rights advocacy. He donated to Wikipedia, the Wounded Warrior Project, and similar

charities. He often gave in-hand when he encountered homeless veterans.

   In early summer 2010, the plaintiff accepted a job as the senior network engineer at the Kendall Square, Cambridge,

Massachusetts, biotechnology firm Daedalus Software. Among other products, Daedalus makes a platform used by organ and

tissue banks to track human donor material for transplantation into live patients. Its clients included the University of Miami

Tissue Bank (UMTB), one of the largest transplant-tissue banks in the nation. The plaintiff's primary responsibility at

Daedalus was to compile and test contingency plans for business continuity and disaster recovery in compliance with the

federal Health Insurance Portability and Accountability Act (HIPAA) and the Health Information Technology for Electronic and

Clinical Health Act (HITECH Act). Please see, respectively, 42 U.S.C. Sec. 1320d-2(d)(2) and 42 U.S.C. Sec. 17931(a),

extending 45 C.F.R. Secs. 164.308, 164.310, 164.312, and 164.316 to non-federal entities like Daedalus and its clients,

including the contingency-planning mandates of 45 C.F.R. Secs. 164.308(a)(7), 164.310(a)(2)(i), and 164.312(a)(2)(ii).

Please see also Exhibit 4 hereto; 45 C.F.R. Secs. 164.308, 164.310, and 164.312 (retrieved September 2019). Easier, less

risky, but less--civically-important work was available to the plaintiff for roughly equal pay when he accepted his job at

Daedalus, although it is worth noting that the plaintiff also reasonably expected his role at Daedalus would benefit his future

prospects better than his alternatives.

   In early 2013, while the plaintiff was working as a senior engineer on the infrastructure-services team at publicly-traded

Edgewater Technology, he learned through technology-news aggregator Slashdot that Aaron Swartz had taken his own life

facing up to thirty-five-(35) years in federal prison and a twenty-two-(22)--count federal felony indictment brought under the

controversial Computer Fraud and Abuse Act (CFAA) by then--U.S.-Attorney Carmen M. Ortiz.

   The plaintiff knows that many outside his field find it difficult to understand how he and many thousands of others, who

like him, never met Aaron Swartz are so deeply affected by his suicide. Perhaps it is because of the intensity of the common

foundational experiences, like those described above, that are shared by many in the technology field. Perhaps it is because

those so affected share an understanding of Swart's level of talent and the future contributions that were lost to the world

when he died. Perhaps it was some combination of the above and other intangible/ephemeral factors.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Or perhaps it is because the DOJ put out a nonsensical narrative in its futile and ill-advised effort to justify the unjustifiable loss of Aaron Swartz and this narrative was especially ridiculous to those with the requisite technical understanding to debunk in real-time such a phony and self-serving deception. Please see Exhibit 101 hereto, public statement of the expert witness hired by Swartz's defense regarding his likely testimony that Aaron Swartz had not broken the law.

What is known for sure, however, is that on a daily basis Aaron Swartz's work continues to benefit billions of people who do not know his name. This happens, for example, every time someone views any of the millions of pieces of content available under a Creative Commons license on YouTube and other platforms because Swartz co-founded Creative Commons. Please see Great Minds v. FedEx Office & Print Servs, 886 F.3d 91, 93 (2d Cir. 2017) for a brief primer on Creative Commons licensing.

It happens whenever someone views an online news article syndicated or otherwise made possible by the RSS standard that Aaron Swartz helped create. Please see Barclays Capital, Inc. v. Theflyonthewall.com, 700 F. Supp. 2d 310, 325 n. 21 (2d Cir. 2010) for background on RSS.

It happens whenever DemandProgress advances a worthy cause, because Aaron Swartz co-founded DemandProgress. For the example of net neutrality, please see United States Telecom Association v. FCC, 855 F.3d 381 (D.C. Cir. 2017), denying rehearing en banc of 825 F.3d 674 (D.C. Cir. 2016).

It happens whenever anyone reads a federal-court document without signing up for PACER by using the platforms derived from RECAP because Aaron Swartz helped seed RECAP.

And it happens whenever anyone benefits from the civic work of technologists and others from all over the world who come together volunteering their time and skills every year on Aaron Swartz Day, thus carrying forward Aaron Swartz's spirit of civic commitment.

The resulting harms to the American public and humankind from the Justice Department's willful choice to drive Aaron Swartz to suicide are irreparable and impossible to quantify, as the White House partially reflected in the relevant statement it released. Financial damages are inadequate in the face of such losses. Perhaps the best thing that can be done is that which is required to ensure that such abuses of prosecutorial power never again delay so significantly the progress of all humankind for the benefit of dubious--but--well-invested special interests.

To be clear: the suicide of Aaron Swartz under the relevant circumstances also struck perhaps the hardest single blow in decades against the public's trust in the judicial system. Never before or since have sixty-one thousand (61,000) people signed a petition to the president of the United States demanding he fire a U.S. attorney, as they did demanding the ouster of then--U.S.-Attorney Carmen M. Ortiz following Aaron Swartz's death. Please see Exhibit 102 hereto; WhiteHouse.gov

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------------------------------

petition to fire U.S. Attorney Carmen M. Ortiz (2013). The granting of that petition could have ameliorated some of the

damage to the public's trust, but its denial instead only intensified the public's loss of confidence by demonstrating the near-

total lack of accountability of the DOJ to the very same public that it supposedly serves.

The plaintiff cried when he learned of Aaron Swartz's suicide, as he told Rolling Stone. Please see Exhibit 3 hereto at 13

(p.42), at 4 (p.14-17), at 12 (p.40-44), at 18 (p.59-62), and at 19 (p.65).

Later that year, the plaintiff learned of the atrocities against American children documented in the so-called "troubled teen

industry" by the sworn Congressional testimony of the Government Accountability Office (GAO), the investigate arm of the

U.S. legislature, and others, in hearings before the House Committee on Education and Labor. Please see Exhibit 103

hereto; video of the October 2007 Congressional hearing on institutionalized child abuse in the residential-treatment

industry (October 2007) (date approximated); and Exhibit 104 hereto; video of the April 2008 Congressional hearing on

institutionalized child abuse in the residential-treatment industry (April 2008) (date approximated). Such horrific incidents

include when staff from the now-defunct "wilderness-therapy program" North Star Expeditions starved and marched teenager

Aaron Bacon to death in the Utah desert.

By means of illustration but by no means limitation, the following occurred elsewhere in the troubled-teen industry:

* another facility routinely broke and wired shut the jaws of any youth who showed "disrespect;"

* a "boot camp" facility staffer who called himself "the drill sergeant" trained his pit bull to bite youth in the groin;

* a facility forced an adolescent boy to lie face down on a red-ant hill and prohibited him from brushing the ants off of his

face and body;

* a facility placed black bags and hangman's nooses around the heads of youth and then tightened the ropes to simulate

hangings;

* a facility made adolescent girls trade sexual favors for food;

* other facilities used thorazine and similar drugs as "chemical straight jacket[s]" when such medications were clearly

unjustified; and

* a facility called the "Judge Rotenberg Educational Center" in the plaintiff's home state of Massachusetts used taser-like

shock devices on learning-challenged youth, and in one case there, staff held down the shock button continuously as a

teenage boy writhed around on the floor in agony for a prolonged period, as shown in security video aired in Exhibit 105

hereto; Anderson Cooper; Shocking Treatment; CNN/Anderson Cooper 360.

Please see Exhibit 106 hereto, transcript and additional written record of the October 2007 Congressional hearing on child

abuse in the residential-treatment industry, Government Printing Office (GPO) (October 2007) (date approximated from

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

memory); Exhibit 107 hereto, transcript and additional written record of the April 2008 Congressional hearing on child abuse

in the residential-treatment industry, GPO (April 2008) (date approximated); Exhibit 108 hereto, Gregory Kutz, Managing

Director of Forensic Audits and Special Investigations, written report corresponding to the October 2007 Congressional

hearing on child abuse in the residential-treatment industry, U.S. Government Accountability Office (GAO) (October 2007)

(date approximated); Exhibit 109 hereto, Gregory Kutz, Managing Director of Forensic Audits and Special Investigations,

written report corresponding to the April 2008 Congressional hearing on child abuse in the residential-treatment industry,

GAO (April 2008) (date approximated); and Exhibit 110 hereto, Kate Brown, written report corresponding to the

Congressional hearings on child abuse in the residential-treatment industry, GAO.

   Mr. Gregory Kutz, then the managing director of forensic audits and special investigations for the GAO, labeled some of

these incidents "torture," and maintained that description when specifically asked to clarify his choice of terms. Mr. Kutz

ended one of his Congressional sessions of troubled-teen--industry testimony by saying to the effect (paraphrased by the

plaintiff due to lack of access to the primary source materials provided in exhibits 103-104 and 106-110):

> |If you had walked in partway through my presentation, you might have assumed that I was talking about human-rights
> |violations that occurred in a third-world country. Unfortunately, these human-rights violations occurred right here, in
> |the United States.

