TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

* in D.E. 2 at 8 (p.14), as stipulated-to in RFA 6, i.e. violation of 28 C.F.R. Secs. 541.31(a) and 541.31(c): that the temperature in the SHU regularly approached that of the outdoors during the winter due to insufficient insulation in the exterior walls, and that rather than fix the building or leave the heat at a sufficient level, the eventual amelioration effort of the MCC administration weeks after the problem's annual emergence in late 2016 was to hand out thermal underwear that did not cover the face, feet, or hands when 28 C.F.R. Sec. 541.31(c) expressly requires adequate footwear.

* in D.E. 2 at 9 (p.16), as stipulated-to in RFA 11, i.e. violation of 28 C.F.R. Sec. 541.31(a): that the plaintiff was intentionally placed in a cold cell with leaking water pooled on the floor and algae growing in the toilet---each posing a heightened risk of infection---at a time when the plaintiff reasonably assumed that his immune system was compromised by over six (6) weeks of starvation, and that MCC acknowledged the water leak in an email to The Huffington Post.

* in D.E. 2 at 9 (p.17), that the plaintiff was repeatedly threatened by Defendant Bussanich with the brutal practice of force-feeding if he didn't stop his Constitutionally-protected expression of protest via his hunger strike even though by then the practice of force-feeding had grown increasingly controversial to the point where few medical professionals were willing to perform the procedure and where courts had begun restraining prison officials from engaging in it. In 2015---the year prior to the plaintiff's transfer to MCC---the American Nurses Association awarded a registered nurse in the U.S. Navy its brand new "Year of Ethics" award for the nurse's steadfast refusal of a direct order to violate his conscience by force-feeding hunger-striking detainees. Please see also RFA 9, 23-27.

* in D.E. 2 at 10 (p.18), as stipulated-to in RFA 6: the plaintiff was denied the ability to send sealed media mail, pursuant to 28 C.F.R. Sec. 540.20, to Rolling Stone for the feature-length article it commissioned on the plaintiff's case because, MCC claimed, Rolling Stone is not a member of the news media. Please see Exhibit 10 hereto; 28 C.F.R. Sec. 540.20 (retrieved September 2019).

* in D.E. 2 at 11 (p.19), the plaintiff's sealed media mail to another reporter arrived with signs of tampering.

* in D.E. 2 at 11 (p.20), as stipulated-to in RFA 6: Defendant Tatum personally denied the plaintiff his First Amendment right to be interviewed by multiple media outlets that requested access to him, including Rolling Stone and Wired, and there was no valid, reasonable, penological reason to deprive the plaintiff, the reporters, and the public of these interviews.

* in D.E. 2 at 11 (p.21), as stipulated-to in RFA 6: Additional mail sent by the plaintiff containing articles and letters to officials for publication at The Huffington Post and elsewhere, as well as responding to other media inquiries either was not sent out from the facility or arrived without having been sealed by prison staff as per standard FBOP practice after their review, including but not limited to a letter for publication to then--President-elect Donald Trump regarding the economic and logistical problems of operating a facility such as MCC in a largely-dilapidated building in the most expensive city in the world, as well how the FBOP appears to use assignments of favored staff, including then--Warden Tatum, to MCC for

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

periods of time that seem designed to help them maximize their pension benefits at taxpayer expense just prior to

retirement.

The public maintained an active interest in the plaintiff's hunger strike as evidenced by the correspondence he received

from all over the country and many foreign nations. Please see Exhibit 139 hereto; pictures of mail received by the plaintiff

while he was at MCC (2016-2017).

Members of the public also began a rotating vigil, skipping meals in solidarity with the plaintiff. Please see Exhibit 140

hereto; records of the rotating vigil (2016-2017). A protest also took place at the federal courthouse in Boston.

Massachusetts Lawyers Weekly covered this protest. Please see Exhibit 141 hereto; article about the #FreeMartyG protest at

the John J. Moakley Federal Courthouse in Boston; Massachusetts Lawyers Weekly (late 2016 or early 2017) (date

approximated from memory).

While the plaintiff was at MCC, reporters from The Huffington Post, Rolling Stone, Newsweek, Wired, and others inquired

with Defendant Tatum for comment on the plaintiff. Rolling Stone, Wired, and possibly others requested interviews with the

plaintiff by going to Defendant Tatum, who personally denied each of these requests.

Inmates in federal SHUs are usually limited to one (1) social phone call of fifteen-(15)-minute duration per calendar month.

The plaintiff's attorney formally requested that the plaintiff be allowed additional phone calls, as one (1) social phone call per

month is the absolute minimum allowed by regulation. Please see Exhibit 11 hereto, 28 C.F.R. Sec. 540.100 (retrieved

September 2019). Defendant Tatum personally denied this request.

The plaintiff's hunger strike clearly constituted protected speech in accordance with Stefanoff v. Hays County, 154 F.3d

523, 527 (5th Cir. 1998) (citing Texas v. Johnson, 491 U.S. 397, 404 (1989)) and Birdo v. Gomez, 2016 U.S. Dist. LEXIS

98238, 13-cv-6864 (N.D. Ill. July 27, 2016) in that it conveyed a particularized message in protest of the government's

actions and inactions regarding the protection of institutionalized youth and prosecutorial discretion. The public clearly

understood this message, conveyed by the plaintiff's own writing and the coverage of other journalists. The public, in fact,

participated with the plaintiff, echoing his protected speech in petition for the redress of grievances. Please see Exhibit 140

hereto.

Shortly before Thanksgiving 2016, The Huffington Post published an open letter from the plaintiff to then--U.S.-Attorney-

General Loretta Lynch and Justice Department Inspector General Horowitz regarding the plight of institutionalized children,

the abuse of Justina Pelletier at the hands of Boston Children's Hospital, and the tendency of Massachusetts U.S. Attorney

Carmen M. Ortiz and her subordinates even after the suicide of Aaron Swartz to indict citizens for political reasons. Please

see Exhibit 142 hereto; Ryan Grim block-quoting Martin Gottesfeld; coverage of open letter to Attorney General Loretta

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/15/2019 08:26:29 PM

Lynch and Inspector General Horowitz; The Huffington Post (November 2016) (date approximated and the plaintiff notes for accuracy that his handwriting of the word "facts" was instead typed as "feats"). The Huffington Post inquired for comment with both the attorney general's office and the office of the inspector general (OIG) prior to publication. Please see Id.

   After The Huffington Post published the plaintiff's first open letter to the attorney general, Sr. Agent Frank Adamo and another agent from the DOJ OIG came to MCC to interview the plaintiff during his hunger strike. No Miranda warning was given and the plaintiff's attorney was not informed of the custodial questioning. Please see RFA 23 (right to counsel). Agent Adamo, however, directly threatened the plaintiff with further criminal prosecution, using the example of Martha Stewart, if the plaintiff chose to lie. Both Defendant Tatum and Agent Adamo openly recorded the interview; Adamo used his mobile phone and Tatum used the Cisco teleconferencing camera present in the interview room.

   The plaintiff described many of the conditions in the MCC SHU detailed in the instant complaint, including the frigid temperature. Sr. Agent Adamo replied by asking the plaintiff if it was so cold that he could see his breath---an erroneous and ridiculous standard in opposition to common sense and falling far short of the federal regulatory requirement for appropriate heating of SHUs explicitly mandated by 28 C.F.R. Sec. 541.31(a). Please see Exhibit 12 hereto, 28 C.F.R. Sec. 541.31 (retrieved September 2019).

   The OIG took no discernable action in response to the plaintiff's open letter after interviewing the plaintiff on the record without a Miranda warning or his attorney present.

   The plaintiff continued his hunger strike and his writing.

   Defendant Bussanich continued his attempts at psychological manipulation, intimidation, and coercion to get the plaintiff to stop his Constitutionally-protected hunger strike. He repeatedly threatened the plaintiff with the brutal practice of force-feeding and continually reminded the plaintiff that he could leave the SHU if and only if he ceased his hunger strike. Please see D.E. 2 at 10 (p.17), Exhibit 1 hereto at 3 (p.31), and RFA 23-27.

   Having been denied an in-person interview with David Kushner of Rolling Stone, the plaintiff later attempted to communicate candidly with him by sealed special mail, including by sending his growing contemporary memoranda, pursuant to 28 C.F.R. Secs. 540.2(b), 540.2(c), and 540.18(c)(1). Please see Exhibit 13 hereto, 28 C.F.R. Sec. 540.2 (retrieved September 2019); and Exhibit 14 hereto, 28 C.F.R. Sec. 540.18 (retrieved September 2019).

   At first, the plaintiff was told that he could not send sealed special mail to Mr. Kushner because the address the plaintiff provided for Mr. Kushner was a P.O. box. This was both untrue and irrelevant. The address had a street name and street

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

number, as well as a unit number. Further, there is no applicable policy, regulation, or statute that allows FBOP staff to decline to accept special mail addressed to a P.O. box. Please see <u>RFA 23-27</u>.

When the plaintiff pointed out the facts above, he was then told that MCC does not consider Rolling Stone a national news publication. This argument was perhaps even more specious than its predecessor, and, again, it failed to comply with relevant policy. <u>FBOP Program Statement 5265.14 sec. 12</u>, "INMATE CORRESPONDENCE WITH REPRESENTATIVES OF THE NEWS MEDIA," clearly states, "If there is doubt whether a representative qualifies [as a member of the news media], contact the Public Information Officer in the Central Office." Please see <u>Exhibit 15</u> hereto; excerpt from program statement 5265.14, Correspondence; Federal Bureau of Prisons (April 5, 2011).

Yet the defendants and their parties in privity at MCC had not contacted the Public Information Officer in the Central Office, as required.

This left the plaintiff with no option to communicate with Kushner, whose interview request had been among those denied by Defendant Tatum. Please see <u>RFA 23-27</u>.

In late December 2016, The United States Court of Appeals for The First Circuit decided <u>United States v. Tavares</u>, 844 F.3d 46 (1st Cir. 2016). It was a stunning rebuke of U.S. Attorney Carmen M. Ortiz. The Boston Globe wrote that the high court "lambasted" Ortiz for federally interfering in local politics. The case was up until that point considered Ortiz's signature indictment. It was one of the cases mentioned by The Huffington Post in "This Federal Prosecutor Is Building a Career Indicting the Good Guys..." and one of the cases most heavily cited by The Boston Globe when it named Ortiz its 2011 "Bostonian of the Year."

Ridiculed by the second-highest court in the land for carrying on political prosecutions, U.S. Attorney Ortiz announced her retirement from office while the plaintiff was over seventy-five (75) days--or nearly three (3) months--into his hunger strike protesting Ortiz for political prosecutions. Shortly thereafter, upon the advice of a <u>pro-bono</u> publicist and at the behest of Mrs. Gottesfeld and others, the plaintiff announced the end of his hunger strike, effective January 10th, 2017, on the one-hundred-(100)-day mark.

About eight (8) months later, a federal jury in Boston acquitted four (4) defendants of all charges in the so-called "Top Chef" union-busting case brought on similarly-dubious legal ground during Ortiz's tenure. Please see <u>United States v. Fidler</u>, No. 15-cr-10300, ECF No. 325 (D. Mass. August 15, 2017). It was yet another stunning rebuke of Ortiz's legacy of stretching federal law and the power of the U.S. attorney to police local politics past its breaking point, though by a jury rather than by the U.S. Court of Appeals. The U.S. attorney's office had pulled out all the stops to win, even calling A-list celebrity-chef Padma Lakshmi to testify, a move that raised the prominence of the case and thereby its stakes in the political arena as well.

- Page 46 of 163 -

----------------------------------------------------------------------------------------

Another rebuke of Ortiz's legacy would come in early 2018, in another one of the cases initiated at the height of Ortiz's seemingly-mad grab for tyrannical power. U.S.-Magistrate-Judge--turned--U.S.-District-Court-Judge Leo T. Sorokin effectively forced Ortiz's old subordinates to drop an Ortiz-era political indictment brought against two staffers from the Boston mayor's office. Ortiz had accused the defendants of pressuring a concert producer into hiring union stage hands in order to secure a permit for a live-music festival named "Boston Calling." The pressure from the mayor's office followed an incident a little over a decade earlier in nearby Rhode Island caused by an inexperienced stage hand. It was summed up thusly by Senior U.S. District Court Judge Ronald R. Lagueux in Passa v. Derderian, 308 F. Supp. 2d 43, 46 (D.R.I. 2004) (emphasis in original and other emphasis added):

> |On February 20, 2003, a deadly fire destroyed a nightclub located in West Warwick, Rhode Island, known to its patrons
> |as "The Station." The fire started during the first minutes of a performance by the rock band Great White, while the club
> |itself was crowded with spectators, staff, and performers. When defendants, Jack Russell, Mark Kendall, David Filice,
> |and Eric Powers, members of the band "Great White" (hereafter referred to as "Band Members") took the stage that
> |night they and their tour manager, Daniel Bichele, ignited pyrotechnic devices as part of their performance. These
> |"pyrotechnics," also described as stage fireworks, or sparklers, caused flaming sparks to explode behind the stage area.
> |According to witnesses, the sparks from these fireworks ignited foam insulation material previously installed in the club's
> |ceiling and walls for soundproofing purposes. Once started, the fire quickly spread throughout The Station, creating a
> |fiery inferno in its wake. In less than three [(3)] minutes, the entire establishment was ablaze, and a reported 412 [(four
> |hundred twelve)] people inside the building that night were scrambling to escape the conflagration. According to this
> |Court's best estimates, this tragic fire left 100 [(one hundred)] individuals dead and more than 200 [(two hundred)]
> |injured. Only seventy-seven [(77)] people are reported to have escaped the building without physical harm, yet, even for
> |these lucky few who escaped bodily injury, the disaster continues to haunt their memories and affect their lives. The
> |impact of this tragedy on the victims, the survivors, their families and friends, and the entire community cannot be
> |overstated. The Station nightclub fire, dubbed the fourth worst nightclub fire in American history, see Peter Adomeit,
> |The Station Nightclub Fire and Federal Jurisdictional Reach: The Multidistrict, Multiparty, Multiforum Jurisdiction Act of
> |2002, 25 W. New Eng. L. Rev. 243, 243 (2003), continues to pervade the consciousness of those affected by the tragedy,
> |even as we sort through the ashes in search of understanding.
> |In the wake of this tragedy, numerous lawsuits have been filed throughout southern New England in both state and
> |federal courts.

