TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------------

4. The Defendants Violated the Plaintiff's First Amendment Rights.

It is important that the instant plaintiff brought two (2) overlapping but jurisprudentially-distinct groups of liberty-interest

claims under The First Amendment: (a) Prior Restraints and (b) Retaliation.

a. Prior Restraints

The instant defendants totally precluded the instant plaintiff from some exercises of his First Amendment rights.

As noted in the complaint, the plaintiff's mail of specific items was blocked by the defendants and their parties in privity,

including an open letter to then--President-elect Donald Trump meant for publication in The Huffington Post, please see D.E.

2 at 11 (p.21). This prior restraint implicated the plaintiff's First-Amendment rights to free speech, freedom of the press,

and to petition the government for the redress of grievances. Please see RFA 6, 23, and 26.

As also noted above in Sec. II(A)(2), the instant defendants denied the plaintiff all ability to communicate directly with Mr.

David Kushner, the reporter for Rolling Stone who featured the plaintiff and his case in Exhibit 3 hereto. Defendant Tatum

personally denied the plaintiff an in-person interview and phone calls with Kushner, and the ability to send Kushner mail as a

member of the press in direct violation of FBOP regulations and policies explicitly guaranteeing the plaintiff that right; i.e.

28 C.F.R. Secs. 540.2(d), 540.18(a), and 540.18(c)(1); and FBOP PS 5265.14. Please see exhibits 13-15 hereto. The plaintiff

was left with no alternatives. The prior restraint was total. Cf. Pell v. Procunier, 417 U.S. 822, 824-28 (1974). Please see

also Procunier v. Martinez, 416 U.S. 396 (1974), invalidating vague and penologically-invalid restrictions on the contents of

convicted prisoners' outgoing mail.

Numerous other letters from the plaintiff to his wife disappeared, or the envelopes bearing them arrived empty after MCC

staff failed to seal them after their search for contraband, including the plaintiff's letter detailing his findings regarding

Defendant Tatum's manipulation of the federal pension system for his own personal fiduciary benefit. Please see D.E. 2 at 12

(p.21) and RFA 30.

The plaintiff clearly had a protected liberty interest in all of these actions, unencumbered by any criminal conviction and

grounded in The First Amendment. The defendants could not and did not advance any valid overriding government interest

to support their prior restraint of the plaintiff's speech.

Instead the defendants cite to the non-opposite case of Ndoromo v. Holder, No. 09-cv-5741 (BMC) (E.D.N.Y. January 20,

2010) in support of the irrelevant proposition that "there is not a 'constitutional nor statutory right for a prisoner to be

assigned to a facility that best enables him to undertake media communications.'" D.E. 52 at 12-13. The plaintiff in

Ndoromo, however, was a convict and not a pre-trial detainee. So, for reasons already specified, that case, like Sandin, is

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

not applicable to the instant matter.

Moreover, the instant plaintiff does not seek "to be assigned to a facility that best enables him to undertake media communications," as the instant defendants attempt to trivialize, but rather to vindicate his Constitutionally-protected rights against the total prior restraints described herein. The instant defendants transferred the instant plaintiff as a pre-trial detainee outside his district to the self-described toughest SHU in the nation for the express purpose of interfering with his media and family communications based on their content and totally preempting some of those communications. Such motives and effects, as applied to pre-trial detainees, were not contemplated by the Ndoromo Court.

Defendants opine, "Plaintiff does not have a constitutional right to be interviewed by the media." D.E. 52 at 31. This is a shocking and false---and shockingly false---averment to be filed by an assistant U.S. attorney who is sworn to uphold The Constitution. Please cf. U.S. Const. amend I. Please see also above sec. III(A)(5).

In reality, however, as a pre-trial detainee, the total prohibition against the plaintiff's media interviews failed to meet the standard elucidated in Bell v. Wolfish, 441 U.S. 520, 538 (1979). The prohibition was meant to curtail the plaintiff's speech and nowhere do the defendants provide evidence of "an alternative purpose to which [the restriction] may rationally be connected." The total prohibition of these interviews---as opposed to the regulation of time, length, place, attire, presence of staff, recording equipment, and restraints---clearly was "excessive in relation to" any "alternative purpose assigned" for a reasonable restriction. Id.

Please cf. Turner v. Safley, 482 U.S. 78, 94-99 (1987), upholding that while prison authorities "may regulate the time and circumstances" of marriages of sentenced prisoners, they may not, "even under the reasonable relationship test," entirely ban sentenced prisoners from marrying. The "reasonable relationship test," moreover, is more deferential to prison authorities than the test applicable to pre-trial detainees. The Court also noted that total denial of the right to marriage was only permissible in the cases of prisoners serving life terms because "denial of the right [to marriage] was part of the punishment for crime." Id. at 96. In comparison, the rights of the public and publishers, beyond that of a single potential spouse, were implicated by the defendants' denial of the plaintiff's media interviews. Unlike a marriage ceremony, the plaintiff's media interviews, required no direct physical contact between the plaintiff and any outsider and therefore

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 02:35:10 PM

presented fewer security concerns and implicated no state-level licensure.

If prison authorities cannot lawfully prevent convicted prisoners from marrying and must provide the times and circumstances for such marriages to occur, then prison authorities must do the same in regards to media interviews of pre-trial detainees. The instant defendants point to nothing supporting the total prior restraint they implemented against a pre-trial detainee's First Amendment rights in the instant case.

  In De Jonge v. Oregon, 299 U.S. 353, 364 (1937), The U.S. Supreme Court held that "Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment." Of course, if a federal right is safeguarded from trespass by the states under The Due Process Clause of The Fourteenth Amendment, then that same right is safeguarded against federal trespass by The Due Process Clause of The Fifth Amendment.

  And If a right is protected by Due Process, then the instant defendants could not lawfully trespass against that right without first obtaining an adequate finding against the plaintiff, which they did not.

  "Any system of prior restraints of expression comes before this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." New York Times Co. v. United States, 403 U.S. 713, 714 (1971) (per curium) (internal citations and quotations omitted).

  "First Amendment rights are guaranteed by the Constitution and cannot be legislated away... There is no doubt that the First Amendment protects the spoken word as well as the right of free association." Hedges v. Obama, 890 F. Supp. 2d 424, 460 (S.D.N.Y. 2012) (internal citations omitted) (remanded on other grounds 724 F.3d 170 (2d Cir. 2013)).

b. Retaliation

  When the instant defendants and their parties in privity weren't successful in preemptively blocking the instant plaintiff's First-Amendment--protected activities, they took unlawful retaliatory actions and omissions after the fact. Please see RFA 1-11, 21, and 23-27. Courts for a long time have held that even among convicted prisoners serving sentences, "[A] hunger strike may be protected by the First Amendment if it was intended to convey a particularized message." Stefanoff v. Hays County, 154 F.3d 523, 527 (5th Cir. 1998) (citing Texas v. Johnson, 491 U.S. 397 404; (1989)). Please see also Birdo v. Gomez, 2016 U.S. Dist. LEXIS 98238, 13-CV-6864 (N.D. Ill. July 27, 2016) at *52, "It is sufficient to say that, on these facts,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Plaintiff's actions are constitutionally protected as to the alleged unreasonable force and purported retaliation. Plaintiff initiated his hunger strike as a specific response..."

Whatever protection is afforded to convicted prisoners who engage in hunger strikes "to convey a particularized message," at least the same level of protection, and, indeed, a great deal more, applies to the instant case because the plaintiff was a pre-trial detainee, and far from simply implicating his own rights in a hunger strike about which the public had and showed little or no interest, the public and publishers demonstrated a significant interest in the plaintiff's hunger strike, as noted above in Sec. II(A)(2) and found in exhibits 3, 135-136, and others hereto.

The defendants preference D.E. 52 at 31, for Grand Jury Subpoena John Doe v. United States, 150 F.3d 170, 171 (2d Cir. 1998) over Stefanoff and Birdo is misplaced. It was The Court in John Doe that declared a medical emergency and ordered force-feeding, and not an arbitrary and capricious agency action taken outside the adversarial process, as was threatened in the instant case. Please cf. D.E. 52 at 20 n. 9, admitting that "the need never materialized" to force-feed the instant plaintiff---i.e. that there was no such medical emergency---and yet the plaintiff was nonetheless continuously threatened by Defendant Bussanich and others with force-feeding even though such a need was never in fact imminent. These threats were unnecessary and coercive rather than informative and their sole purpose was to curtail the plaintiff's First Amendment protected speech.

Additionally, the instant defendants were not able to block all of the plaintiff's print work from publication while he was in MCC. The plaintiff maintains that his placement in the SHU without Due Process was never lawful. Nonetheless, his continued placement in the SHU for weeks after the end of his hunger strike while such articles and an open letter to the acting U.S. attorney general ran in the politics section of The Huffington Post and Shadowproof Press, demonstrates that the defendants' retaliation continued for twenty-five (25) days after the declared end of the plaintiff's hunger strike in continuing violation of 28 C.F.R. Sec. 541.33(a). Please see Exhibit 23 hereto; 28 C.F.R. Secs. 541.23, 541.25, 541.26, and 541.33 (retrieved September 2019).

"The First Amendment protects a prisoner's right to be free from retaliation for exercising his right to petition for redress of grievances." Marino v. Schult, 2019 U.S. App. LEXIS 9903, 18-997-pr (2d Cir. April 4, 2019) at *3, citing Espinal v. Goord, 558 F.3d 119, 128-29 (2d Cir. 2009). Further, Id. citing Espinal v. Goord at 128:

|To state a claim for First Amendment retaliation, a plaintiff "must show (1) that the speech or conduct at issue was
|protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection
|between the protected speech and the adverse action."

And, "[F]ederal courts have typically incorporated [42 U.S.C. Sec.] 1983 law into Bivens actions." Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995).

- Page 88 of 163 -

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

The instant complaint explicitly alleges that the plaintiff was transferred to MCC in retaliation against his

Constitutionally-protected hunger strike. D.E. 2 at 5 (p.1) and at 12 (p.22). The instant defendants have admitted as much.

RFA 9, 11, 23-26, and 29. On first impression is is manifest (prima facie) that the plaintiff's publications and other writings

were both protected speech and petitions for the redress of grievances. Please see Exhibit 3 hereto at 4 (p.14-18), at 12

(p.40-46), at 17 (p.58), at 18 (p.60-62), and at 19 (p.65-66). Specifically, Id. at 18 (p.62) states:

> |[H]e began a hunger strike until two demands were met: a commitment by U.S. Attorney Ortiz to cease what he called
> |"political prosecutions" under the CFAA, and a pledge from every presidential candidate to protect children such as
> |[Justina] Pelletier from institutional abuse. In November, over 50 days into his hunger strike, he remained just as
> |resolved. "I will not give Carmen Ortiz a felony CFAA conviction on an activist," he told me at the time. "[T]hat's not
> |going to happen after Aaron Swartz." True to his word, he continued his strike until January, shortly after Ortiz
> |announced her retirement.

(The plaintiff notes for accuracy that his hunger strike sought for Ortiz to cease all political prosecutions, not just those

under the CFAA.)

Please see also exhibits 125-127, 131-132, and 137-138; Exhibit 144 hereto, written after the end of the plaintiff's hunger

strike, Ryan Grim block-quoting Martin Gottesfeld, open letter to Acting--U.S.-Attorney-General Sally Yates, The Huffington

Post (January 24th, 2017); and Exhibit 145 hereto, Kevin Gosztola block-quoting Martin Gottesfeld, open letter to Acting--

U.S.-Attorney-General Sally Yates, Shadowproof Press (January 24th, 2017).

It is similarly obvious that the defendants took adverse action against the plaintiff. Within days of sending Exhibit 138

hereto, the plaintiff was transferred districts away to a non-medical facility and summarily thrown in the SHU with no regard

whatsoever to the defendants' own policies and regulations. Please see RFA 11, and 1-6; D.E. 2 at 5 (p.1) and at 12 (p.22).

The defendants stipulate to the causal link between the plaintiff's hunger strike and his transfer to the SHU at MCC. Please

see D.E. 52 at 2, "Plaintiff, a pretrial detainee at the time was held at MCC from November 14, 2016[,] to February 4,

2017---a total of 81 days. Despite being charged with crimes in the District of Massachusetts, he was held for this short

period of time at MCC because he was engaged in a hunger strike," (internal citations omitted).

Defendants aver that "Upon arrival at MCC," the plaintiff "was placed in MCC's Special Housing Unit (the 'SHU') in order to

allow the prison to properly monitor him and tend to his hunger strike," but this claim clearly has the tail wagging the dog,

given that the plaintiff was transferred across multiple federal-court districts specifically to be thrown in MCC's SHU.

Defendants' goals were not to "monitor" and "tend" to the plaintiff's hunger strike---that could have been done, as it has

been in so many other cases, in The District of Massachusetts. Instead their goal was to break the plaintiff's hunger strike

through unconstitutional means. Please see D.E. 2 at 10 (p.17), at 9 (p.16), and at 12 (p.22); RFA 9, 11, 23-27; and Exhibit

1 hereto at 4 (p.54-71).

