TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------------------------------

|have a cause of action against the individual Federal agents and the Federal Government. Furthermore, this provision
|should be viewed as a counterpart to the Bivens case and its progeny[sic], in that it waives the defense of sovereign
|immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to
|have occurred in Bivens (and for which that case imposes liability upon the individual Government officials involved.)"
|S Rep. No 93-588, p 3 (1973)
|In the absense of a contrary expression from Congress, [Sec.] 2680(h) thus contemplates that victims of the kind of
|intentional wrongdoing alleged in this complaint shall have an action under FTCA against the United States as well as a
|Bivens action against the individual officials alleged to have infringed their constitutional rights.

Congress thus has not been "silent" on the issue of a damages remedy for violations of Constitutional rights by federal

jailors, nor has it taken "legislative action suggesting that Congress does not want a damages remedy." Though Bivens was a

judicial creation, Congress in effect adopted Bivens as its own and provided it siblings. When Congress enacted The PLRA, it

limited to the extent it found necessary the types of damages claims that prisoners can bring to federal courts, but it did not

seek to cut off Constitutionally-implied-damages claims all together, though it easily could have done so. For example,

please see 42 U.S.C. Sec. 1997e(e), which was enacted on April 26th, 1996, approximately twenty-five (25) years after

Bivens was decided.

The instant defendants attempt to conflate, to their undeserving benefit, the caution necessary to protect the autonomy

of the president and U.S. attorney general in the post--September-11th national-security context with the normal and

longstanding deference to prison administrators that Courts routinely consider but nonetheless reject in the face of the

wanton unconstitutional abuses that pervade the instant case. Please see Abbasi at 1862 (internal citations omitted):

|[T]he question is only whether "congressionally uninvited intrusion" is "inappropriate" action for the Judiciary to take.
|The factors discussed above all suggest that Congress' failure to provide a damages remedy might be more than mere
|oversight, and that congressional silence might be more than "inadvertent." This possibility counsels hesitation "in the
|absence of affirmative action by Congress."
|Furthermore, in any inquiry respecting the likely or probably intent of Congress, the silence of Congress is relevant; and
|here that silence is telling. In the almost 16 years since September 11, the Federal Government's responses to that
|terrorist attack have been well documented. Congressional interest has been "frequent and intense," and some of that
|interest has been directed to the conditions of confinement at issue here. Indeed, at Congress' behest, the Department
|of Justice's Office of the Inspector General compiled a 300-page report documenting the conditions in the MDC in great
|detail. Nevertheless, "[a]t no point did Congress choose to extend to any person the kind of remedies that respondents
|seek in this lawsuit."
|This silence is notable because it is likely that high-level policies will attract the attention of Congress. Thus, when
|Congress fails to provide a damages remedy in circumstances like these, it is much more difficult to believe that
|"congressional inaction" was "inadvertent."

And cf. Carlson v. Green 446 U.S. at 18 (emphasis added):

|Bivens established that the victims of a constitutional violation by a federal agent have a right to recover damages
|against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action
|may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special
|factors counseling hesitation in the absence of affirmative action by Congress." [Bivens v. Six Unknown Named Agents
|of Federal Bureau of Narcotics, 403 U.S. 388, 396 (1971)]; Davis v. Passman, 442 US 228, 245... (1979). The second is
|when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute
|for recovery directly under the Constitution and viewed as equally effective. Bivens, supra, at 397...; Davis v. Passman,
|supra, at 245-47...
|Neither situation obtains in this case. First, the case involves no special factors counseling hesitation in the absence of

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------------

|affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to |suggest that judicially created remedies against them might be inappropriate. Davis v. Passman, supra, at 246...

Some Courts have held after Abbasi that the FBOP's administrative-remedy system is a viable alternative remedy within the meaning of Abbasi. The language used by The Supreme Court, however, reveals that it is not. The Abbasi court contemplated only "alternative remedies" created by Congress. "For if Congress has created 'any alternative, existing process...'" Abbasi at 1858 (emphasis added).

The Abbasi Court made no mention of the FBOP's administrative-remedy system as a possible alternative despite its obvious awareness of the existence of that system. Please cf. Setser v. United States, 566 U.S. 231, 244 (2012), a case decided before Abbasi that did not ~~involving~~ involve Constitutionally-implied-damages wherein the same six (6) justices who decided Abbasi were present (Roberts, Kennedy, Ginsberg, Alito, Thomas, and Breyer) and The Supreme Court made explicit reference to the FBOP's administrative-remedy system as a means of alternative resolution. The Abbasi Court knew about the FBOP's administrative-remedy system and deliberately omitted reference to it in when analyzing alternatives in the Constitutionally-implied-damages context because the FBOP's administrative-remedy system is a discretionary Executive creation neither "provided" nor "explicitly declared" by Congress as "a substitute for recovery directly under the Constitution." Moreover, the FBOP administrative-remedy system is not at all a judicial remedy and its results or lack thereof ultimately can only be brought into Constitutional compliance by later judicial review.

Further, as detailed above in Section III(B), the FBOP's administrative-remedy system was not available to the instant plaintiff. The circumstances of the instant case thus independently preclude the system from being considered a viable alternative in the instant case. Similarly, without access to the law library, a petition pursuant to Sec. 2241, as contemplated by the Abbasi Court, was also unavailable to the instant plaintiff while he was in the SHU. Please see RFA 15 and 23-26.

The instant defendants made sure that at the time the instant plaintiff was in the MCC, he had no way out of the SHU except to end his hunger strike. This was their intentional design, and they carried it through to fruition. Since they successfully denied the instant plaintiff all alternative avenues to equitable remedies during the time of his hunger strike, and then transferred him out of the FBOP before he could file a petition pursuant to Sec. 2241 or use the administrative-remedy system, the design of the instant defendants produced a "damages or nothing" scenario for the instant plaintiff in terms of vindicating the past violations of his rights, as contemplated in Bivens. They should not now be indemnified on the basis that the instant plaintiff could not make use of the options they intentionally kept outside his reach.

f. The Plaintiff's First Amendment Implied-Damages Claims Must Be Allowed To Proceed.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

    Should The Honorable Court decide that the plaintiff's First Amendment Implied-Damages claims present a new "context" under Abbasi despite the citation by three (3) Supreme Court justices in Sell v. United States, 539 U.S. 166, 193 (2003) (Scalia, J., dissenting) to Lyons v. United States Marshals, 840 F.2d 202 (3rd Cir. 1987), as well as the decisions in Lyons v. Powell, 838 F.2d 28 (1st Cir. 1988) and 729 F. Supp. 1404 (D.N.H. 1989), then the plaintiff's First Amendment claims must nonetheless be allowed to proceed in the absence of special factors counseling hesitation.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.,</u> 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:22:21 PM

<u>5. The False Claims Act (FCA): Title 31 U.S.C. Sec. 3730(b)(1)</u>

    Liberally construed, the instant complaint states a claim under <u>31 U.S.C. Sec. 3730(b)(1)</u>, <u>The False Claims Act</u> (herein also the "FCA"), for false claims paid by the government at taxpayer expense. "[T]he FBOP appears to use assignments of favored staff, including then-Warden Eskar[sic] Tatum, to MCC for periods of time which seem designed to help them maximize their pension benefits at taxpayer expense just prior to retirement." <u>D.E. 2</u> at 12 (p.21). Please see also <u>RFA 30</u>.

    The complaint also states "The [U.S. Marshals Service] had [the plaintiff] transferred to MCC in pursuit of some of the unlawful purposes described above." <u>D.E. 2</u> at 12 (p.22).

    The U.S. Court of Appeals clarified the scope of <u>The FCA</u> in <u>United States ex rel Schwedt</u>, 59 F.3d 196, 199 (D.C. Cir. 1995):

> |The [False Claims] Act penalizes the presentation of a "false or fraudulent claim for payment" or the use of "a false
> |record or statement to get a false or fraudulent claim paid." 31 U.S.C. [Sec.] 3729(a). A submission need not be an
> |actual invoice to be a "claim" or "statement" under the Act. As the Supreme Court explained in United States v.
> |Neifert-White Co., 390 U.S. 228, 233, 19 L. Ed. 2d 1061, 88 S. Ct. 959 (1968), "this remedial statute reaches beyond
> |'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money."
> |Each individual false claim or statement triggers the statute's civil penalty. <u>See United States v. Bornstein</u>, 423 U.S.
> |303, 313, 46 L. Ed. 2d 514, 96 S. Ct. 523 (1976).

    The instant defendants were willing to commit the instant violations of <u>The Constitution</u>, <u>The Federal Rules of Criminal Procedure</u>, federal regulations, and FBOP policies, and they were indeed hesitant to refrain from doing such, because of their involvement in the pension-fraud conspiracy. Please see <u>Exhibit 1 hereto</u> at 6 (p.77).

    When the plaintiff drafted the instant suit, however, he did not have access to sufficient legal resources. Please see <u>D.E. 2</u> at 12 (p.24) and at 16. Thus, the plaintiff did not know, could not discover, and could not have been expected to follow the usual idiosyncratic procedures for such claims, which are known as <u>qui tam</u> actions. Once the plaintiff was able to review these procedures in a less-inadequate law library, he followed them as best he could. He notified the U.S. attorney general pursuant to <u>31 U.S.C. Sec. 3730(b)(2)</u>. Please see <u>Exhibit 1</u> hereto at 5 (p.76); and <u>Exhibit 16</u> hereto.

    If in its wisdom The Honorable Court finds that the instant deviation from the usual FCA procedures requires dismissal of the instant FCA claims, then the plaintiff would stipulate to a voluntary dismissal without prejudice. The instant plaintiff, however, also notes he would refile in accordance with the proper procedure, and therefore such a dismissal would be judicially uneconomical and of little, if any, other consequence. Cf. <u>Lyons v. Powell</u>, 729 F. Supp. 1404, 1406-07 (D.N.H. 1989) (discussing contemporary <u>Fed. R. Civ. P. 4(d)(5)</u>).

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

The plaintiff also notes 5 U.S.C. Sec. 3301, empowering the president to: "(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service." The plaintiff further notes 5 U.S.C. Sec. 3304(d), requiring the Office of Personnel Management (herein also the "OPM") to promulgate regulations "consistent with the principals of equitable competition and merit based appointments." The directors of the FBOP and U.S. Marshals Service also bear a fiduciary responsibility not to waste taxpayer funds by needlessly inflating pensions. 5 U.S.C. Sec. 1212(a)(3). Please see also 29 U.S.C. Sec. 1304(b)(7) and 31 U.S.C. Sec. 3512(c)(1)(B).

In turn, 5 C.F.R. Secs. 300.102(c), 300.103(c), and 335.103(b) explicitly preclude the employment of "non-merit-based" factors in the employment and promotion of federal employees--such as maximizing the pensions of the maximum number of individual wardens. Please see Exhibit 30 hereto; 5 C.F.R. Secs. 300.102 and 300.103 (retrieved November 12th, 2019).

The instant plaintiff therefore notes 18 U.S.C. Secs. 286, 664, 1954, 1957, and 1962; and the inapplicability of 31 U.S.C. Sec. 3729(b)(2)(B) to the instant FCA claims due to the overarching legal maxim of unjust enrichment, i.e. that the instant defendants must not be allowed to keep their ill-gotten gains from the criminal acts they perpetrated in violation of the above-cited authorities.


## E. THE INSTANT DEFENDANTS MUST BE DENIED IMMUNITY.

A wealth of controlling and precedential case law requires that the instant defendants be denied immunity for all of their unconstitutional acts. The conduct of the instant defendants is judicially indistinguishable from the violations found in previous cases and the defendants' own conduct reflects their culpable knowledge and intent.

Additionally, The Supreme Court long ago rejected the argument "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Anderson v. Creighton, 483 U.S. 511, 535 n. 12 (1985). The Court instead held "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "[T]he focus" of qualified-immunity analyses "is on whether the officer had fair notice that her conduct was unlawful." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam).

There can be no serious argument that the conduct alleged in the instant case was clearly unlawful and that the defendants had more than fair notice thereof.


## 1. Immunity Is Inapplicable To Many of the Plaintiff's Claims.

Though the instant defendants left unaddressed the plaintiff's claims under The FCA and his claims for injunctive relief under either The APA or The Constitution, the plaintiff notes that immunity is inapplicable to all these claims. Allen v. Coughlin, 64 F.3d 77, 81 (2d Cir. 1995) (citing Giacolone v. Abrams, 850 F.2d 79, 84 (2d Cir. 1988), other citations

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

omitted):

|We turn now to the question whether appellees are entitled to qualified immunity as a matter of law. The doctrine of
|qualified immunity protects government officials from liability for money damages in actions arising out of performance
|of their discretionary functions. It does not bar declaratory and injunctive relief, however, which Allen has requested.
|Even if established, therefore, qualified immunity is not grounds for dismissing all of Allen's claims.

## 2. The Defendants Must Be Denied Immunity To the Plaintiff's Title 42 U.S.C. Sec. 1985(3) Claims.

As early as 2007---nearly a decade prior to the events in controversy in the instant case---The Second Circuit put federal

officials on notice regarding 42 U.S.C. Sec. 1985(3). Please see Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 358 Sec.

"DISCUSSION F(3)" (E.D.N.Y. 2013) (citing Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007)):

|Defendants also suggest that they are entitled to qualified immunity because in 2001 it was not clearly established that
|[42 U.S.C.] Section 1985 applied to federal officials. As the Second Circuit has already explained, however, although it
|may not have been clearly established in 2001 that [Sec.] 1985 prohibited conspiracies among federal officials, "federal
|officials could not reasonably have believed that it was legally permissible for them to conspire with other federal
|officials to deprive a person of equal protection of the laws." [Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007)]. "[T]he
|proper inquiry is whether the right itself--rather than its source--is clearly established." Russo v. City of Bridgeport, 479
|F.3d 196, 212 (2d Cir. 2007) (emphasis in original). Accordingly, qualified immunity is inappropriate.

