TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Twitter.

64. After Carmen Ortiz's office used the threat of Judge Gorton and other threats to drive Aaron Swartz to suicide, Judge Gorton ordered the names of government agents redacted from case documents before releasing them to the public for fear of retaliation.

65. After Carmen Ortiz's office drove Aaron Swartz to suicide but before the acts for which I was indicted, various government agencies, including the U.S. Sentencing Commission, endured cyberattacks under the banner of Anonymous and this later caused Chief U.S. District Court Judge Patti B. Saris to disqualify herself from my case.

66. My hunger strike caused serious issues for then-soon-to-be-former--U.S.-Attorney Carmen Ortiz at a time when she was already in a very weak political position due to intense ongoing long-term controversy and condemnation from both sides of the political aisle and when the opposing political party was about to take over the DOJ.

67. During my hunger strike protesting Carmen Ortiz for her long record of flimsy political prosecutions, The United States Court of Appeals for The First Circuit rebuked Carmen Ortiz by reversing what The Boston Globe called one of her "signature indictments" for failure to state a crime, i.e. for federal interference in local politics.

68. The Harvard Kennedy School rejected Carmen Ortiz's subsequent attempts to secure employment.

69. No big law firm hired Carmen Ortiz after she left the U.S. attorney's office or took her on as a partner; she instead works for a small firm in Boston that had ties to her former government office.

70. The acting director of the U.S. Marshals Service and the director of the Federal Bureau of Prisons transferred me to MCC New York as an overt act in their conspiracy to protect Carmen Ortiz, the DOJ, and their pension-fraud scam by depriving me of my Constitutional rights to free speech, freedom of the press, freedom of association, the ability to petition the government for the redress of my grievances, due process, equal protection, access to counsel, access to the courts, a speedy and public trial in my district, and freedom from cruel and unusual punishment.

71. Defendants Tatum and Bussanich joined the conspiracy shortly before I arrived at MCC and took willing part through many overt actions including: placing me in the SHU with no administrative hearings or written orders; threatening me with forced-feeding if I didn't stop my Constitutionally-protected hunger strike; stigmatizing me by housing me--a strictly-non-violent human-rights activist--with Joaquin El Chapo Guzman Loera and other high-profile RICO and terrorism defendants; placing me in solitary confinement in a cold, leaky cell; ordering their staff to treat me in a hostile, coercive, and intimidating manner; denying me phone calls, access to my counsel, electronic messaging, and interviews with Rolling Stone, Wired, and other outlets, as well as ordering my mail sabotaged, not accepted by unit staff for mailing, or not sent so that I could not refute the stigmatizing narrative being put out by the defendants' parties in privity in the Boston U.S. attorney's office; and trying to frame me for placing pornography on a protected computer and then destroying the evidence of their botched attempt.

72. Fellow inmates and also correctional staff repeatedly explicitly recognized that my steadfast insistence on my hunger strike was well beyond the ordinary firmness expected from a similarly-situated individual and I attribute this to my upbringing, my love for The Constitution, my civic dedication, my personal abhorrence for both prosecutorial and child abuse, my participation in martial arts and wrestling, and my personal history overcoming child abuse.

73. It is obvious from my knowledge of the inner workings of The U.S. Marshals Service and the Federal Bureau of Prisons that my same-day transfer across many U.S. court districts from Wyatt in Rhode Island to MCC in Manhattan required approval at the highest level of the U.S. Marshals Service and the Federal Bureau of Prisons, i.e. the heads of those organizations.

74. During my time at MCC New York, it was well known among the inmate population that Defendant Bussanich moved to MCC New York because of a lengthy litigation history against him in Pennsylvania.

75. During my hunger strike I authored a Constitutionally-protected petition for the redress of some of my grievances addressed to then-AUSA Adam J. Bookbinder and this petition appears as exhibit 138 to my opposition.

76. When I filed the case, I had no access to an adequate law library; I was unaware and unable to research the proper procedure for filing a qui tam action under The False Claims Act, though I have since notified the U.S. attorney general and sent him all the paperwork that would have been required to pursue a qui tam action under The FCA.

77. The heads of the FBOP and U.S. Marshals Service joined the above-detailed conspiracy to deprive me of my

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Constitutional rights as a form of patronage in return for federal prosecutors allowing them to continue their ongoing pension-fraud and other scams, actionable under the FCA, without fear of federal prosecution.

78. To comply with Due Process requirements, the FBOP did not apply its unconstitutional former rule, known as the "byline restriction," against pre-trial employees in the same way that it did not enforce rules to prevent pre-trial detainees from conducting businesses and this demonstrates that the defendants in the case knew that there actions to hinder my publishing were unlawful.

79. Rolling Stone was delayed in publishing its feature about my case because its reporter could not interview me in person until after I left MCC and arrived at The Plymouth County Correctional Facility (PCCF), where the subsequent in-person interview was finally able to take place.

80. Recently two (2) inmates who had to be pepper sprayed during a violent altercation in my unit each served only eleven (11) resultant days in the SHU due to adjudication of their culpability compared to my eighty-one (81) days in the SHU at MCC and my subsequent forty-four (44) days in SHUs on the way to the FCI Terre Haute CMU, all without being charged with a single inmate disciplinary infraction, including the twenty-five (25) days I spent in the SHU at MCC after the declared end of my hunger strike.

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States of America. Executed on November 18th, 2019.

Martin S. Gottesfeld

Exhibit 2

**The Intercept_**

# Inside El Chapo's Confinement: Cockroaches, Frigid Temperatures, Tacos, and a Three-Lieutenant Escort

Martin Gottesfeld

February 3 2019, 9:11 a.m.



The high-security federal jail known as the Metropolitan Correctional Center, near Foley Square in New York City, on Jan. 21, 2017. The facility has housed some of New York's highest-risk federal defendants. Joaquín Guzmán, the Mexican drug kingpin known as "El Chapo," has been held there since January. Photo: Karsten Moran/The New York Times via Redux

*Editor's note: Martin Gottesfeld is currently serving a 10-year federal prison sentence, convicted of a cyberattack against Boston Children's Hospital, in protest of the facility's controversial treatment of a young girl in its custody. His case has been profiled by Rolling Stone magazine. During a period of his confinement, he was housed in a unit adjacent to Joaquín "El Chapo" Guzmán at the Federal Bureau of Prisons' Metropolitan Correctional Center, in New York. Access to the facility is severely restricted, and this is the first account of the conditions surrounding Guzmán's detention during his trial. See FreeMartyG.com for more on Gottesfeld's case and background.*

1.    **At the tail** end of the Obama administration, I was locked up a stone's throw away from Joaquín "El Chapo" Guzmán at the Federal Bureau of Prisons' infamous Metropolitan Correctional Center, New York, or MCC NY, in downtown Manhattan, where Guzmán is currently being held during his ongoing federal trial. I was there writing and waging a hunger strike when El Chapo first arrived. Much has been written about El Chapo's trial, but close to nothing about the conditions of his confinement, as the security around him has made access off limits to any journalist other than me.

2.    I'm an imprisoned human rights activist and political journalist focusing on protecting institutionalized children from common tortures in America like these:

Congressional "Hearing on "Child Abuse and Deceptive Marketing by Re...



3. I'm currently suing the Bureau of Prisons and MCC NY for both state and federal civil rights violations, related to the conditions where El Chapo is held, and I'm exploring class-action certification. My lawsuit against MCC NY offers a new and rare glimpse into prison life in the solitary confinement cells that El Chapo has now called home for nearly two years. Besides simply recovering my fees and costs, however, my goals aren't financial. Instead I'm asking the court to force MCC NY to respect human dignity, the First Amendment, federal regulations, and other human and civil rights.

