regional office where the Regional Appeal was answered, and one to the Warden's Administrative Remedy File at the original filing location.

g. **File Maintenance**.  The Warden's Administrative Remedy File and Administrative Remedy Files at the Regional Offices and Central Office shall be maintained in a manner that assures case files are readily accessible to respond to inquiries from Federal Bureau of Prisons staff, inmates, and the public.  Institutions shall file Regional and Central Office response copies with the inmate's institution submission copy.  Regional offices shall file copies of Central Office responses with the inmate's Regional Appeal file.  Each location shall maintain copies of supporting material and investigation notes with the case file.

When a Regional or Central Office Appeal was not preceded by a lower level filing, the institution and regional copies shall be filed at the institution and region having responsibility for the inmate at the time of response.

To provide information and feedback, Wardens and Regional Directors are encouraged to route response file copies from subsequent appeal levels to the Coordinator and the appropriate department head or person who investigated and drafted the response at their respective levels.

## 14.  ACCESS TO INDEXES AND RESPONSES §542.19

**Inmates and members of the public may request access to Administrative Remedy indexes and responses, for which inmate names and Register Numbers have been removed, as indicated below.  Each institution shall make available its index, and the indexes of its regional office and the Central Office.  Each regional office shall make available its index, the indexes of all institutions in its region, and the index of the Central Office.  The Central Office shall make available its index and the indexes of all institutions and regional offices.  Responses may be requested from the location where they are maintained and must be identified by Remedy ID number as indicated on an index.  Copies of indexes or responses may be inspected during regular office hours at the locations indicated above, or may be purchased in accordance with the regular fees established for copies furnished under the Freedom of Information Act (FOIA).**

At present, fees are detailed in 28 CFR § 16.10, which specifies a charge of $.10 per page duplicated and no charge for the first 100 pages.  Staff shall forward funds received for purchase of index and response copies to the FOIA/Privacy Act Section, Office of General Counsel, Central Office.

Any location may produce its index or that of another location by making the appropriate entries

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

on a SENTRY retrieval transaction, and specifying the "SAN" (sanitized) output format.

## 15.  RECORDS MAINTENANCE AND DISPOSAL

a.  **Disposal Authority**.  The authority for Administrative Remedy records disposal is the "job number" NC1-129-83-07 provided by the National Archives.

b.  **Administrative Remedy Indexes**.  SENTRY Administrative Remedy indexes shall be maintained in computer-accessible form for 20 years, then destroyed.  Pre-SENTRY indexes shall be maintained at the site of creation for 20 years, then destroyed.

c.  **Administrative Remedy Case Files**.  Administrative Remedy Case Files shall be destroyed three full years after the year in which the cases were completed (i.e., response completed). For cases submitted since implementation of the SENTRY module (July 1990), at the end of each calendar year (beginning at end of 1993), run SENTRY index retrieval transactions to identify the lowest case number for cases answered (status = cl* and status date in the appropriate range) during the calendar year ended three years previously.  Cases below that number must be destroyed.  Thus, cases answered in 1990 would be destroyed at the end of 1993; cases answered in 1991 would be destroyed at the end of 1994, etc.

To identify the lowest case number for cases answered during a given year, it may be necessary to check indexes with "Date Received" in the year in question as well as those with "Date Received" in the previous year.

Cases maintained under the pre-SENTRY numbering and filing system should be destroyed according to the following schedule:

> **YEAR OF CASE #        DESTROY AT END OF**

## 16.  ADMINISTRATIVE REMEDY PROCEDURES UNDER THE PRISON RAPE ELIMINATION ACT (PREA)

Title 42 U.S.C. §15607 (a) required the Attorney General to publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape.  Title 42 USC § 15607(b) states that the national standards shall apply immediately to the Federal Bureau of Prisons upon adoption of the final rule.  The final rule is published in Title 28 C.F.R. Part 115. This section only addresses administrative remedy procedures in relation to issues of sexual abuse, and shall not constitute the sole response of the agency to allegations of sexual abuse. Appropriate steps to address the safety and security of inmates shall be made in accordance with the other provisions of the PREA regulations, and the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**.

proj

**15**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## §115.52 Exhaustion of administrative remedies.

**(a)   An agency shall be exempt from this standard if it does not have administrative procedures to address inmate grievances regarding sexual abuse.**

The Federal Bureau of Prisons has an administrative remedy system, and therefore section 115.52 (a) does not apply.  The following sections, 115.52 (b) through 115.52 (g), apply to inmates seeking a formal review of issues relating to sexual abuse.  For any issue not specified in sections 115.52 (b) through 115.52 (g) below, the administrative remedy system outlined in Sections 1 through 15 of this Program Statement applies.

**(b)(1)   The agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse.**

"Sexual abuse" is defined for the purposes of this section in 28 C.F.R. § 115.6, as referenced in the Bureau's policy on Sexually Abusive Behavior Prevention and Intervention Program.

Administrative remedies regarding allegations of sexual abuse may be filed at any time.  For all other issues, the 20 calendar day period specified in Section 8 of this Program Statement shall be followed.  Accordingly, administrative remedies regarding an allegation of sexual abuse shall not be rejected as untimely under Section 11 of this Program Statement, above.

Once filed, the inmate should follow the time requirements for appeal, as stated in Section 9 of this Program Statement, above.

**(2)   The agency may apply otherwise-applicable time limits on any portion of a grievance that does not allege an incident of sexual abuse.**

If the inmate includes on a single form multiple unrelated issues, the portion of the administrative remedy regarding allegations of sexual abuse should be accepted and processed.  The inmate shall be advised to use a separate form for each unrelated issue.

**(3)   The agency shall not require an inmate to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse.**

Inmates are not required to attempt informal resolution under Section 7 of this Program Statement, above, regarding allegations of sexual abuse.

**(4)  Nothing in this section shall restrict the agency's ability to defend against an inmate lawsuit on the ground that the applicable statute of limitations has expired.**

16

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**(c)  The agency shall ensure that**

**(1)   an inmate who alleges sexual abuse may submit a grievance without submitting it to a staff member who is the subject of the complaint, and**

**(2)   such grievance is not referred to a staff member who is the subject of the complaint.**

Matters in which specific staff involvement is alleged may not be investigated by either staff alleged to be involved or by staff under their supervision.  Allegations of physical abuse by staff shall be referred to the Office of Internal Affairs (OIA) in accordance with procedures established for such referrals.  Where appropriate, e.g., when OIA or another agency is assuming primary responsibility for investigating the allegations, the response to the Request or Appeal may be an interim response and need not be delayed pending the outcome of the other investigation.

**(d)(1)  The agency shall issue a final agency decision on the merits of any portion of a grievance alleging sexual abuse within 90 days of the initial filing of the grievance.**

**(2)  Computation of the 90-day time period shall not include time consumed by inmates during the course of an administrative appeal.**

**(3)  The agency may claim an extension of time to respond, of up to 70 days, if the normal time period for response is insufficient to make an appropriate decision.  The agency shall notify the inmate in writing of any such extension and provide a date by which a decision will be made.**

**(4)  At any level of the administrative process, including the final level, if the inmate does not receive a response within the time allotted for reply, including any properly-noticed extension, the inmate may consider the absence of a response to be a denial at that level.**

Time frames in this section are consistent with Section 12 of this Program Statement, above.

