Dana Gottesfeld in reference to
Martin Gottesfeld, ID #12982-104
FCI Terre Haute
PO Box 33
Terre Haute, IN 47808

December 12, 2019

Honorable Paul G Gardephe
U.S. District Court Judge
Southern District of NY
Thurgood Marshall, U.S. Courthouse
40 Foley Square
New York, NY 10007



Re: Gottesfeld v. Hurwitz, 18 Civ. 10836 (PGG)

Dear Judge Gardephe,

I hope this letter finds you well. Please find exhibits
102-141 attached in this envelope. These are filed by
friends of the plaintiff. This is a<sup>close but</sup> incomplete list due to
a computer malfunction, but all-permitting, the rest shall
be filed soon.

Sincerely,
Dana Gottesfeld.

12/9/2019

Case 1:18-cv-10836-PGG   Document 115   Filed 12/17/19   Page 2 of 42

Remove United States District Attorney Carmen Ortiz from office for overreach in the case of Aaron Swartz. | We the People: Your Voice i…

Exhibit 102

Get Email Updates          Contact Us

Help make We the People even better.
Share your feedback on how this new
platform can improve.

Share Your Feedback

Log in   Create an Account

This petition has been responded to by the White House. See the response below.

## Petition Closed

This petition can no longer be signed.

**Helpful Hints**

**Recent Petitions**

**Recent Responses**

**History of Petitions**

**WE PETITION THE OBAMA ADMINISTRATION TO:**

# Remove United States District Attorney Carmen Ortiz from office for overreach in the case of Aaron Swartz.

It is too late to do anything for Aaron Swartz, but the who used the powers granted to them by their office to hound him into a position where he was facing a ruinous trial, life in prison and the ignominy and shame of being a convicted felon; for an alleged crime that the supposed victims did not wish to prosecute.

A prosecutor who does not understand proportionality and who regularly uses the threat of unjust and overreaching charges to extort plea bargains from defendants regardless of their guilt is a danger to the life and liberty of anyone who might cross her path.

http://lessig.tumblr.com/post/40347463044/prosecutor-as-bully

http://www.nytimes.com/2013/01/13/technology/aaron-swartz-internet-activist-dies-at-26.html

**Published Date:** Jan 12, 2013

**Issues:** Criminal Justice and Law Enforcement, Government Reform, Technology and Telecommunications

**TOTAL SIGNATURES**

# 61,179

**Share this Petition**

**OFFICIAL WHITE HOUSE RESPONSE TO**
Remove United States District Attorney Carmen Ortiz from office for overreach in the case of
Aaron Swartz.

# Response to We the People Petitions on U.S. Attorney's Office Personnel Matters

Aaron Swartz's death was a tragic, unthinkable loss for his family and friends. Our sympathy continues to go out to those who were closest to him, and to the many others whose lives he touched.

We also reaffirm our belief that a spirit of openness is what makes the Internet such a powerful engine for economic growth, technological innovation, and new ideas. That's why members of the Administration continue to engage with advocates to ensure the Internet remains a free and open platform as technology continues to disrupt industries and connect our communities in ways we can't yet imagine. We will continue this engagement as we tackle new questions on key issues such as citizen

12/9/2019

Case 1:18-cv-10836-PGG   Document 115   Filed 12/17/19   Page 3 of 42

Remove United States District Attorney Carmen Ortiz from office for overreach in the case of Aaron Swartz. | We the People: Your Voice i…

participation in democracy, open access to information, privacy, intellectual property, free speech, and security.

As to the specific personnel-related requests raised in your petitions, our response must be limited. Consistent with the terms we laid out when we began We the People, we will not address agency personnel matters in a petition response, because we do not believe this is the appropriate forum in which to do so.

Tell us what you think about this response and We the People.

## Signatures: 19 of 61,179

| CREATOR | S. V. | D. H. | C. M. |
|---|---|---|---|
| L. P. | Saint Louis, MO | Hasbrouck Heights, NJ | Bellevue, WA |
| Eugene, OR | January 07, 2015 | January 07, 2015 | January 07, 2015 |
| January 12, 2013 | Signature # 61,179 | Signature # 61,178 | Signature # 61,177 |
| Signature # 1 | | | |

**U. O.**
January 06, 2015
Signature # 61,176

**D. S.**
Burlington, VT
January 05, 2015
Signature # 61,175

**B. F.**
Circleville, NY
January 05, 2015
Signature # 61,174

**C. W.**
Mililani, HI
January 05, 2015
Signature # 61,173

**L. O.**
January 04, 2015
Signature # 61,172

**G. D.**
Bronx, NY
January 04, 2015
Signature # 61,171

**E. D.**
San Luis Obispo, CA
January 03, 2015
Signature # 61,170

**Y. Y.**
Raleigh, NC
January 03, 2015
Signature # 61,169

**R. T.**
December 31, 2014
Signature # 61,168

**S. W.**
Davenport, IA
December 28, 2014
Signature # 61,167

**J. C.**
Punta Gorda, FL
December 23, 2014
Signature # 61,166

**J. R.**
Bolivar, PA
December 22, 2014
Signature # 61,165

**M. P.**
Hilliard, OH
December 21, 2014
Signature # 61,164

**K. E.**
Crestview, FL
December 20, 2014
Signature # 61,163

**L. B.**
December 17, 2014
Signature # 61,162

Load Next 20
Signatures

**Home**

**The White House Blog**

**Photos & Videos**

Photo Galleries
Video
Live Streams
Podcasts

**Briefing Room**

Your Weekly Address
Speeches & Remarks
Press Briefings
Statements & Releases
White House Schedule
Presidential Actions
Legislation
Nominations &
Appointments
Disclosures

**Issues**

Civil Rights
Defense
Disabilities
Economy
Education
Energy & Environment
Ethics
Family
Fiscal Responsibility
Foreign Policy

**The Administration**

President Barack Obama
Vice President Joe Biden
First Lady Michelle Obama
Dr. Jill Biden
The Cabinet
White House Staff
Executive Office of the
President
Other Advisory Boards

**About the White House**

Inside the White House
Presidents
First Ladies
The Oval Office
The Vice President's
Residence & Office
Eisenhower Executive
Office Building
Camp David

**Our Government**

The Executive Branch
The Legislative Branch
The Judicial Branch
The Constitution
Federal Agencies &
Commissions
Elections & Voting
State & Local Government
Resources

12/9/2019

Case 1:18-cv-10836-PGG   Document 115   Filed 12/17/19   Page 4 of 42

Remove United States District Attorney Carmen Ortiz from office for overreach in the case of Aaron Swartz. | We the People: Your Voice i...

Health Care
Homeland Security
Immigration
Poverty
Rural
Seniors & Social Security
Service
Taxes
Technology
Urban Policy
Veterans
Women
Additional Issues

Air Force One
White House Fellows
White House Internships
Tours & Events

WWW.WHITEHOUSE.GOV

En español | Accessibility | Copyright Information | Privacy Policy | Contact
USA.gov | Subscribe to RSS Feeds | Apply for a Job

United States Government Accountability Office

# GAO

## Testimony

Before the Committee on Education and
Labor, House of Representatives

Exhibit 108

For Release on Delivery
Expected at 10:30 a.m. EDT
Wednesday, October 10, 2007

# RESIDENTIAL TREATMENT PROGRAMS

## Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth

Statement of Gregory D. Kutz, Managing Director
Forensic Audits and Special Investigations

Andy O'Connell, Assistant Director
Forensic Audits and Special Investigations



**GAO**
Accountability ★ Integrity ★ Reliability

October 10, 2007



**G A O**
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-08-146T, a testimony before the Committee on Education and Labor, House of Representatives

# RESIDENTIAL TREATMENT PROGRAMS

## Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth

## Why GAO Did This Study

Residential treatment programs provide a range of services, including drug and alcohol treatment, confidence building, military-style discipline, and psychological counseling for troubled boys and girls with a variety of addiction, behavioral, and emotional problems. This testimony concerns programs across the country referring to themselves as wilderness therapy programs, boot camps, and academies, among other names.

Many cite positive outcomes associated with specific types of residential treatment. There are also allegations regarding the abuse and death of youth enrolled in residential treatment programs. Given concerns about these allegations, particularly in reference to private programs, the Committee asked GAO to (1) verify whether allegations of abuse and death at residential treatment programs are widespread and (2) examine the facts and circumstances surrounding selected closed cases where a teenager died while enrolled in a private program.

