## GAO

United States Government Accountability Office

Report to the Chairman, Committee on Education and Labor, House of Representatives

Exhibit 109

May 2008

# RESIDENTIAL FACILITIES

# Improved Data and Enhanced Oversight Would Help Safeguard the Well-Being of Youth with Behavioral and Emotional Challenges



G A O
Accountability * Integrity * Reliability

GAO-08-346

May 2008



Highlights of GAO-08-346, a report to the Chairman, Committee on Education and Labor, House of Representatives

# RESIDENTIAL FACILITIES

## Improved Data and Enhanced Oversight Would Help Safeguard the Well-Being of Youth with Behavioral and Emotional Challenges

## Why GAO Did This Study

Federal funding to states supported more than 200,000 youth in residential facilities in 2004, many seeking help to address behavioral or emotional challenges. However, federal investigations have identified maltreatment and civil rights abuses in some facilities. GAO was asked to provide national information about (1) the nature of incidents that adversely affect youth well-being in residential facilities, (2) how state licensing and monitoring requirements address youth well-being in these facilities, and (3) what factors affect federal agencies' ability to hold states accountable for youth well-being in residential facilities. GAO conducted national Web-based surveys of state child welfare, health and mental health, and juvenile justice agencies and achieved an 85 percent response rate for each of the three surveys. We also visited four states, interviewed program officials, and reviewed laws and documentation.

## What GAO Recommends

GAO recommends that the Secretary of Health and Human Services (HHS) work to address state barriers in reporting maltreatment data for residential facilities, that the Attorney General work with federal agencies to access information for targeting civil rights investigations, and that the Attorney General and the Secretaries of HHS and Education work to enhance their state oversight efforts. GAO also discusses the implications of options that states, federal agencies, and Congress may use to safeguard and improve the civil rights and well-being of youth in residential facilities. While HHS and the Department of Justice (DOJ) generally agreed with our recommendations and suggested further action that could be taken, Education did not directly respond to the recommendations in its comments.

To view the full product, including the scope and methodology, click on GAO-08-346. To view the e-supplement online, click on GAO-08-631SP. For more information, contact Kay Brown, (202) 512-7215 or brownke@gao.gov.

## What GAO Found

Youth in some residential facilities have experienced maltreatment including sexual assault, physical and medical neglect, and bodily assault that sometimes resulted in civil rights violations, hospitalization, or death. Survey respondents from 28 states reported at least one death in residential facilities in 2006. National data submitted to HHS from states show that 34 states reported 1,503 incidents of youth abuse and neglect by facility staff in 2005, but these data are understated due to state barriers in collecting and reporting facility-level information. Specific facility information that was reported and that could help target federal investigations was generally not shared with relevant agencies, such as DOJ's Civil Rights Division, because there was no formal mechanism to share this information.

All states have processes in place to license and monitor certain types of residential facilities, but state agencies reported several oversight gaps. Some government and private facilities—particularly juvenile justice facilities and boarding schools—are often exempt from licensing requirements by law or regulation. In addition, licensing standards do not always address some of the most common risks to youth well-being, such as suicide. State officials reported that they are unable to conduct annual on-site reviews at facilities, in part because of fluctuating levels of staff resources. Few state agencies reported suspending or revoking a facility's operating license, in some cases due to lack of alternatives in placing the displaced youth.

**Number of State Agencies Reporting That They Do Not Exempt or Exempt Private Residential Facilities from Licensing Requirements, 2006**

| Facility type | Not exempt | | Exempt |
|---|---|---|---|
| Residential schools and academies[a] | 19 / 15 / 14 | | 18 / 10 / 14 |
| Detention center | n/a / n/a / 14 | | n/a / n/a / 11 |
| Boot camp | 10 / 6 / 4 | | 6 / 2 / 3 |
| Wilderness camp | 24 / 16 / 13 | | 3 / 3 / 1 |
| Treatment facility | 39 / 35 / n/a | | 1 / 0 / n/a |

Legend: Child welfare | Health and mental health | Juvenile justice

Source: GAO analysis of state agencies' responses to survey.

Note: Other agency responses included no such facility in the state, don't know, and no response.

[a] Residential schools and academies includes both government and private facilities.

HHS, DOJ, and Education hold states accountable for youth well-being under federal grant programs, but their authority is limited and monitoring practices are inconsistent. These agencies do not have the legal authority to hold states accountable for youth well-being in private residential facilities unless they serve youth under programs that receive federal funds. Agency officials also said they lack authority to require suicide prevention, and other requirements were inconsistent across programs. Agencies did not always include facilities in their state oversight reviews, and were inconsistent in addressing state noncompliance.

# Contents

| | | |
|---|---|---:|
| **Letter** | | 1 |
| | Results in Brief | 3 |
| | Background | 5 |
| | Fatalities and Maltreatment Occurred in Government and Private Facilities, but State and National Data Do Not Fully Capture the Extent and Nature of the Problem | 11 |
| | State Licensing and Monitoring Exclude Some Facilities and Do Not Address All Risks to Youth Well-Being | 19 |
| | Federal Agencies Challenged to Address Weaknesses in State Oversight of Residential Facilities | 32 |
| | Options for Taking Action to Promote Youth Well-Being in Residential Facilities | 36 |
| | Conclusion | 38 |
| | Recommendations for Executive Action | 39 |
| | Agency Comments and Our Evaluation | 40 |
| **Appendix I** | **Objectives, Scope, and Methodology** | 44 |
| **Appendix II** | **Circumstances Surrounding State-Reported Suicides in Residential Facilities for Youth, 2006** | 50 |
| **Appendix III** | **State-Reported Incidents of Staff Maltreatment of Youth in Residential Facilities, Fiscal Year 2005** | 52 |
| **Appendix IV** | **Licensing Status for Selected Residential Facilities** | 55 |
| **Appendix V** | **State Agency Accreditation Requirements for Residential Facilities for Youth** | 71 |
| **Appendix VI** | **Selected State Licensing Standards for Residential Facilities for Youth** | 72 |

| Appendix VII | Selected State Monitoring Requirements for Residential Facilities for Youth | 74 |
|---|---|---|
| Appendix VIII | State Agency Actions Taken within the Last 3 Years against Government and Private Residential Facilities | 76 |
| Appendix IX | Comments from the Department of Education | 78 |
| Appendix X | Comments from the Department of Health and Human Services | 81 |
| Appendix XI | Comments from the Department of Justice | 84 |
| Appendix XII | GAO Contacts and Staff Acknowledgments | 86 |

**Related GAO Products** | | 87

**Tables**

Table 1: Selected Federal Funds That Can Be Used to Support Youth in Residential Facilities, by Federal Agency and Subagency — 8

Table 2: Estimated Number of Youth in Residential Settings per Latest Available Agency Data — 9

Table 3: State Child Welfare Agencies Reporting the Greatest Number of Youth Placed in Out-of-State Residential Facilities — 31

Table 4: State Child Welfare Agencies Reporting the Greatest Number of Youth Received from Other States for Placement in Residential Facilities — 31

Table 5: Federal Program Requirements for States That Address
Certain Risks to Youth Well-Being in Residential Facilities          33
Table 6: Status of State Agency Responses to GAO Survey on
Residential Facilities for Youth                                     45
Table 7: States Reporting Youth Suicides by Type of Facility,
Authorization for Providing Services, and Related
Investigatory Findings, 2006                                         50
Table 8: State-Reported Incidents of Staff Maltreatment of Youth in
Residential Facilities, Fiscal Year 2005                             52
Table 9: Licensing Status for Selected State-Operated Residential
Facilities                                                           55
Table 10: State Agencies Reporting the Licensing Status for State-
Operated Residential Facilities That Serve Youth                     55
Table 11: Licensing Status for Selected Residential Facilities That
Receive Government Funds                                             57
Table 12: State Child Welfare Agencies Reporting the Licensing
Status for Selected Private Residential Facilities That
Serve Youth and Receive Government Funding                           58
Table 13: State Health and Mental Health Agencies Reporting the
Licensing Status for Selected Private Residential Facilities
That Serve Youth and Receive Government Funding                      60
Table 14: State Juvenile Justice Agencies Reporting the Licensing
Status for Selected Private Residential Facilities That
Serve Youth and Receive Government Funding                           62
Table 15: Licensing Status for Selected Exclusively Private
Residential Facilities                                               64
Table 16: State Child Welfare Agencies Reporting the Licensing
Requirements for Selected Exclusively Private Residential
Facilities That Serve Youth and Receive No Government
Funding                                                              65
Table 17: State Health and Mental Health Agencies Reporting the
Licensing Requirements for Selected Exclusively Private
Residential Facilities That Serve Youth and Receive No
Government Funding                                                    67
Table 18: State Juvenile Justice Agencies Reporting the Licensing
Status for Selected Exclusively Private Residential
Facilities That Serve Youth and Receive No Government
Funding                                                              69
Table 19: Number of States that Require at Least Some of the
Residential Facilities That They License or Certify to Have
Independent Accreditation                                            71

