# Appendix IX: Comments from the Department of Education



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

**APR 2 2 2008**

THE ASSISTANT SECRETARY

Ms. Kay E. Brown
Director, Education, Workforce
  And Income Security Issues
Government Accountability Office
441 G Street, NW
Washington, D.C. 20548

Dear Ms. Brown:

This is in response to your request for comments on the Government Accountability Office (GAO) draft report, "Residential Facilities: Improved Data and Enhanced Oversight Would Help Safeguard the Well-Being of Youth with Behavioral and Emotional Challenges" (GAO-08-346). We appreciate the opportunity to comment on the draft report.

The national surveys conducted by GAO for this draft report are not of State educational agencies (SEAs), the entities for which the U.S. Department of Education (Department) has oversight responsibility under the Individuals with Disabilities Education Act (IDEA). Instead, the national surveys conducted by GAO for this draft report were of State child welfare, health and mental health and juvenile justice agencies. The draft report includes approximately 50 pages of data tables showing significant variability in the extent, level and nature of State oversight of residential schools and academies, detention centers, boot camps, ranches, wilderness camps and treatment facilities. However, survey questions about the presence of educational programming and the quality of educational programming in the several States surveyed, in various settings, were not directed at SEAs. The draft report therefore gives only a partial picture of State monitoring of educational programs for students with disabilities who are publicly placed in residential facilities.

As noted in the draft report, States have the primary responsibility for ensuring the well-being of youth in residential facilities and other settings, and States are responsible for licensure, accreditation and monitoring of facilities in accordance with State standards of care. Some students "with emotional and behavioral challenges" cited in the GAO draft report's age cohort of 12-17 would be receiving services under the IDEA if they met the eligibility criteria for services under that law.

The role of the Department in administering the IDEA is to ensure that SEAs carry out their general supervision responsibilities in section 612(a)(11) of IDEA. Each SEA is responsible for ensuring that IDEA requirements are met in the State, and that each education program in the State, including programs administered by any other State or local agency, meets the education standards of the SEA. The Department's periodic

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

monitoring of SEAs' implementation of the IDEA under section 616 of IDEA includes a review of State monitoring and oversight activities. This could include a review of the SEAs' procedures for monitoring special education programs for students with disabilities who are publicly placed in public or private residential facilities to ensure that such children and youth with disabilities receive a free appropriate public education. The IDEA regulations also include State complaint procedures requiring each SEA to adopt written procedures for resolving any signed written complaint at the State level, alleging that a public agency has violated a requirement of Part B of IDEA or the Part B of IDEA regulations. The Department monitors States' implementation of their complaint procedures to ensure that complaints are resolved in a timely manner.

States and the Secretary of the Interior are required to make annual submissions of data to the Secretary of Education and the public under section 618 of IDEA. These data include the number and percentage of children with disabilities, by disability category, who are educated in a variety of settings, including public or private residential facilities. Fewer than one half of one percent of all children receiving special education and related services are placed in a residential setting by a public education agency under IDEA. These residential placements are for students with significant cognitive disabilities, students who are blind or deaf, students with traumatic brain injury and other conditions, typically of low incidence, requiring intensive and specialized services not available in a less restrictive setting. Thus, residential settings are uncommon placements for serving children under IDEA.

Data on children with disabilities served under the IDEA (available on-line at { HYPERLINK "http://www.ideadata.org/" }) do not necessarily correspond to GAO's study categories of "behavioral and emotional challenges" nor do the age ranges match the study ranges, but IDEA data do give insight about placements. In Fall 2006, 9,373 students ages 6 through 21 with "emotional disturbance" served under IDEA were in residential facilities, while 7,741 students with emotional disturbance were served in correctional facilities. The latter facilities would presumably include the "detention center" category in the study. In comparison, roughly 450,000 students with "emotional disturbance" were served in all educational environments under IDEA.

In addition to children with disabilities served under IDEA, some children are served under the Prevention and Intervention Programs for Children and Youths Who Are Neglected, Delinquent, or at Risk (Title I, Part D of the Elementary and Secondary Education Act, as amended by the No Child Left Behind Act of 2001). Students provided supplemental educational services under Title I, Part D in institutional settings represent only a small percentage of all youth detained or serving sentences in juvenile or adult residential facilities. The role of the Department in administering the Title I, Part D program is to improve educational services for children and youth in local and State institutions for neglected or delinquent children and youth. The Department's monitoring of SEAs' implementation of the Title I, Part D program includes a review of State monitoring and oversight activities to ensure compliance with all statutory and regulatory requirements.

Appendix IX: Comments from the Department
of Education

Some of the students described in the GAO draft report also may be receiving education
and services pursuant to Section 504 of the Rehabilitation Act of 1973, which prohibits
disability-based discrimination by the recipients of federal financial assistance.  Among
other things, at the elementary and secondary level Section 504 requires that qualified
individuals with disabilities be provided with regular or special education and related aids
and services that are designed to meet the needs of individuals with disabilities as
adequately as the needs of individuals without disabilities are met.  Section 504 is
enforced by the Department's Office for Civil Rights (OCR) through complaint
investigation, proactive compliance reviews and the provision of technical assistance.
Additional information about Section 504 compliance activities is available from OCR at
{ HYPERLINK "http://www.ed.gov/ocr" }.

While it is not in the Department's statutory or regulatory authority through IDEA or
Title I, Part D to ensure oversight of the total well-being of youth in residential facilities,
we recognize that a protective and safe school environment, that is consistent with a
State's responsibility for monitoring and oversight of school programs, is necessary for
all students.  Please let us know if you need additional information regarding activities
underway at the Department to ensure appropriate oversight for State accountability for
youth well-being in residential facilities and other settings.

Sincerely,

Tracy R. Justesen

# Appendix X: Comments from the Department of Health and Human Services



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary
for Legislation

Washington, D.C. 20201

MAY 07 2008

Kay Brown
Acting Director,
Education, Workforce,
   and Income Security Issues
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Brown:

Enclosed are the Department's comments on the U.S. Government Accountability
Office's (GAO) draft report entitled: RESIDENTIAL FACILITIES: Improved Date and
Enhanced Oversight Would Help Safeguard the Well-Being of Youth with Behavioral
and Emotional Challenges (GAO 08-346).

The Department appreciates the opportunity to review and comment on this report before
its publication.

Sincerely,

Jennifer P. Luong

for Vincent J. Ventimiglia, Jr.
Assistant Secretary for Legislation

Attachment

## COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS) ON THE U.S. GOVERNMENT ACCOUNTABILITY OFFICE'S (GAO) DRAFT REPORT ENTITLED: "RESIDENTIAL FACILITIES: IMPROVED DATA AND ENHANCED OVERSIGHT WOULD HELP SAFEGUARD THE WELL-BEING OF YOUTH WITH BEHAVORIAL AND EMOTIONAL CHALLENGES" (GAO-08-346)

### GAO Recommendations

To help policymakers craft solutions that best address the magnitude of maltreatment and other threats to youth well-being in residential facilities, and also to facilitate federal oversight across states and agencies, we recommend that the Secretary of HHS take action to determine what barriers remain in those states that do not report case-file data for residential facilities to NCANDS and explore options to help states address existing barriers.

To help target federal civil rights investigations among states and facilities that can provide maximum benefit, we recommend that the U.S. Attorney General direct its Civil Rights Division to request access to HHS's NCANDS case-file data for residential facilities. We also recommend that the Attorney General have the Division query HHS, the Office of Juvenile Justice and Delinquency Prevention, and Education regarding other sources of relevant information within relevant subagencies, such as HHS' Centers for Disease Control and Prevention.

