*Exhibit 117* [handwritten]

# GUIDELINES FOR CARE OF JUSTINA PELLETIER DOB 05/24/1998
## Boston Children's Hospital
### February 13, 2013

### Approach   ← *I + be (excretory)* [handwritten]

1. Multidisciplinary, team based.
2. Positive, proactive, forward-looking, rehabilitation-oriented, therapeutic approach rather than diagnostic.
3. Set strict limitations on medical discussions with the family and eliminate interaction with providers outside our hospital, except as initiated by medical team in relation to clinical picture and collateral information.   *vid m & tcc, constitutional rights, this ethical oblig* [handwritten]

### Goals of admission

1. Reduce the number of providers to a core team in order to reduce potential confusion from use of multiple providers across many institutions and state lines.
2. Patient will ambulate, feed by mouth, and drink with adequate nutritional intake.
3. Establish a psychiatric plan to meet Justina's ongoing psychiatric and rehabilitative needs.
4. Reduce number of medications that patient takes.
5. Coordinate care with primary care provider rather than specialist care.

1. Follow the behavioral plan that will be formulated with input from all relevant disciplines which will day schedule, feeding and functioning plans with a therapeutic approach.

2. Participate in daily intensive physical therapy as indicated. Focus of daily physical therapy will be to improve overall functional ability for safe independent mobility.   *vid see cloud* [handwritten]

3. Both parents are to be supportive of their daughter and not be involved in the medical management.
   i. Parents may not administer any medications or flushes to patient No discussion of diagnostic test results, consulting team recommendations or past medical issues with (on-call) residents.   *↗ deprivation* [handwritten]
   ii. Limit communication exclusively through neurology team;
   iii. No medical discussions to be held in the room or within the patient's hearing.
   iv. No dictation of care or calling in consult teams or second opinions on own accord.   *F /law* [handwritten]

4. Will follow up with the feeding plan will be formulated by GI and nutrition.   *× law* [handwritten]

5. No diagnostic tests and no new consultations are to be requested unless Justina develops a new or acute process as observed and assessed by the medical team.

6. Medication regimen will be simplified with a gradual reduction of medications to an small set of essential, non-detrimental, modestly dosed medications with limited side effects (e.g. Lyrica and vitamin cocktail may be OK for now, but not Tegretol, Midodrin, metoprolol)

Exhibit 119



Exhibit 120

# Justina Pelletier's Guardian Hacktivist: "My Notes On the FBI's Lies Are Contraband"

DIARY / MARTY GOTTESFELD // Posted at 1:35 pm on November 8, 2017 by Marty Gottesfeld

Share On Facebook     Share On Twitter

_Martin Gottesfeld_ was _featured by Michelle Malkin_ for _defending_ Justina Pelletier when she was _maimed_ at Harvard-affiliated Boston Children's Hospital (BCH), leading to his imprisonment without bail by a _Harvard-affiliated judge_ and _Obama-appointed prosecutors_. See _FreeMartyG.com_, the FreeMartyG _Facebook page_, and the _@FreeMartyG_ Twitter account for more info.



Federal Magistrate Judge Marianne Bowler didn't recuse herself from my case despite clear financial and other conflicts of interest, but she did help Obama's prosecutors keep things quiet.

It's hard enough fighting the corrupt and still-strong remnants of the Obama Department of "Justice" without having to bring the battle to them from behind the walls of perhaps the _most corrupt_, FBI-protected jail in the Commonwealth of Massachusetts. But imagine not being allowed to keep paper copies of the various lies the Bureau's agents swore to under oath or even your own notes on them

## TRENDING



1   Vulnerable Virginia Democrat Speaks Out: John Brennan: 'I Will Accept Your Trial and Sentencing, That Day Is Coming'

2   Global Warming Activists Bill Gates and Al Gore Defend Their Use of Private Jets. Should You Take Them Seriously?

3   Former DOJ Official: Durham's Statement Means "He's Got the Goods on Somebody"

4   Watch: Democrats Signal a Lost Jerry Nadler to Bang His Gavel While Republicans Speak

5   MSNBC Contributor and Other Leftists Freak Out Over Trump Chocolate Bars

_House Democrats Seek Censure Instead of Impeachment. It's Not Going to Happen_

Jeff Charles



**FBI Interviewed Steele's Primary Subsource in January 2017; Learned the Dossier was 'Hearsay Upon Hearsay'**

Elizabeth Vaughn

because of an order issued by a <u>biased, conflicted judge</u> with much to hide. Imagine too that your own lawyers actually agreed to it on your behalf without even checking with you first. Then take a look below, especially at Item 5 on Page 2, which forbids me from even holding on to my own notes regarding the discovery materials in my case showing serious federal government misbehavior:



Now, <u>I recently wrote</u> about another one of the federal government's dirtiest tricks, the so-called "good faith exception" to the 4th Amendment. The documents that I and <u>other journalists</u> needed in order to show the public that Boston FBI agent Michael W. Tunick lied under oath to Magistrate Judge Jennifer Boal are supposedly covered by the "protective order" above. That order was put in place by Magistrate Marianne Bowler, for whom my prosecutors went "judge shopping" after duping Boal. Bowler failed to recuse herself despite having worked for Harvard Medical School, which oversees alleged "victim" Boston Children's Hospital. Bowler is also married to a tenured professor of that same school, and even sat on the board of a foundation that granted money and runs fundraisers for another alleged victim named throughout case documents.

What every alleged "victim" shares in common of course, besides Bowler, is that they all tortured Justina Pelletier.

To be sure though, Bowler is not entirely to blame for that protective order. <u>The prosecution</u> requested it and my first attorneys agreed to it without ever consulting me. It seems clear that was not in my best interest. It's clearer still that <u>I would never</u> have agreed to it regardless.

So, I want to note for the record that I have not signed the agreement on the last page above to abide by this euphemistically labelled gag order and to further assure



*Start Including Gay Love Stories?*
*Global Warming Activists Bill Gates and Al Gore Defend Their Use of Private Jets. Should You Take Them Seriously?*



*The Grandmother Who Confronted Liz Warren on School Choice is a Rock Star and You Should Know Her Name*

Kira Davis



*Vulnerable Virginia Democrat Gets Dragged By Constituents During an Open House Over Her Impeachment Stance*

streiff

<u>other journalists</u>, who are not parties to my case, that they aren't bound by it either.

Now, anyone know any honest, competent attorneys looking to take on an interesting federal hacking case?

*A version of this article with the complete protective order was previously published at <u>FreeMartyG.com</u>*



***Global Warming Activists Bill Gates and Al Gore Defend Thei Use of Private Jets. Should You Take Them Seriously?***

Alex Parker

**f** Share On Facebook     **𝕐** Share On Twitter

SHOW COMMENTS



**Former DOJ Official: Durham's Statement Means "He's Got the Goods on**



**Watch: Democrats Signal a Lost Jerry Nadler to Bang His Gavel While Republicans**



**Tom Brokaw Gets It on Impeachment, Says What We're All Thinking About It**



**New Poll Has Still More Very Bad News For Democrats**



**The New Ghostbusters Trailer Is Out, and It's Already Causing SJW Meltdowns**



**Oops: Nadler Accidentally Confesses to the Left's Impeachment Motivations**

# RECENT STORIES



# SAVAGE: FBI AGENT REFUSES TO INVESTIGATE TORTURED CHILDREN

## Special Agent chose brutal abusers over 15-year-old girl in wheelchair

**Marty Gottesfeld | freemartyg.com - APRIL 4, 2018** 💬 0 Comments





*Marty Gottesfeld is an Obama-era political prisoner and Republican Senate candidate against incumbent Elizabeth Warren. You can donate to his legal defense fund at FreeMartyG.com or to his political campaign at VoteMartyG.com.*

With all of the recent attention on the apparent malfeasance in the upper echelons of the DOJ, I couldn't help but feel that the media has been losing sight of the pervasive and systemic nature of the organization's problems and of the bulk of the dirty iceberg lurking just beneath the surface of the Justice Department. As is becoming increasingly clear, more is required than a simple change in leadership at the top if we are to really address the situation and I was grateful to hear the part of President Trump's State of the Union speech when he said that he plans to fire federal employees who undermine the public's confidence in our government.

So, to highlight the deeper issues, I figured that I'd profile one of the crooked lower-level modern-day FBI field agents whom I know: Michael W. Tunick. In many ways,

Tunick is a microcosm of the larger problems which permeate his agency.

Tunick attended the elite Duke University, known for its NCAA Division I basketball program as well as its strong academics. He was a member of the school's lesser-known but still successful wrestling team, but he failed to stand out with his individual record of 33-47. He graduated, apparently without honors, in 2009. Then like many of his fellow agents, he began a lackluster career in the private sector before joining the FBI and being assigned to one of its top units – the Boston field office's Cyber Crime Squad (CCS).

It wouldn't be long until Tunick would have a chance at a big break: being one of the lead agents on a very high-profile case. However, as has become increasingly normal in the heavily politicized and patronized FBI, in order to please his superiors, Agent Tunick would have to put politics over morality and ignore the plight of real victims to instead do the dirty work of powerful monied interests who had his department in their back pocket. And, indeed, those influential elites had found their man.

The case would center around a young girl named Justina, who had been enduring almost unfathomable torture at the hands of Harvard's primary pediatric teaching facility, Boston Children's Hospital (BCH).

