UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Martin S. Gottesfeld, pro se,
    Plaintiff
  -against-
Hugh J. Hurwitz, et al.

Case No.: 18-cv-10836-PGG-GWG

CLAIM FOR MANDATORY JUDICIAL NOTICE (F.R. EVID. 201(c)(2))

Plaintiff and Claimant Martin S. Gottesfeld (herein the "claimant"), acting pro se, here moves The Honorable Court pursuant to Fed. R. Evid. 201(c)(2) to take mandatory judicial notice of the herewith-provided exhibits 1-6 hereto, which are relevant to pending matters before The Court. Claimant notes Exhibit 1 at 2 ¶ 7 of his same-dated motion to compel.

Respectfully filed pursuant to the prison mailbox rule of Houston v. Lack, 487 U.S. 266 (1988) by mailing to The Court in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and handed to Ms. J. Wheeler of the FCI Terre Haute CMU unit team, acting in her official capacity as an agent of the defendants, on Sunday, December 22nd, 2019, or the first opportunity thereafter,

by: /s/ MSG
Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

- Page 1 of 1 -

Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. §1746(1) on this 22nd day of December, 2019:

1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-JLC (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

2. I am in the special-housing unit (SHU) inside the Federal Correctional Institution Terre Haute, Indiana (herein "FCI-THA") communications-management unit (herein "CMU"), where agents operating under both the defendants in the case and their common counsel placed me in administrative segregation on Monday, December 9th, 2019, in brazen and blatant retaliation for my litigation and my litigation-related activities.

3. This is at the least the third (3rd) such set of retaliatory acts carried out by these same agents despite the watchful eye of The Court.

4. Once again, there has been no administrative-detention hearing, so once again these agents are violating 28 C.F.R. § 541.26(b) and The Due Process Clause of The Fifth Amendment, just as gave rise in part to the case. Please see docket entry (D.E.) 101-7 at 27.

5. Interesting events that are relevant to the case transpired here on Friday, December 20th, 2019, and Saturday, December 21st, 2019.

6. I have formally requested the preservation against spoliation or other loss of the audio and video surveillance recordings of these events for admission in the case. Exhibit 2.

7. Based upon my years of training and experience as an imprisoned national political journalist covering DOJ misconduct for publications that include The Huffington Post, Red State, World Net Daily (WND), Info Wars, The Western Journal, and The Intercept; as an imprisoned human-rights advocate featured by

The Daily Mail, The New American, RT, Michelle Malkin, Rolling Stone, Sirius/XM's The Willkow Majority, Shadowproof Press, The Daily Wire, The Daily Caller, and John Kiriakou; and as a federal-court litigant; I believe that the recent events were the proximate result of ~~an~~ the contemporaneous entry of one or more of my filings on the public docket of the case, or the agents operating under both the defendants in the case and their common counsel (herein the "defendants' agents") reading my yet-to-be-entered filings dated Thursday, December 19th, 2019, during their unlawful extrajudicial content-based Executive discretionary pre-screening of my court filings ~~[illegible]~~, or both.

8. The defendants' agents swapped one type of unlawful extrajudicial retaliation and obstruction for another, still aimed to dissuade me from litigating and sabotage my efforts, with the culpable intent of misleading The Court ~~[illegible]~~ into the ~~belief~~ mistaken belief that the issues I raised in my previous filings dated Monday, December 9th, 2019, and thereafter are moot when in fact they are not.

9. The defendants' agents continue to refuse my lawful request pursuant to the case for a phone call to The Clerk of The Court, so that I cannot alert The Honorable United States District Court Judge Paul G. Gardephe to their misconduct despite the obligations of the defendants' counsel under Local Civil Rule 1.5(b)(5) and New York Rule of Professional Conduct 1.16(a) - or perhaps more likely, those obligations and the violations thereof are precisely the reason why the defendants' agents are blocking me from calling The Court.

