Dana Gottesfeld *in reference to Martin Gottesfeld*
Martin Gottesfeld, Register Number 12982-104
FCI Terre Haute Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

January 29, 2020

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

RECEIVED FEB - 3 2020 PRO SE OFFICE

    Re:    *Gottesfeld v. Hurwitz*, 18 Civ. 10836 (PGG)

Dear Judge Gardephe:

I hope this letter finds your Honor well. On December 15th, 2019, the Clerk of the Court docketed a partial list of exhibits by friends of the plaintiff (D.E. 115) in support of his Memorandum Of Law In Support Of Plaintiff's Opposition To Defendant's Motion To Dismiss The Complaint (D.E. 101) The list was incomplete due to technical issues. Please find missing exhibits 101, 106, 107, and 138 provided with this letter.

                        Sincerely,

                        /s/ Dana E. Gottesfeld
                        *Dana Gottesfeld in reference to Martin Gottesfeld*
                        Martin Gottesfeld, Register Number 12982-104
                        FCI Terre Haute Federal Correctional Institution
                        P.O. Box 33
                        Terre Haute, IN 47808


cc:    Alexander J. Hogan
       Assistant United States Attorney
       86 Chambers Street, Third Floor
       New York, New York 10007

# Unhandled Exception

Exhibit 101

## Building Better Internets

# The Truth about Aaron Swartz's "Crime"

JANUARY 12, 2013 *By* Alex Stamos *in* CYBERCRIME, RIGHTS AND LEGALITY, SECURITY *Tags:* AARON SWARTZ, CYBERSECURITY, LAW 669 COMMENTS

I did not know Aaron Swartz (http://www.aaronsw.com/weblog/), unless you count having copies of a person's entire digital life on your forensics server as knowing him. I did once meet his father, an intelligent and dedicated man who was clearly pouring his life into defending his son. My deepest condolences go out to him and the rest of Aaron's family during what must be the hardest time of their lives.

If the good that men do is oft interred with their bones, so be it, but in the meantime I feel a responsibility to correct some of the erroneous information being posted as comments to otherwise informative discussions at Reddit (http://www.reddit.com/r/news/comments/16ffph/reddit_cofounder_aaron_swartz_commits_suicide/), Hacker News (http://news.ycombinator.com/item?id=5046845) and Boing Boing (http://boingboing.net/2013/01/12/rip-aaron-swartz.html#more-205376). Apparently some people feel the need to self-aggrandize by opining on the guilt of the recently departed, and I wanted to take this chance to speak on behalf of a man who can no longer defend himself. I had hoped to ask Aaron to discuss these issues on the Defcon stage once he was acquitted, but now that he has passed it is important that his memory not be besmirched by the ignorant and uninformed. I have confirmed with Aaron's attorneys that I am free to discuss these issues now that the criminal case is moot.

I was the expert witness on Aaron's side of US vs Swartz (http://www.scribd.com/collections/3151539/United-States-v-Aaron-Swartz-11-cr-10260-MA), engaged by his attorneys (http://kvn.com/) last year to help prepare a defense for his April trial. Until Keker Van Nest called iSEC Partners (https://www.isecpartners.com) I had very little knowledge of Aaron's plight, and although we have spoken at or attended many of the same events we had never once met.

Should you doubt my neutrality, let me establish my bona fides. I have led the investigation of dozens of computer crimes, from Latvian hackers blackmailing (http://www.krtv.com/news/da-davidson-fined-375k-latvian-hackers-plead-guilty/) a stock brokerage to Chinese government-backed attacks (https://www.isecpartners.com/media/10932/isec_aurora_response_recommendations.pdf) against dozens of American enterprises. I have investigated small insider violations of corporate policy to the theft of hundreds of thousands of dollars, and have responded to break-ins at social networks, e-tailers and large banks. While we are no stranger to pro bono work, having served as experts on EFF vs Sony

BMG (https://www.eff.org/cases/sony-bmg-litigation-info) and Sony vs Hotz (http://www.groklaw.net/articlebasic.php?story=20110327185437805), our reports have also been used in the prosecution of at least a half dozen attackers. In short, I am no long-haired-hippy-anarchist who believes that anything goes on the Internet. I am much closer to the stereotypical capitalist-white-hat sellout that the antisec people like to rant about (http://i1-news.softpedia-static.com/images/news2/ImageShack-Hacked-by-Full-Disclosure-Contestants-3.jpg) (and steal mail spools from) in the weeks before BlackHat.

I know a criminal hack when I see it, and Aaron's downloading of journal articles from an unlocked closet is not an offense worth 35 years in jail (http://www.justice.gov/usao/ma/news/2011/July/SwartzAaronPR.html).

The facts:

- MIT operates an extraordinarily open network. Very few campus networks offer you a routable public IP address via unauthenticated DHCP and then lack even basic controls to prevent abuse. Very few captured portals on wired networks allow registration by any visitor, nor can they be easily bypassed by just assigning yourself an IP address. In fact, in my 12 years of professional security work I have never seen a network this open.
- In the spirit of the MIT ethos, the Institute runs this open, unmonitored and unrestricted network on purpose. Their head of network security admitted as much in an interview Aaron's attorneys and I conducted in December. MIT is aware of the controls they could put in place to prevent what they consider abuse, such as downloading too many PDFs from one website or utilizing too much bandwidth, but they choose not to.
- MIT also chooses not to prompt users of their wireless network with terms of use or a definition of abusive practices.
- At the time of Aaron's actions, the JSTOR website allowed an unlimited number of downloads by anybody on MIT's 18.x Class-A network. The JSTOR application lacked even the most basic controls to prevent what they might consider abusive behavior, such as CAPTCHAs triggered on multiple downloads, requiring accounts for bulk downloads, or even the ability to pop a box and warn a repeat downloader.
- Aaron did not "hack" the JSTOR website for all reasonable definitions of "hack". Aaron wrote a handful of basic python scripts that first discovered the URLs of journal articles and then used curl to request them. Aaron did not use parameter tampering, break a CAPTCHA, or do anything more complicated than call a basic command line tool that downloads a file in the same manner as right-clicking and choosing "Save As" from your favorite browser.
- Aaron did nothing to cover his tracks or hide his activity, as evidenced by his very verbose .bash_history, his uncleared browser history and lack of any encryption of the laptop he used to download these files. Changing one's MAC address (which the government inaccurately identified as equivalent to a car's VIN number) or putting a mailinator email address into a captured portal are not crimes. If they were, you could arrest half of the people who have ever used airport wifi.
- The government provided no evidence that these downloads caused a negative effect on JSTOR or MIT, except due to silly overreactions such as turning off all of MIT's JSTOR access due to downloads from a pretty easily identified user agent.
- I cannot speak as to the criminal implications of accessing an unlocked closet on an open campus, one which was also used to store personal effects by a homeless man. I would note that trespassing charges were dropped against Aaron and were not part of the Federal case.

In short, Aaron Swartz was not the super hacker breathlessly described in the Government's indictment and forensic reports, and his actions did not pose a real danger to JSTOR, MIT or the public. He was an intelligent young man who found a loophole that would allow him to download a lot of documents quickly. This loophole was created intentionally by MIT and JSTOR, and was codified contractually in the piles of paperwork turned over during discovery.

If I had taken the stand as planned and had been asked by the prosecutor whether Aaron's actions were "wrong", I would probably have replied that what Aaron did would better be described as "inconsiderate". In the same way it is inconsiderate to write a check at the supermarket while a dozen people queue up behind you or to check out every book at the library needed for a History 101 paper. It is inconsiderate to download lots of files on shared wifi or to spider Wikipedia too quickly, but none of these actions should lead to a young person being hounded for years and haunted by the possibility of a 35 year sentence.

Professor Lessig will always write more eloquently than I can on prosecutorial discretion (http://lessig.tumblr.com/post/40347463044/prosecutor-as-bully) and responsibility, but I certainly agree that Aaron's death demands a great deal of soul searching by the US Attorney (http://www.justice.gov/usao/ma/meetattorney.html) who decided to massively overcharge this young man and the MIT administrators (http://web.mit.edu/ogc/) who decided to involve Federal law enforcement.

I cannot speak as to all of the problems that contributed to Aaron's death, but I do strongly believe that he did not deserve the treatment he received while he was alive. It is incumbent on all of us to figure out how to create some positive change out of this unnecessary tragedy. I'll write more on that later. First I need to spend some time hugging my kids.

*Edit 1:* Fixed typo. Thank you @ramenlabs.

*Posted from San Carlos, CA.*


# 669 responses


DELORES QUADE says:
January 12, 2013 at 12:58 pm
; (

> QUIXOTE (@QUIXOTE34) says:
> January 13, 2013 at 12:06 pm
> The arrogant government prosecutors who, in effect, murdered Aaron, as well as the irresponsible academics who shrugged their shoulders in indifference and the various media outlets that casually reported on his arrest, should think carefully about the lack of proportion in the American criminal justice system, and the devastating impact it can have on real lives.
>
> Authorities in New York have undertaken a similarly disproportionate assault on Internet freedom and academic whistle-blowing, arresting and prosecuting a blogger who sent out "Gmail confessions" in which a well-known New York University department chairman appeared to be

[House Hearing, 110 Congress]
[From the U.S. Government Printing Office]

Exhibit 106

CHILD ABUSE AND DECEPTIVE MARKETING
BY RESIDENTIAL PROGRAMS FOR TEENS

=======================================================================

HEARING

before the

COMMITTEE ON
EDUCATION AND LABOR

U.S. House of Representatives

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

_____

HEARING HELD IN WASHINGTON, DC, APRIL 24, 2008

_____

Serial No. 110-89

_____

Printed for the use of the Committee on Education and Labor

Available on the Internet:
http://www.gpoaccess.gov/congress/house/education/index.html

_____

U.S. GOVERNMENT PRINTING OFFICE
41-839 PDF            WASHINGTON DC:  2008
------------------------------------------------------------------
For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512�091800
Fax: (202) 512�092104 Mail: Stop IDCC, Washington, DC 20402�090001

COMMITTEE ON EDUCATION AND LABOR

GEORGE MILLER, California, Chairman

| | |
|---|---|
| Dale E. Kildee, Michigan, Vice Chairman | Howard P. ``Buck'' McKeon, California, Senior Republican Member |
| Donald M. Payne, New Jersey | Thomas E. Petri, Wisconsin |
| Robert E. Andrews, New Jersey | Peter Hoekstra, Michigan |
| Robert C. ``Bobby'' Scott, Virginia | Michael N. Castle, Delaware |
| Lynn C. Woolsey, California | Mark E. Souder, Indiana |
| Ruben Hinojosa, Texas | Vernon J. Ehlers, Michigan |
| Carolyn McCarthy, New York | Judy Biggert, Illinois |
| John F. Tierney, Massachusetts | Todd Russell Platts, Pennsylvania |
| Dennis J. Kucinich, Ohio | Ric Keller, Florida |
| David Wu, Oregon | |

Rush D. Holt, New Jersey
Susan A. Davis, California
Danny K. Davis, Illinois
Raul M. Grijalva, Arizona
Timothy H. Bishop, New York
Linda T. Sanchez, California
John P. Sarbanes, Maryland
Joe Sestak, Pennsylvania
David Loebsack, Iowa
Mazie Hirono, Hawaii
Jason Altmire, Pennsylvania
John A. Yarmuth, Kentucky
Phil Hare, Illinois
Yvette D. Clarke, New York
Joe Courtney, Connecticut
Carol Shea-Porter, New Hampshire

Joe Wilson, South Carolina
John Kline, Minnesota
Cathy McMorris Rodgers, Washington
Kenny Marchant, Texas
Tom Price, Georgia
Luis G. Fortuno, Puerto Rico
Charles W. Boustany, Jr.,
    Louisiana
Virginia Foxx, North Carolina
John R. ``Randy'' Kuhl, Jr., New
    York
Rob Bishop, Utah
David Davis, Tennessee
Timothy Walberg, Michigan
[Vacancy]

Mark Zuckerman, Staff Director
Sally Stroup, Republican Staff Director

C O N T E N T S

----------

                                                                 Page

Hearing held on April 24, 2008...................................     1

Statement of Members:
    Altmire, Hon. Jason, a Representative in Congress from the
        State of Pennsylvania, prepared statement of..............    57
    McKeon, Hon. Howard P. ``Buck,'' Senior Republican Member,
        Committee on Education and Labor..........................     5
        Prepared statement of.....................................     8
        Additional submissions:
            Statement of Madeline McGrotha, alumni of New
                Horizons for Young Women..........................     6
            Statement of Kelsey Snoke, Kaysville, UT.............     7
    Miller, Hon. George, Chairman, Committee on Education and
    Labor..........................................................     1
        Prepared statement of.....................................     4
        Questions submitted to witnesses and their responses:
            Dr. Bellonci.........................................    90
            Ms. Brown............................................    91
            Mr. Kutz.............................................    93
            Mr. Martin-Crawford..................................    99
            Ms. Whitehead........................................   100
        Additional submissions:
            Compilation of testimony from Community Alliance for
                the Ethical Treatment of Youth (CAFETY), Internet
                address...........................................    58
            Letter from Brew and Libby Hagood....................    58
            Abuse at a troubled teen ``faith-based'' program
                using physical restraint by a ``chemical straight
                jacket,'' by Doug Hoover..........................    59
            Letters received concerning residential programs for
                teens.............................................    65
    Platts, Hon. Todd Russell, a Representative in Congress from
        the State of Pennsylvania, Department of Justice reports
        for fiscal years 2004, 2005, and 2006, Internet address....    44

Statement of Witnesses:
    Bellonci, Christopher, M.D., child/adolescent and adult
        psychiatrist, medical director, senior clinical consultant,
        Walker School..............................................    22

```
        Prepared statement of...................................    24
Brown, Kay, Director, Education, Workforce and Income
  Security, U.S. Government Accountability Office............    26
        Prepared statement of...................................    29
Kutz, Greg, Managing Director, Forensic Audits and Special
  Investigations, U.S. Government Accountability Office......    10
        Prepared statement of...................................    12
Martin-Crawford, Jon, former program participant at the
  Family Foundation School, member, board of advisors, CAFETY   17
        Prepared statement of...................................    20
Whitehead, Kathryn, former program participant at Mission
  Mountain School, founder, CAFETY..........................    12
        Prepared statement of...................................    15
```

CHILD ABUSE AND DECEPTIVE MARKETING BY RESIDENTIAL PROGRAMS FOR TEENS

----------

Thursday, April 24, 2008

U.S. House of Representatives

Committee on Education and Labor

Washington, DC

----------

The committee met, pursuant to call, at 10:03 a.m., in Room
2175, Rayburn House Office Building, Hon. George Miller
[chairman of the committee] presiding.

Present: Representatives Miller, Kildee, Scott, McCarthy,
Kucinich, Wu, Bishop of New York, Sestak, Loebsack, Hirono,
Altmire, Hare, Shea-Porter, McKeon, Petri, Platts, and Kline.

Staff present: Tylease Alli, Hearing Clerk; Tico Almeida,
Labor Policy Advisor; Jody Calemine, Labor Policy Deputy
Director; Sarah Dyson, Investigative Associate, Oversight;
Patrick Findlay, Investigative Counsel; Ruth Friedman, Senior
Education Policy Advisor (Early Childhood); Ryan Holden, Senior
Investigator, Oversight; Lloyd Horwich, Policy Advisor for
Subcommittee on Early Childhood, Elementary and Secretary
Education; Lamont Ivey, Staff Assistant, Education; Brian
Kennedy, General Counsel; Danielle Lee, Press/Outreach
Assistant; Sharon Lewis, Senior Disability Policy Advisor;
Stephanie Moore, General Counsel; Alex Nock, Deputy Staff
Director; Joe Novotny, Chief Clerk; Rachel Racusen, Deputy
Communications Director; Margaret Young, Staff Assistant,
Education; Michael Zola, Chief Investigative Counsel,
Oversight; Mark Zuckerman, Staff Director; Stephanie Arras,
Minority Legislative Assistant; James Bergeron, Minority Deputy
Director of Education and Human Services Policy; Robert Borden,
Minority General Counsel; Cameron Coursen, Minority Assistant
Communications Director; Kirsten Duncan, Minority Professional
Staff Member; Alexa Marrero, Minority Communications Director;
Susan Ross, Minority Director of Education and Human Resources
Policy; and Linda Stevens, Minority Chief Clerk/Assistant to
the General Counsel.

Chairman Miller [presiding]. The Committee on Education and
Labor will come to order for the purposes of conducting this
hearing on ``Child Abuse and Deceptive Marketing by Residential
Programs for Teens.''

Last October, this committee heard from the parents of
three children who died in private residential programs as a

result of abuse and neglect they experienced at the hands of
staff members. The stories these parents told left everyone in
this room stunned, heart-broken and angry.

Bob Bacon testified that program staff members mocked his
son Aaron when the 16-year-old boy asked for medical help,
calling him a faker. For weeks, the staff deprived Aaron of
adequate food and water, even when his weight loss became
frighteningly apparent.

Cynthia Harvey told the committee that program staff
members waited 45 minutes before summoning appropriate medical
care for her daughter Erica, who had collapsed and was having
difficulty breathing.

