Chairman Miller. Excuse me, I lost you. Do you know that as a fact, or----

Mr. Kutz. Yes, we have cases of that.

Chairman Miller. Oh, I see.

Mr. Kutz. Yes, absolutely. The one was the worst case, where you had the husband and wife. But you have other situations where you had undisclosed to the parents that the referral service was getting money for each referral they made to the program, or a vacation or--there were other things like that they were getting paid. So there was a financial relationship between them.

Chairman Miller. A lot of these programs appear to have a 28-day or 30-day--there was a time, and I don't know if it is relevant in this case, where that was related to insurance payment, that you got an insurance benefit that, sort of, had a 30-day cut-off on it for mental health or treatment.

Is that operative in this situation, with respect to placement of these young people?

Mr. Kutz. I don't know.

But with respect to health insurance, we were marketed by some of the programs, one in particular saying that you might be able to get money back from your health insurance. But what they told us was, ``Don't tell them in advance because,'' I think the word was, ``you will be up a creek.'' So they said, wait until the end. Well, you know most insurance programs require pre-approval for substantial disbursements.

And so you advise a parent not to talk to the health insurance company, get them to believe they are going to get money at the end of the day. I believe they would be up a creek, probably, because most health insurance companies--even for hospital stays, you have to get pre-approval for health insurance. So, for something like this that is even possibly not covered at all, to give parents that advice is very misleading.

Chairman Miller. Dr. Bellonci, do you know of that?

Dr. Bellonci. Yes, absolutely. I think the point is that most health insurances would do the due diligence and not fund programs that were unlicensed or unaccredited. So I don't think most health insurances would actually support these programs.

Health insurances also want to know that they are getting a return on their investment for treatment. And they would know that these are not programs practicing evidence-based practice or care, and, therefore, they would not allow payment to these programs.

And I think that your point is essential, about the desperation that these families are finding themselves in as they are searching for appropriate treatment and intervention. I think it is a very large issue. It has to do with access to appropriately licensed, regulated, accredited programs. It has to do with the shortage of child psychiatrists in this country. It has to do with the limitations on health care, particularly behavioral health. And it has to do with mental health stigma.

Chairman Miller. Thank you.

Mrs. McCarthy?

Mrs. McCarthy. Thank you again, Mr. Chairman.

I was just wondering, as I was listening to the testimony, where a lot of these particular facilities are. I was just wondering, Ms. Brown, when you were looking at all this if there was a correlation between where these facilities are and maybe that particular state being extremely weak in child protective cases, you know, those states that might be weak or didn't have the finances to be able to do what they need to do, just even through, say, foster care of anything that had to do with children.

Ms. Brown. We did see some correlation between a lack of

oversight in some states and types of facilities, Utah being one that had a very large number of--a disproportionally large number of boot camps. Now, they have since started to make some changes in their laws in oversight. And we don't know how that has affected the number of facilities there.

I think Mr. Kutz's team actually has a map that outlines where some of the different facilities and types are.

Mr. O'Connell. Mr. Chairman, if I could add--Andy O'Connell from GAO--we have found that most of these boot camps, wilderness programs, residential treatment centers exist in about 48 states today.

Chairman Miller. Yes. The map, I think, is page 22 or 23 in the GAO testimony, where they demonstrate where their case studies, where the student came--what state they came from to what state they went to the program.

Mrs. McCarthy. Okay. You know, the more I keep hearing this testimony--some of us are old enough, going back to the 1960s and the 1970s when, unfortunately, children that had some mental illnesses were in these particular facilities that were supposed to be hospitals or treatments for them until investigations like yours were done to expose that these children were living under conditions that were totally unacceptable to the majority of people of the world.

And I think that, you know, by having a hearing like this and trying to expose the issues that we are facing with, unfortunately, young people and parents who want to do the right thing for their children are led down this path, as Mr. Miller has said--you know, these parents want the best for their kids, and sometimes they do come to the end of the line.

But I think that I do believe the federal government has the right and certainly we should be able to work it out, whether it is, you know, putting standards to protect children. Your facility--we are not concerned about facilities that are treating our young people at an early age. But in this day and age, I mean, it breaks my heart to hear about these particular facilities. You would have would have grown or certainly gotten past on what we should be doing for our children and our young people.

So hopefully we will go forward. Hopefully a hearing like this will educate those parents that might be having a problem with their young person now to really go out and--that is why I just think collecting the data and having a place to go for parents to really check out what it is, maybe even working with every D.A. in this country, to set up something with them so that we can put that data in that also, and really start collecting the information for more information for those parents.

You know, today is the world of the Internet, today is the Web site. You know, put out the ones that are there, you know, that are the good ones, or even the bad ones, so parents can make an intelligent decision.

But I do believe the federal government has a role, because obviously the states haven't done their job. And I think that is what we are seeing here.

With that, I yield back.

Chairman Miller. Thank you.

Mr. Kildee?

Mr. Kildee. Mr. Chairman, under general leave, I will submit questions in writing.

Chairman Miller. Thank you.

Mr. Platts?

Mr. Platts. Thank you, Mr. Chairman.

Before questions, if I could move that we keep the record open for 14 days for additional testimony and for some of the documentation that we have requested?

Chairman Miller. That is fine, without objection.

Mr. Platts. Okay, thank you, Mr. Chairman.

Dr. Bellonci, to follow up on your testimony, you talk about the membership of the American Association of Children's Residential Centers and that any member of the association has to be licensed and you encourage additional accreditation as well.

Am I correct in understanding that, first, the license is by the individual state, wherever the facility is located?

Dr. Bellonci. Correct.

Mr. Platts. Are you aware, to be licensed, does it involve any--or does it mandate on-site visits of the facilities, to have those licenses?

And then, also, does it involve or require any follow-up interviews with individuals who have gone through the facilities after they have left them?

Dr. Bellonci. I think that is an excellent question.

I can't speak to every state, because what you are hearing is there is really a patchwork of state licensing and regulation.

Mr. Platts. Right.

Dr. Bellonci. I can speak to Massachusetts, where they do come on site. They are authorized to come unannounced.

There are actually multiple levels of oversight and regulation that my facility comes under. So Department of Education can come from the state. Child Welfare can come from the state because they have children placed in our program. Department of Mental Health can come from the state. Our licenser, which is EEC, can come.

And whenever there is an allegation of abuse or neglect against our facility, they do on-site visits. They would meet with the staff. They would talk about the incident. We would provide them the data.

We do our own internal investigation. We have a very low threshold. Even though we are serving children as young as 5, if a child makes an allegation against a staff person, we investigate that, and we do, at times, even report on ourselves.

And there is a whole division of Child Welfare/Child Protective Service that has institutional investigational capacity.

But I can't speak to whether or not----

Mr. Platts. The other states.

How about in Massachusetts, to your specific state, any follow-up with individuals after they have left your facility or other facilities, in other words, to get that feedback after they are no longer on site?

Dr. Bellonci. It is a real problem, the follow up after youth leave programs.

There have been times--and I have been at the agency 13 years now--that I have heard about youth making an allegation against a staff person after they have left. And that would be also investigated, within the capacity of gathering the data, finding the staff that are probably no longer even there, to try to track down what occurred.

Mr. Platts. But there is no--what I am really after was more like any random sampling, of just randomly picking--not because an allegation was made, but just a random, we would pick this patient or individual to follow up with, with the parents, with the individual.

Dr. Bellonci. Not that I am aware of. We do try to do our own outcome studies, and we have staff that call 6, 12--we are trying for even further--months out, just to see, are we doing what Congressman Scott asked, can we have data to show that our intervention is yielding results. And it is a real challenge,

but we are trying to do the best we can to gather data to show that it is a treatment worth the state's investment.

Mr. Platts. Great. Thank you.

I guess, to any of our witnesses, our focus has really been on the medical side or behavior modification, but an important part of any of these facilities, as the Committee on Education and Labor, is the education that is provided.

And through some of our testimony--Ms. Whitehead, I think in your testimony you talked about it really didn't exist, that you taught yourself algebra and that you really didn't have an education aspect, even though you were there for a long period of time.

What, to the best of your knowledge, each of you, education standards are adhered to or, you know, enforced, given that we have national standards, what we expect of our states to do for children? Whether it be in a public or private setting, we want, you know, a minimum level.

What kind of oversight occurs, to the best of your knowledge, regarding education standards?

Mr. Martin-Crawford. As far as education, that is the only thing that I can give The Family School credit for. We did actually have a decent education. Most of us--some of us have gone--a few people went to American University; I went to Vassar College. We had a bunch of decent graduates coming out of it.

Whether or not these teachers were certified or not to teach the classes is a different question. We did have some that were qualified enough that they could have been certified, but I don't believe they were.

At the same time, we also have no time to do anything but do homework. So, in that nature, our grades were obviously going to be improved. But, at the same time, it is the only thing that the school actually has credentials for. They do give out a New York state Regents Diploma that is actually an official New York state Regents Diploma, unlike a couple of other----

Mr. Platts. So you took the Regents Exam?

Mr. Martin-Crawford. I took the Regents Exams. I took A.P. college--not A.P., but college credits while I was a senior. You know, I was able to get into a relatively decent school.

That is not the case with all programs and definitely not the case with some of them; it is completely the opposite. But when it comes down to misleading aspects of it, that is the only thing that I could say that they probably told my parents the truth about.

Mr. Platts. And, Ms. Whitehead, yours was probably one of those opposite--or, from your testimony, not a very good standard?

Ms. Whitehead. Right. I mean, my facility was accredited. I don't know what kind of documentation they needed to prove that. But what I can tell you is that we had schooling maybe a couple hours a day. And then we had one certified teacher that taught everybody both history and science. And then there was an uncertified teacher, the headmaster's wife, that taught English, which was pretty minimal.

So, overall, maybe we had, I would say, 12 hours of schooling a week, maybe. And some of our field trips were considered schooling. You know, we would look at the trees and identify the leaves and things like that. But when I left the facility, I was far behind in everything. You know, I barely knew how to write a paper, and I was in 10th grade.

Mr. Platts. Okay.

Dr. Bellonci. If I may?

Mr. Platts. Yes.

Dr. Bellonci. Our students follow the same Mass Curriculum

Frameworks. We have data to show that they have educational attainment. We actually do quite well with a very disabled population, particularly in terms of learning disabilities. Most of our children are gaining a year for a year in reading. We are struggling more with math, as the nation is.

They have to take the MCAS, which is our state annual exams. So we have to meet all the same criteria. They are on individual educational plans, and we meet with the school district annually to update those.

Mr. Platts. Okay.

Mr. Kutz. I would add a couple things here for us.

We saw some examples of schools that said they were accredited, and they weren't. So that has been something out there.

And we had one kid, in our case study number five, who was there for 4 years and he got no education.

Mr. Platts. Ms. Brown, did you----

Ms. Brown. From the oversight perspective, I can tell you that in our survey of the states, when we asked about what aspects state agencies monitored, they presence of educational programming and also, in particular, the quality of educational programming were the least likely to be monitored.

Mr. Platts. Of, kind of, a cross-section.

Ms. Brown. Of other things, like physical plants, staff issues, use of seclusion and restraint.

Mr. Platts. Okay. Thank you.

Thank you, Mr. Chairman.

Chairman Miller. Thank you.

Mr. Kutz, on your case number five, on page 15, you write about in the report the interaction between the parents and the placement facility. And you talk about, when the victim's father, the victim of this abuse, refused to attend therapy meetings for the fear of losing his job, the program told him to quit. When he would not quit his job or miss work to attend the meetings, the victim said the program convinced his mother to leave her husband. After the parents separated, the program would not allow the victim to contact his father. The victim said the program never told the victim's family that all of the drug tests they performed--and we referred to this earlier-- were negative results, including the initial one.

I mean, I just don't understand this pattern of therapy, where this much trauma can be activated within the family. I don't quite get this. I have never heard of----

Mr. Kutz. It is an incredible story, actually. It was almost like a cult-like organization. And they brainwashed a lot of the parents, it appeared from what we saw, and they became part of the process.

And actually kids were going home at night sometimes to other people's parents' houses and staying, and there was abuse going on, in some cases, at other parents' houses.

So it was a very bizarre thing, Mr. Chairman. There is a movie about it. ``Over the G.W.'' it is called. I mean, it is just an incredible story.

And this was one of the ones that accepted Medicaid money. That is how they were primarily funded, millions and millions of dollars from Medicaid.

But the parents became, kind of, sucked into the program. And there were apparently split marriages and things involved, because one parent might get sucked in, the other one didn't, and that caused pretty significant issues.

Chairman Miller. Dr. Bellonci, you are----

Dr. Bellonci. You know, we have learned a lot about the treatment of mental health disorders for children and youth in this country. There are established, evidence-based protocols and practices, largely funded by the federal government. The

Substance Abuse and Mental Health Services Administration,
National Institutes of Mental Health have funded studies to
show what works and what does not.

    This is absurd that this is being done in the form of--or
in the claim of treatment. And to think that federal dollars
are being spent in this abuse is unconscionable to be and,
certainly, not anything that any child psychiatrist, any
medical professional, any mental health professional should be
condoning or participating in.

    You know, it is not like we don't know what works. And the
fact that we are not utilizing what is known is, I think, the
greatest sin.

    Chairman Miller. Thank you.

    Mr. Kutz, you have, several times in your testimony this
morning, used the word ``torture.'' And we have some discussion
about the use of restraints and--I am sorry----

    Ms. Brown. Seclusion and restraint?

    Chairman Miller. Seclusion and restraints. Could you
comment on this and why you used the word ``torture''?

    Mr. Kutz. Yes. I would say two things.

    Torture would be, for example, in case number one, where
the boy couldn't walk, was having trouble breathing, yet they
were forcing him to exercise. They were actually picking him up
and dropping him on the ground as a push-up. In other words, he
couldn't do a push-up, he was ready to die, and they were
picking him up and dropping him on the ground. And I understand
the last word he breathed was ``no.'' And so, that is an
incredible case.

    But you are talking about the human restraint here too, and
we saw human restraint in many forms. The ones that caused the
death were typically the face-down restraint. And, again, some
of those were done contrary even to the program's policies and
procedures, where there were either three people on top of a
child or one. And one of the boys, in fact, had asthma, and the
staff had not been told that, and they did a face-down
restraint, and he died.

    Some of the other restraints were, you know, it was called
three-point, four-point, five-point; three-point being three
people holding down limbs or the head. The five-point restraint
would have been one person on each arm, one person on each leg,
and one person holding the neck or the head still, many times
for hours.

    And so, I would say that that is pretty severe abuse,
bordering on torture. I mean, I am not sure what the
distinction is between abuse and torture, but certainly I think
that in some of the cases I would define it as torture, what we
saw.

    Chairman Miller. I just wanted to make sure you weren't
casually using the term. You are using it based upon the case
studies that you examined.

    Mr. Kutz. Not just the case studies. Other kids in these
programs had the same thing done to them.

    Chairman Miller. On page two of your long testimony, you
explained how you selected these cases. ``We limited our cases
to closed criminal cases and, thus, did not include ongoing
cases from the last several years.''

    Can you tell us how many ongoing cases there were?

    Mr. Kutz. There is a lot. And we actually had more cases we
looked at. We didn't include them in the testimony because they
had some sort of ongoing litigation, or there may have been
some other reason we excluded them.

    But, as I mentioned before, there are other big civil cases
with hundreds of plaintiffs involved that are out there right
now that have some of the similar types of things we have
talked about here, that your two former victims, I will call

them, sitting at the table here have described, the same types of things. So there are hundreds of cases out there of individuals involved with these.

Chairman Miller. That is abuse you are----

Mr. Kutz. Yes, those are abuse because the kids are still alive for that particular----

Chairman Miller. Or, I don't know if there were families, but what about in--were there other cases of death?

Mr. Kutz. Yes. Yes, there were others. Suicides and other types of cases of death, yes.

Chairman Miller. Can you supplement your testimony for the committee with those numbers?

Mr. Kutz. We can provide other information based on the other cases.

Chairman Miller. Do you know those numbers?

Mr. Kutz. We don't have any broad numbers, again, as Ms. Brown. I think just no one knows how many. But we can submit other information on what we know, yes.

Chairman Miller. So these cases were selected from a larger number----

Mr. Kutz. Absolutely.

Chairman Miller [continuing]. Of cases either of death and/ or abuse.

Mr. Kutz. Yes. And given another couple years, we could have used some of those other cases as they became closed, et cetera, yes.

Chairman Miller. Yes.

Ms. Brown, you know, very often this Congress has reacted very, very quickly to the question of background checks, certainly around the care of young children or the teaching of children, people working with children. We have criminal background checks. We are worried about sexual predators. We worry about all those kinds of things. In many cases, we have enacted statutes to require that of states or agencies or of programs.

How do these programs fall within those kinds of background checks?

In the first round of hearings, I think in a number of instances, we found very questionable characters working in these programs but no requirements for background checks. I don't know, again, what your survey told you about the background checks.

And Mr. Kutz has alluded to, in a number of cases, where students were sexually preyed upon by some elements of these programs. What can you tell us about that?

Ms. Brown. Well, according to what was reported to us, state agencies are saying that they do require background checks when they are funding facilities. Now----

Chairman Miller. If the facility is required to be licensed by the agency.

Ms. Brown. Correct.

Chairman Miller. But if their facility is not required, as a number of these apparently were not, that would not apply.

Ms. Brown. Correct.

Chairman Miller. There is no generic state law with respect to that for a business?

Ms. Brown. There may be some generic state laws. I don't know if we know the full answer to that.

But certainly there are facilities that are exclusively private that are not under the purview of state agencies that would not be monitored for their background checks. Even if they were required to conduct them, there was no oversight, no one would know whether they had actually conducted them and what the outcomes were.

Chairman Miller. Mr. Kutz, in any of your interviews the

GAO did of prospective programs, was there any discussion about
background checks, about staffing?

Mr. Kutz. Yes. And sometimes they had been done; sometimes
they hadn't.

But remember what we talked about here earlier. A lot of
these people were never convicted of anything. So even if you
did a fingerprint background check on a lot of these people,
they might come up clean, but they could have been involved
with the cases of torture and abuse we have been talking about
here.

But I still would support a fingerprint background check as
being one of the potential standards here.

Chairman Miller. Mr. Platts, do you have any further
questions?

Mr. Platts. Thank you, Mr. Chairman.

No other questions. Just, again, my thanks to each of you
for your testimony.

And, Mr. Chairman, also to echo your sentiments on the
abuse that occurs to the youth, the children in these programs,
and also the psychological, probably, ramifications to the
parents who are probably in desperate situations, seeking what
they think is help and trusting others to be giving assistance
when, instead, they are not, and the long-term consequences
within the family dynamics of the abuse that occurs in these
facilities.

I think that is an important aspect of the oversight you
are leading and the efforts to reform it. So, again, my thanks
for your leadership on the issue.

