offer my insights on the final question.

When asked if this is a problem that the states can handle without
federal intervention, the answer is clearly not as easy as we would
like. While ideally, this is a situation that all states should be able
to manage, it is clear that it is not something that has been done thus
far, while numerous states have been contacted about the abuses that go
on. Additionally, as was pointed out in the first hearing on October
10th, 2007, part of the problem with this industry is the ability for
programs to pick up and move from one state to the next, thus avoiding
reporting and penalty.

The ideal would be for all states to establish their own
regulations that are up to the same standards, or in excess of the
standards, of what has already been included in H.R. 5876. However,
until such time as the states act upon this call, it is evident that
the catalyst for such regulation must come from the federal government.
Just as was in the case with the paramount case of Brown v Board of
Ed., and other cases of integration during that important time in U.S.
History, it is clear that the federal government has an obligation in
this case to ensure proper and safe treatment for its most important
citizens * * * the children. As a nation, we are focused on bringing
evil to justice and being the leaders of a free, democratic world. We
have a responsibility to do so. Part of this responsibility starts
right here in our own home.

Many programs, already have called this legislation something that
is going to give ``drug dealers and predators'' easy access to
students. They have called for state, rather than any federal
legislation. They have repeated this empty claim for years. Jan Moss of
NATSAP sat and made the same statement, later creating a link for an
``ethical complaint process'' which has ever since been ``under
construction.'' While the need for programs to help the truly troubled
is undeniable, we must have a safety net in place to avoid the problems
that have gone on for far too long.

The proposed federal legislation is the tip of the iceberg when it
comes to what is necessary for states to adopt. While it seems to be
far reaching, the reality is that it is as loose as possible given the
scope of the problem. As such, I see no possible way for the states to
regulate such programs on their own until a federal mandate of
regulations is in place. Once each state meets such standards and is
able to self regulate in a safe and open way, perhaps the federal
legislation would be able to back off. Regardless, the suggestion of a
national reporting and statistics website is something that is useful
for the long haul, and should be implemented as quickly as possible.
Since the hearing, it is frightening how many parents have already
contacted myself and Mrs. Whitehead about such programs and their fears
of not knowing whether or not a program is safe. Without accurate
reporting parents are in the dark and childrens' lives are in the
balance. Please ensure that this bill moves quickly and efficiently
through the necessary channels. It is of the most crucial importance
for our future generations.

Sincerely,

Jon Martin-Crawford.

------

U.S. House of Representatives,
Washington, DC, May 9, 2008.

Ms. Kathryn Whitehead,
277 Starr St., Brooklyn NY.

Dear Ms. Whitehead: Thank you for testifying at the April 24, 2008
full Committee hearing, ``Child Abuse and Deceptive Marketing by
Residential Programs for Teens.'' Below are the questions which
Committee members have asked you to respond for the record. Please send
an electronic version of your written response the Committee staff. If
you have any questions, please contact us.

Ranking Member Howard P. ``Buck'' McKeon (R-CA) has asked that you
respond to the following questions:

1. Does the Department of Health and Human Services (HHS) have the capacity to carry out direct Federal regulation of the variety of residential treatment centers discussed at the hearing?

2. If not, how long would it take HHS to develop the capacity?

3. How many staff would HHS have to hire to carry out inspections of every program and location in the country? How many staff would HHS have to hire to investigate all reports of child abuse and neglect reported by the states and all complaints of child abuse or neglect received by the proposed national hotline?

4. If States were able to do a good job of regulating these programs, would direct Federal regulation be necessary?

Thank you for your time at the hearing and in responding to these questions.

———

Follow-Up Statement of Kathryn Whitehead

Dear Chairman Miller: In response to Ranking Member McKeon's request for a response for the record, I regret I am unqualified to comment on the first 3 questions. I would like to submit a response for the record on question 4.

If States were able to do a job of regulating these programs, would direct Federal legislation be necessary?

I do believe that federal regulation would play an important role in assuring youth safety and program accountability even in the event that effective regulation and monitoring policies were in place at the state level. I will touch upon the 3 concerns I have surrounding the loopholes that would remain present.

1. The history of the industry's fluidity, by which program operators easily relocate from one state to another, suggests a need for some type of monitoring at the federal level. Without federal regulation, a facility may easily be shut down in one state and open in a different state, under a different name. At the very least, the federal government should maintain a mechanism for tracking programs that have been closed for cause to ensure that they do not re-open in another state. Furthermore, in the event that one state has less stringent standards of oversight in scope and reach, parents may easily be deceived into thinking the same protections exist in the state in which they reside.

2. States do not maintain the same level of regulatory standards and thus there is variability across state lines. This problem can be addressed by setting a national level of requirements that becomes the basis for state regulation. Youth are often sent to a state they are not resident of. A white paper issued by the Department of Public Health and Human Services in the state of Montana titled, ``Unregulated Youth Residential Care Programs in Montana,'' it was estimated that ninety to 95 % of youth placed in ``therapeutic residential schools or programs'' are from out of state. In the best interest of youth, such interstate commerce of minors should receive federal oversight.

3. The historical failure of the ability of families to hold facilities accountable suggests a need for federal legislation such as H.R. 5876, which contains the ``Private Right of Action'' clause and will help circumvent the obstacles which have arisen when families attempt to hold programs accountable in court for their failure to meet the standards advertised or maltreatment of their child. By allowing for jurisdictional expansion and for courts to award punitive damage and costs, such as attorney fees, families will not be limited to seek justice in a state or county with a vested interest in the promoting the particular program accused or industry and help make cases more attractive to attorneys.

Sincerely,

Kathryn Whitehead.

———

Case 1:18-cv-10836-PGG   Document 143-2   Filed 02/03/20   Page 3 of 52

[Whereupon, at 12:25 p.m., the committee was adjourned.]

[House Hearing, 110 Congress]
[From the U.S. Government Printing Office]

Exhibit 107

# CASES OF CHILD NEGLECT AND ABUSE AT PRIVATE RESIDENTIAL TREATMENT FACILITIES

=======================================================================

HEARING

before the

COMMITTEE ON
EDUCATION AND LABOR

U.S. House of Representatives

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

_____

HEARING HELD IN WASHINGTON, DC, OCTOBER 10, 2007

_____

Serial No. 110-68

_____

Printed for the use of the Committee on Education and Labor

Available on the Internet:
http://www.gpoaccess.gov/congress/house/education/index.html

U.S. GOVERNMENT PRINTING OFFICE
38-055                    WASHINGTON : 2008
_____
For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512◆091800
Fax: (202) 512◆092104 Mail: Stop IDCC, Washington, DC 20402◆090001

COMMITTEE ON EDUCATION AND LABOR

GEORGE MILLER, California, Chairman

| | |
|---|---|
| Dale E. Kildee, Michigan, Vice Chairman | Howard P. ``Buck'' McKeon, California, |
| Donald M. Payne, New Jersey | Ranking Minority Member |
| Robert E. Andrews, New Jersey | Thomas E. Petri, Wisconsin |
| Robert C. ``Bobby'' Scott, Virginia | Peter Hoekstra, Michigan |
| Lynn C. Woolsey, California | Michael N. Castle, Delaware |
| Ruben Hinojosa, Texas | Mark E. Souder, Indiana |
| Carolyn McCarthy, New York | Vernon J. Ehlers, Michigan |
| John F. Tierney, Massachusetts | Judy Biggert, Illinois |
| Dennis J. Kucinich, Ohio | Todd Russell Platts, Pennsylvania |
| David Wu, Oregon | Ric Keller, Florida |
| Rush D. Holt, New Jersey | Joe Wilson, South Carolina |
| Susan A. Davis, California | John Kline, Minnesota |

Danny K. Davis, Illinois
Raul M. Grijalva, Arizona
Timothy H. Bishop, New York
Linda T. Sanchez, California
John P. Sarbanes, Maryland
Joe Sestak, Pennsylvania
David Loebsack, Iowa
Mazie Hirono, Hawaii
Jason Altmire, Pennsylvania
John A. Yarmuth, Kentucky
Phil Hare, Illinois
Yvette D. Clarke, New York
Joe Courtney, Connecticut
Carol Shea-Porter, New Hampshire

Cathy McMorris Rodgers, Washington
Kenny Marchant, Texas
Tom Price, Georgia
Luis G. Fortuno, Puerto Rico
Charles W. Boustany, Jr.,
    Louisiana
Virginia Foxx, North Carolina
John R. ``Randy'' Kuhl, Jr., New
    York
Rob Bishop, Utah
David Davis, Tennessee
Timothy Walberg, Michigan
Dean Heller, Nevada

Mark Zuckerman, Staff Director
Vic Klatt, Minority Staff Director

C O N T E N T S

----------

                                                              Page

Hearing held on October 10, 2007.................................    1

Statement of Members:
    Altmire, Hon. Jason, a Representative in Congress from the
        State of Pennsylvania, prepared statement of..............  132
    McKeon, Hon. Howard P. ``Buck,'' Senior Republican Member,
        Committee on Education and Labor..........................    5
            Prepared statement of.................................    6
    Miller, Hon. George, Chairman, Committee on Education and
        Labor.....................................................    1
            Prepared statement of.................................    3
            American Bar Association recommendations..............    7
        Alliance for the Safe, Therapeutic, and Appropriate Use
            of Residential Treatment (ASTART), statement of.......  132
        Letters submitted for the record..........................   11
        Questions for the record submitted to Dr. Pinto...........   26
        Questions for the record submitted to Mr. Kutz............   27
        Questions for the record submitted to Ms. Moss............   27

Statement of Witnesses:
    Bacon, Bob, father of Aaron Bacon.............................   41
            Prepared statement of.................................   43
    Harvey, Cynthia Clark, mother of Erica Clark Harvey...........   38
            Prepared statement of.................................   40
    Kutz, Greg, Managing Director, Forensic Audits and Special
        Investigations Unit, Government Accountability Office......   30
            Prepared statement and the GAO report, ``Residential
                Treatment Programs: Concerns Regarding Abuse and Death
                in Certain Programs for Troubled Youth,'' Internet
                address...........................................   32
            Responses to questions for the record.................   32
    Lewis, Paul, father of Ryan Lewis.............................   34
            Prepared statement of.................................   36
    Moss, Jan, executive director, National Association of
        Therapeutic Schools and Programs..........................   44
            Prepared statement of.................................   46
            Additional materials submitted........................   50
            Responses to questions for the record.................   64
    Pinto, Ph.D., Allison, research psychologist and assistant
        research professor, Louis de la Parte Florida Medical
        Health Institute, University of South Florida.............   75

Prepared statement of.................................... 77
Additional materials submitted.......................... 81
Responses to questions for the record................... 79

CASES OF CHILD NEGLECT AND
ABUSE AT PRIVATE RESIDENTIAL
TREATMENT FACILITIES

----------

Wednesday, October 10, 2007

U.S. House of Representatives

Committee on Education and Labor

Washington, DC

----------

The committee met, pursuant to call, at 10:33 a.m., in room
2175, Rayburn House Office Building, Hon. George Miller
[chairman of the committee] presiding.
Present: Representatives Miller, Kildee, Payne, Woolsey,
Hinojosa, McCarthy, Tierney, Kuchinich, Wu, Bishop of New York,
Sarbanes, Sestak, Loebsack, Hirono, Altmire, Clarke, McKeon,
Petri, Castle, Platts, Kline, Boustany, and Kuhl.
Staff present: Tylease Alli, Hearing Clerk; Jeff Appel, GAO
Detailee; Sarah Dyson, Investigative Associate, Oversight;
Patrick Findlay, Investigative Counsel; Denise Forte, Director
of Education Policy; Ruth Friedman, Senior Education Policy
Advisor (Early Childhood); Ryan Holden, Senior Investigator,
Oversight; Lamont Ivey, Staff Assistant, Education; Thomas
Kiley, Communications Director; Ann-Frances Lambert,
Administrative Assistant to Director of Education Policy;
Danielle Lee, Press/Outreach Assistant; Alex Nock, Deputy Staff
Director; Joe Novotny, Chief Clerk; Rachel Racusen, Deputy
Communications Director; Dray Thorne, Senior Systems
Administrator; Margaret Young, Staff Assistant, Education; Mark
Zuckerman, Staff Director; James Bergeron, Minority Deputy
Director of Education and Human Services Policy; Robert Borden,
Minority General Counsel; Cameron Coursen, Minority Assistant
Communications Director; Kirsten Duncan, Minority Professional
Staff Member; Taylor Hansen, Minority Legislative Assistant;
Victor Klatt, Minority Staff Director; Alexa Marrero, Minority
Communications Director; Susan Ross, Minority Director of
Education and Human Services Policy; and Linda Stevens,
Minority Chief Clerk/Assistant to the General Counsel.
Chairman Miller [presiding]. A quorum being present, the
investigative hearing of the Committee on Education and Labor
titled ``Cases of Child Neglect and Abuse in Private
Residential Treatment Facilities'' will come to order.
Pursuant to Committee Rule 12(a), any member may submit an
opening statement in writing which will be made part of the
permanent record, and I will recognize myself, followed by the
senior Republican member, Mr. McKeon, for an opening statement.
I want to welcome everybody to today's hearing on cases of
child neglect and abuse at private residential treatment
facilities. For a number of years now, I have been deeply
concerned about the allegations of child abuse in private
residential treatment programs, which are often referred to as
boot camps or wilderness programs or behavior modification

facilities. These allegations range from neglect to torture, a
word I do not use lightly.

Today, we will hear about neglect and abuse cases where the
outcome was the worst one imaginable, the death of a child. We
will hear testimony from parents of children who died, and I
thank them for joining us today and for having the courage to
speak publicly about their ordeals.

It is estimated that hundreds of private residential
treatment programs operate nationwide. The programs are
governed for the most part by a weak patchwork of state
regulations. In many states, these programs operate without
regulation, licensing or accreditation of any kind, despite
often exorbitant prices of tuition.

Parents often send their children to these programs when
they feel they have exhausted their alternatives. Their
children may be abusing drugs or alcohol, attempting to run
away or physically harm themselves, or otherwise acting out.
They send their children to these programs because the promises
of staff members to be able to help children straighten out
their lives.

In far too many cases, however, the very people entrusted
with the safety, the health and the welfare of these children
are the ones who violate the trust in some of the more horrific
ways imaginable. We are aware of stories where program staff
members have forced children to remain in seclusion for days at
a time, to remain in so-called stress positions for hours at a
time, to undergo extreme physical exertion without sufficient
food or water.

And, today, we will hear evidence of even more horrifying
stories of the children denied access to bathrooms, forced to
defecate on themselves, or children forced to eat dirt or their
own vomit, of children paired with older children, their so-
called buddies, whose job it essentially was to abuse them.
There is only one word for this behavior, and that is inhumane.

This nightmare has remained an open secret for years.
Sporadic news accounts of specific incidents have built a
record that should never have been ignored, but shamefully it
was and the federal government has completely failed to grasp
the urgency of this situation.

In 2003, I urged then Attorney General John Ashcroft to
begin an immediate investigation into reports of child abuse at
private residential treatment programs. The attorney general
refused, as did his successor, Alberto Gonzales.

I also then wrote Secretary of State Colin Powell asking
him to investigate the treatment of children in facilities
located overseas but serving American children and operated by
U.S. companies. Secretary Powell's response was insufficient.

We will learn today that a number of these programs
actually operate on federal land, yet no federal agency, not
the Bureau of Land Management nor the Department of Interior,
no one, has thought to review problems associated with these
federal tenants, despite repeated incidents of injury or death
of a child.

No federal agency keeps official data about the number of
children enrolled in private residential treatment programs,
despite the fact that children are typically transported across
state lines, sometimes even by force, in order to be enrolled
in the programs, and I believe that that is an outrage.

In late 2005, I asked the Government Accountability Office
to launch an investigation of private residential treatment
programs. The GAO agreed, and I am pleased that the GAO has
devoted its significant resources to this important issue.

Today, the GAO will present case studies of programs where
death has occurred. Next year, GAO expects to release an
industrywide review, thus providing us with a comprehensive

look at the industry.

In the past, it has been estimated that anywhere from 10,000 to 20,000 children are enrolled in these programs at any one time. I am sure that there are programs staffed by caring professional and competent staff members who do help to improve children's lives, yet there are clearly a number of programs staffed by untrained, unlicensed, poorly paid staff members who simply cannot be entrusted with the child's welfare.

As a result, without regulation, the industry as a whole will continue to present unacceptable risks to children it serves. That is why in 2005 I proposed legislation to provide resources to states to help them create licensing standards for private residential treatment programs. The legislation would also boost the oversight of facilities overseas operated by U.S. companies.

This hearing, as well as the ongoing work by GAO and by the committee's investigative staff, will help determine if it is the appropriate legislative response or if the situation demands something else.

One thing is clear, however, that in light of the findings we will hear today, Congress must act and it must act swiftly to ensure the wellbeing of children participating in these programs. We can all agree we have no mandate more urgent than keeping children safe.

I would like to thank all of our witnesses for joining us today. We will look forward to your testimony and working with you to put a stop to these abuses.

And now I would like to yield to Congressman McKeon for his opening statement.

[The statement of Mr. Miller follows:]

Prepared Statement of Hon. George Miller, Chairman, Committee on
Education and Labor

Good morning.

