miles per day. On the days he did have food it consisted of undercooked
lentils, lizards, scorpions, trail mix, and a celebrated canned peach
on the 13th. On top of this, with temperatures below freezing, he
endured 13 of 20 nights with only a thin wool blanket, plus 5 nights
without warmth or protection of any kind. Aaron complained of severe
stomach pain and asked to see a doctor as early as the third day of
hiking, and by the tenth day had lost all control of his bodily
functions; but unbelievably, as he got weaker and lost nearly 20% of
his body weight they repeatedly refused to send him to a doctor. Taken
from what appears to be the industry handbook, their policy had
predetermined that these kids are all liars and manipulators and
therefore ``Aaron was faking.''

    [Slide #3] This grotesque skeleton is what Aaron looked like when
he was seen the evening before he died by Georgette Costigan, the
registered EMT who, still insisting that he was faking, didn't even
take his vital signs, but instead took the occasion to barter a meager
piece of cheese in return for his promise to try harder and hike the
following day. This company employed EMT, and relative of owner Bill
Henry, dismissed his final desperate plea to see a doctor who could
prove he wasn't faking and made a conscious decision to prove a point
rather than render aid, thus effectively killing our son rather than
saving him.

    What you cannot see in these photos are the bruises, cuts, lesions,
rashes, blisters and open sores that covered Aaron's body from head to
toe. These scars of abuse and the dried skin stretched taut over his
bones are what his mother and I were left to discover without any
warning when the sheet was pulled back at the mortuary. This, we
screamed, could not be our son as we grabbed each other and collapsed
to our knees, but the scar above his now sunken right eye told us that
it was. It was in that one shocking moment of proof that our lives
changed forever.

    The stories of Aaron's death and the others who have died, or
survived the abuses of these programs, are chilling reminders of the
dangers of absolute power, and point out the extremely high risks we
take in allowing these programs to operate without strict regulation
and oversight.

    This country, this congress and this committee are faced as never
before with several urgent and critically important choices.

    If we choose economic growth over human rights; if we choose no-
growth-in-government over the safety of our children; and if we
continue to place our faith in the self-regulation of private
enterprise over the mandate of our government to protect our nation's
health, safety and welfare, we are choosing to fail in our sacred
obligations to our children, our families, and our future.

    I implore you, as I know Aaron would, to PLEASE stop paying lip
service to ``family values'' and start placing ``value-in-families.''
We can do this in part, by investing the resources of the American
people in our children who will soon inherit our challenging legacy;
and we can START NOW by putting a stop to these fraudulent and
destructive programs of institutionalized child abuse.

    _____

    Chairman Miller. Thank you.
    Ms. Moss?

STATEMENT OF JAN MOSS, EXECUTIVE DIRECTOR, NATIONAL ASSOCIATION
        OF THERAPEUTIC SCHOOLS AND PROGRAMS

    Ms. Moss. Mr. Chairman, Mr. McKeon, members of the
committee, good morning. I am Jan Moss. I am a mother of two
grown children and a grandmother of three.
    To those of you who have spoken today of your devastating
losses, I express my condolences, respect and utmost deference.
I have not suffered the loss of a child. I do, however, have a
nephew who suffered abuse in an offshore program.

I am here as the executive director of the National Association of Therapeutic Schools and Programs, generally known as NATSAP. We were established in 1999 in an effort to raise the bar of the private therapeutic programs serving children and families in crisis. Among our goals is the complete elimination of the abusive and neglectful practices we have heard about today. Clearly, we still have a very long way to go.

Chairman Miller, you acknowledged in your December 2005 letter to the Government Accountability Office that there are, indeed, programs that provide high-quality services to help troubled adolescents get back on track. We are committed to ensuring that these programs remain available to families in dire need of help. We are working to ensure that the only programs on the market are those of the highest quality.

NATSAP is the only entity in this country working with therapeutic schools and programs to improve them. We are a trade organization. We do not provide certifications nor do we conduct investigations.

Our principles of good practice are based on our 12 ethical principles and were formulated using the standards set by the joint commission which accredits nearly 15,000 care programs in the United States. We will not accept or retain members that do not abide by our ethics or attest to following our principles of good practice.

When we receive notification of a concern about one of our members, we review evidence from state licensing authorities, attorneys general, accrediting bodies and other third parties. If a member has acted in a manner inconsistent with the law or our principles, we proceed on a case-by-case basis, either requiring the program to implement change or canceling its membership.

NATSAP will review the findings of the GAO's investigation into NATSAP member programs and will take action as appropriate.

Our professional development activities include a national conference which over 700 people attend annually. We hold six regional conferences with an estimated total attendance of over 800 individuals. Each conference provides continuing education courses led by industry experts, university researchers and other clinical professionals.

In 2006, NATSAP launched its first professional journal. Dr. Michael Gass of the University of New Hampshire is the managing editor.

In 2007, NATSAP launched its research initiative which will provide members an affordable data collection tool to evaluate the effectiveness of their clinical work. The University of New Hampshire will house the database, making it available not only to internal but also external researchers.

Dr. Keith Russell from the University of Minnesota has just released the results of his 4 years of research on outdoor behavioral treatment.

In 2007, the NATSAP board of directors strengthened its membership requirements. We now require members to be licensed by the appropriate state mental health agency or accredited by a reputable mental health accreditation organization, such as the joint commission.

Unfortunately, not all states have licensing requirements. We are working to address this inadequacy. We have worked successfully with the State of Utah to establish regulations for therapeutic boarding schools which had previously escaped licensure requirements by claiming plain boarding school status. In Montana, we worked diligently to have appropriate licensure requirements put into place, but the stringent bill that we favored lost to a less rigorous bill.

We continue to push for strong state licensure and monitoring requirements. We are hopeful that Chairman Miller, Ranking Member McKeon and this committee will help us in these efforts. We need your assistance.

The American Bar Association has submitted to this committee the ABA's recommendations for legislation to assure the safety of children and youth placed in private residential treatment facilities. We are in fundamental agreement to the extent that the ABA recommends licensure and monitoring of these facilities. We expand on the ABA's recommendations by supporting the licensure and monitoring of all adolescent treatment facilities, including those that are funded by public entities.

Mr. Chairman and Mr. McKeon, NATSAP extends its sincere appreciation for your commitment to eliminating deceptive, abusive and neglectful programs by encouraging state licensure and enforcement. We are committed to working with this committee, other organizations and parents to draft and enact meaningful legislation to put an end to the horrific pain and suffering we have heard today.

Thank you.

[The statement of Ms. Moss follows:]

Prepared Statement of Jan Moss, Executive Director, National Association of Therapeutic Schools and Programs

Mr. Chairman, Mr. McKeon, members of the Committee, thank you for the opportunity to participate in this hearing. I am Jan Moss.

I am a mother of two grown children and a grandmother of three. To those of you who have spoken today of your devastating losses, I express my condolences, respect and utmost deference. I have not suffered the loss of a child. I do, however, have a nephew who suffered abuse in an offshore program.

I am here as the Executive Director of the National Association of Therapeutic Schools and Programs, generally known as NATSAP. We were established in 1999 in an effort to raise the bar of the private therapeutic programs serving children and families in crisis. Among our goals is the complete elimination of the abusive and neglectful practices we have heard about today. Clearly we still have a long way to go.

Chairman Miller, you acknowledged in your December 2005 letter to the Government Accountability Office that there are, indeed, ``programs that provide high-quality services to help troubled adolescents get back on track.'' The three personal narratives I am attaching to my written testimony underscore the value of high-quality therapeutic schools and programs. We are committed to ensuring that these programs remain available to families in dire need of help. We are working to ensure that the only programs on the market are those of the highest quality.

NATSAP is the only entity in this country working with therapeutic schools and programs to improve them. We are a trade organization. We do not provide certifications or conduct investigations.

I am attaching the Ethical Principles of the National Association of Therapeutic Schools and Programs to my written testimony. Our Principles of Best Practice are based on our 12 Ethical Principles and were formulated using the standards set by the Joint Commission, which accredits nearly 15,000 health care programs in the United States. We will not accept or retain members that do not abide by our ethics or attest to following our Principles of Good Practice.

When we receive notification of a concern about one of our members, we review evidence from state licensing authorities, attorneys general, accrediting bodies, and other third parties. If a member has acted in a manner inconsistent with the law or our Principles, we proceed on a case-by-case basis, either requiring the program to implement change, or cancelling its membership. NATSAP will review the findings of the

GAO's investigation into NATSAP member programs and will take action as appropriate.

Our professional development activities include a national conference, which over 700 people attend annually. We hold six regional conferences, with an estimated total attendance of over 800 individuals. Each conference provides continuing education courses led by industry experts, university researchers, and other clinical professionals.

In 2006, NATSAP launched its first professional Journal. Dr. Michael Gass of the University of New Hampshire is the managing editor. In 2007, NATSAP launched its Research Initiative, which will provide members an affordable data-collection tool to evaluate the effectiveness of their clinical work. The University of New Hampshire will house the database, making it available not only to internal, but also external researchers. Dr. Keith Russell, University of Minnesota, has just released the results of his four years of research on outdoor behavioral treatment.

In 2007, the NATSAP Board of Directors strengthened NATSAP's membership requirements. We now require members to be licensed by the appropriate state mental health agency, or accredited by a reputable mental health accreditation organization, such as the Joint Commission.

Unfortunately, not all states have licensing requirements. We are working to address this inadequacy. We have worked successfully with the State of Utah to establish regulations for therapeutic boarding schools, which had previously escaped licensure requirements by claiming plain ``boarding school'' status. In Montana, we worked diligently to have appropriate licensure requirements put into place, but the stringent bill we favored lost to a less rigorous bill.

We continue to push for strong state licensure and monitoring requirements. We are hopeful that Chairman Miller, Ranking Member McKeon, and this Committee will help us in these efforts. We need your assistance.

The American Bar Association has submitted to this Committee the ABA's recommendations for legislation to assure the safety of children and youth placed in private residential treatment facilities. We are in fundamental agreement to the extent that the ABA recommends licensure and monitoring of these facilities. We expand on the ABA's recommendations by supporting licensure and monitoring of all adolescent treatment facilities, including those that are funded by public entities.

Mr. Chairman and Mr. McKeon, NATSAP extends its sincere appreciation for your commitment to eliminating deceptive, abusive, and neglectful programs by encouraging state licensure and enforcement. We are committed to working with this Committee, other organizations, and parents to draft and enact meaningful legislation to put an end to the horrific pain and suffering we have heard about today.

attachment 1.--testimony of trevor miles heaton

Chairman Miller and Honorable Committee Members, I would like to thank you for the opportunity to share my testimony of hope and success with you.

To understand my viewpoint regarding the issue at hand, a brief history of my past is necessary. My name is Trevor Heaton. I am a 19 year old recovering heroin addict living in Salt Lake City. I began smoking pot at age 13. From there I rapidly progressed to pain medications and eventually became confined to a vicious heroin addiction. I have been to four different treatment facilities, both in and out of Utah. I have been admitted to the psychiatric ward several instances for drug related problems. I have also been part of the juvenile court system. I stole, lied, cheated, abused, neglected, and rationalized my way through my addiction. My story is no different than any other addict out there in such that I have the disease of addiction and must do everything in my power to keep this demon in remission.

It took years of using and several treatment programs for me to finally make the decision to change my life around. Obviously, the choice to stay sober is made by myself, and only for myself, but the

treatment programs I attended were influential in helping me make this choice. The reason I did not remain sober after my first programs was do to a conscious decision on my part. The treatment centers provided me with all the necessary life skills, coping mechanisms, and tools to remain sober, but I simply chose not to apply the knowledge and skills I had been presented with. Two of the programs I went to were very impressive, and two were not. I can't blame a program for my relapses because although a program may not have been as quality as another, I was still made aware of my addiction, yet chose to ignore all the instruction I had been given.

I feel very fortunate to be alive today. I live a wonderful life and could not be happier. I am about to graduate from Salt Lake Community College with my Associates of Science Degree in Social Work. I have a 4.0 college GPA and plan to go for my Masters degree. I have a stable job. Relationships with family and friends have been restored to the fullest. I attend A.A. meetings regularly. I am on the Alumni Council of the National Association of Therapeutic Schools and Programs. I am also on the Salt Lake Mayors Coalition for Alcohol, Tobacco, and Other Drugs. As I said, life is beautiful at the moment. I have been given a second chance at life. This second chance was made possible by the many professionals and staff I encountered at various treatment centers throughout my journey. As we are all aware, the price of drug rehabilitation is quite expensive, but the lessons learned and the tools that are provided through such programs are priceless.

I am very grateful to my family for providing me with such resources as drug rehabilitation. I am also grateful for those individuals who have helped shape my life into something truly amazing. I respectfully ask that do all you can to eliminate abusive and neglectful programs while also doing whatever is necessary to preserve options for children and families in need of specialized treatment and educational services. Treatment is the greatest tool we have in the fight against addiction. I am proof that there is hope and that recovery is able to breed success and triumph. If you would like more information on my experience, you may contact me at any time. Once again, thank you for the opportunity to participate in this extraordinarily important hearing.

                    Respectfully submitted,

                                    Trevor Miles Heaton,
                                        Riverton, UT.

    attachment 2.--written testimony of thomas and emily vitale

    Chairman Miller and Honorable Committee Members, thank you for the opportunity to share our testimony with you. Chairman Miller, we share your urgent desire to ensure that abusive and neglectful ``boot camps'' and ``tough love'' programs do not harm adolescents in need of special care and nurturing.

    However, most therapeutic schools and programs do provide healthy, positive environments in which children may learn while healing. Our daughter Caroline is one child who benefited greatly from a therapeutic boarding school. She had been in and out of many ``regular'' high schools, never able to get her homework done (she is extraordinarily bright so teachers assumed she was lazy). As she spiraled into depression and self-injury, we realized she needed a school where she would be both safe and able to work on the issues that caused her to de-rail.

    Caroline spent 18 months at the King George School, an emotional growth boarding school in Northern Vermont. During that time she attended academic classes, excelled in therapeutic art classes, participated in group and individual therapy sessions. At no time was she or any student there forced to participate in programs like those which you aim to eliminate. Her experience there has changed her life and ours. She is currently back at a ``regular'' high school and is applying to college for next year. She would never have been able to do this without the support and nurturing of the King George School.

    Certainly, you must eliminate abusive and neglectful programs. You must also preserve options for children and families in need of

specialized treatment and educational services.

If you would like more information on our family's experience, or better yet, if you would like to hear from our daughter, Caroline, please contact us.

attachment 3.--testimony of alexandrine lyons-boyle

Chairman Miller and Honorable Committee Members, I sincerely applaud your desire to ensure that abusive and neglectful ``boot camps'' and ``tough love'' programs are not able to harm children who need therapy and care, and need to get on the right track. I've seen news programs that horrified me regarding these programs.

However, I sent my daughter to a wilderness therapy program that was not a boot camp, not a tough love program, but was an outstanding therapeutic program that saved her life.

My daughter had always been a happy child, a good student, and a sweet daughter until she reached high school. At that time, for many reasons, including depression, ADD, and the innate meanness of many teenage girls (the way ``her friends'' treated her would make you cry), she began to abuse drugs. She was so depressed that she would lie on our kitchen floor and just cry. She went from being an A-B student in high level classes (honors and advanced grades), to receiving straight F's, and being told by the high school principal that they were processing her to have her removed from the school. She was arrested repeatedly.

When I learned of Catherine Freer Wilderness Therapy from her psychiatrist, I immediately sent her to this program. She spent 3 weeks hiking in the wilderness with 5 other teenagers, and 3 adults--two of the adults were trained counselors, and one a licensed therapist. All operated in close contact with a licensed therapist back in the home office who was in constant contact with the parents. These were wonderful, caring people, who, through their program, changed my daughter's life.

They taught her self-reliance and self confidence (she had to cook for herself, set up her own tent at night, and carry her own supplies during the day). She is proud of what she did. They structured all conversation so the kids couldn't just trade war stories, but had to really think about why they had made the decisions they had made, what they wanted from life, what their values were, and were they living by those values? How had they affected the people in their lives? What was their future going to be like? For 24 hours a day, every day for 3 weeks, my daughter was in therapy--caring, educational, and successful therapy. She was also in the healing environment of nature, which is awesome and cannot be duplicated indoors.

After only 3 weeks, she was a changed person. The last day, when she walked into the room where her family was waiting, she had a huge smile on her face, she looked tanned, a bit heavier, much healthier; she looked confident and proud of herself, and happy! I was amazed! She was proud of all she'd accomplished, of how she'd changed, and she was looking so forward to sharing her experiences with her family.

Much, much more amazing is how now, six months later, she is again an ``A'' student, a smiling, happy person, who has excellent values. In fact, she has an appreciation for life that she never had before.

She has thanked me many times for sending her to Catherine Freer Wilderness Therapy. She changes her mind frequently now about what she will major in at college, but neither of us have any doubt that she will be a college graduate, a responsible member of society, and a good person.

I could give you much more detail, but in the interest of being brief, I will simply say that you are welcome to contact either my daughter or myself to learn more of the outstanding wilderness program she attended.

The people at Catherine Freer are very, very caring. They are NOTHING like I've seen on the news programs about the boot camps and tough love programs. Please, please do not lump them in with those other extremely scary, dangerous, and ineffective programs that harm children rather than helping them.

Thank you for protecting our youth from those harmful programs, and thank you for finding a way to differentiate the good from the bad in your legislation, and making sure programs like Catherine Freer continue to help children like my daughter.

        Sincerely,

                                Alexandrine Lyons-Boyle,
                    Mother of Leilagh Boyle, Schaumburg, IL.

              attachment 4.--natsap ethical principles

Members of the National Association of Therapeutic Schools and Programs (NATSAP) provide residential, therapeutic, and/or education services to children, adolescents, and young adults entrusted to them by parents and guardians. The common mission of NATSAP members is to promote the healthy growth, learning, motivation, and personal well-being of our program participants. The objective of all our therapeutic and educational programs is to provide excellent treatment for our program participants; treatment that is rooted in good-hearted concern for their well-being and growth; respect for them as human beings; and sensitivity to their individual needs and integrity.

In applying to become or continue as a member of The National Association of Therapeutic Schools and Programs, we agree to:

1. Be conscious of, and responsive to, the dignity, welfare, and worth of our program participants.

2. Honestly and accurately represent ownership, competence, experience, and scope of activities related to our program, and to not exploit potential clients' fears and vulnerabilities.

3. Respect the privacy, confidentiality, and autonomy of program participants within the context of our facilities and programs.

4. Be aware and respectful of cultural, familial, and societal backgrounds of our program participants.

5. Avoid dual or multiple relationships that may impair professional judgment, increase the risk of harm to program participants, or lead to exploitation.

6. Take reasonable steps to ensure a safe environment that addresses the emotional, spiritual, educational, and physical needs of our program participants.

7. Strive to maintain high standards of competence in our areas of expertise and to be mindful of our limitations.

8. Value continuous professional development, research, and scholarship.

9. Place primary emphasis on the welfare of our program participants in the development and implementation of our business practices.

