and detainees, they are occurring in youth residential facilities across the country, without oversight or accountability.

Here is one description that typifies the experiences reported by participants:

We would be forced to do pushups until some boys got hernias. We would be put into an `iso' box exposed to extreme heat. We would be deprived of meals as a punishment. They used stress positions. They beat people with sticks and their fists and feet. They made kids carry trash and building supplies up and down the hill above the program. They made kids move piles of rocks for no reason. They would keep you up as a way to `break' you.

The distress and suffering

Youth were clearly distressed and suffering. When participants were asked to rate how much they experienced a variety of feelings while attending the program (where responses included ``not at all,'' ``a little bit,'' ``some,'' ``a lot,'' and ``don't know''), the majority endorsed ``a lot'' of feeling sad, stressed, angry, confused, hopeless, and scared; most participants reported feeling happy, loved, hopeful, and proud only ``a little bit'' or ``not at all.'' In response to the question, ``Would you recommend the program to others?,'' participants' responses included: ``I still have bad dreams about it. I wake up shaking and nervous that I am there again. It has scarred me emotionally and I don't know if I will ever get over it;'' ``The program helped me realize what a sick sad world we live in;'' ``It was terrible. I was and still am horrified by the whole experience;'' ``It was a terrible place. Mentally scarring. I would hope NO ONE would ever have to go to a place like that. It's worse than jail;'' ``They abused me. That's what they do. They abuse people;'' ``I don't ever want another child to be so abjectly hopeless or so horribly abused. I don't ever want another family to be torn up when there is the possibility of being reunited and healed;'' ``There are better ways to deal with a troubled teen than send them to a school that abuses kids.''
What can we conclude?

Recognizing that the reports provided are retrospective and fully acknowledging that these accounts are not necessarily a representative sample of all youth who have attended residential specialty programs, these findings nonetheless provide compelling evidence that widespread mistreatment is occurring and that youth are suffering in programs across the country. As for the question that parents, professionals, and program operators ask, here is a direct answer from one program participant:

Okay * * * I have a good idea of what you may or may not be thinking at this point. `This guy's just some defiant little bastard who hates the world, and sees everyone and everything negatively!' Understandable, but whether you'll believe it or not, I'm not making this stuff up. I'm not just some pissed off kid who wants to whine. I'm a highly intelligent, well-educated, and responsible citizen, and as such a person, I know very well that my rights were totally and completely denied.
A study of four states

A study of four states was undertaken as a pilot effort for a larger, national state-by-state study through a partnership of four organizations: A START, based at the Florida Mental Health Institute; the American Bar Association Center on Children and the Law; the National Disability Rights Network; and the Federation of Families for Children's Mental Health. The 2-year study will involve (1) an in-depth review of state laws, policies, and practices regarding regulation and oversight of residential programs; (2) education of and technical assistance to state lawmakers and leaders to bring about needed policy reform; and (3) guidance for parents about placing children in residential centers. The preliminary findings from the pilot study are presented because, even with such a small number, it is clear that there are problems of state policy that contribute to the problem of mistreatment of children and their families.
Study methodology

While we acknowledge that there are several approaches to remedying the problems that are described above, we believe the wisest course of action is to first systematically gather information about how states handle the issue of licensure and regulation of residential treatment programs for minors, as well as information on monitoring and quality assurance requirements. In order to begin this process, we developed a brief protocol designed to elicit the desired information from state administrators responsible for licensure of these programs and for ensuring quality of care, state child mental health administrators, and other key stakeholders such as the protection and advocacy administrators. The protocol was designed as a telephone interview and was expected to take between 45 minutes and 1 hour to complete.

The study was conducted in Connecticut, Missouri, Utah, and California. These states were selected in order to achieve geographic diversity as well as diversity in size and history/experience in regulating residential programs for minors. Respondents were from the Protection and Advocacy agency, child welfare, education, juvenile justice, and mental health. We intended to assess: (1) the degree to which respondents were knowledgeable of the regulations and the monitoring process and the degree to which they agreed with each other and (2) the extent to which there were laws, regulations, and policies in place to address this issue. As the intent was to get an overview of what problems might exist regarding regulation, rather than to determine which states did this well or badly, the findings are not reported by specific state.

Study findings

Most respondents deferred to the individual who was in charge of licensing for the state. In some states, representatives from other agencies did not seem to have a working knowledge of how programs were regulated. The person with this responsibility was variously located in child welfare, social services, or human services. In general, the child mental health administrators were less familiar with the state regulations governing licensure and monitoring and did not see this as part of their domain. Representatives from the Protection and Advocacy agency saw this as an important issue, but had not become directly involved.

All four states had legislation requiring the executive branch to issue rules/regulations regarding the operation of residential treatment facilities for minors. However, there was variance as to which kinds of programs the regulations applied. In one state, the rules applied only to facilities in which a governmental agency placed youngsters. In some states, there was an attempt to define levels of residential care, with more stringent treatment standards applying to the most restrictive group homes and community treatment facilities.

All four states reported that there are several pathways to residential placements for minors. Placement could occur through social services/mental health (into therapeutic foster care, group homes, community treatment facilities, or hospitalization); juvenile justice (into boot camps); special education; and private placement. Respondents also stated that licensing and monitoring of juvenile justice, mental health, and special education residential programs were the purview of their respective agencies. None of the states were able to report how many children were placed privately by their parents or how many children were placed out of state by local agencies or by parents, nor was there any attempt to monitor the effectiveness of those placements.

Programs were able to opt out of the licensing requirements established for the purpose of providing mental health treatment in facilities for minors in several ways. In some states, if the programs were considered to be religious institutions, they were exempt. Also, in some states, if a program accepted only private placements, it did not require licensure. In some states, if a program defined itself as a boarding school or educational facility, it could be exempt from regulation, even though the services provided were described as ``emotionally corrective'' or ``therapeutic.''

Despite the plan to describe the states with anonymity, it is important to mention Utah, a state that has had substantial problems with questionable programs existing and being exempt from regulation. In 2005, the state legislature amended the licensure law to ensure that all programs, except legitimate private residential schools, be subject to state regulation and monitoring (Utah Legislation, 2005). The rule-making process took over a year, which is not unusual given the importance of public review and comment. Commendably, Utah is now implementing its new, more stringent regulations that address how programs will be included in licensure requirements and will be monitored for compliance with those requirements. Although it is too early to understand the impact of new regulations in Utah, this state certainly bears watching.

All four states reported that they have in place regulations establishing standards for treatment services, educational services, and child care/supervision; however, as noted above, these requirements do not apply to all programs in the state. The basic requirements included such elements as (1) each child must have an individualized treatment plan and

(2) the provider must be able to meet the needs identified in the plan. Monitoring includes assessing (1) the individualized treatment plans, (2) the individualized educational plans, and (3) requirements to assess quality of services. In some of the states, there were requirements related to child care and supervision but these treatment aspects were not specified except for the higher end, more restrictive programs.

For programs to which the rules and regulations apply, all four states reported that specific rules regarding children's rights, parental rights, punishment, and use of seclusion and restraints are in place. All four also stated that there are procedures in place for reporting abuse. These included reporting abuse to a child welfare hotline and requiring that abuse laws be posted in every facility. Children must have access to a phone and employees of residential programs must be trained about the different kinds of employee behaviors that are not permitted.

While all four states have established licensure requirements and standards for at least some types of residential treatment facilities providing services to minors, their ability to monitor compliance was of concern. Some states monitor compliance with requirements which govern such things as staff qualifications, staffing patterns, and number of hours of psychotherapeutic service per week per child.

In some states, following application for licensure, there is an on-site review of requirements and interviews with staff and management. There may be unannounced licensing monitoring visits, as frequently as quarterly. There may also be a requirement for an annual inspection, which comes with the renewal process. On-site visits may also be made if a complaint is made, either from staff, clients, family, or citizens. However, respondents reported that monitoring is compromised by the number of staff who do the job. In one state, the monitoring agency is staffed to visit a 10% random sample of licensed facilities, and this is not as frequent as once per year. States vary in whether they provide licensing and monitoring at no cost to the program or whether they charge to cover these services.

Study conclusions

While we recognize that four states are too small a number upon which to draw conclusions, it was apparent that there is an absence of data about how effective current laws are. Most agency respondents deferred to the person who was in charge of licensing and did not see licensing or in some cases even the monitoring of quality of care delivered as part of their responsibility. There appeared to be an assumption that providers will obey the laws, but there were no safeguards in place to protect children who are placed privately by their parents. Staff from the responsible state agencies is already stretched in its ability to monitor the safety and the effectiveness of the quality of care delivered for the children already in their

custody.
Building bridges with residential treatment centers

The concerns about state policies regarding residential treatment have been supported by a related development. The Child, Adolescent, and Family Branch of the U.S. Center for Mental Health Services convened a meeting in Omaha, Nebraska in June 2006 to address the historic split between providers of residential care for children with mental health challenges and advocates for home and community-based care within systems of care. The meeting brought together representatives from the federal, state, and local level, youth and family advocates, system of care council members, tribal representatives, providers of service, and representatives of national associations related to children's mental health and to residential care. Although residential programs which lack oversight were not represented, the agreements that emerged should serve to inform parents, professionals who provide referrals to residential treatment programs, and the operators of residential programs--good and otherwise--of the expectations that constitute good care and treatment.

The purposes of the summit were to identify areas of agreement in values and philosophies between the different groups, to identify emerging best practices in linking and integrating residential services with home and community-based services, and to set the stage for strengthening relationships and services partly by developing a joint statement about the importance of creating a comprehensive and integrated service array and partly by creating action steps for the future.

The sponsoring organizations involved with residential care were largely representative of well-established not-for-profit licensed residential programs rather than the unlicensed and unregulated, for-profit programs that have been the primary concern of A START (Friedman et al., 2006a; Friedman et al., 2006b). However, the summit was of direct relevance to the concern of A START about protecting children in residential settings and enhancing the availability of a wide range of supports and services for children and families.

The summit did result in the beginnings of a ``joint resolution to advance a statement of shared core principles'' which was then distributed to participants and modified over a period of several months. This resulted in a final product, which was distributed by Dr. Gary Blau, Chief of the Child, Adolescent, and Family Branch of the Center for Mental Health Services, on September 14, 2006, with a request for individual, agency, and/or organizational endorsement. This process of securing endorsements is still ongoing.

As indicated in the preamble to the resolution, the call is for ``a comprehensive, flexible, family-driven and youth-guided array of culturally competent and community-based services and supports, organized in an integrated and coordinated system of care in which families, youth, providers, advocates, and policymakers share responsibility for decision making and accountability for the care, treatment outcomes and well-being of children and youth with mental health needs and their families'' (Child, Adolescent, and Family Branch, 2006, p. 1). The joint resolution acknowledges the need for 24-hour out-of-home treatment settings but indicates that within such settings children and youth should have a developmentally appropriate role in their care and in creating rules and that family members should be viewed as partners and have open access to the setting.

In the section on ``Clinical Excellence and Quality Standards,'' the joint resolution calls for ensuring ``that all treatment services are licensed and regulated by appropriate agencies, and that monitoring is performed by well-trained individuals (including families and professionals) whose values are consistent with the principles articulated in this resolution'' (Child, Adolescent, and Family Branch, 2006, p. 5). It also indicates in this section that programs should strive to eliminate coercive interventions such as seclusion, restraint, and aversive practices and that visits between families and children should not be restricted for punitive purposes.

