United States District Court
Southern District of New York

RECEIVED
FEB 7 - 2020
PRO SE OFFICE

Martin S. Gottesfeld, pro se,
    Plaintiff
  - against -
Hugh J. Hurwitz, et al.

Case No.: 18-cv-10836-PGG-GWG

REPLY TO DEFENSE COUNSEL'S OPPOSITION (D.E. 135) TO
MOTION FOR SANCTIONS (FED. R. CIV. P. 11(c) AND LOC. CIV.
R. 1.5(b)(5)) (D.E. 134)

Plaintiff Martin S. Gottesfeld (herein the "plaintiff"), acting
pro se, hereby replies to defense counsel's opposition (docket
entry (D.E.) 135) to his MOTION FOR SANCTIONS (FED. R.
CIV. P. 11(c) AND LOC. CIV. R. 1.5(b)(5)) (D.E. 134).

   In support of this reply and the underlying instant motion, the
plaintiff herewith provides and moves the Honorable Court
pursuant to Fed. R. Evid. 201(c)(2) to take mandatory
judicial notice of Exhibit 1 hereto, Declaration of Martin S.
Gottesfeld (January 26th, 2020).

   Though the relevant sanctions motion, which is now found at
instant docket entry 134, is fifteen (15) pages accompanied
by a further four (4)-page declaration under the penalty of
perjury, id. at 16, counsel for the defendants attempts to
contest only three (3) items. Nowhere does defense counsel
attempt to provide admissible evidence to rebut either the
plaintiff's aforementioned declaration or the admissions of counsel's
own clients, found at D.E. 99 and previously cited to by

Page
1
of
19

1 of 24

defense counsel at D.E. 111 at 10 citing D.E. 99. In contrast, both the plaintiff's declaration and the defendants' admissions are made under the penalty of perjury.

Counsel for the defendants instead expects the Court to favor him and his office so greatly over the unrepresented incarcerated plaintiff that he need not produce evidence even as the unseemliness of the instant matter grows more palpable with time. And of course, who would prosecute counsel for the defendants if he perjured himself, his colleagues? That is indeed an unlikely prospect. Please cf. Limone v. United States, 497 F. Supp. 2d 143 (D. Mass. 2007) and United States v. Ted Stevens (R-AK).

After enumerating an incomplete list of the plaintiff's contentions, please cf. D.E. 135 at 1 ¶ 1 and D.E. 134 at 1-19, counsel for the defendants once again concedes the inapplicability of Sandin v. Conner, 515 U.S. 472 (1995). D.E. 135 at 1 ¶ 2. Counsel for the defendants characterizes his past citation to Sandin as "a mistake," but he does not do so under the penalty of perjury because he cannot do so without perjuring himself. As previously noted, counsel first argued the supposed inapplicability of the Cruel and Unusual Punishment Clause in favor The Due Process Clause on the explicit basis that the plaintiff was a pre-trial detainee, D.E. 52 at 1 n. 2, but then went on to misapply Sandin nineteen (19) pages later, D.E. 52 at 20. Please see D.E. 101-1 at 32-35.

At the time, the plaintiff noted that this posture "seems unlikely to be an oversight and more likely than not that counsel for the defendants was trying to strike a 'foul' blow, as contemplated by the Berger [v. United States, 295 U.S. 78 (1935)] court." D.E. 101-1 at 32. Counsel's subsequent actions

and omissions, however, remove all doubt, especially since he still does not come forward with the case law that actually controls in the instant case even after he was presented with that case law in a motion for sanctions based upon his omission of that same case law. D.E. 134 at 16 ¶¶ 5-7, and id. at 4-8. The fact that counsel for the defendants responded to a motion for sanctions citing, inter-alia, his omission of controlling case law directly adverse to the position of his clients in violation of Fed. R. Civ. P. 11, Loc. Civ. R. 1.5(b)(5), N.Y. R. Prof. Cond. 3.3(a)(2), N.Y. R. Prof. Cond. 3.1(a), N.Y. R. Prof. Cond. 1.16(a)(2), and N.Y. R. Prof. Cond. 8.4(c), by continuing to omit that controlling case law proves that his omissions are intentional and that nothing will deter his future misconduct other than an order of sanctions by The Court.

Indeed, as noted prior to the latest round of sanctionable such omissions, counsel for the defendants "[in his] motion cherry-pick[ed] non-precedential citations and in those citations [committed his] omissions of quotation marks and internal citations in order to avoid the above-quoted two-(2)-prong test under The Eighth Amendment." D.E. 101-1 at 42, citing D.E. 52 at 31 and referring to Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2000) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)) as quoted D.E. 101-1 at 41.

Counsel's pattern of omissions, continued in D.E. 135, is not one of unintentional "mistake," but rather one of conscious misrepresentation. It will continue openly so long as The Court tolerates it openly.