   These atrocities are perpetrated with impunity even as children and money cross state lines and U.S. borders. Federal law

enforcement takes no discernable action to protect these child victims and their families. This lack of law-enforcement

response, as explicitly noted by Mr. Kutz in his sworn testimony detailing eight (8) of the most egregious fatal cases and by

Congressman George Miller, then the chairman of the House Committee on Education and Labor, caused then-Ranking-

Member Buck McKeon to ask Mr. Kutz why there weren't eight (8) people in jail for murder. Mr. Kutz could not explain the

systemic inaction of law enforcement at all levels.

   The troubled-teen industry, it turns out, is a billion-dollar phenomenon and a top lobbying interest in many parts of the

country. The industry dupes parents with deceptive marketing practices at a time when the trust between them and their

children is at its weakest and when they are most desperate because they feel their children are out of control. Parents pay

top dollar to snake-oil salesman promising easy fixes to problems like anorexia, drug and alcohol addiction, autism spectrum

disorder, and bipolar personality disorder. By the time these parents learn the truth, it is often too late for their dead

children. Many parents never accept the truth about the troubled-teen industry, and in his testimony Mr. Kutz explicitly noted

a cult-like atmosphere surrounding many troubled-teen--industry programs.

   Chairman Miller explicitly told the public during a 2007 PBS interview that he was concerned that the highest levels of the

U.S. government were being infiltrated to stop action from being taken to protect these kids. Please see Exhibit 111 hereto;

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:11:33 PM

Who's Watching the Kids?; PBS Montana (2007) (approximated from memory).

   The troubled-teen--industry cult hit home for the plaintiff when his then-girlfriend (and now wife) Mrs. Dana E. Gottesfeld
(nee Barach) asked him to use his Internet-research skills to look into Logan River Academy (LRA) in Logan, Utah. Her
parents and the Los Angeles Unified School District sent her youngest brother there based upon its claim to be a "therapeutic
boarding school." It did not take long, however, for the plaintiff to encounter the above-referenced information and to
inform Mrs. Gottesfeld.

   Mrs. Gottesfeld's parents appeared far too psychologically committed to the troubled-teen industry though, to react
rationally to the dangers. A struggle ensued.

   The plaintiff and Mrs. Gottesfeld started an online petition demanding the release of Mrs. Gottesfeld's little brother and
that LRA stop its abusive practices. Survivors of LRA came forward by the dozen, as well as a couple of parents, and
confirmed the plaintiff's worst fears about the facility. Some were recent and knew Mrs. Gottesfeld's little brother at LRA.
Survivors from other programs also lent their support, increasing the online buzz.

   The plaintiff called the local and state police in Utah, the American Civil Liberties Union (ACLU), the Federal Trade
Commission (FTC), the American Medical Association (AMA), the American Psychological Association (APA), AdvancED
(which accredits LRA and many other known-abusive troubled-teen--industry programs), the Federal Bureau of Investigation
(FBI), and numerous other governmental and non-government organizations (NGOs). The plaintiff wrote to the
aforementioned Massachusetts State Representative Barry Finegold, seeking an audience regarding the industry with U.S.
Senator Elizabeth Warren. The plaintiff later discovered, however, that Mr. Finegold was a trustee of The Judge Rotenberg
Educational Center, the troubled-teen--industry facility that used taser-like shock devices on learning-challenged youth.

   The plaintiff built shutdownloganriver.com and corresponding social-media accounts. Yet again, the plaintiff's own
finances took a lower priority to a public imperative. As the plaintiff told Rolling Stone, "I really was pouring my heart and
soul into the fight for [Mrs. Gottesfeld's little brother], to the point where I basically wasn't working." Please see Exhibit 3 at
7 (p.25).

   As happened in the previous cases documented before Congress though, help was unforthcoming from the state and
federal governments. The public, however, took notice.

   Mrs. Gottesfeld's brother became a proverbial hot potato with the petition quickly amassing hundreds of signatures and
the story making its way around social media. After spending over seven (7) months at LRA, Mrs. Gottesfeld's brother was

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

removed within about ten (10) days of the launch of the petition---but still not soon enough. Another troubled-teen--industry

program declined to take him off of LRA's hands due to the public scrutiny building around his situation. Based upon the

child-trafficking documented in the industry by the above-cited Congressional testimony, that other program was likely the

nearby and nefarious Provo Canyon School (PCS), which shared the same medical director as LRA, Mr. Robert H. Crist.

Unbeknownst to the plaintiff at that point, the United States Court of Appeals upheld a permanent injunction against PCS

and Mr. Crist. In Milonas v. Williams, 691 F.2d 931, 940 (10th Cir. 1982), The Court:

    |enjoined the defendants from their use of the polygraph, monitoring and censoring of mail, use of isolation rooms, and
    |use of excessive physical force. In this regard, the district court found that the defendants' actions violated the first
    |and fourteenth amendment rights of the plaintiffs.

Dozens of LRA survivors from 2005-2013, however, consistently and credibly detailed that with the exception of the

polygraph, LRA gratuitously employed the above practices and others of a similarly-disturbing nature. Without knowing of

the injunction against Crist, the plaintiff knew that other kids remained in danger at LRA.

Then came Anonymous.

The international hacker/activist, or "hacktavist," group that got its start fighting the cult of Scientology and that took an

active role in the Arab Spring, please see Exhibit 3 at 7 (p.24), also counted many supporters who were already familiar with

the troubled-teen industry. Anonymous issued a press release in November 2013 and called for a massive online

demonstration, a "Twitter storm," using the hashtag #ShutLoganRiver.

At the appointed hour, #ShutLoganRiver reached number two (2) worldwide. The media took notice. Some of the largest

English and English-plus-other-language news outlets in the world published articles, specifically including The Daily Mail, RT,

and Al-Jazeera. The troubled-teen industry was no longer a skeleton buried quietly in a U.S. closet.

Mrs. Gottesfeld's little brother went home to his parents in Los Angeles, California, the next month, December 2013, from

Oak Grove, the non-profit community-based treatment program in California where his parents placed him as an

intermediary step after LRA. But he only returned home after Oak Grove stopped one of his prescription medications as an

apparent disciplinary measure, triggering a cease-and-desist letter from an attorney previously engaged by the plaintiff and

Mrs. Gottesfeld to draft a custody suit.

Around this time, the plaintiff first saw news of Justina Pelletier circulating online among groups of survivors of

institutionalized child abuse. An insufficient level of information was available, however, for the plaintiff to vet the case

properly. But the allegations against Harvard-affiliated Boston Children's Hospital (herein also "BCH") were local to the

plaintiff and shocking. The plaintiff performed and published some initial research on the Pelletier case, but around that

time another matter came to the foreground.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

The plaintiff was contacted by a representative from the office of U.S. Senator Tom Harkin. Senator Harkin and Congressman Miller, who chaired the hearings on the troubled-teen industry in the House, were each retiring at the end of the legislative session and in their respective chambers they were introducing and sponsoring The Keeping Students Safe Act. The Act aimed to reform residential institutions for youth in America. The staffer from Harkin's office asked the plaintiff for help promoting the bill on Twitter.

The plaintiff notes that the existing laws were sufficient to prosecute the federal crimes of the troubled-teen industry. The Keeping Students Safe Act, however, would have deterred such crimes in the future and eased prosecution of past and present offenders.

The day The Keeping Students Safe Act was introduced in February, 2014, the corresponding hashtag trended regionally on Twitter in Washington, D.C.

Again the public was interested. Please see Exhibit 112 hereto; @AllStudents Safe; Tweet to @StopLoganRiver thanking the plaintiff and his team for getting the hashtag for The Keeping Students Safe Act trending in Washington, D.C.; Twitter (February 2014) (date approximated).

Unfortunately though, The Keeping Students Safe Act wasn't destined to become law in 2014.

As the bill languished in legislative committees, the plaintiff again saw Justina Pelletier's case circulating online. More information, some of which was picked up much later by Rolling Stone, had become available since the plaintiff's initial research in prior months. Please see Exhibit 3 hereto at 3 (p.7-11) and at 8 (p.29-30), as well as Exhibit 5 hereto at 1 (p.1 and 3-6) and at 2 (p.8 and 11); C. Mitchell Shaw; Save a Girl's Life, Get Treated Worse Than a Terrorist; The New American (December 2017).

It was clear that Justina's life was in danger at Boston Children's Hospital and that by any relevant jurisprudential definition she was suffering grievous bodily harm. Please see Exhibit 6 hereto; United States Court of Appeals for The First Circuit: Pattern Jury Instruction 5.04: Justification: Self-Defense, Duress, Necessity (Updated November 25th, 2015) (emphasis in original):

    |First, [defendant] acted under an immediate threat of serious bodily injury or death;
    |Second, [defendant] had a well-grounded belief that the threat will be carried out;
    |Third, [defendant] had no reasonable opportunity to escape, or otherwise frustrate the threat.

That ongoing harm, moreover, appeared to be unlawful based upon the expert opinion of Harvard Law School Emeritus Professor Alan Dershowitz. He appeared on the news to announce he'd assist Justina Pelletier's family pro bono and said that from what he'd seen, the law always supported the Pelletiers. That law appears to include In re Sevigny's Case, 337 Mass. 747; N.E.2d 258 (1958), holding that the state courts in Massachusetts are not to pick sides in scientific disputes where each

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

side is supported by reason and logic.