The Huffington Post noted in Exhibit 128 hereto that concert-stage work can prove dangerous, but did not explicitly note the

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/15/2019 08:33:55 PM

the nearby incident at The Station and the one hundred (100) deaths (the death toll estimated by Judge Lagueux was later

confirmed). This was likely because the HuffPost reporters themselves were not from the New England area. The Huffington

Post reporters instead referenced a more-recent but significantly--less-deadly incident that captured national attention and

was described thusly by U.S. District Court Judge Sarah Evans Barker in Estate of Vandam v. Daniels, 278 F.R.D. 415, 420-21

(S.D. Ind. November 23, 2011):

> The horrific facts underlying this litigation sadly have become unsettlingly familiar to almost everyone across Indiana,
> indeed, throughout the country. Each August, the Indiana State Fair presents a series of concerts at the Hoosier Lottery
> Grandstand, located within the Indiana State Fairgrounds in Indianapolis, Indiana. Sugarland, a popular country music
> duo, was scheduled to take the stage for one such concert on August 13, 2011. Regrettably, the show never began that
> night, as what initially looked like inclement weather quickly escalated into tragedy. Moments before the concert was
> set to begin but after the grandstands and adjoining seating areas had filled with eager fans, strong winds swept
> through and toppled the stage's overhead rigging and lighting system; these structures collapsed directly into the
> grandstand and onto assembled audience members. This tragic event, to which we hereinafter refer as the "Stage
> Collapse," proximately resulted in seven [(7)] lost lives and serious injuries to numerous other persons.

People very often die, are seriously injured, or both when engineers, doctors, and others in technical roles make mistakes.

While The Station nightclub fire and the Indiana State Fairgrounds Stage Collapse weren't deliberate---unlike the deaths of

Aaron Swartz and many troubled-teen--industry victims, and the maiming of Justina Pelletier---it was against this backdrop

that Boston Mayor Marty Walsh's office insisted that the producers of the twice-annual Boston Calling music festival hire

experienced union stagehands for the first such show that would take place under the purview of the newly-elected mayor.

The potential consequences of such an accident to the newly-elected mayor---not to mention to the concert goers---were

obvious should his office have failed to insist on qualified personnel.

Ortiz's indictment of the two (2) mayor's office staff caused some familiar with Ortiz--who is somewhat-widely said to

have never met a microphone she did not like--to wonder if the U.S. attorney was trying to cast shade on Mayor Walsh to

make way for her own mayoral campaign after she left the U.S. attorney's office.

Regardless, by early 2018, the entire community, from potential jurors, the defense bar, local U.S. district court judges,

the presiding U.S. circuit court judges, and neutral or even Obama-administration--aligned local, national, and international

news outlets all seemed to have had enough of Ortiz's legacy of (mis)use of prosecutorial discretion. It was against this

backdrop that Judge Sorokin issued United States v. Brissette, 2018 U.S. Dist. LEXIS 44426, 16-cr-10137-LTS (D. Mass.

March 19, 2018). (The First Circuit has since reversed in United States v. Brissette, 2019 U.S. App. LEXIS 9255 (1st Cir.

March 28, 2019), but left open the element of "wrongfulness" and Ortiz's former underlings seem hard-pressed satisfy it

given the nature and scope of the above-noted disasters and the valid governmental interest in the mitigation of such risks

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

within the permitting jurisdiction of the Boston mayor's office.)

   On the way to these acquittals, the plaintiff began requesting the use of the typewriter in the small self-contained law library in the 9-south SHU at MCC.

   About one (1) or two (2) weeks later, the plaintiff was taken to the 9-south law library. As a SHU inmate, the plaintiff was required to "cuff up," i.e. to back up to a slot in his cell door with his hands behind his back so that staff could handcuff him behind his back before bringing him anywhere, including to the 10-south medical-exam room to meet Defendant Bussanich and the 9-south law library.

   The plaintiff was thus led to the 9-south law-library cage handcuffed behind his back, carrying a manila envelope of paperwork in his hands. Upon entry to the 9-south law-library cage, one of the correctional officers (herein also "COs") escorting the plaintiff placed the plaintiff's manila envelope of paperwork on one of the computer desks while the plaintiff was still handcuffed behind his back.

   The movement on the computer desk caused the computer mouse to register a movement as well. This woke the computer.

   As soon as the computer came out of standby, a pornographic video began playing full-screen with the volume turned all the way up, echoing off the concrete walls in the central chamber of the unit. The plaintiff tried to display for the cameras that his hands were still cuffed behind his back and that he hadn't touched the computer then playing the pornography. The plaintiff believed and continues to believe that the incident was an attempt to frame him for a less-altruistic computer-hacking charge, as the law-library computers in the FBOP---and especially in its SHUs---are not supposed to have access to the Internet and it was quite suspicious that the machine seemed to have been set-up beforehand to come out of standby at full volume and with the video playing automatically, i.e. with no other action required by an unwitting user to trigger the video except simply moving the mouse or typing a key. Please see RFA 15.

   It seems unlikely that any inmate could or would let the machine go into standby with such a video playing full-screen at full volume without getting caught. The plaintiff never heard of anyone being held responsible for the bypassing of Internet restrictions on the law-library computers. Instead, MCC staff told him that IT staff at MCC "cleaned up" (likely deleted) the file almost immediately. Based on the plaintiff's knowledge and experience in the IT industry, such action would greatly complicate, if not totally preclude, future digital forensics and qualify as destruction of evidence and obstruction of justice.

   The plaintiff finds it far more likely than not, based upon his experiences with federal law enforcement and in the custody of the Federal Bureau of Prisons, that if he had been uncuffed then left alone in the 9-south law library and if he had been the one to move the mouse and wake the law-library computer, then he would have been indicted for alleged hacking of the

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

law-library computer and the FBOP computer network in order to view online pornography, and that, as a proximate result,

he would have lost considerable public support. This sequence of events---which the plaintiff likely only avoided by blind

luck---would have benefited quite considerably the defendants and their parties in privity.

The plaintiff informed his defense counsel of the incident at the next opportunity and also asked to discuss it with special

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 11:45:21 AM

investigative services (S.I.S.) (internal investigations) at MCC. He never heard back. No one from S.I.S. ever came to speak

to the plaintiff. From that point forward, the plaintiff was not comfortable going to the only law library available to him as a

SHU inmate. Please see RFA 16.

   Shortly thereafter, the plaintiff requested a quantity of ten (10) BP-8 administrative-remedy forms from his unit

counselor. His unit counselor declined to provide the plaintiff with the requested administrative-remedy forms, explicitly

telling the plaintiff, "I'm not giving you ten BP-8s." Please see RFA 12.

   The same unit staff also denied BP-8 forms to other inmates in the 9-south SHU during this same period, including the

inmate directly across G-tier from the plaintiff. After nine (9) days of fruitless requests, the plaintiff and the inmate across

from him resorted to handwriting substitute forms in a futile attempt to engage the FBOP's administrative-remedy

procedures. For the plaintiff, this entailed manually handwriting copies for his own records as well.

   The plaintiff handed his unit counselor two (2) such handwritten substitute BP-8 forms on or about January 29th, 2017.

Please see RFA 13 and attachments.

   That week the plaintiff also learned of the systematic gaming of the federal pension program by favored FBOP staff,

including Defendant Tatum. Federal employees in Manhattan and other expensive areas of the country receive cost-of-living

adjustments that then also factor into their pension calculations. A federal-employee pension is not based off of

contributions by that employee nor an aggregated average of that federal employee's total compensation throughout their

career with the government. Please see RFA 30.

   Pension benefits for an eligible federal employee, rather, are based on that employee's few years of highest compensation,

including the cost-of-living adjustments received at facilities like MCC in Manhattan and the nearby Metropolitan Detention

Center (herein also "MDC") in Brooklyn. Wardens at MCC appear to stay just long enough to maximize their pensions before

retirement. Staff, including the plaintiff's unit counselor, seemed to know well ahead of time and with remarkable

confidence---despite no formal announcement---the exact month in which Defendant Tatum would retire. The defendants

have since confirmed that Warden Tatum has in fact retired. Please see D.E. 52 at 9 n. 1.

   On or about Tuesday, February 2nd, 2017, the plaintiff tried to send his wife, who at the time was also a contributor at

The Huffington Post, a letter detailing his findings on the pension issue. This letter was never delivered.

   Two (2) days later, i.e. the next Saturday---during the weekend---the plaintiff received the only response he would ever

get to his attempts to utilize the FBOP's administrative-remedy system and to his work on the federal pension program. Two

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

(2) deputy U.S. marshals arrived in the morning in a minivan and transported the plaintiff from MCC to The Plymouth County

Correctional Facility (PCCF), a non-FBOP facility in Plymouth, Massachusetts. Please see RFA 12-13 and 16-17.

   Rolling Stone was able to interview the plaintiff in-person at PCCF and was not able to publish its feature on the plaintiff's

case until after that in-person interview took place. Please see Exhibit 1 hereto at 6 (p.79).

## B. ANNOTATED AND SUMMARIZED PROCEDURAL HISTORY

   * November 13th, 2018: The plaintiff---while not in FBOP custody---certified that he placed the instant complaint in the

prison-mail system pursuant to Houston v. Lack, 487 U.S. 266, 270 (1988). The instant complaint was thus filed on that

date, less than two (2) years after the plaintiff was transferred to MCC New York.

   * November 13th, 2018: The plaintiff filed (pursuant to Houston v. Lack) his first motion for the appointment of pro bono

counsel (D.E. 4), noting therein his efforts over a long period to secure counsel.

   * November 19th, 2018: The instant case is opened as 18-cv-10836.

   * December 21st, 2018: The Honorable U.S. District Court Judge Paul G. Gardephe is assigned to the instant case and The

Honorable U.S. Magistrate Judge Gabriel W. Gorenstein is designated to the instant case.

   * February 3rd, 2019: The plaintiff publicly announced the instant case in his article in The Intercept (Exhibit 2 hereto).

   * February 5th, 2019: An order of service is issued and plaintiff's motion for the appointment of pro-bono counsel is denied

without prejudice (D.E. 8).

   * February 5th, 2019: The complaint in its entirety survived screening pursuant to 28 U.S.C. Secs. 1915A(a), 1915A(b)(1),

and 1915A(b)(2).

   * February 6th, 2019: SUMMONS ISSUED for the four (4) instant defendants and the FRCP 4 service package is hand-

delivered to the U.S. Marshals Service. NOTICE OF PRETRIAL CONFERENCE is issued for April 11th, 2019, at 10:15 A.M. in

Courtroom 705, 40 Centre Street, New York, NY 10007 before The Honorable Paul G. Gardephe (D.E. 10).

   * February 11th, 2019: The U.S. Marshals Service effectuates service of the instant complaint on the four (4) instant

defendants. Please see docket-entry text for D.E. 23-26.

   * February 15th, 2019: The instant plaintiff is transferred back into the custody of the Federal Bureau of Prisons at MDC

Brooklyn and placed directly into the SHU without an administrative-detention hearing or written administrative-detention

order. FBOP staff explicitly tell a credible and reliable witness that, regarding the plaintiff's situation, "It's political." Please

see D.E. 14 at 1 (p.4) and RFA 2-5.

   * March 11th, 2019: The Plaintiff mails his first motion for preliminary relief pursuant to Fed. R. Civ. P. 65. Please see

D.E. 12, 13, and 14, all entered on March 15th, 2019.  — Page 52 of 163 —

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

* March 18th, 2019: The Court issues a show-cause order to the defendants (D.E. 16-17) regarding the plaintiff's motion for preliminary relief (D.E. 12-14).

* March 20th, 2019: AUSA Alexander J. Hogan files an answer to the Court's show-cause order (D.E. 19).

* March 21st, 2019: The Court adjourns its show-cause hearing sine die based on the schedule provided ex parte by the government for the plaintiff's transfer to the communications-management unit (herein also "CMU") at the Federal Correctional Institution (FCI) Terre Haute, Indiana. The plaintiff remains in the SHU with neither a written administrative-detention order nor a administrative-detention hearing after thirty-four (34) consecutive days.

* March 22nd, 2019: The U.S. Marshals Service returns proof of its service of the instant complaint upon all four (4) instant defendants, effectuated on February 11th, 2019 (D.E. 23-26).

* March 26th, 2019: The plaintiff is moved to the Federal Transfer Center (FTC) Oklahoma City, Oklahoma, where he is again placed in the SHU without a written administrative-detention order or administrative-detention hearing, after spending thirty-nine (39) consecutive days in the SHU at MDC Brooklyn also without an administrative-detention hearing or written administrative-detention order. Please see D.E. 43 at 3 (p.2).