No part of "monitor[ing]" and "tend[ing] to" the plaintiff's hunger strike necessitated blocking his mail and phone calls to

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------

Rolling Stone and his family, refusing him media interviews, keeping him in frigid temperatures and abject filth, threatening and coercing him, and transferring him more than one (1) federal-court district away from home---all as a pre-trial detainee. The defendants point to no other prison hunger strike---because there is none---started by any inmate---convicted or not--- in Massachusetts that resulted in a transfer to the self-described toughest SHU in America in The Southern District of New York. As held in Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998):

> |A prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not
> |transfer an inmate in retaliation for the exercise of constitutionally[-]protected rights.

   In the instant case, however, the plaintiff did have a liberty interest as a pre-trial detainee in remaining in his district as noted above, and, further, while a transfer of the plaintiff to a nearby medical facility may have been justified in order to "monitor" and "tend to" the plaintiff's hunger strike, it was clearly retaliatory to transfer of the plaintiff so far outside his federal-court district directly to the SHU that the defendants and their parties in privity label the toughest in America was retaliatory.

   "An adverse action in a retaliation claim is 'conduct that would deter a similarly[-]situated individual of ordinary firmness from exercising his or her constitutional rights.'" Marino v. Schult, 2019 U.S. App. LEXIS 9903, 18-997-pr (2d Cir. April 4, 2019) at *4 (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001))). While the defendants failed to deter the instant plaintiff, it is prima facie obvious that their actions and omissions would have deterred "a similarly[-]situated individual of ordinary firmness," and that their actions, though unsuccessful, were indeed so designed. Please see RFA 23-27; and Exhibit 1 hereto at 2 (p.21-31) and at 5 (p.72), describing the force-feeding process with which the plaintiff was threatened. Please see D.E. 2 for the conditions the plaintiff endured more than one (1) federal-court district away from his home.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/16/2019 02:40:39 PM

<u>5. The Defendants Stigmatized the Plaintiff and Restricted His Liberty, i.e. "Stigma-Plus."</u>

The Second Circuit explained in <u>Crenshaw v. City of New Haven</u>, 652 Fed. Appx. 58, 60 (2d Cir. June 21, 2016), with

thorough citations to binding precedent:

> |A protectable liberty interest may arise in connection with a "loss of reputation" when "coupled with some other tangible
> |element." Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir. 1994). This is known as a "stigma-plus" claim. Id. In order to
> |sustain a "stigma-plus" claim, a plaintiff must allege "(1) the utterance of a statement about [him] that is injurious to
> |[his] reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and
> |material state[-]imposed burden in addition to the stigmatizing statement." Velez v. Levy, 401 F.3d 75, 87 (2d Cir.
> |2007) (internal quotation marks and alteration omitted). "The defamatory statement must be sufficiently public to
> |create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not
> |implicate a liberty interest." Id. "Similarly, because a free-standing defamatory statement is not a constitutional
> |deprivation, but is instead properly viewed as a state tort of defamation, the plus imposed by the defendant must be a
> |specific and adverse action clearly restricting the plaintiff's liberty--for example, the loss of employment." Id. at 87-88
> |(internal quotation marks and alterations omitted).

During the plaintiff's hunger strike, but before his transfer to MCC New York, the defendants' parties in privity returned an

inquiry for comment from Newsweek reporter Anthony Cuthbertson and slanderously accused the plaintiff of fleeing justice

and endangering the lives of children. Please see <u>Exhibit 132</u> hereto; and <u>Exhibit 14</u> hereto, Christina Sterling; email from

Spokesperson for then--U.S.-Attorney Carmen M. Ortiz, to Anthony Cuthbertson, Newsweek Reporter, forwarded to Mrs.

Dana E. Gottesfeld (October, 2016) (date approximated from memory). As should have been expected, the defendants'

parties in privity failed to prove either accusation at the plaintiff's trial. Please see <u>Exhibit 26</u> hereto noting that the

plaintiff's jury did not find any potential impact on patients whatsoever; Frank Camp; "'Guardian Hacktavist' Martin

Gottesfeld Convicted; Faces Up To 15 Years In Prison"; The Daily Wire (August 4th, 2018). Please see also <u>United States v.

Gottesfeld</u>, 16-cr-10305-NMG ECF No. 399 (D. Mass. January 23rd, 2018), holding that the plaintiff did not obstruct justice

with his trip to Cuba in pursuit of the internationally-established right of political asylum. Please see also <u>42 U.S.C. Sec.

17391(a)</u>, noted above, extending the business-continuity contingency-planning mandates of <u>45 C.F.R. Secs. 164.308(a) and

164.312(a)(2)(ii)</u> to non-federal healthcare entities, including Justina Pelletier's torturers at Boston Children's Hospital; and

<u>Exhibit 4</u> hereto, <u>45 C.F.R. Secs. 308, 310, and 312</u>.

Despite Newsweek's inaction on the slanderous statement provided for publication by the defendants' parties in privity,

and the explicit refutation thereof by Rolling Stone, please see <u>Exhibit 3</u> hereto at 10 (p.34), i.e. "Gottesfeld assured

himself, correctly, that patients and medical records would not be affected," the defendants' parties in privity continued

trying to pedal this boldfaced lie to other media outlets. Please see <u>Exhibit 147</u> hereto; feature-length article on Martin

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Gottesfeld; The Miami New-Times (April, 2017) (date approximated from memory).

These statements, it's worth noting, were not issued by a sworn-in assistant U.S. attorney but by a DOJ non-attorney spokesperson, and they were not issued in court. A prosecutor's "statements to the media are not entitled to absolute immunity." Buckley v. Fitzsimmons, 509 U.S. 259, 277 (1993). Please see also Powers v. Coe, 728 F.2d 97, 103 (2d Cir. 1984); and Flagler v. Trainor, 663 F.3d 543, 549 (2d Cir. 2011). Further, a grant of qualified immunity in this cause of action to anyone employed by the U.S. Justice Department is inappropriate given the clear violation, in issuing the above, of District of Massachusetts Local Rule 83.2.1: Release of Information By Attorneys:

> |From the time of arrest... in any criminal matter until the commencement of trial... a lawyer associated with the
> |prosecution or defense shall not release or authorize the release of any extrajudicial statement, which a reasonable
> |person would expect to be disseminated by means of public communications, relating to that matter and concerning...
> |Any opinion as to the accused's guilt or innocence as to the merits of the case or the evidence in the case.

Please see Exhibit 27 hereto, District of Massachusetts Local Rule 83.2.1 (retrieved September 2019).

If the statement on behalf of the U.S. attorney's office found in Exhibit 146 hereto in response to the request for comment also found therein was authorized by prosecutors, then it was in violation of local rule. If the statement was not authorized by prosecutors, then the defendants' parties in privity who released it acted without authorization. In neither circumstance should they benefit from immunity. The plaintiff also notes that the defendants' parties in privity in the Massachusetts U.S. attorney's office admitted in their public statement in Exhibit 146 hereto that they were aware of the plaintiff's status in detention.

The above clearly establishes the first prong of the plaintiff's stigma-plus claim, i.e. "the utterance of a statement about [him] that is injurious to [his] reputation, that is capable of being proved false, and that he or she claims is false." Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005). The "tangible and material state[-]imposed burden in addition to the stigmatizing statement," Id., carried out by the defendants, as parties in privity to the Massachusetts U.S. attorney's office, was their transfer of the plaintiff to the SHU at MCC along with their inference with his efforts to communicate with The Huffington Post, Newsweek, Rolling Stone, and other media outlets to refute this demonstrably-false and slanderous statement, as well as all of the other injuries to the plaintiff noted herein. The plaintiff has clearly stated a prima facie stigma-plus claim. Indeed, given that MCC is specifically and in(famously) known to house the most dangerous and vile criminals like Joaquin "El Chapo" Guzman Loera and Jeffrey "Pedophile Island" Epstein, and that the defendants and their parties in privity transferred the plaintiff as a pre-trial detainee such a distance across multiple U.S.-court districts despite the relative proximity of other holding facilities like the Federal Medical Center at Fort Devens in Massachusetts, which, unlike MCC, are medically-oriented---it is clear that among other things the defendants and their parties in privity were trying to stigmatize the plaintiff. Please see also RFA 1-6, 9-11, 15, and 23-29.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------

6. The Defendants Denied the Plaintiff Access To His Counsel.

    As stated above, within one (1) week of the plaintiff's transfer to MCC---itself following his arraignment in The District of Massachusetts by less than a month---the defendants' parties in privity sought and obtained a highly-restrictive protective order in The District of Massachusetts. Had the plaintiff been able to confer with his counsel via the telephone, exactly as he had customarily done at Wyatt, then the plaintiff's criminal defense attorney would not have consented to this protective order.

    As noted above in Sec. II(A)(2), agents of the defendants and their parties in privity conducted and recorded a custodial questioning of the plaintiff centering on his reporting in The Huffington Post. No Miranda warning was given and the plaintiff had no access to his counsel. The plaintiff was, however, threatened with further criminal prosecution.

    By transferring the plaintiff to a facility where they knew and intended that he would no longer be housed in the medical unit but summarily thrown in the SHU and deprived of at-will outbound phone calls to his attorney, the defendants assisted their parties in privity in denying the plaintiff access to his counsel for a custodial questioning and materially impacted his access to the courts.

    Please see Benjamin v. Fraser, 264 F.3d 175, 186-87 (2d Cir. 2001) discussing access to counsel and Id. n. 9 distinguishing claims seeking a new criminal trial due to denial of access to counsel from the instant claims seeking possible money damages and prospective injunctive relief. Please see also RFA 1-6, 9, and 23-29.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 02:47:36 PM

D. THE PLAINTIFF STATED CLAIMS FOR WHICH RELIEF MUST BE GRANTED.

The plaintiff was not required to elect remedies or identify the particular statutes or implied causes of action available to him under the law. Please see above Sec. III(A)(1)(a). Nonetheless, he stated claims for which relief must be granted.

The plaintiff, as an unrepresented incarcerated party, is leery and makes no claim that the below are an exhaustive list. He depends on The Honorable Court to know the law and the available relief better than he. In order to refute the defendants' motion as completely as possible, however, the plaintiff explicitly notes the below.

1. Title 5 U.S.C. Secs. 701 Et Seq.

Liberally construed, the instant complaint states the following claims pursuant to 5 U.S.C. Secs. 701 et seq., i.e. The Administrative Procedures Act (APA): that The Court issue an order requiring "that the FBOP, MCC, and [U.S. Marshals Service] each adhere to 28 CFR [Secs.] 541.25, 541.26, 541.31(a), 540.2(b)(2), 540.2(a), and 540.20[,] as well as the 1st, 5th, 6th, and 8th Amendments of the U.S. Constitution and Article 1 of the New York Constitution." D.E. 2 at 14 Sec. VI(3). Please see also Exhibit 23 hereto, 28 C.F.R. Secs. 541.23, 541.25, 541.26, and 541.33; Exhibit 12 hereto, 28 C.F.R. Sec. 541.31; Exhibit 13 hereto, 28 C.F.R. Sec. 540.2; and Exhibit 10 hereto, 28 C.F.R. Sec. 540.20. The allegations giving rise to these claims were stated explicitly in the instant complaint, D.E. 2 at 6 (p.5-7) and at 10 (p.18), and have been admitted by the defendants, RFA 1-6, 9-17, 23-29.

The complaint, moreover, clearly asserts of an equal-protection and Due-Process claim. Please see D.E. 2 at 5 (p.2), showing that even among federal SHUs, for example, the SHU at MCC New York is deliberately operated as tougher than other SHUs. Please see also Id. (p.4-9), comparing life in a federal SHU to life in general population, the existence of federal regulations to "safeguard the civil rights of inmates," and the violations of those safeguards in the instant case.

While the plaintiff did not have computer access to the relevant sections of C.F.R. at the time he drafted the instant complaint, he is now able to highlight that the conditions detailed in D.E. 2 at 8 (p.10-16) violate 28 C.F.R. Sec. 541.31(a), "Your living conditions in the SHU will meet or exceed standards for healthy and humane treatment..." and 28 C.F.R. Sec. 541.31(c), "You will receive adequate institution clothing, including footwear..." (The text of 28 C.F.R. Sec. 541.31 is available as Exhibit 12 hereto.) Please see also RFA 6 and 23-29.

Further, while the plaintiff argues that he never should have been forced into the SHU, it is easy to see, given D.E. 2 at 7 (p.8), i.e. "[the plaintiff] was held in solitary confinement in the SHU at MCC, including twenty-five (25) days past the

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

declared end of this hunger strike," that 28 C.F.R. Sec. 541.33(a) was violated, i.e., "You will be released from

administrative detention status when the reasons for your placement no longer exist." (The text of 28 C.F.R. Sec. 541.33 is

available as Exhibit 23 hereto.) Please see also RFA 6 and 23-29.