The Second Circuit affirmed the district court. Turkmen v. Hasty, 789 F.3d 218, 262 (2d Cir. 2015). And this was the state

of the law at the time of the instant events in controversy.

Eventually, in 2017---after the events in controversy in the instant case---The Supreme Court granted the defendants in

the above case qualified immunity to liability under Sec. 1985(3). Ziglar v. Abbasi, 137 S. Ct. 1843, 1865 Sec. V (2017). Yet,

this only further distances the instant defendants from a subsequent grant of qualified immunity. Qualified immunity is

supposed to be like lightning---rarely, if ever, striking in the same place more than once. And these defendants were clearly

on notice that their behavior in the instant case was objectively unreasonable.

## 3. The Defendants Must Be Denied Immunity To the Plaintiff's State Civil-Rights Claims.

The plaintiff seriously doubts that the instant defendants are entitled to any immunity from his state-law claims as he

doubts there is anything new or novel enough in his claims to warrant such considerations. The defendants have admitted as

much. Please see RFA 21 and 27.

Yet, as a proximate result of the instant defendants' acts and omissions, the instant plaintiff has not been able to prepare

and present his claims under New York law and The New York Constitution. The plaintiff notes his simultaneous motion for

an order requiring the instant defendants to provide the plaintiff with the necessary resources in order to do so.

The plaintiff knows and notes, however, that The Honorable Court is fluent with the relevant state law and that in all

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------------------------------

probability the legal landscape, as accurately viewed by The Court, requires that the instant defendants be denied immunity

to the plaintiff's state-law claims.

   Should The Court, in its wisdom, however, find that the instant defendants may be entitled to immunity from the instant

state civil-rights claims, then it should still, for the moment, deny immunity without prejudice and order the defendants to

provide the plaintiff with the appropriate resources to argue any relevant matters of law.

## 4. The Defendants Must Be Denied Immunity To the Plaintiff's Fifth Amendment Damages Claims.

   "This Court will not confer immunity on any official who glaringly disregards the very regulations that he or she is

entrusted to discharge dutifully and in good faith." Tellier v. Fields, 280 F.3d 69, 86 (2d Cir. 2000). Please see also Exhibit

22 hereto, 28 C.F.R. Secs. 541.25, 541.26, and 541.33; and Palmer v. Richards, 364 F.3d 60, 67 (2d Cir. 2004) (citing

Tellier at 84 and 85). The same regulations, although now found in 28 C.F.R. Secs. 541.25, 541.26, and 541.33, are at the

heart of the instant implied-damages claims arising from The Fifth Amendment. This Court first denied prison officials

qualified immunity on such claims in 1998. Tellier v. Scott, 49 F. Supp. 2d 607, 615 (S.D.N.Y. 1998).

   Indeed, in many of the above-cited cases from decades ago, prison officials requested and were denied qualified immunity

by The Second Circuit. These precedential decisions have not been abrogated. Tellier v. Fields requires that the instant

defendants be denied qualified immunity for their willful violation of The Due Process Clause. Indeed, Tellier was a convict

serving a sentence at MCC, but the instant plaintiff was not. Cf. Benjamin v. Fraser, 264 F.3d 175, 188 n. 11 (2d Cir. 2001).

However far away the defendants were from immunity in Tellier, they placed themselves across an unbridgeable divide some

sixteen (16) years later in the instant case of a pre-trial detainee with stronger Due Process protections. As The Second

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:29:02 PM

Circuit upheld from Tellier v. Scott, 49 F. Supp. 2d 607, 615 (S.D.N.Y. 1998):

> |[D]efendants are not entitled to summary judgment "if any reasonable trier of fact could find that the defendants'
> |actions were objectively unreasonable." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995). An officer's actions are
> |objectively unreasonable "when no officer of reasonable competence would have made the same choice in similar
> |circumstances." Id. at 421. Courts should refrain from granting summary judgment on grounds of qualified immunity
> |until disputed factual issues pertaining to the defense are resolved. Id.
> |As has been noted already, the law at the time of plaintiff's detention had clearly established that regulations like [28
> |C.F.R. Sec.] 541.22 created a liberty interest in remaining free of administrative segregation, and defined the scope of
> |the official's permissible conduct. See, e.g., Wright v. Smith, 21 F.3d 496, 500 (2d Cir. 1994) (holding that state prison
> |regulation mandating hearing within 14 days left "no doubt" that prison officials "acted unconstitutionally where
> |confinement... continued without a hearing, for 67 days["]). Moreover, even in the aftermath of Sandin, there is
> |continued support for the existence of the due process claim asserted by plaintiff. See, e.g., Sealy[sic][ v. Giltner], 116
> |F.3d [47,] 52 [(2d Cir. 1997)].

Moreover, the instant defendants failed to rebut any of the plaintiff's factual allegations about conditions in the SHU at

MCC. "[Defendant] made no effort before the district court to demonstrate what [plaintiff's] conditions were, content to rest

on the argument that 'since plaintiff served only 77 days in SHU, no liberty interest is implicated.'" Palmer v. Richards, 364

F.3d 60, 67 (2d Cir. 2004) (denying qualified immunity to prison officials). Please cf. D.E. 52 at 28, "Courts in this Circuit

have routinely held that confinement in the SHU for a period of time comparable to Plaintiff's does not rise to the level of a

liberty interest."

As already discussed, the instant plaintiff was a pre-trial detainee and thus any time in the SHU implicated his liberty

interests, let alone eighty-one (81) days. Please see again Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001) (collecting cases)

("The district court concluded, joining our fellow Circuits, that Sandin does not apply to pretrial detainees").

But setting aside for the moment the plaintiff's pre-trial status and the fact that he need not plead particularly harsh

conditions or a particularly long period of administrative confinement, the defendants dishonestly aver "Plaintiff does not set

forth any such particularly harsh conditions." D.E. 52 at 28 (internal citations omitted). Ignoring the instant complaint (and

Berger), defendants' counsel then glances over the explicit allegations of frigid cold, D.E. 2 at 8 (p.14) and at 9 (p.16);

insect and rodent infestation, D.E. 2 at 8 (p.10-12); the total shut off of water, Id. (p.13); and leaky still water, D.E. 2 at 9

(p.16). These unrebutted allegations must be taken as true, especially since they have now been admitted by each of the

defendants in RFA 6, 10-11, 23-27, and they preclude any finding of immunity.

These conditions were not only a threat to human life, but as the world recently saw, they contributed to the death of pre-

trial detainee Jeffrey Epstein. It is impossible to hold that the conditions in exhibits 2, 135-136, 142, 144-145, and 148

hereto, of which the plaintiff and others repeatedly warned high officials, were not a threat to the instant plaintiff's long-

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

term health, given what happened to Epstein.

5. The Defendants Must Be Denied Immunity To The Plaintiff's Sixth Amendment Damages Claims.

The state of the law at all relevant times as to the instant plaintiff's rights under The Sixth Amendment was just as clear. As noted in United States v. Auernheimer, 748 F.3d 525, 532 (3rd Cir. 2014), quoting United States v. Cabrales, 524 U.S. 1 (1998), "The proper place of colonial trials was so important to the founding generation that it was listed as a grievance in the Declaration of Independence. It was of such concern that the Constitution of the United States 'twice safeguards the defendant's venue right.'"

This right is not an esoteric holdover from a bygone era that competent officials could reasonably overlook. It continues to be upheld in Fed. R. Crim. P. 18 and the courts today continue to require detention "within the district." Fed. R. Crim. P. 46(h)(1).

The very peculiar nature of the transfer of the instant plaintiff also belies any claim of its perceived Constitutional validity. The instant defendants deviated greatly from their normal practices from other cases, even those involving hunger strikes, when they moved the pre-trial instant plaintiff, with no notice to his counsel or the court, nor hearings of any kind, to a non-medical facility outside the district while there was no need for emergency medical intervention and a better-suited federal medical center (FMC) available locally in Massachusetts. This deviation speaks to an ulterior purpose that has now been admitted. Please see RFA 1-6, 10-11, and 23-27. Moreover, if such a transfer could be proper, then it would be far more commonplace. If perceived as permissible, then why not more of them?

A federal court already denied immunity to an FBOP director in such a case thirty (30) years ago. Lyons v. Powell, 729 F. Supp. 1404 (N.D.H. 1989). And, while the same cannot be done in the instant case due to Heck v. Humphrey, this right was clearly well established because other convictions were vacated. Please see Auernheimer at 541:

> "Though our nation has changed in ways which it is difficult to imagine that the Framers of the Constitution could have
> foreseen, the rights of criminal defendants which they sought to protect in the venue provisions of the Constitution are
> neither outdated nor outmoded." [United States v.] Passodelis, 615 F.2d [975, ] 977 [(3d Cir. 1980)]. Just as this was
> true when we decided Passodelis in 1980---after the advent of railroad, express mail, the telegraph, the telephone, the
> automobile, air travel, and satellite communications---it remains true in today's Internet age.

The defendants also violated the plaintiff's right to counsel. Please see above Secs. III(C)(6) and III(D)(4)(c)(iii). They are not entitled to immunity for this violation. As early as 1974 The Supreme Court recognized the right of detainees to counsel. "[A]ppellants cannot raise a defense of qualified immunity because their actions did 'violate clearly established... constitutional rights of which a reasonable person would have known." Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984) (quoting Procunier v. Martinez, 416 U.S. 396, 419-21 (1974). Moreover, "even when a litigant fails to prove actual

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional

right." Id.

  The right of detainees to the presence of counsel during custodial questionings was clearly established and well known to

all law-enforcement officials---including prison officials---some fifty (50) years before the instant defendants and their

parties in privity violated that right of the instant plaintiff. Miranda v. Arizona, 384 U.S. 436 (1966). "As we have recently

held, '[T]he proper inquiry is whether the right itself---rather than its source---is clearly established." (Emphasis in original)

Iqbal v. Hasty, 490 F.3d 143, 177 (2d Cir. 2007) (quoting Russo v. City of Bridgeport, No. 05-4302-cv, 2007 U.S. App. LEXIS

4428, at *39 (2d Cir. June 12, 2007) (collecting cases), amending 479 F.3d 196 (2d Cir. 2007).

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:34:52 PM

6. The Defendants Must Be Denied Immunity To the Plaintiff's Eighth Amendment Damages Claims.

   Years before the instant events in controversy, The U.S. Court of Appeals surveyed the status of the law regarding

inmates' conditions-of-confinement claims under The Eighth Amendment. Walker v. Shult, 717 F.3d 119, 126 (2d Cir. 2013)

(collecting cases). The Court noted the following clearly-established Eighth Amendment rights, under each of which the

instant plaintiff brings credible allegations:

   * Freedom from extreme temperatures. Gaston v. Coughlin, 249 F.3d at 164; Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir.

1988); Wright v. McMann, 487 F.2d 519, 521-22, 526 (2d Cir. 1967) (inmates forced to sleep in the cold).

   * Freedom from inadequate sleeping surfaces. Bell v. Luna, 856 F. Supp. 2d 388, 397-98 (D. Conn. 2012).

   * Freedom from unsanitary conditions. Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981) and Young v. Quinlan, 960 F.2d

351, 365 (3d Cir. 1992).

   * Freedom from substantial risk of serious harm, Jones v. Goord, 435 F. Supp. 2d 221, 238 (S.D.N.Y. 2006); and Farmer v.

Brennan, 511 U.S. 825, 833 (1994).

   Beyond the clear demarcation of the above rights years, if not decades, prior to the instant events in controversy, there is

another time-tested reason the federal courts must not flinch in vindicating the plaintiff's Eighth Amendment rights as a

pre-trial detainee. "'We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution

are always a proper subject for adjudication, and that we have not the right to decline to exercise that jurisdiction simply

because the rights asserted may be adjudicated in some other forum.'" Wright v. McMann, 387 F.2d 519, 523 (2d Cir. 1967)

(quoting McNeese v. Board of Education, 373 U.S. 668, 674 n. 6 (1963)).

   Moreover, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).

7. The Defendants Must Be Denied Immunity To the Plaintiff's Stigma-Plus Damages Claims.

   At the time of the instant events in controversy, i.e. when the plaintiff was pending trial, the contours were clearly well

established as far as his right not to be stigmatized outside the courtroom by the defendants' parties in privity while the

defendants and their agents affected a prior restraint on his ability to refute the corresponding false extrajudicial

statements. Given the positions in law enforcement of each of the offending defendants, their agents, and their collective

parties in privity, there can be no serious argument that they did not or should not have known their conduct was

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

unconstitutional.

In addition to The District of Massachusetts Local Rule 83.2.1, found as Exhibit 26 hereto, each of the U.S. district courts in New York has adopted a similar rule that defendants Tatum and Bussanich knew or should have known. S.D.N.Y. and E.D.N.Y. Loc. Crim. R. 23.1(a); N.D.N.Y. Local Rule 23.1; and W.D.N.Y. Loc R. Crim. P. 23.1(b) (enforcing New York Prof. Cond. Rules 3.6, 5.3, and 8.4). As had The Honorable District Court for The District of Columbia, of which defendants Hurwitz and Anderson should have been well aware. D.D.C. Loc. Crim. R. 57.7(b)(1) and Loc. Crim. R. 57.7(b)(2)(vi).

A public official was denied immunity to a stigma-plus claim more than a decade before the events in controversy in the instant case. Kelez v. Levy, 401 F.3d 75, 99-102 (2d Cir. 2005). Moreover, two years prior, a stigma-plus claim was validated against a high official who made defamatory statements to the press during an investigation. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003). The Second Circuit found that high officials have control over the statements released by their offices to the press and cannot claim that such statements were "random and unauthorized." Id.