4. There's a lot of mystery surrounding the 10-South unit at MCC where El Chapo is being housed. Much of that is fueled by the effects of it being a "SAMs" or "special administrative measures" unit. As such, the inmates aren't supposed to come into any visual or other contact with other inmates.

5. Even magazines they receive in the mail must be prescreened by the FBI for the supposed reason of intercepting hidden messages. Outbound communications are similarly restricted and monitored in real time.

https://theintercept.com/2019/02/03/el-chapos-confinement-cockroaches-tacos-and-a-three-lieutenant-escort/

You can read more about the SAMs program here. For the rest of the details of my pending litigation, you can read the full filing at FreeMartyG.com.

6. But it's virtually impossible to prevent inmates from seeing other inmates. For my part, I was regularly paraded to the 10-South medical exam room during my 81 consecutive days in solitary confinement at MCC NY, and I shopped at the 10-South commissary. When I caught glimpses of El Chapo being moved, I noted his unassuming appearance. He was about my height and weight, and I'm 5-foot-7, 180 pounds (obviously, though, I weighed less during my hunger strike).

7. Once El Chapo arrived at MCC NY, the staff appeared to be doing everything they could to get him to roll on the rest of the Sinaloa Cartel and especially to try to get him to reveal where he's allegedly hiding $1 billion or so in assets in Mexico. The prison transferred Spanish-speaking staff to his unit in case he ever let something slip in his native language. This also seemed to be part of a "good cop, bad cop" routine. They vacated the cell next to his in an apparent effort to reduce his conversational options. They seemed to hope that he'd get lonely and decide to speak to prison staff.

8. Even within the "SAMs" program though, El Chapo was subject to extra precautions. While every inmate in 10-South is also on a status called a "lieutenant hold," which requires using a lieutenant and two lower-ranking correctional officers to move them anywhere, El Chapo was a "three-lieutenant hold," meaning that three lieutenants were necessary to move him. Finding three available lieutenants was no easy task, which meant that moving El Chapo was always an all-consuming process.

9. The facility itself is trash, with cockroach-infested meal trays and frigid, leaky cells. One inmate resorted to drinking from his toilet when the

water was shut off. (Its sister facility across the river is now the subject of public attention, as detainees have been living without heat.)

10. In my lawsuit, I also describe how, as a member of the press, my First Amendment rights were violated. Among other things, MCC NY and its warden refused to let me send sealed media mail to Rolling Stone, which was profiling me and my case, as they were required to do by federal regulation. According to them, Rolling Stone didn't qualify as a legitimate national news organization.

11. Here's what I think they didn't want Rolling Stone and its readership to see:



Drawing: Courtesy of Martin Gottesfeld

12. The above is my hand-drawn diagram of the cell where MCC NY houses

high-profile inmates like El Chapo. I made that drawing as I was standing in that cell myself about two years ago, but MCC NY wouldn't let me mail this diagram to the press.

13. My proximity to El Chapo might also explain why the prison wouldn't let Rolling Stone or Wired interview me in the prison.

24. Some inmates, however, saw at least one benefit from the alleged drug lord's arrival. Once he was in 10-South, the kitchen served his unit tacos for dinner.

We depend on the support of readers like you to help keep our nonprofit newsroom strong and independent. Join Us →

## RELATED


**"'Vicious' And 'Brutal'" — Life Inside a Freezing Federal Prison With No Heat**


**Police Make More Than 10 Million Arrests a Year, but That Doesn't Mean They're Solving Crimes**


**Prisons Across the U.S. Are Quietly Building Databases of Incarcerated People's Voice Prints**

Exhibit 3

HOME > CULTURE > CULTURE FEATURES

**Rolling Stone**

Subscribe

JUNE 29, 2017 3:38PM ET

# The Hacker Who Cared Too Much

**When a programmer shut down a hospital website to defend a sick girl, he raised a crucial question: What are the bounds of protest in the digital age?**

*By* **DAVID KUSHNER** 



**If convicted, Martin Gottesfeld could face up to 15 years in prison and $500,000 in fines.**
Madeleine Hébert/Flickr

One afternoon in a modest, hilltop home in West Hartford, Connecticut, Linda Pelletier, a sandy-blond mother of four, opened a greeting card from her 15-year-old daughter, Justina. To her surprise, a small, intricately folded piece of paper slipped out from inside. It was an origami fortune teller. Pelletier poked her thumbs and forefingers under the flaps, spread them apart, then unfolded the flap that faced her. A chill shot through her as she read the message, written as tiny as her daughter's handwriting would allow: "I'm being tortured."

2. Six months earlier, Justina, a spunky petite brunette, seemed like any other middle-class, suburban girl. She collected stuffed giraffes, listened to Taylor Swift and ice skated competitively, coached by her mom, a champion skater in her own right. But then she began feeling unusually sick. She developed searing stomach pains and confounding digestive problems. It got so bad her parents took her to see Dr. Mark Korson, a metabolic geneticist then at the Tufts Medical Center. He had given her a working diagnosis of mitochondrial disease, a chronic genetic disorder that can cause weakened muscles, neurological problems and dementia.

3. Soon after, in February 2013, Justina's symptoms became too much to bear, as her stomach felt like it was ripping apart. Desperate and scared, her parents rushed her through a blizzard to the best hospital in reach, Boston Children's, the renowned teaching facility associated with Harvard. By the time she arrived, she was slurring her speech and barely able to swallow food.

4. But the doctors at Children's gave Linda and Lou a shockingly different diagnosis than the one she'd received at Tufts: Justina didn't have mitochondrial disease; her illness, they said, was in her head. The hospital told them that they were taking Justina off her mitochondrial and pain medication. Confused and reeling, the parents refused to comply. And when they attempted to check Justina out of the hospital, they were blocked by security guards. The state was taking emergency custody of their daughter under suspicions of what they called "medical child abuse" at the hands of the parents. "We didn't even get a chance to say goodbye," Lou later said.

5. Transferred to Bader 5, the hospital's psych ward, Justina's condition rapidly declined. She could barely walk or speak anymore, and felt like she had knives in her stomach. But the treatment she claims she endured was the most devastating of all. "I was getting worse and they didn't believe me that I was in pain," Justina tells me. According to a lawsuit the Pelletiers later filed against Boston Children's, Justina was left in hallways and in bathrooms for hours at a time. When forced to walk, she would fall at times "and they would laugh at me," she says. Her toenails were ripped out, she alleged in the lawsuit, when they pulled her in a wheelchair and her feet dragged on the floor.

6. **RELATED**

**The Brilliant Life and Tragic Death of Aaron Swartz**

**Sex Workers Say Incel Campaign to Report Them to IRS Won't Work**

7. Even more frightening, she was too afraid to tell her parents any of this. Their communications – limited to one 20-minute call and one hour-long visit each week – were closely monitored by hospital staff, and she worried about what might happen to her parents or her if they overheard her. Instead, she resorted to sneaking notes, such as the one hidden in the origami, to her family. After the Pelletiers began speaking out publicly about their daughter on social media and to local news, a judge ordered the family put under a gag order. "I couldn't talk to anybody," Justina recalls.

8. To the Pelletiers and their supporters, Justina had been "kidnapped," as her father Lou put it, by the state of Massachusetts for the sake of medical experimentation. Korson, the Tufts doctor who had given Justina her original diagnosis, wrote a scathing letter to the Pelletiers' attorney on their behalf calling Children's actions "the most severe and intrusive intervention a patient can undergo…it feels like Justina's treatment team is out to prove the diagnosis at all costs."

9. But, according to the state, it was the parents who were the real danger. The Department of Children and Families (DCF) and Boston Children's refuted the allegations against them. They were protecting Justina from parents who were, as one Children's physician put it, "overmedicalizing" the girl and neglecting to give her the psychiatric treatment she needed. Taking custody was in the child's best interest, the hospital contended in a statement at the time, because of "both parents' resistance towards recommended treatment plans." Children's spokesperson Rob Graham tells me Justina's "treatment by each of Boston Children's providers was proper; their care fell squarely within the appropriate professional standards of care, and resulted in patient improvement."