**(e)(1)  Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates, shall be permitted to assist inmates in filing requests for administrative remedies relating to allegations of sexual abuse, and shall also be permitted to file such requests on behalf of inmates.**

**(2)  If a third party files such a request on behalf of an inmate, the facility may require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf, and may also require the alleged**

pro

17

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**victim to personally pursue any subsequent steps in the administrative remedy process.**

**(3)  If the inmate declines to have the request processed on his or her behalf, the agency shall document the inmate's decision.**

This section is applicable only to allegations of sexual abuse; inmates must personally file administrative remedies relating to other issues.

The inmate's approval of the remedy filed on his or her behalf shall be documented, and include the inmate's signature.  An inmate's decision to decline to have the remedy processed on his or her behalf should also be documented, and include the inmate's signature.  The documentation should be retained in the agency Administrative Remedy File at the appropriate level and on Sentry in accordance with Section 13 of this Program Statement.

Responses to third party remedies should be provided to the inmate who is the subject of the remedy.

An inmate is required to personally file any subsequent appeal.  However, the inmate may receive assistance in preparing the appeal in accordance with Section 10 of this Program Statement, above.

**(f)(1)  The agency shall establish procedures for the filing of an emergency grievance where an inmate is subject to a substantial risk of imminent sexual abuse.**

This section applies when an administrative remedy alleges a substantial risk of imminent sexual abuse.  If a remedy meets both of these criteria, the remedy will receive expedited processing, as described below.

Section 12 of this Program Statement provides for an "emergency" administrative remedy as required by section 115.52(f).  An expedited BP-9 (BP-229) response shall be provided if a remedy is determined to be of an emergency nature which threatens the inmate's immediate health or welfare.  *See* 28 C.F.R. § 542.18.

The inmate shall clearly mark "Emergency" on the BP-9 (BP-229), and explain, in writing, the reason for filing as an emergency administrative remedy under this section.

If an inmate files an emergency administrative remedy with the Warden, the local Administrative Remedy Coordinator shall make a determination as to whether the remedy alleges a substantial risk of imminent sexual abuse.  If the local Administrative Remedy Coordinator agrees that the administrative remedy meets the criteria for an emergency administrative remedy, the request shall

pro|

**18**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

be accepted, and receive expedited processing as stated below.

If the remedy is rejected for failing to meet the criteria of an emergency grievance under this section, a rejection notice will be provided to the inmate, and the remedy will be processed in accordance with the usual time frames indicated above.

**(2)   After receiving an emergency grievance alleging an inmate is subject to a substantial risk of imminent sexual abuse, the agency shall immediately forward the grievance (or any portion thereof that alleges the substantial risk of imminent sexual abuse) to a level of review at which immediate corrective action may be taken, shall provide an initial response within 48 hours, and shall issue a final agency decision within five calendar days.  The initial response and final agency decision shall document the agency's determination whether the inmate is in substantial risk of imminent sexual abuse and the action taken in response to the emergency grievance.**

If an inmate files the emergency grievance with the institution under Section 12 of this Program Statement, above, alleging a substantial risk of imminent sexual abuse, an expedited BP-9 (BP-229) response shall be provided within 48 hours.  Best efforts to provide BP-10 (BP-230) and BP-11 (BP-231) responses within five calendar days should also be made in accordance with the provisions on exhaustion referenced above.  If the inmate does not receive a response within the time allotted for reply, the inmate may consider the absence of a response to be a denial at that level.

Inmates may also file "sensitive" administrative remedies under Section 8 of this Program Statement, above, regarding allegations of sexual abuse.  If an inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the remedy became known at the institution, the inmate may submit the remedy directly to the appropriate Regional Director.  *See* 28 C.F.R. § 542.14 (d) (1).  "Sensitive" grievances should be processed in accordance with Section 8 and Section 11 of this Program Statement, and the expedited response times specified in this section do not apply.

**(g)   The agency may discipline an inmate for filing a grievance related to alleged sexual abuse only where the agency demonstrates that the inmate filed the grievance in bad faith.**

The maintenance of an effective sexual abuse prevention policy, and general secure and orderly running of an institution, requires that inmates be held responsible for manipulative behavior and false allegations.  Allegations of false reports will be considered by staff in accordance with the procedures and standards of the Inmate Discipline Program policy.

pro

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

17. **INSTITUTION SUPPLEMENT**

Each Warden shall forward a copy of any Institution Supplement developed to implement this Program Statement to the Regional Administrative Remedy Coordinator and to the National Inmate Appeals Administrator in the Central Office.

*Records Retention Requirements*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

pro[

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 20

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------

FROM: 12982104
TO: Gottesfeld, Dana
SUBJECT: Document Needed for Filing in South. Distr. of NY
DATE: 04/17/2019 05:28:38 PM


My Darling Dana,

As a medium-priority item for the upcoming weekend, I need you to find a paper or possibly papers from my legal work which
was mailed home from the Plymouth County Correctional Facility. There is definitely at least one such document, and there may
be more than one.
It/they will be written on lined paper and will have "Substitute BP-8" or "Substitute BP-8 Form" written in ink clearly at the top.
It/they should be dated for roughly the last week of January 2017 or the first week of February 2017. And the one which I'm sure
exists will mention sending sealed special mail to Rolling Stone reporter David Kushner as well as relevant sections of 28 CFR.
The other(s) may mention other prison conditions, especially the types of things I was publishing at Huff Post around that time,
i.e. lack of heat, insect and rodent infestations, deliberate indifference of medical and mental health staff, leaky cells, and the
like.
This document or documents should be located in the envelopes labeled "A", "A2", "A3", "A4", "A5", or "A6". If not, then I would
look in the "W" and "W2" envelopes.
Now, to be sure that is a good-sized stack of papers to sort through. As I recall, these documents were written in black ink,
which should help you scan through things fairly quickly. Most of what is in those envelopes will not be written on lined paper.
And most of what is written on lined paper will not be written in black ink. Plymouth County only issued blue pens. And I
predominantly used pencils at the Donald W. Wyatt Detention Facility.
If/when you find it, please scan and email yourself a soft copy so that it doesn't get lost. Then be ready to file a hard copy (but
not the original) with The Southern District of New York (as far as I can tell, the unwritten third-party rule here does not apply to
filing things with The Honorable Court and by the time you actually do file it, you will likely be a named plaintiff on that suit
anyways, establishing a clear right for us to coordinate on such filings).
Please also mail me as many copies as you can in a white letter-sized envelope with one stamp. Copies here cost $0.15 per
page and if you are spending the $0.55 on the stamp anyways, then it's likely cheaper to have you make me some extra copies.

Thanks and sorry for the extra menial work.

My Love Always,
Marty
This message was sent at approximately 5:27 P.M. on Wednesday, April 17th, 2019.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-------------------------------------------------------------------------------------------

FROM: Gottesfeld, Dana
TO: 12982104
SUBJECT: RE: Document Needed for Filing in South. Distr. of NY
DATE: 04/23/2019 11:21:57 AM

Received Friday 4/19 at 4:08pm

Hi my love,

It was 3 pages - 1 form of 2 pages and 1 form of 1 page in folder W2. Copies printed and in the mail to you tomorrow. Let me know when you want me to send to Southern District of New York (your letter said be ready to file).