To achieve these objectives, GAO conducted numerous interviews and examined documents from closed cases dating as far back as 1990, including police reports, autopsy reports, and state agency oversight reviews and investigations. GAO did not attempt to evaluate the benefits of residential treatment programs or verify the facts regarding the thousands of allegations it reviewed.

To view the full product, including the scope and methodology, click on GAO-08-146T. For more information, contact Gregory D. Kutz at (202) 512-6722 or kutzg@gao.gov.

## What GAO Found

GAO found thousands of allegations of abuse, some of which involved death, at residential treatment programs across the country and in American-owned and American-operated facilities abroad between the years 1990 and 2007. Allegations included reports of abuse and death recorded by state agencies and the Department of Health and Human Services, allegations detailed in pending civil and criminal trials with hundreds of plaintiffs, and claims of abuse and death that were posted on the Internet. For example, during 2005 alone, 33 states reported 1,619 staff members involved in incidents of abuse in residential programs. GAO could not identify a more concrete number of allegations because it could not locate a single Web site, federal agency, or other entity that collects comprehensive nationwide data.

GAO also examined, in greater detail, 10 closed civil or criminal cases from 1990 through 2004 where a teenager died while enrolled in a private program. GAO found significant evidence of ineffective management in most of the 10 cases, with program leaders neglecting the needs of program participants and staff. This ineffective management compounded the negative consequences of (and sometimes directly resulted in) the hiring of untrained staff; a lack of adequate nourishment; and reckless or negligent operating practices, including a lack of adequate equipment. These factors played a significant role in the deaths GAO examined. See the table below for detailed information related to three of the case studies.

### Examples of Case Studies GAO Examined

| Sex/age | Date of death | Cause of death | Case details |
|---|---|---|---|
| Female, 15 | May 1990 | Dehydration | ▪ Showed signs of illness for 2 days, such as blurred vision, vomiting water, and frequent stumbling<br>▪ Program staff thought she was faking her illness to get out of the program<br>▪ Collapsed and died while hiking<br>▪ Lay dead in the road for 18 hours<br>▪ Program brochure advertised staff as "highly trained survival experts" |
| Male, 15 | Sept. 2000 | Internal bleeding | ▪ Head-injury victim with behavioral challenges who refused to return to campsite<br>▪ Restrained by staff and held face down in the dirt for 45 minutes<br>▪ Died of a severed artery in the neck<br>▪ Death ruled a homicide |
| Male, 14 | July 2002 | Hyperthermia (high body temperature) | ▪ Experienced difficulty while hiking and sat down, breathing heavily and moaning<br>▪ Fainted and lay motionless<br>▪ One staff member hid behind a tree for 10 minutes to see whether the victim was "faking it"<br>▪ Staff member returned and found no pulse<br>▪ Died soon afterwards |

Source: Records including police reports, legal documents, and state investigative documents.

Mr. Chairman and Members of the Committee:

Thank you for the opportunity to discuss residential treatment programs for troubled youth. In the context of this testimony, we are using the term residential treatment program to refer to entities across the country and abroad calling themselves wilderness therapy programs, boarding schools, academies, behavioral modification facilities, and boot camps, among other names. While some of these programs are funded publicly by state and local government agencies, others are privately owned and operated. Private residential treatment programs typically market their services to the parents of troubled teenagers—boys and girls with a variety of addiction, behavioral, and emotional problems—and provide a range of services, including drug and alcohol treatment, confidence building, military-style discipline, and psychological counseling for illnesses such as depression and attention deficit disorder.

Many cite positive outcomes associated with specific types of residential treatment. There are also allegations regarding the abuse and death of youth enrolled in residential treatment programs. Given concerns about these allegations, particularly in reference to private programs, you asked us to (1) verify whether allegations of abuse and death at residential treatment programs are widespread and (2) examine the facts and circumstances surrounding selected closed cases where a teenager died while enrolled in a private program.

To verify whether allegations of abuse and death at residential treatment programs are widespread, we gathered available information about allegations made over the last 17 years by performing interviews with relevant experts, reviewing relevant studies and documents, conducting Internet searches for Web sites making allegations, reviewing data from the National Child Abuse and Neglect Data System (NCANDS),[1] and reviewing relevant state and federal court documents. We were unable to disaggregate information on public and private programs; consequently, the information we present includes allegations against both types.

To select our case studies, we identified numerous closed civil and criminal cases in which a court was asked to decide whether a private

---

[1]According to the Administration for Children and Families (part of the U.S. Department of Health and Human Services), NCANDS is a voluntary national data collection and analysis system created in response to the requirements of the Child Abuse Prevention and Treatment Act.

residential treatment program was responsible for the death of an enrolled teenager. When identifying our cases, we specifically excluded teenager deaths at public programs such as state-sponsored foster programs, juvenile justice programs for delinquent youth, or programs that exclusively treat psychological disorders or substance abuse in a hospital setting. We focused on deaths between the years 1990 and 2004 to illustrate the long-standing issues presented by private residential treatment programs. We limited our cases to closed cases and, thus, ongoing cases from the last several years were not included in our work. We selected these 10 cases based on several factors including victim age, program location, type of program the victim attended, and date of death.

We then examined, in more detail, the facts and circumstances of the death and any related abuse of the victim. To validate the facts and circumstances of each case, and to the extent possible, we conducted interviews with related parties, including current and former program staff and officials, attorneys and law enforcement officials involved in the cases, and the parents of the victims. Further, we reviewed available documentation to support the facts of each case including (but not limited to) marketing materials, police reports, autopsy reports, and state agency oversight reviews and investigations. In addition, we conducted site visits at nine residential treatment programs to obtain a firsthand perspective on how residential treatment programs operate. Five of these nine programs were related to the still-operational programs discussed in our cases— either because they were the same program or represented a permutation of the original program operating under a different name or in a new location.  Where we obtained financial information about the programs, we converted this information to 2007 dollars so that the information was comparable.

It is important to emphasize that residential treatment programs are intended to help youth with serious problems—in some cases, these problems constitute life-threatening addictions and diseases. We did not attempt to evaluate the benefits of residential treatment programs in dealing with these serious problems. Moreover, it is not possible to generalize the results of our investigation as applying to all residential treatment programs, whether privately or publicly funded. We found it difficult to obtain an overall picture of the extent of the residential treatment program industry. For example, while states often regulate publicly funded programs, a number of states do not license or otherwise regulate private programs. Because programs determine how to describe themselves, especially in their marketing materials, there is no standard definition for "wilderness therapy program," "boot camp," or other terms

used to describe the types of programs and facilities considered to be part of this industry. GAO is completing a comprehensive review of state and federal oversight of residential treatment programs for youth with behavioral and emotional challenges and expects to report next year.

We performed our work from June through September of 2007 in accordance with the quality standards for investigations set forth by the President's Council on Integrity and Efficiency.

## Summary

We found thousands of allegations of abuse, some of which involved death, at residential treatment programs across the country and in American-owned and American-operated facilities abroad between the years 1990 and 2007. Allegations included reports of abuse and death recorded by state agencies and the Department of Health and Human Services, allegations detailed in pending civil and criminal cases with hundreds of plaintiffs, and claims of abuse and death that were posted on the Internet. For example, according to the most recent NCANDS data, during 2005 alone 33 states reported 1,619 staff members involved in incidents of abuse in residential programs. Because there are no specific reporting requirements or definitions for private programs in particular, we could not determine what percentage of the thousands of allegations we found are related to such programs.

We also examined, in greater detail, 10 closed cases where a teenager died while enrolled in a private program. We found significant evidence of ineffective management in most of these 10 cases, with program leaders neglecting the needs of program participants and staff. This ineffective management compounded the negative consequences of (and sometimes directly resulted in) the hiring of untrained staff; a lack of adequate nourishment; and reckless or negligent operating practices, including a lack of adequate equipment. These factors played a significant role in most of the deaths we examined. For example:

- In May 1990, a 15-year-old female was enrolled in a 9-week wilderness program. Although the program brochure claimed that counselors were "highly trained survival experts," they did not recognize the signs of dehydration when she began complaining of blurred vision, stumbling, and vomiting water 3 days into a hike. According to police documents, on the fifth day and after nearly 2 days of serious symptoms, the dying teen finally collapsed and became unresponsive, at which point counselors attempted to signal for help using a fire because they were

not equipped with radios. Police documents state that the victim lay dead in a dirt road for 18 hours before rescuers arrived.