Table 20: Number of State Agencies Reporting That They Require Licensed Government-Operated and Private Residential Facilities to Meet Certain Standards, 2006    72

Table 21: Number of State Agencies Reporting That They Monitored, for All or Less Than All, Selected Issues at Residential Facilities for Youth, 2006    74

Table 22: Number of State Agencies Taking Actions against Government and Private Residential Facilities within the Last 3 Years    76

## Figures

Figure 1: States That Reported at Least One Fatality in Residential Facilities, 2006    12

Figure 2: Number of State-Reported Fatalities by Type of Residential Facility and Agency, 2006    13

Figure 3: Number of States That Reported Specific Causes of Youth Fatalities in Residential Facilities, 2006    14

Figure 4: Percentage of State-Reported Incidents of Youth Maltreatment by Residential Facility Staff, Fiscal Year 2005    15

Figure 5: State Agencies Reporting the Licensing Status of State-Operated Residential Facilities That Serve Youth    20

Figure 6: Number of State Agencies Reporting That They Do Not Exempt or Exempt Private Residential Facilities Receiving Government Funds from Licensing Requirements, 2006    22

Figure 7: Aspects of Well-Being Monitored by State Agencies in Private Residential Facilities That Served Youth and Received Government Funding    26

Figure 8: State Agency Actions Taken within the Last 3 Years against Government Residential Facilities    28

Figure 9: Number of State Agencies Reporting That They Did Not Routinely Share Oversight Information Regarding Certain Residential Facilities    30

## Abbreviations

| | |
|---|---|
| AWOL | Absent Without Leave |
| CAPTA | Child Abuse Prevention and Treatment Act |
| CARF | Commission on Accreditation Rehabilitation Facilities |
| CMS | Centers for Medicare & Medicaid Services |
| COA | Council on Accreditation |
| CRIPA | Civil Rights of Institutionalized Persons Act |
| DOJ | Department of Justice |
| HHS | Department of Health and Human Services |
| JC | The Joint Commission |
| NCANDS | National Child Abuse and Neglect Data System |
| OJJDP | Office of Juvenile Justice and Delinquency Prevention |
| Education | Department of Education |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

May 13, 2008

The Honorable George Miller
Chairman
Committee on Education and Labor
House of Representatives

Dear Mr. Chairman:

Since the 1990s, government and private entities have established hundreds of residential facilities—including boarding schools and academies, boot camps, and wilderness camps—to serve youth with behavioral and emotional challenges. Nationwide, federal funding to states supported more than 200,000 youth in facilities in 2004, and an unknown number of youth were placed in facilities by parents or others. These facilities can provide youth who cannot be served in their communities with a less restrictive alternative to hospitalization or incarceration. However, annual investigations by the Civil Rights Division within the Department of Justice, have detailed incidents of abuse and neglect, which in some cases have been severe enough to result in hospitalization or death.

States are primarily responsible for ensuring the well-being of youth in facilities and other settings, and states vary in how they license and monitor facilities in accordance with individual state standards of care. In addition, in return for receiving funds under various federal grant programs, state agencies agree to comply with federal program requirements, including those related to youth well-being. These programs generally fall under the purview of three federal agencies: The Department of Health and Human Services (HHS) provides funds to states for child welfare, mental health, and substance abuse; the Department of Justice (DOJ), for serving delinquent youth; and the Department of Education (Education), for educating youth. These agencies have authority to hold states accountable for state-operated or private facilities that serve youth under federally funded state programs. However, the federal government does not have oversight authority for other private facilities that serve only youth placed and funded by parents or other private entities. In this report we refer to facilities that receive no government funding as exclusively private facilities.

In an October 2007 testimony on residential treatment programs for troubled youth we looked specifically at abuse and neglect of youth in certain types of private facilities.[1] This report provides national information about (1) the nature of the incidents that adversely affect the well-being of youth in government and private residential facilities, (2) how state licensing and monitoring requirements address the well-being of youth in residential facilities, and (3) what factors affect federal agencies' ability to hold states accountable for youth well-being in residential facilities. We are also providing information on options that states, federal agencies, and Congress may use to better promote youth well-being in residential facilities.

For purposes of this study, we defined residential facilities as those that require youth—ages 12 through 17—to reside at the facility and that provide program services for youth with behavioral and emotional challenges.[2] There are no uniform definitions for the types of residential facilities, and we worked with states to identify definitions that would be commonly understood, including boarding schools and academies, training and reform schools, wilderness camps, ranches, and treatment centers. We surveyed state child welfare, health and mental health, and juvenile justice directors in the 50 states, the District of Columbia, and Puerto Rico to determine how states oversee child well-being[3] in residential facilities.[4] We received at least one completed survey from each state except Puerto Rico, completed surveys from all 3 agencies in 33 states, and completed surveys from a total of 44 child welfare agencies, 45 health and mental health agencies, and 44 juvenile justice agencies. In the surveys, we asked about residential facilities that were government

---

[1] For additional information see GAO, *Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth*, GAO-08-146T, Washington, D.C.: Oct. 10, 2007.

[2] Our review included facilities that provided one or more of the following types of programs: juvenile justice, youth offender, juvenile delinquency, and incorrigibility programs; treatment programs for youth with behavioral, emotional, mental health, and substance abuse issues; homes for pregnant teens; schools for discipline or character education; and therapeutic group homes, such as a home that specializes in supporting and treating youth with severe emotional disorders.

[3] In this report, we use the term *states* to refer collectively to the 50 states plus the District of Columbia and Puerto Rico.

[4] We did not survey state education agencies, because they generally do not license residential facilities for youth.

operated; privately operated that received any government funds; 5 and privately operated with no government funding. This report does not contain all of the results from the survey.  The survey and a more complete tabulation of the results can be viewed by accessing the following link: http://www.gao.gov/cgi-bin/getrpt?GAO-08-631SP.  To further our understanding, we visited 4 states—California, Florida, Maryland, and Utah—and interviewed relevant officials. These states were selected based on the diversity of their state licensing and monitoring policies for residential programs; reports of child maltreatment; and geographic location. We also obtained state-reported data that HHS collects and maintains in its National Child Abuse and Neglect Data System (NCANDS). We reviewed federal statutes, regulations, and guidance concerning the roles and responsibilities of selected agencies, and interviewed HHS, DOJ, and Education officials, as well as national association representatives and other experts on residential facilities for youth. We analyzed reports, studies, evaluations, and other documents regarding state licensing and monitoring of residential facilities for youth, but the scope of our work did not include the quality of services provided at residential facilities. See appendix I for more information on our scope and methodology. We performed our work between November 2006 and April 2008, in accordance with generally accepted government auditing standards.

## Results in Brief

Youth in some government and private residential facilities have experienced maltreatment including physical abuse, neglect or deprivation of necessities, and sexual abuse that sometimes resulted in death or hospitalization, but data limitations hinder efforts to quantify the problem. Survey respondents from 28 states reported at least one death in a residential facility in 2006, often in accidents or suicides that, in some cases, may have been attributable to a lack of supervision or neglect by staff. In terms of youth maltreatment, NCANDS data show that 34 states reported 1,503 incidents of youth abuse and neglect by facility staff in 2005, but these data are underreported. Many state agencies we surveyed reported having information gaps, in part due to barriers in collecting facility specific information on deaths and maltreatment for all or some facilities. Facility-specific information for facilities that states did report to

[5] Private facilities may receive government funds through contracts with state or county agencies to serve youth under state systems of care, such as juvenile justice, or as certified providers of care under government health insurance programs, such as Medicaid. Private funding may be provided by parents or others placing youth in a facility who are not under the cognizance of a government agency.