To help ensure that the existing federal regulatory structure protects youth well-being across government and private residential facilities supported by federal programs, we recommend that HHS, DOJ, and Education work to enhance their oversight of state accountability for youth well-being in residential facilities. Such efforts could include ensuring that residential facilities are included in federal oversight reviews and on-site visits to states.

### HHS Response

As described in the report, the National Child Abuse and Neglect Data System (NCANDS) is a voluntary national data collection system. States are encouraged, to the extent practical, to report information for all data elements and technical assistance is provided to assist them in doing so. This Federal/State partnership has been very effective over the years in increasing the quantity and quality of information reported by States to the Federal Government on incidents of abuse and neglect reported to State Child Protective Service agencies.

The number of States or jurisdictions (including the District of Columbia and Puerto Rico) reporting case-level information has increased each year and for the most recent data available, Federal Fiscal Year (FFY) 2006, the number of States submitting case-level data increased to 51, up from 49 submitting case-level data for the FFY 2005 reporting year (the data used by GAO for the report).

Appendix X: Comments from the Department
of Health and Human Services

**COMMENTS OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES
(HHS) ON THE U.S. GOVERNMENT ACCOUNTABILITY OFFICE'S (GAO)
DRAFT REPORT ENTITLED: "RESIDENTIAL FACILITIES: IMPROVED
DATA AND ENHANCED OVERSIGHT WOULD HELP SAFEGUARD THE
WELL-BEING OF YOUTH WITH BEHAVORIAL AND EMOTIONAL
CHALLENGES" (GAO-08-346)**

Addressing barriers to capturing more complete information on incidents of abuse and
neglect, including child maltreatment-related fatalities occurring in residential facilities,
will require continued improvements in the reporting of information on perpetrators and
the reporting of case-level information on fatalities. ACF has seen improvements in both
of these areas and ACF will continue to work with States to improve the collection of
information on perpetrators and on fatalities, wherever possible and feasible.

ACF would be pleased to work with the Department of Justice (DOJ) to provide
NCANDS information that DOJ might find useful; however, it is important to note that
NCANDS captures no identifying information on individual children, perpetrators, or
facilities and, therefore, ACF is unclear whether the information would prove useful in
targeting civil rights investigations.

ACF's current oversight activities vis-à-vis GAO's third-paragraph recommendation are
commensurate with existing statutory authority and resources.

A key issue for consideration would be a requirement that facilities inform
parents/caregivers about the use of disciplinary action, restraint, seclusion or critical
incidents to ensure that there are communications and to affirm a family's "right to
know" what is happening with their child.

SAMHSA is listed in the report in Table 5 on page 36 as having no program requirements
to address certain risks to youth well-being. It is important to note that SAMHSA has no
legal authorization in this area. SAMHSA has taken extensive action within its legal
authorities to address issues of seclusion and restraint, suicide prevention, etc., but does
not have regulatory oversight of individual residential facilities at the local level.

The issue of unlicensed facilities should be more clearly addressed in the report and
recommendations. While licensing issues are discussed on pages 24-26, there is only a
very brief mention of State licensing systems in the conclusion and there are no
recommendations related to this issue. It is SAMHSA's understanding that this was a
reason that the study was conducted and therefore SAMHSA recommends that this issue
be discussed prominently and in more detail.

2

# Appendix XI: Comments from the Department of Justice



**U.S. Department of Justice**

APR 2 4 2008

*Washington, D.C. 20530*

Ms. Kay Brown
Acting Director, Education, Workforce, and
  Income Security
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Brown:

Thank you for the opportunity to comment on the draft Government Accountability Office (GAO) report entitled "Residential Facilities: Improved Data and Enhanced Oversight Would Help Safeguard the Well-Being of Youth with Behavioral and Emotional Challenges" (GAO-08-346). The Department of Justice (Department) understands the rationale behind the first two recommendations; the GAO has recommended additional efforts that may enhance oversight. With regard to the third recommendation, we believe that the Department's Office of Justice Programs' Office of Juvenile Justice and Delinquency Prevention (OJJDP) already has implemented measures that have started to and, over time, will achieve the results the GAO intended to bring about. Consequently, we believe it would be beneficial if the report highlighted the existing accomplishments of OJJDP.

To help target federal civil rights investigations among states and facilities that can provide maximum benefit, the GAO recommends that the Attorney General work with the Secretary of HHS to obtain access to the case data file found in the National Child Abuse and Neglect Data System for residential facilities. Also, the GAO recommends that the Attorney General work with HHS, the OJJDP, and Education to obtain access to other sources of relevant information within relevant sub-agencies, such as HHS' Centers for Disease Control and Prevention. The Department agrees with these two recommendations and intends to address our compliance in our statutorily required response to the Congress.

In its third recommendation, the GAO proposes that the Department, HHS, and Education work to enhance their oversight of state accountability for youth well-being in residential facilities. The OJJDP currently invests a considerable amount of resources for training and provides even more funding for technical assistance on this issue either at a state's request or proactively. For example, today, the OJJDP is intensively assisting two states with conditions of confinement issues while, at the same time, fulfilling the OJJDP's statutory obligations. In addition, in fiscal year 2007, the OJJDP Administrator

**Appendix XI: Comments from the Department of Justice**

Ms. Kay Brown                                                                                              2

created a new working relationship with the Department's Civil Rights Division for the purpose of producing better coordinated responses with states. That relationship already has produced beneficial results. Finally, the OJJDP intends to continue providing oversight of state accountability for youth well-being in residential facilities to the full-extent of the OJJDP's applicable statutory authority, including federal oversight reviews and on-site visits to states. Including these accomplishments in the report would be worthwhile.

The OJJDP agrees with the GAO that working with HHS and Education is an important way to enhance youth well-being in residential facilities and that such effort can be coordinated, in part, through the Coordinating Council on Juvenile Justice and Delinquency Prevention (Council). One of the functions of the statutorily created Council is to coordinate all federal juvenile delinquency programs and all federal programs and activities involving detaining and caring for unaccompanied juveniles. Further, the Council is charged with examining how separate programs can be coordinated among federal, state, and local governments. The Department is a key player on the Council.

For the reasons given above, we recommend GAO's third recommendation include specific actions for each agency, and suggest that HHS and Education develop, in consultation with the Department of Justice and through the Council, minimum standards of care for all relevant federal programs.

If you have any questions, you or your staff may contact Richard Theis, Audit Liaison Group, on (202) 514-0469.

Sincerely,

Lee J. Lofthus
Assistant Attorney General
for Administration

# Appendix XII: GAO Contacts and Staff Acknowledgments

**GAO Contact**     Kay E Brown, (202)512-7215, brownke@gao.gov

**Staff Acknowledgments**     Cindy Ayers (Assistant Director) and Arthur T. Merriam Jr. (Analyst-in-Charge) managed all aspects of the assignment. Kathleen Drennan, Vernette Shaw, and Mark E. Ward made significant contributions to this report, in all aspects of the work. In addition, Denise M. Fantone contributed to the initial design of the engagement; Carolyn Boyce provided technical support in design and methodology, survey research, and statistical analysis; Doreen Feldman and James Rebbe provided legal support; and Charles Willson assisted in the message and report development.

    **GAO-08-346  Residential Facilities**

# Related GAO Products

*Residential Facilities:  State and Federal Oversight Gaps May Increase Risks to Youth Well-Being*, GAO-08-696T, (Washington, D.C.:  April 24, 2008).

*Residential Programs:  Selected Cases of Death, Abuse, and Deceptive Marketing*, GAO-08-713T, (Washington, D.C.:  April 24, 2008).

*Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth.* GAO-08-146T. Washington. D.C.: October 10, 2007.