To learn more about what happened, including how I fought for Justina's life and human rights, please see this article by Michelle Malkin, this one by Rolling Stone or this one by Daily Wire. Or, you can watch this clip by Lee Camp or this one below from Infowars:



When Special Agent Tunick and his superiors learned about the above, they didn't spend one moment doing anything to help Justina, who had already been detained against her will by BCH for over a year and crippled by its alleged malpractice and healthcare fraud. Instead, as the FBI testified in court, they immediately started investigating me for trying to save Justina's life with a digital sit-in — an Internet and fundraising disruption — at the $2 billion Harvard hospital, which receives $300 million/year in federal funding. But that callousness only represents a fraction of the true monstrosity of Tunick and his fellow federal government agency.

Indeed, as detailed by Red State, the New American and Daily Wire as well as by me at WND, Infowars and the Huffington Post, Tunick and his colleagues, including former chief cyber crime prosecutor and Harvard alum Adam Bookbinder, went to Magistrate Judge Marianne Bowler for a bogus search warrant for my home. The warrant is bogus for many reasons, not the least of which are the conflicts of interest on the part of the judge to whom they went to have it issued. It turns out that not only did Bowler work for BCH's overseer, Harvard Medical School, but she is married to one of its professors and worse yet she was the director of a non-profit that raises money for Justina's tormentors. Indeed, Bowler recused herself from at least one other Boston Children's Hospital case while she was presiding over my docket — but not from mine.

Cases like this demonstrate that federal monsters like Tunick, Bookbinder and Bowler have little respect for the 4th Amendment, nor for its requirement that warrants be issued by neutral and detached judges.

Then, when Tunick and his bent Boston FBI cronies were actually searching my house and seizing my things, I told them all about how there are many thousands of institutionalized children in America suffering fates like these:

Congressional "Hearing on "Child Abuse and Decepti...



Tunick and his fellow agents didn't bat an eye. Nor have they done anything with their badges to protect these kids since. Even when the DOJ was asked by the chair of the House Committee on Education and Labor to help these kids, it did nothing despite money and children crossing state lines. And that makes them monsters of the worst kind.

But Tunick and these other thugs still worked on defending their depravity. In the months that followed they went to my wife's parents in California to try to intimidate them. Then, as covered by Daily Wire, Shadowproof and Red State as well as by me at WND, my wife reported that they threatened to come after her for posting evidence of their corruption documented in the FBI's own flagrantly unashamed sworn court testimony.

Indeed, the mob has nothing on these guys and I'm not the only person from Boston saying as much. Let's hope President Trump uses his constitutional authority to do something about this. Justina and other kids deserve better.

WATCH LIVE



Exhibit 122

**YVONNE ABRAHAM**

# Middlesex DA's office shows troubling attitude about evidence

**By** Yvonne Abraham  Globe Columnist, October 17, 2015, 10:41 p.m.



Aisling Brady McCarthy. KEITH BEDFORD/GLOBE STAFF

Middlesex County prosecutors had information that could have helped Aisling Brady McCarthy, the nanny accused of killing the 1-year-old she was caring for. But instead of sharing it, as they should have, they kept it to themselves for more than a year while she remained in jail.

In April, a Superior Court judge found that the information — that the baby's injuries could have had another cause — was potentially helpful to the defendant, and that prosecutors should have turned it over sooner. That remarkable finding, that the Commonwealth withheld exculpatory evidence in a murder case, went unnoticed at the time.

But given allegations of questionable conduct by Middlesex prosecutors in the case of Nathan Wilson — the strikingly similar case of a Malden baby whose father was charged with violently shaking him to death — it bears a hard look now. Like McCarthy, Geoffrey Wilson eventually had the charges against him dropped after a medical examiner reversed a homicide finding.

McCarthy was accused of killing Rehma Sabir in January 2013. She was charged after Alice Newton, a prosecution medical expert, concluded (as she did in the Wilson case) that the 1-year-old had suffered injuries, including severe bleeding in the back of the eyes, which indicated abusive head trauma, also known as shaken baby syndrome.

After McCarthy was jailed without bail, prosecutors sought the opinion of Dr. Alex Levin, an eye specialist, on whether the injuries to the baby's eyes indicated abuse. In a series of phone calls starting in August 2013, Levin expressed hesitation about coming to that conclusion. He told prosecutors he had found less severe retinal hemorrhaging, and repeatedly raised the possibility that the baby's injuries might have been caused by something other than abuse — an immune disorder called Job Syndrome — according to a court document.

Ethics rules require that prosecutors share information like that with the defense in a timely manner. District attorneys hold many more cards than defense attorneys in criminal cases, and they're held to very high standards. They're supposed to make their cases on the merits, and not by sitting on evidence that could benefit the accused.

"Their job is not just to win," said David Rossman, a professor of law at Boston University who was briefly a prosecutor in Middlesex County. "Their job is to do justice,

and that means even if they are morally certain a person did it, and there is a piece of evidence in their hands that in the eyes of a reasonable, objective person would make it seem less certain the defendant is guilty, they've got to turn it over."

That obligation was there, even if prosecutors disagreed with the doctor. Even if Levin had been an unhinged quack, and not, as he is, a nationally known expert who has regularly delivered findings of abuse in shaken baby cases.

Not only must exculpatory evidence be shared, it must be shared promptly.

"Immediacy is not required, but the law demands some level of promptness," said Daniel Medwed, professor of law at Northeastern University. "More to the point . . . we should expect and demand immediate compliance."

The best prosecutors would have shared that information right after the first phone call. But, prosecutors on the McCarthy case kept it to themselves: not only after that first phone call with Levin, but through several more over the course of a year. This even after defense attorneys, who learned of Levin's work by happenstance, asked for it repeatedly.

It's hard to imagine prosecutors could have been unaware of the information's significance. Those same assistant district attorneys were working on the Wilson case. A few weeks after their first call with Levin, Geoffrey Wilson's attorney presented them with evidence suggesting that Nathan Wilson's death could have been caused by a genetic defect that made his blood vessels prone to rupture.

In a September 2013 e-mail, the medical examiner told prosecutor Katharine Folger that he wanted to change his homicide finding about the Wilson baby. (He did not do so officially until Aug. 1, 2014, and complained to Folger that the Middlesex District Attorney's office had attempted to pressure him into sticking with his original homicide finding, according to the examiner's case notes, obtained by the Globe.)

Folger had been in on some of the calls with Levin, too. Yet, even as the Wilson case was unraveling, Folger and other prosecutors didn't share Levin's speculation about the

immune disorder with McCarthy's defense attorneys.

Nor did they share the information after a large crack appeared in their case against the nanny: In December 2013, a judge threw out an assault and battery charge against McCarthy, finding insufficient evidence to support the charge that she caused the bone fractures central to prosecution claims that she had abused the baby.

Instead, after finding a reference to him in files from the medical examiner, McCarthy's attorneys learned Levin had been consulted in January 2014. They repeatedly requested Levin's report, notes, and any exculpatory evidence. District Attorney Marian Ryan said prosecutors revealed in August that Levin had considered an alternative cause of death. But they did not turn over the more extensive — and more clearly exculpatory — notes from his conversations with prosecutors until January 2015, after Judge Maureen Hogan ordered them to do so. It had been 16 months since the first phone call with Levin.

They should have done it sooner, the judge said.

"Prosecutors had an obligation to turn over to the defendant information provided to them by Dr. Levin which was exculpatory, or . . . arguably exculpatory, prior to the time that they did," Hogan said in an April 22 hearing.

The judge is right, District Attorney Marian Ryan concedes.

"We take our responsibility to produce all exculpatory evidence very seriously," Ryan said in a written statement. "While there were several extenuating circumstances which delayed the production of Dr. Levin's final written report, we acknowledge and agree that the information should have been provided to the defendant sooner."

McCarthy had her bail reduced and was released this past May, after her defense team presented the medical examiner with reports from nine outside specialists challenging the homicide finding, prompting a complete review of the post-mortem. The Levin information almost certainly would have sped up that process, Thompson said.

Charges against McCarthy <u>were dropped</u> Aug. 31, after the medical examiner changed the baby's cause of death from homicide to "undetermined." McCarthy, who was in the country illegally, was immediately deported back to Ireland.

It's impossible to say for sure what would have happened if McCarthy's attorneys had had the Levin information sooner. Judge Hogan found that, while prosecutors failed to fulfil their obligations, their actions did not constitute grounds for the case to be dismissed, or harm McCarthy's chances of a fair trial.

But McCarthy's attorneys are convinced she would not have sat in prison for more than two years if prosecutors had done the right thing.

"Their own expert was questioning the diagnosis of abuse," said attorney Melinda Thompson. "Had the medical examiner been aware of this, her analysis could have been different early on."

Even for those convinced McCarthy murdered Rehma Sabir, there is plenty here to be concerned about when it comes to Marian Ryan's office. This is not how prosecutors should be bringing anybody to justice. The integrity of the entire system depends on fairness towards all defendants, regardless of guilt of innocence.

"Rules like those related to discovery are designed to make the playing field more even," said Medwed, the Northeastern University professor. "Flouting those rules leaves defendants playing with one hand tied behind their backs."

Ryan and her prosecutors know this. But maybe they need a reminder: Sometimes, justice and winning aren't the same thing.

———————

Columnist Yvonne Abraham can be reached at yvonne.abraham@globe.com.