10. Today is the thirteenth (13th) day of my hunger strike, protesting in part the denial of my requests to call The Court.

11. My resting blood pressure upon getting out of bed in the morning, as measured by the defendants' agents, was approximately 145/105 and I am not taking my prescription blood-pressure medication during my hunger-strike in order to demonstrate the strength of my resolve to call The Court, cease the retaliatory and obstructive conduct of the defendants' agents, and be made whole for what they have done with malice aforethought.

12. If the defendants' agents attempt to force-feed me — which they are again threatening to do — then I am liable to have a heart attack and enter cardiac arrest.

13. I have also decided that if agents of the defendants attempt to force-feed me, then in protest of the entire medical profession for its dishonorable tacit assent to such barbarism as we approach the year 2020, I shall never again take my blood-pressure or any other pharmaceutical medication.

14. My requests for an Indiana State Health-Care Proxy (HCP) form and copies of the relevant patients'-rights documentation have been fruitless even though, I believe, state-licensed medical professionals are mandated by law to provide to me and any other patient these documents upon request.

15. My requests to update my emergency-contact information with the FBOP have also been fruitless. Please see previous exhibits from other filings.

16. All of this has happened because the defendants' agents fervently wish to block or at least unduly delay The Court from hearing about their now-eleven-(11) straight months of unlawful extrajudicial obstruction, retaliation, degradation, and humiliation carried out to bring an end to my Constitutionally-protected petitions, speech, and political journalism.

17. During my medical evaluation on the morning of Friday, December 20th, 2019, Registered Nurse Worthington asked me when I expected to see the disciplinary-hearing officer (herein the "DHO").

18. I replied that I did not know.

19. An agent of the defendants confidently told R.N. Worthington (likely based upon his years of experience as a correctional officer (herein "CO")) that it would almost certainly be after the holidays that I see the DHO.

20. I have detailed in previous filings in the case the malicious and retaliatory actions of the defendants' agents on Monday, December 9th, 2019, when baselessly and frivolously they accused me of serious inmate misconduct supposedly because I provided notice pursuant D.C. Code §§ 13-421 et seq. and 16-1905.

21. My previous filings in the case describe how the defendants' agents' accusation against me was unnumbered and untimely, and therefore violated my right to Due Process; how my legal work relevant to my pending direct appeal in my criminal case was interrupted, confiscated, and obstructed at a critical juncture less than thirty (30) days before the briefing deadline when I was ~~a~~ soliciting a new appellate attorney; and how I was placed in administrative ~~detention~~ segregation inside a cell without a desk or adequate sleep surface and wherein the only water source is known to be toxic to human life, ~~as insects~~ and cockroaches roam ~~uncontrolled~~ the corroded metal uncontrolled, among other issues.

22. Based upon the wording of the accusation and ~~my~~ years of training and experience I and others felt before the events in above-paragraph seven (7) that the defendants' agents intended, in prison parlance, "to drag me out back here," i.e. in solitary confinement and hamstrung to litigate, for as long as possible before any DHO hearing and then to "drag me out" at a further thirty (30) days pending a bogus so-called "threat assessment" before "dragging me out" yet ~~again~~ longer pending a retaliatory transfer — as ~~have~~ the defendants' agents have done in the past to many similarly-situated persons.

23. To be clear: I meant what I said and I said what I meant — as is my practice — in my letter to Senate Minority Leader Schumer, i.e. I do not wish to leave the communications-management unit (CMU) until whatever necessary changes are made to stop these units from being used illegitimately to squash the First Amendment rights of political prisoners to speech, protest, petition, association, and worship. That's why I co-wrote The CMU Series, the publication of which I eagerly await and expect prior to "Super Tuesday," but preferably after any possible Senate trial.

24. On Wednesday, December 18th, 2019, after advising me in writing that I could make a social telephone call to The Office of The Clerk of The Court, the defendants' agents answered my written request from Saturday, December 14th, 2019, seeking the appropriate phone number. Exhibit 3.