Paul Lewis testified that program staff members ignored his
son Ryan's obvious signs of emotional distress, denying him the
psychiatric care that could have saved his life.

In each of these cases, it was clear from the parents'
testimony that the deaths of their children were preventable.
Untrained, uncaring staff, reckless management and
irresponsible operating practices permitted these horrible
tragedies to occur.

Sadly, the deaths of Aaron, Erica and Ryan are not isolated
cases. The Government Accountability Office found thousands of
allegations of abuse and neglect in private residential
programs for teens between 1990 and 2007.

The abuses included staff members forcing children to
remain in so-called ``stress'' positions for hours at a time;
to undergo extreme physical exertion without food, water or
rest; and to eat their own vomit.

The purpose of today's hearing is to gain a better overall
understanding of the industry in which these types of abuses
have been allowed, in many cases, to continue almost unchecked.

Specifically, we will learn more about where these programs
operate, the loose patchwork of state laws that govern them,
and how they market themselves to parents.

We will also discuss legislation that Congresswoman
McCarthy and I have introduced to keep kids safe in these
residential programs.

Residential programs for teens, which come in a variety of
forms, including therapeutic boarding schools, wilderness
camps, boot camps and behavior modification facilities, have
sprung up in greater numbers since the 1990s.

As we will hear today, a number of these programs use
deceptive marketing practices to appeal to parents. They claim
to be subject to independent inspections that never happen.
They claim to offer services that they don't, like schooling
with transferable education credits. They assure parents that
health insurance will cover the cost of their services when, in
reality, it won't.

Programs are aided in these deceptions by their
relationships with ancillary service providers, like referral
services. While referral services purport to offer independent
advice to parents about which programs would be best for their
children, the truth is that at least some of the referral
services operate with significant conflicts of interest.

This tangled web of deception, fraud and conflicts of
interest makes it extremely difficult for parents to judge
whether any of these programs offer a safe, professional, high-
quality environment for their children.

We know that there are many programs and many people around
the country who are committed to helping improve the lives of
young people and who do good work every day, but it is
difficult for parents to tell the good programs from the bad.
And that difference can be lethal.

Making matters worse, some of these programs operate free
of minimum standards of care. It is estimated that hundreds of

these programs operate nationwide, with anywhere from no regulation whatsoever to some regulation.

Even the information that states collect on many of these programs is limited. Indeed, in a survey conducted by the GAO, state agencies in 45 states could not say whether or not a death had occurred at exclusively private residential programs for teens in 2006.

The legislation that Congresswoman McCarthy and I have introduced will end the federal government's longstanding failure to address this nightmare of abuse and neglect. The goal of our legislation is simple: We want to keep the children safe.

This legislation will require the U.S. Department of Health and Human Services to establish minimum standards that all programs must meet, including prohibitions on the physical and mental abuse of children and requirements that programs provide children with adequate food, water and medical care.

These standards will also include new training requirements for program staff members, including how to identify and report child abuse. The legislation will require Health and Human Services to set up a hotline for people to call to report abuse at these programs.

It will also require Health and Human Services to create a Web site with information about each program, so that parents can look to see if substantiated cases of abuse have occurred at the programs they are considering for their kids.

The legislation will require Health and Human Services to enforce these standards by inspecting program facilities and, when there is a violation, by issuing civil penalties up to $50,000 per violation. Within 3 years, the legislation would call upon the states to take up this role of setting standards and enforcing them.

We have an obligation to keep kids safe no matter what setting they are in, and this legislation would take the first steps toward finally ending the horrific abuses that have gone on for far too long in some of these private residential programs for teens.

We must treat this issue with the urgency it demands by acting on this legislation quickly.

Individuals who have themselves lived through this abuse are in the hearing room today, as are family members of abuse victims. I want to thank all of them for being here to remind us why this issue is so important.

And I wanted to thank our witnesses. We appreciate that you took the time to be with us today, and we look forward to hearing your testimony.

At this point, I recognize Congressman McKeon from California, who is the senior Republican on the committee. And then we will turn to the panel of witnesses for your testimony. Congressman McKeon?

[The statement of Mr. Miller follows:]

    Prepared Statement of Hon. George Miller, Chairman, Committee on
                    Education and Labor


Good morning. Welcome to today's hearing on ``Child Abuse and Deceptive Marketing by Residential Programs for Teens.''

Last October, this Committee heard from the parents of three children who died in private residential programs as a result of the abuse and neglect they experienced at the hands of staff members.

The stories these parents told left everyone in this room stunned, heartbroken, and angry.

Bob Bacon testified that program staff members mocked his son, Aaron, when the 16-year-old boy asked for medical help, calling him a ``faker.'' For weeks, the staff deprived Aaron of adequate food and

1/24/2020

Case 1:18-cv-10836-PGG   Document 143   Filed 02/03/20   Page 10 of 52
- CHILD ABUSE AND DECEPTIVE MARKETING BY RESIDENTIAL PROGRAMS FOR TEENS

water--even when his weight loss became frighteningly apparent.

Cynthia Harvey told the committee that program staff members waited 45 minutes before summoning appropriate medical care for her daughter, Erica, who had collapsed and was having difficulty breathing.

Paul Lewis testified that program staff members ignored his son Ryan's obvious signs of emotional distress, denying him the psychiatric care that could have saved his life.

In each of the three cases, it was clear from the parents' testimony that the deaths of their children were preventable. Untrained and uncaring staff, reckless management, and irresponsible operating practices permitted these horrible tragedies to occur.

Sadly, the deaths of Aaron, Erica, and Ryan were not isolated cases.

The Government Accountability Office found thousands of allegations of abuse and neglect at private residential programs for teens between 1990 and 2007.

The abuses included staff members forcing children to remain in so-called ``stress'' positions for hours at a time; to undergo extreme physical exertion without food, water, or rest; and to eat their own vomit.

The purpose of today's hearing is to gain a better overall understanding of the industry in which these types of abuses have been allowed, in many cases, to continue almost unchecked.

Specifically, we will learn more about where these programs operate, the loose patchwork of state laws that govern them, and how they market themselves to parents.

We will also discuss legislation that Congresswoman McCarthy and I have introduced to keep kids safe in residential programs.

Residential programs for teens--which come in a variety of forms, including therapeutic boarding schools, wilderness camps, boot camps, and behavior modification facilities--have sprung up in greater numbers since the 1990s.

As we will hear today, a number of these programs use deceptive marketing practices to appeal to parents.

They claim to be subject to independent inspections that never happen.

They claim to offer services that they don't, like schooling with transferable education credits.

They assure parents that health insurance will cover the cost of their services when in reality it won't.

Programs are aided in these deceptions by their relationships to ancillary service providers, like referral services.

While referral services purport to offer independent advice to parents about which programs would be best for their children, the truth is that at least some of the referral services operate with significant conflicts of interest.

This tangled web of deception, fraud, and conflicts of interest makes it extremely difficult for parents to judge whether any of these programs offer a safe, professional, high-quality environment for their children.

We know that there are many programs and many people around the country who are committed to helping improve the lives of young people and who do good work every day, but it is difficult for parents to tell the good programs from the bad.

Making matters worse, these programs often operate free of minimum standards of care. It is estimated that hundreds of the programs operate nationwide, with anywhere from no regulation whatsoever to some regulation.

Even the information that states collect on many of these programs is limited. Indeed, in a survey conducted by the GAO, state agencies in 45 states could not say whether deaths had occurred at exclusively private residential programs for teens in 2006.

The legislation that Congresswoman McCarthy and I have introduced will end the federal government's longstanding failure to address this nightmare of abuse and neglect.

The goal of our legislation is simple--we want to keep children safe.

The legislation will require the U.S. Department of Health and Human Services to establish minimum standards that all programs must meet, including prohibitions on the physical and mental abuse of children and requirements that programs provide children with adequate food, water, and medical care.

These standards will also include new training requirements for program staff members, including how to identify and report child abuse.

The legislation will require HHS to set up a hotline for people to call to report abuse at these programs. It will also require HHS to create a website with information about each program, so that parents can look to see if substantiated cases of abuse have occurred at a program that they are considering for their kids.

The legislation will require HHS to enforce these standards by inspecting program facilities and, when there are violations, by issuing civil penalties of up to $50,000 per violation. Within three years, the legislation would call upon the states to take up this role of setting standards and enforcing them.

We have an obligation to keep kids safe no matter what setting they are in, and this legislation would take the first step toward finally ending the horrific abuses that have gone on for too long in private residential programs for teens.

We must treat this issue with the urgency it demands by acting on this legislation quickly.

Individuals who have themselves lived through this abuse are in the hearing room today, as are family members of abuse victims. I want to thank you all for being here to remind us why this issue is so important.

I also want to thank all of our witnesses. We appreciate that you took the time to be with us today and we look forward to hearing your testimony.

Thank you.

———

Mr. McKeon. Thank you, Chairman Miller. And good morning.

We are here today for our second hearing on residential treatment facilities for teens. I know I speak for all my colleagues when I say that I was deeply troubled by the testimony we heard last year.

Many of these facilities have been established to serve children who are deeply troubled. Whether they are suffering from drug addiction or severe emotional or behavioral problems, many of the youth who enter these facilities are placed there by parents as a last resort.

Yet no parent, no matter how serious the troubles their child may face, would knowingly send their child to a place where they may be abused or neglected.

Today's hearing builds on our findings from last year by examining the marketing practices of residential treatment facilities. Once again, I expect we will hear of some worst-case scenarios in which parents may have been deliberately misled.

Our witness panel also includes former participants in these types of programs. I want to take a moment to thank these witnesses for offering their testimony today, when I know they have faced some very difficult experiences.

At the outset of today's hearings, I think it is important that we ask the same questions that we asked last year: How pervasive are these problems? What safeguards are in place to protect against them? And what are the best practices in the industry so that we can encourage broader adoption of their practices?

The facilities we are examining today receive no federal

funding under the Juvenile Justice Programs this committee has been working to reform over the past year. Nonetheless, I understand that Chairman Miller has introduced legislation that would establish a federal regulatory structure and mandate state regulatory systems.

I am eager to work with him on our shared effort to stop instances of neglect, abuse and death. At the same time, we must be mindful of the ramifications of any new federal intervention, in order to ensure these issues are addressed in the best, most appropriate and most effective possible manner.

The question of the scope of the problem will be important as we continue to examine the possibility of federal legislation. Although even one instance of child abuse and neglect is too many, we cannot provide an effective response until we understand whether the problems are a few isolated incidents or part of a larger pattern.

We also need to understand how these facilities are being regulated under state and local laws. The last thing we hope to do is create a patchwork of confusing regulations that would undercut our ability or the ability of states to protect young people and their families.

One area I think deserves greater attention in our deliberations is the question of what works. We are right to focus on cases where children have been harmed or parents have been misled. But the picture would be incomplete without also examining the stories of those young people who have been able to turn their lives around thanks to this type of intervention.

Mr. Chairman, I request that two pieces of testimony be included in the record in order to broaden and enlighten the discussion. This testimony comes from two young women who had positive, life-changing experiences at residential treatment facilities.

Chairman Miller. Without objection, they will be made part of the record.

[The information follows:]


Prepared Statement of Madeline McGrotha, Alumni of New Horizons for Young Women


I honestly believe I am alive today as a result of the wilderness program that I attended. I attended a wilderness program by the name of New Horizons for Young Women located in Maine from March 1st, 2006 until May 1st, 2006. It was the best and most rewarding experience of my life and I am truly blessed to have been given the chance to experience the help that I received at New Horizons.

Beginning in middle school I spun into a deep depression. Throughout the years it developed into something worse and worse. At the age of 16 I dropped out of high school and didn't see any reason for myself to keep living. I hated myself, my family, and the world. People had tried to help me in any way that they could, but I was extremely defiant and not receptive to any of the help that was being offered to me. I had been to numerous therapists, tried many different prescription drugs for my depression, but nothing seemed to work. I needed something more, something that I couldn't get in the environment that I was in.

Wilderness took me out of my normal environment. It removed me from my family problems, a harmful boyfriend, and a crowd of people that I didn't need to associate myself with. It allowed me to focus on myself for the first time in my life. I was surrounded by people who cared about my well being and showed that to me in every possible way they could.

While I was in the wilderness program I gained so much confidence through completing the day to day activities that we had to do. In the program we lived in tents in the woods of Maine. Before this experience I had never even been camping before, so living in the woods for two

months is a huge accomplishment for me and something that I am very proud of. I learned to saw down small trees, make a fire without a lighter, cook my own food along with many other things I would have never thought I would be able to do. We hiked during the day and even though it was physically hard sometimes, it wasn't anything too strenuous and it was actually very therapeutic. On these hikes it gave me time to really think about things, most importantly to me, the relationship with my mother and father which had become so damaged and destructive over the past couple of years. It also gave me a chance to talk in a non threatening environment with the counselors about the thoughts I was having. Wilderness in my experience was in no way a boot camp and after the first week it was apparent that this was not punishment but a tool to help me grow into the person that I unknowingly wanted and needed to be.

I want to personally make sure that every person is able to continue to get the help that they so desperately need from these types of programs. These programs save lives and I can't stress enough how important that is. I truly feel like my success is a direct result of the program that I attended. I graduated on time from a traditional boarding school in Texas called San Marcos Baptist Academy and currently am studying psychology at the University of North Florida. I am also involved in a sorority on campus, Kappa Delta. Another huge accomplishment is the mended relationships that I have developed with my mother and father, which is extremely important to me. After my experience I learned to successfully function in society and I feel that none of this would have been possible without my life changing experience in my wilderness program.

———

Prepared Statement of Kelsey Snoke, Kaysville, UT

My name is Kelsey Snoke and I am 18 years old. I am writing this to give you a brief feel of my story.

When I was in about eighth grade I started having bad mood swings, depression, and anxiety. When I was feeling down, I started cutting and burning myself to forget about what I was feeling. It never got any better, just worse.

I started going to a therapist regularly. It was hard because I couldn't find one that I connected with. The end of my ninth grade was the beginning of the worst of the problems I was having. I started going to day treatment during the day and at night would go home. I also spent two separate weeks in acute treatment. After I was finished with these programs, I was doing well for a few months and then fell back into the same behaviors. My parents and I began to realize that it was only a short term fix and didn't really do much for me long term. I started hating school and refused to go any more. I was way behind on my work and honestly never thought I would ever finish high school.

Things started getting severely out of control. My parents weren't sure how to help me anymore and started looking for other options. I knew I needed help and agreed with my parent's decision to find a long term residential program. They researched the different options and found a program in Spanish Fork Utah called New Haven.

The three of us were able to visit the campus to take a tour and got to meet with some girls that were in the program. I knew right then that it was a place that could help me. My parent's took me to New Haven right after Thanksgiving in 2006 to start the program and I ended up staying for nine and a half months.

It was very difficult at first being in a new place and not being able to see my family every day. I was very nervous and didn't want to participate in activities and groups. I soon realized that I needed to open up and start working on my issues. There was a lot of work involved in progressing in the program that included me and my parents.

There were many group activities such as tasks for recreational therapy, equine therapy, as well as group therapy on specific topics

that helped me learn to trust my peers and people around me.

Every six weeks New Haven held a family weekend for parents to come and participate with their girls in activities around campus. On the second family weekend, some things happened that was a turning point in my treatment.

There was a rope course in the field that was about thirty feet high with a rope and log ladder and a suspended log beam at the top. I always looked at it and hoped I would never have to do any activities with it. When it was our family's turn for rec. therapy, the therapist told me I needed to get over my fear and climb the rope course. I was overwhelmed and scared to death. They helped me put on a harness and other equipment and then we got started. I was to climb the ladder that was swaying with each step and had to say something that I am capable of with each step. It was very difficult and scary, but I did it! At the top I walked across the beam and stood there reflecting on what I had done before I came down. I was very proud of myself for accomplishing this task. This is only one of the many things I did that taught me that I can do anything I put my mind to do.

New Haven has been a very positive experience for me. I don't know where I would be in my life if I hadn't completed this program. I have learned so many things. I can go to my family when there are problems and need support. I have learned to build positive relationships. I have learned to be independent and do things on my own. I have learned to accept responsibility for my actions. I'm finishing my senior year of high school and will be graduating on time. I can do things I never thought I could do. But most of all--I learned to love myself!

———

Mr. McKeon. Once again, I want to thank Chairman Miller for his leadership on this issue, and I want to thank each of our witnesses for being here to explore this important issue.

I expect that we will proceed thoughtfully, cautiously and deliberately on this issue in the coming months in an effort to ensure youth and their families are protected.

And I yield back.

[The statement of Mr. McKeon follows:]

Prepared Statement of Hon. Howard P. ``Buck'' McKeon, Senior Republican
            Member, Committee on Education and Labor

Thank you Chairman Miller, and good morning. We're here today for our second hearing on residential treatment facilities for teens.

I know I speak for all my colleagues when I say that I was deeply troubled by the testimony we heard last year. Many of these facilities have been established to serve children who are deeply troubled. Whether they are suffering from drug addiction or severe emotional or behavioral problems, many of the youth who enter these facilities are placed there by their parents as a last resort. Yet no parent, no matter how serious the troubles their child may face, would knowingly send their child to a place where they may be abused or neglected.