Chairman Miller. Thank you. I want to thank you and Mrs.
McCarthy for all your cooperation and your input in this
matter. And I look forward to continuing to work with the whole
committee on this.

And I certainly want to thank GAO for all your work. I can
tell you how much we appreciate it. I think you have given us a
much better idea of the scope of the problem that we are
confronting, some of the difficulties that we are going to have
in trying to deal with it, given the patchwork of regulations
and the creativity of some of these organizations.

Tragically, you have also given us a pretty good idea of
how dangerous and reckless some of these programs are, with
respect to the students that have been assigned to their care
by their parents.

And maybe even more astonishing is almost the predatory
nature of some of these programs, in preying on both the
students when in their care and preying on these families prior
to their surrendering their children to the care of these
programs.

Again, this is not an indictment of this entire industry.
But clearly these reckless and dangerous programs should not be
able to hide behind those who are doing the responsible thing
with respect to the care of these children, in many instances,
who are, in fact, very, very difficult problems and, as Dr.
Bellonci pointed out, cannot be cared for in their own homes.
They require some other kind of treatment outside of their
homes.

Ms. Whitehead and Mr. Martin-Crawford, thank you very much
for publicly coming forward and talking about your experiences.
And, obviously, I think every member of this committee wishes
you the best in your continued endeavors. I am quite amazed,
given your stories, to see where you are today, and you should
be very proud of that.

And, Dr. Bellonci, thank you for giving us a compass here
of where we should be thinking about and some standards of what
we should be thinking about, with respect to the program you
are involved in but also the state's regulation of that kind of

program.
    So thank you all. I am sure we will be back in touch with
you in rather short order, because I think the hearing has
raised some issues that we want to continue to clarify from
both sides of the aisle. But thank you for your cooperation.
    And, with that, the committee will stand adjourned. Thank
you.
    [The statement of Mr. Altmire follows:]

Prepared Statement of Hon. Jason Altmire, a Representative in Congress
                From the State of Pennsylvania

    Thank you, Chairman Miller, for holding this hearing about child
abuse and deceptive marketing by some residential programs for teens.
This is our committee's second hearing about residential treatment
programs for teenagers and I commend you for your dedication to
protecting teenagers and for your diligence in investigating these
programs.
    Last October, this committee met to discuss cases of child abuse
and neglect in residential treatment facilities. Since then, the
Government Accountability Office (GAO) has continued to investigate
instances of child abuse and deceptive marketing by some of these
programs. Today, I am interested to hear about the results of the most
recent GAO study and to learn about what role Congress may be able to
play tin ensuring the safety of children at these facilities.
    Thank you again, Mr. Chairman, for holding this hearing. I look
forward to continuing to work with you on this important issue.

                    ————

    [Additional submissions of Mr. Miller follow:]
    [Compilation of testimony from Community Alliance for the
Ethical Treatment of Youth, Internet address follows:]

    http://cafety.youthrights.org/wiki/index.php?title=Submit--Your--
                        Testimony

                    ————


                    ------


        Abuse at a Troubled Teen ``Faith-Based'' Program Using Physical
                Restraint by a ``Chemical Straight Jacket''

    This is a case of physical abuse, of chemical restraint by illegal
medicating of our daughter and other children using illegally obtained
prescription medications without the child's or parents' knowledge, and
what appears to be a local government cover up or simply repeated lack
of actions by Public Servants that followed.
    This is our family's statement concerning our run-in with an
unregulated ``religious'' teen program known as Mountain Park Baptist
Church and Boarding Academy in Patterson Missouri. This program was
owned by Bobby R. and Betty Sue Wills and operated by Samuel L. and
Deborah Gerhardt.
    On or around January 15, 2003 my wife Katrina mentioned that she
had called around to some of the local Baptist churches in our hometown
of Lewisville, Texas. Katrina was looking for a boarding school for our
daughter Erika. Katrina felt that Erika was falling away from God with
some of the behaviors of adolescence that were starting to show needed
a change in direction before the behaviors escalated. Erika was not a
bad kid, or a troubled teen. She was starting to show how head strong

she could be at times.

My wife Katrina in her teen years had, herself, been enrolled in a boarding school in 1983 to 1984 in Mississippi called Bethesda Home for Girls. Katrina, from what she remembered, had a pleasant experience and felt Erika could gain from her own experience at a bible-based boarding academy.

The first time my wife Katrina mentioned sending Erika away to a boarding school I had the usual fears that any parent would have. I wanted to make sure our daughter would be taken care of properly and could grow both mentally and spiritually.

Katrina said that a church staff office worker at Temple Baptist Church in Lewisville, Texas had a name and number to a Baptist boarding school in Missouri. Katrina had called and talked to Brother Sam Gerhardt and realized during the phone conversation that Sam Gerhardt also had run Redemption Ranch for Boys in Mississippi. Katrina had remembered that it was the boy's academy owned and operated by Bobby R. Wills and Betty Sue Wills, and who also ran the Bethesda Home for girls.

Katrina was excited to say the least she reflected on many of the good times she had while she attended Bethesda. She spoke highly of ``Papa and Mama Wills'' (Bob and Betty Wills). Katrina told me of the bus tours they would take going around to different churches and singing for the church's congregations. With Katrina's memories of the good times she had while attending Bethesda, along with her fond memories of the Wills, and with the recommendation of a local church, I felt that I would need to take a leap of faith and go along with Katrina's decision to send Erika to a boarding school.

January 18, 2003 we enrolled our daughter Erika in Mountain Park Baptist Boarding Academy in rural Patterson, Missouri.

I understood from what was represented to us that Mountain Park was firm in discipline, and would be a good Christian environment that Erika would be involved in. When we were driving back to Texas from dropping off Erika we felt confident that, although Mountain Park Baptist Boarding Academy would be tough at first for Erika, it would ultimately be a good experience for her.

Looking back this first impression was the furthest from the truth and only the beginning of a bad nightmare.

For the first few weeks everything seemed like it was going well. Then Katrina came home from her Wednesday night church program at Northview Baptist Church in Lewisville, Texas with a folder from a church member by the name of Elaine Dawson. Elaine had asked previously which Boarding Academy Erika had been sent to. Katrina told her. Elaine went on the Internet and found several websites and articles concerning Mountain Park and the owners. Elaine gave Katrina the folder and told her to view it with an open mind. Katrina gave me the folder and asked if what was in it could be true. I read through the articles from the websites www.mountainparksurviors.com, www.mountainparkhorrors.com, and copies of lawsuits and bankruptcy concerning the Wills and Gerhardts. I was shocked at what I saw.

If even an ounce of what was contained in the folder was true, I knew I did not care to be associated, nor have my family members associated with the Wills and Gerhardt clan.

The next day I called to have our DSL Internet connection hooked back up so I could do my own research. One of the forum posts concerned a mother who tried to remove her daughter from Mountain Park Academy and was arrested for kidnapping.

I told Katrina that when she spoke to Erika or the staff at Mountain Park Academy not to let on that we felt something was not right. My greatest fear at that time was for Erika's safety and to see what had to be done to remove her as soon as we could.

Mountain Park required a Power of Attorney, and since access to our daughter was limited and from what I understood at that time concerning papers we signed, we could not just drive up and demand custody of our daughter. I now know different. Their power of attorney was not limited as it stated or even legal, although Mountain Park Academy

Administrator/Principal Samuel L. Gerhardt presented that it was. The
contract papers are illegal, according to Missouri Laws concerning
``take it or leave contracts.'' Mountain Park Boarding Academy clearly
had the upper hand as far as the contract agreement was concerned.

As soon as the DSL was re-connected I started researching for
myself. I have researched the stories of abuse, neglect, reaching back
in to the early 1970's and also found that they had connection to
Lester Roloff and his brand of discipline that gave me alittle more
insight into how they operated.

I decided then that we had to get Erika out of there as quickly and
as safely as we could. I was torn because I wanted to confront Samuel
and Deborah Gerhardt for the lies that we had been told, but I was
concerned that if they were confronted over the phone something bad may
happen to Erika. It was a tough decision, but we decided not to tip
them off that we knew things weren't as they the Gerhardt's represented
them to be. As parents we had to play along with Mountain Park's stupid
manipulation game with their requests to help ``re-establish our
authority as Erika's Parents.''

The whole time they were trying to make it seem as if they were
helping to re-establish our relationship with our daughter they were
actually working to destroy the relationship.

I knew in order to get Erika out safely it was a possibility that
we would have to wait until our first ``four month family visit''
unless an opportunity arose before that.

I knew that according to a copy of the Power of Attorney that had
been posted on Mountain Park Survivor's website and comments that were
with it, we needed to draw up a Revocation of Power of Attorney to
remove any supposed parental right Mountain Park thought they had. I
contacted a few attorneys and others for suggestions. I found out what
the form needed to say and to whom to submit, etc. I found a generic
version on the Internet and modified it. We would also have to have it
signed, before a notary, and make sure it was also filed as certified
in Wayne County, Missouri, where Mountain Park was located, before
going for our visit.

Meanwhile, on or around the first part of April 2003 Erika had
mentioned that her tooth was cracked and she needed to see a dentist.
We told her that she needed to tell the staff at medicine call so they
could make arrangements for an appointment. It took close to two
months, and only after Katrina made several calls to Debbie Gerhardt,
for Mountain Park Academy to finally get Erika to their dentist. First
they would use the excuse that Erika couldn't go to the dentist until
her four-month family visit. Then the next excuse was that the dentist
could not see her for a few weeks. Normally for emergency dental work
it should be a few days at most, not a few weeks. That was pure neglect
on Mountain Park's side. For them to allow a child that was suffering
with a cracked tooth to continue to suffer until it was finally made an
issue with the repeated requests by the parents. I guess Mountain Park
realized that we as parents still had some authority. Or they noticed
that we as parents would not allow our child to suffer as they would.

Erika's tooth was repaired by sub-standard dental work to say the
least. We had to take her to another dentist once she was set free from
their Gulag to have a dentist repair the sub-standard work Mountain
Park's dentist had done. We paid $144.00 for Mountain Park dentist,
(because in Mountain Park's and their dentist words Erika had a huge
cavity) and then another $351.00 to have the cracked tooth and crappy
dental work corrected after she was out.

While it took well over a month for Mountain Park get around to
taking our daughter to a dentist of their choosing after our repeated
requests, it took less than a week for them to send a notice that ``we
as the parent of Erika needed to replenish her medical account.'' In my
opinion Mountain Park's greed played a part since the coffer was not
full to the rim.

My wife Katrina had started requesting ``our first family visit''
around mid to late April. First Sam Gerhardt told her that request
couldn't be made over the phone it had to be in writing. So Katrina

hand wrote a request and sent it. Next the request came back, with a
note saying that request had to be made on the request form that was
contained in the PARENT/student handbook. So Katrina filled out the
correct form and sent it. The next week we received it back with
another note stating that the dates Katrina had chosen WOULD NOT work
because that was the week of graduation.

So Katrina, being a little peeved by this time, called up Mountain
Park and asked Mrs. Harper (Mountain Park's Secretary) to please get a
message to Sam Gerhardt that we will be there to see Erika on May 16,
2003 for our family visit.

Time was growing very near and although we didn't realize, at that
time, the real reason that Mountain Park was trying to stall us on our
visit. I now feel we caught them off guard alittle when we arranged our
visit a week before graduation instead of two weeks after graduation.
(explained later)

On May 15, 2003 we left Texas for the long 10-hour drive to
Missouri for Our First Family visit. On Saturday May 16, 2003 instead
of going directly to Mountain Park Academy, we made a detour to the
County Court House to file the revocation of Power of Attorney papers
with the county clerk.

Shortly after filing the papers we proceeded to the sheriff's
office. There we asked to see Sgt. Handy. Another Deputy was on duty
(Deputy Fox) and said that Sgt. Handy was off that day. We spoke with
him and told him that we were going to Mountain Park to retrieve our
daughter. I asked him if he was familiar with the Boarding School and
he said ``Oh yes, we here of all kinds of things going on out there.''

Deputy Fox asked if we needed an officer to go with us. At first we
said yes but when he said that we needed to wait a little while until
he called someone. I decided that I wasn't going to take a chance of
wasting time, since I didn't know just how well he knew them and what
if any his connection was. I knew through researching Mountain Park
Academy they had a maintenance guy with the last name of Fox and I was
not going to wait to find out if they were related. I told him that we
go alone and if we needed them we would call.

We drove straight to the Mountain Park Compound we arrived shortly
after 9:00 am. Of course the front door to the office was locked. (They
would not want any of their golden geese escaping.)

My wife called from their front porch phone so we could gain access
to the office. There we met Debbie Gerhardt. She asked who we were and
allowed us in to the office.

Katrina was allowed to go back into the dorm to get Erika. From
what Katrina has told me, she grabbed Erika's bag and started filling
it as fast as she could. Katrina said that the student guide that
escorted her back to the dorm had an odd look on her face like she knew
something was awry.

While Katrina was getting Erika, I stayed in the front office
making small talk with Debbie. She asked me where we would be staying
for our visit and what sights did we plan on seeing while we were on
our ``family'' visit.

That was the longest ten minutes of my life, standing there
listening to someone that I knew was an out-and-out liar and a fraud.
And worst of all using religion as a tool to take advantage of people
and their family in need.

As soon as Erika had entered the office I started making a beeline
for the front door. Debbie wanted to continue the small talk but at
that point I really had one thing on my mind and that was to get Erika
out of there.

We exited the office and headed straight for our vehicle. On the
road out of the Mountain Park Compound I turned to Erika and told her
that I hoped that she got everything she wanted (as far as clothes and
personal items) because if she didn't she would not be seeing them
again. She had the most puzzled look on her face. And said ``Sir?''
Katrina repeated what I had said. I told Erika then that she was out
and was not coming back so what ever she left she will not see again.

I wasted no time getting out of Missouri; we drove as fast and as

hard as we could to get back to Texas and away from Mountain Park's
Culpable Regime.

   On the drive home Erika had complained that her right arm hurt and
that she had three spots that looked like burns. Katrina asked Erika to
pull up her shirtsleeve to see the spots. I didn't see them real clear
until we got home. One spot was on the inside near her wrist, one spot
was inside of her arm near her elbow, and the other spot was located on
the inside of her upper arm.

   As soon as we arrived home I emailed Attorney Oscar Stilley, whom
we had previously been in contact, to let him know that we filed the
revocation of power of attorney and that we arrived home with Erika
safely. I mentioned to him in the email that Erika had three spots on
her arm that appeared to be possibly burns and she didn't know how she
got them. I also asked him what, if any, repercussions should I expect
from Mountain Park as far as Mountain Park expecting full payment of
tuition.

   We spent the rest of the weekend enjoying the time with our family.
On Sunday night around 5:00 PM CST, I stayed close to the phone
expecting Mountain Park to be calling wanting to know if we were lost
and why Erika was not back at the Academy.

   That call never came. I guess once again that Mountain Park has
shown that they were not concerned about our daughter, or our family.
They never even bothered to call to check up with us on her status.

   Of course, it might also be possibly someone in Wayne County
informed Mountain Park administrators that we had filed the Revocation
of Power of Attorney.

   On Monday morning Katrina faxed a copy of the filed revocation
Power of attorney, just so if Mountain Park didn't already know they
would then be notified that we did not plan on bringing Erika back to
them.

   On Tuesday around 11:40pm CST, I receive an email from Oscar
Stilley (a reply to the one I sent him on Saturday night) Oscar dropped
a bombshell in that email. One I never in my wildest dreams thought
would happen. In that email he mentioned that he and others suspected
that Mountain Park Administrators/Owners/Staff may have been illegally
medicating the children in their custody. Without a Doctor's
prescription, without the knowledge of the children, and without the
knowledge of the parents. He didn't know exactly what drug was used but
asked if I would be willing to have Erika tested for a class of
medications. He thought it was rather strange that Erika had burns on
her arm but she didn't know how she got them. I printed a copy of
Oscar's email with the list of drugs to test for and the following
morning (Wednesday) I took Erika to our family doctor to have drug
tests done.

   We spent another week in turmoil not knowing what the results would
show. We would let all the abuse (burns on her right arm), and the
neglect (dentist incident) pass as something to learn from and to never
again take a leap of faith no matter how innocent and well-meaning
people seem to be on the surface.

   But then the three-page tests results came back. The first page
(urine test): ``none detected.'' I thought well good may be Mountain
Park was abusive but not cruel and inhumane as other people on the
Internet had portrait them to be. Then the following day I got a call
from the nurse at the doctor's office. ``Mr. Hoover it would appear
that the results I gave you yesterday were not complete there are two
more pages that came in today and it shows that Erika tested positive
for chlorpromazine in the serum (blood) test, which goes by the brand
name Thorazine and traces of Mellaril.'' The test results on the third
page clearly show that Erika was drugged with Thorazine at a level of
198ng/ml.

   Horrified * * * ! Damn right. How dare they. * * * Mountain Park
Boarding Academy states that they don't believe in Behavior
Modification drugs. The BASTARDS were going against their own policies
and violating the law by secretly medicating the children in their
care.

1/24/2020

Case 1:18-cv-10836-PGG   Document 143-1   Filed 02/03/20   Page 14 of 52
CHILD ABUSE AND DECEPTIVE MARKETING BY RESIDENTIAL PROGRAMS FOR TEENS

Looking back this would explain the complete change in Erika's headstrong attitude. When we picked her up from Mountain Park Academy she was overly submissive.

It was not God, it was not Mountain Park's Miracle ``Religious'' Message and Discipline practices. It the simple fact that they were chemically restraining children that refused to conform.

For the record, I do not know how many other children over the 30 years that Wills and the Gerhardts claim to of been helping troubled teens were or may have been restrained chemically, but there are other children with positive serum tests and positive hair tests. Our daughter was not the only child to fall victim to these predators; we are not the only family that knows this to be true.

Also for the record, based on my daughter's positive test results, I contacted the Wayne County Sheriff's Department about abuse of my child. I also called the Missouri child abuse hotline and complained. As a result, the Sheriff's Department and a unit of the State Highway Patrol went to Mountain Park, took urine samples from kids and drinks, and collected pills, and apparently hair samples to test for illegal drugs. But either the lab never received the samples, the samples were never tested, or the test results were lost or destroyed, because according to a state investigative letter sent to me almost 2 years later, they could not substantiate my claims because the Department could not get the Sheriff's Office or the Highway Patrol to give them results.

On the surface it would appear to the general public that Mountain Park Baptist Boarding Academy is using religion to help bring change in the lives of children in their care. In reality it is not religion that this Clan (Bobby Ray and Betty Sue Wills and Samuel L. and Deborah Gerhardt, who are related by marriage, and any of the other family members of their staff) at Mountain Park Baptist Boarding Academy & Palm Lane Baptist Boarding academy were using to ``help troubled teens.'' Religion is simply the cloak that is hiding their abusive practices.