Welcome to today's hearing on ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities.''

For a number of years now, I have been deeply concerned about allegations of child abuse in private residential treatment programs, which are often referred to as ``boot camps,'' ``wilderness programs,'' or ``behavior modification facilities.''

These allegations range from neglect to torture--a word that I don't use lightly.

Today, we will hear about neglect and abuse cases where the outcome was the worst one imaginable: the death of a child. We will hear testimony from the parents of children who died. I thank them for joining us today and for having the courage to speak publicly about their ordeals.

It is estimated that hundreds of private residential treatment programs operate nationwide. The programs are governed by a weak patchwork of state regulations. In many states, these programs operate without regulations, licensing, or accreditation of any kind, despite the often exorbitant price of tuition.

Parents often send their children to these programs when they feel they have exhausted their alternatives. Their children may be abusing drugs or alcohol, attempting to run away or physically harm themselves, or otherwise acting out. They send their children to these programs because of the promise that staff members will be able to help children straighten their lives out.

In far too many cases, however, the very people entrusted with the safety, health, and welfare of these children are the ones who violate that trust in some of the most horrific ways imaginable.

We have heard stories where program staff members forced children to remain in seclusion for days at a time; to remain in so-called ``stress'' positions for hours at a time; or to undergo extreme

physical exertion without sufficient food and water.

Today, we will hear even more horrifying stories, of children denied access to bathrooms and forced to defecate on themselves. Of children forced to eat dirt or their own vomit. Of children paired with older children--so-called ``buddies''--whose job it is, essentially, to abuse them.

There is only one word for these behaviors: Inhuman.

This nightmare has remained an open secret for years. Sporadic news accounts of specific incidents have built a record that should never have been ignored, but shamefully was.

The federal government has completely failed to grasp the urgency of this situation.

In 2003, I urged then-Attorney General John Ashcroft to begin an immediate investigation into reports of child abuse at private residential treatment programs. The Attorney General refused, as did his successor, Alberto Gonzales.

I also wrote to then-Secretary of State Colin Powell asking him to investigate the treatment of children in facilities located overseas but serving American children and operated by U.S. companies. Secretary Powell's response was insufficient.

We will learn today that a number of these programs actually operate on federal land. Yet no federal agency--not the Bureau of Land Management, not the Department of the Interior, no one--has thought to review problems associated with these federal tenants, despite repeated incidents ending in the injury or death of a child.

No federal agency keeps official data about the number of children enrolled in private residential treatment programs, despite that fact that children are typically transported across state lines--sometimes even by force--in order to be enrolled in the programs.

This is an outrage.

In late 2005, I asked the Government Accountability Office to launch an investigation of private residential treatment programs. The GAO agreed, and I am pleased that GAO has devoted significant resources to this important issue. Today, the GAO will present case studies of programs where deaths occurred. Next year, GAO expects to release an industry-wide review, thus providing us with a comprehensive look at the industry.

In the past, it has been estimated that anywhere from 10,000 to 20,000 children have been enrolled in these programs at any one time.

I am sure that there are programs staffed by caring, professional, competent staff members, who do help to improve children's lives. Yet there are clearly a number of programs staffed by untrained, unlicensed, poorly paid staff members who simply cannot be entrusted with children's welfare. As a result, without regulations, the industry as a whole will continue to present unacceptable risks to the children it serves.

That is why, in 2005, I proposed legislation to provide resources to states to help them create licensing standards for private residential treatment programs. The legislation would also boost oversight of facilities overseas operated by U.S. companies.

This hearing, as well as the ongoing work by GAO and by the Committee's investigative staff, will help determine if that is the appropriate legislative response or if the situation demands something else.

One thing is clear, however: In light of the findings we will hear today, Congress must act, and it must act swiftly, to ensure the well-being of children participating in these programs. We can all agree that we have no mandate more urgent than keeping children safe.

I'd like to thank all of our witnesses for joining us today. We look forward to your testimony and to working with you to put a stop to these abuses.

Thank you.

———

Mr. McKeon. I thank the chairman for yielding.

Today's hearing will explore a difficult topic. The facilities we will be looking at receive no federal funding and, therefore, are not regulated by the federal juvenile justice legislation under this committee's jurisdiction. Nonetheless, the allegations of mistreatment raise a number of serious questions.

I want to recognize the families who are here today and thank them for their willingness to share their personal stories. The loss of a child is something no parent should have to endure.

I also want to take the opportunity to recognize the Government Accountability Office for its work in this area. Often on issues like these where our jurisdiction as federal lawmakers may be uncertain, the GAO's work can help provide clarity. This includes an analysis of how these programs are funded and regulated and what efforts are in place currently at the state level, but also perhaps at the federal level to ensure the safety and effectiveness of the programs.

We will also hear today from a researcher in this field and, on behalf of practitioners, the National Association of Therapeutic Schools and Programs, who can offer perspectives on the regulatory framework in place as well as steps that can be taken to improve upon current requirements to protect the youth in these facilities.

As I understand it, the work of the GAO has focused on the question of whether allegations of abuse and death at these residential treatment facilities are widespread and on providing a review of the case studies. The GAO was unable to differentiate between public and private programs in determining how prevalent these allegations are, which demonstrates how difficult it may be to address this issue at the federal level.

It seems to me that the question of how widespread these alleged incidents of mistreatment are is critical. Of course, even one incident of abuse or, worse, the loss of life is unacceptable.

But before we consider federal intervention, we need to better understand the breadth of the problem so we can determine the best way to protect the youth in these programs. We need to take a step back to evaluate what an appropriate federal role would be, if any, in regulating these programs. This requires that we first understand current federal involvement, an area I hope we will explore today.

Many of these facilities have been established to serve children who are deeply troubled, whether they are suffering from drug addiction or severe emotional or behavioral problems. Many of the youth who enter these facilities are placed there by their parents as a last resort.

This committee has held a series of hearings this year to examine how we can improve our juvenile justice system. Our efforts have focused on identifying effective strategies that prevent juvenile delinquency and encourage healthy child development. Although these privately funded programs are not currently governed by the juvenile justice statute under our jurisdiction, I hope we can examine this issue through the broader context of juvenile delinquency prevention in order to understand how existing programs can meet the needs of troubled youth.

Once again, let me thank the witnesses for being here to help shed light on these facilities, the role they play in serving troubled youth and the efforts at the state and local level to ensure safety.

I yield back the balance of my time.
[The statement of Mr. McKeon follows:]

Prepared Statement of Hon. Howard P. ``Buck'' McKeon, Senior Republican
Member, Committee on Education and Labor

     I thank the gentleman for yielding.
     Today's hearing will explore a difficult topic. The facilities we
will be looking at receive no federal funding, and therefore are not
regulated by the federal juvenile justice legislation under this
Committee's jurisdiction. Nonetheless, the allegations of mistreatment
raise a number of serious questions.
     I want to recognize the families who are here today and thank them
for their willingness to share their personal stories. The loss of a
child is something no parent should have to endure.
     I also want to take the opportunity to recognize the Government
Accountability Office for its work in this area. Often on issues like
these, where our jurisdiction as federal lawmakers may be uncertain,
the GAO's work can help provide clarity. This includes an analysis of
how these programs are funded and regulated, and what efforts are in
place currently--at the state level, but also perhaps at the federal
level--to ensure the safety and effectiveness of the programs.
     We will also hear today from a researcher in this field and, on
behalf of practitioners, the National Association of Therapeutic
Schools and Programs, who can offer perspectives on the regulatory
framework in place, as well as steps that can be taken to improve upon
current requirements to protect the youth in these facilities.
     As I understand it, the work of the GAO has focused on the question
of whether allegations of abuse and death at these residential
treatment facilities are widespread, and on providing a review of case
studies. The GAO was unable to differentiate between public and private
programs in determining how prevalent these allegations are, which
demonstrates how difficult it may be to address this issue at the
federal level.
     It seems to me that the question of how widespread these alleged
incidents of mistreatment are is critical. Of course even one incident
of abuse or worse, the loss of life, is unacceptable. But before we
even consider federal intervention, we need to better understand the
breadth of the problem so we can determine the best way to protect the
youth in these programs. We need to take a step back to evaluate what
an appropriate federal role would be, if any, in regulating these
programs. This requires that we first understand current federal
involvement, an area I hope we will explore today.
     Many of these facilities have been established to serve children
who are deeply troubled. Whether they are suffering from drug addiction
or severe emotional or behavioral problems, many of the youth who enter
these facilities are placed there by their parents as a last resort.
     This Committee has held a series of hearings this year to examine
how we can improve our juvenile justice system. Our efforts have
focused on identifying effective strategies that prevent juvenile
delinquency and encourage healthy child development. Although these
privately-funded programs are not currently governed by the juvenile
justice statute under our jurisdiction, I hope we can examine this
issue through the broader context of juvenile delinquency prevention in
order to understand how existing programs can meet the needs of
troubled youth.
     Once again, let me thank the witnesses for being here to help shed
light on these facilities, the role they play in serving troubled
youth, and the efforts at the state and local level to ensure safety. I
yield back the balance of my time.

                      ——————

     Chairman Miller. I thank the gentleman for his statement.
     Without objection, all members will have 14 days to submit
additional materials and questions for the hearing record.
     [The American Bar Association Recommendations, submitted by
Mr. Miller, follow:]

American Bar Association Recommendations

February 12, 2007

RESOLVED, That the American Bar Association urges state, territorial, and tribal legislatures to enact laws that require the licensing, regulating, and monitoring of residential treatment facilities that are not funded by public or government systems, but are privately-operated overnight facilities that offer treatment to at-risk children and youth under age 18 for emotional, behavioral, educational, substance abuse, and social issues and problems, including strenuous athletic, mental health, and tough love programs. This legislation should:

1. Require licensure of, or otherwise regulate, private residential treatment facilities by defining clearly which programs must comply with the statute and impose minimum legal requirements to operate and maintain them, including standards regarding staff qualifications and residents' physical and emotional safety, educational, mental health, and other treatment needs.

2. Require government monitoring and enforcement of the operational standards outlined in the statute.

3. Promote the preferred use of appropriate in-home and community-based prevention and intervention programs for at-risk children and youth by requiring enhanced governmental support that provides families with better access to these programs.

FURTHER RESOLVED, That the American Bar Association urges the Congress to enact legislation that would assure the safety of American children and youth placed in U.S-owned, but foreign-based unregulated private residential treatment facilities by requiring U.S. federal agencies to work with foreign governments to monitor such facilities regularly.

Report: The ABA Youth at Risk Initiative and Relevant ABA Policy

In August 2006, American Bar Association (ABA) President Karen Mathis launched the ABA Youth at Risk Initiative geared towards youth ages 13 to 19 who are at risk of entering juvenile and criminal justice systems. Many of these youth and families face problems that elevate this risk, including serious unmet mental health needs, serious emotional or behavioral problems, bad peer choices, and gang involvement.

They require the use of proven, ``evidence-based'' services including appropriate in-home services that resolve these problems with the youth's family and in the community.\1\ Also in August 2006, the ABA House of Delegates approved a recommendation urging state, territorial, and tribal governments to ensure that ``community mental health systems serving youth are reinvigorated and significantly expanded to provide greater access to troubled youth and their caretakers.''

The ABA has long supported appropriate government regulation and oversight of residential facilities serving children and youth. In 1979, the House of Delegates approved the Institute of Judicial Administration/American Bar Association Juvenile Justice Standards, in which the ABA called for ``the provision of a safe, humane, caring environment, and access to required services for juveniles'' with the ``least possible restriction of liberty'' necessary and a ``careful adherence to legal rights'' (Standard 1.2, Standards Relating to Correctional Administration). The standards also encouraged governments and independent agencies to assure the protection of juveniles' substantive and procedural rights and pertinent laws and regulations were ``continuously complied with'' (Standards 1.2, 1.3, Standards Relating to Monitoring).

More recent ABA resolutions have addressed similar and related issues. In 2004, an ABA resolution encouraged the use of law to ensure foster care children have ``uninterrupted education access'' (August 2004). The ABA has also called for an increase in funding and financing ``for public mental health services so that * * * juveniles with mental

health or emotional illness or disorders can obtain the support
necessary to enable them to live independently in the community, and to
avoid contact with the criminal and juvenile justice systems.''
(February 2004). In 1990, the ABA passed a resolution supporting
juveniles' right to physical safety ``to be protected from abuse,
physical violence, and sexual assault while in foster custody'' (August
1990).

In August 2004, the ABA approved Standards for the Custody,
Placement and Care; Legal Representation; and Adjudication of
Unaccompanied Alien Children in the United States. The standards state
that unaccompanied alien children in residential facilities must always
``be treated with dignity, respect and special concern for [their]
particular vulnerability as a child'' (III.B). They are ``entitled to a
reasonable right of privacy'' including ``the ability to talk privately
on the phone without automatic monitoring; to receive and send
uncensored mail; and to meet privately with attorneys and other
visitors'' (III.K). The standards also state that unaccompanied alien
children must be protected ``from all forms of physical, sexual or
mental violence, injury or abuse, as well as neglect, abandonment,
maltreatment and exploitation'' while in residential care (III.L).
United States citizen children and youth placed by their parents or
others in purportedly ``therapeutic'' unregulated private residential
facilities require and deserve no less protection.

This is by no means the first time the ABA has called for the
protection of American children from harm in the international context.
Indeed, the safety of American youth who might be placed in foreign-
based facilities is also related to earlier concerns for children
addressed by the House of Delegates. In August 1997, the Association
endorsed U.S. ratification and full implementation of the Hague
Convention on Jurisdiction, Applicable Law, Recognition, Enforcement
and Co-operation in Respect of Parental Responsibility and Measures for
the Protection of Children, which calls for protection of children who
cross national borders. In February 1991, the ABA urged U.S.
ratification of the Convention on the Rights of the Child (now ratified
by over 190 nations but not the U.S.) which contains several provisions
focused on the protection of children who cross national borders. Much
earlier, the ABA's call for the U.S. ratification of the Hague
Convention on Civil Aspects of International Child Abduction (of which
the U.S. is a party) demonstrates another instance of the ABA's concern
for children's welfare when they are victims of international care and
custody disputes.
Unregulated Private Residential Treatment Facilities

Since the early-1990s, parents have been placing their children and
youth in unregulated private residential treatment facilities at an
increasing rate. Hundreds of U.S. and foreign-based facilities have
opened in the last ten years. It is estimated that these facilities
serve between 10,000 and 14,000 American youth per year.\2\ Despite
research on the efficacy of community-based and family-centered
intervention and prevention programs and treatment, thousands of
parents bypass available public systems and send, at their own expense,
their ``troubled'' children and youth to unregulated private
residential treatment facilities.

As relayed in numerous newspaper articles and exposes, many
children and youth enrolled in these programs are not afforded basic
and fundamental rights and protections. Public media accounts share
disturbing reports by youth and parents describing inferior treatments,
educational access violations, and instances of mental, physical, and
sexual maltreatment, neglect, and abuse.\3\ The Bazelon Center for
Mental Health Law collected the following documented accounts (through
media and Bazelon Center investigations and interviews) that represent
only a fraction of the abuses children and youth have experienced: \4\

    Limitations on the ability to contact parents for extended
periods of time;

    Overuse of medication to control behaviors. In some cases
children and youth were permanently disfigured because of over-

medication;
    Confiscation of children's and youths' shoes to prevent
them from running away;
    Use of physical restraint techniques that last for hours
at a time. The overuse of restraints has led to the death of some
children and youth; and
    Sexual abuse by facility staff members, in some instances
having young girls exchange sexual favors for food.
    Despite egregious abuses, these facilities continue to grow in
number and size. The industry is booming and reportedly worth over a
billion dollars.\5\ A parent may pay between $3,000 and $5,000 dollars
a month to send their child or youth to an unregulated private
residential treatment facility and not be able to monitor his or her
progress because of rules limiting family contact.\6\ The industry
prospers on promises to modify troublesome behaviors and to make
``bad'' kids good. Its financial sustainability is assured by frequent
deceptive advertising on the internet that market facilities as
offering an array of mental health and educational services that are
often not available or provided by unqualified staff.\7\
    In 2005, Representative George Miller (D-CA) asked the U.S.
Government Accountability Office (GAO) to conduct a comprehensive
investigation of unregulated private residential treatment facilities
in light of repeated reports and allegations of child abuse and fraud.
In August of 2005, the Children's Welfare League of America also called
upon the GAO to conduct such an investigation, but it has not yet done
so.
Regulation, Oversight, and Monitoring of U.S.-Based Unregulated Private
        Residential Treatment Facilities
    The first part of this recommendation calls for state legislatures
to pass laws that require states to license, regulate, and monitor
unregulated private residential treatment facilities for children and
youth. First, the recommendation encourages state legislators to define
clearly which programs must comply with the law. Many unregulated
private facilities have easily avoided state licensure and monitoring
by claiming exemption in vague exceptions to state licensure
requirements. For example, one facility skirted state oversight by
designating itself as a ``boarding school'' rather than a residential
treatment facility, despite its lack of educational services.\8\ Many
state laws include broad provisions regarding oversight of residential
treatment facilities that are easily avoided by programs that chose to
designate themselves as something else, e.g., a ``boot camp'' or
``boarding school.''
    The first part of the recommendation also encourages states to
establish and enforce standards for licensure that assure the safety,
health, and well-being of children and youth placed in these
facilities. This standards requirement intends to combat the human
rights violations and abuses that have occurred at so many facilities
that remain unregulated by state law. Only a handful of states have
proposed or passed comprehensive legislation that establish standards
to monitor and regulate private residential treatment facilities for
children and youth.
    For example, in 2005, the Utah legislature passed a law that
expands state licensing requirements to all residential treatment
programs, including ``therapeutic schools.'' \9\ The Utah law requires
the Utah Department of Human Services, Office of Licensing to establish
health and safety standards for residential treatment licensees that
address client safety and protection, staff qualifications and
training, and the administration of medical procedures and standards.
The new law also empowers the licensing office to revoke licenses if
covered residential programs fail to meet the law's standards or engage
in conduct that poses a substantial risk of harm to any person. Any
facility that continues to operate in violation of the law is guilty of
a misdemeanor, if the violation endangers the welfare of clients. The
law also requires the licensing office to designate local government
officials as residential treatment facility inspectors who are charged

with conducting compliance assessments.