10. Manage our finances to ensure that there are adequate resources to accomplish our mission.

11. Fully disclose to prospective candidates the nature of services, benefits, risks, and costs.

12. Provide informed, professional referrals when appropriate or if we are unable to continue service.

                        ————

[Additional materials submitted by Ms. Moss follow:]

                                    October 23, 2007.

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.

Dear Chairman Miller: The National Association of Therapeutic Schools and Programs (NATSAP) respectfully requests the enclosed information be submitted for the record in regards to your hearing ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities''.

1. Summary of Research from 1999--2006 and Update to 2000 Survey of Outdoor Behavioral Healthcare Programs in North America--Dr. Keith C. Russell, Ph.D., College of Education and Human Development, University of Minnesota

2. Incident Monitoring in Outdoor Behavioral Healthcare Programs: A
Four-Year Summary of Restraint, Runaway, Injury, and Illness Rates--Dr.
Keith C. Russell, Ph.D., University of Minnesota, and Nevin Harper,
M.A., University of Minnesota
    3. A Multi-Center, Longitudinal Study of Youth Outcomes in Private
Residential Treatment Programs--Ellen Behrens, Ph.D. and Kristin
Satterfield, Ph.D. of Canyon Research and Consulting
    4. Copies of agenda for the NATSAP Annual and Regional Conferences,
which demonstrates the high quality of education, presented by
credentialed individuals, that is provided at these conferences.
    5. Volume I, Numbers I and II of the Journal of Therapeutic Schools
and Programs (JTSP); Managing Editor Dr. Michael Gass, University of
New Hampshire.
    Thank you.
        Sincerely,

                        NATSAP Board of Directors.
                        ————

    [The technical report, ``Summary of Research From 1999-
2006, and Update To 2000 Survey Of Outdoor Behavioral
Healthcare Programs in North America,'' by Keith C. Russell,
Ph.D., Director, Outdoor Behavioral Healthcare Research
Cooperative (OBHRC), College of Education and Human
Development, University of Minnesota, dated May 2007, may be
requested at the following Internet address:]

                    http://www.obhrc.org/
                        ————

    [The risk incident paper, ``Incident Monitoring in Outdoor
Behavioral Healthcare Programs: A Four-Year Summary of
Restraint, Runaway, Injury, and Illness Rates,'' by Keith C.
Russell, Ph.D., Director, Outdoor Behavioral Healthcare
Research Cooperative (OBHRC), College of Education and Human
Development, University of Minnesota, may be accessed at the
following Internet address:]

            http://cehd.umn.edu/kin/research/obhrc/publications/
                    incidentnatsap001.pdf
                        ————

Bylaws of the National Association of Therapeutic Schools and Programs

            (A Tax-Exempt/Non-Profit Corporation)

Article 1.--Offices

            SECTION 1. REGISTERED AND PRINCIPAL OFFICES

    The registered office of The National Association of Therapeutic
Schools and Programs, Inc. (the ``Corporation'', a tax-exempt, non-
profit Corporation, shall be 126 North Marina, Prescott, Arizona 86301;
and the name of the registered Agent at this address is Janice K. Moss.

The mailing address of the initial principle office of the Corporation shall be 126 North Marina, Prescott, Arizona 86301. The registered office need not be identical with the principle office of the Corporation and may be changed at any time by the Board of Directors.

## SECTION 2. OTHER OFFICES

The Corporation may also have offices at such other places, within or without the State of Arizona, where it is qualified to do business, as its business may require and as the board of Directors may, from time to time, designate.
Article 2.--Directors

## SECTION 1. POWERS

All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation managed under the direction of its Board of Directors, subject to any limitation set forth in the Articles of Incorporation, other provisions of these Bylaws relating to action required or permitted to be taken or approved by the Members, if any, of this Corporation, the activities and affairs of this Corporation.

## SECTION 2. NUMBER AND ELECTION

The Corporation shall have no more than sixteen Directors excluding ex-officio Members, unless changed by amendment to these Bylaws. Collectively, they shall be known as the Board of Directors. Elections for available board positions shall be held by ballot. The exact number of Directors shall be fixed within the limit by a resolution adopted by the Board of Directors.

## SECTION 3. TERMS OF OFFICE

All Directors elected to the board shall serve for two-year terms and may be appointed at the pleasure of the board to serve one additional two-year term. The term of Directors begins and expires at the Annual Member meeting following the annual election.

## SECTION 4. QUALIFICATIONS

Directors of the Corporation shall be a Member of the Executive Committee with decision-making authority, or be owner, president, chief executive, or Director of Member programs in good standing

## SECTION 5. DUTIES

It shall be the duty of the Directors to:
(a) Perform any and all duties imposed on them collectively or individually by law, by the Articles of Incorporation of this Corporation, or by these Bylaws;
(b) Appoint and remove, employ and discharge, and, except as otherwise provided in these Bylaws, prescribe the duties and fix the compensation, if any, of all Officers, Agents and Employees of the Corporation;
(c) Supervise all Officers, Agents and Employees of the Corporation to assure that their duties are performed properly;
(d) Meet at such times and places as required by these Bylaws;
(e) Register their addresses with the Secretary of the Corporation and notices of meetings mailed or telegraphed to them at such addresses shall be valid notices thereof.

## SECTION 6. VACANCIES

Vacancies on the Board of Directors shall exist (1) on the death,

resignation, removal, or expiration of term of any Director, and (2) whenever the number of authorized Directors is increased.

Vacancies on the board may be filled by the (1) the Members, (2) the Board of Directors, or (3) if the Directors remaining in office constitute fewer than a quorum of the Board, they may fill the vacancy by the affirmative vote of a majority of all the Directors remaining in office.

### SECTION 7. RESIGNATIONS

A Director may resign effective upon giving written notice to the President, the Secretary, or the Board of Directors. A resignation is effective when the notice is delivered unless the notice specifies a later effective date.

### SECTION 8. REMOVAL OF DIRECTORS

A Director may be removed, with or without cause, upon the affirmative vote of not less than a majority of the Directors.

### SECTION 9. COMPENSATION

Directors shall serve without compensation except that they shall be allowed reasonable advancement or reimbursement of expenses incurred in the performance of their regular duties as specified in Section 5 of this Article. Reasonable expense limits shall be determined by resolution of the Board of Directors. Directors may not be compensated for rendering services to the Corporation in any capacity other than Director unless such other compensation is reasonable and is allowable under the provisions of Section 10 of this Article.

### SECTION 10. RESTRICTION REGARDING INTERESTED DIRECTORS

Notwithstanding any other provision of these Bylaws, no persons serving on the board may be interested persons. For purposes of this Section, ``interested persons,'' means either:

(a) Any person currently being compensated by the Corporation for services rendered it within the previous twelve (12) months, whether as a full- or part-time Officer or other Employee, Independent contractor, or otherwise, excluding any reasonable compensation paid to a Director as Director; or

(b) Any brother, sister, ancestor, descendant, spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, or father-in-law of any such person.

(c) Any person so deemed by vote of the existing board of Directors.

Article 3.--Meetings and actions of the board of directors

### SECTION 1. PLACE OF MEETINGS

Meetings shall be held at such place within or without the State of Arizona, which has been designated by resolution of the Board of Directors. Any meeting, regular or special, may be held by conference telephone, electronic video screen communication, or other communications equipment. Participation in a meeting through use of conference telephone constitutes presence in person at that meeting so long as all Directors participating in the meeting are able to hear one another.

### SECTION 2. NOTICE OF MEETINGS

Notice of the date, time, place, or purpose of annual and other regular meetings of the Board of Directors need not be given. Notice of any special meeting, setting forth the date, time and place of the meeting, shall be given to each Director by oral or written notice not

less that two (2) days before the meeting. The notice need not describe the purpose of the special meeting unless otherwise required by the Articles of Incorporation or other provisions in these Bylaws.

### SECTION 3. QUORUM FOR MEETINGS

At all meetings of the Board of Directors, a majority of the Directors then in office shall constitute a quorum. If a quorum is present when a vote is taken, the affirmative vote of a majority of Directors present is the act of the Board of Directors unless the articles of Incorporation, other provisions of these Bylaws or the Code otherwise require the vote of a greater number of Directors. If a quorum shall not be present at any meeting of the Board, the Members present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

### SECTION 4. PRESUMPTION OF ASSENT

A Director who is present at a meeting of the Board of Directors when corporate action is taken is deemed to have assented to the action taken unless 1) his dissent or abstention from the action taken is entered in the minutes of the meeting, or 2) he delivers written notice of his dissent or abstention to the presiding offer of the meeting before its adjournment or to the Corporation immediately after adjournment of the meeting. The right of dissent or abstention in not available to a Director who votes in favor of the action taken.

### SECTION 5. CONDUCT OF MEETINGS

Meetings of the Board of Directors shall be presided over by the President of the Corporation or, in his or her absence, by the Vice President of the Corporation or, in the absence of each of these persons, by a Chairperson chosen by a majority of the Directors present at the meeting. The Secretary of the Corporation shall act as secretary of all meetings of the board, provided that, in his or her absence, the presiding Officer shall appoint another person to act as Secretary of the Meeting.

### SECTION 6. ACTION BY WRITTEN CONSENT WITHOUT MEETING

Any action required or permitted by the Board of Directors under any provision of law may be taken without a meeting. Such action by written consent shall have the same force and effect as the majority vote of the Directors. Any certificate or other document filed under any provision of law which relates to action so taken shall state that the action was taken by unanimous written consent of the Board of Directors without a meeting and that the Bylaws of this Corporation authorize the Directors to so act, and such statement shall be prima facie evidence of such authority.

### SECTION 7. NON-LIABILITY OF DIRECTORS

The Directors shall not be personally liable for the debts, liabilities, or other obligations of the Corporation.
Article 4.--Officers

### SECTION 1. NUMBER OF OFFICERS

The officers of the Corporation shall be a President, a Vice President, a Secretary, and a Chief Financial Officer who shall be designated the Treasurer. The President shall serve as Chair.

### SECTION 2. QUALIFICATION, ELECTION, AND TERM OF OFFICE

Case 1:18-cv-10836-PGG Document 143-3 Filed 02/03/20 Page 12 of 52

Officers of the Corporation must either be an owner, a member of the Executive Committee with decision-making authority, or be president, chief executive, or Director of member programs in good standing. Officers shall be elected by and from the Board of Directors. When a board member is elected to serve as an officer his/her term on the board is extended to coincide with the term of the office Each officer shall hold office for two years and may serve an additional two-year term pending an affirmative vote of the majority of the Board of Directors at the regular meeting immediately preceding the end of the Officer's first term. No President may serve more than two terms. Each officer shall hold office until his or her term expires or until he or she resigns, is removed, or otherwise is disqualified to serve, or until his or her successor shall be elected and qualified, whichever occurs first.

### SECTION 3. REMOVAL AND RESIGNATION

Any officer may be removed, either with or without cause, by a majority vote of the Board of Directors, at any time. Any officer may resign at any time by giving written notice to the Board of Directors or to the President or Secretary of the Corporation. Any such resignation shall take effect at the date of receipt of such notice or at any later date specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

### SECTION 4. VACANCIES

Any vacancy caused by the death, resignation, removal, disqualification, or otherwise, of any officer shall be filled by the Board of Directors. In the event of a vacancy in any office other than that of President, such vacancy may be filled temporarily by appointment by the President until such time as the Board shall fill the vacancy. Vacancies occurring in offices of officers appointed at the discretion of the board may or may not be filled, as the board shall determine.

### SECTION 6. DUTIES OF PRESIDENT

The President shall be the chief executive officer of the Corporation. The president shall have general executive charge, management and control of the properties, business and operations of the Corporation with all such powers assay be reasonably incident to such responsibilities. The President shall have the authority to agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Corporation; and, shall have such other powers and duties as designated in accordance with these Bylaws and as from time to time may be assigned by the Board of Directors.

### SECTION 7. DUTIES OF VICE PRESIDENT

In the absence of the President, or in the event of his or her inability or refusal to act, the Vice President shall perform all the duties of the President, and when so acting shall have all the powers of, and be subject to all the restrictions on, the President. The Vice President shall have other powers and perform such other duties as may be prescribed by law, by the Articles of Incorporation, or by these Bylaws, or as may be prescribed by the Board of Directors.

### SECTION 8. DUTIES OF SECRETARY

The Secretary shall keep the minutes of all meetings of the Board of Directors and the minutes of all meetings of the Members, in books provided for that purpose; the Secretary shall attend to the giving and serving of all notices; may, in the name of the Corporation, affix the

1/24/2020

Case 1:18-cv-10836-PGG   Document 143-3   Filed 02/03/20   Page 12 of 52
CASES OF CHILD NEGLECT AND ABUSE AT PRIVATE RESIDENTIAL TREATMENT FACILITIES

seal of the Corporation to all contracts of the Corporation and attest
the seal of the Corporation thereto; shall have charge of such books
and papers as the Board of Directors may direct, all which shall at all
reasonable times be open to inspection of any Director upon request at
the office of the Corporation during business hours; and shall in
general perform all duties incident to the office of Secretary, subject
to the control of the President and the Board of Directors.

## SECTION 9. DUTIES OF TREASURER

The Treasurer shall have responsibility for the custody and control
of all the funds and securities of the Corporation. The Treasurer shall
perform all acts incident to the position of Treasurer subject to the
control of the President and the Board of Directors; and shall, if
required by the Board of Directors, give such bond for the faithful
discharge of duties in such form as the Board of Directors may require.
Article 5.--Committees

## SECTION 1. EXECUTIVE COMMITTEE

The Officers of the Corporation will constitute the Executive
Committee. The Board of Directors may delegate to such Committee any of
the powers and authority of the board in the management of the business
and affairs of the Corporation, except with respect to:
  a) The approval of any action which, under law or the provisions of
these Bylaws, requires the approval of the Members or of a majority of
all of the Members.
  b) The filling of vacancies on the board or on any committee, which
has the authority of the board.
  c) The fixing of compensation of the Directors for serving on the
board or on any committee.
  d) The amendment or repeal of Bylaws or the adoption of new Bylaws.
  e) The amendment or repeal or any resolution of the board, which by
its express terms is not so amendable or repealable.
  f) The appointment of committees of the board or the Members
thereof.
  g) The expenditure of corporate funds to support a nominee for
Director after there are more people nominated for Director than can be
elected.
  h) The approval of any transaction to which this Corporation is a
party and in which one or more of the Directors has a material
financial interest, except as expressly provided in Arizona Nonprofit
Corporation Law.

## SECTION 2. OTHER COMMITTEES

The Corporation shall have such other committees as may from time
to time be designated by resolution of the Board of Directors. Such
other committees may consist of persons who are not also members of the
board. These additional committees shall act in an advisory capacity
only to the board.

## SECTION 3. MEETINGS AND ACTION OF COMMITTEES

Meetings and action of committees shall be governed by, noticed,
held and taken in accordance with the provisions of these Bylaws
concerning meetings of the Board of Directors, with such changes in the
context of such Bylaw provisions as are necessary to substitute the
committee and its members for the Board of Directors and its members,
except that the time for regular meetings of committees may be fixed by
the committee. The time for special meetings of committees may also be
fixed by the Board of Directors. The Board of Directors may also adopt
rules and regulations pertaining to the conduct of meetings of
committees to the extent that such rules and regulations are not
inconsistent with the provisions of these Bylaws.

Article 6.--Members

## SECTION 1. IDENTITY OF MEMBERS

The Members of the Corporation shall be composed of those Members
who have been elected as such by a majority of the Board of Directors;
and shall retain their status as Members so long as they continue to
meet the standards of membership as determined by the Board of
Directors and pay any and all annual dues imposed by the Corporation
upon its Members in a timely fashion.

## SECTION 2. MEMBERSHIP STANDARDS

The Board of Directors shall establish by resolution standards for
each category of membership, if any. The standards for membership may
be changed from time to time at the discretion of the Board of
Directors. Some categories of Members may not have voting rights.

## SECTION 3. MEMBERSHIP DUES

Membership dues shall be set by the Board of Directors from time to
time in such amounts, as the Board of Directors deems appropriate. The
dues amounts may differ among categories of membership. Membership dues
shall be paid annually and the Treasurer shall be responsible for
mailing an annual dues statement to each Member.

## SECTION 4. ANNUAL MEETING

The annual meeting of the Members shall be held at the national
conference of the association of each year or such other date as
designated by the Board of Directors. The date, time and place of the
annual meeting shall be designated by the Board of Directors and stated
in the notice of the meeting. The business to be transacted at the
annual meeting shall include the transaction of business as may
properly come before the meeting.

## SECTION 5. SPECIAL MEETINGS

Special meetings of the Members may be called at any time for any
purpose by the President or a majority of the Board of Directors and
shall be called by an Officer or Director of the Corporation upon the
request in writing of a majority of the Members. Such request shall
state the purpose or purposes of the meeting. Business transacted at
all special meetings shall be confined to the purpose or purposes
stated in the notice of the meeting.

## SECTION 6. NOTICE OF MEETINGS

The Corporation shall notify Members of the date, time, and place
of each Annual and Special Members' Meeting no fewer that ten (10), nor
more than sixty (60) days, before the meeting date. Unless the Arizona
NonProfit Corporation Code (the ``Code'') or the Articles of
Incorporation require otherwise, the Corporation is required to give
notice only to Members entitled to vote at the Meet. Unless the Code or
the Articles of Incorporation require otherwise, notice of an Annual
Meeting need not include a description of the purpose or purposes for
which the meeting is called. Notice of a Special Meeting must include a
description of the purpose or purposes for which the meeting is call.
If not otherwise fixed pursuant to the Code, the record date for
determining Members entitled to notice of an Annual or Special Members'
Meeting is the close of business on the day before the first notice is
delivered to Members. Unless other provisions of these Bylaws require
otherwise, if an Annual or Special Members' meeting is adjourned to a
different date, time, or place, notice need not be given of the new
date, time or place if the new date, time or place is announced at the

meeting before adjournment. If a new record date for the adjourned
meeting is or must be fixed pursuant to these Bylaws, however, notice
of the adjourned meeting must be given under this Section to persons
who are Members as of the new record date. Any Member may waive notice
of any meeting by written waiver filed with the records of the meeting
either before or after the holding of such meeting. If mailed, such
notice shall be deemed to be delivered when deposited in the United
State s mail with first class postage thereon prepaid, addressed to the
Member at his address, as it appears in the Corporation's record of
Members. If telexed, such notice shall be deemed to be delivered the
day such notice is telexed to the Member

### SECTION 7. WAIVER OF NOTICE

A Member may waive any notice required by the Code, the articles of
Incorporation, or these Bylaws before or after the date and time stated
in the notice. The waiver must be in writing, be signed by the Member
entitled to the notice, and be delivered to the Corporation for
inclusion in the minutes or filing with the corporate records. A
Member's attendance at a meeting (1) waives objection to lack of notice
or defective notice of the meeting; and (2) waives objection to
consideration of a particular matter at the meeting that is not within
the purpose or purposes described in the meeting notice, unless the
Member objects to considering the matter when presented. Unless
otherwise required by these Bylaws, neither the business transacted nor
the purpose of the meeting need be specified in the waiver; provided,
however, that any waiver of notice of meeting required with respect to
an amendment of the articles of Incorporation pursuant to Code, as
amended, a plan of merger pursuant to Code, amended, or a sale of
assets pursuant to Code, as amended, shall only be effective upon
compliance with Code, as amended.