The document offers a set of values, principles, practices, and standards that, if implemented, would go a long way to addressing the concerns about the protection of children with mental health challenges and the pattern of sending children hundreds if not thousands of miles from home to unlicensed programs which reduce their contact with their families. The document provides important guidelines for policy makers and advocates who are seeking to develop a comprehensive, integrated system and also for policy makers who are seeking to develop or strengthen licensing and monitoring procedures to ensure that children are treated safely, that they and their families have an appropriate voice in their treatment, and that the use of coercive and aversive practices is eliminated. Over the next several years, if the values and principles of this joint resolution are not only endorsed but, more importantly, put into practice, they will go a long way toward ameliorating the risk that children and families are now encountering because of unlicensed and unregulated programs that are highly coercive and aversive in their practices.

The importance of action: next steps

The abusive and deceitful practices described in this article are unconscionable and cry out for remedial action. The following actions are recommended for questionable practices, to eliminate programs and protect against further harm to vulnerable children and families:

Identify programs that engage in the practices described above. Monitoring the Internet is one way of identifying them; this effort could be undertaken as a project of an organization involved in the protection of youth and advocacy for them. An additional way to identify programs is by locating children and families who have had negative experiences. Several Internet sites, used by youth, provide for information exchange with a focus on experiences in residential programs. The information collected should be organized to allow for systematic review. Similarly, the analysis of data from the current, ongoing Internet-based survey of youths' experiences in residential programs (Pinto et al., 2006) should continue to include a focus on identifying programs that do not meet quality standards for care.

Identify states that do not license or regulate the operation of residential programs for youth or that otherwise tolerate the existence of programs with questionable practices. The proposed national, state-by-state study described above should provide good information to help states address needed policy changes. Individual state legislators, state legislative committees, and ultimately each affected state's legislature must be aware of how their laws and policies govern the existence of these programs and take necessary actions regarding licensure, regulation, and monitoring to assure appropriate care and safety for the youth they purport to serve.

Advocate with the National Conference of State Legislatures to address these practices nationally and offer guidance to the states to strengthen oversight of residential programs.

Work with Congress to address the existence of these programs, including those that operate outside the country, and determine whether federal action is appropriate to assure that vulnerable children are not harmed and that parents are not paying exorbitant prices for programs that are ineffective at best.

Promote the 2006 ``Recommendation from the ABA Youth at Risk Initiative Planning Conference'' with all legislative bodies to ``[p]rohibit operation of unlicensed, unregulated residential treatment facilities that operate programs whose efficacy has not been proven empirically, such as boot camps, tough love, and `scared straight' programs, and require the closing of such facilities. The law should provide for such facilities to be replaced with: better access to preventative services, with a focus on family involvement and community-based resources, wherever possible; and carefully regulated `residential treatment facilities' that are reserved for youth whose dangerous behavior cannot be controlled except in a secure setting.''

Urge vigilance by juvenile probation officers and other court officials, including lawyers and judges, as well as mental

health, education, substance abuse, and other professionals who
encounter troubled young people, in identifying youth who are at risk
of being placed in one of these treatment facilities; encourage them to
engage the youth and parents in a discussion regarding better options;
impress upon them the necessity of parental involvement in the youth's
treatment; and identify to them the safety risks and the costs
associated with programs that promise a quick fix or an unorthodox fix.

Create a coalition of national advocacy and legal
organizations, mental health organizations, and professional
organizations that promote the well-being of children to demand state
and national action regarding the degrading and demeaning practices to
which children in these unregulated programs are subjected.

Inform civil rights and tort attorneys of the practices in
which these programs engage and encourage them to take legal action
against them.

Also inform attorneys who represent youth in juvenile
court proceedings of the risks these programs pose to their young
clients and of more appropriate, evidence-based alternatives. Ensure
that attorneys have ready access to the National Council of Juvenile
and Family Court Judges' ``Delinquency Guidelines.''

Ensure that schools are cognizant of the risks that face
youth who are placed in these programs and that they disseminate
information to parents about child and adolescent behavior and the best
available treatment programs for youth whose behaviors require
intervention. School psychologists, social workers, and counselors must
likewise be well informed about alternatives, ideally evidence-based
programs.

Disseminate widely best practices that address diagnostic
and treatment issues and placement issues with the collaboration of
state mental health, child welfare, education, and juvenile justice
agencies and by the U.S. Departments of Health and Human Services and
Justice to those involved in the care, treatment, and education of
youth. This information should also be disseminated by parent
organizations and other sources of information for parents.

## REFERENCES

American Bar Association, Commission on Youth at Risk. (2007).
    Recommendations from the ABA youth at risk initiative planning
    conference. Family Court Review, 45, 366--380.
Child, Adolescent, and Family Branch, U.S. Department of Health and
    Human Services, Substance Abuse and Mental Health Services
    Administration, Center for Mental Health Services. (2006,
    September). Building bridges between residential and community
    based service delivery providers, families and youth: Joint
    resolution to advance a statement of shared core principles.
    Building Bridges Summit, Omaha, NE. Retrieved February 13, 2007
    from http://www.aacrc-dc.org/public/pdfs/FinalBBResolution.pdf
Dukes, L. (2005, March 26). Financial troubles shut down CEDU schools.
    Bonner County Daily Bee. Retrieved February 13, 2007 from
    http://www.bonnercountydailybee.com/articles/2005/03/26/news/
    news01.txt
Friedman, R. M., Pinto, A., Behar, L., Bush, N., Chirolla, A., Epstein,
    M., et al. (2006a, February). Unregulated residential treatment
    facilities: A present-day threat to youth, families and the
    field of children's mental health. 19th Annual Conference of
    the Research and Training Center for Children's Mental Health,
    Tampa, FL.
Friedman, R. M., Pinto, A., Behar, L., Bush, N., Chirolla, A., Epstein,
    M., et al. (2006b). Unlicensed residential programs: The next
    challenge in protecting youth. American Journal of
    Orthopsychiatry, 76, 295--303.
Hechinger, J., & Chaker, A. M. (2005, March 31). Boarding-school
    options shift for troubled teens--shutdown of Brown schools
    shows challenge of selecting a ``therapeutic'' program. The

Wall Street Journal, p. D1.

Herman, M. (2005, September 19). Behavioral health news--When is ``tough love'' too tough? States scrutinize boarding schools. National Conference of State Legislatures State Health Notes: Forum for State Health Policy Leadership, 26(452), 2--6. Retrieved February 13, 2007 from http://www.ncsl.org/print/Health/shn/archive/shn452.pdf

Kilzer, L. (1999, July 18). Desperate measures. Denver Rocky Mountain News. Retrieved February 13, 2007 from http://www.denver-rmn.com/desperate/site-desperate/mpg2-desperate.shtml

Pinto, A., Epstein, M., Lewis, P., & Whitehead, K. (2006, August 12). Exploitation of youth & families: Perspectives on unregulated residential treatment. American Psychological Association Annual Meeting, New Orleans, LA.

Pinto, A., Friedman, R. M., & Epstein, M. (2005). Exploitation in the name of ``specialty schooling'': What counts as sufficient data? What are psychologists to do? American Psychological Association: Public Interest Directorate, Children, Youth and Families Division News. Retrieved September 29, 2005 from http://www.apa.org/pi/cyf/specialty-schooling.pdf

Rock, S. (2005, January 23). Referral agency's connection to boot camp angers parents. The Kansas City Star. Retrieved February 13, 2007 from http://www.isaccorp.org/thayer/thayer-learning-center.01.23.05.html

Rock, S. (2004, December 19). Teen's death raises concerns about boot camp--Panel: it may have been prevented. The Kansas City Star. Retrieved February 13, 2007 from http://www.isaccorp.org/thayer/thayer-learningcenter.12.19.04.html

Rubin, B. M. (2004, January 14). The last resort: Therapeutic education industry booms as parents seek programs for their troubled children. Chicago Tribune.

Szalavitz, M. (2006, January 29). The trouble with tough love. Washington Post, p. B01. Retrieved October 30, 2006 from http://www.washingtonpost.com/wp-dyn/content/article/2006/01/28/AR2006012800062.html

Szalavitz, M. (2006). Help at any cost: How the troubled-teen industry cons parents and hurts kids. New York: Riverhead.

Utah Legislation ch. 2, Sec. 62A. (2005). Licensure and Regulation of Programs and Facilities. Amendment S.B. 107. Retrieved September 30, 2005 from http://www.le.state.ut.us/?2005/htmdoc/sbillhtm/sb0107.htm

Weiner, T. (2003, September 6). Program to help youths has troubles of its own. The New York Times, p. 8. Weiner, T. (2003, June 17). Parents divided over Jamaica disciplinary academy. The New York Times, p. 10. Weiner, T. (2003, May 24). Owner of private discipline academy in Costa Rica is arrested. The New YorkTimes, p. 2. Weiner, T. (2003, May 9). Parents, shopping for discipline, turn to harsh programs abroad. The New YorkTimes, p. 1.

    Lenore B. Behar, Ph.D. is the Director of Child & Family Program Strategies in Durham, North Carolina and she is a founding member of A START. For 32 years, Dr. Behar served as the director of children's mental health for the State of North Carolina and brought about major policy changes which put the state in a national leadership position. She also served, from 1992 to 2000, on a panel appointed by the federal court to oversee systems reform in Hawaii through a settlement agreement involving children's rights to education and treatment.

    Robert Friedman, Ph.D. is a Professor and Interim Dean of the Louis de la Parte Florida Mental Health Institute (FMHI) and he initiated A START in an effort to ensure that children with mental health challenges are adequately protected and served and that their parents are not misled and exploited. For the past 15 years, Dr. Friedman has been Chair of the Department of Child and Family Studies at FMHI, where

he also has directed one of two federally funded Research and Training Centers for Children's Mental Health. Dr. Friedman has been a consultant to over 40 states, has served on many national groups, such as the Planning Board for the Surgeon General's Report on Mental Health, and has given testimony to congressional committees and, more recently, President Bush's New Freedom Commission on Mental Health.

Allison Pinto, Ph.D. is a Research Assistant Professor at the Louis de la Parte Florida Mental Health Institute. She has served as Director of Clinical Training and Clinical Program Manager in a community mental health center and has worked directly with youth and families as a licensed clinical psychologist. She has been coordinating the efforts of A START since its inception.

Judith Katz-Leavy, M.Ed. is a consultant in the field of child and family mental health. She served for over 30 years in high-level positions related to children's mental health services and systems of care in the National Institute of Mental Health and the Substance Abuse and Mental Health Administration. She served during 1992 and 1993 on the President's Health Care Reform Task Force and in 1999 as Section Editor for Mental Health: A Report of the Surgeon General, Chapter 3: ``Children and Mental Health.''

William G. Jones, J.D. is a retired Chief District Court Judge from Charlotte, Mecklenburg County, North Carolina. He is a member of the advisory panel of the Katie A. vs. Banta lawsuit in Los Angeles County, which addresses the mental health treatment of children in the child welfare system. He is a consultant to the American Bar Association Center on Children and the Law's National Resource Center on Legal and Judicial Issues, and the Family Violence Department of the National Council of Juvenile and Family Court Judges.

———

### End Institutional Abuse Wiki

The following homepage and posts were downloaded by Allison Pinto from http://endinstitutionalabuse.wikispaces.com on October 24, 2007 at 3:21 p.m. EST. This online wiki was created on October 4, 2007, less than one week prior to the October 10, 2007 congressional hearing titled, ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities.'' It was created in order to provide a virtual space for individuals to post letters, accounts and concerns that they want to share directly with Congress regarding the abuse of youth in residential facilities. The wiki is also an opportunity for individuals to provide direct input regarding proposed legislation to address this issue. It is intended to serve as a means of participatory policymaking.

All letters and accounts directed to Congress by the person posting on this ``End Institutional Abuse'' wiki are included in this document. Accounts that were submitted that focus on the experience of someone other than the person directly posting on the wiki are not included in this document. Newspaper articles posted on the wiki are also not included in this document. Finally, wiki participants' responses to one another are not included in this document.