Further, these omissions are substantial. They include, but are in no way limited to, the following:

- Tellie v. Fields, 280 F.3d 69 (2d Cir. 2000), please see D.E. 101-1 at 34-35, D.E. 101-2 at 21-23, and D.E. 101-3 at 7-8;

- Gaston v. Coughlin, 249 F.3d 156 (2d Cir. 2001), please see D.E. 101-1 at 41-42, D.E. 101-2 at 21 and 36, and D.E. 101-3 at 11;

- Wright v. McMann, 460 F.2d 126, ~~128~~ (2d Cir. 1971), please see D.E. 101-2 at 38 and 34-35, and D.E. 101-3 at 11;

- Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004), please see D.E. 101-1 at 34 and 37-38, D.E. 101-2 at 21 and 23, and D.E. 101-3 at 7-8;

- Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999), please see D.E. 101-1 at 37-38 and 41, ~~D.E.~~ and D.E. 101-2 at 20-21 and 23;

- Corselli v. Coughlin, 842 F.2d 23 (2d Cir. 1998), please see D.E. ~~101-2~~ 101-1 at 42 and D.E. 101-3 at 11;

- Farmer v. Brennan, 511 U.S. 825, 832 (1994), please see D.E. 101-1 at 41-42 and D.E. 101-3 at 11;

- Allah v. Milling, 876 F.3d 48 (2d Cir. 2017), please see D.E. 101-1 at 33; and

- Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001), please see D.E. 101-2 at 20.

Reviewing the implications of the above controlling authorities for the instant case and that each is of course noteworthy and well-known in this circuit, it is manifestly obvious that defense counsel's original omission of all of these authorities was intentional ~~and has~~ as is his motive for so doing. Moreover, even after being presented with each of these cases, defense counsel continues omitting them, D.E.

111 at 3-4 and D.E. 135.

Indeed, the dangers and likely prejudice of defense counsel's omissions ~~and misrepresentations~~ of Benjamin v. Fraser 264 F.3d 175, 188 (2d Cir. 2001) (collecting cases) and Johnson v. Mann, 460 Fed. Appx. 11, 14 (2d Cir. 2012) (citing Benjamin v. Fraser at 188-89) are clearly demonstrated by one of the frivolously-cited ~~that~~ decisions that defense counsel did provide, D.E. 59 at 28, citing Alhaj v. McCarthy, 2012 U.S. Dist. LEXIS 100471, No. 11 Civ. 9049 (LTS) (RLE) (S.D.N.Y. July 18, 2012) at *8-9. In Alhaj, This Court was led astray some ten-plus-(10+) years after Benjamin and applied Sandin to a ~~pretrial~~ pre-trial detainee. D.E. 101-1 at 32-33.

Further in the instant case, defense counsel concealed the inapplicability of Sandin only ~~after~~ the plaintiff was forced to expend time and limited resources ~~to~~ rebutting his citations to Sandin and Alhaj and his intentional and concurrent omissions of Benjamin and the other authorities cited supra. D.E. 134 at 17 ¶¶ 10-12. He did not do so when he was first explicitly notified. Id. at 3-4, quoting D.E. 59 at 1 and citing D.E. 61. ~~These~~ Defense counsel's misrepresentations and omissions, along with his deliberate and flagrant choice to violate the mandatory Loc. Civ. R. 56.1, ~~D.E. 101~~ Please see D.E. 101-1 at 16-17 and D.E. 9 at 12-13, caused the plaintiff the need to write an exhaustive and comprehensive opposition, D.E. 101 and 101-1 through 101-8, et al., that otherwise would have been unnecessary.

Defense counsel continues proving that he is utterly without shame by continuing to try to capitalize on the ~~useless~~ otherwise-unnecessary work he forced the plaintiff to do—and which he knew and wagered that most unrepresented incarcerated plaintiffs would be incapable of

doing — by now citing a manifestly-inapplicable rule — as opposed to all of the applicable rules that defense counsel broke — in an unscrupulous effort to deny the plaintiff all ability to rebut new meritless arguments and new inadmissible evidence presented for the first time without prior leave from the Court in a reply memorandum, D.E. 111 at 18 n. 7; D.E. 122 at 6 ¶¶ 11-12 (which the plaintiff has requested to be moved into D.E. 124, as he originally filed it); D.E. 125 ¶2, citing D.E. 111, D.E. 131 at 1-3, id. at 6-8, and id. at 18 ¶8; and the plaintiff's REPLY TO DEFENDANT'S OPPOSITION (D.E. 125) TO PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME (D.E. 124), filed pursuant to the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988), on Monday, January 20th, 2020.

Rather than misapply the inapplicable rules requested meritlessly by defense counsel, the Court must apply the mandatory rules broken by defense counsel, including Loc. Civ. R. 1.5(b)(5), Loc. Civ. R. 1.5(F), and The New York Rules of Professional Conduct as detailed infra and in D.E. 134. "[J]ustice must satisfy the appearance of justice," Offutt v. United States, 348 U.S. 11, 14 (1954), yet the glaring injustices in the instant case intensify with each passing day; D.E. 72 at 2, D.E. 87 at 1, D.E. 87 at 3, D.E. 79 at 7, et al.; Barrett Brown, "Sentenced to ten years, activist Marty Gottesfeld began writing about Bureau of Prisons corruption. Then he was shipped to a secretive new facility. His family hasn't heard from him since." Medium.com/Barrett Brown (December 18th, 2019), ~~https://medium.com/@Barrett~~ https://medium.com/@barrettbrown/inmate-marty-gottesfeld-wrote-about-prison-corruption-then-the-prison-silenced-him-d7da0349da02; Helen McBreen, Political Activist & Prisoner Enters 4th Week of Hunger Strike: Marty Gottesfeld held in Secure Housing Unit with sensory deprivation and no potable water.