   The state court issued a prior-restraint gag order with no prior hearing and no meaningful opportunity to bring objections, which also appeared unlawful. This gag order was vacated rather than enforced shortly after the Commonwealth brought its first contempt motion alleging violations thereof by Justina's father Lou Pelletier.

   Federal and local law enforcement in Justina Pelletier's case yet again refused to intercede and protect an American child. Please see Exhibit 113 hereto; video of Lou Pelletier discussing the FBI's lack of follow-through to save his daughter's life; Liberty News Media (March 2014) (date approximated from memory).

   The plaintiff, once presented with a compelling series of evidence including but not limited to some of the above, could not look away. The fact that Justina Pelletier's torturers were part of multi--billion-dollar child-care non-profits only made their acts more scandalous and heinous; and the inaction of the authorities more corrupt.

   The plaintiff could not let Harvard and its affiliate Boston Children's Hospital torture and kill Justina Pelletier if there was anything appropriate he could do to stop them. Every fiber in the plaintiff's being told him that under the circumstances he had to act to preserve the life of an innocent child like Justina Pelletier.

   The plaintiff began participating with the #FreeJustina movement. As noted by the press, he took immediate action against some of Pelletier's captors. Please see Exhibit 3 at 8 (p.31-33). The plaintiff notes, however, that he had not "decided to wait" to stage a digital sit-in of BCH. Rather, it took time for him to harness the power required for such a sit-in to be effective. The plaintiff actually worked for weeks nearly around the clock to be ready in mid-April for BCH's largest annual online fundraiser. Please see Exhibit 114 hereto; Ryan Grim block-quoting Martin S. Gottesfeld; Why I knocked Boston Children's Hospital Off the Internet: A Statement by Martin Gottesfeld; The Huffington Post (September 2016) (date approximated from memory).

   Justina's situation rapidly worsened as the plaintiff leveraged the not-inconsiderable skills he gleaned through his tens of thousands of hours of professional experience in order to render impotent the preparatory mitigation measures of a $2-billion Harvard-affiliated institution that had a month's advance notice of his coming digital sit-in.

   Days before the fundraiser, TheBlaze published one (1) of Justina Pelletier's handwritten notes to her family. Please see Exhibit 115 hereto; Justina Pelletier; Justina Pelletier's note to her family; TheBlaze (April 2014) (date approximated from memory). Justina was smuggling such notes to her family hidden in origami art projects. Please see Exhibit 116 hereto; TheBlaze; Shocking Note Allegedly Penned By Justina Pelletier to Her Family; (April 17th, 2014) (title and date approximated from memory); and Exhibit 3 hereto at 1 (p.1) and at 3 (p.7). The plaintiff clarifies, however, in reference to the prior-restraint gag order mentioned in Exhibit 3 hereto at 3 (p.7), that the gag order purported to ban the Pelletiers from speaking to the press, but not among themselves. It was instead the treatment plan enforced at BCH's insistence that barred

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.,</u> 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:15:48 PM

the Pelletier's from discussing Justina Pelletier's treatment or care with her during their monitored and censored weekly

telephone calls and in-person visits chaperoned by armed guards. Please see <u>Exhibit 117</u> hereto; Jurriaan Peters; copy of

BCH treatment plan for Justina Pelletier; Boston Children's Hospital (February 2013) (date approximated).

Justina Pelletier's note, published in mid-April 2014, said that Boston Children's Hospital staff, "hurt me all the time," they

"don't let me sleep vary[sic] much," and they "laff[sic] at me when I'm falling." Please see <u>Exhibit 115</u> hereto. Justina

Pelletier relayed to her family, "I say it (torcher[sic] stop) then they say nuthang[sic] and kepe[sic] pushing me and [it] goes

on and on!" Please see <u>Id.</u>

Justina Pelletier also urged, "Hury[sic]!" Please see <u>Id.</u>

The plaintiff continued the fast pace of his efforts. As he later told Rolling Stone in <u>Exhibit 3</u> at 10 (p.33):

|Eighty (80) percent of my thought process was centered around, "I don't want this girl to die," and the other twenty (20)
|percent was, "Ok, what do I have to do, technically, to make this [digital sit-in] happen?"

As the plaintiff later published in The Huffington Post, he finished his work just in time and the digital sit-in of BCH was

successful. Please see <u>Exhibit 114</u> hereto.

Justina Pelletier's plight reached new prominence in the public discourse. A short time later, Justina Pelletier was moved to

a facility in her home state of Connecticut---a transition that authorities previously assured the media was impossible. At

the new facility, the restrictions that prevented Justina Pelletier's family from conversing candidly with her and from filming

and photographing her were rescinded.

One of Justina Pelletier's older sisters wasted little time and filmed a brief cell-phone video of Justina Pelletier pleading

from her wheelchair with both Massachusetts Juvenile and Family Court Judge Joseph F. Johnston, who oversaw the case

initiated at BCH's insistence against Justina Pelletier's parents, and Massachusetts Governor Deval Patrick, an alumnus of

both Harvard and Harvard Law School, as well as a former Clinton-era assistant U.S. attorney general and a world-class

hypocrite (please see <u>Johnson v. Murphy</u>, 2001 U.S. Dist. LEXIS 24013, 8:87-Civ-369-T-24TBM (M.D. Fla. June 28, 2001)).

Justina Pelletier rubbed her visibly-atrophied legs in the video and urgently insisted that she be allowed to go home with her

family.

Justina Pelletier's video, entitled, <u>Justina's Plea</u>, went viral. Please see <u>Exhibit 118</u> hereto; Justina's Plea; A Miracle for

Justina Facebook Page (June 2014). It never could have been filmed, however, without the plaintiff's digital sit-in. Within

days, on motion of the Commonwealth, Judge Johnston reversed himself and returned custody to the Pelletiers.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Justina Pelletier then went home. Though after spending sixteen (16) months against her will under the care of Boston Children's Hospital without her medications, she was no longer able to walk. So, her father Lou Pelletier carried her.

Justina Pelletier remains crippled today. Please see Exhibit 119 hereto; Recent picture of Justina Pelletier; A Miracle for Justina Facebook Page.

The plaintiff returned to his successful career in information technology without ever seeking recognition or financial gain for his role in Justina Pelletier's release. Rather than profit from his months of work helping otherwise-defenseless children---work for which Justina Pelletier later thanked the plaintiff in Exhibit 3 at 19 (p.67)---the plaintiff had forgone other, paying, work and acted at great risk to himself.

As the defendants' parties in privity later noted during their immoral prosecution of the plaintiff, the plaintiff literally acted under the banner of "Anonymous" (emphasis added). The plaintiff thus would have happily remained a largely-unknown figure if not for the insistence of the defendants' parties in privity on a public federal prosecution of the plaintiff.

But the defendants' parties in privity did insist on a public federal prosecution of the plaintiff.

After the defendants' parties in privity arrested the plaintiff and issued a sensationalized press release that made global headlines, he went on a hunger strike for one hundred (100) days in order to protest human-rights violations and political prosecutions, and as will soon be detailed below, he became a widely-published national-news journalist while in federal custody. Again, the plaintiff took on such daunting and dangerous challenges when he knew he did not stand to benefit financially.

These facts and circumstances, in addition to the explicit pleadings themselves, clearly demonstrate that while retrospective money damages could possibly play a role in deterring the financially-motivated defendants from continuing and repeating their unlawful acts, any construal of the instant complaint as one focused primarily on retrospective money damages is illogical, inaccurate, and inappropriate.

In further demonstration, thereof, the plaintiff hereby pledges under penalty of perjury that he will not enrich himself financially using any money damages resulting from the instant case. Rather, he would utilize any such award(s) to fund further litigation to vindicate the human and Constitutional rights of institutionalized persons. Please see Exhibit 1 at 1 (p.3).

2. The Defendants' Attempted Suppression of the Truth Heard 'Round the World

The defendants and their parties in privity seemed perfectly content with their prosecution of the plaintiff splashed across the worldwide media---so long as they controlled the narrative. When that narrative began to turn against them--- accurately---however, they largely stopped commenting to the press and, behind the scenes, they worked to deprive the

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

plaintiff of his First Amendment rights, including through threats of force, and to violate the plaintiff's rights under the

Fifth, Sixth, and Eighth Amendments. Please see RFA 23-27. Their apparent sense of urgency is understandable given some

of the scandalous details that have since emerged.

   With the plaintiff in the SHU at MCC though, his counsel unwittingly assented to a protective order, please see United

States v. Gottesfeld D.E. 43, 16-cr-10305-NMG (D. Mass. November 21, 2016). The plaintiff never assented to this

protective order and he did not know of its existence until it was too late and his counsel had assented to it without his

knowledge or consent. Please see Exhibit 120 hereto; Martin Gottesfeld; My Notes on the FBI's Lies Are Contraband (2017)

(title and date approximated from memory); Red State. The defendants' parties in privity previously noted in email

correspondence with the plaintiff's criminal defense attorney that the plaintiff has a tendency to publish illuminating

documents. (If necessary, Mrs. Gottesfeld can produce this email, which was forwarded to the plaintiff via Pretty-Good

Privacy (PGP). Doing so, however, would be difficult, and the plaintiff does not wish to ask Mrs. Gottesfeld to do so

unnecessarily). The explicit terms of the protective order proposed by the defendants' parties in privity within a week of his

move to the SHU at MCC prohibit such publication of important documents and the illegitimate motives behind this

prohibition are now obvious for reasons detailed below in this section.