* April 1st, 2019: The plaintiff is transferred to the FCI Terre Haute CMU after forty-four (44) consecutive days in SHUs without administrative-detention hearings or written administrative-detention orders. The plaintiff is given no administrative hearing or written order prior to his placement in the CMU.

* April 2nd, 2019: The defendants file a motion to adjourn the first pre-trial conference (D.E. 29) and announce they will move to stay discovery. Id. at 2 n. 2.

* April 5th, 2019: The Court reschedules the initial pre-trial conference for May 23rd, 2019, at 12:30 P.M. and extends the defendants' time to answer or otherwise move in regards to the complaint until May 20th, 2019, but does not stay discovery (D.E. 34).

* May 16th, 2019: The Defendants file a motion to dismiss the complaint (D.E. 51 and 52) and to stay discovery (D.E. 52 at 33 Sec. V and D.E. 53 at 3).

* May 21st, 2019: The Court adjourns the first pre-trial conference sine die and orders the plaintiff to respond to the defendants' motion on June 20th, 2019, but the Court does not stay discovery (D.E. 55).

* June 10th, 2019: The plaintiff files (pursuant to Houston v. Lack) a motion for an extension of time to file his opposition to the defendants' motion to dismiss (D.E. 59).

* June 20th, 2019: Mrs. Dana E. Gottesfeld files D.E. 57 as next friend to the plaintiff, noting delays in the mail between The Court and the plaintiff and the efforts of the plaintiff to prevent those delays, while asking The Court to extend the

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

plaintiff's June 20th, 2019, deadline to oppose the defendants' motion. The Court had not yet received the plaintiff's June

10th, 2019, motion for an extension of time to file.

  * June 25th, 2019: The Court endorses (D.E. 58) Mrs. Gottesfeld's letter motion (D.E. 57) and extends the plaintiff's time

to file until July 11th, 2019.

  * July 2nd, 2019: After twenty-one (21) days, The Court receives the plaintiff's June 10th, 2019, motion for an extension

of time to file (D.E. 59).

  * July 2nd, 2019: The Court grants the plaintiff's motion to extend his time to file his opposition to the defendants' motion

to dismiss until August 31st, 2019 (D.E. 62).

  * August 5th, 2019: The Court denies the plaintiff's motions for preliminary relief pursuant to Fed. R. Civ. P. 65 and denies

without prejudice the appointment of pro-bono counsel (D.E. 66).

  * August 5th, 2019: The plaintiff files (pursuant to Houston v. Lack) for an extension of time to file his opposition, a

motion for a temporary restraining order protecting his right to publish, and a motion for a declaratory judgment protecting

his right to publish.

  * August 8th, 2019: The plaintiff mails his requests for admissions pursuant to Fed. R. Civ. P. 5, Fed. R. Civ. P. 26, and

Fed. R. Civ. P. 36.

  * August 11th, 2019: The plaintiff mails his notification of the qui-tam part of the instant case to The Honorable U.S.

Attorney General William Barr. Please see Exhibit 16 hereto, Martin Gottesfeld, qui-tam notification to the U.S. attorney

general (August 11th, 2019).

  * August 12th, 2019: The Court receives the plaintiff's motion for an extension of time to file his opposition (D.E. 67),

motion for a temporary restraining order protecting his right to publish (D.E. 68), and motion for a declaratory judgment

protecting his right to publish (D.E. 69).

  * August 13th, 2019: Ms. Michelle Malkin files a letter motion to Judge Gardephe via Mrs. Dana E. Gottesfeld pursuant to

Fed. R. Civ. P. 24, seeking to quote and publish the plaintiff and his work (D.E. 72 at 2).

  * August 15th, 2019: The Court grants the plaintiff's motion for an extension of time to file until October 15th, 2019, with

defendants' reply due to November 5th, 2019 (D.E. 73).

  * August 19th, 2019: The plaintiff for the first time receives a copy of The Court's order denying his requests for

preliminary relief (D.E. 66) even though markings indicate that it was received by the FCI Terre Haute mail room a week

earlier on August relief 12th, 2019 (please D.E. 74 at 6), and the plaintiff immediately files (pursuant to Houston v. Lack) a

motion for an extension of time to file a motion for reconsideration pursuant to Loc. Civ. R. 6.3 (D.E. 74).

  * August 24th, 2019: The plaintiff sends Form 95s for a separate but relevant future case to the U.S. attorney general's

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

office and FBI headquarters. Please see <u>Exhibit 7</u> hereto.

   * August 26th, 2019: The plaintiff Notice of Qui Tam Action is delivered to the attorney general's office. Please see <u>Exhibit 16</u> hereto at 10.

   * August 28th, 2019: The Court receives the plaintiff's motion from August 19th, 2019, requesting an extension of time to file a motion for reconsideration (<u>D.E. 74</u>).

   * September 4th, 2019: The Court receives the plaintiff's reply (<u>D.E. 75</u>) to the defendants' opposition (<u>D.E. 70</u>) to his earlier motions for a temporary restraining order (<u>D.E. 68</u>) and declaratory judgment (<u>D.E. 69</u>).

   * September 6th, 2019: The plaintiff's Form 95 for a separate but relevant future case reaches the U.S. Department of Justice. Please see <u>Exhibit 7</u> hereto at 6, 13, and 15.

   * September 9th, 2019: The plaintiff's Form 95 for a separate but relevant future case reaches FBI headquarters. Please see <u>Exhibit 7</u> hereto at 11 and 14.

   * September 10th, 2019: The plaintiff's requests for admissions are admitted pursuant to <u>Fed. R. Civ. P. 36(a)(3)</u>, <u>Fed. R.</u>

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 11:46:33 AM

Civ. P. 36(b), and Fed. R. Civ. P. 6(d).

* September 13th, 2019: The Court receives the plaintiff's Notice of Likely Shenanigans (D.E. 76), describing unlikely events with his mail to counsel for potential intervenor The Intercept.

  * September 18th, 2019: The U.S. Department of Justice formally acknowledges its September 6th, 2019, receipt of the plaintiff's Form 95. Please see Exhibit 7 hereto at 15.

  * September 27th, 2019: The Court receives the plaintiff's notification pursuant to Loc R. Civ. P. 1.5(b)(5) and N.Y. R. Prof. Conduct 3.3(a)(3), 3.4(a)(4), and 4.1 (22 NYCRR 1200.0) (D.E. 78).

  * October 1st, 2019: The Court receives the plaintiff's Supplemental Motion For a Temporary Restraining Order Protecting Plaintiff's Right To Publish (D.E. 79) after fifteen (15) days (filed pursuant to Houston v. Lack on September 16th, 2019).

  * October 1st, 2019: The Court receives the plaintiff's Second Supplemental Motion For a Temporary Restraining Order Protecting Plaintiff's Right To Publish (D.E. 80) after nine (9) days (filed pursuant to Houston v. Lack on September 22nd, 2019).

  * October 2nd, 2019: The plaintiff files (pursuant to Houston v. Lack) a motion for an extension of time to file his opposition to the defendants' motion to dismiss (D.E. 51 and 52), seeking an additional two (2) weeks due to a number of factors beyond his control.

  * October 14th, 2019: The plaintiff files (pursuant to Houston v. Lack) a motion for a hearing should his opposition to the defendants' motion to dismiss (D.E. 51-52) fail to appear on time without reason.

  * October 15th, 2019: The Court receives the plaintiff's October 2nd, 2019, motion for an extension (D.E. 81).

  * October 29th, 2019: The Court receives the plaintiff's Third Supplemental Motion For a Temporary Restraining Order Protecting Plaintiff's Right To Publish (D.E. 84) filed pursuant to Houston v. Lack on October 20th, 2019.

  * October 29th, 2019: The Court receives the plaintiff's motion for an extension of time to file this opposition (D.E. 85), filed pursuant to Houston v. Lack on October 20th, 2019, citing actions and omissions of agents of the defendants.

  * October 30th, 2019: The plaintiff files (pursuant to Houston v. Lack) a motion for an extension of time to file his opposition tot he defendants' motion to dismiss (D.E. 51 and 52), seeking an additional two (2) weeks due to failure of agents of the instant defendants to make vital commissary deliveries to the plaintiff.

  * October 31st, 2019: The instant defendants oppose (D.E. 86) the plaintiff's request for an extension of time to file (D.E. 85).

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------------

* November 6th, 2019: The plaintiff receives and replies pursuant to Houston v. Lack on the same day to the defendants

opposition (D.E. 86) to his request for an extension of time to file (D.E. 85).

* November 18th, 2019: The plaintiff files (pursuant to Houston v. Lack) the instant opposition, his claim for mandatory

judicial notice pursuant to Fed. R. Evid. 201(c)(2) of his requests for admissions, his motion to compel the delivery without

punishment of the his essential documents, his motion to add defendants, and his motion for an extension of time to file

exhibits one hundred one (101) and higher hereto.

No discovery conference has been held as contemplated by Fed. R. Civ. P. 26(f), no initial disclosure has been made as

contemplated by Fed. R. Civ. P. 26(a)(1), no protective order has issued as contemplated by Fed. R. Civ. P. 26(c), and no

stay of discovery has been ordered. The instant defendants have not contacted by the instant plaintiff outside of service of

docketed filings. No party has complained about service of process pursuant to Fed. R. Civ. P. 5 or requested extensions of

time to answer out-of-court requests.

The instant case is exempt under Fed. R. Civ. P. 26(a)(1)(B)(iv) from the requirement of an initial disclosure, and exempt

under Fed. R. Civ. P. 26(d)(1) from the requirement of an initial discovery conference.

## III. ARGUMENTS

A wide array of both general and specific legal arguments and standards apply to the instant case. For clarity, the plaintiff

has subdivided them in this section and noted their overlap in some places.

## A. LEGAL STANDARDS

## 1. Legal Standards For the Pro Se Complaint

Specific standards apply to pro se complaints, including the following:

## a. The Pro Se Complaint and Pleadings Must Be Read For Their Strongest Arguments.

"It is well established that the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the

strongest arguments that they suggest.'" Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting

Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) and collecting cases).

Further, as held Id. at 475, quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) and collecting cases:

|This policy of liberally construing pro se submissions is driven by the understanding that "[i]mplicit in the right of self-
|representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from
|inadvertent forfeiture of important rights because of their lack of legal training."

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------------

Moreover, as held in Thompson v. Choinski, 525 F.3d 205, 209-10 (2d Cir. 2007) (internal citation omitted to Moorish

Science Temple of America, Inc. v. Smith, 693 F.2d 987, 989 (2d Cir. 1982)):

> If a pro se litigant pleads facts that would entitle him [or her] to relief, that petition should not be dismissed because
> the litigant did not correctly identify the statute or rule of law that provides the relief he [or she] seeks. Thus, even if
> the district court is correct that [the plaintiff] should have styled some of his claims as a civil rights action, if the facts
> alleged entitled him to relief the court should have treated the claims as properly pleaded, or at least given the
> petitioner leave to file an amended pleading identifying the proper source of law without dismissing the action.

The plaintiff is not required to elect between remedies. Id. citing Lee v. Winston, 717 F.2d 888, 893 n. 4 (4th Cir. 1983).

Further, "The rule favoring liberal construction of pro se submissions is especially applicable to civil rights claims." Ortiz v.

McBridge, 323 F.3d 191, 194 (2d Cir. 2003).

Fed. R. Civ. P. 8(e) further provides, "Pleadings must be construed so as to do justice."

## b. The Pro Se Plaintiff Must Be Granted Leave To Amend To Fix Non-Fatal Flaws.

Dovetailing with the previous standard, a pro se plaintiff must be granted leave to amend a complaint to fix non-fatal

flaws. Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir. 1999):

> Although the language of [28 U.S.C. Sec.] 1915 is mandatory, stating that "the court shall dismiss the case" in the
> enumerated circumstances, we conclude that a pro se plaintiff who is proceeding in forma pauperis should be afforded
> the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a
> claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would
> succeed in stating a claim.

Thus, the plaintiff should be allowed leave to amend his complaint, to add necessary defendants, including The United

States, and to broaden and add specificity to his claims wherever necessary to sustain them or preserve his rights.

## 2. Local Civil Rule 56.1

Though the defendants seek relief under Fed. R. Civ. P. 56, i.e. summary judgment, they fail to comply with Loc. Civ. R.

56.1. This failure is intentional given that the defendants' common counsel is an assistant U.S. attorney in The Southern

District of New York and is therefore expected to be fluent with the local rules, unlike the unrepresented non--college-

educated incarcerated plaintiff.

Loc. Civ. R. 56.1(a) required the defendants to annex a "short and concise statement, in numbered paragraphs, of the

material facts as to which the moving part[ies] contend[] there is no genuine issue to be tried." The rule dictates, "Failure

to submit such a statement may constitute grounds for denial of the motion."

The plaintiff moves The Honorable Court to deny the defendants' motion in its entirety with prejudice for intentional

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

failure to comply with Loc. Civ. R. 56.1(a) in a case against a pro-se prisoner plaintiff.

The Court, however, "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a [Rule 56.1] statement." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2000) (quoting Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000)). In one such case, The Second Circuit upheld The Court's discretion to "overlook the defendants' failure to file a Rule 56.1 statement," noting that the plaintiff in that case did "not explain how she may have been harmed or prejudiced by the defendants' oversight." Alexander v. Bd. of Educ., 648 Fed. Appx. 118, 121-22 (2d Cir. May 6, 2016).