    These sections of C.F.R. are of statutory creation under 5 U.S.C. Sec. 301; 28 U.S.C. Secs. 509, 510, and 515-519; and 18

U.S.C. Secs. 4042(a)(2) and 4042(a)(3). Please see those statutes and Exhibit 28 hereto, 28 C.F.R. Sec. 541.20, (retrieved

September 2019). The plaintiff is thus entitled to review in U.S. district court of agency acts and omissions under these

regulations by 5 U.S.C. Secs. 702 and 703. The scope of review under 5 U.S.C. Sec. 706 is broad, i.e., "To the extent

necessary to decision[sic] and when presented, the reviewing court shall decide all relevant questions of law, interpret

constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action..."

Moreover, under 5 U.S.C. Sec. 705, the court may grant injunctive relief pending review:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court,
> including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a
> reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or
> to preserve status or rights pending conclusion of the review proceedings.

    The defendants never rebutted the aforementioned factual allegations in their motion to dismiss and they have

subsequently admitted them to be true. Therefore all of the unrebutted and admitted factual allegations must be taken as

true at this stage of litigation. To the extent that the defendants may be found to have implicitly argued these factual

allegations, at this juncture all evidentiary inferences must be drawn in the plaintiff's favor.

    Monetary damages under The Constitution, moreover, are on their own insufficient to remedy the instant issues because

they are retrospective and not a prospective remedy. "[T]he Bivens remedy, in addition to compensating victims, serves a

deterrent purpose. Because the Bivens remedy is recoverable against individuals, it is a more effective deterrent than the

FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect." Carlson

v. Green, 446 U.S. 14, 21 (1980) (internal citations omitted). Please see also Marino v. Watts, 2016 U.S. Dist. LEXIS

104946, Civ. No. 9:12-CV-801 (NAM/DJS) (N.D.N.Y. August 8, 2016) at *22, The "core purpose" of Bivens is "deterring

constitutional violations by individuals."

    While it is true that financial damages can have a deterrent effect, there certainly has been no such deterrent effect in

the instant case. Perhaps federal officials are now (over)confident that courts will allow them to hide behind Ziglar v.

Abbasi, 137 S. Ct. 1843 (2017). Regardless, if anything, events that recently transpired since the defendants became aware

of the instant case, as admitted in RFA 22, strongly indicate that they treated the plaintiff's initiation of the instant case as

a dare---one they have belligerently pushed as far as they can by making the instant plaintiff one (1) out of the eighty (80)

or so federal inmates designated to a communications-management unit (CMU) out of a general population of approximately

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

one hundred eighty thousand (180,000). Thus the instant plaintiff is now part of just four hundredths of a percent (0.04%) of the federal-prison population housed in CMUs meant to monitor and curtail his access to the press. Please see D.E. 79 at 33; Federal Register excerpt describing the prohibition preventing CMU inmates, as opposed to SHU inmates, from sending special mail to members of the media; and RFA 29.

   There is also a high employee-turnover rate at the FBOP. For example, since the plaintiff's arrival at MCC three (3) years ago, the Bureau has had five (5) distinct leaders, and MCC has had no fewer than three (3) and possibly more. Since the government indemnifies these officials and they cannot reasonably be expected to stay long on the job, deterring them as individuals is the judicial equivalent of Whack-A-Mole.

   The Court has the statutory authority to grant relief for the plaintiff's claims under the APA. Please see Vidal v. Nielsen, 279 F. Supp. 3d 401 (N.D.N.Y. 2018) and Berkun v. Terrell, 2012 U.S. Dist. LEXIS 110283, 12-CV-706 (JG) (E.D.N.Y. August 6, 2012) n. 4 (citing Polanco v. United States DEA, 158 F.3d 647, 652 (2d Cir. 1997)). Indeed, as early as 1969, The U.S. Court of Appeals echoed The Supreme Court on the APA in Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 102 (2d Cir. 1969) (quoting Abbot Laboratories v. Gardner, 387 U.S. 136, 140 (1967)):

   |There can be no question at this late date that Congress intended by the Administrative Procedures Act to assure
   |comprehensive review of "a broad spectrum of administrative actions," including those made reviewable by specific
   |statutes without adequate review provisions as well as those for which no review is available under any other statute.

   Such relief would survive the succession of individual FBOP officers. The prospect of being held in contempt of court and the possible sanctions for such a finding are likely a far more effective deterrent against future misconduct and means of ensuring compliance with the plaintiff's rights than money damages against predecessors since departed.

   Should The Honorable Court in its wisdom find The APA inapplicable to the instant case for any reason, then the

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 03:13:26 PM

alternative implied cause of action for injunctive relief from repeated Constitutional violations recognized by The U.S. Court

of Appeals, noted in Berkun v. Terrell above, and then validated by The Supreme Court in Bivens v. Six Unknown Named

Agents of Federal Bureau of Narcotics, 409 F.2d 718, 723 (2d Cir. 1969) (citing to Marbury v. Madison and rev'd on other

grounds, 403 U.S. 388) is applicable due to the lack of any other option for survivable prospective relief:

> It is now clear that there is an implied injunctive remedy for threatened or continuing constitutional violations. See Bell
> v. Hood, 327 U.S. 678, 684 & n. 4, 66 S. Ct. 773, 90 L. Ed. 939 (1946); Larson v. Domestic and Foreign Commerce
> Corp., 337 U.S. 682, 696-697, 69 S. Ct. 1457, 93 L. Ed. 1628 (1949); Ex Parte Young, 209 U.S. 129, 28 S. Ct. 441, 52 L.
> Ed. 714 (1908); United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L. Ed. 171 (1882). This exercise of the general
> equity powers of the federal court initially may have developed in part because of the lack of an equity jurisdiction in
> many of the states. See Hart & Wechsler, supra, at 578, 650-651. But injunctive relief also seems to be an essential
> corollary to the power of judicial review established by Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60
> (1803). The power to declare an action of the legislative or executive branch unconstitutional is an empty one if the
> judiciary lacks a remedy to stop or prevent the action. Few more unseemly sights for a democratic country operating
> under a system of limited government power can be imagined than the specter of its courts standing powerless to
> prevent a clear transgression by the government of a constitutional right of a person with standing to assert it. Cf.
> Cromwell v. Benson, 285 U.S. 22, 56-61, 52 S. Ct. 285, 76 L. Ed. 598 (1932). Thus, even if the Constitution itself does
> not give rise to an inherent injunctive power to prevent its violation by governmental officials there are strong reasons
> for inferring the existence of this power under any general grant of jurisdiction to the federal courts by Congress.

Please see also Doe v. United States Civil Service Com., 483 F. Supp. 539, 564 n. 22 (2d Cir. 1980) (validating suits

seeking simultaneously implied remedies for both injunctive relief and damages).

Finally, any prospective remedy must obviously be directed towards those currently in office. The defendants have noted

that Defendants Tatum, Anderson, and Bussanich retired. The plaintiff was unaware of their departures. The plaintiff

further notes that Defendant Hurwitz is no longer the acting director of the FBOP because---tellingly---a high-profile loss of

life occurred in segregation at MCC while Defendant Hurwitz was trying to evade accountability in the instant case for the

conditions there in segregated housing. The plaintiff has therefore simultaneously filed a motion to add defendants to his

claims, specifically those under The APA or for implied injunctive relief.

2. Title 42 U.S.C. Sec. 1985(3)

The instant complaint alleges "that The [U.S. Marshals Service] had [the plaintiff] transferred to MCC in pursuit of some of

the unlawful purposes described above," please see D.E. 2 at 12 (p.22). Such "unlawful purposes" clearly included:

* deprivation of the plaintiff's Constitutional rights to Due Process, please see D.E. 2 at 6 (p.5-8) and above Sec. III(C)(1-3

and 5);

* violations of equal protection, please see D.E. 2 at 5 (p.2 and 4-21) and above Sec. III(C)(1-3 and 5);

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

\* abridgments and retaliations against free speech, freedom of association, and freedom of the press, please see D.E. 2 at 10 (p.17-21) and above Sec. III(C)(4-5);

\* denial of counsel, please see D.E. 2 at 5 (p.4) and above Sec. III(C)(6);

\* infliction of cruel and unusual punishment, please see D.E. 2 at 5 (p.2), at 7 (p.8-14), and at 9 (p.16-17) and above Sec. III(C)(3).

Title 42 U.S.C. Sec. 1985(3) allows the plaintiff to state claims wherein: "two [(2)] or more persons... conspire[d]... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," and explicitly allows:

|in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any
|act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of
|having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have
|an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the
|conspirators.

The Second Circuit has recognized similar claims under 42 U.S.C. Sec. 1985(3) in the prison context on other occasions. In Iqbal v. Hasty, 490 F.3d 143, 151, 176 (2d Cir. 2006) (rev'd on other grounds sub nom. Ashcroft v. Iqbal, 556 U.S. 662 (2009)), The Second Circuit recognized a 42 U.S.C. Sec. 1985(3) claim brought by a former federal detainee in the SHU at MDC Brooklyn.

Please see also Turkman v. Hasty, 789 F.3d 218, 232, 262-64 (2d Cir. 2014) (rev'd on other grounds sub nom. Zigler v. Abbasi, 137 S. Ct. 1843 (2017)). Although those federal defendants were later held to have qualified immunity in implementing an Executive policy with regard to non-citizens detained without charge, such a finding is not opposite to the instant case, wherein officials took actions in violation of Executive policy after previous denials of qualified immunity in similar and controlling circumstances. Please see below Sec. III(E), "THE INSTANT DEFENDANTS MUST BE DENIED IMMUNITY."

Further, The Second Circuit specifically construes 42 U.S.C. Sec. 1985(3) to cover political discrimination. Please see Keating v. Carey, 706 F.2d 377, 387-88 (2d Cir. 1982) (collecting cases, some internal citations omitted):

|A narrow interpretation of the statute as protecting only blacks and other analogously[-]oppressed minorities is
|untenable in light of the history of the Act. As noted above, the Ku Klux Klan Act was a response to President Grant's
|request for legislation empowering the federal government to end the Klan's anarchic tyranny and reestablish civil order.
|A century later, the view of the Act is apt to be distorted by the current perception of the Klan as a racist organization.
|The Congress of 1871, however, did not view the Klan solely as a racist organization to oppress blacks but as a political
|organization intent on establishing Democratic [party] hegemony in the South. The Senate Select Committee to
|Investigate Alleged Outrages in the Southern States concluded that the Klan "has a political purpose, is composed of
|members of the democratic or conservative party, [and] has sought to carry out its purposes by murders, whippings,
|intimidations, and violence." 15 H.R. Rep. No. 1, 42nd Cong., 1st Sess. XXX, XXXii (1871).
|Congress believed that the victims of this violence were carpetbaggers or "men of Union sentiment," in a word,
|Republicans. Black or white, "the victims whose property is destroyed, whose persons are mutilated, whose lives are

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

|sacrificed, are always Republicans." Cong. Globe, 42nd Cong., 1st Sess. 412, col. 3, 413, col. 1 (1871) (remarks of
|Congressman Roberts). "The dead and the wounded, the maimed and the scourged, are all, Republicans." Id. at 426,
|col. 3 (remarks of Congressman McKee). "Every victim of Ku Klux outrage has been a Republican." Id. at 437, col. 2
|(remarks of Congressman Cobb). The Klan's object is "the defeat of Republicanism." Id. at app. 196, col. 2 (remarks of
|Congressman Snyder). The Klan's "systematic plan... is not to leave in any of those States a brave white man who dares
|to be a Republican or a colored man who dares to be a voter." Id. at 702, col. 1 (remarks of Senator Edmunds). The
|Klan's "purpose is by these innumerable and nameless crimes to drive those who are supporting the Republican Party to
|abandon their political faith or to flee from the state" (or at least to quit their jobs in the state civil service). Id. at
|app. 252, col. 1 (remarks of Senator Morton). Finally, those "who vote with the party... or who accept a petty office
|from a Republican Administration, are in much of the country continually in imminent peril for their lives." Id. at 654,
|col. 1 (remarks of Senator Osborn).
|In our view, Congress did not seek to protect only Republicans, but to prohibit political discrimination in general. At
|least one informed Republican Senator acknowledged that the Act would have to be applied to conspiracies against a
|man "because he was a Democrat... or... a Catholic,... or... a Methodist,... or... a Vermonter." Cong. Globe, 42nd
|Cong., 1st Sess. 567, col. 2 (1871) (remarks of Senator Edmunds of Vermont).
|Nothing in the many cases applying the statute to racial discrimination suggests that we should now turn history on its
|head and exclude from protection the group that seems to have been foremost in the mind of Congress. Indeed, several
|courts have held that political discrimination is prohibited by [42 U.S.C. Sec.] 1985."