8. The Defendants Must Be Denied Immunity To The Plaintiff's First Amendment Damages Claims.

The plaintiff's rights under The First Amendment were perhaps the best established of all. The same year The Supreme Court decided Bivens, a damages award was upheld against prison officials in a First Amendment case involving censorship and blocking of inmate mail. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). That year, The Supreme Court also determined that guarding military and diplomatic secrets---governmental interests of higher significance than any of those at play in the instant case---could not justify the toll that would be incurred by prior restraints upon our informed representative system of government. New York Times Co. v. United States, 403 U.S. 713 (1971).

Some four (4) decades ago, The U.S. Court of Appeals reversed a grant of qualified immunity to law-enforcement officials who violated The First Amendment. Heimbach v. Lyons, 597 F.2d 344, 346 (2d Cir. 1979). Then, The Court struck down an unconstitutional prior restraint enacted by public employees. McKenna v. Peekskill Housing Authority, 647 F.2d 332 (2d Cir. 1981). Two (2) years later, the high court remarked, "Since [Ex Parte] Hull, courts have recognized the First Amendment rights of prisoners." McCann v. Coughlin, 698 F.2d 112, 116 (2d Cir. 1983).

"Retaliatory [prisoner] transfers were clearly illegal in 1980. A reasonable jury could find that a reasonable commissioner of corrections would be aware of this." Meriwether v. Coughlin, 879 F.2d 1037, 1046 (2d Cir. 1989) (internal citations omitted). Please see also Id. at 1045-46, "1. The First Amendment Claim." These events took place at least some thirty-five (35) years prior to the events in the instant case. Of course, if retaliatory prisoner transfers are clearly illegal, then competent officials would know that other retaliatory acts were also unlawful.

Eighteen (18) years before the instant events in controversy, The Second Circuit reaffirmed, "prison authorities may not

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

transfer an inmate in retaliation for the exercise of constitutionally protected rights." <u>Davis v. Kelly</u>, 160 F.3d 917, 920 (2d Cir. 1998).

    Moreover, federal-prison officials already lost a trial in a U.S. district court, wherein the FBOP's former restriction prohibiting inmates from publishing articles under their own bylines was ruled unconstitutional. <u>McGowan v. United States</u>, 825 F.3d 118, 122 (2d Cir. 2016) (citing <u>Jordan v. Pugh</u>, 504 F. Supp. 2d 1109, 1124 (D. Colo. 2007)). Yet for <u>Due Process</u> reasons, the instant defendants never formally and officially applied that rescinded former prison rule to pre-trial detainees like the instant plaintiff. Please see <u>Exhibit 1</u> at 6 (p.78). This difference in the FBOP's own policy reflected that FBOP staff and policymakers clearly knew the limits of their ability to curtail the free-press rights of the pre-trial plaintiff but nonetheless did so with culpable intent.

    Before the events in the instant case, The Second Circuit charitably granted BOP defendants qualified immunity <u>Id.,</u> wherein that convict-plaintiff spent less than twenty-four (24) hours in a different SHU that is nowhere near as harsh as the SHU at MCC New York, into which the instant defendants placed the instant pre-trial plaintiff for eighty-one (81) days. Moreover, the series of events detailed in this section---including the FBOP's rescindment of an unconstitutional former policy that for Due Process reasons it did not apply to pre-trial detainees---lays waste to any claim by the defendants of qualified immunity to the instant <u>First Amendment</u> violations.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:40:07 PM

9. The State of the Law In 1871 Would Not Have Conferred Immunity On the Instant Defendants.

Congress specifically passed The Civil Rights Act of 1871 to hold accountable public officials, including the instant

defendants. The state of the common law in 1871 would have not conferred immunity on the instant defendants and they

make no argument that it would have done so. This is an insurmountable obstacle for the defendants' instant claims of

qualified immunity because, despite much attempted judicial policymaking since 1871, such claims can only be rightly

adjudged in the context of the common law of that era.

When defendants assert an affirmative defense, including qualified immunity, they assume the burden of proof. Please

see Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018):

|Qualified immunity is an affirmative defense on which the defendant has the burden of proof. See, e.g., Gomez v.
|Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980); Rogoz v. City of Hartford, 796 F.3d [236,] 271
|[(2d Cir. 2015)]. "To the extent that a particular finding of fact [i]s essential to an affirmative defense,... it [i]s
|incumbent on [the defendant] to request that the [factfinder] be asked the pertinent question." Kerman [v. City of New
|York], 374 F.3d [93,] 120 [(2d Cir. 2004)].
|Usually, if a jury trial has been properly demanded, the factfinder for such questions will be a jury, see Fed. R. Civ. P.
|38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution---or as provided by a federal
|statute---is preserved to the parties inviolate.").

In addition to the instant defendants' previously-cited failure to prove that reasonable officers would not have known that

their conduct violated the plaintiff's Constitutional rights, the instant defendants fail to meet another burden required for

them to successfully assert the affirmative defense of qualified immunity: they do not and cannot demonstrate that they

would be entitled to immunity under the common law as it existed when Congress passed The Civil Rights Act of 1871.

As Justice Thomas rightly noted in Ziglar v. Abbasi, 137 S. Ct. 1843, 1869 (2017) (Thomas, J., concurring):

|The Civil Rights Act of 1871, of which [42 U.S.C. Sec.] 1985(3) and the more frequently litigated [Sec.] 1983 were
|originally a part, established causes of action for plaintiffs to seek money damages from Government officers who
|violated federal law. See [Secs.] 1, 2, 17 Stat. 13. Although the Act made no mention of defenses or immunities, "we
|have read it in harmony with general principals of tort immunities and defenses rather than in derogation of them."
|Malley v. Briggs, 475 U. S. 335, 339, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (internal quotation marks omitted). We
|have done so because "[c]ertain immunities were so well established in 1871... that 'we presume that Congress would
|have specifically so provided had it wished to abolish' them." Buckley v. Fitzsimmons, 509 U. S. 259, 268, 113 S. Ct.
|2606, 125 L. Ed. 2d 271 (1993); accord, Briscoe v. LaHue, 460 U. S. 325, 330, 103 S. Ct. 1107, 75 L. Ed. 2d 96 (1983).
|Immunity is thus available under the statute if it was "historically accorded the relevant official" in an analogous
|situation "at common law," Imbler v. Pachtman, 424 U. S. 409, 421, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976), unless the
|statute provides some reason to think that Congress did not preserve the defense, see Tower v. Glover, 467 U. S. 914,
|920, 104 S. Ct. 2820, 81 L. Ed. 2d 758 (1984).
|In some contexts, we have conducted the common-law inquiry that the statute requires. See Wyatt v. Cole, 504 U. S.
|158, 170, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992) (Kennedy, J., concurring). For example, we have concluded that
|legislators and judges are absolutely immune from liability under [Sec.] 1983 for their official acts because that
|immunity was well established at common law in 1871. See Tenney v. Brandhove, 341 U. S. 367, 372-376, 71 S. Ct. 783,
|95 L. Ed. 1019 (1951) (legislators); Pierson v. Ray, 386 U. S. 547, 553-555, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

(judges). We have similarly looked to the common law in holding that a prosecutor is immune from suits relating to the "judicial phase of the criminal process," Imbler, supra, at 430, 96 S. Ct. 984, 47 L. Ed. 2d 128; Burns v. Reed, 500 U. S. 478, 489-92, 111 S. Ct. 1934, 114 L. Ed. 2d 547.

In developing immunity doctrine for other executive officers, we also started off by applying common-law rules. In Pierson, we held that police officers are not absolutely immune from a [Sec.] 1983 claim arising from an arrest made pursuant to an unconstitutional statute because the common law never granted arresting officers that sort of immunity. 386 U. S., at 555, 87 S. Ct. 1213, 18 L. Ed. 2d 288. Rather, we concluded that police officers could assert "the defense of good faith and probable cause" against the claim for an unconstitutional arrest because that defense was available against the analogous torts of "false arrest and imprisonment" at common law. Id., at 557, 87 S. Ct. 1213, 18 L. Ed. 2d 288.

In further elaborating the doctrine of qualified immunity for executive officials, however, we have diverged from the historical inquiry mandated by the statute. See Wyatt, supra, at 170, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (Kennedy, J., concurring); accord, Crawford-El v. Britton, 523 U. S. 574, 611, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998) (Scalia, J., joined by Thomas, J., dissenting). In the decisions following Pierson, we have "completely reformulated qualified immunity along principles not at all embodied in the common law." Anderson v. Creighton, 483 U. S. 635, 645, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (discussing Harlow v. Fitzgerald, 457 U. S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Instead of asking whether the common law in 1871 would have accorded immunity to an officer for a tort analogous to the plaintiff's claim under [Sec.] 1983, we instead grant immunity to any officer whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, 557 U. S. ___, ___-___[sic], 136 S. Ct. 305, 308, 193 L. Ed. 2d 255, 259 (2015) ( per curiam[sic]) (internal quotation marks omitted); Taylor v. Barkes, 575 U. S. ___, ___[sic], 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78, 81 (2015) (a Government official is liable under the 1871 Act only if "'existing precedent... placed the statutory or constitutional question beyond debate'" (quoting Ashcroft v. al-Kidd, 563 U. S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011))). We apply this "clearly established" standard "across the board" and without regard to "the precise nature of the various officials' duties or the precise character of the particular rights alleged to have been violated." Anderson, supra, at 641-643, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (internal quotation marks omitted). We have not attempted to locate that standard in the common law as it existed in 1871, however, and some evidence supports the conclusion that common-law immunity as it existed in 1871 looked quite different from our current doctrine. See generally Baude, Is Qualified Immunity Unlawful? 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at =2896508 (as last visited June 15, 2017).

Because our analysis is no longer grounded in the common-law backdrop against which Congress enacted the 1871 Act, we are no longer engaged in "interpret[ing] the intent of Congress in enacting" the Act. Malley, supra, at 342, 106 S. Ct. 1092, 89 L. Ed. 2d 271; see Burns, supra, at 493[,] 111 S. Ct. 1934, 114 L. Ed. 2d 547. Our qualified immunity precedents instead represent precisely the sort of "freewheeling policy choice[s]" that we have previously disclaimed the power to make. Rehberg v. Paulk, 566 U. S. 356, 363, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012) (internal quotation marks omitted); see also Tower, supra, at 922-923, 104 S. Ct. 2820, 81 L. Ed. 2d 758 ("We do not have a license to establish immunities from" suits brought under the Act "in the interests of what we judge to be sound public policy"). We have acknowledged, in fact, that the "clearly established" standard is designed to "protec[t] the balance between vindication of constitutional rights and government officials' effective performance of their duties." Reichle v. Howards, 566 U. S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (internal quotation marks omitted); Harlow, supra, at 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (explaining that "the recognition of a qualified immunity defense... reflected an attempt to balance competing values"). The Constitution assigns this kind of balancing to Congress, not the Courts. In today's decision, we continue down the path our precedents have marked. We ask "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted," ante, at ___[sic], 198 L. Ed. 2d, at 320 (internal quotation marks omitted), rather than whether officers in petitioners' positions would have been accorded immunity at common law in 1871 from claims analogous to respondents'. Even if we ultimately reach a conclusion consistent with the common-law rules prevailing in 1871, it is mere fortuity. Until we shift the focus of our inquiry to whether immunity existed at common law, we will continue to substitute our own policy preferences for the mandates of Congress. In an appropriate case, we should reconsider our qualified immunity jurisprudence.

Should The Honorable Court find that during the events in controversy any of the rights violated by the instant defendants were not clearly established to reasonable officers, then the time is now to reconsider the judicial policymaking that subsumes qualified-immunity jurisprudence.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: <u>Gottesfeld v. Hurwitz, et al.</u>, 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:47:41 PM

<u>10. Qualified Immunity Is Now An "Unqualified Disaster."</u>

Justice Thomas is not alone in his desire to reevaluate the current incarnation of the qualified immunity doctrine.

Indeed, such reevaluation is necessary to comport with an older and more-important doctrine, "[J]ustice must satisfy the appearance of justice." <u>Offutt v. United States</u>, 348 U.S. 11 (1954). Please see also Amir H. Ali and Emily Clarke of the MacArthur Justice Center; on qualified immunity; The Appeal (theappeal.org), a project of Tides Advocacy (June 20, 2019); and Qualified Immunity Is An Unqualified Disaster; Reason Magazine (2019) (title and date approximated from memory).

As Justice Sotomayor, joined by Justice Ginsburg, lamented in <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1162 (2018):

|As I have previously noted, this Court routinely displays an unflinching willingness "to summarily reverse courts for
|wrongly denying officers the protection of qualified immunity" but "rarely intervene[s] where courts wrongly afford
|officers the benefit of qualified immunity in these same cases." [Salazar-Limon v. Houston, 137 S. Ct. 1277 (2017)];
|see also Baude, Is Qualified Immunity Unlawful? 106 Cal. L. Rev. 45, 82 (2018) ("[N]early all of the Supreme Court's
|qualified immunity cases come out the same way--by finding immunity for the officials"); Reinhardt, The Demise of
|Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and
|Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1244-
|1250 (2015). Such a one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law
|enforcement officers, gutting the deterrent effect of the Fourth Amendment.
|The majority today exacerbates that troubling asymmetry. Its decision is not just wrong on the law; it also sends an
|alarming signal to law enforcement officers and the public. It tells officers that they can shoot first and think later, and
|it tells the public that palpably unreasonable conduct will go unpunished. Because there is nothing right or just under the
|law about this, I respectfully dissent.