10. However, a December 2013 in-depth investigation of Justina's case by the *Boston Globe* found that, in the previous 18 months, Children's had "been involved in at least five cases where a disputed medical diagnosis led to parents either losing custody or being threatened with that extreme measure." There was even a nickname for such custody battles, which occurred at other hospitals as well: "parentectomy." The *Globe*, in a wider investigation into the DCF, found more disturbing data. More than 95 children were found to have died in state custody between 2001 and 2010.

11. To get help with Justina, the Pelletiers reached out to Reverend Patrick Mahoney, director of the Christian Defense Coalition, a group who had rallied around keeping Terri Schiavo alive during her controversial right-to-die case. Mahoney believed that the "government was overstepping their boundaries into personal individual freedom." As the Pelletiers' spokesperson, he transformed their fight into an online campaign, soliciting volunteers to help spread the word.

12. As publicity surrounding Justina's case reached its height, Martin Gottesfeld, a 30-year-old computer security expert who had no relation to Justina or her family, decided to act — during one of the hospital's biggest fundraising periods of the year. According to the indictment from the U.S. District Court of Massachusetts, Gottesfeld attacked the computer servers of Children's and the nearby Wayside Youth and Family Support Network, the residential treatment facility where Justina was moved after Bader 5. Though no patients' records were compromised or harmed, the hospital claimed the attack, which lasted several days and temporarily downed the website, "disrupted day-to-day operations as well as research being done." Children's claimed the attack cost $300,000 to mitigate, and resulted in another $300,000 in losses due to the hospital's donation website being shut down.

13. But the attack largely achieved Gottesfeld's intended effect: It put the institution overseeing her care on the defense and raised awareness of Justina's story. The feat also landed Gottesfeld behind bars. He is currently awaiting trial inside a detention center in Plymouth, Massachusetts, charged with conspiracy and intentional damage to a protected computer, under the Computer Fraud and Abuse Act, or CFAA, a law written during the Reagan administration to protect government computers from "unauthorized access."

14. The CFAA faces widespread criticism for being both outdated and overzealously applied. Most notably, this happened in the case of activist Aaron Swartz, the Harvard research fellow who was charged with illegally downloading several million journal articles from the online academic database JSTOR, which he reportedly intended to make openly available to the public. Though Swartz was fighting for freedom of information, U.S. Attorney Carmen Ortiz famously declared "stealing is stealing," charging him under the CFAA with felony counts that carried a maximum sentence of 35 years and potential fines of $1 million. Refusing to take a plea, Swartz committed suicide in January 2013.

15. If convicted, Gottesfeld could face up to 15 years in prison and $500,000 in fines. His case, currently awaiting a trial date, has launched its own campaign and hashtag #FreeMartyG. And it's raising an increasingly crucial question: What are the bounds of protest in the digital age?

16. As Gottesfeld awaits the answer that will determine his fate, I visit him on an overcast day in March. Stocky, dark-haired, in a green prison jumpsuit, his eyes redden as he clutches his black phone on the other side of the Plexiglas barrier. "I don't want any activist to go through what I went through for trying to do the right fucking thing," he says.

27. "Any of my fellow Bostonians down for a protest?"

28. It was the wee hours of December 24th, 2013, when Gottesfeld fired off this Facebook message, linking to a sensationalized article he'd found on the depths of the Internet. He was inside his darkened, ground floor apartment decorated with framed classic rock LPs – hammering at his laptop from his sagging, L-shaped, gingham couch. He couldn't believe what he'd just read on Facebook about Justina Pelletier. When a Facebook friend limply replied about how "messed up" the world had become, Gottesfeld stiffened his back. "They only win if we give up," he typed back.

29. Born Martin Karim and raised in Andover, Massachusetts, Gottesfeld is a survivor of abuse himself. At age 12 – having never met his Bangladeshi father and after his mother had a nervous breakdown – his maternal grandparents, Jay and Gloria Gottesfeld, agreed to adopt him. His grandfather, a computer engineer, resented the arrangement – "I felt unwanted, like I was a burden," Marty tells me. At times, Jay would lash out physically and emotionally. Gloria confirms his account. "It's true, unfortunately," she says.

30. But, Marty adds, his grandfather (whom he calls his father) was abused as a child at an orphanage. "He's a survivor of institutionalized child abuse," Gottesfeld says. "I'm a survivor of child abuse." The point being, he adds, "I take child abuse really seriously." Gloria recalls him frequently coming to the aid of the less fortunate, including a time when, as a young boy, he attacked a teenager who had portrayed a bully in a school play, thinking he was the real thing.

31. Around 1996, after getting access to a computer at his grandparents' home, Gottesfeld felt a new sense of purpose. Soon, he was writing and selling his own utility software. His technical skills and grades got him into the esteemed boarding school Exeter, where he found like-minded peers, including a teenage Mark Zuckerberg. "We hung out in a common crowd since we were both computer kids," Marty says. They shared what he calls "this intrinsic drive to just always code, code, code, code and code some more." (A spokesperson for Zuckerberg confirms that the two were classmates, but says they haven't had contact since Exeter.) After Gottesfeld got into trouble for exploring vulnerabilities in the school's computer system, he dropped out and went into computer consulting.

32. On the side, Gottesfeld maintained a budding passion for human rights causes, supporting Amnesty International and Human Rights Watch. But it wasn't until he started dating Dana Barach – a thoughtful Brandeis student with wavy long red hair whom he met online – that he found a way to fuse his worldview with his programming skills.

23. In July 2013, Barach visited her 16-year-old brother at Logan River Academy, a so-called "troubled-teen" facility in Utah where he'd been living since February. Dana's parents had sent him there for the typical reasons: he was smoking pot, playing guitar late into the night and failing at school. Dana returned from Utah with allegations of gross mistreatment that struck a nerve with Gottesfeld. He says he called the Utah police, Human Rights Watch, even the FBI, but to no avail. "I was pretty much roundly and flatly ignored," he says. But after posting about Logan River on Facebook, he got a message from someone claiming to be part of the hacker collective Anonymous: "Would you like some help?"

24. Gottesfeld had never interacted with Anonymous, and only knew of its "mystique," as he puts it. By 2013, the decentralized group had become notorious for international campaigns against targets from the Church of Scientology to Middle Eastern dictators during the Arab Spring. But the Anonymous hacker (whose name Gottesfeld does not want to reveal) told Gottesfeld that he had also been fighting to liberate kids from troubled-teen centers, and that he himself had suffered a brain injury while residing at one. If Gottesfeld needed media attention on the problems at Logan River, the hacker told him, then Anonymous could deliver. "We'll take any help we can get," Gottesfeld replied.

25. The hacker, who claimed to be homeless and working only from his phone, schooled him in online activism tactics: Twitterstorms, flooding Twitter with a hashtag about Logan River; YouTube testimonials, a tearful video from a Logan River alum testifying to abuse; Facebook rebel-rousing, creating groups on Logan River and networking with other activists; an online petition to end certain practices at Logan River. "I really was pouring my heart and soul into the fight for him to the point where I basically wasn't working," Gottesfeld says.

26. Beginning in November 2013, Logan River's website sustained a distributed denial-of-service attack which, according to a later intictment, "disrupted... the website intermittently over a period of months." Just as the Anonymous hacker had promised, Gottesfeld had succeeded in getting media attention that forced Logan River to respond. "His criticism was unfounded and his comments on social media ultimately had no impact on families

who recognized the success of our program – no student has been pulled from our Academy over this malicious incident," Logan River Academy spokesperson Caroline Luz tells *Rolling Stone*. (Logan River has been under new ownership since 2016).