Love you,
Dana

Sent Monday 4/22 at 11:19pm

MARTIN GOTTESFELD on 4/19/2019 3:08:40 PM wrote
My Darling Dana,

As a medium-priority item for the upcoming weekend, I need you to find a paper or possibly papers from my legal work which was mailed home from the Plymouth County Correctional Facility. There is definitely at least one such document, and there may be more than one.
It/they will be written on lined paper and will have "Substitute BP-8" or "Substitute BP-8 Form" written in ink clearly at the top. It/they should be dated for roughly the last week of January 2017 or the first week of February 2017. And the one which I'm sure exists will mention sending sealed special mail to Rolling Stone reporter David Kushner as well as relevant sections of 28 CFR. The other(s) may mention other prison conditions, especially the types of things I was publishing at Huff Post around that time, i.e. lack of heat, insect and rodent infestations, deliberate indifference of medical and mental health staff, leaky cells, and the like.
This document or documents should be located in the envelopes labeled "A", "A2", "A3", "A4", "A5", or "A6". If not, then I would look in the "W" and "W2" envelopes.
Now, to be sure that is a good-sized stack of papers to sort through. As I recall, these documents were written in black ink, which should help you scan through things fairly quickly. Most of what is in those envelopes will not be written on lined paper. And most of what is written on lined paper will not be written in black ink. Plymouth County only issued blue pens. And I predominantly used pencils at the Donald W. Wyatt Detention Facility.
If/when you find it, please scan and email yourself a soft copy so that it doesn't get lost. Then be ready to file a hard copy (but not the original) with The Southern District of New York (as far as I can tell, the unwritten third-party rule here does not apply to filing things with The Honorable Court and by the time you actually do file it, you will likely be a named plaintiff on that suit anyways, establishing a clear right for us to coordinate on such filings).
Please also mail me as many copies as you can in a white letter-sized envelope with one stamp. Copies here cost $0.15 per page and if you are spending the $0.55 on the stamp anyways, then it's likely cheaper to have you make me some extra copies.

Thanks and sorry for the extra menial work.

My Love Always,
Marty
This message was sent at approximately 5:27 P.M. on Wednesday, April 17th, 2019.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

-----------------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Gottesfeld, Dana
SUBJECT: RE: RE: Document Needed for Filing in South. Distr
DATE: 04/23/2019 12:01:04 PM

My Darling Dana,

I received your message below roughly when indicated inline and I am replying at approximately 12:00 P.M. on Tuesday, April 23rd, 2019. There is no need for you to acknowledge this message.

Thank you! Do not send to the court yet. But please do keep the originals in a safe, dry, place.

My Love Always,
Marty
-----Gottesfeld, Dana on 4/23/2019 11:21 AM wrote:

>

Received Friday 4/19 at 4:08pm

Hi my love,

It was 3 pages - 1 form of 2 pages and 1 form of 1 page in folder W2. Copies printed and in the mail to you tomorrow. Let me know when you want me to send to Southern District of New York (your letter said be ready to file).

Love you,
Dana

Sent Monday 4/22 at 11:19pm

MARTIN GOTTESFELD on 4/19/2019 3:08:40 PM wrote
My Darling Dana,

As a medium-priority item for the upcoming weekend, I need you to find a paper or possibly papers from my legal work which was mailed home from the Plymouth County Correctional Facility. There is definitely at least one such document, and there may be more than one.
It/they will be written on lined paper and will have "Substitute BP-8" or "Substitute BP-8 Form" written in ink clearly at the top.
It/they should be dated for roughly the last week of January 2017 or the first week of February 2017. And the one which I'm sure exists will mention sending sealed special mail to Rolling Stone reporter David Kushner as well as relevant sections of 28 CFR. The other(s) may mention other prison conditions, especially the types of things I was publishing at Huff Post around that time, i.e. lack of heat, insect and rodent infestations, deliberate indifference of medical and mental health staff, leaky cells, and the like.
This document or documents should be located in the envelopes labeled "A", "A2", "A3", "A4", "A5", or "A6". If not, then I would look in the "W" and "W2" envelopes.
Now, to be sure that is a good-sized stack of papers to sort through. As I recall, these documents were written in black ink, which should help you scan through things fairly quickly. Most of what is in those envelopes will not be written on lined paper. And most of what is written on lined paper will not be written in black ink. Plymouth County only issued blue pens. And I predominantly used pencils at the Donald W. Wyatt Detention Facility.
If/when you find it, please scan and email yourself a soft copy so that it doesn't get lost. Then be ready to file a hard copy (but not the original) with The Southern District of New York (as far as I can tell, the unwritten third-party rule here does not apply to filing things with The Honorable Court and by the time you actually do file it, you will likely be a named plaintiff on that suit anyways, establishing a clear right for us to coordinate on such filings).
Please also mail me as many copies as you can in a white letter-sized envelope with one stamp. Copies here cost $0.15 per page and if you are spending the $0.55 on the stamp anyways, then it's likely cheaper to have you make me some extra copies.

Thanks and sorry for the extra menial work.

My Love Always,
Marty

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------------

This message was sent at approximately 5:27 P.M. on Wednesday, April 17th, 2019.

Exhibit 21

1. BACK IN THE GO-GO DAYS of 2011 I got into some sort of post-modern running conflict with a certain declining superpower that shall remain nameless, and shortly afterwards found myself in jail awaiting trial on 17 federal criminal counts carrying a combined maximum sentence of 105 years in prison. Luckily I got off with just 63 months, which here in the Republic of Crazyland is actually not too bad of an outcome.

2. The surreal details of the case itself may be found in any number of mainstream and not-so-mainstream news articles, from which you will learn that I was the official spokesman for Anonymous, or perhaps the unofficial spokesman for Anonymous, or maybe simply the self-proclaimed spokesman for Anonymous, or alternatively the guy who denied being the spokesman for Anonymous over and over again, sometimes on national television to no apparent effect. You'll also find that I was either a conventional journalist, an unconventional journalist, a satirist who despised all journalists, an activist, a whistleblower, a nihilistic and self-absorbed cyberpunk adventurer out to make a name for himself, or "an underground commander in a new kind of war," as NBC's Brian Williams put it, no doubt exaggerating.

3. According to the few FBI files that the bureau has thus far made public, I'm a militant anarchist revolutionary who once teamed up with Anonymous in an attempt to "overthrow the U.S. government," and on another, presumably separate occasion, I plotted unspecified "attacks" on the government of Bahrain, which, if true, would really seem to be between me and the king of Bahrain, would it not? There's also a book out there that claims I'm from Houston, whereas in fact I spit on Houston. As to the truth on these and other matters, I'm going to play coy for now, as whatever else I may be, I'm definitely something of a coquette. All you really need to know for the purposes of this column is that I'm some sort of eccentric writer who lives in a prison, and I may or may not have it out for the king of Bahrain.