- In another example, we learned that, in July 2001, a 14-year-old male enrolled in a boot camp became so dehydrated that he began to eat dirt from the desert floor. Witnesses said that when he eventually fell unconscious and appeared to have a seizure, the program director told staff members to put the victim in the flatbed of a pickup truck and drive him to a hotel. When they could not revive him at the hotel, they put him back in the flatbed of the truck, returned to the camp, and placed the teen's limp body onto his sleeping bag. The program director assured his staff that "everything will be okay" but the victim died soon afterwards.

- In December 2001, on Christmas Day, a 16-year-old female was climbing in an extremely dangerous area unsupervised by program staff. According to documents we reviewed, the girl slipped, fell about 50 feet into a crevasse, and died of massive brain trauma about 3 weeks later. An investigation revealed numerous licensing and safety violations with the program, including an improperly low staff-to-youth ratio, failure of staff to scout the hiking location prior to the hike, and no first aid kit (it was left at the base camp).

## Background

Since the early 1990s, hundreds of residential treatment programs and facilities have been established in the United States by state agencies and private companies. Many of these programs are intended to provide a less-restrictive alternative to incarceration or hospitalization for youth who may require intervention to address emotional or behavioral challenges. As mentioned earlier, it is difficult to obtain an overall picture of the extent of this industry. According to a 2006 report by the Substance Abuse and Mental Health Services Administration, state officials identified 71 different types of residential treatment programs for youth with mental illness across the country.[2] A wide range of government or private entities, including government agencies and faith-based organizations, can operate these programs. Each residential treatment program may focus on a specific client type, such as those with substance abuse disorders or

---

[2]For addition information, see H. T. Ireys, L. Achman, and A. Takyi. *State Regulation of Residential Facilities for Children with Mental Illness*. DHHS Pub. No. (SMA) 06-4167 (Rockville, Md.: Center for Mental Health Services, Substance Abuse and Mental Health Services Administration, 2006).

suicidal tendencies. In addition, the programs provide a range of services, either on-site or through links with community programs, including educational, medical, psychiatric, and clinical/mental health services.

Regarding oversight of residential treatment programs, states have taken a variety of approaches ranging from statutory regulations that require licensing to no oversight. States differ in how they license and monitor the various types of programs in terms of both the agencies involved and the types of requirements. For example, some states have centralized licensing and monitoring within a single agency, while other states have decentralized these functions among three or more different agencies. There are currently no federal laws that define and regulate residential treatment programs. However, three federal agencies—the Departments of Health and Human Services, Justice, and Education—administer programs that can provide funds to states to support eligible youth who have been placed in some residential treatment programs. For example, the Department of Health and Human Services, through its Administration for Children and Families, administers programs that provide funding to states for a wide range of child welfare services, including foster care, as well as improved handling, investigation, and prosecution of youth maltreatment cases.[3]

In addition to the lack of a standard, commonly recognized definition for residential treatment programs, there are no standard definitions for specific types of programs—wilderness therapy programs, boot camps, and boarding schools, for instance. For our purposes, we define these programs based on the characteristics we identified during our review of the 10 case studies. For example, in the context of our report, we defined wilderness therapy program to mean a program that places youth in different natural environments, including forests, mountains, and deserts. Figure 1 shows images we took near the wilderness therapy programs we visited.

---

[3]Under Titles IV-B and IV-E of the Social Security Act and the Child Abuse and Neglect Prevention and Treatment Act.

**Figure 1: Environments Where Wilderness Therapy Programs Operate**





Source: GAO.

Note: These images show the surroundings that youth enrolled in a wilderness treatment program might encounter. Clockwise from the upper left, these images show (1) West Virginia woodlands, (2) an Oregon river, and (3) a Utah mountain range.

According to wilderness therapy program material, these settings are intended to remove the "distractions" and "temptations" of modern life from teens, forcing them to focus on themselves and their relationships. Included as part of a wilderness training program, participants keep journals that often include entries related to why they are in the program and their experiences and goals while in the wilderness. These journals, which program staff read, are part of the individual and group therapy provided in the field. As part of the wilderness experience, these programs

also teach basic survival skills, such as setting up a tent and camp, starting a fire, and cooking food. Figure 2 is photo montage of living arrangements for youth enrolled in the wilderness programs we visited.

**Figure 2: Living Arrangements at Wilderness Therapy Programs GAO Visited**



Source: GAO.

Note: The top two images show living arrangements at two wilderness therapy programs—a "time out" shelter (upper left) and an enrolled youth's campsite (upper right). The bottom two images show the girls' tent (lower left) and the shelter for group therapy and meetings (lower right) for the middle phase of a residential treatment program.

Some wilderness therapy programs may include a boot camp element. However, many boot camps (which can also be called behavioral modification facilities) exist independently of wilderness training. In the context of our report, a boot camp is a residential treatment program in which strict discipline and regime are dominant principles. Some military-style boot camp programs also emphasize uniformity and austere living conditions. Figure 3 is a photo montage illustrating a boot camp which minimizes creature comfort and emphasizes organization and discipline.

**Figure 3: Interior of a Boot Camp Facility That GAO Visited**






Source: GAO.

Note: These images show the interior of a boot camp facility. Clockwise from the upper left, the images show (1) the overall layout of "the boot camp" room in the facility, where male enrollees spend the majority of their indoor time and sleep on the floor; (2) the limited supplies and personal items of enrollees, including a rolled sleeping bag and mat; (3) bathroom facilities; and (4) a room with bunk beds for youth in the advanced phase of the program.

A third type of residential treatment program is known as a boarding school. Although these programs may combine wilderness or boot camp elements, boarding schools (also called academies) are generally

advertised as providing academic education beyond the survival skills a wilderness therapy program might teach. This academic education is sometimes approved by the state in which the program operates and may also be transferable as elective credits toward high school. These programs often enroll youth whose parents force them to attend against their will. The schools can include fences and other security measures to ensure that youth do not leave without permission. Figure 4 shows some of the features boarding schools may employ to keep youth in the facilities.

**Figure 4: Security Features Employed at a Boarding School GAO Visited**






Source: GAO.

Note: These images show the exterior of a boarding school. Clockwise from the upper left, the images show (1) a close-up of the video surveillance equipment and motion detectors in place on the outside of the school; (2) tall exterior fencing and motion detector; and (3) an angle of the facility exterior that clearly displays security features, including video monitoring, lighting, fencing, and wire mesh over the windows.

A variety of ancillary services related to residential treatment programs are available for an additional fee in some programs. These services include:

- Referral services and educational consultants to assist parents in selecting a program.

- Transport services to pick up a youth and bring him or her to the program. Parents frequently use a transport service if their child is unwilling to attend the program.

- Additional individual, group, or family counseling or therapy sessions as part of treatment. These services may be located on the premises or nearby.

- Financial services, such as loans, to assist parents in covering the expense of residential treatment programs.

These services are marketed toward parents and, with the exception of financial services, are not regulated by the federal government.

## Widespread Allegations of Abuse and Death at Residential Treatment Programs

We found thousands of allegations of abuse, some of which involved death, at public and private residential treatment programs across the country between the years 1990 and 2007. We are unable to identify a more concrete number of allegations because we could not locate a single Web site, federal agency, or other entity that collects comprehensive nationwide data related to this issue. Although the NCANDS database, operated by the Department of Health and Human Services, collects some data from states, data submission is voluntary and not all states with residential treatment programs contribute information. According to the most recent NCANDS data, during 2005 alone 33 states reported 1,619 staff members involved in incidents of abuse in residential programs. Because of limited data collection and reporting, we could not determine the numbers of incidents of abuse and death associated with private programs.

It is important to emphasize that allegations should not be confused with proof of actual abuse. However, in terms of meeting our objective, the thousands of allegations we found came from a number of sources besides NCANDS. For example:

- We identified claims of abuse and death in pending and closed civil or criminal proceedings with dozens of plaintiffs alleging abuse. For instance, according to one pending civil lawsuit filed as recently as July 2007, dozens of parents allege that their children were subjected to over 30 separate types of abuse.

- We found attorneys around the country who represent youth and groups of youth who allege that abuse took place while these youth were enrolled in residential treatment programs. For example, an attorney based in New Jersey with whom we spoke has counseled dozens of youth who alleged they were abused in residential treatment programs in past cases, as has another attorney, a retired prosecutor, who advocates for abuse victims.