NCANDS was not shared with agencies, such as the DOJ Civil Rights Division, that may use such information to prioritize civil rights investigations at the federal level. DOJ annual reports convey the severity of maltreatment and civil rights violations uncovered by investigations in both government and private facilities receiving government funds across the nation.

All states have processes in place to license and monitor certain types of residential facilities, but state agencies reported several gaps in coverage that may place some youth at higher risk for maltreatment and death. First, some government-operated and private facilities—such as juvenile justice facilities and residential schools and academies—are often exempt from licensing requirements altogether by law or regulation. Additionally, licensing requirements do not always address suicide and other common risks to youth well-being, and requirements that do exist may be inconsistently applied across different types of agencies and facilities. For example, almost all state juvenile justice agencies we surveyed required facilities to have written suicide prevention plans, compared to about two-thirds of state child welfare and health and mental health agencies. State agencies also reported gaps in their monitoring processes for residential facilities. Some state agencies reported that monitoring did not occur at some facilities or reported that certain aspects of youth well-being, such as the quality of education programming and the use of psychotropic medications, were not included in their monitoring reviews. State officials also reported that they are unable to conduct yearly on-site reviews at facilities they monitor, because of fluctuating levels of staff resources committed by the state. Few state agencies reported taking action to suspend or revoke a facility's operating license, in some cases because the state had no alternatives for serving the youth who would have been displaced. Finally, interagency coordination to ensure that facilities are providing an appropriate education, or other specialized services, is often lacking. Several officials also noted the importance of increasing coordination to share monitoring results as agencies may place youth in common facilities within and across state lines.

HHS, DOJ, and Education all have oversight processes to hold states accountable for the well-being of youth under the grant programs they administer, but the scope of the agencies' oversight authority and different monitoring practices hinder their efforts. Most notably, these agencies do not have the legal authority to hold states accountable for youth well-being in private residential facilities unless they serve youth in state programs that receive federal funds. For facilities under federal purview, agency officials said that they do not have authority to modify youth well-being

requirements established in law, and such requirements vary by federal agency and program. For example, in comparing requirements across relevant HHS, DOJ, and Education programs, only HHS had requirements for states to address abuse and neglect prevention. Requirements were inconsistent even among programs within the same agency. HHS, for example, had requirements for states to address suicide prevention under Medicaid programs, but not under child welfare programs or programs for substance abuse and mental health. In monitoring state compliance with federal program requirements, agencies did not always include residential facilities in their oversight reviews. While on-site reviews conducted by DOJ specifically included these facilities, HHS reviews of states' child welfare systems targeted individual children, and did not necessarily include those in residential facilities. Federal agencies were also inconsistent in how they addressed state noncompliance with federal program requirements. In fiscal year 2007, for example, DOJ assessed financial penalties against 8 states and Puerto Rico, while other federal agencies reported that they did not assess penalties against noncompliant states.

Weaknesses in the current federal-state regulatory structure have failed to safeguard the civil rights and well-being of some of the nation's most vulnerable youth, and we discuss the implications of some options for action that states, federal agencies, and Congress may consider in any restructuring effort. In addition, we remain concerned about the gaps in reported data that have persisted over a decade since the reporting requirement has been in place. We are also making recommendations for action that federal agencies can implement now under the existing regulatory structure, including that the Secretary of Health and Human Services explore options to address state barriers in reporting maltreatment data for residential facilities; the Attorney General work with other federal agencies to access information that could help target civil rights investigations; and HHS, DOJ, and Education work to enhance their oversight of state accountability for youth well-being in residential facilities. HHS and DOJ either generally agreed, or did not disagree, with each of our recommendations. They also suggested further action that could be taken to address the report findings related to oversight for residential facilities. Education did not directly respond to the report recommendations but rather discussed its role and responsibilities for oversight of certain programs.

## Background

In the continuum of care for youth with behavioral and emotional challenges, residential facilities can provide an alternative to

hospitalization or incarceration for youth who cannot live at home and receive services in their communities.[6] Youth in these facilities range from young children through those who are transitioning to adulthood. These youth can exhibit a wide range of challenging behaviors, including antisocial or suicidal behaviors, substance abuse, and delinquency.

The array of residential facilities reflects the diversity of the population they serve. There are no uniform definitions of residential facilities, and for those facilities treating children with mental illness, states reported at least 71 different facility types, according to a 2006 HHS report.[7] Facilities can provide a range of services, such as those for youth suffering from substance abuse or severe emotional disorders, either on-site or through links with community programs, including educational, medical, psychiatric, and clinical/mental health services. A wide range of government or private entities, including faith-based organizations, can operate these facilities. The cost to support youth in a residential setting can amount to thousands of dollars per month at some residential facilities.

## Youth Maltreatment Data

HHS maintains and disseminates state-reported child abuse and neglect data in NCANDS to fulfill requirements in the Child Abuse Prevention and Treatment Act (CAPTA). Enacted in 1974, CAPTA established a focal point in the federal government to identify and address issues of child abuse and neglect in all settings, including residential facilities, and support effective methods of prevention and treatment.[8] Under CAPTA, all states receiving funds from the state grant program are required to work with HHS to provide—to the maximum extent practicable—specific data on child maltreatment, including the number of

---

[6] Parents may determine that it is best for some youth to live in an alternative setting, or youth who are at risk of running away or are a danger to themselves or others may be placed in a facility.

[7] U.S. Department of Health and Human Services, *State Regulation of Residential Facilities for Children with Mental Illness*. DHHS Pub. No. (SMA) 07-4167. Rockville, Maryland: Center for Mental Health Services, Substance Abuse and Mental Health Services Administration, 2006.

[8] Last reauthorized in 2003, CAPTA authorizes state grants to help states with their child protective service functions, and Children's Justice Act grants to improve states' investigation and prosecution of child maltreatment.

children reported to have been abused or neglected and the number of deaths resulting from abuse and neglect.[9]

In addition, CAPTA requires that states receiving grants have laws or programs in effect for the investigation of child abuse and neglect.[10] The law also requires states receiving grants to establish citizen review panels to review state and local child protection activities, which may include child fatality review committees established by states to review child fatalities for evidence of maltreatment, and to forward such cases for prosecution.

## State Oversight Processes

States have systems in place to license a wide range of businesses, and have general licensing requirements that include obtaining permits for land use, meeting building and safety codes, and establishing a basis for taxation. Beyond these general licensing requirements, states may have additional requirements that are specific to a category of business declared by the owner, such as a residential facility, or more specific types of businesses within this category, such as a boarding school or wilderness camp. Some states have centralized all licensing and monitoring of facilities serving youth within a single agency, while other states have decentralized these functions among three or more different agencies, including state child welfare, mental health, and juvenile justice agencies. In addition, other agencies may provide oversight, such as the local fire and health departments, and the agency that places youth in the facility. State education agencies may also provide oversight for a facility's educational programs. Oversight activities typically include licensing or certifying government or privately operated facilities, investigating complaints, and monitoring facility compliance with state or local standards, but there are no minimum standards commonly used by licensing agencies.

States may also require residential facilities to seek accreditation in addition to obtaining a license to operate in their state. Accrediting agencies are private, peer-based, member-funded agencies designed to encourage and promote high-quality care. Accreditation is typically

---

[9] U.S. Department of Health and Human Services, *Child Maltreatment 2005*, Appendix A lists the required data elements.

[10] How a state organizes its child abuse and neglect reporting and investigation systems, and therefore whether it investigates and captures reports of abuse and neglect at exclusively private facilities, is the state's prerogative.

obtained by a self-initiated application and guided self-evaluation, followed by an on-site visit by a voluntary committee associated with the accrediting agency.[11] Some of the benefits to accreditation that states provide include strengthening confidence in the quality of care, fulfilling regulatory requirements in some states, and improving risk management and risk reduction.

## Federal Oversight of Programs That Support Residential Facilities

Three federal agencies—HHS, DOJ, and Education—administer federal programs that states may use to support youth with community-based services while living at home or, when needed, in residential facilities or other settings. This support is provided primarily through certain subagencies, as shown in table 1.