*Child Welfare and Juvenile Justice: Federal Agencies Could Play a Stronger Role in Helping States Reduce the Number of Children Placed Solely to Obtain Mental Health Services.* GAO-03-397.  Washington, D.C.: April 21, 2003.

*Mental Health: Extent of Risk from Improper Restraint or Seclusion Is Unknown.* T-HEHS-00-26. Washington, D.C.: October 26, 1999.

*Mental Health: Improper Restraint or Seclusion Use Places People at Risk.* HEHS-99-176. Washington, D.C.: September 7, 1999.

*Prison Boot Camps: Short-Term Prison Costs Reduced, but Long-Term Impact Uncertain.* GGD-93-69 Washington, D.C.: April 29, 1993.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, DC 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

**PRINTED ON** ♻ **RECYCLED PAPER**

**United States Government Accountability Office**

# GAO

Testimony

Before the Committee on Education and
Labor, House of Representatives

Exhibit 110

For Release on Delivery
Expected at 10:00 a.m. EDT
Thursday, April 24, 2008

# RESIDENTIAL FACILITIES

## State and Federal Oversight Gaps May Increase Risk to Youth Well-Being

Statement of Kay E. Brown, Director
Education, Workforce, and Income Security Issues



**G A O**
Accountability * Integrity * Reliability

April 24, 2008



**GAO**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-08-696T, a report to the Committee on Education and Labor, House of Representatives

# RESIDENTIAL FACILITIES

## State and Federal Oversight Gaps May Increase Risk to Youth Well-Being

## Why GAO Did This Study

Nationwide, federal funding to states supported more than 200,000 youth in facilities seeking help for behavioral or emotional challenges in 2004. Recent federal reviews and investigations highlighted maltreatment in some facilities, resulting in hospitalizations and deaths. This testimony discusses (1) what is known about incidents that adversely affect youth well-being in residential facilities, (2) the extent that state oversight ensures youth well-being in these facilities, and (3) the factors that affect the ability of federal agencies to hold states accountable for youth well-being in residential facilities. This testimony is based on GAO's ongoing work, which included national surveys to state agencies of child welfare, health and mental health, and juvenile justice for the year 2006. GAO achieved an 85 percent response rate for each of the three surveys. The work also included site visits to four states (California, Florida, Maryland, and Utah) and discussions with the Departments of Education (Education), Justice (DOJ), and Health and Human Services (HHS). Interim work related to this testimony was completed between November 2006 and March 2008, in accordance with generally accepted government auditing standards.

## What GAO Recommends

GAO recommendations will be included in its final report upon completion of ongoing work.

To view the full product, including the scope and methodology, click on GAO-08-696T. For more information, contact Kay E. Brown (202) 512-7215 or brownke@gao.gov.

## What GAO Found

Survey respondents from 49 states reported investigating complaints of youth maltreatment in residential facilities in 2006, including physical abuse, neglect, and sexual abuse, and 28 states reported deaths. There were no discernable patterns in the types of facilities involved, including whether facilities were operated by government or private entities, or located in urban or rural areas. State officials said that the number of maltreatment incidents was greater than the total reported to HHS—1,503 incidents in 2005—due to barriers in data collection and reporting, including inconsistent funding and authority.

States license and monitor residential facilities, but state agencies reported oversight gaps that may place youth in some facilities at higher risk for maltreatment and death. Some types of facilities are exempt from state licensing requirements—primarily state operated juvenile justice facilities and private residential schools and academies. Licensing standards did not always address suicide prevention and other common risks. State agencies reported an inability to conduct yearly on-site visits to facilities because of fluctuating levels of staff resources dedicated by states, and infrequently sharing negative findings from their oversight results.

**Aspects of Well-Being Monitored by State Agencies in Private Residential Facilities That Served Youth and Received Government Funding**

| Monitoring requirement | Monitored for less than all residential facilities | | | Monitored for all facilities | | |
|---|---|---|---|---|---|---|
| Physical plant | 4 | 16 | 13 | 36 | 22 | 24 |
| Staffing issues | 5 | 15 | 13 | 36 | 22 | 23 |
| Use of approved seclusion and restraint | 7 | 13 | 10 | 33 | 23 | 25 |
| Use of psychotropic medications | 9 | 15 | 14 | 31 | 22 | 22 |
| Presence of educational programming | 7 | 18 | 17 | 31 | 8 | 18 |

Legend: ☐ Child welfare   ░ Health and mental health   ▓ Juvenile justice

Source: GAO analysis of state agencies' responses to survey.

Note: Other agency responses included no such facility in state, don't know, and no response.

HHS, DOJ, and Education hold states accountable for youth well-being, but federal efforts are hindered by the scope of the agencies' oversight authority and practices. Most notably, these agencies do not have the authority to hold states accountable for youth in private residential facilities unless they serve youth in state programs that receive federal funds. For facilities that were under federal purview, federal requirements did not always address the identified risks to youth—including such risks as suicide and inappropriate use of seclusion and restraint—and program requirements were inconsistent. In monitoring state compliance, federal agencies did not always include residential facilities in their oversight reviews.

_____ **United States Government Accountability Office**

Mr. Chairman and Members of the Committee:

Thank you for inviting me here today to discuss our ongoing work reviewing how state and federal agencies protect the well-being of youth in residential facilities who are receiving services for their behavioral or emotional challenges. Nationwide, federal funding to states supported more than 200,000 youth in government or private facilities in 2004. In addition, an unknown number of youth are placed in facilities by parents or others. These facilities include boarding schools and academies, boot camps, and wilderness camps. Overall, residential facilities play an important role in serving youth who cannot be safely served in their communities while living at home, due to risk of running away or harm to themselves or others. However, recent federal reviews highlighted youth fatalities in residential facilities due to neglect or maltreatment, and ongoing federal investigations continue to document incidents of abuse and neglect in some facilities for youth that in some cases have been severe enough to result in hospitalization or death.

As you know, states are primarily responsible for ensuring the well-being of youth in facilities and other settings, and do so by setting their own standards of care certain facilities must meet to obtain and maintain an operating license. Federal agencies also set requirements for youth well-being that states agree to uphold in exchange for receiving federal program funds, such as those administered by the Department of Health and Human Services (HHS) to support state systems of care for child welfare, mental health, and substance abuse; the Department of Justice (DOJ), for state juvenile justice systems; and the Department of Education (Education), for state education systems. Further, if patterns of maltreatment are identified and found to violate the civil rights of youth in certain facilities that are operated or substantially sponsored by state and local governments, the federal Civil Rights of Institutionalized Persons Act (CRIPA) authorizes the Attorney General of the United States to conduct investigations and bring actions against state and local governments. However, under the current regulatory framework, federal oversight authority does not extend to private facilities that serve only youth placed and funded by parents or other private entities. In some states, safeguarding youth in these facilities is the primary responsibility of parents and facility staff.

My remarks today will focus on the following issues with regard to youth well-being in residential facilities in terms of

(1) what is known about the incidents that adversely affect the well-being of youth in residential facilities,

(2) the extent that state oversight ensures the well-being of youth in residential facilities, and

(3) the factors that affect the ability of federal agencies to hold states accountable for youth well-being in residential facilities.

This testimony was developed using multiple methodologies, and was limited to residential facilities we defined as those that require youth—ages 12 through 17—to reside at the facility and that provide program services[1] for youth with behavioral and emotional challenges. We surveyed three state agencies—child welfare, health and mental health, and juvenile justice[2]—about residential facilities that were government operated, privately operated that received government funds, and privately operated with no government funding. To further our understanding, we visited four states—California, Florida, Maryland, and Utah—and interviewed relevant officials. These states were selected based on the diversity of their state licensing and monitoring policies for residential programs, reports of child maltreatment, and geographic location. The scope of our work did not include the quality of services provided at residential facilities. We also obtained data from HHS's National Child Abuse and Neglect Data System (NCANDS); reviewed federal statutes, regulations, and guidance; and interviewed HHS, DOJ, and Education officials, as well as national association representatives and other experts on residential facilities for youth.  The scope of our work did not include the quality of services provided at residential facilities.  We performed our work between November 2006 and March 2008, in accordance with generally accepted government auditing standards.