Show 94 comments

Case 1:18-cv-10836-PGG   Document 115-4   Filed 12/17/19   Page 15 of 42

©2019 Boston Globe Media Partners, LLC

12/9/2019    Middlesex County, Mass., prosecutors withheld exculpatory evidence in two 'shaken baby' cases | The Washington Post

Case 1:18-cv-10836-PGG  Document 115-4  Filed 12/17/19  Page 16 of 42

Exhibit 1293

# The Washington Post

*Democracy Dies in Darkness*

# Middlesex County, Mass., prosecutors withheld exculpatory evidence in two 'shaken baby' cases

By **Radley Balko**

Oct. 20, 2015 at 9:19 a.m. EDT

In the Boston Globe, columnist Yvonne Abraham writes about how prosecutors in the Middlesex County, Mass., district attorney's office withheld exculpatory evidence in the Shaken Baby Syndrome case against Irish nanny Aisling Brady McCarthy.

McCarthy was accused of killing Rehma Sabir in January 2013. She was charged after Alice Newton, a prosecution medical expert, concluded (as she did in the Wilson case) that the 1-year-old had suffered injuries, including severe bleeding in the back of the eyes, which indicated abusive head trauma, also known as shaken baby syndrome.

After McCarthy was jailed without bail, prosecutors sought the opinion of Dr. Alex Levin, an eye specialist, on whether the injuries to the baby's eyes indicated abuse. In a series of phone calls starting in August 2013, Levin expressed hesitation about coming to that conclusion. He told prosecutors he had found less severe retinal hemorrhaging, and repeatedly raised the possibility that the baby's injuries might have been caused by something other than abuse — an immune disorder called Job Syndrome — according to a court document . . .

Not only must exculpatory evidence be shared, it must be shared promptly.

"Immediacy is not required, but the law demands some level of promptness," said Daniel Medwed, professor of law at Northeastern University. "More to the point . . . we should expect and demand immediate compliance."

The best prosecutors would have shared that information right after the first phone call. But, prosecutors on the McCarthy case kept it to themselves: not only after that first phone call with Levin, but through several more over the course of a year. This even after defense attorneys, who learned of Levin's work by happenstance, asked for it repeatedly . . .

In a September 2013 e-mail, the medical examiner told prosecutor Katharine Folger that he wanted to change his homicide finding about the Wilson baby. (He did not do so officially until Aug. 1, 2014, and complained to Folger that the Middlesex District Attorney's office had attempted to pressure him into sticking with his original homicide finding, according to the examiner's case notes, obtained by the Globe.)

Folger had been in on some of the calls with Levin, too. Yet, even as the Wilson case was unraveling, Folger and other prosecutors didn't share Levin's speculation about the immune disorder with McCarthy's defense attorneys.

A judge has since found that they should have turned all of that information over much, much sooner. McCarthy spent more than a year in jail before she was released earlier this year.

As Abraham points out, this is the second botched "shaken baby" case in Middlesex County. Geoffrey Wilson was accused of killing his son Nathan by shaking him to death. He was cleared only after his attorneys produced evidence that the child had a genetic condition that causes veins and arteries to rupture, one of the alleged symptoms of Shaken Baby Syndrome. Here's Abraham writing on that case last week:

AD

Initially, forensic pathologist Peter Cummings ruled that the 2010 death of the baby, Nathan Wilson, was a homicide, the result of abusive head trauma, or shaken baby syndrome. His father, Geoffrey Wilson, was charged by Ryan's office with the baby's murder . . .

Cummings decided to file an amended death certificate changing the cause of death from "homicide" to "could not be determined."

In supplemental case notes, handwritten by Cummings and placed in the baby's closed case file the day before the murder charges were dropped, Cummings said that the DA and her staff had not wanted him to change his finding. He called the way they dealt with his office on the case "unethical and unprofessional." He accused them of "M.E. shopping" in the hopes of getting a different opinion.

"I told them I felt bullied and at times as though I was being forced to sign the case out in a way I did not think was honest," Cummings wrote in the case notes, obtained by the Globe.

Let's also not forget that it was Middlesex County that put the now much disputed Shaken Baby Syndrome on the map in the 1997 prosecution of Louise Woodward, a British au pair accused of killing 8-month-old Matthew Eappen. The state's expert witness in that case has since said that he would not give today the testimony that he gave then, explaining that we now know that a number of medical conditions can produce the symptoms that experts once claimed could only have come from shaking. It's just another example of the problems with asking judges to be the gatekeepers of what science does and doesn't get into the courtroom. Dozens, perhaps hundreds, of people were convicted based on expert testimony that we now know was at best grossly overstated, and at worst was simply false.

But these prosecutors didn't just rely on bad science; they actively suppressed evidence that not only should have informed that their theories about these cases were flawed, but was ultimately the evidence that led to the accused getting freed. A just system would sanction them. If they aren't punished, there's little disincentive to do it again, or for other prosecutors who might be tempted to shortchange a suspect's rights.

AD

**Radley Balko**
Radley Balko blogs and reports on criminal justice, the drug war and civil liberties for The Washington Post. Previously, he was an investigative reporter for the Huffington Post and a writer and editor for Reason magazine. His most recent book is "The Cadaver King and the Country Dentist: A True Story of Injustice in the American South." **Follow** 🐦



10 Tremont Street, 6th Floor   •   Boston, MA  02108
617.720.8447 p   •   857.233.5336 f
KJCLawFirm.com

Exhibit 127

Kathy Jo Cook, Esq.
KJCook@KJCLawFirm.com

February 16, 2016

**_Via In Hand_**

Clerk of Courts - Civil Office
Suffolk Superior Court
Three Pemberton Square, 12th Floor
Boston, MA  02108

Re:     *Justina Pelletier PPA Louis and Linda Pelletier v. Jurriaan M. Peters, M.D. et al.,*
        *Suffolk Superior Court, Civil Action No.: 2016-0474D*

Dear Sir or Madam:

Pursuant to Rule 15(a), enclosed please find Plaintiff's Amended Complaint for filing.

Thank you for your assistance in this matter.

Sincerely,

KJC Law Firm, LLC

Kathy Jo Cook
KJC/jr

Enclosures

KJC Law Firm LLC
Boston   •   Worcester

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2016-0474D

JUSTINA PELLETIER PPA LOUIS and LINDA PELLETIER,    )
LOUIS PELLETIER and LINDA PELLETIER,    )
    *Plaintiffs,*    )
        )
vs.    )
        )
JURRIAAN M. PETERS, M.D., SIMONA BUJOURNEAU, PHD., )
ALICE NEWTON, M.D., COLLEEN RYAN, M.D., and    )
CHILDREN'S HOSPITAL INTEGRATED CARE ORGANIZATION, )
LLC d/b/a BOSTON CHILDREN'S HOSPITAL,    )
    *Defendants.*    )

<u>PLAINTIFFS' AMENDED COMPLAINT</u>

<u>PARTIES</u>

1.  The minor plaintiff, Justina Pelletier, is a resident of West Hartford, Connecticut.

2.  The plaintiff, Louis Pelletier, is a resident of West Hartford, Connecticut, and he is the father of Justina Pelletier.

3.  The plaintiff, Linda Pelletier, is a resident of West Hartford, Connecticut, and she is the mother of Justina Pelletier.

4.  The defendant, Jurriaan M. Peters, M.D., was at all relevant times a physician, specializing in child neurology, licensed to practice medicine in the Commonwealth of Massachusetts with a usual place of business at Boston Children's Hospital, 300 Longwood Ave, Boston, Suffolk County, Massachusetts.

5.  At all times relevant herein, Dr. Peters treated the minor plaintiff, Justina Pelletier, while she was admitted to the neurology service at Boston Children's Hospital.

6.  The defendant, Simona Bujourneau, PhD., was at all relevant times an psychologist, specializing child and adolescent psychology, with a usual place of business at Boston Children's Hospital, 300 Longwood Ave, Boston, Suffolk County, Massachusetts.

7.  At all times relevant herein, Dr. Bujourneau treated the minor plaintiff, Justina Pelletier, while she was admitted to the neurology service at Boston Children's

Hospital.

8. The defendant, Alice Newton, M.D., was at all relevant times a physician, specializing in child abuse pediatrics, licensed to practice medicine in the Commonwealth of Massachusetts with a usual place of business at Boston Children's Hospital, 300 Longwood Ave, Boston, Suffolk County, Massachusetts.

9. At all times relevant herein, Dr. Newton was the Child Protection Team Case Reviewer of the minor plaintiff, Justina Pelletier, during the period of time that she was at Boston Children's Hospital.

10. The defendant, Colleen Ryan, M.D., was at all relevant times a physician, specializing in child psychiatry, licensed to practice medicine in the Commonwealth of Massachusetts with a usual place of business at Boston Children's Hospital, 300 Longwood Ave, Boston, Suffolk County, Massachusetts.

11. At all times relevant herein, Dr. Ryan was the attending psychiatrist and treated the minor plaintiff, Justina Pelletier, while she was inpatient in a locked ward, Bader 5, at Boston Children's Hospital.

12. The defendant, Children's Hospital Integrated Care Organization LLC is a Massachusetts LLC doing business as Boston Children's Hospital with a usual place of business at 300 Longwood Ave, Boston, Suffolk County, Massachusetts.