25. I immediately made a written request to add the Clerk's telephone number to my TRULINCS account if necessary and for a social call during normal business hours

to the Clerk's office, but I was unable to hand it over for processing until mail call the next day; Thursday, December 19th, 2019. Exhibit 4.

26. I had not and have not made any social call from this SHU.

27. One of the defendants' agents since confirmed to me that the phone number for the Office of The Clerk was indeed already approved in my TRULINCS and that my TRULINCS account was the source for the answer provided by the defendants' agents in Exhibit 3.

28. In a non-CMU SHU, absent intervening events, far more likely than not, I would have been able to call The Clerk on Friday, December 20th, 2019, and provided The Clerk's Office could accept a call from a federal prison, I would have been able to alert The Court to recent events and request an emergency hearing. While I believe based upon my training and experience that this fact is related to the actions and omissions of the defendants' agents after mail call on Thursday afternoon, December 19th, 2019, and that it affected their decision-making, I do not believe that it was causal like the events in above-paragraph seven (7), but rather that it narrowed their options to courses of conduct that would render me unable to call The Court.

29. Therefore I believe based on my training and experience ~~that some~~ and with the benefit of hindsight, that sometime shortly after mail call on Thursday, December 19th, 2019, such time likely coinciding with the entry of at least one (1) of my filings from the SHU onto the docket of the case, the imperitives of the agents of the defendants ~~from overt intimidation,~~ shifted ~~retaliation, coercion, and obstruction to~~ from overt retaliation, intimidation, degradation, humiliation, coercion, and obstruction to: first and foremost, work to undermine the accurate perception that they are retaliating against and blocking my ongoing litigation, so as to prevent The Court from interceding, if necessary by once again misrepresenting the Feds ~~(please see my motion for sanctions)~~ to The Court (please see my motion for sanctions for examples of previous such misrepresentations); second, continue retaliating and obstructing my ongoing litigation under the guise of some other supposedly legitimate motive; third, avoid future legal liability for the tortious acts thus-far committed; and fourth,

minimize scrutiny from the public and from my fellow political reporters and human-rights advocates.

30. Rather than make a social call to The Clerk of The Court, on Friday, December 20th, 2019, I received a distinctly antisocial and passive-aggressive visit from a man who identified himself as an "alternate DHO," but who came off more like an unscrupulous lemon-slinging used-car salesman.

31. I believe based on my experience and training that the defendants' agents want the public and any reviewing court(s) to believe falsely that they used an "alternate DHO" because my demand pursuant to D.C. Code §§ 13-42 et seq. and 16-1905 explicitly named the usual suspects, i.e. Jason Bradley and the PREA monster known as Todd "The Terd Voyeur" Royer and that it would have been a conflict of interest for either of them to handle the incident report. Such attempts to create an appearance of impartiality, however, were quickly belied by subsequent events.

32. DHOs are not supposed to be employees of the relevant individual facility but of the corresponding FBOP regional office. This too is meant to create a misperception of neutrality and detachment from the complaining staff member when no such neutrality exists.

33. I find it hard to believe that an alternate DHO working for the far-away regional office in Kansas City was available on such short notice and far more likely that he is an employee inside FCC Terre Haute.

34. Nonetheless one of the defendants' agents explicitly stated later that he works for regional and I look forward to discovering the truth of the matter.

35. The alternate DHO (herein "ADHO") was in a distinctive and unusual rush, as were others. It seems I quickly went from someone to be "dragged out back here" to a hot potato.

36. I noticed that out of the seventy (70) or so names listed on the copy of my D.C. Code § 16-1905 demand carried by the ADHO, Jason Bradley was highlighted, lending credence to my assertion in above paragraph 31.