Today's hearing builds on our findings from last year by examining the marketing practices of residential treatment facilities. Once again, I expect we will hear of some worst case scenarios in which parents may have been deliberately misled. Our witness panel also includes former participants in these types of programs. I want to take a moment to thank these witnesses for offering their testimony today, when I know they faced some very difficult experiences.

At the outset of today's hearing, I think it's important that we ask the same questions that we asked last year: how pervasive are these problems? What safeguards are in place to protect against them? And what are the best practices in the industry, so that we can encourage their adoption?

The facilities we are examining today receive no federal funding under the juvenile justice programs this committee has been working to reform over the past year. Nonetheless, I understand that Chairman

Miller has introduced legislation that would establish a federal regulatory structure and mandate state regulatory systems. I am eager to work with him on our shared effort to stem instances of neglect, abuse and death. At the same time, we must be mindful of the ramifications of any new federal intervention in order to ensure these issues are addressed in the best, most appropriate, and most effective possible manner.

    The question of the scope of the problem will be important as we consider the possibility of federal legislation. Although even one instance of child abuse and neglect is too many, we cannot provide an effective response until we understand whether the problems are a few isolated incidents or part of a larger pattern.

    We also need to understand how these facilities are being regulated under state and local laws. The last thing we hope to do is create a patchwork of confusing regulations that would undercut our ability, or the ability of states, to protect young people and their families.

    One area that I think deserves greater attention in our deliberations is the question of `what works'. We are right to focus on cases where children have been harmed or parents have been misled. But the picture would be incomplete without also examining the stories of those young people who have been able to turn their lives around thanks to this type of intervention. Mr. Chairman, I request that two pieces of testimony be included in the record in order to broaden and enlighten the discussion. This testimony comes from two young women who had positive, life changing experiences at residential treatment facilities.

    Once again, I want to thank Chairman Miller for his leadership on this issue, and I want to thank each of our witnesses for being here to explore this important issue. I expect that we will proceed thoughtfully, cautiously, and deliberately on this issue in the coming months in an effort to ensure youth and their families are protected. I yield back.

                              ———

    Chairman Miller. Thank you.
    The chair notices the presence of a quorum. And before introducing our witnesses, let me briefly lay out how we will proceed in today's hearing.
    Because of the importance of this issue, I am exercising the right to extend the 5-minute rule for myself and Mr. McKeon. Following the witnesses' testimony, we will each have 15 minutes apiece for questioning.
    It is our intention to yield 5 minutes of our time to the chairwoman and senior Republican of the Subcommittee on Healthy Families and Communities, Ms. McCarthy and Mr. Platts.
    Following the expiration of extended questioning, all of the members will be recognized for 5 minutes.
    And, with that, let me introduce our witnesses.
    Our first witness will be Mr. Gregory Kutz, who is currently the managing director of GAO's Forensic Audits and Special Investigation unit. Mr. Kutz has testified and written investigative reports about the federal government's handling of Hurricanes Katrina and Rita, military pay problems at the Department of Defense, and smuggling of nuclear materials across our nation's borders, among other important issues.
    He is accompanied by Andy O'Connell, the assistant director of investigations at GAO.
    Kathryn Whitehead is a former program participant at Mission Mountain School, where she spent 18 months as a teenager. She currently works for the Mental Health Association of New York City's Coordinated Children's Services Initiative, working toward keeping struggling youth in their communities. Ms. Whitehead is also a co-founder of the Community Alliance for the Ethical Treatment of Youth, an advocacy organization whose mission is ending human rights abuses of youth in

residential programs.

Jon Martin-Crawford is a former program participant at the Family Foundation School, where he spent almost 2 years as a teenager. Jon is currently working toward a double master's in English and secondary education, and is also working with the Community Alliance for the Ethical Treatment of Youth, hoping to shed light on the troubled teen industry.

Dr. Christopher Bellonci is the board-certified child/adolescent/adult psychiatrist, who has worked in residential treatment in school consultation since completing his child psychiatry training at McLean Hospital in 1993. He is currently the medical director and senior clinical consultant at Walker in Needham, Massachusetts, working with children experiencing severe emotional and behavioral disorders secondary to major mental illnesses, trauma and developmental disorders. Dr. Bellonci is on the Mental Health Advisory Board of the Child Welfare League and is a board member of the American Association of Children's Residential Centers.

Kay Brown is the director of GAO's Education, Workforce and Income Security team and has more than 20 years' experience at GAO. She is responsible for GAO's work related to child welfare, child support, domestic nutrition assistance, among other social programs. Throughout her career at the GAO, Ms. Brown has managed projects that focused on improving governmental performance and services to children and families, disability and retirement benefit delivery, and customer service and program integrity.

She is accompanied by Cindy Ayers, assistant director for Education, Workforce and Income Security at the GAO.

And, Mr. Kutz, we will begin with you. And I believe under our arrangement, you will be allowed 10 minutes. As you know, there will be an orange light when there is 1 minute left and then a red light, and we hope that you will be able to wrap up your testimony, but we clearly want you to be able to complete your thoughts in a coherent fashion.

Welcome to the committee, and thank you for your work.

STATEMENT OF GREG KUTZ, MANAGING DIRECTOR, FORENSIC AUDITS AND SPECIAL INVESTIGATIONS, U.S. GOVERNMENT ACCOUNTABILITY OFFICE

Mr. Kutz. Mr. Chairman and members of the committee, thank you for the opportunity to discuss residential programs for troubled youth.

Last year I testified that negligent practices contributed to the death and abuse of troubled youth. Today's testimony responds to your request that we continue our work in this area.

My testimony has two parts. First, I will discuss cases of death and abuse. Second, I will discuss industry marketing practices. I will also play excerpts from telephone calls we made to certain programs while posing as fictitious parents with troubled youth.

First, we took an in-depth look at eight cases of youth that died or were allegedly abused at private programs. It is important to note that we did not evaluate the benefits of these programs. In addition, the results of case studies cannot be projected to all programs.

For these cases, we found that untrained staff and ineffective management contributed to the death and abuse of youth. Human restraint also played a key role in several cases. The following examples will provide more detail.

First, one group became lost and spent several additional hours hiking when the reported heat index outside was 120 degrees. A 14-year-old boy, weighing 250 pounds, had problems breathing, but was encouraged by the staff to continue. When he

returned to the camp, he collapsed against a tree and fell to the ground. Staff believed that he was faking it until he vomited, became unresponsive and ultimately died.

A 17-year-old male jumped off of a building in a suicide attempt and severely broke his left arm, with the bone exposed. Despite this severe wound, the boy was punched, slammed against walls and rolled in the dirt. He was beaten so severely that he forgot who he was and he became unconscious. These beatings continued for 2 weeks before he was finally given medical treatment.

A 16-year-old boy having trouble breathing and walking was tortured and humiliated for days. One staff member told the boy that he deserved an Academy Award for faking it. He died later that day. An autopsy report for this boy showed 71 contusions and abrasions from head to toe.

Another 16-year-old boy with asthma was placed in a face-down restraint by three staff members before he died. Another boy was restrained more than 250 times, including two times for more than 12 hours each. A 12-year-old boy, weighing 87 pounds, was placed in a face-down restraint with a staff member lying on top of him until he died.

And a staffer referred to as the ``drill instructor'' trained his pitbull to bite people in the crotch on command. A 17-year-old boy experienced this painful abuse.

Other kids in these and other programs also experienced disturbing abuse. For example, boys at one boot camp were required to stand with bags over their head and a hangman's noose around their neck. The rope on this noose was tightened to simulate a hanging. The individual responsible for this told officers that this was an appropriate form of discipline.

Another boy was forced to lie face-down on a red ant hill and was not allowed to brush the ants off of his face or his body. In a separate incident, this boy was required to lie on his stomach for 10 hours. He was only allowed to get up to vomit, and then he was required to clean up his vomit before he got down on the ground again.

And finally, the posterboard shows the picture of a horse in Canada. This horse was starved, as you can see by the protruding ribcage. Neglect also resulted in the problems with the hoof that you see on the picture.

You are probably wondering what this has to do with today's hearing. Here is the interesting answer to that question: This horse belonged to the owner of one of our case-study programs. This owner was convicted in Canada for cruelty to 39 horses and seven Golden Retrievers.

Although he received a lifetime ban from taking care of animals in Canada, he was allowed to take care of teenagers here in the United States, and the results should not be surprising. He and his wife were cited in Utah for, among many things, use of profane language to humiliate youth, improper seclusion, and rat infestation.

Let me move on to my second point of my testimony here. Posing as fictitious parents with troubled teenagers, we called a number of programs and referral services to see what they would tell us. What we found were examples of deceptive and other questionable marketing practices. Let me describe a few of these cases for you.

First, one program told our fictitious parent that they must apply to have their child admitted to the program. Although we never actually applied, the posterboard on my right shows that our fictitious child, Devon, was approved for admission to this program.

One fictitious parent was also told that membership in a trade association was like a Good Housekeeping seal of approval. One program went so far as to tell us that site

inspections were performed by this association. The reality is that this association simply collects dues but does no due diligence of any programs.

And one referral service told our fictitious parent that the boot camp they recommended feeds the child a whole-grain diet and that, along with exercise and rest, ``the bipolar, the depression, those kinds of things, they just go away after a while.''

Our fictitious parent heard other deceptive and questionable information during our undercover calls. Issues related to taxes, reimbursement of health insurance, and education provided.

One explanation for these shady marketing practices relates back to the root cause of many problems: money. These programs aren't cheap. Costs for the programs that we called ranged from $2,800 per month to over $13,000 per month.

In conclusion, we, as a country, judge other countries harshly for their human rights violations. Yet, at the same time, we found torture and abuse of youth across the United States. I can't tell you how widespread this problem is, but if the only horror stories are the ones that I have described for you, then isn't that enough?

Mr. Chairman, I want to commend you for your continued oversight of this matter. We support the committee's efforts to put a framework of oversight and control in place over these programs. Although the youth we are talking about today are troubled, that shouldn't be an excuse for anybody to torture and abuse them.

I now want to play the excerpts I mentioned at the beginning of my statement here of some of the phone calls we made, posing as fictitious parents with troubled youths. And what you will see on the screen, assuming it works, is the transcriptions of these conversations on the monitor while you listen.

[Audio clip played.]

Mr. Kutz. Mr. Chairman, thank you for being generous with my time, and that ends my statement.

[The statement, ``Residential Programs: Selected Cases of Death, Abuse, and Deceptive Marketing,'' may be accessed at the following Internet address:]

http://www.gao.gov/new.items/d08713t.pdf

————

Chairman Miller. Thank you.

Ms. Whitehead, welcome again. You will be given 5 minutes. And at some point, there will be an orange light in front of you, and that will give you an idea that there is about a minute. But, again, we want you to complete your thoughts in a manner that you are comfortable with.

Thank you.

STATEMENT OF KATHRYN WHITEHEAD, FORMER PROGRAM PARTICIPANT, MOUNTAIN MISSION SCHOOL

Ms. Whitehead. Good morning, Chairman Miller, Ranking Member McKeon and distinguished members of the committee. Thank you for this opportunity to testify before you today. I appreciate your leadership and efforts to help protect youth from abuse and neglect by convening this hearing.

I am here to share the tragic experience of myself and family at an unregulated facility in Montana called Mission Mountain School, a NATSAP member program where the headmaster, John Mercer, served on the board of directors for several

years.

I will also speak on behalf of a youth survivor advocacy group, the Community Alliance for the Ethical Treatment of Youth, to the general concerns of youth placed in private residential care.

At the age of 13, I was diagnosed with chronic depression following a suicide attempt and hospitalized at a local psychiatric hospital. When I was discharged, lacking any community-based support, my family sought to identify services outside of my community and found Mission Mountain School at the recommendation of a hired educational consultant.

Mission Mountain School held great promise, as it was sold to us as a small, family-like therapeutic environment for girls ages 12-18 with above-average intelligence. I packed my treasured belongings, reminders of home, and my mom and I flew out to Montana.

I felt hopeful that maybe this special school for kids like me would help, as they claimed to have the ability to treat any myriad of serious psychiatric issues, such as bipolar disorder, eating disorders and depression. Sadly, this couldn't be further from the truth.

Upon arrival, I quickly encountered the punitive and invasive interventions which would come to define my 18 months at Mission Mountain School. My mom left me shortly after we had arrived, and most of my belongings were taken from me.

I never received any explanation of the rules of the program, though the rules quickly took shape during the series of group sessions held daily. Everyone was called out in group when they first arrived. Every infraction was framed as an act of dishonesty. We were all labeled liars and manipulators upon arrival.

Often there were punishments when we were thought to have been dishonest, euphemistically called ``consequences.'' Consequence always involved some type of physical punishment: forced labor, exercise, labor such as ice-picking, rock-picking, and chopping wood. More serious rule-breaking would result in what was called an ``intervention,'' which was work crew all day long, with breaks only during group chores and mealtime.

There were personal interventions and group interventions. Sometimes the group was put on interventions which would last weeks, if not months, and during this time no contact was allowed with the outside world--in contrast to our already monitored and censored contact under usual conditions.

It was generally understood that we were being exhausted for the purpose of making us more truthful, whatever that meant to those in charge. Exercise was a rigorous daily requirement. Slowing down from exhaustion only resulted in more exercise or getting yelled at. Staff would often use profanity.

I was not allowed to speak with my family for months after I arrived, and calls thereafter were monitored. Any criticisms were labeled as ``manipulative,'' and my phone call was promptly disconnected, followed by punishment.

The most powerful figure at the facility was a headmaster with no formal training in mental health and whose group therapy sessions were particularly bizarre and frightening. He was often confrontational or would smirk and laugh.

He would attempt to unearth repressed memories and encourage regressive states. I recall on multiple occasions my friends speaking as if they were toddlers, recounting alleged instances of abuse. Hours would be spent with girls reliving their traumatic experiences at the unqualified hands of the staff.

Intensive group sessions sometimes lasted all night. Bathroom use was prohibited. Any allegations of abuse discussed

in group therapy were never reported by staff to proper
authorities.

Because all the founders were members of A.A., it seemed to
them that everyone was an addict of sorts. I was deemed an
alcoholic and a sex addict. A close friend was deemed a sex
addict. She had never had sex in her life and denied the claim.
And as a result, staff forced her to carry six large rocks on
her back at all times for several months, naming them issues
like ``sexual abuse'' and ``sex addiction,'' causing bruising
along her spine.

At other times, inappropriate and humiliating interventions
were used, such as forbidding youth from talking for several
weeks, forcing youth to wear gloves because it was thought they
were masturbating, or tying two girls together because they
didn't get along.

When I got caught with a plan to run away, I was placed on
a personal intervention, where I had to rock-pick for a week, 8
to 10 hours a day, and at one point dropped off 25 miles from
school and forced to hike back. This was all done in the name
of therapy.

Education was nearly nonexistent; claims of illness taken
as manipulative. We had no access to advocates, no rights
whatsoever.

Then one day, 18 months later, I was told I was to be
discharged. I had visited home maybe twice while there and was
ever more grossly ill-prepared to function in the world. My
nights were filled with a reoccurring nightmare of being chased
by the founders and brought back to the facility, despite
protests that I was healthy now.

In the end, all Mission Mountain School gave me was more
confusion, increased anxiety and depression, and made social
functioning after discharge ever more difficult.

The work I have done since then I anticipate will speak to
the broad pattern of atrocities Dr. Pinto commented on in her
testimony at the hearings in October 2007.

As co-founder and executive director of the Community
Alliance for the Ethical Treatment of Youth, I have heard from
over 1,000 survivors and understand that, in most instances,
parents remain unaware of the abuse their children have
experienced and often firmly believe the program saved their
child's life.

To me, this is the saddest repercussion of these
facilities. At once not only is the trust between parent and
child broken, but the truth is further hidden behind the facade
promulgated by deceived parents.

What I am hoping to convey----

Chairman Miller. Ms. Whitehead, I am going to ask you to
wrap up, if you might.

Ms. Whitehead. What I am hoping to convey today through my
testimony is that numerous residential facilities that are in
operation are stripping youth of their basic human rights to
dignity, respect, to least restrictive care, appropriate mental
health treatment, to education and parental contact, to freedom
of thought and opinion, and ultimately to freedom from
censorship and torture.

The legitimate practice of therapeutic intervention is
being injected with a perverse form of social control,
including inhumane treatment practices, which defy the ethical
principles upheld by peer-reviewed mental health practices.

I believe this bill to be a promising and important first
step in curbing such draconian methodology and applaud Chairman
Miller for introducing the first piece of comprehensive
legislation to that end.

Thank you.