These Faith-based programs need regulated as well as the other teen programs. If researched, you will find that many of the ``faith-based'' programs have a network behind the scenes.

Some of the very referral services and non-profit corporations have the very people that run these programs sitting on the board of the non-profit corporations. The fox minding the hen house, so to speak. These non-profit corporations are believed also to be using the ``Associations of Christian Child Caring Agencies'' that have been set up in several states: Texas, Florida, Missouri, and many other states. These agencies use referral services to transfer children from state to state. In some cases, even to out of the country and/or off-shore programs. The Founder of FACCCA is Bobby R. Wills. Michael Palmer was also on the board of FACCCA, as well as the corporate board of Palm Lane Baptist Boarding Academy in Florida, which the Wills also owned. Michael Palmer, who owned Genesis Ministries, as known as Victory Christian Academy, is believed to have transferred students out of the country to Palmer's Genesis-by-the-Sea Academy in Mexico, which was raided several years ago for abusive practices.

When Mountain Park Baptist Boarding Academy in Missouri and Palm Lane Baptist Boarding Academy in Florida finally shut their doors, Mountain Park Boarding Academy's Principal Sam Gerhardt was quoted as saying, ``We've been in some battles for the last couple of years. It is just time for us to do something different.''

My belief is that although we were unable to get these criminals charged, as they should have been, we got to close to what was actually happening. They were caught with their hand in the cookie jar. Instead of them standing on their religious soapbox much like they had done so many times in the past they instead closed the academies and fled to another state: first to Newport and now Knoxville area of Tennessee.

Mountain Park Academy's Owners/Administrators/staff were likely illegally obtaining prescription medications to control, dominate, and warehouse the children under their care so they could fleece the

parents of the tuition monies. And they were making quite a profit for
their ``church''--only a rough estimate of well over $4 million a year.
Of course the IRS may need to check to verify the actual amounts they
claimed.

To further add insult to the injury it would appear that they are
using the profits of tuition money, along with donated mission funds to
defend them in court and provide them with a nice retirement nest egg
and to buy political favors along the way.

I have screamed loud and I have screamed long and still in today's
America I cannot get the civil servants of Missouri to do their jobs. I
called and wrote all levels of local, state, and federal agencies,
including the governor's office and the FBI. Sure Missouri Family
Services investigated but never followed through. Instead they sent a
letter dated April 18, 2005, stating, in part, the following:
Incident Number 03209148 and 03217038

``This case was pending until the results came back from the MSHP
Division of Drugs and Crime Control. As of April 18, 2005, there are no
results of these tests. The Wayne County Sheriff's office reportedly
forwarded the evidence to MSHP Division of Drugs and Crime Control for
testing, however, there is no report in the Wayne County Sheriff's
Office in reference to this. Numerous attempts were made to obtain this
information from Wayne County Sheriff's office and the MSHP Division of
Drugs and Crime Control.''

--Rick Engelhardt (by Dea Nobis, OHI Field Supervisor).

My question is this: Why and how could a case be closed as
unsubstantiated when the results have not been received?

The federal court in the Eastern district of Missouri is clearly
not impartial. Justice in America is not blind, in my personal opinion,
it is being bought. If a person was to review the case Woods v. Wills a
person would clearly have to reason that the premature summary
judgments, along with rulings by the Judge were not impartial they were
biased to the defendants. The issue of was Mountain Park using drugs on
the children in their care never even was allowed in to the trial. The
parents' portion of the complaint concerning fraud by Mountain Park
Academy was also not allowed in. How is this happening?

Please keep in mind that when we realized what Mountain Park
Boarding Academy Owners and Administrators were using illegally
obtained prescription medicine, and illegally medicating children in
their care, we did everything in our power to get criminal
investigation and charges to be brought against them before any civil
actions were taken. The civil court actions were only brought against
them after no criminal actions were taken. We have cooperated fully
with the Government Agencies that are supposed to stop this type of
Illegal activity. We will continue to cooperate fully if and when any
criminal actions are finally brought against these religious frauds.

Too many people in power positions mysteriously are turning a blind
eye to what is happening.

Finally, the Federal Government is looking into the physical abuses
and the deceptive practices used by Owners and Administrators of
programs in the troubled teen industry.

Although the Hearing held on April 24, 2008 covered and made public
the physical abuses, deaths, it covered a few of the deceptive
practices in only a few programs. I heard mention of physical
restraints used against several of the children in these programs, but
what was not mentioned was use in these programs of chemical
restraints.

From the research, I have done it clearly shows the effects of
chlorpromazine is a chemical restraint also known as the ``Chemical
Straight Jacket.'' In Mountain Park Academy's use of this chemical
straight jacket it achieved for them what physical abuse could not.
With chemical restraints there are no outward signs of abuse, but it is
no less dangerous. There are many side effects from the use of
chlorpromazine some that will not appear until years down the road. I
hope that Erika will be fortunate and any adverse effects will not

affect her in the future.

In closing I would like to thank the Committee for allowing our statement to be included into the records.

I hope that the committee, lawmakers, and the general public will see that this issue is not an isolated incident. In researching Mountain Park Boarding Academy, the only regulation through the state of Missouri was an annual fire inspection. What a joke. I hope that regulating the programs will promote the safety and well being of our children and to stop the abuse and torture that has existed for many years. It is well past time to regulate these programs.

It has been shown that these programs are either unable or unwilling to self regulate for the safety of children these programs have placed profits above the well being and safety of children.

Thank you,

Doug Hoover.

------

Letters Received Concerning Residential Programs for Teens

Beth Goldberg,
Gloucester, MA, May 7, 2008.

To Whom It May Concern: My son attended the Family Foundation School from January 2003 until December 2004.

After many interventions, which included school counselors, doctors, therapists, drug counseling and two psychiatric hospitals he was sent to Family Foundation School

Prior to his being accepted as a student, I was required to visit the school, speak with admissions directors, get a tour of the campus, and participate in a family lunch. At that time, I determined that this was the place that my son needed to be to address his addiction issues.

My son was heavily involved in drugs and alcohol, was abusive both physically and verbally, stole, lied, cheated and was sexually promiscuous. He punched holes in walls, broke doors, snuck out at night, refused to go to school, and was completely out of control. He had no respect for himself or anyone else. No matter what interventions were put in place here at home, it became painfully clear that they were not working, and that he was in need of long term rehabilitation. I felt completely hopeless, and without any viable options to help my son.

I heard about the Family Foundation School from a parent whose son had attended the school, and was then attending Northeastern University after completing the Family School program. A year later my son was enrolled at the school. He was sixteen years old.

Today, my son is a senior at Binghamton University and is slated to graduate in a matter of weeks. He has been sober for five years. The tools he received at the Family Foundation School were far beyond anything I could have imagined.

Not only did he learn the tools to become a responsible, caring and sober adult, but he experienced many educational opportunities which included taking college credit courses while at the school, participating in national debate competition in Salt Lake City, Utah, and found his voice in Family Foundation School's award winning chorus and theatre productions. He was a contributing editor of ``The Family Times'' newspaper and surrounded by caring adults who encouraged him to be the very best he could be. My son also learned the value of giving back, and has returned to the school to work part time while attending college.

There are no words to express my gratitude to the Family Foundation School. I believe that my son is alive today because of his attendance there. He went to the school as a defiant, irresponsible, drug and alcohol addicted teen and left the school as a caring member of this world with a sense of how to use the tools he was given to maintain a sober and healthy life. He has a strong sense of community and of the importance of helping others. There is no doubt he gained these

important convictions as a result of his stay at the school.

The Family Foundation School also works very closely with parents to help them understand addictions and encourages participation in 12 step programs, as well as offers family meetings to address specific issues. Parents are given many insights and opportunities to gain tools to move into the future as a healthier parent. The healing that occurred as a result of my son's attendance at the Family Foundation School has been felt though out our family system. I have an honest, loving and open relationship with my son today and he has healed relationships with his brother and father as well. I will forever be grateful to the caring and talented staff at the school.

If you have any questions, please feel free to contact me at the address and phone number above.

> Sincerely,
>
> Beth Goldberg.

---------

January 14, 2008.
Re: Education and Labor Full Committee Hearing ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities'' (10/10/07)

Dear Representative: As leaders in the private outdoor behavioral healthcare industry, we were instrumental in obtaining regulations in our state and would like to offer our expertise and experience to you as you consider drafting legislation for programs such as our own. Unfortunately, we recently received negative attention at the Education and Labor Full Committee Hearing ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities.'' We hope that you will take the time to look beyond what was conveyed, listen to the other side of the story, and to consider our recommendations for regulation.

Twenty years ago, Catherine Freer Wilderness Therapy Programs was founded on the belief that combining therapy and outdoor experiences would offer troubled teens and their families a valuable treatment option. Since 1988, our program has helped thousands of adolescents address the issues that are causing them to struggle. These youth, as many will attest, would most likely still be abusing drugs and alcohol, alienated from their families, in jail, or worse if their parents hadn't intervened and sent them to our therapeutic wilderness program. (Enclosed please find letters from clients and their parents discussing their experiences at our program.) We currently hold multiple licensures in the State of Oregon and are accredited by the Joint Commission on Accreditation of Health Care Organizations (JCAHO).

Catherine Freer Wilderness Therapy Programs serves 300 adolescents per year and helps middle class youth whose parents have run out of options for saving them from self-destruction. These are kids that haven't found success in outpatient treatment, have not yet become enmeshed in the criminal justice system, and who don't qualify for federally or state funded programs. These working families often fall through the cracks and can do little to help their children with emotional and behavioral issues. We strongly believe that these families deserve to have options for their children. With our licensing and accreditation, 70 percent of our families are able to receive some third party (insurance) reimbursement for their treatment, which is a critical factor for most of our clients. Taxpayer dollars are not used to run our program.

Our program was mentioned in the Government Accountability Office's testimony due to the tragic loss of life of one of our participants (Refer to GAO-08-146T--Case 8). Even with licensing, accreditation and regulation, incidents can happen as our program has learned to our great sorrow. With all of the information before them, the investigating authorities came to the conclusion that this young woman's demise was not the result of abuse and neglect. (Her dehydration was later found to be caused by the use of a prescription drug for which no FDA warnings existed at the time of her treatment with us.) It is unfortunate that not all the details were brought forth

in the GAO's testimony regarding this incident. We also suffered the unrelated loss of a participant that died from a falling tree limb and a client who died of natural causes while sleeping. In all of these cases, we reached out to the authorities, asking for them to thoroughly examine and review these incidents. And, in each case, neither abuse nor neglect was found.

We firmly believe that well-crafted and thoughtful regulation can raise the bar for outdoor therapy programs and other privately funded therapeutic programs. These programs offer effective approaches to treatment for families. At Catherine Freer, we have invested heavily in outcome research to verify that our treatment is helping families. Following is some of the data gleaned from multiple studies:

Long-Term Outcome Research Program

A study by the Outdoor Behavioral Healthcare Industry Council (OBHIC) and the University of Idaho Wilderness Research Center of 850 parents and adolescent participants indicates that clients entered wilderness programs with about the same level of dysfunction as adolescent patients entering psychiatric hospitals. At graduation their average scores were slightly above the normal adolescent range. Another phase of this study suggests that a large majority are doing well 24-months after treatment. More than 80 percent of parents and over 90 percent of graduates contacted believed that their wilderness treatment experience was effective two years after the process. (Enclosed please find detailed information on the research and a summary of other research from 1999-2006.)

Catherine Freer Customer Satisfaction/Outcome Study

This study found that 90 percent of parents said they would recommend the Catherine Freer program to others. The average satisfaction score for their children being treated with dignity and respect was 2.84 on a three-point scale. On a four-point scale (one indicating an ``extremely serious problem'' and four indicating ``not a problem''), parents rated their children on 13 behavior items with an average pre-program score of 1.81, a one-month post-program score of 3.38, and a one-year post-program score of 3.45.

As this research clearly indicates, outdoor therapy is a proven solution for troubled youth. Our industry is helping serve families in need and deserves attention and regulation, not censure. Presently there are 102 outdoor behavioral healthcare programs. Ninety percent of these programs are licensed by state agencies, and more than 60 percent are nationally accredited by the Joint Commission or the Council on Accreditation (Russell, K. C. [2007], Adolescent Substance Use Treatment: Service Delivery, Research on Effectiveness, and Emerging Treatment Alternatives. Director, Outdoor Behavioral Research Cooperative, College of Education and Human Development, University of Minnesota.) We believe that the risks to adolescents participating in a licensed and accredited private therapeutic wilderness program are not significantly different from the risks to adolescents in the general population. Unfortunately, there are some programs that are not licensed and have created both service quality and risk problems for some families and their children.

Understanding the importance of regulation, we strongly advocated that Oregon develop regulatory rules for outdoor therapy programs operating within the state. We had the honor of consulting on legislation and participated actively in helping craft the regulations. Oregon created a good process, with clear assignment to Child Welfare for both writing and enforcing the regulations, while including both program stakeholders and outside parties as consulting participants. We believe the result could serve as a national model for regulation of outdoor therapeutic youth programs.

From our experience, some of the issues that should be addressed through regulation include management issues, following the JCAHO model: how policies are created, monitored and enforced; outside oversight on those processes; and how incident reports are analyzed and then utilized to alter policies and to provide staff training. In addition, intake procedures, medication management, and staff

qualifications and training should be considered in the regulation process.

We humbly request to join you at the table to help create regulations that would protect families, while at the same time preserving viable options for children in need. We also ask that there be a serviceable level of appropriations allocated to fund this regulation and abuse and neglect prevention. We would be happy to discuss approaches to regulation creation with you and your staff and be helpful in the future in any way that we can.

> Sincerely,
>
> Robert Cooley, Ph.D.,
> Executive Director.
> Paul Smith, MA,
> Program Director.

————

> Cody W. Traub,
> Kalama, WA, January 9, 2008.

Dear Congressman Miller: It has come to my attention that you are working on some legislation to regulate outdoor wilderness programs. Putting restrictions and capping these programs would be a mistake.

In 2002 I attempted to take my own life. I was only an 8th grade student. I suffered severely from depression, behavior and family issues. Many times I thought there was no hope for me. My parents also felt similar at times.

I was in and out of different behavioral treatment centers in the Portland, Oregon area. Nothing worked. I came home to the same destructive environment and fell back on bad behavioral habits. It seemed as if I was lost and had nowhere to go.

I had little aspirations in my life. After being stuck in different facilities and coming home to the same issues, I found hope. Catherine Freer Wilderness Therapy Programs answered my call for help.

One March day in 2002, my parents picked me up at a behavioral health center in Washington State. They transported me to the offices of Catherine Freer Wilderness Therapy Programs in Albany, Oregon. I was terrified. As I was in all of the facilities I went to.

After having a group meeting with other families and participants, my journey began. I said goodbye to my parents, as I would not see them for the next twenty-one days.

The group of complete strangers left for an unknown location in the Oregon Cascades. We arrived in the unknown location and began our trek through the Oregon wilderness. The next three weeks would be the hardest and most influencing events of my life.

After completing the three week trek through the Oregon wilderness, I was a new person. I left the trek and spent a day with my parents in Bend, Oregon. A day later, my parents transported me to Burns, Oregon where I stayed on a mule ranch with a well structured family.

I stayed on the ranch for two months. I was stripped of all of my materialistic items and lived a simple life working on the ranch. This experience helped shape me.

Overall, my experiences with Catherine Freer Wilderness Therapy Programs were phenomenal. I would not have the drive, personality and sense of humor I have today without this experience. There is the possibility that I could have taken a different path in my life. I could be a criminal or even dead today without this program.

I went from a depressed, self destructive middle school student to a mature young man that made history in his small town. In high school, I served on the Washington Association of Student Councils as the President and held the office of President on my high school student council. I had the opportunity to meet with several Washington legislators, Governor Chris Gregoire and U.S. Congressman Brian Baird. My teachers and principals described me as a history maker and dream student.

I started working at the age of fifteen years old for the City of Kalama, Washington as a Computer Network Manager and Administrative

Assistant. In January 2008, I started working full time for the City of Kalama with my old position and in a new position at the Kalama Police Department as a limited authority law enforcement Community Service Officer. I am also currently enrolled in the Associates in Criminal Justice program at the University of Phoenix.

Without Catherine Freer Wilderness Therapy Programs, I would have never made those accomplishments. I would not have the sense of humor I have nor would I have the motivation and morals I do today.

Please do not put a cap on outdoor and in-patient therapy programs. These programs are life changing for many people and it would be a devastating event to see the programs botched because of government regulations.

Best wishes,

Cody W. Traub,
Kalama, WA.

———————

January 4, 2008.

To Whom It May Concern: I am writing to express my support for wilderness programs. It has been five years since I first participated in a Catherine Freer Wilderness Expedition and five years now that I have been sober. I owe my sobriety to Catherine Freer Wilderness expeditions. Without the program's support, I would not have had the motivation to drop my addiction to drugs and alcohol and return to values that I once knew were important. In all honesty, I would have ended up dead or in prison without the intervention the Catherine Freer program offered.

The program was effective because it took place in the wilderness. The wilderness offered the necessary space to evaluate my life and an important reminder of what is necessary to survive in this world--food, water, shelter, clothing, and friends--and what is not--drugs and alcohol. Catherine Freer used the wilderness to make me responsible for my own life. In the wilderness, I was responsible for wearing the best clothes for the weather, eating enough food, and making sure my water was clean. These skills demonstrated how good life is when I do the right things and how miserable it can be when I do not. With the support of my Catherine Freer Wilderness expedition and the lessons learned from the wilderness, I was able to rekindle a relationship with my family, return to school, and take advantage of opportunities not before available.

One of the opportunities that I took advantage of was being a field staff for Catherine Freer. With the perspective of being both a field staff and a client, I know Catherine Freer takes the necessary precautions to create safe experiences for their clients. As a client, I always felt safe and cared for by the staff leading me through the experience. As a staff member, I learned that my trust in those staff that led me through the wilderness was not blind.

I would like to think that Congressman Miller's intent is good, but I am worried about the type of legislation he may propose. Miller has capitalized on the misfortunes that have occurred in the wilderness programs while overlooking the success these businesses have in saving lives. I therefore believe that Miller's proposal will hinder wilderness programs' success. Congress should not restrict Catherine Freer from being able to effectively change destructive behavior. I applaud Catherine Freer for being safe and humane, and I find Miller's proposals unnecessary.

I would not have been awarded three years in a row Academic All-American in college or have continued to pursue a love for the wilderness with my father as a companion if it had not been for Catherine Freer. I urge you to think about the good that this program has had for me and the many others and balance it against the risks those must take to effectively participate in a wilderness program. Please let Catherine Freer and the other businesses in the industry provide their services without restricting or hindering them.

Sincerely,

Chas Biederman,
South Haven, MS.

————

January 10, 2008.