Finally, the first part of this recommendation encourages state legislatures to assure families access to in-home and community-based prevention services that have proven effective instead of unregulated private residential treatment facilities that have not shown their efficacy.\10\ Studies show that community mental health programs for children and youth with significant mental health and behavioral problems are more effective and less costly.\11\ In 1999, the U.S. Surgeon General, in his report on mental health, found that admissions to residential treatment facilities had been justified on the basis of community and child protection. These justifications, however, do not stand up to research scrutiny. Seriously violent and aggressive children and youth do not improve in these settings and community interventions that target change in peer associations are highly effective at reducing aggressive behaviors. Moreover, children and youth who need protection from themselves (i.e., who attempt suicide, persistently run away, or abuse drugs) may require a brief hospitalization for an acute crisis, but subsequent intensive community-based services may be more appropriate than a residential treatment facility.\12\

In 2003, the U.S. President's New Freedom Commission on Mental Health called for better systems of care to detect early childhood emotional disturbances and provide prevention and intervention services to prevent these problems from worsening.\13\ A year later, the National Institutes of Health, State of the Science Conference-- Preventing Violence and Related Health Risking Social Behaviors in Adolescents issued a statement affirming that ``scare tactics'' used at ``get tough'' programs and boot camps don't work and in fact may make children's and youths' behavioral problems worse.\14\ Finally, communities all over the country have begun to implement evidence-based community programs for at-risk children and youth, such as treatment foster care, wraparound services, multisystemic therapy, and functional family therapy.

Regulation, Oversight, and Monitoring of Foreign-Based Unregulated
        Private Residential Treatment Facilities

The second part of this recommendation calls upon the federal government to oversee the operations of U.S.-owned unregulated private residential treatment facilities that are located abroad. To avoid state regulation and monitoring, many U.S. companies have opened private residential treatment facilities in the Caribbean or overseas. Some of the most egregious human rights violations against American children and youth have occurred in foreign-based unregulated facilities where they are restricted from communicating with family.\15\

To respond to these abuses, in 2004, the U.S. Department of State issued a fact sheet on privately-owned overseas behavior modification facilities stating that some facilities ask parents to sign contracts giving staff broad authority to take any action deemed necessary to assure children's and youths' progress in the program.\16\ The fact sheet also warns that children's and youths' communication privileges and contact with family and the outside world may be restricted. Finally, it warns parents that:

The Department of State has no authority to regulate these entities * * * and does not maintain information about their corporate or legal structures or their relationships to each other or to organizations in the United States. The host country where the facility is located is solely responsible for compliance with any local safety, health, sanitation, and educational laws and regulations, including all licensing requirements of the staff in that country. These standards may not be strictly enforced or meet the standards of similar facilities in the United States. The Department of State has, at various times, received complaints about nutrition, housing, education, health issues, and methods of punishment used at some facilities.

Prior to enrolling their minor children in such overseas ``Behavior Modification Facilities,'' the Department of State strongly recommends

parents/guardians visit the facility and thoroughly inform themselves about both the facility and the host country's rules governing it and its employees.

In the 109th Congress (2005), Representative Miller (D-CA) proposed the ``End Institutional Abuse Against Children Act,'' \17\ which requires the U.S. Department of Justice to coordinate with foreign countries to investigate and inspect foreign-based private residential treatment facilities, periodically. The proposed legislation also requires the justice department to issue protection and safety rules for foreign-based programs and requires the U.S. Department of State to report any abuses of American children and youth.

Conclusion

In February 2006, then ABA President-Elect Karen Mathis held a planning conference for her Youth at Risk Initiative. Sixty child welfare and juvenile justice experts participated in the conference and recommended that the ABA encourage the passage of legislation that:

Prohibit[s] the operation of unlicensed, unregulated residential treatment facilities that operate programs whose efficacy has not been proven empirically, such as boot camps, tough love, and ``scared straight'' programs, and require the closing of such facilities. The law should provide for such facilities to be replaced with: better access to preventative services, with a focus on family involvement and community-based resources wherever possible; and carefully regulated ``residential treatment facilities'' that are reserved for youth whose dangerous behavior cannot be controlled except in a secure setting.

These recommendations are a step towards achieving these goals. State and federal legislators have begun to take action in light of the abuses that have befallen children and youth placed by their parents in unregulated private residential treatment facilities. However, there is no comprehensive collection of data available about the number of programs that exist or the extent to which they are licensed, monitored or regulated. In many states there is a paucity of regulatory oversight or monitoring for these programs and as of yet, there is no federal guidance on the issue. It is time for the ABA to respond to these problems. The ABA must educate itself on the issues relating to this disturbing trend and encourage change that emphasizes the regulation, monitoring, and evaluation of unregulated private residential treatment facilities.


Respectfully submitted by Dwight Smith, Chairperson, Commission on Youth At Risk, February 2007.

Executive summary

         1. Summary of the Recommendation

This recommendation encourages efforts to require the licensing, regulating, and monitoring of residential treatment facilities that are not funded by public or government systems, but are privately-operated overnight facilities that offer treatment to at-risk children and youth for emotional, behavioral, educational, substance abuse, and social issues and problems, including strenuous athletic, mental health, and tough love programs.

         2. Summary of the Issue Which the Recommendation Addresses

This recommendation addresses the lack of government oversight and monitoring of private unregulated residential treatment facilities by outlining aspects of government regulation that should be instituted to impose minimum legal requirements to operate and maintain these facilities, including standards regarding residents' physical and emotional safety.

         3. Explanation of how the proposed policy will address the issue

This resolution calls attention to the problems that face thousands of children and youth who are sent to private residential treatment facilities that are not regulated or monitored by government. It encourages such regulation and promotes the use of community-based services to ensure that these children and youth receive appropriate assistance that meets their educational, mental health and other

treatment needs in a physically and emotionally safe environment. By bringing the ABA's influence to bear on the entities that should oversee these programs, this resolution will encourage greater awareness, increased knowledge, improved laws and policies for these children and youth at risk.

    4. Summary of Any Identified Minority Views or Opposition
No opposition to this recommendation has been identified.

### ENDNOTES

\1\ ``Evidenced-based'' refers to intervention and prevention programs that have been carefully assessed to determine their long-term positive outcomes.

\2\ Pinto, A., et. al., Exploitation in the Name of `Specialty Schooling:' What Counts as Sufficient Data? What are Psychologists to Do? Tampa, FL: Louis de la Parte Florida Mental Health Institute, University of South Florida, 2005. .

\3\ Gorenfeld, J. ``No More Nightmares at Tranquility Bay?'' AlterNet, January 2006; Dibble, S. ``Scrutiny Increased on Centers for Teens,'' The San Diego Union Tribune, January 2005; Rowe, R. ``Tranquility Bay: The Last Resort,'' BBC News-World Edition, December 2004; Labi, N. ``Want Your Kid to Disappear?'' Legal Affairs, July/August 2004; Kilzer, L. ``Desperate Measures,'' Denver Rocky Mountain News, July 1999.

\4\ The Bazelon Center for Mental Health Law. Fact Sheet: Children in Residential Treatment Centers. Washington, DC. .

\5\ Chen, M. ``At Some Youth `Treatment' Facilities, `Tough Love' Takes Brutal Forms.'' The New Standard, November 2005.

\6\ Szalavitz, M. ``The Trouble with Tough Love,'' Washington Post, January 2006.

\7\ Pinto, A., Specialty Schooling, 2005.

\8\ ``Desperate Measures,'' July 1999.

\9\ Licensure of Programs and Facilities, Utah Senate Bill 107 (2005).

\10\ Bazelon Center. Fact Sheet; see also U.S. Department of Health and Human Services. Mental Health: A Report of the Surgeon General--Executive Summary. Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services, National Institutes of Health, National Institute of Mental Health, 1999, 169-171.

\11\ Surgeon General, Mental Health, 1999, 169-171; McKechnie, M. Children's Mental Health System in Oregon--Past, Present and Future. Portland, OR: Juvenile Rights Project, Inc., 2004. ; Chamberlain, P. ``Treatment Foster Care.'' Washington, DC: Juvenile Justice Bulletin, U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, 1998.

\12\ Surgeon General, Mental Health, 1999, 169-171.

\13\ President's New Freedom Commission on Mental Health. Achieving the Promise: Transforming Mental Health Care in America. Washington, DC, 2003. .

\14\ National Institutes of Health. Preventing Violence and Related Health Risking Social Behaviors in Adolescents: an NIH State of the Science Conference Statement. Rockville, MD: U.S. National Institutes of Health, 2004.

\15\ See, e.g., Bay, Gorenfeld, J. ``No More Nightmares at Tranquility Bay?'' AlterNet, January 2006; Rowe, R. ``Tranquility Bay: The Last Resort,'' BBC News-World Edition, December 2004.

\16\ U.S. Department of State. Fact Sheet: Behavior Modification Facilities. Washington, DC: U.S. Department of State, 2004. .

\17\ End Institutional Abuse Against Children Act, H.R. 1738, 109th Cong. (2005).

------

[Letters submitted for the record follow:]

October 15, 2007.

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
     Washington, DC.

     Dear Chairman Miller: As the mother of a 17 year old son who went through an exemplary wilderness program for eight weeks at the beginning of 2007, and is now in his sixth month of an 18 month program at a top notch therapeutic boarding school, it was with great interest that I watched the approximately two hour hearing referenced above. I want to commend the House Committee on Education and Labor for taking up this important matter. Nothing could possibly be more important than the safety and welfare of our children, especially when we are seeking help for them to overcome serious problems.

     Our particular story began in August 2006 just prior to our son starting his junior year in high school. Throughout August, we discovered that our son had been leading a double life, having successfully hidden his drug abuse from us. I refer to a ``double life'' because our son did not ditch school, always maintained a grade point average of at least 3.0, was not disrespectful to any large degree, participated in family life, was not out until all hours, etc. We discovered that most of his drug use was done (sometimes daily) at our local public high school in our upscale Southern Orange County, California neighborhood in the bathroom during school hours, and went completely undetected. Nevertheless, when it became apparent that our son was troubled more than what we considered to be within the range of normal adolescence angst, we took immediate action to get to the source of the problem. When he admitted to drug use, we took him to an adolescent psychologist, and a local drug education program followed by an intensive outpatient program through a hospital. In addition, at his request, he transferred schools so he could get away from his negative peer group. I cannot adequately express the hell we went through for six months frantically trying to get local help for our son. To say that we were in a state of shock, confusion, exhaustion and fear would be an understatement. Although our son managed to stay off drugs, we could see that his life was still not working; his grades began to fall, he seemed depressed, and appeared to need more help than we were able to find for him locally. When we came across a communication he had with a friend that indicated that although he had stayed away from substances, he missed them, he still identified with that way of life, and he was considering returning to using drugs, we knew we had to look for a different intervention.

     Finding a safe, effective residential program proved difficult at first. The personnel at the local drug education program suggested a small boys program in Utah. When we investigated the program and called parents whose children were at the program, we determined that it would not be an appropriate placement for our son. We were then referred by our psychologist to a marketing representative of a particular company that ran a number of programs in different states. She tried to convince us over the phone that we should send our son to one of their programs. Feeling uncomfortable with the limited choices that we were uncovering, I went on the internet and found an educational consultant. I called the consultant who spent a great deal of time explaining options to me, and then gave me other families he had worked with to call as a reference. I finally felt like I found someone who knew this industry well and would be diligent in finding a placement for our son. What still bothers me to this day is that as well read, involved people, my husband and I had no idea where to turn when we needed help for my son. We had to learn by trial and error about the options available, and could have very well made a terrible mistake.

     Sending our son out of state for treatment was one of the hardest decisions my husband and I have ever had to make. We are so grateful that through our educational consultant we were able to place our son in two superb programs. We believe with all our heart that our son's life was saved by these programs, and if you spoke directly to him, he would say the same thing. He was never in any physical or emotional

danger while in the wilderness or at his school. Quite the contrary--he has been helped by highly competent, dedicated, trained and educated professionals who have mentored him with skill, honesty, love, understanding and compassion. The wilderness program has an incredibly high staff to student ratio, uses the highest quality equipment and communication systems, makes sure the participants are well fed and hydrated, checks their feet for frost bite daily (my son was in Utah during the winter), and watches the students' physical health (my son had a case of shingles when he was there and he was immediately put under the care of a physician who prescribed antibiotics). The clinical staff at the wilderness program are nothing less than brilliant, and they got through to my son with counseling, activities in the great outdoors, assigning books for him to read, having him do written assignments, etc. They included our family every step of the way with weekly family phone sessions and written communications, as well as two visits while our son was there. In March, our son left the wilderness to become a student at a therapeutic boarding school. He has continued on his journey of self-discovery, is taking a full load of college preparatory classes, will graduate high school, and we anticipate that he will go on to college after completing the program. He is rediscovering his talents and passions, and wants a different, better life for himself. Last week, I spoke to his college counselor at his boarding school for over an hour. I am so grateful for this because with the kind of substance abuse in which our son was involved, we very well could have been talking to law enforcement, hospital emergency personnel or even to a morgue instead of a college counselor. Although no one can predict the future, we feel so much hope and confidence for our son's life.

After watching the hearing, and listening to the anguished stories of the parents who testified and the wrenching information brought out in the case studies that the Government Accountability Office (GAO) presented, there is no doubt in my mind that regulation, oversight, licensing and monitoring are needed. As Mr. McKeon so rightly stated, there are ``bad actors'' in every industry. The programs that deliver unsound, unsafe, abusive, neglectful, and sometimes even fatal, services to our children should be held accountable for their appalling actions. My heart goes out to the parents whose children died, and I understand that they shared their stories to prevent other families from having their children put in perilous situations.

That being said, I hope that the more extensive industry-wide review that the GAO is preparing to present in early 2008 will include information on the many wonderful, clinically sound programs that have not only saved countless lives, but have given the teens the tools they need to have the opportunity to live full, productive and joyous lives. I encourage the Committee to take a bi-partisan approach (what could be more bi-partisan than our children?) in delving deeper into this issue in a careful, deliberate manner. We need sensible legislation, not legislation that could throw the baby out with the bath water and hamstring credible programs from helping our youth. There are programs that are operating ethically and effectively, and they should be consulted as a resource for safe standards and appropriate regulation. I'm sure that the ethical programs do not see it as a benefit to the industry to have substandard, dangerous programs in operation.

The most disappointing facts to come out of the hearing is that the criminal justice system has not properly prosecuted the wrongdoers, and that the Forest Department wasn't even aware that one of the programs in question was in arrears on its rent and that its permit had expired eight years ago. These examples prove that legislating regulation is just the start; making sure that the initiative is backed by funding and training for those charged with oversight, is the only way to make a real difference.