### SECTION 8. QUORUM

Members entitled to vote may take action on a matter at a meeting
only if a quorum of those Members, present in person or represented by
proxy, exists with respect to that matter. Unless the Articles of
Incorporation, other provisions of these Bylaws or the Code provides
otherwise, ten percent (10%) of the votes entitled to be cast on the
matter by the Members constitutes a quorum for action on that matter;
however, unless twenty percent (20%) or more of the voting power is
present in person or by proxy, the only matters that may voted upon at
an annual or regular meeting of Members are those matters that are
described in the meeting notice. When a quorum is once present at a
meeting, it is not broken by subsequent withdrawal of any of those
present.

### SECTION 9. VOTING

If a quorum exists, action on a matter by the Members is approved
if the votes cast favoring the action exceed the votes opposing the
action, unless the Articles of Incorporation, a Bylaw adopted by the
Members pursuant to the Code, as amended, or the Code requires a
greater number of affirmative votes. Unless otherwise provided in the
Articles of Incorporation, Directors are elected by a plurality of the
votes cast by the Members entitled to vote in the lection. Unless the
Articles of Incorporation or these Bylaws provide otherwise, each
Member is entitled to one vote in person, by proxy on each matter voted
on at Member meeting or called for via mail or electronic mail. A
Member may appoint a proxy by an instrument in writing not more than
one month prior to the meeting, unless such instrument provides for a
longer period. Such proxy shall be dated, but need not be sealed,
witnessed or acknowledged.

### SECTION 10. REPRESENTATION OF MEMBERS

Each Member school shall be represented at any meeting of Members by an individual designated in writing to the Corporation by the chief administrator of the Member program. Any action by such representative shall be deemed to be the action of the Member so represented.

## SECTION 11. CHANGE OF MEMBER'S REPRESENTATIVE

If any person serving as a representative of a Member program ceases to be an Employee of or associated with the Member school, such person shall cease to be a representative of such Member school or an Officer or Director of the Corporation, as the case may be.

## SECTION 12. TERMINATION OR SUSPENSION OF MEMBERSHIP

(a) Grounds for Termination or Suspension. The membership of a Member shall terminate or be suspended upon the occurrence of any of the following events:
Resignation of the Member;
Expiration of the period of membership, unless the membership is renewed on the renewal terms fixed by the board;
The Member's failure to pay dues, fees, or assessments as set by the board within sixty days after they are due;
Upon his or her notice of such termination or suspension delivered to the office of the Executive Director of the Corporation personally or by mail, such membership to terminate or suspend upon the date of delivery of the notice or date of deposit in the mail.
Upon a determination by the Board of Directors that the Member has engaged in conduct materially and seriously prejudicial to the interests or purposes of the Corporation.
(b) Procedure for Termination or Suspension. Following the determination that a Member should be terminated or suspended under subparagraph (a) of this section, the following procedure shall be implemented:
A notice shall be sent by first-class or registered mail to the last address of the Member as shown on the Corporation's records, setting forth the termination or suspension and the reasons therefor. Such notice shall be sent at least fifteen (15) days before the proposed effective date of the termination or suspension.
The Member being terminated or suspended shall be given an opportunity to be heard, either orally or in writing, at a hearing to be held not less than five (5) days before the effective date of the proposed termination or suspension. The hearing will be held by the Board of Directors in accordance with the quorum and voting rules set forth in these Bylaws applicable to the meetings of the Board. The notice to the Member of the termination or suspension shall state the date, time, and place of the hearing.
Following the hearing, the Board of Directors shall decide whether or not the Member should in fact be terminated, suspended, or sanctioned in some other way. The decision of the Board shall be final.
Any action challenging a suspension or termination of membership, including a claim against alleging defective notice, must commence within one year after the date of termination or Suspension.
If this Corporation has provided for the payment of dues by Members, any Member terminated from the Corporation shall receive a refund of the current years dues already paid. The refund shall be based on the effective date of the termination.

## SECTION 13. RIGHTS ON TERMINATION OF MEMBERSHIP

All rights of a Member in the Corporation shall cease on termination or suspension of membership as herein provided.
section 14. amendments resulting in the termination of memberships
Notwithstanding any other provision of these Bylaws, if any amendment of the Articles of Incorporation or of the Bylaws of this

Corporation would result in the termination of all memberships or any
class of memberships, then such amendment or amendments shall be
effected only in accordance with the provisions of Arizona Nonprofit
Corporation Law.
Article 7.--Indemnification
    section 1. indemnification by corporation of directors, officers,
                            employees and other agents
    To the extent that a person who is, or was, a Director, Officer,
Employee or other Agent of this Corporation has been successful on the
merits in defense of any civil, criminal, administrative or
investigative proceeding brought to procure a judgment against such
person by reason of the fact that he or she is, or was, an Agent of the
Corporation, or has been successful in defense of any claim, issue or
matter, therein, such person shall be indemnified against expenses
actually and reasonably incurred by the person in connection with such
proceeding.
    If such person either settles any such claim or sustains a judgment
against him or her, then indemnification against expenses, judgments,
fines, settlements and other amounts reasonably incurred in connection
with such proceedings shall be provided by this Corporation but only to
the extent allowed by, and in accordance with the requirements of,
Arizona Nonprofit Corporation Law.
                    section 2. insurance for corporate agents
    The Board of Directors may adopt a resolution authorizing the
purchase and maintenance of insurance on behalf of any Agent of the
Corporation (including a Director, Officer, Employee or other Agent of
the Corporation) against any liability other than for violating
provisions of law relating to self-dealing (Arizona Nonprofit
Corporation Law) asserted against or incurred by the Agent in such
capacity or arising out of the Agent's status as such, whether or not
the Corporation would have the power to indemnify the Agent against
such liability under the provisions of Arizona Nonprofit Corporation
Law.
Article 8.--Execution of instruments, deposits and funds
                    section 1. execution of instruments
    The Board of Directors, except as otherwise provided in these
Bylaws, may by resolution authorize any Officer or Agent of the
Corporation to enter into any contract or execute and deliver any
instrument in the name of and on behalf of the Corporation, and such
authority may be general or confined to specific instances. Unless so
authorized, no Officer, Agent, or Employee shall have any power or
authority to bind the Corporation by any contract or engagement or to
pledge its credit or to render it liable monetarily for any purpose or
in any amount.
                    section 2. checks and notes
    Except as otherwise specifically determined by resolution of the
Board of Directors, or as otherwise required by law, checks, drafts,
promissory notes, orders for the payment of money, and other evidence
of indebtedness of the Corporation shall be signed by the Treasurer and
countersigned by the President of the Corporation.
                    section 3. deposits
    All funds of the Corporation shall be deposited from time to time
to the credit of the Corporation in such banks, trust companies, or
other depositories as the Board of Directors may select.
                    section 4. gifts
    The Board of Directors may accept on behalf of the Corporation any
contribution, gift, bequest, or devise for the charitable or public
purposes of this Corporation.
Article 9.--General provisions
                    section 1. maintenance of corporate records
    The Corporation shall keep at its principal office in the State of
Arizona:
    (a) Minutes of all meetings of Directors, committees of the board
and, if this Corporation has Members, of all meetings of Members,
indicating the time and place of holding such meetings, whether regular

or special, how called, the notice given, and the names of those
present and the proceedings thereof;

(b) Adequate and correct books and records of account, including
accounts of its properties and business transactions and accounts of
its assets, liabilities, receipts, disbursements, gains and losses;

(c) A record of its Members, if any, indicating their names and
addresses and, if applicable, the class of membership held by each
Member and the termination date of any membership;

(d) A copy of the Corporation's Articles of Incorporation and
Bylaws as amended to date, which shall be open to inspection by the
Members, if any, of the Corporation at all reasonable times during
office hours.

                section 2. fiscal year of the corporation
The fiscal year of the Corporation shall begin on the first day of
January and end on the last day of December in each year.

                     section 3. corporate seal
The Board of Directors may adopt, use, and at will alter, a
corporate seal. Such seal shall be kept at the principal office of the
Corporation. Failure to affix the seal to corporate instruments,
however, shall not affect the validity of any such instrument.

                    section 4. annual statements
No later than three (3) months after the end of the fiscal year,
the Corporation shall prepare:

(a) A balance sheet showing in reasonable detail the financial
condition of the Corporation as of the close of its immediately
preceding fiscal year, and

(b) A profit and loss statement showing the results of its
operations during the preceding fiscal year.

(c) Form 990EZ will be filed for each fiscal year.

Upon written request, the Corporation shall promptly mail to any
Member of record a copy of the most recent such balance sheet and
profit and loss statement.

Article 10.--Amendment of bylaws

                      section 1. amendment
These Bylaws may be amended by a two-thirds vote of the Board of
Directors of the Corporation. The Members will be notified of the
change to the Bylaws. Upon notification a simple majority of the
Members may overturn the Board's decision to amend the Bylaws. The
membership at large is also empowered to amend the bylaws by proposing
a change to the membership at an annual meeting or in writing. Such
proposed change in the Bylaws must pass with a simple majority vote of
all eligible Members. The membership may also provide by resolution
that any Bylaw provision repealed, amended, adopted or altered by them
may not be repealed, amended adopted or altered by the Board of
Directors.

Article 11.--Amendment of articles

                   section 2. amendment of articles
After Members, if any, have been admitted to the Corporation,
amendment of the Articles of Incorporation may be adopted by the
approval of the Board of Directors and by the approval of the Members
of this Corporation.

                    section 3. certain amendments
Notwithstanding the above sections of this Article, this
Corporation shall not amend its Articles of Incorporation to alter any
statement which appears in the original Articles of Incorporation of
the names and addresses of the first Directors of this Corporation, nor
the name and address of its initial Agent, except to correct an error
in such statement or to delete such statement after the Corporation has
filed a ``Statement by a Domestic Non-Profit Corporation'' pursuant to
Arizona Nonprofit Corporation Law.

Article 12.--Prohibition against sharing corporate profits and assets

  section 1. prohibition against sharing corporate profits and assets
No Member, Director, Officer, Employee, or other person connected
with this Corporation, or any private individual, shall receive at any
time any of the net earnings or pecuniary profit from the operations of

the Corporation, provided, however, that this provision shall not
prevent payment to any such person of reasonable compensation for
services performed for the Corporation in effecting any of its public
or charitable purposes, provided that such compensation is otherwise
permitted by these Bylaws and is fixed by resolution of the Board of
Directors; and no such person or persons shall be entitled to share in
the distribution of, and shall not receive, any of the corporate assets
on dissolution of the Corporation. All Members, if any, of the
Corporation shall be deemed to have expressly consented and agreed that
on such dissolution or winding up of the affairs of the Corporation,
whether voluntarily or involuntarily, the assets of the Corporation,
after all debts have been satisfied, shall be distributed as required
by the Articles of incorporation of this Corporation and not otherwise.
Certificate
     This is to certify that the foregoing is a true and correct copy of
the Bylaws of the Corporation named in the title thereto and that such
Bylaws were duly adopted by the Board of Directors of said Corporation
on the date set forth below.

———

Responses to Questions for the Record From the National Association of
Therapeutic Schools and Programs

     Chairman Miller and Members of the Committee on Education and
Labor: We appreciate the opportunity to appear before your committee
and address the important issues relating to abuses in private
residential treatment of children and adolescents. The National
Association of Therapeutic Schools and Programs is fully in support of
stopping abusive, irresponsible practices in residential treatment of
children in both public and private settings.
     We appreciate your leadership and focus in pushing for responsible,
informed legislation aimed at improving safety and quality of care for
troubled children and adolescents who must be placed in out of home
residential settings. We too feel that strong, well-informed licensure
and regulation is called for, and is in fact available in many states.
It should be encouraged and available in all states.
     We are enclosing answers to your specific queries as well as a
brief statement of background information that provides a context to
better understand both the evolution of private residential care and
the evolution of NATSAP as a professional and trade organization
committed to improving the quality of care for children and their
families.
A Brief History of Private Therapeutic Schools and Programs
     There has been a rapid growth of private residential treatment
programs in the past 20 years. Figure 1 demonstrates the acceleration
of growth by simply plotting the number of NATSAP programs founded by
decade revealing a rapid acceleration of programs in the past two
decades.

figure 1

  *2000-2010 is estimated based on the number of programs founded from
2000-2005.

     Prior to 1980 there were in fact few options for treating troubled
adolescents. For the first half of the century one could summarize the
approaches as follows: reformatories (prisons), military academies, the
military, boarding schools, the unskilled labor market in factories,
mines, and farms, or for the most seriously disturbed and wealthiest
families--long term, psychoanalytically inspired, psychiatric
facilities.
     In the 1960s and 70s a number of alternative approaches for
treating adolescents emerged. They stood in stark contrast to

treatments offered by the penal system or by mainstream medicine and psychiatry. Many of the early programs opposed the ``medical model'' by explicitly rejecting the use of professional therapists and psychotropic medication.

What principles guided these programs? Mel Wasserman, the founder of the CEDU programs, stated that the path of a troubled adolescent is built on a foundation that is not ``plumb and square.'' To correct this problem, children needed the elements of strong parenting such as adult, attention, supervision, clear structure, and accountability. In brief, the early models suggested that adolescents should not be pathologized or diagnosed; they didn't need therapy. Instead they needed a chance to grow up and develop character in a new environment, free from the obstacles that interfered with normal emotional development.

In the 1980s, program growth began to accelerate and led to spin-offs from the original alternative programs such as the CEDU programs. Wilderness programs also began to emerge and provided a natural way to address psychological defenses by placing adolescents in challenging natural situations that took away their ingrained but maladaptive strategies of dealing with society. Wilderness programs also provided meaningful accountability. In addition, they added a spiritual element by forcing self-centered adolescents to confront and be inspired by natural forces much larger than themselves. Wilderness programs also provided the format for a rite of passage and a chance for adolescents to see themselves in a new perspective.

These approaches were quite diverse in style and inspiration, but shared a common belief that in order to correct the dangerous trajectory of troubled youth they must be removed from toxic environments in their communities and placed in situations that provided increased adult supervision and structure. These programs provided alternative environments aimed at teaching skills, reducing maladaptive behaviors, and providing time for adolescents to return to the path of developing a healthy character structure. With few exceptions these programs remained outside the mainstream practice of psychiatry.

Rise and Fall of Inpatient Psychiatry

Mainstream psychiatry underwent many changes that profoundly influenced the rise in alternative programs. In the late 1970s and into the mid 1980s, psychiatry underwent a rapid growth in residential programming. Hundreds of adolescent psychiatric hospitals, both public and private, opened throughout the country. These facilities offered treatment with medium length of stays up to a month or more, and served thousands of troubled adolescents. The initial growth of psychiatric hospitals was in response to a clear need to address the increasing struggles of youth in a modern American culture that had lost the presence of adult supervision, and structure for youth.

These hospitals provided a bio-psychosocial form of treatment, but the environment and management style were heavily influenced by the general medical-hospital model. Psychiatric hospitals were staffed with attending psychiatrists and skilled nursing staff. Treatment included medication management, individual and family therapy, as well as milieu management generally provided in locked and secure facilities with the ability to physically restrain patients when necessary.

However, the rapid expansion of conventional residential psychiatric facilities ground to a halt in the latter half of the 1980s, due in large part to managed care and Prozac (or more accurately stated, to the powerful organizations behind these concepts: insurance and pharmaceutical companies). Insurance and pharmaceutical companies were the agents that dramatically changed the direction of mainstream psychiatry. Reacting to rising costs, marketing corruption and greed, insurance companies began to manage and restrict length of stay to the point that psychiatric hospitals became strictly emergent, short-term, palliative treatments for the acutely suicidal. At the same time, psychiatry became enamored with the power of neurotransmitters and in 1985 we entered the age of Prozac, a new antidepressant with fewer side

effects that could change an individual's mood quickly by altering the level of serotonin available at the synapse.

For a variety of reasons, beyond the scope of this introduction, short term palliative and medication based treatments in unstructured community settings fail to address the needs of thousands of struggling adolescents. And so, these changes in mainstream psychiatry in the latter half of the 80s and first half of the 90s created the environment that led to the rapid growth of private residential programs, many of which are members of NATSAP.

In the past decade we have seen the emergence of creative alternative residential programs that combine the best of the earlier alternative and wilderness programs with the sophistication and professional training of psychiatry, psychology, social work, and family therapy. The NATSAP member programs represent unique blends of these various influences, in environments that provide a much needed and less expensive level of care than offered by in-patient psychiatric hospitals.

The National Association of Therapeutic Schools and Programs (NATSAP)

The National Association of Therapeutic Schools and Programs (NATSAP) was itself formed in 1999 in an effort to raise awareness of these relatively new levels of care. The founding members sought to create a professional organization that would support the work of treating adolescents in non-traditional residential settings. The first priority of this fledgling organization, unanimously endorsed by the early members, was to develop a common set of ethical principles and best practice standards. Our goal was to educate and increase awareness among all programs of practices that would create safe environments for working with adolescents and their families.

For the past eight years NATSAP has maintained an ongoing process of evaluating and improving our practice standards. We have annual conferences attended by over 700 individuals as well as 6 regional conferences attended by over 800 this year. The conferences focus on continuing education for professionals in our programs as well as educating all member employees as to best practice standards. In addition, we have launched a professional journal, publish a quarterly newsletter, and have begun a long term outcome research project in cooperation with the University of New Hampshire that will examine program effectiveness and create a long term data base to facilitate further research by independent investigators. A number of our member programs have also supported major research efforts by independent investigators in the past eight years*. In particular, Dr. Keith Russell (associate professor at the University of Minnesota) has published a number of articles on the short and long term effectiveness of wilderness programs. Dr. Ellen Behrens has published several articles documenting the effectiveness of longer term therapeutic programs.

It is important to understand that NATSAP is a professional and trade organization. We strive to educate, exchange information, and raise practice standards. We are not an accrediting or licensing agency although we have asked that all members provide evidence that they are licensed by a state agency charged with monitoring the well being of participants in behavioral health settings, or if state licensure is not available, programs must be accredited by a national entity that accredits behavioral health programs. We also require that a member's clinical program be directly supervised by an independently licensed clinician.