Please note that the accounts included in this document represent the views and perspectives of the individuals who posted letters and accounts on the End Institutional Abuse wiki, and are not the views or opinions of Allison Pinto who created the wiki space. They are spell-checked but otherwise unedited.

The wiki will remain active online so that members of Congress can continue to visit it in order to directly access accounts about abuse of youth in residential facilities as they are submitted.

### End Institutional Abuse Wiki Homepage

HELP END INSTITUTIONAL ABUSE

We need to raise awareness in our society about the problems of institutional abuse and mistreatment. Please help.

This wiki is a virtual grass roots effort to organize and speak out. We've got less than a week * * *

On October 10, 2007, the Committee on Education and Labor will be holding a hearing in Congress entitled, ``Cases of Child Neglect and Abuse at Private Residential Treatment Facilities.''

There will be an opportunity for the presentation of written personal accounts and position statements regarding issues of mistreatment, abuse and neglect in youth residential programs, to be submitted for the record. If you would like to submit a statement, letter or story to Congress, please click on the ``discussion'' tab above and post your letter or story.

Please note that this wikispaces site is a public site, so it is visible to anyone and everyone. Be careful to include only that information that you are comfortable sharing in the public domain.

Also, please recognize that wiki technology makes it possible for individuals to respond to one another's contributions. If you choose to respond to someone else's post, please maintain a respectful stance that honors the inherent dignity of that individual.

If you would like to provide input, feedback or suggestions regarding the ``End Institutional Abuse Against Children Act,'' please click on ``Federal Legislation'' to the left, and submit your ideas on the corresponding discussion page. This legislation was proposed in 2005 and it is expected that it will be revised before it is reintroduced in Congress, so your ideas are needed.

Thanks for any help you can provide in bringing attention to these issues, in order to restore the safety and well-being of youth and families in our society.

[Editor's Note.--To see all the entries in this wiki please access the following Internet address:]

http://endinstitutionalabuse.wikispaces.com

----

------

Chairman Miller. Thank you very much for your testimony.
Thank you to all of you for your testimony.
I cannot think of testimony that we have received in this committee that has caused a greater sense of anger or sorrow than what we just heard this morning.

Mr. Kutz, I would direct again my fellow committee members
to the first couple of paragraphs in your summary. They are
absolutely astonishing in today's world when you say that ``We
found thousands of allegations of abuse, some of which involve
death, at residential treatment programs across the country in
American-owned and American-operated facilities abroad between
1990 and 2000.

``Allegations include reports of abuse and death recorded
by state agencies, by the Department of Health and Human
Services, allegations detailed in pending civil and criminal
cases with hundreds of plaintiffs, claims of abuse and death
that were posted on the Internet.

``For example, according to the most recent NCANDS data,
during 2005 alone, 33 states reported 1,619 staff members
involved in incidents of abuse in residential programs. Because
there are no specific reporting requirements or definitions of
private programs in particular, we could not determine what
percentage of the thousands of allegations we found related to
such programs.

``We also examined in greater detail 10 closed cases where
teenagers died while enrolled in the private program. We found
significant evidence of the ineffective management in most of
these 10 cases with program leaders neglecting the needs of
program participants and staff. This ineffective management
compounded the negative consequences and sometimes directly
resulted in the hiring of untrained staff, lack of adequate
nourishment, reckless or negligent operating practices,
including a lack of adequate equipment. These factors played a
significant role in most of the deaths that we examined.''

In the 10 facilities that you looked at, Mr. Kutz, where
these children died, could you name those 10 facilities for the
committee, please?

Mr. Kutz. Yes, if you would like me to go on the record
with that, I would.

Chairman Miller. Yes.

Mr. Kutz. We did leave it off, but if you asked that, I
will.

Chairman Miller. I will ask you to do that now.

Mr. Kutz. I will do them one by one.

Number one was Summit Quest. Number two was Challenger.
Number three is North Star. Number four is Obsidian Trails.
Number five is the Aldredge Academy, which was already
mentioned by one of the parents here. Number six was the
American Buffalo Soldiers Reenactment Camp. Number seven was
Red Rock Ranch Academy. Number eight was Catherine Freer
Wilderness, which was also mentioned. Number nine was Skyline
Journey. And number 10 was Thayer Learning Center.

Chairman Miller. Thank you.

A number of these facilities, if I understand correctly,
have remained open. Which facilities are those? Some have
closed either related to these incidents or other reasons, but
which of these remain open after these children have died?

Mr. Kutz. That is correct. Some have closed and there are
five that remain open in some form, and I will go through those
with you also.

Again, Aldredge, which was our case number five. The Red
Rock Canyon School, which was the parents of the Red Rock Ranch
Academy, our case study number seven, is open. Catherine Freer,
which was mentioned, is still open, but it is open now in
Oregon. The Nevada location related to our case study is
closed. The Skyline Journey from our case number nine is
closed, but it now operates as something called Distant Drums.
And then Thayer Learning Center, our case study number 10, is
still operating.

Chairman Miller. From your investigation of these 10 deaths

at these facilities, can you comment as to whether or not these
deaths at these facilities appear to have been fully
investigated?

Mr. Kutz. Not necessarily. I mean, from a criminal
standpoint, we did not do an in-depth investigation of the
quality. I would say that they were not done of equal quality
necessarily, but we did not dig enough into that.

From a criminal standpoint, there really was not a whole
lot of result. There was one individual who was prosecuted and
is serving concurrent 6-and 5-year sentences. The other
prosecutions or pleas resulted in community service or
probation, things like that. And in some cases, there were no
charges at all made at the end of the day.

So it was a wide variety, but very little criminal result
for any one involved in these cases.

Chairman Miller. Thank you.

Ms. Moss, it is my understanding that three of the
facilities that Mr. Kutz just mentioned are NATSAP members--is
that correct--that remain open?

Ms. Moss. Yes.

Chairman Miller. And those are which?

Ms. Moss. Catherine Freer, Red Rock Canyon and Aldredge
Academy.

Chairman Miller. Aldredge Academy.

Mr. Kutz, are there additional members? Were there three,
or was it five?

Mr. Kutz. There are three current. There were two that are
now closed that were NATSAP members. The Obsidian and Skyline
were NATSAP members based on our understanding.

Chairman Miller. Okay, but they are now closed, as I
understand it.

Mr. Kutz. Correct.

Chairman Miller. Let me just ask Mr. Lewis, Ms. Clark
Harvey or Mr. Bacon, in a sense, what would you say to parents
who are considering this alternative for their child, and I
think we all recognize that very often parents are considering
these alternatives because they do not know quite what else to
do. It is not that they have not tried a lot of things with
their children, but they have not worked out the way they had
hoped or had become more difficult or what-have-you. So it is a
very difficult time for parents, but you have been there
tragically. What would you recommend to parents?

Mr. Lewis?

Mr. Lewis. In hindsight, I would not let my son out of my
hand, out of my sight. Nobody loves your children like we do,
and to turn your child over to somebody else and hope that they
are going to love and protect your child, I think, was very
naive on our part.

I think what we need to do as a society and a community is
provide much stronger home-based programs for children that are
struggling so they stay with their families, and they stay with
the community that they know and loves them.

You know, hindsight is a wonderful thing. We thought
Aldredge was an answer to our prayers, and it turned out to be
a living nightmare for us, and I cannot imagine the nightmare
it was for my son.

Chairman Miller. Ms. Clark? Ms. Clark, what do you think?

Ms. Harvey. I would have to agree. There is absolutely no
way for any family to be certain of any of the claims that are
made by these programs. There is just no way to do the amount
of research and to determine whether it is appropriate or not,
so I would make a blanket statement of do not send your child
to a residential treatment program far away from your home
because, as things stand right now, you have no absolutely no
assurance that they will be taken care of.

Chairman Miller. Mr. Bacon?

Mr. Bacon. I would like all of the parents to understand that the risks involved in sending your child to one of these programs are far greater than what you can imagine. In our case, we were weighing the risks of what we thought was an unhealthy environment in the public high school that our son attended, whether it was drug use and peer pressure. The risks that we assumed, and the risk that I think every parent assumes when they send their child to a residential program, is much higher than probably any risk that they can face near home.

Chairman Miller. Thank you.

Mr. Kutz, you mentioned one of your discussions was a question of misleading advertising or marketing or assurances to parents.

Last night and early this morning, I was on the Internet and sort of scooting around some of these sites, and it is a very seductive introduction to parents who are distraught, who are stressed, who have been dealing with this maybe for multiple years.

They generally list a series of problems that children have--bipolar, schizophrenia, depression, drug and substance abuse, ADD--and the suggestion is that the staff can deal with all of these. Any one of those is a career for a professional, and all of my work in mental health and my wife's work in mental health and involvement with kids, and the idea that you can just insert a problem and this counselor can take care of any number of these problems in an effective way is----

I have not seen a practice that way except in these representations, the suggestion that they are trained effective counselors for each one of these disorders, and, of course, most parents in that situation would identify with one or more on that list, and I just wondered if you might address that.

Mr. Kutz. Yes. And I can speak to the 10 cases in depth, but the parents were pretty much told what they wanted to hear. As you said, it almost did not matter what the circumstances were for the child. The programs were purported to be experts for those kids.

And it went far beyond that. You had cases where you had no one that knew CPR in the entire program, you know, just something basic like that where you are having kids out in the wilderness or at a boot camp or whatever and no one knows CPR.

And they market to the desperate parents. You heard these parents today. I mean, they were in a desperate situation. They were looking for something, and they were probably vulnerable at the time. I do not want to speak for them, but I think they probably were. I am a father. I could see how that could happen.

And I just think what you mentioned earlier and what the parents mentioned here for parents looking today, it is buyer beware. Buyer beware. I mean, these are programs, especially where they are unregulated programs in certain states, you really do not know what you are getting.

Could I go back to the criminal also? The fact is there were not a lot of criminal prosecutions and documented evidence that the people that are dealing with these programs have a background. When parents are doing due diligence on these programs, an interesting point here is how do they know that some of the people who were involved in the abuses and the cases that we talked about here are not dealing in the current programs today. The answer is they will not know, and so it is a very difficult environment out there for parents.

Chairman Miller. Could you elaborate on the Thayer case, number 10, the 10th case in your item?

Mr. Kutz. Yes. And that is the most recent case from Missouri. Yes, that was a case I mentioned. That was one where

we believe that there was certainly abuse, and I read the autopsy report myself in depth twice, and I really could not believe it actually.

I mean, this kid had bruises, abrasions and kind of signs of abuse from head to toe, from his head down to the bottom of his legs, and there were reports that he had been dragged around, and the other kids at the program had been forced to drag him around when he was unable to exercise.

And I mentioned to you in the opening statement that when he was unable to exercise, then the penalty was not medical treatment, but to put a 20-pound sandbag around his neck and make him wear it around. So that is a case of absolutely clear abuse, in my judgment.

Chairman Miller. You know, Dr. Pinto made the point--and I think it probably strikes all of us here--had any parent engaged in any of this behavior against a child, they would be in jail. Almost any singular incident of numerous incidents and ongoing activities against these children--a parent, a schoolteacher, a coach--they would all be gone.

I will get into it later because I have a second round of questioning here, but, you know, my concern is that these people sort of reinvent themselves. They leave Nevada. They show up in Oregon. They leave this program. They rename themselves.

I followed some of these programs now longer than it took to cross the West by walking. I mean, you know, these people constantly are morphing themselves, and your point is you do not know who is ``counseling'' your kid, whether there is criminal behavior, whether they have their own problems.

But, you know, one of the things that stuns me is the marketing of the wilderness and the outdoors and nature and then to take people into the outdoors and the wilderness and nature and brutalize them in the name of the nature. I do not get it.