Info Wars (January 2nd, 2020), URL not visible on plaintiff's printed version; Frank Camp, "'Guardian Hacktivist' Martin Gottesfeld Alleges 'Toxic' Water In Secretive CMU Prison Where He's Being Held: Prison Responds", DailyWire (January 10th, 2020), https://www.dailywire.com/news/guardian-hacktivist-martin-gottesfeld-alleges-toxic-water-in-secretive-cmu-prison-where-hes-being-held-prison-respo [URL truncated in plaintiff's printed version]; and et al.

Next in D.E. 135, defense counsel continues violating Fed. R. Civ. P. 11(b)(2), Fed. R. Civ. P. 11(b)(3), Fed. R. Civ. P. 11(b)(4), N.Y. R. Prof. Cond. 3.3(a)(2), N.Y. R. Prof. Cond. 3.1(a), N.Y. R. Prof. Cond. 1.16(a)(2), and N.Y. R. Prof. Cond. 3.3(b)(1) by maliciously misrepresenting the plaintiff's timely motions for extensions while withholding controlling legal authorities that are directly adverse to his positions. D.E. 135 at 1 & 3, citing D.E. 81, 85, 89, and 91.

Defense counsel frivolously, falsely, and maliciously avers that the plaintiff "requested extensions of [the filing] deadline [for the his opposition to D.E. 51-52] on October 15, 2019, October 19, 2019, and November 14, 2019," referring respectively to D.E. 81, 85, and 89. D.E. 135 at 1 & 3, citing D.E. 81, 85, 89, and 91. In reality, however, defense counsel is well aware that each of these motions was filed in accordance with the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988). Please see D.E. 81 at 1, at 4 & 9, and at 6; D.E. 85 at 1 and at 4; and D.E. 89 at 1 and at 5; each citing explicitly Houston v. Lack. The plaintiff further reiterated this point in D.E. 90 at 3-5, citing either D.E. 86; Houston v. Lack; Exhibit 3 to plaintiff's August 5th, 2019, NOTICE OF FILING (presumably D.E. 71, but not necessarily so); 28 C.F.R. §§ ~~~~

540.203(a), 540.203(b)(1), and 540.203(c); Ex Parte Hull, 312 U.S. 546 (1941); and Fed. R. Civ. P. 5(b)(2)(B).

Then, even if defense counsel didn't know about the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988), and somehow hadn't noticed all of the references thereto supra — which would itself subject him to liability under N.Y. R. Prof. Cond. 1.1(a) and N.Y. R. Prof. Cond. 1.3(a) as detailed in D.B. 134 at 5-6 — the plaintiff drove home the point explicitly in the instant motion. D.B. 134 at 8-9, citing the prison-mailbox rule of Houston v. Lack. Yet after his earlier "omission of Houston v. Lack from D.B. 88" was cited in D.B. 134 at 8, defense counsel still omitted this widely-known adverse decision from D.B. 135 and knowingly ~~misrepresented~~ ~~the~~ and materially misrepresented the ~~dates of~~ filing dates of D.B. 81, 85, and 89.

As the Court and defense counsel are well aware, under the prison-mailbox rule, papers ~~docketed~~ by the ~~various~~ unrepresented incarcerated plaintiff must be considered filed on the date he hands them to prison officials for mailing to the Court so long as he demonstrates that he affixed sufficient pre-paid first-class U.S. postage thereto, which the plaintiff did ~~forced~~ show for all of the motions in controversy. See citations supra. The Supreme Court decided Houston v. Lack in 1988 — some thirty-one (31) to thirty-two (32) years ago. The Second Circuit clarified the wide-ranging scope of the prison-mailbox rule approximately twenty-seven (27) years ago in Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993); ~~Moreover, Houston gives no indication that it should be limited.~~

Moreover, Houston gives no indication that it should be

limited to habeas appeals. The foundation of Houston is the inherent disadvantage suffered by the pro se [incarcerated] litigant in his ability to monitor the course of his litigation. That disadvantage is no different in the civil context. The concerns illustrated by [T]he [Supreme] Court in Houston apply equally here. See Houston, 487 U.S. at 271. Unlike other litigants, the pro se prisoner litigant cannot personally ensure receipt of his legal documents by the court clerk.

( [Emphasis] in original, alterations [] added.)

The concerns of the Supreme Court, as echoed above by the Second Circuit are especially and peculiarly applicable to the instant plaintiff because the instant defendants and their counsel moved him to a CMU in violation of his right to Due Process for (4) days after they received service of the instant complaint and then proceeded to exercise unlawful content-based preemptive discretionary Executive review of and and delay of his court filings, petitioning a co-equal branch of government to serve as a check on their power. Please see D.E. 134 at 10-11; citing N.Y. R. Prof. Cond. 3.4(a)(6); 18 U.S.C. § 241; D.E. 101 Exhibit 2 (found at D.E. 101-4 at 3); D.E. 23-26; D.E. 13; D.E. 134 Exhibit 1 at 4 ¶¶ 32-33 (found at D.E. 134 at 19); 28 C.F.R. §§ 541.25(a) and 541.26 (now found at D.E. 101-7 at 27); Aref v. Lynch, 833 F.3d 242 (D.C. Cir. 2016); D.E. 59 at 1; Fed. R. Civ. P. 11(b)(1); and N.Y. R. Prof. Cond. 1.16(a), 1.16(a)(1),

3.1(b)(2), and 3.2.