   The Boston FBI---almost as if to prove how little changed in its office since the days of its Organized Crime Strike Force

and James "Whitey" Bulger---launched an investigation as news of Justina Pelletier's case reached its apex. But this

investigation was not into how hometown Harvard-affiliate Boston Children's Hospital charged the Medicaid program

felonious amounts of federal-tax dollars in effect to cripple Justina Pelletier by treating her against her will for a bogus

psychological condition that at some point even its incompetent and self-interested practitioners likely realized she didn't

have. No, rather, in an obvious and thus-far--successful attempt to indemnify BCH, FBI special agents, including Michael

Tunick, began targeting the plaintiff for his work protecting children like Justina Pelletier; children whom the Boston FBI

allowed its political allies to torture, cripple, and kill despite the vocal protests of Congressman Miller and others. Please see

Exhibit 121 hereto; Martin Gottesfeld; Savage: FBI Monster Ignores Child Torture; Info Wars (2018) (title and date

approximated from memory).

   Tunick and the Boston U.S. attorney's office---about a year and a half after the latter knowingly caused the death of Aaron

Swartz, please see D.E. 69 at 40---secured an unlawful pen-register/tap-and-trace (PRTT) order by misleading The Honorable

U.S. Magistrate Judge (and former Assistant U.S. Attorney) Jennifer C. Boal into explicitly authorizing them to collect the

Transmission-Control Protocol (TCP) and User-Datagram Protocol (UDP) port numbers traversing the plaintiff's home Internet

connection. Through this illegitimately-obtained ex parte order, Tunick et al. exceeded statutory authority as explicitly

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

codified in 18 U.S.C. Sec. 3121(c) (emphasis in original, other emphasis added):

|(c) Limitation. A government agency authorized to install and use a pen register or tap and trace device under this
|chapter or under State law shall use technology reasonably available to it that restricts the recording or decoding of
|electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and
|transmitting of wire or electronic communications so as not to include the contents of any wire or electronic
|communications.

The defendants' parties in privity then pried into the contents of the plaintiff's Internet traffic without a warrant. A full

discussion of the technical topics is beyond the scope of this opposition and will be the subject of other litigation by the

plaintiff and Mrs. Gottesfeld. Please see Exhibit 7 hereto; Form 95s of Martin S. Gottesfeld (August 24th, 2019).

The plaintiff, however, declares under penalty of perjury that the TCP and UDP port numbers collected through the PRTT

order are distinct from Internet Protocol (IP) addresses and clearly meet the statutory definition of "contents" both

referenced above in 18 U.S.C. Sec. 3121(c) and as codified below in 18 U.S.C. Sec. 2510(8):

|(8) "contents", when used with respect to any wire, oral, or electronic communication, includes any information
|concerning the substance, purport, or meaning of that communication.

The plaintiff further declares under penalty of perjury that every competent network technician knows that TCP and UDP

port numbers impart a great deal of the "substance, purport, or meaning" of Internet communications. Please see Exhibit 1

at 1 (p.4). Further, there would be only one (1) objectively-correct response should the following question appear on any

certification exam or technical-skills hiring assessment in the private-sector IT industry:

|True or false: TCP and UDP port numbers convey information regarding the substance, purport, or meaning of Internet
|communications?

The one (1) correct answer to the foregoing question is: "true." And the plaintiff declares under penalty of perjury that for

fear of incompetency, he would never hire any entry-level network technician who answers the foregoing question in the

negative. Please see Exhibit 1 hereto at 1 (p.5). Yet the defendants' parties in privity swore an affidavit before Magistrate

Judge Boal telling her the exact opposite. Given the technical expertise that FBI Special Agent Tunick also swore he

possessed at the time of the PRTT application, either he was lying then, or the plaintiff is lying now and the plaintiff should

be charged with perjury. The plaintiff, however, seriously doubts that any U.S. attorney would invite a trial on this point---

though the plaintiff would certainly welcome one.

Using the unlawfully-obtained content information of the TCP and UDP port numbers---and only by relying on said

unlawfully-obtained content information---the defendants' parties in privity were able to reliably determine not just when,

with whom, and for how long the plaintiff was communicating, but the purport of his communications, i.e. that the

plaintiff was using virtual-private network (VPN) and The Onion Router (TOR) as opposed to other TCP/IP-based services

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:54:08 PM

provided by the same remote parties. It is a well-known fact that VPN and TOR are commonly used---and indeed designed---

for lawful purposes by IT professionals like the plaintiff, and the defendants' parties in privity knew that the plaintiff was an

IT professional from their physical surveillance of the plaintiff on his way home to Somerville, Massachusetts, from his job

at Edgewater Technology in nearby Wakefield, Massachusetts. VPN and TOR are also lawfully used by privacy advocates in

their Internet browsing to protect their reasonable expectation of privacy. Given the Third-Party Doctrine, it is indeed

perverse to penalize a citizen such as the plaintiff in a probable-cause analysis for his choice to use such technologies,

especially in light of the fact that the government was indeed leveraging the Third-Party Doctrine (and exceeding even that

overly-permissive standard) to pry into his private Internet traffic without a warrant. Tunick omitted the common and lawful

uses of these technologies in sworn affidavits and emphasized that criminals use them.

   On or about September 29th, 2014, Tunick and Assistant U.S. Attorney Adam Bookbinder, Assistant U.S. Attorney David J.

D'Addio, or both sought U.S. Magistrate Judge Marianne B. Bowler for a search warrant for the plaintiff's home. A subsequent

statistical analysis, however, revealed that in September 2014 Magistrate Judge Bowler did not appear to be the "emergency

magistrate" judge designated to issue search warrants in the vicinage. At most, she was the "backup emergency magistrate"

judge.

   In detail, The District of Massachusetts uses a scheduled monthly rotation of U.S. magistrate judges to issue PRTT orders,

search warrants, and criminal complaints. Each month a particular U.S. magistrate judge in the district is designated to

hear such applications as the emergency magistrate judge and another is designated the backup emergency magistrate

judge. The identities of these magistrate judges are communicated to the U.S. attorney's office. Once a magistrate judge

in one of these roles issues a search warrant or criminal complaint in The District of Massachusetts, they are then

designated to all future related matters in the resultant case(s), including bail.

   One problem with this system is that it enables magistrate-judge shopping. Prosecutors can simply wait in cases they do

not consider time-sensitive for their preferred U.S. magistrate judge to become the emergency magistrate judge; or for him

or her to become the backup emergency magistrate judge and for the primary to be unavailable, even if only briefly. The

District of Massachusetts has fewer magistrate judges and Article III judges than The Southern District of New York. Please

see Exhibit 8 hereto at 3-4; Federal-State Court Directory (2017 ed.); Leadership Directories, Inc. (2017); and cf. Id. at 5-6.

   Seven (7) U.S. magistrate judges sat in Massachusetts in September 2014: The Honorable David H. Hennessy, Marianne B.

Bowler, Jennifer C. Boal, Judith Gail Dein, Robert B. Collins, M. Page Kelley, and Kenneth P. Neiman. (The plaintiff notes

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

that The Honorable U.S. Magistrate Judge Leo T. Sorokin became a U.S. district judge in June 2014, that The Honorable

Donald L. Cabell was an assistant U.S. attorney until 2015, and that The Honorable Jerome J. Niedermeier last appears in

the record on January 15th, 2014. It is unclear, moreover, that The Honorable Kenneth P. Neiman was a possible emergency

magistrate judge for Boston-based warrants in September 2014 because at that time he sat in the hours-distant federal

courthouse in Springfield, Massachusetts.)

   Assuming an even distribution of magistrate judges, i.e. that in any given seven-(7)-month rotation each magistrate

judge is the emergency magistrate judge exactly once and each magistrate judge is the backup emergency magistrate judge

exactly once, this means that prosecutors had to wait at most six (6) months for their magistrate judge of choice to become

the emergency magistrate judge.

   A relatively-simple combinatoric analysis yields more illuminating results. Please see Exhibit 9 hereto, Martin Gottesfeld,

combinatoric analysis (September 2019). Combinatorics is "a branch of mathematics founded on the formulas for

permutations and combinations." United States v. Jefferson, 302 F. Supp. 2d 1295, 1300 n. 5 (M.D. Ala. 2004). More

specifically, from Vuyanich v. Republic Nat'l Bank, 505 F. Supp. 224, 346 (N.D. Tex. 1980)---and while noting that it is in fact

possible for some events in combinatoric analyses to have at most zero (0) or one (1) "way" in which to take place:

> |Combinatorial theory is used to calculate the number of different combinations or sequences which may result when a
> |series of events... takes place, each of which may take place in more than one way[sic]...

   Maintaining the assumption of an even distribution of magistrate judges in the rotation and with seven (7) magistrate

judges in The District of Massachusetts, there were some nine million three hundred forty-four thousand one hundred sixty

(9,344,160) unique seven-(7)-month schedules of emergency magistrate judges and backup emergency magistrate judges.