The instant plaintiff, as an unrepresented incarcerated party, moves The Honorable Court, should it choose to overlook the defendants' deliberate choice to flout the local rules of its district, to first notice the plaintiff and provide him an opportunity to answer any material fact it would otherwise find supportive of a grant of summary judgment against him, thus making it as if the defendants had obeyed Loc. Civ. R. 56.1(a). Otherwise, the unrepresented incarcerated plaintiff would be prejudiced by any such grant. This prejudice is self-evident. If the defendants had complied with the local rule, then the plaintiff would have been on notice to contradict each specific numbered item in their Rule 56.1 statement and he would have done so. Thus, any failure by the plaintiff due to the defendants' omission of a Rule 56.1 statement that results in a disposition unfavorable to the plaintiff is prejudicial to him with regard to his ability to sustain the instant case.

The plaintiff notes that simply allowing the defendants to provide a Rule 56.1 statement now would also prejudice the plaintiff by allowing the defendants to act out-of-turn. The defendants were required to provide their Rule 56.1 statement before the plaintiff filed his opposition to their motion. They cannot now be allowed to gain a tactical advantage from the information contained in the plaintiff's opposition in order to better formulate their Rule 56.1 statement. The plaintiff, for example, has already requested admissions with regards to the defendants' motion and he should not be forced to take further discovery at this late stage of summary judgment in order to refute a late and out-of-turn Rule 56.1 statement. Such an allowance would produce an incentive for movants in the district to intentionally withhold their Rule 56.1 statements until after the respondents' oppositions, and would, in effect, remake the Loc. Civ. R. 56.1 from its original useful purpose.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 11:53:31 AM

3. Heck v. Humphrey

   The plaintiff cannot and does not use the instant case as a collateral attack on the judgment entered against him by the

district court in Massachusetts in the case of United States v. Gottesfeld, 16-cr-10305-NMG. Please see Heck v. Humphrey,

512 U.S. 477 (1994) and Allamby v. United States, 207 Fed. Appx. 718 (2d Cir. November 7, 2006).

   Indeed, for clarity's sake, the plaintiff would have preferred to wait for the final outcome of his criminal proceedings

before filing any action that could be perceived or misperceived as tangential thereto. The plaintiff, however, simply does

not have that option because statutes of limitation are elapsing. The plaintiff notes cases including Hadid v. City of New

York, 730 Fed. Appx. 68 (2d Cir. April 18, 2018) wherein pro-se plaintiffs, due to their interpretation of Heck v. Humphrey,

erroneously waited for their invalid convictions to be overturned prior to commencing civil actions related thereto and

resulting therefrom only to have their civil actions dismissed as time-barred, because, like the instant plaintiff's instant

causes of action, they would not have invalidated those criminal convictions.

   The plaintiff notes for purposes of illustration that he would have filed the same claims in the instant case in The Southern

District of New York regardless of the outcome of United States v. Gottesfeld in Massachusetts. While the district court in

Massachusetts had sole initial jurisdiction over United States v. Gottesfeld, it could not have jurisdiction over the instant

claims because they occurred outside its vicinage. Likewise, while the district court in The Southern District of New York has

territorial jurisdiction of the instant case, it has no jurisdiction over United States v. Gottesfeld, which lies outside its

vicinage.

   The plaintiff, regardless of the judgment entered against him in Massachusetts, was entitled to have his rights upheld to

petition the government for the redress of his grievances, to freedom of the press, due process, access to counsel, familial

and marital consortium, freedom of association, a public trial, and freedom from cruel and unusual punishment. These rights

include his ability to protest the immorality of the choice of the government and its agents to prosecute him in the first

place given their wide prosecutorial discretion, and also include his right to protest the social and financial connections

between the federal judicial officers who passed judgment regarding the plaintiff and those who gained either financially or

otherwise as a result. As cited above, "Under our system of government, the primary check against prosecutorial abuse is a

political one." In re Grand Jury Investigation, 315 F. Supp. 3d 602, 612 (D.D.C. 2018) (citing Morrison v. Oliver, 487 U.S.

654, 728 (1988) (Scalia, J., dissenting)).

   Upholding these rights is required whether or not the judgment entered against the plaintiff in United States v. Gottesfeld

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

is valid. And the statutes of limitation are running for the plaintiff to vindicate these rights while he continues to litigate United States v. Gottesfeld in The U.S. Court of Appeals for The First Circuit.

## 4. Fed. R. Evid. 201(c)(2) and Exhibits Hereto

The Court "must take judicial notice [of an adjudicative fact] if a party requests it and the court is supplied with the necessary information," Fed. R. Evid. 201(c)(2) and Fed. R. Evid. 201(a). The plaintiff hereby formally requests pursuant to Fed. R. Evid. 201(c)(2) that The Honorable Court take judicial notice of all the exhibits hereto. For convenience, the plaintiff herewith provides a list of these exhibits as Appendix 1 hereto.

Many of the exhibits hereto provided herewith by the plaintiff are from newspapers and periodicals, including The Intercept (Exhibit 2), Rolling Stone (Exhibit 3), The New American (Exhibit 5), the yearly (periodical) Leadership Directory (Exhibit 8), The Huffington Post (exhibits 114, 128-129, 132-135, 137, 142, and 144), TheBlaze (Exhibit 116), Red State (Exhibit 120), Info Wars (Exhibit 121), The Boston Globe (Exhibit 122), The Washington Post (Exhibit 123), Newsweek (exhibits 130 and 131), Shadowproof Press (Exhibit 136 and 145), and Massachusetts Lawyers Weekly (Exhibit 141). The plaintiff notes in regards to these exhibits and others from newspapers or periodicals Fed. R. Evid. 902(6), mandating that "Printed material purporting to be a newspaper or periodical" is "self-authenticating" and requires "no extrinsic evidence of authenticity in order to be admitted."

Many of the exhibits hereto provided herewith by the plaintiff are official publications as contemplated by Fed. R. Evid. 902(5), i.e. "A book, pamphlet, or other publication purporting to be issued by a public authority," and are thus also "self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted." These include a pattern jury instruction published by the United States Court of Appeals for The First Circuit (Exhibit 6), FBOP program statements (exhibits 15 and 19), sections of the Code of Federal Regulations (exhibits 4, 10-14, 18, 23, and 28-30), publications from the Government Printing Office (exhibits 106 and 107), and printed reports published by the U.S. Government Accountability Office (exhibits 108-110).

Similarly, exhibits 103 and 104 hereto are videos of hearings before The U.S. House of Representatives Committee on Education and Labor and are published officially by the U.S. Congress. The testimony therein is sworn under penalty of perjury. Fed. R. Evid. 902(5) thus also applies thereto.

Should The Honorable Court be left with any questions regarding the authenticity, relevancy, or admissibility of any of the exhibits hereto provided herewith by the plaintiff, then the plaintiff requests an opportunity to be heard on any such issue at an evidentiary hearing.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

5. The Role of the U.S. Attorney

In Berger v. United States, 295 U.S. 78, 88 (1935), The U.S. Supreme Court admonished:

|The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose
|obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a
|criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very
|definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may
|prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty
|to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction
|as it is to use every legitimate means to bring about a just one.

Then, The Supreme Court noted in Brady v. Maryland, 373 U.S. 83, 87 (1963):

|Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of
|justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the
|proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in
|the courts."

6. The Appearance of Justice

As an overarching legal tenet, "[T]o perform its high function in the best way, 'justice must satisfy the appearance of justice.'" In re Murchinson, 349 U.S. 133 (1955) (quoting Offutt v. United States, 348 U.S. 11 (1954)).

The plaintiff raises this issue as this stage of the instant litigation not as an allegation of partiality nor of an appearance thereof, nor any perceived or actual conflict of interest, nor misconduct, but rather in reflection upon much of the history that both predates the filing of the instant case and proximately resulted therein. The plaintiff looks forward to adjudication of the instant case that all parties and the public will consider well-argued, fairly-played, thoroughly-briefed, impartially-decided, and in which all concerned can have full confidence.

This is especially important in the instant proceedings due to the questions of integrity that pervaded and persist from the prior criminal litigation in The District of Massachusetts that gave rise to the instant case.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/16/2019 12:31:12 PM

<u>B. THE PLAINTIFF EXHAUSTED THE AVAILABLE ADMINISTRATIVE REMEDIES.</u>

<u>1. The Defendants' Assertions and Admissions Show the Plaintiff Exhausted the Available Administrative Remedies.</u>

   Defendants aver that the plaintiff failed to comply with <u>42 U.S.C. Sec. 1997e(a)</u>, i.e. the requirement enacted in <u>The</u>

<u>Prison Litigation Reform Act</u> (herein also the "<u>PLRA</u>") that a prisoner must exhaust "such administrative remedies as are

available" prior to commencing a federal action (<u>D.E. 52</u> at 12 Sec. II). In support of this supposed affirmative defense, the

defendants included a <u>DECLARATION OF JOY AASSIDDAA</u> (<u>D.E. 52-1</u>), dated May 16th, 2019, reciting aspects of the normal

FBOP administrative-remedy procedures from <u>28 C.F.R. Sec. 542</u> and stating under penalty of perjury, "the BOP's

computerized database" is called "SENTRY" (<u>D.E. 52-1 at 1 p.2</u>), that Aassiddaa, acting in her "capacity as Legal Assistant"

had "reviewed the SENTRY administrative remedy records pertaining to Plaintiff in this action" (<u>Id.</u> at 2 p.8), and, "Based

upon this review, Plaintiff has failed to file any administrative remedies at any time during his incarceration at a BOP

facility. I have attached a true and correct copy of the SENTRY Administrative Remedy Generalized Retrieval for Plaintiff as

Exhibit A" (<u>Id.</u> p.9, emphasis added).

   This "true and correct" copy of the SENTRY administrative-remedy generalized retrieval is presumably <u>D.E. 52-2</u>, date-

and-time stamped May 8th, 2019, at 9:43 A.M.--some eight (8) days prior to Aassiddaa's declaration. This time difference,

moreover, appears neither accidental nor unrelated to the defendants' claim of non-exhaustion.

   Indeed, a report compiled from SENTRY on the plaintiff on May 16th, 2019---the date of Aassiddaa's declaration under

penalty of perjury that <u>D.E. 52-2</u> was at that time unequivocally "true and correct"---would have revealed the presence of BP-

9s filed by the plaintiff at FCI Terre Haute on May 6th, 2019, and entered into the system on May 8th, 2019. Please see

<u>Exhibit 17</u> hereto; R. Eisele; SENTRY report for Martin S. Gottesfeld; Federal Bureau of Prisons (June 24th, 2019, 3:00 P.M.).

   Aassiddaa's declaration to The Court dated May 16th, 2019, stating, "Plaintiff has failed to file any administrative

remedies <u>at any time</u> during his incarceration at a BOP facility" (<u>emphasis</u> added) was thus objectively wrong and

demonstrably misleading. Additionally, the copy of the SENTRY administrative-remedy generalized retrieval for the plaintiff

attached by Aassiddaa was not "true and correct" at the time Aassiddaa declared that it was under penalty of perjury, and

Aassiddaa likely knew so when she led The Court to believe---without caveats or qualifiers as to the report's date or what

Aassiddaa likely saw in SENTRY on the day of her declaration---that the report was unequivocally "true and correct" on May

16th, 2019, and all other times.

   As the plaintiff will now demonstrate, the presence of his 2019 administrative-remedy requests from FCI Terre Haute

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

speaks to the unavailability to him of the FBOP administrative-remedy procedures in 2016 and 2017 at MCC New York, and in 2019 at MDC Brooklyn and FTC Oklahoma, when he was held in the SHUs at each of these three (3) facilities. Please see RFA 18-20.

   Under Fed. R. Civ. P. 36(a)(3), the defendants have each individually admitted that shortly before the plaintiff was transferred out of MCC New York he asked for a quantity of ten (10) BP-8 forms from a member of his unit team who was acting in his official capacity as an agent of the FBOP and as an appropriate source of administrative-remedy forms under both 28 C.F.R. Sec. 542.14(c)(1) and FBOP Program Statement (herein also "FBOP PS") 1330.18 Sec. 8, and that this member of the plaintiff's unit team responded to the plaintiff by telling him, "I'm not giving you ten [(10)] BP-8s." Please see RFA 12; Exhibit 18 hereto, 28 C.F.R. Part 542, including 28 C.F.R. Sec. 542.14(c)(1) (retrieved September 2019); and Exhibit 19 hereto, FBOP PS 1330.18, which includes Sec. 8 thereof (retrieved September 2019).

   The plaintiff notes that the defendants requested a stay of discovery in the instant case on multiple occasions, including D.E. 29 at 2 n. 2, D.E. 52 at 33 Sec. V, and D.E. 53 at 3. The Honorable Court never issued such a stay, however, in addressing the requests of the defendants. Please see D.E. 34 and D.E. 55. As The Honorable Court is no doubt aware, it must allow discovery as to the issue of administrative-remedy exhaustion as per Hernandez v. Coffey, 582 F.3d 303, 305, 307-08 (2d Cir. 2009). The instant case is further exempted from the requirements of initial disclosure and an initial discovery conference pursuant to Fed. R. Civ. P. 26(a)(1)(B)(iv), Fed. R. Civ. P. 26(a)(3), Fed. R. Civ. P. 26(d)(1), and Fed. R. Civ. P. 26(f)(1). And, after the defendants noted they were "not willing to discuss settlement of this action," D.E. 53 at 3 n. 6, The Court postponed sine die its initial conference (D.E. 55), the purpose of which The Court previously indicated, D.E. 10 at 1, "is to discuss whether settlement is possible and to fix a discovery schedule."