The plaintiff notes the following facts that show the defendants' 42 U.S.C. Sec. 1985(3) conspiracy against him is
motivated by political discrimination:

 * During the Pelletier controversy and the plaintiff's subsequent detention at MCC, Massachusetts has and had the largest
Democratic-party majority in the nation;

 * Support for the Pelletier family fell almost entirely down partisan lines, with Republicans backing the family against the
Democratic administration of then--Massachusetts-Governor Deval Patrick and his hyper-democratic alma matter, Harvard
University, and its children's hospital;

 * Carmen M. Ortiz---whom the plaintiff was protesting for political prosecutions---mentored under Harvard Professor
Phillip Heymann and was a political appointee of Democrat and Harvard-alumnus Barrack Obama;

 * Ortiz was nominated on the recommendation of Senator Edward Kennedy (D-MA), of The Harvard Kennedy School
Kennedys;

 * Ortiz's spokesperson told Newsweek reporter Anthony Cuthbertson just prior to the plaintiff's transfer to MCC that Ortiz
was "aware" of his status in detention, please see Exhibit 146 hereto;

 * The defendants and their parties in privity did not move the plaintiff to MCC until he announced the political goals of his
hunger strike, became a contributor to The Huffington Post, his writing appeared in the "Politics" section thereof, and until
just after the 2016 presidential election, when it became clear that the Republican party was about to take over The Justice
Department and the plaintiff petitioned AUSA Bookbinder for redress of his grievances. Please see Exhibit 1 hereto at 5
(p.75); and Exhibit 138 hereto.

 * D.E. 2 at 11 (p.21), specifically alleges, "Additional mail sent by the plaintiff containing articles and letters to officials
for publication at The Huffington Post and elsewhere... either wasn't sent out from the facility or arrived without having

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

been sealed by prison staff..., including but not limited to a letter for publication to then--President-elect Donald Trump;"

   * Immediately after the plaintiff's arrival at MDC Brooklyn on Friday, February 15th, 2019, agents of the defendants knew

of his designation to a CMU and made unprompted admissible opposing-party statements to reliable witness Johnell

Turner---after the government had just convinced This Court that Mr. Turner is credible and reliable---telling Mr. Turner that

the plaintiff is "an activist" and that his situation is "political." Please see D.E. 14 at 1 (p.4); D.E. 13 at 3 (p.28-31); and

D.E. 16 at 1, where The Court took judicial notice thereof.

   * The defendants have admitted their participation in this exact conspiracy, RFA 23-27.


The plaintiff asserts that his political expression and his political journalism are entitled to special solicitude under Sec.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 03:27:16 PM

1985(3). Moreover, the peculiar nature of his out-of-district transfer and return on a Saturday required approval at the

highest level of The U.S. Marshals Service and Federal Bureau of Prisons. Please see Exhibit 1 hereto at 5 (p.73). The

plaintiff further notes that his subsequent transfer to a CMU required the approval of the assistant FBOP director. Please see

Aref v. Lynch, 833 F.3d 242, 247 (D.C. Cir. 2016); Id. n. 2; RFA 29; and Exhibit 29 hereto, 28 C.F.R. Sec. 540.202(b) "[CMU]

Designation Procedures" (retrieved November 12th, 2019). This is consistent with the conspiracy alleged in the instant case

under 42 U.S.C. Sec. 1985(3) and indeed indicative thereof. While the low-level coconspirators likely did not act with

political malice aforethought---and thus Constitutionally-implied-damages and injunctive relief would apply to them and not

42 U.S.C. Sec. 1985(3)---the coconspirators operating at the level of Executive political appointees sought for political

reasons to deprive the plaintiff of equal enjoyment of his rights specifically enumerated above---a malevolent intent

cognizable under 42 U.S.C. Sec. 1985(3). Please see Exhibit 1 hereto.

   The plaintiff notes his simultaneously-filed but separate motion to add defendants to his claims, including those under 42

U.S.C. Sec. 1985(3).


3. State Civil-Rights Violations

   The instant complaint explicitly alleged "State civil rights violations." Please see the following:

* D.E. 2 at 2 Sec. I, "LEGAL BASIS FOR CLAIM;"

* Id. at 10 (p.17);

* Id. at 12 (p.23), i.e. "The plaintiff intends to show that his rights under Article 1 of The New York Constitution,

specifically but not necessarily limited to [Secs.] 5, 8, and 11 were also violated;"

* Id. at 12 (p.24) and at 16, noting that the plaintiff lacks access to necessary law-library resources to pursue his state--

civil-rights claims; and

* D.E. 2 at 14 Sec. VI, "RELIEF," seeking relief pursuant to "Article 1 of the New York Constitution."

   The plaintiff recalls that The Court noted his assertion of "'state civil rights violations,'" but he no longer has a copy of the

relevant docket entry due to the choice of the agents of the instant defendants not to move the plaintiff's legal work with

him into FBOP custody but instead to mail it to his home. Please see Exhibit 1 hereto at 1 (p.10) and Exhibit 20 hereto. He

believes from memory this explicit acknowledgement of his state--civil-rights claims may appear in D.E. 6.

   The defendants have also explicitly acknowledged the plaintiff's state-law claims. Please see D.E. 52 at 11, "... and various

- Page 101 of 163

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

provisions of the New York State Constitution." They have also admitted that the New York State Constitution is binding upon them, their predecessors in office, their codefendants, agents, employees, servants, officers, assignors, assignees, attorneys, contractors, and other such person or persons acting under color of authority in active concert or participation with such entities. They have further admitted that they conspired to violate the plaintiff's rights under New York law, including his rights as a medical patient. Please see RFA 21 and 27.

The defendants, however, prefer the nonsensical construal that rather than bring freestanding state-law claims, the plaintiff wishes to extend Bivens to cover state-law issues. D.E. 52 at 24 n. 10. The plaintiff does no such thing.

MCC is subject to the concurrent territorial jurisdiction of both the federal and New York State governments because the state has never ceded its jurisdiction. As This Court noted regarding a potential case arising out of the conduct of federal-prison officials at MCC, "Furthermore, if [inmate] Hernandez' version of the facts is correct, and assuming that the force used on his person was excessive and greater than that necessary to maintain control of [him] and prevent his escape or injury to the officers, Hernandez has a good claim for the common law tort of assault and battery, actionable under New York State law. If such an action were sued out against these defendants [from MCC New York] in the state court, the defendants would be placed in the dilemma of having to go to trial in that court, which is fully able to protect Hernandez' rights, or alternatively, as was conceded by the Assistant United States Attorney before me in pre-trial discussions, acting for defendants he could, and doubtless would, remove the state court action forthwith to this Court pursuant to 28 U.S.C. Sec. 1442(a)." Hernandez v. Lattimore, 454 F. Supp. 763, 767 (S.D.N.Y. 1978) (rev'd on other grounds, 612 F.2d 61 (2d Cir. 1978)). Please cf. United States v. Davis, 726 F.3d 357, 368-70 (2d Cir. 2013).

There is no federal bill of patients' rights. And doctors as well as other medical practitioners are principally licensed by the states and not the federal government. In this regard, at least, federal law is "deficient," as contemplated by 42 U.S.C. Sec. 1988(a). The defendants' actions, taken for purposes admitted in RFA 9 and 23-29, in threatening the plaintiff with the brutal practice of force-feeding, as explicitly alleged in D.E. 2 at 10 (p.17) almost certainly violated the New York Patients' Bill of Rights, though without access thereto the plaintiff is unable to specifically point to a particular section thereof, and the plaintiff's claim under New York law should be sustained.

The plaintiff further has separately and simultaneously (pari passu) moved The Honorable Court to order the instant defendants to provide him with access to New York State case law and procedures prior to passing on the merits of any of the plaintiff's state-law claims.

The plaintiff additionally notes his simultaneously-filed motion to add former--FBOP-Director Thomas Kane and former--Acting-Director of The U.S. Marshals Service David L. Harlow as defendants for his New York State civil-rights claims, as

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

they held office while the plaintiff was in the SHU at MCC New York.

4. Implied Damages Under The U.S. Constitution (Bivens)

    The instant plaintiff has an implied (non-statutory) retrospective cause of action for damages against federal officials for deprivation of his Constitutional rights. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). The instant complaint makes the following such claims against all the defendants for deprivation of the plaintiff's rights to:

    * Due Process, please see above Sec. III(C) and D.E. 2 at 6 (p.5-8);

    * equal protection, please see above Sec. III(C) and D.E. 2 at 5 (p.2 and 4-21);

    * petition the government for the redress of grievances without retaliation, please see above Sec. III(C) and D.E. 2 in its entirety;

    * free speech, and freedom of the press, please see above Sec. III(C)(3) and D.E. 2 at 10 (p.17-21);

    * freedom of association, please see above Sec. III(C) and D.E. 2 at 5 (p.4) and at 10 (p.18-21);

    * venue, please see above Sec. III(C)(2) and D.E. 2 at 12 (p.22);

    * the assistance of counsel, please see above Sec. III(C)(6) and D.E. 2 at 5 (p.4); and

    * freedom from cruel and unusual punishment, please see above Sec. III(C)(3) and D.E. 2 at 5 (p.2) and at 7 (p.8-14) and at 9 (p.16-17).

    The Constitutionally-implied-damages remedy is unique to the other remedies sought by the plaintiff because it is

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 03:26:29 PM

retrospective and allows for damages against the individual federal officials who committed unconstitutional acts against

him, even if their identities are unknown. "If a federal prisoner in a[n F]BOP facility alleges a constitutional deprivation, he

may bring a Bivens claim against the offending individual officer." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001).

"[H]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests." Bivens, 403 U.S.

at 395.

   The plaintiff's claims under 5 U.S.C. Secs. 701 et seq., unlike those in Bivens, et al., are prospective and specifically

exclude money damages. Please see 5 U.S.C. Sec. 702, requiring, "An action in a court of the United States seeking relief

other than money damages."

   The plaintiff's claims under 42 U.S.C. Sec. 1985(3), in contrast to Bivens, are for conspiracy as opposed to the resultant

unconstitutional acts.

   The plaintiff's state-law claims arise from the common law, the New York State Constitution, and state statutes, as

opposed to The United States Constitution.

   But there is no federal statute that creates a retrospective cause of action for damages against individual federal agents

for Constitutional violations. On the centennial of Congress's enaction of the Reconstruction-era statute 42 U.S.C. Sec.

1983, it was precisely this conspicuous ongoing absence that led The Supreme Court to hold that The Constitution itself

implies such a remedy.

   Yet, if the defendants were to prevail, their interpretation would neuter Bivens, and therefore The Constitution. This

would lead to the nonsensical result that otherwise-sovereign state governments would be liable for damages in federal

courts for the unconstitutional transgressions of their agents under 42 U.S.C. Sec. 1983, a statute that does not contemplate

unconstitutional acts by federal agents, and that federal officials would be liable under 42 U.S.C. Sec. 1985 for conspiracies

to violate individuals' Constitutional rights, and for neglecting to prevent such conspiracies under 42 U.S.C. Sec. 1986, but

yet not for the unconstitutional wrongs actually committed to bring those conspiracies to fruition.

   In support of this strained and counterintuitive proposition, which itself would give rise to equal-protection issues, the

instant defendants tout The Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009) and its more-recent decision

in Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). In reality, however, the defendants misconstrue Iqbal and Abbasi---a nuanced

Supreme Court decision that only appears to support the defendants' argument when oversimplified and selectively read. The

defendants meanwhile fail to address the timing and the very unique circumstances of these decisions as well as Welch v.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Bartlett, 169 F.3d 389 (2d Cir. 1999); Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000); Gaston v. Coughlin, 249 F.3d 156 (2d Cir.

2001); Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004); and Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001). Please see

D.E. 52 at 4, "Table of Authorities."

   The thrust of the defendants' argument stems from text cherry-picked from Justice Kennedy's opinion in Abbasi. The

defendants first note Id. at 1855, "These three cases---Bivens, Davis, and Carlson---represent the only instances in which the

[Supreme] Court has approved of an implied damages remedy under the Constitution."

   Defendants cite to Id. at 1857, noting that (emphasis added), "expanding the Bivens remedy is now a 'disfavored' judicial

activity" (internal citation omitted to Iqbal at 675 ("Because implied causes of action are disfavored, the [Supreme] Court

has been reluctant to extend Bivens liability 'to any new category of defendants'" (internal citation omitted to Corr. Servs.

Corp. v. Malesko, 534 U.S. at 68))). For the reasons enumerated below, these arguments are unavailing and Iqbal and

Abbasi are not opposite to the instant plaintiff's claims.


a. Abbasi Did Not Neuter Bivens.


   The defendants would like to live in nation where in all but three (3) narrowly-construed sets of circumstances, federal

officials like themselves are impervious to lawsuits for damages arising from their violations of the Constitutional rights of

citizens. Such tyrannical invincibility would be specifically perilous to individual liberty and Due Process, and defeat the rule

of law. This concept ought not be seriously entertained---especially when the rulings cited by the defendants evince of no

such holding by The Supreme Court.