Newly-appointed U.S. Circuit Judge Don R. Willett was more direct in his eloquent dubious (dubitante) concurrence in

<u>Zadeh v. Robinson</u>, 902 F.3d 483, 498 (5th Cir. 2018):

|The court is right about [plaintiff's] rights: They were violated. But owing to a legal <u>deus ex machina</u>---the "clearly
|established law" prong of qualified-immunity analysis---the violation eludes vindication. I write separately to register my
|disquiet over the kudzu-like creep of the modern immunity regime. Doctrinal reform is arduous, often-Sisyphean work.
|And the entrenched, judge-made doctrine of qualified immunity seems Kevlar-coated, making even tweak-level
|tinkering doubtful. But immunity ought not be immune from thoughtful reappraisal.
|To some observers, qualified immunity smacks of unqualified impunity, letting public officials duck consequences for
|bad behavior---no matter how palpably unreasonable---as long as they were the <u>first</u> to behave badly. Merely proving a
|constitutional deprivation doesn't cut it; plaintiffs must cite functionally identical precedent that places the legal
|question "beyond debate" to "every" reasonable officer. Put differently, it's immaterial that someone acts
|unconstitutionally if no prior case held such misconduct unlawful.
|Today's case applies prevailing immunity precedent (as best we can divine it): [the plaintiff] loses because no prior
|decision held such a search unconstitutional. But courts of appeals are divided---intractably---over precisely what degree
|of factual similarity must exist. How indistinguishable must existing precedent be? On the one hand, the Supreme Court
|reassures plaintiffs that its caselaw "does not require a case directly on point for a right to be clearly established." On
|the other hand, the Court admonishes that "clearly established law must be 'particularized' to the facts of the case." But
|like facts in like cases is unlikely. And this leaves the "clearly established" standard neither clear nor established among
|our Nation's lower courts.
|Two other factors perpetuate perplexity over "clearly established law." First, many courts grant immunity without first
|determining whether the challenged behavior violates the Constitution. They avoid scrutinizing the alleged offense by
|skipping to the simpler second prong: no factually analogous precedent. Forgoing a knotty constitutional inquiry makes
|for easier sledding. But the inexorable result is "constitutional stagnation"---fewer courts establishing law at all, much

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

less clearly doing so. Second, constitutional litigation increasingly involves cutting-edge technologies. If courts leapfrog the underlying constitutional merits in cases raising novel issues like digital privacy, then constitutional clarity---mater-of-fact guidance about what the Constitution requires--remains exasperatingly elusive. Result: blurred constitutional contours as technological innovation outpaces legal adaptation.

[Title 42 U.S.C.] Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose.

Count me with Chief Justice Marshall: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for violation of a vested legal right." The current "yes harm, no foul" imbalance leaves victims violated but not vindicated; wrongs are not righted, wrongdoers are not reproached, and those wronged are not redressed. It is indeed curious how qualified immunity excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations.

Qualified immunity aims to balance competing policy goals. And I concede it enjoys special favor at the Supreme Court, which seems untroubled by any one-sidedness. Even so, I add my voice to a growing, cross-ideological chorus of jurists and scholars urging recalibration of contemporary immunity jurisprudence and its "real world implementation."

Judge Willet, as well as Justice Thomas, Justice Sotomayor, and Justice Ginsburg--who together represent half of the court that decided Abbasi---are not alone in voicing such concerns. Please see also Eves v. LePage, 927 F.3d 575, 590 (1st Cir. 2019) (Thompson, J., concurring) (citing Zadeh v. Robinson, 902 F.3d 483, 489 (5th Cir. 2018) (Willett, J., concurring dubitante)).

The district courts are increasingly vocal on these matters as well. The unenviable and impossible job is left to them in the first instance to balance the judicially-created doctrine of qualified immunity, as it is handed down today, with the paramount and irreconcilable concern of maintaining public confidence in the judiciary.

Highly-controversial official misconduct is often fresh in the civic psyche when district courts adhere to qualified-immunity jurisprudence and dismiss corresponding civil-rights suits. By the time a subsequent appeal affirms the district court's front-line decision, even if it does so dubitante, public pressure has often eased. Put another way, it is easy for the higher courts to use the lower courts as human shields, insulating themselves from the immediate and intense public and political consequences of their judicially-created immunity policy.

As U.S. District Judge James O. Browning noted in Manzanares v. Roosevelt Cty. Adult Det. Ctr., 331 F. Supp. 3d 1260, 1294 n. 10 (D.N.M. 2018):

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted [Sec.] 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)()("Cato Brief"). "The text of 42 U.S.C. [Sec.] 1983... makes no mention of immunity, and the common law of 1871 did not include any across-the-board defenses for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

|Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted
|[Sec. 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi,
|137 S. Ct. 1843, 1871, 198 L. Ed. 2d 290 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our
|qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have
|previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal
|quotation marks omitted). The judiciary should be true to [Sec.] 1983 as Congress wrote it.
|Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when
|there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable
|and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were
|deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an
|indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first
|and then to always say that the law is not clearly established could be stunting the development of constitutional law.
|See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).


As U.S. District Judge Dale A. Drozd recently noted in Ventura v. Rutledge, 2019 U.S. Dist. LEXIS 119236, No.

1:17-cv-00237-DAD-SKO (E.D. Cal. July 17, 2019) at *26 n. 6:

   |While there is so much more that could, and perhaps should, be said about the current state of this judicially created
   |doctrine, the undersigned will stop here for today. In short, this judge joins with those who have endorsed a complete
   |reexamination of the doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many
   |cases.


For this reason too, if reached, the instant defendants must be denied immunity.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:53:06 PM

11. Qualified Immunity Unconstitutionally Usurps Legislative Power.

   Congress enacted The Constitution but never passed into law qualified immunity. The mentions of "immunities" in The Constitution are for the benefit of its citizens and not of its officials. U.S. Const. art. IV, sec. 2, cl. 1 (U.S. 1787); and Id. amend. XIV, sec. 1 (U.S. 1868).

   The Supreme Court decided Bivens in 1971 and the phrase "qualified immunity" first appears in Supreme Court dicta in Scheuer v. Rhodes, 416 U.S. 232, 247-48 (1974).

   Yet, more recently, The Supreme Court greatly expanded qualified immunity for government officials and backed away from damages actions for citizens. But who is better entitled to relief, the citizen harmed by a federal official who violates his or her explicitly-ratified Constitutional rights or the federal official who in order to avoid liability under The Supreme Law of the Land invokes a judicially-created privilege that is limited to federal court and was never enacted into statute or amended into The Constitution?

   Please see U.S. Const. art. VI, cl. 2 (U.S. 1787):
   |This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or
   |which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in
   |every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

   The judicial expansion of qualified immunity well past any threshold recognizable to The Founders is a usurpation of legislative power that subserviates under the whim of non-elected judges The Constitution and the statutes duly-enacted "in Pursuance thereof," including 42 U.S.C. Secs. 1983 and 1985. Qualified immunity, as it exists today, is a far more pervasive intrusion by the judiciary into legislative responsibilities than the recognition of implied-damages remedies for Constitutional violations. It is utter hypocrisy for the courts to expand judicially-created immunities that defy sensibility while contracting judicially-created damages remedies that Americans believe are inherent to The Constitution.

   Lay Americans unaccustomed to legal proceedings assume from their innate senses of equity and right and wrong that viable damages remedies exist for Constitutional violations and that common sense dictates that the ratification of The Constitution was itself sufficient to create those remedies without any subsequent affirmative act by Congress. In contrast, Americans are shocked to learn about the judicially-created doctrine of qualified immunity. Americans are then dismayed again to learn that while their federal courts will not hear their damages actions due to a claimed judicial hesitance to venture beyond the letter of the laws enacted by Congress, the same federal courts concurrently embark on exactly such a zealous extra-legislative venture in order to confer immunity on officials absent the explicit passage of any such immunity

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

by Congress, or, indeed, despite Congress's clear intent to hold all public officials accountable under The Constitution.

   In one instance, the federal judiciary tells citizens that a Congressional omission of a cause of action leaves their grievances unredressed, while simultaneously the same federal judiciary tells citizens that a Congressional omission results in an unlegislated immunity for federal officials. If Congress had sufficient time to enact formal damages remedies under The Constitution but chose not to do so, as goes the argument, then the same must be said for qualified immunity. Yet, to derive a truism from The Honorable Circuit Judge Don R. Willet: heads plaintiffs have no cause of action, tails defendants are immune. Either way "unalienable" Constitutional "rights" are transformed into unenforceable ideals--the stuff of myth and legend (or of propaganda). Please cf. Jessop v. City of Fresno, 918 F.3d 1031 (9th Cir. 2019) (officers granted qualified immunity for stealing $225,000 for themselves while executing warrant); and Mattos v. Agareno, 661 F.3d 433, 436-38 (9th Cir. 2011) (cert. denied sub nom. Brooks v. Daman, 132 S. Ct. 2682 (2012)) (officers granted qualified immunity for tasing and laying face down seven-(7)-month's-pregnant woman who peacefully refused to sign a traffic citation).

   Such inequities fomented the American Revolution. For one example, The Founders explicitly blamed King George III "For protecting [Armed Troops], by a mock Trial, from Punishment for any Murders which they should commit on the Inhabitants of these States." Declaration of Independence p.15-17 (U.S. 1776). Please cf. Winzer v. Kaufman Cty., 916 F.3d 464 (5th Cir. 2019) (officers granted qualified immunity for, within six (6) seconds of the encounter, fatally shooting and subsequently tasing a mentally-impaired twenty-five-(25)-year-old who was riding a bicycle and carrying a toy cap gun in his belt).

   Accountability of public officials is thoroughly contemplated throughout both The Declaration of Independence and The Constitution. Please see The Declaration of Independence p.2 (involving "Despotism"); U.S. Const. art. I, sec. 9, cl. 8 (prohibiting titles of nobility); Id., cl. 2 (forbidding suspension of Habeas Corpus except "in Cases of Rebellion or Invasion" when "the public safety may require"); Id. art. II, cl. 1 (no pardons or reprieves for impeachment and removal from office); and Id. art. II, sec. 4 (prescribing the possibility of removal from office). American schoolchildren still recite the words, "WE[sic] hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness---that to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed..." The Declaration of Independence p.2.

   In comparison, qualified immunity for public officials who violate The Constitution appears nowhere in either founding document. (Wherein immunity is conferred upon public officials, its scope is limited and strictly defined. Please see U.S. Const. art. I, sec. 6, cl. 1 (legislators privileged from arrest in transit and during Congressional session except in cases of "Treason, Felony, and Breach of the Peace" and from questioning about "Speech or Debate in either House"). Cf. U.S. Const.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------------

art. I, sec. 3, cl. 7 (public officials who are removed from office remain "liable and subject to Indictment, Trial, Judgment and Punishment, according to Law").)

Put another way in Pierson v. Ray, 386 U.S. 547, 558 (1967) (Douglas, J., dissenting) by U.S. Supreme Court Justice William O. Douglas, reflecting on a finding of absolute judicial immunity using themes just as applicable to qualified immunity:

> I do not think that all judges, under all circumstances, no matter how outrageous their conduct are immune from suit under [42 U.S.C. Sec. 1983]. The court's ruling is not justified by the admitted need for a vigorous and independent judiciary, is not commanded by the common-law doctrine of judicial immunity, and does not follow inexorably from our prior decisions.
> The statute, which came on the books as [Sec.] 1 of the Ku Klux Klan At of April 20, 1871, 17 Stat 13, provides that "every person" who under color of state law or custom "subjects, or causes to be subjected, any citizen... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." To most, "every person" would mean every person, not every person except judges. Despite the plain import of those words, the Court decided in Tenney v. Brandhove, 341 US 367, 95 L ed 1019, 71 S Ct 783[sic], that state legislators are immune from suit as long as the deprivation of civil rights which they caused a person occurred while the legislators "were acting in a field where legislators traditionally have power to act." Id., at 379, 95 L ed at 1028[sic]. I dissented from the creation of that judicial exception as I do from the creation of the present one.
> The congressional purpose seems to me to be clear. A condition of lawlessness existed in certain of the States, under which people were being denied their civil rights. Congress intended to provide a remedy for the wrongs being perpetrated. And its members were not unaware that certain members of the judiciary were implicated in the state of affairs which the statute was intended to rectify. It was often noted that "[i]mmunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress." Cong Globe, 42d Cong, 1st Sess, 374[sic]. Mr. Rainey of South Carolina noted that "[T]he courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity." Id, at 394[sic].
> Congressman Beatty of Ohio claimed that it was the duty of Congress to listen to the appeals of those who "by reason of popular sentiment or secret organizations or prejudiced juries or bribed judges, [cannot] obtain the rights and privileges due an American citizen..." Id., at 429. The members supporting the proposed measure were apprehensive that there had been a complete breakdown in the administration of justice in certain States and that laws nondiscriminatory on their face were being applied in a discriminatory manner, that the newly won civil rights of the Negro were being ignored, and that the Constitution was being defied. It was against this background that the section was passed, and it is against this background that it should be interpreted.
> It is said that, at the time of the statute's enactment, the doctrine of judicial immunity was well settled and that Congress cannot be presumed to have intended to abrogate the doctrine since it did not clearly evince such a purpose. This view is beset by many difficulties. It assumes that Congress could and should specify in advance all the possible circumstances to which a remedial statute might apply and state which cases are within the scope of the statute. "Underlying [this] view is an atomistic conception of intention, coupled with what may be called a pointer theory of meaning. This view conceives the mind to be directed toward individual things, rather than toward general ideas, toward distinct situations of fact rather than toward some significance in human affairs that these situations may share. If this view were taken seriously, then we would have to regard the intention of the draftsman of a statute directed against 'dangerous weapons' as being directed toward an endless series of individual objects: revolvers, automatic pistols, daggers, Bowie knives, etc. If a court applied that statute to a weapon its draftsman had not thought of, then it would be 'legislating,' not 'interpreting,' as even more obviously it would be if it were to apply the statute to a weapon not yet invented when the statute was passed." Fuller, The Morality of Law 84 (1964).
> Congress of course acts in the context of existing common-law rules, and in construing a statute a court considers the "common law before the making of the Act." Heydon's Case, 3 Co Rep 71, 76 Eng Rep 637 (Ex. 1584). But Congress enacts a statute to remedy the inadequacies of the pre-existing law, including the common law. It cannot be presumed that the common law is the perfection of reason, is superior to statutory law (Sedgwick, Construction of Statutes 270 (1st ed. 1857); Pound, Common Law and Legislation, 31 Harv L Rev 383, 404-406 (1908)), and that the legislature always changes law for the worse. Nor should the canon of construction "statutes in derogation of the common law are to be strictly construed" be applied so as to weaken a remedial statute whose purpose is to remedy the defects of pre-existing law.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