27. Finally, in December 2013, Dana's parents brought her brother back home. Though Logan River remained open, for Gottesfeld, it was a profound victory and evidence of the power of the Internet to affect social change.

28. Soon after, he read about a girl, Justina Pelletier, who seemed to be suffering unimaginable abuse at the hands of the state, and felt a call to action again. In the coming weeks, Gottesfeld took to her cause, spreading the #FreeJustina hashtag on Twitter. He stayed up all night pulling articles on her case, posting on Facebook and exchanging hundreds of direct messages on Twitter with potential volunteers. "So far I haven't been sued/arrested," he wrote to one. "I've been pretty careful...it's not the end of the world though. I'm prepared."

29. With the case gaining attention online, the pressure mounted. Kathleen Higgins, a former Bader 5 nurse-turned-whistleblower, wrote Olga Roche, commissioner of the Department of Children and Families, comparing the hospital's treatment of Pelletier to "torture." "From the perspective of the teen whose life has been derailed," Higgins went on, "she is the ward of a state devoid of compassion and conscience, prohibited from contact with every facet of her life that holds meaning for her."

30. Barry Pollack, a former federal prosecutor who served for 15 years on the Board of Directors of the Massachusetts Society for the Prevention of Cruelty to Children, wrote the Massachusetts Department of Public Health Commissioner Cheryl Bartlett demanding an investigation into Bader 5. "Among other things," he wrote, "arrogance, professional mediocrity, and/or a rush to judgment, Bader 5 appears virtually synonymous with abuse for many children."

31. On March 20th, 2014, as public outrage grew over Justina's story, an Anonymous operation, #OpJustina, was declared, demanding Pelletier's release. "We will punish all those held accountable and will not relent until Justina is free," the mission statement that circulated online read. It included the home address and phone numbers of the judge and Children's administrator overseeing the case, as well as technical information about the hospital's computer server. Three days later, Gottesfeld posted an Anonymous-style video on YouTube warning the treatment centers. "Failure to comply with our demands will result in retaliation of the likes you've never seen," the robotic voice in the video declared over an image of the American flag.

32. And yet the threats alone failed to deliver. Two days later, on March 25th, Massachusetts Juvenile Court Judge Joseph Johnston found that the parents had acted irresponsibly by calling the hospital "Nazis" and claiming that Children's "was punishing and killing Justina." Such statements, he determined, were evidence that they "engage in very concerning conduct that does not give this court any confidence they will comply with conditions of custody." He awarded permanent custody of Justina to the Massachusetts Department of Children and Families. If the parents wouldn't help their daughter, then the state would.

33. For Gottesfeld, the DCF's decision felt like a punch to the gut – and an urgent call to hack on Justina's behalf. "Eighty percent of my thought process was centered around, 'I don't want this girl to die,'" he recalls, "and the other 20 percent was, 'OK, what do I have to do technically to make this happen.'" That day, Gottesfeld crippled the website of Wayside, the residential treatment facility where Justina was being held, with a DDOS attack. He found that Children's was fund-raising in April, and decided to wait until then to go after their site. "I'd have to hit Children's where they appear to care the most, the pocketbook and reputation," he **later wrote**. "All other efforts to protect Justina weren't succeeding and time was of the essence. Almost unbelievably, they kept their donation page on the same public network as the rest of their stuff. Rookie mistake."

34. On April 19th, he sat on his couch, *The Simpsons* on the TV in the background, as he waited for the website to begin going down. Gottesfeld assured himself, correctly, that patients and medical records would not be affected. But this didn't stave off a backlash from one of the largest Anonymous social media feeds, YourAnonNews, which tweeted: "To all the "Anons" attacking the CHILDREN'S HOSPITAL in the name of Anonymous via Op **#JustinaPelletier** – IT IS A HOSPITAL: STOP IT."

35. Gottesfeld ignored the reprimand. He didn't need anyone's endorsement and had all the power he needed to pull off the attack. DDOS attacks subsided within the week, and fulfilled Gottesfeld's goal of spotlighting the case. "Though we do not know the source," Wayside said in a statement after the attack, "we are dismayed and concerned that someone would try to disrupt the important work we do with hundreds of children and families."

36. The avalanche of action over neglected children in Boston took a dramatic turn on April 29th. Following the death of three children under the DCF's supervision, Roche, the embattled commissioner of the DCF, resigned. "I don't have confidence at this point in the agency and I'm very worried about the agency," then-Governor Deval Patrick said about the DCF. "My confidence in the whole organization has been rattled."

37. But Justina herself would ultimately prove to be her most powerful advocate in the wake of the attacks. She hatched a plan to get her own voice – and face – online. With the help of a her older sister, Justina shot a short video of herself inside her new facility in Thompson, Connecticut and had it posted online. On June 8th, a 45-second cellphone video appeared on the "Miracle for Justina" Facebook support page. It showed Pelletier in her zebra-striped wheelchair, rubbing her thin legs, and pleading to Judge Johnston to reverse his decision. "All I really is to be with my

family and friends," she says in a shaky voice. "You can do it. You're the one that's judging this. Please let me go home."

38. There was no question about its authenticity. Despite 16 months of the hospital insisting that her symptoms were in her head, it was painfully clear that no amount of psychiatric treatment had improved her conditions. And, once again, the exposure online worked in her favor. Days later, on June 17th, the family received stunning news. On the recommendation of the Massachusetts DCF, Judge Johnston agreed to dismiss the case, citing "credible evidence that circumstances have changed." (Michelle Hillman, a spokesperson for the DCF, declined to comment on the court's decision). The next day, Pelletier's father carried her out of her wheelchair up the hill to their front door and, at last, into their home.

39. "I was just so happy to be with my family again at home," Justina says. Reverend Mahoney, the director of the Christian Defense Coalition, thanked the power of online activism with getting her back. "Giving God all credit," he says, "this couldn't have happened without the Internet." Gottesfeld had one thought when he heard the news of Justina's release: "Mission accomplished."

40. Tim Wu, a Columbia Law School professor and former director of the Poliak Center for the First
Amendment at the Columbia Journalism School, has described the Computer Fraud and Abuse Act
as the "most outrageous criminal law you've never heard of."

41. When the law was written three decades ago, the intent was to keep **hackers** out of government
and corporate machines (a concern that surfaced after members of the administration saw the 1983

cyber-war movie *WarGames*). But with the rise of the Internet, the CFAA instead has been used to prosecute hundreds of cases that the original authors – let alone science fiction writers at the time – could not have even conceived.

42. The tipping point came in 2013 with the suicide of Aaron Swartz, who became a symbol of reform for lawmakers and activists. "I cried when Aaron died," Gottesfeld recalls, in a quiet voice. But Swartz wasn't alone, as others have been pursued under the CFAA given the law's squirrelly definition of what unauthorized access really means. According to the Electronic Frontier Foundation, the digital rights activist group that has been fighting to reform the law, "creative prosecutors have taken advantage of this confusion to bring criminal charges that aren't really about hacking a computer, but instead target other behavior prosecutors dislike."

43. The CFAA has a long history of being controversially applied. Often, the question isn't so much a matter of whether a criminal act has been committed, but how fairly it's being prosecuted. In 2008, a jury found a 49-year-old mother, Lori Drew, guilty of violating the CFAA by creating a fake MySpace page to harass one of her daughter's classmates, who tragically took her own life. The conviction, however, was overturned the following year for setting a dangerous precedent "which would convert a multitude of otherwise innocent Internet users into misdemeanant criminals," as District Judge George Wu ruled. Matthew Keys, a social-media editor for Reuters, faced 25 years in prison for helping members of Anonymous deface the *Los Angeles Times* website in 2010, the equivalent of spraying graffiti on a building. Last April, under the CFAA, he was sentenced to two years in prison.