1 of 5

4. Over the last couple of years of incarceration, I've had ever so many exciting adventures, some of which I've detailed in the prior incarnation of this column, "The Barrett Brown Review of Arts and Letters and Jail." I've watched two inmates get into a blood-spattered fight over the right to sell homemade pies from a particular table. I have participated in an unauthorized demonstration against an abusive guard and been thrown into the hole as a suspected instigator. I've shouted out comical revolutionary slogans while my Muslim cellmate flooded our tiny punishment cell in order to get back at the officers who'd taken his Ramadan meal during a search. I've found myself with nothing better to read than an autobiography by Wendy's Old-Fashioned Hamburgers founder Dave Thomas, and read it, and found it wanting.

5. I've stalked a fellow inmate who talks nonsense to himself all day due to having never come down after a PCP trip, suspecting that he might say something really weird that I could compare and contrast with the strange William Blake poems I'd been reading and thought this might be a funny idea for an article, and I was right, so do not ask me to apologize for this, for I shall not. I've been extracted from my cell by a dozen guards and shipped to another jail 30 miles away after the administration decided I was too much trouble. I've spent one whole year receiving sandwiches for dinner each night, but the joke's on them because I love sandwiches.

6. I've read through an entire 16th-century volume on alchemy out of pure spite. I've added the word "Story" to the end of every instance of prison graffiti reading "West Side" that I've come across thus far. I've conceived the idea of writing a sequel to the Ramayana but abandoned the project after determining that the world is not prepared for such a thing. I've been subjected to a gag order at the request of the prosecution on the grounds that the latest *Guardian* article I'd written from jail had been "critical of the government." I've learned all sorts of neat convict tricks like making dice out of toilet paper, popping locks on old cell doors, and appreciating mediocre rap. I've managed to refrain from getting any ironic prison tattoos and feel about 65 percent certain that I'll be able to hold out for the two years left in my sentence. And I've read Robert Caro's four-volume biography of Lyndon Johnson over the course of a month, in the process becoming something of a minor god, beyond good and evil, unfazed by man's wickedness.

7. After being sentenced last January I released a statement reading:

> "Good News! — The U.S. government decided today that because I did such a good job investigating the cyber-industrial complex, they're now going to send me to investigate the prison-industrial complex. For the next 35 months, I'll be provided with free food, clothes, and housing as I seek to expose wrongdoing by Bureau of Prisons officials and staff and otherwise report on news and culture in the world's greatest prison system. I want to thank the Department of Justice for having put so much time and energy into advocating on my behalf; rather than holding a grudge against me for the two years of work I put into in bringing attention to a DOJ-linked campaign to harass and discredit journalists like Glenn Greenwald, the agency instead labored tirelessly to ensure that I received this very prestigious assignment. Wish me luck!"

8. In fact I had no intention of doing anything of the kind; it was merely the same manner of idle bluster that I've been putting out to the press for years now because I'm a braggart. Actually I was hoping to just sort of relax and maybe catch up on my plotting. But a month later, when I arrived at the Fort Worth Correctional Institution to serve the remainder of my sentence, the place turned out to be an

2 of 5

unspoiled journalistic paradise of poorly concealed government corruption and ham-fisted cover-ups. Even so, I was still reluctant to grab at even this low-hanging fruit. I'd spent the 18 months prior to my arrest overseeing a crowd-sourced investigation into that aforementioned "cyber-industrial complex," a subject which, although important, I also happen to find personally distasteful; the research end involved going through tens of thousands of emails stolen by Anonymous from the toy-fascist government desk-spies and jumped-up quasi-literate corporate technicians to whom the American "citizenry" have accidentally granted *jus primae noctis* over several Constitutional amendments. I hate all this computer shit and was actually a little relieved when the FBI finally took me down, thereby sparing me from the obligation to read another million words of e-Morlock jibber-jabber about Romas/ COIN and Odyssey and persona management and whatever else the public is just going to end up ignoring until it's too late anyway.

9. So I was disinclined to sully the rest of my incarceration vacation by having to memorize a book of Bureau of Prisons policies and court rulings on due process rights for inmates to see which ones are being routinely violated by the prison administration, and then run around secretly interviewing inmates and getting copies of receipts and making Freedom of Information requests and all that. After all, there already exists here a clandestine network of inmates who do all of this and more, and who routinely make significant discoveries ranging from procedural violations to outright criminal conduct by staff and administrators — and, naturally, all of these documented revelations are generally ignored by the incompetent regional reporters to whom the inmates occasionally send such materials. As I happen to know some of the 3 or 4 percent of U.S. journalists and editors who are capable of doing their jobs, I figured I'd just hook one of them up with the prisoner in question, hope that some instance of wrongdoing gets exposed in print, take more than my share of the credit, put out a victory statement reading, "No one imprisons Barrett Brown and gets away with it! Mwah ha ha!!" or something to that effect, and then spend the rest of my sentence doing whatever it is that I do for recreation.

10. In late March I put my awesome plan in motion, using the inmate email system to follow up with a journalist I'd provided with contact info for one of the inmate researchers and reiterating that the fellow had documented evidence of corruption within the Bureau of Prisons. Then, an hour later, my email was cut off. After a couple of days of inquiry I was pulled aside by the resident head of security, a D.C. liaison by the name of Terrance Moore, who told me he'd been the one to cut off my email access, as I'd been "using it for the wrong thing," which he clarified to mean talking to the press. When I sought to challenge this plainly illegal move by turning in the BP-9 form to begin the Administrative Remedy process that inmates are required to exhaust before suing the federal official who's violated their right to due process under what's known as a Bivens claim, the prison's Administrative Remedy coordinator simply failed to log it into the system for over a month, finally doing so only after the matter had been brought to the attention of the press; finally on June 4 he deigned to register receipt of the BP-9, thereby belatedly starting the clock on the 20 days the prison is allotted in which to address one's grievance — and then he failed to respond even by that illicitly extended deadline.

11. I've since learned that this sort of thing is common here, and that in fact I was lucky to get my grievance officially acknowledged as received at all; I've seen copies of forms that have yet to be logged five months after being turned in to the unit staff. That would be problematic enough anywhere, as it constitutes denial of access to the courts. But it's especially despicable at an institution like this,

which includes a medical unit for inmates who require ongoing treatment — because to the extent that they don't actually receive that treatment, the only recourse is to pursue the Remedy process so that their complaints won't simply be tossed out of court on the grounds that they've "failed to exhaust" that process before going to the judge. I've included copies of the relevant documents in prior columns and will continue to provide updates as I take my case to the regional office, the national office, and finally to the courts, as of course it will be interesting to see whether or not the BOP takes due process seriously or, barring that, is at least willing to buy me off with a carton of Marlboros.

12. In the meantime, I continue to have neat adventures. Last month one of the American Indian inmates invited me to attend their weekly sweat lodge ceremony, which is held in a fenced-off area that each federal prison is required to provide for ritual use by the Natives. The next morning I showed up at the appointed time and, having determined that it wasn't an ambush, I began helping the 20 or so resident Indians break up tree branches for fire kindling, something I did very much with the air of a five-year-old who believes himself to be "helping Daddy." Next we built a large bonfire (I assisted by staying out the way and being good) by which to heat up several dozen large rocks that would be used for "the sweat." The fire-making process was expedited by strategically placed crumpled-up sheets of the Fort Worth *Star-Telegram*, which I gather is not a strictly traditional aspect of most shamanistic ceremonies. As if to acknowledge this, one of the Indians declared, "The one good thing the white man ever did was invent paper." Naturally all eyes were on me, and I knew that this might be my only chance to win them over. "We didn't invent it," I blurted out. "We just stole it from the Chinese." This produced appreciative chuckles all around. "I got a laugh out of the Indians!" I thought exultantly, my triumph so complete that I was unbothered by the fact that what I'd said wasn't really true.