- We found that allegations are posted on various Web sites advocating for the shutdown of certain programs. Past participants in wilderness programs and other youth residential treatment programs have individually or collectively set up sites claiming abuse and death. The Internet contains an unknown number of such Web sites. One site on the Internet, for example, identifies over 100 youth who it claims died in various programs. In other instances, parents of victims who have died or were abused in these programs have similarly set up an unknown number of Web sites. Conversely, there are also an unknown number of sites that promote and advocate the benefits of various programs.

Because there are no specific reporting requirements or definitions for private programs in particular, we could not determine what percentage of the thousands of allegations we found are related to such programs. There is likely a small percentage of overlapping allegations given our inability to reconcile information from the sources we used.

## Cases of Death at Selected Residential Treatment Programs

We selected 10 closed cases from private programs to examine in greater detail. Specifically, these cases were focused on the death of a teenager in a private residential treatment program that occurred between 1990 and 2004. We found significant evidence of ineffective management in most of these 10 cases, with many examples of how program leaders neglected the needs of program participants and staff. In some cases, program leaders gave their staff bad advice when they were alerted to the health problems of a teen. In other cases, program leaders appeared to be so concerned with boosting enrollment that they told parents their programs could provide services that they were not qualified to offer and could not provide. Several cases reveal program leaders who claimed to have credentials in therapy or medicine that they did not have, leading parents to trust them with teens who had serious mental or physical disabilities requiring proper treatment. These ineffective management techniques compounded the negative consequences of (and sometimes directly

resulted in) the hiring of untrained staff; a lack of adequate nourishment; and reckless or negligent operating practices, including a lack of adequate equipment. These specific factors played a significant role in most of the deaths we examined.

- **Untrained staff.** A common theme of many of the cases we examined is that staff misinterpreted legitimate medical emergencies. Rather than recognizing the signs of dehydration, heat stroke, or illness, staff assumed that a dying teen was in fact attempting to use trickery to get out of the program. This resulted in the death of teenagers from common, treatable illnesses. In some cases, teens who fell ill from less-common ailments exhibited their symptoms for many days, dying slowly while untrained staff continued to believe the teen was "faking it." Unfortunately, in almost all of our cases, staff only realized that a teen was in distress when it was already too late.

- **Lack of adequate nourishment.** In many cases, program philosophy (e.g., "tough love") was taken to such an extreme that teenagers were undernourished. One program fed teenagers an apple for breakfast, a carrot for lunch, and a bowl of beans for dinner while requiring extensive physical activity in harsh conditions. Another program forced teenagers to fast for 2 days. Teenagers were also given equal rations of food regardless of their height, weight, or other dietary needs. In this program, an ill teenager lost 20 percent of his body weight over the course of about a month.  Unbeknownst to staff, the teenager was simultaneously suffering from a perforated ulcer.

- **Reckless or negligent operating practices.** In at least two cases, program staff set out to lead hikes in unfamiliar territory that they had not scouted in advance. Important items such as radios and first aid kits were left behind. In another case, program operators did not take into account the need for an adjustment period between a teenager's comfortable home life and the wilderness; this endangered the safety of one teenager, who suddenly found herself in an unfamiliar environment. State licensing initiatives attempt, in part, to minimize the risk that some programs may endanger teenagers through reckless and negligent practices; however, not all programs we examined were covered by operating licenses. Furthermore, some licensed programs deviated from the terms of their licenses, leading states, after the death of a teen, to take action against programs that had flouted health and safety guidelines.

See table 1 for a summary of the cases we examined.

**Table 1: Summary of Victim Information**

| Case | Victim information | Program attended | Date of death | Cause of death | Case details |
|------|-------------------|------------------|---------------|----------------|--------------|
| 1 | Female, 15, California resident | Utah wilderness therapy program (death occurred in Arizona) | May 1990 | Dehydration | • Died while hiking on fifth day of program<br>• Exhibited signs of illness for 2 days, such as throwing up water, falling down, and complaining of blurred vision<br>• Collapsed due to dehydration<br>• Lay dead for 18 hours on dirt road<br>• Program brochure given to parents had advertised program staff as "highly trained survival experts"<br>• Died on federal land |
| 2 | Female, 16, Florida resident | Utah wilderness therapy program | June 1990 | Heat stroke | • Died while hiking on third day of program<br>• Program had not considered child's adjustment from a coastal, sea-level residence to a high desert wilderness area<br>• Died of "exertional heatstroke" while hiking<br>• Program owner acquitted of criminal charges but placed on state list of suspected child abusers |
| 3 | Male, 16, Arizona resident | Utah wilderness therapy program | March 1994 | Acute infection resulting from perforated ulcer | • Exhibited signs of physical distress for nearly 3 weeks, such as severe abdominal pain, significant weight loss (20 percent of body weight), loss of bodily functions, and weakness<br>• Collapsed and became unresponsive<br>• Air lifted to hospital and pronounced dead on arrival<br>• Died on federal land |
| 4 | Male, 15, Oregon resident | Oregon wilderness therapy program | Sept. 2000 | Severed artery | • Refused to return to campsite but did not behave violently<br>• Restrained by staff and held face down to the ground for almost 45 minutes<br>• Died of severed artery in neck<br>• Death ruled a homicide<br>• Grand jury declined to issue an indictment<br>• Died on federal land |
| 5 | Male, 14, Massachusetts resident | West Virginia residential school and wilderness therapy program | Feb. 2001 | Suicide (hanging) | • Attempted suicide twice before enrolling in program<br>• On the fifth day of program cut arm several times with camp-issued pocket knife<br>• Staff did not take the knife away<br>• Hung himself near his tent the next day<br>• Program had no suicide prevention plan |

| Case | Victim information | Program attended | Date of death | Cause of death | Case details |
|------|-------------------|------------------|---------------|----------------|--------------|
| 6 | Male, 14, Arizona resident | Arizona boot camp | July 2001 | Dehydration | • On seventh day was punished for asking to go home<br>• Forced to sit in 113-degree desert heat<br>• Was delirious and dehydrated<br>• Taken to motel room, placed in shower tub, left unattended<br>• Staff returned victim to camp in the flatbed of a pickup truck and placed his limp body onto his sleeping bag<br>• Staff later found him unresponsive and he died at the hospital |
| 7 | Female, 16, Virginia resident | Utah wilderness therapy program | Jan. 2002 | Massive head trauma | • Fell while hiking on Christmas Day<br>• Staff had not scouted extremely dangerous area beforehand<br>• Staff had no medical equipment, against its licensing agreement<br>• Took about one hour for first paramedics to arrive<br>• Died on federal land |
| 8 | Female, 15, California resident | Oregon wilderness therapy program (also operated in Nevada at time of death) | May 2002 | Dehydration/ heat stroke | • Died while hiking on first day of program<br>• Told others she had taken methamphetamines before the hike, but was not screened for drug before hike<br>• Experienced signs of distress for several hours while hiking<br>• Collapsed and stopped breathing<br>• Died of heat stroke complicated by the methamphetamines and prescription medication<br>• Died on federal land |
| 9 | Male, 14, Texas resident | Utah wilderness therapy program | July 2002 | Hyperthermia (excessive body temperature) | • On a 3-mile hike in desert heat<br>• Complained of thirst and refused to continue hike<br>• Left in the sun for an hour and stopped breathing<br>• Staff member hid behind a tree for 10 minutes thinking the victim was "faking" illness<br>• Help arrived over an hour after death<br>• Died on federal land |

| Case | Victim information | Program attended | Date of death | Cause of death | Case details |
|------|-------------------|------------------|---------------|----------------|--------------|
| 10 | Male, 15, California resident | Missouri boot camp and boarding school | Nov. 2004 | Complications of rhabdomyolysis due to a probable spider bite | • Displayed signs of distress for several days<br>• Program's medical officer told staff victim was "faking it"<br>• Became lifeless and could hardly move<br>• Punished for being too weak to exercise and forced to wear a 20-pound sandbag around his neck<br>• Autopsy reported death was caused by complications of rhabdomyolysis due to a probable spider bite, but also found numerous bruises all over the victim's body |

Source: Records including police reports, legal documents, and state investigative documents.