**Table 1: Selected Federal Funds That Can Be Used to Support Youth in Residential Facilities, by Federal Agency and Subagency**

| Agency and Subagency | Program authority and fiscal year 2007 funding | Purpose |
|---|---|---|
| **HHS** | | |
| Administration for Children and Families | Title IV-B of the Social Security Act—$287 million | Support for state child welfare system |
| | Title IV-E of the Social Security Act—$6.9 billion | Support for state child welfare system |
| Substance Abuse and Mental Health Services Administration | Block Grants for Prevention and Treatment of Substance Abuse—$1.8 billion | Support for state substance abuse prevention and treatment systems |
| | Block Grants for Community Mental Health Services—$428 million | Support for state mental health systems |

[11] Three major national accreditation organizations for residential facilities include the Council on Accreditation (COA), the Commission on Accreditation of Rehabilitation Facilities (CARF), and the Joint Commission (JC). COA partners with human service organizations worldwide to improve service delivery outcomes by developing, applying, and promoting accreditation standards. CARF is an independent, nonprofit accreditor of human service providers in the areas of behavioral health, child and youth services, and medical rehabilitation. JC accredits and certifies health care organizations and programs in the United States in an effort to improve the safety and quality of care provided to the public through the provision of health care accreditation and related services that support performance improvement in health care organizations.

| Agency and Subagency | Program authority and fiscal year 2007 funding | Purpose |
|---|---|---|
| Center for Medicare and Medicaid Services | Title XIX of the Social Security Act—$189.1 billion | Support for medical assistance for low-income persons |
| **DOJ** | | |
| Office of Juvenile Justice and Delinquency Prevention | Juvenile Justice Delinquency Prevention Act—$320 million | Support for state juvenile justice system |
| **Education** | | |
| Office of Special Education and Rehabilitative Services | Individuals with Disabilities Education Act—$11.8 billion | Support for state special education systems |
| Office of Elementary and Secondary Education | Elementary and Secondary Education Act as Amended by the No Child Left Behind Act of 2001—$14.7 billion | Support for state education systems |

Source: GAO analysis of federal budget documents.

In 2004, HHS and DOJ reported that states served more than 200,000 youth in residential settings under certain federal programs for child welfare, mental health, and juvenile justice as shown in table 2.

**Table 2: Estimated Number of Youth in Residential Settings per Latest Available Agency Data**

| | State agencies | | |
| Placement | Child welfare | Mental health[a] | Juvenile justice |
|---|---|---|---|
| Number of youth | 107,000 | 11,000 | 93,000 |

Source: Child welfare data: Child Welfare League of America: National Data Analysis System, Number of Children in Out-of-Home Care, by Placement Setting 2004.

Notes: Mental health data: Office of Applied Studies, Substance Abuse and Mental Health Services Administration, National Survey of Substance Abuse Treatment Services, March 31, 2006.

Juvenile justice data: Office of Juvenile Justice and Delinquency Protection: Census of Juveniles in Residential Placement, 2006.

[a]According to HHS's Substance Abuse and Mental Health Services Administration officials, the approximately 11,000 youth include those receiving treatment at public and private facilities as of March 31, 2006, most with a primary focus of substance abuse treatment and many fewer with a mental health focus.

To receive federal funds under these programs, states generally develop and submit to the relevant agency a multiyear plan that addresses federal

program requirements.[12] The relevant federal agency reviews and approves state plans, along with any states annual performance reports that states submit describing progress in meeting goals. Federal agencies also audit states' use of grant funds via reviews of state records and site visits in the settings where youth reside, such as residential facilities. States that fail to meet the required standards may face the withholding of federal funds.

## Federal Investigations of Civil Rights Abuses in Residential Facilities

The Civil Rights of Institutionalized Persons Act (CRIPA), enacted in 1980, authorizes the Attorney General of the United States to conduct investigations and bring actions against state and local governments relating to conditions of confinement in institutions that are owned, operated, or managed by or provide services on behalf of, state or local governments.[13] Institutions covered by CRIPA include youth residential facilities.

CRIPA is implemented by the Special Litigation Section within DOJ's Civil Rights Division. Under CRIPA, the Special Litigation Section investigates covered facilities to determine whether there is a pattern or practice of violations of residents' federal rights. According to DOJ, to date, the Special Litigation Section has been successful in resolving the majority of CRIPA investigations that have uncovered unlawful conditions by obtaining voluntary correction or a judicially enforceable settlement designed to improve conditions.

---

[12] For example, states receiving Title IV-B funds are required to submit a 5-year child and family services plan that sets forth the goals that the state intends to accomplish and assurances that that states will review their progress.

[13] Whether a private facility is covered by CRIPA would depend on the level of governmental involvement. For example, if a state or local government enters into a contract with a private facility to house certain juveniles, the facility might be considered an institution covered by the statute. However, CRIPA states that privately owned and operated facilities are not covered by the statute where the only connection between the facility and the state is a state license or the facility's receipt of Medicaid and certain other federal payments on behalf of residents of the facility.

# Fatalities and Maltreatment Occurred in Government and Private Facilities, but State and National Data Do Not Fully Capture the Extent and Nature of the Problem

States we surveyed reported fatalities as well as incidents of physical abuse, sexual abuse, and neglect of youth in both government and private facilities in 2006, but data limitations hinder efforts to quantify the problem. Accidents and suicides—often attributable to a lack of supervision by staff—were among the most common types of youth fatalities, according to surveyed states; while in the four states we visited, the most common causes of youth maltreatment were abusive staff and lack of appropriate supervision. Many states had inconsistent or incomplete data on adverse incidents—especially from exclusively private facilities. National data, derived from state reports, suffer from these same limitations, leaving states with little opportunity to identify the extent of the problem and find solutions. State-reported information also fails to convey the severity of civil rights violations uncovered in some facilities each year—that show extreme cases of sexual assault, medical neglect, and bodily assault requiring hospitalization.

## Youth Fatalities Occurred in Government and Private Facilities across the Nation, with Accidents and Suicide among the Primary Causes

Youth fatalities occurred in both government and private residential facilities, in states across the nation. Of the states we surveyed, 28 reported that at least one youth had died in this setting in 2006, as shown in figure 1.[14]

---

[14] We could not determine the number of deaths in each state because of the possibility of duplicative reporting across agencies.

**Figure 1: States That Reported at Least One Fatality in Residential Facilities, 2006**



Source: GAO analysis of state agency responses to survey; map, Map Resources.

Note: The survey question was as follows: In 2006, how many youth aged 12-17 died in each of the following categories of residential facilities providing targeted services in your state? Include youth who died at the facility as well as youth in AWOL status or others who died or were pronounced dead outside the facility: (a) total deaths in 2006, (b) deaths of youth under the care and supervision of your agency at government-operated facilities, (c) deaths of youth under the care and supervision of your agency at private facilities that receive any government funds, (d) deaths of youth under parental or non-government custodial care at private facilities that receive any government funds, and (e) deaths of youth under parental or nongovernment custodial care at private facilities that do not receive government funds (including faith-based facilities).

Child welfare agencies reported more deaths in residential facilities than other agencies, and nearly three times as many states reported deaths in private facilities that received government funds than in government-operated facilities (see fig. 2). However, this may bear little or no relation to the relative risk of death in either facility type due to differences in the proportion and risk factors of youth served, among other factors. While no state we surveyed reported fatalities in exclusively private facilities, one or

more agencies in 45 states reported that they did not have data for these types of facilities.

**Figure 2: Number of State-Reported Fatalities by Type of Residential Facility and Agency, 2006**



State agencies

Source: GAO analysis of state responses to surveys.

In our survey, deaths in the 28 states were most often attributed to accidental causes (see fig. 3), but sometimes accidental deaths, if investigated, are attributable to abuse or neglect. In Florida, for example, juvenile justice officials said that a youth death in a county-operated boot camp was first classified as an accident, but after investigation by a child fatality review committee, was reclassified as a death caused by maltreatment and referred for prosecution.

**Figure 3: Number of States That Reported Specific Causes of Youth Fatalities in Residential Facilities, 2006**



Causes of youth fatalities

Source: GAO analysis of state agency responses to survey.

Notes:  The survey question was as follows: Of the total youth deaths that you reported, how many died from each of the following causes: (a) suicide, (b) homicide, (c) application of seclusion and restraint techniques, (d) medically related accident, (e) accident that occurred while in a runaway or AWOL status, (f) other accidental cause, and (g) other causes?

Other causes of youth fatalities in residential facilities include natural causes, choking, and internal bleeding.