---

[1] Our review included facilities that provided one or more of the following types of programs: juvenile justice, youth offender, juvenile delinquency, and incorrigibility programs; treatment programs for youth with behavioral, emotional, mental health, and substance abuse issues; homes for pregnant teens; schools for discipline or character education; and therapeutic group homes, such as a home that specializes in supporting and treating youth with severe emotional disorders.

[2] In this report, we use the term *states* to refer collectively to the 50 states plus the District of Columbia and Puerto Rico. We did not survey state education agencies because they generally do not license residential facilities for youth.

## In summary

- Youth maltreatment and death occurred in government and private residential facilities across the nation, according to states we surveyed; however, data limitations hinder efforts to quantify the full extent of the problem. State-reported data collected by HHS in 2005 showed 1,503 incidents of maltreatment by facility staff in 34 states, including physical abuse, neglect or deprivation of necessities, and sexual abuse. Moreover, 28 states responding to our survey reported at least one death in residential facilities in 2006, with accidents and suicides among the most common types of fatalities. These reported data, however, did not capture information from all facilities. Many states lack authority under state law to collect data on exclusively private facilities, and data that states did report were often incomplete. As a result, the number of adverse incidents was likely more numerous and widespread than reported.

- All states have processes in place to license and monitor certain residential facilities, but states reported oversight gaps that may place youth in some facilities at higher risk for maltreatment and death. Most notably, state agencies exempted some types of government and private facilities from licensing requirements altogether, primarily juvenile justice facilities and private schools and academies. In addition, licensing standards do not always address suicide and other common risks to youth well-being. Although monitoring is key to ensuring facility compliance with standards, agencies in states we visited reported an inability to conduct yearly on-site reviews of conditions at each facility, because of fluctuating levels of staff resources committed by the state. Similarly, although information sharing can strengthen oversight for facilities shared by multiple agencies, many state agencies reported that they did not routinely share information with other state agencies about negative findings or when facility licenses were suspended or revoked.

- HHS, DOJ, and Education all have processes to hold states accountable for the well-being of youth, but federal efforts are hindered by the scope of the agencies' oversight authority and monitoring practices. Most notably, these agencies do not have the authority to hold states accountable for youth well-being in private residential facilities unless they serve youth in state programs that receive federal funds. For facilities under federal purview, federal requirements did not always address the primary risks to youth well-being, such as suicide, and requirements were inconsistent among programs. In monitoring state compliance, federal agencies did not always include residential facilities in their oversight reviews.

# Youth Maltreatment Occurred in Facilities Across the Nation, but Data Are Limited and Not Used to Target Federal Civil Rights Investigations

Nearly all states (49) responding to our survey reported investigating complaints of youth maltreatment in residential facilities in 2006, including facilities operated by government as well as private entities, and located in both urban or rural areas. The types of maltreatment reported by states included physical abuse, neglect or deprivation of necessities, and sexual abuse that sometimes resulted in hospitalization or death. State reported data to NCANDS from 2005 showed that 34 states reported 1,503 incidents of youth maltreatment by facility staff. Of these incidents, neglect or deprivation of necessities was the most frequent cause of youth maltreatment, followed by physical abuse, as shown in figure 1.

**Figure 1: Percentage of State-Reported Incidents of Youth Maltreatment by Residential Facility Staff, Fiscal Year 2005**



Source: NCANDS.

[a]"Other" incidents of youth maltreatment states reported to NCANDS include medical neglect and psychological or emotional maltreatment.

Of the states we surveyed, 28 reported that at least one youth had died in a residential facility in 2006. These deaths were primarily due to accidents and suicide, but also due to homicide and application of seclusion and restraint (see fig. 2).

**GAO-08-696T  Residential Facilities**

**Figure 2: Number of States That Reported Specific Causes of Youth Fatalities in Residential Facilities, 2006**



Causes of youth fatalities

Source: GAO analysis of state agency responses to survey.

Notes:

The survey question was as follows: Of the total youth deaths that you reported, how many died from each of the following causes: (a) suicide, (b) homicide, (c) application of seclusion and restraint techniques, (d) medically related accident, (e) accident that occurred while in a runaway or absence without leave status, (f) other accidental cause, and (g) other causes?

Other causes of youth fatalities in residential facilities include natural causes, choking, and internal bleeding.

Overall, officials from the states we visited said that the number of maltreatment incidents and deaths was greater than reported due to barriers in collecting and maintaining data. When available, comprehensive reporting of incident data can be used by state and federal agencies to assess the extent of maltreatment in residential facilities, inform risk assessments, target oversight resources, and develop policies to address trends. However, the lack of authority under state law hinders many states from collecting data on certain facilities—such as exclusively private facilities—and expanding oversight to cover them. In addition, states that have such authority reported difficulties sustaining data collection in times of budget shortages. National data in NCANDS for

2005—derived from state reports—suffers from these same limitations, as well as others. First, some states did not report data for residential facilities to NCANDS,[3] so the data may understate the number of maltreatments and fatalities. Second, many states (37) did not consistently identify whether the individual maltreating youth was facility staff, a parent, or other individual. Last, NCANDS only tracked fatalities resulting from maltreatment, not suicide or accidents that may be an indicator of neglect or other problem that needs resolution.

In the states we visited, youth maltreatment in facilities was attributed to several factors—such as a lack of experienced staff, insufficient staff training, or lack of appropriate supervision—particularly in smaller facilities. For example, county officials in one state told us that adverse incidents were most likely to occur in contractor operated six-bed group homes—frequently used by state probation and child welfare agencies—where the state reimbursement rate is generally not high enough to hire skilled personnel and provide staff with ongoing training, support, and oversight.

However, while in most facilities youth maltreatment may occur infrequently as a result of isolated circumstances, investigations of government and private facilities serving youth conducted under DOJ's Civil Rights Division (Division) have found a pattern or practice of civil rights violations in some facilities, including physical and sexual abuse, medical neglect, and inadequate education.  At the end of fiscal year 2006, the latest year for which data were available, federal investigators reported active cases involving over 175 facilities in 34 states.[4] Annual reports from DOJ over the past several years have documented their findings of youth maltreatment in certain juvenile justice or mental health facilities:

<u>Physical and sexual abuse occurred without management intervention.</u> In one facility, staff hit youth and slammed them to the ground. Staff hog-tied and shackled youth to poles in public places, and girls were forced to eat

---

[3]In fiscal year 2005, 10 states did not submit reports showing the number of fatalities in residential facilities, 2 states did not submit a report, 7 states did not track facility incident data in a format that could be shared with NCANDS, and 1 state involved in litigation did not report facility data.

[4]For additional information see U.S. Department of Justice *Department of Justice Activities Under the Civil Rights for Institutionalized Persons Act, Fiscal Year 2006,* U.S. Department of Justice (Washington, D.C.: 2007).

their own vomit if they threw up while exercising in the hot sun. Staff routinely broke and wired shut the jaws of youth who showed disrespect in another facility. In some facilities, staff engaged in sexual acts with boys. Youth-on-youth violence occurred on an almost daily basis in some facilities, at times resulting in injuries that required hospitalization. Youth were sexually assaulted and threatened with sexual assault by other youth in some facilities, all without effective intervention from management.