## FACTS

### *Mitochondrial Disorder*

13. Mitochondrial disorder is an inherited chronic illness that can be present at birth or develop later in life. It causes debilitating physical, developmental, and cognitive disabilities with symptoms including poor growth, loss of muscle coordination, muscle weakness and pain, seizures, vision and/or hearing loss, gastrointestinal issues, learning disabilities, and organ failure.  The disorder is progressive and there is no cure.

14. It is estimated that 1 in 4,000 people has Mitochondrial Disorder.

15. Mitochondrial Disorder is a disease of the mitochondria, "the powerhouse of the cell," which generates the energy that powers cell and organ function. When the mitochondria do not function properly, organs stop working effectively.

16. The severity of symptoms is different from person to person and may involve any combination of a variety of body systems including the brain and muscles (causing poor stamina, altered muscle tone, muscle weakness, seizures, stroke-like episodes);

2

autonomic nervous system (temperature dysregulation, heart rate abnormalities, dizziness, poor heat and/or cold tolerance, (too much/too little sweating, skin pallor); eyes (vision loss); hearing deficit; endocrine disease; heart (cardiomyopathy); liver (dysfunction, cirrhosis); kidneys (failure); and metabolic issues.  Common symptoms include poor growth, loss of muscle control, muscle weakness, neurological problems, autism and autistic-like features, developmental delays and learning disabilities, heart disease, autonomic dysfunction, gastrointestinal disorders and severe constipation.

17. Mitochondrial Disorder can sometimes be diagnosed with DNA testing and muscle biopsy. However, it is widely known and accepted in the medical community that a negative test result does not rule out the disorder, as such testing is not reliable for that purpose.

18. In the absence of positive DNA testing or muscle biopsy for Mitochondrial Disorder, the diagnosis is made based on family medical history, the patient's medical history and the patient's signs and symptoms.

19. The confirmed diagnosis of a sibling greatly enhances the statistical probability that an individual who exhibits signs and symptoms of Mitochondrial Disorder has the disorder.  Such a diagnosis confirms that one or both of the parents carries the genes for the disorder and their offspring may inherit it.

20. Patients with Mitochondrial Disorder often present with gut dysmotility, a condition in which muscles of the digestive system become impaired and changes in the speed, strength or coordination of the digestive organs occur. In the normal small intestine, liquefied food and secretions including digestive enzymes are pushed onwards by waves of muscular contraction. When these contractions are impaired, the contents are trapped, and cause distention with symptoms such as bloating, nausea, vomiting, severe constipation, and even malnutrition.

*Justina Pelletier's medical history.*

21. In 2011, Justina Pelletier was a 12-13 year old child with a complex medical history which included but was not limited to left parieto-occipital stroke (neonatal or childhood), long-term gastrointestinal issues (gut dysmotility), cardiac issues (tachycardia), urological issues (urinary and fecal incontinence), dysautomia, right hemiparesis, dysfunctional menstrual bleeding, colonic neuropathy, muscle weakness, progressive fatigue and pain, chronic constipation, dysmenorrhea, esophageal reflux, special learning abilities, and alopecia. Her treatment history included laparotomy, lysis of a congenital band, nasogastric intubation, and appendectomy.

3

22. By 2011, Justina Pelletier's sister had been diagnosed with Mitochondrial Disorder. Muscle biopsy had been performed and showed a respiratory chain defect.

23. In 2011, Justina was experiencing signs and symptoms including fatigability, gut dysmotility, and autonomic symptoms including tachycardia.

24. In 2011, Justina presented to Tufts Medical Center in Boston, Massachusetts, with pain, weakness, fatigability, some loss of speech, constipation, and other symptoms consistent with Mitochondrial Disorder. The treatment team at that time could not identify a unifying diagnosis or an organic cause of the pain.

25. The treatment team initially suspected that Justina's symptoms may have been psychiatric in nature and caused or contributed to by her parents' belief that Justina's symptoms were real and medically caused rather than imaginary and caused by psychiatric delusion, and by their actively seeking medical treatment for her symptoms. In response to this suspicion, they filed a claim of abuse and neglect similar to those required by Massachusetts G.L. c. 119 § 51A with the Connecticut Department of Children and Families.

26. The team also convened a family meeting with the Pelletiers and advised them of the Connecticut abuse and neglect report.  The team, recognizing that the suspicion of a psychiatric disorder, specifically somatoform, was not the only possible cause of Justina's symptoms, recommended that the family consult with Mark Korson, M.D., a Mitochondrial Disorder specialist, to investigate the possibility of Mitochondrial Disorder and that Justina engage in therapeutic treatment and counseling on a regular basis.

27. The family was unhappy about the suspicion of neglect and abuse. However, they recognized that the medical advice was appropriate.  The claim was investigated by the Connecticut Department of Children and Families and determined to be unsubstantiated; there was no probable cause to believe that Justina had been neglected or abused.  The Connecticut case was closed.

28. The family, despite their displeasure with the accusation of abuse and neglect, was educated by the treatment team about the psychiatric and emotional challenges faced by children with Mitochondrial Disorder.

29. In 2011, based on the suggestion of the Tufts Medical Center team, Justina began treating with Mark Korson, M.D.  Dr. Korson is a Board Certified Clinical Biochemical Genetics physician, and at the time, he was the Chief of the Metabolism Clinic at Tufts Medical Center.  Dr. Korson is universally recognized as an expert in clinical practice for patients with Mitochondrial Disorder.  Dr. Korson is presently the Medical Director of the Genetic Metabolic Center for Education and is responsible for overseeing both the company's consultative services and educational content

4

together with a team of biochemical geneticists.  Prior to holding this position, Dr. Korson launched the Metabolic Outreach Service at Tufts Medical Center to aid area teaching hospitals lacking metabolic services. This program educated and advised non-metabolic clinicians, enabling greater participation in the care of metabolic patients.  Prior to holding that position, he directed the Metabolism Clinic at Boston Children's Hospital.  Since 2007, he has co-directed the North American Metabolic Academy, the premier training conference for genetic trainees on this continent, sponsored by the Society for Inherited Metabolic Disorders. He has given hundreds of lectures in the US and abroad, including Cyprus, Great Britain, Israel, Jordan, Malaysia, and most recently, the Republic of Georgia.

30. Dr. Korson ultimately diagnosed Justina with Mitochondrial Disorder.

31. During that time, Justina was suffering from consistent, severe gastrointestinal pain and constipation, which is a common sign of Mitochondrial Disorder. Justina's dysmotility had been being treated by Alejandro Flores, M.D. Dr. Flores was, at the time, the Chief of Pediatric Gastroenterology and Nutrition at Tufts Medical Center and an Associate Professor at Tufts University School of Medicine. He is a graduate of the Universidad de San Carlos de Guatemala School of Medical Sciences, and received graduate training at Baylor College of Medicine, Children's Hospital Boston/Harvard Medical School, Duke University Medical Center, Hospital Militar, Jacaltenango Hospital, Roosevelt Hospital in Guatemala, and the World Health Organization/UNICEF. Dr. Flores is Board Certified in Pediatric Gastroenterology and Pediatrics and worked to support metabolic and mitochondrial patients with GI dysfunction.  At or around the time of the events which give rise to the plaintiffs' claims, Dr. Flores had moved his practice to Boston Children's Hospital.  Dr. Flores continues to practice at Boston Children's Hospital, and he is currently the Director and Chair of Ambulatory Community Services and an Associate Physician for Motility and Gastrointestinal Disorders. He is also a clinical professor of pediatrics for Harvard Medical School.

32. Throughout the course of his career, Dr. Flores has lectured and educated medical professionals about the concerns and dangers of mistaking dysmotility and other gastrointestinal disorders for psychiatric conditions, such as Munchausen by Proxy and, conversely, the need for diligence in investigating that possibility when a patient presents with complicated gastrointestinal dysfunction.

33. In 2012, following an extensive review of Justina's pertinent medical history, medical records and family history, Dr. Flores advised Mr. and Mrs. Pelletier that Justina needed to have a cecostomy tube surgically placed. A cecostomy tube or C-tube is a thin, soft plastic tube that is put into the large bowel through a tiny hole in the abdomen. The C-tube allows the patient to put a flushing (irrigating) solution directly into the bowel. The solution flushes the stool out through the anus. Justina's family

5

consented to the surgical placement of a cecostomy bag by Dr. Flores, based on his medical advice. The procedure, performed in April 2012, was successful and effective.

34. Justina had also been seeing cardiologist Alisa Niksch, M.D. at Tufts Medical Center for nearly a year, since March 22, 2012.  Dr. Niksch noted that Justina suffered from a common manifestations of Mitochondrial Disorder, specifically a "trend" towards postural tachycardia (POTS), and that she occasionally had heart pounding after minimal activity, which is an inappropriate hyper adrenergic response. Dr. Niksch was successful in addressing these issue, and as of October 23, 2012, Justina's cardiac issues were improved.   Dr. Niksch graduated from the University of Virginia Medical School in 1999 and thereafter completed post-graduate training at University Hospital of Cleveland, Rainbow Babies & Children's Hospital, Columbia University Medical Center, Stanford University and University of California.  Dr. Niksch was and is Board Certified in Pediatrics and Pediatric Cardiology.