37. The ADHO told me that my staff representative of choice, Counselor B. Orr, declined to represent me, but I now believe that in reality the ~~Counselor Orr could not attend the same-day hearing~~ agents of the defendants were in such a rush to find me guilty so they could get me out of the SHU and conjure a more effective ~~façade~~ to mask their retaliatory motives; that Counselor Orr simply could not with no prior notice attend the same day hearing that the defendants' agents had planned and that they fought tooth and nail not to delay to the point where in so doing they ablated their own ~~façade~~.

38. The ADHO asked me if I had any alternates in mind for my staff representative and I told him that I had originally elected Officer S. Harvey but that he had to decline because he can't be around DHO Jason Bradley. Since DHO Bradley wasn't presiding over the hearing, ~~however, it was my understanding that he could~~ incident report any longer, however, I told the ADHO that ~~he could~~ Officer Harvey could likely now accept.

39. The ADHO left the SHU to go ask Officer Harvey to be my staff representative.

40. After representing me and another prisoner in disciplinary hearings before DHO Bradley on or about May 3rd, 2019, Officer Harvey caught DHO Bradley falsifying records and reported him. FBOP Regional Director Krueger and The Office of the Inspector General took no discernable corrective action against DHO Bradley and he remains in his position after falsifying records in order to railroad a prisoner. DHO Bradley they retaliated against Officer Harvey and again his misconduct was openly tolerated if not outright encouraged by Director Krueger. Supposedly to protect Officer Harvey from DHO Bradley - who arguably should not hold a position of trust due to his intentional falsification of federal documents - but more likely to protect DHO Bradley and enable his continued commission of federal felonies inside the FBOP's North Central Regional Office under the administration of Director Krueger, there is now a standing separation order for DHO Bradley and Officer Harvey that ensures that Officer Harvey is never again in the position to blow the whistle on DHO Bradley.

41. A short time later the ADHO returned to the SHU and told me that Officer Harvey declined again to be my staff representitive. On Saturday, December 21st, 2019, I asked Officer Harvey why he declined to be my staff representitive once DHO Bradley was no longer assigned to the hearing and he responded that even when DHO Bradley does not decide a particular incident report, he is still in charge of all disciplinary matters at the institution and that he, Officer Harvey, can never now be a staff representitive. Officer Harvey's candid explanation shatters the façade in above-paragraph 31.

42. The ADHO then asked me if I had in mind other staff representitives.

43. I named another Officer and without conferring with anyone else or any documentation the ADHO told me he was unavailable because he works the second shift. (DHO hearings always take place during first shift so only staff who work first shift can be staff representitives.)

44. I proceeded to name a string of other officers and off the top of his head the ADHO proceeded to tell me that each did not work first shift.

45. At one point the ADHO asked me if I wanted the warden to appoint for me a staff representitive which I declined.

46. While I was still trying to think of other possible staff representitives the ADHO

46. I asked how long it would be for the warden to appoint a staff representitive and the ADHO answered about a week.

47. I declined the appointment of a staff representitive by the warden and continued thinking.

48. While I was still trying to think of other possible staff representitives, the ADHO declared that he would have the warden appoint one.

49. Either the ADHO made up as he went along that all of my backup choices for staff representitive did not work first shift, or, more likely, he knew all of their shift assignments because he is not in reality a regional employee

(who would not know the shift assignments of so many non-regional officers), but an employee of FCI Terre Haute – one whom seems to have been chosen in a rush and given specific marching orders. Either way, my due process rights were violated, and I look forward to discovering the truth of the matter.

50. The ADHO also asked me if I wanted to call any witnesses or present any evidence.

51. I gave the ADHO the name of another prisoner who could testify to the falsehood of the charges and the untimliness of the delivery of the incident report some three (3) days after the supposed incident. I told him that I wanted to present the relevant statutes and the surveillance footage showing that my accuser read and understood my D.C. Code §§ 13-421 et seq. and 16-1905 demand and responded to it orally on Friday, December 6th, 2019, but did not issue the incident report it was at least thirty-six (36) hours past the required twenty-four (24) hour window.