[The statement of Ms. Whitehead follows:]

Prepared Statement of Kathryn Whitehead, Former Program Participant at
   Mission Mountain School and Founder of Community Alliance for the
                  Ethical Treatment of Youth (CAFETY)

     Good morning Chairman Miller, Ranking Member McKeon and
distinguished members of the Committee. Thank you for this opportunity
to testify before you today. I appreciate your leadership and efforts
to help protect youth from abuse and neglect by convening this hearing.
     I am here to share the tragic experience of myself and family at an
unregulated facility in Montana called Mission Mountain School. I am
also here to tell you about the patterns of mistreatment and abuse of
youth in residential programs across the country, which I have become
aware of through my work with the youth advocacy group, Community
Alliance for the Ethical Treatment of Youth. Finally, I will offer my
perspective on the ways in which legislation could help to increase
protections and at long last bring an end to the atrocious mistreatment
of American youth in residential facilities across the country.
     My story is one of a youth battling mental illness, a group of
Montana residents taking the liberty to assume that their own
experience as recovering alcoholics was qualification enough to operate
a facility for struggling youth, and parents operating from a place of
gullible desperation, willing to spend upwards of $70,000 to fund a
fictitious therapeutic milieu that amounted to little more than
humiliation, deprivation and abuse--leaving in its wake a family torn
apart and a traumatized 15 year old.
     At the age of 13 I was diagnosed with chronic depression following
a suicide attempt, and hospitalized at a local psychiatric hospital.
When I was discharged, lacking any community based support, my family
sought to identify services outside of my community and found Mission
Mountain School at the recommendation of a hired educational
consultant.
     Mission Mountain School held great promise, as it was sold to us as
a small family-like therapeutic environment for girls ages 12-18 with
above average intelligence. It was located in picturesque Condon MT.
Though I felt unspeakable grief at leaving my family and all that was
familiar to me behind, I knew I needed help. I packed my treasured
belongings, reminders of home, and my mom and I flew out to MT. I felt
hopeful, that maybe this `special school' for kids like me would help
me, as they claimed to have the ability to treat any myriad of serious
psychiatric issues, such as bipolar disorder, eating disorders and
depression.
     Sadly, this could not be further from the truth. Upon arrival I
quickly encountered the punitive and invasive interventions, which
would come to define my 18 months at Mission Mountain School.
     My mom left me shortly after we had arrived and my belongings were
taken from me. I never received any explanation of the rules of the
program, though the rules quickly took shape during the series of
groups sessions held daily. Everyone was called out in group when they
first arrived--every infraction was framed as an act of dishonesty. We
were all labeled ``liars'' and ``manipulators'' upon arrival. Our daily
diaries were read, and compared to the detailed life histories that we
were forced to write soon after arrival, which were required to include
details of every sexual encounter we had experienced in our short lives
to ensure accuracy.
     Often there were `punishments' when we were thought to have been
dishonest, euphemistically called ``consequences.'' Consequence always
involved some type of physical punishment--forced labor, such as ice
picking, rock picking, and chopping wood. More ``serious'' rule
breaking would result in what was called an ``intervention,'' which was
work crew all day long with breaks only during group, chores and
mealtime.
     Sometimes the group was put on ``interventions'' which would last
for weeks if not months, and during this time no contact was allowed
with the outside. It was generally understood that we were being

exhausted for the purpose of making us more truthful--whatever that
meant to those in charge. Exercise was a rigorous daily requirement.
Slowing down from exhaustion only resulted in more exercise or getting
yelled at.

I was not allowed to speak with my family for months after I
arrived, and calls thereafter were monitored. Any criticisms were
labeled as ``manipulative'' and my phone call was promptly
disconnected, followed by punishment. If at some point we ``advanced''
enough in the program to not require such monitoring, that just meant
that by that point, we were no longer expressing our concerns because
we knew our parents wouldn't believe us anyway.

The most powerful figure at the facility was the headmaster who has
no formal training in mental health and whose group therapy sessions
were particularly bizarre and frightening. He was often confrontational
or would smirk and laugh. He would pit friends against friends, and
force us to say mean things to one another. He would attempt to unearth
repressed memories and encourage regressive states. I recall that on
multiple occasions my friends speaking as if they were toddlers,
recounting alleged instances of abuse. Hours would be spent with girls
reliving their traumatic experiences at the unqualified hands of the
staff. Intensive group sessions sometimes lasted all night. Bathroom
use was heavily regulated. Any allegations of abuse discussed in group
``therapy'' were never reported by staff to proper authorities.

Because all of the founders were members of AA, it seemed to them
that everyone was an addict of sorts. I was deemed an alcoholic and sex
addict, a close friend was deemed a sex addict. She had never had sex
in her life, and denied the claim and as a result, staff forced her to
carry 6 large rocks on her back at all times for several months, naming
them issues like ``sexual abuse'' and ``sex addiction,'' until she
conceded to staff that each issue was true, detailing traumatizing
experiences supportive of that claim. When I got caught with a plan to
run away I was placed on personal intervention where I had to rock pick
for a week, eight to ten hours a day, at one point dropped off 25 miles
from school and forced to hike back. This was all done in the name of
therapy.

At other times inappropriate and humiliating interventions were
used such as forbidding youth from talking for several weeks at a time,
forcing youth to wear gloves because it was thought that they
masturbated, or tying two girls together because two girls didn't get
along. Claims of illness were framed as manipulative.

Education was non-existent; schooling a joke. We would have
schooling maybe a few hours a day a couple days out of the week. I
taught myself algebra, and uncertified teachers taught English and
Spanish. We weren't allowed any information about the outside word such
as newspapers or news magazines. I learned next to nothing. It wasn't
until I was nearing graduation from Mission Mountain School that I
underwent testing outside of the facility and was diagnosed with a
learning disability.

We had no access to advocates, no rights whatsoever. Groups of
educational consultants would come in on occasion for a visit. They
were always impressed by our manners and ability to be so forthcoming.
None came to the facility unannounced. None asked us for our honest
opinions of the program * * * although even if they had, given the
insidious fear-based environment, it's doubtful I would've spoken--it
wasn't long before I was broken down and I came to believe what I was
told: that Mission Mountain School was to be the only place that could
save me from myself or I'd end up in ``jail, insane or dead''. The
cumulative effect of the program was losing all sense of self.

Then one day, 18 months later, I was told I was to be discharged.
None of it made any sense to me--though I was told I had been given the
tools to live, I found it difficult to reconcile their claim with my
internal landscape. My nights were filled with a reoccurring nightmare
of being chased by the founders and brought back to the facility,
despite my protests explaining that I was healthy now. In the end, all
Mission Mountain School gave me was more confusion, increased anxiety

and depression, and made social functioning after discharge evermore difficult. It wasn't until 10 years later that I came to recognize the damage done and sought change.

I'd like to speak about the work I've done since then, which will hopefully speak to the broad pattern of atrocities Dr. Pinto commented on in her testimony at the hearings in October 2007. As co-founder and Executive Director of the Community Alliance for the Ethical Treatment of Youth, I have heard from over one thousand survivors and understand that, in most instances, parents remain unaware of the abuse their children have experienced and often firmly believe the program saved their child life. To me, this is the saddest repercussion of these facilities. At once not only is the trust between parent and child broken, but the truth of the youth is further hidden behind a facade promulgated by deceived parents. In my communications the majority of folks I've been in contact with have reported first hand with regards to:

Trauma due to use of escort services

Communication and privacy rights violations such as mail-monitoring, call-monitoring and filtering, restricted or interrupted correspondence.

Inappropriate Seclusion and Restraint

Inhumane Treatment such as:

Forced labor

Restricted access to the bathroom

Scare tactics

Exposure to harsh elements

Excessive exercise

Food/nutritional deprivation

Sleep deprivation

Physical punishment

Emotional, physical or sexual abused by staff

Education and Mental Health Treatment

no individualized plan

dissatisfaction with the training background of the staff members who were providing education, therapy,

support and/or care

What I am hoping to convey today through my testimony is that numerous residential facilities that are in operation today are stripping youth of their basic human rights to dignity, respect, to least restrictive care, appropriate mental health treatment, to education and parental contact, to freedom of thought, opinion and association, and ultimately to freedom from censorship and torture. The legitimate practice of therapeutic intervention is being injected with a perverse form of social control, including inhumane treatment and practices, which defy the ethical principles upheld by peer reviewed mental health practices.

As a nation it is our obligation to hold places of care accountable to their claim. A nation with the best interest of the child in mind must be in the position to assure this is occurring. For this reason it is critical that oversight is stringent enough for this to occur, is questionable that youth safety can be assured if visits occur once every 2 years. Quality assurance is paramount--if a place claims to be a place of healing a facility must be able to back up such claims. It is our nations responsibility to families to ensure not just that abuse is not occurring, but that therapy is never used as justification for the violation of the human rights of youth. Consistent with such commitment, every youth ought be entitled to the least restrictive care possible. Facilities must be held accountable to claims that deceive parents into thinking that no alternative exists and that years of imprisonment are a necessary therapeutic intervention. Of concern are misinformed families who lack community support and feel they have no alternative but to choose institutionalize their child (unnecessarily) at the behest of programs concerned with their interests over that of the youth.

I strongly believe this bill to be a promising and important first

step in curbing such draconian methodology this industry has been founded upon and applaud Chairman Miller for introducing the first piece of comprehensive legislation to that end.

————

Chairman Miller. Thank you. Thank you very much.
Mr. Martin-Crawford?

STATEMENT OF JON MARTIN-CRAWFORD, FORMER PROGRAM PARTICIPANT,
THE FAMILY FOUNDATION SCHOOL

Mr. Martin-Crawford. First, I would like to thank the chairman and the committee for the opportunity to present my side of this story.

After watching the hearing back in October, I was truly inspired by the clear case of morality that brought together both sides of the aisle on this discussion.

We have been called noisy complainers, and we have been called manipulating troublemakers, but after over 10 years, I finally have my chance to speak.

My name is Jon Martin-Crawford, and I was locked up at a NATSAP-affiliated program, The Family Foundation School, in Hancock, New York, from 1995 to 1997.

My life at home was anything but stable, causing me to seek my own release from it all. I created a persona for myself, the troublemaker at school, always looking for attention I didn't get at home. I was involved in drugs by the age of 13. I was lost, constantly in fights, legal run-ins and more. My parents were at wits' end. My only release was my music, my writing and my skateboarding.

After being expelled from public school and one private school for marijuana use and writing an underground newspaper, my parents were told to send me to The Family shortly thereafter, thinking it would give me what I needed.

Once I arrived at The Family, I knew I was there until I was 18. I went through what seems like the ritualistic stripping of identity almost all of us survivors faced. I was stripped; my clothes were taken and thrown away. My music, my art, my skateboard all destroyed. What I didn't have with me my parents were told to destroy as well. I was left with only a letter from my mother for the next 3 months.

I had been to some in-patient settings before, but this one was different. Other places allowed phone calls, mail and peer communication. Here, I wasn't even allowed to call home the first few months. Even after that, I only got that one phone call home a week, nothing more--no access to CPS.

Here I was only allowed to talk to staff and kids that had been there more than 6 months. I was told I was denying the extent of my drug use, and I was confused as to just how I would ``get better'' enough to see my family. I sat and watched and learned to play the game of lies necessary to get privileges and eventually get out. I was lucky and figured these rules out quickly enough not to endure what I saw many kids endure.

But I witnessed it all, including staff punching students in the face while restraining, not once but several times. Typical restraint procedures were wrapping kids up in duct tape and blankets. Kids were not let out of this wrap, even to use the bathroom, for feminine hygiene, or just to move around a little bit and extend their limbs.

Restraints were not only done by faculty, but students as well. Usually, this was even more brutal and was often done in front of all other students to show what will happen if you act out. Kids were forced to eat food they were allergic to and keep eating even if vomiting as a result.

We were forced to attend daily religious services and A.A. meetings and share personal stories with the outside world. Kids as young as 12 being taken out of school to carry out pointless manual labor, such as shovel manure, carry wheelbarrows of rocks, sweeping the roof, shoveling numerous things, for days on end.

When kids tried to run away, it was again not only staff but students told to chase, tackle, restrain and bring them back.

Many things were heard from staff, berating kids with high levels of verbal abuse, often of a highly derogatory and sexual nature, at times regarding sexual orientation. An admitted sex addict was one of the high-up faculty and counselors, as well as a dorm monitor living above the boys' dorm.

The rules I learned to avoid many of these problems were as follows: I made up a horrible past to cure myself of. Our moral inventory was nearly always fabricated to make our problems seem worse and the program seem like salvation. Tell on yourself and your peers for things you may have never done to give the illusion you are getting better and working the program.

If you have certain gifts, you can find a way to skate by. For me, I was their golden boy with my pen. And at my graduation speech, as well as for others, our speeches were used as propaganda as part of the family day for all the parents to hear their message of goodwill.

Under no circumstances were we to tell our parents or prospective parents the truth about what we saw. I was fortunate enough to go home after a while, but I quickly learned that if I told my parents the truth about what I saw, I would only be explained as a manipulation and lose more privileges.

While I had been fortunate enough to miss out on these horrors personally, I gave many tours to prospective parents, always omitting the details of restraints, punishments, and any lack of communication against the abuses that took place.

As a dorm leader, I was told to wake up one of the kids in my dorm with the lamp that only had a floodlight as a bulb, burning his retinas. I participated in the restraining and took part in the barrage of verbal attacks, just as did many of my peers.

I am not proud of this, but we had no choice. If we did not conform, we were being negative and subjected to the same treatment and lack of privileges as everyone else.

Once I left, I saw that I was now in the real world with real problems again, and the school had never helped me with those problems. After nightmares of The Family led to a relapse, I was soon out of Vassar College and into the military. The training in the military, although viewed by some to be harsh, was a cakewalk compared to the hell endured at The Family School.

My trust issues were never resolved after leaving The Family, and the nightmares remain. Ultimately, these psychological issues and flashbacks led to the need for my discharge from the Army, something I regret to this day.

For years, I thought all this was my fault. While the nightmares and anxiety never wore off, getting high at least made it go away again.

I will not blame others for my choices and my mistakes; I take responsibility for those. What I blame The Family for is stripping me of my childhood. I still have nightmares of being locked up and told I am ruining my life. I still read their monthly paper of lies and get nauseous remembering what we witnessed.

The only thing I can say to temper my disdain for these

types of schools or at least for The Family is this: While the
programs, as they are, have little positive effect long term, I
do believe that kids in my position need some sort of help. I
believe there can be a safe solution, as some staff are
genuinely decent and caring people. We need oversight and
regulation of these facilities, with swift and severe penalties
for those who stray from the standards.

What must be remembered through all of this is that these
success stories that these places put out tend to fall in the
1-to 2-year range after leaving such programs and are usually
the opinions of parents.

A true statistic? Of the 25 kids from my graduation class
and the one prior to mine, maybe four remain sober.

While many can now say they live successful lives, it came
anywhere between 5 and 10 years after leaving the program and
figuring out life on their own with psychiatric help.
Unfortunately, this cannot be said for all.

The programs are quick to take credit for a successful
story and are just as fast to claim that anyone that doesn't
make it just didn't work the program. The truth? The nightmares
and psychological scars of being dragged from your home to a
place in the middle of nowhere, restrained in blankets and duct
tape, assaulted, verbally and physically--those scars and that
trauma never go away.

For my friends who have since died from suicide because of
the nightmares or those who still suffer the nightmares, our
time and our voice will not be in vain. There comes a time for
every man to make amends and right their wrongs. This is a
lesson all these programs preach, and it is a lesson they
should now follow.

[The statement of Mr. Martin-Crawford follows:]


  Prepared Statement of Jon Martin-Crawford, Former Program Participant
at the Family Foundation School and Member of the Board of Advisors for
  the Community Alliance for the Fair and Ethical Treatment of Youth


    I would like to thank the Chairman and the Committee for the
opportunity to present my side of this story. After watching the
hearing back in October, I was inspired by the clear case of morality
that brought together both sides of the aisle in this discussion.

    We have been called ``noisy complainers'' we have been called
``manipulating troublemakers.'' After over 10 years, I finally have my
chance to speak. My name is Jon Martin-Crawford. I was locked up at the
NATSAP affiliated program, The Family Foundation School, in Hancock,
NY, from 1995 to 1997.

    My life at home was anything but stable. This caused me to seek my
own release from it all. I created a persona for myself at school, the
troublemaker, always looking for the attention I didn't get at home.
Involved in drugs by the age of 13, I was lost. My only release was my
music, my writing, and my skateboarding. After being expelled from
public school and one private school for marijuana and writing an
underground newspaper, my parents sent me to The Family shortly
thereafter.

    Once I arrived at The Family, I knew I was there until I was 18. I
went through what seems like the ritualistic stripping of identity
almost all of us survivors faced. My clothes were taken and thrown
away. My music, my art, my skateboard all destroyed. What I didn't have
with me, my parents were told to destroy as well. I was left with only
a letter from my mother for the next 3 months.