To Whom It May Concern: I am not sure where I would be right now if it weren't for the Catherine Freer Wilderness Program. I am actually frightened when I think about it. My life was on a road to disaster, and I had refused the help of my loved ones, close friends, and professionals who tried to stop my self destructive behavior. I felt angry, lost, and alone, and the only comfort I could find was in drugs and alcohol. If it weren't for my father enlisting me in this program I most surely would be in serious trouble today, if I were around at all.

My mother died when I was very young and, despite therapy and support from my family, I self-medicated with drugs and alcohol. I felt as though nobody could really understand what I was going through, and I longed to get away and be on my own with my friends who also used. I attempted to run away from home several times, and went on binges that sometimes lasted several days. I was fifteen years old.

By the time my drug use was at its worst I had experimented with cocaine, ecstasy, methamphetamines, and prescription drugs. I was also a regular user of alcohol and marijuana. Although these drugs made me feel better while I was using, I was destroying my relationships with everyone around me, most importantly my father. I feel so guilty when I think of what I put him through during that time. I am so lucky to have family that cares about me so much, and even though they did everything they knew how to help me, I was destroying their trust and abusing their help.

My father tried so many ways to reach me. He sent me to several counselors, which I manipulated into thinking that I was fine by blaming everything on him. We tried to ease my depression with drugs such as Zoloft and others, but it didn't help. I was still using, lying, sneaking out in the middle of the night, and getting in trouble with the law. It seemed like nothing was working. I didn't want to stop. Then my dad found out about the Catherine Freer Wilderness Program.

He heard about it from the parent of one of my friends that I first started using with. He had sent his daughter on a trek to try and change her destructive behavior and drug use. Although it seemed extreme, it was like a last hope. So one day my dad woke me up early and took my brother and me to the Catherine Freer office. It was there that I met the other kids who I would be sharing this experience with and their families. Everyone had a chance to tell their stories, and I realized that even though our situations were different we all had a lot in common. It was heartbreaking to here everyone's families share the effect that their child's and sibling's actions had on them. Everyone cried. I was scared, because I knew that we were about to be sent away.

At first I resisted, as I am sure most kids do, but after a week or too out there in the wilderness things started to become more clear. The Catherine Freer staff was so amazing; you could tell that they were really there to help us. It was hard to open up in group every night, it's hard to be so vulnerable with people you hardly know, but over the period of three weeks I learned more about myself than I ever had. I knew I wanted to change my life. I knew that I had to make things right with my family and loved ones. I made the decision to change and, in a way, it was scarier than being on trek. It was very emotional, physically challenging, and eye-opening. I learned important tools to stop my addiction and become the person I want to be. These tools have helped me tremendously to this day, and will continue to help me throughout my life.

After trek was over I had the opportunity to stay in a transitional home. It was there that I learned even more tools to help me overcome addiction and rebuild the damaged relationships with my family. The Catherine Freer staff was still very much involved with my progress,

making phone calls to the home to see how I was doing, and planning weekend retreats for the people in the transitional homes. I felt very cared for and valued by these people, and I still do. I have received multiple emails and phone calls from members of the Catherine Freer staff even years later.

When I left the transitional home and returned to my home town things were not easy. But with the help of those people who had supported me for the last couple of months I became active in AA and NA. They encouraged me to communicate with my father and use the tools I had acquired to rebuild our relationship. Now we are closer than we have ever been. I learned how to communicate my true feelings and have conversations in a way that I had never had before with my family.

My senior year of high school I applied for my small communities' royalty court for the Strawberry Festival. It might not seem much to people that have never been to the Strawberry Festival, but for my town it is huge. I couldn't believe it when I was accepted onto the court and went on to win the title of queen. It was a great honor, and an experience I will never forget. It was so rewarding to share with the Catherine Freer staff this accomplishment, because I give them a lot of credit for my success, as I mentioned in my newspaper article when I was on the court.

Since the Catherine Freer Program worked with my school I was able to earn credits for the time I was away, which helped me to graduate on time. Since graduation I have gone on to attend Western Oregon University, where I am well into my third year. My inspiration to become a teacher came from the woman who tutored us at the transitional home. Somehow she was able to get us to actually care about our education, and she allowed me to take on extra credits which helped me to graduate. It was her dedication and compassion for our learning that really inspired me to teach. It couldn't have been an easy job, we were a group of girls with many behavior issues, but she didn't give up on us. I want to have that impact on my students someday. I want to show them that I care about them as people, and I want them to succeed.

I have been living on my own know for about three years. My first year I spent in the dorms on campus at Western, and now I live in an apartment close by with a roommate that I met in the dorms. I have been spending my summers working at a grass seed research farm in Albany, and for a little over a year I have also been working at Target in Salem, Oregon. I am supporting myself and continuing my education, and I am very happy. I have many friends who do not use, and I am very close with my family.

I still read my journals that I wrote while I was on trek from time to time to remind me how far I have come. Whenever I am frustrated or upset I think about all of the good things I have in my life because of the changes I have made. I cannot thank the people at Catherine Freer enough for this opportunity to be a whole, happy, and healthy person, and for caring enough to keep in contact with me years later. If it were not for completing this program when I was 16 years old I probably would not have even completed high school. I owe so much to them, and I hope they are able to continue helping troubled kids for a long, long time. Thank you for reading my story.

   Sincerely,

         Erin Van Atta,
         Montana Academy.

---

          May 4, 2008.

Dear Chairman Miller and Ranking Member McKeon: After studying your proposed bill, I write to include my reactions in the public record. I applaud your intentions and efforts to improve the safety of private programs, but I strongly oppose H.R. 5876 as written.

I am an owner of a private therapeutic program that would fall under regulation with the proposed bill. I agree that we must place safety and appropriate care of children as the foremost priority in all residential care, in both public and private settings. I also agree

with the general safety requirements outlined in Section 3 with the possible exception of section E (access to telephones must in many cases be supervised to ensure that access is restricted to parents and a child abuse reporting number). Unrestricted access to telephones has great potential to corrupt treatment with calls to undesirable and unsafe contacts.

However, I strongly disagree with the suggestion that the law turn over authority for regulation of these basic safety principles to the federal government. Federal authority to regulate will override and conflict with the many states that have worked for years to understand and create regulations responsive to this level of treatment. Federal regulation in all fifty states will also create a costly, inefficient, bureaucracy that largely duplicates state and county agencies that are already in place to provide on-sight inspection and assurance of compliance with safety standards. It would also be impossible for the federal government to create well informed and reasonable regulatory rules and enforcement procedures within the ninety day period allowed. Appropriate regulation can only derive from a careful and diligent attempt to examine and understand these programs and the need they fill.

The mandate from your committee to the GAO was simply to investigate and document any evidence of abuse in private programs. The investigation did indeed document a few clear incidents of abusive practices. They made no attempt to compare these incidents of abuse to the incidence in the public at large, or in public residential programs. However, it should be noted that the GAO's suggestion that they uncovered ``thousands of allegations of abuse in residential programs'' came directly from the Department of Health and Human Services NCANDS data base, a data base that derives almost entirely from public, state funded, and licensed residential treatment programs. If anything, the GAO report provided clear evidence that whatever child safety laws are passed with regard to residential care must apply across the board to publicly run programs, groups homes and foster homes as the evidence overwhelmingly suggests that the incidence of abuse is much greater in these programs than in private placements in which parents have complete authority over making and terminating the placement.

What was lacking in the mandate was any effort to understand and report on the important care that is now given to thousands of children in private residential treatment facilities. Tens of thousands of families are paying out of pocket to place their children in private residential programs each year because of inadequate and failed treatment in their community settings. Virtually all of the children in our private therapeutic programs have tried and failed to respond to conventional outpatient therapies, community based psychiatric facilities, and medication. And yes, there are a few remaining programs that are highly disciplinary in nature, the so called ``boot camps'', but they have nothing in common with virtually any of the private programs that would fall under the regulation of this law. In fact, the vast majority of military and boot camp programs are run by state correctional facilities which are not covered by your bill.

The problem for most troubled adolescents in private residential care is that they are grossly immature, and have failed to develop a personality structure sufficient to handle the stress and demands of being a teenager in a culture that is loose, unstructured, and toxic. It is extremely dangerous to be an adolescent who relates to the demands of being a teenager with the approach of a child. Such adolescents display a variety of DSMIV-R Axis I psychiatric symptom clusters such as anxiety, depression, school failure, impulsivity, and lack of morality. However, the underlying problems are primarily failures in character development. Treatment of such problems does not require a hospital level of care, but often does require removing children from their locally toxic environments and placing them in safe, nurturing, well structured programs that allow them to repair the wounds that have led to their failures to mature.

Attempts to regulate such programs must first involve an effort to understand them in order to establish regulations that are appropriate but reasonable for the levels of care. Failure to take the time to understand and be responsive to the different levels of care required for character growth can result in eliminating these important programs, or turning them all into inpatient hospitals, or day treatment programs, solutions that have already been tried and failed for these children and their families.

Most states have worked with programs for many years to understand, and modify standards to fit treatments and yet protect children. The federal government does not have this local level of expertise, and making a mistake in this type of regulation that eliminates or alters significantly these programs will put thousands of children in eminent danger for their life.

I strongly urge you to amend your bill to provide funds for states to meet or exceed your basic standards of section 3 within one year of passing this law. In this way we will have strong basic standards, but each state can demonstrate how they meet these standards for the various types of programs that operate in their jurisdictions. You will also greatly reduce the funding requirements of the bill, empower states, and eliminate a costly bureaucracy.

I feel that I own and operate a high quality therapeutic school, as do many of my colleagues. We support the intent and goals of your bill, but are terrified that arbitrary and uniformed regulation can easily make it impossible for us to operate our facilities that truly have saved thousands of struggling adolescents.

Respectfully,

John L. Santa, Ph.D.,
Licensed Clinical Psychologist, Owner, Montana Academy.

————

To Whom It May Concern: I was one of those parents who had my son at 15 escorted to The Family Foundation School on April 23, 2003. He was escorted at 4:30 A.M. After coming home drunk and God knows what else. He graduated on June 25, 2005 with a high school diploma, above average grades, and many extracurricular activities. It was one of the few times in his life he finished what he started to my amazement and did it better than I would have ever dreamed. The experience may even have saved his life!

But most important, he was sober for 26 months and experienced life on life's terms and allowed his brain, (frontal lobes) to develop. Now he is my only child, and I am here to tell you that I was a very protective parent who hated the idea of doing this in the first place. But it does not take a keen eye to see the spiral of drugs and alcohol coming to a point of critical mass. I did what was right and stand by it to this day.

Was the school tough. * * * yes? Did it brainwash my son * * * yes. But he needed the structure and he needed his brain washed. He will tell you for himself that he needed the structure. He watched the testimony along with me and after he discussed it, his comment was that he wants to go back and visit the school one day.

I would encourage you to invite parents and former students, sober or not to tell their side of the story of their experience. Ask any military person, West Point Cadet or grunt and they will tell you the school was a cake walk. Go to any AA meeting and you will hear that there is no ``easy or soft'' way of combating addiction.

Yes, the school has evolved, grown for the better made changes but it was never the hell this kid is portraying. And regarding scars, I am not buying it. As for the failure of his military career, what part did he play in that? What part did he play in getting to the school in the first place? Everyone has scars, get over it.

Did you watch the PBS program about life aboard the Nimitz, the aircraft carrier? You will hear young kids at 18 talk about the horrendous conditions they escaped to find that the structure in the military was the best thing for them. Furthermore, they did not allow

their awful environment to become an excuse for any failure. They got
off their back sides and had the courage and presence of mind to do
something about it. Now my son does not walk the line as I would like
him to but I am convinced that the school planted a seed that for ever
more will stay with him.

    Yes, like anything out there, there are the good schools and bad
schools for wayward youth. There are some losers that need to be shut
down or tweaked. But The Family Foundation School is not one of them.
The school is an open book.

       Regards,

                        Gene Lysick,
                        Montana Academy.

----

                             May 6, 2008.

    Chairman Miller and Committee Members: I write, after studying your
bill, to place my observations about its surface good intentions and
its deeper fatal flaws into the public record. Unfortunately HR 5876
addresses upsetting and real state-level problems with an expensive,
massively inefficient and duplicative federal solution that is likely
to do substantial collateral damage to useful, innovative,
irreplaceable high-quality programs that have nothing to do with these
incidents or flawed practices. As written it ought not to be passed. If
amended sensibly, it could serve a useful purpose.

    Since my comments are critical, my motives may be relevant. Let me
introduce myself briefly. I am a democrat, who has trained and worked
as an economist. My objections to your bill are not to do with a
doctrinaire allergy to regulation, for surely some sectors of the
economy, like medicine, surgery and psychiatric programs that involve
high-risk youth, need regulatory structure and constraints. With my
colleagues I have supported sensible state regulation of therapeutic
programs for teenagers in Montana. Inasmuch as there has been
resistance to this effort in our state, your bill could help us if it
encouraged responsible state supervision for adolescent programs here.
Yet, as written, your bill seems unlikely to help very much with
Montana's own effort--and instead it overrides state regulation with
new federal bureaucracy.

    I was trained as a physician--educated at Harvard College,
Cambridge University (UK), Case-Western Reserve School of Medicine
(Ohio) and in Yale's Department of Psychiatry. For 8 years I was a
professor of psychiatry at University of California (San Francisco),
where I helped direct the training of young psychiatrists. Since then I
have become experienced in private outpatient and hospital inpatient
practice with both teenagers and adults. I have led adolescent hospital
start-ups in Texas and Montana, serving as clinical or medical
director, and I have decades of outpatient office experience. In 1997,
in a break from the enforced mediocrity of managed care and unnecessary
overhead costs of inpatient units, I joined other experienced
clinicians to co-found a first-rate therapeutic school in a remote
valley west of Glacier Park--called Montana Academy. In this past
decade we hired and trained a remarkable staff: 8 PhD psychologists, 2
board-certified psychiatrists, 3 MSW therapists, 7 certified teachers,
and tens of BA-level supervisory staff, who together address the
protean serious developmental problems of 85 floundering teenagers.

    In sum, in 35 years of clinical and administrative experience I
have become expert in some of the problems of troubled American
teenagers and knowledgeable about the various approaches to the
treatment of their own and their families' many troubles.

    Given my involvement in an innovative, safe and well-managed
clinical and academic program, given our professional ethical
scruples--about which I may say that we need no instruction from
anyone--it is clearly in our interests to promote competent, firm
regulation and licensure. It is in our interest that sensible
regulation weed out irresponsible, incompetent programs and practices,
and expel the bad actors. For both can harm children and, when they do,

they tar our collective reputations. There is no protective motive on your committee that we do not share, nor is there any fierce indignation about wretched adult misbehavior or mismanagement that we did not also feel long before your committee hearings. In fact, we know more about what it takes to provide safe, responsible and useful treatment than you have any reason to have learned. Moreover, most of the measures your bill calls for--e.g., criminal background checks, proper training of staff, prohibitions of staff violence or sadism, adequate medical supervision, and the proper care and feeding of growing children--already are established aspects of our routine practice and should be enforced--by competent regulation--in any program involving children and teenagers. We have been impatient about the lack of enforcement of ethical standards in program marketing and in the referral process.

Yet the values and good intentions we share do not produce great enthusiasm for HR 5876. In fact, I have three substantial reasons to oppose your approach to these problems--and to propose an alternative. In brief, your hearings documented a few egregious clinical debacles and unethical marketing practices--and, as to the latter, we could add examples of practices more troubling than those the GAO cites. But as egregious as those cited cases may be, the GAO report and the evidence cited in your hearings fail to justify the solution you propose: a massive new federal howitzer to be fired immediately and from Washington, DC at distant private programs taking care of troubled teenagers.

First, your data provide no reliable measure of the size of the problem for which you propose this massive federal solution. The GAO report claims to have ``identified . . . ``thousands of allegations of abuse . . . at residential programs across the country'' (p. 1)--but these data concern public programs for adjudicated youth. Those data are not relevant to private programs for troubled teenagers. The populations of adjudicated teenagers in public programs is not at all the same as the population in private NATSAP programs, nor are those programs structured or staffed in the same ways, nor are the results of residential treatment at all comparable (Ellen Behrens, 2008). There are not ``thousands of allegations of abuse'' in private residential programs. And HR 5876 specifically excludes all those public programs from its regulatory mandate, so that, in effect, the GAO report demonstrates a substantial problem about apples so as to justify federal regulation of oranges.

Second, a few egregious cases of abuse, incompetence and unethical marketing practices certainly might justify sudden massive federal intervention if there were no state regulation in place already. But in many states, particularly in states in which most of the private programs for troubled youth have long been up and running, there already are regulatory rules and licensure standards, which are firmly enforced by state authorities. In some of those states (e.g., Utah) this structure and those nuanced regulatory practices are the result of years of experience and expertise. State regulators know well the best programs and best practices as well as those programs with egregious problems, and have adjusted their regulatory practices in a nuanced way to their local, innovative programs. Surely it would be useful for federal pressure to push states new to regulation to learn from those whose tested practices result from solid experience and years of data, but to ride roughshod over those informed local regulatory agencies and to invest massively in yet another centralized federal bureaucracy seems another example of Washington arrogance and contempt. Moreover, if (as implied in HR 5876) the goal is to promote state governments to accomplish their own adequate regulation, massively funding a new national bureaucracy for inspection and enforcement hardly seems like a rational way to do it. To argue, as you have, that some examples of incompetence or misbehavior justify a massive new federal juggernaut is no different than to urge, on the basis of regularly published examples of physician malpractice, impairment or error, that we need massive federal regulation to over-ride, supercede and supervise California's

own medical licensure board. I expect the honorable chairman's own state board would discover a fatal flaw in this logic.

Parental due diligence, already in place, makes the need for a new federal bureaucracy less than obvious. Unlike teen inmates in public programs, teenagers in private residential schools have parents involved--at the very least to give consent and to pay the tuition. At Montana Academy we have never enrolled a student without requiring parents first to come to Montana themselves--to discuss their children's problems, meet our staff, visit our school and talk privately with other students. Moreover, the parents of every child we have ever enrolled has been referred to us by an independent educational consultant, who has visited our program and knows all alternative programs in the nation.

In addition, there are independent accreditation bodies that, in our case, make federal inspection redundant. Montana Academy's academic program is accredited by the Northwest Association of Schools and Colleges (NWASC), which accredits Montana's public schools. Our clinical program--policies and procedures, safety, staff credentialing, clinical competence--has been accredited by the Joint Commission on the Accreditation of Health Care Organizations (JCAHO). Both academic and clinical aspects of our program has been reviewed and accredited by the National Independent Private Schools Association (NIPSA). The state of Montana is putting in place a state licensure, and we must demonstrate that we meet state fire codes. This being so, a reasonable person must ask why--in addition to NWASC, JCAHO, NIPSA, Montana's Fire Marshall, Flathead County Public Health Department (kitchen standards) and the MT Department of Labor--the legitimate regulation of Montana Academy also requires a new federal bureaucracy, located three thousand miles away, to duplicate these requirements and inspections. At the least, it makes sense to exempt from new federal scrutiny any program that achieves regular, substantial on-site inspection in other ways.