I realize this communication is lengthy; however, this issue is of the utmost importance to me. Please do not hesitate to contact me if you would like any other information.
                Respectfully,

Marla Kaufman.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller:
    I am requesting that these comments be placed on the Official
Record regarding the October 10, 2007 House Committee on Education and
Labor hearing on cases of child abuse and neglect at residential
treatment centers.
    My daughter and our family were the grateful recipients of the
highly professional services of a therapeutic boarding school and a
wilderness program. She was heavily into drugs and alchohol, and was
eventually date raped, after dropping out of High School. We chose,
after much research to not have her be part of the ``system'' that
gives her a number and wants her to be like everyone else. We chose a
wilderness program that had a great reputation with the backing of many
educational conslutants. After this program, we sent her to a
therapeutic emotional growth boarding school. To put this into
perspective, we saved her life and have our independent, strong,
willful, and beautiful daughter with us today. No, she is not the
perfect person that we all envision as parents, however she is not
branded after being in a ``system''.
    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families.
    I am extremely concerned if problems with a few result in harm to
the majority. The majority can be effected by the few, so, I am
requesting that your Committee defer from drafting a bill until
complete due diligence is done on the complete impact of the entire
situation, which is your responsibility, is known.
        Sincerely,

                            Gregg Heyne.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: I request that these comments be placed on
the Official Record regarding the October 10, 2007 House Committee on
Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    I am the parent of a child who has completely turned his life
around as a result of both having a ``wilderness'' experience with
highly trained and skilled psychologists and counselors and then being
placed in a therapeutic residential campus where he has been able to
learn the kinds of life skills that will allow him to be a productive
and contributing member of society. This would not, under any
circumstance, have happened had he not been spirited away from his
destructive home environment and placed in the kind of supportive and
substance free environment that allowed him to achieve his potential.
One year ago, I would have guaranteed that he would be dead today.
Sending him away, against his will (to the extent he had any
independent judgment) was the hardest most wrenching moment of my life.
He is now my best friend, has become the kind of man I dreamed he would
become and is ready to take on society fully aware of his weaknesses,
but with a determination to overcome them.
    I am concerned that the proposed legislation is seeking to address
admittedly harmful ``schools'' by creating a one size fits all
solution. My son's school is fully accredited by both the state and the
independent accrediting bodies. It has a staff of highly qualified
psychologists and persons trained to deal with adolescents who are at
extreme risk. It is also expensive and my greatest sadness is the

1/24/2020

Case 1:18-cv-10836-PGC   Document 143-2   Filed 02/03/20   Page 21 of 52
CASES OF CHILD NEGLECT AND ABUSE AT PRIVATE RESIDENTIAL TREATMENT FACILITIES

inability of so many other parents with lesser means to find schools like it. Not only will the creation of additional regulatory bodies create additional regulatory compliance- and yet more expense for parents who are truly at the end of all other options (and often of their finances), but variations among the states will create a nightmare for schools simply seeking to care for their wards. As a former school board president, I know that California's rules relating to residential facilities were created, much like the current proposed legislation, to prevent abuse by effectively banning residential care schools and non-voluntary programs. While this prevents abuse at one level, it does not save the children most in need. Applying those rules to schools in other states would effectively bar California children from participating in programs that are often a last resort.

The wilderness programs of 8-10 weeks where most of the children are first taken before they can enter a therapeutic school are tremendous first steps and have a remarkable track record of awakening kids to the desperate state of their lives. These are regulated by the states and should remain as such. Without this first introduction to assuming responsibility for their actions, the children would never succeed in the longer programs at the therapeutic schools.

I would hope that before this bill is reported out there will be some effort by members or staff to visit some of the very successful schools. If any of those members or staff have teenage children, there first response will probably be: ``How I wish my child were in a school like this!'' Stories of abuse are legion in our society. Preventing families from having the opportunity to take their children out of a poisonous environment (for the child) and placing him or her in a responsible and caring institution would be just as abusive as the supposed cure.

Thank you for your consideration.

Sincerely,

Dewey Watson,

Tierney Watson & Healy, Cornerstone Law Group, San Francisco, CA.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
       Washington, DC.

Dear Chairman Miller: I am requesting that these comments be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers.

My son/daughter and our family were the grateful recipients of the highly professional services of a therapeutic boarding school and a wilderness program. My daughter had serious problems when she was a young teenager that led us to send her first to a wonderful wilderness program and then to an emotional growth boarding school. The daughter who came back to us after almost 2 years was a changed child and is now a productive young adult. Without these programs we do not think she could have become the person she is.

The vast majority of therapeutic emotional growth boarding schools and wilderness programs are professional, experienced, ethical and extremely valuable to children and families in crisis. As in our case and many others, they save lives and families.

I am extremely concerned if problems with a few result in harm to the majority. So, I am requesting that your Committee defer from drafting a bill until complete due diligence is done on the complete impact of the entire situation, which is your responsibility, is known.

Sincerely,

Ilene Ferber.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
       Washington, DC.

Dear Chairman Miller: I am requesting that these comments be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers.

My son and our family were the grateful recipients of the highly professional services of a therapeutic boarding school and a wilderness program. My 16 yr. old son was suffering from emotional issues ( poor identity, needy, phony face, mother issues, anger, violence, etc) which resulted in his joining a gang and dealing in drugs for acceptance while flunking out of a high quality high school. He has an IQ over 160. We had him abducted into a wilderness program in Utah for 6 weeks which was the best thing in the world for him at that time. I visited the nomadic troop of troubled teens in the winter for only two nights but it was long enough to see the care, concern and love the 2 or 3 ever present counselors had for the 10 or 12 in their particular group. There is no abuse, physical touching, corporal punishment or cold or hunger issues. They were fully equipped for the elements and I was impressed with how these VERY troubled inner city gang members eventually began to pull together, to hold each other accountable, to accept responsibility, to join in and follow the rules and to work like men. No matches, (rub sticks together for fire). They cook their own food over the fire every meal and change camp sites every day packing everything they own on their backs. No knives except with counselors for food preparation, no flash lights, no watches * * * only the sun to keep time. Some kids stayed for 4 to 5 months until clean and emotionally ready to move on. These kids were happy and proud, even while reluctantly accepting the idea of rules and responsibility.

After the wilderness program he attended an emotional growth school for 24 months where he truly gain the life skills to put his life back on track. He accelerated his education (no TV, no phones, no ipods, no electronic games, etc.) and graduated from high school with a 3.1 GPA while also graduating from the schools emotional growth program. My son is now 19 and is a sophomore at Portland State University with a 3.2 GPA. He chose to live with me rather than his mother and has become a very squared away young man. I am very proud of the work he did for himself at both wilderness program and the emotional growth school. He and many others would be lost with out these services. I feel sorry for the many families who cannot afford or are not aware of these fine schools. Unfortunately, many of kids will end up in our court and penal systems instead of these much better programs. The government should help fund, but not regulate this work. Look what the government has done to most school systems. Free enterprise does a much more efficient, effective and economical job.

The vast majority of therapeutic emotional growth boarding schools and wilderness programs are professional, experienced, ethical and extremely valuable to children and families in crisis. As in our case and many others, they save lives and families.

I am extremely concerned if problems with a few result in harm to the majority. So, I am requesting that your Committee defer from drafting a bill until complete due diligence is done on the complete impact of the entire situation, which is your responsibility, is known.

Mike Duyn,
Macadam Forbes, Oncor Intl., Portland, OR.

———

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
Washington, DC.

Dear Chairman Miller: I have heard about the bill you are sponsoring about child abuse at Residential treatment centers. I surely applaud any desire to end abuse, but wanted you to know the tremendous good the legit schools do. My son was going down a path of failure and drug abuse in high school. We had tried at the normal ways of helping him, drug counseling, tutors, special education plans, etc. but nothing worked. We were at wits end. Although we are middle class, I am a

construction super and my wife was a gov't secretary, we got a second
mortgage on our house and got a educational consultant involved. She
found a wilderness program for my son, and then a residential emotional
growth school. We were reluctant at first of course, sending away our
son for someone else to parent. And we had heard some of the horror
stories about programs (in Costa Rica I think). But we visited some
schools and found one that fit. Our son spend two years there. Two
years he may not have had otherwise. the school was amazing, full of
love and caring people who helped not only my son, but my wife and I as
parents also. My son learned so much there, mainly to have the self
esteem to value himself more than he did. He still struggles, as most
young people do, but he is alive and happy and drug free. That was a
gift to us beyond value. So I wanted you to know that there are many
good programs out there. And they do tremendous good for so many
families. We could barely afford the school, and I am worried that the
passing of this bill as is will only escalate the costs so only the
very rich can afford them.

So please in your efforts to help, consider the effect this bill
will have on the good, no LIFESAVING programs. The added paperwork and
buracratic requirements will only make it harder for the schools to
exist.

I have read that many of the states that have abuse problems are
handling it themselves with their own bills too. I am sure there are
State's right's issues here also. A federal bill might make a school in
one state have to meet the licensing requirements in the home state,
further adding to the mess.

Your bill is for a noble cause, but please be careful you don't
harm more families than you help.

Please add my comments to the Official record regarding the Oct. 10
2007 House Committee on Education and Labor hearing on cases of child
abuse and neglect at residential treatment centers.

                        Thank you for you time,

                                    Charles H. Bird Jr.,
                                            Waldorf MD.

                        ————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
            Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    My son and our family are the grateful recipients of the highly
professional services of a therapeutic boarding school and a wilderness
program. Our son was going down a dangerous path of self-destruction
and oppositional behavior. Without access to the wonderful wilderness
program and unbelievably effective therapeutic boarding school that he
is at, he would never have been able to make the incredible changes
that were necessary to turn his life around. If all children could
attend school like this our jails would be empty.
    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families.
    I am extremely concerned if problems with a few result in harm to
the majority. So, I am requesting that your Committee defer from
drafting a bill until complete due diligence is done on the complete
impact of the entire situation, which is your responsibility, is known.
    Please exclude emotional growth and therapeutic boarding schools
from your proposed bill. It will only serve to place an undue burden on
the children, parents, and administrators of such schools by making
them devote more time to filling out government forms than teaching and
helping.
    Thanks for your time.

Sincerely,

Denise J. Grigst.

_____

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: I am requesting that my comments be placed on
the Official Record regarding the October 10, 2007 House Committee on
Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    My son has been through an excellent Wilderness Program and is
currently in a wonderful Therapeutic Boarding School. He has never been
more happy or productive in his life. I think the end result of this
therapy will be to develop a productive member of society in a young
man who had little chance of this a year ago.
    As in most things, there are good and bad. My wife and I personally
put in a great effort and expense to find the right placements for our
son and I urge other families to do the same. I hope that your
Committee will not throw the baby out with the bath water regarding
these treatment programs. Please find a way to preserve the good ones
without making them more expensive. They are already a financial burden
for most of us who have had to send our child there in the hope of
saving their life.
            Respectfully,

Stephen J. Folzenlogen,
                                Houston, Texas.

_____

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    My daughter and our family were the grateful recipients of the
highly professional services of a therapeutic boarding school and a
wilderness program. Our school district had no viable options for my
daughter, and she was on a risky and self-destructive path. At our
wits' end, our family life in disarray, we turned to an educational
consultant who after meeting with us and interviewing my daughter
recommended a wilderness program and therapeutic boarding school that I
believe may have saved my daughter's life. As a result of this
intervention, today my daughter is doing very well as a healthy and
productive student at a major college of art.
    I'm sure you would agree that the vast majority of therapeutic
emotional growth boarding schools and wilderness programs are
professional, experienced, ethical and extremely valuable to children
and families in crisis. As in our case and many others, they save lives
and families.
    I am extremely concerned if problems with a few result in harm to
the majority. So, I am requesting that your Committee defer from
drafting a bill until care and complete due diligence is accomplished
on the complete impact the bill will have on the entire situation.
    Thank you.
            Respectfully,

Neal Hirsch,
                                Highland Park, IL.

_____

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed

on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.

My son and our family were the grateful recipients of the highly
professional services of a therapeutic boarding school and a wilderness
program. My son had issues growing through adolescence. which as a
family we were not able to solve at home. We tried for nearly 15
months. He was and is an exceptionally bright child, who was heading on
a path to jail or death. Until his issues surfaced, he was a perfect
son, so to speak. Our need was to protect him, and provide a means for
him to grow emotionally, in a safe and therapeutic environment. The
program he attended was great for him and for our family. We re-
connected and learned a lot about his inner issues and his poor coping
mechanisms to deal with stress. He graduated high school at his
emotional growth boarding school, came home for the summer and now is
off at UC Berkeley. Had we not intervened with this therapeutic
boarding school program, he would probably be in a juvenile hall, and
if lucky rebuilding his life through community colleges.

The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families. I appreciate the need to
ensure ALL program are run safely, and as a parent it was a very scary
process finding a good one. We found that educational consultants help
identify schools, through their network and expertise.

I am extremely concerned if problems with a few result in harm to
the majority. So, I am requesting that your Committee defer from
drafting a bill until complete due diligence is done on the complete
impact of the entire situation, which is your responsibility, is known.
Placing a bureaucracy upon a system that in the most part is working,
may increase costs and dis empower the schools to provide the structure
they need. Unfortunately most of these kids have come from public
schools, where for various reasons, all administration keep arms length
with any issues with the kids, thus creating the legislated low-
boundary type environment that kids with emotional issues just flounder
in.

Thank you for reading my comments,

Elaine Wuertz.

———

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.

Dear Chairman Miller: Please place the following comments on the
Official Record regarding the October 10, 2007, House Committee on
Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.

I understand that some recent, high-profile cases are propelling
you to take action on wilderness programs and residential treatment
centers. I would like to urge you to proceed with caution.

My son recently spent several years attending wilderness programs
and a therapeutic, emotional growth boarding school, following his
explusion in rapid succession from several private and public schools
in the Bay Area.

He was making extremely bad choices and his behavior was out of
control.

Although he is extremely bright, my son also has ADHD, and his many
teachers through the years had managed to instill in him the belief
that he was stupid because he couldn't sit still in class. His recourse
was to try to position himself as a ``bad boy,'' and he was able to
indulge that fantasy to the extreme in the toxic social environment
that children encounter in the Bay Area. I had to get him out of there
and away from all the terrible peer pressure.

My son spent 10 weeks in a Wilderness Program where he was able to
detoxify his body, start to explore his behavior and motivations, and

develop tremendous pride in his ability to ``bust'' a fire and move through the mountains without leaving a trace. He then spent a year at an emotional growth boarding school where he was enveloped in a loving culture far from the influences of TV, video games, gangsta rap, drugs, and negative peer pressure. He developed respect for his own intellect and started to do very well in his academic classes. He also learned to cook for the school, fell trees and remove tree stumps, care for the farm animals, sew clothes, cross-country and telemark ski, and numerous other skills that he never would have developed in the fast-paced, self-indulgent Bay Area.

Our path was not a straight one. My son was not ready to give up his old image that easily, so he ended up back at Wilderness for another 10 weeks, and then attended a residential treatment center for about a year. He was finally able to leave the world of programs to attend his senior year at a more traditional boarding school, and he excelled. He is now enrolled as a freshman in the business school of a California university and is eager to get on with his life. He also believes that he has been fortunate to develop more emotional skills and maturity than any of his peers.

The programs my son attended, along with the vast majority of wilderness programs, therapeutic emotional growth boarding schools, and residential treatment centers, are professional, experienced, ethical, and extremely valuable to children and families in crisis. As in our case and many others, they save lives and families. My son continues to tell me that he would be dead by now if I hadn't sent him away.

I am extremely concerned that the problems of a few programs might result in harm to the majority of them because of legislative over-reaction and heavy handedness. Harm to the programs will result in harm to the families that depend on them. Bad or unnecessary legislation will result in:

Higher costs and loss of resources to administrative functions. These programs are already extremely costly and present significant financial hardship to the families that rely on them. If they were to become more expensive due to unecessary bureaucracy, many families would find them completely unaffordable, and many children would be at risk.

The lumping of successful and ethical schools with abusive fringe programs.

Sensationalism that will further stigmatize the parents and children who have benefited so significantly from these programs. Most of us have had little support from our family and friends in this process because they just don't get it--they haven't had to live with our troubled children, and they don't understand what these kids need to get better.

I understand the current hearings are based, in part, on a report requested by you and issued by the Government Accountability Office, entitled ``Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth.'' It should be noted that many of the cases cited in the report are over 10 years old. States have been and are currently adopting oversight and safety standards in response to these and other cases. This issue is a state's rights (10th Amendment) issue: the states should retain the authority to regulate such programs as each state feels is appropriate. The concerns are already being dealt with responsibly at the state level so no federal government action should be needed at this time.

In conclusion, I am asking that your Committee defer from drafting a bill until complete due diligence is done and the complete impact of the entire situation is known. Children's lives are at risk if you make these programs less affordable and accessible. We need them.

Sincerely,

Barbara B. Kamm,
Los Altos, CA.

_____

Hon. George Miller, Chairman,

Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    My son and our family were the grateful recipients of the highly
professional services of a therapeutic boarding school and a wilderness
program.
    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families.
    I am extremely concerned if problems with a few result in harm to
the majority. So, I am requesting that your Committee defer from
drafting a bill until complete due diligence is done on the complete
impact of the entire situation, which is your responsibility, is known.
            Sincerely yours,
                    Seth Finklestein, M.D.,
                    Biotrofix, Inc., Needham, MA.

                    ————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers. There must be a distinction drawn
between the types of programs that any new law would cover. The
radical, 60 Minutes type of hysteria of the yelling and screaming drill
instructor is far different than the type of program my daughter
experienced during her seven weeks spent in wilderness and then
eighteen months at her boarding school.
    My daughter and our family were the grateful recipients of the
highly professional services of a therapeutic boarding school and a
wilderness program. The program is a highly successful emotional
growth, therapeutic boarding school that provided a miracle by allowing
my child to become a happy, resilient, contributing member of society.
Many methods were employed to achieve this result, the greatest of all
was learning to trust in a very loving encouraging atmosphere. No
`military' tactics were ever allowed, it was not consistent with the
founders vision.
    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families.
    I am extremely concerned if problems with a few result in harm to
the majority. So, I am requesting that your Committee defer from
drafting a bill until complete due diligence is done on the complete
impact of the entire situation, which is your responsibility, is known.
                    Howard L. Page,
                    Residential & Commercial Broker.

                    ————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    Our daughter and our family were the grateful recipients of the
highly professional services of a therapeutic boarding school and a
wilderness program. Our daughter, outside her past environment, has

matured. She is now able to articulate her feelings and addressed many
issues that were preventing her from being the whole and beautiful
young woman, and better citizen, that she is now. This has changed our
lives. If there were more attention being paid to the local public
schools in our country, many of these problems would be lessened for
sure.