We do not speak for programs that are not members of our organization, but as a group of programs we have taken a clear public stand against all abusive practices with children. We have continuously educated programs and staff in models and methods of handling adolescents with the aim of eliminating the use of potentially abusive methods. Our practice standards specifically preclude:

    procedures that deny a nutritionally adequate diet;
    physically abusive punishment;
    any behavior support management intervention that is

Case 1:18-cv-10836-PGG   Document 143-3   Filed 02/03/20   Page 22 of 52

contrary to local, state and/or national licensing or accrediting
standards; and,
    the application of consequences that are not in accordance
with the program participant's basic and fundamental rights and
protections.
    We are as opposed to the abuse of children as much or more than
anyone who has testified at your hearings. At the same time we
recognize the importance and value of residential treatment offered by
NATSAP member programs, and we ask that the House Committee on
Education and Labor take time to study and understand this important
level of care. Our member programs now serve nearly eighteen thousand
children annually. Families who seek private alternatives do not do so
lightly or capriciously, but generally out of desperation. They look
for alternatives because they see their children failing and unable to
get back on a trajectory that will make it possible to become
independent, productive young adults. Children end up in residential
treatment only after they have failed in numerous attempts in
outpatient and community based settings. Parents make the difficult
decision to send their child to a residential program only when they
realize that, despite their best efforts, their home environment is
failing support their child's growth and development in healthy ways.
Parents see that their children are lost, anxious, depressed, failing
in school, or engaging in behavior that is risky and dangerous. Many of
these children drift into a world filled with alcohol, drugs, and a
dangerous lack of respect and empathy that compromises society's
collective values. Parents have no choice but to separate these lost
adolescents from their toxic community environments.
    It is the failure of community based service that has given rise to
the growth of private residential programs. It is vitally important
that legislators understand the importance of this level of care, and
understand how many lives would be at greater risk if private
residential programs were not available. Of course such programs should
be licensed and regulated in a manner that adequately assures the
safety and well being of participants, but it is also essential that
regulation be well designed and informed so as to support the
important, life saving environments and levels of care that such
private programs offer.
    We further ask that any legislative effort take into consideration
the major distinctions in types of programs that are available and not
proceed as if all private residential programs are the same. They are
not. NATSAP member programs include the following basic types of
programs:
        Therapeutic Boarding Schools
        Small Residential Programs
        Residential Treatment Centers
        Outdoor Therapeutic and Wilderness Programs
        Specialty Psychiatric and Behavioral Health Programs
        Transitional or Young Adult Living Programs
    Each of these program types requires basic practice standards,
coupled with standards that reflect the differences in setting and
level of structure required in each setting.
    Outside of NATSAP, there remain a number of ``boot camps'' or
punishment based programs that employ degrading, abusive behavioral
management techniques that are in direct violation of NATSAP practice
standards. Many of these programs are public or state contracted
corrective facilities, not private programs. If such a program is a
member of NATSAP, and we become aware of an inappropriate practice, we
will ask the program to stop and correct such practices immediately or
be removed from membership. If such a program is not a member of NATSAP
we, of course, have no influence over it. Therefore, we educate the
public of the differences between programs that ascribe to our
published practice standards and those that do not.
    Finally, our hearts go out to those brave individuals who testified
about the circumstances of their adolescent's deaths in programs. Due
in large part to their heartfelt testimony, we have recently enacted a

``sentinel event'' policy (attached) that will require reporting,
review and data sharing in an effort to learn from past mistakes and
prevent future serious injury or loss of life in our member programs.
    We are working with an extraordinarily troubled population of
adolescents who have failed to respond to numerous medications,
outpatient care, and other community-based treatments. Working with
such a population is inherently risky. Nonetheless, we must not ignore
or give up on these adolescents at a time when they need our help most.
    NATSAP is committed to ensuring that families in desperate need of
specialized treatment services for their adolescents may choose
confidently from an array of nurturing, safe, and effective programs.
We continue our mission to improve adolescent residential care with
renewed vision, vigor, and optimism. ,
                    research references

Behrens, E. (2006). An evidence-based practice model for residential
        treatment programs. Journal of Therapeutic Schools and
        Programs, 1 (2), 33-65.
Behrens, E. & Satterfield, K. (2007). Longitudinal family and academic
        outcomes in residential programs: How students function in
        important areas of their lives. Journal of Therapeutic Schools
        and Programs, 2 (1), 81-94.
Russell, K.C. (2003). Assessing treatment outcomes in outdoor
        behavioral healthcare using the Youth Outcome Questionnaire.
        Child and Youth Care Forum. 32(6), 355-381.
Russell, K.C. (2002). Assessing outcomes in outdoor behavioral
        healthcare. Behavior Management, March/April, 22(2), 12-18.
Russell, K. C. (2002). Does outdoor behavioral healthcare work? A
        review of studies on the effectiveness of OBH as an
        intervention and treatment. Journal of Therapeutic Camping,
        Summer/Fall, 2(2), 5-12.
Russell, K. C. and Hendee, J.C. (1999). Wilderness therapy An emerging
        treatment for adolescents with behavioral problems. Proceedings
        of the 6th World Wilderness Congress, Bangalore, India. Watson,
        A. ed., Rocky Mountain Research Station, US Forest Service,
        USDA, Ogden, UT.

In Response to Representative Robert Scott
    1. What mechanism is in place to deal with circumstances where your
members have self-certified that they are abiding by NATSAP's ethics
and good practices standards when they are in fact not in compliance
with these standards?
    If a member program is not complying with the signed ethics and
good practice standards we encourage employees, other programs, or
families to submit a specific written complaint. The complaint process
is as follows:
    a) Any complaint against a member program must be submitted to
NATSAP in the form of a signed letter to the Executive Director of
NATSAP.
    b) If the complaint involves a specific program participant the
Executive Director must obtain an appropriate release of information
permitting NATSAP to access and review personal and confidential
information.
    c) After receiving a written, signed complaint, the Executive
Director will contact and inform the President of NATSAP.
    d) The Executive Director and President will review and determine
whether the complaint involves a potential violation of ethics or
practice standards. If so the complaint is referred to the Ethics
Committee Chairperson.
    e) The Ethics Committee Chairperson will establish a 3-5 member
subcommittee to review the complaint.
    f) Oftentimes, problems are resolved by directly addressing issues
with the member program. If it agrees to change its practices to
correct any deviation from our standards the issue is typically closed.
Depending on the severity of the infraction and its consequences, the
subcommittee might recommend the program's membership status be made
conditional or be terminated.

g) The subcommittee reports its findings and recommendations back to the President and Executive Director.

h) If membership sanctions are recommended, the matter will be brought to the Board of Directors, and the Board will follow Section 11 (Termination or Suspension of Membership) of the organization's by-laws (attached).

2. Dr. Pinto testified that she has collected 700 concerns on residential treatment centers over 6 months, while NATSAP has investigated less than 5 claims against its members. Can you please explain the discrepancy in these numbers?

Dr. Pinto and her colleagues have been engaged for several years in efforts to draw attention to private ``institutional abuse'' of children. They have collaborated with advocacy groups and have contributed as ``experts'' to several web sites and blogs that are intended to expose the horrors of abusive private adolescent treatment programs. Dr. Pinto's recent testimony before the House Committee on Education and Labor suggested that she actively solicited narratives from victims of adolescent maltreatment as part of her efforts to collect and draw attention to reports of abuse and neglect in private residential treatment settings. Dr. Pinto's high visibility among, and active outreach to, communities of victims of abuse and neglect were likely the greatest factors contributing to the large quantity of narratives she managed to gather.

NATSAP does not solicit reports of abuse and neglect; however, anyone who affirmatively contacts NATSAP via email, telephone, or our website receives information as to how an ethical or practice complaint about a NATSAP member may be filed with NATSAP. NATSAP has prepared for the Committee on Education and Labor a summary of some 17 complaints it has received regarding member programs. NATSAP does not accept complaints about non-members, yet it does refer to governmental and credentialing entities those individuals who contact NATSAP seeking to file a complaint against a non-member.

3. Is there currently any requirement that other treatment options be utilized to address a child's behavioral issues before sending them to such a center?

We are aware of no legal or industry requirement that other treatment attempts be made prior to an adolescent's placement in a private residential program. As a matter of practice, however, families typically make numerous unsuccessful attempts at treatment and exhaust all other options prior to placing their son or daughter in a private residential setting.

The NATSAP principles require programs to establish specific admission criteria used to distinguish between those candidates for treatment who will, and those candidates who will not, be best served by their program.

Principle 4.0--Admission/Discharge Policy The program/school will have a written Admission Policy, which defines the enrollment criteria and delineates inclusion and exclusion criteria. Such criteria will be consistent with the mission of the program/school. Admission forms will provide pertinent history including family, medical, psychiatric, developmental, and educational background information.

Principle 4.1--The Admissions screening process will examine the physical, emotional, behavioral, and academic history, in order to determine whether the program is appropriate in light of the respective participant's needs and limitations.

In Response to Chairman George Miller

1. What is NATSAP's policy regarding the use of its logo by members? For example, are there any restrictions for using the NATSAP logo on marketing materials and websites? Are NATSAP members using the NATSAP logo required to disclose that use of the NATSAP logo does not represent endorsement by NATSAP of the safety, quality, or effectiveness of the members' program?

All members of NATSAP are encouraged to use the logo to indicate they are a member of an association that promotes ethical practices and standards that are openly available to the public. To be a member of

NATSAP, programs have to submit annually an affidavit affirming that they are in compliance with our ethical principles. On our website and in our directory we clearly indicate that our members endorse our principles of good practice and ethics, but we are not and make no claim to be an accrediting or licensing agency. We operate much like most other professional organizations such as the American Psychological Association, or the American Psychiatric Association, or the Association of Licensed Social Workers. All of these associations ask members to attest by signature that they are in compliance with membership standards. Sanctions are applied to a member only upon discovery that the member has failed to comply with standards or made a false representation in this regard. We operate in the same fashion.

2. Ms. Moss indicated that NATSAP will research complaints or reports of alleged misconduct by members. What procedures are in place for reporting misconduct to NATSAP? Are reporting procedures documented? Does NATSAP make its reporting procedures widely available, for example on its website? Do members have a duty, arising from their membership, to report any misconduct to NATSAP that violates NATSAP's Ethical Principles or Principles of Good Practice? How many complaints of misconduct has NATSAP received since its formation? And what steps were taken to research such complaints or reports of misconduct?

The procedures for handling complaints regarding ethical or best practice standards are outlined in the first answer to Representative Scott above. In addition, NATSAP members are encouraged and expected to report to NATSAP any misconduct that violates NATSAP's Ethical Principles or Principles of Good Practice. The 2008 NATSAP membership agreement will state this obligation as a duty of membership.

NATSAP has no record of complaints concerning its members submitted or reviewed prior to 2002. Since 2002, 17 complaints have been filed with NATSAP. Twelve of these complaints were submitted after the current complaint procedure was published. Please see our summary of complaints for greater detail on NATSAP's responses to reports of misconduct.

3. Ms. Moss indicated that NATSAP researched at least one instance where a complaint was made regarding a member's website. Please describe the complaint, the actions taken by NATSAP, and the corrective actions taken by the member, and provide the identity of the member.

NATSAP[MB1] received this particular complaint in June 2006 and forwarded it to Gil Hallows, Ethics Chair. The complaint and NATSAP's internal reporting on the matter (printed in italics) read as follows:

a) Program listing on their website and on the NATSAP website stated ``individual therapy twice per week, flexible lengths of stay, daily group sessions''.

Rick Meeves, Executive Director of Outback Therapeutic Expeditions, acknowledged the statement was in error in the NATSAP Directory (and website) and on the program's website and stated it was an unintentional oversight on their part. He committed to reviewing all of their marketing literature and correcting this misstatement. He authorized NATSAP to change the statement to ``weekly individual therapy sessions'' on our website and would make sure that next year's directory is accurate. Mr. Meeves also committed to clarifying the statement ``daily group sessions'' to more accurately reflect that two groups are conducted by therapists and the balance are educational or process groups conducted by other staff.

b) Generally not delivering what they said they would:
   Parent weekend was minimized compared to what they were told
   Couldn't see the camp or other kids because of ``3 hours of HIPAA paperwork''. Verbally and on website ``supposedly take part in desert rituals and rites of passage. There was no exposure to camp rituals, understanding the process, etc.; no rites of passage that are talked about and that staff [previously informed me] would be part of the parent visit when I checked [my son] in.''
   [Cancellation] of a family therapeutic experience on the parent visit should not have been blamed on ``the wilderness is both

advantageous and difficult, and today we got the bad, sorry. There were things we had to deal with and we didn't get to you. Bye.''

Mr. Meeves further committed to reviewing all of the written material Outback uses pertaining to their parent visits in the context of what they are actually doing to insure they are accurately representing this part of their program. He believes that they occasionally have a therapist who may not deliver the full extent of services to parents during the parent visits, and committed to monitoring this more closely, but believes overall they deliver what they say they will to parents.

I feel confident that Rick [Meeves] will follow through with his commitments. I will check in with Rick [Meeves] in the near future to hold him accountable for making the stated corrections and completing the internal reviews.

4. What actions does NATSAP intend to take in light of the testimony given by the U.S. Government Accountability office regarding Alldredge Academy's delinquency in remitting permit fees to the federal government? Is operating on federal land without a valid permit a violation of NATSAP's Ethical Principles or Principles of Good Practice?

NATSAP reviewed Alldredge Academy's application carefully when it applied for membership in late 2003. We interviewed the ownership and management, as well as talking directly to the licensing agency in their state. After careful consideration and deliberation we admitted them to membership status in late 2004. There are a few facts that we were unaware of that emerged from your hearings and in your question that we will consider to be a written ethical complaint. These issues, and the delinquency in remitting permit fees to the federal government, have been referred to our ethics committee for review and investigation. We are willing to provide you with a copy of our findings. We respectfully request copies of the GAO and Committee on Education and Labor's investigations and sources of information that indicate a failure on Alldredge Academy's part to comply with specific ethical and practice principles.

5. NATSAP hosts national and regional conferences to foster the professional development of its members. Have any of these conferences ever included lectures, workshops, presentations or discussions concerning cases of abuse, neglect, mistreatment, or death of children; what led to these horrific tragedies; what needs to change; and what NATSAP members need to do in response?

Agendas for NATSAP's past five national conferences are attached. Examination of the agendas makes it clear that most of the topics are related to improving the clinical treatment of children in our members' programs. The aim of the conference is to exchange information, generate enthusiasm for best practices, and support those who work directly with children. Inherent in the presentations are many ways to approach children that obviate the need for confrontational interactions that have the potential of leading to abuse. We also have had many direct presentations at both national and regional conferences that address specifically prevention of abuse and deaths in programs. Below is a listing of such presentations:

NATSAP 2003 Conference
  Abuse Risk Management
  Risk Management
NATSAP 2005 Conference
  Critical Incident Response (4 hour workshop)
  Effective Programs and Risk Reduction: It Is All About Relationships
NATSAP 2006 Conference
  A Look At Suicide in Out-of Home Placements
NATSAP 2007 Conference
  Behavior Support Management from a NATSAP Perspective (3 hour workshop)
  Critical Incident Response
  Joint commission--pre-conference workshop (note)

NATSAP 2008 Conference
 Risk Management (8 hour workshop--scheduled as of August
15)
 Regional Conferences
 2006:
 Self Harm, Cutting; Dealing With a Growing Epidemic
 2007:
 Crisis Management
 Emergency Preparedness
 6. NATSAP's new membership requirements mandate that members be
licensed by an appropriate state mental health agency, or accredited by
a reputable mental health accreditation organization. On what basis is
an accreditation organization deemed to be credible?
 The accreditation organization must have standards on Clinical
service, and safety of program participants that clearly define
requirements regarding the treatment being offered and the credentials
of the staff providing the clinical services. Currently NATSAP will
accept the Commission on Accreditation of Rehabilitation Facilities
(CARF), Commission on Accreditation (COA) and Joint Commission (JCAHO).
These three agencies are the most respected independent behavioral
health accrediting agencies in the country. All of these accrediting
agencies require annual reports of compliance and have regular on-site
inspections to assure that programs operate in accordance with their
own, and the accrediting organization's, policies.
 7. Please provide a chart showing the year in which each NATSAP
member joined NATSAP, or lost its membership due to expiration or
revocation. [See Addendum A]
 8. It is our understanding that the NATSAP board is primarily
comprised of individuals associated with member programs. Given that
NATSAP researches and acts upon complaints against members when they
are reported to NATSAP, please describe NATSAP's policy regarding
conflicts-of-interest for its board members. For example, are board
members required to recuse themselves on matters before the board when,
by virtue of their affiliation with a particular member, their judgment
may be prejudiced in fact or in appearance?
 To be considered for election to the board of directors of NATSAP,
an individual must be an owner or an executive of a member program in
good standing. It has always been our practice to have board members
recuse themselves during discussions where conflicts of interest exist
or have the potential to exist. The specific procedure reads as
follows: Conflicts of interest that affect NATSAP at times exist with
individual Board members, the executive director, ad hoc board members,
committee chairs or committee members. During all business meetings it
is necessary and appropriate for the leader of each meeting to ask
members who have a potential conflict of interest to recuse themselves
during discussion and or voting when such conflicts arise.
 9. Recent reports indicate that a NATSAP member, Youth Care, Inc.,
has been placed on probation by the Utah Department of Human Services
and that criminal neglect charges have been filed against this member
due to the death of a child. Youth Care, Inc. uses the NATSAP logo on
its website to promote their program. Given these reports and the use
of the NATSAP logo by this member, what steps does NATSAP intend to
take to research reports of criminal neglect on the part of Youth Care,
Inc.?
 10. Aspen Education Group, which owns Youth Care, Inc., also
operates Aspen Achievement Academy, another NATSAP member. Aspen
Achievement Center is currently being investigated for a teen's
attempted suicide. While authorities conduct a thorough investigation,
what does NATSAP do to ensure the safety of students placed in its
member facilities?
 Response to Questions 9 and 10:
 Both Youth Care and Aspen Achievement Academy are current members
and we will ask both to respond to our current ``sentinel event review
policy''. Since both are also accredited by the Joint Commission and
licensed by the state of Utah they are required to provide detailed

information regarding all sentinel events. They are also required to
conduct a ``root cause analysis'' to examine the causes of the death
and to determine whether procedures or policies need to be revised to
increase safety in the future. On review we will require a corrective
action plan and, if the deaths resulted from violations of practice
standards or ethical principles, sanctions will be issued.
    Add a summary of the complaint and identify the parties.