I have backpacked for 30 years. I was on a trip this weekend in the high rims above Lake Tahoe in the aftermath of a snowstorm, and in that trip, we must have stopped six or seven times and checked everybody, saying, ``Are we okay? Can you proceed? Do you think we should go back? We are this many hours into it. We have this many hours of daylight. Is everybody drinking water? Is everybody snacking, because we are burning a lot of energy because it is really cold?''

For 30 years, I have hiked in that fashion with kids. I have had kids come into our camp in the middle of the night on different wilderness programs, but all of them were schooled in how to deal with the program. They were all given challenges, massive hikes, really quite stunning what they accomplished, with a guide, with full education with the dangers of how to take care of yourself, how to respond, how to handle the worst, and then the challenge is laid out, and I kind of understand that. I can see why that is used as a tool.

But the idea that you take a person and you have her walk out in 100-degree weather and somehow this is good for you and nobody is paying attention to dehydration and nobody is paying--in the name of the wilderness that--this is therapeutic? No, this is abuse.

And back to your point on mismarketing, it is a wonderful thing for parents to think, ``Gee, maybe I can get my kid out of this neighborhood, and we can start over, and they can go out there and, you know, they will be fishing and they will be swimming and they will be doing all these things,'' you know. It is just outrageous that they would suggest that somehow you can have a positive outcome with these children by using the outdoor experience as an abusive action against children.

It is stunning to me, and it is contrary to any norm of

anybody who has been out in those situations, especially when you have young people with you in terms of learning about the outdoors.

I mean, as I went on these Web sites one after another--and then when you look at the cost--I do not know, Mr. Kutz. I have about 30 seconds. If you would just outline what you saw in terms of some of the costs----

Mr. Kutz. Yes, the cost is fairly interesting. I mean, this is all in 2007 dollars, but the range was $131 to about $450, and the average was $300 per day, which is about $2,000 a week, and so the cost of this is very significant, and that is for the 10 cases that we looked at, certainly. We have looked at other ones that are in that kind of price range. So $300 a day was the average cost.

Chairman Miller. Thank you.

Mr. McKeon?

Mr. McKeon. Thank you, Mr. Chairman.

I would just ask the chairman kind of what he plans on doing about this. It is the first I have heard of these abuses going on. I have a couple of friends that have sent their children away to schools and did not have any of these kind of problems, but one death is more than should be tolerated.

Question: Ms. Moss, in your report, you talk about a joint commission, 15,000 programs. Was that correct?

Ms. Moss. The joint commission accredits over 15,000 health care----

Mr. McKeon. Programs such as these?

Ms. Moss. Yes. They are not all like these. There are psychiatric hospitals----

Mr. McKeon. What is the point----

Ms. Moss [continuing]. Medical hospitals. So it is over 15,000 that they accredit.

Mr. McKeon. How many of these programs are in your association?

Ms. Moss. That are accredited by joint commission?

Mr. McKeon. Well, just how many are in your program?

Ms. Moss. We have 180 programs, sir, as members of our organization.

Mr. McKeon. And do you know how many children are enrolled in these programs, these 180?

Ms. Moss. The information that I received last year when we did our 2006 annual renewal is that there were approximately 16,000 children served in our in our member programs during 2006.

Mr. McKeon. Sixteen thousand. Do you have any idea how many deaths have come from those 180 programs or out of those 16,000 youth?

Ms. Moss. In 2006, sir, I do not recall immediately. Our organization has grown from a starting point of six programs to the 180 this year. I am sorry I do not have that information at my hand right now.

Mr. McKeon. Mr. Kutz, do you have any idea from your investigation how many deaths have resulted from these programs?

Mr. Kutz. No, we do not. We just know that there are thousands of cases of reported death and abuse. There is no real central repository.

Mr. McKeon. Excuse me again. Thousands of----

Mr. Kutz. Death and abuse. Mostly abuse, but there are other reports of death. There is just no way to quantify. There is no good centralized source in the federal or state governments to quantify this.

Mr. McKeon. It is amazing to me. As the chairman said, if a parent just were reported abusing a child, the children would be taken away from them, they would probably go to jail, and

they would have to prove their innocence, and yet we have just
from the witnesses here today three deaths, and it looks to me
like there is no criminal action taken, except in the case
where we had a $5,000 penalty and some kind of probation or
something. What are the police doing about this? I mean, deaths
are pretty serious, and nobody is taking any action?

Mr. Kutz. Well, I can just answer this for the 10 cases. We
did look at police reports. There were extensive investigations
done in most of the cases, and, again, only one person is
serving time today, from case study number six, for
manslaughter and I believe another charge, concurrent 6-and 5-
year sentences. Everyone else, as I mentioned, either was
prosecuted or pled, either got community service or time served
or some lesser charge.

So there were really no teeth behind the investigation. It
does not mean they were not good investigations. We did not
really evaluate the quality of the investigations, but there
was really no action on the criminal side here.

Mr. McKeon. This just boggles my mind. I cannot even
imagine how this----

Mr. Bacon?

Mr. Bacon. In the case of our son and North Star
Expeditions, it was a program licensed in the State of Utah. It
was owned by two gentlemen who were previously field counselors
in the Challenger program where a young woman died. In the
investigation on the former death, these two people turned
state's evidence against that owner in exchange for assisting
the State of Utah in writing the regulations for the State of
Utah and a license to operate their own program.

So, when our son died, there was an immediate investigation
that was brought about by the county attorney in Garfield
County. We were very fortunate that in the sheriff's office,
there was an experienced homicide investigator who arrived at
the scene first. From the evidence that she collected, it
became clear very quickly to the county attorney that this was
a very suspicious case, and he called in to the State of Utah,
to the attorney general's office, and asked them to assist in
the investigation.

As a result, both owners--I believe that there were seven
people. I am not sure about the exact numbers--counselors and
EMTs were charged with felony child abuse and neglect to report
child abuse, among other misdemeanor charges. All of them pled
guilty to lesser charges, were given probation and community
service, and told that they could not work in child programs
after this.

There was one counselor who decided that a felony did not
mean that much to him. So, despite the fact that the plea
agreements were supposed to prevent us from the agony of going
through the trial procedure, we had to do that anyway. He was
found guilty of felony child abuse.

The judge sentenced him to 1 year in jail and community
service, he was out in 2 months, and we were informed that at
that point it was no longer about Aaron Bacon, it was about
what was good for Craig Fisher. The judge told us it was no
longer about what was right for Aaron Bacon, it was what was
right for Craig Fisher, and he got off with 2 months and
community service.

Mr. McKeon. I would like to yield to Mr. Platts some of my
time at this time.

Mr. Platts. Thank you, Mr. Chairman and Ranking Member
McKeon.

First, I certainly add my words of sympathy on the loss of
loved ones of our family members here today and thank all our
witnesses, especially you, for your courage in sharing your
family stories that we may do our best to see that they are not

repeated and the tragedy that your families have suffered are
not repeated in other families.
    Mr. Kutz, in your investigation, it seems that your focus
was private programs, not public, but you do reference an
ongoing investigation that is going to be more comprehensive.
Is that correct?
    Mr. Kutz. Yes, a more comprehensive look at the----
    Mr. Platts. Would that include public and private to give
us an understanding of maybe what is better?
    Mr. Kutz. Yes, it will include both.
    Mr. Platts. What is the timeframe for us getting that
information?
    Mr. Kutz. I believe early next year.
    Mr. Platts. Okay. In the 10 cases specific that you did
investigate, how many, if any of those, were cases in states
where there was state licensing in place?
    Mr. Kutz. Several were, and several were not. It was mixed.
    Mr. Platts. And the ones where there was, was the response
then more appropriate?
    I mean, I agree with the chairman and the ranking member.
When you read these cases and Mr. Bacon just citing the example
of his son's, the repercussions, the consequences are
unbelievable. There were not any. I mean, lives were taken in a
horrific manner, and was it any better in any sense with those
with state licensing?
    Mr. Kutz. With respect to that, where there was state
licensing, there were several cases where the licenses were
revoked, and so there was some action on the license. Again, I
mentioned not much on the criminal side, but on the licensing
side, licenses were revoked or possibly permits on federal
lands. Some of these did that on federal land also, and the
permits were revoked there also.
    Mr. Platts. You reference in your written testimony that
the states while they do not often regulate the private that
they more often regulate publicly funded programs. Did you get
in detail in what way they regulate the public funding in this
report?
    Mr. Kutz. No, I do not have any direct knowledge of the
public.
    Mr. Platts. Okay. Of those that are privately regulated,
private entities that are regulated by states, was there a
state that you would point to us as the best model for us to
look at to say this state seems to be doing it better than
anyone else?
    Mr. Kutz. I think that that will be probably in our report
next year, but I know that talking to my staff, Utah has gone
through several revisions because a lot of the cases here
happened in Utah. There have been increases in the requirements
in Utah, I think several iterations of that. Whether that is
the model or not, I cannot speak to that, but there has been a
lot of activity from a legislative standpoint in the State of
Utah.
    Mr. Platts. I think that would be helpful.
    Chairman Miller. If the gentleman would just yield for 1
second, I just want to inform the members of the committee that
I think there is a little less than 5 minutes now on the roll
call vote. We will recess for the votes, and we will come back
immediately after. Hopefully, that is in 20 minutes or so.
    The gentleman is free to go ahead now.
    Mr. Platts. Thank you, Mr. Chairman. I will try to wrap up
quickly or give the ranking member back----
    Of that ongoing study, I think it would be very helpful if
part of that investigation is kind of the best models out there
that we can learn from to then try to look at how to replicate
elsewhere.

A final question, Ms. Moss. You mentioned 180 programs that are currently members, and in your testimony, you talked about they have to have a state license or an accreditation from the joint commission----

Ms. Moss. Yes. Mental health accreditation. Yes, sir.

Mr. Platts. So all 180 of your programs have that?

Ms. Moss. The board ruling went into effect the 1st of May, where all new members have to be licensed and-or accredited, and they also have to have oversight by a licensed clinician, in other words, somebody that has a state licensure.

The current members, for those that have been members of our organization, have until January of 2009 to obtain that licensure and-or that accreditation, and the organization is working with other states as well as with other accrediting agencies to make sure that those accreditations are available.

In 2009, if we have a current member, whether it is a founding member or any other member that has not received that licensure or accreditation, they will not be a member of our organization.

Mr. Platts. Okay. Thank you, Ms. Moss.

And to our family members, I especially want to thank you again. As a parent of an 8-year-old and an 11-year-old, I cannot imagine the anguish that you have gone through, and your willingness to be here today is going to help save the lives of other children in the future, and I sincerely thank you.

I yield back to the ranking member.

Chairman Miller. The gentleman has 2 minutes.

Mr. McKeon. Again, I would like to thank you for being here.

I would like to thank you, Mr. Kutz, Mr. O'Connell, from the GAO for this study.

I hope as we move forward on this issue that it does not become a partisan issue, that this is something that we can work together on to better the situation. I am sure that there are young people that have gone to some of these programs that have benefited, I would imagine out of that many people, but I think it is something we really need to look at.

What concern I have is, apparently, law enforcement just does not get involved in these things, so if you can have a bad actor--and it seems like whatever field you are in, you can find bad actors. We could find doctors that have had real problems in their lives. So I think it seems like people just gravitate to wherever they can do the bad things they want to do.

My concern is that if there is an incident, such as these, where deaths occur and abuse and there is some attention brought to them and maybe there is some slight action taken, as we have seen here, it might shut them down. They might move to another state and start all over again, and nobody has any way of knowing the problems. So that is something that I think that we really need to look at.

I am generally opposed--as Mr. Bacon maybe pointed out in his opening comments--I do not like to see federal legislation, but there are some times where it has to happen, and if you have a situation like this where people can go from one state to another to avoid prosecution, it might be that federal legislation is needed.