Please see also D.E. 134 at 17-18 ¶¶ 18-26.

Please see again D.E. 90 at 4-5; citing (each of) 28 C.F.R. §§ 540.203(a), 540.203(b)(1), and 540.203(c) (now found at D.E. 79 at 12-13); and Ex Parte Hull, 312 U.S. 546 (1941).

Please see also D.E. 79 at 7 and at 42 ¶¶ 2-4.

Please see also D.E. 59 at 2, citing Houston v. Lack and filed on Monday, June 10th, 2019—some ten (10) days before a filing deadline (D.E. 55 at 1), but not entered until July 2nd, 2019—some twenty-two (22) days later and twelve (12) days after the filing deadline. Please see also D.E. 58-59.

More recently, please see D.E. 136, 137, and 138; each filed on Sunday, December 22nd, 2019 (D.E. 136 at 1-2, D.E. 137 at 2-3, D.E. 138 at 1); each with the relevant postage stamps manually cancelled by agents of the instant defendants so as to avoid a dated postmark by the United States Postal Service (all three [3] filings were sent in the same envelope, an image of which appears at D.E. 136 at 3, D.E. 137 at 7, and D.E. 138 at 20); the envelope for each marked "1223" by agents of the defendants to (mis)lead observers to the conclusion that they marshaled it to the U.S.P.S. on December 23rd, i.e. "12/23;" but each not received by the Court until thirty-one (31) days after filing — a full month. Given the nature of D.E. 137 and D.E. 138, its not hard to see why this mailing to the Court was so delayed. Please cf. D.E. 116 at ¶9, where agents of the defendants neglected to unnecessarily manually cancel the postage stamps and the U.S.P.S. applied a dated postmark a full week after the filing of what agents of the defendants knew to be an

emergency ~~filing~~ motion (D.E. 116 at 1-2).

Is it any wonder why defense counsel doesn't want to acknowledge Houston v. Lack and the circumstances of the instant case? Of course, however, Fed. R. Civ. P. 11, Loc. Civ. R. 1.5(b)(5), and The N.Y. Rules of Prof. Cond. leave him no choice — so long as they are enforced.

Moreover, less than two (2) years ago, The Second Circuit removed all doubt that the prison-mailbox rule applies to papers filed in opposition to summary-judgment motions, such as the motions in controversy in D.E. 134 and D.E. 135. "As an initial matter, we note that [the plaintiff] is correct that his opposition to summary judgment should be deemed timely filed under the prison mailbox rule." Lewis v. Lee, 737 Fed. Appx. 24, 26-27 (2d Cir. June 5, 2018), citing Houston v. Lack, 487 U.S. 266, 268, 270-71 (1988).

Neither ~~has~~ was The Second Circuit quiet or equivocal about the broad scope of the prison-mailbox rule in the years between Houston v. Lack and Lewis v. Lee. In addition to the above-cited case of Dory v. Ryan in 1993; please see Noble v. ~~Kelly~~ Kelly, 246 F.3d 93, 97 (2d Cir. 2001), noting extensions of the prison-mailbox rule, collecting cases, and adopting The Ninth Circuit's applicable ruling in Faile v. Upjohn Co., 988 F.2d 985, 988 (4th Cir. 1993); Fernandez v. Artuz, 402 F.3d 111, 113-114 (2d Cir. 2005), collecting cases of extensions; and id. at 113 n.2, same and citing Faile.

Thus, the plaintiff did not file D.E. 81 on October 15th, ~~of 2019 — as as misrepresented by defense counsel in D.E. 135 at 1 ¶ 3~~ 2019 — the same day as the filing deadline — as misrepresented by defense counsel in D.E. 135 at 1 ¶ 3, but

rather the plaintiff filed D.E. 81 on October 2nd, 2019 — some thirteen ~~days~~ (13) days prior to the ~~deadline on that~~ deadline. Then agents of defense counsel delayed the mailing and entry of D.E. 81 in violation of their own policies on mail to the Court, thereby depriving the Court of time to consider the motion prior to the expiration of the deadline. This thirteen-(13)-day difference is material, just as the twenty-two-(22)-day difference is material to D.E. 59 and the thirty-one-(31)-day difference is material to D.E. 136-138. These differences cannot be omitted in good faith when arguing timeliness as defense counsel endeavors. Indeed, for this reason, the Court has prudently taken to ordering the Clerk to send the plaintiff ~~times~~ sensitive documents via Certified Mail. D.E. 64 at 1 and D.E. 91 at 2.

Moreover, anyone familiar with litigation, whether pro se or U.S. Supreme Court Justice, knows that so long as a litigant timely moves for an extension, they are generally not considered "in violation" of the relevant deadline ~~as defense counsel~~ while the motion for the extension is pending bizarrely avers. Yet, even if this general custom of comity did not apply to the instant case, defense counsel's omissions of controlling case law ~~are~~ is nonetheless material, misleading, and sanctionable. "Once a pro se ~~litigant~~ [incarcerated] litigant has done everything possible to bring his action, he shall not be penalized by strict rules which might otherwise apply if he were represented by counsel." Ortiz v. Cornetta, 867 F.2d 146, 148 (2d Cir. 1989); citing Houston v. Lack.