The average wait for prosecutors to get their single--most-preferred U.S. magistrate judge as the emergency magistrate

judge was three (3) months. The average wait for prosecutors to get their single--most-preferred U.S. magistrate judge as

either the emergency magistrate judge or backup emergency magistrate judge, however, was just one and two thirds

months, or just under fifty-one (50.73) days, which represents the peak of a bell curve. Prosecutors would never have had to

wait more than five (5) months to have their preferred U.S. magistrate judge as either the emergency magistrate judge or

backup emergency magistrate judge.

   In comparison, a random draw would have given prosecutors only a one seventh (14.29 percent) chance of getting their

preferred magistrate judge and those odds wouldn't change with time (except for when magistrate judges take vacations).

Under the existing system though, there was a two sevenths (28.57 percent) chance---double that of a random draw---that a

prosecutor's single--most-preferred magistrate judge was either the emergency magistrate judge or backup emergency

magistrate judge at any particular moment, including when they started any particular case.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Gaining or losing some magistrate judges does not meaningfully change the likelihood of magistrate-judge shopping by prosecutors. Please see the below table:

| Number of magistrate judges | Number of unique schedules | Average wait for a partic. emergency magistrate | Average wait for a partic. magistrate in either em. role | Chance in random draw of selecting partic. mag. |
|---|---|---|---|---|
| 2 | 2 | ½ month | None | 50% |
| 3 | 12 | 1 month | 10.1 days | 33.3% |
| 4 | 216 | 1½ months | 17.39 days | 25% |
| 5 | 5,280 | 2 months | 1 month | 20% |
| 6 | 190,800 | 2½ months | 40.58 days | 16.67% |
| 7 | 9,344,160 | 3 months | 50.73 days | 14.29% |
| 8 | 598,066,560 | 3½ months | 2 months | 12.5% |
| 9 | 48,234,009,600 | 4 months | 2½ months | 11.1% |

No matter how many magistrate judges sit in the district, the probability that any given magistrate judge is either the emergency magistrate judge or backup emergency magistrate judge is always twice that of the same magistrate judge being selected in a random draw.

Further, by tracking the emergency magistrate judges and backup emergency magistrate judges in the months recently passed, prosecutors can easily predict to a good degree of accuracy the next months' rotation. For instance, if prosecutors in The District of Massachusetts have recorded the following data for eight (8) magistrate judges labeled A through H (such as the eight (8) magistrate judges whom currently sit in The District of Massachusetts) through the first four (4) months of an eight-(8)-month emergency/backup emergency magistrate judge cycle:

```
Month:                               1  2  3  4  5  6  7  8
Emergency magistrate judge:          A  C  F  B
Backup emergency magistrate judge:   B  E  A  G
```

Then prosecutors know the following in month four (4):

* It will be at least four (4) to five (5) months before magistrate judges A and B again become available as either the emergency magistrate judge or backup emergency magistrate judge because they have both already appeared in each role in this cycle.

* Magistrate judges D and H are especially likely to appear soon in the rotation as either the emergency magistrate judge or backup emergency magistrate judge because they are yet to appear in the line-up and the cycle is halfway over.

* Magistrate judges C and F are each due to become the backup emergency magistrate judge in the next four (4) months.

* Magistrate judges E and G are each due to become the emergency magistrate judge in the next four (4) months.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

This system, to a knowledgeable mathematician, is clearly designed to allow prosecutors to magistrate-judge shop. Jay Gottesfeld would not be fooled. His son is similarly not fooled.

It is a fundamental tenet of game theory that potential advantages do not go unused, such as the ability to pick a magistrate judge predisposed to the issuance of a warrant or criminal complaint and the subsequent denial of bail. The well-known "prisoner's dilemma" is just one (1) such example of this tenet, albeit perhaps the best known in criminal practice, to arise since the publication of the seminal work, John-Louis Von Neumann and Oskar Morgenstern, Theory of Games and Economic Behavior (1944). Please see Page v. United States, 884 F.2d 300, 300 (7th Cir. 1989).

But game theory has other implications. "[G]ame theoretic models have longstanding and widespread acceptance in economics and other disciplines." Unwired Planet, LLC v. Apple, Inc., 2017 U.S. Dist. LEXIS 20928, 13-cv-04134-vc (N.D. Cal. February 14, 2017). "Analysis that tracks economic theories known as 'game theory' is used in the airline industry to predict actions by competitors and gauge competitors' reactions." United States v. AMR Corp., 140 F. Supp. 2d 1141, 1182 (D. Kan. 2001). "[T]he broad definitions used in the study of 'game theory,' and in legal courses on the subject, certainly apply [to death-penalty litigation]." In re Byrd, 269 F.3d 585, 594 (6th Cir. 2001).

Lawyers, moreover many in U.S. attorneys' offices, are no strangers to game theory. "Yes, this is sort of an exercise in non-quantitative game theory, but that is exactly what sophisticated commercial and bankruptcy lawyers do all day long." Giaimo v. Detrano (In re Detrano), 222 B.R. 685, 688-89 (E.D.N.Y. 1998) (emphasis added). Of course, it follows that assistant U.S. attorneys (herein also "AUSAs") leverage this advantage not only to maximize their chances of the issuance of a warrant or complaint, but since the system in The District of Massachusetts ensures that the same magistrate judge remains affixed to all subsequent pre-trial matters, AUSAs also thereby increase their chances of rulings favorable to them on detention, discovery, speedy-trial exclusions, and other matters. The maintenance of the same easily-controlled assignment of a magistrate judge to later proceedings indeed speaks to the intentional design of the system to enable magistrate-judge shopping by prosecutors when it is manifestly obvious that a random draw subsequent to the determination of probable cause would at least limit the illegitimate benefits of this striking tendency for abuse.

With the plaintiff in the SHU at MCC, however, his ability to continue publishing the truth about his case and his ability to discover the relevant procedural history of the unlawful PRTT and prosecutorial magistrate-judge shopping that led directly to the assignment of Magistrate Judge Bowler to his case were greatly hindered, if not entirely eliminated, while the media and the public were paying the closest attention to the plaintiff's case. As an additional safeguard, the defendants' parties in privity also secured the aforementioned protective order from Magistrate Judge Bowler and the plaintiff's counsel while the plaintiff was unaware of that effort and unable to stop it.

The plaintiff indeed only discovered and published the following facts much later, after he left the SHU at MCC, after he

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:57:08 PM

stopped his hunger strike and media interest waned:

  * the factual allegations of the plaintiff's VPN and TOR traffic used to secure the search warrant for his home originated in

a PRTT rather than a wiretap ordered upon probable cause by an Article III judge, therefore, the statutory authority of 18

U.S.C. Secs. 2510(8) and 3121(c) was unlawfully exceeded;

  * the magistrate-judge--assignment process for federal criminal cases in The District of Massachusetts is fundamentally

flawed and allows for easy magistrate-judge shopping by prosecutors;

  * U.S. Magistrate Judge Marianne B. Bowler was not the emergency magistrate judge in the district at the purported time

when the defendants' parties in privity sought her out for a search warrant for the plaintiff's home; and

  * not a single exclusion pursuant to The Speedy Trial Act, 18 U.S.C. Sec. 3161(h)(7)(A), appears in the record of the

plaintiff's criminal case for the two hundred forty-five (245) days between his arrest and his indictment, as was required by

18 U.S.C. Sec. 3161(b).


  But wait; there's more.

  Magistrate Judge Bowler signed and sealed that she heard the application for the search warrant for the plaintiff's home on

September 29th, 2014. The top of the very first page of the application for that warrant, however, was dated very clearly

September 30th, 2014---the next day. Thus, either Magistrate Judge Bowler issued the search warrant for the plaintiff's

home before the application for that warrant was written or she rubber-stamped the resulting warrant without reading the

application carefully enough to notice that at its very beginning, at the very top, it was postdated like a bad check. It is

obviously and evidently impossible that Magistrate Judge Bowler examined the warrant application carefully enough to notice

the date discrepancy before she rubber-stamped it. Please see United States v. Gottesfeld D.E. 166, 16-cr-10305-NMG (D.

Mass. May 4, 2018).