   ~~And, after the defendants noted they "are not willing to discuss settlement of this action," D.E. 53 at 3 n. 6, The Court postponed sine die its conference to set a discovery schedule (D.E. 55), as The Court previously indicated the purpose of the conference would be, "The purpose of the conference is to discuss whether settlement is possible and to fix a discovery schedule," D.E. 10 at 1.~~

   Should the defendants move to withdraw their properly-obtained admissions, then the plaintiff notes the prejudice he would endure in otherwise having to establish these truths and that he would move for an evidentiary hearing to present evidence of this prejudice as a result of, among other things, the instant defendants transfer of him to a communications-management unit (CMU) where he has already faced unconstitutional retaliation from their agents in privity meant to punish his participation in the federal-court adjudication process. The plaintiff further notes that the defendants have responded to numerous filings and never before complained about service pursuant to Fed. R. Civ. P. 5(b)(2)(C). Please see docket report. Therefore they have waived any such issue. Further, any carelessness on the behalf of the U.S. attorney's office in

- Page 64 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------------

the handling of incoming mail pursuant to Fed. R. Civ. P. 5(b)(2)(C) is a clearly-insufficient reason to prejudice the plaintiff

in summary judgment by the withdrawal of properly-admitted facts and documents. The plaintiff further notes that agents of

the defendants maintain digital copies of all of his outgoing mail, with the possible (albeit unlikely exception) of his

privileged legal mail to his attorneys. Ergo, agents of the defendants possess irrefutable evidence that the plaintiff properly

mailed his requests for admissions to their common counsel as so stated in his accompanying claim for mandatory judicial

notice of those same admissions.

Still, should The Honorable Court allow the defendants to withdraw their admissions to the prejudice of plaintiff, the

plaintiff notes that he would immediately request subpoenas to identify his counselor while he was in the SHU at MCC New

York and the staff and other inmates whom he can call to testify as to each of the withdrawn admissions.

The defendants have each also admitted that the hand-drawn substitute BP-8 forms included in the plaintiff's requests for

admissions are authentic and that the plaintiff resorted to these forms in an effort to utilize the FBOP's administrative-

remedy program after FBOP staff denied him "ten [(10)] BP-8s." Please see RFA 13. The defendants also admitted that these

substitute forms were never filed in SENTRY, as is now separately confirmed by D.E. 52-2 and Exhibit 17 hereto. (The

plaintiff further notes that he requested copies of these hand-drawn substitute forms before the defendants filed their

instant motion. Please see Exhibit 20 hereto; Martin Gottesfeld and Dana Gottesfeld; electronic messages (April 17th, 2019,

April 22nd, 2019, and April 23rd, 2019).)

The defendants likewise admitted that as a standard practice and matter of course, FBOP unit team staff members

designated under both 28 C.F.R. Sec. 542.14(c)(4) and FBOP PS 1330.18 Sec. 8, specifically including the unit staff at the

SHUs at both MCC New York and MDC Brooklyn during the periods the plaintiff was at each respective facility, routinely fail

to log BP-8s and BP-9s they receive from inmates into the official systems used to log such requests. Please see RFA 14.

Such practices were also noted by award-winning journalist Barrett Brown in one of his published newspaper articles from

FBOP custody. Please see Exhibit 21 hereto at 3 (p.10-11); Barrett Brown; newspaper column about life in the FBOP;

publisher and date ascertainable upon request but unknown to ~~the name of~~ plaintiff at time of filing.

The defendants further each admitted that an incident took place in the MCC New York law library that precluded the

plaintiff from using the FBOP's administrative-remedy process by cutting off his ability to do the legal and procedural

research required to make proper use of the administrative-remedy process and that the plaintiff's subsequent efforts to

resolve the aforementioned incident through discussions with the special investigative services (S.I.S.) personnel of MCC

New York were more than reasonably sufficient and yet utterly fruitless. Please see RFA 15. This is the pornography incident

detailed above. In one (1) of the plaintiff's hand-drawn BP-8s included and admitted Id., he requested to speak with S.I.S. As

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

noted above, however, the plaintiff received likely the only response he ever would to his final attempt to utilize the FBOP's

administrative-remedy system when he was told to pack his property on Saturday, February 4th, 2017, for transfer out of

MCC New York.

   The defendants admitted that in totality, as a direct and proximate result of the acts and omissions of themselves and

their parties in privity, the FBOP's administrative-remedy procedures were totally, completely, and irrevocably rendered

unavailable to the plaintiff for use addressing any and all events and circumstances arising out of his confinement in the SHU

at MCC New York. Please see RFA 16.

   The plaintiff notes that prior to the relevant admission by the defendants he attempted to obtain evidence that the facility

to which the defendants transferred the plaintiff, The Plymouth County Correctional Facility (herein also "PCCF"), operated

by Plymouth County, Massachusetts, Sheriff Joseph McDonald Jr., does not participate in the FBOP's administrative-remedy

program. His request for information sent to PCCF without a subpoena duces tecum, however, went unanswered. Please see

Exhibit 22 hereto; Martin Gottesfeld; request for information to the Plymouth County Correctional Facility (September 2019)

(date approximated from memory). Should the defendants be allowed to withdraw their admissions and refuse to stipulate

that PCCF does not participate in the FBOP administrative-remedy program, then the plaintiff notes that he would request

leave and time to issue a subpoena duces tecum to PCCF to confirm this fact.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/16/2019 12:32:56 PM

<u>2. The Defendants Must Be Estopped From Raising Non-Exhaustion.</u>

   In <u>Williams v. Priatno</u>, 829 F.3d 118 (2d Cir. 2016), the Second Circuit discussed the meaning of the word "available" in

the statute <u>42 U.S.C. Sec. 1997e(a)</u> in light of The Supreme Court's then-recent decision in <u>Ross v. Blake</u>, 136 S. Ct. 1850

(2016). These cases control here. The Second Circuit echoed The Supreme Court in noting, "the behavior of the defendants

may render administrative remedies unavailable." <u>Williams v. Priatno</u> at 123.

   Both The Second Circuit and The Supreme Court noted that prison officials may "thwart inmates from taking advantage of

a grievance process." <u>Id.</u> at 124 quoting <u>Ross v. Blake</u> at 1860. The plaintiff was thus "thwart[ed]" when he was flatly denied

a quantity of ten (10) BP-8 forms and then transferred out of FBOP custody both within days of his attempts to file his first

hand-drawn substitute forms (now admitted as genuine and authentic by the defendants) and before he ever received an

answer to those substitute forms. Please see <u>RFA 17</u>.

   A quantity of ten (10) BP-8 forms was necessary for the plaintiff to present the issues in the instant case and ensure their

consideration in the face of arbitrary and capricious FBOP actions. Please see <u>Fernandini v. United States</u>, 2017 U.S. Dist.

LEXIS 117920, 1:15-cv-3843-GHW (S.D.N.Y. July 26, 2017) at *16 n. 4:

> |The regulations governing this [FBOP] administrative [remedy] process note that an inmate may only grieve "a single
> |complaint or a reasonable number of closely related issues" at one time. 28 C.F.R. [Sec.] 542.14(c) ("If the inmate
> |includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and
> |the inmate shall be advised to use a separate form for each unrelated issue.")

   The defendants have already demonstrated in their oppositions to the plaintiff's motions for temporary restraining orders

that they refuse to consider matters that are closely related as being such. For example, the defendants continue today to

retaliate against the plaintiff due to his exercise of his <u>First Amendment</u> rights and to interfere with the plaintiff's ability to

conduct journalism and publish his writing by administratively detaining the plaintiff without the administrative hearings and

written administrative orders required by Due Process and federal regulations, just as they did at MCC. The defendants, for

example, continue detaining the plaintiff in a communications-management CMU (herein also "CMU") without <u>Due Process</u>

and in direct violation of the findings of The U.S. Court of Appeals in <u>Aref v. Lynch</u>, 833 F.3d 242 (D.C. Cir. 2016). The

defendants nonetheless averred in <u>D.E. 70</u> at 1 that their past behavior and their current behavior have "nothing whatsoever

to do with" each other, even as they escalated their retaliation against the plaintiff---who in three (3) years in custody had

never before been found culpable of a single inmate disciplinary charge, communications-related or otherwise---by placing

him in a highly-restrictive communications-management unit where they then retaliated against him for participating in

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

federal-court proceedings. The defendants thus prefer to argue that closely-related matters are not closely related in order

to play jurisdictional games and the plaintiff thus required a quantity of ten (10) BP-8s at MCC in order to preclude future

controversy as to his methods of exhaustion.

  Further, "[A] claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted

grievance." Gonzalez v. Morris, 2018 U.S. Dist. LEXIS 42534, 9:14-cv-1438 (GLS/DEP) (N.D.N.Y. March 15, 2018) at *8

quoting Simmons v. Robinson, 2011 U.S. Dist. LEXIS 337, No. 07 Civ. 7383, 2011 WL 31066 (S.D.N.Y. January 4th, 2011)

(citing Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2008)) at *4. All of the plaintiff's claims in the instant case are closely

related in that they arise from the defendants' retaliatory and unconstitutional acts against the plaintiff aimed at quelling his

protected speech to Rolling Stone and other national and international media outlets as a means of petitioning for the

redress of his grievances. Please see RFA 23-27.

  After Ross v. Blake was decided, This Court reiterated, "a defendant may be estopped from asserting non-exhaustion

where he takes some action to inhibit an inmate from accessing available administrative remedies." Lowman v. Baird, 2017

U.S. Dist. LEXIS 205965, 16-cv-6518-VSB (S.D.N.Y. December 14, 2017) (internal citations omitted) at *18. This Court also

reiterated Id. the holding of The Second Circuit in Ruggiero v. County of Orange, 467 F.3d 170, 178 (2d Cir. 2006) (emphasis

in original, other emphasis added):

> |A prisoner's failure to exhaust can be excused if the defendants' actions estop them from presenting the failure to
> |exhaust as a defense. Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004), or their actions render grievance
> |procedures de facto unavailable, Hemphill [v. New York, 380 F.3d 680, 687 (2d Cir. 2004)]...
> |In our prior cases recognizing that defendants' actions may estop them from raising non-exhaustion as a defense, each
> |prisoner alleged that defendants took affirmative action to prevent him from availing himself of grievance procedures.
> |E.G., Ziemba[ v. Wezner, 366 F.3d 161, 162 (2d Cir. 2004)] (beating, threatening, and denying grievance forms and
> |writing implements);

  In light of the defendants' conduct denying the plaintiff BP-8 forms in the instant case, then within a short period failing to

file and respond to his hand-drawn substitute BP-8 forms before transferring him outside of their custody, the plaintiff

moves The Honorable Court to estop the defendants from presenting their claim of non-exhaustion.

  Alternatively, the plaintiff moves The Honorable Court to find that the FBOP's administrative-remedy procedures were

unavailable to him due to the frank refusal over many days, as noted at the top of his hand-drawn substitute BP-8 forms and

RFA 13, of the defendants' staff---the only such staff authorized under 28 C.F.R. Sec. 542.14(c)(1)---to provide him with

BP-8s, their failure to meet with him after the law-library incident (RFA 15) and their failure therefore to ensure that he had

access to reference materials on both the FBOP administrative-remedy procedure and legal principles of exhaustion while he

was still at MCC and not yet barred from filing administrative-remedy requests due to his absence from FBOP custody. No

FBOP policy allowed the staff designated under 28 C.F.R. Sec. 542.14(c)(1) to deny the plaintiff and other inmates

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

administrative-remedy forms and no written policy limits the number of forms an inmate may request.

Further support for an estoppel, a finding of unavailability, or both can be found in the vicinage's cases documenting a years-old and well-established course of conduct at MCC persisting from before the plaintiff's arrival there until today whereby the FBOP's administrative-remedy procedures are systematically rendered unavailable because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." LionKingZulu v. Jayne, 714 Fed. Appx. 80, 80-81 (2d Cir. March 13, 2018) (citing Williams v. Priatno at 123-24 (quoting Ross v. Blake at 1859-60)).

In Rivera v. Fed. Bureau of Prisons, 2019 U.S. Dist. LEXIS 45082, 17 Civ. 5103 (GBD) (DCF) (S.D.N.Y. March 15, 2019) at *7-8, the plaintiff attempted to file numerous administrative-remedy forms with his counselor at MCC, yet according to Aassiddaa none of them appeared in SENTRY even though the Court inferred that the warden responded to them.

In Cannonier v. Skipper-Scott, 2019 U.S. Dist. LEXIS 27749, 18 Civ. 2383 (LGS) (S.D.N.Y. February 20, 2019) at *3-4 and 11, the plaintiff asked for a BP-8 while at MCC, but a career FBOP officer with at least a decade of experience instead gave him a BP-9, causing the plaintiff's administrative-remedy request to be rejected for failure to first timely file a BP-8.

In another case against instant Defendant Tatum, i.e. Ramirez v. Tatum, 2018 U.S. Dist. LEXIS 214034, 17 Civ. 7801 (LGS) (S.D.N.Y. December 19, 2019) at *9-10, the plaintiff repeatedly asked for administrative-remedy forms and was denied for weeks before the forms he was eventually given and which he tried to file disappeared after he turned them in to MCC staff.