   Indeed, contemplating the exact scenario of Bivens, The Supreme Court noted in Butz v. Economou, 438 U.S. 478, 506

(1978) (quoting U.S. v. Lee, 106 U.S. at 220, 27 L. Ed. 171, 1 S. Ct. 240 and citing Marbury v. Madison, 1 Cranch 137, 2 L.

Ed. 60 (1803) and Scheuer v. Rhodes, 416 U.S. at 239-40, 40 L Ed 2d 90, 94 S. Ct. 1683, 71 Ohio Ops 2d 474):

> |The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the
> |protection provided by basic constitutional guarantees... Extensive Government operations offer opportunities for
> |unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official
> |can be an important means of vindicating constitutional guarantees.
> |Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are
> |subject to federal law.
> |"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with
> |impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to
> |obey it."


   If The Supreme Court intended to neuter to Bivens then it would have explicitly done so. Instead, it left intact all previous

Bivens case law and set down a new test for future Constitutionally-implied-damages remedies under The Constitution.

The "special factors" that counseled caution extending a Constitutionally-implied-damages remedy in Abbasi; i.e. the need

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

for the Executive to protect the American public in the unprecedented aftermath of the September 11th, 2001, terrorist

attacks; are generally inapplicable and not opposite to any of the plaintiff's claims in the instant case. As noted above in

Sec. II(A)(1), the instant plaintiff is a native-born American citizen and res judicata applies to the ruling made in limine by

The U.S. District Court in United States v. Gottesfeld, 16-cr-10305-NMG ECF No. ___ (D. Mass. _____, __, 2018)

precluding the Department of Justice from using the words "terrorist," "terrorism," and similar language to refer to the

instant plaintiff---who was and who remains a widely-featured human-rights advocate and nationally-published journalist.

   The majority of the plaintiff's implied-Constitutional-damages claims rest upon standing precedential decisions. "Some

differences, of course, will be so trivial that they will not suffice to create a new Bivens context." Abbasi at 1865.

   Further, as noted below, where some of the instant plaintiff's implied-Constitutional-damages claims can be construed as

arising in a new context, these claims easily pass muster under the test set forth by The Supreme Court in Abbasi, with

reasons specific to each claim supporting the extension of a corresponding Constitutionally-implied-damages remedy.

## b. Previous Constitutionally-Implied-Damages Cases Remain Good Law.

   As noted above, the defendants ignore Tellier v. Fields, which The Second Circuit never overturned. Indeed, The Second

Circuit never overturned a single such previously-authorized extension of Bivens in the wake of Iqbal and Abbasi. And this is

logical.

   Tellier was well-established law in The Second Circuit for nearly seventeen (17) years by the time in 2017 when The

Supreme Court announced that extending Bivens "is now" a "disfavored" judicial activity (emphasis added). Indeed, Tellier

was established about nine (9) years before The Supreme Court decided Iqbal, from which the "disfavored" quote was

derived in Abbasi. Rather than futilely try to contend with this immutable truth, the defendants ignore it.

   Indeed, a thorough search through the case law of every U.S. circuit court, reveals not one (1) instance after Abbasi in

which The U.S. Court of Appeals overturned an already-existing extension of Bivens. The plaintiff notes, respectfully, that it

would be up to The Second Circuit and not to The District Court to overturn Tellier and The Second Circuit has not done so.

"The parties have briefed and argued the question of whether Abbasi abrogates our precedent extending the Bivens cause of

action beyond the three contexts of Bivens, Davis, and Carlson. We need not address that question, however, to resolve the

instant case." Gonzalez v. Hasty, 755 Fed. Appx. 67, 69 (2d Cir. November 14, 2018), referring specifically to Tellier v.

Fields.

   This Court must rule in a manner consistent with Tellier and The Second Circuit's other previously-authorized

Constitutionally-implied-damages cases. Only after such a ruling is entered on the record could a question be certified for

interlocutory appeal. 28 U.S.C. Sec. 1292(b).                    — Page 106 of 163 —

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

c. The Plaintiff's Constitutionally-Implied-Damages Claims Are On Solid Legal Ground.

i. The Plaintiff's Fifth Amendment Implied-Damages Claims Rely On Tellier, Welch, and Palmer.

As noted above in Section III(C), the plaintiff's Fifth Amendment implied-damages claim relies on binding Second Circuit precedent from Tellier. Should the instant defendants wish to disturb this precedent, they must do so before The Second Circuit. Unless and until overturned, This Court is bound by this precedential ruling, and a Constitutionally-implied-damages remedy lies thereunder.

Further support for the plaintiff's Fifth Amendment implied-damages claim comes from Welch and Palmer. "Cf. Chin v. Bowen, 833 F.2d [21,] 24 [(2d Cir. 1987)] ('Both Bivens and [42 U.S.C.] section 1983 actions are designed to provide redress for constitutional violations. Though the two actions are not precisely parallel, there is a general trend in the appellate courts to incorporate [Sec.] 1983 law into Bivens suits.' (internal quotation marks and footnote omitted))." Gonzalez v. Hasty, 802 F.3d 212, 221 (2d Cir. 2015). "[T]he implied cause of action is the 'federal analog to suits brought against state officials under Rev. Stat. 1979, 42 U.S.C. [Sec.] 1983.'" Iqbal at 675-76.

ii. The Plaintiff's Sixth Amendment Implied-Damages Claims Rely On Marsh v. Kitchen and Doe v. United States Civil Service Com.

As early as 1973--just two (2) years after The Supreme Court decided Bivens--The Second Circuit found subject-matter jurisdiction for implied-damages claims under The Sixth Amendment. Marsh v. Kitchen, 480 F.2d 1270, 1271 n.2 (2d Cir. 1973).

And This Court found that Bivens's rationale "has been applied to other constitutional provisions by lower courts. See, e.g.,... Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144 (D.D.C. 1976) (Sixth Amendment)." Doe v. United States Civil Service Com., 483 F. Supp. 539, 563 n. 21 (S.D.N.Y. 1980).

It is important to note that the plaintiff does not--because he cannot do so at this time--seek to affect in any way his criminal case in The District of Massachusetts. Please see above Sec. II(A)(3), "Heck v. Humphrey." The damages the plaintiff herein seeks pursuant to his Sixth Amendment rights do not require such and the relevant statutes of limitations are elapsing for him to obtain the relief to which he is entitled. Please see again Benjamin v. Fraser, 264 F.3d 175, 187-87 n. 9 (2d Cir. 2001).

No conviction can justify and indemnify those responsible for the violation of the plaintiff's right as a pre-trial detainee not to be transported outside his district against his will and without Due Process of Law. Similarly, the civil pleading of this

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

violation does not necessitate the reversal of the plaintiff's conviction.

   Further, as noted above, the plaintiff seeks vindication in the instant case due to the harm to his reputation caused by allegations the defendants and their parties in privity speciously uttered to the press outside the courtroom and in violation of local rules, but which where found wanting by the jury in his criminal case. In this regard, the plaintiff has secured a

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 05:08:50 PM

favorable outcome on his acquitted conduct, as contemplated by the Heck court.

   The plaintiff's reputation is further harmed due to his inability to possess and publish his discovery, which would mitigate

the damage to his reputation by allowing him to publish documents calling into question the morality of the charges brought

against him and the integrity of those pursuing him while they indemnified Justina Pelletier's torturers. Independent of the

plaintiff's criminal case, the plaintiff is entitled to bring the full circumstances of his alleged acts to The Court of Public

Opinion and to pursue Executive clemency. He has suffered an actual injury as a result of the defendants and their parties in

privity denying him access to his counsel.


iii. The Plaintiff's Eighth Amendment Implied-Damages Claims Rely On Hernandez v. Lattimore, Gonzalez v. Hasty, and Gaston
v. Coughlin.

   On December 6th, 1979---about thirty (30) years before The Supreme Court decided Iqbal---The Second Circuit implied a

damages claim for cruel and unusual punishment under The Eighth Amendment in Hernandez v. Lattimore, 612 F.2d 61 (2d

Cir. 1979). Some six (6) years after Iqbal, The Second Circuit continued to cite Chin v. Bowen, 833 F.2d 21, 24 (2d Cir.

1987), noting, "Both Bivens and [42 U.S.C.] section 1983 actions are designed to provide redress for constitutional

violations. Though the two actions are not precisely parallel, there is a general trend in the appellate courts to incorporate

[Sec.] 1983 law into Bivens suits" (internal quotation marks and footnote omitted). Gonzalez v. Hasty, 802 F.3d 212, 221 (2d

Cir. 2015). The Second Circuit continued to consider implied-damages claims pursuant to The Cruel and Unusual Punishment

Clause. Id. at 221 and 224.

   Given the applicability of 42 U.S.C. Sec. 1983 case law, the precedential decision of Gaston v. Coughlin also further

supports the plaintiff's federal Constitutionally-implied-damages claim under The Eighth Amendment.


d. The Plaintiff's Constitutionally-Implied-Damages Claims Must Continue To Be Recognized.

   The Supreme Court began its opinion in Abbasi by noting the peculiar context in which the case arose. Ziglar v. Abbasi,

137 S. Ct. 1851 (2017):

   |After the September 11 terrorist attacks in this country, and in response to the deaths, destruction, and dangers they
   |caused, the United States Government ordered hundreds of illegal aliens to be taken into custody and held. Pending a
   |determination whether a particular detainee had connections to terrorism, the custody, under harsh conditions to be
   |described, continued. In many instances custody lasted for days or weeks, then stretching into months. Later, some of
   |the aliens who had been detained filed suit, leading to the cases now before the [Supreme] Court.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Further down, The Supreme Court expanded on the above introductory paragraph. Id. at 1852-53 (internal citations

omitted):

|In the weeks following the September 11, 2001, terrorist attacks---the worst in American history---the Federal Bureau of
|Investigation (FBI) received more than 96,000 tips from members of the public. Some tips were based on well-grounded
|suspicion of terrorist activity, but many others may have been based on fear of Arabs and Muslims. FBI agents
|"questioned more than 1,000 people with suspected links to the [September 11] attacks in particular or to terrorism in
|general."
|While investigating the tips---including the less substantiated ones---the FBI encountered many aliens who were present
|in this country without legal authorization. As a result, more than 700 individuals were arrested and detained on
|immigration charges. If the FBI designated an alien as not being "of interest" to the investigation, then he or she was
|processed according to normal procedures. In other words the alien was treated just as if, for example, he or she had
|been arrested at the border after an illegal entry. If, however, the FBI designated an alien as "of interest" to the
|investigation, or if it had doubts about the proper designation in a particular case, the alien was detained subject to a
|"hold-until-cleared policy." The aliens were held without bail.
|Respondents were among some 84 [(eighty-four)] aliens who were subject to the hold-until-cleared policy and detained
|at the Metropolitan Detention Center (MDC) in Brooklyn, New York. They were held in the Administrative Maximum
|Special Housing Unit (or Unit) of the MDC.

The Supreme Court noted that each of the plaintiffs in Abbasi, "was illegally in this country, arrested during the course of

the September 11 investigation, and detained in the Administrative Maximum Special Housing Unit for periods ranging from

three to eight months. After being released [they] were removed from the United States." Id. Further, "it seems fair to

conclude from the arguments presented" that the Abbasi plaintiffs "acknowledge that in the ordinary course aliens who are

present in the United States without legal authorization can be detained for some period of time." Id.

Thus, the circumstances noted by The Supreme Court in Abbasi differ materially and manifestly from the instant case and

are inapplicable. The Supreme Court explicitly noted the difference between the claims in Abbasi and those arising from the

deprivation of the Constitutional rights of citizens in the federal-prison context. Please see Id. at 1860 (internal citations

omitted), noting that the Abbasi plaintiffs:

|challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the
|wake of a major terrorist attack on American soil. Those claims bear little resemblance to the three [(3)] Bivens claims
|the [Supreme] Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home
|without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials
|for failure to treat an inmate's asthma. The [Second Circuit] Court of Appeals therefore should have held that this was a
|new Bivens context.

In contrast, the instant plaintiff is an American citizen and he was neither accused nor convicted of terrorism at any time

during his life. In further stark difference to Abbasi, the instant plaintiff does not challenge federal officials for their

compliance with a high-level executive policy drafted during a time of crisis, but rather the opposite; he challenges federal

officials for their non-compliance with long-established executive policies during a mundane time of normal operations.

"With respect to the claims [in Abbasi] against the Executive Officials, it must be noted that a Bivens action is not 'a proper

vehicle for altering an entity's policy.'" Id. quoting Correctional Services Corp. v. Malesko, 534 U.S. 61, 74 (2001). "'The

purpose of Bivens is to deter the officer.'" Id. quoting FDIC v. Meyer, 510 U.S. 471, 485 (1994). Unlike Abbasi, the purpose of the instant plaintiff's Constitutionally-implied-damages claims is not to alter Executive or Judicial policies, but to deter federal officials from intentional violations thereof, and by extension, to deter their violations of the Constitutional guarantees that these policies implement.