----------------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/16/2019 06:59:28 PM

Pierson v. Ray, 386 U.S. 547, 558 (1967) (Douglas, J., dissenting) continued:

|The position that Congress did not intend to change the common-law rule of judicial immunity ignores the fact that
|every member of Congress who spoke on the issue assumed that the words of the statute meant what they said and that
|judges would be liable. Many members of Congress objected to the statute because it imposed liability on members of
|the judiciary. Mr. Arthur of Kentucky opposed the measure because:
|"Hitherto... no judge or court has been held liable, civilly or criminally, for judicial acts... Under the provisions of
|[section 1] every judge in the State court... will enter upon and pursue the call of official duty with the sword of
|Damocles suspended over him..." Cong Globe, 42d Cong, 1st Sess, 365-366.
|And Senator Thurman noted that:
|"There have been two or three instances already under the civil rights bill of State judges being taken into the United
|States district court, sometimes upon indictment for the offense... of honestly and conscientiously deciding the law to
|be as they understood it to be. ...[sic]
|"Is [section 1] intended to perpetuate that? Is it intended to enlarge it? Is it intended to extend it so that no longer a
|judge sitting on the bench to decide causes can decide them free from any fear except that of impeachment, which
|never lies in the absence of corrupt motives? Is that to be extended, so that every judge of a State may be liable to be
|dragged before some Federal judge to vindicate his opinion and to be mulcted in damages if that Federal judge shall
|think the opinion was erroneous? That is the language of this bill." Cong. Globe, 42d Cong., 1st Sess., Appendix 217.
|Mr. Lewis of Kentucky expressed the fear that:
|"By the first section, in certain cases, the judge of a State court, though acting under oath of office, is made liable to a
|suit in Federal court and subject to damages for his decision against a suitor. ..." Cong. Globe, 42d Cong., 1st Sess.,
|385.
|Yet despite the repeated fears of its opponents, and the explicit recognition that the section would subject judges to
|suit, the section remained as it was proposed: it applied to "any person." There was no exception for members of the
|judiciary. In light of the sharply contested nature of the issue of judicial immunity it would be reasonable to assume
|that the judiciary would have been expressly exempted from the wide sweep of the section, if Congress had intended
|such a result.
|The section's purpose was to provide redress for the deprivation of civil rights. It was recognized that certain members
|of the judiciary were instruments of oppression and were partially responsible for the wrongs to be remedied. The
|parade of cases coming to this Court shows that a similar condition now obtains in some of the States. Some state
|courts have been instruments of suppression of civil rights. The methods may have changed; the means may have
|become more subtle; but the wrong to be remedied still exists.
|Today's decision is not dictated by our prior decisions. In Ex parte Virginia, 100 US 339, 25 L ed 676, the Court held that
|a judge who excluded Negroes from juries could be held liable under the Act of March 1, 1875 (18 Stat. 335), one of the
|Civil Rights Acts. The Court assumed that the judge was merely performing a ministerial function. But it went on to
|state that the judge would be liable under the statute even if his actions were judicial. It is one thing to say that the
|common-law doctrine of judicial immunity is a defense to a common-law cause of action. But it is quite another to say
|that the common-law immunity rule is a defense to liability which Congress has imposed upon "any officer or other
|person," as in Ex parte Virginia, or upon "every person" as in these cases.
|The immunity which the Court today grants the judiciary is not necessary to preserve an independent judiciary. If the
|threat of civil action lies in the background of litigation, so the argument goes, judges will be reluctant to exercise the
|discretion and judgment inherent in their position and vital to the effective operation of the judiciary. We should, of
|course, not protect a member of the judiciary "who is in fact guilty of using his powers to vent his spleen upon others,
|or for any other personal motive not connected with the public good." Gregorie v. Biddle, 177 F.2d 579, 581. To deny
|recovery to a person injured by the ruling of a judge acting for personal gain or out of personal motives would be
|"monstrous." Ibid. But, it is argued that absolute immunity is necessary to prevent the chilling effects of a judicial
|inquiry, or the threat of such inquiry, into whether, in fact, a judge has been unfaithful to his oath of office. Thus, it is
|necessary to protect the guilty as well as the innocent.
|The doctrine of separation of powers is, of course, applicable only to the relations of coordinate branches of the same
|government, not to the relations between the branches of the Federal Government and those of the States. See Baker v
|Carr, 368 US 186, 210, 7 L ed 2d 663, 82 S Ct 691[sic]. Any argument that Congress could not impose liability on state
|judges for the deprivation of civil rights would thus have to be based upon the claim that doing so would violate the
|theory of division of powers between the Federal and State Governments. This claim has been foreclosed by the cases
|recognizing "that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

|badge of authority of a State..." Monroe v Pape, 365 US 167, 171, 172, 5 L ed 2d 492, 497, 81 S Ct 473[sic]. In terms of
|the power of Congress, I can see no difference between imposing liability on a state police officer (Monroe v[sic] Pape,
|supra) and on a state judge. The question presented is not of constitutional dimension; it is solely a question of
|statutory interpretation.
|The argument that the actions of public officials must not be subjected to judicial scrutiny because to do so would have
|an inhibiting effect on their work, is but a more sophisticated manner of saying "The King can do no wrong." Chief
|Justice Cockburn long ago disposed of the argument that liability would deter judges:
|"I cannot believe that judges... would fail to discharge their duty faithfully and fearlessly according to their oaths and
|consciences... from any fear of exposing themselves to actions at law. I am persuaded that the number of such actions
|would be infinitely small and would be easily disposed of.
|While, on the other hand, I can easily conceive cases in which judicial opportunity might be so perverted and abused for
|the purpose of injustices as that, on sound principles, the authors of such wrong out to be responsible to the parties
|wronged." Dawkins v Lord Paulet, LR 5 QB 94, 110 (C. J. Cockburn, dissenting)[sic].
|This is not to say that a judge who makes an honest mistake should be subjected to civil liability. It is necessary to
|exempt judges from liability for the consequences of their honest mistakes. The judicial function involves an informed
|exercise of judgment. It is often necessary to choose between differing versions of fact, to reconcile opposing
|interests, and to decide closely contested issues. Decisions must often be made in the heat of trial. A vigorous and
|independent mind is needed to perform such delicate tasks. It would be unfair to require a judge to exercise his
|independent judgment and then to punish him for having exercised it in a manner which, in retrospect, was erroneous.
|Imposing liability for mistaken, though honest judicial acts, would curb the independent mind and spirit needed to
|perform judicial functions. Thus, a judge who sustains a conviction on what he forthrightly considers adequate evidence
|should not be subjected to liability when an appellate court decides that the evidence was not adequate. Nor should a
|judge who allows a conviction when what is later held an unconstitutional statute.
|But that is far different from saying that a judge shall be immune from the consequences of any of his judicial actions,
|and that he shall not be liable for the knowing and intentional deprivation of a person's civil rights. What about the
|judge who conspires with local law enforcement officers to "railroad" a dissenter? What about the judge who knowingly
|turns a trial into a "kangaroo" court? Or one who intentionally flouts the Constitution in order to obtain a conviction?
|Congress, I think, concluded that the evils of allowing intentional, knowing deprivations of civil rights to go unredressed
|far outweighed the speculative inhibiting effects which might attend an inquiry into a judicial deprivation of civil rights.
|The plight of the oppressed is indeed serious. Under City of Greenwood v Peacock, 384 US 808, 16 L ed 2d 944, 86 S Ct
|1800 the defendant cannot remove to a federal court to prevent a state court from depriving him of his civil rights. And
|under the rule announced today, the person cannot recover damages for the deprivation.


Please cf. U.S. Const. art. VI, cl. 2 (U.S. 1787).

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/17/2019 12:10:20 PM

APPENDIX 1: LIST OF EXHIBITS AND PAGES OF FIRST APPEARANCE

I. EXHIBITS ONE (1) THROUGH THIRTY (30)

1: Declaration of Martin S. Gottesfeld (pg. 8)

2: Martin Gottesfeld; Inside El Chapo's Confinement: Cockroaches, Frigid Temperatures, Tacos, and a Three-Lieutenant Escort; The Intercept (February 3rd, 2019, 9:11 A.M.) (pg. 8)

3: David Kushner; The Hacker Who Cared Too Much: How a Crusade to Save Children Landed a Hacker in Prison; Rolling Stone (June 29th, 2017) (pg. 8)

4: 45 C.F.R. Secs. 164.308, 164.310, and 164.312 (retrieved September 2019) (pg. 16)

5: C. Mitchell Shaw; Save a Girl's Life, Get Treated Worse Than a Terrorist; The New American (December 2017) (pg. 22)

6: United States Court of Appeals for The First Circuit: Pattern Jury Instruction 5.04: Justification, Self-Defense, Duress, Necessity (Updated November 25th, 2015) (pg. 22)

7: Form 95s of Martin S. Gottesfeld (August 24th, 2019) (pg. 27)

8: excerpts from Federal-State Court Directory 2017 Edition; Leadership Directories, Inc. (2017) (date approximated) (pg. 28)

9: Martin Gottesfeld; combinatoric analysis (September 2019) (pg. 29)

10: 28 C.F.R. Sec. 540.20 (retrieved September 2019) (pg. 43)

11: 28 C.F.R. Sec. 540.100 (retrieved September 2019) (pg. 44)

12: 28 C.F.R. Sec. 541.31 (retrieved September 2019) (pg. 45)

13: 28 C.F.R. Sec. 540.2 (retrieved September 2019) (pg. 45)

14: 28 C.F.R. Sec. 540.18 (retrieved September 2019) (pg. 45)

15: excerpt from program statement 5265.14, "Correspondence;" Federal Bureau of Prisons (April 5th, 2011) (pg. 46)

16: Martin Gottesfeld; qui tam notification to the U.S. attorney general (August 11th, 2019) (pg. 54)

17: R. Eisele; SENTRY report for Martin Gottesfeld; Federal Bureau of Prisons (June 24th, 2019, 3:00 P.M.) (pg. 63)

18: 28 C.F.R. Part 542 (retrieved September 2019) (pg. 64)

19: excerpt of program statement 1330.18, including sec. 8; Federal Bureau of Prisons (retrieved September 2019) (pg. 64)

20: Martin Gottesfeld and Dana Gottesfeld; electronic messages (April 17th, 2019, April 22nd, 2019, and April 23rd, 2019) (pg. 65)

21: Barrett Brown; newspaper column about life in the FBOP; publisher and date ascertainable upon request (pg. 65)

22: Martin Gottesfeld; request for information to PCCF (September 2019) (date approximated from memory (pg. 66)

23: 28 C.F.R. Sections 541.25, 541.26, and 541.33 (retrieved September 2019) (pg. 76)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------------------------------------

24: Federal Rule of Criminal Procedure 18 (retrieved September 2019) (pg. 78)

25: Federal Rule of Criminal Procedure 24 46 (retrieved September 2019) (pg. 78)

26: Frank Camp; "'Guardian Hacktavist' Martin Gottesfeld Convicted; Faces Up To 15 Years In Prison"; The Daily Wire (August 4th, 2018) (pg. 91)

27: District of Massachusetts Local Rule 83.2.1 (retrieved September 2019) (pg. 92)

28: 28 C.F.R. Sec. 541.20 (retrieved September 2019) (pg. 95)

29: 28 C.F.R. Sec. 540.202(b) "[CMU] Designation Procedures" (retrieved November 12th, 2019) (pg. 101)

30: 5 C.F.R. Secs. 300.102 and 300.103 (retrieved November 12th, 2019) (pg. 131)

II. EXHIBITS ONE HUNDRED ONE (101) THROUGH ONE HUNDRED FORTY-EIGHT (48)

101: Public statement of the expert witness hired by Aaron Swartz's defense (pg. 17)

102: WhiteHouse.gov petition to fire U.S. Attorney Carmen M. Ortiz (2013) (pg. 17)

103: Video of the October 2007 Congressional hearing on institutionalized child abuse in the residential-treatment industry; U.S. House of Representatives (October 2007) (date approximated) (pg. 18)

104: Video of the April 2008 Congressional hearing on institutionalized child abuse in the residential-treatment industry; U.S. House of Representatives (April 2008) (date approximated) (pg. 18)

105: Anderson Cooper; Shocking Treatment; CNN/Anderson Cooper 360 (pg. 18)

106: transcript and additional written record of the October 2007 Congressional hearing on child abuse in the residential-treatment industry; Government Printing Office (GPO) (October 2007) (date approximated) (pg. 18)

107: transcript and additional written record of the April 2008 Congressional hearing on child abuse in the residential-treatment industry; GPO (April 2008) (date approximated) (pg. 19)

108: Gregory Kutz, Managing Director of Forensic Audits and Special Investigations; written report corresponding to the October 2007 Congressional hearing on child abuse in the residential-treatment industry; U.S. Government Accountability Office (GAO) (October 2007) (date approximated) (pg. 19)

109: Gregory Kutz, Managing Director of Forensic Audits and Special Investigations; written report corresponding to the April 2008 Congressional hearing on child abuse in the residential-treatment industry; GAO (April 2008) (date approximated) (pg. 19)

110: Kate Brown; written report corresponding to the Congressional hearings on child abuse in the residential-treatment industry; GAO (pg. 19)

111: Who's Watching the Kids?; PBS Montana (2007) (date approximated from memory) (pg. 19)

112: @AllStudentsSafe; Tweet to @StopLoganRiver thanking the plaintiff and his team for getting the hashtag for The Keeping Students Safe Act trending in Washington, D.C.; Twitter (February 2014) (date approximated from memory) (pg. 22)