44. This was the landscape in which the FBI began its investigation in April 2014 into the attacks on the computer networks at Children's Hospital and Wayside. According to an affidavit by FBI Special Agent Michael W. Tunick, investigators successfully traced the YouTube video for #OpJustina to the account of Gottesfeld, who says he hadn't bothered covering his tracks because he didn't believe he was doing anything wrong.

45. Around 6:30 a.m. on October 1st, 2014, nearly four months after Pelletier's return, Gottesfeld and Dana were awoken by their doorbell. "They're here," Gottesfeld told his girlfriend, as he saw two short-haired men in windbreakers on the security camera outside. The two men from the FBI had a search warrant related to the hacking of Children's. As Gottesfeld let them in, they were followed by about a dozen others, who began collecting Gottesfeld's computer equipment, taking pictures and searching the house. Gottesfeld remained calm, and used the opportunity to evangelize. "You should look into the troubled-teen industry," he urged one of the agents.

46) After the FBI left with their equipment, Gottesfeld and Dana walked to a nearby park to talk, fearful that their home had been bugged. The joint they smoked helped ease their paranoia, but Dana worried he could become the next Aaron Swartz, facing decades behind bars. Gottesfeld reassured her as best he could. "Courage is not the absence of fear," he said, "courage is acting *despite* fear." He refused to let the government convict an online activist whom, in his opinion, hadn't harmed anyone.

47) So he had a contingency plan, he told her, to leave the country. Just because he was fleeing didn't mean Dana should come too. "I can put myself in danger, but I don't want to put you in danger," he told her. But there was no way Dana was going to sit at home wondering if he was alive or dead. "I want to come," she replied. One snowy day in December 2014, they drove to a courthouse in New Hampshire and got married. Then they started plotting their escape to Cuba.

48. In February 2016, Gottesfeld found a guy outside Miami selling boats on Craigslist and made an appointment to meet him. Careful to remain quiet in case they were being monitored, Gottesfeld and Dana crammed two big duffel bags and a backpack with their essentials – including three laptops – and left the rest in their Boston apartment. Without telling their landlord, family, employers, or friends, they waited until dark to load their white Toyota and hit the road.

49. As Gottesfeld drove through the night, the two barely spoke. Gottesfeld vaped and flipped the radio dial for the heaviest metal he could find. Dana saw her world fisheye around her. "It doesn't 100 percent feel real," she recalls thinking. "What are we doing? This is crazy." She felt terrible for ditching out on everyone without a word, and leaving them to worry. But she reassured herself that it was only a matter of time before they were safe in Cuba and able to speak with them all again. "It's not like we would disappear forever," she recalls.

50. Nearly 30 sleepless hours after leaving Somerville, they pulled into a Miami marina. The Craigslist guy lived in a houseboat and showed them several crafts. They considered a sailboat, but settled on a small white speedboat for $5,000. With the bags in the boat and abandoning their car, they took to the ocean, cutting over the chopping waves. Gottesfeld had no experience boating, and the waves were rougher and higher than either had expected. As the other boats around them faded into the vast empty landscape, Dana couldn't help marveling. "I was just thinking about how big the ocean is," she recalls. Gottesfeld sped as fast as they could, the water spraying over them.

51. But then, after hours at sea, their boat sputtered to a stop. Something had broken down. The two of them sat there alone, wet, cold, not knowing what had happened or why. Gottesfeld, the ad-hoc engineer, sprang into action, desperately trying to get the boat up and running again, until the moment came when he reached for the radio and put out a distress signal. They'd reached the end of their line. "I just wanted to be off the water," Dana says. "I didn't even care."

52. The call was answered by the most unlikely of rescuers: an 11-deck cruise ship. The Disney Wonder was carrying hundreds of families past Cuba when the distress call came in. As rain poured down and violent waves lashed, the Disney crew struggled to tie the small white speedboat to the ship until Gottesfeld and Dana were safely brought onboard. "They just gave us blankets and a doctor looked at us and gave us some Gatorade," Dana recalls.

53. The two were sequestered into their own cabin, with guards stationed outside their door. Aside from chaperoned smoke breaks on the deck, they spent the next two days cooped up inside. Afraid to talk openly with each other, they bided their time watching television and picking at the trays of cruise food delivered three times a day. "It was kind of like the calm before a storm," Dana recalls.

54. After the ship docked in Miami on February 17th, and after the last mouse-eared tourist was gone, the FBI agents moved in. They arrested and cuffed Gottesfeld and Dana in their room. They were hauled down to the police station, where Dana was question and Marty was booked. They'd never

imagined having to say goodbye like this. And they had no idea if or when they'd see each other again. "We didn't really know," Dana says.

55. The next week, on the crisp blue morning of February 25th, 2016, Justina Pelletier appeared on the steps of the Massachusetts state building with her family and lawyers. Since Justina came home, she was back to being treated for the illness she was first diagnosed: mitochondrial disease. Now, dressed in tan pants, black boots and a black cardigan, she looked healthier – the product of several surgeries (including a stomach operation at Yale), and months of horseback-riding therapy – but was still confined to a wheelchair.

56. The family was there to announce a lawsuit against Children's and the four doctors who helped obtain custody of Justina. (The case is still pending). They were asking for unspecified damages over gross negligence and civil rights violations. Though the family had been forced into bankruptcy as a result of the case, the suit is not about "revenge," her father told the assembled press. "I just really don't want this to happen again to another family," Justina said, still struggling to speak without slurring. ("Boston Children's is confident that once all of the evidence is presented at trial, a jury will find that our providers were not negligent and did not cause harm to Justina," Graham, the hospital spokesperson, says).

57. In the wake of Justina's release, awareness and action is growing to prevent such custody battles from happening again. "We must protect children from the rare disturbed parent," University of North Carolina law professor Maxine Eichner, herself a parent of a child with mitochondrial disease, wrote in the *New York Times* opinion pages of the Pelletier case. "But medical child abuse, as it has been understood, is far too big and blunt an instrument to accomplish this purpose. It has harmed too many genuinely sick kids, and made life hell for too many loving parents."

58. (A bipartisan bill nicknamed Justina's Law, which would "prohibit federal funding of any treatment or research in which a ward of the state is subjected to greater than minimal risk to the individual's health with no or minimal prospect of direct benefit," was introduced in 2014 but languished before the House.)

59. While the Pelletiers waged their battles, Gottesfeld endured a new chapter of his own. Since being arrested in Miami, he has been charged with conspiracy and intentional damage to a protected computer under the CFAA. Though the indictment acknowledges that Gottesfeld "was concerned about what he believed were abuses at facilities," it also alleges that he "impacted the entire Hospital community" by disrupting fundraising and compromising the communication of patients and doctors.

60. Given the history of CFAA prosecutions, Tim Watkins, the assistant federal defender representing Gottesfeld, says he can't predict how much of an example will be made of his client. And there is no telling how the CFAA will fare under the Trump administration, for which Gottesfeld's case may be the first test. "I don't think anyone is qualified to know what [Attorney General Jeff] Sessions and the DOJ is going to prosecute or not prosecute," Watkins says. (The Massachusetts U.S. Attorney's office and FBI declined comment because the case is ongoing.)

61. When Gottesfeld and I first spoke in September, while he was being held at the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island, he sounded defeated. "Institutionalized children face human rights violations that have been going on for a long, long time," he told me. "I've been an advocate for a while with this, but, from in here, there's really not all that much that I can do."

62. Four days later, he began a hunger strike until two demands were met: a commitment by U.S. Attorney Ortiz to cease what he called "political prosecutions" under the CFAA, and a pledge from every presidential candidate to protect children such as Pelletier from institutional abuse. In November, over 50 days into his hunger strike, he remained just as resolved. "I will not give Carmen Ortiz a felony CFAA conviction on an activist," he told me at the time. "that's not going to happen after Aaron Swartz." True to his word, he continued his strike until January, shortly after Ortiz announced her retirement.