13. By and by we crawled into the lodge, a wood-and-canvas structure with a dirt floor, in the middle of which had been dug a pit to hold the heated rocks that would be providing the extraordinary heat we would need to sweat out our sins. The flap was then closed from the outside, leaving us in perfect darkness, and thereafter began the first of the 15-minute "rounds" of the sweat ceremony, which consisted of all manner of tribal songs, entreaties to the spirits, and sometimes just discussions and announcements. At one point my sponsor, a Lakota, declared that although superficially white, I might nonetheless have an "Indian spirit." It was one of the nicest things anyone had ever said about me, this polite supposition that I might not really be descended from the fair-skinned race of marauding, treaty-breaking slavers whose *Novus Ordo Seclorum* had been built on a foundation of genocide. But insomuch as I'd spent the bulk of the ceremony not in prayer, but rather in a state of neurotic concern over whether or not my self-deprecating comment from an hour earlier about whites stealing paper could have perhaps been a bit more crisply phrased, I'm afraid my spirit would seem to be Anglo-Saxon after all.

14. Although undeniably majestic, the ceremony was also something of a disappointment. I had gone into the thing hoping that I might mysteriously know exactly what to do — how to pass the peace pipe and all that — and maybe even start singing old Cherokee songs that the eldest of those present would barely recall having heard from their own grandfathers. Stunned, the Indians would collectively intone, "He shall know your ways as if born to them," this being the ancient prophecy I had thereby fulfilled, and then I would unite the tribes under my banner and lead the foremost of their warriors on a jihad

4 of 5

against our shared enemies, as Paul Muad'Dib did. Instead, the Indians had to remind me several times not to just stand up and start walking around during the ceremony.

25. I'm currently in the midst of another adventure, having been placed back in the hole two weeks ago after a suspicious incident in which staff singled me out for a search of my locker and found a cup of homemade alcohol, or "hooch." Next time, then, we'll take a look at life here in the Special Housing Unit, or SHU, as the hole is more formally known, and where I expect to spend some 45 days. And when I get back, there better not be any more Republican presidential primary contenders. You don't need three dozen slightly different variations on right-Hegelian nationalist populism from which to choose. That's just excessive.

26. **Disparaging Comment of the Day about General Douglas MacArthur:**

> "He'd like to occupy a throne room surrounded by experts in flattery; while in a dungeon beneath, unknown to the world, would be a bunch of able slaves doing his work and producing the things that, to the public, would represent the brilliant accomplishment of his mind. He's a fool, but worse, he is a puking baby."

> — Dwight Eisenhower

> (Quoted by Jean Edward Smith, *Eisenhower in War and Peace*)

Exhibit 22

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

The Plymouth County Correctional Facility
Attention: Inmate Grievance Coordinator (IGC)
26 Long Pond Road
Plymouth, MA 02360

Saturday, August 10th, 2019

In Re: <u>Evidentiary Request Pertaining To **S.D. NY 18-cv-10836-PGG**</u>

To Whom It May Concern:

I hope that this letter finds you well.

My name is Martin Stephen Gottesfeld. My Plymouth County Correctional Facility (PCCF) ID number is 71225. I arrived at PCCF on Saturday, February 4th, 2017, via special transport directly from the U.S. Marshals Service and I left on Friday, February 15th, 2019, via PCCF van to The Donald W. Wyatt Detention Facility.

I am also the sole plaintiff in the federal case <u>**18-cv-10836-PGG**</u> in The Honorable U.S. District Court for The Southern District of New York, i.e. <u>**Gottesfeld v. Hurwitz, et al.**</u> Neither PCCF nor the Plymouth County Sheriff's Department are parties to this case and it is clear they never will be. The facility is, however, in possession of some evidence that I need to admit in the case and it is my hope that a subpoena duces tecum won't be necessary given the mundane nature of the evidence that I seek and the ease with which it can be provided.

For your convenience, I have enclosed an unexecuted declaration that I believe would be sufficient under the Federal Rules of Evidence. As long as it is true and accurate, executing the enclosed is likely the simplest and fastest way forward.

If, however, you would like to provide other documents to satisfy this request, then those other documents would have to meet federal evidentiary requirements. For your convenience, I have included copies of <u>Fed. R. Evid. 803</u>, <u>Fed. R. Evid. 902</u>, and <u>28 U.S.C. §1746</u>. I know from experience that the PCCF Legal Department is thoroughly competent to provide further guidance in answering this request.

For your further convenience, I have enclosed a self-addressed stamped envelope (SASE) for your use answering this request.

If you should have any questions for me, please do not hesitate to ask.

With gratitude,

Martin S. Gottesfeld, pro se

- Page 1 of 1 -

## Declaration Under Penalty of Perjury:

I, _____, declare that the
           [Print Name]

following is true and accurate to the best of my knowledge, information, and
belief:

1. I am the inmate grievance coordinator (IGC) for the Plymouth County
Correctional Facility (PCCF) in Plymouth, Massachusetts, and an officer of the
Plymouth County, Massachusetts, Sheriff's Department.

2. I oversee PCCF's administrative remedy program as contemplated by 42
U.S.C. §1997e(a).

3. I have reviewed the records of former PCCF inmate Martin S. Gottesfeld
(PCCF ID number 71225).

4. Based upon my review of the records of former PCCF inmate Martin S.
Gottesfeld, Mr. Gottesfeld arrived at PCCF and was booked into the facility on
Saturday, February 4th, 2017.

5. Based upon my training and experience as the IGC at PCCF, I know that
PCCF does not participate in the Federal Bureau of Prisons (FBOP) inmate
administrative remedy program, 28 CFR Part 542 Subpart B.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the
foregoing is true and correct.

Executed on _____.
                [Print Date]


_____
   [Signature]

- Page 1 of 1 -

§ 1746. Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Rule 902. Evidence That Is Self-Authenticating

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

(1) *Domestic Public Documents That Are Sealed and Signed.* A document that bears:

(A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and

(B) a signature purporting to be an execution or attestation.

(2) *Domestic Public Documents That Are Not Sealed but Are Signed and Certified.* A document that bears no seal if:

(A) it bears the signature of an officer or employee of an entity named in Rule 902(1)(A); and

(B) another public officer who has a seal and official duties within that same entity certifies under seal—or its equivalent—that the signer has the official capacity and that the signature is genuine.

(3) *Foreign Public Documents.* A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester—or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either:

(A) order that it be treated as presumptively authentic without final certification; or

(B) allow it to be evidenced by an attested summary with or without final certification.

(4) *Certified Copies of Public Records.* A copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

certified as correct by:

(A) the custodian or another person authorized to make the certification; or

(B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule prescribed by the Supreme Court.