## Case One

The victim was a 15-year-old female. Her parents told us that she was a date-rape victim who suffered from depression, and that in 1990 she enrolled in a 9-week wilderness program in Utah to build confidence and improve her self-esteem. The victim and her parents found out about the program through a friend who claimed to know the owner. The parents of the victim spoke with the owner of the program several times and reviewed brochures from the owner. The brochure stated that the program's counselors were "highly trained survival experts" and that "the professional experience and expertise" of its staff was "unparalleled." The fees and tuition for the program cost a little over $20,600 (or about $327 per day). The victim and her parents ultimately decided that this program would meet their needs and pursued enrollment.

The victim's parents said they trusted the brochures, the program owner, and the program staff. However, the parents were not informed that the program was completely new and that their daughter would be going on the program's first wilderness trek. Program staff were not familiar with the area, relied upon maps and a compass to navigate the difficult terrain, and became lost. As a result, they crossed into the state of Arizona and wandered onto Bureau of Land Management (BLM) land. According to a lawsuit filed by her parents, the victim complained of general nausea, was not eating, and began vomiting water on about the third day of the 5-day hike. Staff ignored her complaints and thought she was "faking it" to get out of the program. Police documents indicate that the two staff members leading the hike stated that they did not realize the victim was slowly dehydrating, despite the fact that she was vomiting water and had not eaten any food.

GAO-08-146T

On the fifth day of the hike, the victim fell several times and was described by the other hikers as being "in distress." It does not appear that staff took any action to help her. At about 5:45 p.m. on the fifth day, the victim collapsed in the road and stopped breathing. According to police records, staff did not call for help because they were not equipped with radios—instead, they performed CPR and attempted to signal for help using a signal fire. CPR did not revive the victim; she died by the side of the road and her body was covered with a tarp. The following afternoon, a BLM helicopter airlifted her body to a nearby city for autopsy. The death certificate for the victim states that she died of dehydration due to exposure. Although local police investigated the death, no charges were filed. Utah officials wanted to pursue the case, but they did not have grounds to do so because the victim died in Arizona. The parents of the victim filed a civil suit and settled out of court for an undisclosed sum.

Soon after the victim's death and 6 months after opening, the founder closed the program and moved to Nevada, where she operated in that state until her program was ordered to close by authorities there. In a hearing granting a preliminary judgment that enjoined the operator of the program, the judge said that he would not shelter this program, which was in effect hiding from the controls of the adjoining state. He chastised the program owner for running a money-making operation while trying to escape the oversight of the state, writing, "[The owner] wishes to conduct a wilderness survival program for children for profit, without state regulation" and she "hide[s] the children from the investigating state authorities and appear[s] uncooperative towards them." He expressed further concerns, including a statement that participants in the program did not appear to be receiving "adequate care and protection" and that qualified and competent counselors were not in charge of the program. The judge also noted that one of the adult counselors was "an ex-felon and a fugitive." After this program closed, the program founder returned to Utah and joined yet another program where another death occurred 5 years later (this death is detailed in case seven). We found that the founder of this residential treatment program had a history in the industry—prior to opening the program discussed in this case, she worked as an administrator in the program covered in another case (case two). Today, the program founder is still working in the industry as a consultant, providing advice to parents who may not know of her history.

| Case Two | The victim was a 16-year-old female who had just celebrated her birthday. According to her mother, in 1990 the victim was enrolled in a 9-week wilderness therapy program because she suffered from depression and |

struggled with drug abuse. The victim's mother obtained brochures from
the program owner and discussed the program with him and other
program staff. According to the mother, the program owner answered all
her questions and "really sold the program." She told us:

> "I understood there would be highly trained
> and qualified people with [my daughter] who
> could handle any emergency… they boasted
> of a 13-year flawless safety record, [and] I
> thought to myself 'why should I worry? Why
> would anything happen to her?'"

Believing that the program would help her daughter, the victim's mother
and stepfather secured a personal loan to pay the $25,600 in tuition for the
program (or about $400 per day). She also paid about $4,415 to have a
transport service come to the family home and take her daughter to the
program. The victim's mother and stepfather hired the service because
they were afraid their daughter would run away when told that she was
being enrolled in the program. According to the victim's mother, two
people came to the family home at 4 a.m. to take her daughter to the
program's location in the Utah desert, where a group hike was already
under way.

Three days into the program, the victim collapsed and died while hiking.
According to the program brochure, the first 5 days of the program are
"days and nights of physical and mental stress with forced march, night
hikes, and limited food and water. Youth are stripped mentally and
physically of material facades and all manipulatory tools." After the victim
collapsed, one of the counselors on the hike administered CPR until an
emergency helicopter and nurse arrived to take the victim to a hospital,
where she was pronounced dead. According to the victim's mother, her
daughter died of "exertional heatstroke." The program had not made any
accommodation or allowed for the fact that her
daughter had traveled from a coastal, sea-level residence in Florida to the
high desert wilderness of Utah. The mother of the victim also said that
program staff did not have salt tablets or other supplies that are commonly
used to offset the affects of heat.

Shortly after the victim died, the 9-week wilderness program closed. A
state hearing brought to light complaints of child abuse in the program and
the owner of the program was charged with negligent homicide. He was
acquitted of criminal charges. However, the state child protective services
agency concluded that child abuse had occurred and placed the owner on

Utah's registry of child abusers, preventing him from working in the state at a licensed child treatment facility. Two other program staff agreed to cooperate with the prosecution to avoid standing trial; these staff were given probation and prohibited from being involved with similar programs for up to 5 years. In 1994, the divorced parents of the victim split a $260,000 settlement resulting from a civil suit against the owner.

After this program closed, its owner opened and operated a number of domestic and foreign residential treatment programs over the next several years. Although he was listed on the Utah registry of suspected child abusers, the program owner opened and operated these programs elsewhere—many of which were ultimately shut down by state officials and foreign governments because of alleged and proven child abuse. At least one of these programs is still operating abroad and is marketed on the Internet, along with 10 other programs considered to be part of the same network. As discussed above, the program owner in our first case originally worked in this program as an administrator before it closed.

## Case Three

The victim was a 16-year-old male. According to his parents, in 1994 they enrolled him in a 9-week wilderness therapy program in Utah because of minor drug use, academic underachievement, and association with a new peer group that was having a negative impact on him. The parents learned of the program from an acquaintance and got a program brochure that "looked great" in their opinion. They thought the program was well-suited for their son because it was an outdoor program focusing on small groups of youth who were about the same age. They spoke with the program owner and his wife, who flew to Phoenix, Arizona, to talk with them. To be able to afford the program's cost of about $18,500 (or $263 per day), the victim's parents told us they took out a second mortgage on their house. They also paid nearly $2,000 to have their son transported to the campsite in the program owner's private plane. At the time they enrolled their son, the parents were unaware that this program was started by two former employees of a program where a teenager had died (this program is discussed in our second case).

According to the victim's father, his son became sick around the 11th day of the program. According to court and other documents, the victim began exhibiting signs of physical distress and suffered from severe abdominal pain, weakness, weight loss, and loss of bodily functions. Although the victim collapsed several times during daily hikes, accounts we reviewed indicate that staff ignored the victim's pleas for help. He was forced to continue on for 20 days in this condition. After his final collapse 31 days

into the program, staff could not detect any respiration or pulse. Only at this time did staff radio program headquarters and request help, although they were expected to report any illnesses or disciplinary incidents and had signed an agreement when employed stating that they were responsible for "the safety and welfare of fellow staff members and students." The victim was airlifted to a nearby hospital and was pronounced dead upon arrival. The 5-foot 10-inch victim, already a thin boy, had dropped from 131 to 108 pounds—a loss of nearly 20 percent of his body weight during his month-long enrollment.[4]

The victim's father told us that when he was notified of his son's death, he could only think that "some terrible accident" had occurred. But according to the autopsy report, the victim died of acute peritonitis—an infection related to a perforated ulcer. This condition would have been treatable provided there had been early medical attention. The father told us that the mortician, against his usual policy, showed him the condition of his son's body because it was "something that needed to be investigated." The victim's father told us he "buckled at the knees" when he saw the body of his son—emaciated and covered with cuts, bruises, abrasions, blisters, and a full-body rash; what he saw was unrecognizable as his son except for a childhood scar above the eye.