Suicide was among the most common causes of fatalities in residential facilities reported by states we surveyed, and can be related in some instances to inadequate staff supervision and services. In Alaska, for example, a youth participating in a sex offender program hanged himself at night while residing in a private facility contracting with the state. After the state agency and the local law enforcement agency investigated, the facility corrected substandard practices in staffing, supervision, and clinical services. In Wisconsin, after three youth hanged themselves in private residential facilities under contract with a state agency, the state increased staff training and monitoring of residents and sponsored statewide suicide awareness and prevention training for those who work with youth in residential settings. See appendix II for more information on the results of suicide investigations in the states we surveyed.

## Youth Maltreatment Was Primarily Related to Inexperienced Staff, Lack of Supervision, or Insufficient Training

States responding to our survey reported that they investigated complaints of physical abuse, sexual abuse, or neglect in both government and private facilities (49 states), including those that are exclusively private (37 states). Similarly, NCANDS data from 2005 showed that 34 states reported incidents of youth abuse and neglect in residential facilities. Of the 1,503 reported incidents, neglect was the most frequent cause of youth maltreatment, followed by physical abuse. (See fig. 4 and app. III.)

**Figure 4: Percentage of State-Reported Incidents of Youth Maltreatment by Residential Facility Staff, Fiscal Year 2005**




Source: NCANDS.

[a] "Other" incidents of youth maltreatment states reported to NCANDS include medical neglect and psychological or emotional maltreatment.

In the states we visited, abuse and neglect of youth in residential facilities was often associated with staff resource concerns—such as a lack of experienced staff, insufficient training, or lack of appropriate supervision—particularly in smaller facilities. In California, for example, county officials told us that adverse incidents were most likely to occur in contractor-operated six-bed group homes—frequently used by state probation and child welfare agencies—where the state reimbursement rate is generally not high enough to hire skilled personnel and provide staff with ongoing training, support, and oversight.

Another cause of youth maltreatment may be attributable to the improper application of seclusion and restraint, according to state officials. State officials in Florida said that improper application of seclusion and restraint techniques may result in staff restraining youth for too long, or with too much force, causing injury or death.

## Data Limitations Preclude Identifying the Extent of the Maltreatment or Finding Solutions

State and federal information systems for tracking and reporting incidents of maltreatment have limitations in helping state and federal agencies monitor the well-being of youth in residential facilities and address outstanding problems. When available, comprehensive reporting of incident data can be used by state and federal agencies to assess the extent of maltreatment in residential facilities, inform risk assessments, target oversight resources, and develop policies to address trends. However, although states responding to our survey reported that the ability to collect and maintain data on all facilities in the state was a high priority, state officials we interviewed reported barriers in addressing these activities: First, the lack of authority under state law hinders many states from collecting data on certain facilities—such as exclusively private facilities—and expanding oversight to cover them; second, states that have such authority reported difficulties sustaining data collection in times of budget shortages. As a result, state officials said that the number of adverse incidents was likely more widespread and numerous than reported.

NCANDS, which is derived from state reports, suffers from these same limitations, as well as others. First, some states do not report data for residential facilities to NCANDS,[15] so it may understate the number of fatalities and maltreatments. Second, many states do not consistently identify whether the individual maltreating youth was facility staff, a parent, or other individual.[16] Finally, NCANDS only tracks fatalities resulting from maltreatment, not suicide or accidents that may be an indicator of neglect or another problem that needs resolution. Cognizant HHS officials said that its NCANDS contractor routinely works with states to improve data quality, but cannot enforce state participation as data reporting is voluntary under the law.

HHS highlighted the need to improve the quality of data reported by states in a 2005 report to Congress,[17] noting that national collection of data on

---

[15] In fiscal year 2005, 10 states did not submit reports showing the number of fatalities in residential facilities—2 states did not submit a report, 7 states did not track facility incident data in a format that could be shared with NCANDS, and 1 state involved in litigation did not report facility data.

[16] In 2005, 37 states were unable to consistently identify whether the individual maltreating youth was facility staff, a parent, or other individual.

[17] For additional information see U.S. Department of Health and Human Services, Administration on Youth and Families, *Child Maltreatment 2005* (Washington, DC: U.S. Government Printing Office, 2007).

child fatalities is complicated by the many steps that are needed to establish the cause of death. The report stated that while state child fatality review committees can investigate and help classify deaths correctly, they are not implemented in every community, nor do they have the resources to review each suspicious death of a child or adolescent. In this report, HHS suggested that Congress fund research on ways to improve national reporting of youth fatality data, including procedures for investigating and documenting the cause of fatalities.

## Federal Investigations Highlight the Severity of Civil Rights Violations Occurring in Some Residential Facilities

In most facilities, youth maltreatment may occur infrequently as a result of isolated circumstances, but over the years, DOJ investigations of facilities serving youth have found a pattern or practice of civil rights violations, including physical and sexual abuse, medical neglect, and inadequate education in some government and private facilities receiving government funds. At the end of fiscal year 2006, the latest year for which data were available, DOJ's Civil Rights Division reported active cases involving over 175 facilities and 34 states.[18] Annual reports from the division over the past several years have documented their findings of youth maltreatment in certain juvenile justice or mental health facilities:

*Physical and sexual abuse occurred without management intervention.* In one facility, staff hit youth and slammed them to the ground. Staff hog-tied and shackled youth to poles in public places, and girls were forced to eat their own vomit if they threw up while exercising in the hot sun. Staff routinely broke the jaws of youth who showed disrespect in another facility. In some facilities, staff engaged in sexual acts with boys. Youth-on-youth violence occurred on an almost daily basis in some facilities, at times resulting in injuries that required hospitalization. Youth were sexually assaulted and threatened with sexual assault by other youth in some facilities, all without effective intervention from management.

*Severe neglect resulted in poor education, suffering, and death.* In a 1-year period at one facility, three boys committed suicide. In one suicide, staff lacked the appropriate tool to cut the noose from a victim's neck and also did not have oxygen in the tank they brought to help resuscitate him. The dental clinic at one facility was full of mouse droppings, dead roaches,

---

[18] For additional information see U.S. Department of Justice, *Department of Justice Activities under the Civil Rights for Institutionalized Persons Act, Fiscal Year 2006* (Washington, D.C. 2007).

and cobwebs; medications in the cabinet had expired over 10 years ago. In a state-operated mental health facility used by adolescents, older psychotropic medications, with serious side effects, were administered to sedate patients. One adolescent received 22 such psychotropic sedatives over a 2-month period. In another facility, youth were not provided with special education services as required by federal law.

DOJ's Civil Rights Division reports that it receives more credible allegations of violations of youth rights than it can investigate. During fiscal year 2006 alone, the division reported receiving approximately 5,000 citizen letters, hundreds of telephone complaints, and 135 inquiries from Congress and the White House. In the 26 years CRIPA had been in effect, through September 2006, the division investigated conditions in 433 facilities. Division officials said that they also receive many allegations of civil rights violations in exclusively private facilities, such as private boarding schools.

DOJ Civil Rights Division officials stated they rely on advocacy groups and media stories to identify investigations, but with additional sources of information, they could better target their scarce investigative resources. Division officials said that they were unaware that NCANDS tracked state-reported maltreatment data, and that obtaining case-level NCANDS information on the incidents of maltreatment and death occurring in specific facilities would be helpful. Division officials said that the results of federal agency monitoring reviews of states that highlight findings related to residential facilities would also be useful, but that there was no formal mechanism to share oversight findings for residential facilities under the purview of multiple federal programs. Except in one instance,[19] officials said that no federal agencies—including HHS, Education, and DOJ's Office of Juvenile Justice and Delinquency Prevention—were coordinating with DOJ's Civil Rights Division to provide pertinent oversight results.

---

[19] According to DOJ officials, the Civil Rights Division has been granted access to HHS's Centers for Medicare & Medicaid Services (CMS) database that contains the annual survey results for CMS oversight of residential facilities.

## State Licensing and Monitoring Exclude Some Facilities and Do Not Address All Risks to Youth Well-Being

All states have processes in place to license and monitor certain types of residential facilities, but our survey identified several gaps that exempt certain types of facilities from oversight and allow some of the common causes of youth death and maltreatment to go unaddressed. These gaps include the fact that some types of government-operated and private facilities are exempt from licensing requirements, licensing requirements do not always address the primary causes of youth death and maltreatment, and state agencies inconsistently monitor facilities and share their monitoring results. Increasing coordination and information sharing among state agencies—both within and across states—was a high-priority activity states identified to improve the oversight of youth well-being in residential facilities.