Severe neglect resulted in poor education, suffering, and death. In a 1-year period at one facility, three boys committed suicide. In one suicide, staff lacked the appropriate tool to cut the noose from a victim's neck and also did not have oxygen in the tank they brought to help resuscitate him. The dental clinic at one facility was full of mouse droppings, dead roaches, and cobwebs; medications in the cabinet had expired over 10 years ago. In a state-operated mental health facility used by adolescents, older psychotropic medications, with serious side effects, were administered to sedate patients. One adolescent received 22 such psychotropic sedatives over a 2-month period. In another facility, youth were not provided with special education services as required by federal law.

The Special Litigation Section of DOJ's Civil Rights Division receives more credible allegations of violations of youth rights than it can investigate. During fiscal year 2006 alone, the Division received approximately 5,000 citizen letters; hundreds of telephone complaints, and 135 inquiries from Congress and the White House. Division officials stated that with additional sources of information, they could better target their scarce investigative resources. Officials said that receiving more detailed information from NCANDS on the incidents of maltreatment and death occurring in specific facilities would be helpful, as would the results of federal agency monitoring reviews of states that highlight findings related to residential facilities. Except in one instance,[5] officials said that no federal agencies—including HHS, Education, and DOJ's Office of Juvenile Justice and Delinquency Prevention (OJJDP)—were coordinating with the Division to provide pertinent oversight results.

---

[5]According to DOJ officials, the Civil Rights Division has been granted access to HHS's Centers for Medicare and Medicaid Services (CMS) database that contains the annual survey results for CMS oversight of residential facilities.

# Gaps in State Oversight of Residential Facilities May Place Well-being of Some Youth at Risk

All states have processes in place to license and monitor certain residential facilities, but our survey identified several gaps that allow some of the common causes of youth maltreatment and death to go unaddressed. These gaps include the fact that some types of government and private facilities are exempt from licensing requirements, licensing standards do not always address the primary causes of youth maltreatment and death, and state agencies inconsistently monitor and enforce facility compliance and share their monitoring results.

## Certain Facilities Are Exempt from State Licensing Requirements

Licensing all facilities in a state—government or private facilities—can help ensure that residential facilities meet relevant state standards. Among state-operated facilities, however, more than half (28) of juvenile justice agencies reported exempting facilities from licensing.[6] In addition, many state agencies reported that certain types of private facilities were also exempt from licensing, regardless of whether they received some government funding or were exclusively private. Private residential schools and academies—a category that includes boarding schools and training or reform schools—were exempted more often from licensing than other types of private facilities, according to survey respondents. Conversely, treatment facilities were the type most commonly required to have a license. Agencies in six states reported they exempted faith-based facilities from licensure.[7] In addition, many agencies reported not knowing the licensing status of certain types of private facilities or reported that

[6]The survey question was as follows: Which, if any, of the following types of government operated facilities providing residential targeted (child welfare, health mental health, juvenile justice) services for youth are currently exempt from licensing or monitoring in your state by statute or state regulations—state operated facilities? Response options were (a) exempt from licensing by our agency, (b) exempt from routine monitoring by our agency, (c) exempt from both, (d) not exempt from either, (e) no such facility in state, (f) don't know, and (g) no response.

[7]These six states are Arizona, Arkansas, Iowa, Maine, Missouri, and South Carolina. In addition, licensing officials we interviewed in Florida stated that faith-based facilities had the option of being licensed by the state or by a faith-based licensing authority. The survey question was as follows: Which, if any, of the following types of private facilities providing residential targeted services for youth are currently exempt from licensing or routine monitoring in your state by statute or state regulation: Faith-based facilities? (a) exempt from licensure by our agency, (b) exempt from routine monitoring by our agency, (c) exempt from both, (d) not exempt from either, (e) no such facility in state, (f) don't know, and (g) no response.

they did not have certain types of facilities in their state.[8] Some states are considering laws that would expand their licensing authority for private facilities.

One reason that private residential facilities may be exempt from licensing requirements is that state agencies do not have the necessary statutory or regulatory authority. Regarding residential schools and academies, for example, all agencies in 15 of the 33 states that responded to all three agency surveys reported that they did not have either the authority or the regulatory responsibility to license these facilities.[9]

The lack of licensing for all facilities serving youth has several consequences, in that there are no commonly accepted definitions of facility types. Within individual states, facility operators may bypass state licensing requirements by self-identifying their business as a type that is exempt from state licensing. In Texas, for example, a residential program self-identified as a private boarding school is not regulated by the state licensing agency, but the same facility would require a license if it self-identified as a residential treatment center or therapeutic camp. Inconsistent licensing practices across states can have implications as well. For example, a 2007 directory showed that Utah, which only recently implemented licensing requirements covering wilderness camps, was home to over 25 percent of registered wilderness programs in the United States.

Facility licensing is also important because parents and others considering placing youth in private facilities at their own expense do not always have the information they need to screen facilities and make an informed decision. In our testimony on private facilities last October,[10] we described cases in which program leaders told parents their programs could provide

---

[8]Across agencies, states most often responded that they did not have private boot camps, ranches, and wilderness camps. Among state juvenile justice agencies, for example, 25 reported having no private boot camps in their state that received government funding, 22 reported having no ranches, and 17 reported having no wilderness camps. Somewhat fewer states reported not having exclusively private boot camps (19), ranches (17), and wilderness camps (14).

[9]Two of the 15 states—Massachusetts and Utah—have a central agency that is responsible for licensing residential facilities. While we did not receive all three surveys from Texas, it also exempts residential schools and academies from licensing.

[10]GAO, *Residential Treatment Programs: Concerns regarding Abuse and Death in Certain Programs for Troubled Youth* GAO-08-146T (Washington, D.C.: October 10, 2007)

services that they were not qualified to offer, claimed to have credentials in therapy or medicine that they did not have, and led parents to trust them with youth who had serious mental disabilities. One national association for programs serving youth with behavioral and emotional difficulties testified before Congress that state licensing was important because the field does not currently have the capacity to certify facility integrity.

Some states are considering laws that would expand their licensing authority for private facilities, while some use other methods to provide protections for youth. For example, Florida, among other states, includes requirements addressing youth well-being in contracts facilities must sign to serve youth under state care. Florida officials estimated that 85 percent of residential facilities in the state's juvenile justice system are private facilities under contract with the state. The agency uses the contract provisions to help ensure that facilities provide youth with needed services in compliance with agency regulations as well as state statutes.

Accreditation is another method used by some states in lieu of, or to augment, state licensing requirements. For example, Ohio and Wyoming require specific health-related facilities to obtain accreditation instead of licensure as a condition to serving youth under state care. Of the states responding to our survey, a greater number of health and mental health agencies reported requiring facilities to be accredited by private organizations, due in part to conditions of participation for certain federal programs.[11] The accreditation process may require providers to meet higher standards than those required by state licensing bodies; however, accreditation does not necessarily ensure the safety and well-being of youth. Officials from an accrediting organization told us that they do not always inform the state if a facility's accreditation status has been suspended or limited. In general, fewer states reported requiring accreditation than not across the three agencies we surveyed.

---

[11]For example, HHS's Medicaid program, a federal-state health insurance program for low-income and other specific populations, requires that providers of certain health or mental health services obtain accreditation from an approved accrediting organization to certify that the facility meets standards for safety, quality of care, treatment, and services.