35. Dr. Korson, Dr. Flores and Dr. Niksch were not the only specialists from Tufts Medical Center who treated Justina for the various presentations of her Mitochondrial Disorder. From December 7, 2011, until January 28, 2013, she was seen by a number of highly-qualified, experienced doctors at Tufts Medical Center all of whom were aware of the concerns raised but disproved earlier about somatization and potential neglect and continued to treat Justina medically for Mitochondrial Disorder appropriately and in accordance with the standard of care, including Jeremy Wiygul, M.D., Chief, Pediatric Urology; Carl-Christian A. Jackson, Pediatric Surgeon; Stuart V. Braun, M.D., Chief, Pediatric Orthopedics/Orthopedic Surgeon; and David Griesemer, M.D., Neurologist.

36. Each of these providers recognized the working diagnosis of Mitochondrial Disorder and treated Justina's physical symptoms prior to her admission at Boston Children's Hospital. They were aware of her physical symptoms, her family dynamics, her prescribed medications, and the intense psychiatric and emotional strain she endured while suffering from a chronic illness and severe pain. None of these providers, who treated and evaluated her regularly, ever took any steps which could ultimately result in the termination of Justina's relationship with her parents as a means of treatment.

37. Justina was regularly treated for her psychological and emotional concerns by Dean T. Hokanson, PhD., of Clinical Associates of Greater Hartford, LLC.  Dr. Hokanson graduated, with honors, with an AB in Psychology from Duke University in 1967. He earned his PhD. In Clinical Psychology from the University of Texas in 1971. He completed a full-time pre-doctoral internship at the Institute of Healthy Living in Hartford, Connecticut, a two year postdoctoral program in Psychoanalysis and Psychotherapy at New York University from 1971-1973 and a postdoctoral program

at the Summer Institute on Family Therapy at the prestigious Ackerman Family Institute in New York City. He was the Chief Psychologist at the Newington Children's Hospital from 1971-1974 and was then elevated to the position of Assistant Hospital Administrator for Patient Services. He has been an adjunct faculty member at the University of Hartford since 1971, teaching Introductory Psychology, Child Development, Assessment and Intelligence Testing, Adolescent Psychology, and Motivation and Emotions. He has been a clinical psychologist with Clinical Associates of Greater Hartford, LLC for many years treating thousands of children and adolescents. He performs clinical and independent medical examinations for multiple facilities. He has treated Justina since 2006, and she has been his full-time patient since 2011.

38. Dr. Hokanson is intimately familiar with Justina's complex medical history and the concerns of somatization which were previously considered but not substantiated. Dr. Hokanson expressly rejected the diagnosis of somatization and/or Munchausen-by-proxy and was actively treating Justina for a Dysthymia, which is a persistent depression that is frequently present in children who suffer from chronic, debilitating illness.

   *The defendants' negligence and violation of the rights of Justina and her parents.*

39. On Tuesday, February 5, 2013, fourteen year old Justina Pelletier was brought by her parents to the emergency department of Connecticut Children's Medical Center with leg weakness and pain, progressing over the last few months; lethargy, malaise, speech difficulty, worsening over last few weeks; increased alopecia to the head; and headache. Justina was noted to have a history of Mitochondrial Disorder, stroke as a toddler, and that she was being followed at Tufts Medical Center. She was admitted to neurology for further work-up, who concluded that her "gait abnormality is strongly suggestive of non-organic cause."

40. Following testing and consultation with Dr. Griesemer and Dr. Korson, who confirmed that they were in agreement with the diagnosis of Mitochondrial Disorder based on "Justina's clinical picture and positive family [history]," neurology discharged Justina on February 8, 2013 in stable condition with a plan for follow-up in Boston.

41. On Saturday, February 9, 2013, Justina returned to the emergency department of the Connecticut Children's Medical Center with "likely mitochondrial abnl [abnormality], dehydration and difficulty taking fluids." A plan was made for IV fluids, check labs and transfer. According to the records, Justina was "accepted to Boston children's for further workup of mitochondrial disease."

42. Despite the complexity of Justina's presentation and the medically appropriate consideration of a psychological component to her presentation, there was no

allegation that Justina was abused or that total isolation from her parents and family would be an appropriate treatment or diagnostic protocol.

43. Justina was transferred to Boston Children's by ambulance. According to the emergency department records Justina arrived at the hospital via ambulance with her mother at 4:07 a.m. The emergency department physician recorded a history of a stroke at age two with residual right sided weakness, GI dysmotility and a presumed diagnosed of mitochondrial disease. According to the record, Ms. Pelletier reported that Justina had been in her usual state of health one month ago, including starting a new school, ambulating, ice skating and skiing, when she began to decline and that two weeks earlier, Justina had become fatigued and lethargic, sleeping six hours after the school day, had developed dysarthric speech, and had difficulty swallowing, being able to take in fluids but not solid food.

44. Mrs. Pelletier reported that she took Justina to Connecticut Children's Medical Center and when Justina was not improving and contacted Dr. Korson, who recommended that they go the Boston Children's Hospital. In addition, Mrs. Pelletier reported that EEG had been performed in Connecticut and was concerning for seizures.

45. The defendant, neurologist Jurriaan Peters, M.D., saw Justina at 8:00 a.m. in the emergency department. He immediately questioned what he referred to as the "black and white thinking of Mom (some providers are incompetent/insufficient and most don't understand her daughter's complicated disease and, others are excellent and unique in their understanding of her daughter's problems – and Mom is close and personal with the latter per her own report)" and "the referral of Mom to her daughters' 'mito' disorder –even though this is questioned still if I understand documentation correctly." He wrote: "[w]e will definitely involve social work and psychiatry."

46. Dr. Peters contacted Dr. Korson who advised Dr. Peters that he had been treating Justina and had clinically diagnosed her with Mitochondrial Disorder, that Justina's sister had the same diagnosis with a respiratory chain defect diagnosed by muscle biopsy, and that he had referred the Pelletier family to Boston Children's Hospital to see Dr. Flores, her long time gastroenterologist. Dr. Korson did not express concerns about non-medical or non-organic contributors to Justina's presentation.

47. Dr. Peters also spoke with Justina's pediatrician, Dr. Binder, who admitted that he rarely saw Justina and did not have the expertise necessary to diagnose or treat her condition(s) but had some disagreements with the extent of Justina's specialized care. According to Dr. Peters' report of the conversation, Dr. Binder stated that "[t]here has been an explicit concern for factitious disorder by proxy although not many providers have stated this firmly, let alone spelled that thought out. This may be in part due to her complicated medical history and potential for underlying

medical disease, which some test results have suggested, although again there is no unifying diagnosis." Dr. Peters reported that "[Binder] agrees with our suggestion to get Risk Management involved early in the process...she is at large risk for iatrogenic injury and her healthcare providers are at risk for medicolegal liability." Dr. Binder gave no specific example of any diagnosis that was misdiagnosed or psychiatric in nature, admitted that he was not qualified to make such a determination, did not identify any qualified specialist who shared that opinion with him, and did not identify any provider who opined to him that Justina suffered from, or was suspected of suffering from, "factitious disorder by proxy."

48. In his February 11, 2013, 7:40 a.m. note, Dr. Peters wrote that as of that point in time he had spoken to Dr. Binder and Dr. Korson and had concluded that "the bigger picture is very concerning for Munchausen by Proxy - in part superimposed on medical issues that are outside my area of expertise. She has no formal diagnosis of a metabolic disorder and has several GI problems. We are involving Risk Management, Patient Relations, S/W [social work], CPT [child protection team], Psychiatry, GI [gastroenterology], Metabolism."

49. The Children's Hospital "Child Protective Team" was headed by the defendant, Alice Newton, M.D., who was the team "case reviewer."

50. At or around 5:24 p.m., Dr. Peters spoke with Dr. Griesemer, a child neurologist from Tufts Medical Center. Dr. Griesemer reported that there may be some basis for their medical concerns but "other doctors voiced similar concerns." He was specifically asked about separating parent from child "through DCF [the Massachusetts Department of Children and Families]." Dr. Greisemer did not agree with that option and thought the parents were entitled to the benefit of the doubt if "the case becomes legally challenged."

51. Dr. Peters requested a psychiatric evaluation of Justina. The defendant, Simona Bujourneau, PhD, responded, evaluated Justina on February 11, 2011, and wrote her first note at 8:59 p.m. The "Primary Reason for Evaluation" was reported to be: "Somatic concerns." Dr. Bujourneau noted that Justina had been treating with a psychiatrist (presumably she meant Dr. Hokanson, a psychologist) for years. Dr. Bujourneau did not contact Dr. Hokanson except to have him fill out a questionnaire sent to him more than two weeks later on February 27, 2013.

52. Dr. Bujourneau reported that Justina had no history of psychiatric diagnosis and no family history of psychiatric illness. Dr. Bujourneau described Justina as happy, well-functioning at a "special integrated school," and displayed no risky behaviors. Dr. Bujourneau wrote: "Justina Pelletier is a 14 yo [year old] girl with a complicated medical history of likely perinatal stroke, long history of constipation s/p cecostomy (April 2012), headaches, abdominal pain, and a possible diagnosis of a mitochondrial disorder and recent dx [diagnosis] of epilepsy (on Tegretol) who presents for further

evaluation of progressive weakness, altered mental status (eyes rolling back and word retrieval difficulties), intermittent dysarthria, incontinence, and inability to walk. She has previously had an extensive workup at Tufts and Connecticut Children's (including consults with metabolism, cardiology, GI, psychiatry, and neurology) which has not yielded a definitive unifying diagnosis. She is admitted to the neurology service for further evaluation given the concern for her progressive weakness and her altered mental status."