52. The ADHO told me that I could not present the statutes.

53. I noticed that the ADHO had a copy of my written request to Counselor Orr, dated Tuesday, December 17th, 2019, in which I requested that he present copies of my D.C. Code demand; 18 U.S.C. § 3621(c); D.C. Code §§ 16-1905, 13-421, 13-422, 13-423 and 13-423(a); Hunter v. Lane, 1987 U.S. Dist. LEXIS 16727, No. 84 C 1635 (N.D. Ill. February 11th, 1987); Williams v. Lane, 851 F.2d 867 (7th Cir. 1988); and an informative and credible article on long-arm statutes. Please see Exhibit 5. I further note that when I submitted Exhibit 5 to the defendants' agents, the incident report had been numbered post-hoc (as happened with the last incident report) and that I had signed paperwork confirming the election of Counselor Orr as my staff representative. This paperwork buttresses my belief in above-paragraph 37 that Counselor Orr did not decline but was forced off. I cannot herewith include this paperwork without risking the spoliation or other loss of my only copy thereof.

54. A short time after the ADHO left the SHU, a woman in plain clothes

P13

whom I'd never met entered the SHU and introduced herself as my staff rep.

55. I replied that I thought it would take a week to get a warden-appointed staff rep.

56. She said that she guessed that they wanted hurry this one along.

57. Warden B. Lammer was one of the addressees on my relevant D.C. Code demand. That it was he who appointed my staff rep, and also her subsequent conduct, further undermines the façade of impartiality noted in above paragraph 31.

58. My warden-appointed staff rep. asked me if there were witnesses I wanted to call or evidence that I wanted to present.

59. I gave the same answers as I gave to the ADHO.

60. She provided a similar answer about not presenting the statutes.

61. I noted that if she would not present the statutes, that I could print them from the law library, but that I wouldn't be able to use the library until Monday and it would take some days after that for me to receive the printouts from education.

62. When it appeared she was leaving, she really was just beckoning the ADHO, who was hiding just outside the doorway snooping in on our conversation unbeknownst to me but beknownst to her.

63. At no point did she describe the potential consequences of the charges, as she was required to do. Exhibit 6 item 6.

64. At no point did she explain to me in advance the procedures for the hearing, as she should have done. Exhibit 6 item 7.

65. At no point did she give any indication that she—as opposed to the ADHO—spoke to my witness as she was required to do. Exhibit 6 item 2.

66. At no point did she notify the ADHO that she encountered difficulties preventing her from functioning properly. Exhibit 6 opening paragraph.

67. From that moment forward, when she beckoned the ADHO from behind the door that she knew but did not tell me was shielding him from view during our discussion, it became clearer and clearer that she, the ADHO, the

warden who had appointed her so unusually fast and others were in cahoots and had already determined the outcome of the hearing before it started.

68. The supposed disciplinary hearing began when the ADHO stopped hiding.

69. I advised the ADHO that I had just met my staff rep and that I had insufficient notice of the hearing. He feigned like I had plenty of notice.

70. In order to have sufficient notice to prepare a written statement, I needed my staff rep. to secure and share with me a statement from my witness and the written documentation I requested in Exhibit 5, as well as to have reviewed the relevant surveillance footage. That's why in Exhibit 5 I specifically asked, "Can you please let me know prior to the DHO hearing whether or not you can secure this evidence?"

71. My staff rep neither secured nor presented any of those things. She didn't even bring a notepad or pencil.

72. ~~At one point~~ The only comment she made during the hearing was to the effect that she was just there to make sure my rights weren't violated; but she didn't and they were. Further, that wasn't her role. Exhibit 6.

73. Generally, the role of a staff representative at FCC Terre Haute "is to help the inmate present the best defense possible to the charged violations." Officer Harvey in fact does exactly that. Exhibit 6 opening paragraph. My warden-appointed staff rep. was the functional equivalent of a potted plant.