    I had been to some inpatient settings before, but this one was
different. Other places allowed phone calls, mail, and peer
communication. Here, I wasn't even allowed to call home the first few
months. Even after that, I only got that one phone call home a week * *
* nothing more * * * no access to Child Protective Services. Here I was
only allowed to talk to staff and kids that had been there more than 6

1/24/2020

Case 1:18-cv-10836-PGG   Document 142   Filed 02/03/20   Page 27 of 52
CHILD ABUSE AND DECEPTIVE MARKETING BY RESIDENTIAL PROGRAMS FOR TEENS

months. I was told I was denying the extent of my drug use, and I was
confused as to just how I would ``get better'' enough to just see my
family. I sat and watched, and learned to play the game of lies
necessary to get privileges, and eventually get out. I got lucky and
figured these rules out quickly enough to not endure what I saw many
kids endure. But I still witnessed it all.
    Including:
        Staff punching students in the face while restraining. * *
* not once but several times
        Typical restraint procedures were wrapping kids up in Duct
tape and blankets. Kids were not let out of this wrap, even to use the
bathroom, feminine hygiene, or just to move around and let the body out
of the confinement, while in an isolation room (the 6X6 library room)
        Restraints were not only done by faculty, but many senior
and junior members of students. Usually, this was even more brutal and
was often done in front of all other students to show ``what will
happen if you act out''
        Kids forced to eat food they were allergic to, and keep
eating even if vomiting as a result.
        Kids as young as 12 being taken out of school to carry out
pointless manual labor such as shovel manure, carry wheelbarrows of
rocks, sweeping the roof, etc. for days on end
        When kids tried to run away it was again, not only staff,
but many students told to chase, tackle, restrain, and bring them back.
        Many things heard from staff, berating with high
level verbal abuse, often of a highly derogatory and sexual nature, at
times regarding sexual orientation
        An admitted sex addict was one of the high-up faculty and
counselors, as well as a dorm monitor living above the boy's dorm
        The rules I learned to avoid much of these problems were as
follows:
        make up a horrible past to ``cure yourself of''* * * our
moral inventory was nearly always fabricated to make our problems seem
worse, and the program seem like salvation
        Tell on yourself and your peers for things you may have
never done to give the illusion you're getting better
        if you have certain ``gifts'' you can find ways to skate
by. Me, I was the school's golden boy with my pen and my graduation
speech, as well as others were used as propaganda at graduations as
part of ``family day'' for all parents to hear.
        Under no circumstances tell your parents or prospective
parents the truth about what you see happening.
        Yes, I was fortunate enough to go home once a month after a while.
All I wanted for those weekends at home was to sleep, watch and watch
television. I quickly learned that telling our parents the truth about
what happened at The Family would only be explained away as
manipulation and we would lose our privileges.
        While I had been fortunate enough to miss out on most of the
horrors personally, I unfortunately gave many tours to prospective
parents, always omitting the details of restraints, punishments, and
lack of any sort of communication or safeguards against the abuses that
took place. As a dorm leader, I was told to wake up one of the kids in
my dorm with the light from the lamp * * * that only had a flood light
as a bulb * * * burning his retina. I participated in the restraining,
and took part in the barrage of verbal attacks just as did many of my
peers. I am not proud of this, but we had no choice in any of this. If
we did not conform, we were ``being negative'' and subject to the same
treatment and lack of privileges.
        Once I left, however, I saw that I was now in the real world with
real problems again, and the school had never helped me with those
problems. After nightmares of The Family led to a relapse, I was soon
out of Vassar College and into the military. The training in the
military, although viewed by some to be harsh, was a cakewalk compared
to the hell endured at The Family School. My trust issues were never
resolved after leaving The Family, and the nightmares remained.

Ultimately, all these psychological flashbacks led to the need for my
discharge from the Army, something I regret to this day.
     For years, I thought all this was my fault. While the nightmares
and anxiety never wore off, getting high made it go away again. I will
not blame others for my choices, my mistakes. I take responsibility for
those. What I do blame The Family for is stripping me of my childhood.
I still have nightmares of being locked up and told I'm ruining my
life. I still read the monthly paper of lies the school puts out and
get nauseous remembering the stuff we witnessed.
     The only thing I can say to temper my disdain for these types of
schools, or at least for The Family is this:
     While the programs, as they are, have little positive effect long
term, I do believe that kids in my position need some sort of help. I
do believe there can be a safe solution, as some staff are genuinely
decent and caring people We need oversight and regulation of these
facilities with swift and severe penalties for those who stray from the
standards.
     What must be remembered through all of this is that the ``success
stories'' of programs tend to fall in the one to two year range after
leaving such program * * * and usually are the opinions of parents. A
true statistic? Of the 25 kids from my graduating class and the one
prior to mine, maybe 4 remained sober. While many can now say they live
successful lives, it came anywhere between 5-10 years after leaving the
program and figuring out life on their own with psychiatric help.
Unfortunately, this cannot be said for all.
     The programs are quick to take credit for a successful story, and
are just as fast to claim anyone that doesn't make it just ``didn't
work the program'' The truth? The nightmares and psychological scars of
being dragged from your home to a place in the middle of nowhere,
restrained in blankets and duct tape, assaulted, verbally and
physically. * * * those scars and that trauma never go away.
     For my friends who have since died from suicide, and still suffer
the nightmares, our time and our voice will not be in vain. There comes
a time for every man to make amends and right their wrongs. This is a
lesson these programs preach, and it is a lesson they must now follow.

                            ───────

     Chairman Miller. Thank you.
     Dr. Bellonci?

STATEMENT OF CHRISTOPHER BELLONCI, M.D., MEDICAL DIRECTOR AND
          SENIOR CLINICAL CONSULTANT, WALKER SCHOOL

     Dr. Bellonci. Mr. Chairman and members of the committee, I
am pleased to be here in support of your proposed legislation,
the ``Stop Child Abuse in Residential Programs for Teens Act of
2008.''
     As a child and adolescent psychiatrist who dedicates his
career to the treatment of youth with mental health disorders,
I am frankly horrified to hear about these accounts of latent
abuse in the name of treatment or therapy.
     Nothing that I learned in medical school or my clinical
training could ever justify such treatment. The behavioral
interventions you have heard described have no role in the
appropriate treatment of mental or substance abuse disorders.
As you are hearing, this is trauma-inducing and not trauma
treatment.
     Let me start by saying that treatment for a child or
adolescent with serious emotional disturbance should be in the
least restrictive environment, and preferably with their
family. However, there are many children that cannot
effectively be treated and managed in a home or community
environment safely and need more acute, intensive treatment.
     I am here today to talk about Walker and the specific needs
of children and adolescents being treated in residential

centers.

Walker is licensed in Massachusetts through our state's Early Education and Care agency. As an accredited school, we are also approved by our state Department of Education. We are accredited by the Council on Accreditation, a national accrediting body originally affiliated with the Child Welfare League of America.

Our licensing and accrediting agencies all require frequent renewal and on-sight visits by representatives of these various regulatory bodies. We also adhere to reporting requirements that are consistent with those proposed in your legislation.

EEC has clear guidelines for adherence to civil rights that would prohibit restriction of access to mail, family visits or phone calls. We do not utilize wilderness programming or boot camp experiences. We would never allow other children to restrain other children.

Our staff undergoes a minimum of 2 weeks of pre-service training, including instruction in Cornell University's Therapeutic Crisis Intervention, with a focus on de-escalation strategies and techniques that are individualized to the unique strengths and needs of the children we work with.

Staff is cleared by the Massachusetts Criminal Records search process before they are allowed unsupervised contact with children. During orientation, staff also receives training regarding mandated reporting laws, first aid and CPR.

Walker has explicit policies outlining unacceptable forms of discipline, consistent with those outlined in your proposed legislation, that would never allow the sorts of treatment that you are hearing described today.

We also have clear policies regarding notification of adverse outcomes, both to parents and guardians, as well as our state child protective service, our licenser, and funding and referral sources.

We strive for transparency in our work and view parents as essential allies in the complex treatment of children. We have an open campus and invite and encourage parents to visit and be an active part of the treatment milieu.

Increasingly, we have been serving children and families in their homes, schools and communities. We actively partner with our state's child welfare and mental health departments in advancing best-practice principles and provide consultation and program review and development to over 35 school districts in Massachusetts.

We take our commitment to family-driven practice seriously and, in the last year, have hired our first parent liaison coordinator, who is a parent of a child formerly in residential care at Walker. For over 5 years, we have had a current parent serving as a voting member of our board of directors. We also have an active parent council and run parent support groups for all interested families.

I work directly with most of the children served in our residential program, providing psychiatric treatment. It is against my ethical and licensing requirements to make a medication change without first discussing the risks and benefits of the proposed treatment and obtaining informed consent.

In this regard, I am frankly concerned that your legislation may not go far enough, as it calls for notification to parents within 24 hours of a medication change, after that change has already been made, when it is quite clear standards of ethical practice require the informed consent to be obtained prior to any removal or addition of a medication except in emergency situations.

The goal of this legislation is to ensure that children are not abused in these treatment settings, not to limit access to

appropriate, regulated and licensed residential care for
children who are in need of these services.
    Licensing creates a baseline of expectations to which all
programs within a state can be held accountable. Effective
licensing requirements help promote client rights, staff
competence, quality improvement, and consistent practice. They
provide the constants, the solid ground from which innovative
and transformative practice can be launched. They also provide
a degree of safeguard against the potential of harm to
children, events of a type that can undermine efforts to create
meaningful change.
    All of us working in licensed residential centers should
support this goal. All residential treatment programs should
provide for all of the child's developmental needs, including
mental health care, physical health care, and education needs;
be licensed within the states where they practice and adhere to
national standards; encourage parents to be active parts of the
treatment teams for their youth; and employ a well-trained,
multidisciplinary, culturally competent staff.
    Thank you for raising this important issue. And when it is
appropriate, I would be happy to take questions.
    [The statement of Dr. Bellonci follows:]

    Prepared Statement of Christopher Bellonci, M.D., Child/Adolescent and
       Adult Psychiatrist, Medical Director, Senior Clinical Consultant,
                            Walker School

    Mr. Chairman and members of the committee, my name is Christopher
Bellonci, M.D. and I am pleased to be here in support of your proposed
legislation, the ``Stop Child Abuse in Residential Programs for Teens
Act of 2008''. I am a board-certified child and adolescent psychiatrist
and the medical director at Walker, a multi-service agency in Needham,
Massachusetts that offers residential treatment as one of a range of
programs in our service array. I am a member of the American Academy of
Child and Adolescent Psychiatry who paid for my travel to be here
today. I co-wrote the Academy's Practice Parameter on The Prevention
and Management of Aggressive Behavior in Child and Adolescent
Psychiatric Institutions with Special Reference to Seclusion and
Restraint and am a board member of the American Association of
Children's Residential Centers.
    First let me start by saying that treatment for a child or
adolescent with serious emotional disturbance should be in the least
restrictive environment, preferably with their family. However, there
are many children that can not effectively be treated and managed in a
home or community environment safely and need more acute intensive
treatment. I am here today to talk about Walker and the specific needs
of children and adolescents being treated in residential centers. We
are licensed in Massachusetts through our state's Early Education and
Care (EEC) agency. As an accredited school, we are also approved by our
state Department of Education. We are accredited by the Council on
Accreditation, a national accrediting body originally affiliated with
the Child Welfare League of America.
    Our licensing and accrediting agencies all require frequent renewal
and on-sight visits by representatives of these various regulatory
bodies. We also adhere to reporting requirements that are consistent
with those proposed in your legislation. EEC has clear guidelines for
adherence to civil rights that would prohibit restriction of access to
mail, family visits or phone calls. We do not utilize wilderness
programming or boot camp experiences. Our staff undergo a minimum of
two weeks of preservice training including instruction in Cornell
University's Therapeutic Crisis Intervention with a focus on de-
escalation strategies and techniques that are individualized to the
unique strengths and needs of the children we work with. Staff are
cleared by the Massachusetts Criminal Records search process before
they are allowed unsupervised contact with children. During orientation

staff also receive training regarding mandated reporting laws, first aid and CPR. Walker has explicit policies outlining unacceptable forms of discipline consistent with those outlined in your proposed legislation. We also have clear policies regarding notification of adverse outcomes both to parents and guardians, as well as our state child protective service, our licensor, and funding and referral sources.

We strive for transparency in our work and view parents as essential allies in the complex treatment of children. We have an open campus and invite and encourage parents to visit and be an active part of the treatment milieu. Increasingly, we have been serving children and families in their homes, schools and communities. We actively partner with our state's child welfare and mental health departments in advancing best practice principles and provide consultation and program review and development to over 35 school districts in Massachusetts.

We take our commitment to family-driven practice seriously and in the last year have hired our first parent liaison coordinator, a parent of a child formerly in residential care at Walker. For over 5 years we have had a current parent serve as a voting member of our Board of Directors. We also have an active parent council and run parent support groups for all interested families.

I work directly with most of the children served in our residential program providing psychiatric treatment. It is against my ethical and licensing requirements to make a medication change without first discussing the risks and benefits of the proposed treatment and obtaining informed consent. In this regard, I am concerned that your legislation may not go far enough as it calls for notification to parents within 24 hours of a medication change when it is quite clear standards of ethical practice require the informed consent to be obtained prior to any removal or addition of a medication except in emergency situations.

The goal of this legislation is to ensure that children are not abused in these treatment settings, not to limit access to appropriate, regulated and licensed residential care for children who are in need of these services. All of us working in licensed residential centers should support this goal. All residential treatment programs should:

1. provide for all of the child's developmental needs including, mental health care, physical health care and education needs,

2. be licensed within the States where they practice and adhere to national standards,

3. encourage parents to be active parts of the treatment teams for their youth,

4. and employ a well trained, multidisciplinary, culturally competent staff.

The Board of the AACRC is equally concerned about the growing number of unlicensed residential programs. We believe that residential care in licensed and accredited facilities is an important and necessary part of an organized system of care and believe that all residential providers should be licensed within the States where they practice. In fact, all members of the AACRC are licensed and this is a condition of membership. We also strongly encourage residential centers to seek accreditation which hold the standards they must adhere to even higher.

As an organization representing agencies committed to working collaboratively with families and youth, we were disturbed by the concerns raised in this committee's previous hearing about children and youth experiencing harm in residential settings. We support the initiatives of this committee and its proposed legislation and believe that residential treatment is an appropriate placement for some youngsters and that there are high quality programs being administered by committed and competent staff.

The AACRC's mission is to support the professional development of this committed and competent workforce. The AACRC looks forward to working alongside this committee and state and federal agencies in ensuring that standards are in place for residential centers.

Licensing creates a baseline of expectations to which all programs within a state can be held accountable. Effective licensing requirements help promote client rights, staff competence, quality improvement, and consistent practice. They provide the constants, the solid ground from which innovative and transformative practice can be launched. They also provide a degree of safeguard against the potential of harm to children, events of a type that can undermine efforts to create meaningful change. AACRC requires licensure of its members and is concerned about the variability of practice that can occur in unlicensed settings, which can lead to adverse outcomes for children and their families and criticism of the field. AACRC encourages organizations to work with their state authorities to create meaningful and reasonable licensing frameworks for residentially based services.

Accreditation is not an effective replacement for licensing, as the accountability it yields is less stringent than that which typically occurs through licensing and regulation. Nonetheless it is an important accompaniment to licensure. Accreditation standards encompass emerging knowledge and evidence in the field and come together to define clinical and managerial practices that result in high quality and effective care.

Agency-developed standards, policies, and procedures build upon the framework of licensing and accreditation, creating unique, mission-driven structures as the foundation for care and innovation. Establishment and measurement of desired outcomes and performance indicators helps each organization assess the degree to which it is fulfilling its own objectives and creates the possibility of comparison or benchmarking with other similar entities on key aspects of care identified through accreditation and licensing.

Compliance with accreditation standards, particularly in conjunction with adherence to licensing and regulatory requirements and a quality improvement infrastructure, provides the foundation of safety and best practice that can infuse transformational change, elevate practice, and improve outcomes. AACRC supports efforts to establish licensure requirements and encourages agencies to pursue voluntary accreditation, as part of implementing a transformation agenda.

In the last two decades, the thinking about family involvement across the child serving systems has begun to change. The Child and Adolescent Service System Program (1985) envisioned a central role for families in community systems of care for children with mental health problems. Wraparound, family decision making, and parent-professional partnerships have emerged in child welfare, education, medical, and juvenile justice arenas, as well as in mental health. Such service configurations have recently been supported by research and heralded in salient mental health public policy studies, including the Surgeon General's and the President's New Freedom Commission reports. Research specific to residential care has also consistently identified improved child outcomes when parents and families are more involved. The response from the field to these developments has been slow but not insignificant, as residential centers across the country increasingly design processes and practices for more inclusion of parents and family members in the care of their children. The result has been improved outcomes for children and families.

Parents and families provide important information and feedback. An approach that engages them equally creates a shared responsibility for growth and change. It provides the opportunity for staff to work together with parents and to utilize family members' experience and expertise. This yields an increased ability to understand the child within the context of his/her family, culture and community, and to develop realistic expectations, plans, and supports. The family is affirmed in having their strengths recognized and valued; the staff benefit from having support and assistance and from being relieved of the implicit, at times self-imposed, responsibility to be the ones who will ``fix'' the child. Family-driven care is a partnership.