Finally, neither the GAO report nor hearings before your committee seem to have bothered to ask a representative sample of parents about their experience--and so discover the worth of many of these private residential programs. I can tell you, as they would, that there are no equivalent services available within conventional psychiatric and psychological and academic facilities. I can tell you, as they would, that their children already had failed to respond to outpatient therapies tried at home, brief hospitalization, and competent prescriptions of (usually multiple) medications. I can tell you, as they would, that they would not have some so far, or endured a painful separation from their much-loved children, if contemporary psychiatric remedies had resolved their many potentially crippling problems.

Yet I can find little evidence in HR 5876 to suggest that, prior to offering this legislation, the committee has given respectful consideration to the collateral damage this legislation could do--as it creates a remote, federal bureaucracy and mandates unknown new rules, regulations and costly requirements. Given the total lack of consideration and knowledge about the unique virtues of these alternative programs, there is a significant risk, many of us recognize, that such a federal bureaucracy will, with the best intentions in the world, transform our less-costly, ingenious, innovative and effective private programs into stereotyped, massively-costly psychiatric hospitals. That is, we fear that, out of an imprecise picture of alternative private schools and programs, and out of indignation at the egregious misbehavior of the few, you may destroy something valuable for the many--innovative useful programs that have taken us years to develop, and about which we are justly proud.

I hope that these observations and objections can get a serious hearing from members of the committee and the Congress--and that responsible legislators will consider the duty to which physicians must swear an oath: first to do no harm.

                Sincerely yours,

                        John A. McKinnon, M.D.,
                            Co-Founder and CEO.

CHILD ABUSE AND DECEPTIVE MARKETING BY RESIDENTIAL PROGRAMS FOR TEENS

---

Kristie Henley,
Bonners Ferry, ID, May 6, 2008.

To Whom It May Concern: My name is Kristie Henley (formerly Vollar, maiden name Woodbury). I'm a graduate of Explorations Wilderness Assessment Course in Trout Creek, MT, as well as Mission Mountain School in Condon, MT. I graduated Explorations in 1993 and Mission Mountain School in 1994. I am also an Affiliate member of NATSAP (National Association of Therapeutic Schools and Programs), and a student member of the American Psychological Association. I work at Woodbury Reports, Inc., owner of the resource web site Strugglingteens.com.

I'm not sure where to start, as I wasn't sure I'd be given a chance to share my story / experience with schools and programs in the private parent choice network. I want to thank Mr. McKeon for allowing additional testimony from graduates who hold other views of their program than those that were allowed to testify. No one coerced me (or even asked me) to share my story, it is of my own free will and desire.

I initiated contact after I watched the second of Congressman Miller's hearings on abuse in residential treatment centers, emotional growth schools and programs, therapeutic boarding schools, wilderness camps, etc. and saw the testimony of Kathryn Whitehead, former student at Mission Mountain School. One reason I felt it was important for me to speak up is because I was Kathryn's roommate at Mission Mountain School for almost eight months. She was the first roommate I had upon arrival. My intention here is not to poke holes in her testimony or bash her in any way, as each of us will see things differently and each interprets experience differently. However, I know there was at least one inaccuracy in her testimony that I'd like to be addressed for the record.

That inaccuracy is in the educational component of Mission Mountain School. According to Ms. Whitehead's testimony, ``we only attended 12 hours of unaccredited education (by uncertified teachers) per week with ``extreme amounts exercise''.'' This is an exaggeration. We attended school Monday through Friday. Classes started between 9:00-9:30 am (after a community meeting to communicate with each other how we were all doing) and ended at 2:30 or 3:00 pm. At 3:30 pm we had a 45 minute aerobic exercise time, Monday, Wednesday and Friday. Depending on the season, this was either 45 minutes of biking or cross-country skiing. On Tuesday and Thursday, we did yoga or stretching. This exercise was for health reasons as well as Physical Education credits, not for punishment.

Our lunch period was an hour and a half each day. For part of the lunch break, we did community chores * * * the same type of chores rural families would do in a home, or people would do on a working ranch: cooking, dishes, kitchen cleanup, taking care of pets, cleaning horse stalls, gathering/ chopping firewood, etc. These were designed to help the students learn work ethic, discipline, responsibility, carrying your own weight, etc. There was a daily rotation so groups of girls would each take turns on different chores.

Educational classes included Health, Sciences, English, Math, etc. There were also a couple independent study programs, which provided a variety of options. The independent study classes were a lot like being homeschooled. One of the Sciences we did was Environmental/ Earth Science. As part of the labs of Earth Science, we would take field trips to the surrounding forests to identify different plant life.

We also attended 3-4 hours of standard education on Saturday morning. The classes we took were accredited and we did receive high school diplomas. My transcripts were fully accepted by North Idaho College, which would not have happened if the school were unaccredited. We even took monitored SATs, which were also accepted by my community college. I did not have to take an entrance exam, nor did I have to take a GED exam prior to being accepted in college.

I have written numerous articles over the years based on my

experiences in both a wilderness program and a therapeutic boarding school, which were published in the Woodbury Reports newsletter and on the website Strugglingteens.com. I have attached many of them to this letter showing that although the programs I attended were not easy, they did help me and I am grateful.

It has been 14 years since I graduated and there hasn't been one day over the last 14 years that I felt either of my programs were abusive or punitive. In fact, I currently work in the network of private, parent choice, emotional growth/therapeutic boarding schools. Many alumni do. I chose to work in this network because I believe my programs saved my life, changed me for the better and gave me tools to lead a very successful life and work through life's trials. I also know how bad it can be if a mismatched placement is made, and want to help ensure that doesn't happen.

Over the last eight and a half years of working in this network, I have visited numerous schools and programs. I have talked with children, out of the presence of others, under no scrutiny of the staff or other students. I have asked them questions about their programs and experiences, and shared my experiences with them. Although there are bad programs and referral services out there, many programs are highly reputable and know what they are doing. I have helped place a handful of students in programs, based on their needs. I have written articles about my experiences and done a lot of research on which schools and programs work well and which don't.

In this second hearing, all the examples except one (not including the two witnesses who attended schools) were outside the network in which I work. Many were actually state run/ state placed facilities or boot camps, rather than private, parent choice therapeutic boarding schools or wilderness programs. In addition, the ``referral agencies'' the GAO contacted were not in fact Independent Educational Consultants experienced in successful placements of children. The GAO did not for example objectively contact my office, which is one of the largest (yet legitimate) companies of information for parents and professionals. They contacted us before the first hearing, where we shared with them some of the research we do annually on schools and programs in the private, parent choice network. They did not use any of the information we provided. We also would like to see those illegitimate referral agencies and programs shut down, but not at the detriment of the good schools and programs available to help the thousands of children who need (and succeed) in private programs.

If more information is needed, I can be contacted via email at kristie@woodbury.com, via my office 208-267-5550, on my cell phone at 208-610-9831, or postal mail at PO Box 1107, Bonners Ferry, ID 83805.

———

To Whom It May Concern: I attended the Family Foundation School for two and a half years starting in 1991 and ending shortly after graduation from high school in 1993. During my stay at The Family I was involved in all levels of the organization, first as a troubled teen being admitted, then as a student, a senior member of the student body, an employee, and eventually as a college student.

I was shocked and appalled by the allegations made by a fellow Family School alumni, Jon--Martin Crawford, before the US House of Representatives. I know that many of the statements made by Mr. Crawford are untrue and feel compelled to do whatever I can to restore any damage to the reputation of the Family School suffered as the result of this testimony.

It is not easy for many people to understand the profoundly positive impact The Family School has had in my life and the lives of countless other troubled teenagers. All who have known me from my teen years through today mark two phases in my life, before The Family School and after The Family School. My parents, brothers, friends, and others are still in amazement and grateful fifteen years later for the process I went through at The Family and the results that it has produced.

Today I own and run a rapidly growing Internet Advertising company with over 50 employees in Lake Mary, Fl. Many of the virtues I learned while attending The Family School are actively in place in our work environment. Honesty, Work Ethic, Integrity, and the pride associated with being a contributing member of society are all alive and well within our organization. I know of many of my fellow alumni who have made significant improvements in their lives and have bettered their families and communities as the result.

I believe it is enormously important that everyone who heard the testimony of Mr. Crawford learn the reality of what really happens at The Family School. In admirably high numbers, troubled teens become top students, athletes, painters, actors and actresses, singers, golfers, debaters, chess players, and most importantly, positive members of their families. All of this is accomplished in a very loving environment that empowers people to move beyond their current troubles and issues and ``act their way to right thinking''.

There are undoubtedly organizations that profess to change lives, and do so under the conditions Mr. Crawford described. Like any reasonable person * * * I am horrified that such institutions exist. Please be assured that The Family Foundation School * * * is not such an institution. The greatest shame that could come from this testimony would be if legislation were passed that contained provisions which hampered the ability of life saving organizations like the Family School from carrying out their good work. Undoubtedly, there is a need to protect teenagers from mistreatment at the hands of others, let's not do so by removing the ability of The Family School to protect them from themselves.

                    Most Sincerely,

                            Michael E. Jenkins,
                            Founder & CEO, MarketLeverage.

                              ————

                         Michelle Funaro,
                      Guilford, CT, May 8, 2008.

To Whom It May Concern: After viewing the latest senate hearings on the child abuse and deceptive practices of residential programs, I felt compelled to write as I have a daughter who attended The Family Foundation School in Hancock, NY from Sept. 2003 to June 2005. I will share some of our family history with you. My daughter was a difficult child growing up. We, her parents, always made sure she received all the love and care that she needed. By the age of 14, she was drinking, drugging, getting in trouble in school, stealing, and getting in trouble with the law. By the age of 16, she was stealing credit cards, money, the car and taking off in the middle of the night. By this time, she would go to parties, use drugs, get drunk, and was sexually active without use of protection. She became verbally and physically abusive to us.

My daughter was the driver involved in a car accident that could have taken the lives of three other girls, as well as her. By the age of 17, she was failing in high school. The school said that they could not provide an education for her and that we needed to find someplace else for her to go. My daughter had been through the court system for 3 separate offenses (possession of drugs, possession of stolen credit cards, and for physically abusing me). She was mandated by the court to wear a monitoring device and was restricted to home, medical/therapy appointments, and school only. She was using her therapist to obtain medication that she then crushed and snorted up her nose, along with the medication that she and her friends were taking from family member's medicine cabinets or buying off the streets.

We had gotten to the point that we had to lock up our wallets/purses/money and put locks on bedroom doors so she didn't steal from us. We hired an attorney so that we did not violate our daughter's rights. We went through the court system to get permission from the courts to take her to The Family Foundation School in Hancock, NY. It would have been her choice to go to an adult woman's prison instead of

going to a residential program. The court felt she was not capable of making good decisions and gave me the power to make the decision for her. The court and the school system monitored the entire time she was at the school. Reports were supplied and I continued to go to court for her with her attorney. She faced a mandated jail sentence if she didn't complete her program at the school.

This was not an easy decision for us. It took research, talking to other parents, students, visiting the school, and investigating it plus figuring out where we were going to get the funds for this. The place was clean, spiritual, food was good, educational standard were high, and the staff was well qualified and caring. Some of staff members having been former addicts themselves understood the disease. We understood that, they could help guide our children.

I took my daughter to the school with a court order in hand. She was under the influence of drugs. When we got to the school, she and her belongings went into the administrative building. She was searched, as was her clothes, toiletries, etc. They found sleeping pills hidden in a makeup container. I was allowed to say goodbye to her, which she refused, and I left. We were not allowed communications for 30 days, although I was in weekly contact with the school and a staff member who was overseeing her program and her family group.

After 6 weeks we had a meeting with other parents and staff and got to visit with our daughter. We were also exchanging letters and receiving phone calls each week for 10 minutes. If she acted up then she lost the privilege of speaking to us and we did not get the call. As her parents, we were required to go to a 12 Step Meeting. In our case, we went to Families Anonymous, a 12 step program for people affected by a family member or friend who was an addict or had behavioral issues. We also attended family and parent group sessions at The Family Foundation School. We learned how to not enable the behaviors of our loved ones.

My daughter went to school, did chores and was expected to participate in gym, help maintain the grounds (shoveling snow in the winter, sweeping, garden, etc). There were some things that I thought odd and that I questioned. My questions were answered to my satisfaction. Medical and mental healthcare was provided as needed. She went to the OB doctor, dentist, eye doctor and talked to the school psychologist. She was on some medication while she was there. My daughter was expected to participate in two extracurricular activities (chorus, art, debate, school newspaper, yearbook, or sports). The school has a nationally recognized 1st place chorus and debate team.

There were times that she received consequences. Sitting in the corner, running around the building for exercise, and yes, moving gravel size rocks back uphill to the upper parking lot when she refused to go to class. I was always informed about what was going on with her. I was aware that if the child was a danger to themselves and to others that they would be separated from the group. There was no wrapping with duct tape and blankets. There was a padded room with cameras to monitor the child if they tried to hurt someone and were completely out of control. At no time were they left alone or physically abused.

We visited our daughter many times, ate lunch with her family group, took her off campus and made visits back home. The school went on daytrips and overnight trips to competitions, historical sites, the movies, bowling, the park and even had special programs brought into the school. There is a spiritual aspect to this school as they run the program with the principles of a 12 step program. Respect of other religions and cultures was taught. The children would go on spiritual retreats to a retreat house, in Pennsylvania, twice a year. They put on a play for the community and the parents once a year and also a holiday show. These children have amazing talents when channeled in the right direction.

I would also add that the school was open to me coming there at any time. I agreed to limit my visits to times that were best for my daughter. Personal possessions were limited due to space and need. We were allowed to send clothing and personal items as needed. Money was

sent at Christmas so the children could go shopping (at a mall) for each other.

When my daughter graduated, she graduated with 30 high school credits and 9 college credits. The school works with local colleges to allow students to take college courses while they are there. After graduation she went on a trip to Lourdes, France with the Dean of Education, Father Stephen Morris, with many other graduates and staff members. They were escorting mentally and physically handicapped women to Lourdes for 9 days. After that my daughter remained at the school working in a paid position in the office for the summer before returning home.

It has taken time for things to settle down after she returned. I'm not going to say that it was perfect, because it has not been easy. She does have resentments at being sent away for 21 months. She tells us at times that she was traumatized and yet I know that she had a difficult time leaving the staff and students. I believe that I got back the same child that I sent to that school. It's the behaviors that have changed. She also knows that there are consequences and that we are strong enough to follow through with them, if she returns to her old ways. She now makes better choices, lives on her own, works, and is going to college. She is no longer that angry, abusive child. She is turning into a responsible adult, who still has some anxiety issues. We continue to support her seeking counseling.

Not too long ago she said to me: ``Mom, I know someday soon that we are going to be the best of friends.'' I know that had we not sent her to The Family Foundation School, she would not be alive today. At the very least, she is still alive 4\1/2\ years later. I'm sure things have changed at The Family Foundation School even in the past 10-plus years. I can't vouch for what happened then. I can tell you what my experience has been over the past 4\1/2\ years. We've healed as a family. We have gained back a daughter. We will always be grateful to The Family Foundation School.

Sincerely,

Michelle Funaro.

———

Robert H. Kieserman,
Cherry Hill, NJ, May 8, 2008.

To Whom It May Concern: I am writing this letter to praise the efforts of the staff and faculty of The Family Foundation School in Hancock, New York. My son Benjamin was taken to the school on December 20, 2005 by escorts. Ben never had any substance abuse problems, but rather behavioral issues that reeked havoc and chaos in our home for over two years. Despite going from psychologist to psychologist to psychiatrists, no one was able to reach Ben. He shut himself up in his bedroom, refused to attend school, and was in jeopardy of heading down a road of self-destruction. Finally, in desperation, we sent him to FFS.

No words could ever describe the gratitude we have for the folks at FFS. They devoted every ounce of perseverance they had to turn Ben around toward a positive life direction. There were times that they needed to be firm with him, but always in a loving manner. Ben graduated from the Family Foundation School in December, 2007 with a high school diploma. He now holds down two part-time jobs and just finished his first semester of college. He lives with us, and he is a different person than he was three years ago. FFS helped Ben look at himself, develop the self-confidence that he needed, and provided him the coping skills that he will have for the rest of his life. Throughout Ben's two years at FFS, his sponsor Chris Stein along with his co-Family leader Cindy Argiros, worked arduously with Ben and was always available to us as well, and Chris became our dear and trusted partner in changing Ben's life for the better. Susan Runge, Director of Psychological Services, was also a tremendous influence on Ben and on us, teaching us how to be better parents to an adult child. Every member of the staff interacted with Ben, and since he has been home, we

have had many opportunities to openly and candidly discuss his life at
FFS. Ben now acknowledges that although everyone on the staff
challenged him to live up to his fullest potential as a person, they
always treated him with respect, and most importantly, with a dedicated
love. He has told us that there were times that other students were
isolated for bad behavior, but at no time, was there any concern by any
of the students that those students were mistreated. At all times,
according to Ben, discipline was administered with sternness, but with
compassion and with a parent's love.

   I wish to go on record that both my wife and I strongly support the
work of the entire staff and faculty of FFS. They have created one
miracle after the next, and if not for them, most of the children who
have entered through their doors as lost souls, but have walked out as
accomplished high school graduates and better men and women, would
never have seen that transition in their lives. We will forever be
indebted to each and every member of the FFS team.

                    Sincerely,

                              Robert & Regina Kieserman.

                              ——————

                         Roberta M. Mathews,
                    New York, NY, May 7, 2008.
   Dear Mr. Chairman: I am writing because I respectfully oppose the
elements of the recently introduced H.R. 5876, ``Stop Child Abuse in
Residential Programs for Teens Act of 2008''. I would like to submit to
you and the Committee that there are many residential treatment
programs for teens which are providing very high quality clinical
services and which abide by the highest ethical standards of
professional conduct and delivery of services. While a small minority
of the programs across our nation has proven to be negligent and should
be held accountable on a case by case basis, it is my opinion that
federal regulation of the many programs in our nation is unnecessary.
However, the already existing regulation and licensure by each of the
States as well as professional accreditation should continue as it has
to assure high standards and ethical delivery of services.
   My own experience with these matters makes me certain of the
necessity for families to have personal choice of private treatment
options for youth which are safe, ethical, and professionally
effective. My teenage son, who has struggled for the past two years
with serious clinical depression and severe anxiety disorder, has been
receiving highly effective, professional treatment, first at a
therapeutic wilderness program and then at a small residential
treatment center and school. In both these private programs, the
treatment services are rooted in respect, dignity, expertise, and
compassion. I can assure you that many programs like the ones my son
has experienced are delivering truly life-saving services to youth.
   Parents of teenagers in crisis have often first utilized all modes
of out-patient treatment in order to keep their teenager at home; but
in some cases, like my son's, the personal crisis deepens and there
needs to be a more intensive and sustained treatment intervention that
cannot be provided in out-patient therapy or even in brief in-patient
hospitalization. Parents, like me, who have searched for help through
established channels, can find very high-quality private residential
programs with the help of educational consultants who can answer all
questions about licensure, accreditation, and standards of each
program. Also, parents can go and visit the programs in person, which
is what my husband and I did before we decided on one for our son. It
is highly important to preserve the element of personal choice because
what parents and their consultant need to find is a program whose
specialized services match the individual needs and specific problems
of each teen. When parents are searching to identify that match, they
often find that the best program(s) are not in their home state. It is
a very difficult decision to send one's child out-of-state for
treatment, but my husband and I feel that it was the best decision that
we've ever made because our son has received the specialized help that

he needed so badly and which couldn't be had near home.