    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families. The word
``professional'' is key here. The professional schools are not the
problem. They do not need the burden of beuracracy and they need to be
subsidized, if anything.

    I am extremely concerned if problems of a few, and scattered,
results in harm to the majority, that is doing good. So, I am
requesting that your Committee defer from drafting a bill until
complete due diligence is done on the complete impact of the entire
situation, which is your responsibility, is known. STOP THE DRAFTING OF
THIS BILL.

    Don't burden the parents and programs that are professional and
well respected.

    I am a California resident, a citizen, a voter and a caring parent
(who has to struggle with this issue, in large part, because of the
abysmal public schools!).

                Very sincerely yours,

                            Bill Smitrovich.

--------

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.

    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.

    Our son's life was saved by the Wilderness Program and following
that, the emotional growth boarding school he attended. He went from
being a child lost, on his way to certain death via drugs and alcohol
(at the base of this behavior--low self-esteem) to a happy, productive,
amazing young man who will contribute greatly to our society.

    We understand that there are programs that are unethical and can be
abusive to children. This was our greatest fear in sending our son
away. We did maniacal research on schools and while were fortunate to
have found safe and beneficial environments, we certainly read about
unethical facilities in business to profit from the tragedies and
desperation of families in crisis. We are in complete agreement that
these facilities should be closed. However, widespread legislation that
forces the places that are helping our children, would be devastating.

    The vast majority of therapeutic emotional growth boarding schools
and wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. I can't imagine
where we would be if we hadn't found such a place.

    It is vital that the schools that do help our youth are not
negatively impacted by this bill. I am requesting that your Committee
defer from drafting a bill until complete due diligence is done on the
complete impact of the entire situation.

    I am happy to share our story and have attached a presentation that
discusses the impact that low self-esteem can have on individuals and
how powerful the change can be when they are in a safe, nurturing
environment, with people who know how to deal with these issues. Please
feel free to call us if you would like further information.

                Regards,

                    Shelly and David Seeger,
                        Symantec Corp.

--------

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
  Washington, DC.
 Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
 Our daughter and our family were the grateful recipients of the
highly professional services of a wilderness program and a therapeutic
emotional growth boarding school from September 2005 through June 2007.
Our daughter, who had previously been an honor student and positively
active teen, reacted to a boyfriend breaking up with her by slipping
into depression and trying to ease those feelings with dangerous
behaviors around alcohol, sexual promiscuity, and drugs. During a
turbulent downward spiral the summer of '05, she grew angry and defiant
and in August ran away to California. We found her 9 days later and
brought her home, but she believed her life was over and was intent on
destroying herself. We understood that we needed to take action for our
daughter and we sought out the help of an educational consultant who
helped us to select the right wilderness program for our daughter (she
was there for 9\1/2\ weeks) and also the emotional growth boarding
school where she enrolled in November 2005 and from which she graduated
in June 2007. These programs saved her life and our entire family has
benefited from the experiences The emotional growth school she attended
is founded on the values of honesty and love. We/she wish that all
students could grow and flourish in the positive environment that her
emotional growth school provided and continues to provide. (Yes, she
went back to visit over Labor Day and stays in contact with both staff
and other students from the school.) Our daughter is now a freshman at
University of Colorado--Colorado Springs and is pursuing a degree in
psychology which will allow her to work with troubled teens and ``give
back''.
 While there are some less than desirable programs/schools, the vast
majority of therapeutic emotional growth boarding schools and
wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families. The current expense
structure was a significant hurdle for us but we found a way through a
second home equity loan to pay for the help our daughter needed. These
costs are already extremely high and it is wrong to put more
bureaucratic cost onto the backs of parents when it is not needed.
Please find a way to bring the poorly run programs into line without
adding cost to programs that are well run and extremely effective in
saving/changing lives.
 I am concerned that your committee will let problems with a few
programs/schools result in harm to the majority of well run and
effective programs/schools. I am requesting that your committee defer
from drafting a bill until complete due diligence is done on the
overall impact of the entire situation. It is your responsibility to
act with complete knowledge and not with a partial understanding of the
``sensational'' situations that are in the minority but get all the
media attention and coverage. Please take into consideraton what
federal legislation will do to the majority of programs, such as the
ones our family experienced. Our daughter will tell you that they
``saved my life''.
  Sincerely,

        Debra R. Bryant,
         Monument, CO.

      ————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
  Washington, DC.
 Dear Chairman Miller: We are requesting that the following comments

be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities''.

Our daughter completed a 2 month wilderness program and is currently enrolled in a therapeutic boarding school. Prior to enrolling her in these programs we were keenly aware of, and were very concerned about of mistreatment in such programs.

Of course, we wanted to ensure that our daughter was placed in an environment that was, first and foremost, safe and one where she would receive the type of care she and our family needed to get our lives back on track. We conducted extensive research and engaged with an educational consultant to assist us in our search.

We learned that there is a broad range of programs which may be referred to as ``Residential Treatment Facilities''. We were convinced that the vast majority of wilderness programs and therapeutic boarding schools which we investigated are professionally run, experienced, ethical and, most important extremely valuable to children and families such as ours. Such programs have saved lives and families.

We are happy to report that our daughter has made remarkable progress as a direct result of the outstanding care and treatment she has received in both the wilderness program and the therapeutic boarding school.

We agree that there is a need to put an end to all mistreatment but we believe this may only occur at only a small percentage of wilderness and residential treatment programs and it is not clear that mistreatment at residential treatment facilities is on the rise or decline. We are extremely concerned that increased regulation, aimed at addressing the problems of a few, could become intrusive and harmful to many reputable programs and affected families such as ours.

We believe it is the committee's responsibility, as it is ours as parents, to do what is in the best interest of our children and for our families. We hereby request that your Committee refrain from drafting legislation or taking any action until due diligence is done to more completely assess the situation.

　　　　　Respectfully yours,

　　　　　　　　Richard and Diane Scheno,
　　　　　　　　　　　Fremont, CA.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
　　　Washington, DC.

Dear Chairman Miller: I am requesting that these comments be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers.

My daughter and our family were the grateful recipients of the highly professional services of a residential treatment center and a wilderness program in Utah.

Our 15 year old daughter had become practically non-functional due to emotional issues. We had a team of therapists and doctors here at home working with her but it was only when she went to a wilderness program that we started to see real progress. After wilderness, she went to a residential treatment center where she got the care and support of an amazing therapeutic team. It is here that she learned the skills needed to cope with her emotional problems; it was here that real and lasting change was made.

These two programs saved our daughter's life. Many of the therapists and counselors who work at these programs are performing miracles every day, changing the lives of so many troubled teenagers.

While reading the GAO's report of abuse at some facilities is heartbreaking, I believe that the vast majority of residential treatment centers, therapeutic boarding schools and wilderness programs are professional, experienced, and ethically run. I also believe that continued regulations and oversight are critical for the safety of the

residents in the programs. However, I hope that the problems caused by a few will not result in harm to the over all industry.

These facilities provide a much needed level of service for so many families in crisis. Please don't throw the baby out with the bath water.

I am respectfully requesting that your Committee defer from drafting a bill until an assessment of the entire situation is done.

> Sincerely,
>
> Ann and Phil Sheridan,
> San Jose, CA.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.

Dear Chairman Miller: As a lifelong democrat and former constituent from the East Bay, I always supported your efforts and hope you will continue to reward my faith. I have some concerns regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers. I am requesting that my comments be placed on the Official Record regarding this hearing.

Our daughter and our family were the grateful recipients of the highly professional services of a therapeutic boarding school and a wilderness program beginning in 2005. Our daughter had previously fought severe depression and low self-esteem which lead her into self-destructive behavior. After years of therapy and even moving to a rural environment in a new state, my wife and I became desperate. We took what we believed to be a huge step and enrolled her in a wilderness program followed by a therapeutic boarding school. We found both programs to be highly professional and rewarding. Our daughter turned 18 while attending the boarding school, and stayed on another 9 months of her own choice as an adult in order to graduate. She is now living at home, attending college full time and working part time. Those programs saved our daughter and positioned her to thrive.

The vast majority of therapeutic emotional growth boarding schools and wilderness programs are professional, experienced, ethical and extremely valuable to children and families in crisis. As in our case and many others, they save lives and families.

I am extremely concerned that problems with a few abusive programs may result in harm to the majority of programs. So, I am requesting that your Committee defer from drafting a bill until complete due diligence is done to thoroughly explore the residential treatment situation and how legislation might effect the good ethical programs as well as the bad. I agree that abusive programs must be ``cleaned up'' as quickly as possible, but I hope you can find a way to do that without encumbering the beneficial programs with unnecessary bureacrasy, while burdening the families with added costs.

I wish you well in your efforts.

> Sincerely,
>
> Pete Small,
> Ridgefield, WA.

————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
    Washington, DC.

Dear Chairman Miller: We are requesting that these comments be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers.

Our son and our family are the VERY grateful recipients of the highly professional services of a residential treatment center (RTC) and a therapeutic wilderness program. We are quite sure that without the assistance of the professionals at the RTC and the amazing

therapist he worked with in wilderness, he would be part of the
juvenile system and most likely, hopelessly addicted.

We believe our story is typical for a child without underlying
mental illness. The short version is that our son started to experiment
with marijuana with his friends at about the age of 14. In his freshman
year, his grades nose dived; he was using more and a greater variety of
readily available street drugs. Out patient therapy was ineffective in
getting the behavior under control. We dug into our retirement funds to
send him to a non-therapeutic boarding school that offered ``success
through structure.'' Unfortunately, that school enrolled a large group
of adolescents that really needed a therapeutic environment because
they had serious drug use and behavioral issues. Many of those children
got worse, not better. The result for our child is that he used more
drugs more frequently, despite the punishment of longer and longer
detention and more severe campus restrictions, and he began to get in
trouble with the authorities. He was arrested twice--once for assault
and once for minor in possession. The frightening thing for us was that
we could tell that he was scared and he was trying to change, but he
couldn't * * * he didn't have the skills and by this time, he was not
only scared, but angry and defiant. As parents, we knew that at the
young age of 16, he was on the verge of making decisions that would
have negative, life changing consequences.

We decided to send him to a Wilderness Therapy program that came
highly recommended by our educational consultant * * * we hired ed
consultants because we realized that doing it on our own had led us to
the first bad choice for placement. The wilderness program we used
operates in the Blue Ridge Mountains and undoubtedly uses Federal
lands. His initial reaction was to try to run and he resisted for about
2 weeks. But, then he finally ``worked the program.'' The program in
this case was to help him reconnect with his old self, to become sober,
to understand his anger and motivations and to become open to change.
He was guided in this journey by a wonderful therapist with over 25
years of experience in working with adolescents. It was hard for him,
but he was never in danger physically. We realize wilderness therapy
isn't for every kid, but his personnel growth during that period was
phenomenal. In his own words, it was the ``best worst thing I ever
did'' and he thanked us for sending him.

We followed wilderness therapy with a private and well respected
Residential Treatment Center in Utah (for this we have remortgaged our
home). He is thriving. He has the guidance of a skilled therapist, is a
leader among the other teen boys (strong positive peer culture
environment); he is working a 12-step program to deal with addiction
issues, his health has improved and his grades are up. Again he has
thanked us. On the home front, we are participating in family therapy
with him and with our other children to shore up our parenting skills
and the extra skills we will need to support him when he is back. We
are working toward bringing him home early next year.

Prior to hearing about your inquiry at the Committee level, we had
considered writing to our congressional representatives (Blumenauer,
Smith and Wyden) to urge them to help families pay for this kind of
life saving intervention. Our insurance (Federal Employee Program
through Blue Cross Blue Shield) categorically excludes residential
treatment and wilderness. The result is that we have sacrificed
retirement and home equity. But we feel fortunate that we had those
resources to tap into. Most families that we talk to who are also using
these programs make these same sacrifices to afford the care their
child needs. Many families cannot afford it and their children are at
the very least jeopardizing their health and future, if not filling up
juvenile detention facilities and jails. We ask that you avail
yourselves to recent studies on the successful outcomes of children
placed in well run private RTCs, therapeutic boarding schools and
wilderness programs. Take input from juvenile probation officers and
others in law enforcement, most of whom consider these interventions as
positive alternatives to the juvenile court system.

We realize there has been a virtual boom in the adolescent

treatment industry and with that has come the establishment of some disreputable and unsafe places that prey on families in crisis. Our hearts ache for the parents that have lost children while trying to save them. Still, you must find a way to support the work of residential treatment centers, therapeutic emotional growth boarding schools and wilderness programs that are run by professionals, who are experienced, ethical and extremely valuable to the recovery of children and their families. As in our case and many others, they save lives and families.

We are extremely concerned that the problems with a few bad programs will result in harm to the majority. So, we are requesting that your Committee defer from drafting a bill until complete due diligence is done and the entire situation is known.

Thank you for considering and including our comments.

Very respectfully yours,

Sheryl Carrubba and Mark McClure,

Portland, OR.

—————

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
Washington, DC.

Dear Chairman Miller: I am requesting that these comments be placed on the Official Record regarding the October 10, 2007 House Committee on Education and Labor hearing on cases of child abuse and neglect at residential treatment centers.

My son and our family were the grateful recipients of the highly professional services of a residential treatment center and a wilderness program. We want you to know that at no time in either wilderness or RTC was there anything remotely close to physical abuse.

This is our son's story:

By April, 2006 our 16 year old son was severely depressed, thought he was worthless and was failing in school--and had started self-medicating with a wide range of drugs. We were lucky in that our family has always gotten along with each other and had open communications. As parents, we did all we could and still his situation continued to worsen. We simply did not have the tools, knowledge or skills to help him. It was only a matter of time before he would be in jail or dead. And he didn't care.

We did an intervention and sent him to a wonderful wilderness program. Two months in the Utah desert helped a lot, but he was still not ready to come home. Although he was now clean, he still hadn't done the hard work to look deep within himself to change his way of life and learn the tools that could help him do that. It took 10 months in a residential treatment center for him get his life in order. The RTC staff was demanding, but also loving and kind.

Today our son is a mature young man who has been clean and sober for 18 months. He is happy, confident and looking forward to going to college to become a therapist in order to give other at risk kids a reason to live.

He went back to his wilderness program this past summer as a 12-step volunteer in order to help kids that were like him 18 months ago. He's been invited to work there next summer because of the positive impact he had on the kids.

The vast majority of residential treatment centers, therapeutic emotional growth boarding schools and wilderness programs are professional, experienced, ethical and extremely valuable to children and families in crisis. As in our case and many others, they save lives and families.

I am extremely concerned if problems with a few result in harm to the majority. So, I am requesting that your Committee defer from drafting a bill until complete due diligence is done on the complete impact of the entire situation, which is your responsibility, is known.

Sincerely,

Barbara Damm and John McKinney,

6th California Congressional District.

———

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: Our daughter and our family are recipients of
the highly professional services of a therapeutic boarding school and a
wilderness program.
    Lindsey was fourteen years old when we decided that she could no
longer live at home with us without being a danger to herself. Lindsey
did not want to abide by our rules and no matter the warnings,
consequences, etc. she did not take us seriously. She was drinking,
smoking marijuana and behaving in a manner that was totally out of
control. We hired an educational consultant and by interviews
determined that Lindsey needed to experience being at a Wilderness camp
and then on to some type of boarding school. Lindsey stayed at the
wilderness camp for ten weeks and in those weeks she began to slowly
recognize her lack of self esteem and self confidence that led to her
negative choices. The hard work both emotional and physical was
facilitated by a highly competent and caring staff and therapist who
believed in Lindsey. Although at the end of ten weeks strides of
improvements were made we all knew that she was not ready to come back
home. Lindsey is now enrolled at an emotional growth treatment school
run by a team of administrators, teachers, staff and qualified
therapists where she is being positively challenged to be accountable,
honest, loving and vunerable in academics, emotional issues and
physical abilities. It is good, hard work for her. As her parents, we
are also challenged to do our part to improve our communication and
relationship with each other. We are committed to this school for
helping us navigate through a process of growth which ten months ago
looked bleak.
    Families like ours are extremely grateful for these types of
options such as wilderness camp and emotional growth/residential
treatment facilities. This is why we are extremely concerned that
problems with a few such facilities (such as neglect and abuse) result
in harm to the majority. We are requesting that your Committee defer
from drafting a bill until complete due diligence is done on the entire
situation and results are known.
    We are requesting that our comments be placed on the Official
Record regarding the October 10, 2007 House Committee on Education and
Labor hearing on cases of child abuse and neglect at residential
treatment centers.
                Sincerely,
                                Kurt and Arlene Bosshard,
                                        Kapaa, HI.