                                                October 23, 2007.
Hon. Dale K. Kildee,
U.S. House of Representatives, Rayburn HOB, Washington, DC.
    Dear Representative Kildee: We are enclosing a full accounting of
the ethical complaints received by NATSAP since 2002. We do not have
records of complaints filed prior to 2002 as we changed executive
directors, moved central office location, and did not have adequate
reporting procedures in place. As we compiled existing records since
2002 we realize that while our procedures have improved, they remain
inadequate to ensure accurate registration, recording of deliberation,
and documentation of outcomes. This hearing has made it clear that
NATSAP must move quickly to establish a more transparent and accurate
record of complaints. To this end the Board has already adopted a new
Sentinel Event Policy (enclosed in the report to Chairman Miller) that
creates a mandatory reporting of any events that lead to death or
serious injury. We are now in the process of creating a more
comprehensive system to encourage reporting of all ethical and practice
complaints as well as a process that will ensure accurate and timely
response and record of such complaints.
    The following pages provide summaries of all ethical and practice
complaints we have records for from 2002- 2007. We are also enclosing
copies of all of our records of complaints in Appendix A with specific
names removed in order to protect confidentiality of individuals.
            Sincerely,
                        NATSAP Board of Directors.
Ethical and Practice Standard Complaints
    1. (February, 2002) Program A--The complaint, filed by the parents
on February 3, 2002 included a) not being responsive to the young man's
need for medical attention; b) violation of privacy by contacting the
parent's school district regarding the young man's crisis prior to
contacting the parents; c) moving the young man to a ``safe house'' and
not disclosing the costs. There is a document marked confidential that
appears to have been faxed to a machine that was out of ink. The
document, however, is included with the other information.
    The review information on this complaint is limited except
for a copy of an email sent by Dr. John Santa, then Ethics Chair, that
indicated the complaint needed to be reviewed but first needed to
obtain appropriate releases of information, which were not forthcoming.
The program closed January 2004.
    2. (June, 2004) Program B--A former teacher sent email expressing
concern regarding the ownership of the program and requesting
confidentiality. This request for confidentiality and use of his
statement prevented further review.
    3. (September, 2004) Program C--A complaint was received from an
educational consultant. Written complaints and releases of information
were received from two parents. The complaints focused primarily on
quality of care and that the executive director was not licensed in
Montana as a therapist.
    Gil Hallows, Ethics Chair, reviewed the complaint and,
according to his report, found facts that supported a disgruntled
employee assisted by an educational consultant. Mr. Hallows There is a
document marked confidential that appears to have been faxed to a
machine that was out of ink. The document, however, is included with
the other information, that the Executive Director's role was that of
an administrator with therapy provided by two licensed therapists. The
complaint of a ``misrepresentation of the nature of services'' was not

substantiated but did suggest shortcomings in the areas of quality assurance and customer service more than a clear-cut breach of ethics.

4. (September, 2004) Program D--The complaint was filed by a NATSAP member program regarding the recruiting of their employees by another member program.

Dr. John Santa and Gil Hallows spoke with the individual filing the complaint and the member program named in the complaint. Dr. Santa and Mr. Hallows did not find a violation of ethical standards. They did recognize the potential impact if our members failed to recruit in open ways. Several articles have been written for the NATSAP newsletters as well as open discussions held at Regional and National Conferences regarding ethical practices in recruitment.

5. (March, 2005) Program E--Father wrote letter stating his daughter was started on medication without his consent. He stated he shares custody with his ex-wife. He further requested ``anonymity and the utmost delicacy in approaching the [program]''. While he handwrote a release to investigate, a NATSAP Release of Information was mailed to him on March 22, 2005. He failed to sign it and return it.

6. (February, 2006) Program F--Employee complaint. Sharon Laney, President, in review of the complaint with Jan Moss, Executive Director found it to be an employee grievance and that the employee had done the right thing by contacting the Montana Labor Board. The individual was advised that the incidents reported, which were labor related, were not addressable under NATSAP's guidelines.

7. (June, 2006) Program G--A parent filed a complaint addressing the information on the program's website and their delivery of services. The complaint and the report provided by Gil Hallows (in italics) follow:

a) Program listing on their website and on the NATSAP website stated ``individual therapy twice per week, flexible lengths of stay, daily group sessions''.

The Executive Director acknowledged the statement was in error in the NATSAP Directory (and website) and on the program's website and stated it was an unintentional oversight on their part. He committed to reviewing all of their marketing literature and correcting this misstatement. He authorized NATSAP to change the statement to ``weekly individual therapy sessions'' on our website and would make sure that next year's directory is accurate. He also committed to clarifying the statement ``daily group sessions'' to more accurately reflect that two groups are conducted by therapists and the balance are educational or process groups conducted by other staff.

b) Generally not delivering what they said they would:
   Parent weekend was minimized compared to what they were told
   Couldn't see the camp or other kids because of ``3 hours of HIPAA paperwork''. Verbally and on website ``supposedly take part in desert rituals and rites of passage. There was no exposure to camp rituals, understanding the process, etc.; no rites of passage that are talked about and that staff [previously informed me] would be part of the parent visit when I checked [my son] in.''
   [Cancellation] of a family therapeutic experience on the parent visit should not have been blamed on ``the wilderness is both advantageous and difficult, and today we got the bad, sorry. There were things we had to deal with and we didn't get to you. Bye.''

The program Executive Director further committed to reviewing all of the written material the program uses pertaining to their parent visits in the context of what they are actually doing to insure they are accurately representing this part of their program. He believes that they occasionally have a therapist who may not deliver the full extent of services to parents during the parent visits, and committed to monitoring this more closely, but believes overall they deliver what they say they will to parents.

I feel confident that [Executive Director] will follow through with his commitments. I will check in with him in the near future to hold him accountable for making the stated corrections and completing the

internal reviews.

8. (July, 2006) Program H--The father notified NATSAP of a complaint filed with the State of North Carolina, Department of Health and Human Services, Division of Facilities. The email was sent to Gil Hallows, Ethics Chair, on August 15, 2006. A Release of Information was not required at the time as this review could be conducted without the need to question the program about the specific young woman involved. The complaint covered unauthorized medical treatment. No formal report was submitted after Gil Hallows' inquiry.

9. (September, 2006) Program I--The complaint focused on disputing a) a penalty for early withdrawal from the program; b) a delay in the discussion of a Treatment Plan the parents had received; c) loss of contact lens; d) requirements for letter writing (program requires student to write 1 per week; parents received 3 letters in the 10 weeks their daughter was in the program; e) the consulting psychiatrist prescribed naltrexone and zonisamide; and f) because of all of the above they requested a refund of the early withdrawal penalty cost as applied to their American Express card.

Gil Hallows, Ethics Chair, advised Jan Moss, Executive Director that the review included requesting a copy of the contract with the parents and found that the contract advises the parents of the early withdrawal. Mr. Hallows also advised Ms. Moss the other concerns raised were ``customer service'' issues as opposed to ethical or practice violations and that he had counseled the program, encouraging them to review their practices.

10. (September, 2006) Program J--The parent provided NATSAP with the complete medical history of the child, police reports and was advised that the state was conducting an investigation. Sharon Laney reviewed the situation with an attorney due to the ongoing state investigation. October 2007, Ms. Laney has followed up with the mother, who has not responded. We are sending an official request to the State of Florida Investigation agency for the results of their investigation.

11. (December, 2006) Program K--A mother wrote a letter outlining her concerns regarding her adult daughter's admission to a young adult program under the guidance of her father. Due to the age of the young woman, which would require a Release of Information from her, and her father's participation in the admission process, NATSAP did not conduct any review.

12. (December, 2006) Program L--The parents' written complaint addressed the program's philosophy including

a) Dedicated to the concept of using the least restrictive means necessary to induce change.

Actual experience: For the first 2 weeks of enrollment, the young woman was made to sleep on the floor in the common room; was made to wear shower shoes, inside and out, weather conditions notwithstanding; all students are given ``time outs for crying. Timeouts consisted of sitting cross-legged away from the group''.

b) The therapist will contact the parents within the first 2 weeks of placement to establish a regular schedule of therapeutic phone calls and begin the therapeutic alliance with the parents. Actual experience: Received only one phone call and it was a message left on the home message machine

c) Karate is inherently therapeutic and promotes character development and physical well-being. Quotes follow from the philosophy including ``multiple benefits for the students, including * * * a greater respect for others''; ``increased understanding of self and increased tolerance for others''; ``students * * * develop personalities founded on humility and gentleness''. Actual experience: Daughter was openly chastised in class for not paying attention (daughter has ADHD).

d) Initial and ongoing assessment of academic needs and academic programs are individualized. Actual Experience: Two weeks after enrollment the educational advisor contacted the parents and advised them that an academic assessment had not been done (normally within two weeks of enrollment). The assigned educational advisor was ignorant of

the Psychological Evaluation of their daughter, had no knowledge of her
expressive language disorder, nor her diagnosed ADHD.

Executive Director, Jan Moss, directed the parents to the
Utah state licensing agency, Department of Human Services as this
agency has comprehensive behavior management and program management
standards. Note: Copy of the Release of Information has been misplaced.

13. (January, 2007) Program M--The parent submitted a complaint in
writing and release of information. The complaint addressed the school
was dispensing medication without a license to do so. An email request
was placed on April 13, 2007 requesting details that would assist
NATSAP in its review of the complaint with no response. Over the next
several weeks, Jan Moss called several times to confirm academic
licensure status as requested in the complaint, but did not receive a
return call. Ms. Moss was advised months later that no return call was
made due to an ongoing investigation and was advised at that time of
the program closure on August 31, 2007.

14. (February, 2007) Program N--The complaint filed by the parent
outlined that medical treatment was denied to her son initially and
that they waited until he was dehydrated to the point he had to be
hospitalized for 4 days. Jan Moss responded to the email requesting a
signed letter outlining the complaint and attached 2 Release of
Information forms. One form was to be signed by the parent and the 2nd
form by her son, as he was over 18. Due to not receiving the signed
releases, we were unable to conduct a review.

15. (May, 2007) Program O--NATSAP was among 60 organizations and
individuals copied on a complaint filed with the State of Utah
Department of Human Services. The complaint addressed in detail the
parent's view of the program's violation of Utah regulations. Within
the week after receipt, James Meyer, Ethics Chair, inquired with Ken
Stettler of the Utah licensing agency and was advised the complaint was
being reviewed. We will inquire further with the program and with the
state authorities.

16. (June, 2007) Program P--The parent provided email notification
of complaint. Jan Moss sent response to request complaint with
signature plus completion of Release of Information on June 28, 2007.
Due to not receiving the signed releases, we were unable to conduct a
review.

17. (July, 2007) Program Q--The parent complaint addressed
treatment of a sinus infection and misrepresentation of the program's
population. Per procedure, Jan Moss reviewed the complaint with
President, Sharon Laney. Ms. Laney advised Ms. Moss to direct the
parents to the Utah licensing authorities, Department of Human
Services, regarding the treatment of the medical condition and the
misrepresentation to the Ethics Chair, James Meyer. Mr. Meyer reported
that his review found no evidence of misrepresentation. Ms. Moss is in
receipt of a 2nd letter from the parents questioning the review and she
has requested Mr. Meyer to follow-up with the parents. We have not
completed the review of this complaint.

————

Chairman Miller. Dr. Pinto?

STATEMENT OF ALLISON PINTO, PH.D., RESEARCH PSYCHOLOGIST AND
ASSISTANT RESEARCH PROFESSOR, LOUIS DE LA PARTE FLORIDA MEDICAL
        HEALTH INSTITUTE, UNIVERSITY OF SOUTH FLORIDA

Dr. Pinto. Good morning, Chairman Miller, Ranking Member
McKeon and distinguished members of the committee.
Thank you for this opportunity to testify before you today,
and I am grateful for your leadership and your efforts to help
protect youth from maltreatment by convening this hearing.
I am Dr. Allison Pinto, and I am a child and adolescent
psychologist licensed in the states of California and Florida.
I am a member of the American Psychological Association and
assistant professor at the University of South Florida and a

researcher at the Children's Board of Hillsborough County, a children's services council in Florida.

For the past 3 years I have served as the coordinator of A START: Alliance for the Safe, Therapeutic and Appropriate use of Residential Treatment.

Each week, I receive phone calls and emails from concerned youth, family members and professionals who are trying to navigate the increasingly complex world of residential services for youth, or to cope with the aftermath of their experiences. I have also spoken with a variety of individuals associated with the growing number of programs that are being framed as alternatives to traditional residential mental health care.

Many parents and professionals are shocked by the descriptions of institutional abuse that continue to emerge regarding the care that American adolescents are receiving in alternative residential programs. In disbelief, they often ask, ``Well, how do you know that these are not just a few isolated incidents that have been sensationalized in the media?'' or ``How do you know that these are not just the complaints of manipulative, troubled teens or disgruntled families?''

People are also in shock to learn that in many states these programs are not required to be licensed or regulated with regard to the education, mental health care and residential services that they provide.

In order to address this disbelief and to gain a clearer understanding of the variety of residential services that are now available for youth, we posted an online survey to systematically gather reports from individuals who participated in residential programs when they were adolescents. Within 6 months, over 700 people responded to the survey.

The detailed descriptions that young adults have been willing to share through this survey provide data that reveal a highly disturbing phenomenon. While there are youth and families who are satisfied with the services that they have received, a significant number of adolescents report maltreatment in programs across the country. Survey findings reveal the following:

Reports of mistreatment, abuse and neglect are widespread. There were concerns expressed regarding 85 programs located in 23 states and in several foreign countries.

Facilities are not maintaining health and safety standards, and youth are experiencing medical neglect and educational deprivation.

Incidents of physical and sexual abuse have occurred that were never reported by youth due to threatening program environments or the absence of universal access to protection and advocacy hotlines.

Treatment is violating human rights. In the guise of behavior modification, youth are required to earn their basic human rights to privacy, dignity and contact with family members. Youth are being deprived of food, sleep and shelter. They are forced to endure stress positions, humiliation and intentionally fear-inducing encounters. Programs are also using cruel and dangerous thought reform techniques.

The use of seclusion and restraint is highly, highly, grossly inappropriate. These practices are being used as punishments for rule violations rather than only when a person is a serious danger to themselves or others. Youth are enduring painful restraint practices, and isolation for periods of weeks, even months has been reported.

Youth have expressed profound distress about their residential experiences. For some respondents, the memories of their experience remain deeply disturbing and have led to a pattern of anxiety consistent with post-traumatic stress disorder.

So are these reports credible? Based on the level of detail and the overall coherence of the accounts provided and using my clinical judgment as a child psychologist, I conclude that they are very credible. If those of us who are mandated reporters of suspected child abuse were to learn of this type of treatment occurring in a family's home, we would be required to file a suspected child abuse report so that the concerns could be investigated. We must consider the reports of maltreatment and abuse occurring in residential facilities just as seriously.

Recognizing that the online reports provided are retrospective and are not necessarily from a representative sample of all individuals who attended residential programs, the survey findings, nonetheless, indicate that a serious problem has emerged.

Because there are now hundreds of reports of abuse and neglect related to a diversity of programs across many states, these reports reveal a coherent pattern of institutional maltreatment. Once a pattern becomes apparent, it is not appropriate scientifically or ethically to dismiss reports of maltreatment as a few bad apples or a few noisy complaints.

We must now acknowledge the problem in order to resolve it.

Thank you again for the opportunity to present this testimony and for your efforts to safeguard and restore the wellbeing of American youth and families. I would be pleased to answer any questions.

[The statement of Dr. Pinto follows:]

Prepared Statement of Allison Pinto, Ph.D., Research Psychologist and Assistant Research Professor, Louis de la Parte Florida Medical Health Institute, University of South Florida

Thank you, Mr. Chairman and committee members, for this opportunity to testify before you today regarding the very serious problems of mistreatment, abuse and neglect of youth in residential facilities.

I am a child psychologist licensed in the states of California and Florida, an assistant professor at the University of South Florida, and a researcher at the Children's Board of Hillsborough County, a children's services council in Florida.

For the past three years I have served as the coordinator of A START: Alliance for the Safe, Therapeutic and Appropriate use of Residential Treatment. A START is a national, cross-sector alliance of mental healthcare and other child-serving professionals, as well as parents and youth, who have come together in response to growing concerns regarding the mistreatment and abuse of youth in residential facilities.

Each week, I receive phone calls and emails from concerned youth, family members and professionals who are trying to navigate the increasingly complex world of residential services for youth, or to cope with the aftermath of their experience in residential programs. I have also spoken with a variety of individuals associated with the growing number of residential programs that are being framed as alternatives to traditional residential mental healthcare.

Many parents and professionals are shocked by the descriptions of institutional abuse that continue to emerge regarding the care that American adolescents are receiving in alternative residential programs. In disbelief, they often ask, ``How do you know that these aren't just a few isolated incidents that have been sensationalized in the media?'' or ``How do you know that these aren't just the complaints of manipulative, ``troubled teens'' or disgruntled families?

In order to address these questions, and to gain a clearer understanding of the variety of residential programs now available for youth, my colleagues and I posted an online survey to systematically gather reports from individuals who participated in residential programs when they were adolescents. Within six months over 700 people responded to the survey.

The detailed descriptions that young adults have been willing to share through this survey provide data that reveal a highly disturbing phenomenon. While there are youth and families who are satisfied with the care and services they have received in residential programs, a significant number of adolescents report being mistreated and maltreated in programs across the country. To give you a sense of the nature and scope of problems that have emerged, I will be submitting for the record a preliminary summary of our survey findings, which reveal the following:

1. Reports of mistreatment, abuse and neglect are widespread. There were concerns relating to 85 programs located in 23 states, and in U.S.-owned programs based in foreign countries as well. More than half of the identified programs are self-described ``therapeutic boarding schools,'' and more than one third of the identified programs are members of NATSAP.

2. Youth are being transported to residential facilities by escort services under threat or use of force, without their consent. Youth were transported in handcuffs and leg-irons, and experienced these practice as highly distressing--they frequently felt like they were being kidnapped with their parents' permission.

3. Facilities are not maintaining health and safety standards. Youth were not provided with the basics of a sanitary environment, leading to illnesses such as scabies, and staff supervision was not consistently provided to ensure the safety of program participants.

4. Amateur psychological interventions are being conducted. In the guise of ``behavior modification,'' youth were required to earn their human rights to privacy, dignity, contact with family members, and peer relations--rights that are now safeguarded for all participants in licensed and regulated mental healthcare facilities. Youth were recruited and admitted on the basis of identified psychiatric disorders, but then received services that ignored established standards of care specific to their presenting problems.

5. Educational deprivation is occurring. In a variety of programs, youth were not receiving instruction from trained and qualified teachers, textbooks and educational materials did not meet state curriculum standards, and vacuous education is being provided in the guise of ``independent study.'' Some students returned home to their original school settings to find themselves significantly behind and some who ``graduated'' from the alternative residential programs discovered afterward that the diplomas they received were not recognized by their home states or college admissions departments.

6. Medical neglect is occurring. Medications were administered without appropriate supervision by trained medical personnel, as well as the discontinuation of medications without physician monitoring. The absence of trained medical providers in residential programs has caused health problems to go unrecognized and untreated, in some cases leading to death.

7. The use of seclusion and restraint is grossly inappropriate. Seclusion or physical restraint were used as a punishment for rule violations and negative attitudes. Isolation for periods of weeks was reported, and youth described enduring painful, dangerous and humiliating restraint practices. In licensed mental healthcare facilities this would be prohibited, as seclusion and physical restraint can only be used when a person is determined to be a serious danger to self or others.

8. Treatment is violating human rights. Youth were deprived of food, sleep and shelter as a consequence for breaking rules or not evidencing sufficient progress in the program. Youth have been forced to endure stress positions, physical pain and fear-inducing encounters such as being taken into the woods or onto the highway blindfolded.