I appreciate, Ms. Moss, what your organization is trying to do where you say if some way you can clean up some of the bad apples. I have seen it in other organizations that we deal with, where it has been effective, but sometimes it is not enough, and I think that is something that we need to address.

And I appreciate the chairman holding this hearing.

Chairman Miller. Thank you very much. We will recess, and, hopefully, we will be back here in about 20 minutes. Thank you

very much, and thanks for sticking with us because we have a few more questions we would like to ask you. Thank you.

[Recess.]

Chairman Miller. Thank you very much for bearing with us here and our busy congressional schedule.

I would like now to recognize Congresswoman McCarthy from New York for questioning.

Mrs. McCarthy. Thank you, Mr. Chairman, and thank you for bringing this to everybody's attention.

To the family members, I know it has been a very troubling journey for all of you, but with you being here today, you are bringing this to national attention, and with all the pain and suffering that your families have gone through, you can make a difference and, hopefully, prevent another family going through what you have all suffered these last several years, and my heart goes out to you.

With that, Mr. Kutz and Ms. Moss, many parents put their children into these programs based on snazzy and, in some cases, according to your report, misleading marketing products. I imagine these marketing tools do not include any information on incidents of crime, violence, accidents or deaths.

In 1990, Congress passed the Clery Act which requires colleges to notify parents about campus crime annually. I am shocked that there is no similar requirement for children in these residential programs who are arguably even more vulnerable than our college students.

I am also shocked that owners and program leaders are not required to disclose if they have previously had to shut down a program and under what circumstances. It is totally unacceptable that parents are not informed, and families involved in these programs should have a parents' bill of rights.

Do you think these residential treatment facilities should have to disclose violent incidents, accidents and deaths in their marketing materials or to the parents of enrolled children on an annual basis?

Mr. Kutz?

Mr. Kutz. Well, I would say that they did not do that, and with respect to disclosure to the parents of what was actually going on, not only did they not tell them what was going on, I believe in many cases we saw that they lied to the parents, and they misrepresented what was actually happening.

Certainly, it would seem that that has merit, having some disclosure requirements here, and, again, you have to have teeth behind that somehow. I do not know how you get that, but some teeth behind disclosure of what is going on would have some merit.

Mrs. McCarthy. In your report, did you find that even those that were hired into these particular programs--did anybody do any background checks on them?

Mr. Kutz. I think there were some that did and some that did not. We did have one case where there was an ex-con that was handling kids. So somehow that person got through, but I do not even know what the requirements were. There were no licensing requirements. There were not any real standards there, so I do not even know what the criteria was they were using to bring people in. I believe in some of the states now that have licensing requirements a background check is one of the thing that is required in some states.

Mrs. McCarthy. Ms. Moss?

Ms. Moss. On the question of disclosure, one of the things that we always recommend when a parent calls is they need to check with the state licensing agency to see if there is anything in the background of that program. We also stress the fact that if there is no licensing agency, they need to contact

the attorney general's office to make sure that there is nothing in that background.

Mrs. McCarthy. But how do we get this information to these parents? I mean, obviously, usually, the parents are so distressed by the time they even come to this situation where they are trying to find the best treatment for their child, and there are so many programs out there. Half of them are not even registered with the state. It is kind of hard to guide these parents.

Ms. Moss. It is very difficult.

Mrs. McCarthy. They did due diligence. They asked the right questions, and yet they ended up with, unfortunately, their children dying.

Ms. Moss. I do not think any of our NATSAP programs would be opposed to disclosure on that.

Mrs. McCarthy. What do you think about having some data where we can, you know, have data like where parents could go on to the Web site when they would be looking?

I am sorry. Did you want to ask----

Mr. Lewis. Yes. About 3 or 4 months after the criminal case was resolved in relation to our son, I had called the people at Aldredge Academy, and I talked to the woman that we had originally talked to when we placed Ryan, and I presented myself as a parent that was looking into the program.

I said, ``I understand you have some legal issues that I have read about a little bit online, and I am concerned about it,'' and her response was, ``Well, that has all been taken of, and the family is very happy with the result,'' and that could not have been further from the truth.

So that is the information that they were telling people, if they were to call them and ask about my son's death. They clearly misrepresented our position on the whole matter.

Mrs. McCarthy. Thank you.

Mr. Bacon, you mentioned earlier in your opening statement that you were talking about we here have a responsibility certainly for taking care of and looking to make sure our children are safe. One of the things that I was thinking of as you said it, you know, right now we have a mortgage crisis going on. One of the problems was that those that unfortunately were doing predatory lending might have been kicked out of the state, that did not stop them from going into another state and doing the same thing.

I see that we seem to have the same case where one particular program was closed, reopened up into another program in another state. So, again, this is where data and the collection of data from state to state so the states would also have that information--do you have any comments on that?

Mr. Kutz. Yes. It is not just the programs moving from state to state. It is really the people. Because you can change the name of--we have seen that in a lot of the investigations we do in many different things. It is easy to start up a new entity and to shuffle the deck and reemerge somewhere. So that appears to be a real issue here.

Mrs. McCarthy. I am looking forward to your second report in February. Appreciate it.

I thank again everybody for their testimony.

Mr. Chairman?

Chairman Miller. Mr. Kildee?

Mr. Kildee. Thank you, Mr. Chairman.

Ms. Moss, you mentioned that when you get a complaint that you look into that complaint case by case. How many have you proceeded on case-by-case complaints?

Ms. Moss. Could you clarify proceeded on?

Mr. Kildee. Yes. You stated that when you get a complaint about an organization, an entity that belongs to your

organization, that you examine that complaint and proceed on a case-by-case basis. That was your words.

Ms. Moss. Right.

Mr. Kildee. How many have you proceeded on?

Ms. Moss. As far as closing down, canceling their membership, sir, the two that we would have canceled their membership were closed prior to cancellation of the membership.

Mr. Kildee. So have you proceeded on any of these complaints case by case?

Ms. Moss. We did evaluate the Catherine Freer and the Aldredge Academy cases. There was no criminal negligence found and no wrongdoing found, sir. Therefore, they remained members.

Mr. Kildee. So there is one or two then that you have proceeded on a case-by-case basis about?

Ms. Moss. On the ones that had been reported to us, yes, sir. And in this case in the deaths, yes.

Mr. Kildee. There has only been one or two reported to you?

Ms. Moss. Right. On the deaths. The others that have occurred, sir, we have received the reports on those and also have found no negligence, no wrongdoing, no criminal action found.

Mr. Kildee. So, again, you have only received one or two complaints, and you have stated that you proceed on a case-by-case basis. It did not take you very long then if there is only one or two of those.

Ms. Moss. Sir, I misunderstood the question. I thought you were referring to the ones here in this hearing. There have been others.

Mr. Kildee. No. I am referring----

Ms. Moss. Yes, sir. There have been others. I do not have the numbers that we have----

Mr. Kildee. Do you have any idea about how many you have proceeded on a case----

Ms. Moss. During my tenure, sir, there has probably been about five or six.

Mr. Kildee. Could you supply the records of those case-by-case interviews to this committee?

Ms. Moss. I can certainly try to do that, sir, yes.

Mr. Kildee. Well, I think more than try.

Ms. Moss. Okay. Yes, sir, I can do that.

Mr. Kildee. All right. Because if we do not, Mr. Chairman, I would suggest that we subpoena the records then. But if you----

Ms. Moss. I will provide them to you, sir.

Mr. Kildee. Thank you very much.

Chairman Miller. I thank the gentleman.

Mr. Kutz, let me take you back to the Thayer Learning Center, if I might. Is it correct that the cause of death to date is a spider bite?

Mr. Kutz. Yes, Mr. Chairman.

Chairman Miller. And this is the incident which you talked about earlier where in reading the autopsy report and going over the autopsy, this was a child that was badly bruised?

Mr. Kutz. Thirty bruises and contusions from head to toe, yes.

Chairman Miller. So what is your thinking in reconciling the spider bite as the cause of death and what appears to be very substantial physical abuse?

Mr. Kutz. Well, I think there were two things going on. There was the abuse going on, and then there were the signs of other things related to the spider bite. So there was a medical issue and then at the same time they were misinterpreting the medical that he was faking it or for some other reason. So they were abusing him because he appeared to be lazy or appeared to not be actually exercising. So I think a lot of the abuse came

Case 1:18-cv-10836-PGG   Document 143-4   Filed 02/03/20   Page 21 of 36

because of the spider bite because he was exhibiting symptoms
that, again, they misinterpreted as faking it.
    Chairman Miller. And what is the status of that
investigation?
    Mr. Kutz. There is no ongoing investigation there that we
are aware of.
    Chairman Miller. What is the status of the--is it a closed
case or----
    Mr. Kutz. There were no charges filed in that case. There
was a civil settlement for $1 million in that case.
    Chairman Miller. And Thayer remains open. Is that correct?
    Mr. Kutz. Yes.
    Chairman Miller. Well, I do not know. We will have to look
at that. I think there is something glaring in this case, and,
you know, I have previously asked the Justice Department to
look at this business. They have refused, but maybe on a
specific case, they can find new interest. When you have a
child that appears, as you represent the autopsy, to be this
badly and systematically abused, there has to be some other
interest here.
    Mr. O'Connell. Mr. Chairman, if I could add something to
the Thayer case?
    Chairman Miller. Yes.
    Mr. O'Connell. We talked to the prosecutors who said there
was not evidence to prosecute. However, the state's family
services division did find that there were patterns of neglect
and abuse at Thayer.
    Chairman Miller. Yes, I think, as you said, if you walked
in in the middle of this testimony, you would think we were
talking about human rights abuses in Third World countries. I
have to believe that there is, in fact, a federal interest in
this in the treatment of these children, and I think that at a
minimum in a particular case we might very well be on solid
ground asking for oversight by the Justice Department of the
death of that individual.
    You also mentioned, Mr. Kutz, Aldredge Academy is operating
on federal lands. There with the Bureau of Land Management or
what? Forest Service? Bureau of----
    Mr. Kutz. That one is Forest Service, Mr. Chairman.
    Chairman Miller. That is Forest Service?
    Mr. Kutz. Yes.
    Chairman Miller. And they have been on that land how long?
    Mr. Kutz. About 10 years, I understand.
    Chairman Miller. My understanding is they are in arrears on
their rent?
    Mr. Kutz. Correct. They have not filed usage reports for, I
believe, 8 years, and they will owe the federal government tens
of thousands of dollars. So their permit is invalid basically.
    Chairman Miller. Would that send you a signal as a trade
association, Ms. Moss, that something might be amiss if people
had not paid their rent for years?
    Ms. Moss. Yes, sir.
    Chairman Miller. So what have you done in that situation?
    Ms. Moss. Haven't paid their rent?
    Chairman Miller. Yes.
    Ms. Moss. For the federal land?
    Chairman Miller. Yes.
    Ms. Moss. We are not familiar with what programs operate on
federal land or not, sir. So if they did not pay their
membership dues, their membership is canceled.
    Chairman Miller. So it is all about the membership dues?
    Ms. Moss. No, sir, it is not. It is not.
    Chairman Miller. Well, I am trying to figure out what else
it is about because you cannot find any evidence of abuse, you
do not know the financial situations. I am just trying to

1/24/2020

Case 1:18-cv-10836-PGG   Document 143-4   Filed 02/03/20   Page 22 of 36
CASES OF CHILD NEGLECT AND ABUSE AT PRIVATE RESIDENTIAL TREATMENT FACILITIES

figure out what your association is about.

Ms. Moss. If there is findings of wrongdoing, sir, or criminal action taken or ethical violations----

Chairman Miller. By outside organizations?

Ms. Moss. Yes, sir. We do not do the----

Chairman Miller. So you do not do your own investigations?