The situation presented in D.E. 81, 85, and 89 — and never contested by the defendants — that for five (5) weeks the plaintiff was denied the ability to purchase postage, photocopies, and other items despite his attempt to stock up ahead of time,

clearly proved that the plaintiff did "everything possible to bring his action." *Ortiz* at 148. Please cf. *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977). In contrast to *Gittens v. Sullivan*, 670 F. Supp. 119, 123 (S.D.N.Y. 1987) and *Dugar v. Coughlin*, 613 F. Supp. 849, 853 (S.D.N.Y. 1985), the ~~plaintiff~~ instant plaintiff was denied all access to ~~pos~~ obtain postage. Please cf. D.E. 101-8 at 13.

In contrast to *Gittens* at 122 and *Dugar* at 854, the instant plaintiff was denied all access to make his own photocopies of over two hundred (200) pages.

And defense counsel sought to penalize the unrepresented incarcerated plaintiff by holding him to an impossible filing deadline — in effect to obtain an illegitimate dismissal — while omitting the above-cited authorities.

Counsel for the defendants ~~re~~ misrepresented that D.E. 85 was filed on October 19th, 2019, likely a typo and meant instead to be its date of entry of October 29th, 2019. D.E. 135 at 1 ¶3. In reality, it was filed on October 20th, 2019, some nine (9) days before it was entered on October 29th, 2019, i.e., the date of the deadline proposed in D.E. 81.

Defense counsel also misrepresented that D.E. 89 was filed on November 14th, 2019, i.e., some two (2) days after the deadline proposed in D.E. 85. In reality, however, it was filed on October 30th, 2019, some ~~twelve (12) days before the~~ thirteen days before the deadline proposed in D.E. 85.

For the reasons stated supra, D.E. 134 is correct and D.E. 135 at 1 ¶3 represents further shameful though utterly shameless violations of each of Fed. R. Civ. P. 11 (b)(2), Fed. R. Civ. P. 11 (b)(3), Fed. R. Civ. P. 11 (b)(4), Fed. R. Civ. P.

11(b)(1), Loc. Civ. R. 1.5(b)(5), N.Y. R. Prof. Cond. 3.3(a)(2), 3.3(a)(2), N.Y. R. Prof. Cond. 3.1(a), N.Y. R. Prof. Cond. 1.16(a)(2), 1.16(a)(2), N.Y. R. Prof. Cond. 3.3(a)(1), N.Y. R. Prof. Cond. 8.4(c), N.Y. R. Prof. Cond. 3.1(b)(2), and N.Y. R. Prof. Cond. 3.4(a)(3).

Notably, defense counsel made the misrepresentations and omissions noted supra while also misrepresenting The Second Circuit's affirmation of Gonzalez v. Hasty, 269 F. Supp. 3d 45, 57-58 (E.D.N.Y. 2017), affirmed on other grounds, 755 Fed. Appx. 67 (2d Cir. 2018). Please see D.E. 131 at 6-7.

Finally in D.E. 135, which again is an unsworn filing, defense counsel denies that there is a "wide-ranging conspiracy to deprive Plaintiff of his rights." Id. at ¶¶ 1-2 ¶ 4. This is a thinly-veiled attempt at verbal sleight of hand. As a journalist – even a journalist who's lost forty (40) pounds fifty-one (51) days into a hunger strike – and a student of The George Carlin School of the English Language, the plaintiff is not fooled and neither should be the Court.

By qualifying his denial, i.e. that "there is no wide-ranging conspiracy" (emphasis added), defense counsel attempts to skirt each of Fed. R. Civ. P. 11(b)(2), Fed. R. Civ. P. 11(b)(3), Fed. R. Civ. P. 11(b)(4), Loc. Civ. R. 1.5(b)(5), N.Y. R. Prof. Cond. 3.1(a), and N.Y. R. Prof. Cond. 3.3(a)(1), while still violating N.Y. R. Prof. Cond. 8.4(c). Whether or not a conspiracy is "wide-ranging" is a matter of subjective opinion rather than objective legal fact.

"Your Honor, the courtroom is a crucible. In it, we burn away impurities until we are left with a pure product – the truth – for all time." (Captain Jean-Luc Picard), Star Trek: The Next

Generation, Season 2, The Measure of a Man, speaking, fittingly, as a JAG officer in a civil rights case determining whether Lieutenant Commander Data was a sentient being and had the right to decline an experimental and risky procedure.

Any passing first-year law or journalism student would notice that defense counsel offered a subjective pseudo-denial rather than asserting that he, personally, is not part of any conspiracy to deny the instant plaintiff his rights. The former is a dodge, while the latter would be actionable under the above-cited authorities.