  Magistrate Judge Bowler's eagerness to issue the search warrant for the plaintiff's home makes sense, however, given her

deep longstanding financial and personal connections to BCH and its parent Harvard. In 1969, Magistrate Judge Bowler

worked as a research assistant for Harvard Medical School, which claims that its research was disrupted by the plaintiff's

digital sit-in to save Justina Pelletier's life. Magistrate Judge Bowler was later a trustee at New England Baptist Hospital,

which also has a professional relationship with Harvard. From 1995 through 2005, Magistrate Judge Bowler was a director of

The Boston Foundation (herein also "TBF"), which gave BCH well over one hundred thousand dollars ($100,000) in 2014 and

gave millions to Harvard and its hospitals across other years. In 2015, the year after BCH claimed fundraising losses from

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

the plaintiff's digital sit-in, TBF gave BCH between two and a half million dollars ($2,500,000) and five million dollars ($5,000,000). Less than two (2) weeks after Bowler issued the search warrant for the plaintiff's home, i.e. in October 2014 and before TBF's 2015 multi-million-dollar donation to BCH, TBF awarded Magistrate Judge Bowler the honorific title of director emerita. At the time Magistrate Judge Bowler issued the warrant in question, she was (and still is today) a member of the visiting committee on neuroscience at Harvard's largest teaching hospital, Massachusetts General Hospital (MGH), where Dr. Alice Newton, who was in charge of making the formal medical allegations against the Pelletiers, held a dual role as the head of the child-protection teams at both BCH and MGH. During the Justina Pelletier controversy, Newton left or was removed from her role at BCH and continued as the head of the child-protection team at MGH. She has since largely been disgraced and discredited due to her roles in the calamitous "Irish Nanny case" and Geoffrey Wilson case, wherein each case her findings of supposed child abuse by caregivers were refuted by up to nine (9) other medical experts, and the caregivers she accused were exonerated after spending two and a half (2.5) years in jail in the Irish Nanny case and four (4) years accused of killing his own infant son in the Wilson case. The Middlesex County, Massachusetts, district attorney's office stands accused of withholding exculpatory evidence that reflected negatively on Newton's rushes to judgment in both cases. Please see Exhibit 122 hereto; Yvonne Abraham; article about Newton, the DA's office, and the medical examiner; The Boston Globe; and Exhibit 123 hereto; article about Newton, the DA's office, and the medical examiner; The Washington Post.

Most important of all though, Magistrate Judge Bowler is and was married to Dr. Marc Pfeffer, the Dzau professor of cardiology at Harvard Medical School and a senior cardiologist at Harvard-affiliated Brigham and Women's Hospital (BWH). Dr. Pfeffer's cardiology department at BWH boasts openly on its website about its close working relationship with its counterpart at BCH, which stopped Justina's heart medicine, Metoprolol, leaving her tachycardic (with a fast heart rhythm). Please see Exhibit 124 hereto, print-out from the BWH cardiology department website, noting its close working ties with BCH, Brigham and Women's Hospital; Exhibit 117 hereto, mentioning Metoprolol; and Exhibit 125 hereto mentioning Justina Pelletier's tachycardia following BCH's stoppage of her Metoprolol; Emily Rooney; Justina Pelletier's Parents Fighting to Get Her Back; PBS/WGBH Greater Boston (March 2014) (title and date approximated from memory).

Paragraph eight (8) of the application for a search warrant for the plaintiff's home, moreover, explicitly alleged that the plaintiff's digital sit-in caused "disruption to the network on which BCH and other Harvard University-affiliated[sic] hospitals communicate." Such "other Harvard University-affiliated hospitals" clearly include both BWH, which pays and paid Magistrate Judge Bowler's husband---with whom she is eligible to file joint income-tax returns---and MGH, where she maintained and maintains to this day her own professional association.

- Page 33 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

28 U.S.C. Sec. 455(a) mandates:

|Any justice, judge, or magistrate [judge] of the United States shall disqualify himself [or herself] in any proceeding in
|which his [or her] impartiality might reasonably be questioned.

28 U.S.C. Sec. 455(b)(1) mandates judicial self-disqualification (emphasis added):

|Where [the judge] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary
|facts concerning the proceeding.

28 U.S.C. Sec. 455(b)(4) mandates judicial self-disqualification when:

|[The judge] knows that he [or she], individually or as a fiduciary, or his [or her] spouse or minor child residing in his [or
|her] household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other
|interest that could be substantially affected by the outcome of the proceeding.

28 U.S.C. Sec. 455(c)(5) mandates judicial self-disqualification when:

|[The judge] or his [or her] spouse, or a person within the third degree of relationship to either of them, or the spouse
|of such a person:... (iii) Is known by the judge to have an interest that could be substantially affected by the outcome
|of the proceeding.

And yet Magistrate Judge Bowler did not disqualify herself from the plaintiff's case. Neither did she disclose, pursuant to

28 U.S.C. Sec. 455(e) and Canon 3D of the Code of Conduct for U.S. Judges, her connections to BCH and the "Harvard

University-affiliated" entities explicitly implicated in paragraph eight (8) of the search-warrant application. She did,

however, fail to issue a detention order in the plaintiff's case until one hundred thirty-nine (139) days after the plaintiff

arrived at the Donald W. Wyatt Detention Facility (herein also "Wyatt") for his initial appearance.

Yet again, the plaintiff did not discover these facts until much later due to the defendants and their parties in privity, and

the plaintiff's publication of these compelling and striking details was unduly delayed. Still more was yet to come.

Approximately twelve (12) FBI agents raided the home of the plaintiff and Mrs. Gottesfeld on October 1st, 2014, outfitted

with their rubber-stamped warrant, dated one (1) day before the date on the top of the corresponding application, by a

magistrate judge who at the time had not been the "emergency magistrate" in the vicinage and who by reasonable and

objective standards the law required to disqualify herself from the plaintiff's case. The agents first feigned interest in

protecting kids like Justina Pelletier and Mrs. Gottesfeld's little brother. They were, in reality however, thoroughly

uninterested in protecting tortured children. Although Special Agent Hughes of the Boston FBI finally promised to put the

plaintiff in touch with agents who could investigate the troubled-teen industry, he broke his word and in fact never did so.

Please see Exhibit 3 at 13 (p.45).

The FBI used the postdated warrant obtained through magistrate-judge shopping and an unlawful PRTT to seize thousands

of dollars of the plaintiff's computer equipment. Fearful that the FBI would crash their wedding, the plaintiff and Mrs.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------------

Gottesfeld drove to the Manchester, New Hampshire, town hall on the day after Christmas 2014 and got married with no prior notice to anybody and without their friends and family present.

   In approximately April 2015, special agents Tunick and Hughes lured the plaintiff by telling him they were going to return his property. The meeting, however, was really an attempt to interrogate the plaintiff without his attorney present. When the plaintiff made it known to Tunick and Hughes that his only interest in meeting them was the return of his property, Tunick handed the plaintiff a grand-jury target letter signed by then--Assistant-U.S.-Attorney Adam J. Bookbinder, a graduate of Harvard Law School and the subsequent division-chief for cybercrime prosecutions in the Massachusetts U.S. attorney's office after the Aaron Swartz tragedy.

   The plaintiff was disturbed to learn in the months that followed how little morality and justice matter in the contemporary U.S. federal courts and how the Federal Rules of Evidence effectively deprive juries of their Constitutional role in criminal cases, thereby depriving the accused of the safeguard of his or her peers' moral sensibilities. Long gone are the days when the federal courts served as the essential moral stopgap and final check-and-balance on the power of federal law enforcement. The simple common-sense decency affirmed into the federal criminal-justice system by decisions like Sorrells v. United States, 287 U.S. 435 (1932) and Miranda v. Arizona, 384 U.S. 436 (1966) was steadily eroded by decisions like Smith v. Maryland, 442 U.S. 735 (1979), United States v. Leon, 468 U.S. 897 (1984), and Brogan v. United States, 522 U.S. 398 (1998).

   The former venue of We The People is bastardized into a rubber-stamp for ever-increasing police power. The law-enforcement agencies themselves, meanwhile, are co-opted to do the bidding of the prevailing special interests of the day regardless of the law and common sense and decency.

   Billion-dollar industries and institutions nowadays torture, maim, and murder American children like Justina Pelletier and Mrs. Gottesfeld's little brother with the outright overt protection rather than scrutiny of all levels of law enforcement. Aaron Bacon, Jon Martin-Crawford, Karlye Newman, Sindre Hylland, Chelsey Cruz, and a long line of other childhood victims are dead for this reason. Justina Pelletier demands justice from her wheelchair. And twenty-five-(25)--plus--term Congressman George Miller retired unsuccessful in his attempts to bring the Awesome power of the United States to bear in order to protect its most vulnerable and precious asset---its youth. Immoral actors are held unaccountable under the law.

   The plaintiff came to understand and accept in light of all this that the still-notorious Boston FBI was not investigating him for an Internet outage that even its private-sector washouts like Tunick must have known from the beginning didn't harm a

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 07:59:04 PM

soul. Rather, the FBI was indemnifying its patrons and political supporters at omnipotent Harvard. It seems J. Edgar Hoover

and Peter Strzok would be proud of their modern counterparts in Massachusetts.

   The plaintiff, in comparison, was devastated by these revelations, but he was nonetheless forced to accept them as a

result of the destruction of his own life at the hands of the Boston FBI and Carmen Ortiz's office in retaliation for his actions

to stop the torture of children like Justina Pelletier, carried out by moneyed special interests like Harvard and the troubled-

teen industry. He didn't have the funds to write the right checks to get FBI agents like Tunick and Hughes to do their jobs as

if they care about children like Mrs. Gottesfeld's little brother and Justina Pelletier, and even if he did, the concept is morally

repugnant.

   The plaintiff began to explore the possibilities for political asylum abroad. But he had never before imagined leaving the

United States. As a proud American, he had eschewed international travel, even for business. Ironically perhaps, he had

been unwilling to subject himself to the territorial jurisdiction of any foreign judiciary for fear of corruption. He had never

sought a passport. This greatly limited his options.

   The plaintiff eventually chose Cuba as the least-unlikely possibility within his physical reach without a passport and without

uttering a false document. Shortly after the FBI raid, however, Washington and Havana announced they were normalizing

diplomatic relations, and the plaintiff realized the odds of relief in Cuba were greatly diminished.