In Morgan v. Ward, 2016 U.S. Dist. LEXIS 12695, 1:14-cv-7921-GHW (S.D.N.Y. February 2, 2016) at *15-18, the plaintiff was refused BP-8s by MCC staff and then given confusing advice that resulted in the FBOP rejecting his BP-10 and BP-11 as "untimely."

In Correa v. Hastings, 2014 U.S. Dist. LEXIS 97637, 13-CV-05862 (PAC)(SN) (S.D.N.Y. July 16, 2014) at *24-31, the plaintiff was misled about administrative-remedy procedures by MCC staff, confusing FBOP documentation, and his lawyer declined to help him.

In Lewis v. Eldridge, 2016 U.S. Dist. LEXIS 55928, 13-cv-01485 (ALC) (S.D.N.Y. April 27, 2016) at *17, the plaintiff swore that she "did file grievances [and] the defendant is just not mentioning or disclosing them."

The Honorable Court should send a clear signal of disapproval of this longstanding course of conduct, about which the district bench has now ruled many times in isolation. The PLRA's exhaustion requirement is meant to reduce the quantity and increase the quality of inmate lawsuits and to ensure that prison officials are first given a chance to remedy problems on their merits before suits are filed. Woodford v. NGO, 548 U.S. 81, 93, 94 (2006). The exhaustion requirement is not meant to be abused by prison officials who are typically well-represented parties in federal civil-rights litigation against pro se

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

incarcerated plaintiffs with limited education and even more limited access to legal resources, as is the situation in the instant case.

The FBOP's choice of "SENTRY" as the name of its adminstrative-remedy request database, moreover, is revelatory of its

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.,</u> 18-cv-10836-PGG-GWG
DATE: 11/16/2019 12:45:04 PM

true intended purpose. If that true intended purpose had been to record accurately requests for administrative remedies then the name "SCRIBE" would have been a better fit. If its true intended purpose had been to aid in the investigation of reports of legal, regulatory, and policy violations, staff misconduct, malpractice, etc., then "WATSON" or "SHERLOCK" would have been apt. In reality, however, the true purpose of "SENTRY" is to frustrate attempts made by inmates in good faith to gain access to the courts for litigation.

The <u>Paperback Oxford English Dictionary 660 (7th ed. 11th imp. 2012)</u> defines "sentry" as follows (<u>emphasis</u> in original, <u>other emphasis</u> added):

Isentry <u>n</u>. (pl. <u>sentries</u>) a soldier stationed to keep guard or <u>to control access to a place</u>.

Courts have found that interpreting the plain meaning of a word like "sentry" ought to be done in accordance with how people "use the word in everyday parlance." <u>Munoz-Gonzalez v. D.L.C. Limousine Serv.,</u> 904 F.3d 208, 219 (2d Cir. 2018) (citing <u>Mohamed v. Palestinian Auth.,</u> 566 U.S. 449, 454 (2012)). In everyday parlance, a sentry is deployed to keep unwanted people out of place, including by deadly force. This is especially true when the U.S. government uses the word "sentry," as it does in the instant case. A thorough review of federal case law produced eighty (80) cases where the words "sentry" or "sentries" were used in just such a context. While the words also appeared in other contexts, these other contexts were by far less common, especially in government uses. Please see <u>Exhibit 1</u> hereto at 1 (p.9) and <u>APPENDIX 2: LIST OF "SENTRY" CASES</u> for the full list of these eighty (80) cases drawn from U.S. district courts and circuit courts across the nation, as well as the U.S. Supreme Court.

These uses of "sentry" and "sentries" to restrict access go back over a century. Please see <u>In re Winder,</u> 30 F. Cas. 288 (1st Cir. October 1862, Term) (quoting Benjamin F. Bayley, sheriff, Suffolk County, in execution of a writ of habeas corpus), "Should the sentry or party with whom you first communicate refuse you permission to see Colonel Dimmick..."

The two (2) most common uses of the terms "sentry" and "sentries" in the case law are by the military, used to guard entrances to bases and primarily to keep people out of bases, and by the courts themselves policing entrance to their forums for claims, claimants, witnesses, evidence, and causes of action--the exact same type of use employed, though largely illegitimately, by the FBOP. Please see, for example, <u>Farrell v. United States,</u> 167 F.2d 781, 782 (2d Cir. 1948), "The port area was enclosed and kept guarded by sentries at each of five [(5)] entrance gates." Please see also <u>In re Namanda Direct Purchaser Antitrust Litig.,</u> 331 F. Supp. 3d 152, 168-69 (S.D.N.Y. 2018) (quoting <u>Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,</u> 769 F. Supp. 2d 269, 281-82 (S.D.N.Y. 2011) (internal citations omitted) (quoting <u>Daubert v. Merrell</u>

- Page 71 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), "the United States Supreme Court confirmed that trial courts should serve

as sentries, preventing juries from being overwhelmed by unsupportable speculation cloaked as expertise." Please see also

Grayton v. Ercole, 691 F.3d 165, 171 (2d Cir. 2011) (quoting People v. Johnson, 93 N.Y.2d 254, 258; 711 N.E.2d 967; 689

N.Y.S.2d 689 (1999)), "A Geraci 'hearing is no mere formality... [it] plays the valuable role of sentry, admitting statements

not subject to cross-examination only where the requisite link between the defendant's misconduct and the witness's silence

has been established."

   Other uses by federal courts include United States v. Ray, 294 F. Supp. 532, 538 (S.D. Fla. 1969), "The entire reef

formation stands as a sentry between the coast line and the open sea, protecting grass beds where many varieties of fish

feed." And Staton v. United States, 566 F. Supp. 174, 177 (W.D. Vir. 1983), "The hunters stationed sentries along the Park

boundary. Their duty was to divert dogs from forbidden territory." Please see also Fausto v. Diamond, 589 F. Supp. 451, 469

(D.R.I. 1984), "The Establishment Clause has historically been an indefatigable sentry, patrolling the actions of government

to prevent incursions upon our cherished religious liberty."

   Where, as here, the FBOP effectively named its administrative-remedy database, "surly Executive courtroom bouncer,"

and then engaged in a course of conduct designed to defeat inmates' attempts to utilize the Bureau's theoretical

administrative-remedy procedures so that its staff can deceptively claim non-exhaustion, The Court must rule based upon

both the district's numerous and increasing experiences with such issues at MCC, as well as the instant evidence, and the

plaintiff is entitled to an estoppel against the instant defendants because the FBOP has made its administrative-remedy

procedures unavailable to inmates at MCC.

   George Carlin would not have been fooled by the FBOP's choice of language. And neither should be The Honorable Court.


## 3. The Administrative-Remedy Procedures At MCC Are Opaque and Thus Unavailable.


   Further still, The Honorable Court should find that FBOP's administrative-remedy procedures are opaque---and thus

unavailable---in the instant situation where the plaintiff's repeated requests for BP-8 forms were fruitless, his attempts to

create and use hand-drawn substitute forms were not entered into SENTRY and went unanswered, and he was then

transferred out of the FBOP's custody. Moreover, 28 C.F.R. Sec. 542 and FBOP PS 1330.18 provide no guidance whatsoever

for these contingencies. Please see Exhibit 18 hereto and Exhibit 19 hereto.

   The plaintiff, nonetheless, clearly exceeded the capability of an ordinary inmate in his attempts to submit hand-drawn

substitute forms. The Second Circuit reiterated in Williams v. Priatno at 123-124, citing to Ross v. Blake:

      |Second, "an administrative [remedy] scheme might be so opaque that it becomes, practically speaking, incapable of
      |use." In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

   As Exhibit 17 hereto and D.E. 78 at 21 and at 31-32 demonstrate, the plaintiff was able and willing to utilize the FBOP's

administrative-remedy procedures when they truly were made available to him at FCI Terre Haute, Indiana.

   The plaintiff further notes D.E. 13 at 3 (p.26) and RFA 18, where staff at MDC Brooklyn handed him the wrong form in

answer to his explicit request for a BP-8. "The Complaint states that [the defendant] intentionally gave Plaintiff a BP-9

instead of a BP-8 for informal resolution, so that Plaintiff's BP-9 form would be rejected, which the Court assumes to be true

for purposes of this motion [for summary judgment] and does not condone." Cannonier v. Skipper-Scott, 2019 U.S. Dist.

LEXIS 27749, 18 Civ. 2383 (LGS) (S.D.N.Y. February 20, 2019) at *11.

## 4. Aassiddaa's Declaration (D.E. 52-1 and 52-2) Is Inadmissible

   Pursuant to Fed. R. Evid. 901(b)(9), the plaintiff objects to the admission of Aassiddaa's declaration at D.E. 52-1 and 52-2

because the practice of attaching an eight-(8)-day-old report from SENTRY clearly does not produce an accurate result upon

which one can declare facts as Aassiddaa does about what the plaintiff did or did not do "at any time." At most, Aassiddaa's

SENTRY report could be averred to reflect the status of SENTRY at the time of the report itself some eight (8) days prior to

her declaration. Further, Aassiddaa's declaration fails to establish the accuracy of the information in SENTRY itself in the

face of published evidence that many properly-filed requests for administrative remedies in the FBOP are never entered into

SENTRY or are entered late, as in Exhibit 21 hereto, and in the defendants' own admissions, please see RFA 14.

   Aassiddaa has no knowledge, as contemplated by Fed. R. Evid. 803(6)(A), as to whether the plaintiff actually filed

administrative-remedy forms, and her report in fact fails to note the hand-drawn forms the plaintiff did submit through

proper channels. BP-8s are further never logged into SENTRY. "As Defendant acknowledges, these informal grievances are

not logged in SENTRY, and so defendant provides no documentation regarding the filing of an informal grievance." Lewis v.

Eldridge, 2016 U.S. Dist. LEXIS 55928, 13-cv-01485 (ALC) (S.D.N.Y. April 27, 2016) at *16. Aassiddaa does not declare that

she was FBOP unit staff nor that she made a round through the 9-south SHU while the plaintiff was there in order to

determine whether BP-8s were being handed out and accepted back. Thus, she would not know if any such documents were

filed, as in the plaintiff's case, prior to his transfer out of the FBOP's custody, only to go unanswered in the time when he

could ~~have~~ timely file a BP-9---which in turn might have then gone unfiled in SENTRY.

   Pursuant to Fed. R. Evid. 803(6)(E), the plaintiff has clearly shown that the sources and methods used by Aassiddaa are

inaccurate and lack trustworthiness. The plaintiff therefore requests that The Honorable Court rule Aassiddaa's declaration

inadmissible in its entirety.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------

C. THE DEFENDANTS DEPRIVED THE PLAINTIFF OF PROTECTED LIBERTY INTERESTS.

Throughout the plaintiff's time at MCC New York, the defendants and their parties in privity deprived him of numerous protected liberty interests. It is uncontested that at all times when the plaintiff was at MCC he was a pre-trial detainee. Please see the defendants' motion, D.E. 52 at 1 n. 2, "because Plaintiff was a pretrial detainee at the time...," and Id. at 2, "Plaintiff, a pretrial detainee at the time, was held at MCC [New York] from November 14, 2016[,] to February 4, 2017---a total of 81 days." The defendants, however, go on, Id. at 20, to misapply the "atypical and significant hardship" standard from The Supreme Court's manifestly inapplicable decision in Sandin v. Conner, 515 U.S. 472, 484, 486 (1995).

In reality though, "The district court concluded, joining our fellow Circuits, that Sandin does not apply to pretrial detainees." Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (collecting cases).

"Moreover, Sandin itself specifically distinguished pretrial detainees from convicted prisoners. The Court rejected precedents from cases concerning pretrial detainees, noting that 'the punishment of incarcerated prisoners [as opposed to the detention of pre-trial detainees]... serves different aims than those found invalid in Bell [v. Wolfish].'" Id. at 189 citing Sandin v. Conner, 515 U.S. at 485.

Even more direct, "The District Court erred in applying Sandin v. Conner, a case applying the Eighth Amendment to claims brought by convicted prisoners to Johnston, who in February and March 2005 was a pretrial detainee." Johnson v. Maha, 460 Fed. Appx. 11, 14 (2d Cir. 2012) (citing Benjamin v. Fraser at 188-89).

It is interesting that in the defendants' motion to dismiss they first note the supposed inapplicability of The Cruel and Unusual Punishment Clause in favor of The Due Process Clause on the explicit basis that the plaintiff was a pre-trial detainee, D.E. 52 at 1 n. 2, but then they go on to misapply Sandin nineteen (19) pages later, D.E. 52 at 20. It seems unlikely to be an oversight and more likely than not that counsel for the defendants was trying to strike a "foul" blow, as contemplated by the Berger court (please see above Sec. III(A)(5)).

Regardless, the plaintiff need not demonstrate that the defendants' actions and omissions caused him to endure "atypical and significant hardship" in order to vindicate his protected liberty interests. "See also Bell [v. Wolfish], 441 U.S. at 536 (noting that a state may 'detain [a person] to ensure his presence at trial and may subject him to restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate The Constitution" (emphasis in original). McGarry v. Pallito, 687 F.3d 505, 513 (2d Cir. 2012) (emphasizing Bell v. Wolfish, 441 U.S. at 536).