Moreover, unlike those in Abbasi, the instant plaintiff does "challenge more than standard 'law enforcement operations.'" Id. at 1861 (internal citation omitted).

The Supreme Court continued to note this distinction, which also applies to the instant case. Id. at 1862 (internal

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 05:14:14 PM

citations omitted):

>It is of central importance too, that this is not a case like Bivens or Davis in which "it is damages or nothing." Unlike the
>plaintiffs in those cases, respondents do not challenge individual instances of discrimination or law enforcement
>overreach, which due to their very nature are difficult to address except by way of damages actions after the fact.
>Respondents instead challenge large-scale policy decisions concerning the conditions of confinement imposed on
>hundreds of prisoners. To address those kinds of decisions, detainees may seek injunctive relief.

The instant plaintiff, on the other hand, does challenge individual instances of unconstitutional law-enforcement

overreach, and, in order to address the past injuries of the instant plaintiff "'it is damages or nothing.'" Id. citing Bivens,

403 U.S. 388, 410 (1971).

As The Supreme Court stated Id. at 1859-60:

>The proper test for determining whether a case presents a new Bivens context is as follows. If the case is different in a
>meaningful way from previous Bivens cases decided by this Court, then the context is new. Without endeavoring to
>create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples
>might prove instructive. A case might differ in a meaningful way because [(i)] of the rank of the officers involved; [(ii)]
>the constitutional right at issue; [(iii)] the generality or specificity of the official action; [(iv)] the extent of judicial
>guidance as to how an officer should respond to the problem or emergency to be confronted; [(v)] the statutory or other
>legal mandate under which the officer was operating; [(vi)] the risk of disruptive intrusion by the Judiciary into the
>functioning of other branches; or [(vii)] the presence of potential special factors that previous Bivens cases did not
>consider.

While the above list is not exhaustive, its seven (7) factors should be considered at a minimum.

i and ii. The Ranks of the Officers Involved and the Constitutional Rights At Issue Are Not New.

Constitutional implied-damages claims are nothing new against wardens and prison medical directors.

For examples under The Due Process Clause, please see Tellier v. Fields, 280 F.3d 69, 82 (2d Cir. 2000); and Adams v.

Beaudouin, 2011 U.S. Dist. LEXIS 6498, 09-CV-2136 (NGG) (LB) (E.D.N.Y. January 24, 2001). Neither are they new to instant

Defendants Tatum and Bussanich. Ramirez v. Tatum, 2018 U.S. Dist. LEXIS 214034, 17 Civ. 7801 (LGS) (S.D.N.Y. December

19, 2018). Rodriguez v. Warden, 2014 U.S. Dist. LEXIS 108864 (S.D.N.Y. August 5, 2014) (adopted by 2015 U.S. Dist. LEXIS

24133 (February 27, 2015)).

For examples of implied-damages claims for violations of Equal Protection by wardens and medical staff, please see

McClenton v. Menifee, 2006 U.S. Dist. LEXIS 60297, 05 Civ. 2844 (JGK) (S.D.N.Y. August 29, 2006) and Id. at *31 n. 11

(collecting cases); as well as Ojo v. United States, 2018 U.S. Dist. LEXIS 137431, 15-cv-6089 (ARR) (LB) (E.D.N.Y. August 14,

2018).

For examples of implied-damages claims arising from retaliation against the right to petition the government for the

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

redress of grievances by wardens and medical staff, please see Turkman v. Ashcroft, 2006 U.S. Dist. LEXIS 39170, 02 CV

2307 (JG) (E.D.N.Y. June 14, 2006) (aff'd in part, rev'd in part, on other grounds 589 F.3d 542 (2d Cir. 2009)). Indeed,

Defendant Bussanich is no stranger to this type of claim. Henderson v. Bussanich, 2006 U.S. Dist. LEXIS 98121, CIVIL

ACTION No. 3:CV-06-0925 (M.D. Pa. June 20, 2006) at *32-34.

In regards to implied-damages claims arising against wardens and medical staff for violations of prisoners' rights to free

speech, please see O'Rourke v. Smith, 1983 U.S. Dist. LEXIS 13496, No. 81 CIV. 6466 (CBM) (S.D.N.Y. September 23, 1983)

at *121-22 (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979) and internal citation omitted to Carlson v. Green, 446 U.S. 14,

18 (1980)):

> |"[S]entenced prisoners enjoy freedom of speech... under the First... Amendment[t][sic]... [P]retrial detainees, who
> |have not been convicted of any crimes, retain at least those rights that... are enjoyed by convicted prisoners." It is
> |clear that allegations of the unlawful confiscation of reading materials and of the destruction and/or confiscation of
> |written work implicate First Amendment rights, and that an action for damages may be brought in federal court against
> |federal officials who violate those rights.

Please see also Gilliam v. Quinlan, 608 F. Supp. 823, 834 (S.D.N.Y. January 16, 1985), "First amendment protections are

perhaps the most jealously guarded of prisoners' rights."

Implied-damages cases explicitly invoking the freedom of the press are somewhat more exotic, but even so, not unheard-

of. Indeed, about nine (9) years before the plaintiff arrived at MCC New York, a U.S. District Court struck down as

unconstitutional a blanket FBOP prior restraint on articles published by federal inmates and the FBOP rescinded the relevant

policy. McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016) (citing Jordan v. Pugh, 504 F. Supp. 2d 1109, 1124 (D.

Colo. 2007)).

A warden in The Second Circuit faced an implied-damages claim for violations of First Amendment freedom of association

more than seven (7) years before the instant plaintiff was transferred to MCC New York. Eady v. Lappin, 2009 U.S. Dist.

LEXIS 97513, 9:05-CV-0824 (NAM/GHL) (N.D.N.Y. September 30, 2009) at *69.

Implied-damages claims for denial of access to counsel are nothing new to federal-prison wardens. Malik v. Hershberger,

1995 U.S. Dist. LEXIS 3887, 93 Civ. 4396 (LAP) (S.D.N.Y. March 29, 1995) at *18-19; Iqbal v. Hasty, 490 F.3d 143, 170 (2d

Cir. 2006); and Elmaghraby v. Ashcroft, 2005 U.S. Dist. LEXIS 21434, 04 CV 1809 (JG)(SMG) (E.D.N.Y. September 27, 2005)

at *20-21 (rev'd on other grounds sub nom. Ashcroft v. Iqbal).

Defendant Bussanich is also no stranger to Eighth Amendment claims. Henderson v. Bussanich, 2006 U.S. Dist. LEXIS

98121 at 16-20. Indeed, a review of the case law from Defendant Bussanich's time in Pennsylvania, prior to his transfer to

MCC, reveals that he was sued at least fourteen (14) times for acts and omissions occurring in the roughly-six-(6)-year

period between late 2003 and 2009: (1) Harper v. U.S. Penitentiary Lewisburg (2003); (2) Whooten v. Bussanich (2004); (3)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Vega v. United States DOJ (2004); (4) Henderson v. Bussanich (2006); (5) Mackey v. BOP (2005); (6) Hopkins v. Smith (2005); (7) Boling v. Bussanich (2007); (8) Santee v. United States (2007); (9) Smith-Stewart v. Bledsoe (2008); (10) Baker v. Williamson (2009); (11) Hicks v. Bussanich (2009); (12) Kerce v. Ball (2010 case arising from acts and omissions starting in 2009); (13) Milhouse v. Jordan (2009); and (14) Holbdy v. Bussanich (2014 case arising from acts and omissions in 2008-2009).

There are a further four (4) lawsuits filed in the same period against staff under the supervision of Defendant Bussanich: (1) Hakeem v. Salaam (2003); (2) Anderson v. BOP (2004); (3) Hill v. Smith (2005); (4) Wallace v. Lappin (2009).

It was well-known among the inmate population, including to the instant plaintiff, that Defendant Bussanich moved to MCC New York because of this lengthy litigation history in Pennsylvania. Please see Exhibit 1 hereto at 5 (p.74).

And thereafter this litigation history only expanded. Defendant Bussanich was sued no fewer than a further eleven (11) times in the instant vicinage: (1) Nkanseh v. Medical Dep't of MCC (2010); (2) Banks v. United States; (3) Rodriguez v. Warden (2013); (4) El-Hanafi v. United States (2013); (5) Stalman v. United States (2014); (6) Dobek v. Leanaweaver (2015); (7) Ferndandez v. United States (2015); (8) Mayes v. United States (2015); (9) Lesane v. United States (2016); (10) Rivera v. Fed. Bureau of Prisons (2017); and (11) McKiver v. Fed. Bureau of Prisons (2017).

A lawsuit was also filed in the same period against staff operating under Defendant Bussanich's supervision: Correa v. Hastings (2013).

Defendant Bussanich thus may be the most-sued "doctor" in the FBOP, a superlative not exactly deserving of a Dos Equis commercial: He doesn't always malpractice, but when he does, he prefers to claim qualified immunity (and please see below Sec. III(E) as to any such claims of qualified immunity).

Constitutionally-implied-damages claims that were brought by a pre-trial detainee against an FBOP director and the U.S.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 05:21:16 PM

Marshals Service thirty (30) years prior to the filing of the instant case parallel those made against instant defendants

Hurwitz and Anderson, and were recognized in each of the instant Court's sister circuits. Please see Lyons v. U.S. Marshals,

840 F.2d 202, 203 (3d Cir. 1988):

|Appellant James Lyons instituted this suit while he was a pretrial detainee at the United States Penitentiary in
|Lewisburg, Pennsylvania (Lewisburg). The suit, brought under the authority of Bivens v. Six Unknown Named Agents of
|Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), seeks damages and injunctive relief
|for the transfer of Lyons to Lewisburg from a New Hampshire prison, as well as for the conditions faced by Lyons as a
|pretrial detainee at Lewisburg...
|On April 2, 1986, Lyons was arrested in Massachusetts on federal drugs and firearms charges. Lyons was then taken to
|Rhode Island for arraignment, and on May 2, 1986, was indicted in the United States District Court for the District of
|Rhode Island. Because of overcrowding in the Rhode Island detention facility, Lyons was transferred to Concord State
|Prison in New Hampshire as a federal pretrial detainee on July 1, 1986. While imprisoned there, Lyons instituted a civil
|suit protesting the conditions for pretrial detainees.
|On August 25, 1986, Lyons was transferred to the United States Penitentiary in Lewisburg, Pennsylvania. Lyons alleges
|that this transfer occurred in retaliation for his filing the lawsuit in New Hampshire and for his publicizing the conditions
|for pretrial detainees in the local newspapers. Lyons remained at Lewisburg for over two months, until November 4,
|1986, at which time he was transferred to a Massachusetts facility...
|Like all other pretrial detainees at Lewisburg, Lyons was classified as an "unsentenced holdover," segregated from the
|general population of prisoners, and placed in the Special Housing Unit on Administrative Detention status. Lewisburg
|segregates pretrial detainees from the general prison population for the detainees' own protection, as well as for the
|security of the institution. The detainees are placed in an administrative detention unit because Lewisburg does not
|have other segregated facilities designed to house pretrial detainees.
|Lyons contends that conditions for pretrial detainees in Lewisburg's Special Housing Unit were unconstitutionally harsh,
|and in particular, worse than those for sentenced inmates. According to Lyons, he was typically locked in his cell 23 to
|24 hours per day. He got a maximum of three showers and five hours of recreation per week. In addition, Lyons claims
|he was not allowed to make a telephone call until almost a month after he arrived at Lewisburg, and thereafter was
|allowed only one other call, which was not successful. Other alleged conditions include insufficient clothes and linens,
|inadequate law library materials and restricted use of the main prison law library; interference with mail and legal
|materials; restricted allotment of stamps, paper, pens, and envelopes, combined with a prohibition on commissary
|purchases; inadequate food served in the cell rather than in the prison dining rooms; and inadequate lighting, air,
|quiet, and space in the cells.

    Please see also Exhibit 1 hereto at 1 (p.10-19) and at 3 (p.38-43); D.E. 2 at 5 (p.4) and at 8-11; and RFA 1-6, 10-11, and

23-27.

The Third Circuit continued in Lyons v. U.S. Marshals at 206 (internal citations omitted):

|Lyons, in his affidavit opposing defendants' summary judgment motion, introduced letters tending to show that the BP-8
|and BP-9 complaint forms were extremely difficult for pretrial detainees to obtain. For example, in a letter to Warden
|Crandell dated September 17, 1986, Lyons wrote: "I cannot get a BP 8 or 9 form to save my life. I have written to the
|counselors and the FAL Unit. Forget it. No response. How do I get one?" On the same day, Lyons wrote to Norman
|Carlson, Director of the Bureau of Prisons that "I write to these counselors and I still never get a response. I ask for
|everything. I went crazy trying to get a BP-8 to complain. Nothing.["] The affidavit also incorporates a letter dated
|September 20, 1986, from Lyons to a Lt. Holt, alleged to be in charge of the Special Housing Unit, in which Lyons states
|that "I have requested BP forms several times with no response, so I will take this route."