113: Video of Lou Pelletier discussing the FBI's lack of follow-through to save his daughter's life; Liberty News Media (March 2014) (date approximated from memory) (pg. 23)

114: Ryan Grim block-quoting Martin Gottesfeld; Why I Knocked Boston Children's Hospital Off the Internet: A Statement by Martin Gottesfeld; The Huffington Post (September 2016) (date approximated from memory) (pg. 23)

115: Justina Pelletier; Note to the Pelletiers; TheBlaze (April 2014) (date approximated) (pg. 23)

116: Shocking Note Apparently Penned by Justina Pelletier to Her Family; TheBlaze (April 17th, 2014) (title and date

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

approximated from memory) (pg. 24)

117: Jurriaan Peters; copy of BCH treatment plan for Justina Pelletier; Boston Children's Hospital (February 2013) (date approximated) (pg. 24)

118: Justina Pelletier; Justina's Plea video; A Miracle for Justina (May 2014) (pg. 24)

119: Recent picture of Justina Pelletier; A Miracle for Justina (pg. 25)

120: Martin Gottesfeld; My Notes On the FBI's Lies Are Contraband; Red State (2017) (title and date approximated from memory) (pg. 26)

121: Martin Gottesfeld; Savage: FBI Monster Ignores Child Torture (2018) (title and date approximated from memory) (pg. 26)

122: Yvonne Abraham; article about Alice Newton, the DA's office, and the medical examiner; The Boston Globe (pg. 33)

123: article about Alice Newton, the DA's office, and the medical examiner; The Washington Post (pg. 33)

124: print-out of BWH cardiology department website announcing its close working relationship with BCH; Brigham and Women's Hospital (pg. 33)

125: Emily Rooney; Justina Pelletier's Parents Fighting to Get Her Back; PBS/WGBH Greater Boston (March 2014) (title and date approximated from memory) (pg. 33)

126: video of the rescue of Martin Gottesfeld (February 15th, 2016) (pg. 37)

127: Lou and Linda Pelletier PPA Justina Pelletier v. Boston Children's Hospital, et al. (amended complaint); Massachusetts Suffolk County Superior Court (filed February 2016) (title and date approximated from memory) (pg. 37)

128: Ryan Grim and Daniel Marans; This Federal Prosecutor Is Building a Career Indicting the Good Guys: But Is U.S. Attorney Carmen Ortiz the One Gone Wrong?; The Huffington Post (July 2016) (authors' names, title, and date approximated from memory) (pg. 38)

129: Ryan Grim block-quoting Martin Gottesfeld; Why This Activist Hacker Is Going On a Hunger Strike In Jail; The Huffington Post (September 26th, 2016) (title and date approximated from memory) (pg. 39)

130: Anthony Cuthbertson; Anonymous Hacker Begins Second Week of Hunger Strike In Prison; Newsweek (October 11th, 2016) (title and date approximated from memory) (pg. 39)

131: Anthony Cuthbertson; Anonymous Hacker Indicted As Hunger Strike Continues; Newsweek (October 20th, 2016) (title and date approximated from memory) (pg. 39)

132: Martin Gottesfeld; The Wrong Ortiz Retires In Boston; The Huffington Post (October 26th, 2016) (title and date approximated from memory) (pg. 40)

133: Martin Gottesfeld; From Prison With Love: Why I Became an Activist Hacker; The Huffington Post (October 2016) (title and date approximated from memory) (pg. 40)

134: Martin Gottesfeld; The Permanent and Potentially-Fatal Effects of Martin Gottesfeld's Hunger Strike; The Huffington Post (October 2016) (title and date approximated from memory) (pg. 40)

135: Martin Gottesfeld; How the U.S. Marshals and Federal Bureau of Prisons Are Trying To Break My Hunger Strike; The Huffington Post (January 2nd, 2017) (title and date approximated from memory) (pg. 40)

136: Kevin Gosztola block-quoting Martin Gottesfeld; Jailed Activist Pens Open Letter About Human Rights Abuses At Plymouth Country Correctional Facility; Shadowproof Press (February 14, 2017) (title and date approximated from memory) (pg. 41)

137: Martin Gottesfeld; Aaron Herndandez Suicide Highlights Systemic Problem In Massachusetts Jails and Prisons; The Huffington Post (April 2017) (title and date approximated from memory) (pg. 41)

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------

138: Martin Gottesfeld; email to then-AUSA Adam Bookbinder (November 2016) (date approximated from memory) (pg. 41)

139: pictures of mail received by Martin Gottesfeld while he was at MCC (2016-2017) (pg. 44)

140: records of rotating vigil during Martin Gottesfeld's hunger strike (2016-2017) (pg. 44)

141: article about the #FreeMartyG protest at the John J. Moakley Federal Courthouse; Massachusetts Lawyers Weekly (late 2016 or early 2017) (date approximated from memory) (pg. 44)

142: Ryan Grim block-quoting Martin Gottesfeld; coverage of open letter to Attorney General Loretta Lynch and Inspector General Horowitz; The Huffington Post (November 2016) (date approximated from memory) (pg. 44)

143: graph of nightly temperatures in Manhattan from the plaintiff's time in the MCC SHU, November 14th, 2016, through February 4th, 2017 (pg. 84)

144: Ryan Grim block-quoting Martin Gottesfeld; coverage of open letter to Acting--U.S.-Attorney-General Sally Yates; The Huffington Post (January 24th, 2017) (pg. 89)

145: Kevin Gosztola block-quoting Martin Gottesfeld; coverage of open letter to Acting--U.S.-Attorney-General Sally Yates; Shadowproof Press (January 24th, 2017) (pg. 89)

146: Christina Sterling; email to Anthony Cuthbertson (Newsweek) (October 2016) (date approximated from memory) (pg. 91)

147: feature-length article on the plaintiff containing content from the Massachusetts U.S. attorney's office; The Miami New-Times (April 2017) (date approximated from memory) (pg. 91)

148: Aviva Stahl; Prisoners Endure a Nightmare "Gulag" In Lower Manhattan, Hidden In Plain Site; The Gothamist (June 19, 2018) (pg. 118)

APPENDIX 2: "SENTRY" CASE

○ Bradis v. Sears, Roebuck & Co., 2018 US. Dist. LEXIS 124390 (M.D. Fla. July 2, 2018) at 13-14, sorting to more claims out, quoting Exbon v. Vista Outdoor Inc., 2017 US. Dist. LEXIS 117236 at 3 (M.D. Fla. July 18, 2017)

○ Marcotte v. Burlington Northern Sante Fe Rail Corp, 2007 U.S. Dist. LEXIS 97734 (D.N.M. Oct 11, 2007) at 48, cert. see Rule 606(b) as "sentry" according to extremes to Rule 606, relief

○ Schroth v. Warner, 353 F. Supp. 1071, 2044 (D. Hawaii 1973), "For the purposes of this decision, I take judicial notice" Fort was that services, i.e., instructions to public access

○ U.S. v. Rountree, 2008 US. Dist. LEXIS 80456, 3:58mj:109/EWT (M.D. Fla. Sept 12, 2008) at 2, sentry's duty to ensure entrants had valid driver's licences and not DUI

○ U.S. v. Liddel, 4:01 F.Supp. 2d 3, 18-19 (D.D.C. 2006), gate to court w/state sentry

○ Cherokee Nation v. United States, 124 F.3d 1413, 1418, "As litigation adversaries, may the United States services a relatively trustworthy sentry, but this court is cautioned the Tribes would prefer to have an invited party guard Ft. "the henco.'"

○ U.S. v. Ray, 294 F.Supp. 532, 536 (S.D. Fla. 1969), ref as sentry flanking Congress back from opencea; U.S. v. Ray, 281 F.Supp. 876 (S.D. Fla. 1968)

○ Jones v. Willingham, 248 F.Supp. 791, 793 (D. Kan. 1965), inmates posted sentries to prevent others from approaching

○ Li v. Wachovia Mtg. Corp., 2010 US. Dist. LEXIS 37864, No. C09-04798 TEH (N.D. Cal. March 25, 2010) at 8 (quoting Local 894, Superline Transp. Co., 863 F.2d 1), 20 C1st Cir., 1988), deter sentry to Rule 606) author, Schroth v Marcotte

○ Ex Parte Duncan, 446 F.2d 876, 871 (9th Cir. 1971), sentries guarding entrance to Pearl Harbor base

○ United States v. Bauer, 1999 US. App. LEXIS 5409, Nos. 97-20144, 97-10205, 97-10924 (9th Cir. 1999) at 3-4, sentries to shoo away hikers and hunters

○ Schoenfeld v. Quamme, 492 F.3d 1016, 1018 (9th Cir. 2007) re: Camp Pendleton, "All entrances to the base feature sentries and security gates."

○ Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010, 1029 n.3 (8th Cir. 1982) "the OAFB's chief of security had instructed gate sentries that civilians with signs, buttons or clothing that were political or ideological in nature should not be allowed on base."

o *Krutsinger v. Pharmacia Corp*, 2004 U.S. Dist. LEXIS 20766, Case No. 02-CV-0111-MJR (S.D. Ill. May 20, 2004) at 12, "The Court concludes this Order may enter the gate, where it acts as sentry..."

o *Vertas v. United States*, 256 F.2d 786, 790 (7th Cir. 1958) "The magazine area from which Private Singsdale the exclusive was surrounded by wire, locked, inaccessible to unauthorized persons, and guarded at all times by sentries patrolling its perimeter."

o *Smith v. United States*, 330 F. Supp. 867, 870 (E.D. Mich. 1971), "a civilian seaman was shot by a ship's sentry upon returning to the ship" ( *Stepp v. United States*, 207 F.2d 909 (4th Cir. 1953), cert. denied, 347 U.S. 933, 74 S.Ct. 627, 98 L.Ed. 1084

o *Lassiter v. Hardee Power Co*, 73 F. Supp. 264, 270 (E.D. Tenn. 1947), "In addition to stationary guards at entrances and other points and a portion of the time, armed roaming sentry forces, the fence was patrolled 24 hours a day along patrol roads inside the fence."

o *United States v. Wilson*, 432 F. Supp. 223, 226 (S.D. Tex. 1976), "There exists no chain-link or barbed-wire fence to which access from the river. There is no wall, there are no guards on sentry duty, nor are there watchtowers along this frontier."

o *United States v. Myers*, 2009 U.S. Dist. LEXIS 923, CAUSE No. 2:08-m-1632 (S.D. Tex. January 8, 2009) at 1-2, "According to the testimony of Master-at-Arms (MA) Roll, on May 9, 2008, at approximately 10:00 p.m., Defendant (d) Myers approached the sentry gate at the Corpus Christi Naval Air Station where he encountered sentry guard MA Rolle. About 200 yards before the sentry gate is a white line painted on the roadway and an orange jersey barricade warning drivers that they are about to enter a Federal reservation."

oo o *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1429 n.22, "The Supreme Court found that the road was essentially a public one as there was no sentry posts or guards at either entrance or anywhere along the route." (quoting *Flowers v. U.S.*, 407 U.S. 197, 218 (quoting *United States v. Flowers* 452 F.2d 80, 90 (5th Cir. 1972)(Simpson, J. dissenting))

o *United States v. Perez*, 922 F.2d 782, 785 (11th Cir. 1991) "Perez acted as a sentry for Plesencia and actively coordinated counter-surveillance. The delivery was only permitted to proceed after Perez and others had carefully searched the area and reported to Plesencia that the area was safe."

- *United States v. Ramos*, 685 F.2d 252, 259 (5th Cir. 1982) (Williams, J. dissenting) "A camp was set up with various security experiences... At one time a sentry reported to the commander by radio that a stranger was approaching. He was instructed to turn the stranger away by telling him that the group was a local operation."

- *United States v. Mason*, 452 F.2d 85, 90 n. 1 (5th Cir. 1971) "The street and its sidewalks are completely open to the public. There is no sentry post or guard at either entrance or at any place along the route."

- *Shacketon v. Cincinnati & Canal Zone*, 108 F.2d 625, 627 (5th Cir. 1939) "The entrance to the reservation was posted with signs prohibiting trespassing and showing that it was a government reservation... The sentry stopped the party at the gate, asked their designation and directed them to their destination."

- *United States v. Holley*, 831 F.3d 322, 334 n. 3 (5th Cir. 2016) (Graves, J. dissenting) "The implication: that the Fourth Amendment right in these circumstances only arises upon the erecting of a fence, the closing of a gate, or the posting of a sentry."

- *Martin v. Halliburton*, 98 F.3d 477, 479 (5th Cir. 2010) "The sentry posted at the north gate of LSA Anaconda saw [or] Price's chase truck returning only noting that none of Defendant's truck services attempted to enter the camp, applied protocol for dealing with unidentified and unescorted vehicles attempting to enter LSA Anaconda."

- *Shapco Distribution Co. v. Commanding General of Marine Corps Base, Camp Lejeune*, 616 F. Supp. 1065, 1068[1068] (E.D.N.C. 1985) "With the exception of those three housing complexes, restricted access to the entire area is controlled by armed sentries. As noted Goorer, every entrance to the base is either controlled by armed sentries or is conspicuously marked with signs setting forth the military's absolute control over the area... In short, the court finds no evidence that the base housing areas have been opened to the public..."

- *Station v. [Spg]*, 566 F. Supp. 174, 177 (W.D. Va. 1983) "The units stationed sentries along the Post boundary. Their duties were to divert cars from forbidden territory."

- *Duvall v. DC*, 370 F. Supp. 625, 632 (E.D.N.C. 1970) "The perimeter fence had a large opening... No sentry was posted at this opening."

Sentry Cases, Post...