63. Throughout our months of conversations and correspondence, Gottesfeld maintained this steadfast conviction. And despite his differences with his grandparents over the years, he had their support, even if they regret where he has ended up. "He was trying to help this girl, and trying to help people who had no one else to help them," Gloria Gottesfeld tells me. "He was trying to do good, but I wish he had done it some other way."

64. When he was transferred to Plymouth, however, the pain of being behind bars took a dire turn when his grandfather died from complications from lymphoma in March. A few days later, I visit Gottesfeld, who was denied his request to visited his grandfather before his death, or attend the

funeral. He breaks into tears at the mere mention of his grandfather's name. "I don't have any regrets about what I did," he tells me, "but the price is heavier than I expected."

65, He's hoping that by sharing his side of the story now, for the first time in full, he can raise awareness about both the CFAA and Justina's case. And given that Trump is in office, he's wishing that Kid Rock would write a song about Justina to get the president's attention. "I've always been a Kid Rock fan," he says.

66, When I ask him what he would say to Justina, whom he has never met or spoke with, emotions fill his voice. "She was very brave and she suffered and endured something that would have killed a lot of other people," he says, "I wish her nothing but happiness and success in her life and her family's efforts to achieve justice and to try to make sure what happened to her never happens to any other kid."

67, I relay this to Justina and her family during a visit to their home, and her parents are quick to distance themselves from the hacking of Children's. But Justina, who's been quiet and shy during the interview, boldly speaks up. Though the two have never talked or met, she and Gottesfeld share a unique bond, and she, more than anyone, knows what it's like to be trapped inside the system. It's as if they've traded places, and now, for the first time, she can take a stand to help him get out – just as he had done for her. "He shouldn't be in jail," she tells me, as her parents shift uncomfortably in their seats. "He didn't hurt any kids. He was just trying to help." When I ask her what she would like to tell Gottesfeld if she could, she gathers herself for a moment, and then replies. "Just, 'thank you,'" she says.

**In This Article: hackers**

---

 **Want more Rolling Stone? Sign up for our newsletter.**     COMMENTS    22

---

## SPONSORED STORIES

Recommended by

### Sponsored Stories

### More From Rolling Stone

**Hear '2 Dope Queens' Interview Michelle Obama in Final Podcast Episode**

**Stormy Daniels Considering Suing Columbus, Ohio Police Over July Arrest**

Exhibit 4

45 CFR

## § 164.308 Administrative safeguards.

(a) A covered entity or business associate must, in accordance with § 164.306:

(1)(i) Standard: Security management process. Implement policies and procedures to prevent, detect, contain, and correct security violations.

(ii) Implementation specifications:

(A) Risk analysis (Required). Conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information held by the covered entity or business associate.

(B) Risk management (Required). Implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level to comply with § 164.306(a).

(C) Sanction policy (Required). Apply appropriate sanctions against workforce members who fail to comply with the security policies and procedures of the covered entity or business associate.

(D) Information system activity review (Required). Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports.

(2) Standard: Assigned security responsibility. Identify the security official who is responsible for the development and implementation of the policies and procedures required by this subpart for the covered entity or business associate.

(3)(i) Standard: Workforce security. Implement policies and procedures to ensure that all members of its workforce have appropriate access to electronic protected health information, as provided under paragraph (a)(4) of this section, and to prevent those workforce members who do not have access under paragraph (a)(4) of this section from obtaining access to electronic protected health information.

(ii) Implementation specifications:

(A) Authorization and/or supervision (Addressable). Implement procedures for the authorization and/or supervision of workforce members who work with electronic protected health information

CFR                                                    1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

or in locations where it might be accessed.

(B) Workforce clearance procedure (Addressable). Implement procedures to determine that the access of a workforce member to electronic protected health information is appropriate.

(C) Termination procedures (Addressable). Implement procedures for terminating access to electronic protected health information when the employment of, or other arrangement with, a workforce member ends or as required by determinations made as specified in paragraph (a)(3)(ii)(B) of this section.

(4)(i) Standard: Information access management. Implement policies and procedures for authorizing access to electronic protected health information that are consistent with the applicable requirements of subpart E of this part.

(ii) Implementation specifications:

(A) Isolating health care clearinghouse functions (Required). If a health care clearinghouse is part of a larger organization, the clearinghouse must implement policies and procedures that protect the electronic protected health information of the clearinghouse from unauthorized access by the larger organization.

(B) Access authorization (Addressable). Implement policies and procedures for granting access to electronic protected health information, for example, through access to a workstation, transaction, program, process, or other mechanism.

(C) Access establishment and modification (Addressable). Implement policies and procedures that, based upon the covered entity's or the business associate's access authorization policies, establish, document, review, and modify a user's right of access to a workstation, transaction, program, or process.

(5)(i) Standard: Security awareness and training. Implement a security awareness and training program for all members of its workforce (including management).

(ii) Implementation specifications. Implement:

(A) Security reminders (Addressable). Periodic security updates.

(B) Protection from malicious software (Addressable). Procedures for guarding against, detecting, and reporting malicious software.

CFR                                                            2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(C) Log-in monitoring (Addressable). Procedures for monitoring log-in attempts and reporting discrepancies.

(D) Password management (Addressable). Procedures for creating, changing, and safeguarding passwords.

(6)(i) Standard: Security incident procedures. Implement policies and procedures to address security incidents.

(ii) Implementation specification: Response and reporting (Required). Identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity or business associate; and document security incidents and their outcomes.

(7)(i) Standard: Contingency plan. Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence (for example, fire, vandalism, system failure, and natural disaster) that damages systems that contain electronic protected health information.

(ii) Implementation specifications:

(A) Data backup plan (Required). Establish and implement procedures to create and maintain retrievable exact copies of electronic protected health information.

(B) Disaster recovery plan (Required). Establish (and implement as needed) procedures to restore any loss of data.

(C) Emergency mode operation plan (Required). Establish (and implement as needed) procedures to enable continuation of critical business processes for protection of the security of electronic protected health information while operating in emergency mode.

(D) Testing and revision procedures (Addressable). Implement procedures for periodic testing and revision of contingency plans.

(E) Applications and data criticality analysis (Addressable). Assess the relative criticality of specific applications and data in support of other contingency plan components.

(8) Standard: Evaluation. Perform a periodic technical and nontechnical evaluation, based initially upon the standards implemented under this rule and, subsequently, in response to environmental

CFR                                                  3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

or operational changes affecting the security of electronic protected health information, that establishes the extent to which a covered entity's or business associate's security policies and procedures meet the requirements of this subpart.

(b)(1) Business associate contracts and other arrangements. A covered entity may permit a business associate to create, receive, maintain, or transmit electronic protected health information on the covered entity's behalf only if the covered entity obtains satisfactory assurances, in accordance with § 164.314(a), that the business associate will appropriately safeguard the information. A covered entity is not required to obtain such satisfactory assurances from a business associate that is a subcontractor.

(2) A business associate may permit a business associate that is a subcontractor to create, receive, maintain, or transmit electronic protected health information on its behalf only if the business associate obtains satisfactory assurances, in accordance with § 164.314(a), that the subcontractor will appropriately safeguard the information.

(3) Implementation specifications: Written contract or other arrangement (Required). Document the satisfactory assurances required by paragraph (b)(1) or (b)(2) of this section through a written contract or other arrangement with the business associate that meets the applicable requirements of § 164.314(a).

[68 FR 8334, 8377, Feb. 20, 2003; 78 FR 5566, 5694, Jan. 25, 2013]

[EFFECTIVE DATE NOTE: 78 FR 5566, 5694, Jan. 25, 2013, amended paragraph (a) and revised paragraph (b), effective Mar. 26, 2013.]