(5) *Official Publications.* A book, pamphlet, or other publication purporting to be issued by a public authority.

(6) *Newspapers and Periodicals.* Printed material purporting to be a newspaper or periodical.

(7) *Trade Inscriptions and the Like.* An inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control.

(8) *Acknowledged Documents.* A document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments.

(9) *Commercial Paper and Related Documents.* Commercial paper, a signature on it, and related documents, to the extent allowed by general commercial law.

(10) *Presumptions Under a Federal Statute.* A signature, document, or anything else that a federal statute declares to be presumptively or prima facie genuine or authentic.

(11) *Certified Domestic Records of a Regularly Conducted Activity.* The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

(12) *Certified Foreign Records of a Regularly Conducted Activity.* In a civil case, the original or a copy of a foreign record that meets the requirements of Rule 902(11), modified as follows: the certification, rather than complying with a federal statute or Supreme Court rule, must be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed. The proponent must also meet the notice requirements of Rule 902(11).

(13) *Certified Records Generated by an Electronic Process or System.* A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

902(11) or (12). The proponent must also meet the notice requirements of Rule 902(11).

(14) *Certified Data Copied from an Electronic Device, Storage Medium, or File.* Data copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent also must meet the notice requirements of Rule 902(11).

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Rule 803. Exceptions to the Rule Against Hearsay— Regardless of Whether the Declarant Is Available as a Witness

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

(1) *Present Sense Impression.* A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.

(2) *Excited Utterance.* A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

(3) *Then-Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

(4) *Statement Made for Medical Diagnosis or Treatment.* A statement that:

(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and

(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

(5) *Recorded Recollection.* A record that:

(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

(B) was made or adopted by the witness when the matter was fresh in the witness's memory; and

(C) accurately reflects the witness's knowledge.

If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

(6) *Records of a regularly conducted activity.* A record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

(7) *Absence of a record of a regularly conducted activity.* Evidence that a matter is not included in a record described in paragraph (6) if:

(A) the evidence is admitted to prove that the matter did not occur or exist;

(B) a record was regularly kept for a matter of that kind; and

(C) the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness.

(8) *Public records.* A record or statement of a public office if:

(A) it sets out:

(i) the offices activities;

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

(9) *Public Records of Vital Statistics.* A record of a birth, death, or marriage, if reported to a public office in accordance with a legal duty.

(10) *Absence of a Public Record.* Testimony—or a certification under Rule 902—that a diligent search failed to disclose a public record or statement if:

(A) the testimony or certification is admitted to prove that

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(i) the record or statement does not exist; or

(ii) a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind; and

(B) in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least 14 days before trial, and the defendant does not object in writing within 7 days of receiving the notice—unless the court sets a different time for the notice or the objection.

(11) *Records of Religious Organizations Concerning Personal or Family History.* A statement of birth, legitimacy, ancestry, marriage, divorce, death, relationship by blood or marriage, or similar facts of personal or family history, contained in a regularly kept record of a religious organization.

(12) *Certificates of Marriage, Baptism, and Similar Ceremonies.* A statement of fact contained in a certificate:

(A) made by a person who is authorized by a religious organization or by law to perform the act certified;

(B) attesting that the person performed a marriage or similar ceremony or administered a sacrament; and

(C) purporting to have been issued at the time of the act or within a reasonable time after it.

(13) *Family Records.* A statement of fact about personal or family history contained in a family record, such as a Bible, genealogy, chart, engraving on a ring, inscription on a portrait, or engraving on an urn or burial marker.

(14) *Records of Documents That Affect an Interest in Property.* The record of a document that purports to establish or affect an interest in property if:

(A) the record is admitted to prove the content of the original recorded document, along with its signing and its delivery by each person who purports to have signed it;

(B) the record is kept in a public office; and

(C) a statute authorizes recording documents of that kind in that office.

(15) *Statements in Documents That Affect an Interest in Property.* A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose—unless later dealings with the property are inconsistent with

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the truth of the statement or the purport of the document.

(16) *Statements in Ancient Documents.* A statement in a document that was prepared before January 1, 1998, and whose authenticity is established.

(17) *Market Reports and Similar Commercial Publications.* Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations.

(18) *Statements in Learned Treatises, Periodicals, or Pamphlets.* A statement contained in a treatise, periodical, or pamphlet if:

(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and

(B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the statement may be read into evidence but not received as an exhibit.

(19) *Reputation Concerning Personal or Family History.* A reputation among a person's family by blood, adoption, or marriage—or among a person's associates or in the community—concerning the person's birth, adoption, legitimacy, ancestry, marriage, divorce, death, relationship by blood, adoption, or marriage, or similar facts of personal or family history.

(20) *Reputation Concerning Boundaries or General History.* A reputation in a community—arising before the controversy—concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation.

(21) *Reputation Concerning Character.* A reputation among a person's associates or in the community concerning the person's character.

(22) *Judgment of a Previous Conviction.* Evidence of a final judgment of conviction if:

(A) the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

(B) the conviction was for a crime punishable by death or by imprisonment for more than a year;

(C) the evidence is admitted to prove any fact essential to the judgment; and

(D) when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The pendency of an appeal may be shown but does not affect admissibility.

   **(23)** *Judgments Involving Personal, Family, or General History, or a Boundary.* A judgment that is admitted to prove a matter of personal, family, or general history, or boundaries, if the matter:

   **(A)** was essential to the judgment; and

   **(B)** could be proved by evidence of reputation.

   **(24)** [*Other Exceptions.*] [Transferred to Rule 807.]

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The Plymouth County Correctional Facility
Office of the Inmate Grievance Coordinator
26 Long Pond Road
Plymouth, MA 02360



USPS TRACKING #

9114 9023 0722 4293 0879 95



Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Martin S. Gottesfeld
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

9114 9023 0722 4293 0879 57

Label 400  Jan. 2013
7690-16-000-7948

Saturday, August 10th, 2019, **Houston v. Lack, 487 US 266 (1988)**

Houston v. Lack
Sat. Aug 10th, 2019
Address Label Pending
FBOP Review for Plymouth
County Correctional Facility Inmate
Grievance Coordinator (IGC)





Exhibit 23

28 CFR

## § 541.25 Notice received when placed in the SHU.

You will be notified of the reason(s) you are placed in the SHU as follows:

(a) Administrative detention status. When placed in administrative detention status, you will receive a copy of the administrative detention order, ordinarily within 24 hours, detailing the reason(s) for your placement. However, when placed in administrative detention status pending classification or while in holdover status, you will not receive an administrative detention order.

(b) Disciplinary segregation status. When you are to be placed in disciplinary segregation status as a sanction for violating Bureau regulations, you will be informed by the DHO at the end of your discipline hearing.

[75 FR 76263, 76273, Dec. 8, 2010; 76 FR 11078, 11079, Mar. 1, 2011]

[EFFECTIVE DATE NOTE: 75 FR 76263, 76273, Dec. 8, 2010, revised Subpart B, effective Mar. 1, 2011; 76 FR 11078, 11079, Mar. 1, 2011, delayed the effective date of the amendment appearing at 75 FR 76263, 76273, Dec. 8, 2010, until June 20, 2011.]