In the wake of the death, the state revoked the program's operating license. According to the state's licensing director, the program closed 3 months later because the attorney general's office had initiated an investigation into child abuse in the program, although no abuse was found after examining the 30 to 40 youth who were also enrolled in the program when the victim died. The state attorney general's office and a local county prosecutor filed criminal charges against the program owners and several staff members. After a change of venue, one defendant went to trial and was convicted of "abuse or neglect of a disabled child" in this case. Five other defendants pleaded guilty to a number of other charges—five guilty pleas on negligent homicide and two on failure to comply with a license. The defendants in the case were sentenced to probation and community service. The parents of the victim subsequently filed a civil suit that was settled out of court for an undisclosed amount.

---

[4]The program consisted of four phases. At the start of the second phase, students were required to fast for 2 days. During this phase, students slept under tarpaulins and, at the end of their fast, they were each given a supply of food and told that they were responsible for cooking and rationing it themselves. This food supply was the same for all participants and was supposed to last each of them for a week.

**Case Four**

The victim was a 15-year-old male. According to the victim's mother, in 2000 she enrolled her son in a wilderness program in Oregon to build his confidence and develop self-esteem in the wake of a childhood car accident. The accident had resulted in her son sustaining a severe head injury, among other injuries. After an extensive Internet search and discussions with representatives of various wilderness programs and camps for head-injury victims, the mother told us she selected a program that she believed would meet her son's needs. What "sold me on the program," she said, was the program owner's repeated assurances over the telephone that the program was "a perfect fit" for her son. She told us that to pay for the $27,500 program, she withdrew money from her retirement account. The program was between 60 to 90 days (about $305 to $450 per day) depending on a youth's progression through the program.

The victim's mother said that she became suspicious about the program when she dropped her son off. She said that the program director and another staff person disregarded her statements about her son's "likes and dislikes," despite believing that the program would take into account the personal needs of her son. Later, she filed a lawsuit alleging that the staff had no experience dealing with brain-injured children and others with certain handicaps who were in the program. What she also did not know was that the founder of the program was himself a former employee of two other wilderness programs in another state where deaths had occurred (we discuss these programs in cases two and three). The program founder also employed staff who had been charged with child abuse while employed at other wilderness programs.

According to her lawsuit, her son left the program headquarters on a group hike with three counselors and three other students. Several days into the multiday hike, while camping under permit on BLM land, the victim refused to return to the campsite after being escorted by a counselor about 200 yards to relieve himself. Two counselors then attempted to lead him back to the campsite. According to an account of the incident, when he continued to refuse, they tried to force him to return and they all fell to the ground together. The two counselors subsequently held the victim face down in the dirt until he stopped struggling; by one account a counselor sat on the victim for almost 45 minutes. When the counselors realized the victim was no longer breathing, they telephoned for help and requested a 9-1-1 operator's advice on administering CPR. The victim's mother told us that she found out about the situation when program staff called to tell her that her son was being airlifted to a medical center. Shortly afterwards, a nurse called and urged her to come to the hospital with her husband. They were not able to make it in time—on the drive to the hospital, her son's

doctor called, advised her to pull to the side of the road, and informed her that her son had died. The victim's mother told us that she was informed, after the autopsy, that the main artery in her son's neck had been torn. The cause of death was listed as a homicide.

In September 2000, after the boy's death, one of the counselors was charged with criminally negligent homicide. A grand jury subsequently declined to indict him. The victim's mother told us that at the grand jury hearing, she found out from parents of other youth in the program that they had been charged different amounts of money for the same program, and that program officials had told them what they wanted to hear about the program's ability to meet each of their children's special needs. In early 2001, the mother of the victim filed a $1.5 million wrongful death lawsuit against the program, its parent company, and its president. The lawsuit was settled in 2002 for an undisclosed amount.

Due in part to the victim's death, in early 2002, Oregon implemented its outdoor licensing requirements. The state's Department of Justice subsequently filed a complaint alleging numerous violations of the state's Unlawful Trade Practices Act and civil racketeering laws, including charges that the program misrepresented its safety procedures and criminally mistreated enrolled youth. In an incident unconnected to this case, the program was also charged with child abuse related to frostbite. As a result of these complaints, in February of 2002, the program entered into agreement with the state's attorney general to modify program operations and pay a $5,000 fee. The program continued to work with the State of Oregon throughout 2002 to comply with the agreement. In the summer of 2002, BLM revoked the camping permit for the program due, in part, to the victim's death. The program closed in December of 2002.

**Case Five**

The victim was a 14-year-old male. According to his father, in 2001 the victim was enrolled in a private West Virginia residential treatment center and boarding school. He told us that his son had been diagnosed with clinical depression, had attempted suicide twice, was on medication, and was being treated by a psychiatrist. Because their son was having difficulties in his school, the parents—in consultation with their son's psychiatrist—decided their son would benefit by attending a school that was more sensitive to his son's problems. To identify a suitable school, the family hired an education consultant who said he was a member of an educational consultants' association and that he specialized in matching troubled teens with appropriate treatment programs. The parents discussed their son's personality, medical history (including his previous

suicide attempts), and treatment needs with the consultant. According to the father, the consultant "quickly" recommended the West Virginia school. The program was licensed by the state and cost almost $23,000 (or about $255 per day).

According to the parents and court documents, the victim committed suicide 6 days into the program. On the day before he killed himself, while participating in the first phase of the program ("survival training"), the victim deliberately cut his left arm four times from wrist to elbow using a pocket knife issued to him by the school. After cutting himself, the victim approached a counselor and showed him what he had done, pleading with the counselor to take the knife away before he hurt himself again.[5] He also asked the counselor to call his mother and tell her that he wanted to go home. The counselor spoke with the victim, elicited a promise from him not to hurt himself again, and gave the knife back. The next evening the victim hung himself with a cord not far from his tent. Four hours passed before the program chose to notify the family about the suicide. When the owner of the program finally called the family to notify them, according to the father, the owner said, "There was nothing we could do."

In the aftermath of the suicide, the family learned that the program did not have any procedures for addressing suicidal behavior even though it had marketed itself as being able to provide appropriate therapy to its students. Moreover, one of the program owners, whom the father considered the head therapist, did not have any formal training to provide therapy. The family also learned that the owner and another counselor had visited their son's campsite, as previously scheduled, the day he died. During this visit, field staff told them about the self-inflicted injury and statements the victim had made the night before. According to the father, the owner then advised field staff that the victim was being manipulative in an attempt to be sent home, and that the staff should ignore him to discourage further manipulative behavior.

The owners and the program were indicted by a grand jury on criminal charges of child neglect resulting in death. According to the transcript, the judge who was assigned to the case pushed the parties not to choose a

---

[5]Cutting is a common practice of superficially cutting oneself to draw attention and is often associated with adolescent mental health and behavioral issues. It is not considered an attempt to commit suicide, based on information in the American Psychiatric Association's 2003 Practice Guidelines for the Assessment and Treatment of Patients with Suicidal Behaviors.

bench trial to avoid a lengthy and complicated trial. The program owner pleaded no contest to the charge of child neglect resulting in death with a fine of $5,000 in exchange for dismissal of charges. The state conducted an investigation into the circumstances and initially planned to close the program. However, the program owners negotiated an agreement with the state not to shut down the program in exchange for a change of ownership and management. According to the victim's father, the family of the victim subsequently filed a civil suit and a settlement was reached for $1.2 million, which included the owners admitting and accepting personal responsibility for the suicide.

This program remains open and operating. Within the last 18 months, a group of investors purchased the program and are planning to open and operate other programs around the country, according to the program administrators with whom we spoke. As part of our work we also learned that the program has a U.S. Forest Service permit however, because it has not filed all required usage reports nor paid required permit fees in almost 8 years, it is in violation of the terms of the permit. We estimate that the program owes the U.S. Forest Service tens of thousands of dollars, although we could not calculate the actual debt.

**Case Six**

The victim was a 14-year-old male. According to police documents, the victim's mother enrolled him in a military-style Arizona boot camp in 2001 to address behavioral problems. The mother told us that she "thought it would be a good idea." In addition, she told us that her son suffered from some hearing loss, a learning disability, Attention Deficit Hyperactivity Disorder (ADHD), and depression. To address these issues her son was taking medication and attending therapy sessions. According to the mother, her son's therapist had recommended the program, which he described as a "tough love" program and "what [her son] needed." The mother said she trusted the recommendation of her son's therapist; in addition, she spoke with other parents who had children in the program, who also recommended the program to her. She initially enrolled her son in a daytime Saturday program in the spring of 2001 so he could continue attending regular school during the week. Because her son continued to have behavioral problems, she then enrolled him in the program's 5-week summer camp, which she said cost between $4,600 and $5,700 (between $131 and $162 per day). Her understanding was that strenuous program activities took place in the evening and that during the day youth would be in the shade.