### Juvenile Justice Facilities and Residential Schools and Academies Are Often Excluded from Agency Licensing Requirements

All states reported licensing certain types of residential facilities for youth, but their responses to our survey also showed gaps in licensing coverage (see app. IV). Licensing all facilities, public or private, can help ensure that residential facilities meet the relevant standards for protecting youth well-being. Among state-operated facilities, juvenile justice agencies were more likely to exempt facilities from licensing than child welfare and mental health agencies (see fig. 5). The juvenile justice officials we interviewed said that this was because some state statutes do not require state-operated juvenile facilities to have a license in order to operate.

**Figure 5: State Agencies Reporting the Licensing Status of State-Operated Residential Facilities That Serve Youth**



Number of state agencies

Type of facilities

☐ Not exempt

▨ Exempt

Source: GAO analysis of state agencies' responses to survey.

Note: The survey question was as follows: Which, if any, of the following types of government operated facilities providing residential targeted (Child Welfare, Health Mental Health, Juvenile Justice) services for youth are currently exempt from licensing or monitoring in your state by statute or state regulation—state operated facilities? Response options were (a) exempt from licensing by our agency, (b) exempt from routine monitoring by our agency, (c) exempt from both (d) not exempt from either, (e) no such facility in state, (f) don't know, (g) no response.

Many state agencies also reported that certain types of private facilities were exempt from licensing, regardless of whether they received some government funding or were exclusively private (see fig. 6). Private residential schools and academies—a category that includes boarding schools and training or reform schools—were exempted more often from licensing than other types of private facilities, according to survey respondents. Conversely, treatment facilities were the type most commonly required to have a license. Agencies in six states reported they

exempted faith-based facilities from licensure.[20] However, many agencies reported not knowing the licensing status of certain types of private facilities or reported that they did not have certain types of facilities in their state. Across agencies, states most often responded that they did not have private boot camps, ranches, and wilderness camps.[21]

---

[20] These six states were Arizona, Arkansas, Iowa, Maine, Missouri, and South Carolina.  In addition, licensing officials we interviewed in Florida stated that faith-based facilities had the option of being licensed by the state or by a faith-based licensing authority. Note: The survey question was as follows: Which, if any, of the following types of private facilities providing residential targeted services for youth are currently exempt from licensing or routine monitoring in your state by statute or state regulation—Faith-based facilities? (a) exempt from licensure by our agency, (b) exempt from routine monitoring by our agency, (c) exempt from both, (d) not exempt from either, (e) no such facility in state, (f) don't know, (g) no response.

[21] Among state juvenile justice survey respondents, for example, 25 reported having no private boot camps in their state that received government funding, 22 reported having no ranches, and 17 reported having no wilderness camps. Somewhat fewer survey respondents reported not having exclusively private boot camps (19), ranches (17), and wilderness camps (14).

**Figure 6: Number of State Agencies Reporting That They Do Not Exempt or Exempt Private Residential Facilities Receiving Government Funds from Licensing Requirements, 2006**



Source: GAO analysis of state agencies' responses to survey.

Notes: The total number of agency responses for a specific facility type does not include instances in which agencies reported that there was no such facility in the state, they did not know, or that they did not respond.

The survey question was as follows: Which, if any of the following types of residences that provide targeted services for youth are currently exempt from licensing or routine monitoring in your state by statute or state regulations? The response options were (a) exempt from licensure, (b) exempt from monitoring, (c) exempt from both, (d) not exempt from either, (e) no such residence in the state, (f) don't know, and (g) no response.

ªResponses for this type include all private facilities, not just those receiving government funding.

One reason that private residential facilities may be exempt from licensing requirements is that state agencies do not have the necessary statutory or regulatory authority. Regarding residential schools and academies, for example, all agencies in 15 of the 33 states that responded to all three agency surveys reported that they did not have either the authority or the regulatory responsibility to license these facilities.[22]

The lack of licensing for all facilities serving youth has several consequences. Within individual states, facility operators may bypass state licensing requirements by self-identifying their business as a type that is exempt from state licensing. In Texas, for example, a residential treatment program self-identified as a private boarding school is not regulated by the state licensing agency, but the same facility would be required to obtain a license if it self-identified as a residential treatment center or therapeutic camp. Inconsistent licensing practices across states can have implications as well. For example, a 2007 directory showed that Utah, which only recently implemented licensing requirements covering wilderness camps, was home to over 25 percent of registered wilderness programs in the United States.

Facility licensing is also important because parents and others considering placing youth in private facilities at their own expense do not always have the information they need to screen facilities and make an informed decision. In our testimony on private facilities last October, we described cases in which program leaders told parents their programs could provide services that they were not qualified to offer, claimed to have credentials in therapy or medicine that they did not have, and led parents to trust them with youth who had serious mental disabilities. One national association for programs serving youth with behavioral and emotional difficulties testified before Congress that state licensing was important because the field does not currently have the capacity to certify facility integrity.

Certain states have taken different approaches to improve oversight of residential facilities. Some states are considering laws that would expand their licensing authority for private facilities, while other states use alternative methods to provide protections for youth. For example, some

---

[22] Two of the 15 states—Massachusetts and Utah—have a central agency that is responsible for licensing residential facilities.

**GAO-08-346 Residential Facilities**

state agencies include requirements addressing youth well-being in contracts facilities must sign to serve youth under state care. Florida officials estimated that 85 percent of residential facilities in the state's juvenile justice system are private facilities under contract with the state. Florida's juvenile justice system uses the contract provisions to help ensure that facilities provide youth with needed services in compliance with agency regulations as well as state statutes.

Accreditation is another method used by some states in lieu of, or to augment, state licensing requirements. For example, Ohio and Wyoming require specific health-related facilities to obtain accreditation instead of licensure as a condition to serving youth under state care. Of the states responding to our survey, a greater number of health and mental health agencies compared to other agencies reported requiring facilities to be accredited by private organizations, due in part to conditions of participation for certain federal programs.[23] The accreditation process may require providers to meet higher standards than those required by state licensing bodies. However, accreditation does not necessarily ensure the safety and well-being of youth. Officials from an accrediting organization told us that they do not always inform the state if a facility's accreditation status has been suspended or limited; such information sharing is dependent on how well state agencies coordinate with them. In general, fewer states reported requiring accreditation than not across the three agencies we surveyed, as shown in appendix V.

## State Licensing Standards Do Not Consistently Address Suicide and Other Identified Risks to Youth Well-Being

Licensing standards that states have in place for certain government and private residential facilities address many, but not all, of the most common risks to youth well-being that states had identified in our survey. Standards based on sound research can help ensure that youth receive minimum standards of care that address risks to well-being across facility types. Almost all states reported that when they required licensing, they required facilities to meet standards related to the safety of the physical plant, proper use of seclusion and restraint techniques, reporting of adverse incidents, and qualification requirements and background checks for

---

[23] For example, HHS's Medicaid program, a joint federal-state program to provide health care coverage for certain low-income, aged, or disabled individuals, requires that states providing inpatient psychiatric services in a nonhospital setting to individuals under age 21 must ensure that such services are accredited by one of three specified accrediting organizations or a comparable one recognized by the state.

staff.[24] These standards can help reduce the risk of harm due to accidental causes and staff maltreatment. However, other requirements addressing risks to youth are less often included as a part of licensing. For example, while states reported that almost all juvenile justice facilities are required to have written suicide prevention plans, about a third of state child welfare and health and mental health agencies reported that they do not have similar requirements for government facilities. In addition, most of the agencies in our survey did not require private facilities to have written suicide prevention plans. (See app. VI.)

## Monitoring May Not Be Comprehensive or Frequent Enough to Protect All Aspects of Youth Well-Being

State agencies reported monitoring youth well-being in residential facilities, but certain aspects of youth well-being were not included in all monitoring activities. Among six different aspects of youth well-being we asked about in our survey, the quality of educational programming and use of psychotropic medications were most likely to be reviewed at only some, or none, of the facilities monitored by child welfare, health and mental health, and juvenile justice agencies. Conversely, staffing issues were most often included in all monitoring reviews of government and private facilities. (See fig. 7 for results pertaining to private facilities that receive government funds, and app. VII for results pertaining to state-operated facilities, private facilities that received government funds, and exclusively private facilities.)