## State Licensing Standards Do Not Address Some Primary Risks to Youth Well-being

Our survey results showed that the licensing standards that states have in place for certain government and private residential facilities address many, but not all, of the most common risks to youth well-being that states had identified in our survey. The extent that state licensing standards cover the various aspects of youth well-being is important to safeguard youth from harm. Almost all states reported that when they required licensing, they required facilities to meet standards related to the safety of the physical plant, proper use of seclusion and restraint techniques, reporting of adverse incidents, and qualification requirements and background checks for staff.[12] These standards can help reduce the risk of harm due to accidental causes and staff maltreatment. However, other requirements addressing risks to youth are less often included as a part of licensing. For example, while states reported that almost all juvenile justice facilities are required to have written suicide prevention plans, about a third of state child welfare and health and mental health agencies reported that they do not have similar requirements for government facilities. In addition, most of the agencies in our survey did not require private facilities to have written suicide prevention plans.

## State Practices Inconsistent in Monitoring and Enforcing Facility Compliance

State agencies reported monitoring youth well-being in residential facilities, but survey results showed that certain aspects of youth well-being were not included in all monitoring activities, as shown in figure 3. Periodic on-site reviews to monitor and enforce facility compliance help ensure that licensing standards are taken seriously and that risks to youth well-being are quickly addressed. Among six different aspects of youth well-being we asked about in our survey, the quality of educational programming and the use of psychotropic medications were most likely to be reviewed at only some or none of the facilities monitored by child welfare, health and mental health, and juvenile justice agencies. Conversely, staffing issues were most often included in all monitoring reviews of government and private facilities.

---

[12]Note: the survey question was as follows: When your agency develops or opens a government-operated residential facility that provides targeted services to youth, is the facility required to meet state standards in any of the following areas? (a) pass inspection of physical plant, (b) provide evidence of safe child care practices, (c) have written procedures for reporting physical or sexual abuse or neglect of youth, (d) meet all staff qualifications requirements, including training, (e) perform staff background checks, (f) meet specified staff-to-child ratios (g) provide evidence of appropriate educational programming, (h) have procedures in place for use of approved seclusion and restraint techniques, and (i) have written suicide prevention plans. A similar question was asked for private facilities.

**Fig. 3: Aspects of Well-Being Monitored by State Agencies in Private Residential Facilities That Served Youth and Received Government Funding**



Source: GAO analysis of state agencies' responses to survey.

Note: The survey question was as follows: In 2006, did your agency routinely monitor or follow-up, or authorize for monitoring or follow-up, any of the following issues—in the absence of a complaint—at private residential facilities that received government funding providing targeted services for youth? Response options for this question were: (a) yes, monitored for all; (b) yes, monitored for some; (c) no, did not monitor; (d) no such facility in the state; (e) don't know; (f) no response.

In addition, three of the four states we visited reported that they were unable to meet their goals for conducting annual monitoring visits at residential facilities due to a lack of resources. States reported that visiting

facilities was necessary at least once a year, if not more often, to ensure that conditions for youth had not changed due to changes in personnel, ownership, or funding. However, the number of facilities visited each year depended on the fluctuating levels of resources committed by the state. In Maryland, agency officials said that state resources were redirected, as necessary, to meet state goals for monitoring residential facilities for youth. In Florida and Utah, however, agency officials said that imbalances between the current workload and staff resources constrained the state's capacity to conduct efficient, effective, and timely monitoring of residential facilities. A facility operator in California said that on-site monitoring had been as infrequent as once every 5 years.

State agencies reported taking actions against facilities with identified problems in the last 3 years, but few reported suspending or revoking a facility's operating license. Options used included increased monitoring or requiring corrective action plans. Maryland state officials said that they may be less likely to close facilities when they fall below state standards if there is a shortage of facilities in the state and closing the facility would limit the state's ability to serve the youth who would be displaced by a closing. In addition, these officials noted that shutting down a facility is extremely disruptive to the youth who are placed there.

## State Agencies Reported a Lack of Coordination to Share Oversight Results

Many state agencies reported that they did not routinely share information with others regarding negative findings from their monitoring reviews. State agency coordination to share monitoring results can strengthen oversight in situations where facilities are used by multiple agencies and can help ensure that youth are not placed in facilities that another agency has already identified as having problems. However, one or more state agencies reported that they did not routinely share reports of adverse incidents (17) or when facility licenses had been suspended or revoked (12).

Improving coordination among agencies across states is also important because almost all states reported in our survey that they placed some youth in out-of-state residential facilities. For example, child welfare agencies in the top 5 states reported placing over 3,500 youth in at least 26 states. Out-of-state placement can be difficult to manage, but may be used when the demand for services exceeds the state's capacity, particularly for cases requiring highly specialized treatment—such as therapeutic treatment for youth who committed arson, or who were involved in gangs. State agencies or parents may also place youth in other states where family members reside. Interstate coordination is important is to ensure that

agencies sending youth for placement in other states are able to screen out facilities that have had negative findings uncovered during monitoring reviews or have outstanding allegations of maltreatment. Information sharing about adverse conditions in facilities may be particularly important in cases where state licenses cannot serve to help in making appropriate placement decisions. Four of the top five states that received the greatest number of out-of-state placements—according to child welfare agencies we surveyed—exempted one or more types of facilities from state licensing requirements.

## Federal Agencies Challenged to Address Weaknesses in State Oversight of Residential Facilities

HHS, DOJ, and Education hold states accountable for youth well-being in certain residential facilities, but their scope of authority is limited, and gaps in agency oversight practices result in inconsistent protections for youth. Most notably, these agencies can hold states accountable for conditions in facilities that serve youth through programs supported by federal funds[13]—whether government or private—but cannot hold states accountable for conditions in facilities that are exclusively private. When federal agencies do have oversight authority under certain federal programs, however, they do not always hold states accountable for addressing some of the primary risks to youth well-being. For example, in comparing requirements across HHS, DOJ, and Education, only HHS reported requiring states to address abuse and neglect prevention under certain federal programs. (See table 1.)

---

[13] This derives from Congress' powers under Article I, Section 8 of the U.S. Constitution and provisions of federal law establishing conditions for state grants. Congress, as part of its spending power, can attach conditions to states' receipt of federal funds.

**Table 1: Federal Program Requirements for States that Address Certain Risks to Youth Well-being in Residential Facilities**

| Agency and program area | Abuse and neglect prevention | Suicide prevention | Use of seclusion and restraint | Education quality |
|---|---|---|---|---|
| **HHS** | | | | |
| Child welfare | Yes | No | No | Yes |
| Medicaid | Yes | Yes | Yes[a] | No |
| Substance abuse and mental health | Yes | No | No | No |
| **DOJ** | | | | |
| Juvenile justice and delinquency prevention | No | No | No | No |
| **Education** | | | | |
| Elementary and secondary education | No | No | No | Yes[b] |
| Special education and rehabilitative services | No | No | No | Yes[b] |

Source: Analysis of HHS, DOJ, and Education documents.

[a]Applies only to psychiatric residential treatment facilities.

[b]Applies only to public agencies and children placed by public agencies in private facilities.

Federal program requirements are limited even for risks such as suicide, a problem documented by several federal agencies. For example, the Centers for Disease Control and Prevention (CDC)—which is part of HHS—have identified suicide as the third leading cause of death in 2004 among all U.S. youth,[14] and suicide was one of the leading causes of death among youth in residential facilities, as reported by states in this study. In addition, a study commissioned by DOJ recommends increased mental health screening for suicide prevention among incarcerated youth.[15] DOJ officials we spoke with generally agreed with the need to focus on suicide prevention in residential facilities, and suggested that additional federal requirements in this area would be helpful. DOJ and HHS have Web sites that list resources states can use for this purpose, but HHS officials said

---

[14]For additional information, see Department of Health and Human Services' Centers for Disease Control Morbidity and Mortality Weekly Report on *Suicide Trends Among Youths and Young Adults, aged 10-24 years—United States, 1990--2004.*

[15]National Center on Institutions and Alternatives. *Juvenile Suicide in Confinement: A National Survey.* February 2004.

that states are more responsive to a requirement or more specific agency guidance.