53. Dr. Bujourneau appears to have completely rejected the working diagnosis of the Tufts Medical Center team, specifically, Mitochondrial Disorder resulting in other manifestations, including gut dysmotility and inappropriate hyper adrenergic response.

54. Dr. Bujourneau noted that mother saw herself as "child's advocate" and that Justina saw herself in a "sick role," and she concluded based on this very brief interaction: "Somatization index: Parent report: total score of 75. Functional Disability Inventory: Total score of 46. Hospital Functional Disability Inventory - 9 (Severe impairment noted with toileting, and with eating meals by mouth, drinking by mouth, and walking. DSM-IV Multiaxial Diagnosis-Axis I: 300.82: Somatoform Disorder, NOS. Axis II: 799.9/deferred on Axis II. Axis III: Headaches, mitochondrial disorder, GI dysmotility, perinatal stroke-stable."

55. Gerard Berry, M.D. responded to a request for a metabolism consult "to comment on past history of suspected mitochondrial disease/mitochondrial dysfunction" on February 12, 2013, at 11:00 a.m. Dr. Berry noted that "Justina has been followed by many providers at Tufts Medical Center for these concerns including Dr. Mark Korson in the Metabolism Program for the past several years." He further noted that Justina's sister had "suspected mitochondrial disease," writing that a "muscle biopsy in the past has shown a decreased activity of complex 4 of the respiratory chain with perhaps compensatory increase in mitochondrial DNA copy number. A defined DNA abnormality as the cause of the mitochondrial disease has not been identified yet." Dr. Berry did not contact Dr. Korson or any of Justina's regular doctors at Tufts Medical Center. After his "history and physical examination," he concluded that he was "not clear about the etiology of Justina's overall illness," and he was "not sure what further testing should be performed."

56. Dr. Peters noted in his February 12, 2013 7:43 a.m. note that he had "reviewed and edited, and contributed to formulation of the plan" which he described as "[c]oordination of care with GI, SW, CPT, metabolic disease team, legal department, outside providers, and Mom. Avoidance of diagnostic procedures and renewed discussions on past or current medical issues, set limits and focus on rehabilitation aspects of care."

57. Dr. Peters wrote a second note at 6:45 p.m. that same day, February 12, 2013, summarizing the two hour "multidisciplinary meeting" held that afternoon at 2:00 p.m. and the following discussion with Mrs. Pelletier held at 3:45 p.m.:

CPT x 3, psychiatry x 2, SW, RN staff, PT, NP, neurology resident and attending, legal division - for second part with mother only neurology team and psychiatry team (4 persons - attending x 2, intern/resident x2 plus Mom).

**Summary:** Strong and well-documented concerns for Pediatric Condition Falsification (or Medical Child Abuse), concerns expressed also for induced symptoms but currently little data to suggest the latter. Meeting early into hospital stay is indicated and appropriate. Importance of aligning members of health care team and consult providers. Importance of engaging mother and forming therapeutic alliance with her. Setting limits, discussion of therapeutic plan and its elements (see below). Importance of protection of more junior staff (residents, interns, nursing students), instructing them not to engage in lengthy medical discussions and deferring to day time team (attending and senior resident). Involvement of father in process and continue to update throughout admission. Plan was formulated to set limits and expectations, therapeutic and not diagnostic plan.

**Summary part II:** Mother invited in, explained lack of data to support any underlying neurological diagnosis. We used the terms "psychogenic" as well as "somatoform disorder", and spent quite some time about these symptoms, and with the help of the psychiatry team we discussed common psychological mechanisms as well as the typical approach to these problems. Mom expressed concerns that we would not acknowledge her physical issues including possible mitochondrial disease (defer to Metabolic team), dysmotility (defer to GI team) and stroke (our team, but not an active issue). We explained that I would not focus on taking any diagnosis away, and that a multidisciplinary team approach is warranted, but that the channels of communication regarding medical issues will go through us. We explained we would like to embark on a proactive, therapeutic path akin to a rehabilitation program. More so, we will not engage in complicated and lengthy discussions on many potential diagnosis and test-results, and we will set strict limits to the amount of diagnostic tests we will perform. We emphasized that a novel approach may allow us to be different and perhaps more successful than previous medically oriented approaches. We explained to her that there would be parts of the plan that she would not like or endorse, or even frankly disagree with but as long as we had a relation of trust we would work through these issues. For example, rather than focusing on why Tegretol was prescribed, by who and if it should have been tapered by now, we will simply discontinue it (stepwise). The same applies for metoprolol, and midodrin. The Mom needs to return to her role as mother and not medical care taker

11

or health provider or advocate. We did not discuss that for some parts of the plan it would be beneficial to Justina i[f] Mom is not present for part of the day or treatment. Mom was agreeable to setting up a therapeutic plan on the condition GI and metabolic teams stay on board. She expressed her confidence in the team.

58. Despite the teams' purported "[s]trong and well-documented concerns for Pediatric Condition Falsification (or Medical Child Abuse), and despite the fact that Drs. Peters, Bujourneau and Newton were mandated reporters, no G.L. c. 119 § 51A report was made to DCF.

59. Under the auspices of § 51A, each of the Children's Hospital providers were mandated reporters and failure to report the suspected abuse, if it was indeed suspected, would have been a grave violation of law and the professional standards of conduct as medical doctors. Mandated reporters are afforded no discretion to investigate, remedy, or ameliorate the suspected abuse. They must immediately make an oral report to the Department of Children and Families when they have reasonable cause to believe that a child is suffering from abuse or neglect. Failure to do so can result in fines, criminal prosecution, and discipline from the Board of Registration of Medicine.

60. After these meetings, Dr. Peters spoke to Christian Ionita, M.D., a pediatric neurologist at Connecticut Children's Medical Center who reported that he saw Justina "last week, and deemed the presentation psychogenic but has provided no prior care to her," that "he was informed by multiple members of the team at CCMC that her illness was psychogenic, and he tells me Mom was told this before, and she reportedly had indicated she understood and even accepted it," and that "Mom refused to work with a certain inpatient psychiatrist he often works with, and requested a specific psychiatrist."

61. Dr. Bujourneau's February 12, 2013 note reports the "extensive team meeting with psychiatry, neurology, PT, social work, CPT, and legal present. Discussed case history and treatment plan. Neurology and psychiatry team then met with Mrs. Pelletier separately to discuss multidisciplinary recommendations. Specifically, Dr. Peters discussed with mother (as well as father via telephone) that the multidisciplinary team would be focusing on recovery and rehabilitation for Justina, rather than focusing on diagnosis, with the goal to get Justina back to her baseline functioning (e.g., walking, eating, able to attend school, motor control). This includes the team creating a behavior plan for Justina to facilitate her recovery (e.g., PT sessions, eating plans, psychoeducation, med. reduction). Neurology and psych team emphasized to parents the need for her to be supportive to Justina's recovery efforts (and that we would be modifying plan as we go along to address her changing needs/progress). PCS team also provided psychoeducation to parents regarding mind/body connection, as well as our case formulation about current

psychiatric conceptualization and diagnosis of a somatoform disorder." The parents indicated that they were happy with a multi-disciplinary approach, including therapeutic and psychiatric overlays, as long as "[Justina's] medical issues are also addressed." Dr. Bujourneau then prepared a written treatment plan that was distributed to and approved by all members of the multi-disciplinary team including Dr. Peters.

62. The treatment plan of the team, including Drs. Newton, Peters and Bujourneau, included the immediate termination of Mr. and Mrs. Pelletier's right to meaningfully participate in making important medical decisions for Justina, the immediate termination of Mr. and Mrs. Pelletier's right to seek a second opinion, the immediate termination of all diagnostic testing and evaluation of physical causes of her symptoms, and would require that all of their interactions with their child's doctors be "supervised" by hospital staff. Additionally, the treatment plan was to discontinue multiple medications without consultation with the prescribing doctors.

63. The defendants, Dr. Bujourneau, Dr. Peters, and Dr. Newton, were was not qualified to exclude mitochondrial disease as a possible organic cause of Justina's symptoms. Moreover, no reliable physical diagnosis could be made until Justina's dehydration and nutritional needs were treated.

64. Dr. Peters's note dated February 13, 2013, 10:52 a.m., indicates that he also spoke with Justina's cardiologist, Dr. Niksch, (this note is dated after the treatment plan was put in place which involved a plan to stop medications, including the metoprolol and midodrine).  During that conversation with Dr. Niksch advised Dr. Peters that the "metoprolol" that she had prescribed was effective, but that the "midodrine" could be stopped.

65. Disregarding Dr. Niksch's advice, the treatment plan was not changed.  Indeed Dr. Peters's note reports further meetings with Mrs. Pelletier and Mr. Pelletier (by phone) on February 13, 2016 and the team:

**AM:** On rounds Mom expressed concerns that we wanted to stop medications and noted she did not agree with our approach and plan. I reiterated parts of the plan and discussion we had the day before, and made it clear that I wanted to prevent another discussion on medical details at the bedside at this point. Eventually I resorted to examination of the patient, and mother left the room. I was asked to speak the father but declined as we were on morning rounds and had multiple other patients to see. Mom expressed her frustration but the psychiatry team came and was able to defuse the situation.