74. My warden-appointed staff rep. was required to "assist me" in presenting "whatever information" I wanted to present and "in preparing a defense," i.e. a written statement. Exhibit 6 item 1. "This will require, in every case, consultations with the inmate." Id. item 1 (emphasis added). The relevant instructions explicitly require more than 1 consultation; i.e. one to find out what needs to be gathered and another going over the results. She never handed me a single sheet of paper.

75. Similarly, my warden-appointed staff rep. was supposed to "present" any evidence favorable to the inmate's defense." Id. item 4, but she never looked at or presented the camera footage that I requested.

76. My warden-appointed staff rep. eschewed the delay I requested to present

the relevant statutes, leaving me unable to prepare a written statement despite Pl.'s opening paragraph and item 5.

77. I asked the ADHO to review the camera and audio footage but he refused. He insisted the accusation was timely when my witness and the footage proved the opposite.

78. Oddly, the ADHO had the statutes printed. I'm not sure why. Perhaps safe in the assumption that I had been preempted by representus staffus minimus from preparing a written statement, he felt that he could use them against me. Or perhaps in some strange way he thought that after my written warning about the lack of qualified immunity, it would somehow help him avoid liability if he pretended to consider my argument and evidence - a formality entirely skipped by DHO Bradley.

79. Regardless, I showed him and he actually seemed to understand that the supposedly-offending language in my D.C. Code demand came from §16-1905 itself. I $ explained that if I didn't use that language, then anyone who received my demand could claim insufficient notice and that enforcing the incident report would neuter the statute, but it was clear that his salary depended on him acting as if he hadn't heard me.

80. I told him that the incident report was retaliatory, and that the last one had been untimely too. It was expunged after I largely served the sanctions. I told him that this was a repeated Due Process violation. It was like talking to a well.

81. The ADHO never asked my staff rep. to leave for deliberations, Exhibit 6 item 8, because there were no deliberations and why would he ask her to leave? They are coconspirators. The fix was in before I met either of them.

82. The ADHO never asked me if I had a written statement because he knew that he and his cohort made that impossible.

83. The ADHO never asked if I had anything else to say before he found me guilty. When he announced the sanctions it further confirmed the goal of the day; why they had rushed the whole process that day. He took twenty-seven days good time, fined me $50, and took away my electronic messaging and my phone privileges for forty-five (45) days.

84. This meant that they would let me out of the SHU – and that counsel for the defendants could tell The Court that I was no longer being subjected to the conditions therein; perhaps even tell The Court that I had been found guilty of extorting federal employees; while omitting that I was still being blocked from calling The Court to contest whatever counsel might say.

85. This also sabotages my direct appeal, for which I have a filing deadline before the next forty-five (45) days. I had been using electronic messaging – not for social communications – but to communicate with attorneys. I had just solicited Brendon Semple, Esq., and I was awaiting his response when they brought me to the SHU.

86. Shortly after the ADHO and status representus minimus left the SHU, my accuser and the unit's intelligence officer came in with a food tray even though it wasn't mealtime. They offered to let me out of the SHU if I took the tray. My guess is that their superiors were waiting to relay confirmation to counsel for the defendants that he could assure The Court that my motion for an order to show cause is moot. There was no "threat assessment" even though my accuser claimed she felt threatened.

87. But my motion is not moot. The retaliation continues, albeit more covertly than before. The bullies continue their retaliation, intimidation, and coercion under the guise that it is they who are being coerced and intimidated. The victimizers play victim. It's one of the oldest tricks in the book. It's exactly what Justine's tormentors did when the truth was coming out.

88. I refused the tray. Not until I call The Court I told them.

89. I will use my last stamps to mail this filing and other filings in other cases. I do not know that I will get more. They skipped my commissary again last week. I want it noted during my apparent silence – the rosier the picture painted by the defendants' counsel for The Court, the more I wish for the Court to hear me in opposition.