Parents are strong and effective voices, advocating in pragmatic and realistic ways for the needs of children on quality improvement,

planning, and governance bodies. As political partners with
professionals, parents are powerful advocates for the full continuum of
care, inclusive of residential, and for efforts to meet the needs of
children and families in local communities. The research in residential
treatment consistently shows that the processes and outcomes of care
improve in correlation with the degree of family involvement.
    At the governance level parents are valuable members of Boards of
Directors, and offer critical input into strategic planning and
resource allocation. At the system level parents can have important
voices on advisory committees and interagency collaboratives. Parents
understand the importance of a full array of services and, in telling
their stories, have a powerful influence on policy makers.
    Such multi-level partnerships can help establish and reinforce a
culture of family-driven care. They are more readily supported if the
organization has made the leadership commitment to become family driven
and can dedicate budgetary resources to supporting parent travel,
paying stipends, or hiring parents as paid staff. The Board of
Directors and CEO can ask themselves a series of key questions in
assessing readiness to move in this direction, for example:
    Do the staff of the organization act, speak, and interact
in ways that truly welcome, support, affirm, and incorporate the
perspectives and wishes of parents?
    Do parents have to be ``invited'' into the organization or
is it a baseline assumption of staff that parents are reciprocal
partners?
    Is the organization committed to redefining itself as
providing an intervention within a community continuum rather than as a
placement of last resort?
    Does the organization believe that sharing decision-
making, leadership, and power with parents yields better outcomes for
children and youth?
    Is the organization willing to implement training and
other practices that culturally reinforce the importance of parents and
families in day to day actions, discussions, and care planning?
    The responses to these questions can drive strategic planning and
practice innovation. Changes in practice, even incremental, can and do
lead to positive results.
    The American Academy of Child and Adolescent Psychiatry is
currently working on a Practice Parameter defining best practice for
residential treatment and once available, AACAP would be happy to share
it with the committee. Many of my remarks are taken from Position
Papers developed over the last 5 years by the AACRC.
    Thank you for the opportunity to present these comments to the
Committee.

                        _____

    Chairman Miller. Thank you.
    Ms. Brown, you will be recognized for 10 minutes, as
promised you.

  STATEMENT OF KAY BROWN, DIRECTOR, EDUCATION, WORKFORCE AND
     INCOME SECURITY, U.S. GOVERNMENT ACCOUNTABILITY OFFICE

    Ms. Brown. Chairman Miller and members of the committee,
thank you for inviting me here today to discuss our work on
residential programs for teens.
    This morning, you have already heard a number of heart-
wrenching examples of individual cases of abuse and death in
residential facilities. Now I would like to try to shed some
light on what we know about the national picture.
    To clarify the difference between our work and the case
studies that you heard, my remarks are based on our ongoing
work. Over the past year, we conducted national surveys of
three separate agencies in each state: child welfare, health
and mental health, and juvenile justice. Each of these state

agencies may place youth experiencing behavioral and emotional challenges in residential facilities. In our survey, we asked about a broad range of facilities, including the types that you have heard about today. We also visited four states.

Today I will discuss what we know about the extent of youth maltreatment in these facilities across the nation, what states are doing to protect youth in these facilities, and what federal agencies are doing to oversee state efforts.

In summary, youth maltreatment and fatalities occurred in both government and private facilities all across the nation. However, we don't know the full extent of the problem because many states either don't collect or don't report data for all residential facilities.

Regarding oversight, we identified gaps in state activities that leave youth in some facilities at greater risk of maltreatment or death. We identified similar gaps in federal activities.

Regarding the extent of the problem, in one year 34 states reported to HHS more than 1,500 incidents of youth maltreatment that were committed by facility staff. As you can see, hopefully, from the graphic above, the proportion of incidents related to physical abuse was 24 percent; to neglect or deprivation of necessities, 44 percent; and sexual abuse, 9 percent.

Officials in the states we visited cited factors such as a lack of experienced staff, insufficient training or lack of appropriate supervision as causes.

In addition, in our survey, 28 states reported at least one death in residential facilities. This next graphic shows that 16 states reported deaths due to accidents, nine due to suicide, and fewer states to homicide and the use of seclusion and restraint. I should mention here, though, that deaths related to seclusion and restraint may also be categorized as accidents in some cases.

It is important to note that these data are not complete. The number of adverse incidents is very likely more numerous and more widespread than reported, for a number of reasons.

For example, in many states, officials said they lacked authority under state law or regulation to collect data on private facilities that do not receive government funds. And the HHS database I mentioned earlier tracks fatalities that result from maltreatment but not from suicides or accidents, both of which may be an indicator of neglect or other problems.

Regarding my second topic, state oversight, as you know, under the current structure, states are primarily responsible for ensuring the well-being of youth in residential facilities. To do this, they have a range of tools at their disposal, including licensing, standards, monitoring, and enforcement when violations are found.

All states in our survey reported having some licensing processes. However, the types of facilities licensed and the licensing requirements varied from state to state, and we found gaps in the licensing activity.

Most notably, state agencies often exempted certain types of facilities from licensing and, in particular, private residential schools and academies. This is worrisome because owners can self-identify the type of facility they operate. Therefore, a facility could bypass state requirements by identifying itself as a type of facility not subject to licensing.

In addition, for those facilities that states did license, they used standards that addressed many but not all of the primary risks to youth well-being that you have heard about today. Almost all states reported that licensed facilities are required to meet basic standards, such as the safety of the

physical plant. However, about a third of state Child Welfare
and Health and Mental Health agencies reported that they do not
require written suicide-prevention plans.

Once a facility is licensed, regular monitoring helps
ensure that licensing standards are taken seriously and that
risks to youths' well-being are addressed quickly. However,
officials in three of the four states we visited were unable to
meet their goals for conducting regular site visits for
monitoring at residential facilities. They were also unable to
conduct unannounced site visits, which can reveal conditions
that might not be seen during your regular announced visit.
These officials cited fluctuating levels of resources and large
workloads as factors limiting their visits.

There are also other approaches to overseeing facilities.
For example, some states required accreditation either in
addition to or instead of licensing, as a condition of serving
youths under state care.

Finally, turning to federal oversight of state efforts, the
Departments of Health and Human Services, Justice, and
Education all have certain processes in place through their
grant programs to hold states accountable for the well-being of
youth in general.

However, as with the states, we found gaps in their
oversight related to residential facilities. For example, under
current law, federal agencies do not have the authority to hold
states accountable for youth well-being in private residential
facilities unless those facilities serve youth in programs that
receive federal funds.

For those facilities that are under federal purview,
federal requirements did not always address the primary risks
to youth well-being. HHS, Justice, and Education all reported
that they do not have authority to require that states have
suicide-prevention plans as a condition for receiving grants
that they administer.

Similarly, with one exception, federal programs also do not
require that states ensure the proper use of seclusion and
restraint practices in residential facilities.

Federal agencies did not always include residential
facilities in their oversight visits and have not used all of
the enforcement tools available to them, such as financial
penalties.

In conclusion, the results of our ongoing studies show that
the current federal-state oversight structure is inadequate to
protect youth from maltreatment and death at a time when they
are most vulnerable. Given the wide variety of facility type
and the variation among state laws, there are no simple
solutions.

Without meaningful data, state and federal agencies don't
know the extent of maltreatment in their jurisdictions, so they
cannot accurately assess the risk to youth in facilities or
best target their oversight resources. And licensing alone
holds no guarantees without clear standards, regular monitoring
and a full array of enforcement tools.

The comprehensive results of our work will be included in a
report to be released next month. This report will provide
options for action that states, federal agencies and Congress
may want to consider in any restructuring effort. We also
anticipate that our report will contain recommendations for
action that federal agencies can implement now under the
existing structure.

Mr. Chairman, this concludes my statement. I would be happy
to answer any questions you or others on the committee would
have.

[The GAO statement, ``Residential Facilities: State and
Federal Oversight Gaps May Increase Risk to Youth Well-Being,''

may be accessed at the following Internet address:]

http://www.gao.gov/new.items/d08696t.pdf

———

Chairman Miller. Thank you very much.

Thank you all for your testimony. As disturbing as it is, it is important that this committee hear it and, hopefully, this Congress hear it.

I have been involved with the attempt to protect children in out-of-home placement for over 30 years. And I guess I am saddened by the fact that, 30 years later, we still see this number of children put in these positions of jeopardy while the government looks on because of the patchwork and incomplete system that we have here, so that we can have simple but vital information about these programs, as Ms. Brown has pointed out.

You know, the last time this country witnessed somebody with a bag over their head and a noose around their neck, the world was horrified, the nation was embarrassed, and it was at Abu Ghraib.

To be told by this committee that this is considered a valid therapy, I guess, or a practice by somebody in the care of somebody else's child, and putting the noose around their neck with a bag over their head, that this was accepted, I think would horrify this nation again. But, unfortunately, we don't have a picture of that. We just have the sad results of it, with what happened to that young person.

It is hard to believe. It is hard to believe that people would do this to somebody else's child.

Mr. Kutz, in your testimony you describe eight programs where children were abused and a number of cases involving misleading marketing practices by programs and referral services.

To the extent that you can, can you identify these programs and services that either abused these kids or used misleading marketing practices?

Mr. Kutz. Would you like me to name for the record the ones--there are eight----

Chairman Miller. If you can, yes.

Mr. Kutz [continuing]. For the death and abuse, and then there is the table we had of the misleading marketing----

Chairman Miller. Yes. Yes.

Mr. Kutz. All right. Let me go through those with you.

The names of the facilities, the first four were death cases, and that was the Arizona Boys Ranch, Lonestar Expeditions, Star Ranch, and Summit Quest Academy. Those were cases one through four.

The other four cases, which were abuse cases--three of the first four also were abuse cases. Cases five through eight were Kids of North Jersey, Bethel Boys Academy, Whitmore Academy, and Royal Gorge Academy.

So those are the eight cases of death and abuse.

With the marketing, some of the 10 in there are multiple hits, if you will. So I will go through those.

Case number one was the C.S. Landre Foundation, and that was one of the cases you saw in my opening statement on the monitor, of the tax scheme where people were asking others to make donations for their children.

The second case was Spring Creek Lodge Academy. Cases three, four and five were Lonestar Expeditions, which was the same as our case number two, the death case.

Cases six, seven and 10 were Teen Path, and that is a referral service. And cases eight and nine were Parent Help, and that is also a referral service.

Chairman Miller. You know, if your child applies to college, they ask a lot of questions about your child when you finally get to the final steps; they want a lot of information.

To what extent did--you played this series of tapes about representations about these programs. And you are not a mental health professional, and I understand that.

But to what extent was there any attempt to delineate the information about the child, in terms of what maybe pre-diagnosis had been, other placements of that child, what other determinations were made by mental health workers or psychiatric health workers that that child might have been exposed to? In many instances, these are not the first placements of these children.

Was any effort to develop that history and then inform those parents what would or would not be available that was aligned with that?

Mr. Kutz. I made some of the calls myself, actually. And for the cases that I called, I called five of them, and four of them didn't ask any questions at all about my fictitious child. The fifth one did ask a lot of interesting and good questions.

We made, in total, 30 or so calls. And in most cases, the focus was on the marketing, not actually extracting information on the child and whether the child would be a good fit for that program. So I think that is kind of--do you want to add to that, Andy?

Mr. O'Connell. Yes, most of the conversations centered on cost----

Chairman Miller. Would you just identify yourself for the visual record?

Mr. O'Connell. Andy O'Connell from GAO.

Chairman Miller. Thank you.

Mr. O'Connell. Of the 30 phone calls that we made, the big pitch was about the program itself and not about cost. It mostly centered on the cost and how you could finance the cost to pay to go to these schools.

Chairman Miller. Ms. Whitehead and Mr. Martin-Crawford, after you arrived at your programs, was there any attempt to take your personal history, to discuss that with you, and then to tell you what the plan of treatment would be?

I am not going into the validity of the treatment, but just if those acts were engaged in.

Ms. Whitehead. Well, when I first arrived, actually, there was no real set of treatment plan established, but we were required to write out our life history and our sexual history in detail. And that was how they gathered information, or they would read our diaries from home.

But we were never notified of any kind of treatment plan or goals or anything like that.

Chairman Miller. Mr. Martin-Crawford?

Mr. Martin-Crawford. Likewise, anything that we had actually been asked, as I mentioned earlier, when it came down to our past or, you know, any plan of treatment, it was really what we did. And then if we came with a list, you know, say, I smoked pot a couple times, that wasn't good enough, and we had to say that we were doing cocaine and crack in order to speak with our families.

So any type of writing down what we needed help on was sort of--they told us what we needed help on, whether we did or didn't.

Chairman Miller. Mr. Kutz, in one of the narratives in your report--and correct me if I am wrong--but I believe that, in fact, drug tests were administered to one of the students repeatedly. The drug tests were negative, and they were reported as positive to the parents. Is that correct? Including the initial test?

Mr. Kutz. That is correct. And, also, what was just described here, we did see evidence where kids were forced to confess to things far worse than they had actually done. That was significant, and not just the kid we looked at, but a number of kids in that program were forced to do that at the admission process.

Chairman Miller. And those confessions were then used how?

Mr. Kutz. Well, then they had to keep repeating them during the counseling, that--I guess it is called the M.I.

Is that correct?

Mr. Martin-Crawford. Yes, it is called the moral inventory. Ours were used not as much for the counseling as for parents. So when we had a group----

Chairman Miller. Those were then told to parents, that progress----

Mr. Martin-Crawford. Right.

Chairman Miller. Again, I don't want to put words in your mouth. But those were used to tell the parents what?

Mr. Martin-Crawford. That way, when my parents came and I was saying, oh, yeah, well, by the way, I was smoking crack and shooting people or something, that way they thought that they did the right thing in putting me there and that I really needed to be there and this would, you know, save my life.

Chairman Miller. Those admissions were viewed as progress being made.

Mr. Martin-Crawford. Or at least as good enough reason for me to be there, so it made them feel better. Like, if I had just told them the truth, that I had smoked marijuana a few times, it wouldn't seem as though I really needed to be there as much.

Chairman Miller. Dr. Bellonci, I could give you an hour, but I am only going to give you about 2 minutes, to tell me what, as a professional and in your experience, what your impression is of this. And I will come back to you in a second round, but I have got to move on to other members.

Dr. Bellonci. It makes me ill, hearing it, frankly. And to think that this is being done in the name of treatment is abhorrent to me.

You know, just to clarify, the difference between the programs that you are hearing about and my facility, we don't advertise. Children are referred to us by their public school or by the state of Massachusetts child welfare or child mental health agencies. Our admissions office is run by a licensed clinical social worker----

Chairman Miller. I understand that, but let me explain. You know, the marketing here is to desperate parents who have gone through much of that before. I don't want to compare it to your program, at this point. I just want your professional impressions of this.

Dr. Bellonci. It is abuse. There is nothing about what you are hearing that can be construed as treatment, therapeutic, intervention, care. I had the same association you had to Abu Ghraib when I was hearing this.

This is no way to treat anyone, particularly someone who is already struggling with depression, substance abuse, mental health issues. It is only going to exacerbate the problem and not lead to treatment.

So there is no way that I could begin to defend any of the practices that you are hearing as anything remotely appropriate or acceptable.

Chairman Miller. Thank you.

Mrs. McCarthy, recognized for 5 minutes.

Mrs. McCarthy. Thank you, Chairman Miller.

This is actually the second hearing that we have put together on this. And I thank the chairman for following

through and his long work on this issue.

Mr. Platts and I, when we had this hearing, going back last fall, and we had the parents speaking and telling their stories, it was heart-breaking.

With that being said, the legislation that was introduced yesterday to try to make a difference, as with anything down here, you know, we saw the hearing pushed back immediately. And I find it hard, mainly because when we are trying to do something so that there are standards that children are not abused, I don't understand why there is a push-back. When we are looking at how possibly these schools or treatment areas can have some standards to take care of the children, I don't understand why there is a push-back on that.

I don't understand, if you are dealing with children that already have some problems, why we shouldn't be doing background checks on those that are supposed to be helping them. So I have a real hard time understanding a lot of that.

But with that being said, I need to ask some questions.

And, Ms. Brown, your testimony said there is not a single Web site, federal agency and other entity that collects nationwide data on incidents in these programs. Our bill calls for a central Web site which will have data on these facilities and their operating systems, and requires marketing materials to include a link to this Web site so parents can see information for themselves.

Would you think that this would actually help parents make a decision on exactly what they are putting their child into?

Ms. Brown. I think that that Web site has a number of advantages that it offers.

The first and most important one would be to give parents information that would help them make an informed decision. This is assuming that incidents of abuse and facility names and that kind of thing were all contained on the Web site.

There are also a couple of other advantages. In the hearing in the fall, we talked about facilities that, if they were shut down in one state, move to another state. And a Web site like this could help try to prevent that kind of activity.

And then the third piece is, in our surveys and in our state visits, we learned that state agencies--the officials in state agencies that place children in residential facilities don't always share information with each other in the way that they should. And so sometimes one agency may have decided that they didn't really want to place their children in a facility because of problems they knew and they didn't tell the other agencies.

So, if this Web site could be constructed in a way that it had all of the information that you have in the bill, I think it would be helpful to the agencies, as well.

Mrs. McCarthy. The other thing I wanted to follow up on--with a lot of the issues that we deal with here on the Education Committee and the research that we do on certain bills, I have found that when we pass a law here, you know, and we put it out to the states, we really are not getting the information that we need to make the correct decisions. So I really become some person of--I like data. I like a lot of data now.