There have been absolutely no abusive treatment practices in the programs that I have come to know well. Both in the therapeutic wilderness program and at the residential treatment center where my son still currently resides, he has been kept safe and has been met with treatment protocols which place a priority on personal dignity and respect. The credentialed, highly professional clinicians who have worked with him and with our family have operated on the highest standards of professional conduct and also have demonstrated a solid foundation of expertise and compassion in their work with struggling teenagers.

These private programs deserve to continue their life-saving work unencumbered by federal regulation. It is far better for the States, individually, to take on the responsibility of oversight and regulation because there can be a closer working alliance between a state government and its constituent programs to ensure that professional licensure and the highest quality standards are upheld and enforced. This, in turn, will best protect the necessity for families to have personal choice of private, professional residential treatment programs which are safe, ethical, and clinically effective.

    Sincerely,

                     Roberta M. Mathews.

---

                                  May 7, 2008.

RE: A Realistic Commentary on The Family Foundation School

To Whom It May Concern: My name is Sal Guarino and I have had a close association with The Family Foundation School (`The Family') for nearly twenty years. The following is my personal and well qualified letter of support for a tremendous institution that has served the desperate needs of so many so well for decades. You will find my testimony to be fundamentally in direct contrast with the one-sided comments offered by Mr. Martin-Crawford recently. I would like to thank you sincerely in advance for your consideration of my words.

Having been an employee of The Family for the better part of a decade, who was closely involved in The Family's early days of becoming the truly exceptional haven for troubled kids and families and academically superior school that it is today, and knowing its founders and many of its principal architects and contributors very well, and being acquainted with many of its alumni too, I assure you that my assessment of this wonderful institution that has helped so many is based on a solid foundation of a rich history of direct experience and observation.

I have witnessed hundreds of The Family's graduates transform from children who were typically rejected by their home schools due to behavior problems, were underperforming academically, were unhappy and in many cases profoundly sad and unmotivated to do much of anything, were abusive toward their parents (by any reasonable measure of professional or lay assessment), were putting themselves at serious risk due to a variety of high risk behavior, such as drug use, sexual promiscuity, illegal acts, self-mutilation and numerous other maladaptive behaviors, who were once `good kids' from caring families who tried in vain to help their children, only to meet blatant and often forceful resistance from them, who had typically been treated by numerous mental health professionals by the time they came to The Family, with limited or no positive results to speak of, and I can assure you that contrary to Mr. Martin-Crawford's testimony, which was at times clearly untrue, and at other times, at best incomplete, The Family is not only being unjustly characterized in a negative light, but it is in fact a truly unique and remarkable place--a superior school academically and perhaps more importantly, a refuge that offers the safety and security that its `at risk' students and their families need, as well as the right combination of therapeutic variables required to address the short term needs of stability and compliance for these adolescents and the long term development of strong, healthy

and well developed coping skills.

Upon viewing Mr. Martin-Crawford's faulty and obviously jaded testimony, I was struck by several of his points on which I will offer comment below. Please note that I am paraphrasing his comments:

Mr. Martin-Crawford mentioned that he suffered from relapses after leaving The Family due to his nightmares about his experiences there.

By even the most extreme brand of psychological analysis, one that would already be pushing the limits of common sense, to offer the clear causative relationship between his supposed nightmares and the relapses that Mr. Martin-Crawford suffered subsequently is spurious. This seems more clearly to be a casting of blame and inaccurate responsibility on the Family for behavior that Mr. Martin-Crawford engaged in of his own volition. The fact that Mr. Martin-Crawford, years after his successful graduation from the Family, continues to claim it was responsible for his ongoing personal struggles, is dubious at best.

Mr. Martin-Crawford asserts that 4 of his 25 classmates are `sober' today. (Please note that at The Family and elsewhere, `sober' is often the word often used as a general term to describe someone being in a positive state of recovery from what may be numerous negative behavior patterns.)

Whether Mr. Martin-Crawford is using the term in this general sense or in the more literal one, suggesting that those referenced are abstinent from alcohol, it is clearly a positive attribution to The Family. This raises another interesting point. Presuming that this is a correct statement and assuming that none of the other classmates have reaped any legitimate benefits from their experience at The Family, (another logical stretch for the point of argument here), then Mr. Martin-Crawford is in fact asserting that 16% of his group has made a significant positive accomplishment! If Mr. Martin-Crawford were to further investigate the data on recovery rates and behavior change for troubled adolescents over time, as difficult as it is to gather and interpret accurately, he may be surprised at the success he attributed to The Family, albeit perhaps unwittingly, in his House testimony.

Mr. Martin-Crawford indicated that he had to fabricate stories of how poor his behavior was before arriving at The Family in order to create the illusion that he was getting better as a result of his stay at the school. He asserted that this was necessary in order to appease the staff members.

While he did perhaps engage in fabrication, as he claims, it was not in fact necessary. In viewing the dynamics of The Family, or any other environment that is attempting to help troubled teen-agers come to terms with their own behavior in an honest and straight-forward manner, one is advised to consider a proposition that I suspect almost all parents, including me, would be in accordance with. That is that the full truth may not always be included in the initial explanations offered by our kids! This is especially likely when the teens are in the midst of negative behavior or other addictive patterns. Perhaps if Mr. Martin-Crawford had spent more time and attention on examining his own personal liabilities, which is a core tenet of The Family's and many other therapeutic models, rather than on attempting to `beat the system,' he would have gained further useful insight into how even the `small' deceitful actions of word and thought may be at the root of one's difficulties or at the least be contributors to one's problems.

There are many other drastic misrepresentations and key omissions in Mr. Martin-Crawford's testimony. I am sure that anyone with even minimal exposure to The Family would find the comments of Mr. Martin-Crawford both outrageous and frankly, rather sad. As much as I dispute his erroneous testimony, I can also honestly say that I feel bad for John in light of his apparent state of mind at present. That he seems to be mired in a morass of self-pity and blame toward, as they say, `the hand that fed him' troubles me on a personal level. As The Family suggests though, it is important to oppose someone's actions at times but to also reach a hand out to them simultaneously. This is a challenging call to action of course but one that I will certainly take

on regarding John. I will make myself available to him as a friend and
mentor should he wish to make that connection.

Beyond the scope of his commentary though, I would like to conclude
by suggesting that members of this great body, those in whom we as
citizens have placed our trust to do what's best with our most precious
resources, visit The Family personally. You could then experience
firsthand a place where so many thankful parents have entrusted their
most precious resources--their children--into the hands of the most
caring, wise and humble group of dedicated helpers and teachers you
will find. Taking the time to do so would likely be a welcomed and
refreshing change from the daily grind of Washington and would give you
the unrivaled benefits of direct exposure to assess its merits and
intentions. The Family School is not perfect but it has been so dearly
close enough for so many grateful parents and alumni who swear by it.
As successful as The Family has been, however, it remains very open to
constructive criticism to improve itself at every level. Its track
record clearly reflects its commitment to a constant, open-minded and
positive evolution. And by the way, it couldn't hurt to know of a great
place for a troubled teen. Perhaps someday you may need it!

Thank you again for your patient consideration of my comments. It
is deeply appreciated.

                              Sal Guarino,
                              Sanford, FL.

                        _____

                        Scott Montgomery,
                             West Point, TX.

To Whom It May Concern: This Letter is in support of the Family
Foundation School and staff who work miracles with kids having a
difficult time finding their way. My daughter has been at the school
for 1 year and is doing extremely well compared to what she was like
when enrolled. My daughter thanks me every time I see her for saving
her life and I agree. There may be other programs out there but I was
fortunate enough to find this one and am very pleased at what my
daughter has accomplished with the care and guidance of the FFS staff.
I can actually say I am proud of her today, something I could not have
said a year ago. I am sure that what ever comes of this the staff at
the FFS will learn from it and incorporate it into the every day life
at the FFS. If you are in doubt I urge you to visit the FFS and see for
yourself what this place of miracles is all about.

        Thank You

                        Scott Montgomery.

                        _____

                             May 2, 2008.
To Whom It May Concern: The intention of my letter is to encourage
the members of the Education and Labor Committee to make therapeutic
programs (specifically wilderness and residential treatment centers)
available to struggling adolescents and their families which are safe
and therapeutically appropriate.

I write as a parent and taxpayer to communicate my experience with
two programs (the Aspen Education Group (SUWS-Idaho wilderness program)
(``SUWS'') and the New Haven Residential Treatment Center (``New
Haven'')) we used which helped save our adolescent daughter's life. The
SUWS therapeutic wilderness program took place outside Boise Idaho and
New Haven is located in Spanish Fork, Utah should you wish to look into
their programming. My daughter has successfully transitioned from both
SUWS and New Haven to a therapeutic boarding school this past year and
continues on her journey in a less structured environment.

My daughter had a traumatic childhood. In 2006 we required the
different interventions offered by SUWS and thereafter New Haven. When
we started down this path of intervention we were full of fear, anxiety
and hopelessness. SUWS (for the summer) and New Haven (the following
school year) provided us with a sanctuary of safety, compassion and
hope so that we could all develop life-strengthening skills and begin

to examine the core issues that got us to this point.

Tragically, there have been instances of abuse and neglect in wilderness and residential treatment center programs. There is a compelling need for states to license and regulate therapeutic programs so that the safety and welfare of children in need of such services can be carefully safeguarded. The U.S. House Education and Labor Committee has convened hearings to consider allegations (some verified, some not) of abuse and neglect within private therapeutic wilderness and residential treatment center programs. To date, the majority of the voices heard have condemned such programs. There are, however, thousands of positive stories of rehabilitation and healing at many residential treatment centers and wilderness programs. I would like to go on record stating that our daughter's life and the life of our family have been saved by two of these programs. We have been given a second chance. We could not have done the work needed without this intervention.

Programs like SUWS and New Haven have saved lives, overcome incredible challenges, restored broken families through the participation of family members themselves, and helped youths reclaim their lives to become productive members of society. You should be aware that there is a broad spectrum of available programs run responsibly, safely and with integrity. I urge you to consider what programs like SUWS and New Haven are doing and support their life changing work with regulation to weed out the horror story programs. Please share our experience with your colleagues in Congress. You have an obligation to protect families and children by ensuring that responsible, safe and much-needed programs like SUWS and New Haven may continue into the future with proper regulatory oversight.

Our family has been blessed by many, many gifts we received from the staff, therapists, and treatment personnel at both SUWS and New Haven RTC. We hope that such services will be available to others in the future in their time of crisis.

Sincerely,
Wendy M. Broadbent.

———

Jupiter, FL, April 28th, 2008.

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.

Re: Hearing on ``Child Abuse and Deceptive Marketing by Residential
        Programs for Teens''

Dear Congressman Miller: I would like to thank you and the Committee for exposing a multi-billion dollar plus industry that has been allowed to run amok without effective regulatory oversight, licensing or enforcement. It is my understanding that I may submit the following, for Congressional Record. I apologize for the length of this letter, however to give an accurate summation of the depth of deception and corruption that we encountered, I found it necessary.

In November of 2004, my daughter Tenley Aleksandra Ryan was admitted to what we understood was a ``Therapeutic Boarding School'' called Hidden Lake Academy (HLA) in Dahlonega, Georgia, owned by Leonard Buccellato. We were referred to the academy by her psychologist who provided a brochure of Hidden Lake Academy. I visited the academy web-site, telephoned the academy and was forwarded literature including a ``Parent Handbook''. Up until this point, I had no idea what a ``Therapeutic Boarding School'' entailed. I was desperate to save my daughter, as all else was failing. Hidden Lake Academy offered hope, we were vulnerable and thus a continuing nightmare unfolded.

Hidden Lake Academy Marketing Representations as apparent in all literature/media provided:
        Licensed Therapeutic Boarding School
        All peer group counselors were licensed with a Masters Degree level or higher

All teachers were certified in their field by the State of Georgia

Clay Erikson, ``M.D.'' Director of Addiction Services(Addiction counselor)

24 hour RN on staff to dispense psychotropic medications

SACS accredited ( including Science lab required for College Preparatory Credit)

No violent or court ordered children were accepted

Safe, nurturing environment

Restrictions involved light tasks such as raking and would not be `corporal'; duration would be limited one hour, to an hour and a half after classes.

Pre-paid tuition refunded minus last month's deposit (if child was pulled early)

As a ``Therapeutic Boarding School,'' fees/expenditures were tax deductible

   The Truth:

Hidden Lake Academy was not a ``licensed Therapeutic Boarding School'' ( in their attorney's own written words to Carol Winstead ORS, ``therapeutic is a marketing term'' Quirk and Quirk P.C., August 8th, 2004''). HLA was marketed to other states as a licensed TBS, accepting out-of-state IEP students and children under the ``No Child Left Behind ACT''. No record of students transported from state to state pursuant to the ICPC, as exempt from licensure, although HLA accepted students nationwide for a `therapeutic' program.

All peer group counselors were not licensed by the State of Georgia. The only licensed counselors were the owner, Leonard Buccellato, who did not counsel children, but instead signed off on counseling bills for tax purposes and Joe Stapp (currently new Headmaster). For example, Kees de Ventes, Spiritual Coordinator, was given a peer group to counsel and taught English without any qualifications. Another counselor, Chris Grimwood lists an M.S.W. from'' Farington University'' an on-line diploma mill.

Farington University is not accepted by the State of Georgia Department of Education, therefore he cannot be licensed.

All teachers were not certified in their field by the State of Georgia (cross utilized without permission from SACS) Example:. Kees De Ventes, Spiritual Coordinator .

Clay Erikson, M.D. Director of Addiction Services was stripped of his M.D. in the State of Washington in 1999.

R.N. was not always on staff to dispense medication, office receptionists frequently dispensed medications. There were dangerous mistakes made.

SACS--There was never a Science Lab on premises. HLA counsel Quirk and Quirk wrote that ``a mobile lab was purchased'', but HLA Director of Operations, teachers and staff later confirmed that a mobile lab was never purchased.

Violent and court ordered children were accepted into and attended Hidden Lake Academy. Psychiatrists later reported that Leonard Buccellato asked them to change the children's diagnosis so the child could meet school parameters. For example, changing a diagnosis of Pedophilia to ODD(Opposition Defiant Disorder).

The environment was not safe, nor was it nurturing. It was based on fear. Relentless screaming and grilling of the children ensued. Attempted suicides, rapes, cuttings, broken limbs, zip-tying, cold-cocking, hazing, and other egregious harms occurred that were not properly documented or reported, and were denied by the school. However, EMS records clearly indicate the incidents occurred, including ``life flight'' transport.

Restrictions would go as long as eight hours. Parents requested restriction guidelines during a `parent workshop' and the guidelines were never provided. Climbing up and down a hill for hours at instructors pace in all weather.

Carrying logs and boulders across a field for hours in all weather.

Relentless push-ups in a Goose Laden Field, no gloves provided

Picking up Goose feces with no gloves provided
Girls were not permitted to use lavatories, but instead told to use the ``wood-line''
Leonard Buccellato used the children as labor both at HLA, his private home, at his mother's home and clearing land for new stables. (OSHA)
HLA withheld pre-paid tuition monies for services not used or provided, if child was withdrawn.
Because HLA was specifically and intentionally not a licensed Child Caring Institution under the tax code, the fees of the mere private boarding school were not properly tax deductible. Nevertheless, Owner Buccellato signed off on the counseling bills, when he never saw the children, for the unauthorized deductions taken by the unknowing parents.
Other Abuses:
At no time, was I or other parents, informed that our minor children would be strip searched by HLA staff, without parental consent.
At no time were we ever informed our children would be held at ``the Chalet'', away from the main campus, if on restrictions when agencies or educational consultants visited.
At no time was I or other parents informed that children would be used as informants against each other during ``fall-out''. If a child did not oblige, there were severe negative consequences.
After much research about HLA, the following Georgia authorities were contacted by me and several other parents regarding the misrepresentations and abuses at HLA:
Governor Perdue; Secretary of State Cathy Cox(then); Attorney General Thurbert Baker
Tobin McDaniel GAO State of Georgia; Department of Human Resources--Office of Regulatory Services--Residential Child Care--CPS; Margaret Palli DHR; Carol Winstead DHR/ORS; Nina Edidin ORS Attorney; Tamisha Jones ORS;
Keith Bostick DHR/ORS; Sharon Dougherty ORS; Amy Murphy DHR/ORS
Katherine Wallace DHR/CPS; Cara Adams DHR/ORS/CPS; Mollie Fleeman Secretary of State Professional Licensing Board; Georgia Medical Board Agent: Adrienne Baker; State Fire Marshall; IRS Fresno, CA(on-line Fraud reporting); Department of Education; GAC;
SACS--Southern Association Of Colleges--Dr. Judy Flatt
CASI--Council on Accreditation and School Improvement--Dr. Judy Flatt
SAIS--Southern Association of Independent Schools--Tom Redmon
The Georgia ORS refused to require licensure of HLA as a Child Caring Institution (Therapeutic Boarding School) despite years of parent inquiries, complaints and pressure until HLA was hit by a class action based on fraudulent business practices that brought public attention. The ORS finally succumbed, and CPS launched an investigation into Hidden Lake Academy in the summer of 2006. CPS investigators told me they found that suicide attempts, rapes, cuttings, broken bones, zip tying, cold cocking and the like were never reported to CPS by either HLA, the Lumpkin County Sheriff's Department, Chestatee Hospital, and other responsible institutions. Either there was no protocol in place, or if there was protocol in place, it was not followed. The ORS knew that psychotropic drugs were being dispensed, there was a ``Director of Addictions,'' albeit stripped of his medical license, and many children were given the wrong medication by a receptionist or whoever was available to dispense meds. ORS also was aware of the lack of licensing among the counseling staff. Nevertheless, ORS Director Keith Bostick still refused to require HLA to be licensed as a Child Caring Facility, until finally in December of 2006, the ORS was forced to admit that Hidden Lake Academy had indeed been operating under the radar for 12 years as a ``Therapeutic Boarding School'', a ``Child Caring Institution'' without proper licensure. Despite the CPS report of 2006, ORS granted HLA two consecutive six month temporary licenses. Mr. Bostick assured us that if HLA did comply with the regulations in the

first six months, ORS would shut them down. Nothing had changed, he did not shut them down.