———

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
    Dear Chairman Miller: I am requesting that these comments be placed
on the Official Record regarding the October 10, 2007 House Committee
on Education and Labor hearing on cases of child abuse and neglect at
residential treatment centers.
    Our son and our family were the grateful recipients of the highly
professional services of a therapeutic boarding school and a wilderness
program. Our son had started on a downward spiral in his sophomore year
of high school, smoking marijuana and not doing his school work. He
ended that year using a multitude of different drugs and binge-drinking
alcohol. After desperately exploring what options were available to us,
we heard from a friend of the family about a wilderness program that
had saved his daughter's life. We worked with an educational consultant
whom the friend recommended and chose the same wilderness program. This
program was run in a caring and conscientous manner, and their

counselors and staff are outstanding. Our son ended up liking the
program and learned much about himself. He is even considering working
there when he graduates from high school. He is now enrolled in an
emotional growth/therapeutic boarding school. Whereas the wilderness
program is the first step in taking a young person out of an unhealthy
environment, the therapeutic boarding school provides a deep learning
of healthy habits and cements them in an 18-month program. The program
involves the whole family in this learning process. I can unequivocally
say that this experience has saved our son's life!

    I have met and spoken with numerous other parents whose children
have attended similar programs. They all had excellent experiences and
were extremely grateful that those options are available. The vast
majority of therapeutic/emotional growth boarding schools and
wilderness programs are professional, experienced, ethical and
extremely valuable to children and families in crisis. As in our case
and many others, they save lives and families.

    I am extremely concerned if problems with a few programs result in
harm to the majority. So, I am requesting that your Committee defer
from drafting a bill until complete due diligence is done and the
complete impact of the entire situation is assessed.

        Sincerely,

                        Inge Jechart,
                        Pleasanton, CA.

------

   [Questions for the record submitted to Dr. Pinto follow:]

                  Congress of the United States,
                      Washington, DC, October 15, 2007.
Allison Pinto, Ph.D., Complexity Research & Development,
Children's Board of Hillsborough County, Tampa, FL.
    Dear Dr. Pinto: Thank you for testifying at the October 10, 2007
full Committee hearing, ``Cases of Child Neglect and Abuse at Private
Residential Treatment Facilities.'' Enclosed are the questions which
Committee members have asked you to respond for the record. Please send
an electronic version of your written response (in Word format) to the
Committee staff by COB on Wednesday, October 24, 2007--the date on
which the hearing record will close. If you have any questions, please
contact us. Once again, we greatly appreciate your testimony at this
hearing.

        Sincerely,

                  George Miller, Chairman.

    Representative Robert Scott (D-VA), has asked that you respond in
writing to the following questions:
    1) Do ``tough love'' strategies have an appropriate treatment role
for major psychological disorders? If so, what is that role?
    2) Is there currently an obligation for mental health professionals
who recommend these programs to clients to ascertain their safety and
validity as a treatment option?
    3) Is there currently any requirement that other treatment options
be utilized to address a child's behavioral issues before sending them
to such a center?

------

   [Questions for the record submitted to Mr. Kutz follow:]

                  Congress of the United States,
                      Washington, DC, October 15, 2007.
Gregory D. Kutz, Managing Director,
Forensic Audits and Special Investigations, GAO, Washington, DC.
    Dear Mr. Kutz: Thank you for testifying at the October 10, 2007
full Committee hearing, ``Cases of Child Neglect and Abuse at Private
Residential Treatment Facilities.'' Enclosed are the questions which
Committee members have asked you to respond for the record. Please send

an electronic version of your written response (in Word format) to the Committee staff by COB on Wednesday, October 24, 2007--the date on which the hearing record will close. If you have any questions, please contact us. Once again, we greatly appreciate your testimony at this hearing.

Sincerely,

George Miller, Chairman.

Representative Robert Scott (D-VA), has asked that you respond in writing to the following questions:

1) What percentage of youths attending these programs are minorities?

2) Will or can the GAO report disaggregate the deaths/abuses being investigated by the reason the individual is in the program and whether the individual is taking psychotropic medication?

3) Is there currently an obligation for mental health professionals who recommend these programs to clients to ascertain their safety and validity as a treatment option?

4) Is there currently any requirement that other treatment options be utilized to address a child's behavioral issues before sending them to such a center?

————

[Questions for the record submitted to Ms. Moss follow:]

Congress of the United States,
Washington, DC, October 15, 2007.

Jan Moss, Executive Director,
The National Association of Therapeutic Schools and ProgramsThe
        National Association of Therapeutic Schools and Programs,
        Prescott, AZ.

Dear Ms. Moss: Thank you for testifying at the October 10, 2007 full Committee hearing, ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities.'' Enclosed are the questions which Committee members have asked you to respond for the record. Please send an electronic version of your written response (in Word format) to the Committee staff by COB on Friday, November 2, 2007. If you have any questions, please contact us. Once again, we greatly appreciate your testimony at this hearing.

Sincerely,

George Miller, Chairman.

Representative Robert Scott (D-VA), has asked that you respond in writing to the following questions:

1) What mechanism is in place to deal with circumstances where your members have self-certified that they are abiding by NATSAP's ethics and good practices standards when they are in fact not in compliance with these standards?

2) Dr. Pinto testified that she has collected 700 concerns on residential treatment centers over 6 months, while NATSAP has investigated less than 5 claims against its members. Can you please explain the discrepancy in these numbers?

3) Is there currently any requirement that other treatment options be utilized to address a child's behavioral issues before sending them to such a center?

Chairman George Miller respectfully request that you respond to the following questions:

1) What is NATSAP's policy regarding the use of its logo by members. For example, are there any restrictions for using the NATSAP logo on marketing materials and websites? Are NATSAP members using the NATSAP logo required to disclose that use of the NATSAP logo does not represent endorsement by NATSAP of the safety, quality, or effectiveness of the members' program.

2) Ms. Moss indicated that NATSAP will research complaints or reports of alleged misconduct by members. What procedures are in place

for reporting misconduct to NATSAP? Are reporting procedures
documented? Does NATSAP make its reporting procedures widely available,
for example on its website? Do members have a duty, arising from their
membership, to report any misconduct to NATSAP that violates NATSAP's
Ethical Principles or Principles of Good Practice? How many complaints
or reports of misconduct has NATSAP received since its formation, and
what steps were taken to research such complaints or reports of
misconduct.

3) Ms. Moss indicated that NATSAP researched at least one instance
where a complaint was made regarding a member's website. Please
describe the complaint, the actions taken by NATSAP, the corrective
actions taken by the member; and provide the identity of the member.

4) What actions does NATSAP intend to take in light of the
testimony given by the U.S. Government Accountability Office regarding
the Alldredge Academy's delinquency in remitting permit fees to the
federal government? Is operating on federal land without a valid permit
a violation of NATSAP's Ethical Principles or Principles of Good
Practice?

5) NATSAP hosts national and regional conferences to foster the
professional development of its members. Have any of these conferences
ever included lectures, workshops, presentations or discussions
concerning cases of abuse, neglect, mistreatment, or death of children;
what led to these horrific tragedies; what needs to change; and what
NATSAP members need to do in response?

6) NATSAP's new membership requirements mandate that members be
licensed by an appropriate state mental health agency, or accredit by a
reputable mental health accreditation organization. On what basis is an
accreditation organization deemed to be ``reputable?''

7) Please provide a chart showing the year in which each NATSAP
member joined NATSAP, or lost its membership due to expiration or
revocation.

8) It is our understanding that the NATSAP board is primarily
comprised of individuals associated with member programs. Given that
NATSAP researches and acts upon complaints against members when they
are reported to NATSAP, please describe NATSAP's policy regarding
conflicts-of-interest for its board members. For example, are board
members required to recuse themselves on matters before the board when,
by virtue of their affiliation with a particular member, their judgment
may be prejudiced in fact or in appearance?

9) Recent reports indicate that a NATSAP member, Youth Care, Inc.,
has been placed on probation by the Utah Department of Human Services
and that criminal neglect charges have been filed against this member
due to the death of a child. Youth Care, Inc. uses the NATSAP logo on
its website to promote their program. Given these reports and the use
of the NATSAP logo by this member, what steps does NATSAP intend to
take to research reports of criminal neglect on the part of Youth Care,
Inc.?

10) Aspen Education Group, which owns Youth Care, Inc., also
operates Aspen Achievement Academy, another NATSAP member. Aspen
Achievement Center is currently being investigated for a teen's
attempted suicide. While local authorities conduct a thorough
investigation, what does NATSAP do to ensure the safety of the students
placed in its member facilities?

————

Chairman Miller. Before proceeding to introduce our
witnesses, let me lay out the process we follow generally in
investigative hearings specific to this hearing.

An investigative hearing differs from a legislative or
oversight hearing in that the investigations may involve
allegations that public officials acting in their official
capacity or private citizens or entities have engaged in
certain conduct that may suggest the need for a legislative
remedy. Because of the importance of getting complete, full and
truthful testimony, witnesses at investigative hearings before

the committees of Congress are sworn in, and our witnesses will be sworn today.

I understand that some witnesses, as is their right, may be accompanied by counsel. While counsel are welcome to advise their clients, they may not coach them or answer questions on their behalf. House Rule 11 2(k)4 authorizes the chairman of the committee to ``punish breaches of order and decorum and professional ethics on the part of counsel by censure or exclusion from hearings, and the committee may cite the offender to the House for contempt.''

I will not tolerate any tactics designed to disrupt the purposes of this hearing, and I must say I do not expect any.

To ensure that we have ample opportunity to flesh out the relevant facts for the record, I have exercised my prerogative as chair, pursuant to Committee Rule 2(b), to extend the 5-minute rule for myself and for Mr. McKeon. Following the witnesses' testimony, we will each engage in one round of 15-minute questionings and then go to the other members of the committee under the 5-minute rule.

I would like now to introduce our panel of witnesses.

Mr. Greg Kutz is currently the managing director of GAO's Forensic Audits and Special Investigations unit. Mr. Kutz has testified and written investigative reports about the federal governments' handling of Hurricanes Katrina and Rita and military pay problems in Department of Defense and the smuggling of nuclear materials across our nation's borders, among other important issues.

He will be accompanied by Mr. Andy O'Connell, who is the assistant director for investigations at the GAO.

Mr. Paul Lewis is the father of Ryan Lewis, who died in 2001.

Ms. Cynthia Harvey is the mother of Erica Harvey, who died in 2002.

Mr. Bob Bacon is the father of Aaron Bacon, who died in 1994.

Ms. Jan Moss is the executive director of the National Association of Therapeutic Schools and Programs created in January of 1999. NATSAP is a 501(c)6 not-for-profit trade association that represents therapeutic schools, residential treatment programs, wilderness programs and other similar programs.

And finally, Dr. Allison Pinto is a clinical child psychologist and research assistant professor at the Florida Mental Health Institute at the University of South Florida where she coordinates A START, which is Alliance for Safe Therapeutic and Appropriate Use of Residential Treatment. Dr. Pinto has coordinated public awareness and advocacy efforts relating to the mistreatment of children in private and unregulated residential treatment facilities. She also serves as a principal investigator of a qualitative study regarding experience of youth and families who have participated in the residential treatment programs.

For those of you who have not testified, first, let me welcome you all to the committee and explain that we will have a lighting system. When you begin your testimony, there will be a green light, which is on the table, which will give you 5 minutes to testify. When you see the yellow light, it means you roughly have 1 minute in which to sum up your testimony. And with the red light, your time is expired, although we certainly want you to conclude your testimony in a fashion so you have properly conveyed those thoughts at that time.

And let me remind you that you have to turn on the microphones in front of you.

Before we move on to the testimony, if each of you would stand and raise your right hand for the purpose of being sworn

in.
     Do you swear that the testimony that you are about to give,
that you will tell the truth, the whole truth and nothing but
the truth?
     Let the record show the witnesses have answered in the
affirmative.
     Please be seated.
     We will now hear from our first witness, Mr. Kutz of the
GAO.
     Welcome.

STATEMENT OF GREG KUTZ, MANAGING DIRECTOR, FORENSIC AUDITS AND
 SPECIAL INVESTIGATIONS UNIT, GOVERNMENT ACCOUNTABILITY OFFICE

     Mr. Kutz. Mr. Chairman and members of the committee, thank
you for the opportunity to discuss residential treatment
programs for youth.
     There are many who claim positive outcomes for troubled
youth at these programs. At the same time, there are widespread
allegations of death and abuse. My testimony today addresses
these allegations.
     My testimony has two parts: first, some background on the
scope of our work; and, second, the results of our work.
     First, since at least the early 1990s, hundreds of
residential treatment programs have been established across the
United States. There is no standard definition of these
programs and no way to know how many exist. There are no
federal laws that regulate private programs. However, some
states have statutory regulations that require licensing.
     Common names for these programs include boot camps,
boarding schools and wilderness programs. The first poster
board shows examples of wilderness program settings which are
typically in the mountains, the forest or the desert. The
second poster board shows first the restrictive nature of some
of these programs which you can see by the fencing and the
cameras and, second, the military theme of other programs.
     All of these programs offer in some way to reform the lives
of very troubled youth.
     The purpose of our work was to address allegations of death
and abuse at these programs. Our focus was on private programs.
However, our overall analysis of the extent of death and abuse
included both public and private programs. It was beyond our
scope to evaluate the benefits of residential treatment
programs.
     Moving on to the results of our work, we identified
thousands of reported cases of death and abuse at these
programs. Sources of these allegations include HHS, state
agencies, the Internet and pending and closed civil and
criminal lawsuits.
     Allegations include physical, emotional and mental abuse.
Examples of abuse include: youth being forced to eat their own
vomit; denied adequate food; being forced to lie in urine or
feces; being kicked, beaten and thrown to the ground; and being
forced to use a toothbrush to clean a toilet and then forced to
use that toothbrush on their teeth.
     We took an in-depth look at 10 cases that were closed of
teenagers that died between 1990 and 2004. Ineffective program
management played a key role in most of these deaths.
     The next poster board shows four key themes from our case
studies, which include untrained staff, misleading marketing
practices, abuse before death and negligent operating
practices. I will now use these case studies to discuss these
four themes.
     First, we found program staff with little or no relevant
training. In many cases, program managers and staff

misinterpreted signs of treatable conditions, such as dehydration. As a result, many of these kids died slowly while program management and staff continued to believe that they were faking it. It seems the only way staff could be convinced that these kids were not faking it was when they stopped breathing or had no pulse.

For example, in one case, a 16-year-old male exhibited significant signs of distress for nearly 3 weeks, including the loss of bodily functions. In 30 days, this 5-foot 10-inch boy dropped from 131 pounds to 108 pounds. Despite these warning signs, he was forced to continue hiking. There was no emergency response until he collapsed and stopped breathing. Unfortunately at this point, it was too late.

In another case, a 14-year-old male was forced to sit in the 113-degree sun for hours. He began eating dirt due to hunger, became dehydrated and appeared to have a seizure. He was hauled in the back of a pickup truck to a motel where he defecated and vomited on himself. Staff then pressed his stomach and mud oozed out from the boy's mouth. They then cleaned him up, put him into the back of the pickup truck and took him back to the campsite. He died shortly after this in a hospital.

Another 14-year-old male showed signs of excessive body temperature and heavy breathing, but staff assumed that he was faking it. Although the boy became unconscious, staff continued to believe that he was faking it. The final check was for staff to hide behind a tree for 10 minutes to see if this unconscious boy would actually revive himself. When the staff returned to the boy, there was no pulse, which finally triggered an emergency response. But, once again, it was too late.

The second theme was misleading marketing practices. Many of these programs took advantage of desperate parents misrepresenting that their programs were a perfect fit for these kids' unique issues. For example, as shown on the poster board, one program brochure touted their staff as highly trained survival experts with experience that was unparalleled.

However, these experts believed that a 15-year-old female who was not eating, and vomiting water, was faking it. These experts allowed these symptoms to go on for 2 days until the girl finally collapsed on the road and stopped breathing. These experts became so lost that they wandered into another state. Lacking radios, these experts had to build a fire to signal for help.

The next poster board shows the body of this girl who lay dead on the road for 18 hours until help arrived.

Another program marketed its expertise in handling suicidal youth to the parents of a 14-year-old male who had twice attempted suicide. This boy committed suicide 6 days into the program by hanging himself by his tent. The parents later found that there was no specific suicide expertise in this program. However, the staff were experts in whitewater rafting.

Our third theme was abuse of these kids before they finally died. For example, a 14-year-old male was forced to wear black clothing and stand in direct sunlight for several hours during the day. Despite strenuous physical exertion, he was fed an apple for breakfast, a carrot for lunch and a bowl of beans for dinner.

A 15-year-old male refused to return to a campsite after urinating. Although his refusal was not violent, two counselors forced him to the ground and held him face down in the dirt until he stopped struggling. One of the counselors was on top of this boy for 45 minutes. This boy died from a severed artery in his neck.

Another 15-year-old male was dragged around when he was unable to exercise. As his condition deteriorated and he lost

bodily function, he was forced to wear a 20-pound sandbag
around his neck as punishment. The autopsy report for this boy
showed 30 contusions and abrasions all over his body.

As I am sure you will agree, there is no need for me to
elaborate further on the fourth theme of these cases, the
negligent and reckless operating practices of these programs.

In conclusion, today's testimony reveals disturbing facts
about the world of residential treatment programs. If you had
walked in partway through my presentation, you might have
assumed that I was talking about human rights violations in a
Third World country. Unfortunately, these human rights
violations occurred right in the United States of America.

Mr. Chairman, I want to commend you for holding today's
hearing and putting a spotlight on this important issue. I also
want to thank the parents who represent three of our case
studies for having the courage to testify about the tragic
death of their child.