9. Treatment is explicitly abusive. There were incidents of physical and sexual abuse that youth never reported due to distrust of staff, threatening program environments, or the absence of universal access to child protection and advocacy hotlines.

10. Youth are in distress and suffering. Respondents expressed

profound distress about their residential experiences. Comments
included:

``It was a terrible place. Mentally scarring. I would hope
NO ONE would ever have to go to a place like that. It's worse than
jail.''

``I don't ever want another child to be so abjectly
hopeless or so horribly abused. I don't ever want another family to be
torn up when there is the possibility of being reunited and healed.''

``I still have bad dreams about it. I wake up shaking and
nervous that I am there again. It has scarred me emotionally and I
don't know if I will ever get over it.''

Some youth were informed by staff that their parents were aware of
the maltreatment that they were enduring, and then felt betrayed and
abandoned by their families, causing damage to their relationships that
has been difficult to heal even after families have been reunited. For
some respondents, the memories of their experience in alternative
residential programs remain deeply disturbing and have led to a pattern
of anxiety consistent with post traumatic stress disorder.

Are these reports credible? Based on the level of detail and the
overall coherence of the accounts provided, and using my clinical
judgment as a child psychologist, I conclude that they are very
credible. If those of us who are mandated reporters of suspected child
abuse were to learn of such treatment occurring in a family's home, we
would be required to file suspected child abuse reports so that the
concerns could be investigated. We must consider the reports of
mistreatment and abuse occurring in residential facilities just as
carefully.

Recognizing that the online reports provided are retrospective and
are not necessarily from a representative sample of all individuals who
attended residential programs as youth, the survey findings nonetheless
provide compelling information indicating that there are far more than
a few isolated cases of youth who are being mistreated and are
suffering in residential programs. Because there are now hundreds of
reports, related to such a diversity of programs, in such a broad range
of states and countries, these reports reveal a coherent pattern of
institutional maltreatment. Once a pattern becomes apparent in this
manner, it is not appropriate, scientifically or ethically, to dismiss
reports of maltreatment as exceptions to the norm. Rather, it becomes
necessary to understand each report in the context of an evolving,
societal phenomenon of institutional mistreatment and abuse, which must
be acknowledged if it is to be eliminated.

Thank you for bringing attention and responding to this disturbing
phenomenon, in order to safeguard and restore the well-being of
American youth and families.

————

[Responses to questions for the record from Dr. Pinto
follow:]

                                        October 24, 2007.
Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
        Washington, DC.

Dear Chairman Miller: Thank you for the opportunity to testify at
the October 10, 2007 hearing, ``Cases of Child Neglect and Abuse at
Private Residential Treatment Facilities.'' I appreciate the
opportunity to contribute what I have learned from youth, family
members, service providers and other child-serving professionals
regarding patterns of mistreatment and maltreatment in residential
programs. I am grateful for your attention and expressed concern about
these problems, and I am hopeful that the Committee will respond both
to protect youth and families from further harm and to restore the
well-being of those who have already been injured in residential care.
To augment my testimony, I am submitting a response to the questions
posed by Representative Robert Scott (D-VA) as well as the following

materials for the hearing record:
     ``Protecting Youth in Unlicensed, Unregulated Residential
`Treatment' Facilities,'' an article co-authored with Lenore Behar,
Robert Friedman, Judith Katz-Leavy and William G. Jones, which was
published in Family Court Review in July, 2007.
     This peer-reviewed article includes preliminary findings
of the online survey of young adults who attended specialty residential
programs when they were adolescents, which I referred to in my
testimony. Analyses of the full set of personal accounts are currently
underway, and will be made available when completed.
     ``Unlicensed Residential Programs: The Next Challenge in
Protecting Youth,'' an article co-authored with Robert M. Friedman and
other members of the Alliance for Safe, Therapeutic and Appropriate use
of Residential Treatment (A START), which was published in the American
Journal of Orthopsychiatry in 2006.
     This peer-reviewed article reviews the phenomenon of
``specialty'' residential programs for youth, describes the efforts A
START, and provides recommendations regarding responses across fields
and sectors.
     ``The Exploitation of Youth and Families in the Name of
``Specialty Schooling:'' What Counts as Sufficient Data? What are
Psychologists to Do?'' an article co-authored with Robert Friedman and
Monica Epstein, which was published in Summer, 2005 in the APA Public
Interest Directorate: Children, Youth and Families Division News.
     This peer-reviewed article provides a summary of
identified problems relating to the phenomenon of private residential
services for youth, based upon an initial review of reports published
in the media prior to the availability of any more systematically
collected information on the issues.
     ``A START Fact Sheet'' posted on the A START website at
http://astart.fmhi.usf.edu
     This fact sheet describes the phenomenon of mistreatment
in private residential facilities for youth, summarizes initial efforts
of A START, and provides a list of warnings for parents considering
residential treatment.
     Postings to http://endinstitutionalabuse.wikispaces.com,
an online wiki created less than one week prior to the October 10, 2007
hearing to provide a virtual space where individuals can post letters,
accounts and concerns that they want to share directly with Congress
regarding the abuse of youth in residential facilities. Many people who
submitted letters to this wiki described their personal experiences of
mistreatment and abuse in private residential facilities. The wiki is
also an opportunity for individuals to provide input regarding proposed
legislation to address this issue as a means of participatory
policymaking.
     Thank you again for the opportunity to contribute to the
Committee's efforts to clarify and respond to the patterns of
mistreatment and abuse in private residential treatment. If you need
any further information from me, I would be pleased to provide it. A
powerful response is urgently needed in order to protect and restore
the well-being of American youth and families, so your leadership in
these efforts is deeply appreciated.
             Sincerely,
                         Allison Pinto, Ph.D.,
   Department of Child and Family Studies, Louis de la Parte Florida
                               Mental Health Institute.
Response to Questions Posed by Representative Robert Scott (D-VA)
     Do ``tough love'' strategies have an appropriate treatment
role for major psychological disorders? If so, what is that role?
     ``Tough love'' strategies are not appropriate treatment strategies
for major psychological disorders or for other milder social, emotional
or behavioral difficulties experienced by youth. In 2004, the National
Institutes of Health (NIH) issued a State-of-the-Science Conference
Statement regarding the prevention of violence and related health-
risking social behaviors in adolescents. NIH concluded, ``the evidence

indicates that `scare tactics' don't work and there is some evidence
that they may make the problem worse rather than simply not working.''
This report noted that ineffective, inappropriate treatment for
adolescents included programs limited to scare tactics or toughness
strategies. (For further details, go to: http://consensus.nih.gov/2004/
2004YouthViolencePreventionSOS023html.htm)

Often these `tough love'' strategies are actually referred to as
`behavior modification'' in private residential facilities for youth.
It should be noted that these practices were addressed decades ago in a
1974 study prepared by the staff of the Subcommittee on Constitutional
Rights of the Committee on the Judiciary, U.S. Senate, which was
titled, `Individual Rights and the Federal Role in Behavior
Modification.'' Even at that time, there was opposition to `behavior
modification therapies'' on the basis of rights to privacy and mandates
against cruel and unusual punishment, especially with regard to thought
reform techniques. Similar techniques are now being used in numerous
private residential programs for youth, per the reports of former
program participants and staff members (For examples, see the article I
am submitting for the record titled, `Protecting Youth in Unlicensed,
Unregulated Residential `Treatment' Facilities,'' as well as letters
submitted on the `End Institutional Abuse'' wiki). These strategies
place all program participants at risk, but especially those youth with
major psychological disorders who are already particularly vulnerable.

Is there currently an obligation for mental health
professionals who recommend these programs to clients to ascertain
their safety and validity as a treatment option?

Psychologists, psychiatrists, clinical social workers and
psychiatric nurses abide by the principles and standards established by
their respective professional ethical codes. For example, the APA
Ethical Principles of Psychologists and Code of Conduct defines
principles of beneficence and nonmaleficence, fidelity and
responsibility, integrity and justice. With regard to justice, the Code
states, `Psychologists exercise reasonable judgment and take
precautions to ensure that their potential biases, the boundaries of
their competence, and the limitations of their expertise do not lead to
or condone unjust practices.'' With regard to standards of competence,
the Code states, `Psychologists have or obtain the training,
experience, consultation, or supervision necessary to ensure the
competence of their services, or they make appropriate referrals.''
Furthermore, psychologists do not accept fees for referrals as this is
deemed unethical. (For further details, go to: http://www.apa.org/
ethics/code2002.html)

Each mental health profession has a code that is similar in many
ways to this APA Code for psychologists, and in many states the
licensing of mental health professionals through the Department of
Health and Human Services or Board of Behavioral Sciences is linked to
these various professional codes. As such, there is an accountability
for providing safe, therapeutic and appropriate referrals among
licensed mental healthcare professionals.

There are two dilemmas worth noting, however. First, very little
information is available and accessible at this time with regard to
particular residential treatment programs for youth, especially
programs that advertise themselves as alternatives to traditional
residential mental healthcare. In many states these alternative
residential programs are still not required to be licensed or regulated
with regard to the mental healthcare they provide (e.g. programs that
self-identify as `therapeutic wilderness programs,'' `therapeutic
boarding schools'' or `emotional growth academies.'') This makes it
difficult for mental health professionals, as well as families, to
discern whether a particular program is safe and appropriate.

The other dilemma worth noting is that many families are being
referred to private residential treatment facilities by individuals
other than mental health professionals. Families receive
recommendations from teachers, pastors, legal professionals and friends
and often these recommendations are more compelling to them than those

they receive from mental health professionals (if they seek a
referral), especially if the family has already tried to get their
child's needs met through the formal mental healthcare system without
success. Furthermore, there is an emerging referral ``industry'' of
self-identified ``educational consultants,'' and these individuals are
not required to be licensed. As such, they are not accountable for the
recommendations they provide to families. It should also be noted that
numerous private residential programs pay these referral sources, a
practice that is prohibited in the ethical codes of mental health
professionals.

    Is there currently any requirement that other treatment
options be utilized to address a child's behavioral issues before
sending them to such a center?

   Through the Individuals with Disabilities Education Act (IDEA),
youth are entitled to receive services in the ``least restrictive
environment.'' The federal law indicates that states must have
procedures in place to assure that, ``to the maximum extent
appropriate, children with disabilities, including children in public
or private institutions or other care facilities, are educated with
children who are not disabled, and that special classes, separate
schooling, or other removal of children with disabilities from the
regular educational environment occurs only when the nature or severity
of the disability is such that education in regular classes with the
use of supplementary aids and services cannot be achieved
satisfactorily.'' Through the Individualized Education Program (IEP)
planning process, students are safeguarded from inappropriate placement
in residential facilities. (For further details, go to: http://
www.wrightslaw.com/info/lre.osers.memo.idea.htm)

   The dilemma is that many families are by-passing the IEP process
because they are paying out-of-pocket to place their children in
private residential facilities. Families who choose this route are
often never made aware of the full continuum of educational and mental
healthcare options that might benefit their children. Families who
contact me after having placed their children in private residential
facilities often indicate that they were never made aware of community-
based treatment that could have provided more intensive interventions
than regular education and outpatient psychotherapy, without requiring
them to use out-of-home residential care. This realization is often
quite distressing to parents who say they never wanted to send their
children away but were led to believe that residential treatment was
their only option.

   Thank you for the careful attention you are paying to these issues,
and for your leadership in safeguarding and restoring the healthy
development and well-being of youth and families.

           Respectfully submitted,

                   Allison Pinto, Ph.D.

————

   [Additional submissions from Dr. Pinto follow:]

       Exploitation in the Name of ``Specialty Schooling''

   The Exploitation of Youth and Families in the Name of ``Specialty
Schooling:'' What Counts as Sufficient Data? What are Psychologists to
                       Do?

  Allison Pinto, Ph.D., Robert M. Friedman, Ph.D. and Monica Epstein,
                      Ph.D.,
Louis de la Parte Florida Mental Health Institute, University of South
                      Florida

   Correspondence concerning this article should be addressed to
Allison Pinto, Department of Child and Family Studies, Louis de la
Parte Florida Mental Health Institute, MHC 2222, University of South
Florida , 13301 N. Bruce B. Downs Boulevard , Tampa , Florida 33612 or

Case 1:18-cv-10836-PGG   Document 143-3   Filed 02/03/20   Page 39 of 52

apinto@fmhi.usf.edu.

A multi-disciplinary taskforce has formed at the Louis de la Parte Florida Mental Health Institute to study the issues raised in this article, and the authors wish to thank and acknowledge the other members of this taskforce: Lenore Behar, Amy Green, Barbara Huff, Charles Huffine, Christina Kloker-Young, Wanda B. Mohr and Christine Vaughn.

The Exploitation of Youth and Families in the Name of ``Specialty Schooling:'' What Counts as Sufficient Data? What are Psychologists to Do?

Despite an expanding evidence base regarding promising and effective practices in children's mental health, and the implementation of these practices in a growing number of communities, an alarming treatment phenomenon is now occurring. Since the early 1990's, hundreds of private residential treatment facilities have been established across the country and abroad, and thousands of American youth are now receiving services in these institutions. Many of these programs identify themselves as private ``therapeutic boarding schools,'' ``emotional growth schools,'' or ``specialty boarding schools.'' Unlike accredited and licensed residential treatment centers that are required to meet clear and comprehensive standards with regard to the treatment they provide, many of these new programs are not currently subject to any licensing or monitoring as mental health facilities in a number of states. It is the unlicensed and unregulated programs that are the focus of this article.

Highly disturbing reports have been published in the public media describing financial opportunism by program operators, poor quality treatment and education, rights violations and abuse of youth in these facilities (Dibble, 2005; Rowe, 2004; Aitkenhead, 2003; Weiner, 2003d; Kilzer, 1999). Outrage has been expressed by youth, family members and program employees (Rock, 2005; Rowe, 2004; Rubin, 2004; Aitkenhead, 2003; Rimer, 2001). The former director of one program expressed her dismay by sending a letter to the regional Department of Child Welfare calling for the program to be closed immediately because it ``takes financial advantage of parents in crisis, and puts teens in physical and emotional risk'' (Weiner, 2003a, par. 39). Multiple state investigations have been conducted and lawsuits have been filed in response to reports of abuse, neglect and mistreatment of youth in ``therapeutic boarding schools.'' In numerous cases the lawsuits have led to convictions or high cost settlements (Hechinger & Chaker, 2005; Dukes, 2005; Rock, 2005).

Several states already have good laws on licensing and regulation of these facilities and other states have responded to these growing concerns by proposing (and in a few states passing) legislation to monitor and regulate the full range of residential programs for youth, including ``therapeutic boarding schools.'' An example of such legislation is Utah Senate Bill 107, which was signed into law in March, 2005; this bill defines ``therapeutic schools'' and clearly specifies that these programs must be licensed and regulated like all other residential treatment facilities for youth (S. 107, 2005). Beyond the state level, Federal Bill HR 1738, the End Institutionalized Child Abuse Bill, was introduced in Congress in April, 2005; this bill proposes to provide funding to states to support the licensing and monitoring of the full range of child residential treatment programs.

Although policymakers have begun to take action, there has been little response from the field of children's mental health. In particular, there has been no acknowledgement of the reports of abuse in ``therapeutic boarding schools'' and similar programs by the American Psychological Association. In one sense, the lack of response from psychologists is consistent with our epistemological framework and commitment to the scientific method; we typically gather data first, and then analyze and interpret it, prior to developing a response or course of action. Currently, there are no comprehensive, systematically collected data available about private, unregulated residential treatment, so the lack of response at this time might seem appropriate.

In addition to valuing the science of psychology, however, we also aspire to safeguard the welfare and rights of those whom we seek to serve, and we say that we are aware that special safeguards may be necessary to protect the rights and welfare of vulnerable persons or communities (Ethical Principles of Psychologists and Code of Conduct, 2002). It is therefore important that we educate ourselves about the current residential treatment phenomenon and then respond, as psychologists, in a manner consistent with our principles and our mission. Although the increased and unregulated institutionalization of youth is far from what we may have hoped for or predicted, it is occurring nonetheless, and we cannot ignore it any longer.

The following review is a summary of the issues that have been identified in the accounts that have been published to date regarding residential treatment programs that are not licensed or accredited as such, but continue to operate. These accounts have been featured in publications including the New York Times, the Washington Post, and Time Magazine, and have been aired on BBC News and National Public Radio. The series of articles published in 2003 by Tim Weiner at the New York Times is particularly comprehensive, and is based on interviews and correspondence with more than 200 parents, youth, staff members and program officials. Lou Kilzer has also reported extensively on the topic in the Denver-Rocky Mountain News (Kilzer, 1999). It should be noted that these series do not address all residential treatment and neither does this article. They specifically raise concerns about unlicensed and unregulated private programs that serve youth with emotional and behavioral challenges.

A ``Booming Industry''

It is difficult to determine exactly how many private residential treatment programs billed as ``specialty schools'' currently exist. In a white paper titled, ``Unregulated Youth Residential Care Programs in Montana'' the author noted that, ``Because private behavioral healthcare programs are not required to be licensed or registered with any state agency, it is a bit like knowing about an `undiscovered lake' in the mountains (Montana Department of Public Health and Human Services [DPHHS], 2003).'' Regardless, an Internet search using the term ``troubled teen therapeutic boarding school'' easily identifies a few hundred facilities, many of which are listed on websites such as strugglingteens.com, familyfirstaid.org and natsap.org. In January, 2004, the Chicago Tribune reported, ``Even in a lackluster economy, business for therapeutic schools is booming. While exact numbers are hard to come by, a trade association and other experts say the schools are a $1 billion to $1.2 billion industry that serves 10,000 to 14,000 school-age children (Rubin, 2004, par. 8).'' Some of these residential programs house over 500 youth in a single facility (Cole, 2004; Weiner, 2003a; Weiner, 2003d). According to reports in the Wall Street Journal and the New York Times, the cost of each program generally ranges from $30,000 to $80,000 per year (Hechinger & Chaker, 2005; Rimer, 2001). Medicaid and most health insurance plans will not pay for youth to attend these programs, so families are typically paying out of pocket, sometimes mortgaging their homes or borrowing money from relatives to pay for ``tuition'' (Cole, 2004; Rubin, 2004; Rimer, 2001). It is the very fact that this involves a private transaction between a family and a program that makes it possible for the programs to operate outside of public monitoring.

How the Programs Describe and Market Themselves

Residential facilities that self-identify using the labels of ``therapeutic boarding school,'' ``emotional growth school'' or ``specialty boarding school'' seem to emphasize non-pathologizing approaches in their marketing materials. One program conveys this by stating, ``Labels and diagnoses are left at the door and students are identified and accepted as being intrinsically valuable and good.'' Phrases like, ``respecting dignity and integrity,'' ``uncovering true potential'' and ``accepting personal responsibility'' are frequently incorporated into the program mission statements. At the same time, these programs are often quite explicit in marketing to families of

youth with psychiatric diagnoses, claiming expertise in treating a variety of serious conditions including PTSD, Bipolar Disorder and Eating Disorders (NATSAP Directory, 2005).