Ms. Moss. We do not do our own investigations, sir.

Chairman Miller. You do not do your own looking at the quality of these organizations?

Ms. Moss. No, sir, we do not.

Chairman Miller. They essentially self-certify?

Ms. Moss. They are not certified by our organization. We are not an accrediting agency. We are not a licensing agency.

Chairman Miller. What the hell do you do?

Ms. Moss. We are a trade organization, sir, that is focused on improving the field of therapeutic schools and programs.

Chairman Miller. But, as I read your testimony, and correct me where I am wrong, you say that ``we proceed on a case-by-case basis either requiring a program to implement change''-- where have you done that?

Ms. Moss. There have been ethical violations that have been filed with us, ethical complaints that have been filed with us. In one case, there was a marketing issue that there was a misstatement on their Web site. We researched it, talked to them, and they removed that false advertising on their Web site. So they did make the corrective action.

Chairman Miller. Okay. Anything else on that Web site, on that marketing thing set off any bells and whistles for you?

Ms. Moss. I do not evaluate their marketing, sir.

Chairman Miller. And you have canceled memberships?

Ms. Moss. Counseled them, sir?

Chairman Miller. Canceled?

Ms. Moss. Yes, we have, sir.

Chairman Miller. For what purposes?

Ms. Moss. For an ethical violation. Primarily, most of the cancellations have come after they have lost their license.

Chairman Miller. Okay. So this would be a violation of your principles and best practices that you testified to in your statement? Is that what it is?

Ms. Moss. Yes. I am sorry, sir. I am not understanding the question.

Chairman Miller. Well, I am trying to figure out what the ethical violation is. Kids are dying and being abused in a rather wholesale fashion, and you say that there has been a cancellation or somebody had something wrong on their Web site and that violated the ethical standards. I just wonder where abuse of children falls in those ethical standards.

Ms. Moss. Sir, we look to the third-party investigators to advise us as to what actions were taken, what their findings were on these investigations.

Chairman Miller. So, essentially, you are an organization where these people self-certify that they will adhere to the principles of your best practices, which are based on 12 ethical principles which were formulated using the standards of the joint commission. So it is not like they are adhering to the joint commission. They are self-certifying that they will adhere to 12 ethical principles that were formulated with those standards in mind.

Ms. Moss. Yes, sir, but we also require the licensure and accreditation. I have to have the license on file. We look to the states, sir, not to this association.

Chairman Miller. What kind of license do you have to have on file?

Ms. Moss. We have to have a mental health agency license on file or an accrediting agency which is a mental health

accrediting agency.

Chairman Miller. But you----

Ms. Moss. Those are our new membership requirements.

Chairman Miller. Are there schools in your program that are
members of your trade association that do not have those
requirements because they are not required by the state?

Ms. Moss. At this time, that is true, sir. That will not be
true in 2009, as of January 1 of 2009. That is why we have been
working so hard with----

Chairman Miller. So, if they are not in a state that does
not require this, they will no longer be eligible for
membership.

Ms. Moss. They will no longer be eligible for membership.

Chairman Miller. Do they have to have also a license from
the Department of Education?

Ms. Moss. Could you state that again?

Chairman Miller. Some of these programs represent that they
are also doing schooling at the same time. Do they have a
license from the Department of Education?

Ms. Moss. Most of them do, sir, that do offer high school
credits or high school diplomas, but that will on longer be
accepted as an accreditation or a licensure within our
organization.

Chairman Miller. Would they have to then have both? Would
they have to have mental health and education?

Ms. Moss. If they offer high school credits and a high
school diploma, they will have to be accredited by an academic
accrediting body. The licensing will depend upon the state,
sir. I am not familiar with all of the educational licensing,
so I believe that would happen on a state-by-state basis. Some
states require that the private schools are licensed. Others do
not.

Chairman Miller. Mr. Kutz, what did you find in the
universe of licensing here? Who was licensed, what were they
licensed to do, and was it relevant to what they were doing?

Mr. Kutz. Some of our 10 case studies were licensed, and
other ones--there was no licensing requirement. As I mentioned
in one of the other earlier questions, in some cases, where
there were entities who had deaths and there were violations of
licensing requirements, their license was revoked in the state,
but it was only after a death had occurred that that happened,
which raises questions about what kind of due diligence is
being done absent a death or significant abuse at these places.
I think our broader study is probably going to look at that.

Chairman Miller. But let me ask you this. Are all of the
licenses that they have related to their activities, or do they
also have activities that are not licensed?

Mr. Kutz. There are some activities they were doing that
they were not licensed for, yes. We did see that. I cannot
remember specifics, but----

Chairman Miller. And, again, I do not mean to hold NATSAP
responsible for all of this activity or the industry
responsible for all the activity, but when I look at these
sites, it is very interesting. Sometimes they will tell you,
you know, they are licensed with the State Department of
Education, but they list a whole series of mental health
treatment activities, and there is no mention of accreditation,
licensing or anything, and that would not be true in NATSAP as
of 2009.

But what would a parent rely on? I mean, the words
``accreditation'' and ``training'' are thrown around in these
marketing paragraphs. You know, you would think you were
dealing with Johns Hopkins, okay, but you are not. But they
constantly, you know, intersperse those words in the marketing,
and so you do not know if ``accreditation,'' ``licensing''

pertains to the mental health services, to the educational
services, to the medical services because it--I mean, they are
pretty clever pieces of writing.

   Mr. Kutz. It is very difficult. I could not have said it
better than you just said it. I mean, it is very difficult for
a parent to wade through this and figure out what exactly is
going on, and something that might appear to be there that
looks like you said, Johns Hopkins, or something like that,
there might be nothing there. I mean, in some cases, the
medical officer was also running the kitchen, and when you
looked behind the medical officer, they had no medical
training. They were not a licensed anything. So they were self-
proclaimed, in many cases, experts in things with no
credentials behind them.

   Chairman Miller. Well, I mean, that is why I worry. Again,
you know, I look, Ms. Moss, at your testimony that you are
holding these people to ethical principles and so forth, and
yet when you look at how a number of these children died--
dehydration, heat exhaustion, dehydration, head trauma which
was probably maybe caused to dehydration, loss of
consciousness, dehydration, heat stroke, hyperthermia, another
form of dehydration--you do not get very far in training before
you tell people how dangerous and fatal dehydration can be,
especially if you have a program that is designed to be in the
desert.

   I mean, I do not get the ethical standards here or the
professional standards of the training where people would not
recognize and prevent--in fact, prevent--the dangers and the
fatalities related to dehydration. I mean, this is like Care
101.

   Ms. Moss. Sir, this is the first we have heard of the
circumstances of these deaths. We will take these back to the
board, and we will review them in depth.

   Chairman Miller. Mr. McKeon said there is a lot of room
here for something in terms of oversight.

   I also serve on the Resources Committee, so is the Forest
Service looking at their arrears payment?

   Mr. Kutz. That is something that we would refer to them,
certainly. We do referrals of various things, and we will make
sure there is an official----

   Chairman Miller. We will do a referral along with you.

   Mr. Kutz [continuing]. Notice to them of what we
identified, yes.

   Chairman Miller. One of my concerns is, again, my
experience with some of these organizations is, in some cases,
you know, there is a substantial investment being made. In
other cases, there is not much investment at all, and you are
wandering around on federal land. We have had Conestoga wagons
wandering around in the Southwest for a number of years, and
there is really no investment, and when they had trouble in
Arizona, they simply moved north into Nevada and continued
their activities. So, if somebody is not paying their rent,
bells and whistles might go off on whether they are paying
properly trained people and skilled people to watch after these
young people.

   Mr. Kutz. Well, in the case here of the Forest Service,
they were not aware that for 8 years they had not been
receiving reports from Aldredge and that the fees had not been
paid until we actually talked to them, and then they were like,
``Oops. Looks like we have a problem.'' So that raises
questions--we did not look at that--on both sides.

   Chairman Miller. If you knew how they treated holders on
some federal, you would wonder what they are thinking.

   Let me stop there and see if Mr. McKeon or Mr. Kildee----

   Mr. Kildee?

Mr. Kildee. Just another question to Ms. Moss. And I do look forward to some documentation that you will supply us as to how you responded on a case-by-case basis to the complaints or information you had received. But what do your members gain by joining NATSAP?

Ms. Moss. They gain continuing education with our conferences. They gain the journal. They gain access to others in this profession. They gain insight into the newest clinical studies. There are many clinicians in our organizations that present at our conferences. It is basically an education type of benefit.

With the new research initiative, they will gain from that. They will be able to----

Mr. Kildee. Not what they will, what have they. How many conferences do you have a year?

Ms. Moss. We have one national conference a year, and we have six regional conferences a year.

Mr. Kildee. It would seem that much of what they may gain-- and this is what I worry about--is that they may gain a certain credibility that to belong to, you know, this Good Housekeeping group. I do not think your group exactly is comparable to the Good Housekeeping seal of approval, but I think that can be used as an advertising thing, ``We belong to NATSAP, and, obviously, we are good.''

I think you have something to prove to this committee and to the American public that you are supplying more than just credibility to these groups that belong to you, and I worry about that. I think very often people see a national organization and feel it is something like the Good Housekeeping seal of approval. I think you have a long ways to go before you ever approach that.

I think what I worry about is that you supply them just credibility.

Ms. Moss. Sir, that is why we are here asking for your help in state licensure and regulation. We do not want to be the Good Housekeeping seal of approval. We want to supply services to our members so that they can improve the care that they give to children and families.

Mr. Kutz. Congressman, could I add one thing?

Mr. Kildee. Yes.

Mr. Kutz. In the marketing materials--and, again, this is not NATSAP's responsibility--these entities do market themselves as being members of NATSAP, and it does provide some credentials for them, even though they are a trade association so they are not really required to do due diligence necessarily. So that is something we saw in the marketing materials for many of our case studies that were NATSAP members or other members of other associations or whatever the case may be.

Mr. Kildee. But an organization could use that in their advertising, ``We are a member of NATSAP,'' right?

Mr. Kutz. They did. That is not could. They did.

Mr. Kildee. So it is used and it does give them a certain credibility perhaps to----

Mr. Kutz. Someone who might not be aware of what it exactly means, yes.

Mr. Kildee. But it sounds good, right, that they belong to this national organization?

Dr. Pinto. If I could comment because I do receive calls from families on a weekly basis at this point, and this point is absolutely what I am hearing from families, that they are having such difficulty because there is not a place that they can go on the Web or some kind of a clearinghouse where they can get information about programs, both good programs and programs of concern, and so they are desperately trying to make

sense based on the information that is out there.

And absolutely when you have a seal on a Web site that is
the joint commission seal and right next to it you have a
NATSAP logo seal, I have heard multiple parents saying, ``Yes,
but it is a NATSAP-affiliated program. It is a NATSAP-
accredited program.'' So, even though NATSAP says, ``We are not
about accreditation,'' that is how parents are making sense of
it.

I am seriously concerned about the mixed messages that are
going to families, because although NATSAP is saying that they
are trying to help families, I do not understand why, when
NATSAP attended a presentation that Paul Lewis, myself and
several other individuals made last year at the American
Psychological Association Conference, where we indicated that
there were hundreds of reports of mistreatment and abuse in
these kinds of facilities, after that presentation, NATSAP
representatives came up and expressed such concern and said
something very similar to what Ms. Moss just said when she just
said, ``Well, we will take these back to our board and review
them in depth,'' that was the same kind of language that we got
last year.

And what was the response? The response was the open letter
to critics that now is on the NATSAP Web site that describes
the concerns that we have reported in these presentations at
the APA and elsewhere as ``the noisy complaints of a few
individuals.'' So that is not sending a message to families
that NATSAP takes these reports of abuse seriously, and I have
not seen evidence that they have done anything in response to
what we have made very clear in the presentations that we have
done over the last 2 years that this is something that is a
great concern to them.