Further, the plaintiff has never alleged a "wide-ranging conspiracy to deprive" him of his rights. Rather, the plaintiff alleges a conspiracy of fixed and finite size with specific members. D.E. 2 at 3, D.E. 98. And the plaintiff has introduced significant

admissible | evidence of this conspiracy that the defendants and their counsel have never contested while they have tried to duck discovery. D.E. 2 at 6 ¶¶ 5-22 and at 15; D.E. 13 at 1 ¶¶ 1-31, at 5 ¶¶ 37-38 and 41-44, at 7 ¶ 48, at 8 ¶¶ 51-56, and at 10 ¶¶ 58-64 and at 13; D.E. 14 at 1 ¶ 4, at 2 ¶¶ 10 and 12-14, and at 3 ¶¶ 16-19; D.E. 29 at 2 n. 2; D.E. 30 at 6-12; D.E. 33 at 1 ¶¶ 5-8; D.E. 40 at 3 ¶ 2, at 5 ¶ 6, and at 7 ¶ 5; D.E. 42 at 2 ¶¶ 3-11 and at 3 ¶¶ 14-16; D.E. 43 at 3 ¶¶ 3-5, at 4 ¶¶ 7-10, and at 7 ¶ 25; D.E. 45 at 3-6; D.E. 50 at 19-20 and at 25-28; D.E. 53 at 3; D.E. 69 at 5-64; D.E. 78; D.E. 79 at 7; 28 C.F.R. § 540.202(b), found at D.E. 79 at 11; 28 C.F.R. § 540.203, found at D.E.

Page | 79 at 12-14; BOP Program Statement 5214.02, Communications
15 | Management Unit, ch. 2-3, found at D.E. 79 at 17-20; Federal
of | Register Vol. 80, No. 14 at 3175, discussing the BOP Assistant Director,
19 | found at D.E. 79 at 37; D.E. 29 at 41; D.E. 80; D.E. 84

at 18-25; D.B. 99; ~~DB 134~~ D.B. 101-2 at 15-17; ~~and~~
~~D.B. 137, into other~~ D.B. 101-4 at 38-41; ~~and~~ D.B. 134.

In particular, there is only one (1) word to describe defense
counsel's attempt to use an unsworn subjectively-qualified denial of
~~the~~ facts admitted by his clients and attested to elsewhere by others under
the penalty of perjury and that one word is: frivolous. In fact,
as a matter of law, conspirators in the BOP have deprived the
plaintiff to his right to Due Process. Aref v. Lynch, 833 F.3d
242 (D.C. Cir. 2016). Defense counsel offers no rebuttal to The
U.S. Court of Appeals decision in Aref, and his department did
not obtain certiorari on that decision. Please cf. 18 U.S.C. § 241.

~~Just as defense counsel raises no citation to The New York~~
~~Rules of Professional Conduct, nor to any case law he raises therein~~

Indeed, as nationally-syndicated investigative-journalist Michelle
Malkin found regarding the plaintiff's case:

> It's all about power, prestige and pull in the top echelons
> of the Bay State's medical community, many New
> Englanders have informed me. BCH's feeding affiliate is
> Harvard Medical School. The ties between and among
> influential and wealthy alumni in the realms of health
> care, politics and the courts are innumerable...
> And like the third rail, those who dare challenge these
> renowned institutions risk great danger to their
> freedom and their lives.

Exhibit 2 hereto, Michelle Malkin, The brutal battle
against medical kidnappers, syndicated (June 28,
~~2018~~ 2017).

Just as defense counsel makes no citation to The New York Rules of Professional Conduct, nor to any case law besides Sandlin; he does not contest that he ~~did~~ used perjured testimony and false evidence, R.B. 134 at 8-10; falsely and frivolously misrepresented that the plaintiff moved for an extension "without further elaboration on what he was unable to receive that [was] preventing him from filing his opposition, ✗ id. at 7; maliciously harassed and injured the plaintiff, his family, and his team, while causing unnecessary delay and needlessly increasing the cost of the instant litigation, id. at 11; and violated the plaintiff's attorney-client privilege, cost him nine (9) months of publication, and prejudiced his direct appeal, id. at 18 ¶¶ 24-29. As a result, defense counsel has waived his ability to do so.

"In light of [the defendant]'s failure to contest these issues, we conclude that [the defendant] has waived its ability to do so." ~~Bifolk~~ Bifolck v. Philip ~~Mo~~ Morris USA Inc., 2019 U.S. App. LEXIS 25023, Docket No. 17-3927, (2d Cir. August 2d, 2019) at * 10 n. 6.

"[The defendant] failed to contest that representation. As such, we conclude that [the defendant] argument is waived." United States v. Berg, 669 Fed. Appx. 587, 588 (2d Cir. October 20, 2016), citing United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir. 1995).

Simply rereading R.B. 134 after R.B. 135 reveals the ~~read Exhibit 1 thereto~~ woeful inadequacy and frivolousness of the opposition. Defense counsel must truly find it inconceivable that The Court will apply the rules to him

This begs the question, in how many other cases has defense

counsel misapplied decisions like Scudby while omitting decisions like Benjamin against pro se litigants?

From a game-theory perspective, if defense counsel and those in his office can do as he has done in the instant case while risking only an occasional consequence-free admission of a "mistake" after their opponents, such as the instant plaintiff, are forced to expend resources working needlessly due to their misconduct, then it is axiomatic that this is precisely what they will do. It is the Court that must provide a sufficient disincentive to curtail such conduct. Indeed, the plaintiff is still exhausting resources working needlessly due to defense counsel's misconduct because rather than straighten up and fly straight when confronted with D.E. 134, he doubled down on his misconduct in D.E. 135.