   The plaintiff also realized that the FBI was likely employing its most-sophisticated means of electronic surveillance in order

to track his movements and associations both online and in the physical world, especially since the front of the search

warrant the plaintiff received on October 1st, 2014, explicitly listed 18 U.S.C. Sec. 371, the general conspiracy statute.

Evading the FBI, however, proved trivial for the plaintiff because, he believes, its field agents like Tunick and Hughes do not

understand the technical workings of the physical-surveillance tools dropped into their laps any better, metaphorically

speaking, than Laika the dog understood the Sputnik 2 spacecraft that carried her into orbit on November 3rd, 1959. It is,

after all, a fortunate phenomenon that was in no way lost on America's Founders that intelligent people make poor henchmen

because they ask too many questions and are not easily fooled into blindly doing a master's bidding.

   The plaintiff disappeared from the FBI's radar in Massachusetts on Martin Luther King Jr. Day weekend, 2016; an irony not

lost on the plaintiff given the FBI's unfortunate history with the civil-rights icon. The plaintiff drove to Key West, Florida,

bought a used gasoline-powered boat for four thousand five hundred dollars ($4,500) from a seller he met online, and made

it to Cuba overnight in rough seas with no prior power-boating experience, surprising the Cuban military at one of the island

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

nation's international marinas in the very early A.M. hours the next day.

On the day the plaintiff learned that then-President Obama was flying to Havana to normalize travel between the United States and Cuba, the Cuban authorities told the plaintiff that then--head-of-state Raul Castro personally declined to grant the plaintiff political asylum. The Cuban authorities put the plaintiff back on his boat, which they claimed had been maintained in good working order at the international marina where he came ashore, and told him to leave Cuban territory and not to return under threat of prison.

The Cuban military moved the plaintiff across three (3) safe-houses on the island over the next four (4) weeks while the Cuban government considered the plaintiff's application for political asylum.

Just over halfway back to Key West, however, the plaintiff's boat broke down. Adrift in ten-(10)-to-fifteen-(15)-foot seas dozens of miles from shore, the plaintiff used the international emergency frequency on the very-high--frequency (VHF) radio band, U.S. channel 16, and issued a general distress call. Approximately thirty (30) minutes later, the Disney Wonder cruise liner answered one of the plaintiff's subsequent May-Day calls.

The plaintiff was rescued at sea. Please see Exhibit 126 hereto; video of the plaintiff's rescue by the Disney Wonder (February 2016). But the plaintiff wasn't out of the woods.

Disney contacted U.S. authorities in the Bahamas, and the FBI flagged the plaintiff. The Disney crew posted a guard outside the plaintiff's cabin and his movements on board were tightly restricted. The ship spent the next full day at Disney's private island in the Bahamas and drove to port in Miami over the following night.

A U.S. Customs and Border Protection (CBP) agent arrested the plaintiff aboard ship early the next morning, and then turned him over to Tunick once disembarked from the vessel.

The Pelletiers, within a week of the plaintiff's arrest, sued Boston Children's Hospital and four (4) of its practitioners; Alice Newton, Colleen Ryan, Ioana Simona Bujoreanu, and Jurriaan Peters; for negligence, gross negligence, medical malpractice, and civil-rights violations. Please see Exhibit 127 hereto; Lou and Linda Pelletier PPA Justina Pelletier v. Boston Children's Hospital, et al. (amended complaint); Massachusetts Suffolk County Superior Court (filed February 2016) (title and date approximated from memory). A trial is scheduled for 2020.

Shortly into the plaintiff's time in custody, he began planning his hunger strike.

As a former competitive judo player and non--heavy-weight wrestler with a winning record, the plaintiff was experienced in managing his weight and capable of maintaining strict dietary discipline. As the son of Jay Gottesfeld, the plaintiff was capable of maintaining strict intellectual and mental discipline. Both physical and mental control are essential not only to maintain a hunger strike but also to maintain the effective communication of a particularized message throughout months of starvation.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

First though, came the easy part of any well-planned long-term hunger strike.

From February 2016 through October 2nd, 2016, with the help of his fellow inmates, many of whom survived institutionalized child abuse in troubled-teen--industry settings, the plaintiff gained approximately thirty (30) pounds while he awaited external coordination with a pro bono publicist.

In early July 2016, The Huffington Post---a publication not otherwise known to criticize Obama appointees---surprised the plaintiff and many others and prominently featured Exhibit 128 hereto; Ryan Grim and Daniel Marans; This Federal Prosecutor Is Building a Career Indicting the Good Guys: But Is U.S. Attorney Carmen Ortiz the One Gone Wrong?; The Huffington Post (July 2016) (authors' names, title, and date approximated from memory). It is coauthored by Ryan Grim, who was then the Washington, D.C., bureau chief for The Huffington Post, along with one of its national reporters. Therein former--Boston-U.S.-District-Court-Judge Nancy Gertner, former--Massachusetts-Attorney-General Martha Coakley, former--Rhode-Island-State-Representative (and DemandProgress co-founder) David Segel, former director of the Massachusetts Civil Liberties Union Harvey Silverglate, and others lambasted then--Massachusetts-U.S.-Attorney Carmen M. Ortiz for her long track record of flimsy and politically-motivated prosecutions against "the Good Guys."

Judge Gertner explicitly and succinctly labeled Ortiz's indictment of two (2) staff from the Boston mayor's office an "abuse of power." That case, as detailed below, would later fall apart.

Two (2) of the other pending high-profile indictments brought by Ortiz's office and mentioned by The Huffington Post also later fell apart. The U.S. Court of Appeals for The First Circuit reversed one (1) for failure to state a crime. Another led to a full jury acquittal of four (4) codefendants. The Aaron Swartz tragedy also figured prominently in the Huffington Post article, under the heading, "The Death of a Boy Genius" (heading approximated from memory).

The Huffington Post also quoted from the sixty-three-(63)--page decision in the largely-political case United States v. Henderson, 857 F. Supp. 2d 191, 211 (D. Mass. 2012) (recon. denied 904 F. Supp. 2d 134, indict. dism. 951 F. Supp. 2d 228 (2013)), in which U.S. District Court Judge Douglas P. Woodlock opined about the "improvident invocation of the federal criminal felony process" by Ortiz and her predecessor in bringing that political case, the pursuit of which he deemed "overkill." The Huffington Post also joined Judge Woodlock, who was a federal prosecutor in The District of Massachusetts before his appointment to the bench, in quoting the April 1st, 1940, address to the Second Annual Conference of United States Attorneys by then--U.S.-Attorney-General (and future--Supreme-Court-Justice) Robert H. Jackson:

> |the prosecutor has more control over life, liberty and reputation that any other person in America... [w]ith the law
> |books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation
> |of some [A]ct on the part of almost anyone.

The Huffington Post further noted---accurately---that the press is often times the only real-time check on the power of a

- Page 38 of 163

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/15/2019 05:54:49 PM

runaway federal prosecutor. As federal courts have noted, "Under our system of government, the primary check against

prosecutorial abuse is a political one." <u>In re Grand Jury Investigation</u>, 315 F. Supp. 3d 602, 612 (D.D.C. 2018) (citing

<u>Morrison v. Olson</u>, 487 U.S. 654, 728 (1988)) (Scalia, J., dissenting). The plaintiff, who stood and stands accused of a so-

called crime that thousands of people, including Justina Pelletier, instead consider an act of selfless heroism, had and has a

Constitutional interest not only in his own freedom of speech and freedom of the press, but also in the real-time check on

the power and discretion of those prosecuting him.

   In late August or early September 2016, Rolling Stone commissioned its feature on the plaintiff. And the Washington,

D.C., bureau chief of the Huffington Post published <u>Exhibit 114</u> hereto, block-quoting the plaintiff, which made a notable

splash. Although the relevant social-media counters have since been reset due to a change in The Huffington Post's website

during its rebranding to be called simply, "HuffPost," the plaintiff's statement at the time in 2016 was shared or liked on

Facebook more than three thousand two hundred (3,200) times---as high a metric as many contemporary political articles

about the upcoming presidential election and some five hundred (500) times more than The Huffington Post's earlier hard-

hitting feature-length expose on U.S. Attorney Carmen M. Ortiz (<u>Exhibit 128</u> hereto).

   Follow-up coverage immediately ran in The International Business Times and The Washington Times. Fox 25, the largest

broadcast-TV news station in New England, also interviewed the plaintiff by phone from Wyatt that night.

   Boston Children's Hospital and Carmen Ortiz's office each declined to comment to The Huffington Post. Please see <u>Exhibit</u>

<u>114</u> hereto.

   Shortly thereafter, The Huffington Post published <u>Exhibit 129</u> hereto; Ryan Grim block-quoting Martin Gottesfeld; Why

This Activist Hacker Is Going On a Hunger Strike In Jail; The Huffington Post (September 26th, 2016) (title and date

approximated from memory). The Huffington Post then made the plaintiff one of its contributors.

   Throughout the plaintiff's hunger strike at Wyatt he was housed in the medical unit and not in segregation. His

communications abilities were maintained for over a month at nearly the same levels as other general-population detainees.