The defendants' reliance on, D.E. 52 at 28, upon Alhaj v. McCarthy, 2012 U.S. Dist. LEXIS 100471, No. 11 Civ. 9049 (LTS)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 01:09:21 PM

(RLE) (S.D.N.Y. July 18, 2012) at *8-9 is similarly misplaced in that it too cited Sandin in a matter involving a pre-trial

detainee. It is also worth noting that the dismissal obtained therein was without prejudice and, among other things (inter

alia), leave was granted for the plaintiff to amend his complaint. Thus, in discussing the Sandin standard, The Court was

providing guidance for an amended complaint.

Further, any opinion holding that convicted and sentenced prisoners enjoy a right or privilege despite their status would

also obviously vindicate that the plaintiff had the same right or privilege as a pre-trial detainee. The same cannot be said,

however, of opinions like Sandin, holding that convicted prisoners are constitutionally stripped of a right or privilege. Such

opinions are inapplicable and not opposite to the plaintiff's instant claims, and only precedential opinions directly addressing

the removal of rights and privileges from pre-trial detainees are controlling in the instant case.

1. The Defendants Unconstitutionally Segregated the Plaintiff In the Special-Housing Unit (SHU).

Because the defendants misapply Sandin, they claim that absent "'unusually harsh conditions' accompany[ing] the

confinement," D.E. 52 at 20, the eighty-one (81) consecutive days that the plaintiff spent as a pre-trial detainee in MCC's

9-south special-housing unit without any administrative-detention hearing or written administrative-detention order was too

short to implicate a protected liberty interest.

Regardless of duration, however, placing pre-trial detainees, which the plaintiff was at the time, in administrative

detention implicates a liberty interest. Please see Allah v. Milling, 876 F.3d 48, 57 (2d Cir. 2017) (internal citations omitted

to Bell v. Wolfish, 441 U.S. 520, 538, 539 n. 20 (1979)):

> |Under Wolfish, a restriction related to a legitimate goal such as institutional security will still be punitive if it is
> |excessively harsh. Indeed, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his
> |presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where
> |conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh
> |methods, would not support a conclusion that the purpose for which they were imposed was to punish.

In Allah v. Milling, The Second Circuit upheld that placement of a pre-trial detainee in administrative segregation violated

the detainee's due-process rights without relying on the length of that segregation. In that case, however, unlike the instant

case, prison authorities complied with the relevant regulations and were thus entitled to qualified immunity, unlike the

instant defendants---a topic explored fully below in Sec. III(E)(4). Moreover, the instant complaint, the defendants'

admissions, i.e. RFA 1-30, the case law of the vicinage dealing with MCC New York, the instant opposition, and the exhibits

hereto, specifically Exhibit 1, make clear---without factual contradiction from the defendants---that the defendants' actions

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------

against the plaintiff were, except for removal of the shackles and chains from the plaintiff while he was in his cell,

indistinguishable from "throwing [the plaintiff] in a dungeon," as contemplated by the Wolfish court. For this reason, the

plaintiff maintains that his Eighth Amendment rights were violated despite the defendants' attempt to reframe the matter

partially under The Fifth Amendment, so as to avoid the obvious implication of their behavior--that they punished a pre-trial

detainee before he had his day in court in order to stop his Constitutionally-protected acts of speech, association, protest,

petition, and journalism.

Indeed, even in the post-Sandin case of a convicted prisoner, The Second Circuit nonetheless upheld that federal

regulations create a liberty interest in avoiding federal administrative detention. Please see Tellier v. Fields, 280 F.3d 69,

83 (2d Cir. 2000):

| [W]e find that [28 C.F.R.] Section 541.22 contains mandatory language that gives rise to a "state-created right," and
| since we agree with the district court that Sandin requires a factual determination regarding the nature of Tellier's
| confinement, defendants' motion to dismiss was properly denied at this point in the litigation.

Please see also Benjamin v. Fraser, 264 F.3d 175, 188 n. 11 (2d Cir. 2001), clarifying that Rene Tellier was a convict in

the eyes of the federal system. Please note as well that 28 C.F.R. Sec. 541.22 since appears to have been moved to 28

C.F.R. Secs. 541.25, 541.26, and 541.33. Please see the old text of 28 C.F.R. Sec. 541.22 as quoted in Tellier v. Fields at

74; and cf. Exhibit 23 hereto; the current text of 28 C.F.R. Secs. 541.25, 541.26, and 541.33 (retrieved September 2019).

In Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004), The Southern District of New York and The Second Circuit upheld that

seventy-seven (77) days in the SHU---◀ less than the time period stipulated in the instant case---implicated a protected

liberty interest for a convict upon a showing of conditions not as harsh as those in the instant case of a pre-trial detainee.

Id. at 66. Please cf. D.E. 2 at 5 and at 8-11 (p. 4 and 10-21), and RFA 6, 10, 11, 23, and 26.

"We had repeatedly held, prior to Palmer's disciplinary hearing in August 2000, that SHU confinements shorter than 101

days would deprive a prisoner of a liberty interest--and thus trigger due process rights---if the conditions of confinement

were severe enough." Id. at 67 (citing Colon v. Howard, 215 F.3d 227, 232 n. 5 (2d Cir. 2000), Sealey v. Giltner, 197 F.3d

578, 589 (2d Cir. 1999), and Welch v. Bartlett, 196 F.3d 389, 393-94 (2d Cir. 1999)).

Please see also Wright v. Smith, 21 F.3d 496 (2d Cir. 1994), holding that sixty-seven (67) days in the SHU without a

hearing violates a protected liberty interest. The Second Circuit noted Id. a similar pattern of practice at Attica State Prison,

evincing of a desire to pay lip service to the Due Process rights of convicted prisoners, as the instant plaintiff and others

have long asserted exists at MCC affecting pre-trial detainees.

On February 18th, 1998---some eighteen (18) years prior to the instant plaintiff's arrival at MCC and the instant

defendants' attempted assertion of qualified immunity---this Court decided Tellier v. Scott, 49 F. Supp. 2d 607 (S.D.N.Y.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------

1998). The former warden and other employees of MCC New York, unsatisfied with this Court's ruling on many of the same arguments the instant defendants now proffer, tried their luck with The U.S. Court of Appeals, which also ruled against them and affirmed the district court in Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000).

   Indeed, by 1990, The Second Circuit "had already clearly stated that a prisoner's federal due process rights were implicated by even a ten-day [segregated-]confinement period." Id. at 84 citing Russell v. Coughlin, 910 F.2d 75, 79 (2d Cir. 1990).

   Tellier v. Scott, 49 F. Supp. 2d 607 (S.D.N.Y. 1998), which was decided after Sandin and upheld by The Second Circuit in Tellier v. Fields, has not been disturbed. As the district court noted therein, "Furthermore, in the wake of Sandin, [The Second Circuit] has declined invitations to overturn" rulings that had "long held that state prisoners have a liberty interest in remaining free from administrative confinement where prison regulations 'specify certain conditions that must be met to permit a prisoner's placement' in such confinement." Id. at 610.

   The defendants, in their thirty-four (34) page memorandum in support of their motion to dismiss, make no reference to the case of Rene Tellier at MCC. Please see D.E. 52 at 3, "Table of Authorities." The defendants' omission of Tellier is quite telling. Please see above Sec. III(A)(5).

## 2. The Defendants Unconstitutionally Transferred the Plaintiff Far Away Into Harsh Conditions.

   Even before the plaintiff was summarily thrown in "the hole" at MCC New York, the instant defendants violated his Constitutional rights. Once again, the critical distinction is that the instant plaintiff was then a pre-trial detainee.

   Hunger strikes are not rare events in federal custody. While a small minority of such hunger strikes may result in a transfer to a nearby medical facility, the defendants' transfer of the plaintiff as a pre-trial detainee across multiple federal-court districts to a non-medical facility like MCC is unique to his knowledge. Please see Exhibit 1 hereto at 3 (p.35-39).

   While courts consistently hold that convicted prisoners have no protected liberty interest implicated by a transfer to a particular facility, the same cannot be said for pre-trial detainees. In terms of pre-trial matters, venue "has been fundamental since our country's founding." United States v. Auernheimer, 748 F.3d 525, 532 (3d Cir. 2014). And Id.:

   |The proper place of colonial trials was so important to the founding generation that it was listed as a grievance in the
   |Declaration of Independence. See The Declaration of Independence para. 21 (U.S. 1776) (objecting to "transporting us
   |beyond seas to be tried for pretended offenses"). It was of such concern that the Constitution of the United States
   |"twice safeguards the defendant's venue right." United States v. Cabrales, 524 U.S. 1, 6, 118 S. Ct. 1772, 141 L. Ed. 2d
   |1 (1998). Article III requires that "the Trial of all Crimes... shall be held in the State where the said Crime shall have
   |been committed." U.S. Const. art III, Sec. 2, cl. 3. The Sixth Amendment further provides that "[i]n all criminal
   |prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district
   |wherein the crime shall have been committed." Id. amend VI. This guarantee is codified in the Federal Rules of Criminal
   |Procedure, which require that "the [G]overnment must prosecute an offense in a district where the offense was
   |committed." Fed. R. Crim. P. 18.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------

Please see also Exhibit 24 hereto; Federal Rule of Criminal Procedure 18 (retrieved September 2019).

Indeed, The Speedy Trial Act provides the government only ten (10) excludable days to transport a criminal defendant

arrested in a different district---no matter how far away---in order to make an initial appearance. 18 U.S.C. Sec.

3161(h)(1)(F).

Detention pending trial is clearly part of the prosecution, as contemplated by The Federal Rules of Criminal Procedure. It is

the U.S. attorney general---an officer of the Executive branch---whom oversees both federal prosecutors and pre-trial

detention. Please see 18 U.S.C. Sec. 3142(i)(2). It was the prosecution in the case of the instant plaintiff that moved to

detain him when its charges against him carried no rebuttable presumption of detention. Further, in addition to Fed. R.

Crim. P. 18, detention "within the district" is explicitly required by Fed. R. Crim. P. 46(h)(1). Please see Exhibit 25 hereto;

Federal Rule of Criminal Procedure 46 (retrieved September 2019).

The ability of the government with modern telecommunications technology to try a criminal defendant in one district while

holding him far way in another---as was partially done to the instant plaintiff who appeared before the district court in

Massachusetts from MCC via videoconferencing---was unforeseeable by The Founders in the eighteenth (18th) century and to

Congress in 1974 when it enacted The Speedy Trial Act. Neither legislative body would have approved of the practice in the

instant case of bringing a criminal defendant to Boston for arraignment on October 26th, 2016, and then transporting him so

soon afterwards on November 14th, 2016, not to be held in the neighboring District of Rhode Island nor in the further-

removed District of Connecticut, but instead in the farthest corner of the once-further-removed Southern District of New

York, far away from his spouse, his community, and his support base. Please see United States v. Gottesfeld D.E. 35,

16-cr-10305-NMG (D. Mass. October 26, 2016). Given the above-cited Federal Rules of Criminal Procedure, The Courts

similarly disapprove.

It is self-evident that by moving the instant plaintiff after his arraignment so far outside The District of Massachusetts---

his home---that the instant defendants deprived him of his Constitutional right not to be transported far away from his

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 01:42:28 PM

home against his will as a result of the government's accusation, as happened to the aggrieved Founders. Without modern

technology, of course, such practices would be totally impossible. By refusing to uphold the plaintiff's right not to be

transported and held in segregation far away from his home while awaiting trial, The Court would only encourage and

indemnify such unconstitutional government conduct in the future.

   Inseparable from the instant plaintiff's venue right, the plaintiff had a liberty interest in avoiding the peculiarly-harsh

conditions of the SHU at MCC. Indeed, in other cases, The Supreme Court has recognized that convicts serving sentences

have a protected liberty interest in avoiding transfers into conditions not as harsh as those the instant plaintiff endured at

MCC as a pre-trial detainee. Wilkinson v. Austin, 545 U.S. 209, 224 (2005). While the convicts in Wilkinson had hearings

and a modicum of Due Process beforehand to challenge their transfers, the instant plaintiff as a pre-trial detainee had no

such hearings and Due Process to challenge his transfer into conditions equally harsh in most respects to those in Wilkinson

and harsher in others, as detailed above explicitly.

   The convict-plaintiff in Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004) alleged in an affidavit quoted Id. at 66:

   |The atypical and significant hardship this plaintiff suffered due to his wrongful confinement in S.H.U. was being
   |deprived of his property, [i.e.] personal clothing, grooming equipment, hygienic products and materials, reading
   |materials, writing materials, school books, personal food and vitamin supplements, family pictures as well as personal
   |correspondences, being mechanically restrained whenever this plaintiff was escorted, and being out of communication
   |from his family, were the hardships that this plaintiff suffered while in S.H.U.

   There is some overlap between the claims in the instant case, in Palmer, and in Welch v. Bartlett, 196 F.3d 389, 393-94

(2d Cir. 1999), cited above. All three (3) plaintiffs allege deprivation of family communications and visits. Please see D.E. 2

at 5 (p.4); the above quote from Palmer about, "being out of communications from his family;"; and Welch at 393, "SHU

prisoners... have less access than is normal for general population prisoners to showers, visits, and other privileges..."

   Palmer, Welch, and the instant plaintiff each state they were deprived of personal clothing and hygiene products. Please

see Exhibit 1 hereto at 1 (p.11-13).

   Welch and the instant plaintiff explicitly state they were locked in their cells for 23 hours per day, D.E. 2 at 5 (p.4),

excluded from group activities like communal meals, TV, and recreation facilities, Id., had limited opportunities to bathe,

Id., and were provided with inadequate sleep surfaces, please see Exhibit 1 hereto at 2 (p.14-17). The record does not

reflect that Palmer explicitly stated these same claims, but anything to the contrary in the SHU would be per-se abnormal.