Please see RFA 12-14 and 16-20.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

The above-noted parallels to elements in the instant case continued Id., "this evidence suggest[s] that Lyons was ultimately able to obtain a [BP-8] form... after the filing of this suit." Id. Please see Sec. III(B) above, regarding the instant plaintiff's later access to the FBOP administrative-remedy system.

Moreover, in regards to Lyons's out-of-state transfer as a pre-trial detainee, The Third Circuit noted Id. at 207, that, like in the instant case, there was evidence that:

> tends to support Lyons' contention that a remedy for the problem he allegedly faced was available, if at all, somewhere above the institutional level. If, as Lyons claims, Lewisburg is not equipped either to protect pretrial detainees in the general prison population or to provide satisfactory segregated facilities, it is reasonable to expect that the problem can be effectively addressed, if at all, only in the latter stages of the designated administrative process. Similarly, we think it is also a fair inference that Lyons' request that his allegedly retaliatory transfer be rescinded was not something that could be dealt with by the management of Lewisburg.

Please cf. D.E. 2 at 12 (p.22); D.E. 31 at 3; and D.E. 33 at 2 (p.7).

The Court thus did not dismiss the FBOP director and the U.S. Marshals defendants. (Please cf. D.E. 31 at 2-3:

> The government's preliminary opposition totally ignores the issue of the plaintiff's designation to a so-called Communications Management Unit or CMU, which is a determination under the control of the defendants. The motion for a temporary injunction therefore will not be "moot" when the defendant leaves the SHU at MDC Brooklyn, as the government claims. For these reasons, the proper opposing party of the plaintiff's emergency motion for a temporary injunction is Mr. Hurwitz, and not his subordinate, the warden of MDC Brooklyn, who has no oversight of the plaintiff's designation to a CMU. In contrast to the warden of MDC, it is Mr. Hurwitz who has the authority to change the plaintiff's designation and order the warden of MDC to release the plaintiff from the SHU. Mr. Hurwitz may not be located in The Southern District of New York, but there is only 1 federal government. Venue for the instant case was properly chosen and so long as the FBOP, and thereby Mr. Hurwitz, operate in the district, they are within the jurisdiction of The Honorable Court.
> The injunctive action which the plaintiff seeks is not against a particular facility, but to enjoin the entire bureau.

Please see also Aref v. Lynch, 833 F.3d 242, 247 (D.C. Cir. 2016), "BOP's Assistant Director evaluates and approves the designation" to a CMU.)

Moreover, The Third Circuit continued in Lyons v. U.S. Marshals at 207, noting:

> These facts are important in light of the limited time available to a detainee for pursuing administrative remedies. Under the Speedy Trial Act, 18 U.S.C. [Sec.] 3161(c)(1) (1982), a defendant in a criminal case in the United States courts must be tried within 70 days of indictment. While the Act provides for certain "excludable time," such a defendant can ordinarily expect to be tried within a reasonably short period. When Lyons was initially exposed to conditions at Lewisburg, over three and a half months had elapsed since the filing of the indictment against him. The current record does not disclose whether a trial date had been set as of that time, but it is likely that Lyons did not expect to remain a pretrial detainee at Lewisburg for any extended period of time.
> Because Lyons, on arrival at Lewisburg in the summer of 1986, may have been facing a relatively short period as a pretrial detainee there, because the problems about which he complained were ones that could be addressed, if at all, in the latter stages of the administrative process, and because he may reasonably have believed that he would be unable to secure timely access to that process, we are unwilling to hold as a matter of law that Lyons was barred from seeking judicial relief when he filed his complaint on September 5, 1986.

Three (3) U.S. Supreme Court justices later explicitly cited to Lyons's case in The Third Circuit to support the proposition that a Constitutionally-implied-damages claim "is available to federal pretrial detainees challenging the conditions of their confinement, see, e.g., Lyons v. United States Marshals, 840 F.2d 202 (CA3 1987)." Sell v. United States, 539 U.S. 166, 193

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------------

(2003) (Scalia, J., dissenting on grounds unrelated to the quoted prospect).

Mr. Lyons similarly filed suit against the director of the FBOP in The First Circuit for damages and injunctive relief over

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 05:30:02 PM

the conditions he experienced as an out-of-district detainee held in New Hampshire. The district court summarized Lyons's

action as follows after a remand vacating an erroneous summary judgment entered for the defendants. Please see Lyons v.

Powell, 838 F.2d 28 (1st Cir. 1988) and 729 F. Supp. 1404 (D.N.H. 1989):

> |The gist of the action against the federal defendants is that they had responsibility for plaintiff's pretrial detention and
> |the selection of the [New Hampshire State Prison] for his detention.

The district court then quoted Miranda v. Munoz, 770 F.2d 255 (1st Cir. 1985):

> |Because there is no respondeat superior liability under [Sec.] 1983, Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir.
> |1984); Layne v. Vinzant, 657 F.2d [468] at 471 [1st Cir. 1981]; Kostka v. Hogg, 560 F.2d 37, 40 (1st Cir. 1977),
> |supervisory officials may be found liable only on the basis of their own acts or omissions. Supervisors need not have
> |actual knowledge of the specific incident at issue, however, if they had the power and duty to alleviate the conditions
> |which led to the violation, Pinto v. Nettleship, 737 F.2d at 132-33; Ferndandez v. Chardon, 681 F.2d 42, 55 (1st Cir.
> |1982). We agree with the description of supervisory liability given by the Fourth Circuit in Slakan v. Porter, 737 F.2d
> |368, 373 (4th Cir. 1984):
> |"The outer limits of liability in any given case are determined ultimately by pinpointing the persons in the
> |decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked."

At Lyons v. Powell, 729 F. Supp. 1406, the district court continued:

> |The chain of events which resulted in the plaintiff's incarceration at the [New Hampshire State Prison] culminated as a
> |result of the [federal] defendants making the selection. The court realizes the exigencies of the situation on July 1,
> |1986, but the defendants had a duty to check on institutions where federal pre-trial detainees were lodged. They are
> |also responsible for their omissions in a supervisory capacity. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.
> |Ct. 1999, 29 L. Ed. 2d 619 (1971) is not apposite to the facts of this case.

Such findings are not limited to decades-old case law from sister circuits. Please see Thomas v. Ashcroft, 470 F.3d 491,

496-97 (2d Cir. 2006) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). And similar holdings by The Second Circuit

also go back more than a decade earlier than Lyons. Please see Wright v. McMann, 460 F.2d 126, 134 (2d Cir. 1971):

> |We turn finally to the award by the District Court of $1500.00 damages in Wright's favor against appellant McMann.
> |Reversal is urged on the ground that, although Judge Foley specifically rejected a defense of good faith or probable
> |cause on the part of McMann, he made no finding that McMann personally imposed the deprivations that resulted in the
> |unconstitutional treatment. To find McMann liable when lower prison officials were directly responsible for Wright's
> |treatment, it is argued, is to assess him under a theory of vicarious liability. We disagree.
> |In the first place, although Judge Foley made no specific findings to this effect, there is indeed evidence in the record
> |from which it could readily be inferred that McMann had definite knowledge of the condition of the "strip cells."...

MCC New York and its SHU, specifically G-Tier, where for months the instant plaintiff was held, is a high-profile section of

a high-profile facility that has generated a great amount of publicity and litigation for the Bureau of Prisons and the U.S.

Marshals Service, whose pre-trial detainees make up the majority of MCC's general population. Please see RFA 10; Bell v.

Wolfish; Exhibit 2 hereto; and Exhibit 148 hereto, Aviva Stahl; Prisoners Endure a Nightmare "Gulag" In Lower Manhattan,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Hidden In Plain Site; The Gothamist (June 19, 2018). Moreover, the instant plaintiff wrote to the sitting U.S. attorney general and DOJ inspector general in the politics section of one of the most-influential political publications in the nation. Please see Exhibit 142 hereto. The DOJ responded by sending OIG Senior Agent Frank Adamo to question the instant plaintiff at MCC, where he detailed in video and audio recordings the conditions he endured there. Please see also exhibits 135 and 144 hereto. The evidence is overwhelming that all of the named instant defendants were well aware---or certainly should have been well aware---of these conditions.

  Indeed, the recent news reflects that Defendant Hurwitz was personally entrusted by the U.S. attorney general with the safety and wellbeing of federal pre-trial detainee Jeffrey Epstein in the same 9-south SHU, but that nonetheless Epstein died under mysterious circumstances, and following Epstein's death, Defendant Hurwitz was in fact held responsible by his superiors and reassigned to another role in the FBOP. Therefore, the U.S. attorney general and the organization that employ both Defendant Hurwitz and his current counsel clearly consider the director of the FBOP personally responsible for what happens in the SHU at MCC, and so should The Court.

The Second Circuit noted in Wright v. McMann at 135:
|In short, applying the common law tort standard appropriate in [Sec.] 1983 cases, that one is liable for the "natural
|consequences of his actions," Monroe v. Pape, 365 U.S. 167, 187, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1967), we think
|appellant McMann knew or should have known that Wright was being forced to live under conditions described previously
|by this court as "foul" and "inhumane," 387 F.2d at 526, and today held unconstitutional.

The instant defendants concede in D.E. 52 at 18:
|Before the Supreme Court's decision in Iqbal, it was the law in this Circuit that a supervisor's personal involvement in a
|constitutional violation may be shown by evidence that the supervisor (1) participated directly in the alleged
|constitutional violation; (2) failed to remedy the wrong after being informed of the violation through a report or appeal;
|(3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a
|policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5)
|exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.
|Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

The instant defendants then attempt to stretch Iqbal past the holdings of The Supreme Court and sew confusion. This attempt to fit a square peg in a round hole is both futile and irrelevant. By the instant defendants' own admissions, they each took part directly in all of the claimed violations of the instant plaintiff's Constitutional rights, thus they are directly liable. Please see RFA 23-27. These admissions are consistent with the other evidence cited in the complaint and now available elsewhere on the instant record.

  Further, as The Second Circuit has since noted, a superior official should be held liable for damages when his or her acts or omissions satisfy the requirements of the underlying tort. Please see Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015) (rev'd in part on other grounds sub nom. Ziglar v. Abbasi, 138 S. Ct. 1843 (2017)):

|The proper inquiry is not the name we bestow on a particular theory or standard, but rather whether that standard---be

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------------

|it deliberate indifference, punitive intent, or discriminatory intent---reflects the elements of the underlying
|constitutional tort. See Iqbal, 556 U.S. at 676 ("The factors necessary to establish a Bivens violation will vary with the
|constitutional provision at issue.").
|Our conclusion is consistent with Iqbal, this Court's prior rulings, see Walker, 717 F.3d at 125, and the weight of Circuit
|precedent. For instance, in Starr v. Baca, 652 F.3d 1202, 1206-07 (9th Cir. 2011), the Ninth Circuit determined that
|Iqbal does not preclude Bivens claims premised on deliberate indifference when the underlying constitutional violation
|requires no more than deliberate indifference. See also Dodds v. Richardson, 614 F.3d 1185, 1204-05 (10th Cir. 2010);
|Sandra T.E. v. Grindle, 599 F.3d 583, 590-91 (7th Cir. 2010); Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir.
|2009).


Please see also Manning v. Griffin, 2016 U.S. Dist. LEXIS 44342, No. 15-CV-3 (KMK) (S.D.N.Y. March 31, 2016) at *43

(citing Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 335 (E.D.N.Y. 2013), rev'd in part on other grounds sub nom. Turkmen v.

Hasty, 789 F.3d 218 (2d Cir. 2015)), "Thus, by requiring that claims against superiors defendants satisfy each element of

the underlying constitutional tort, supervisory liability has been essentially transformed into a question of direct liability."

    Now, where the standard of deliberate indifference is the measure, as in the instant Eighth Amendment claims, the

instant defendants are each accountable under that same standard and strong evidence exists, both in the defendants'

admissions and in the exhibits hereto, that each of the named defendants knew and was deliberately indifferent to the

instant Eighth Amendment violations.

    Moreover, the instant defendants have not produced sufficient evidence to call into question their deliberate indifference,

let alone to demonstrate that there is not a triable issue. Please see Gaston v. Coughlin, 249 F.3d 156, 166 (2d Cir. 2000)

(some internal citations omitted and reference to Fed. R. Civ. P. updated to 56(c)(1)(A)):

|In seeking summary judgment dismissing the Eighth Amendment claims, defendants did not submit an affidavit or other
|sworn evidence... denying that they had knowledge of or responsibility for the freezing and unsanitary conditions to
|which [the plaintiff] claimed he was subjected in SHU... Since defendants did not support their lack-of-personal-
|involvement contention with any documentation of the sort envisioned by Fed. R. Civ. P. [56(c)(1)(A)], [plaintiff] was
|not required, in order to defeat summary judgment, to respond with such documentation, see, e.g., St. Pierre v. Dyer,
|208 F.3d 394, 404-05 (2d Cir. 2000). We conclude that [plaintiff's] statement that [defendants] had actual knowledge of
|the inhumane conditions to which he was subjected in SHU---which we do not consider conclusory because it was
|premised on the assertion that those men "made daily rounds" of SHU---should have led the district court to order
|further proceedings with respect to the Eighth Amendment claims against [defendants].