20
- Pendarvis v. U.S., 241 F. Supp. 8, 9 (E.D.S.C. 1965) (citing Stepp v. U.S., 207 F.2d 909 (4th Cir. 1953), cert. denied 347 U.S. 933, 74 S. Ct. 627, 98 L. Ed. 1084) "The leading case on point is an action under the Federal Tort Claims Act for death of a civilian seaman, as a result of being shot by an army sentry on duty, at entrance to a dock. Sic."

  - Kendrick v. U.S., 73 F. Supp. 618, 619 (E.D. Va 1947) "... armed sentries stationed on the southern end of said bridge ... allowed a unit of (a) to board said vessel (and exercised) force ... restrained ..."

  - US v. Bruney, 2004 U.S. Dist. Lexis 29661, Crim. No. 3:03-309-22 (D.S.C. September 14, 2004) at 18-19 "Post, for instance, has numerous definitions encompassing both the posting of physical boundaries or notices and the guarding of a sentry or guard..."

  - Delaney v. United States, 260 F. Supp. 3d 505, 510 n.4 (D.S.C. 2017) "Delaney's second cause of action alleging negligence against the sentries and security personnel stationed at the entrance of the (USN Naval Hospital)..."

  - United States v. Screen, 264 F. Supp. 3d 703, 707 (E.D. Va 2017) "While Pl was just outside the gate, a sentry noticed Pl arguing..."

  - Shopco Distribution Co. v. Commanding General of Marine Corps Base Camp Lejeune, 885 F.2d 167, 168 (4th Cir. 1989) (sp. re. distr. c.) "Access to the remainder of the base is controlled by armed sentries ... Access to four of the camp's eleven gates is controlled at all times by armed sentries."

  - U.S. v. Littriello, 866 F.2d 713, 717 (4th Cir. 1988) "Even assuming arguendo the posted sentry is sleeping, the very presence of a guard can indicate the property has not been abandoned." (emphasis B in original).

  - Stepp v. United States, 207 F.2d 909, 910 (4th Cir. 1953) "This entrance was guarded by a checkpoint which consisted of a sentry shack with a guard on duty." (cited supra)

  - Duff v. United States, 171 F.2d 846, 847 (4th Cir. 1949) "(The) (Pl)(?) the boy was a civilian employee of the training station and the family lived in Post Deposit in a house ... these grounds ran a wire fence which enclosed the reservation at a level 500 feet above the dam. A winding stairway led from the dam to a gate in the fence and inside, near the gate, and was a sentry box (about) 4 ft square which was used to house a telephone and the shelter the guard on duty in bad weather."

- Page 157 of 163 -

- Reed v. P., Atlantic C.L.R.Co., 274 F.2d 304, 305 (4th Cir. 1924), "plaintiffs intestate, a private in the United Guard of South Carolina, was one of a squad assigned to guard defendant's bridge across the Black River near Kingstree in that state... he had been along sentry duty there for a week or ten days before he met his death."

- U.S. v. Beeder, 916 F.3d 356, 363 (4th Cir. 2018), "While she was waiting for a ride to the gate of the base, she began to cry. A service member on guard duty (a sentry) approached her..." (distinct case supra)

- United States v. Chatterji, 46 F.3d 1336, 1344 n.1 (4th Cir. 1994), "By analogy, the courts do a nullity to hold no loss has occurred when a soldier acting as a sentry on patrol was gone to sleep when his conduct was resting, thus running the risk of infiltration by the enemy, because no enemy actually appeared on the sentry's watch."

- In re: Merrick, 2001 U.S. Dist. LEXIS 8101, MISC.NO. 00-086 (E.D. Pa. 2001) at 17 n.4, "But because, as I mentioned in my concurring opinion, lawyers are effectively sentries for the public when they detect judges ethical breaches, they must have these first-button breathing space in this heartland of the administration of justice if they are to do that greater risk." (emphasis in original).

- Spock v. David, 469 F.2d 1047, 1054 (3d Cir. 1972), "There are a few restricted areas in the reservation, such as the ammunition magazine area and the stockade, but these are either fenced off, or if not fenced off, marked by signs as restricted areas or patrolled by sentries."

- "(c)Mar. S. Corp. v. U.S., 103 F.Supp. 243, 260 (S.D.N.Y. 1951), "a sentry bound ____ hrs knowledge." (E.D.N.Y. 2003)

- Oge v. Orleans, 2003 U.S. Dist. LEXIS 22876, 02-CV-1199 (SRU), 03-MISC-0066 (SRU) at 12, "The Sirois hearing 'plays the judicial role of sentry, permitting documents not subject to cross-examination only in one to requisite link between the defendant's misconduct and the witness's silence has been established.'" Citing People v. Johnson, 93 N.Y.2d 254, 288; 71 N.E.2d 967; 689 N.Y.S.2d 689 (N.Y. 1999)

- Page 158 of 163

○ In re Namenda Direct Purchaser Antitrust Litig., 331 F.Supp.3d 152, 168-69 (S.D.N.Y. 2018), "the United States Supreme Court confirmed that trial courts should serve as sentries, preventing the juries from being overwhelmed by unsupported speculation cloaked as expertise." (quoting Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., 769 F.Supp.2d 261, 1832 S.D.N.Y. 2011) (internal citations omitted) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 507 U.S. 579; 113 S.Ct. 2786 (1) 125 L.Ed.2d) 469 (1993)

○ Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., 769 F.Supp.2d 268, 281-82 supra.

○ Farrell v. U.S., 167 F.2d 781, 782 (2d Cir. 1948), "The post-area was enclosed and guarded by sentries at each of the five entrance gates."

○ Grayson v. Trade, 691 F.3d 165, 171 (2d Cir. 2011), "A General testimony is no mere formality... GK[?] plays the valuable role of sentry, admitting statements past scrutiny and cross-examination only where the requisite link between the defendant's misconduct and the witness's silence has been established." (quoting People v. Johnson, 93 N.Y.2d 254, 256; 711 N.E.2d 967; 689 N.Y.S.2d 689 (1999).

86   ○ U.S. v. Marrapese, 610 F.Supp. 991, 996 (D.R.I. 1985), "It strikes the court as supassingly strange that Congress would have taken the pains to mandate that the sworn statement of fact was required to pursue such a course, and that a defendant could then eluck the scrutiny of the sld procedure by the simple expedient of having an attorney swear to conjecture, speculation, and surmise.

○ Fausto v. Diamond, 589 F.Supp. 451, 469 (D.R.I. 1984), "The Establishment Clause has historically been an interdicta[?]da[?] sentry, patrolling the actions of government to prevent incursions upon our cherished religious liberty."

○ Jeaness v. Forbes, 351 F.Supp. 88, 91 (D.R.I. 1972) "All gates, whenever open, were armed sentries present who are charged with the responsibility of allowing entrance to those having official business on the station. A member of the public can only enter the enclosure by obtaining a pass, which requires self-identify, statement of business and place or person visited."

— Page 159 of 163

Sentry (cont.)

- Jones v. Doran Enters, 2019 U.S. Dist. LEXIS 40274, C.A. No. 18-365 WBS CD.R.I. March 13, 2019) at 11, "'[T]he gates of Federal-Equestion jurisdiction are customarily patrolled by a steely-eyed sentry — the well-pleaded complaint rule,'" (quoting Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 17 (1st Cir. 2018) (citation omitted))

- Kyricopoulos v. Gaffney, 2018 U.S. Dist. LEXIS 23864, Civil Action No. 17-11778-FDS (D. Mass., Feb. 13, 2018) at 6 (citing Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989) (calling the exhaustion principal "the disputatious sentry which patrols the pathways of comity."

- Kehoe v. Thornton Accel, 2017 U.S. Dist. LEXIS 10101, Docket No. 2:16-cv-491-VK (D. Maine(?) January 25, 2017) at 3 (quoting BIW Deceived v. Local 56, Inds. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 830 (1st Cir. 1997) (citation omitted) ("The gates of federal question jurisdiction are customarily patrolled by a steely-eyed sentry—the well-pleaded complaint rule . . . ."

- Taylor v. Scott Motors, Inc., 2016 U.S. Dist. LEXIS 33040, C.A. No. 16-083-M (D.R.I. March 15, 2016) at 10 quoting BIW Deceived supra

- Deverol v. Liburotin, 88 F.Supp.2d 34, 48 (D.R.I. 2024) quoting Fausto supra

- Polanco-Pizarro v. Filler-Gonzalez & Rodriguez, P.S.C., 960 F.Supp.2d 340, 343 (D.P.R. 2013) quoting BIW Deceived supra

- Hison v. BP AG Office, 2012 U.S. Dist. LEXIS 110403, CA 12-14 MC (D.R.I. July 25, 2012) quoting Nadworny supra/below

- Melendez v. Puerto Rico, 408 F.Supp.2d 196, 198 (D.P.R. 2005) quoting Nadworny supra/below.

- Chamberlin v. Town of Northwood, 1995 U.S. Dist. LEXIS 10345, Civil No. 93-210-SD, (D.N.H. July 12, 1995) at 4 (quoting Teamsters, Chauffeurs Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("there is, however, an additional sentry that guards the gateway to Rule 60(b) relief . . .")

- Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 46 (1st Cir. 2018) quoting BIW supra/below

- Watchtower Bible v. Municipality of San Juan, 773 F.3d 1, 12 (1st Cir. 2014) Citing Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardía De Jesús, 634 F.3d 3 (1st Cir. 2011), reh'g denied, 638 F.3d 81 (1st Cir. 2021)) "Showing keys is a reasonable restriction on the manner of affording access to public streets within the urbanizations. As such, it is no more a prior restraint than the requirement for which the plaintiffs advocate: an applicant requesting an individual to stop at a security booth, identify him/herself to a guard, and state the purpose of the planned entry."

- Samaan v. St. Joseph Hosp., 670 F.3d 21, 35 (1st Cir. 2012) "Daubert relevancy is the sentry that guards against the tyranny of experts. As the gatekeeper, the trial judge has the duty to mediate the inquiry..." (Daubert v. Merrell Dow Pharms., 509 U.S. 582-93; 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) supra/below), "In carrying out this sentry duty, courts must be guided by the precept that sauce knows no particular form" Citing Ruiz-Troche v. Pepsi 344 F.3d 66, 74 (1st Cir. 2003)

- Maine People's Alliance v. Mallinckrodt, Inc., 471 F.3d 277, 295 n.14 (1st Cir. 2006) "Congress... appears to have placed the onus on EPA, rather than the courts, to stand as the sentry at the gates." [illegible] (1st Cir. 2003)

- Metts v. Murphy, 347 F.3d 346 (Selya, S. Dissenting) n.19 Citing Thornburg v. Gingles, 478 U.S. 30, 92 L.Ed.2d 25, 106 S.Ct. 2752 (1986) ("The Gingles preconditions act as a sentry at the gate — a bright-line rule that must be satisfied before the totality of the circumstances comes into play."

- United States v. Mateos, 358 F.3d 34, 41 (1st Cir. 2003) (quoting U.S. v. Marquez, 280 F.3d 19, 28 n.4 (1st Cir. 2002) ("To be sure, we have left a minor opening for a defendant who does not furnish information because he innocently believes that it would be of no interest. But the district judge is the sentry who guards this portal...")

- ADELSON v. DIPAOLA, 131 F.3d 259, 267-62 (1st Cir. 1997) (quoting McChesney supra/below)

- Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transport Co., 953 F.2d 17, 20 (1st Cir. 1992) "There is, however, an additional sentry that guards the gateway to Rule 60(b) relief."

70 o McLucas v. Tenn, 872 F.2d 1093, 1096 (1st Cir. 1989)("In this area of federal-state relations, the Johnston principle is the disputed tax sentry which patrols the pathways of commerce")

   o U.S. v. Hestng, 617 F.2d 920, 922 (1st Cir. 1988) ("The Act, after all, is a sentry designed to guard a particular set of gates...")

   o In re Linder, 30 F. Cas. 208 (1st Cir. October, 1862, Term) (quoting Benjamin B. Barley, sheriff, Suffolk County in service of Writ of Habeas Corpus) ("Should the sentry or party with whom you first communicate refuse you permission to see Colonel Dimmick...")

   o Beatons, Inc., v. Peerless Indem. Ins. Co., 2019 U.S. App. LEXIS 24908, No. 18-1139 (1st Cir, August 21, 2019) at 7-8, quoting BIW (Decided) below

   o BIW Decided v, Local 56, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 831 (1st Cir. 1997)("The gates of federal question jurisdiction are customarily patrolled by a straightforward sentry -- the 'well-pleaded complaint rule'...")

   o U.S. v. Kokinda, 497 US. 720, 729; 111 L.Ed.2d 571, 583; 110 S.Ct. 3115 (1990) (quoting Greer v, Spock 424 U.S, 828, 851, 47 L.Ed.2d 505, 521, 96 S.Ct. 1211 (Dissenting)) ("No entrance to the Fort is manned by a sentry or blocked by any barrier.⁴)

   o U.S. v. Albertini, 472 U.S. 675, 685; 86 L.Ed.2d 536, 546; 105 S.Ct. 2897 (1985) ("No sentry was posted anywhere along the streets which was open to unrestricted civilian traffic 24 hours a day."

   o Greer v. Spock, 424 U.S. 828, 850; 47 L.Ed.2d 505, 521; 96 S.Ct. 1211 (1976) (quoting Flower v, U.S. 407 US. 197, 198; 31 L.Ed.2d 653, 655; 92 S.Ct. 1842 (1972)(quoting United States v, Flower, 452 F.2d 80, 90 (CA5 1971) (Simpson J., Dissenting)) ("There is no sentry post or guard at either entrance or anywhere along the route.")

   o Flower v, U.S., 407 U.S. 197, 198; 31 L.Ed.2d 653, 655; 92 S.Ct. 1842 (1972) supra – 70 decided in military courts

¹⁵ o U.S. v, Train, 2007 CCA LEXIS 112, NMCCA 200600880 CN.M.Cm.Ct.App. 2007)("He further testified that all visitors must enter the compound through one entrance guarded by two sentries, and that he was unaware if any unauthorized entries to the compound to do so.")