## § 164.310 Physical safeguards.


A covered entity or business associate <u>must</u>, in accordance with § 164.306:

(a)(1) Standard: Facility access controls. Implement policies and procedures to limit physical access to its electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(2) Implementation specifications:

(i) Contingency operations (Addressable). Establish (and implement as needed) procedures that allow facility access in support of restoration of lost data under the disaster recovery plan and emergency mode operations plan in the event of an emergency.

(ii) Facility security plan (Addressable). Implement policies and procedures to safeguard the facility and the equipment therein from unauthorized physical access, tampering, and theft.

(iii) Access control and validation procedures (Addressable). Implement procedures to control and validate a person's access to facilities based on their role or function, including visitor control, and control of access to software programs for testing and revision.

(iv) Maintenance records (Addressable). Implement policies and procedures to document repairs and modifications to the physical components of a facility which are related to security (for example, hardware, walls, doors, and locks).

(b) Standard: Workstation use. Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific workstation or class of workstation that can access electronic protected health information.

(c) Standard: Workstation security. Implement physical safeguards for all workstations that access electronic protected health information, to restrict access to authorized users.

(d)(1) Standard: Device and media controls. Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility.

(2) Implementation specifications:

(i) Disposal (Required). Implement policies and procedures to address the final disposition of electronic protected health information, and/or the hardware or electronic media on which it is stored.

(ii) Media re-use (Required). Implement procedures for removal of electronic protected health information from electronic media before the media are made available for re-use.

(iii) Accountability (Addressable). Maintain a record of the movements of hardware and electronic

CFR                                         5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

media and any person responsible therefore.

(iv) Data backup and storage (Addressable). Create a retrievable, exact copy of electronic protected health information, when needed, before movement of equipment.

[68 FR 8334, 8378, Feb. 20, 2003; 78 FR 5566, 5694, Jan. 25, 2013]

[EFFECTIVE DATE NOTE: 78 FR 5566, 5694, Jan. 25, 2013, revised the introductory text, effective Mar. 26, 2013.]

## § 164.312 Technical safeguards.

A covered entity or business associate must, in accordance with § 164.306:

(a)(1) Standard: Access control. Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights as specified in § 164.308(a)(4).

(2) Implementation specifications:

(i) Unique user identification (Required). Assign a unique name and/or number for identifying and tracking user identity.

(ii) Emergency access procedure (Required). Establish (and implement as needed) procedures for obtaining necessary electronic protected health information during an emergency.

(iii) Automatic logoff (Addressable). Implement electronic procedures that terminate an electronic session after a predetermined time of inactivity.

(iv) Encryption and decryption (Addressable). Implement a mechanism to encrypt and decrypt electronic protected health information.

(b) Standard: Audit controls. Implement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health

CFR                                                                6

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

information.

(c)(1) Standard: Integrity. Implement policies and procedures to protect electronic protected health information from improper alteration or destruction.

(2) Implementation specification: Mechanism to authenticate electronic protected health information (Addressable). Implement electronic mechanisms to corroborate that electronic protected health information has not been altered or destroyed in an unauthorized manner.

(d) Standard: Person or entity authentication. Implement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed.

(e)(1) Standard: Transmission security. Implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network.

(2) Implementation specifications:

(i) Integrity controls (Addressable). Implement security measures to ensure that electronically transmitted electronic protected health information is not improperly modified without detection until disposed of.

(ii) Encryption (Addressable). Implement a mechanism to encrypt electronic protected health information whenever deemed appropriate.

[68 FR 8334, 8378, Feb. 20, 2003; 78 FR 5566, 5694, Jan. 25, 2013]

[EFFECTIVE DATE NOTE: 78 FR 5566, 5694, Jan. 25, 2013, revised the introductory text, effective Mar. 26, 2013.]

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 5

# SAVE A GIRL'S LIFE,
## GET TREATED WORSE THAN A TERRORIST

After Boston Children's Hospital used specious diagnoses and reasoning to claim custody of, and kidnap, a girl from her family, one man took action to help — and got arrested.



**Kidnapping as care:** Justina Pelletier was far from the first child Boston Children's Hospital (BCH) took from her parents. In fact, BCH has done it so many times that they have a name for it: They call it "performing a parentectomy."

by *C. Mitchell Shaw*

In February 2013, when Linda Pelletier took her 14-year-old daughter, Justina, to Boston Children's Hospital (BCH) for flu-like symptoms, the family had no idea of the nightmare that lay before them. Before the ordeal was over, Justina was the victim of what her father, Lou Pelletier, describes as medical kidnapping, torture, and abuse. It would take 16 months and the bravery of a man the Pelletiers had never met for Justina to finally be released and allowed to go home.

That man is Martin Gottesfeld, and he is now in prison awaiting trial on charges that he hacked BCH and knocked out its Internet during a major fundraising drive. He is facing a possible 15-year sentence, and based on court records provided to THE NEW AMERICAN, it appears he is being railroaded by a legal system that — after refusing to protect young Justina — seems intent on punishing him with a heavy dose of persecution by prosecution.

Long before Justina was taken to BCH, she had already been diagnosed with (and was being treated for) mitochondrial disease, a rare genetic disorder. Even with her condition, Justina was an active teenager. She was involved in competitive ice-skating and other activities enjoyed by kids her age. That all changed because a BCH doctor in the seventh month of his internship decided to set aside Justina's diagnosis of mitochondrial disease (which had been made by Dr. Mark Korson, the chief of metabolism at Tufts Medical Center in Boston and one of the foremost experts in the field of metabolic disorders, who had been successfully treating Justina).

Instead, that freshly minted BCH intern decided that Justina was suffering with a mental illness called somatic symptom disorder. That new diagnosis was then rubber-stamped by BCH psychologist Dr. Ioana Simona Bujoreanu, who just happened to be researching somatic symptom disorder under a grant from the National Institutes of Health. Eschewing even the appearance of objectivity, Bujoreanu approved the diagnosis after one 25-minute examination of Justina, without consulting any other physicians. As investigators say, follow the money. With her funding dependent on the grant, one is left to wonder if Bujoreanu conveniently "found" a case of the disorder to study. After all, if the only tool covered by your expense account is a hammer, every problem gets treated like a nail.

On Valentine's Day 2013, Justina's parents tried to discharge her from the hospital. BCH staff sought and received the "help" of the Massachusetts Department of Children and Families (DCF), which took Justina into custody as a ward of the state. DCF justified the action by accusing the Pelletiers of "medical child abuse." Justina was transferred to "Bader 5," BCH's psychiatric ward, and all treatment for her disease was stopped. She was held there and at another facility for 16 months, during which time she was in constant pain and her health declined to the point that the girl — who had led an active lifestyle before her incarceration at BCH — was bound to a wheelchair and unable to use the bathroom without assistance.

The Pelletiers fought a protracted battle to free their daughter and save her life. Time after time, the decision of the court was against them. And while BCH was exposed in the media, the well-connected hospital (BCH is a teaching hospital of Harvard Medical School) seemed willing and able to weather the storm of bad press. It also appeared to have enough pull to avoid being investigated.

Enter Martin (Marty) Gottesfeld, a senior systems engineer with extensive knowledge of computer networks and a bone to pick with the "troubled teen industry" — a loosely connected, multi-million-

## HEALTH

A Boston Children's Hospital doctor in the seventh month of his internship decided to set aside Justina's diagnosis of mitochondrial disease (which had been made by Dr. Mark Korson, the chief of metabolism at Tufts Medical Center in Boston).

dollar industry made up of hospitals, boot camps, behavioral modification programs, and residential treatment programs that too often manage to fly under the radar of accountability.