## § 541.26 Review of placement in the SHU.

Your placement in the SHU will be reviewed by the Segregation Review Official (SRO) as follows:

(a) Three day review. Within three work days of your placement in administrative detention status, not counting the day you were admitted, weekends, and holidays, the SRO will review the supporting records. If you are in disciplinary segregation status, this review will not occur.

(b) Seven day reviews. Within seven continuous calendar days of your placement in either administrative detention or disciplinary segregation status, the SRO will formally review your status at a hearing you can attend. Subsequent reviews of your records will be performed in your absence by the SRO every seven continuous calendar days thereafter.

CFR                                                           1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



(c) Thirty day reviews. After every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation status, the SRO will formally review your status at a hearing you can attend.

(d) Administrative remedy program. You can submit a formal grievance challenging your placement in the SHU through the Administrative Remedy Program, 28 CFR part 542, subpart B.

[75 FR 76263, 76273, Dec. 8, 2010; 76 FR 11078, 11079, Mar. 1, 2011]

[EFFECTIVE DATE NOTE: 75 FR 76263, 76273, Dec. 8, 2010, revised Subpart B, effective Mar. 1, 2011; 76 FR 11078, 11079, Mar. 1, 2011, delayed the effective date of the amendment appearing at 75 FR 76263, 76273, Dec. 8, 2010, until June 20, 2011.]

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 541.33 Release from the SHU.

(a) Administrative detention status. You will be released from administrative detention status when the reasons for your placement no longer exist.

(b) Disciplinary segregation status. You will be released from disciplinary segregation status after satisfying the sanction imposed by the DHO. The SRO may release you earlier if it is determined you no longer require disciplinary segregation status.

[75 FR 76263, 76273, Dec. 8, 2010; 76 FR 11078, 11079, Mar. 1, 2011]

[EFFECTIVE DATE NOTE: 75 FR 76263, 76273, Dec. 8, 2010, revised Subpart B, effective Mar. 1, 2011; 76 FR 11078, 11079, Mar. 1, 2011, delayed the effective date of the amendment appearing at 75 FR 76263, 76273, Dec. 8, 2010, until June 20, 2011.]

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 24

Fed. R. Crim. P.

## Rule 18. Place of Prosecution and Trial

Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

**HISTORY:** Amended Feb. 28, 1966, eff. July 1, 1966; April 30, 1979, eff. Aug. 1, 1979; April 29, 2002, eff. Dec. 1, 2002; April 23, 2008, eff. Dec. 1, 2008.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 25

Fed. R. Crim. P.

## Rule 46. Release from Custody; Supervising Detention

**(a) Before Trial.**  The provisions of 18 U.S.C. §§ 3142 and 3144 govern pretrial release.

**(b) During Trial.**  A person released before trial continues on release during trial under the same terms and conditions. But the court may order different terms and conditions or terminate the release if necessary to ensure that the person will be present during trial or that the person's conduct will not obstruct the orderly and expeditious progress of the trial.

**(c) Pending Sentencing or Appeal.**  The provisions of 18 U.S.C. § 3143 govern release pending sentencing or appeal. The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.

**(d) Pending Hearing on a Violation of Probation or Supervised Release.**  Rule 32.1(a)(6) governs release pending a hearing on a violation of probation or supervised release.

**(e) Surety.**  The court must not approve a bond unless any surety appears to be qualified. Every surety, except a legally approved corporate surety, must demonstrate by affidavit that its assets are adequate. The court may require the affidavit to describe the following:

    **(1)** the property that the surety proposes to use as security;

    **(2)** any encumbrance on that property;

    **(3)** the number and amount of any other undischarged bonds and bail undertakings the surety has issued; and

    **(4)** any other liability of the surety.

**(f) Bail Forfeiture.**

    **(1)** *Declaration.* The court must declare the bail forfeited if a condition of the bond is breached.

    **(2)** *Setting Aside.* The court may set aside in whole or in part a bail forfeiture upon any condition the court may impose if:

        **(A)** the surety later surrenders into custody the person released on the surety's appearance bond; or

        **(B)** it appears that justice does not require bail forfeiture.

    **(3)** *Enforcement.*

USCSRULE                                     1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(A) *Default Judgment and Execution.* If it does not set aside a bail forfeiture, the court must, upon the government's motion, enter a default judgment.

(B) *Jurisdiction and Service.* By entering into a bond, each surety submits to the district court's jurisdiction and irrevocably appoints the district clerk as its agent to receive service of any filings affecting its liability.

(C) *Motion to Enforce.* The court may, upon the government's motion, enforce the surety's liability without an independent action. The government must serve any motion, and notice as the court prescribes, on the district clerk. If so served, the clerk must promptly mail a copy to the surety at its last known address.

(4) *Remission.* After entering a judgment under Rule 46(f)(3), the court may remit in whole or in part the judgment under the same conditions specified in Rule 46(f)(2).

(g) **Exoneration.** The court must exonerate the surety and release any bail when a bond condition has been satisfied or when the court has set aside or remitted the forfeiture. The court must exonerate a surety who deposits cash in the amount of the bond or timely surrenders the defendant into custody.

(h) **Supervising Detention Pending Trial.**

(1) *In General.* To eliminate unnecessary detention, the court must supervise the detention within the district of any defendants awaiting trial and of any persons held as material witnesses.

(2) *Reports.* An attorney for the government must report biweekly to the court, listing each material witness held in custody for more than 10 days pending indictment, arraignment, or trial. For each material witness listed in the report, an attorney for the government must state why the witness should not be released with or without a deposition being taken under Rule 15(a).

(i) **Forfeiture of Property.** The court may dispose of a charged offense by ordering the forfeiture of 18 U.S.C. § 3142(c)(1)(B)(xi) property under 18 U.S.C. § 3146(d), if a fine in the amount of the property's value would be an appropriate sentence for the charged offense.

(j) **Producing a Statement.**

(1) *In General.* Rule 26.2(a)–(d) and (f) applies at a detention hearing under 18 U.S.C. § 3142, unless the court for good cause rules otherwise.

(2) *Sanctions for Not Producing a Statement.* If a party disobeys a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony at the detention hearing.

USCSRULE

2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**HISTORY:** Dec. 26, 1944, eff. March 1, 1946, as amended April 9, 1956, eff. 90 days after April 9, 1956; Feb. 28, 1966, eff. July 1, 1966; April 24, 1972, eff. Oct. 1, 1972; Oct. 12, 1984, P. L. 98-473, Title II, Ch I, § 209(d), 98 Stat. 1987; March 9, 1987, eff. Aug. 1, 1987; April 30, 1991, eff. Dec. 1, 1991; April 22, 1993, eff. Dec. 1, 1993; Sept. 13, 1994; P. L. 103-322, Title XXXIII, § 330003(h), 108 Stat. 2141 April 29, 2002, eff. Dec. 1, 2002.