Police documents indicate about 50 youth between the ages of 6 and 17 were enrolled in the summer program. According to police, youth were forced to wear black clothing and to sleep in sleeping bags placed on concrete pads that had been standing in direct sunlight during the day. Both black clothing and concrete absorb heat. Moreover, according to documents subsequently filed by the prosecutor, youth were fed an insufficient diet of a single apple for breakfast, a single carrot for lunch, and a bowl of beans for dinner. On the day the victim died, the temperature was approximately 113 degrees Fahrenheit, according to the investigating detective. His report stated that on that day, the program owner asked whether any youth wanted to leave the program; he then segregated those who wanted to leave the program, which included the victim, and forced them to sit in the midday sun for "several hours" while the other participants were allowed to sit in the shade. Witnesses said that while sitting in the sun, the victim began "eating dirt because he was hungry." Witnesses also stated that the victim "had become delirious and dehydrated... saw water everywhere, and had to 'chase the Indians.'" Later on the victim appeared to have a convulsive seizure, but the camp staff present "felt he was faking," according to the detective's report. One staff member reported that the victim had a pulse rate of 180, more than double what is considered a reasonable resting heart rate for a teenager.[6] The program owner then directed two staff and three youth enrolled in the program to take the victim to the owner's room at a nearby motel to "cool him down and clean up." They placed the victim in the flatbed of a staff member's pickup truck and drove to the motel.

Over the next several hours, the following series of events occurred.

- In the owner's hotel room, the limp victim was stripped and placed into the shower with the water running. The investigating detective told us that the victim was left alone for 15 to 20 minutes for his "privacy." During this time, one of the two staff members telephoned the program owner about the victim's serious condition; the owner is said to have told the staff person that "everything will be okay." However, when staff members returned to the bathroom they saw the victim facedown in the water. The victim had defecated and vomited on himself.

- After cleaning up the victim, a staff member removed him from the shower and placed him on the hotel room floor. Another staff member

---

[6]This is according to information from the U.S. National Library of Medicine, National Institutes of Health.

began pressing the victim's stomach with his hands, at which point, according to the staff member's personal account, mud began oozing out of the victim's mouth. The staff member then used one of his feet to press even harder on the victim's stomach, which resulted in the victim vomiting even more mud and a rock about the size of quarter. At this point, a staff member again called the owner to say the boy was not responding; the owner instructed them to take the victim back to the camp. They placed the victim in the flatbed of the pickup truck for the drive back.

- Staff placed the victim on his sleeping bag upon returning to camp. He was reportedly breathing at this time, but then stopped breathing and was again put in the back of the pickup truck to take him for help. However, one staff member expressed his concern that the boy would die unless they called 9-1-1 immediately. The county sheriff's office reported receiving a telephone call at approximately 9:43 p.m. that evening saying a camp participant "had been eating dirt all day, had refused water, and was now in an unconscious state and not breathing." This is the first recorded instance in which the program owner or staff sought medical attention for the victim. Instructions on how to perform CPR were given and emergency help was dispatched.

The victim was pronounced dead after being airlifted to a local medical center. The medical examiner who conducted the autopsy expressed concern that the victim had not been adequately hydrated and had not received enough food while at the camp. His preliminary ruling on the cause of death was that "of near drowning brought on by dehydration." After a criminal investigation was conducted, the court ultimately concluded that there was "clear and convincing evidence" that program staff were not trained to handle medical emergencies related to dehydration and lack of nutrition. The founder (and chief executive officer) of the program was convicted in 2005 of felony reckless manslaughter and felony aggravated assault and sentenced to 6-year and 5-year terms, respectively. He was also ordered to pay over $7,000 in restitution to the family. In addition, program staff were convicted of various charges, including trespassing, child abuse, and negligent homicide but were put on probation. According to the detective, no staff member at the camp was trained to administer medication or basic medical treatment, including first aid. The mother filed a civil suit that was settled for an undisclosed amount of money. The program closed in 2001.

**Case Seven**

The victim was a 16-year-old female. Because of defiant, violent behavior, her parents enrolled her in a Utah wilderness and boarding school

program in 2001, which was a state-licensed program for youth 13 to 18 years old. The 5 month program cost around $29,000 (or about $193 per day) and operated on both private and federal land. The parents also hired a transport service at a cost of over $3,000 to take their daughter to the program. We found that the director and another executive of this wilderness program had both worked at the same program discussed in our second case and the executive owned the program discussed in our first case.

According to program documents and the statements of staff members, a group hiking in this program would normally require three staff—one in front leading the hike, one in the middle of the group, and one at the end of the group. However, this standard structure had been relaxed on the day the victim fell. It was Christmas Day, and only one staff member accompanied four youth. While hiking in a steep and dangerous area that staff had not previously scouted out, the victim ran ahead of the group with two others, slipped on a steep rock face, and fell more than 50 feet into a crevasse according to statements of the other two youth—one of whom ran back to inform the program staff of the accident. The staff radioed the base camp to report the accident, then called 9-1-1. One of the staff members at the accident scene was an emergency medical technician (EMT) and administered first aid. However, in violation of the program licensing agreement, the first aid kit they were required to have with them had been left at the base camp. An ambulance arrived about 1 hour after the victim fell. First responders decided to have the victim airlifted to a medical center, but the helicopter did not arrive until about 1-1/2 hours after they made the decision to call for an airlift.

According to the coroner's report, the victim died about 3 weeks later in a hospital without ever regaining consciousness. She had suffered massive head trauma, a broken arm, broken teeth, and a collapsed lung. As a result of the death, the state planned to revoke the program's outdoor youth program license based on multiple violations. In addition to an inappropriate staff-to-child ratio (four youth for one staff member, rather than three to one), failure to prescreen the hiking area, and hiking without a first aid kit, the state identified the following additional license violations:

- Program management did not have an emergency or accident plan in place.

- Two of the four staff members who escorted the nine youth in the wilderness had little experience—one had 1 month of program

experience and the other had 9 days. Neither of them had completed the required staff training.

- The two most senior staff members on the trip had less than 6 months of wilderness experience—but they remained at the camp while other two inexperienced staff members led the hike.

A lawsuit filed by the family in November 2002 claims that the program did not take reasonable measures to keep the youth in the program safe, especially given the "hiking inexperience" of the youth and the "insufficient number of staff." Specifically, the suit claims that the program's executive director waited for an hour before calling assistance after the victim fell. Additionally, the suit claims that staff only had one radio and no medical equipment or emergency plan. The parents filed an initial lawsuit for $6 million but eventually settled in 2003 for $200,000 before attorneys' fees and health insurance reimbursement were taken out.

The program closed in May 2002 due to fiscal insolvency. However, its parent program—a boarding school licensed by the state—is still in operation. We have not been able to determine whether the wilderness director at the time of the victim's death is still in the industry. However, the other program executive remains in the industry, working as a referral agent for parents seeking assistance in identifying programs for troubled youth.

## Case Eight

The victim, who died in 2002, was a 15-year-old female. The parents of the victim told us that she suffered from depression, suicidal thoughts, and bipolar disorder. She also reportedly had a history of drug use, including methamphetamines, marijuana, and cocaine. Her parents explained that they selected a program after researching several programs and consulting with an educational advisor. Although the program was based in Oregon, it operated a 3-week wilderness program in Nevada, which was closer to the family home. The total cost of the program was over $9,200 (or about $438 per day), which included a nonrefundable deposit and over $300 for equipment.

The parents of the victim drove their daughter several hundred miles to enroll her in the program. Because of the distance involved, they stayed overnight in a motel nearby. The next day, when the parents arrived home, they found a phone message waiting for them—it was from the program, saying that their daughter had been in an accident and that she was

receiving CPR. According to documents we reviewed, three staff members led seven students on a hike on the first day of the program. The victim fell several times while hiking. The last time she fell, she lost muscle control and had difficulty breathing. The EMT on the expedition had recently completed classroom certification and had no practical field experience. While the staff called for help, the EMT and other staff began CPR and administered epinephrine doses to keep her heart beating during the 3 hours it took a rescue helicopter to arrive. The victim was airlifted to a nearby hospital where she was pronounced dead.