[24] The survey question was as follows: When your agency develops or opens a government-operated residential facility that provides targeted services to youth, is the facility required to meet state standards in any of the following areas? (a) pass inspection of physical plant, (b) provide evidence of safe child care practices, (c) have written procedures for reporting physical or sexual abuse or neglect of youth, (d) meet all staff qualifications requirements including training, (e) perform staff background checks, (f) meet specified staff-to-child ratios, (g) provide evidence of appropriate educational programming, (h) have procedures in place for use of approved seclusion and restraint techniques, (i) have written suicide prevention plans. A similar question was asked for asked for private facilities.

**Figure 7: Aspects of Well-Being Monitored by State Agencies in Private Residential Facilities That Served Youth and Received Government Funding**



Source: GAO analysis of state agencies' responses to survey.

Note: The survey question was as follows: In 2006, did your agency routinely monitor or followup, or authorize for monitoring or followup, any of the following issues—in the absence of a complaint—at private residential facilities that received government funding providing targeted services for youth? Response options for this question were (a) yes, monitored for all; (b) yes, monitored for some; (d) no, did not monitor; (e) no such facility in the state; (f) don't know; (g) no response.

Three of the four states we visited reported that they were unable to meet their goals for conducting annual monitoring visits at residential facilities due to a lack of resources. Periodic on-site reviews to monitor facility

compliance with licensing requirements helps ensure that licensing standards are taken seriously, and that risks to youth well-being are quickly addressed. States reported that visiting facilities was necessary at least once a year, if not more often, to ensure that conditions for youth had not changed due to changes in personnel, ownership, or funding. However, the number of facilities visited each year depended on the fluctuating levels of resources committed by the state. In Maryland, agency officials said that state resources were redirected, as necessary, to meet state goals for monitoring residential facilities for youth. In Florida and Utah, however, agency officials said that imbalances between the current workload and staff resources constrained the state's capacity to conduct efficient, effective, and timely monitoring of residential facilities. A facility operator in California said that on-site monitoring had been as infrequent as once every 5 years.

State agencies reported on actions taken against facilities in the last 3 years, but few reported suspending or revoking a facility's operating license. A full range of enforcement options allows states to respond to maltreatment in accordance with the severity of the incident and to escalate penalties as necessary to help prevent reoccurrence. Survey respondents, however, often reported that they did not employ the full range of enforcement options against the residential facilities under their purview. For example, most state agencies in our survey reported taking action to increase monitoring of facilities with identified problems, or requiring corrective action plans (See app. VIII and fig. 8). Maryland state officials said that they may be less likely to close facilities when they fall below state standards if there is a shortage of facilities in the state, and closing the facility would limit the state's ability to serve the youth who would be displaced by a closing. In addition, these officials noted that shutting down a facility is extremely disruptive to the youth who are placed there. For these reasons, states may agree to keep a program open if a facility meets certain conditions. For example, we previously reported that, in West Virginia, a program's owners pleading no contest to the charge of child neglect resulting in death negotiated an agreement with the state to keep the program open in exchange for a change in ownership and management.

**Figure 8: State Agency Actions Taken within the Last 3 Years against Government Residential Facilities**



| Action taken | State agency took action | State agency did not take action |
|---|---|---|
| Government facility was closed or license, certification, or operating authority was suspended or revoked | 1 / 0 / 3 | 19 / 18 / 34 |
| Youth were removed | 7 / 2 / 11 | 12 / 16 / 26 |
| Banned new admissions or instituted admission restrictions | 7 / 4 / 7 | 14 / 15 / 30 |
| Referred or recommended criminal investigations for abuse or neglect that carry fines or imprisonment | 10 / 7 / 24 | 11 / 8 / 10 |
| Increased monitoring | 16 / 10 / 32 | 5 / 8 / 6 |
| Required program improvement or corrective action plan | 19 / 17 / 32 | 2 / 2 / 4 |

Legend:
- ☐ Child welfare
- ☐ Health and mental health
- ▨ Juvenile justice

Source: GAO analysis of state agencies' responses to survey.

Note: The survey question was as follows: Over the last 3 reporting years, did your agency take any of the following actions at its government-operated facilities as a result of allegations or findings of noncompliance, improper operations, physical abuse or sexual abuse or neglect of youth, or other negative outcomes? Respondents could also answer "don't know" or "no response."

## Coordination Needed within and among States for Youth Served by Multiple Agencies or across State Lines

Improving coordination to share information among state agencies was a high priority for improving oversight of residential facilities according to survey respondents. Such coordination is needed because some youth may have needs requiring a multi-agency response. A lack of coordination in these instances can result in situations where monitoring activities overlap at some facilities and aspects of youth well-being in other facilities fall through the cracks. Officials in the states we visited raised concerns that ensuring facilities have appropriate education programs for youth is particularly challenging unless state agencies coordinate their oversight efforts. Lack of coordination, particularly with the state education agency, has resulted in cases where facilities remain licensed to operate even though education quality is poor and youth may be unable to transfer education credits upon returning to schools within their communities.

Many state agencies we surveyed reported that they did not routinely share information with other state agencies regarding negative findings from their monitoring reviews of residential facilities, or when facility licenses were suspended or revoked (see fig. 9). Sharing such information is important because it may influence another agency's decision to place youth in the facility.

**Figure 9: Number of State Agencies Reporting That They Did Not Routinely Share Oversight Information Regarding Certain Residential Facilities**



Oversight actions

Licenses suspended or revoked: 12, 12, 14

Results of monitoring activities: 18, 18, 22

Reports of adverse incidents: 17, 17, 18

Findings of noncompliance, sanctions, or other consequences: 17, 20, 20

Number of state agencies (0–24)

☐ Child welfare agencies
☐ Health and mental health agencies
▨ Juvenile justice agencies

Source: GAO analysis of state agencies' responses to survey.

Note: The survey question was as follows: What oversight information regarding residential facilities does your agency routinely share with other state or local government agencies or place on an accessible Web site?  Response options for this question were (a) new licenses issued; (b) licenses suspended or revoked; (c) plans to expand or reduce programs; (d) schedule of upcoming routine monitoring activities (e.g., record reviews or site visits); (e) results of monitoring activities; (f) reports of adverse incidents; (g) findings of noncompliance, sanctions, or other consequences not listed above.

Improving coordination among agencies across states is also important because almost all states reported in our survey that they placed some youth in out-of-state residential facilities. These interstate placements can be initiated by state agencies or private parties, such as parents. Out-of-state placement is more difficult than in-state placement, but may be used when the demand for services exceeds the state's capacity, particularly for cases requiring highly specialized services—such as therapeutic treatment for youth who committed arson, or who were involved in gangs. State agencies or parents may also place youth in other states where family members reside. Table 3 shows the top five states in which state child welfare agencies we surveyed reported the greatest number of youth in out-of-state residential facilities.

**Table 3: State Child Welfare Agencies Reporting the Greatest Number of Youth Placed in Out-of-State Residential Facilities**

| Sending state | Total number of youth | Number of placement states |
|---|---|---|
| California | 1,903 | 26 |
| Pennsylvania | 593 | 18 |
| Alaska | 482 | 14 |
| Rhode Island | 330 | 11 |
| Connecticut | 282 | 13 |

Source: GAO analysis of state child welfare agency survey responses.

Note: The survey questions were as follows: (1) As of October 1, 2006, how many youth from your state were residing in residential facilities providing targeted services in other states? Response options: (a) number of youth under the care and supervision of your agency residing in facilities operated by another state or local government agency, (b) number of youth under the care and supervision of your agency residing in private facilities in the other state, (c) number of youth under parental or nongovernment custodial care residing in private facilities in the other state? Respondents could also check not available. And (2) On October 1, 2006, in what other states were youth under the care and supervision of your agency residing?

Another reason that interstate coordination is important is to ensure that agencies sending youth for placement in other states are able to screen out facilities that have had negative findings uncovered during monitoring reviews or have outstanding allegations of maltreatment. Such information may be particularly important in cases where state licenses cannot serve this purpose. Four of the top five states that received the greatest number of out-of-state youth (see table 4)—according to child welfare agencies we surveyed—exempted one or more types of facilities from state licensing requirements.