Similarly, federal programs also do not generally require that states ensure the proper use of seclusion and restraint practices, which have come under intense scrutiny in recent years. Researchers and clinicians have chronicled the inherent physical and psychological risks in each use of these types of interventions——including death, disabling physical injuries, and significant trauma. Currently, federal seclusion and restraint requirements cover youth placed in psychiatric residential treatment facilities that receive Medicaid payments. However, requirements do not extend to other types of facilities, and federal officials told us that these techniques continue to be used in ways that sometimes cause injury and death. HHS is preparing a draft notice of proposed rulemaking concerning the use of seclusion and restraint in non-medical community-based children's facilities.[16]

Federal agencies have several means of oversight for youth well-being, but perhaps one of the most rigorous is unannounced site visits to the youth's place of residence. According to the federal and state officials we spoke with, only an on-site visit to the facility can reveal whether services in the administrative reports are provided under conditions that ensure youth well-being. For example, DOJ officials observed that students in one of the facilities they visited received their educational instruction while in cages, and reported that it would have been difficult to detect this practice in an administrative review.

Among the federal agencies we reviewed, all included visits to states to ensure compliance with federal requirements, but agencies did not always include visits to residential facilities. DOJ officials target juvenile justice facilities, such as correctional facilities and detention centers, during on-site reviews, but HHS officials do not necessarily include residential facilities in their oversight reviews of state child welfare systems. HHS

---

[16]This draft notice has been submitted for departmental review and clearance. This rule is being promulgated in response to the Children's Health Act of 2000 (Pub. L. No. 106-310, tit. XXXII, §3208) (amending Title V of the Public Health Service Act)), which requires that public or private non-medical, community-based facilities for children receiving support in any form from any program supported, in whole or part, with funds appropriated under the Children's Health Act, shall protect and promote the rights of each resident of a facility, including the right to be free from any restraint or involuntary seclusion imposed for purposes of discipline or convenience. The statute requires HHS to define in regulation the types of facilities covered by this provision's requirements.

selects a sample of child case files for site visits, and because most children are in foster home settings, residential facilities are usually not included.

Similarly, while federal programs contain provisions agencies can use to enforce state compliance with federal requirements, these provisions vary in their rigor and use, and only DOJ has levied financial penalties.[17] To date, HHS and Education have required state corrective action plans as a method of enforcement, but officials said that they may also assess financial penalties in the future.

## Concluding Remarks

As the results of our work show, protecting youth in residential facilities—many of whom are troubled and vulnerable to harm from themselves or from others—requires particular vigilance on the part of parents and responsible government agencies. However, abuse, neglect, and civil rights violations documented in all types of residential facilities—government and private, licensed and unlicensed—show that the current federal-state oversight structure is inadequate to protect youth from maltreatment. Comprehensive results of our work will be included in a report to be released next month. This report will provide some options for action that states, federal agencies, and Congress may consider in any restructuring effort. We anticipate our report will also include recommendations for action that federal agencies can implement now under the existing regulatory structure.

Mr. Chairman, this completes my prepared statement. I would be happy to respond to any questions you or other Members of the committee may have.

## GAO Contacts and Acknowledgments

For further information regarding this testimony, please contact me at (202) 512-7215. Individuals making key contributions to this testimony include Lacinda Ayers, Carolyn Boyce, Doreen Feldman, Art Merriam, Jim Rebbe, and Mark Ward.

---

[17]Federal funding was reduced by $1,552,200 among 8 states and territories in 2007.



This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates."

## Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, DC 20548

To order by Phone: Voice:  (202) 512-6000
                    TDD:    (202) 512-2537
                    Fax:    (202) 512-6061

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548



**PRINTED ON** ♻ **RECYCLED PAPER**

Exhibit 112

 **Keep Students Safe**
@AllStudentsSafe

Replying to @StopLoganRiver

@StopLoganRiver #KeepStudentsSafe is trending in DC where it counts, thx in large part to all of you. TYVM. You have no idea how gr8 it is.

11:18 AM · Feb 12, 2014 · Twitter Web Client





Exhibit 114

*POLITICS*   09/18/2016 10:21 pm ET | **Updated** Sep 18, 2016

# Why I Knocked Boston Children's Hospital Off The Internet: A Statement From Martin Gottesfeld

The high-profile 2014 cyber attack is explained for the first time.

 **By Ryan Grim**

In the spring of 2014, the hacker collective Anonymous took credit for hitting a number of health care and treatment facilities in the Boston area in defense of a patient there named Justina Pelletier. For background on her controversial case, which became the focus of national attention, read here or here.

The attacks became somewhat less anonymous when a man named Martin Gottesfeld was arrested in connection with them in February of this year, after his sailboat ran into difficulty off the coast of Cuba. A Disney cruise ship picked up Gottesfeld and his wife, and Gottesfeld was arrested when the ship docked in Miami. He has been in detention ever since. An indictment is expected any day.

**⫿HUFFPOST⫿**

## Last chance to become a HuffPost founding member!

Sign up for membership to become a founding member and help shape HuffPost's next chapter

Yes, I want to support HuffPost

For the first time, Gottesfeld is coming forward to explain why he did what he did, in an exclusive statement provided to The Huffington Post. A spokeswoman for U.S. Attorney Carmen Ortiz, whose office is pursuing the case, said she had no updates on the case. Boston Children's Hospital and Wayside, two of Gottesfeld's targets, didn't immediately

Case 1:18-cv-10836-PGG   Document 115-3   Filed 12/17/19   Page 35 of 42



respond to a request for comment.

Here is his statement, published in full:

## Why I Knocked Boston Children's Hospital Off The Internet

The answer is simpler than you might think: The defense of an innocent, learning disabled, 15-year-old girl. In the criminal complaint, she's called "Patient A," but to me, she has a name, Justina Pelletier. Boston Children's Hospital disagreed with her diagnosis. They said her symptoms were psychological. They made misleading statements on an affidavit, went to court, and had Justina's parents stripped of custody.

They stopped her painkillers, leaving her in agony. They stopped her heart medication, leaving her tachycardic. They said she was a danger to herself, and locked her in a psych ward. They said her family was part of the problem, so they limited, monitored, and censored her contact with them.

Justina resorted to sneaking notes, hidden in origami, to tell her family what she wasn't allowed to say around eavesdroppers. Hospital staff pushed her to do things she was physically incapable of, due to the physical condition they refused to acknowledge she has. They laughed at her as she struggled futilely. They left her on a toilet for hours when she couldn't void her bowels. They left her secluded in a bare room, or alone in the hallway, sometimes for days when she couldn't wheel herself elsewhere.

When they did move her, they ripped her toe nails, dragging her feet on the floor. They bruised her. Her legs swelled, her gums receded, and her hair fell out. This went on for 11 months at BCH.

Her parents went to the media, and a gag order was issued specifically prohibiting them from speaking to journalists. When she finally left the hospital (in large part thanks to the negative publicity,) she still wasn't allowed home and her ordeal wasn't over. BCH was still in charge and her suffering continued, though the most culpable had successfully manipulated the spotlight onto others.

At her new treatment center, aptly named "Wayside," Justina was verbally assaulted while nude in the shower. She continued to be denied her medications and treated according to the BCH plan.

Her father broke the gag order, publicly stating her life was in danger. The story made big



news, but there was no indication when Justina would be returned to her family and receive the long delayed treatment she desperately needed. A former BCH nurse called what Justina was enduring its proper term: torture. According to international humanitarian law, she was right.

I had heard many, too many, such horror stories of institutionalized children who were killed or took their own lives in the so-called "troubled teen industry." I never imagined a renowned hospital would be capable of such brutality and no amount of other good work could justify torturing Justina. She wasn't alone either. BCH calls what it did to her a "parentectomy," and there had been others over at least the past 20 years.