**13h00:** The psychiatry and neurology teams met with mother and patient relations, and Dad was called in over the phone. Again the discussion was

largely focused on medical detail of her care, and we reiterated that we'd like to focus on rehabilitation aspects. We emphasized several times that we are not taking any diagnoses away (in particular GI dysmotility, stroke and possible mitochondrial disorder) and we would continue to manage with a multidisciplinary, team based approach that would continue to include GI and metabolic specialists. Lengthy discussion on possibility of taking certain medications away, in particular metoprolol, and explained we had been in touch with Tufts cardiologist. Parents expressed their frustration and even disbelief with the notion of psychogenic/somatoform aspects of her current presentation. We placed emphasis that (1) not all was necessarily non-organic and (2) we were not confirming nor actively denying prior diagnoses, just limiting re-investigations and (3) the discussion and our approach is regarding the current (not past) presentation - this includes our impression that her current neurological presentation appears largely nonorganic and bears no relation to remote neurological issues such as her perinatal (or childhood for that matter) stroke. The discussion became repetitive and little progress was made in the context of significant agitation. We did not have the opportunity to present our plan (approach) or proposed day routine. The meeting was adjourned.

**14h00:** Met with CPT x 3, legal division, RN staff x 3, neurology and psychiatry team. Discussion followed about ways to increase chances of successful alliance with the parents and what next step in the admission would be most beneficial to Justina's long term wellbeing and health.

66. The details of the "treatment plan" as set out in Dr. Peters's February 13, 2013, 6:34 p.m. note, are:

    1. Follow the behavioral plan that will be formulated with input from all relevant disciplines which will day schedule, feeding and functioning plans with a therapeutic approach.

    2. Participate in daily intensive physical therapy as indicated. Focus of daily physical therapy will be to improve overall functional ability for safe independent mobility.

    3. Both parents are to be supportive of their daughter and not being involved in the medical management:
        i. Parents may not administer any medications or flushes to patient No discussion of diagnostic test results, consulting team recommendations or past medical issues with (on-call) residents.
        ii. Limit communication exclusively through neurology team.
        iii. No medical discussions to be held in the room or within the patient's hearing.

14

    iv.  No dictation of care or calling in consult teams or second opinions on own accord.

4.  No diagnostic tests and no new consultations are to be requested unless Justina develops a new or acute process as observed and assessed by the medical team.

5.  Medication regimen will be simplified with a gradual reduction of medications to a small set of essential, non-detrimental, modestly dosed medications with limited side effects (e.g. Lyrica and vitamin cocktail may be OK for now, but not Tegretol, Midodrin, metoprolol).

67. Dr. Bujourneau's February 13, 2013 note documents the presentation of the treatment approach, goals of admission and the "concrete plans" to Mr. and Mrs. Pelletier. Dr. Peters's note also reports the presentation of the "treatment plan" to Mrs. Pelletier at or around 3:00 p.m. on the afternoon of February 13, 2013.

68. Mrs. Pelletier was described as being "frustrated" by a treatment plan which essentially took away the Pelletiers' right to meaningfully participate in their daughter's care. In response to her concerns, she was advised that the "child-medical protection team," headed by Dr. Alice Newton, the Child Protection Team Case Reviewer, had been consulted and a "51A" had not been filed. Dr. Bujourneau and Dr. Newton advised the parents that a "51A" <u>would</u> be filed if they did not consent to the treatment plan. They then told Mrs. Pelletier that Justina "will be taken away" if consent to the treatment plan was withheld.

69. The team met with the parents again on February 14, 2015. Mr. Pelletier demanded that they discharge Justina so that she could be taken to Tufts Medical Center to see Dr. Korson. Mr. Pelletier, who was naturally upset, was described as "angry and abusive."

70. Mr. and Mrs. Pelletier were summarily removed from the hospital and separated from their child Justina by force and/or the threat of force by Boston Children's Hospital security and given a no trespassing order. The Massachusetts and Connecticut Department of Children and Families ("DCF") were contacted by Dr. Newton, and a 51A was filed. There is no indication from the records that Dr. Newton ever assessed, evaluated or interviewed Justina. Dr. Newton did not consult with Dr. Hokanson, Dr. Korson, Dr. Flores or any of Justina's long-term, highly-qualified specialists.

71. Social Worker Paulette Brown of DCF signed a sworn Affidavit in support of a Petition to temporarily remove Justina from the custody of her parents, Mr. and Mrs. Pelletier, and grant custody of Justina to DCF on February 15, 2013, just five

days after Mr. and Mrs. Pelletier had voluntarily brought their child to Boston Children's Hospital for help.

72. Mitochondrial Disorder had not been ruled out as an organic cause of her symptoms, the flu had not been ruled out as an organic cause of her symptoms, and there is no indication that Justina's dehydration had been resolved.

73. The social worker reported that "The Boston Children's Hospital was spoken to about the concerns, specifically Dr. Jurriaan Peter[s], Neurologist, Dr. Alice Newton, Child Protection Team Case Reviewer on this case and Dr. Simona [B]ujorneau, Psychologist, and they reported that the child is currently not walking or feeding herself and she is unable to function on a regular day. The concerns the Dr's have is 'Factitious Disorder by proxy.' The Dr's stated that the parents have been seeking medical treatment and now are obstructing child's care."

74. She further reported that Justina had "multiple diagnoses" and "two of [these diagnoses] are debatable and one is that she had a stroke around birth which is known and true. The Dr's say child has metabolic diseases regarding how the body produces energy. The Dr's say child also has issues regarding the movement of the stool. The Dr's say child's current presentation of what is wrong with child now has nothing to do with any of the three diagnoses mentioned....The doctors do not know how the parents picked the current diagnoses and that they are hard to disprove."

75. The social worker also reported that the "Boston Children's Hospital Dr's" stated that "Connecticut Children's Hospital does not want to treat child anymore due to problems working with the family" and that parents "discharged child AMA" when they disagreed with the course of treatment, and that Tufts was "trying to block child's admission from there as they have similar concerns." These statements were false.

76. Based on the allegations presented by the affidavit and the Boston Children's Hospital protection team, DCF obtained custody of Justina on February 15, 2013. A sitter was placed by Justina's bedside at all times and hospital security was placed outside her door. The parents were denied visitation altogether.

77. Despite the fact that the defendants claimed that Mr. and Mrs. Pelletier were over-treating Justina, within days of Justina's admission, they, the neurology and gastroenterology teams, with DCF approval, made a decision to place an NG tube for nutritional rehabilitation.

78. The defendants never took any steps to correct the misrepresentations in Brown's affidavit that claimed Justina was suffering from "Facititous Disorder by proxy."

16

79. Dr. Bujourneau further opined that "given the long time that Justina has been in the 'sick role', the longtime of less than optimal functioning, and the years of significant medical involvement, it is very likely that her recovery will require an equally long time with much psychiatric support. This type of support is available only in a psychiatric-medical type unit, as her medical needs are equally important, need to be integrated in the treatment, and need monitoring during her recovery."

80. Justina remained hospitalized with the Neurology Department for over two months, until April 2013. During this time, Boston Children's Hospital actively sought to disprove the diagnosis of Mitochondrial Disorder.  Justina had a guard outside her door and was only allowed one to two hours of visitation and two hours of phone calls with her family per week.

81. In April 2013, against the wishes of Justina and her parents, Justina was transferred to the locked psychiatric unit at Boston Children's Hospital, Bader 5, and she remained there until January 2014.  Justina was allowed only one to two hours of visitation and two hours of phone calls with her family per week. The defendant, Colleen Ryan, M.D., was responsible for Justina's psychiatric treatment while on Bader 5.

82. Justina's treatment records report that Justina was a "danger to self" because she was unable to attend to activities of daily living.

83. While she was locked up, Dr. Korson made numerous attempts to meet with the treatment team in order to advocate on behalf of his patient and her family in an effort to reunify them. All of those efforts were rejected. In one such instance, Dr. Korson advised Dr. Ryan that the family was willing to engage in cooperative efforts with Boston Children's Hospital in order to reunite with their daughter. Dr. Korson suggested that she try a "different approach" and give the parents a reason to believe that the relationship between them could be positive and helpful for Justina. Approximately two hours after that conversation, and without reason or warning, Dr. Ryan reduced Mr. and Mrs. Pelletier's visitation time to one hour per week.

*Justina's Care and Treatment on Bader 5*

84. While on Bader 5, Justina was deprived of direct sunlight, deprived of exercise and time outdoors, deprived of meaningful therapeutic treatment, and deprived of all meaningful and important familial relations she had ever known.

85. While on Bader 5, Justina was denied her right to an education and denied her right to worship.

86. While on Bader 5, Justina was subjected to conditions that were far more harsh and punitive than the other patients. By way of example and not limitation, Justina was

deprived of visitation and contact with her family far more so than the others. All other patients were allowed visitation to the full extent allowed by Bader 5 policies. Justina was only allowed one hour of visitation per week and limited phone calls. No other patients were deprived of visitation as punishment. Justina and her parents were deprived of visitation as punishment for the parents [alleged] violations of their individualized visitation guidelines.

87. Similarly, unlike the other patients, Justina was denied visitation on holidays and special family days. All other patients saw their families, or at least had phone calls, on major holidays and birthdays. Justina was forbidden from seeing her family on Easter, her birthday, her parents and siblings birthdays, Mother's Day, Father's Day, Thanksgiving, Christmas Eve, and Christmas.