I declare under the penalty of perjury under the laws of The United States that the foregoing is true and correct. Executed on Sunday, December 22nd, 2019.

Martin S. Gottesfeld

To: CMU Unit Team
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Saturday, December 21st, 2019
Subject: Preservation of evidence against spoliation or other loss for impending litigation

Salutations Unit Team,

I hope you are well.

I hereby formally request the preservation against spoliation or other loss of the following audio/video surveillance footage in accordance with Federal Bureau of Prisons policy requiring upon request such preservation:

- Friday, December 20th, 2019 (entire day, 12:00 A.M. – 11:59 P.M.); FCI Terre Haute CMU SHU; all personal interactions between two (2) or more individuals no matter whom;
- Friday, December 20th, 2019 (entire day, 12:00 A.M. – 11:59 P.M.); FCI Terre Haute CMU — the entire unit including staff offices; any and all footage recording the alternate disciplinary hearing officer (DHO), or Warden B. Lammer, or any associate or assistant warden, or other FBOP staff member ranking lieutenant or higher; any staff interaction(s) with inmate Harris; the full chain of custody of all food trays that at any time that day were brought into the FCI Terre Haute CMU SHU; any and all recordings of inmate Gottesfeld's warden-appointed staff representative; and
- Saturday, December 21st, 2019, approx. 9:30 A.M.; FCI Terre Haute CMU SHU; rounds of the morning-watch lieutenant and C.O. S. Harvey, specifically including C.O. Harvey's explanation of why he could not be a staff representative for inmate Gottesfeld.

I hereby certify under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1) that the above evidence is relevant to, and admissible in, litigation that is already pending before The Honorable U.S. District Court for The Southern District of New York (Gottesfeld v. Hurwitz, et al., 18-cv-10836), The Honorable U.S. District Court for The District of Columbia (Brown v. Fed. Bureau of Prisons, 1:19-cv-02795), and The Honorable U.S. District Court for The Southern District of Indiana (Gottesfeld v. Lammer, et al., pending filing and case number). If there is anything else that I must do to ensure the availability of the above evidence, then please detail to me in writing the required procedure.

Thanks,
by: MSG
Martin S. Gottesfeld, pro se

– Page 1 of 1 –

Exhibit 3

To: CMU Unit Team
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Saturday, December 14th, 2019
Subject: Phone Number for Clerk's Office, Southern District of New York?

Salutations CMU Unit Team,

I hope you are well.
I believe – but am not sure – that the phone number for the U.S. District Court for the Southern District of New York (500 Pearl St., New York, N.Y. 10007) is already in my approved TRULINCS contacts. If so, may I please get this phone number? I do not recall it from memory.
If the number is not already in my approved TRULINCS contacts, then can someone look it up for me and bring me the paper forms to add it to TRULINCS?

Thanks,
Martin S. Gottesfeld

212-805-0136

Rec'ved W 2019-12-18
Martin S. Gottesfeld

– Page 1 of 1 –

Exhibit 4

To: CMU Unit Team
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Wednesday, December 18th, 2019
Subject: Social Call to U.S. District Court?

Salutations Unit Team,

    I hope that you are well.
    Thank you for providing the phone number for the Clerk's Office for the U.S. District Court in New York, i.e. 212-805-0136.
    I would like to make a social call to that number as soon as possible.
    If that number does not already appear in my TRULINCS approved contacts, can you please bring me the appropriate paper forms to add it thereto?
    If it is already approved in TRULINCS, may I please make a call to that number as my monthly social call at the next practical juncture during normal business hours?