And, with that being said, there is only one database that collects some of this information, the one operated by HHS called the National Child Abuse and Neglect Data System. The federal government provides funds to states for reporting abuse and neglect to this organization, but a lot of the states aren't putting that data in there. We found that with some of the educational standards.

How would you feel about having a--why doesn't HHS get more comprehensive data from states on the number of incidents of

youth abuse and death? And how can we improve on that?

Ms. Brown. Well, you are absolutely right that the quality of the data in that system is only as good as what the states provide. And, as I said, there are a number of different areas, particularly related to private facilities, that states don't necessarily collect information on.

There are also problems with the way that some of these systems are constructed, so that even though they may be reporting the data, it is impossible to isolate those incidents that happened at residential facilities versus other areas or within a child's family.

One of the things that we have recommended in our report that will be coming out soon is that HHS does step up and try to work with the states and figure out what some of the problems are and how they can improve that data reporting for that system. Because it is used in HHS widely.

And I think that there might be a loophole in the law right now, where states are expected to report these data that says ``to the maximum extent practicable.'' And that does, I think, give a little bit of leeway. That I think it has been long enough that these states have reported this data, that it might be fair to expect them to report it more completely now.

Mrs. McCarthy. I agree.

I want to thank the whole panel for the testimony, and for the parents that are here that testified in the past. And, again, hopefully we can get a handle on this and get this bill onto the floor and passed and hopefully prevent abuse to many of the children that are out there and help the parents.

Thank you. With that, I yield.

Mr. Kutz. Mr. Chairman, could I just add one real quick thing to that? It will take just a second.

What we found at the case-study level, too, is that a lot of the abuse and torture and things like that never gets reported to the state. So that is just another point, that even if the states aren't reporting it, they are not getting it from the programs. A lot of the programs we looked at were cited for not reporting abuse, and most abuse maybe never gets reported in the first place.

Chairman Miller. Mr. McKeon will now be recognized for 15 minutes. And thank you for your patience.

Mr. McKeon. Thank you, Mr. Chairman, for yielding.

I want to begin by thanking all the witnesses for their testimony here today.

I strongly believe that the instances of neglect and abuse and death at these facilities that we have been talking about over the last few months are totally unacceptable and must be stopped. That goes without--probably should go without even needing to be said.

I still don't feel, though, that the committee has a full grasp on the extent of the problem or possible solutions. As you just said, a lot of these things are not even reported.

So I am glad this hearing has been convened today to learn more about these facilities and give members an opportunity to ask questions about them.

Mr. Kutz, you talked about eight instances of death. Has there been any prosecution on those deaths that you are aware of?

Mr. Kutz. Yes, there was one case of a criminal conviction for third-degree assault and false imprisonment, and that person served 1 month. There was also a plea, but there was no time served.

On all the other ones, there were no criminal prosecutions or charges.

Mr. McKeon. So murder is okay now. I mean, listening to just what you said about it, I can't even understand how we

don't have eight people in jail for murder in those instances.
How do you possibly not have----

Mr. Kutz. I agree with you. It is very difficult to look at
this and wonder why there is not more criminal aggressive
effort in this particular case. There was a lot of civil
activity, lots of civil settlements, but that doesn't fix the
problem with the people who were doing the abuse.

And the real issue, I think we talked about at your last
hearing, these people are moving around. So who knows what
program they will move to next, and----

Mr. McKeon. But you have----

Mr. Kutz [continuing]. There is no trail then.

Mr. McKeon. I mean, you know of a death.

Mr. Kutz. Yes.

Mr. McKeon. The police don't find out about it? Or they
just shrug it off and write traffic tickets, or what? I just
don't even understand this.

Mr. Kutz. It may be that it is difficult to prove in a
court of law. I mean, I can't really explain it fully.

Mr. McKeon. To prove how the death occurred, or that there
was a death? I mean----

Mr. Kutz. There was clearly a death and there was clearly
abuse, in some of the cases we looked at. And why there was no
more criminal on that, I just can't explain it for you fully.

Mr. McKeon. I just don't understand that.

Ms. Whitehead, Mr. Martin-Crawford, both of you seem to be
doing quite well now--apparently not as a result of your stay
in these institutions. But how did you get your lives turned
around?

Ms. Whitehead. Well, I think primarily just doing the work
that I have been doing, in terms of advocacy. I mean, it really
took a good 10 years for me to, kind of, get through all of the
depression stuff and the anxiety. And----

Mr. McKeon. It just happened, or did you have some
professional----

Ms. Whitehead. Well, no, I had some therapy around it,
and--but really it was about not really understanding my
experience, not really framing it as abuse, and speaking with
Dr. Pinto at length and understanding that there is some
legitimacy to my claim and finding a place to put that.

So I think that, you know, it was that confusion and that
internal battle that took so long, you know, the nightmares and
understanding where that came from, and then understanding that
it wasn't therapy.

Mr. McKeon. What I am trying to get at is you apparently
had some problems, which is why you were sent to this place.
And if you could just block that out, how did you get the
problems that got you to that point in the first place, how did
those get taken care of?

Ms. Whitehead. Therapy.

Mr. McKeon. After you----

Ms. Whitehead. Oh, after, yes.

Mr. McKeon [continuing]. Came back home.

And was your experience the same?

Mr. Martin-Crawford. My experience, for the most part, when
it came down to the issues that got me into The Family--
marijuana use, things like that--most of it really just came
out of maturity. At some point I just realized that doing the
right thing--going to school, getting a degree, and, you know,
becoming a teacher--meant more to me than hanging out and
getting high.

And as much as I hate to say it, this testimony here,
because of the thorough background checks that certified
teachers get, could be problematic for that. But it is worth
the risk. I mean, I guess my certification means more to me

than these people's.
        Mr. McKeon. Thank you very much.
        Dr. Bellonci, in your testimony you seem to have pretty
extensive knowledge of the legislation that was introduced last
night?
        Dr. Bellonci. Yes.
        Mr. McKeon. When did you see the legislation?
        Dr. Bellonci. Tuesday of this week.
        Mr. McKeon. Tuesday of this week?
        Dr. Bellonci. Yes.
        Mr. McKeon. Today is Thursday?
        Dr. Bellonci. Yes.
        Mr. McKeon. Okay.
        I have some questions I would like to direct at all the
witnesses. Can you tell me how many private residential
treatment programs or boot camps there are nationwide?
        I guess that is a no?
        Ms. Brown. I think it is safe to say the answer, from our
perspective, is no, we don't know.
        Mr. McKeon. And so, if we don't know how many there are, we
probably would not have numbers to break them down by state?
        How many different types of treatment programs----
        Chairman Miller. Let the record show the answer appears to
be no again. [Laughter.]
        Ms. Brown. The answer is no.
        Chairman Miller. Yes, thank you.
        Mr. McKeon. How many different types of treatment programs
are there in the country?
        Mr. Martin-Crawford. I believe that would depend on what
they call themselves. That goes anywhere from emotional growth,
residential treatment, wilderness--I mean, there are so many
different names that it is almost impossible to tell. Because
if we listed 20 names right now, there would be 20 tomorrow.
        Dr. Bellonci. If I may, I mean, I think part of the problem
in even beginning to get the scope of the issue is that there
is no agreement on the terms to define these programs. And I
think one of the things that we really need from the national
level is a definition of the range of out-of-home care options
that exist, and then clear standards to correspond to each of
those definitions of care.
        Mr. McKeon. Okay.
        One of the solutions that has been suggested is some sort
of federal oversight. And I am curious about the capacity that
would be required to regulate these programs on a federal
level.
        Can any of you talk about the manpower, expertise and
funding that is going to be needed to establish and then to
monitor these programs by a federal agency?
        If this doesn't----
        Ms. Brown. I was trying to think if there was anything I
could contribute to that. And I guess the only thing I can say
is, in our options that we lay out for Congress to consider,
one of them is direct regulation, which is the first part of
the bill that relates to asking HHS to monitor the facilities.
And we don't know the cost of that or the capacity.
        When we looked at that option and other options, we
considered the fact that there are really three factors that
need to be weighed against each other, or traded off. And one
is cost. And the second is the federal reach, how far you want
the federal government to be involved in this. And the third is
the extent of protection that children would receive or how
wide the net would be.
        Mr. McKeon. Where would the federal government get the
jurisdiction to be----
        Ms. Brown. For direct regulation?

Mr. McKeon [continuing]. Directly involved in this? Yes.

Ms. Brown. Well, according to our counsel, that would come from the issue of interstate commerce. And there are two ways that that could be applied. The first one is through the marketing practices that we talked about today and those occurring throughout the government. And the second one is related to the number of youth that are actually placed across state lines.

Mr. McKeon. Okay, so if you have a state that had an organization within the state that did not cross boundaries, that only had students coming from within their state, where would the federal government have the ability to get involved in this program?

Ms. Brown. Well, and that--the question there of, if they don't accept or place children in other states, would be, what are their marketing practices, and did those have a wider reach? I know that many of these facilities----

Mr. McKeon. But the ones that are just done within a state, where would the federal government have the ability to intervene?

Ms. Brown. The way that the federal government, in those cases, has influenced that and would be able to in the future would be through the use of federal funds. If you were to----

Mr. McKeon. But if they are not receiving any federal funds, as I understand these programs aren't, where would the federal government have the ability to intervene, according to the Constitution?

Ms. Brown. I have to tell you, first of all, I am not a legal or a constitutional expert, so----

Mr. McKeon. Do we have any on the panel?

Okay. That would probably be better to address somewhere else then.

Ms. Brown. Right.

Mr. McKeon. Okay. At this time, I yield to Mr. Platts for my remaining 5 minutes.

Mr. Platts. Thank you, Mr. McKeon. And I want to thank the chairman and the staff of the committee for their important leadership and work on this issue.

And certainly thank all of our witnesses here today, especially Ms. Whitehead and Mr. Martin-Crawford, for your efforts to try to take the trauma that each of you suffered through not to be repeated against others, and your willingness to be here, not just in testifying, but your advocacy for the rights of other children that are still in these programs.

I tell you, as a parent sitting here today as well as in our last hearing, it is truly sickening to hear of the care given to children entrusted to adults to help better the lives of those children, and instead have resulted, as we have heard, in some instances, in the deaths of those children. And as a nation, we certainly have a moral responsibility to do our best to not allow this to happen.

Mr. Kutz, I would like to start with your comments. First, in the four cases where there were deaths, are any of those facilities still operating today? Or, as to the best of your knowledge, are any of the individuals associated with those facilities still operating under, perhaps, different names?

Mr. Kutz. The answer is yes. Cases two and four are still open under the same name and same individuals involved. Numbers one and three are closed.

Mr. Platts. And under cases two and four, are those institutions or facilities ones that there were legal actions of any kind brought against them?

Mr. Kutz. There was an investigation of case four by the state. And for the other one, there was a civil settlement, but no criminal.

Mr. Platts. All right. As Mr. McKeon stated, it is hard to understand that scenario and that there is not more scrutiny and action, given the circumstances that you have shared with us.

You reference in your testimony that, in three of the eight cases you looked at, the victim was placed in the program by the state or in consultation with state authorities.

To the best of your knowledge, was there any follow-up, site visits, interviews, you know, investigations by the state authorities or entities that placed those individuals to make sure that the child being placed was receiving the care that they were intended to?

Mr. Kutz. Not until it was too late, until it was a problem, and then there was lots of investigative activity. And that gets into the whole issue here, hopefully that the committee's focus here is on preventing these things from happening. And that is really what I would say you should focus on, because once you get to the investigative phase, it is too late. And, as we are hearing here, oftentimes there are no consequences.

But we are talking, also, about Medicaid money. Several of them had Medicaid money. And then one of them had money from the juvenile justice system also. So there were various types of money, either paying for part or all the tuition, even though it was a private program.

Mr. Platts. My focus is not the investigation after allegations of abuse, but if a state is saying, we are placing this child in your custody, at state direction, as to your knowledge, there is no, ``And we will be back in a month to see how that child is doing, how you are operating, how you are caring''? To the best of your knowledge, that did not occur again until it was too late?

Mr. Kutz. I can't say that for sure, but if it was, it was ineffective oversight. And it may not have been random, unannounced visits, which is something I know that has been discussed, and that may be an element of your bill, I believe. But that would be something that I would suggest, no matter who is responsible, that random, unannounced visits would be something that could help this.

Again, if it is a wilderness program, that would be difficult, because you would have to parachute into the wilderness to do a real unannounced visit. But, otherwise, some of the physical structures, you could do a random, unannounced visit.

Mr. Platts. Probably a necessity, to truly get an understanding.

In your testimony, you also talked about--you say, ``A number of states do not license or otherwise regulate certain types of private programs.'' Do you know how many states do regulate in some fashion private residential facilities?

Mr. Kutz. I will let Ms. Brown answer that more so. I mean, with respect to our case studies, some were licensed and some weren't. That was true last fall also.

Mr. Platts. Okay.

Ms. Brown. I think one of the issues there is for private facilities whether they are receiving government funds or whether they are not. And all of the states that we heard from licensed some types of private facilities.

The issue is that there are some that are exempt from licensing. In some cases, it might be, as I mentioned, academies and boarding schools are the ones that are most often not licensed. And then there are also examples like faith-based facilities that would also be exempt from licensing. There are six states that do that.

Mr. Platts. Just a quick follow-up on that, is there a best

example of a state that you would point to that does regulate
private facilities?

Ms. Brown. I wish I could give you a simple answer to that
question. We have an idea of what we would like to see the
oversight and regulatory structure look like. But as we looked
at the states, none of the states that answered our surveys,
which was all but one, had the complete package.

Some had much more developed oversight standards, but they
didn't reach very far, as far as the number of programs, the
types of programs they covered. Some had much more broader
coverage, but their standards and oversight were only this
deep. So it is hard to pick one out.

Mr. Platts. No one perfect example to point to.

Ms. Brown. No, sir.

Mr. Platts. Thank you, Mr. Chairman.

Chairman Miller. Thank you.

Mr. Scott?

Mr. Scott. Thank you, Mr. Chairman, and thank you for
holding the hearing. We are going to be dealing with this
subject, if we don't deal with it directly, at least indirectly
through the reauthorization of Juvenile Justice and Delinquency
Prevention. So it is an important issue as we deal with
juveniles.

I would like to ask Ms. Brown, you know, we know what we
are trying to cover. You, kind of, know it when you see it. But
I was wondering if you had looked at the definition that we
have in the bill to see if it covers everything that needs to
be covered and doesn't leave anything out.

It, for example, does not cover government-run programs.
Should government-run programs be covered?

Ms. Brown. In our survey, we looked both at government-
operated facilities and then private facilities, those that
were exclusively private and those that received government
funds. And we found very similar problems with the government-
operated facilities.

The organization in the Department of Justice that
investigates civil rights abuses for institutionalized persons
in public facilities has an annual report that provides
detailed information on different cases that they have
investigated that sounds very similar to the case studies that
Mr. Kutz reported on.

Mr. Scott. Are there any other programs--that the
government programs ought to be considered. Any other programs
that would not be covered by this definition that ought to be
covered?

Ms. Brown. The issue of----

Mr. Scott. If you are not prepared to answer that now, if
you could think about it and get back to us, that would be
helpful.

Ms. Brown. Yes, I would be happy to.

Mr. Scott. Mr. Kutz, I have seen studies that suggest that
boot camps just don't work, if it is just a disciplinary
program. However, if you have boot camp plus a significant
education component, then it does work. And then it occurs to
me, if you have an education component without the boot camp,
it would probably work anyway.

How do we deal with the question of whether boot camps
work, as we try to regulate them?

Mr. Kutz. The ones we looked at--and I can only speak to
the case studies we looked at, and I am not an expert on this.
The ones we looked at had very little educational program. It
was more a discipline, more of a military style to, I guess,
help youth that maybe had trouble with discipline or whatever
the case may be.

But I didn't see a lot of education in the case studies we

have looked at, so I can't really address how effective----

Mr. Scott. Well, did they accomplish a goal?

Mr. Kutz. Again, I haven't looked at them all. The ones that we looked at, there was some more severe abuse, I would say, of kids at the boot camps. They had more of a difficult environment for the kids.

Mr. Scott. Well, if they weren't abusing them, did the underlying program work?

Mr. Kutz. Again, in the case studies we looked at, I would say no. But, again, I can only speak to a few case studies of that, so that is probably not a fair look at all of the boot camps.

Mr. Scott. Dr. Bellonci, if you are having this physical activity, would it help if you required the students to have physical exams before they signed up?

Dr. Bellonci. Absolutely.

Mr. Scott. Should the staff be certified in CPR?

Dr. Bellonci. Yes.

Mr. Scott. Ms. Brown, we have in here that you ought to have standards. For example, there ought to be a medical emergency plan. But it doesn't say what is in the plan.

Who should decide what specifics are in the plans? Should that be a state-level certification, or should the bill include specifically what should be in the plan?

Ms. Brown. I haven't looked at the bill in that amount of detail, to be able to comment section by section on that.

I know that there is something to be said for having broad standards that are agreed upon at a very high level that everyone can be expected to meet. When you get down to the details of what should exactly be in a medical plan, that may vary depending on the type of student that is being served.