Now ORS has allowed HLA owner Buccellato to recently open a new school, Mountain Brook Academy(MBA) on the same premises as HLA. The ORS license shows ``Ridge Creek-Mountain Brook as a single entity, though Ridge Creek is the `sister' Wilderness Program to HLA and a separate entity. Mountain Brook Academy advertises itself as a ``Residential Treatment Center''. According to the Georgia Department of Juvenile Justice (DJJ), they were told Mountain Brook ``is some kind of wilderness program'' and Chris Grimwood of HLA called looking to take ``base-line offenders'' initially. Mountain Brook would be a lock down facility on the same campus as the three other non-secure schools. ORS will oversee the residential aspect of the program, granting a license and MHDDAD will oversee mental health. The DJJ stated ORS will make their recommendation for application and contract of MBA to the JDD. Mr. Grimwood assured the DJJ that facilities were separate and apparently already has counseling in place. MBA will utilize all staff from Hidden Lake Academy. To put it mildly, this is highly irregular.

Numerous letters and calls to SACS and SAIS were also to no avail. Even with proof that HLA was operating at a sub-par educational level, with hand-picked colleagues making the accreditation visit and review(no Science lab, cross utilization of non-degreed teachers in different fields), they all did nothing.

Attorney General Thurbert Baker's office in a phone call, suggested ``off the record'', I go to the media. I was told the AG's office represents the ORS and the ORS has ``sovereign immunity''. I received a letter this year from the AG's office stating that I may wish to call ``the Better Business Bureau''.

In March of 2006, I contacted Berger and Montague of Philadelphia, September 2006, a class action lawsuit was filed. August 15, 2007, Judge O'Kelley denied the Class Suit, without prejudice. I have since objected to `minute' class wide settlement with prejudice, as it would bear no responsibility for what has been allowed to transpire, not just pertaining to Leonard Buccellato, but the ORS and all State of Georgia agencies, entities that turned their back on our children.

In the interest of the Committee, the testimony of Dr. Christopher Belloncini of the Walker School, may be conflicting. In the spirit of full disclosure, the President of the Walker School is listed as Benjamin W. Thorndike, of Bain Capital, LLC. Because Bain Education was acquired by CRC Health; Bain Capital acquired CRC Health, owning Aspen Education. As reported on FICA:

10/27/2007--Emily Graeber, a 15 year old Missouri girl, goes `missing' on the way back to Aspen Education Group--owned program Island View RTC.(still missing as of 11/09/2207

06/28/2207--Brendan James Blum, a 14 year old California boy, died of a bowel obstruction after complaining of pain, losing bowel control and vomiting, but only given over-the-counter medicine and being told to go to bed. He was enrolled in Aspen Education Group-owned Youth Care RTC in Draper, Utah.

04/2007--Unidentified 16 year old attempted to hang himself from a tree at the ranch with a shoelace. After some time the staff found him unconscious and revived him, but he later died in the helicopter transporting him to the hospital. This took place in Aspen Achievement Academy in Loa, Utah.

There is far more regarding Hidden Lake Academy, but I will not try your patience any more. I have submitted documents to Keith Steck of the GAO and Keith is very aware of Hidden Lake Academy and Leonard Buccellato. I hope this letter will be of some help to the Committee and

I would be happy to address any questions you all may have and do whatever I can to bring safety, transparency, effectiveness and accountability to an out-of-control industry.

Thank you again, for the children.

Respectfully,

Jill Ohanesian-Ryan,

Jupiter, FL.

———

Plano, TX, April 28, 2008.

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.

Re: Hearing on ``Child Abuse and Deceptive Marketing by Residential
       Programs for Teens''
    Dear Congressman Miller: Thank you for your dedication and efforts
regarding this matter. As a parent of two children who were abused in a
three private facilities, and who received no assistance from
government agencies, I understand the importance and necessity of this
action and legislation. I share your mission and have worked diligently
on public internet forums to expose the fraudulent nature of such
programs for the past seven years, trying to get accurate information
to parents so they might make informed choices for their children. No
child should be subjected to abuse and the risk of death under the
guise of ``therapy'' or ``treatment''.
    My older son attended Harlingen Marine Military Academy in the late
90s, which had many similarities to these behavior modification
programs. He was heinously abused during the six months he attended. My
son was a plaintiff in a class action suit and received one of the
largest settlements, due to the nature of his abuse.
    Four years later, my former husband enrolled our younger son at San
Marcos Baptist Military Academy which was closer to home and had a
better reputation. A week after he was there he reported his dorm
officer for molesting the children in his dorm. A repeat offender, that
staff is currently serving a 95 year sentence. Since then, there was
another incidence of sexual misconduct by staff. SMBMA promptly changed
their name to San Marcos Baptist Academy, to avoid public scrutiny, and
continues to operate. Aspen Education now has a weight loss program
operating on SMBA's sizeable campus.
    Following that incident, my son was terrified and began to act out.
Consequently, he was expelled, at which time his father took him to
Hidden Lake Academy (HLA) in Ga. I was not informed or consulted, my
parental rights ignored. That is when I first learned of the private
behavior modification industry. He was 14 at the time. While I did not
enroll my son, I believe my testimony is worthy of your consideration.
I have been in contact with many divorced parents who have found
themselves in this situation and were unable to get their child out of
a program once they were enrolled. Hidden Lake Academy presented false
information to the judge, via telephone, in our family court hearing;
that swayed the judge to rule that my son would stay, consoling me with
the promise to make up my lost visitation. To that, I would implore you
to add something into the legislation that would prevent this from
happening to other divorced parents. Admittance should require the
approval and signatures of both parents.
    My former husband used an Educational Consultant, as required by
HLA. When I spoke to her some time later, she knew nothing about my
son. She knew nothing of HLAs methods and policies and stated that she
referred to HLA based on the owner's reputation. I contacted the
authorities in my state to inquire as to whether she was licensed or
required to be if placing children out-of-state. In fact, such a person
is required to be licensed, but they did not pursue this because she
hadn't physically taken him to HLA. She never met him or my son, simply
spoke to my former husband by phone, and collected a significant sum of
money for a referral to a program she literally knew nothing about.
    As part of this fraudulent industry, there should be stringent
requirements placed on Educational Consultants, who should also be
regulated. At a minimum, they should be required to confirm that the
facilities they refer to are properly licensed, ensure that a pre-
placement evaluation has been conducted to prove the necessity of such
an austere placement, and face adverse action if they violate

regulations. I taped, then transcribed my discussion with her and
posted it on the internet to educate prospective parents. While
kickbacks from programs to Ed Cons may be difficult to prove, HLAs
Headmaster told parents attending the workshop that while HLA couldn't
compensate Ed Cons, parents who provided a receipt would receive a $250
refund that they could do with as they pleased. His tone made his
intention clear. In a NATSAP press release it was reported that Aspen
Education granted $100,000 to the IECA--Independent Educational
Consultants Association, earmarked for training Ed Cons on placing
teens in private residential programs.

Merideth Burns PhD of HLA testified by phone at our family court
hearing. She impressed upon the judge that my son was on a ``slippery
slope'' and needed the treatment HLA offered. My son had no diagnosis
prior to attending HLA. He was diagnosed as ODD by HLA, ``based on his
father's complaints'' the day he was enrolled. I felt this to be a
conflict of interest. I went to court to ask that he be brought home
for Christmas so I could have an independent evaluation conducted to
show the placement was unnecessary. Ms Burns told the judge that his
father would loose $110,000 in pre-paid tuition if our son left the
facility. After the hearing I learned that this was false, based on the
refund policy, which is documented.

When I received the call from Mike Witherspoon at HLA stating that
my son had been enrolled, I asked by what authority he was able to
severe contact between me and my son. Was he in trouble with law
enforcement? Were they a Psychiatric Hospital? Was there a court order
stating that contact between us was not in his best interest? No. They
were a Therapeutic Boarding School, that was their policy, and his
father had agreed to abide by it. I had grave concerns, which only grew
with each passing day. Contact with his siblings, grandparents, and
extended family was also severed; for no just reason. He was totally
isolated from the outside world, and everyone who loved him. Mail and
phone calls were censored. He was, for all intents and purposes,
treated like a criminal. Tragically, a criminal who was not afforded
due process.

My son was placed at HLA in violation of the ICPC (Interstate
Compact) which at that time applied to these programs. I contacted the
ICPC office in my state. They deferred to the Georgia ICPC office's
decision that HLA was a private boarding school, therefore exempt from
ICPC requirements. I provided ample documentation to refute that ruling
and prove that they indeed met ICPCs criteria based on ``services
provided''. Neither office pursued it further. In fact, my state office
didn't even know the criteria or how to implement the ICPC. My
interactions with them are documented in emails. Yet, another failed
attempt to have my son removed from HLA. Another mishandling of our
situation by a government agency.

In case you're not aware, due to the efforts of Robin Arnold-
Williams, the ICPC no longer applies to ``parent-choice'' residential
programs. Ms Arnold-Williams was Executive Director of Utah DHS before
becoming Secretary of the Washington State Department of Social and
Health Services in 2005. As one can imagine, the industry disliked the
ICPC and sought to exempt their programs. Pre-placement proof of need
could significantly decrease profits by interfering with their ``strike
while the iron's hot'' strategy.

I first saw my son three months after he was enrolled at HLA.
Unfortunately, I don't have photo documentation, but he looked almost
as bad as Aaron Bacon did before he died. He was thin, skin was ashen
and dry. He was ill and had been for days. Our 36 hours together was
spent treating his symptoms. He explained to me the so-called treatment
he had received. I was a Counseling student at the time and was
appalled by his accounts. He cried frequently. He expressed frustration
and confusion. He didn't know how to comply because the rules were
constantly changing. They twisted his words and used them against him.
My once vibrant, confident, gregarious, son could not make eye contact
with people in public. He declined to make any decisions about where we
went or what we did. He was jittery and terrified of making a mistake

at the restaurant, and when he inevitably spilled his drink, he lost his appetite and demanded we leave. In the car, I reached to hold his hand. He cried and asked me not to show him affection, it was too confusing. We both cried. What kind of treatment was he receiving? As I would come to understand, the so-called therapy practices were not evidence-based, but based on Synanon and est, employed by mavericks of the Human Potential movement. Might I add, concepts that even adults struggle to comprehend. The origins of the ``therapy'' provided by CEDU programs and all their cloans, of which HLA is one, is well documented and I'd be happy to provide that if it is useful to this investigation. I believe this to be one of the most significant frauds being committed by most programs. Parents assume, based on the advertising and cost of the program, that their child will be receiving stellar, evidence-based treatment.

At this juncture, I have to ask, why insurance companies are paying for ``therapy'' that is not evidence-based? Further, why are parents allowed to take tax deductions for travel expenses to visit their ``disabled'' child, if that child is enrolled in an unlicensed facility which fraudulently claims to their regulatory agency to be nothing more than a private boarding school, but all the while advertises to the public as a Therapeutic Program? Why are school districts paying tuition to unlicensed facilities for children with IEPs who need specialized care, when education is typically inadequate in programs? Citizen of the US are assisting parents in paying exorbitant money for non evidence-based behavior modification.

During our short visit my son divulged that he had been on restrictions for most of the time he'd been there for minor offenses and many times for unsubstantiated claims made by others. He detailed the diet he had consumed while on restrictions. This explained his weight loss. The Headmaster had mentioned that we might hear about the infamous ``Restrictions Diet'' in the parent workshop, stating that ``while sparse, the diet had been approved by the Health Dept''. He implored parents not to be manipulated by their child's complaints, but rather tell them that they were aware of the diet and supported what HLA was doing. Months later, when another issue arose, I inquired with the Health Department to confirm that they had approved the diet. They had not approved the diet and further stated that it wasn't within their scope of duties to do so. This is documented in emails.

The restrictions diet was not mentioned in the Parent Handbook, just as many other punishments. My neighbor, who was the Head of the Nutrition Dept at a local community college told me it was a starvation diet, most likely used for submission, as in Oliver. She said that no teen should consume that diet for more than 24 hours. She also said that given the strenuous nature of the work my son was required to do as punishment, that he should be consuming 3000 calories per day. This is documented in email. My son developed a dependence on Claritin and Flonase due to the excessive consumption of white bread and cheese sandwiches for two meals per day, for months on end.

When my son was denied his first home visit at 7 months, under very suspicious circumstances, I began to research the facility more thoroughly. He was instead sent to Ridge Creek (RC), their newly opened wilderness program. He was in the second group of kids and his placement there was a violation of HLAs own policies at that time. Their marketing stated that RC was not a ``boot camp'', but rather an outdoor leadership program. The facts didn't support that. The Director and all the staff that had daily contact with the children were ex-military. The Director did not possess the necessary credentials or experience to run such a program and most of the staff did not possess credentials or experience working with youth. I have documentation of all staff at that time and their biographies.

In my research I discovered that residential and wilderness programs were required to be licensed in Georgia, but neither HLA nor RC were. Meredith Burns at HLA told me that wilderness programs were not required to be licensed in Ga and refused to have my son removed from RC and sent back to HLA. In June 2001 I contacted Jo Cato at the

Office of Regulatory Services (ORS). I sent her ample documentation to
aid her in identifying the services provided by both facilities,
including links to their online marketing and information from the
Parent Handbook. They conducted an investigation and reported that RC
was required to apply for licensure, but they determined that HLA was
exempt due to their classification as a private boarding school. This,
in spite of the significant documentation I had sent to refute it. I
requested to be sent a copy of the final report of their investigation
of HLA through the open records act. I never received it.

When HLA discovered that I had reported them to ORS, they executed
a successful plan to label me ``adversarial''. They falsely claimed
that I was harassing staff at home and on campus. Without demonstrating
any form of proof, it was decided that I would be forbidden from
calling the facility; all calls had to be placed through their
corporate attorney. Calls were slow to be returned, if at all. I rarely
received my scheduled phone calls with my son for the remainder of his
stay, which was almost a year. They successfully severed contact
between us. It was very difficult to get a pass for my son to attend my
father's wake. HLA offered 24 hours to travel over a thousand miles,
attend the wake, and be back on campus. Their attorney overrode them
and allowed 72 hours. This is documented in email.

As for the College Prep education HLA advertises, my son was an A/B
student before attending HLA. He left there, just short of two years,
five credits behind his peers at home. He had to attend summer school
in order to graduate with his class.

Prior to my former husband withdrawing our son from HLA two months
before graduation, he was slated to attend a traditional boarding
school in the NE. This was required by HLA policy as part of their
``warranty''. If a child did not attend one of their pre-approved
boarding schools following graduation, the warranty would be void. This
is common to the industry, and it's my belief that it's designed to
keep the child as far away from their parents as possible in order to
further the illusion that the ``program worked''.

Resigning myself to the fact that no one could aid me in getting my
son out of HLA, I began to report my experience on the internet in
hopes of contacting other parents who had similar experience with HLA
and other programs. Several years later, I did meet other parents who
were displeased with their experience. We formed a group and
collectively made demands to ORS to properly license HLA, to no avail.
I'm aware that you have received detailed testimony on this issue, so I
won't reiterate all the details of our experience. Except to say that
after several failed attempts, appealing all the way up to the
Governor, HLA was finally required to apply for licensure in 2006, six
years after my first request.

Aware that scores of children had died in wilderness programs, I
was very worried about my son while he was at RC. I asked ORS amongst
others, to act on my son's behalf and remove him from HLAs unlicensed
wilderness program. He remained the full 28 days. He had been out of RC
just a few weeks when I learned that our former neighbor, Ian August,
had died at Skyline Journey in Utah. Ian was one of the GAOs case
studies in the first hearing. I closely followed that case, which was a
gross miscarriage of justice. Familiar with Utah regulations, I noted
over 20 violations based on public comments made by the program owner
and staff, and law enforcement alone. The Licensing Rep who was sent to
investigate attended the same LDS ward as the owner of SJ, and no
violations were cited. When the DA filed charges, Stettler's comment
was, ``Crud, there's got to be something''. He sent a different rep
that cited 4 violations. As you may know, SJs license was eventually
revoked but they continue to operate under the name Distant Drums.

Regarding deceptive marketing practices in general, I can provide
documentation that many of the so-called independent studies published,
touting the effectiveness of the programs, were indeed conducted by
people who formerly had or still have direct connections to programs.
One such study was prepared by Ellen Behrens and staff at ``Evidence
Based Consulting''. She was formerly the director of Aspen's Youth Care

facility where Brandon Blum died recently due to medical neglect.
Partners Smoot and Fenstermacher have connections with Aspen and other
programs. Jan Moss of NATSAP then attempted to apply that study to the
entire industry when it only included 9 Aspen programs. To my knowledge
there hasn't been one genuinely independent, third-party study
conducted to date.

    Over the years, I've noticed serious problems with State Licensing.
Woodside Trails Wilderness was closed due to deplorable conditions,
resulting from an investigation by the Comptroller. The state revoked
their license and removed all state placed children. Woodside changed
their name to Eagle Pines Academy and continued to do business as
usual, as a private boarding school which was exempt from regulation.
The state was aware of this. I sent a letter to Licensing imploring
them to act, telling them that this was a common strategy within the
industry. I didn't get a response. The owner of Woodside, Bebe Gaines,
was on the first Board of NATSAP at that time that this happened.

    Star Ranch's license was revoked following two deaths (restraint
and negligence) and numerous violations of abuse and neglect. While
they aren't allowed to apply for a license to operate an RTC for five
years following a revocation, they are operating with a permit as a
non-residential summer camp called Charis Hills Camp. A non-profit,
religious-based program.

    Aspen Education (now CRC/Bain Capital) owns several programs here
in Texas. Excel is one of them and is not licensed. Recently a child
was taken from the facility to the county jail for a wake up call. He
was turned over to inmates who forced him to disrobe and proceeded to
smear vasoline on his back side. He was taken by the Director of Excel
and an employee of Excel who also worked for the Sheriff's department.

    To this day, Aspen's Academy at Swift River remains unlicensed.
They escorted the state off their property. Why doesn't licensing take
a stronger stand? They could enter the property with a court order and
demand that ASR apply for licensure. Why aren't they motivated to do
so?

    As Ken Stettler--Director of Licensing in Utah--commented, the
state is ``reactive'', not ``proactive''. That is a fundamental flaw
where states are concerned given that they have the authority and are
sanctioned to inspect programs they suspect are operating without a
license. Due to public pressure, Utah has the most comprehensive
regulations of all the states, but are still lacking. The problem in
Utah and elsewhere, solid regulations will not protect children if
Licensing doesn't fulfill their obligation to enforce them. When Ken
Stettler stated publicly that he trusted his fellow moron saints to
correct the violations found at NorthStar (prior to Aaron Bacon's
death), he should've been removed from his post and replaced with
someone who had no direct personal connections to the industry. It has
always seemed a conflict of interest that Utah licensing has articles
written by one of their employees, Carol Sisco, which promote
wilderness therapy.