Mr. Chairman, this ends my statement.

[The prepared statement of Mr. Kutz and the GAO report,
``Residential Treatment Programs: Concerns Regarding Abuse and
Death in Certain Programs for Troubled Youth,'' may be accessed
at the following Internet address:]

        http://www.gao.gov/new.items/d08146t.pdf

                    _____

    [Responses to questions for the record from Mr. Kutz
follow:]

                                        October 24, 2007.
Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.
Subject: Response to Post-hearing Questions on GAO-08-146T: Residential
        Treatment Programs: Concerns Regarding Abuse and Death in
        Certain Programs for Troubled Youth

    Dear Chairman Miller: On October 10, 2007, I testified before the
House Committee on Education and Labor on the results of our
examination of residential treatment programs. This letter provides a
response for the record to the four follow-up questions submitted by
Representative Robert Scott. His questions and our responses follow.
Question One
    What percentage of youths attending these programs are minorities?
Response to Question One
    Based on our research, complete information is not available. As I
testified, there is no reliable comprehensive data source on public and
private programs, so we cannot determine what the total number of
children in these programs is or their gender, race, or other
characteristics.

    However, as part of GAO's ongoing review of state oversight of
public and private residential treatment programs for the Committee,
GAO has found that information on juvenile offenders placed in various
programs is available. Specifically, the Department of Justice through
its Census of Juveniles in Residential Placement has race data on
children held in various types of public and private residential
placement facilities, including boot camps and ranch/wilderness
camps.\1\ Those data show that, of almost 6,500 children under 21 held
in boot camps and ranch/wilderness programs in 2003, the most recent
year for which data are available, almost 35 percent (2,263) were
black, almost 35 percent (2,257) were Hispanic, over 26 percent (1,714)
were white, with American Indians, Asian/Pacific Islanders, and others
accounting for the remaining 4 percent (252).
------------------------------------------------------------------------
    \1\ Data are available from the Department of Justice's Office of

Juvenile Justice and Delinquency Prevention (OJJDP) within the Office of Justice Programs. OJJDP's Web site provides access to a variety of statistics related to the juvenile justice system--see http://ojjdp.ncjrs.gov/ojstatbb.

---------------------------------------------------------------------

Question Two

    Will or can the GAO report disaggregate the deaths/abuses being investigated by the reason the individual is in the program and whether the individual is taking psychotropic medication?

Response to Question Two

    As part of GAO's ongoing review of state oversight of juvenile residential treatment programs, we are attempting to provide a range of information about oversight, including information on deaths and abuse at such facilities. This effort has entailed an extensive effort to survey state agencies involved in the oversight of children in such programs, including state departments of education, mental health, and juvenile justice. GAO plans to include information on the cause of death and maltreatment (abuse) in its upcoming report. However, obtaining information as to why children are in these programs or the number of children in these programs who are taking medication was outside the scope of our recent review. Although the U.S. Department of Health and Human Services sponsors a national data collection effort called The National Child Abuse and Neglect Data System (NCANDS) for tracking the volume and nature of child abuse reporting each year within the United States, state reporting of information to NCANDS is voluntary. Moreover, NCANDS does not report on information about why children are in residential treatment programs or whether they take medication.

Question Three

    Is there currently an obligation for mental health professionals who recommend these programs to clients to ascertain their safety and validity as a treatment option?

Response to Question Three

    The issue as to whether mental health professionals are obliged or required to determine the safety and validity of juvenile residential treatment programs to clients was beyond the scope of our work for the testimony. The issue of program safety is primarily under state, not federal, oversight and is being addressed by GAO's ongoing study regarding these programs. Our ongoing work focuses on treatment programs but does not cover individual mental health professionals. It also does not assess the validity of various treatment options, another complex topic that was beyond the scope of this work.

Question Four

    Is there currently any requirement that other treatment options be utilized to address a child's behavioral issues before sending them to such a center?

Response to Question Four

    The subject of child behavioral treatment options and assessing which ones are appropriate for a child are complex issues and, as such, were beyond the scope of our work for the testimony. This is also outside the scope of GAO's ongoing review of state oversight of juvenile residential treatment programs.

    If you have any further questions, or if you would like to discuss our response, please feel free to contact me.

               Sincerely yours,
                     Gregory Kutz, Managing Director,
                  Forensic Audits and Special Investigations.

―――――

    Chairman Miller. Thank you very much.
    Mr. Lewis?

       STATEMENT OF PAUL LEWIS, FATHER OF RYAN LEWIS

    Mr. Lewis. Chairman Miller and members of the committee,

good morning.

I am here today with my wife, Diana, and my daughter, Erin. The member of our family who is missing today is Ryan.

Ryan lived his life to the fullest surrounded by his adoring friends and relatives. He was a Boy Scout, a Fire Explorer. He was an avid outdoor enthusiast. He enjoyed kayaking, hiking, camping and mountain biking. He read for hours and was a master at putting together complicated ship and airplane models. He was an all-American boy with sparkling blue eyes and a big smile that lit up his freckled face and our whole world.

Ryan could weave an entertaining story and was oftentimes hilarious in his presentation. He had a remarkable way of relating to people of all ages and could draw anyone into a conversation on a variety of topics. He was sensitive to others and could articulate his views and feelings way beyond someone his age.

He was a history buff and could match any adult conversation about World War II. In fact, one night, we met two World War II vets in a restaurant, and one remarked that Ryan knew more about the war than he did, but he had been there.

With all of Ryan's extraordinary qualities, he sadly suffered from clinical depression. He was a brave and courageous person who battled the darkness valiantly. But as a family, we knew that we needed help from professionals and sought out help from clinical psychologists and a child psychiatrist. In addition, Ryan needed an integrative program where he could continue his schooling and receive therapy while being among his peers.

After exhausting all local resources to help Ryan, we reached out to Steve Bozak, an education consultant. We provided him with all of Ryan's educational and medical records. Given Ryan's background, he strongly recommended a therapeutic wilderness program named Aldredge Academy in Davis, West Virginia. He told us this would be the safest place for Ryan. Ryan's psychiatrist, after speaking to the admissions department, also agreed that this might meet Ryan's needs.

Educational and medical records were then sent. His detailed psychiatric information required an extensive application. We were very hesitant to send Ryan so far away, but the program's marketing was first class, appearing to be just what Ryan needed. Aldredge used Ryan's love of the outdoors as a selling tool. The admissions personnel repeatedly touted their professionalism and expertise with children who had the same psychiatric diagnosis as Ryan.

On February 7, 2001, we enrolled Ryan where, again, we were assured by the program personnel that Ryan would be safe. We called every day to inquire about how Ryan was doing. We were assured that he was just fine.

On February 13, only 7 days into the program, we were startled by a call at 11:15 at night. The news ripped through us like an explosion tearing us into a million pieces. L. Jay Mitchell, the owner of Aldredge Academy, informed us that Ryan had hung himself. He told us that there was no indication that Ryan was in trouble. It caught them all completely by surprise, and there was nothing they could have done.

The next day, we flew to West Virginia and met with L. Jay Mitchell, John Weston White and Lance Wells who repeated the same story as the night before. The story did not make sense to me.

The following day, we met with the investigating West Virginia state trooper who told us we were being lied to about the circumstances of Ryan's death. This news was like losing Ryan all over again. In his view, it was a death that could have been prevented.

He told us that the night before Ryan died, he had slashed his arm four times with a pocketknife issued to him by the program. He told them, ``Take this away from me before I hurt myself anymore. I cannot take it anymore, I want to call my mom, and I want to go home.'' The counselors talked to Ryan for a few minutes, and he was told that the people that could help him were coming out the next day. Then they gave him the knife back.

L. Jay Mitchell and John Weston White arrived the next day. Even though they called themselves therapists, neither one of them had any credentials that could remotely qualify them as mental health professionals. In fact, L. Jay Mitchell is a lawyer.

These individuals decided Ryan's desperate cry for help was manipulation so that he could get out of the program. Ryan was ignored and, consequently, at approximately 7:30 on a cold, rainy night, desperate, alone and abandoned, our son hung himself.

One year later, Aldredge Academy, L. Jay Mitchell and John Weston White were indicted by the State of West Virginia for child neglect resulting in death. We were adamantly opposed to the plea agreement made that allowed Aldredge Academy, the corporation, to plea no contest in exchange for dropping charges against the individuals. Aldredge was fined $5,000 for the horrific death of my son.

We filed a civil suit alleging wrongful death, fraud and a tort of outrage. Once again, L. Jay Mitchell was unable to defend himself and acknowledged fault.

In spite of two court verdicts, L. Jay Mitchell continues in this business today. In my opinion, as we sit here today, children are at great risk. Incredibly, Aldredge continues to be a proud member of NATSAP, the National Association of Therapeutic Schools and Programs.

Losing Ryan has been devastating to our family, our friends and the people in our community. We miss him terribly and live with this nightmare every day. All we have left are the fragile memories of Ryan and the wonderment of the prospects that could have been.

We do not want other families to suffer the overwhelming loss of a child in this fraudulent industry. We ask you, Congressman Miller, to do everything in your power to put an end to this gross abuse of our children.

Thank you for the opportunity to share Ryan's story.

[The statement of Mr. Lewis follows:]


            Prepared Statement of Paul Lewis, Father of Ryan Lewis


Our son, Ryan lived his life to the fullest, surrounded by adoring friends and relatives. He was a Boy Scout and a fire explorer. As an avid outdoor enthusiast, he enjoyed kayaking, camping, hiking, and mountain biking. He read for hours and was a master at putting together complicated ship and airplane models. He was an all American boy with sparkling blue eyes and a big smile that lit up his freckled face and our whole world.

Ryan could weave an entertaining story and was often times hilarious in his presentation. He had a remarkable way of relating to people of all ages and could draw anyone into conversation on a variety of topics. He was sensitive to others and could articulate his views and feelings way beyond someone his age. He was a history buff and could match any adult conversation about WW11. In fact, one night we met two WW11 Vets in a restaurant and one remarked that Ryan knew more about the war than he did and he was there!

With all of Ryan's extraordinary qualities, he sadly suffered from clinical depression. He was a brave and courageous person who battled the darkness valiantly. But as a family, we knew that we needed help.

from professionals and sought help from a clinical psychologist and child psychiatrist. In addition, what Ryan needed was an integrated program where he could continue his schooling and receive therapy while being among peers.

After exhausting all local resources to help Ryan, we reached out to Steve Bozak, an educational consultant. We provided him with all Ryan's educational and medical records. Given Ryan's background, he strongly recommended a Therapeutic Wilderness Program named Alldredge Academy in Davis, West Virginia. He told us this would be the safest, most appropriate place for Ryan. Ryan's psychiatrist, after speaking to the Admissions department also agreed that this might meet Ryan's needs.

Educational and medical records were then sent as well as detailed psychiatric information required on an extensive application. We were very hesitant to send Ryan so far away but the program's marketing was first rate, appearing to be just what Ryan needed. Alldredge used Ryan's love of the outdoors as a selling tool. The admissions personnel repeatedly toted their professionalism and expertise with children who had the same psychiatric diagnosis as Ryan's. On February 7, 2001 we enrolled Ryan and were again reassured by the program personnel that Ryan would be safe. We called every day to inquire about how Ryan was doing and we were assured that he was ``just fine''.

On February 13, only seven days into the program we were startled by a call at 11:15 at night. The news ripped through us like an explosion, tearing us into a million pieces. L. Jay Mitchell, the owner of Alldredge Academy, informed us that Ryan had hung himself. He told us that there was no indication that Ryan was in trouble, it caught them all completely by surprise and there was nothing they could have done. The next day, we flew to West Virginia and met with L. Jay Mitchell, John Weston White, and Lance Wells who repeated the same story as the night before. The story didn't make sense to me. The following day we met with the investigating West Virginia State Trooper who told us we were being lied to about the circumstances of Ryan's death.

This news was like losing Ryan all over again since, in his view, it was a death that could have been prevented. He told us was the night before Ryan died; he had slashed his left forearm four times with a program issued pocket knife. He told them, ``Take this away from me before I hurt myself anymore; I can't take it anymore, I want to call my Mom and I want to go home.'' The counselors talked to him for a few minutes and he was told that people who could help him were coming out the next day. Then they gave the knife back to him. L. Jay Mitchell and John Weston White arrived the next day. Even though they called themselves therapists, neither of them had any credentials that would remotely qualify them as mental health professionals. In fact, L. Jay Mitchell is a lawyer. These individuals decided Ryan's desperate cry for help was manipulation so that he could get out of their program. Ryan was ignored and consequently at approximately 7:30 on a cold rainy night, desperate, alone, and abandoned, our young son hung himself.

One year later, Alldredge Academy, Ayne Institute, L. Jay Mitchell and John Weston White were indicted by the state of West Virginia for `Child Neglect Resulting in Death'. We were adamantly opposed to the plea agreement made that allowed Alldredge Academy, the corporation, to plead no-contest in exchange for dropping charges against the individuals. Alldredge was fined $5000.00 for the horrific death of our son.

We filed a civil suit alleging wrongful death, fraud, and a tort of outrage. Once again, L Jay Mitchell was unable to defend himself and acknowledged fault. In spite of two court verdicts, L. Jay Mitchell continues in this business. In my opinion, as we sit here today, children are at great risk. Astonishingly, Alldredge continues to be a proud member of (NATSAP) National Association of Therapeutic Schools and Programs.

Losing Ryan has been devastating to our family, our friends and the people in our community. We miss him terribly and live with this

nightmare every day. All we have left are our fragile memories of Ryan
and wonderment of the prospects that could have been. We don't want
other families to suffer the overwhelming loss of a child in this
fraudulent industry. We ask you, Congressman Miller to do everything in
your power to put an end to this gross abuse of our children. Thank you
for this opportunity to share Ryan's story.

   Our family was duped into believing that caring people would help
Ryan who was struggling with a learning disability and clinical
depression. We thought these were professionals who knew what they were
doing. We had no idea that their interest was profit, not healing.

   There are also additional details to our story that provide a
deeper understanding of issues involved in this fraudulent residential
facility claiming to help children by providing therapy and education.
We would like to add these to the record.

   For example, consider these facts: While he was in the program,
Ryan was 5'1 and weighed 90 pounds. He was forced to carry a makeshift
backpack with approximately 60 pounds of gear. At one point, he was
restrained and had water forced down him.

   In addition, Ryan was forced to hike in silence. This was critical
because Ryan was very articulate and was not allowed to express his
feelings. There is no therapeutic justification for such a policy.

   Further, once he had cut his arm with the program-issued knife,
there was no monitoring of his behavior. No buddy system was employed
nor were counselors vigilant at staying with him at all times. Though
he was clearly expressing suicidal thoughts and behaviors--and had been
sent to the program with a diagnosis of depression--no mental health
professional was consulted to determine whether he should continue in
the program or be hospitalized. Nor were we even notified that he'd
expressed such despair.

   The program was completely unprepared to deal with cases like
Ryan's. It operated under the assumption that all teenage misbehavior
is ``lies'' and ``manipulation'' and that even depression is just
``attention seeking,'' not a mental illness that warrants compassion
and support. We believed we were putting our child in the care of
people who knew what they were doing--and yet the program didn't even
have a protocol in place to deal with suicides. We had no way of
knowing that these people had no business dealing with sick children--
there was no law in place that said they couldn't sell their services
as a treatment for depression.

   There were also additional signs of amateurism and complete
insensitivity to the children they were supposed to be helping. For
one, Ryan died at approximately 7:30 P.M. and we were not notified
until 11:15 P.M., a four hour delay. Phone records show that there were
30-40 calls made during that four hour delay. Clearly, they were
scrambling to cover up what had gone on and figure out how to make it
look better.

   Another example: in an early press release, Alldredge claimed that
none of the other children saw Ryan. This was not true, in fact,
another child found him. This child has been forever traumatized.

   In violation of confidentiality rules, another early press release
provided enough information about Ryan's funeral service to identify
him.

   Finally, in yet another press release, personnel at Alldredge
claimed that all the children successfully completed the program. This
was not the case. In fact, two weeks after Ryan died, another child
that had been in his group, slit his wrists. He was evacuated,
hospitalized, and sent home.

   Four weeks into the program, a third child in his group threatened
suicide in a note to his mother. He, too, went home. It was too late
for Ryan.

   Alldredge Academy has changed its name to Alldredge Wilderness
Journey. Although he is not listed as a staff member, L. Jay Mitchell
is still actively involved in the operation of the program. For parents
in crisis, it would be very difficult to get an accurate history on the
program.

We urge Congress to act to prevent people who do not know how to
treat children with dignity--let alone treat mental illness--from
selling their fraudulent treatment to other vulnerable parents and
children. People with mental illness should have the right to safe,
effective treatment that people with physical illness do--and these
predators should not be allowed to prey on them and their parents.

———

Chairman Miller. Thank you very much, Mr. Lewis, and the
rest of your testimony will be placed in the record in its
form.
    Ms. Clark Harvey?