In terms of the services marketed within these programs, various mental health interventions are described, including individual, group and family therapy, substance abuse counseling, cognitive-behavioral therapy, behavior management (sometimes described in terms of ``point systems'' and ``level systems''), and the maintenance of a therapeutic milieu. Other less traditional interventions are described in some of the institutions, including equine therapy, canine therapy, and wilderness therapy. The educational opportunities in these institutions are often highlighted in marketing materials with phrases such as ``extensive college-preparatory curriculum,'' a ``boutique educational package customized for each participant,'' and education ``custom-tailored to each student's unique needs (NATSAP Directory, 2005).''

There appear to be three major ways in which these programs are currently marketed: through the Internet, through ``educational consultants,'' and through participating family referrals. Many programs host their own websites and are listed as well on ``referral sites,'' which offer web-based surveys for parents to complete to determine whether their children are exhibiting problems that would benefit from residential placement. ``Educational consultants'' are also available to connect families with programs. The qualifications and credentials of these consultants vary (Rubin, 2004) and there is no evidence of educational requirements or state regulations for this profession. It is reported that some referral sources receive a commission by certain residential facilities for each family they recruit, although this arrangement is not regularly made explicit to families (Rock, 2005a; Hayes, 2003). Some programs also encourage families whose youth are attending the program to recruit other families they know; for each new admission, the referring family receives a month of ``tuition-free'' services (Aitkenhead, 2003). Families have reported sending their children to programs on the recommendation of other parents without ever further investigating the program or services described (Cole, 2004).

Actual Services Delivered

Although the services and educational resources described in marketing materials may be highly appealing to families seeking support, many of these programs seem to provide far less than they advertise. With regard to mental health intervention, therapy is often provided by staff members who have no formal clinical training, and therapeutic interventions suggestive of gross incompetence are commonly reported (Cole, 2004; Aitkenhead, 2003; Kilzer, 1999; Weiner, 2003a; Weiner, 2003d). Harsh and punitive behavioral modification practices have been repeatedly documented (Romboy, 2005; Weiner, 2003c; Kilzer, 1999).

Some youth have reported that they were required to discipline other youth in the facility in order to progress within the behavioral modification level system (Lukes, 2005; Weiner, 2003a). Psychiatrists are not regularly part of the treatment team, and incorrect dosing (Romboy, 2005) as well as frequent over-medication of program participants has been reported (Weiner, 2003d). Education has been described as a series of monitored study halls without trained, licensed teachers (Rowe, 2004; Aitkenhead, 2003) and some programs issue ``diplomas'' that would not be officially recognized by state Departments of Education (Garifo, 2005).

Some facilities are explicit about their refusal to accept accountability for delivering the services they advertise (Kilzer, 1999; Weiner, 2003a). For example, in one program, parents are required to sign a contract that ``states plainly that the program `does not accept responsibility for services written in sales materials or brochures' or promises made by `staff or public relations personnel (Weiner, 2003a, par. 25).' ''

Abuse of Youth by Program Staff

Highly disturbing incidents of physical, emotional and sexual abuse

as well as rights violations have been documented in a number of reports (Hechinger & Chaker, 2005; Rock, 2005; Garifo, 2005; Harrie & Gehrke, 2004; Bryson, 2004b; Weiner, 2003b; Montana DPHHS, 2003). In some programs, parents are instructed by staff to immediately dismiss their children's reports of abuse as attempts at manipulation (Aitkenhead, 2003; Weiner, 2003c). Emotional abuse has been reported in terms of verbal abuse, humiliation, forced personal self-disclosure followed by mockery and extreme fear inducement (Hechinger & Chaker, 2005; Rock, 2004; Aitkenhead, 2003; Weiner, 2003b; Weiner, 2003d; Kilzer, 1999). Criminal probes relating to allegations of sexual assault by staff members have occurred in multiple programs as well (Hechinger & Chaker, 2005; Bryson, 2004b; Hayes, 2003; Weiner, 2003d; Montana DPHHS, 2003; Kilzer, 1999).

Excessive and Abusive Seclusion and Restraint Practices

    In a number of programs, the seclusion and restraint procedures are significantly more restrictive than the standards generally accepted by mental health licensing and accrediting bodies. In one program, youth described lying on their stomachs in an isolation room for 13 hours a day, for weeks or months at a time, with their arms repeatedly twisted to the breaking point (Rowe, 2004; Weiner, 2003c; Aitkenhead, 2003). A youth from one Montana facility reported that he spent six months in isolation (Weiner, 2003d). Signed affidavits from former employees of a therapeutic boarding school in northern Utah indicate that youth in that program were restrained face down in manure (Romboy, 2005; Stewart, 2005).

    In some programs, parents sign contracts authorizing program staff to use mechanical restraints on the youth for unlimited periods of time (Kilzer, 1999). The restraint practices in one institution were described by a former resident as, ``a completely degrading, painful experience * * * they pin you down in a five-point formation and that's when they start twisting and pulling your limbs, grinding your ankles (Aitkenhead, 2003, par. 9).'' Records allegedly documenting the use of handcuffs, belts, pepper spray and duct tape to restrain youth have been cited as well (Bryson, 2005b; Dibble, 2005).

Rights violations

    Some programs restrict youth rights without clear clinical justification. Restricted rights include prohibitions against: written and phone contact with family members for the initial two to six months (Kilzer, 1999; Aitkenhead, 2003); privacy, even in bathrooms and showers (Aitkenhead, 2003; Kilzer, 1999); and wearing shoes, which could facilitate running away (Kilzer, 1999). There is no indication that families or youth are provided with information about how to contact advocacy groups if they have concerns about the treatment and care the youth receives. This is quite unlike accredited psychiatric hospitals and residential treatment centers, which are required to post hotline numbers that youth and family members can call if they believe their rights are being violated.

``Escort'' Services

    Families frequently hire ``professional escort services'' to transport youth to the residential facilities (Bryson, 2005; Rowe, 2004; Cole, 2004; Labi, 2004; Rimer, 2001). It is estimated that more than twenty escort companies are currently in operation, and to date they are not state-regulated (Labi, 2004). Parents pay escorts as much as $1800 to enter their sleeping children's bedrooms in the middle of the night, awaken them, handcuff and/or leg iron them if they protest or resist, and travel with them to the residential programs where they will be admitted (Labi, 2004; Weiner, 2003a). Parents sign a notarized power-of-attorney authorizing the escort(s) to `` take `any act or action' on the parents' behalf during the transport (Labi, 2004, par. 16,'' and promising that the family will not sue the escort(s) ``for any injuries caused by `reasonable restraint' '' (Labi, 2004, par. 16).

Neglectful Conditions

    Some of these programs are neglectful, in terms of environmental safety and cleanliness, nutrition and medical care. Unsanitary living conditions have been described repeatedly (Bryson, 2005; Romboy, 2005;

Stewart, 2005; Harrie & Gehrke, 2004; Labi, 2004; Weiner, 2003d;
Aitkenhead, 2003; Kilzer, 1999). Youth have contracted scabies while
living at some residential facilities (Romboy, 2005; Weiner, 2003d;
Kilzer, 1999). Unhealthy diets are maintained for youth in a number of
programs (Romboy, 2005; Labi, 2004; Weiner, 2003d; Weiner, 2003a;
Aitkenhead, 2003; Kilzer, 1999). Authorities have reported that they
found expired medications in a program investigated in December, 2004
(Dibble, 2005), and other programs were recently investigated for
medical neglect as well (Rock, 2005; Romboy, 2005).

Limited Rights of Youth

Although numerous lawsuits have been filed to hold programs
accountable for alleged misrepresentation, mistreatment and abuse, it
is commonly understood that youth currently have little legal standing
to challenge their placement in these programs (Kilzer, 1999). Barbara
Bennett Woodhouse, the director of the Center on Children & the Law at
the University of Florida, stated, ``The constitution has been
interpreted to allow teens effectively to be imprisoned by private
companies like [escort services] and private schools like [unregulated
``specialty boarding schools'']--as long as their parents sign off. If
these were state schools or state police, the children would have
constitutional protections, but because it is parents who are
delegating their own authority, it has been very difficult to open the
door to protection of the child (Labi, 2004, par. 79).''

Minimal to Nonexistent Regulatory Oversight

Limited to nonexistent regulatory oversight is evident in many
states and there is a lack of federal legislation requiring oversight
of private residential treatment programs (Hechinger & Chaker, 2005;
Garifo, 2005; Gehrke, 2005; Rubin, 2004). Thus, institutions are able
to market themselves and provide treatment without accountability,
which in turn makes it possible for programs to take advantage of youth
and families. Even when parents inquire about program licensure or
accreditation, the response they receive may be misleading. Programs
often cite accreditation by the regional Association of Schools and
Colleges and Universities as ``Special Purpose Schools;'' however, this
process only relates to the educational component of a program and does
not address therapeutic or behavioral components or standards relating
to overnight care (Montana DPHHS, 2003).

Proposed Response

A number of issues are raised by the current operation of hundreds
of private residential treatment facilities marketed as ``specialty
boarding schools,'' many of which are reportedly exploiting families
and mistreating and abusing youth. The first issue relates to the need
for responsible and effective oversight. As a society, one of our
primary duties is to provide for the protection and safety of our
citizens, particularly vulnerable populations such as minors. Within
health care, concerns about safety contribute to the development of
licensing, regulatory, monitoring, and accreditation procedures for
organizations, as well as for professions. Laws and procedures
regarding the reporting of child abuse and neglect, and the
investigation of complaints, are primary mechanisms to help keep
children safe. In response to the growing number of reports regarding
mistreatment and abuse of youth in ``therapeutic boarding schools'' and
other similar programs, responsible and effective oversight is crucial
in all states. All facilities that serve minors with emotional and
behavioral challenges need to be licensed and regularly monitored, with
particular emphasis placed on those services provided to address the
emotional and behavioral needs of youth. All such facilities also need
procedures in place for the reporting of abuse. This is particularly
important since accounts in the public media indicate that many of the
private treatment facilities are not open to routine visits by family
and/or professionals and operate outside public scrutiny.

The issue we are raising here is not whether residential care is
needed for some youth, or whether private residential treatment
programs are effective. Clearly there is a need for residential care
for some youth, and some programs are likely very high quality. Rather,

the issue of central concern is whether appropriate standards exist such that all programs providing intervention to youth with identified emotional and behavioral challenges are licensed and monitored with regard to the residential treatment they provide, and are maintaining conditions that protect the safety of those who are served.

A second issue reflected in the recent, dramatic growth of residential treatment facilities is the need to increase access to effective care for children and families in their own homes and communities so that residential care is used only when needed and not by default because other services are unavailable. Progress has been made through efforts such as the system of care grant program of the federal Center for Mental Health Services (2002) and through local and state initiatives, but there clearly is a need for great improvement, as described by the President's New Freedom Commission (2003), and the Child and Family Subcommittee of the President's New Freedom Commission (Huang et al., in press). Significant progress has been made in developing individualized, culturally competent, and intensive interventions to be provided in communities; now the ``reach'' of these efforts needs to be extended.

A third issue related to the proliferation of unregulated residential treatment programs for youth is the use of the worldwide web as a powerful marketing tool. With the growth of access to the Internet by the general public, the mental health field must recognize that families will be the target of intensive, impressive, and effective marketing strategies, and that such marketing makes it difficult for both families and formal service providers to distinguish high quality programs from low quality programs. Such marketing creates a need for professional organizations such as the American Psychological Association to develop resources and provide information to help families make considered and sound choices among treatment options.

There is also a need for professional organizations, including the American Psychological Association, to take a stand on issues such as the need for increased oversight of ``therapeutic boarding schools'' and similar programs, and the need for adequate protections for children in these programs. In the late 1980s, when there was concern about the marketing practices of private for-profit psychiatric hospitals, a Resolution on Advertising by Private Hospitals was issued by APA's Division of Child, Youth, and Family Services (1986). Such action is needed again in the face of multiple, publicized reports that families are being exploited and children are being mistreated and abused in unregulated and unmonitored facilities, and youth have no mechanism to report abuse.

It would certainly be easier to take a strong stand if there were an abundance of carefully and systematically collected data describing who is served in these programs, how they are served, how often abuse and mistreatment takes place, and what the overall outcomes are for the programs and youth. Given the fact that the programs of such great concern are not accountable to the public, these data are unavailable now and not likely to become available in the near future. In the face of multiple reports in the media, and multiple interviews with children, parents, and former staff of such programs, is there not now sufficient information to take action to protect children from abuse and families from exploitation? We strongly believe that the answer to that question is a resounding ``Yes!'' We cannot continue to look the other way or use the absence of data as an excuse for inaction. The time for action is now.

references

Aitkenhead, D. (2003, June 29). The last resort. The Observer Magazine. Retrieved December 16, 2004 from http://observer.guardian.co.uk
American Psychological Association. (2002). Ethical principles of psychologists and code of conduct. Retrieved May 20, 2005 from http://www.apa.org
Associated Press. (2004, September 20). Investigation shows troubled school may be buying interest with lawmakers. The Daily Herald.

Retrieved April 15, 2005 from http://harktheherald.com

Bryson, A. J. (2005, April 21). Utah-based group under fire--
  legislation targets association of schools for troubled youths.
  Deseret Morning News. Retrieved April 21, 2005 from http://
  deseretnews.com

Bryson, A. J. (2005, February 8). Tighter control of youth programs
  sought in Utah. Deseret Morning News. Retrieved April 15, 2005
  from http://deseretnews.com

Bryson, A. J. (2004, April 17). Problems plaguing program for youths.
  Deseret Morning News. Retrieved April 15, 2005 from http://
  deseretnews.com

Bryson, A. J. (2004, April 9). Youth programs in Utah targeted. Deseret
  Morning News. Retrieved April 15, 2005 from http://
  deseretnews.com

Capitol Advantage LLC (n.d.) Legislation Details `To assure the safety
  of American children in foreign-based and domestic
  institutions, and for other purposes.' Retrieved May 20, 2005
  from http://www.congress.org/congressorg/
  bill.xc?billnum=H.R.1738&congress=109

Cole, W. (2004, November 22). How to save a troubled kid? Time
  Magazine. Retrieved April 15, 2005 from http://www.time.com

Dibble, S. (2005, January 10). Scrutiny increased on centers for teens.
  The San Diego Union Tribune. Retrieved April 15, 2005 from
  http://signonsandiego.com

Dukes, L. (2005, March 26). Financial troubles shut down CEDU schools.
  Bonner County Daily Bee. Retrieved April 15, 2005 from http://
  bonnercountydailybee.com

Garifo, C. (2005, February 16). State agencies probe Ivy Ridge.
  Watertown Daily Times. Retrieved February 16, 2005 from http://
  www.wdtimes.com

Gehrke, R. (2005, February 11). New push for camp regulation. The Salt
  Lake Tribune. Retrieved April 15, 2005 from http://
  www.sltrib.com

Harrie, D. & Gehrke, R. (2004, September 21). Teen-help operators have
  clout--Family behind schools with checkered record
calls in political favors, critics say. The Salt Lake Tribune.
  Retrieved February 17, 2005 from http://www.sltrib.com

Hayes, T. (2003, June 18). Boarding schools go unchecked in Utah.
  Deseret Morning News. Retrieved April 18, 2005 from http://
  deseretnews.com

Hechinger, J. & Chaker, A. M. (2005, March 31). Boarding-school options
  shift for troubled teens--shutdown of Brown schools shows
  challenge of selecting a `therapeutic' program. The Wall Street
  Journal. Retrieved April 7, 2005 from http://online.wsj.com

Huang, L., Stroul, B., Friedman, R., Mrazek, P., Friesen, B., Pires,
  S., & Mayberg, S. (in press). Transforming mental healthcare
  for children and their families. American Psychologist.

Kilzer, L. (1999, July 18). Desperate Measures. Denver Rocky Mountain
  News. Retrieved December 28, 2004 from http://www.denver-
  rmn.com

Labi, N. (2004, July/August). Want your kid to disappear? Legal
  Affairs. Retrieved January 19, 2005 from http://
  www.legalaffairs. org

Licensure and Regulation of Programs and Facilities, S.B. 107, General
  Session State of Utah, (2005). Retrieved May 20, 2005 from
  http://bb.utahsenate.org/perl/bb/bb find.pl

Montana Department of Public Health and Human Services. (2003).
  Unregulated youth residential care programs in Montana. Helena,
  MT: Author.

New Freedom Commission on Mental Health, Achieving the Promise:
  Transforming Mental Health Care in America. Final Report. DHHS
  Pub. No. SMA-03-3832. Rockville, MD: 2003.

Rimer, S. (2001, September 10). Desperate Measures. The New York Times.
  Retrieved January 4, 2005 from http://www.nytimes.com

Rock, S. (2005, March 21). Boonville looks to sell old academy. The

Kansas City Star. Retrieved April 15, 2005 from http://
www.kansascity.com

Rock, S. (2005, January 23). Referral agency's connection to boot camp
angers parents. The Kansas City Star. Retrieved April 15, 2005
from http://kansascity.com

Rock, S. (2004, December 19). Teen's death raises concerns. The Kansas
City Star. Retrieved May 20, 2005 from http://kansascity.com

Romboy, D. (2005, March 6). Utah boarding school under fire. Deseret
Morning News. Retrieved April 15, 2005 from http://
deseretnews.com

Rowe, R. (2004, December 7). Tranquility Bay: The last resort. BBC
News--World Edition. Retrieved January 4, 2005 from http://
news.bbc.co.uk

Rubin, B. M. (2004, January 14). The last resort; Therapeutic education
industry booms as parents seek programs for their troubled
children. Chicago Tribune. Retrieved April 15, 2005 from http:/
/www.chicagotribune.com

Stewart, K. (2005, March 1). State's oversight of school lambasted. The
Salt Lake Tribune. Retrieved April 15, 2005 from http://
www.sltrib.com

Stewart, K. (2005, Febrary 5). Licensing for ``therapeutic schools''?
The Salt Lake Tribune. Retrieved April 15, 2005 from http://
www.sltrib.com

The National Association of Therapeutic Schools and Programs, Inc.
(2005). NATSAP 2005 Directory. Tampa, Florida: Author.

Weiner, T. (2003, September 6). Program to help youths has troubles of
its own. The New York Times. Retrieved January 27, 2005 from
http://www.nytimes.com

Weiner, T. (2003, June 17). Parents divided over Jamaica disciplinary
academy. The New York Times. Retrieved January 19, 2005 from
http://nytimes.com

Weiner, T. (2003, May 24). Owner of private discipline academy in Costa
Rica is arrested. The New York Times. Retrieved January 19,
2005 from http://www.nytimes.com

Weiner, T. (2003, May 9). Parents, shopping for discipline, turn to
harsh programs abroad. The New York Times. Retrieved May 9,
2003 from http://www.nytimes.com

———

Protecting Youth Placed in Unlicensed, Unregulated Residential
``Treatment'' Facilities

Lenore Behar, Robert Friedman, Allison Pinto, Judith Katz-Leavy, and
Hon. William G. Jones

    Throughout the country, there is considerable inconsistency in how
states regulate residential treatment programs for youth. In states
with little oversight, the health and safety of youth are unprotected
and they may be subject to substandard treatment, rights violations,
and/or abuse. Three initiatives to address this issue are reported:
    (1) an Internet survey of youth who are former residents, (2) a
four-state pilot study of how states regulate and monitor residential
programs, and (3) a bridge-building conference between residential
treatment providers and mental health leaders. Recommendations address
the next steps for lawmakers, lawyers, judges, mental health and
education professionals, and parents.