Mr. Kildee. I really think we are all concerned up here. We
are all parents up here, and I cannot imagine the pain that you
parents have suffered. But really, you know, if you belong to
an organization that deals with the most vulnerable in our
society, the youth, you should be part of the solution and not
part of the problem.

Ms. Moss. Sir, that is why we are here.

Mr. Kildee. After----

Ms. Moss. We want to be a part of the solution.

Mr. Kildee. Go ahead.

Ms. Moss. We want to be a part of the solution. That is why
we are here.

Mr. Kildee. I hope then if you supply us the information I
requested.

I yield back the balance of my time, Mr. Chairman.

Chairman Miller. Thank you.

Either Mr. Kutz or Ms. Clark Harvey, have there been
additional deaths at the program since your daughter died?

Ms. Harvey. Yes, there were two deaths in Catherine Freer
programs after Erica died, one occurred in Nevada close, I
believe, in the same wilderness area that Erica died in, and
that occurred in October of 2002, and then there was a death in
Oregon in, I believe, March of 2003.

Mr. Kutz. That is correct.

Chairman Miller. That is correct with the information you
have?

Mr. Kutz. Yes.

Chairman Miller. Again, I mean, this is not to make this
NATSAP's problem, but you have five out of 10 deaths here that
are facilities that belong to your organization. Two of the
five have been closed. One has had additional deaths since
Erica Harvey. I mean, this is like Casa Blanca. You are shocked
that gambling is going on here.

Something is very wrong inside a trade organization--you

know, one of the things trade organizations have to decide is
you have to get rid of the frauds, and if you want to survive,
and somehow something is wrong here in the review or the
applications or the self-certification or something that people
can bring this kind of history and just continue on.
    Now maybe that is fine. You are obviously making a
determination or you are leading this committee to believe you
are making changes, but I just say that there is, you know, a
period of years here when somebody was asleep at the switch
here.
    You know, I appreciate the three testimonies that were
attached, Ms. Moss, to your testimony, three statements by
people who had been through different programs, and their
success, and that is what every parent would wish for. I find
that terribly interesting, but not terribly relevant because
that would be the expectation of people who signed up for these
programs.
    That would be their hope, not that every kid is going to
come back successful as they have cited--they have gone on with
their lives, they have become productive, and they have done
those things--but that your child would get treatment. At a
minimum, you would expect them to be safely kept while they
were in care, and that minimum was breached here time and time
and time--in fact, thousands of times that that has been
breached by people taking care of these children.
    So I guess that, you know, we are here when things go
terribly wrong, and I think Dr. Pinto has pointed out being
subjected to this, people do not lightly disgorge others that
they were abused or that they could not cut it or they could
not do these things, and so I think to have people come back
now in the numbers that they have and talk about it, this
cannot be dismissed as noise.
    Ms. Moss. No, sir, it cannot be dismissed as noise, and I
agree with that. NATSAP would benefit from a clearinghouse of
information as much as a parent and family would. We do not
want to be the Good Housekeeping seal of approval. We do want
to raise the bar in the industry. We are a young organization
learning as we are going. We have made mistakes in the past. We
recognize that.
    Chairman Miller. There is some duty of care here, which I
think you are missing.
    Ms. Moss. Absolutely, sir. I agree with that.
    Chairman Miller. I think you are missing it, with all due
respect. You can decide for the moment, but I think you are
missing it. There is some duty of care here, ``as a trade
organization,'' about what happens in your name.
    Ms. Moss. I will take that back to the board, sir, very
definitely.
    Chairman Miller. It is going to be a very busy board. You
are taking things back that----
    Ms. Moss. Yes, sir. Very busy.
    Chairman Miller. Thank you for doing that.
    Dr. Pinto, you raised the question. I am trying to figure
out what it means, when these are individuals who have gone
through the program, for them to come forward, and what weight
we give that.
    Dr. Pinto. Again, I think it is easy for people to presume
that there must be something wrong with these young adults, you
know, ``Well, they were troubled teens to begin with, so they
are probably just still messed up, and that is why they are
describing this and they have it. They are trying to get the
programs.''
    However, if you read the accounts--and I was really
surprised when we created this online survey with over a
hundred questions and many free response opportunities--it is

over a thousand pages. Just trying to print out all of the
responses that came back--this is definitely a group of folks
who have not had an opportunity to speak to their experience,
and when you read the accounts, when you hear what people have
to say, there really is a level of detail and coherence to
their accounts--any given account--but then also across
accounts that makes it clear that there is a phenomenon
occurring, a phenomenon of mistreatment and abuse.

    And it is not the case that everybody is experiencing this,
but it is the case that there are far more than just a few
cases, and, again, if we heard this from a teenager who was in
their own home or in a public school or in a licensed mental
health care facility, immediately, there would be a response
and it would be an investigation to ensure that that just did
not go overlooked, and that is not happening at this point.

    Chairman Miller. In fact, there is an affirmative duty to
report.

    Dr. Pinto. Absolutely. In fact, I am a licensed
psychologist, and as such, I am a mandated reporter of
suspected child abuse, and when I first started getting these
reports, I thought, ``My gosh, as a mandated reporter, I need
to follow up with this.''

    So I called several states' suspected child-abuse-hotlines,
and I described the situation to them, and they said, ``Well,
can you give us the name of the particular staff member who was
the one to conduct this suspected abuse?'' And I said, ``Well,
no, but I can give you the name of the program.'' And they
said, ``If you cannot give us the name of the individual, then
it needs to go to the agency at the state level that monitors
those kinds of programs. We cannot take a report unless you
give us the name of the individual.''

    But then when I would call those agencies, Department of
Education, Department of Health and Human Services, in the
given state, they would say, ``Well, we do not have any
authority over those kinds of programs.'' And so it is a
complete black hole at this point.

    Chairman Miller. Well, thank you very much. And I think
that is a problem also that exists between public programs. I
mean, that is one of the reason I fought very hard over the
years to return children to their own states because once you
have crossed the state line, one, whether you have any
authority and, two, getting other people to respond, it just
becomes a huge barrier, and our states now have changed the law
so the kids are placed differently now than they were 20 years
ago, 15 years ago with kids' placement.

    Carolyn, do you have additional questions?

    Mrs. McCarthy. Actually, she just answered it because we
are giving federal money to the states, and yet they do not
seem to have any control over what that money is doing as far
as these residential programs. So that might be an area we will
look into.

    Chairman Miller. Let me follow up on that, Mr. Kutz, if I
might. You were not looking at the question of whether there is
federal money for some of these programs. Do you have any sense
of--you know, we have IV-B maintenance money for children, out-
of-home placements and foster care and whatever. We know in the
past some out-of-state placements were made with IV-B money. We
have juvenile justice money that goes to placement. I do not
know whether some of these contract with school districts to
receive funding within their state or not. Is there any reason
to suspect that there is some federal involvement in the
placement of--I mean, federal dollars?

    Mr. Kutz. Not in the cases we looked at.

    Chairman Miller. Not in the cases----

    Mr. Kutz. They were funded primarily by parents, and in one

case, health insurance paid for maybe $10,000 of the fees.

Chairman Miller. So, as far as you can tell, they are operating essentially on a tuition----

Mr. Kutz. Yes.

Chairman Miller [continuing]. Payment by parents.

Dr. Pinto. If I could add to that just briefly, I do--if that is okay?

Chairman Miller. Yes.

Dr. Pinto. It does seem like primarily the parents I have spoken to are paying out of pocket as well. However, there are times where a family makes a case, for instance through their IEP, that the publicly available programs or the nonpublic schools that are part of that district's list of available services are not a good fit for their child and they advocate to have their child sent to one of these kinds of private programs, and there are districts, I do recall from my clinical work in California, where that does occur, and therapeutic boarding schools are paid for through the IEP process.

Chairman Miller. Thank you.

Mrs. McCarthy. Mr. Chairman?

Chairman Miller. Yes?

Mrs. McCarthy. May I follow up with a question?

Chairman Miller. Yes.

Mrs. McCarthy. As we have heard all the testimonies, especially the data areas where I would like to see if we can concentrate that in the future if we do legislation, right now, apparently, HHS does have money that is given to the National Child Abuse and Neglect Data System. With what we see, where do you think is--some states will call the child abuse centers. Some will call the state agencies. As we go forward, what would be the best area to collect the data and not have several agencies go through it, but one agency so it is a better clearinghouse and not a confusion to parents when they need to know that data? Do you have any idea, or does that come in the next study?

Mr. Kutz. No, but the data that was collected nationally was a self-reporting, so it is more than likely very incomplete. There were 30-some states, I think, that reported, not that every state has these programs. I do not know whether they do or do not, but, certainly, some central reliable repository would be useful, whether it is at the federal level or not. I mean, maybe from a reporting standpoint, that would make the most sense. States could report to the federal government. But, again, that current database that was used--that is why we cannot say how many thousand or whatever--was self-reporting.

Mrs. McCarthy. Okay.

And, Ms. Moss, just to finish off with one thing. One thing I have learned since being here in Congress--I also sit on Financial Services--is when a trade organization puts their name out and gives the seal of approval of a corporation or an entity that they are supporting, the only thing they have is their reputation, and if you are supporting that reputation, those clients or family members usually will look at that and think that you have already done the investigation. So, whether it is your fault or not, I think you need to look at your organization and maybe possibly decide that you might be doing some of your own investigation if you want to keep your reputation.

With that, I yield back.

Chairman Miller. Thank you.

Any further questions?

Well, let me thank all of you for your time and your testimony and your expertise in this area. I think it has been very helpful to us.

Mr. McKeon and I will put our heads together and think where we go from here. We have a follow-on study from GAO, and, as you can see, there is considerable interest by the members of the committee that we somehow get a handle on what is taking place here and get about trying to keep it from happening. We will have to figure out what the right vehicle is, but we will figure that out, I want to tell you that, and with your help. I hope that you will continue to stay involved with us.

To the family members, thank you for your testimony. I know this was not easy for you, and thank you, though, for sharing it with us.

And, Ms. Moss, Dr. Pinto, thank you for your expertise.

And, Mr. Kutz, and Mr. O'Connell, I know this was not an easy study for you to do, but we appreciate it and appreciate your frankness in dealing with the committee.

Members will have the ability to submit statements for the next 14 days.

And with that, the committee will stand adjourned.

Thank you again.

[The statement of Mr. Altmire follows:]

Prepared Statement of Hon. Jason Altmire, a Representative in Congress
From the State of Pennsylvania

Thank you, Mr. Chairman, for holding this hearing on cases of child neglect and abuse at residential treatment facilities.

Hundreds of residential treatment facilities operate throughout the United States. These facilities typically serve children with severe emotional and behavioral issues, however, vary greatly both in the needs addressed and in the interventions used. Currently, there is no federal law that specifically addresses residential treatment facilities. Most of the regulation for these facilities is at the state level, each with their own way of licensing and monitoring residential treatment facilities, and some with no regulation at all.

Today, we will hear from three parents whose children were subject to abuse and neglect at residential treatment facilities. The outcome in each of these cases was the worst imaginable, the death of the child. I want to thank all of you for testifying today and extend my condolences for your loss.

Thank you again, Mr. Chairman, for holding this important hearing. I yield back the balance of my time.

————

[Statement for the record from the Alliance for the Safe, Therapeutic, and Appropriate Use of Residential Treatment (ASTART) follow:]

October 24, 2007.

Hon. George Miller, Chairman,
Committee on Education and Labor, Rayburn House Office Building,
     Washington, DC.