If the Court has any lingering questions, then the plaintiff requests a hearing and discovery full discovery on the conspiracy issue.

The plaintiff has far more right to seek relief from defense counsel's repeated sanctionable violations of applicable rules than defense counsel has to seek enforcement of manifestly-inapplicable rules and to claim violations of a scheduling order while timely motions for extensions were pending. The double-standard sought by defense counsel is unseemly and unbecoming of the United States. Once again, "justice must satisfy the appearance of justice." Offutt v. United States at 14. The only way for that to happen now is for the Court to issue a six-(6)-prong order as originally requested.

Defense counsel's parting shot at the plaintiff is a further underhanded tactic to distract from his misconduct. We have a system of laws. Under that system, there are rules and the plaintiff has rights as a litigant. Nothing that defense counsel can say about the plaintiff can justify defense counsel's repeated

~~truth~~ and ongoing violations of those rules and rights.

The plaintiff cares not what defense counsel thinks about his defense of a tortured and crippled child who was left for dead by defense counsel's colleagues in an abusive psych ward. The plaintiff's jury refused to find that anything he did potentially impacted the medical treatment of a single child in an adverse way after defense counsel's ~~colleag~~ colleagues put on a week-long dog-and-pony sideshow trial in Boston.

"You cannot just seize people to test your pet theories," the judge) Star Trek: The Next Generation, Season 2, The Measure of a Man. Yet, that is precisely what happened to Justine Pelletier while real-life judges, present company excluded, simply looked the other-way—or worse.

The person whose opinion the plaintiff values most regarding his conduct said what she had to say to Rolling Stone while the defendants unlawfully stopped Rolling Stone from interviewing the plaintiff because they and their co-conspirators were scared of the truth. D.E. 107-4 at 29 & 67.

She is welcome. And defense counsel could learn a lot from her.

Respectfully filed in accordance with the prison-mailbox rule of Houston vs. Lack by mailing to the Court in an envelope bearing sufficient pre-paid first-class U.S. postage affixed thereto and handed to Ms. J. Wheeler of the FCI Terre Haute C.M.U. unit team, acting in her official capacity as an agent of both the defendants and their counsel, on Wednesday, January 29th, 2020, or the first opportunity thereafter,

by:

Martin S. Gottesfeld, pro se

EXHIBIT 1

Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1) on this 26th day of January, 2020:

1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for the Southern District of New York (herein "The Court").

2. On the afternoon of Friday, January 24th, 2020, I received for the first time Docket entry (D.E.) 135 in the case.

3. I received one (1) copy of D.E. 135 via Certified Mail, number 7018 0040 0001 1436 1949, and it ought to be possible using this number to contrast when the aforementioned copy of D.E. 135 actually arrived at FCI Terre Haute with when it was delivered to me by Ms. Rebekka Eisele, acting in her official capacity as an agent of both the defendants and their counsel, at approximately 3:15 P.M. on Friday, January 24th, 2020 — some seven (7) days after the filing of D.E. 135.

4. At the same time that I received the aforementioned copy of D.E. 135 via Certified Mail I received another copy of D.E. 135 from counsel for the defendants via First Class Mail. This other copy came to me in an envelope that was postage-paid by a non-USPS Pitney Bowes machine on Friday, January 17th, 2020, but which wasn't subsequently postmarked by the USPS. Based upon

my training and experience as a CMU prisoner, and markings on the envelope left by agents of both the defendants in the case and their common counsel, I am meant to believe that this envelope was received by the FCI Terre Haute mailroom some forty-eight-plus (48+) hours earlier on Wednesday, January 22nd, 2020.

5. Like all mail sent or received between myself and either the courts or counsel for the defendants, i.e. The U.S. Attorney's Office, ~~I saw~~ the envelopes bearing to me the copies of D.B. 135 were opened outside of my presence and their contents were read and digitally preserved by agents of the defendants and their counsel prior to delivery to/from me from/to the postal service.

6. The aforementioned copies of D.B. 135 served as the first and only formal confirmation I received that the relevant MOTION FOR SANCTIONS was filed, ~~since~~ because agents of the defendants and their counsel are withholding from me anything sent to me by my wife postmarked after January 11th, 2020, some fifteen (15) days ago!

7. Thus, I do not have a copy of the MOTION FOR SANCTIONS as it appears in the record of the case at D.B. 134, but I do have an unfiled copy of the motion that was sent to me by my wife prior to Sunday, January 12th, 2020.

8. My first opportunity to risk using the law library ~~will be tomorrow~~ after receiving D.B. 135 will be tomorrow.

I declare under the penalty of perjury under the laws of The United States that the foregoing is true and correct. Executed on 2020-01-26, by: 

Martin S. Gottesfeld

Exhibit 2

# The brutal battle against medical kidnappers

By Michelle Malkin • June 28, 2017 03:38 AM





The brutal battle against medical kidnappers
by Michelle Malkin
**Creators Syndicate**
Copyright 2017

BOSTON — On the day Boston Children's Hospital celebrated being named **"the number one pediatric hospital in the nation"** by U.S. News & World Report, I was interviewing Dana Gottesfeld in nearby Somerville, Massachusetts. Dana is the young wife of **Martin "Marty G" Gottesfeld**, an imprisoned technology engineer/activist who used his skills to fight against medical child abuse committed at Boston's Children's Hospital.