   About a week into the plaintiff's hunger strike, Newsweek also started covering the story. Please see <u>Exhibit 130</u> hereto;

Anthony Cuthbertson; Anonymous Hacker Begins Second Week of Hunger Strike in Prison; Newsweek (October 11th, 2016)

(title and date approximated from memory); and <u>Exhibit 131</u> hereto; Anthony Cuthbertson; Anonymous Hacker Indicted As

Hunger Strike Continues; Newsweek (October 20th, 2016) (title and date approximated from memory). The U.S. attorney's

office tried to respond to Newsweek's inquiry for comment using the same disingenuous and false narrative, claiming that

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------

the plaintiff had endangered patients' lives, that it later failed to prove to the plaintiff's jury, on which sat a registered

nurse (R.N.) from an area hospital who happened to know better. Again, please see Exhibit 4 hereto, i.e. the federal

regulations requiring BCH to be able to handle digital sit-ins.

Newsweek declined to publish the U.S. attorney's office's retort. Newsweek instead turned it over to the plaintiff, who later

refuted it on the front page of The Huffington Post. Please see Exhibit 132 hereto; Martin Gottesfeld; The Wrong Ortiz

Retires in Boston; The Huffington Post (October 26th, 2016) (title and date approximated from memory).

The Boston U.S. attorney's office waited until the day of the final 2016 presidential debate---a very busy news day---to

indict the plaintiff. And while the U.S. attorney's office had been sure to issue a sensationalized press release about the

plaintiff's rescue at sea and arrest, the U.S. attorney's office was conspicuously silent about the subsequent indictment eight

(8) months later during the plaintiff's hunger strike.

The plaintiff demonstrated no such aversion to informing the public. He continued to write and publish throughout the first

six (6) weeks---or forty-two (42) days---of his hunger strike while staff at Wyatt video-taped him decline one hundred

twenty-three (123) consecutive meals. Please see Exhibit 133 hereto; Martin Gottesfeld; From Prison with Love: Why I

Became an Activist Hacker; The Huffington Post (October 2016) (title and date approximated from memory); and Exhibit

134 hereto; Martin Gottesfeld; The Permanent and Potentially-Fatal Effects of Martin Gottesfeld's Hunger Strike; The

Huffington Post (October 2016) (title and date approximated from memory).

A half-dozen Wyatt staff members quietly supported the plaintiff when they learned of what happened to Justina Pelletier

and the other children for whom the plaintiff advocates. Some of these staff members told the plaintiff that he earned their

respect as his hunger strike elongated across the weeks. These staff members clearly understood the plaintiff's

particularized message. Please see Exhibit 135 hereto describing these events and the refusal of the Wyatt transport detail

who brought the plaintiff to MCC to stop during the hours-long van ride from Central Falls, Rhode Island, to Manhattan in

order to get food for themselves; Martin Gottesfeld; How the U.S. Marshals and Federal Bureau of Prisons Are Trying To

Break My Hunger Strike; The Huffington Post (January 2nd, 2017) (title and date approximated from memory). The plaintiff

also recalls a Wyatt staff member who is a retired U.S. military sniper and who deeply moved the plaintiff during his hunger

strike simply by comparing the plaintiff to a soldier and saluting the plaintiff as if he was a fellow service member. Please

see Exhibit 1 hereto at 1 (p.6-8).

Warden Martin of Wyatt previously informed the plaintiff that telephonic conferences regarding the plaintiff and his

hunger strike were being held between the warden and medical staff at Wyatt, the U.S. Marshals Service, and the U.S.

attorney's office. The plaintiff's counsel, however, were not included in these conferences. The plaintiff also preserved

correspondence between himself, Warden Martin, and David Kushner wherein Warden Martin made clear he was deferring to

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

the U.S. Marshals Service regarding a potential in-person interview between Rolling Stone and the plaintiff. Wyatt did not generally interfere with telephonic interviews of the plaintiff by the media, however. The plaintiff has never taken legal action against Wyatt or its staff, and in fact he praised the line staff at Wyatt during a time when the facility was mired in controversy following the escape of a detainee who led authorities on a days-long manhunt. Please see Exhibit 136 hereto; Kevin Gosztola block-quoting Martin Gottesfeld; Jailed Activist Pens Open Letter About Human Rights Abuses At Plymouth County Correctional Facility; Shadowproof Press (February 14th, 2017) (title and date approximated from memory); and Exhibit 137 hereto; Martin Gottesfeld; Aaron Hernandez Suicide Highlights Systemic Problem In Massachusetts Jails and Prisons; The Huffington Post (April 2017) (title and date approximated from memory).

Wyatt did not curtail the plaintiff's communications and hold him effectively incommunicado until he escalated his hunger strike after the 2016 elections---and days before his transfer to MCC. When the plaintiff coordinated an email of a First Amendment-protected petition for the redress of some of his grievances to AUSA Bookbinder and announced publicly his stoppage of fluid intake. Please see Exhibit 138 hereto; Martin Gottesfeld; email to then-AUSA Adam Bookbinder (November 2016) (date approximated from memory). In eventually blocking the plaintiff's communications, Wyatt bowed to external pressure from the instant defendants' parties in privity.

When Wyatt brought the plaintiff to the hospital approximately forty-eight (48) hours into his fluid stoppage on or about Sunday, November 13th, 2016, a Wyatt officer acted on orders from the U.S. Marshals Service and sought to have the doctors at Rhode Island Hospital feed or hydrate the plaintiff against his will. The doctors immediately refused within ear shot of the plaintiff, explicitly stating, "He[, the patient,] gets to make that choice."

The doctors at Rhode Island Hospital thus upheld the high moral requirements of their profession---which Defendant Bussanich later failed to do.

The next day, Monday, November 14th, 2016, the instant defendants, acting in privity with AUSA Bookbinder, transferred the plaintiff across many U.S. court districts to the Metropolitan Correctional Center (MCC) in The Southern District of New York while he was under indictment in The District of Massachusetts. The plaintiff notes that while prison hunger strikes are common and hunger strikes of long duration have resulted in transfers to medical facilities, nonetheless out-of-district transfers of federal pre-trial detainees like the plaintiff in 2016 are very rare. The Wyatt staff who brought the plaintiff to MCC, for example, had never heard of MCC New York. Please see Exhibit 135 hereto. Further, MCC is not a medical facility and the much-closer Federal Medical Center (FMC) at Fort Devins is inside The District of Massachusetts while MCC New York is not.

At MCC, the plaintiff was immediately taken from receiving and discharge (R&D) to the special-housing unit (herein also

- Page 41 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/15/2019 07:37:31 PM

the "SHU"), designated as "9-south," without any administrative-detention hearing or written administrative-detention

order. Please see RFA 1-5. The plaintiff later detailed the coercion and intimidation utilized by the Federal Bureau of Prisons

immediately upon his entrance to MCC in both collective and individual efforts of the defendants and their parties in privity

to break the plaintiff's hunger strike. Please see Exhibit 135 hereto; and RFA 6, 9-11, 15, and 23-27.

     The plaintiff also continued his copious contemporary notes, recording the details of his hunger strike. These logs totaled

to more than five hundred (500) pages by the time he left MCC. Due to the unmitigated interference of the instant

defendants and their parties in privity with the plaintiff's ability to litigate the instant case, he no longer has access to these

notes, which are now the subject of another motion filed simultaneously with this opposition; please see MOTION TO

COMPEL DELIVERY BY DEFENDANTS WITHOUT PUNISHMENT OF PLAINTIFF'S NECESSARY DOCUMENTS.

     As stated in the instant complaint, the sole inmate entrance to MCC's 9-south SHU was labeled to the effect that it is the

toughest SHU in the U.S. Please see D.E. 2 at 5 (p.2). The defendants have admitted to this fact. Please also see RFA 6. In

turn, this is an overt admission by the defendants that the inmates in the 9-south SHU are treated differently than SHU

inmates elsewhere and are denied the equal protection of the Constitution and other laws. The instant defendants, in their

motion to dismiss, do not contest the factual conditions as alleged in the SHU at MCC, specifically:

     * in D.E. 2 at 5 (p.4), inmates in the SHU at MCC live a tougher existence than general population inmates, one which

includes less access to telephonic communication, bathing, and recreational facilities, in-person visits with family members

and attorneys; no access to electronic messaging, communal meals, television, and these inmates are generally locked down

in their cells twenty-three (23) to twenty-four (24) hours per day.

     * in D.E. 2 at 8 (p.10), as stipulated-to in RFA 6 and 10: the MCC SHU had an uncontrolled rodent and insect infestation

and rats/mice crawled into occupied cells through the gaps underneath the cell doors, causing inmates to resort to blocking

those gaps, which in many cases were their only significant source of ventilation.

     * in D.E. 2 at 8 (p.11), that a cockroach climbed up the body of a prison mental-health practitioner while she was talking

with an inmate/patient on the same tier as the plaintiff, causing her to scream and shudder---as many objectively

reasonable members of the public also would have likely reacted.

     * in D.E. 2 at 8 (p.13), that on at least one (1) occasion, the water was turned off to the SHU leaving the plaintiff and

other inmates there unable to drink or flush their toilets, while bottled water was not distributed, and that at least one (1)

inmate resorted to drinking from his toilet.