Please see Id. at 2 (p.20).

   Similarly, the instant plaintiff and Palmer each state that they were mechanically restrained when escorted outside their

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------

cells, that they were deprived of personal property, grooming equipment, reading materials, and writing materials, which

the record in Welch omits. Please see Id. at 1 (p.11) and at 2 (p.13 and 18-19). The omissions in Welch, however, should not

be taken to exclude the near-certainty that he too endured all of these atypical and significant hardships, as such is per se

standard practice in segregation in correctional facilities. Please see Id. at 2 (p.20).

Palmer and the instant plaintiff each explicitly state that their correspondence was hindered. Please see D.E. 2 at 10

(p.18-21) and Palmer at 68 (quoted above).

Only the instant plaintiff, however, was transported across multiple U.S.-court districts while pending trial---a hardship

atypical to the point of singularity or near-singularity---to a prison which boasts that it maintains, in effect, the toughest

SHU in America. Please see D.E. 2 at 5 (p.2) and at 12 (p.22). Only the instant plaintiff was placed in a freezing cold SHU,

and then in one of the coldest, leakiest cells therein, as stated in Id. at 8 (p.14-16) and admitted in RFA 11. Only the instant

plaintiff was housed amid uncontrolled rodent and insect infestations, as stated Id. at 8 (p.10-12) and admitted in RFA 10.

Only the instant plaintiff had the water shut off for an indeterminate period of time with no bottled water provided as a

substitute, as stated Id. at 8 (p.13). Only the instant plaintiff was repeatedly threatened by a state-licensed medical

professional while he was held nearly-incommunicado with having his four (4) limbs bound to bed posts or a restraint chair,

his face strapped still, and a feeding tube forced up his nose and down his throat in response to his First-Amendment---

protected conduct as a journalist and human-rights advocate. Please see D.E. 2 at 10 (p.17) and Exhibit 1 hereto at 2

(p.21-31):

|21. The practice of force-feeding, as performed in correctional facilities and the FBOP, starts when a team of officers
|outfitted in what resembles riot gear enter an inmate's cell in a show of force and physically subdue the inmate through
|violence.
|22. The proceeding is video-recorded, which immortalizes the humiliation and degradation of the hunger striking
|inmate.
|23. Once five (5) or more correctional officers (COs) subdue the inmate who is to be force-fed, they place the inmate in
|a "five-(5)-point restraint."
|24. In non-euphemistic terms, the COs bind each of the inmate's four (4) limbs to bed posts or to parts of a specially-
|designed "restraint chair," and strap an inflexible mask over the inmate to immobilize the inmate's head and face.
|25. Once the inmate is bound in the five-(5)-point restraint, a "doctor" forces a nasogastric tube up the inmate's nose
|and down the inmate's throat, despite any attempt by the inmate to close his or her nasal passages or throat.
|26. This process is known to cause nasal and esophageal bleeding and to cause harm; many inmates cry at this point but
|prison "doctors" like Defendant Bussanich continue anyway despite their hippocratic oath.
|27. Some prison "doctors" delight in the force-feeding procedure and one of the principal factors differentiating
|medical practice in correctional settings is that prison "doctors" know they will be allowed to perform the force-feeding
|procedure against the will of their patients, which other doctors in non-correctional settings generally neither perform
|nor condone.
|28. The prison "doctor" then pumps liquefied "food" through the tube into the inmate's stomach.
|29. The prison "doctor" then leaves the inmate in the five-(5)-point restraint for hours, before typically ordering him or
|her placed in a paper gown and held in suicide watch for an extended period designed by the prison "doctor" to further
|punish, degrade, and humiliate the inmate for his or her hunger strike.
|30. Despite Defendant Bussanich's oath to "do no harm," Defendant Bussanich repeatedly engaged in the barbaric,
|torturous, sadistic, and harmful practice of force-feeding---not to save life---but rather to punish protest by pre-trial
|detainees.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

|31. Defendant Bussanich and other parties in privity with the defendants in the case wanted to be sure that I knew the |above-outlined force-feeding procedure in full detail and they used it regularly to threaten me.

There is, however, one (1) other big difference between the instant plaintiff and Tellier, Palmer, and Welch: only the instant plaintiff was a pre-trial detainee at the time. And as stated in D.E. 2 at 7 (p.8):

|The plaintiff was never subject to formal disciplinary action at MCC nor elsewhere in the FBOP system and yet he was |punished as badly if not worse than if he was... he... intends to demonstrate... that the eighty-one (81) consecutive |days he was held in solitary confinement in the SHU at MCC, including twenty-five (25) days past the declared end of his |hunger strike all the while his rights to Due Process, freedom of expression, and freedom of the press, amongst others, |were violated represents a far more severe sanction than most inmates receive if adjudicated guilty of a serious, |violent, prison disciplinary infraction.

The plaintiff is now able to confirm the veracity of D.E. 2 at 7 (p.8) with a recent incident wherein two inmates fought in the FCI Terre Haute CMU and were adjudicated guilty by FBOP Disciplinary Hearing Officer (DHO) Jason Bradley. They entered the SHU the morning of the altercation, Monday, November 4th, 2019, and left the SHU on Friday, November 15th, 2019. The instant plaintiff spent some eighty-one (81) days in a harsh SHU having never been charged with any disciplinary infraction while two (2) inmates caught perpetrating dangerous violence spent just eleven (11) days in the SHU. Please see Exhibit 1 hereto at 6 (p.80).

3. The Defendants Inflicted Cruel and Unusual Punishment Upon the Plaintiff Without Due Process of Law.

As mentioned above, the defendants aver that The Fifth Amendment Due Process Clause applies to many of the plaintiff's instant claims instead of The Eighth Amendment prohibition against cruel and unusual punishment. To be sure, the plaintiff faces a lower hurdle to establish that he was punished than to establish that he was punished in a cruel and unusual manner. Ultimately, of course, the finder of fact in this case will determine which standard(s) were violated.

In stipulating to the seemingly-lower bar, however, the instant defendants should not be allowed to euphemize or otherwise reduce the implications of their conduct towards pre-trial detainees, including the instant plaintiff. It is not hard to imagine that, given the option, most prison officials would rather be found to have violated The Due Process Clause than The Cruel and Unusual Punishment Clause because the former signifies to most members of the public that aspects of the defendants' administration somehow fell short of the strict requirements our free society prudently enforces on those entrusted to detain its citizens against their will pending trial while the latter signifies actions that most would find morally reprehensible if not outright inhuman. Indeed, the old standard for judging alleged Eighth Amendment violations was conduct that "can properly be termed 'barbarous' or 'shocking to the conscience.'" Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1970) (citing Church v. Hegstrom, 416 F.2d 449, 451 (2d Cir. 1969). And yet the instant defendants are knowingly culpable against the plaintiff and other pre-trial detainees at MCC even under this old standard, which has since given way

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

because the "Eighth Amendment invokes 'the evolving standards of decency that mark the progress of a maturing society.'"

Id. citing Trop v. Dulles, 356 U.S. 86, 101 (1958).

   Confronted with the well-known, highly-publicized, and "'barbarous'" conditions of the SHU  at MCC, which are clearly

"'shocking to the conscience'" of modern civilized people and offensive to The Law of Nations, defendants' counsel has the

audacity to claim before The Court, "Plaintiff does not set forth any such particularly harsh conditions." D.E. 52 at 28. It's as

if defendants' counsel expects The Honorable Court to serve as his accomplice in covering-up atrocity. One is again

reminded of The Supreme Court's admonition in Berger and RFA 6-8, 11, and 23-27.

   Defendants' counsel---who should certainly be expected to know better---embarked on an analysis of Sandin v. Conner, 515

U.S. 472 (1995) even though Sandin is, as above stated, inapplicable to pre-trial detainees. Notwithstanding the obvious

uselessness of comparing something with itself, this Sandin analysis was further falsified by a silly comparison to the

conditions in the SHU at MCC with the conditions in the SHU at MCC. "Here, Plaintiff complains of conditions that are part-

and-parcel of confinement in the SHU." D.E. 52 at 21. A true Sandin analysis, while still inapplicable to the instant case of a

pre-trial detainee, would, however, compare the conditions in the SHU at MCC to those in general population and to those in

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 02:25:20 PM

other SHUs at other FBOP facilities. From Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999) (emphasis added):

> Whether the conditions of [the plaintiff's] confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.

Three (3) pages after the assertion, "Plaintiff does not set forth any such particularly harsh conditions," D.E. 52 at 28, as if memories could be so short, defendants then try to address "Pest Control, Poor Plumbing, and Inadequate Heat." D.E. 52 at 31. But they do so with total disregard for the relevant federal regulations and controlling case law. Defendants cite not a single decision from The Second Circuit or The United States Supreme Court in this section. If the defendants could have done so, frankly, then they would have and their inability is telling. The pro se incarcerated plaintiff has no such difficulty and he has never been to law school or taken training as a paralegal. He has few of the resources available to him of which the U.S. attorney's office takes advantage every day. He notes that unlike the non-precedential decisions repeatedly cited by the defendants even though they are not contrary to the plaintiff's instant claims, the following are binding and controlling in the instant case.

From Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2000):

> While the Eighth Amendment's prohibition against cruel and unusual punishment "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981), the conditions of confinement must be at least "humane," Farmer v. Brennan, 511 U.S. 825, 832, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994). In order to establish a violation of this Eighth Amendment rights, an inmate must show (1) a deprivation that is "objectively sufficiently serious" that he was denied "the minimal civilized measures of life's necessities," and (2) a "sufficiently culpable state of mind" on the part of the defendant official, such as deliberate indifference to inmate health or safety. Id. at 834 (internal quotation marks omitted). A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates. See, e.g., Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).

It is manifestly obvious from the face of the complaint itself that the conditions in the SHU at MCC denied the plaintiff and others "the minimal civilized measures of life's necessities." Please see D.E. 2 at 7 (p.9-16); and RFA 6, 11, 23, and 26-27. The SHU at MCC is explicitly labeled by the defendants as tougher than all other SHUs in America. D.E. 2 at 5 (p.2). The plaintiff has further clarified and buttressed these claims above and in Exhibit 1 hereto at 5 (p.70-73). Defendant Tatum made weekly rounds through the 9-south SHU and Defendant Bussanich's rounds were even more frequent during the plaintiff's detention therein. Please see Id. at 3 (p.44-45) and at 5 (p.71). The federal regulations are unequivocal, i.e. 28 C.F.R. Sec. 541.31(a), which states, "Environment. Your living quarters will be well-ventilated, adequately lighted,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------------

appropriately heated, and maintained in a sanitary condition." Please see Exhibit 12 hereto; 28 C.F.R. Sec. 541.31,

"Conditions of confinement in the SHU."

   The defendants in their motion cherry-pick non-precedential citations and in those citations they omit their omissions of

quotation marks and internal citations in order to avoid the above-quoted two-(2)-prong test under The Eighth Amendment.

D.E. 52 at 31. They avoid the contemporary requirement of "humane" conditions of confinement and make no citation to

Farmer v. Brennan, 511 U.S. 825, 832 (1994). Please see D.E. 52 at 4, "Table of Authorities."

   With regard to the non-contradictory district-court decisions cited by the defendants, the plaintiff notes Gaston v.

Coughlin, 249 F.3d at 164, citing Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir. 1988) (reversing a grant of summary

judgment in favor of defendants where there was evidence that the prisoner-plaintiff had been deliberately exposed to bitter

cold in his cell block for three months), "We have held that an Eighth Amendment claim may be established by proof that the

inmate was subjected for a prolonged period to bitter cold."

   All the instant parties agree that the plaintiff was held in the SHU at MCC from November 14th, 2016, through February

4th, 2017, i.e. the winter months. D.E. 2 at 8 (p.14) states, "The temperature in the SHU regularly approached that of the

outdoors during the winter due to insufficient insulation in the exterior walls."

   While it should go without saying that New York winters are "bitter[ly] cold," as contemplated by The Second Circuit, the

plaintiff demonstrates that this particular winter was no exception with Exhibit 143 hereto; graph of nightly temperatures in

Manhattan from plaintiff's time in the MCC SHU; November 14th, 2016, through February 4th, 2017.

   "We conclude that the Eighth Amendment claims of frigid temperatures, rodent infestation, and unsanitary conditions

directly outside [plaintiff's] cell, to the extent asserted against [defendants], should be reinstated." Gaston v. Coughlin, 249

F.3d 156, 166 (2d Cir. 2000) (reversing a grant of summary judgment). Thus, the instant claims should not be dismissed in

the first place. The defendants are unable to contend with Gaston v. Coughlin, so they pretend it does not exist. Please see

D.E. 52 at 4 (Table of Authorities).

   The claims made by the instant plaintiff echo those now well-documented in the media and the vicinage's case law about

the SHU at MCC. They evince of no valid reason, penological or otherwise, and they therefore represent punishment as

contemplated by The Supreme Court in Bell v. Wolfish, and cruel and unusual punishment as contemplated by Gaston v.

Coughlin. The instant plaintiff had a Fifth Amendment liberty interest as a pre-trial detainee in his freedom from such

measures and an Eighth Amendment and inalienable right as a human being against such unusual cruelty.

   Defendants' ~~counsel~~ counsel, in the face of what is known all too well about the SHU at MCC by The Court, the press, and his

clients, crossed the line from zealous advocacy to dishonesty. His filing is unbecoming of The United States.