    Here too, the defendants provided no affidavit or sworn evidence denying their knowledge or responsibility for the

conditions in the 9-south SHU. They cannot do so without perjuring themselves. The plaintiff has further provided a non-

conclusory statement under penalty of perjury based upon the regular rounds conducted through the SHU by defendants

Tatum and Bussanich and the media notoriety and litigation history of 9-south and 10-south, which certainly raised the

conditions in the part of MCC shared by these units to the attention of the directors of the FBOP and U.S. Marshals Service.

Please see Exhibit 1 hereto at 4 (p. 46-49). Please see again RFA 6, 11, 23, and 26; and exhibits 2, 135, 142, and 148

hereto.

    Where discriminatory intent is the bar, as noted in above section III(D)(2), the evidence of such discriminatory intent in

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

the instant case grows stronger, not weaker, ascending the chain of command.

Further, since the out-of-district transfer of the instant plaintiff to MCC on short notice constituted an overt act clearly carried out for the express purpose of violating the plaintiff's Constitutional rights, please see D.E. 2 at 12 (p.22) and RFA 23-27, and it required approval from the acting directors of the FBOP and U.S. Marshals Service, an inappropriate finding of "respondeat inferior" would be required to hold lower-level defendants personally responsible for the decree from on high

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:18:57 PM

requiring the plaintiff's same-day out-of-district transfer. Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007).

The Second Circuit continued in Wright v. McMann at 135:

|We think Wright should be properly compensated for the suffering he had to endure, and recovery should not be
|defeated by an attempt by the warden to shift responsibility to inferiors when there is every reason to believe that he
|was aware of segregation cell conditions and when responsibility for permitting such conditions to exist was ultimately,
|in any event, squarely his. We are not moved by the suggestion that if we uphold liability today competent persons
|tomorrow will refuse to become superintendents, as title is presently designated. In the unlikely event that a
|prospective superintendent in fact turns down an offer for fear of personal liability, we think that the position is
|probably better filled by someone determined to supervise the facility so as to prevent the type of inmate treatment
|giving rise to this lawsuit.

And if defendants Hurwitz and Anderson were such people, then Jeffrey Epstein (who would have been a similarly-situated

potential class member) would still be alive to answer the instant court's charges. This Court remanded pre-trial detainee

Epstein to the custody of these instant defendants at MCC after they filed their instant motion, trying to shirk their

responsibilities for the conditions in which Epstein died. If The Honorable Court now dismisses these defendants after the

U.S. attorney general held them responsible for Epstein's death in the same SHU at MCC, then in so doing The Honorable

Court would send a message that it is permissible for the leaders of the FBOP and U.S. Marshals Service to kill through

deliberate acts and omissions the detainees it remands into their custody because afterwards The Court will help them

cover-up and dodge liability.

In any event, the ranks of the officials involved and the Constitutional rights at issue in the instant Constitutionally-

implied damages claims do not differ meaningfully from---and instead closely parallel---decades-old well-established

precedent from many U.S. circuit courts, including The Second Circuit, some of which have been cited to uphold the

availability of such claims by The U.S. Supreme Court.

iii. The Official Actions Have General and Specific Analogs In Case Law.

There is a dearth of guidance from The United States Court of Appeals on this Abbasi factor. Where the circuit courts have

yet to rule, however, common sense is perhaps the most applicable guide.

As detailed in the above text, nothing is new about the official actions in controversy in the instant case. There are

analogs for nearly all of them in the case law, dealing with similarly-situated plaintiffs and federal officials in the same or

similar-ranking positions, or, often, the exact same named defendants. The defendants' motion points to no claim by the

instant plaintiff that is novel in regards to the generality or specificity of any of the relevant official actions, and the instant

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

plaintiff has clearly demonstrated that all of his Constitutionally-implied-damages claims are based upon well-established and controlling precedent.

### iv. The Officers Had Extensive Judicial Guidance As To How To Respond To the Problem To Be Confronted.

When it comes to matters affecting prisoners' rights, there is no shortage of judicial guidance as to how these defendants should have responded to the problems confronted in the instant case, and the defendants point to no such absence. On the contrary, matters of prisoners' rights are perhaps some of the most-frequently--litigated and clearly-outlined in American jurisprudence.

In addition to the Federal Rules of Criminal Procedure and the case law cited throughout this opposition, the defendants' own policies, program statements, and regulations provided thorough guidance, to which the instant defendants could and should have adhered, in order to completely avoid the instant case. This is not a case where well-meaning federal officials followed policy, regulations, and precedent as best they understood them only to be led astray by unconstitutional-yet-mandated practices. Instead, the instant case is one in which the failure of the instant defendants to abide by the relevant guidelines was their first and sufficient warning---or sentry---alerting them that they were entering forbidden territory.

Unlike Abbasi and Iqbal, in the instant case there was no emergency related to national security, or otherwise.

### v. The Officers Were Operating Under Familiar Statutory and Other Legal Mandates.

Once again, the instant defendants were operating on familiar turf that has been well-litigated ever since The Supreme Court decided Bivens. The instant case raises no matters of first impression regarding any of the above-enumerated statutory or other legal mandates, and the defendants point to none.

### vi. There Is No Risk of Disruptive Intrusion By the Judiciary Into the Functioning of Other Branches.

Federal courts have long held that whatever the risk of disruptive intrusion into the Executive branches of the federal and state governments, those risks must be taken in order to uphold the rights of the citizens committed into their custody by those same courts. While courts are reluctant to unduly interfere in prison administration, there is an overwhelming amount of precedential case law, some of which is cited throughout this opposition, uniformly holding that the federal courts cannot send citizens into prison and then look the other way as their Constitutional rights are violated. As The Supreme Court reflected over forty-five (45) years ago in Cruz v. Beto, 405 U.S. 319, 321 (1972) (quoting Johnson v. Avery, 373 U.S. 483, 485 (1969) and citing Ex parte Hull, 312 U.S. 546, 549 (1941); and Younger v. Gilmore, 404 U.S. 15 (1971), aff'g Gilmore v. Lynch, 319 F. Supp. 105 (N.D. Cal. 1970)):

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

|Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons", including prisoners.
|We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that
|prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have
|the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the
|courts for the purpose of presenting their complaints."

Moreover, unlike the convicts in <u>Cruz v. Beto</u> and the above cases cited by The Supreme Court, the instant plaintiff was a

pre-trial detainee during the instant events in controversy.

Liberally construed, the only risk of intrusion identified by the defendants was in their request to stay discovery due to

resource constraints. There has been no suggestion, however, that there would be anything new, novel, or unduly

burdensome about the discovery process in the instant case. Unlike <u>Abbasi</u> and <u>Iqbal</u>, it is hard to imagine that national

security would be a factor in the instant case and the defendants have not pleaded such. Please cf. <u>Abbasi</u> 137 S. Ct.

1860-61 (internal citations omitted):

|Even if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would
|call into question the formulation and implementation of a general [national-security] policy. This, in turn, would
|necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the
|policies and governmental acts being challenged. These consequences counsel against allowing a <u>Bivens</u> action against
|the Executive Officials, for the burden and demand of litigation might well prevent them---or to be more precise, future
|officials like them---from devoting the time and effort required for the proper discharge of their duties. See <u>Cheney v.
|United States Dist. Court for D.C.</u>, 542 U.S. 467, 382, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004) (noting "the paramount
|necessity of protecting the Executive Branch from vexatious litigation that might district it from the energetic
|performance of its constitutional duties").
|A closely related problem, as just noted, is that the discovery and litigation process would either border upon or directly
|implicate the discussion and deliberations that led to the formation of the [national-security] policy in question.
|Allowing a damages suit in this context, or in a like context in other circumstances, would require courts to interfere in
|an intrusive way with the sensitive functions of the Executive Branch... National-security policy is the prerogative of the
|Congress and President. Judicial inquiry into the national-security realm raises "concerns for the separation of powers in
|trenching on matters committed to the other branches." These concerns are even more pronounced when the judicial
|inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other
|equitable relief. The risk of personal damages liability is more likely to cause an official to second-guess difficult but
|necessary decisions concerning national-security policy.

The stakes in the instant case are dissimilar to those in <u>Abbasi</u>. Please see <u>Id.</u> at 1863:

|There is a persisting concern, of course, that absent a <u>Bivens</u> remedy there will be insufficient deterrence to prevent
|officers from violating the Constitution. In circumstances like those presented here, however, the stakes on both sides
|of the argument are far higher than in past cases the Court has considered. If <u>Bivens</u> liability were to be imposed, high
|officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis.
|And, as already noted, the costs and difficulties of later litigation might intrude upon and interfere with the proper
|exercise of their office.
|On the other side of the balance, the very fact that some executive actions have the sweeping potential to affect the
|liberty of so many is a reason to consider proper means to impose restraint and to provide some redress from injury.
|There is therefore a balance to be struck, in situations like this one, between deterring constitutional violations and
|freeing high officials to make the lawful decisions necessary to protect the Nation in times of great peril. Cf. [United
|States v.] Stanley[, 483 U.S. 669, 681, 107 S. Ct. 3054, 97 L. Ed. 2d 550 (1987)] (noting that the special-factors
|analysis in the case turned on "how much occasional, unintended impairment of military discipline one is willing to
|tolerate"). The proper balance is one for the Congress, not the Judiciary to undertake. For all of these reasons, the
|Court of Appeals erred by allowing respondents' detention policy claims to proceed under <u>Bivens</u>.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------

   And please cf. Carlson v. Green, 446 U.S. at 18 (further block-quoted below in Sec. III(D)(4)(e)), "[T]he case involves no special factors counseling hesitation in the absence of affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate."

   Similarly, there are no such concerns counseling caution in the instant case. There was no comparable "time of crisis" nor national-security concern. The defendants concede "the need never materialized" to force-feed the plaintiff. D.E. 52 at 20 n. 9. The stakes of the instant case are no higher than in the past Constitutionally-implied-damages claims that the Supreme Court chose to let stand. The instant plaintiff does not challenge the validity of a detention policy, but instead seeks to enforce preexisting policies that neither side seeks to modify, judicially or otherwise.

   And given the defendants' admissions and the mandates of precedent, it is unclear that further discovery or trial are even

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 05:48:17 PM

necessary. Please cf. Clement v. Cal. Dep't of Corr., 364 F.3d 1148, 1148 (9th Cir. 2004):

|The district court denied the motion for summary judgment by the defendants/appellants, the California Department of
|Corrections and the individual corrections officials (collectively "CDC"). The district court then sua sponte granted
|summary judgment for Clement and issued a permanent, statewide injunction against enforcement of the internet mail
|mail policy. CDC appeals. We affirm the district court's judgment and uphold the injunction.

Please see RFA 1-30 and Code of Conduct for United States Judges Canon 3A(5).

vii. There Are No Potential Special Factors Unconsidered In Previous Constitutionally-Implied-Damages Cases.

The plaintiff is unaware of any potential special factors in his instant Constitutionally-implied-damages claims that were

not considered thoroughly in the previously-cited Constitutionally-implied-damages cases and the instant defendants point to

none.

e. No "Special Factors" Counsel Hesitation.

There are no such "special factors" that counsel hesitation in continuing to recognize the plaintiff's Constitutionally-

implied-damages claims.

In Abbasi, for instance, The Supreme Court considered the availability of alternative remedies to vindicate the

Constitutional rights underlying that case. Please see Abbasi at 1858, quoting Wilkie v. Robbins, 551 U.S. 537, 550 (2007):

|[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary
|to infer a new Bivens cause of action. For if Congress has created "any alternative, existing process for protecting [the
|injured party's] interest" that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from
|providing a new and freestanding remedy in damages."

The instant defendants incorrectly point to The FTCA as such an alternative remedy. D.E. 52 at 26 n. 11. Yet, in deciding

Bivens, The Supreme Court itself found that The FTCA was not a viable alternative. "FTCA was enacted long before Bivens

was decided." Carlson v. Green, 446 U.S. 14, 19 (1980).

Indeed, The FTCA, by its explicit terms, cannot be used to remedy Constitutional violations by federal-government actors.

28 U.S.C. Sec. 2679(b)(2).

This makes sense because, as The Supreme Court noted in Carlson v. Green at 19:

|[W]hen Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts
|committed by federal law enforcement officers, 28 USC [Sec.] 2680(h), the congressional comments accompanying that
|amendment made it crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action:
|"[A]fter the date of enactment of this measure, innocent individuals who are subjected to raids [like that in Bivens] will