Dated: November 18th, 2019
Terre Haute, Indiana

by: _____

Martin S. Gottesfeld
Pro Se
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Sr. Systems Engineer

Rolling-Stone-- & Info-Wars--
Featured Human-Rights Advocate

Political Journalist

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, pro se, certify that on Monday, November 18th, 2019, I mailed the foregoing document to counsel for the defendants in the above-captioned case by handing said copy in an envelope bearing sufficient affixed pre-paid first-class U.S. postage to Ms. J. Wheeler of the FCI Terre Haute CMU unit team, acting in her official capacity as an agent of the defendants, all pursuant to Houston v. Lack, 487 U.S. 266 (1988),

by: _____

Martin S. Gottesfeld, pro se

Exhibit 1

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/17/2019 11:17:14 AM

Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, do hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 18th day of November, 2019, and I declare under penalty of perjury pursuant to 28 U.S.C. Sec. 1746(1) that the following is true and correct (please see Carney v. United States Dep't of Justice, 19 F.3d 807, 812 n. 1 (2d Cir. 1993)):

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG, pending before The Honorable United States District Court for The Southern District of New York (herein also "the case").

2. Section II(B), "Factual Background of the Events In Controversy Declared Under Penalty of Perjury," of my opposition filed today pursuant to the prison-mailbox rule of Houston v. Lack, 487 U.S. 266, 270 (1988) in response to the defendants' motion to dismiss the case (herein "my opposition") is true and correct pursuant to 28 U.S.C. Sec. 1746.

3. As stated at the end of section II(B)(2) of my opposition, "The Defendants' Attempted Suppression of the Truth Heard 'Round the World," I hereby pledge, promise, and contract that I will utilize any award(s) of monetary damages resulting from the case in excess of my fees and costs in order to fund further litigation to vindicate the human and Constitutional rights of institutionalized persons.

4. Every competent computer-network technician knows that Transmission-Control Protocol (TCP) and User-Datagram Protocol (UDP) port numbers impart a great deal of the "substance, purport, or meaning" of Internet communications, and any computer-network technician who claims otherwise is either incompetent, dishonest, or both.

5. The only objectively-correct answer to the following question is "true," and for fear of incompetency, I would never hire any entry-level computer-network technician who answers the following question in the negative: "True or false: TCP and UDP port numbers convey information regarding the substance, purport, or meaning of Internet communications?"

6. At the Donald W. Wyatt Detention Facility (herein "Wyatt"), there was a correctional officer (herein also "CO") who went by the name "Officer T" and who was a retired U.S. military sniper.

7. Officer T learned of the reasons I elucidated for my hunger strike from October 3rd, 2016, to January 10th, 2017.

8. One day, after Officer T learned of the reasons for my hunger strike, as he was going off shift, he saluted me as if I were a fellow service member and told me that I was like a soldier because of my fight for institutionalized American children and I was deeply moved.

9. In September 2019, I completed an assiduous review of the federal case law from every U.S. district and circuit court as well as The Supreme Court of The United States (SCOTUS) looking for the words "sentry" and "sentries," and found that these words are most often used therein to signify persons, rules, or other methods to keep unwanted people, objects, arguments, and other things out of places and venues, especially when the words "sentry" or "sentries" are used by the U.S. government.

10. When I was transferred back into custody of the Federal Bureau of Prisons (herein "the FBOP") on Friday, February 15th, 2019, agents of the defendants in the case did not allow my legal work to travel with me and instead mailed it to my home. I thus am no longer in possession of the papers I received from the court before that date, including docket entry (herein also "D.E.") 6 of the case.

11. When I arrived at MCC New York, I was forced to either donate my personal clothing or ship it home, and the clothing that I shipped home upon my arrival at MCC indeed appears in one (1) of the photographs used by Rolling Stone in its feature about my advocacy.

12. Unlike inmates in general population who had a much wider selection of items available for purchase than I did, I was unable to purchase personal clothing from commissary at MCC New York because I was in the SHU.

13. I was not allowed to bring my hygiene products with me to MCC and the hygiene products available to me in the SHU at

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------

MCC were greatly limited because I could not buy proper toothpaste, dental-flossing products, deodorant, toothbrushes, cotton swabs, mouthwash, or shampoo due to restrictions on commissary purchases by SHU inmates, while inmates in general population at FBOP facilities can purchase all of these items.

14. My sleep surface in the SHU at MCC New York was inadequate; especially due to my many chronic sports injuries accrued over many years of competitive full-contact sports, including judo and wrestling, and other sports, including baseball, climbing, and ultimate frisbee; including dislocated shoulders, separated collar bones, tendonitis, chronic strain and scar tissue around my right iliopsoas tendon (hip flexor), my chronically-strained left sacroiliac joint (rear hip joint), shin splints, and my pulled lower back.

15. Judo, in particular, is a grueling submission sport wherein competitors, known as judoka, are encouraged to win by strangling opponents' carotid arteries (blood chokes) or pulmonary diaphragm (pelvic choke) starting at or before the age of thirteen (13), and by submission joint locks of the elbow and wrist capable of destroying those joints starting at or before the age of seventeen (17).

16. Despite these clear medical needs--which were treated appropriately in terms of my sleep surface at Wyatt--my sleep surface on G Tier of MCC's SHU was less than a half inch thick and left me in constant pain even though I repeatedly requested medical help in the form of an adequate sleep surface.

17. While Officer Nick Tartaglione was in the cell next to me on G Tier of MCC's SHU, he too faced a similarly-thin and inadequate sleeping surface despite similarly-aggravating orthopedic conditions.

18. I was mechanically restrained and escorted outside my cell while I was a SHU inmate at MCC New York, and this is normal for SHU inmates except inmate workers in the SHU while they are working and therefore need the use of their hands.

19. While I was at MCC New York I was deprived of personal property, including a law book that was taken from me upon my entry to the facility as well as grooming equipment, including an electric shaver I was not allowed to bring with me from Wyatt, and reading and writing materials, in the form of rejected and withheld mail and writing implements. At one (1) point, my lawyer contacted the MCC legal department because SHU staff did not hand out the difficult-to-use "flex pens" that are the only writing implement that SHU inmates are allowed to use.

20. For an inmate to encounter conditions in the SHU contrary to those detailed in above paragraphs twelve (12) through nineteen (19) would be abnormal because, with the exception of the failure to distribute "flex pens," all of the above conditions are standard practices in segregation in corrections facilities.

21. The practice of forced-feeding as performed in correctional facilities and the FBOP starts when a team of officers outfitted in what resembles riot gear enter an inmate's cell and physically subdue the inmate through violence and physical force.

22. The proceeding is video-recorded, which immortalizes the humiliation and degradation of the hunger-striking inmate.

23. Once five (5) or more COs subdue the inmate who is to be force-fed, they place the inmate in a "five-(5)-point restraint."

24. In non-euphemistic terms, the COs bind each of the inmate's four (4) limbs to a bed post or to parts of a specially-designed "restraint chair," and strap an inflexible mask over the inmate to immobilize the inmate's head and face.

25. Once the inmate is bound in the five-(5)-point restraint, a "doctor" forces a nasogastric tube up the inmate's nose and down the inmate's throat, despite any attempt by the inmate to close his or her nasal passages or throat.

26. This process is known to cause nasal and esophageal bleeding and to cause harm; many inmates cry at this point but prison "doctors" like Defendant Bussanich continue anyways despite their Hippocratic oath.

27. Some prison "doctors" delight in the force-feeding procedure and one of the principal factors differentiating medical practice in correctional settings is that prison "doctors" know they will be allowed to perform the force-feeding procedure against the will of their patients, which other doctors in non-correctional settings generally neither perform nor condone.

28. The prison "doctor" then pumps liquefied "food" through the tube into the inmate's stomach.

29. The prison "doctor" then leaves the inmate in the five-(5)-point restraint for hours, before typically ordering him or her placed in a paper gown and held in suicide watch for an extended period designed by the prison "doctor" to further punish,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

degrade, and humiliate the inmate for his or her hunger strike.

30. Despite Defendant Bussanich's oath to "do no harm," Defendant Bussanich repeatedly engaged in the barbaric, torturous, sadistic, and harmful practice of force-feeding---not to save life---but rather to punish protest by pre-trial detainees.

31. Defendant Bussanich and other parties in privity with the defendants in the case wanted to be sure that I knew the above-outlined force-feeding procedure in full detail and they used it regularly to threaten me.

32. In response to one (1) of those threats, I told Defendant Bussanich, "Anything you do to me, I'm writing up for The Huffington Post."

33. Upon hearing of my intention to document the force-feeding process in The Huffington Post, Defendant Bussanich's facial expression turned from exuberant to fearful and concerned---like a child caught knowingly doing wrong.

34. Though Defendant Bussanich and others continued to threaten me with force-feeding, it was clear they did not have the stomach to see their use of the procedure appear in print in detail in the politics section of The Huffington Post, especially given the horrific medical abuse and human-rights violations carried out on Justina Pelletier and other children for whom I advocate by other supposed medical professionals and that this force-feeding of me would have been seen by many in the public as an extension of that earlier barbarism by supposed medical professionals.

35. In preparing for my hunger strike, I performed a great deal of research on the likely reactions and the relevant matters of law.

36. Upon starting my hunger strike, I learned a great deal more about prison hunger strikes from my attorneys and Wyatt staff.

37. Hunger strikes are not rare events in custodial settings.

38. Only a small percentage of prison hunger strikes result in inmate transfers.

39. Nearly all inmate transfers resulting from hunger strikes are to medical facilities and I am aware of no other federal pre-trial inmate who was transferred during a hunger strike to a non-medical facility in another U.S. federal-court district.

40. While I was in the SHU at MCC New York the rodent and insect infestation problem affected me because vermin got into my cell and I had to block the gap under my cell door in order to stop the rodents and roaches from coming into my cell.

41. After the cockroach climbed the prison mental-health practitioner, causing her to scream and shutter, as noted in D.E. 2 at 8 paragraph 12, the inmate with whom she was speaking exclaimed, "We have to live in this [filth]."

42. Myself and the other inmates in the SHU at MCC New York did, in fact, "have to live in [that filth]."

43. The temperature in my cell in the SHU at MCC New York while I was there was frigid throughout the winter whenever it got cold outside and Defendant Bussanich personally observed me bundled up in multiple blankets in my cell due to this cold but did nothing.

44. While I was in the SHU at MCC New York, Defendant Tatum made weekly rounds through the SHU and was aware of the conditions therein from talking with inmates yet he did nothing.

45. While I was in the SHU at MCC New York, Defendant Bussanich visited the SHU multiple times per week and was well aware of the conditions therein from talking with myself and other inmates yet he did nothing.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

FROM: 12982104
TO:
SUBJECT: Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG
DATE: 11/17/2019 11:18:18 AM

46. Based on my experience in the press, it is far more likely than not that during their tenures as the heads of their organizations, defendants and Hurwitz and Anderson were made personally aware of the conditions in and around the 10-south and 9-south units at MCC New York due to the high-profile pre-trial defendants housed therein and the history of sustained media interest and publicity generated by the conditions in those units.

47. It is also worth noting that the significant litigation history of the conditions at MCC and especially in its 9-south and 10-south units more likely than not ensured that during their tenures defendants Hurwitz and Tatum were personally aware of the conditions therein.

48. Indeed, the world learned that U.S. Attorney General William Barr reassigned Defendant Hurwitz and the new warden at MCC after pre-trial detainee Jeffrey Epstein died in 9-south.

49. Clearly, U.S. Attorney General William Barr considered Defendant Hurwitz and the warden of MCC New York personally responsible for the conditions in 9-south.

50. Defendant Bussanich saw me during my hunger strike while I was the SHU at MCC New York at most once per day, and he and the medical department went days without seeing me at all.

51. I was not hooked up to any long-term medical-monitoring equipment during my hunger strike at MCC New York, but rather thrown in solitary confinement.

52. In comparison, if the defendants were serious about the needs to "monitor" and "tend to" my hunger strike, they would have housed me in the medical unit--as Wyatt did--and hooked me up to continuous monitoring equipment, but they did no such thing.

53. The defendants did far more to threaten me with forced-feeding then they did to "monitor" and "tend to" my hunger strike.

54. Before Aaron Swartz hung himself, his defense attorneys informed in writing the division chief of cybercrime in the Boston U.S. attorney's office, namely Stephen Heymann, that Heymann's belligerence had left Aaron Swartz suicidal.

55. Heymann responded in writing to this information by telling Aaron Swartz's lawyers, "Fine, we'll lock him up."

56. I drew the same federal judge as Aaron Swartz, namely The Honorable Nathaniel Matheson Gorton.

57. Harvard Medical School and its affiliate, The Brigham and Women's Hospital (BWH) Cardiology Department conduct research to benefit Judge Gorton's family business, Slade Gorton & Co., Inc.

58. I was the only subsequent activist indicted by Carmen Ortiz under the same highly-controversial federal law as Aaron Swartz: The Computer Fraud and Abuse Act.

59. The Honorable Nathaniel Matheson Gorton is widely known as a hanging judge who rules intentionally in error to support the government.

60. Once Aaron Swartz drew The Honorable Nathaniel Matheson Gorton, Carmen Ortiz's office explicitly threatened Aaron Swartz with what they would get Judge Gorton to do to him at sentencing.

61. After then--Assistant-U.S.-Attorney Stephen Heymann, the son of Carmen Ortiz's Harvard Mentor Phillip Heymann, intentionally drove Aaron Swartz to suicide, Republicans in both Houses of Congress convened oversight hearings and slammed Carmen Ortiz for her mishandling of the case.

62. Following the death of Aaron Swartz, over 61,000 people digitally signed an online petition to the White House demanding that President Obama fire Carmen Ortiz.

63. Carmen Ortiz's husband publicly attempted to defend her actions online, and rather than succeed, he was driven off of