Justina's father had bravely broken a gag order and told of the abuse, torture, and mistreatment of his daughter. He told of notes she had managed to sneak out to him folded up in origami that spelled out — in horrid detail — hospital staff laughing as they left her sitting on the toilet for hours, dragging her across the concrete floor causing her toenails to tear off, and refusing her pain medications. Her untreated genetic condition left her in a dangerous position. Lou Pelletier said his daughter's life was in very real danger.

When Gottesfeld heard about Justina's plight, he decided to do something about it. Since bad press was ineffective and the likelihood of an investigation was at or near zero, Gottesfeld decided on a different approach. As he explained in a piece he wrote for the Huffington Post entitled "Why I Knocked Boston Children's Hospital Off the Internet," he decided to hit them where they would feel it: On April 20, 2014, he knocked them off the Internet during a major fundraising drive. Marty wrote that "to save Justina from grievous bodily harm and possible death," he would "have to hit BCH where they appear to care the most, the pocket book and reputation. All other efforts to protect Justina weren't succeeding and time was of the essence." He added, "Almost unbelievably, they kept their donation page on the same public network as the rest of their stuff. Rookie

mistake. To take it down, I'd have to knock the whole hospital off the Internet."

Two months after the BCH hacking, the hospital released Justina, and she went home. Her father had to carry his once-active daughter into their home.

When authorities — who had previously refused to investigate the claims of the Pelletiers and other families that the hospital had taken their children from them under false pretenses and whose children had been subjected to torture and other mistreatment — began to investigate the cyber-attack, they honed in on a YouTube video posted by Gottesfeld on March 23, 2014. That video lays out the details of Justina's



**But he saved a life:** Martin Gottesfeld faces a possible 15-year prison sentence. His crime? He knocked Boston Children's Hospital off the Internet during a major fundraising drive to save the life of a child.

abuse at the hands of the state and the hospital, lists the contact information of those involved in the case, and implores viewers to "use this information to your maximum potential in order to save Justina's life."

Ignoring the fact that the video — which only specifically asks viewers to write letters and make phone calls — should not have been seen as evidence of a crime and used to obtain a search warrant (since encouraging people to write and call is not illegal), FBI investigators used the fact that the video was posted from Gottesfeld's account and IP address to get a "Tap and Trace" order for records related to his Internet traffic. Based on the information gathered by executing that order, investigators filed for and received a search warrant for Gottesfeld's house.

Investigators using the video to obtain both a Tap and Trace order and a search warrant is only the beginning of government malfeasance in this case. As documents provided to THE NEW AMERICAN (and published online*) show, the persecution by prosecution of Marty Gottesfeld — for daring to do what he could to save the life of an innocent child — is mired in overreach, conflicts of interest, and fraud.

As Marty's wife, Dana Gottesfeld, told THE NEW AMERICAN in an exclusive interview, the search warrant based on the Tap and Trace order — and issued after that order was carried out — listed information about particular Internet traffic that was gathered by authorities "exceeding what the Tap and Trace allowed." She told us, "The search warrant affidavit mentions traffic obtained from the Tap and Trace. However the Tap and Trace, as ordered, shouldn't have given them those details."

Add to that the errors, misstatements, exaggerations, and outright falsehoods found in the search warrant affidavit, and one is left to wonder how the search warrant ever could have been issued in the first place. The answer to that question opens up a whole new can of worms — one that stinks of conflicts of interest. The



**Helping or hurting?** During the 16 months that Justina was in the custody of Boston Children's Hospital and Wayside Youth and Family Support Network and denied treatment for mitochondrial disease, her health declined to the point that the girl — who had been active in competitive ice skating — was bound to a wheelchair.

"judge" (she is actually a federal magistrate — not a judge — and should not be signing off on search warrants in the first place, according to constitutional lawyer Joe Wolverton) who signed off on the search warrant has direct ties to BCH and Harvard University. Magistrate Marianne Bowler is married to Dr. Marc Pfeffer, a professor of medicine at Harvard Medical School, which oversees BCH. Furthermore, Bowler was employed as a research assistant in biochemistry at Harvard Medical School prior to starting her legal career.

16. Since FBI Special Agent Michael Tunick made the connection to Harvard explicit in the affidavit, Bowler cannot even claim ignorance of the conflict. In paragraph 8, Tunick wrote, "The incoming traffic resulted in significant disruptions to the BCH website and additional disruption to the network on which BCH and other Harvard University-affiliated hospitals communicate."

17. Bowler is the same magistrate who refused Marty bail, leaving him to sit in prison while awaiting trial. In a statement provided to THE NEW AMERICAN in April, Marty wrote, "Magistrate [Marianne] Bowler's deep personal connection to Harvard Medical School and therefore its affiliated pediatric teaching hospital, Boston Children's call into question every aspect of her involvement with [this] case." He added, "From her original approval of the search warrant for my residence to her five month delay in issuing a bail finding to my detention over the last 14 months. I am deeply concerned about her ability to remain impartial."

18. That was written in April. Bowler eventually outright refused bail in Marty's case. To put that in perspective, Marty Gottesfeld — who was arrested in February 2016 — has already spent more time in prison for taking action to free Justina than she spent in medical incarceration. And he hasn't even been tried yet.

19. Bowler's refusal to grant Marty bail is particularly noteworthy given that she went out of her way to make sure Boston Marathon bomber Dzhokhar Tsarnaev knew his rights (going so far as to read him his Miranda rights from the bench), which resulted in his refusal to continue talking to investigators. Furthermore, she ordered the release of his friend (and suspected accomplice) Robel Phillipos — who was accused of lying to investigators — on $100,000 bond, on the conditions that he remain in his mother's house and wear an electronic monitoring bracelet.

20. Granted, she was right to make sure Tsarnaev was aware of his rights, and she had the legal authority to release Phillipos on bail. But given the difference in the way she has handled this case, it appears that Gottesfeld's rights would be better protected by Bowler if he were a terrorist. At least then, he'd probably be out on bail and home with his wife.

21. The malfeasance and conflicts of interest do not end there, though. The search warrant affidavit signed by her also mentions Wayside Youth and Family Support Network (the BCH-affiliated facility to which Justina was transferred after months at BCH). Paragraph 27 says:

22. Since the attack against BCH in April 2014, the FBI has learned of other DDOS [distributed denial of service] attacks against entities associated with BCH, the Justina Pelletier custody battle, and the troubled teen industry. Additional victims include: NSTAR (which has a relationship with BCH), Wayside Youth and Family Support Network, Judge Rotenburg Educational Center, Greatschools.org, Sorenson's Ranch, and Logan River Academy. These victims all experienced similar attacks.

23. This is important because Bowler is an emeritus member of the Board of Directors of The Boston Foundation, which raises money for Wayside Youth and Family Support Network. She is listed as such on page 18 of their December 2, 2015 report.

24. The facts demonstrated by these court documents, Bowler's connections to the entities involved, and her refusal to treat Gottesfeld with the same decency she willingly showed to terrorists, seem to bear out his claims about Bowler's lack of "ability to remain impartial." This whole case smells of a personal vendetta. Bowler's allegiance appears divided between justice and Harvard, with justice getting the short end of the stick. It is not every day that a federal magistrate is given the opportunity to abuse her power by bringing the full weight of her bench against someone who is accused of attacking something near and dear to her. When that does happen, she is supposed to recuse herself. In fact, procedure requires it. Yet, in the face of all of that, Bowler continues to preside over the case.

25. America does not need those who abuse power to sit in places of power. Magistrate Marianne Bowler needs to be removed from this case — if not the bench.

26. It is a sad commentary when innocent children and those who take action to defend them have less protection under the law than those who abuse and torture children in the name of medical science. It seems more than a little like 1930s Germany. ■

---

*\* The court documents referenced in this article can be found at www.FreeMartyG.com.*

Exhibit 6