USCSRULE

3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 26

# 'Guardian Hacktivist' Martin Gottesfeld Convicted; Faces Up To 15 Years In Prison



 By FRANK CAMP (/AUTHORS/FRANK-CAMP)
🐦 @FRANKDCAMP (HTTPS://TWITTER.COM/FRANKDCAMP)

August 4, 2018

On August 1, 2018, "Guardian Hacktivist" Martin Gottesfeld was found guilty on two charges — conspiracy to intentionally damage a protected computer in violation of 18 U.S. Code § 371, and intentional damage to protected computers in violation of 18 U.S. Code § 1030 (a)(5)(A).

As a result of the conviction, Gottesfeld faces up to 15 years in prison when he is sentenced on November 14.

If you are unfamiliar with the case, check out my previous coverage below prior to reading further:

- The Story Of Martin Gottesfeld: The Hacktivist Who Faces 15 Years In Jail For Trying To Save A Young Girl's Life (https://www.dailywire.com/news/25476/story-martin-gottesfeld-hacktivist-who-faces-15-frank-camp)

- Jailed Hacktivist Martin Gottesfeld Fires Back At Prosecutors Who Are Trying To Keep Him From Using 'Torture' Defense (https://www.dailywire.com/news/28371/prosecution-trying-keep-jailed-hacktivist-martin-frank-camp)

- 'Secret Docket' Revelation Has Jailed Hacktivist Martin Gottesfeld Filing For Case Dismissal (https://www.dailywire.com/news/29833/secret-docket-revelation-has-jailed-guardian-frank-camp)

- Potential Judicial Conflicts Of Interest Arise In Martin Gottesfeld 'Guardian Hacktivist' Case (https://www.dailywire.com/news/32698/potential-judicial-conflicts-interest-arise-martin-frank-camp)

- EXCLUSIVE: Interview With 'Guardian Hacktivist' Martin Gottesfeld (https://www.dailywire.com/news/31935/exclusive-interview-guardian-hacktivist-martin-frank-camp)

I had the opportunity to speak with Gottesfeld after the verdict. The following is our conversation:

DW: Is there anything you want to say in the immediate aftermath of this verdict?

GOTTESFELD: Yeah, an underreported aspect of this, which is kind of a silver lining, is that the jury didn't go with the government's narrative of potential harm to patients. The jury was asked a question on each count — "did this alleged act effect or potentially effect patient care, diagnosis, treatment, etc,." and the jury refused to say yes on both counts.

The government's entire narrative against me has been that I'm a reckless guy who potentially imperiled the hospital's most vulnerable patients, and that's what they've been using as a cudgel against me for two and a half years. Multiple news outlets didn't go with it, and neither did the jury.

What they've convicted me of is costing the government money while they were crippling and torturing a girl in a wheelchair. They convicted a guy for helping a child; they convicted a guy who didn't harm a soul.

*[The jury was asked on the verdict sheet to answer "yes" or "no" to the following questions:*

questions:

*(1) Did the offense cause loss to one or more persons during any one-year period aggregating at least $5,000 in value?*

*(2) Did the offense cause the potential modification or impairment of the medical examination, diagnosis, treatment, or care of one or more individuals?*

*While the jury answered "yes" to the first question on each charge, they specifically asked that the court "consider a verdict including only one of the subparagraphs of each charge," meaning that they were seemingly unable to reach an agreement on the question regarding harm or potential harm to patients.]*

---

IF YOU FIND DEFENDANT "NOT GUILTY" ON QUESTION 1, PROCEED TO QUESTION 2. IF YOU FIND DEFENDANT "GUILTY" ON QUESTION 1, COMPLETE SUBPARAGRAPHS (A) AND (B).

    A) Did the offense cause loss to one or more persons during any 1-year period aggregating at least $5,000 in value?

    Yes  ✓               No _____

    B) Did the offense cause the potential modification or impairment of the medical examination, diagnosis, treatment, or care of 1 or more individuals?

    Yes _____               No _____

---

IF YOU FIND DEFENDANT "NOT GUILTY" ON QUESTION 2, YOUR DELIBERATIONS ARE COMPLETE. IF YOU FIND DEFENDANT "GUILTY" ON QUESTION 2, COMPLETE SUBPARAGRAPHS (A) AND (B).

**A)** Did the offense cause loss to one or more persons during any 1-year period aggregating at least $5,000 in value?

Yes   ✓           No _____

**B)** Did the offense cause the potential modification or impairment of the medical examination, diagnosis, treatment, or care of 1 or more individuals?

Yes _____          No _____

---

*Question:*

*What happens if we remain at an impasse and neither side anticipates being moved?*

---

**DW: Tell me if I'm correct in my assessment. The jury was told that they couldn't acquit you based on the "torture" defense?**

GOTTESFELD: The jury was told in no uncertain terms by Judge Gorton that my good intent was not a legal defense, and was irrelevant to whether or not I committed the act.

There were multiple defenses we were precluded from using under the umbrella of "justification," two of which are "necessity" and "defense of others." These are called "affirmative defenses." In other words, "I did it, but here's why, and here's why it's okay."

Basically, if it was your little girl who was locked in a psych ward, unable to speak to you, and was sending you notes saying she was being tortured, what would you want a stranger to do?

Would you want him to say, "Hmm, two years from now, some biased judge might not let me mention this little girl, so I'm not gonna help her." Is that what we, as a society, want?

**DW: When you appeal the verdict, will you have any new information for the court?**

GOTTESFELD: As you know, I have rock-solid appellate issues on the Speedy Trial Act, and the suppression matter has become more interesting.

In its opposition to the suppression filing, the government tried to downplay [Magistrate Judge Marianne] Bowler's role. However, her husband's workplace came up by name multiple times. It was actually mentioned by name by the prosecutors in their closing argument. Bowler's husband's workplace was effected by the DDoS campaign. She should have recused.

*[Judge Bowler is married to* **Dr. Marc Alan** *(https://www.dailywire.com/news/32698/potential-judicial-conflicts-interest-arise-martin-frank-camp)* **P** *(https://www.dailywire.com/news/32698/potential-judicial-conflicts-interest-arise-martin-frank-camp)* **feffer** *(https://www.dailywire.com/news/32698/potential-judicial-conflicts-interest-arise-martin-frank-camp) , who works at Brigham and and Women's Hospital, a "***teaching affiliate of Harvard Medical School** *(https://hms.harvard.edu/affiliates/brigham-womens-hospital) ." Bowler is the judge who signed off on the search warrant for Gottesfeld's home.]*

Regardless, the appellate court gets to take into account the full trial transcript when they decide a pretrial motion. So the appellate court gets to use all this evidence that Bowler's husband's workplace was affected when we appeal on the suppression grounds as well. I believe I'll win on appeal.

**DW: How so?**

GOTTESFELD: If Gorton does try to hit me with 15 years, and I lose the appeal on the convictions themselves, I can still appeal the sentence. I can appeal not just the fact that this

trail shouldn't have happened in the first place because the Speedy Trial Act says so; not just

that the search shouldn't have happened because it was a biased magistrate who signed the

warrant. Even if I lose on those two grounds, I can then say that the sentence is out of whack

because the government swung and missed on this big enhancement for potentially

imperiling patients, on which the jury failed to sustain them.

Gottesfeld's sentencing will take place on November 14, 2018. I'd like to thank
Martin for taking the time to speak with The Daily Wire. For more information
about the case, visit FreeMartyG.com.