The victim's death was ruled an accident by the coroner—heat stroke complicated by drug-induced dehydration. According to other youth on the hike, they were aware the victim had taken methamphetamines prior to the hike. The victim had had a drug screening done 1 week before entering the program; she tested positive for methamphetamine, which the program director knew but the staff did not. However, the program did not make a determination whether detoxification was necessary, which was required by the state where the program was operating (Nevada), according to a court document. The victim was also taking prescribed psychotropic medications, which affected her body's ability to regulate heat and remain hydrated.

At the time the victim died, this private wilderness treatment program had been in operation for about 15 years in Oregon. Although it claimed to be accredited by the Joint Commission on Heath Care Organizations, this accreditation covered only the base program—not the wilderness program or its drug and alcohol component in which the victim participated.[7] Moreover, even though the wilderness program attended by the victim had been running for 2 years, it was not licensed to operate in Nevada. The district attorney's office declined to file criminal child abuse and neglect charges against two program counselors, although those charges had been recommended by investigating officers. The parents of the victim were never told why criminal charges were never filed. They subsequently filed a civil lawsuit and settled against the program for an undisclosed sum. Two other deaths occurred in this program shortly after the first—one

---

[7]According to its Web site, the Joint Commission on Health Care Organizations evaluates and accredits nearly 15,000 health care organizations and programs in the United States. It maintains state-of-the-art standards that focus on improving the quality and safety of care provided by health care organizations. Its comprehensive accreditation process evaluates an organization's compliance with these standards and other accreditation requirements.

GAO-08-146T

resulted from a previously unknown heart defect and the other from a fallen tree.

Although the wilderness program had a federal permit to operate in Nevada, it was not licensed by that state. After the death, that state investigated and ordered the program closed. The parent company had (and continues to maintain) state licenses in Oregon to operate as a drug and alcohol youth treatment center, an outpatient mental health facility, and an outdoor youth facility, as well as federal land permits from BLM and the U.S. Forest Service. According to program officials, the program has modified its procedures and policies—it no longer enrolls youth taking the medication that affected the victim's ability to regulate her body temperature.

**Case Nine**

The victim was a 14-year-old male who died in July 2002. According to documents we reviewed, the mother of the victim placed her son in this Utah wilderness program to correct behavioral problems. The victim kept a journal with him during his stay at the program. It stated that he had ADHD and bipolar disorder. His enrollment form indicates that he also had impulse control disorder and that he was taking three prescription medications. His physical examination, performed about 1 month before he entered the program, confirms that he was taking these medications. We could not determine how much the program cost at the time.

According to documents we reviewed, the victim had been in the program for about 8 days when, on a morning hike on BLM land, he began to show signs of hyperthermia (excessively high body temperature). He sat down, breathing heavily and moaning. Two staff members, including one who was an EMT, initially attended to him, but they could not determine if he was truly ill or simply "faking" a problem to get out of hiking. When the victim became unresponsive and appeared to be unconscious, the staff radioed the program director to consult with him. The director advised the staff to move the victim into the shade. The director also suggested checking to see whether the victim was feigning unconsciousness by raising his hand and letting go to see whether it dropped onto his face. They followed the director's instructions. Apparently, because the victim's hand fell to his side rather than his face, the staff member who was an EMT concluded that the victim was only pretending to be ill. While the EMT left to check on other youth in the program, a staff member reportedly hid behind a tree to see whether the victim would get up—reasoning that if the victim were faking sickness, he would get up if he thought nobody was watching. As the victim lay dying, the staff member

hid behind the tree for 10 minutes. He failed to see the victim move after this amount of time, so he returned to where the victim lay. He could not find a pulse on the victim. Finally realizing that he was dealing with a medical emergency, the staff member summoned the EMT and they began CPR. The program manager was contacted, and he called for emergency help. Due to difficult terrain and confusion about the exact location of the victim, it took over an hour for the first response team to reach the victim. An attempt to airlift the victim was canceled because a rescue team determined that the victim was already dead.

According to the coroner's report, the victim died of hyperthermia. State Department of Human Services officials initially found no indication that the program had violated its licensing requirements, and the medical examiner could not find any signs of abuse. Subsequently, the Department of Human Services ruled that there were, in fact, licensing violations, and the state charged the program manager and the program owner with child abuse homicide (a second degree felony charge). The program manager was found not guilty of the charges; additionally, it was found that he did not violate the program's license regarding water, nutrition, health care, and other state licensing requirements. Moreover, the court concluded that the State did not prove that the program owner engaged in reckless behavior. Later that year, however, an administrative law judge affirmed the Department of Human Services' decision to revoke the program's license after the judge found that there was evidence of violations. The owner complied with the judge and closed the program in late 2003. About 16 months later, the owner applied for and received a new license to start a new program. According to the Utah director of licensing, as of September 2007, there have been "no problems" with the new program. We could not find conclusive information as to whether the parents of the victim filed a civil case and, if so, what the outcome was.

| Case Ten | The victim was a 15-year-old male. According to investigative reports compiled after his death, the victim's grades dropped during the 2003–2004 school year and he was withdrawing from his parents. His parents threatened to send him to a boarding or juvenile detention facility if he did not improve during summer school in 2004. The victim ran away from home several times that summer, leading his frustrated parents to enroll him in a boot camp program. When they told him about the enrollment, he ran away again—the day before he was taken to the program in a remote area of Missouri. The 5-month program describes itself as a boot camp and boarding school. Because it is a private facility, the state in which it is |

located does not require a license. According to Internet documents, the program costs almost $23,000 (or about $164 per day).

Investigative documents we reviewed indicate that at the time the parents enrolled the teenager, he did not have any issues in his medical history. Staff logs indicate that the victim was considered to be a continuous problem from the time he entered the program—he did not adhere to program rules and was otherwise noncompliant. By the second day of the boot camp phase of the program, staff noticed that the victim exhibited an oozing bump on his arm. School records and state investigation reports showed that the victim subsequently began to complain of muscle soreness, stumbled frequently, and vomited. As days passed, students noticed the victim was not acting normally, and reported that he defecated involuntarily on more than one occasion, including in the shower. Staff notes confirmed that the victim defecated and urinated on himself numerous times. Although he was reported to have fallen frequently and told staff he was feeling weak or ill, the staff interpreted this as being rebellious. The victim was "taken down"—forced to the floor and held there—on more than one occasion for misbehaving, according to documents we reviewed. Staff also tied a 20-pound sandbag around the victim's neck when he was too sick to exercise, forcing him to carry it around with him and not permitting him to sit down. Staff finally placed him in the "sick bay" in the morning on the day that he died. By midafternoon of that day, a staff member checking on him intermittently found the victim without a pulse. He yelled for assistance from other staff members, calling the school medical officer and the program owners. A responding staff member began CPR. The program medical officer called 9-1-1 after she arrived in the sick bay. An ambulance arrived about 30 minutes after the 9-1-1 call and transported the victim to a nearby hospital, where he was pronounced dead.

The victim died from complications of rhabdomyolysis due to a probable spider bite, according to the medical examiner's report.[8] A multiagency investigation was launched by state and local parties in the aftermath of the death. The state social services' abuse investigation determined that staff did not recognize the victim's medical distress or provide adequate treatment for the victim's bite. Although the investigation found evidence of staff neglect and concluded that earlier medical treatment may have

---

[8]According to the National Library of Medicine, rhabdomyolysis is the breakdown of muscle fibers resulting in the release of muscle fiber contents into the bloodstream.

prevented the death of the victim, no criminal charges were filed against the program, its owners, or any staff. The state also found indications that documents submitted by the program during the investigation may have been altered. The family of the victim filed a civil suit against the program and several of its staff in 2005 and settled out of court for $1 million, according to the judge.

This program is open and operating. The tuition is currently $4,500 per month plus a $2,500 "start-up fee." The program owner claims to have 25 years of experience working with children and teenagers. Members of her family also operate a referral program and a transport service out of program offices located separately from the actual program facility. During the course of our review, we found that current and former employees with this program filed abuse complaints with the local law enforcement agency but that no criminal investigation has been undertaken.

Mr. Chairman and Members of the Committee, this concludes my statement. We would be pleased to answer any questions that you may have at this time.

## Contacts and Acknowledgments

For further information about this testimony, please contact Gregory D. Kutz at (202) 512-6722 or kutzg@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this testimony.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, DC 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>     TDD:  (202) 512-2537<br>     Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Susan Becker, Acting Manager, BeckerS@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

PRINTED ON ♻ RECYCLED PAPER