**Table 4: State Child Welfare Agencies Reporting the Greatest Number of Youth Received from Other States for Placement in Residential Facilities**

| Receiving state | Number of youth | Number of sending states |
|---|---|---|
| Utah | 1,827 | 38 |
| Pennsylvania | 1,778 | 5 |
| Montana | 1,060 | 5 |
| Massachusetts | 628 | 15 |
| South Carolina | 336 | 26 |

Source: GAO analysis of state child welfare agency survey responses.

Note: The survey questions were as follows: (1) As of October 1, 2006, how many youth under the care and supervision of other states, any trial jurisdictions, or countries other than the United States were residing in residential facilities providing targeted services in your state? Response options: Number of (a) youth placed in facilities operated by your state agency and (b) youth placed in private facilities in your state? Respondents could also check not available. And (2) On October 1, 2006, from what other states were youth aged 12 to 17 residing in residential facilities providing targeted services in your state?

Finally, our testimony last October showed that information sharing across states is also important because operators of programs shut down in one state for youth maltreatment or death due to negligence sometimes open new programs in another state, and states with weaker licensing and monitoring practices may be especially vulnerable to this practice. Our testimony last October highlighted a 1990 case where a wilderness camp operator moved from Utah to Nevada, and back to Utah as facilities were repeatedly shut down by authorities, and how many youth died in two of these programs.[25]

## Federal Agencies Challenged to Address Weaknesses in State Oversight of Residential Facilities

HHS, DOJ, and Education all have oversight processes to hold states accountable for the well-being of youth in certain residential settings under the grant programs they administer. However, limitations in federal oversight authority and inconsistent monitoring practices hinder federal efforts to ensure that states are keeping youth in residential facilities safe from harm. Most notably, these agencies cannot hold state agencies accountable for conditions in private facilities unless the facilities serve youth in state programs supported by federal funds. When they did have the authority, agencies differed in their oversight practices regarding the extent that agencies had established program requirements specific to residential facilities, had conducted on-site reviews of residential facilities, and had taken actions to enforce compliance with federal requirements.

## HHS, DOJ, and Education Cannot Hold States Accountable for Exclusively Private Facilities

HHS, DOJ, and Education have some authority to hold states accountable for certain aspects of youth well-being in facilities that serve youth under the grant programs they administer—whether state operated or private—but cannot hold states accountable for conditions in facilities that are exclusively private. The federal government has oversight authority in cases where states voluntarily choose to accept federal requirements in exchange for receiving federal

[25] GAO, Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth (GAO-08-146T, Washington, D.C.:  Oct. 10, 2007).

GAO-08-346  Residential Facilities

program funds.[26] In practice, states have agreed to comply with federal oversight requirements in exchange for funds supporting their state systems of child welfare, health and mental health, juvenile justice, and education. Accordingly, under the federal programs that we examined at HHS, DOJ, and Education, states are accountable for ensuring that facilities receiving funds through these programs are in compliance with federal program requirements. However, these agencies cannot hold states accountable for conditions in exclusively private facilities.

## Federal Requirements Do Not Always Address Suicide Prevention and Other Risks to Youth Well-Being

Federal agencies and programs do not always hold states accountable for addressing some of the primary risks to youth well-being in residential facilities. In comparing requirements across HHS, DOJ, and Education, only HHS reported requiring states to address abuse and neglect prevention under certain federal programs. (See table 5.)

**Table 5: Federal Program Requirements for States That Address Certain Risks to Youth Well-Being in Residential Facilities**

| Agency and subagency | Abuse and neglect prevention | Suicide prevention | Use of seclusion and restraint | Education quality |
|---|---|---|---|---|
| **HHS** | | | | |
| Child Welfare | Yes | No | No | Yes |
| Medicaid | Yes | Yes | Yes[a] | No |
| Substance Abuse and Mental Health | No | No | No | No |
| **DOJ** | | | | |
| Juvenile Justice and Delinquency Prevention | No | No | No | Yes |
| **Education** | | | | |
| Elementary and Secondary Education | No | No | No | Yes[b] |
| Special Education and Rehabilitative Services | No | No | No | Yes[b] |

Source: Analysis of U.S. Department of Health and Human Services, DOJ, and Education documents.

[a] Applies only to psychiatric residential treatment facilities.

[b] Applies only to public agencies and children placed by public agencies in private facilities.

---

[26] Congress, as part of its spending power under Article I, Section 8, of the U.S. Constitution, can attach conditions to states' receipt of federal funds.

HHS, DOJ, and Education all reported that they do not have the authority to require that states have suicide prevention plans as a criterion for receiving funds under the grant programs that they administer, although HHS and DOJ have documented a need to address suicide prevention. The Centers for Disease Control and Prevention—which is part of HHS—issued a report that identified suicide as the third leading cause of death in 2004 among all U.S. youth.[27] In addition, a 2004 study commissioned by DOJ recommends increased mental health screening for suicide prevention among incarcerated youth.[28] DOJ officials we spoke with generally agreed with the need to focus on suicide prevention in residential facilities, and suggested that additional federal requirements in this area would be helpful. DOJ and HHS have Web sites that list resources states can use for this purpose, but HHS officials said that states are more responsive to a requirement or more specific agency guidance.

Similarly, agency officials said that federal programs also do not require that states ensure the proper use of seclusion and restraint practices, which have come under intense scrutiny in recent years. Researchers and clinicians have chronicled the inherent physical and psychological risks in each use of these types of interventions—including death, disabling physical injuries, and significant trauma. Currently, federal seclusion and restraint requirements cover youth placed in psychiatric residential treatment facilities that receive Medicaid payments. However, requirements do not extend to other types of facilities, and federal officials told us that these techniques continue to be used in ways that sometimes cause injury and death. HHS is preparing a draft notice of proposed rule

[27] For additional information see Department of Health and Human Services' Centers for Disease Control Morbidity and Mortality Weekly Report on *Suicide Trends among Youths and Young Adults Aged 10-24 years—United States, 1990-200*, (Atlanta, Georgia, Sept. 7, 2007 / 56(35); 905-908).

[28] National Center on Institutions and Alternatives. Juvenile Suicide in Confinement: A National Survey. February 2004.

GAO-08-346  Residential Facilities

making concerning the use of seclusion and restraint in nonmedical community-based children's facilities.[29]

## Federal Oversight Does Not Ensure States Are Monitoring Youth Well-Being in Residential Facilities

Federal agencies have several means of ensuring that states are monitoring youth well-being in residential facilities that receive government funds, but perhaps one of the most rigorous is unannounced site visits to the youth's place of residence. According to the federal and state officials we spoke with, only an on-site visit to the facility can reveal whether services in the administrative reports are provided under conditions that ensure youth well-being. For example, DOJ officials observed that students in one of the facilities they visited received their educational instruction while in cages, and reported that it would have been difficult to detect this practice in an administrative review.

Among the federal agencies we reviewed, all included on-site visits to states to ensure compliance with federal requirements, but agencies did not always include visits to residential facilities. DOJ officials target juvenile justice facilities, such as correctional facilities and detention centers, during on-site reviews to determine state compliance with specific statutory requirements, but HHS oversight reviews of state child welfare systems do not necessarily include children in residential facilities. HHS selects a sample of child case files for site visits, and because most children are in foster home settings, residential facilities are usually not included.

Similarly, while federal agencies have authority to enforce state compliance with federal requirements, these provisions vary in their rigor and use, and only DOJ has levied financial penalties.[30] To date, HHS and Education have required state corrective action plans as a method of

---

[29] This draft notice has been submitted for departmental review and clearance. This rule is being promulgated in response to the Children's Health Act of 2000 (Pub. L. No. 106-310, Title XXXII, § 3208 (amending Title V of the Public Health Service Act)), which requires that public or private nonmedical, community-based facilities for children receiving support in any form from any program supported, in whole or part, with funds appropriated under the Children's Health Act, shall protect and promote the rights of each resident of a facility, including the right to be free from any restraint or involuntary seclusion imposed for purposes of discipline or convenience. The statute requires HHS to define in regulation the types of facilities covered by this provision's requirements.

[30] Federal funding was reduced by $1,552,200 among eight states and territories in 2007.