I knew that BCH's big donation day was coming up, and that most donors give online. I felt that to have sufficient influence to save Justina from grievous bodily harm and possible death, as well as dissuade BCH from continuing its well established pattern of such harmful "parentectomies," I'd have to hit BCH where they appear to care the most, the pocket book and reputation. All other efforts to protect Justina weren't succeeding and time was of the essence. Almost unbelievably, they kept their donation page on the same public network as the rest of their stuff. Rookie mistake. To take it down, I'd have to knock the whole hospital off the Internet.

I also knew from my career experience as a biotech professional that no patients should be harmed if Boston Children's was knocked offline. There's no such thing as an outage-proof network, so hospitals have to be able to function without the Internet. It's required by federal law, and for accreditation. The only effects would be financial and on BCH's reputation.

The network was strong, well funded, but especially vulnerable to a specific attack. Apparently BCH was unwilling to architect around the problem. I see such laziness often in my work, and it leaves our nation vulnerable.

I had spent my career building cyber-defenses. For the first time, I was on the offensive. I coded around the clock for two weeks to perfect the attack. Small test runs were made. BCH bragged to the media that they were withstanding the onslaught and hadn't been taken down. They had no idea what was to come.

I finished the code just in time. It ran. BCH's donation page went down. As they were down, I was nervous. I left it running for a few hours.

Then, with some donations still left, I issued the command to stop the attacks — the point



had been made. Justina wasn't defenseless. Under the banner of Anonymous, she and other institutionalized children could and would be protected. There have been no such egregious parentectomies published at BCH since.

In 2016, Justina's family announced they were suing Boston Children's. The civil claim reads like a medical horror novel.

Under U.S.-ratified human rights Conventions, there can be no justification for torture, not even war, the threat of war, or the preservation of human life. Freedom from torture is a non-derogable human right, and the U.S. is obligated to investigate, prosecute, and punish all acts of torture, no matter who perpetrated them.

To read more, including why what was done to Justina qualifies as torture under international law, see: www.FreeMartyG.com.

*Do you have information you want to share with HuffPost? Here's how.*

 **BEFORE YOU GO** ──────────────────────────



PHOTO GALLERY

Anonymous Unmasked

See Gallery

**Ryan Grim** 🐦
Former Washington Bureau Chief, HuffPost

**Suggest a correction**



Exhibit 115

s with every thing
do not let me sleep vary much

Huys...
Carolen / kristin and more o.t and more
they hirt me all the time push me
all the time and more

Exhibit 116

US

# 'Shocking Note' Apparently Penned by Justina Pelletier to Her Parents

Apr. 15, 2014 1:39pm Liz Klimas

## 12.2K

Shares
Share This
Tweet This

## Email this story to a friend

| Your Name | Your Email Address |
| Friend's Name | Friend's Email Address |
| Your Message | Send Email |

The Connecticut teen who has been in state custody for more than a year after her parents were accused of medical child abuse after disputing a diagnosis has apparently penned a note, giving a look into how she says she's being treated.

"They hurt me all the time push me all the time and more," the purported note from Justina Pelletier says. It also says "[they] do not let me sleep vary [sic] much.

"Hury [sic]!"



Image source: Personhood USA

Keith Mason, president of Personhood USA, a group helping lead the Free Justina Coalition, told TheBlaze that Justina gave the note to her parents a few weeks ago.

"There has been some hesitation to release it because of how tyrannical the DCF has been," Mason said.

Mason called the note "troubling" and said it's "part of the reason we've put a lot of urgency on this campaign." He said he thinks Justina is referring to her treatment by DCF employees and staff at Wayside Youth and Family Network, a facility in Framingham, Mass., where Justina has been living for the last few months as a ward of the Massachusetts Department of Children and Families.

Lou Pelletier, Justina's father, told TheBlaze that Justina snuck her parents the note.

"She's very intelligent and figures out ways to sneak us stuff," he said. "She's been risking life and limb to get any bit of information to us."

In-person visits with Justina, which happen once a week on Fridays, are supervised by DCF staff, he said.

Pressed for more details about the note, including why some of the content was cut off at the top in the image provided, Lou Pelletier became animated, frequently citing his frustration with the case and said published news reports seem to have resulted in DCF crackdowns on allowing Justina to communicate with them.

"She's being allowed to be tortured in this country, I'll leave it at that," he said.

Personhood USA, which originally released the image in its press release, did not immediately return a request from TheBlaze for a complete image of the note.

The case surrounding 15-year-old Justina began last year when her parents, Lou and Linda Pelletier, brought her to Boston Children's Hospital to see a gastrointestinal specialist while she was suffering from the flu. Justina had previously been diagnosed with mitochondrial disease by a doctor at Tufts Medical Center. She had been receiving treatment for the disorder, which manifests itself in various ways, impacting the function of the energy producing organelles of cells.

When admitted to Boston Children's, her parents say, another doctor disagreed with the mitochondrial disease diagnosis, saying she had somatoform, a psychiatric disorder, instead. When the Pelletiers disagreed with physicians' proposed plan to remove Justina from her treatments for mitochondrial disorder in favor of psychiatric treatments, they tried to discharge her to take her to Tufts. At this time, they served with a 51A, a report of alleged physical or emotional abuse.

On Feb. 14, 2013, the state stepped in and took emergency custody of Justina. Over the course of the next year, the Pelletiers appeared in juvenile court several times, fighting to get their daughter back. Most movement in the case occurred in the first months of 2014, when a judge ordered Justina to be moved from Boston Children's. The most recent decision by Judge Joseph Johnson in late March to allow DCF to retain custody of Justina, making the family's next opportunity to appeal in juvenile court May 20.



Justina Pelletier with her parents, Linda and Lou. Justina has been in the state's custody since last year. (Image source: Facebook)

"DCF isn't listening, the judge sure isn't listening … where we have left to go?" Mason said, explaining why the family ultimately decided to allow the release of Justina's note.

"This shocking note reveals for the first time, in Justina's own words, how she is being abused by Massachusetts DCF. The Pelletiers are devastated to see how their daughter is being mistreated while under the custody of the State of

Massachusetts," Rev. Patrick Mahoney, the Pelletier's spokesperson, said in a statement.

"Sadly, Justina's own words paint a picture of mistreatment by DCF that we can see for ourselves," he continued. "Fourteen months ago, when she was removed from her home, she was taking part in ice-skating competitions and living an active life. Under the care of DCF, she is in now a wheelchair and can barely walk. She has not been allowed to attend church, and has not been given her individualized education program which is required by federal law."

On Monday, the family's lawyers filed an appeal to the state's Supreme Judicial Court. The petition requests for custody of Justina to be removed from DCF and restored to her parents.

"This case comes down to the simple fact that new doctors at Boston Children's Hospital, who had no experience with Justina, came up with a different diagnosis than her expert treating physicians at Tufts Medical Center," Mat Staver, founder and chairman of Liberty Counsel, said in a statement. "The state cannot take children from their parents when the parents make reasonable choices for their medical care. This case is outrageous."

Mason also said the Free Justina Coalition is focusing its efforts toward reaching out to Massachusetts Gov. Deval Patrick to get involved in the situation.

DCF did not immediately respond to TheBlaze's request for comment regarding the note.

*This story has been updated to include comments from Lou Pelletier.*

## 12.2K

Shares
Share This
Tweet This

## Email this story to a friend

| Your Name | Your Email Address |
| Friend's Name | Friend's Email Address |
| Your Message | [ Send Email ] |

## Related:

Justina Pelletier



All information © 2014 TheBlaze Inc