88. While on Bader 5, Justina would often be left alone in her wheelchair for hours at a time if she would not, or could not, wheel herself to common areas. From time-to-time other patients would attempt to move Justina to a common area. Often, the patient would be scolded and told that she [Justina] "has to do it herself."

89. While on Bader 5, Justina would often be left on a toilet for long periods of time in an effort to get her to void her bladder or bowels. Justina's assertions that she was physically incapable of doing so would be ignored.

90. Photographs show that while on Bader 5, Justina was often found to have bruises on her feet and ripped toe nails caused by her feet being dragged along the floor while being pushed in her wheel chair. She would appear with bruises on her belly, abdomen, and back.

91. While on Bader 5, the staff would often report to the family and DCF that Justina was making progress with eating, schooling, and becoming more mobile. However, Justina would smuggle messages to her family hidden in art projects. In her smuggled messages, she told the family that she was not being schooled, that she was not walking, and that she wanted to go home.

92. Family phone calls to Justina were monitored by Bader staff. The phone calls would be immediately terminated by staff if the conversation breached the purported "treatment plan" that prohibited Justina's family from discussing her physical health. In addition, phone calls were often abruptly terminated for no reason at all causing great emotional distress for Justina and her family.

93. While on Bader 5, Justina celebrated her fifteenth birthday on May 24, 2013.  She was not allowed visitation or phone calls that day. Several family members purchased birthday gifts from the gift shop and arranged for them to be delivered to her room. Staff intercepted the gifts and kept them in a closet for weeks after her birthday. Justina was never even told until weeks later that anyone had attempted

to send her a birthday gift or card. She was under the belief that her family had forgotten her birthday when, in truth, her family was denied access to her on her birthday.

94. While on Bader 5, Justina was denied medications prescribed to her by her regular treating physicians. By way of example and not limitation, Justina's hypertension medication was discontinued.  Her treatment records reveal that she suffered from tachycardia thereafter. By way of further example, her B12 supplement was discontinued. Justina was recently treated for B12 deficiency.

95. While on Bader 5, the defendants and others knew that Justina did not require residential psychiatric treatment or in-patient hospitalization.

96. While on Bader 5, Justina was subjected to medical research and experimentation.

97. While on Bader 5, Mr. and Mrs. Pelletier were repeatedly threatened by the defendants and others that Justina would never be returned to them if they did not accept the diagnosis of somatoform, accept the termination of their right to make medical decisions regarding Justina's care, and adopt the treatment plan devised by the Boston Children's Hospital doctors. Indeed, when Dr. Ryan recommended on December 3, 2013, that Justina be transitioned to a foster family, that recommendation was not based on any allegation of abuse or neglect. Specifically, Dr. Ryan cited the parents' continued inability to engage in a family re-unification plan (i.e., accept the Boston Children's Hospital doctors' diagnosis and treatment plan) as the basis for her opinion that parental rights and custody should be completely, irrevocably, and permanently terminated.

98. While on Bader 5, the defendants knew or should have known that Justina's condition was caused by physical causes. Specifically, her treatment records indicate that Justina's diagnosis included psychological components and Mitochondrial Disorder, the same diagnosis that they had denied upon her admission.

99. In fact, despite the fact that her Bader 5 treatment records repeatedly indicate that Justina suffered from probable mitochondrial disease, Dr. Ryan concluded on December 3, 2013 that Justina's presentation was "inconsistent with mitochondrial disease." However, her treatment records indicate that no provider ever excluded the probable diagnosis of Mitochondrial Disorder and, as described below, Justina is still treated for this condition to this day.

100. While on Bader 5, the defendants and others knew or should have known that Justina was not being "abused" by Mr. and Mrs. Pelletier.  Nonetheless, they refused to engage in reasonable efforts to reunite Justina with her family. Instead, the family was repeatedly told that they would "never get Justina back" unless they conceded to the diagnosis of somatoform, accepted the treatment plan terminating their right

to participate in making medical decisions for Justina, and agreed to the false allegation that they had medically abused Justina.

101. While Justina was on Bader 5, the defendants and others repeatedly threatened, coerced, and attempted to intimidate Mr. and Mrs. Pelletier into adopting the purported treatment plan and diagnosis. When they refused to do so, they were met with punitive reductions to their visitations with Justina and threatened that their parental rights would be terminated.

102. Mr. and Mrs. Pelletier were met with and intimidated by security guards who supervised their visits and forcibly removed them from the building when they demanded a second opinion or objected to treatment options imposed by the defendants and others.

103. Despite the lack of physical progress, and the acknowledged diagnosis of probable Mitochondrial Disorder, the defendants and others continued to "treat" Justina as if the cause of her symptoms was exclusively psychiatric in nature. Essentially, however, the psychiatric "treatment" Justina received on Bader 5 was simply to pretend that her physical symptoms did not exist, since the doctors said they were all in her head.

104. At no point during her in-patient psychiatric stay was Justina ever evaluated, assessed or treated for the emotional shock and distress she was suffering as a result of being forcibly locked up against her will and isolated from her parents, her sisters, her home, her school, and her friends.

*Effort to terminate Mr. and Mrs. Pelletier's parental rights permanently.*

105. Ultimately, when Mr. and Mrs. Pelletier continued to resist the lock-up of their daughter and the stripping away of their rights as parents, the defendants in concert with DCF sought permanent termination of their rights. As a result of their false allegations of child abuse, Mr. and Mrs. Pelletier's parental rights were permanently terminated in early 2014, a decision which was later reversed when the false nature of the allegations came to light.

106. Justina was ultimately returned to her family after being imprisoned at Boston Children's Hospital against her wishes and those of her parents.

107. The defendants, and others at Boston Children's Hospital, have intentionally and/or knowingly falsely imprisoned other children after purportedly "diagnosing" them with somatoform and/or falsely accusing the parents of medical child abuse.

108. In one such similar case, the parents were coerced into giving informed consent for an admission to Bader 5 under threat of DCF involvement and termination of parental rights.

109. In other similar cases, as was the case here, refusal to give informed consent for a drastic treatment plan resulted in the actual involvement of DCF and the courts to enforce the radical, invasive, and inappropriate treatment plans.

110. Similarly, defendant Dr. Newton, the so-called medical child abuse expert for the hospital has been the subject of public scrutiny after her medically unsupportable opinions resulted in the wrongful imprisonment of adults that were wrongfully accused of child abuse and murder including but not limited to the infamous and tragic "Irish Nanny" case.

111. This practice of executing a strategic and rapid termination of parental rights for parents who withhold consent regarding the diagnosis and treatment of somatoform has become sufficiently established and accepted conduct at Boston Children's Hospital as to have become colloquially referred to by the defendants, using ersatz medical terminology, as a "parentectomy."

### Justina's Care and Treatment After Bader 5

112. Justina continues to be treated for her trauma by Dr. Hokanson, the psychologist who was treating her at the time she was wrongfully imprisoned at Children's Hospital. Justina has suffered severe and debilitating psychiatric trauma as a result of being held against her will in a locked psychiatric ward, isolated from her friends and families, and enduring several months of treatment in which her physical symptoms and disease were denied by her primary caregivers.

113. Justina continues to be treated for her Mitochondrial Disorder.

114. Justina's parents have also suffered incredible emotional and financial hardship. Mr. Pelletier was unable to continue his work as a successful financial advisor because it was a full-time job to fight for custody of Justina. The family spent all of their savings and went into substantial debt in order to fight for their custody of Justina. They are currently bankrupt, spending much of their time addressing the substantial injuries Justina suffered as a result of the defendants' negligence, and Mr. Pelletier is attempting to re-kindle his career.

### JURISDICTION

115. On or about August 13, 2015, the plaintiffs gave notice to the each of the defendants pursuant to G.L. c. 231, §60L.

21

116. Each of the defendants have formally denied liability.

117. In addition, pursuant to G.L. c. 231, 60L(f) this lawsuit is exempt from the provisions of the statute.

<u>CLAIMS OF JUSTINA PELLETIER PPA LOUIS AND LINDA PELLETIER</u>
<u>AGAINST THE DEFENDANT, JURRIAAN M. PETERS, M.D.</u>

<u>COUNT I</u>
<u>NEGLIGENCE</u>

118. The plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

119. On or about February 12, 2013 and thereafter, the defendant rendered care and treatment to the plaintiff and therefore owed to the plaintiff a duty of due care in accordance with accepted standards of medical care and treatment.

120. The defendant breached his duty on or about February 12, 2013 and thereafter when he negligently and carelessly treated the plaintiff in a manner which resulted in the plaintiff's severe and permanent injuries.

121. As a direct and proximate result of the defendant's carelessness, unskillfulness, negligence and improper care and treatment, the plaintiff suffered severe and permanent injuries.

WHEREFORE, the plaintiff demands judgment against the defendant for the above-described damages, plus interest and costs.

<u>COUNT II</u>
<u>GROSS NEGLIGENCE</u>

122. The plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

123. On or about February 12, 2013 and thereafter, the defendant, without regard for the health and well-being of the plaintiff, treated the plaintiff in a grossly negligent manner.

124. As a direct and proximate result of the defendant's malicious, willful, wanton, reckless and/or grossly negligent conduct, the plaintiff suffered severe and permanent injuries.

WHEREFORE, the plaintiff demands judgment against the defendant for the above-described damages, plus interest and costs.