Thanks,
Martin S. Gottesfeld

- Page 1 of 1 -

Exhibit S

To: Canselor B. Orr
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Tuesday, December 17th, 2019
Subject: Incident Report 3338082

Salutations Canselor Orr,

I hope you are well and I thank you for being my staff rep. Prior to the DHO hearing, can you please secure the following evidence?
- A copy of the relevant inmate request, dated Friday, December 6th, 2019;
- A copy of 18 U.S.C. § 3621(c);
- A copy of D.C. Code § 16-1905;
- A copy of D.C. Code § 13-421;
- A copy of D.C. Code § 13-422;
- A copy of D.C. Code § 13-423(a);
- A copy of Hanna v. Lane, 1987 U.S. Dist. LEXIS 16727, No. 8 C 1635 (N.D. Ill., February 11th, 1987);
- A copy of Williams v. Lane, 851 F.2d 867 (7th Cir. 1988); and
- An informative and credible article on long-arm statutes.

Can you please let me know prior to the DHO hearing whether or not you can secure this evidence?

Thanks,
[signature]
Martin S. Gottesfeld

— Page 1 of 1 —

BP-A306
AUG 11
U.S. DEPARTMENT OF JUSTICE

DUTIES OF STAFF REPRESENTATIVE    CDFRM

FEDERAL BUREAU OF PRISONS

FCC Terre Haute, IN
Institution

TO:    All Staff Representatives

FROM:  Complex Warden

There may be questions as to just which part an employee takes when that employee serves as staff representative for an inmate who appears before the DHO. Generally, your role is to help the inmate present the best defense possible to the charged violations. The Warden, the DHO, the reporting officer, investigating officer, a witness to the incident, and UDC members involved in the case may not act as staff representative. If, during your representation, you encounter difficulties which you believe will prevent you from functioning properly, you should notify the DHO of this, and he/she will excuse you if there is a good reason to do so.

(1) You are to assist the inmate in presenting whatever information the inmate wants to present and in preparing a defense. This will require, in every case, consultations with the inmate, and familiarity with the Inmate Discipline Program Statement.

(2) You are to speak to witnesses who might furnish evidence on behalf of the inmate, if the inmate indicates there are such witnesses whom the inmate wishes to have called. You may question witnesses requested by the inmate who are called before the DHO.

(3) You should become familiar with all reports relative to the charge against the inmate. Confidential or security information must of course be protected and may not be shared with any other person, including inmates, staff, visitors, attorneys, etc. Any request for confidential information should be directed to the DHO.

(4) You should present any evidence favorable to the inmate's defense.

(5) You should present information which may assist the DHO and which may obtain a lesser sanction for the inmate. If you believe you need additional time to pursue any of the functions, you may request a delay in the hearing from the DHO, but ordinarily only after you have the concurrence of the inmate to do this.

(6) You are to help an inmate understand the charges and the potential consequences.

(7) You should be familiar with procedures at the hearing, explain them to the inmate in advance, and, if necessary during the hearing, assist the inmate in understanding procedural points.

(8) You should not be present during deliberations by the DHO. An exception would be where you have read confidential information, and want to discuss that with the DHO outside the inmate's presence. In that case, you will have to explain to the inmate, in general terms, what you are doing, and you should leave the room as soon as that function is over.

(9) If the inmate asks you to assist in writing an administrative appeal from the DHO action, you should assist the inmate in doing so.

I have read the "Duties of Staff Representative" and (agree) (do not agree) to serve as staff representative for inmate __Gothestelo__, reg. no. __12982-104__ in the inmate's appearance before the DHO. I do / do not agree for the following reason

Printed Name/Signature of Employee: _____    Date: _____

IR# __3299323__

Record Copy - DHO.
(This form may be replicated via WP)

Replaces BP-306(52) of JAN 88



Sunday, December 22nd, 2019
Houston v. Lack, 487 U.S. 266
(1988)



U.S. District Court
Office of the Pro Se Clerk
500 Pearl St.
New York, NY 10007

RECEIVED
PRO SE OFFICE
JAN 22 2020

Keith S. Gottesfeld
: 14983-104
 Correctional Institution
, IN 47808