Mr. Scott. Well, maybe Mr. Kutz or somebody else could comment too. We have, staff shouldn't be convicted felons, particularly in child abuse areas. Should there be minimum standards for staff in these things? Education level?

Mr. Kutz. Well, I would say yes. I mean, I am not, again, an expert on it, but I would say----

Mr. Scott. Okay. Then who ought to set the standards?

Mr. Kutz. I don't know who should set the standards, no, sir.

But I think you mentioned something else in your comment. There are background checks too, because we did see certain programs do background checks, other ones don't do background checks. We had instances where prior felons were involved with these programs. We have seen that before. So that is something that is quite important, I believe.

Mr. Scott. Well, if you are trying to accomplish a goal, there ought to be some minimum education requirement, some qualifications for staff, if you are trying to accomplish a goal. Who ought to set the standard?

Well, Mr. Chairman, I guess that is something we need to be looking at. I yield back.

Wait a minute. I think we might have an answer.

Dr. Bellonci. I don't know if it is an answer. It is a recommendation.

I think there are a number of accrediting bodies, there are a number of training programs that set their own standards, particularly around behavior management. And to expand on my earlier question of just yes to needing CPR training, there is so much that must go on before you even get to that point.

And even then, I don't think that most of the interventions that you are hearing about are justifiable from a clinical treatment modality. It is just not clinical treatment.

But even when you are a good program that is licensed and accredited and have highly trained and qualified staff, bad

things can still happen. And so, having a rubric that you
follow, that does meet some baseline platform of licensure and
regulation, I think is at least the place to start to try to
clarify, when bad outcomes happen, what you can learn from that
so that it doesn't happen again.

Mr. Scott. Mr. Chairman, my time is expired, but I would
hope that somewhere along the lines we would consider what the
goal of these programs might be, what outcomes they are trying
to get, and the regulations really ought to be consistent with
that. Just having plans and this kind of thing, at some point
some of these programs are working, some of these methodologies
are working, and some don't.

Chairman Miller. Oh, I think that is part of the problem we
have encountered here. Because there are some which are
considered successful by parents and others and maybe even by
those operators, the suggestion is, because some are good, you
can't look at the bad.

And I think we have to delineate these programs, because
there are clearly practices here that have been designed over a
period of years. And after various incidents and run-ins with
various agencies, these people have learned to navigate the
gray areas between federal, state regulation, definitions and
all the rest of that.

And this has not emerged by accident; this is designed.
There have been numerous ones of these programs that are the
most troublesome are third and fourth iterations of various
problems and third and fourth career opportunities for people
who were engaged in previous and serious offenses. So this is
not an accident, that this industry has sprung up in the manner
in which it has.

Ms. Shea-Porter?

Ms. Shea-Porter. Thank you, Mr. Chairman. And I really have
more of a comment.

First I would like to say how sorry I am that you have
experienced what you have. As a former social worker, I am
absolutely horrified. I can't imagine why there wasn't any
oversight, why nobody stepped in. And so, I say I admire both
of you for being here and sharing your story and making a
difference.

And I would like to thank the chairman and those who worked
on this to make sure that we have the changes.

I would also like to say, the federal government does step
in. They step in, they can provide money to states to help them
license and oversee. So I see it as an appropriate role of the
federal government. Indeed, you know, we have some groups that
support animals that would have had more clout than some
organizations had to help you.

The other comment I wanted to make, simply was a question,
I know that on the Web site one of the proposals would be that
they would have access, that they could take a look. But do you
know another way, from your own experience, to help families
recognize the pitfalls of an organization? How would you go
about it? Is there something else you could add to this
discussion about how to warn families before they put their
children in bad treatment facilities?

Ms. Whitehead. Well, I think, sort of, what Dr. Bellonci
was speaking to, in terms of accreditation. I think that, you
know, regulation is important, absolutely, but anybody can open
up a facility and call themselves a therapeutic location and
yet use these aversive methods that are causing more harm than
any benefit.

So I think, you know, that would be a recommendation,
accreditation, as well as a facility with an open campus. I
commend the Walker School for opening up their school to
parents. Because the facility I attended and a lot of the

facilities I hear about, the campuses are closed, no
unannounced visits. People have to call. Parents aren't allowed
to come in, and so nobody really knows what is happening.
    So those are primarily the recommendations--and close to
home. I mean, families shouldn't have to be torn apart to heal.
    Mr. Martin-Crawford. I would say even with the distance
from home, even if kids were sent away, one of the main things
that any parent should look for is, does your child have
absolute access to Child Protective Services and to calling
home to their family? Keeping those two things away, you are
just looking for trouble.
    The other thing for parents that are just browsing Web
sites and not really doing research, if that is the case, a lot
of this is--you will see success stories that are, you know,
``I just graduated.'' And it is really people that graduated
this year or last year, you know, at the most 2 years, saying
how the place saved their lives and all that.
    You look a little further down the road, and these kids--I
mean, it took me probably about 4 or 5 years to start seeing
it. And, you know, it progresses, as time goes by, to now, I
even have my friends' parents that are telling me how much they
hated the experience that their child went through. Because it
takes a long time to really get over the brainwashing and the
scars that you really go through.
    So, I mean, look at the Web sites and all the success
stories that they tout out, from the parents to the students,
graduation speeches, whatever the case may be--you know, try to
be realistic. If you are only getting stuff that is within the
last year, chances are it is because other people have stopped
talking to them for some reason or another.
    Ms. Shea-Porter. Thank you.
    Thank you, Mr. Chairman.
    Chairman Miller. Thank you.
    Mr. Platts?
    Mr. Platts. Thank you, Mr. Chairman.
    Ms. Brown, a follow-up to when I asked about the best
practices and you talked about a lot of these states have good
aspects but no one state, kind of, had the whole package.
    And I don't expect you to have it here today, but if you could
follow up with us what you have identified what you believe to
be the whole package, you know, of this state's good
attributes, standards, this state's. But what would, from your
investigations and research, be that whole package? If you
could follow up to the committee in writing with that, that
would be helpful.
    Ms. Brown. Certainly.
    Mr. Platts. Thank you.
    In your testimony, you referenced the Civil Rights of
Institutionalized Persons Act and the authority of the attorney
general to bring actions. And this relates to state and local
facilities, public facilities.
    Are you aware of, in, say, the last 5 years, how many
investigations and/or actions have actually been initiated by
the attorney general of the United States under this act?
    Ms. Brown. The first thing to say is that the officials
from this organization told us that they get more referrals
each year than they can handle. But they do issue an annual
report. And I am stalling right now, because I am hoping that--
--
    Mr. Platts. The attorney general's office gets more
referrals than they can handle?
    Ms. Brown. Yes, this special litigation division that deals
with the civil rights of institutionalized persons.
    And, okay, so in 2006 they investigated over 175 facilities
in 34 states. And their report does contain quite a bit of

detail about the problems that they saw.
    Mr. Platts. Mr. Chairman, if we could have the report
included as part of the record and we receive copies of that,
that would be wonderful.
    Chairman Miller. Without objection.
    [The three CRIPA reports for fiscal years 2004, 2005, and
2006, respectively, are accessible at the following Internet
addresses:]

    http://www.usdoj.gov/crt/split/documents/split--cripa04.pdf

    http://www.usdoj.gov/crt/split/documents/split--cripa05.pdf

    http://www.usdoj.gov/crt/split/documents/split--cripa06.pdf

----

    Mr. Platts. Thank you, Mr. Chairman.
    So it sounds like they are trying to be dutiful in their
responsibilities but perhaps don't have the resources to be--
did they give any indication of, if they did, I think, 170-some
investigations, was it twice that they received, so 50 percent
they didn't get to? Or that wasn't shared?
    Ms. Brown. Well, they get many, many more referrals than
they can investigate. How many of those would be valid ones
that they should actually be pursuing, I don't know.
    Mr. Platts. Okay.
    Ms. Brown. I can tell you that, in our upcoming report, we
are making a recommendation that relates to trying to encourage
the other federal agencies to work closely with them so that,
if they find information about problematic facilities, they get
that referral over to the Department of Justice so they can
follow up.
    Mr. Platts. Excellent. Because the more coordination and
communication, the more likely we can get the bad apples
identified and pursued.
    Mr. Kutz, a follow up. In your testimony, you talked about
the referral services. I mean, clearly, it seems like false
advertising. In Pennsylvania, we have an unfair trade practices
act that would seem to govern some of this.
    Are you aware of any actions at the state level--or
federal, but more likely at the state level--to pursue any of
these entities that has engaged in the type of advertising or--
you know, fraudulent or apparently misleading information?
    Mr. O'Connell. Andy O'Connell from GAO, just to follow up
on that question.
    We are in dialogue with the FTC regarding our work. And I
don't know what they are doing right now; you would have to ask
them. But we are----
    Mr. Platts. You have shared your results with the FTC, for
them to----
    Mr. O'Connell. Yes, we have.
    Mr. Platts. Okay.
    Mr. O'Connell. And on the one tax scheme that you saw in
our----
    Mr. Platts. Yes, on the 501.
    Mr. O'Connell [continuing]. We are making a referral to IRS
on that.
    Mr. Platts. Great. Thank you.
    Mr. Kutz, I know you investigated these eight specific
cases. What is the youngest age of any child, that you are
aware of, that has been placed?
    Or if anyone else would want to answer that, as well.
    I have heard 12, a number of times 12-year-olds. Are there
children younger than 12 in these facilities?

Mr. Kutz. Of our cases, 12 is about the youngest. But there is evidence that there are kids under 10 years old in these programs, yes.

Dr. Bellonci. My program actually works with children between the ages of 5 to 13 in our residential setting.

Mr. Platts. How about in any of the wilderness or boot camp-type facility? Anyone----

Mr. Martin-Crawford. At ours, as well, the youngest was 12 years old. I think 6th, 7th grade was pretty much where their cut-off was at that point.

But, I mean, there were kids that stayed there, although they were family members of staff members that ended up then being students later on. So they were there all the time.

But the only ones whose parents actually admitted them, the youngest was about 12 years old, a kid that pretty much just had ADD and, while he was there, did develop the behaviors that most of the people pretended to have and that was actually shot last year as a result.

Ms. Whitehead. I know of a facility in Utah called Majestic Ranch that admitted youth as young as 7.

Mr. Kutz. At the other end of the spectrum, we had one program where kids were held beyond their will after 18, which is the other end.

Mr. Platts. And that was one of your cases you referenced?

Mr. Kutz. Yes. There were several kids--one was held there over 13 years.

Mr. Platts. My time has expired. I don't know if we will have another round or not.

Chairman Miller. We will.

Mr. Platts. Thank you.

Chairman Miller. Mr. Kutz, again, in a number of the case studies--I would like you and then maybe Ms. Whitehead and Mr. Martin-Crawford would want to respond also. But in a number of instances, we have students participating in physical actions, maybe abusive actions, against other students.

Can you outline that or tell me what you know about that? And then I will ask the other two to respond from their experiences.

Mr. Kutz. Yes, we saw students being involved in abuse and torture of other students, typically at the direction of some of the staff or owners. But, yes, kids, typically against their will, being responsible for that and being told to carry somebody around, kick them, beat them, whatever the case may be. And we saw that last time, too, the 10 cases from last fall, the same type of things, where kids were involved.

One of the programs, the actual staff were people who had been program participants. So they went through the program, and their qualifications to be the staff were that they had been in the program.

Chairman Miller. Ms. Whitehead?

Ms. Whitehead. My facility didn't use any kind of physical intervention, you know, among students. But what we did, we were required to--it was called ``called out'' in group by other students. And, sort of, to deflect attention away from one student, we would have to call another student out on behavior, vague notions of dishonesty, and then they would get subsequently punished and have to do work crew for the day or rock-picking, things like that.

Chairman Miller. Mr. Martin-Crawford?

Mr. Martin-Crawford. The same was the case in my program. The students did actually have to physically restrain students. We had to chase them, bring them back.

The first few times that a student would do it, if you had just become a senior member, you were told by staff, ``Okay, you are a senior member. You should go and chase them now.''

And then, after a while, it sort of becomes second nature. It is almost just a reflex, at that point, because you know that you are expected to do it.

Chairman Miller. When you discussed wrapping students up in restraints, that was done by other students?

Mr. Martin-Crawford. That was usually initiated by the faculty, but the students assisted. Like, a faculty would say, ``Wrap them up,'' and then the students were the ones that were forced to do it. The faculty was then the one that would say, ``Put them in the isolation room,'' and a student would observe.

So, occasionally, we would let the kids out of the blankets if we thought we wouldn't get in trouble for it, if nobody was looking, but it was something that, if anybody was around, we had no chance of doing.

Chairman Miller. Dr. Bellonci, what is your impression of this?

Dr. Bellonci. Once again, I am horrified. There is no justification for having youth-on-youth interventions like that.

Chairman Miller. Is there in, I don't know, what I would call a normal practice, is there a discussion of this within the profession of whether this is advised or ill-advised?

Dr. Bellonci. Yes, I think it is very clear in the profession that this is ill-advised and unaccepted practice.

You know, one of my comments, as I was listening to what could be helpful, you know, and what a parent might want to ask, I would want to know whether or not--you know, what were the professional qualifications of the staff. I would want to know if there was on-site medical involvement and oversight and an administrative capacity. I would want to know what the training guidelines were for the staff. I would want to know what the history of abuse claims were against the agency.

In my state, you can find out more about a restaurant by doing a Web search for their health standards than you can learn about these kinds of programs that are caring for America's youth. And that is an outrage.

Chairman Miller. Mr. Bellonci, I, I guess like many members, know of families and have been involved with young people and older people and their families--my wife does a lot of mental health work--with bipolar. I know the struggles and the difficulties, both for the individual suffering from bipolar problems and their families.

Ever any suggestion that oatmeal--and I am not being flip here; I am very serious--any suggestion that oatmeal and exercise itself would cause bipolar to go away?

Dr. Bellonci. I have never heard that. You know, it is a serious disorder. It needs to be taken seriously. There are treatment interventions that are successful, that are well-studied in double blind placebo control trials. I have never seen an oatmeal study to show any kind of an outcome.

There are some research studies looking at dietary interventions for ADHD. But, again, I don't believe that they have shown any significant positive outcome in double blind placebo control trials.

That is not to say on a case-by-case basis I haven't anecdotally heard stories of reducing sugar content or caffeine benefiting children, particularly adolescents, but nothing regarding your statement.

Chairman Miller. And, as I understand it, Mr. Kutz, this was held out as, in fact, a cure that would be offered, since this ``parent,'' this interviewer was told that this would make it go away.

Mr. Kutz. That was one of the marketing pitches you heard in the opening statement, yes.

Ms. Brown. An oatmeal diet?

Mr. Kutz. Whole-grain diet, but I guess----

Chairman Miller. Oh, excuse me, whole-grain. Let me correct the record: whole-grain diet.

Again, what bothers me is that, again, a fair amount of experience with a lot of these parents and families, you get to your wits' end with a very difficult child, and a difficult child that you have tried different alternatives to help, and with school districts and all of what it entails for some of the clientele of these facilities. And to then suggest things that just aren't based in fact, science or otherwise, that this will all, sort of, come true, I really believe it is just preying, and in a very unethical fashion, preying on the anxieties and the stress that exists in these families.

The repercussions, you know, of the families engaged in our first hearings and, I assume, many of the families that had their children either abused or died in this hearing, repercussions within those families are long-lasting and sometimes very devastating for the adults who later find out maybe that they had participated in this and how badly they feel about it, in some cases, or, as we discussed, in cases where they voluntary had their children kidnapped from their homes and then realized what had taken place when, certainly, later the child was tragically killed in those programs.

So the idea that this is a harmful intervention at many levels I think is very dangerous for us as policy-makers to consider. Again, you know, we don't want to paint with a very broad brush here, but the fact of the matter is, we are starting to see emerge here some programs that are very dangerous, that are very reckless, with respect to the health and welfare of the children that they have in their custody. And, you know, they have gotten that custody, I think, under very suspect representations and conditions to those families and to the parents.

Mr. Kutz, if I might--and I have a little bit of time left--these financial connections--you know, we went through a long scandal here on colleges referring people to certain student loan lenders and you might not have gotten the best interest rate. But here you have a referral service that may be financially connected, I assume through either fees or commissions for the referral of these patients. And so, again, you have no sense that you are getting informed, independent, ethical representations from the phone calls you made.

Can you tell us about this or what you know about the financial arrangements that may create a conflict of interest?

Mr. Kutz. I would say one case was worse than that. You had a husband-wife team claiming to be independent. One was the referral service; one was the actual program. We called the referral service three separate times, as three separate parents with three different, very different, kids, and each time we were referred to the same program. And it is because it was a husband-wife connection.

Chairman Miller. But they hold themselves out as being independent referrals?

Mr. Kutz. Well, they didn't disclose that to us, as the parents. So I don't know if they hold themselves out as that, but there was no evidence anywhere on their Web or anything they told us that, ``Yes, we are related to this program, and no matter what your problem is, we are going to put you to the same program,'' which appeared to be the reality of the situation.

And there were other issues where I think the referral services are certainly getting money, in many cases, from the programs for the referrals. And those are undisclosed types of situations, typically.