    I particularly appreciate that this legislation provides for a
website for the purpose of disseminating information. I hope that
advocates such as my self will be allowed to submit public information
for consideration. ISAC--International Survivor's Action Committee has
a useful format that could be considered as a model At a minimum, I
feel it would be useful to provide links to the state licensing page,
and that states be required to post all investigations of abuse and
violations of regulations that were cited during monitoring visits.
Texas and Georgia do post most inspection reports, but Utah and other
states don't post any.

    One common defense used by state licensing agencies is that there
is not ample financial resource to adequately monitor these programs.
Attention should be give to that. Programs should pay a significant
permit fee and should incur stiff fines for violations of regulations.
If their record shows repeated violations, they should be put on
probation and monitored more frequently and incur the necessary expense
of this extra monitoring. Just as reckless drivers pay a higher

insurance premium. The taxpayer should not bear the burden.

I'm very pleased about the National Hotline. Careful thought should be given to how to ensure that children and staff have access to that phone at all times. If a program is ever found to have denied access to or retaliated for a call placed to the hotline, that should be grounds for immediate revocation of their permit and significant fine. Ironically, these programs desperately need the discipline and consequences that they purport to provide to children.

NATSAPs creation was funded by the owner of HLA. They claim that their programs are either licensed or accredited with agencies such as JCAHO, giving parents a false sense of security. Last I checked, only \1/3\ of their programs were licensed. Most parents do not understand the difference between the terms ``licensed'' and ``accredited'' and what aspect of the program are monitored by each. Fourteen deaths at Vision Quest and still accredited by JCAHO. Four deaths at Catherine Freer and still accredited. Ironically, Paul Smith of CF was appointed to JCAHOs Behavioral Health Advisory Board and CF was selected as a test site for the purpose of ``sharpening the focus on the accreditation process, emphasizing safety and quality of patient care''. Considered an ``Industry Leader'', there had been 3 deaths at CF at that time, and a fourth shortly after.

Regarding Sen McKowen's comment regarding the lack of criminal action in these deaths, there are several reasons I believe this to be. First and foremost, there appears to be a general feeling that these kids deserve what they get, by some citizens, judges, and prosecutors. On Track Wilderness, displeased with the first Medical Examiner's stated cause of death, hired a private Medical Examiner who coined the term ``excited delirium'' which puts the blame for a child's death during restraint squarely on the child. Appalling, but true. This was the Chase Moody death. If one investigates thoroughly, they will find the reasons there are no criminal charges filed. But, that is possibly a different investigation.

I will close there. It is very difficult, as this is but the tip of the iceberg. I have been researching and compiling information on the industry and the people involved for seven years. I would love to put that information to good use, and would be happy to answer any questions or provide further information that might assist this investigation.

Thank you again for your time.
Sincerely,

Deborah Thomas-Vigliano,
Plano, Texas.

————

[Questions submitted to the witnesses and their responses follow:]

U.S. House of Representatives,
Washington, DC, May 9, 2008.
Christopher Bellonci, M.D.,
Medical Director and Senior Clinical Consultant, Walker School,
Needham, MA.

Dear Dr. Bellonci: Thank you for testifying at the April 24, 2008 full Committee hearing, ``Child Abuse and Deceptive Marketing by Residential Programs for Teens.'' Below are the questions which Committee members have asked you to respond for the record. Please send an electronic version of your written response the Committee staff. If you have any questions, please contact us.

Ranking Member Howard P. ``Buck'' McKeon (R-CA) has asked that you respond to the following questions:

1. Does the Department of Health and Human Services (HHS) have the capacity to carry out direct Federal regulation of the variety of residential treatment centers discussed at the hearing?

2. If not, how long would it take HHS to develop the capacity?

3. How many staff would HHS have to hire to carry out inspections of every program and location in the country? How many staff would HHS

have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?
    4. If States were able to do a good job of regulating these
programs, would direct Federal regulation be necessary?
    Thank you for your time at the hearing and in responding to these
questions.
              Sincerely,

                                      George Miller,
                                                  Chairman.

                              ———

            Follow-Up Statement of Christopher Bellonci, M.D.

    Dear Chairman Miller: The Ranking Member, Howard P. ``Buck'' McKeon
has asked me to respond to several additional questions since I
provided testimony before your committee on April 24th. The first three
questions address the capacity of HHS to the goals of your legislation
entitled ``Stop Child Abuse in Residential Programs for Teens Act of
2008''. In that regard I am not prepared to render an opinion as I have
no knowledge of the functions and capacities of the HHS.
    Regarding the fourth question, addressing whether Federal oversight
would be needed if States were doing a better job of regulating these
programs, I have some thoughts. I think there is an appropriate role
for the Federal government to set clear definitional guidelines of what
qualifies as a Residential treatment center, a therapeutic boarding
school, a wilderness program or a bootcamp. These terms are often used
interchangeably and add to the confusion that exists for parents and in
the field of children's behavioral health. Once definitions were agreed
to, then States could more easily enforce regulation that may already
exist or develop or amend legislation and regulation if needed.
Unfortunately, experience has shown that States have either lacked the
ability or the will to regulate and license these programs on their
own, leaving untold thousands of children, youth and families
vulnerable to predatory marketing practices as was heard during your
hearings on this topic.
    I hope that this additional testimony is helpful as the committee
continues its deliberations.
              Sincerely,

                                Christopher Bellonci, M.D.

                              ———

                      U.S. House of Representatives,
                              Washington, DC, May 2, 2008.
Ms. Kay Brown, Director,
Education, Workforce, and Income Security, the U.S. Government
        Accountability Office, Washington, DC.
    Dear Ms. Brown: Thank you for testifying at the April 24, 2008 full
Committee hearing, ``Child Abuse and Deceptive Marketing by Residential
Programs for Teens.'' Below are the questions which Committee members
have asked you to respond for the record. Please send an electronic
version of your written response the Committee staff. If you have any
questions, please contact us.
    Ranking Member Howard P. ``Buck'' McKeon (R-CA) has asked that you
respond to the following questions:
    1. Does the Department of Health and Human Services (HHS) have the
capacity to carry out direct Federal regulation of the variety of
residential treatment centers discussed at the hearing?
    2. If not, how long would it take HHS to develop the capacity?
    3. How many staff would HHS have to hire to carry out inspections
of every program and location in the country? How many staff would HHS
have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?

4. If States were able to do a good job of regulating these
programs, would direct Federal regulation be necessary?
    Representative Robert Scott (D-VA), has asked for your
recommendations on oversight for programs not covered under the
definition of H.R. 5876 that you thought should be covered.
    Representative Todd Platts (R-PA) has asked for a description of
the ideal oversight/regulation that should be practiced by states; and
    Representative Platts also asked that you submit the CRIPA report
referenced during your testimony for the record.
    Thank you for your time at the hearing and in responding to these
questions.
          Sincerely,
                                    George Miller,
                                        Chairman.

——————

                Follow-Up Statement of Kay E. Brown

    Dear Chairman Miller: Mr. Chairman: This correspondence addresses
questions submitted by committee Members to the GAO on May 2, 2008
following our testimony at the above-referenced hearing.
Questions Submitted by Ranking Member Howard P. ``Buck'' McKeon
    1. Does the Department of Health and Human Services (HHS) have the
capacity to carry out direct federal regulation of the variety of
residential treatment centers discussed at the hearing?
    2. If not, how long would it take HHS to develop the capacity?
    3. How many staff would HHS have to hire to carry out inspections
of every programs and location in the country? How many staff would HHS
have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?
    4. If states were able to do a good job of regulating these
programs, would direct federal regulation be necessary?
    GAO Response: We do not have the information necessary to respond
to questions regarding the capacity of HHS and the staff needed to
directly regulate residential facilities. This information is beyond
the scope of our study.
    Regarding the question of whether direct federal regulation would
be needed if states were able to do a good job of regulating
residential facilities: We found that states' regulation and oversight
and the existing patchwork of federal legislation and oversight have
failed to provide needed protections to youth in some facilities.
However, in our forthcoming report to be issued in mid-May, 2008 (see
Residential Facilities: Improved Data and Enhanced Oversight Would Help
Safeguard the Well-Being of Youth with Behavioral and Emotional
Challenges, GAO-08-346), we identify actions that states, federal
agencies, and the Congress could take, either together or
independently, to address these issues, and we offer policy options for
each to consider. Options for states focus on ways to expand and
improve oversight for residential facilities. States could expand
licensing coverage to establish minimum standards for youth in all
facilities. In some cases, this would require changes in state law or
regulation. Other options include requiring accreditation for all
residential facilities that serve youth, either in addition to or in
lieu of licensing, or creating common contract provisions for all
facilities. States would need to devote the necessary resources to
support regular and effective monitoring to ensure that their new
efforts were achieving the goals.
Question Submitted by Representative Robert Scott
    What are GAO's recommendations for oversight of programs not
covered under the definition of H.R. 5876 that GAO thinks should be
covered?
    GAO Response: Our report showed that youth well-being was at
greater risk in all types of government operated and private facilities

that did not benefit from the full spectrum of oversight activities, such as licensing, standards of care that address common risks to youth well-being, and monitoring. We identified gaps in licensing for both government-operated and private facilities--such as juvenile justice facilities and residential schools and academies. As currently written, H.R. 5876 covers a wide range of types of residential facilities, including private facilities. It is important to cover all types of private facilities to prevent facility operators from self-identifying their program as a type that is not covered by state licensing or, in this case, by federal oversight.

However, the bill does not cover programs that are operated by a governmental entity. Based on our work, we have found that some government operated facilities, such as juvenile justice facilities, are often exempt from state licensing requirements altogether. Annual reports prepared by the Department of Justice Civil Rights Division document patterns of severe youth maltreatment and civil rights violations in these government-operated facilities. Therefore, our report results would support a comprehensive system of licensing for all residential facilities with the common goal of serving youth with behavioral and emotional challenges, regardless of type of facility or whether such facilities were owned or operated by government or private entities.

Question Submitted by Representative Todd Platts

What is a description of the ideal oversight/regulation that should be practiced by states?

Please submit a copy of the CRIPA report referenced during the GAO testimony.

GAO Response: Our forthcoming report describes a set of fundamental elements that are needed for an effective oversight system. These include:

    minimum standards of care that address the primary risks to all aspects of youth well-being;

    comprehensive state licensing that covers the spectrum of facilities with the common goal of serving youth with behavioral and emotional challenges, regardless of ownership, operation, and type;

    regular, timely, and rigorous monitoring that includes announced and unannounced on-site visits to ensure facility compliance with standards;

    a full range of enforcement options to give oversight bodies the flexibility to quickly address identified problems depending on their severity;

    data collection and reporting systems that can act as a feedback loop to assess adequacy of oversight efforts, identify areas of weakness or risk, and inform changes in oversight policy; and

    disclosure of data and reports to government agencies and the public to allow them to make informed choices about use of facilities.

It should be noted that these elements together form the foundation for a minimum system of oversight to help ensure the safety of youth in residential facilities. For example, the basic standards we cover in our in our report include requirements that facilities pass inspection of the physical plant and have procedures in place for use of approved seclusion and restraint techniques, among others. However, these basic standards do not address the quality of the services provided or ensure a facility's success in helping youth address their behavioral or emotional challenges.

The past three CRIPA reports used in the GAO testimony for fiscal years 2004, 2005, and 2006, are included as attachments to this correspondence. In addition, these reports and other information on investigations done under the auspices of the Civil Rights for Institutionalized Persons Act can be found on the following Web site http://www.usdoj.gov/crt/split/findsettle.htm#congrep.

We appreciate the opportunity to provide this information to you and the committee on the issues of safeguarding youth well-being in residential facilities. We would be happy to provide any additional

information upon your request.
                Sincerely,
                        Kay E. Brown, Director,
        Education, Workforce, and Income Security, U.S. Government
                                Accountability Office.

————

                U.S. House of Representatives,
                        Washington, DC, May 9, 2008.
Mr. Gregory D. Kutz, Managing Director,
Forensic Audits and Special Investigations, the U.S. Government
        Accountability Office, Washington, DC.
    Dear Mr. Kutz: Thank you for testifying at the April 24, 2008 full
Committee hearing, ``Child Abuse and Deceptive Marketing by Residential
Programs for Teens.'' Below are the questions which Committee members
have asked you to respond for the record. Please send an electronic
version of your written response (in Word format) to Sarah Dyson of the
Committee staff at sarah.dyson@mail.house.gov. If you have any
questions, please contact Ms. Dyson at (202) 226-9403.
    Ranking Member Howard P. ``Buck'' McKeon (R-CA) has asked that you
respond to the following questions:
    1. Does the Department of Health and Human Services (HHS) have the
capacity to carry out direct Federal regulation of the variety of
residential treatment centers discussed at the hearing?
    2. If not, how long would it take HHS to develop the capacity?
    3. How many staff would HHS have to hire to carry out inspections
of every program and location in the country? How many staff would HHS
have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?
    4. If States were able to do a good job of regulating these
programs, would direct Federal regulation be necessary?
    Thank you for your time at the hearing and in responding to these
questions.
                Sincerely,

                                George Miller,
                                        Chairman.

————

                Follow-Up Statement of Gregory Kutz

    Dear Chairman Miller: This correspondence addresses questions
submitted by Ranking Member Howard P. ``Buck'' McKeon to Gregory Kutz,
Managing Director, Forensic Audits and Special Investigations (FSI), on
May 9, 2008, following our testimony at the above-referenced hearing.
Questions Submitted
    1. Does the Department of Health and Human Services (HHS) have the
capacity to carry out direct Federal regulation of the variety of
residential treatment centers discussed at the hearing?
    2. If not, how long would it take HHS to develop the capacity?
    3. How many staff would HHS have to hire to carry out inspections
of every program and location in the country? How many staff would HHS
have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?
    4. If States were able to do a good job of regulating these
programs, would direct Federal regulation be necessary?
    In addition to these questions, you asked FSI to create a chart
that reflects the state and local response and outcome of any
investigation or action taken by the state for the cases of death and
abuse FSI examined.
GAO Response
    In a letter dated May 8, 2008, GAO's Education, Workforce, and
Income Security (EWIS) Director, Kay Brown, who also testified at the

Committee's April 24, 2008 hearing, submitted GAO's response to these four questions. Similar to the EWIS response, FSI does not have any information to respond to questions regarding the capacity of HHS and the staff needed to directly regulate residential facilities or investigate complaints of child abuse received by a national hotline. This information is beyond the scope of FSI's work.

Regarding the question of whether federal regulation would be necessary if states were able to ``do a good job'' of regulating residential facilities:

As previously cited by EWIS in their response submitted May 8, 2008, GAO found that states' regulation and oversight and the existing patchwork of federal legislation and oversight have failed to provide needed protections to youth in some facilities. FSI found that, in some cases, even after action was taken against a program or staff member in one jurisdiction, that program or staff member was able to move beyond the jurisdiction of the admonishing court or agency and continue working in the industry in another jurisdiction, potentially placing additional children at risk of abuse or neglect.

GAO identified gaps in licensing for both government-operated and private facilities. A comprehensive system of licensing for all residential facilities is important to prevent facility operators from self-identifying their program as a type that is not covered by state licensing. FSI found that in some cases, even though a facility held one type of state license to operate, it did not have the required state license to provide the types of services it offered to the children under their care. States allowed some facilities to operate or obtain licensing even though they employed direct care staff not qualified or trained to effectively deal with the risks and problems children under their care were likely to experience, which sometimes resulted in the abuse, neglect, and death of those children. We reiterate that common definitions, minimum standards of care that address the primary risks to all aspects of youth well-being, and comprehensive licensing requirements that cover the spectrum of facilities with the common goal of serving youth with behavioral and emotional challenges are needed to safeguard children placed in these facilities (regardless of whether such facilities are owned or operated by government or private entities).

The lack of minimum standards of care and definitions common to all facilities located in all states hinders consumers' ability to identify the types of services a particular facility is required or even likely to provide. Parents and guardians do not have access to information that would help verify the qualifications or past history of the program or its staff. And in the cases we examined, the majority of the children were placed in programs located far from their state of residence, presenting additional obstacles for those parents and guardians to gain access to information.

Local or state law enforcement and state child protective service agencies may lack the ability to investigate complaints filed against facilities. They have cited obstacles such as being required to rely on the cooperation of facility operators for access to staff and potential victims; failure of facilities to report incidents or complaints of alleged abuse received or identified by the facility; or that they otherwise lack the authority they feel is needed to adequately investigate complaints of abuse.

In addition to the questions addressed above, you asked FSI to create a chart that reflects the state and local response and outcome of any investigation or action taken by the state for the cases of death and abuse FSI examined. This chart accompanies this letter as Enclosure I.

We appreciate the opportunity to provide this information to you. If you have any questions, please contact me at (202) 512-9505 or Andy O'Connell at (202) 512-7449.

                Sincerely,

                        Gregory Kutz, Managing Director,
                    Forensic Audits and Special Investigations.

Enclosure--1.

--------

------

U.S. House of Representatives,
                    Washington, DC, May 9, 2008.
Jon Martin-Crawford,
57 Hoose Blvd, Fishkill, NY.
    Dear Mr. Martin: Thank you for testifying at the April 24, 2008
full Committee hearing, ``Child Abuse and Deceptive Marketing by
Residential Programs for Teens.'' Below are the questions which
Committee members have asked you to respond for the record. Please send
an electronic version of your written response the Committee staff. If
you have any questions, please contact us.
    Ranking Member Howard P. ``Buck'' McKeon (R-CA) has asked that you
respond to the following questions:
    1. Does the Department of Health and Human Services (HHS) have the
capacity to carry out direct Federal regulation of the variety of
residential treatment centers discussed at the hearing?
    2. If not, how long would it take HHS to develop the capacity?
    3. How many staff would HHS have to hire to carry out inspections
of every program and location in the country? How many staff would HHS
have to hire to investigate all reports of child abuse and neglect
reported by the states and all complaints of child abuse or neglect
received by the proposed national hotline?
    4. If States were able to do a good job of regulating these
programs, would direct Federal regulation be necessary?
    Thank you for your time at the hearing and in responding to these
questions.
            Sincerely,
                                    George Miller,
                                            Chairman.

--------

            Follow-Up Statement of Jon Martin-Crawford

    Dear Chairman Miller: I apologize for the time it has taken to
respond to the questions asked, as I have been somewhat busy with my
educational requirements. Unfortunately, I can not answer the majority
of the questions as asked, because I am in no position to do given my
lack of understanding of the scope and necessity such a program would
entail. However, I do feel as if I can honestly, and quite helpfully,