    STATEMENT OF CYNTHIA HARVEY, MOTHER OF ERICA HARVEY

Ms. Harvey. Good morning. My name is Cynthia Clark Harvey.
Thank you, Chairman Miller and those committee members
present today for the opportunity to share our family's story.
    Our story is a personal tragedy, but please remember that
for each family that has suffered the ultimate damage, the
death of a beloved child, there are perhaps thousands of others
who have suffered physical or psychological neglect and abuse.
For those individual and family victims, there is no public
acknowledgement of their sorrow and pain, as there has been of
ours.
    This is Erica. Our first-born, Erica, was an amazing kid.
Everyone says that about their own, but it is true. She was.
    So many times during Erica's too short life, she would do
or say or create something that just knocked our socks off.
Erica was an incredible student, straight A's, with gifted
classes in math and language. She was a competitive springboard
diver with dozens of medals. Erica was a musician who played
clarinet and drums, a prizewinning visual artist, a weekly
volunteer with a local animal shelter from the time she was 10
and dragged us along so they got two, three or four for the
price of one determined little girl.
    But Erica's bright light seemed to flicker when at 14 and
in the eighth grade she began to experience mental health
problems. Erica became depressed, then suicidal. She engaged in
cutting behaviors. To medicate herself, she began abusing and
using illegal drugs. Erica was hurting in many ways, and our
whole family was suffering.
    Erica was in the care of a psychiatrist and a therapist who
both recommended that we consider a residential treatment
program. Michael and I were desperate to find help for Erica.
Our daughter was 15\1/2\ years old when we made the decision to
send her to what we believed was a legitimate treatment
program, a place staffed with people who could help our family
move forward from some very dark times.
    We compared several programs over a period of many weeks.
We eventually focused in on Catherine Freer Wilderness because
they were and continue to be leaders in the industry, one of
the founding members of NATSAP and of OBHIC. We chose Catherine
Freer because they have claimed to be fully licensed, because
they were JCAHO accredited, because they claimed experience
with teens being treated with psychiatric medications.
    We as parents were interviewed by the program. We laid bare
our hearts, our souls and our story to the program. They told
us our daughter would be treated by experienced staff,
experienced therapists and experienced wilderness guides and
emergency medical technicians. They touted their backcountry
planning and emergency procedures. They told us we could trust
our most precious first-born daughter, Erica, to them.
    On May 26, 2002, we arrived at Catherine Freer's Nevada
office. We had been advised by Freer not to tell Erica we were

placing her until our arrival for the family meeting that would begin the trek. Of all the many profound and tormenting regrets we have about our terrible decision, agreeing to deceive Erica is one of the worst. When we told her why we were there, she was shocked, angry and scared. We will be haunted as long as we live by Erica's cry of ``Please, Daddy, don't make me go.''

On May 27, 2002, the first full day of Erica's Nevada wilderness trek, Freer's trusted team mistook a dire medical emergency for teenage belligerence, and Erica died that afternoon of heat stroke with dehydration.

Over a period of hours, Erica's condition had worsened as she was pushed to keep hiking. When Erica's eyes rolled into the back of her head and she fell off the trail head first into rocks and scrub brush, she was left to lie where she fell for 45 minutes while two Freer staffers, still unwilling or unable to recognize what was happening, watched Erica died a slow, painful death.

When the Freer team finally responded to Erica's last few tortured breaths, they contacted their on-call medical doctor, but the doctor turned out not to be a doctor at all, rather a physician's assistant located in Oregon.

They called the local authorities to ask for help and a helicopter to get Erica to a hospital, but they did not know where they were, and they sent a search-and-rescue team to the wrong GPS coordinates. The helicopter took hours to arrive because, contrary to the advanced planning that we were told to expect, no arrangements with local authorities had been made, nor was any sort of trip plan filed.

Later, we found out that none of the Freer team had experience with administering psychotropic drugs and no training in how to evaluate those drugs' effects on an individual during a trek. We also found out that the EMT on the team was on his very first trek and had only recently completed coursework in EMT and had never experienced a real medical emergency before.

Six days from today, October 16, is Erica's 21st birthday. The day she was born, we held her and we saw the universe in her fierce, dark eyes. We filled ourselves with dreams for her. We imagined who she would be at 2, at 10, at 12, 21, 30. And today, we are only left with memories--some of them beautiful, some of them harsh--and no dreams for Erica's tomorrows.

[The statement of Ms. Harvey follows:]

Prepared Statement of Cynthia Clark Harvey, Mother of Erica Clark Harvey

Thank you, Chairman Miller, and those Committee members present today for the opportunity to share our family's story. Our story is a personal tragedy, but please remember that for each family that has suffered the ultimate damage, the death of a beloved child, there are perhaps thousands of others who have suffered physical or psychological neglect and abuse. For those individual and family victims, there is no public acknowledgement of their sorrow and pain, as there has been of ours.

Our first-born, Erica, was an amazing kid--everyone says that about their own, but it's true, she was. So many times during Erica's too-short life, she'd do or say or create something that just knocked our socks off. Erica was an incredible student, straight A's, with Gifted classes in Math and Language. She was a competitive springboard diver with dozens of medals. Erica was a musician who played clarinet and drums, a prize-winning visual artist, a weekly volunteer with a local animal shelter from the time she was 10 (and dragged us along, so they got two, three or four for the price of one determined little girl.)

Erica's bright light seemed to flicker, when at fourteen and in the 8th grade, she began to experience mental health problems. Erica became

depressed, then suicidal. She engaged in cutting behaviors. To medicate herself, she began abusing illegal drugs. Erica was hurting in many ways and our whole family was suffering.

Erica was in the care of a psychiatrist and a therapist, who both recommended that we consider a residential treatment program. Michael and I were desperate to find help for Erica. Our daughter was 15 and a half years old when we made the decision to send her to what we believed was a legitimate treatment program, a place staffed with people who could help our family move forward from some very dark times.

We compared several programs over a period of many weeks. We eventually focused in on CF because they were, and continue to be, leaders in the industry, one of the founding members of NATSAP, and of OBHIC. We chose CF because they claimed to be fully licensed, because they were JCAHO accredited, because they claimed experience with teens being treated with psychiatric medications. We, as parents, were interviewed by the program. We laid bare our hearts, our souls and our story to the program. They told us our daughter would be treated by experienced staff: experienced therapists and experienced wilderness guides and emergency medical technicians (EMTs). They touted their back country planning and emergency procedures.

They told us we could trust our most precious firstborn daughter, Erica, to them.

On May 26th, 2002, we arrived at CF's Nevada office. We had been advised by CF not to tell Erica we were placing her until our arrival for the family meeting that would begin the trek. Of all the many profound and tormenting regrets we have about our terrible decision, agreeing to deceive Erica is one of the worst. When we told her why we were there, she was shocked, angry and scared. We will be haunted as long as we live by Erica's cry of Please, Daddy, don't make me go.

On May 27th, 2002, the first full day of Erica's Nevada wilderness trek, CF's trusted team mistook a dire medical emergency for teenage belligerence and Erica died that afternoon of heat stroke with dehydration. Over a period of hours, Erica's condition had worsened as she was pushed to keep hiking. When Erica's eyes rolled into the back of her head and she fell off the trail, head first, into rocks and scrub brush, she was left to lie where she fell for forty five minutes, while two CF staffers, still unwilling or unable to recognize what was happening, watched Erica die a slow, painful death.

When the CF team finally responded to Erica's last few tortured breaths, they contacted their on-call medical doctor, but the ``doctor'' turned out not to be a doctor at all, rather a physician's assistant located in Oregon. They called the local authorities to ask for help and a helicopter to get Erica to a hospital but they didn't know where they were and sent the search and rescue team the wrong GPS coordinates. The helicopter took hours to arrive because, contrary to the advance planning that we were told to expect, no arrangements with local authorities had been made, nor was any sort of trip plan filed. Later we found out that none of the CF team had experience with administering psychotropic drugs and no training in how to evaluate those drugs' effect on an individual during a trek. We also found out that the EMT on the team was on his very first trek, had only recently completed coursework in WEMT and had never experienced a real medical emergency before.

Six days from today, October 16, is Erica's 21st birthday. The day she was born, we held her and we saw the universe in her fierce dark eyes. We filled ourselves with dreams for her. We imagined who she'd be at two, at ten, at twelve, twenty-one, thirty. Today we're left with only memories, some of them beautiful, some of them harsh, and no dreams of Erica's tomorrows.

————

Chairman Miller. Thank you very much.
Mr. Bacon?

## STATEMENT OF ROBERT BACON, FATHER OF AARON BACON

Mr. Bacon. Chairman Miller and committee members, my name is Bob Bacon, the father of Aaron Bacon. Speaking for my wife and Aaron's mother, Sally, his brother, Jared, and his sister, Tia Sullivan, and speaking on behalf of the many families not at this table whose lives have been shattered by these fraudulent programs, we deeply appreciate your efforts to put a stop to this country's growing industry of institutionalized child abuse.

During our search for the best alternative, the remaining 3 months of Aaron's sophomore year of high school, my wife and I spoke with therapists, counselors, pastors and doctors until we were eventually referred by friends to North Star Expeditions, a now defunct but formerly licensed Utah-based program that billed itself as a wilderness therapy program for troubled teens.

After reading their very compelling brochure, speaking to their office by phone, and finally meeting with the owners for a personal interview, we thought we had found the perfect situation--caring people who were experienced in counseling kids who were struggling with drugs and social pressure--and to top it off, writing in a daily journal we were told was an integral part of their so-called counseling program. As a writer, we felt journaling would help Aaron sort things out, and we were certain that, as a poet, Aaron would find the awesome beauty of southern Utah to be inspirational and spiritually healing.

Of course, being normal, trusting and honest people ourselves, we assumed we were being told the truth. We were dead wrong. His mother and I will never escape our decision to send our gifted 16-year-old son to his death at North Star. The guilt of our apparent naivete was crippling. We were conned by their fraudulent claims and will go to our graves regretting our gullibility.

Adding further to our regret, we were talked into using their escort service. Aaron was taken from his bed at 5:00 a.m. on Tuesday morning, March 1, 1994, by two burly strangers who announced to Aaron with a tone of authority that any resistance on his part would be countered with whatever physical force was necessary. He was not allowed to speak with us or to put on any shoes. His eyes expressed a strange mixture of anger, despair, fear and loving sadness.

I was able to manage only the briefest of hugs which, being restrained, he could not return. In the trauma of this surreal instant, I offered words of comfort without thinking of their potentially ominous meaning when I said, ``Aaron, I know you will find God in the wilderness.'' Little did I know that these would be the last words I would ever speak to my youngest son.

His mother managed only a fleeting moment to cradle his face in her hands and utter her spontaneous words of love and the assurance that he would later see that this was really for the best.

I cried inconsolably from the depths of my soul as the escort van backed out of our driveway with our terrified son pleading silently with his sad eyes for us not to send him away. This excruciating scene would have to serve for the rest of our lives as the last living memory of our beautiful son.

Aaron arrived in the Escalante wilderness area of southern Utah that same night and waited a few days for a brief intake exam, indoctrination into the rules of the program and the issue of ill-fitting shoes and clothing.

Aaron's body and bloody and tattered journal, in fact, would contain no poetry, but would record in his own words an unbelievable account of torture, abuse and neglect, a horrific

tale that is corroborated by the journals of the so-called
counselors, along with the journals and sworn testimony of his
troubled young cohorts.

A calendar was assembled by criminal investigators that
chronicles 21 days of ruthless and relentless physical and
psychological abuse and neglect. Aaron spent 14 of his 20 days
on the trail without any food whatsoever while being forced to
hike eight to 10 miles per day. On the days he did have food,
it consisted of undercooked lentils, lizards, scorpions, trail
mix and a celebrated canned peach on the 13th.

On top of this, with temperatures below freezing, he
endured 13 of 20 nights with only a thin wool blanket, plus
five nights without any warmth or any protection whatsoever.

Aaron complained of stomach pain and asked to see a doctor
as early as the third day of hiking, and by the 10th day, he
had lost all control of his bodily functions. But unbelievably,
as he got weaker and lost nearly 20 percent of his body weight,
they repeatedly refused to send him to a doctor.

Taken from what appears to be the industry's handbook,
their policy had predetermined that these kids are all liars
and manipulators and, therefore, Aaron was faking. This
grotesque skeleton is what Aaron looked like the evening before
he died.

He was seen by Georgette Costigan, the registered EMT who
is still insisting that he was faking, did not even take his
vital signs, but instead took the occasion to barter a meager
piece of cheese in return for his promise to try harder and to
hike the following day. This company-employed EMT and relative
of owner Bill Henry dismissed his final desperate plea to see a
doctor who could prove he was not faking and made a conscious
decision to prove a point, rather than render aid, thus
effectively killing our son rather than saving him.

What you cannot see in these photos are the bruises, cuts,
lesions, rashes, blisters and open sores that covered Aaron's
body from head to toe. These scars of abuse and the dried skin
stretched taut over his bones is what his mother and I were
left to discover without any warning when the sheet was pulled
back in the mortuary. ``This,'' we screamed, ``could not be our
son,'' as we grabbed each other and collapsed to our knees, but
the scar above his now sunken right eye, told us that it was.
It was in that one shocking moment of proof that our lives
changed forever.

The stories of Aaron's death and the others who have died
or survived the abuses of these programs are chilling reminders
of the dangers of absolute power and point out the extremely
high risk we take in allowing these programs to operate without
strict regulation and oversight.

This country, this Congress and this committee are faced as
never before with several urgent and critically important
choices. If we choose economic growth over human rights, if we
choose no growth in government over the safety of our children,
if we continue to place our faith in the self-regulation of
private enterprise over the mandate of our government to
protect our nation's health, safety and welfare, we are
choosing to fail in our sacred obligations to our children, our
families and our future.

I implore you, as I know Aaron would, to please stop paying
lip service to family values and start placing value in
families. We can do this in part by investing the resources of
the American people in our children who will soon inherit our
challenging legacy, and we can start now by putting a stop to
these fraudulent and destructive programs of institutionalized
child abuse.

[The statement of Mr. Bacon follows:]

Case 1:18-cv-10836-PGG Document 143-2 Filed 02/03/20 Page 52 of 52

Prepared Statement of Bob Bacon, Father of Aaron Bacon

Chairman Miller and Distinguished Committee Members: My name is Bob Bacon, the father of Aaron Bacon.

Speaking for my wife, and Aaron's mother Sally, his brother Jarid and his sister Kia Sullivan; and speaking on behalf of the many families not at this table whose lives have been shattered by these fraudulent programs, we deeply appreciate your efforts to put a stop to this country's growing industry of institutionalized child abuse.

During our search for the best alternative to the remaining three months of Aaron's sophomore year in high school, my wife and I spoke with therapists, counselors, pastors and doctors until we were eventually referred by friends to North Star Expeditions, a now defunct, but formerly licensed Utah-based program that billed itself as a ``wilderness therapy program for troubled teens.''

After reading their very compelling brochure, speaking to their office by phone, and finally meeting the owners for a personal interview, we thought we had found the perfect situation: Caring people who were experienced in counseling kids who were struggling with drugs and social pressure--and to top it off--writing in a daily journal we were told was an integral part of their ``counseling'' program. As a writer, we felt journaling would help Aaron to sort things out; and we were certain that, as a poet Aaron would find the awesome beauty of southern Utah to be inspirational and spiritually healing.

Of course, being normal, trusting and honest people ourselves--we assumed we were being told the truth. We were dead wrong. His mother and I will never escape our decision to send our gifted 16 year old son to his death at North Star. The guilt of our apparent naivete was crippling. We were conned by their fraudulent claims, and will go to our graves regretting our gullibility.

Adding further to our regret, we were talked into using their escort service. Aaron was taken from his bed at 5:00 AM on Tuesday morning, March the 1st, 1994 by two burley strangers who announced to Aaron with a tone of authority that any resistance on his part would be countered with whatever physical force was necessary. He was not allowed to speak to us, or put on any shoes.

His eyes expressed a strange mixture of anger, despair, fear and loving sadness. I was able to manage only the briefest of hugs which, being restrained, he could not return. In the trauma of this surreal instant I offered words of comfort without thinking of their potentially ominous meaning when I said, ``Aaron, I know you will find God in the wilderness.'' Little did I know that these would be the last words I would ever speak to my youngest son!

His mother managed only a fleeting moment to cradle his face in her hands and utter her spontaneous words of love and the assurance that he would later see that this was really for the best.

I cried inconsolably from the depths of my soul as the escort van backed out of our driveway with our terrified son silently pleading with his sad eyes for us not to send him away. This excruciating scene would have to serve for the rest of our lives as the last living memory of our beautiful son.

Aaron arrived in the Escalante Wilderness Area of southern Utah that same night and waited a few days for a brief intake exam, indoctrination into the rules of the program, and the issue of ill-fitting shoes and clothing. This picture of him was taken on March 8th, when he was noted as weighing 131 pounds on a lanky 5'-11'' frame.

Aaron's bloody and tattered journal would contain no poetry, but would record in his own words an unbelievable account of torture, abuse and neglect; a horrific tale that is corroborated by the journals of the so-called ``counselors'', along with the journals and sworn testimony of his troubled young cohorts.

This calendar was assembled by criminal investigators from program records and chronicles 21 days of ruthless and relentless physical and psychological abuse and neglect. Aaron spent 14 of his 20 days on the trail without any food whatsoever, while being forced to hike 8-10