KEYWORDS

residential treatment for youth; licensure/regulation of residential
treatment for youth; abuse in residential treatment; state
responsibility for residential treatment of youth

Introduction
    I did not know where I was going when two strangers came to my room

at home at 3 in the morning, handcuffed me and dragged me down the stairs into a car. While I was at ``name deleted,'' the program used forced labor, excessive exercise, sleep deprivation, nutritional deprivation, physical aggression from staff, and threats. We had work sanctions like carrying rocks, digging holes, in both extreme heat and in cold and snow/rain. Staff punched kids when restraining them; restraints were done using duct tape and blankets. Now it is hard to have lasting relationships, and I don't trust many people. I learned to ``play their game'' * * * make up things and admit anything to get them off your back.

   Quotation from a 20-year-old about treatment that occurred 3 years before I found this program on the Internet and it looked like it was perfect for our son, who argued all the time, skipped school and was disrespectful to me and my wife. We were afraid he would smoke pot and become a juvenile delinquent. They helped us to get a mortgage on our house to pay for the care. They told us to lie to him about where we were taking him, so we did. They told us he would lie to us about what was going on at the school to manipulate us; they told us to ignore his letters. We were not allowed to talk to him on the phone. We never knew what his treatment plan was, but didn't realize that we had the right to know.

   When he ran away and was picked up by a shelter program, we were ready to send him back but the woman at the shelter told us she knew from other kids that the stories were true. We found out later that they used outhouses that they dug themselves. They were punished by being forced to eat with the hogs, down on their knees, like animals. There were many punishments that involved isolation or whippings by staff. They had forced marches and had to carry rocks in their backpacks. Medical problems, like infections, were untreated. We talked to other parents who had kids there and got the same stories. We were horrified about what we did to our son. It has taken years of family therapy to get past this.

                         Quotation from a parent.


   A parent's decision to place a child in a residential treatment center is a serious one, usually fraught with anxiety and based on serious concerns about the child's difficulties, emotional stability, and/or behavioral problems. The decision is frequently guided by the recommendations of a mental health professional, school counselor, juvenile probation officer, or judge. In many cases, the decision comes after other, nonresidential treatments have failed. The choice of a residential treatment program is a complicated one, and in the best of circumstances, the decision is made by matching the child's needs to the program's strengths and based on the assumption that the program provides quality treatment, education, medical care, and honors the rights of children and parents.

   As seen in the opening quotations, substantial problems can arise when placements are made without verifying that these important elements of residential care are in place. A very basic source of verification of program quality is that the program is licensed by the state in which it is located; a higher source of verification is accreditation by a national organization. Neither is foolproof and questionable programs may exist with one or both of these seals of approval. Alternatively, good programs may exist with neither of these approvals. Thus, the issue of program quality is complex, but extremely important to the well-being and safety of children entering these programs and precedes any consideration of treatment effectiveness. This article addresses the most basic measure of quality--how states handle the issue of licensure; how they review or monitor the programs they license; and how they address problems that arise when the requirements for good child care, good treatment, and good education are deficient.

Uncovering a problem
   One of the strongest reports in the media regarding exploitation,

mistreatment, and abuse of minors in unregulated, private residential
treatment facilities appeared in July 1999 by Lou Kilzer in the Denver
Rocky Mountain News. Over the past 4 years, there have been additional
important and shocking media reports. Most notable are a series of
articles by Tim Weiner, The New York Times (May through September
2003); Bonnie Miller Rubin, ``The Last Resort: Therapeutic Education
Industry Booms as Parents Seek Programs for Troubled Children,''
Chicago Tribune (January 14, 2004); and Maia Szalavitz, ``The Trouble
with Tough Love,'' Washington Post (January 29, 2006). Szalavitz has
further captured the unsavory tactics of some programs in her recent
book, Help at Any Cost (Szalavitz, 2006). Youth who attended such
programs, parents, and former staff have also made powerful public
statements about abusive experiences with some of these facilities.
These issues have been discussed in publications of the American
Psychological Association: Public Interest Directorate (Pinto,
Friedman, & Epstein, 2005) and the American Journal of Orthopsychiatry
(Friedman et al., 2006b) and in presentations at meetings of the
American Bar Association (American Bar Association, 2006), American
Psychological Association (Pinto, Epstein, Lewis, & Whitehead, 2006),
and Research and Training Center for Children's Mental Health (Friedman
et al., 2006a).
    Collectively, these reports describe:
    basic human rights violations including (1) youth deaths;
(2) inhumane, degrading discipline; (3) inappropriate, often dangerous,
use of seclusion and restraint; (4) medical and nutritional neglect;
(5) severe restrictions of communication with parents, lawyers, and
advocates;
    substandard psychotherapeutic interventions and education
by unqualified staff;
    failure to assess individual needs of residents;
    denial of full access by parents to their children in
residence;
    financial opportunism and misrepresentations to parents by
program operators; and
    financial incentives to educational consultants who serve
as case finders and recruiters of families.
    Investigations have been conducted of abuse and neglect at several
private unregulated residential programs and lawsuits have been filed
as a result; some lawsuits have led to criminal convictions of the
programs' officials or expensive civil case settlements (Hechinger &
Chaker, 2005; Dukes, 2005; Rock, 2005; Rock, 2004).
    Some of the unregulated programs mislead parents to believe that
creative programming that rises above regulation and above sound
medical and psychological practices is necessary for their difficult
children. Attractive advertisements, particularly on the Internet, are
aimed at parents who are struggling to find help for their troubled
children. Some parents make these placements at their own expense,
without first seeking professional evaluations of the youth's problems,
and the programs do not require professional assessment prior to
placement. Some programs offer to connect the family with an escort
service to transport a child whom parents anticipate would not
otherwise choose to go to the program, which essentially means that two
or more strong adults physically control the youth and force him or her
to go along, either by car or by plane, to the treatment facility. In
some cases, the parents have not seen the programs, which may be
hundreds if not thousands of miles away from home, and they have no
independent data, other than promotional material, to attest to the
effectiveness of the programs. Many programs severely limit parental
contact, by phone and visits, sometimes for as long as a year
(Szalavitz, 2006). Last year, the American Bar Association Center on
Children and the Law, using data reported by Rubin and Szalavitz,
reported an annual estimate of 10 to 15 thousand American youth being
placed by their parents in these privately run, unregulated residential
facilities, which may also include boot camps or wilderness programs
(American Bar Association, 2006).

Regulation of residential programs
    Policies regarding regulation of both public and private
residential facilities are the responsibility of each state. These
policies may be implemented by state legislation, regulation, or other
administrative action. Although many states do oversee residential
programs, in some states private residential treatment facilities for
minors are not subject to regulation, or monitoring either as mental
health facilities or educational facilities. Yet states regulate other
private facilities, such as nursing homes, day care centers, hospitals,
and restaurants. Depending on the state, failure to provide state
oversight of residential programs for minors may occur because these
programs (1) do not accept public funds; (2) are affiliated with
religious organizations; or (3) describe themselves (inappropriately)
as outdoor programs, boarding schools, or other types of nontreatment
programs. In some cases, strong lobbying efforts by interested parties
have contributed to creating and maintaining these exclusions. An
additional problem in some states is that, although regulations exist,
there is ineffective monitoring of programs for compliance; this may be
an issue of insufficient resources being assigned to monitoring, which
ultimately is an issue of insufficient priority.
    If a residential program advertises that it addresses behavior
problems and calls itself a ``therapeutic boarding school,''
``emotional growth academy,'' ``behavior modification facility,''
``wilderness program,'' ``boot camp,'' or other similar terms, then it
most likely should be considered a treatment program because it targets
the social, emotional, and/or behavioral functioning of the children.
Certainly some unregulated residential programs are reputable and
likely could meet licensure requirements. However, other programs do
not adequately provide for the safety and well-being of their residents
and cannot meet such requirements, and it is these programs that are
most concerning.
    Another aspect of the problem is which state agency is responsible
for the licensing and monitoring of residential programs for youth. In
most states these oversight responsibilities are placed in a health
and/or human services or education agency, where there is considerable
understanding of protection, treatment, and education issues and of the
developmental issues of youth. However, in some states, the oversight
responsibility rests with law enforcement, where tendencies to accept a
more punitive view of corrective programs may prevail.
Beginning to address the problem
    The Alliance for the Safe, Therapeutic and Appropriate Use of
Residential Treatment (A START) was initiated by the Louis de la Parte
Florida Mental Health Institute at the University of South Florida to
call attention to this problem and seek solutions that will protect
children in these programs. A START now includes advisors who are
leaders in psychology, psychiatry, nursing, mental health law, policy,
and family advocacy, as well as people with direct experience as
director, evaluator, parent, or participant in such programs. A START
worked with the office of Representative George Miller, now Chair of
the House Committee on Education and the Workforce, to host a press
conference regarding these programs at the U.S. Capitol Building on
October 22, 2005. Major national organizations which endorsed A START's
concerns include the American Psychological Association, American
Association of Community Psychiatrists, American Orthopsychiatric
Association, Child Welfare League of America, Federation of Families
for Children's Mental Health, National Alliance for the Mentally Ill,
and National Mental Health Association. The National Conference of
State Legislatures (NCSL) shares the belief that state policy is
central to addressing this problem and has distributed information,
prepared by A START, to the chairs of relevant state legislative
committees to inform them of the issues (Herman, 2005).
    In the past year, A START has highlighted the problems of private,
unregulated residential treatment facilities through presentations at
major conferences of professional and parent organizations (Friedman et
al., 2006a; Pinto et al., 2006) and published papers in key

professional journals (Pinto et al., 2005; Friedman et al., 2006b). To clarify, the focus has been on facilities that are not licensed and not operated by public or governmental systems but operate private, residential facilities for troubled or difficult children or youth under the age of 18. The focus therefore has not included public or private boarding schools that provide only education, nor has A START addressed concerns related to publicly run psychiatric facilities or private facilities that are licensed and regulated.

The American Bar Association, recognizing the failure of regulation in some states to cover all residential programs in the state, has passed a resolution (by the Association's House of Delegates at their February 2007 meeting) concerning the use of unregulated residential treatment facilities. The resolution ``urges state, territorial, and tribal legislatures to pass laws that require the licensing, regulation, and monitoring of residential treatment facilities that are not funded by public or government systems, but are otherwise privately operated overnight facilities for troubled and at-risk youth under the age of 18'' (see text following this article).

Bringing the problem into focus has been the first step. Efforts currently underway are described below. These include (1) an Internet-based survey of youth who have attended residential treatment programs and a similar survey for parents, (2) a pilot study of four states to gain understanding of the licensure issues and serve as a basis for a national, state-by-state study, and (3) a bridge-building task force of leaders in the child mental health field and directors of residential treatment centers to develop agreement about important elements in residential treatment programs.

Youth perspectives on residential programs for troubled teens

In response to reports of institutionalized abuse, one question that parents, professionals, and residential program operators often ask is, ``How do you know that these are not just a few isolated incidents that have been blown way out of proportion?'' Sometimes the question asked is, ``Yes, but how do you know that these are not just the complaints of disturbed youth who have already tried to manipulate their families and the residential programs and now are trying to manipulate the public?''

As a means of getting better information, an online survey has been developed and posted to gather firsthand reports from young adults who attended residential specialty programs when they were adolescents. The survey is still active, so reports continue to be received. It has provided an opportunity for hundreds of former program participants to share their experiences and express their concerns. It is important that we listen to what they have to say. What follows is only a brief description of the preliminary findings.

Survey methodology

Participants were recruited to participate in the survey through e-mail correspondence; links to the survey were posted on various Web sites. E-mail and Web site addresses were identified based upon previous contacts to gain understanding about services provided to youth in unregulated residential facilities for youth (Pinto et al., 2006). Prospective participants were directed to a description of the study on surveymonkey.com, and if they then consented online to participate, they were directed to the survey itself. Participants were informed that their responses would be anonymous and they would not be linked to their e-mail addresses. The survey was programmed such that it would only accept one completed survey from a given e-mail address. It is recognized that this may not be a representative sample of former program participants; however, it was not possible to identify such a representative sample in this type of survey. This sampling procedure did permit A START to gather information directly from many former program participants. Participants who had attended more than one alternative residential program were instructed to choose one program they had attended and to focus their responses on their experiences in this particular program. At the end of the survey, participants were provided with contact information for the National Disability Rights

Network as an available resource and were provided with the principal
investigator's contact information in case they wanted to follow up
with questions or concerns.

The survey comprised 194 questions regarding direct experience in
residential mental health treatment programs. Questions were organized
into sections focused on: (1) basic demographics and program
identifying information, (2) the process leading up to program entry,
(3) program participation, and (4) program effects. Questions were
designed to gather information regarding the various aspects of
residential care that have been highlighted as problematic in public
media accounts, but efforts were made to ensure that questions were not
framed in ways that would bias responses. The survey included a
combination of forced choice and free-response questions.

Survey findings

The survey was posted online in July 2006. The findings reported
are for the first 3-month period and include responses of 500
individuals. For the purposes of the current analyses, individuals were
included if they provided the name of the program they attended (N =
376), and the program named was an unregulated therapeutic boarding
school, emotional growth academy, or residential treatment program (N =
298), rather than a licensed residential treatment center or a program
of unidentifiable type. Of these individuals, only 5 reported that they
had received the phone number of an advocacy organization to contact if
they had any questions or concerns while participating in the program
and 63 individuals provided no response to the question about access to
an advocate. Responses from these individuals were removed as well, so
that the sample for the current analyses included 230 individuals who
attended a residential specialty program and who reported no or unknown
access to an advocate while attending the program. This group of
participants represents a group of especially vulnerable youth, as they
were attending the types of programs that are likely to have no state
oversight, and the youth were not formally advised about seeking help
if they perceived themselves to be in danger while attending the
program.

Who are these youth?

The majority of the 230 respondents are White (87% Caucasian, 6%
biracial/bicultural, 3% Latino/Hispanic, 3% Asian or other cultural
identities) and the majority are female (68.6%). Half reported that
their family income was $100,000 or greater. Half reported that they
had received a psychiatric diagnosis prior to admission to the program
(50.4%). Almost a third reported that they had also been prescribed
psychotropic medications prior to attending the program (31.3%).
Slightly over half (57.6%) reported that they had tried services and
supports in their home community before attending the residential
specialty program. At the time when they were sent away, youth were
most commonly living in the states of California (26.9%), Florida
(7.3%), New York (6.9%), Texas (5.2%), Michigan (4.3%), or Washington
(4.3%). Almost half reported that they were transported to the program
by an escort service (47.6%) that involved strong adults who forced the
youth to leave home and then, using force or the threat of force,
accompanied the youth to the residential program.

What about the programs?

Respondents identified 58 programs in 21 states. Survey
participants most frequently reported that they had attended a program
in Utah (15.7%), Montana (13%), New York (10.8%), California (7%), or
Georgia (5.7%). There were also a number of individuals who reported
that they attended a program outside the United States in Jamaica
(12.2%) or Mexico (7%), and 4% reported attending programs in the
Dominican Republic, Western Samoa, or Costa Rica. Lengths of stay in
both the U.S.-based and foreign-based programs were extended; slightly
over two-thirds (69.1%) reported that they attended the program for a
year or longer.

Concerns that emerged in the reports from young adults

Violations of patient's rights

Many participants reported that they experienced patient rights

violations. In addition to having no access to advocacy contact
information, the majority reported that their mail was monitored (93%)
and their calls were monitored (96%). Furthermore, the majority also
reported that their letters or conversations were filtered, restricted,
or interrupted (86%). As one participant explained, ``They isolated you
from your family back home. You had no way to freely contact anyone.
They also enacted arbitrary bans to isolate you from friends/ peers.''
Another reported, ``I never spoke to my mom, or even touched a phone
once during the 6 month stay in [program name deleted]. On Christmas
you got to speak with your parents for 5 minutes and I did not get to
talk to my mother because she was never informed of the call.'' And
another: ``As for the e-mails and letters, they read them as they came
in, and before you sent them out. I wrote 7 letters to my mom before
they would send one. It ended up being one big lie, because I could not
tell her I was upset or that I hated it there. At the time, that was
all I was feeling.''

                Misuse of seclusion and restraint
    Many reported firsthand experience in seclusion (57%) or restraints
(34%), and a number of participants witnessed their peers being placed
in seclusion (45%) or restrained (60%). While the most commonly
reported trigger for seclusion or restraint was aggressive behavior,
especially aggression toward staff (87%), a number of behaviors that
would never warrant seclusion or restraint in a licensed or accredited
residential treatment center were endorsed as well, including breaking
a program rule (67%), saying something disrespectful (52%), cursing
(48%), or making a face (30%).
    Many responses were similar to these:
    They had a room with tile flooring where the kids went at 6:00 am
until 10:00 pm, where each hour you would rotate positions. One hour
would be lying on your stomach with your chin on the ground, the next
position was standing on your knees for an hour and the next one was
standing for an hour with your nose to the wall.
    When participants were being ``restrained'', they were in fact
being tortured. They would be forced face down on the hard tile floor
by 3--6 staff members. One staff would ``hold'' your legs down, which
usually meant they spent their time grinding your ankles into the
floor. One or two other staff held your arms out at your sides,
``held'' in the same way the ankles were. The last staff would keep his
knee in your back as he pulled up one or both arms behind your back to
the point where you could literally touch your ear with the opposite
hand from behind your back.
    They would duct tape your hands behind your back then your legs
together then wrap you up in a blanket like a burrito and duct tape
that tighter so you couldn't move or get out. Sometimes it would be so
tight kids would be screaming that they couldn't breathe and really
start panicking. They made the students do this to other students.
    Isolation is where you didn't see the sun or other people for weeks
at a time, were given even more unrealistic exercise expectations, were
more easily restrained, given less time to shower, and you were forced
to lay on your face all day unless exercising, for 16 hours each day.
    Note that none of these treatments or punishments are acceptable at
any level in regulated programs.
                Reports of inhumane treatment
    Beyond seclusion and restraint, there were multiple reports of
various forms of inhumane treatment and abuse. Many participants
reported that they had been required to participate in forced labor
(71%), restricted access to the bathroom (68%), scare tactics (63%),
and exposure to harsh elements like extreme heat, snow, or rain (60%).
In addition, participants described experiences of excessive exercise
(58%), food/nutritional deprivation (43%), sleep deprivation (41%), and
physical punishment (31%). When asked whether they were ever
emotionally, physically, or sexually abused by staff, a number of
individuals reported that was often or sometimes true (45%). It should
be noted that, although each of these practices violates current U.S.
standards regarding the treatment of adults who are prisoners of war