Dear Chairman Miller: I am writing to thank you, your staff, and the entire Committee on Education and Labor for conducting the investigative hearing on ``Child Neglect and Abuse in Private Residential Facilities.'' This is a very important and serious issue that deserves attention at a federal level, and I am delighted that you and your Committee are giving it the attention it deserves.

I am a psychologist at the University of South Florida who specializes in children's mental health. About three years ago, after hearing both from media people and parents about this problem, I began doing some research to try to understand its scope. I was struck then by how little is known about the problem, and how silent my mental health colleagues have been about it, despite fairly widespread coverage in the general media.

In response both to the seriousness of the problem of abuse,

neglect, and exploitation within private residential facilities, and
the absence of voices within the mental health field that were speaking
up about it, I invited several colleagues to join me in deciding how we
can best help address it. We formed a small group called the ``Alliance
for the Safe, Therapeutic, and Appropriate Use of Residential
Treatment'' (A START--http://astart.fmhi.usf.edu)

Our group held a press briefing, with the support of your office,
in Washington about two years ago, has been involved in several
research and public education efforts, and has prepared some of the
first professional articles about this troubling problem. One of our
members, Dr. Allison Pinto, provided testimony as part of your
hearings.

We have found that the abusive practices are most likely to occur
in for-profit, unlicensed, and unregulated facilities. Although it
certainly does occur as well in licensed and non-profit programs, the
most serious problems of abuse and misleading marketing occur in the
for-profit and unlicensed sector.

We recognize that there is a role for high quality, responsible
residential care within a children's mental health system, but we
believe strongly that there must be proper licensing, regulation, and
accreditation in order to increase the likelihood that youth will be
kept safe and will be provided with effective services. We believe that
proper licensing, regulation, and accreditation will only serve to
improve the quality of programs, and will be of benefit to all. We do
worry, however, that if licensing is not accompanied by adequate
monitoring and regulation, it can give the appearance of credibility to
programs that do not deserve it, and so we would strongly support any
proposal to provide resources to help ensure that there is strong
monitoring and regulation to accompany licensing laws.

We believe that it is unconscionable that within our country there
is no systematic data collection to tell us how many children are
served in residential programs each year, or even how many die or are
seriously injured in such programs. We believe that such data
collection is essential to allow us to understand the scope of the
situation, track it over time, and develop sound policy to provide
appropriate care for youth while at the same time protecting them from
abuse and their families from exploitation.

We recognize that there are many families who are desperate for
help, and that this desperation is partly due to the absence of
adequate services in their own communities, the stigma that is attached
to mental health issues, and the lack of information for parents and
professionals about just what is available. We would strongly encourage
any effort to strengthen community systems of care for children with
special mental health challenge and their families, and to provide
families and professionals with access to complete and accurate
information about alternatives that are available to them.

We also have spoken to parents and youth who describe situations
that are clearly not serious enough to merit residential placement.
However, it has been reported to us that when parents make inquiry
about services, the programs often create a sense of heightened
desperation in order to generate an immediate referral. At this point
it is not possible to know how many youth within these programs are
genuinely experiencing a serious challenge, and how many have ended up
there because programs have created a sense of unwarranted crisis in
their parents.

Our A START group is more than happy to assist you and the
Committee in any way that we can. We include mental health
professionals from a variety of disciplines, former staff of programs,
young adults who were formerly in one or more of these programs,
parents, and advocates. We have prepared a summary of the hearings and
the accompanying GAO report and are circulating this widely through our
own networks in order to better educate professionals and the general
public about this problem. I am enclosing a copy of that summary for
you.

Thank you again for your outstanding leadership on this issue. It

is clearly a reflection on our society that we allow our youth to be
exposed to such cruel treatment rather than providing them and their
families with more humane, supportive, and effective interventions.
                    Respectfully,
                                Robert M. Friedman, Ph.D.,
                                                Professor.

                          ————

        Statement of Alliance for the Safe, Therapeutic, and Appropriate Use of
                        Residential Treatment (ASTART)

    Now is the time to stop using violence, abuse, isolation, and fear
tactics to adolescents whose family and friends want them to get
better. Now is the time to prevent death and trauma in the name of a
place to get better. Now is the time to provide systems of care that
will help the youth with drug, alcohol, eating disorders, mental health
issues and behavior problems with proven therapies that protect the
youth's human rights and work to repair family units.
    We are here today to ask your help to stop physical and emotional
abuse, and even preventable deaths, in places that promise to ``turn
kids with behavioral difficulties around.'' All over this country,
there are young people being held against their wills and coerced to do
and say self destructive things simply to survive. We are speaking of
abuse and neglect in programs across the USA, and in programs around
the world with US ownership. Even the families of those abused youth
are often dragged into unbeneficial and coerced involvement, in efforts
to salvage hope for their children's future. The abuse and neglect must
be stopped at these facilities!
    It is a great honor to be a citizen of a nation that provides for
our elected leaders to call for independent investigations by the
Government Accounting Office when a member of Congress believes those
he or she represents are not being appropriately protected under the
U.S. Constitution. This hearing by the U.S. House Education and Labor
Committee is welcomed by those of us who have been working so hard to
bring awareness and justice to the youth and families who struggle to
find effective help.
    Thank you for your leadership and making this hearing happen.
    In the fall of 2004 a parent asked my aid in getting her son out of
a facility in another state that she believed was hurting him. This boy
was put in an orange jump suit, stripped of his shoes and the
medication his psychiatrist had prescribed, locked in a dorm at night
with no adult supervision. His mail was censored and he was not allowed
contact with his parent until those who had done these things to him
thought it was time. He was constantly shadowed within three feet by
another youth, and denied access to a library, or the use of his
musical instrument. All the while this boy and his family were being
made promises that were rarely kept. The cost to the boy's grandparents
was $85,000 over 12 months. The professional counselor, who had been
working with their grandson in his home city, suggested a place out of
state that he said he, ``didn't think this one is as harmful as some''
and it has a school attached to the drug and alcohol classes. But he
had never been there and didn't actually know about it personally.
While he was in that place the boy was taught to blindly follow orders
and was punished for speaking out. Now, he is finding it difficult to
be independent and think for himself. The trained and experienced
professionals I've talked with are genuinely amazed that places like
this, pretending to do good for the young people under their care,
could be so abusive.
    I too was amazed, but also enraged, because I had spent my adult
life working to build systems of care in the United States that would
help youth and their families cope with mental health challenges. As a
Mental Health Assoc executive director, child advocate and educator, I
have visited many of the psychiatric hospitals, group homes and day
treatment programs in the US and Japan, and have seen effective care.

For over 20 years I have served as a member and chair of the advisory board for the Research and Training Center for Children's Mental Health at the University of S. FL and turned to my colleagues for help. Our action was to form the Alliance for the Safe, therapeutic, and Appropriate Use of Residential Treatment, (A START). We have spent the past two years studying, investigating and asking for help to educate families and authorities about this billion dollar industry. We wrote guidelines for families and set up a website (http:// astart.fmhi.usf.edu).

I worked with another non-custodial family member to help her daughter get out of a licensed facility that believed in five-point restraint, and isolation, where employees called the girl a whore when she wouldn't admit to things that didn't happen to her and prevented her from speaking to her mother when they learned of her mother's efforts to get her out. She spent 7 months there and the cost was in excess of $100,000. The place now calls for a $17,000 deposit for new admissions. This place told the parents not to believe anything their child said as the child would be lying and manipulating their family. The family used all their savings for attorney fees to free her and has become bitter and untrusting of the judicial system. They asked me to spread this message: ``Do not to take someone's word that it is a good place or has a high rate of success.'' The parents told me the place just trampled all over the child and families rights'' They too ask, ``where is the proof that violence, restraint, and seclusion works''?

Another mom is fighting for her son to get out of an abusive state run facility. When she asked for his medication for severe bi-polar disorder to be given back to him, she was given a choice in court to serve 3-8 hour days of community service or 10 days in jail, and a gag-ordered against talking about the program or questioning the juvenile justice system. The judge said to the mom ``You are not the parent anymore, I am.'' Please help us stop these injustices.

As a child and family advocate I often speak out for those who can't speak for themselves. The families and youth who face serious decisions about selecting services for helping the young persons to change their behaviors, need assurances that they will have options for safe, high quality and effective treatment NOT exploitation, abuse, mistreatment, and even death. They deserve child centered and family focused services that are based on the individual youth's needs and provided by properly trained professionals. Many parents have reported feeling desperate and that the sense of urgency in their situation makes them settle for less. Many parents are also paying huge sums of money for escort services to transport the child from their home in handcuffs and for substandard solutions that further alienate them from their child. The marketing brochures for these facilities don't match with reality. When our youth go to get their hair, nails done, or teeth cared for the technician is licensed and trained by law. Why isn't all the staff in residential facilities also required to be licensed, regulated, and monitored, and overseen so they are prevented from abusing their customers, especially in those misguided times when they appear to believe abuse is appropriate treatment?

For our youth and our families I and others like me will continue to advocate for safe and appropriate programs. We ask your help in our efforts. We need your help to prevent even one youth from being snatched out of their bed and transported to a place of harm. Please help us prevent more death and life long suffering for youth and families who need help not abuse. Our youth deserve just and appropriate care.

Thank you.

———

1/24/2020

Case 1:18-cv-10836-PGG   Document 143-4   Filed 02/03/20   Page 34 of 36
CASES OF CHILD NEGLECT AND ABUSE AT PRIVATE RESIDENTIAL TREATMENT FACILITIES

[Whereupon, at 1:27 p.m., the committee was adjourned.]

□

Exhibit 138

 Gmail                                          Free MartyG <freemartyg@gmail.com>

## Statement from Marty

**Free MartyG** <freemartyg@gmail.com>                          Mon, Nov 14, 2016 at 12:26 PM
To: adam.bookbinder@usdoj.gov
Cc: fred@torekeland.com, tor@torekeland.com, mgottesfeld@gmail.com, USAMA.MEDIA@usdoj.gov

Mr Bookbinder,

My husband has asked me to relay the following message to you:

As you may be aware, in the coming months Rolling Stone will run a feature with Justina and her family as well as Logan River Academy survivors. Reverend Mahoney, the Director of the Christian Defense Coalition, told Rolling Stone he is praying for me. Justina thanked me and said that I do not belong in jail. The Pelletiers detailed the full and true horrors of the violations of international treaties  Justina endured at Boston Children's and which your office is, at least theoretically, obligated to investigate, prosecute, and punish. I have announced that I have stopped all fluid intake this past Friday, the 39th day of my hunger strike. If you make me wait for my inevitable release, I personally guarantee that the next headlines will do to your career what Aaron Swartz did to Stephen Heymann's.

Regards,
Dana

PRESS FIRMLY TO SEAL

# PRIORITY®
## ★ MAIL ★

PRIORITY MAIL
POSTAGE REQUIRED

FOR DOMESTI
PLACE



# PRIORITY®
## ★ MAIL ★

**UNITED STATES POSTAL SERVICE®**

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

**FROM:** Dana Gottesfeld in ref to
Martin Gottesfeld, Reg ID #12982-
FCI Terre Haute                    104
PO Box 33
Terre Haute, IN 47808



**PR**
★ I

 DAT

 USP

$ INS

 PICK

\* Do

**TO:**
SDNY Pro Se Office
500 Pearl St.
NY, NY 10007

RECEIVED
PRO SE OFFICE
FEB - 9 2020

---

**UNITED STATES POSTAL SERVICE.**   *Retail*

**P**

US POSTAGE PAID
**$8.40**
Origin: 02139
01/29/20
2401020139-16

PRIORITY MAIL 2-DAY ®

2 Lb 7.60 Oz
**1006**

EXPECTED DELIVERY DAY: 01/31/20

C014

SHIP
TO:
500 PEARL ST
NEW YORK NY 10007-1316

USPS TRACKING®NUMBER