"That is so Boston," Dana observed Tuesday in response to the new ranking — which is already splashed in multiple gold medallions across the hospital's website.

It's all about power, prestige and pull in the top echelons of the Bay State's medical community, many New Englanders have informed me. BCH's teaching affiliate is **Harvard Medical School**. The **ties** between and among influential and wealthy alumni in the realms of health care, politics and the courts are innumerable.

It's a network that's "practically untouchable," Dana explained.

And like the third rail, those who dare challenge these renowned institutions risk great danger to their freedom and their lives.

Dana's husband, Marty, faces **felony charges of computer hacking and conspiracy** related to distributed denial-of-service (DDoS) attacks in April 2014 against Boston Children's and the nearby Wayside Youth and Family Support Network residential treatment. Marty had organized a social media army to knock the computer networks of both institutions offline to protest the medical kidnapping of then-15-year-old **Justina Pelletier**. Hackers from the loose-knit collective, Anonymous, allegedly participated in the campaign.

Justina's plight had become international news in Marty's backyard. One fateful winter day in February 2013, Justina traveled with her mom to BCH from her West Hartford, Connecticut, home, seeking relief from a severe case of the flu. Ordinary sickness compounded Justina's rare medical conditions, including mitochondrial disease and postural orthostatic tachycardia syndrome. But those

## Pyongyang on the Prairie, Part Two
December 18, 2017 03:55 PM by Michelle Malkin



## Show biz meltdown: Bombs away!
September 19, 2017 11:18 PM by Michelle Malkin



## There is no such thing as a "deserving DREAMer"
September 6, 2017 08:02 AM by Michelle Malkin



## Keith Ogre-mann: Conde Nasty's Misogynist-in-Chief
August 30, 2017 07:29 AM by Michelle Malkin

## The Red York Times: First in Fake News
August 23, 2017 08:03 AM by Michelle Malkin

illnesses hadn't stopped her from participating in school, competitive ice skating and an active family life.

Instead of receiving top-notch care and attention at BCH, however, Justina was **snatched from her parents** and recklessly re-diagnosed with a psychological condition, **"somatoform disorder."** She was dragged from BCH's neurology department to its infamous **psych ward**, where she was reprimanded for being unable to move her bowels or walk unassisted in her weakened state. At Wayside, she was harassed by a staffer while taking a shower. The physical and mental torture lasted 16 months.

The family is now **suing** the gold medallion-adorned, scandal-plagued Boston Children's Hospital.

"They tried to break us all," Justina's dad, Lou, told me at his West Hartford home, where Justina fights to recover from post-traumatic stress and physical deterioration suffered while she was held hostage.

But the arrogant, tunnel-visioned torturers failed. Thanks to an aggressive awareness-raising campaign by an eclectic coalition including Justina's family, the Christian Defense Coalition's Rev. **Pat Mahoney**, conservative media personalities and left-leaning critics of the Massachusetts child welfare bureaucracy, Justina was eventually freed and reunited with her parents.

Marty G's DDoS attacks were an instrumental catalyst at a time when Justina's family faced a gag order for speaking out.

"I never imagined a renowned hospital would be capable of such brutality and no amount of other good work could justify torturing Justina," Marty wrote in a recent online **explanation** of why he intervened.

"BCH calls what it did to her a **'parentectomy,'** and there had been others over at least the past 20 years. I knew that BCH's big donation day was coming up, and that most donors give online. I felt it to have sufficient influence to save Justina from grievous bodily harm and possible death, as well as dissuade BCH from continuing its well established pattern of such harmful 'parentectomies,' I'd have to hit BCH where they appear to care the most, the pocket book and reputation."

On Tuesday, a federal judge in Boston finally set a court date in Martin "Marty" Gottesfeld's case. After more than a year behind bars without bail (including about 80 days in solitary confinement and a stint in the same detention center as Mexico's notorious drug cartel kingpin **"El Chapo"**), Marty now faces trial in January 2018. He was barred from attending his beloved adoptive father's funeral in April.

"It was the right thing to do," Dana told me through tears as she cradled a Homeland Security storage bag with Marty's wedding ring. She recently lost her job as a result of her **advocacy for Marty**. But the couple, who have never met Justina or her family, will keep fighting medical kidnappings. Relentless as ever, Marty stressed in a brief phone conservation with me the need for state and federal **"Justina's Laws"** to protect wards of the state from being used as research guinea pigs by prestigious medical institutions.

Both the supporters of Justina and Marty remain aghast at the brutal treatment of their loved ones while the real menaces breathe free.

Marty's message from prison in Massachusetts: "Human rights abuses aren't just happening in North Korea. They're here."

Justina's message from her wheelchair in Connecticut: She hopes her torturers "get what they deserve."

Is **anyone in Washington listening**?

Posted in: **Feature Story,Health care**

**Printer Friendly**

Categories: Feature Story, New York Times

About    Contact    Archives    Columns    Photos

Powered by Sound Strategies Inc.
Design by The Blog Studio
© 2004-2019 – Jazz Mustache LLC – all rights reserved





Wednesday, January 29th, 2020; Horsley v. Ladd, 487 U.S. 266 (1988)

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States







Hal Conrathcel Bushhhhn
Box 33
Haute, IN 47808