UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| Martin S. Gottesfeld, <u>pro se</u>,<br> Plaintiff<br> - against -<br> Hugh J. Hurwitz, et al.,<br> Defendants |

*18 cv 10836*

Case No.: 18-cv-10836-PGG-GWG

## <u>NOTICE OF FILINGS</u>

Plaintiff Martin S. Gottesfeld (herein the "plaintiff"), acting <u>pro se</u>,

hereby notifies The Honorable Court and the parties of the effective filing

of the following two (2) items on the below-stated dates pursuant to <u>the</u>

<u>prison-mailbox rule</u> of <u>Houston v. Lack</u>, 487 U.S. 266 (1988):

(1) <u>Declaration of Martin S. Gottesfeld</u> (Friday, January 31st, 2020); and

(2) <u>MOTION FOR SANCTIONS (FED. R. CIV. P. 11(c) AND LOC. CIV. R.</u>

    <u>1.5(b)(5))</u> (Thursday, December 19th, 2019).

This notice is filed pursuant to <u>the prison-mailbox rule</u> of <u>Houston v.</u>

<u>Lack</u>, 487 U.S. 266 (1988) by mailing to The Court in an envelope bearing

sufficient affixed pre-paid first-class U.S. postage and handed to Ms. J.

Wheeler of the FCI Terre Haute CMU unit team, acting in her official capacity

as an agent of the instant defendants, on Friday, January 31st, 2020, or the

first opportunity thereafter,

by: _____

Martin S. Gottesfeld, pro se,
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

U.S.P.S. Tracking # 9114 9023 0722 4291 7997 15



RECEIVED
FEB 12 2020
PRO SE OFFICE

Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1) on this thirty-first (31st) day of January, 2020:

1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

2. I did everything within my power as an unrepresented incarcerated litigant to file my recent MOTION FOR SANCTIONS (FED. R. CIV. P. 11(c) AND LOC. CIV. R. 1.5(b)(5)) on Thursday, December 19th, 2019, as contemplated by the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988), and I was stopped from mailing the motion to The Court when agents of both the defendants and their counsel confiscated my copies of the motion on Monday, December 9th, 2019, and did not return to me those copies until Wednesday, January 29th, 2020, and then kept my unit locked down until yesterday in the late afternoon.

3. I therefore consider the motion as timely filed on Thursday, December 19th, 2019, absent a determination of law and fact by The Court to the contrary.

4. Today is the fifty-third (53rd) day of my new hunger strike, protesting the unconstitutional and retaliatory acts undertaken by the defendants in the case and their parties in privity, including their common counsel, Assistant United States Attorney Alexander J. Hogan, who is the subject of the motion for sanctions.

5. My weight at the beginning of the hunger strike was two hundred twenty-five (225) pounds.

6. My weight this morning was one hundred eighty-three and one quarter (183.25) pounds.

7. I have thus lost forty-one and three quarters (41.75) pounds in the last fifty-three (53) days.

8. For the first thirty-eight (38) days of my hunger strike I ate no solid food and starting on day four (4) I drank sixteen (16) fluid ounces (1 pint) of skim milk, totaling to roughly one hundred sixty (160) calories and containing sixteen (16) grams of protein, each day.

9. Having never recovered the lean body mass I lost in my first hunger strike, I began losing muscle and weight much faster this ~~team~~ time.

10. On day thirty-nine (39), I received a copy of an Order to Show Cause entered in the case of Gottesfeld v. B. Lammer, 2:20-cv-00012-JRS-MJD (S.D. Ind. January 10, 2020) (hereafter "the other case"), requiring agent of the defendants in my S.D.N.Y. case and their common counsel Warden Brian Lammer of The FCI Terre Haute, Indiana, to answer my pending VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2241). Please see the other case, docket entry seven (7), setting a deadline of Friday, February 21st, 2020.

11. Immediately after receiving the Order to Show Cause, I began eating five (5) meals per week pursuant to my understanding of 28 C.F.R. §§ 549.60-549.66 (Attachment 1) and BOP Program Statement 5562.05: Hunger Strikes (Attachment 2), as explained to me by the agents and medical staff of the defendants in the case and Respondent Lammer, and I have not since changed

- Page 1 of 9 -

this practice.

12. "Normally, treatment must continue until adequate oral intake of food and liquid is achieved." Attachment 2 at 9.

13. I am still losing weight and it is objectively unreasonable to consider five (5) meals per week as "adequate oral intake of food and liquid," especially as I am still losing weight.

14. "Only the physician may order that an inmate be released from hunger strike evaluation and treatment. This order shall be documented in the medical record of the inmate." 28 C.F.R. § 549.66 (Attachment 1 at 4).

15. As I filed in the case and as should now appear in the public record thereof, agents/medical staff of both the defendants in the case and Respondent Lammer for some time have been forcing involuntary medical procedures upon me without my consent, against my will, without a court order, without notifying my emergency contacts, and without seeking the consent of my Massachusetts health care proxy and Indiana health care representative appointee Mrs. Dana E. Gottesfeld of Somerville, Massachusetts.

16. Relevant federal regulations provide that prison physicians "shall give consideration to forced medical treatment" when they determine "that the inmate's life or health will be threatened if treatment is not initiated immediately." 28 C.F.R. § 549.65(a) (Attachment 1 at 3).

17. Relevant federal regulations further provide that prison physicians "may order that treatment be administered without the consent of the inmate" when "a medical necessity for immediate treatment of a life or health threatening situation exists." 28 C.F.R. § 549.65(c) (Attachment 1 at 4).

18. No federal regulation provides for prison physicians to consider or order forced medical treatment of hunger-striking prisoners in other scenarios, as revealed by a diligent search.

19. The defendants in the case and their agents, including Respondent Lammer, acknowledge, "The decision to force treatment upon the inmate is a medical decision, preferably by a written physician's order, with potential legal implications." BOP Program Statement 5562.05: Hunger Strikes, Ch. 10 (Attachment 2 at 7).

20. "Only the physician may order involuntary medical treatment." Id. at 8.

21. Medical professionals are licensed by their respective states. For instance, registered nurses are registered by their state and medical doctors are licensed by their state. This includes medical professionals in prisons.

22. Medical professionals licensed by The State of Indiana are required to obey Indiana Code (IC) 16-36, including the medical professionals who have been treating me against my will, to wit: medical doctors William Wilson, Elizabeth Trueblood, and D. Lukens; MLT Ms. Sandusky; and registered nurses Matthew Worthington, Corey Pointer, and Ms. Brazzell.

23. Federal courts are required to give full faith and credit to IC 16-36 pursuant to 28 U.S.C. § 1738, i.e. The Full-Faith-and-Credit Statute.

24. Federal regulations and BOP Program Statements, on the other hand, do not carry the power of legislative enactment, and no federal law overrides or supercedes IC 16-36, as revealed by a diligent search, and again, the federal government does not register prison nurses or license prison physicians to practice medicine.

25. The State of Indiana broadly defines "Health care."

26. "As used in this chapter, 'health care' means any care, treatment, service, or procedure to maintain, diagnose, or treat an individual's physical or mental condition. The term includes admission to a health care facility." IC 16-36-1-1.

27. I am "an adult," as contemplated by IC 16-36-1-3(a)(1), and "unless incapable of consenting under [IC 16-36-1-4]," I "may consent to" my "own health care." IC 16-36-1-3(a).

28. "An individual described in [IC 16-36-1-3] may consent to health care unless, in the good faith opinion of the attending physician, the individual is incapable of making a decision regarding the proposed health care." IC 16-36-1-4.

29. "If an adult incapable of consenting under [IC 16-36-1-4] has not appointed a health care representative under [IC 16-36-1-7] or the health care representative declines to act, except as provided in [IC 16-36-1-9 and IC 16-36-1-9.5], consent to health care may be given in the following order of priority: (1) A judicially appointed guardian of the person or a representative appointed under [IC 16-36-1-8]. (2) A spouse. (3) An adult child. (4) A parent. (5) An adult sibling. (6) A grandparent. (7) An adult grandchild. (8) The nearest other adult relative in the next degree of kinship who is not listed in subdivisions (2) through (7). (9) A friend who: (A) is an adult; has maintained regular contact with the individual; and (C) is familiar with the individual's activities, health, and religious and moral beliefs. (10) The individual's religious superior, if the individual is a member of a religious order." IC 16-36-1-5(a).

30. Nowhere in IC 16-36-1-5 or elsewhere in Indiana law are health-care providers allowed to provide consent to their own treatment on behalf of patients, regardless of whether they are prisoners, and this makes sense because any such enactment would present serious conflicts of interest and undermine the very foundation of informed consent.

31. At no point while the agents of the defendants in the case and of Respondent Lammer were treating me against my will and without my consent did they contact anyone listed in IC 16-36-1-5(a) and seek consent to treat me.

32. My spouse at all times while I have been held at FCI Terre Haute, as contemplated by IC 16-36-1-5(a)(2), and my Indiana Health Care Representative, pursuant to IC 16-36-1-7, are the same person, Mrs. Dana E. Gottesfeld of Somerville, Massachusetts.

33. "A health care provider or any interested person (as defined in IC 30-5-2-6) may petition the probate court in the county where the individual who is the subject of the petition is present for purposes of receiving health care to: (1) make a health care decision or order health care for an individual incapable of consenting; or (2) appoint a representative to act for the individual." IC 16-36-1-8(a).

34. At no time did any health-care provider or any other interested person petition the probate court here in Vigo County, Indiana, pursuant to IC 16-36-1-8(a), with me as the subject of his or her petition.

35. At no point did I ever disqualify Mrs. Dana E. Gottesfeld under IC 16-36-1-9 and she is not and has never been precluded under IC 16-36-1-9.5.

36. IC 16-36-1-9 states, "(a) An individual who may consent to the

individual's own health care under [IC 16-36-1-3] may disqualify others from consenting to health care for the individual. (b) A disqualification must meet the following conditions: (1) Be in writing. (2) Be signed by the individual. (3) Designate those disqualified. (c) A health care provider who knows of a written disqualification may not accept consent to health care from a disqualified individual. (d) An individual who knows that the individual has been disqualified to consent to health care for another may not act for the other under [IC 16-36-1]."

37. Pursuant to IC 16-36-1-9, I hereby disqualify Warden Brian Lammer, Warden T.J. Watson, Regional Director Jeffrey E. Krueger, Medical Director William Wilson, Dr. Elizabeth Trueblood, FCI Terre Haute staff physician D. Lukens, R.N. Corey Pointer, R.N. Matthew Worthington, FCI Terre Haute staff M.L.T. Ms. Sandusky, FCI Terre Haute staff registered nurses Ms. Brazzell and Ms. J. Dean; all employees, agents, advisors, attorneys, contractors, assignees, and other parties in privity of the Federal Bureau of Prisons; all Indiana state-court judges; all U.S. magistrate judges, district judges, circuit judges, and justices; all Indiana county-court judges; all other judicial and semi-judicial officers of The United States or The State of Indiana; anyone who is paid by any department or agency of the federal government to treat me while I am a prisoner; and anyone who is not either my wife, my legal nephew, or my mother.

38. Pursuant to IC 16-36-1-9(c), I am sending a copy of this signed declaration to Medical Director William Wilson, Dr. Elizabeth Trueblood, FCI Terre Haute staff physician D. Lukens, R.N. Corey Pointer, R.N. Matthew Worthington, FCI Terre Haute staff M.L.T. Ms. Sandusky, and FCI Terre Haute staff registered nurses Ms. Brazzell and Ms. J. Dean.

39. "If an individual is incapable of consenting to the individual's own health care, the health care provider shall make a reasonable inquiry as to the availability of individuals who are able to provide health care consent under [IC 16-36-1-5]. Reasonable inquiry includes examining the medical records and personal effects of the individual who is incapable of providing health care consent. The health care provider shall attempt to contact individuals who are high in the priority level and able to provide health care consent under [IC 16-36-1-5] by telephone or other means after a determination is made that the individual is incapable of providing health care consent." IC 16-36-1-17.

40. At no point did the defendants in the case or the agents of them and of Respondent Brian Lammer make any inquiry as to the availability of individuals who are able to provide health-care consent for me under IC 16-36-1-5 even though I provided those agents/health-care providers with my wife's telephone number every day and told them to contact her if they doubted my competency.

41. At no point did the defendants in the case or the agents of them and of Respondent Brian Lammer obtain a second opinion from a licensed physician independent of FCI Terre Haute indicating that the medical treatments to which I did not consent were medically necessary.

42. At no point did the defendants in the case or Respondent Brian Lammer notify my known relatives and friends by certified mail of my condition, the treatment determined to be necessary by the treating physician, or of any attempt to secure an independent second opinion.

43. On Tuesday, January 28th, 2020, I spoke with my newly-retained

appellate counsel Brandon Sample on a privileged legal call.

44. Despite the confidential nature of the call and my reasonable expectation of privacy, through no fault or waiver of my own, agent of both the defendants in the case and Respondent Lammer Ms. Rebekka Eisele sat mere feet away from me during my call and was within easy eavesdropping distance to hear my side of the call.

45. I asked my attorney to contact the local U.S. attorney's office and advise them that I was being custodially-questioned each morning without an attorney present despite my explicit requests for an attorney and that these custodial questionings were both of my mind through oral questioning and my body through forced medical procedures, including two (2) prior occasions when my blood was taken without my consent.

46. I asked my attorney to contact the Indiana state health-care licensing authorities and report doctors William Wilson, Elizabeth Trueblood, and D. Lukens; M.L.T. Ms. Sandusky; registered nurses Matthew Worthington, Corey Pointer, and Ms. Brazzell for treating me against my will without either obtaining proper consent or notifying my emergency contacts of what they were doing.

47. I asked my attorney to contact Respondent Lammer and advise him that The Court in my § 2241 case had granted my emergency motion to preserve audio and video surveillance evidence that his agents did not want to preserve and told me they would allow to be overwritten despite my prompt and proper notification to them of relevent and forthcoming litigation.

48. Less than twenty-four (24) hours after my legal call, agents of both the defendants in the case and of Respondent Lammer, including Captain Bragan, came to the FCI Terre Haute CMU SHU and ordered me to pack my property.

49. These agents at first would not tell me where I was going, though they did tell me that I was not leaving the FCI.

50. These agents then returned the majority of my property to me; although rodents had been allowed to gain access to the bags storing my commissary food items; other food, clothing, and sundry items are missing; and some of my legal work containing documents that I need to file in both cases remains stored inaccessible to me in another container.

51. The rodents destroyed a not insignificant amount of my commissary food items, although by no means the majority of them, and for reasons described below, most of the destroyed items are irreplaceable to me.

52. While going through my property-return process, Captain Bragan would not answer my question as to the status of my hunger strike and address my explicit request to know the consequences of my decisions as to whether or not to eat, other than, eventually, to tell me that I would be monitored by medical.

53. Captain Bragan explicitly told me that my unit was not locked down because of me, but rather due to "maintenance," and that the whole unit would return to normal operations that day at 4:00 P.M. at which point myself and my fellow prisoners would "come out" of our cells.

54. I was taken to a FCI Terre Haute CMU cell and told that I am now once again a "general-population inmate," notwithstanding Aref v. Lynch, which holds to the contrary regarding CMU prisoners.

55. Departing from its previous practice, the medical department did not take my blood this week and did not run any labs prior to my exit from the SHU that would be relevant to assessing whether or not a "medical necessity" exists under 28 C.F.R. §§ 549.60 - 549.66 or BOP Program Statement 5562.05.

56. I have not, in fact, been evaluated by medical in the time since I left the SHU and no attempt has been made to do so.

57. Despite Captain Bragan's assurances that my unit would come off of lockdown on Wed.,   January 29th, 2020, we did not in fact come off of lockdown until after 4:00 P.M. on Thursday, January 30th, 2020.

58. I had my cell very well organized prior to agents of both the defendants and Respondent Lammer packing my property and it will take me over a week to restore my organizational system.

59. The majority of the food items that were lost were purchased from the holiday commissary list, which was available to me prior to my placement in the SHU, but which is now unavailable to me because the holidays are over, and for other reasons detailed below.

60. At the conclusion of the alternate-DHO "hearing"/ambush for incident report number 3338082, Alternate-DHO D. Matthews specifically and explicitly advised me that my sanctions were: (1) 27 days loss of GCT, (2) a fifty dollar ($50) monetary fine, (3) forty-five (45) days loss of phone privileges, and (4) forty-five (45) days loss of electronic messaging.

61. While it's possible there is a discrepency between my recollection and what was said at the hearing--which would be borne out by the audio and video recordings of the hearing--as to the length of the electronic and phone sanctions, I am one hundred percent (100%) certain that both my phone and electronic-messaging privileges were suspended and that my commissary was not suspended.

62. Indeed, as noted in a filing which agents of both the instant defendants and Brian Lammer delayed and which did not appear on the docket until a full month had elapsed, the suspension of both of these privileges while my mail to the courts was so delayed left me effectively unable to reach the courts with any news or information that these agents wished to preempt, and this is the principal reason I maintained my hunger strike after the alternate-DHO hearing/ambush.

63. Preventing news of the DHO hearing/ambush from timely reaching the courts appears to have been a top priority for these agents--who also use mannequins to fool the public about the unmanning of their guard towers.

64. It has come to my attention that the death-row unit was moved to the nearby USP Terre Haute in the same federal correctional complex (FCC) as this FCI, but that the guard towers there are similarly unmanned anyways. Thus, my recent article should be updated to reflect that the death-row is at "FCC" Terre Haute as opposed to "FCI" Terre Haute, but the conclusions of the article are otherwise accurate as to the negligence re the guard towers.

65. While in the SHU, I cannot use electronic messaging even if it is not suspended, but I can see a notification when I log into TRULINCS that someone has sent me a new message.

66. On or about Wednesday, January 22nd, 2020, I noticed such a notice, and I knew that no suspension of my electronic messaging had been entered into the system because nobody would be able to message me if it had been entered.

67. This also meant that none of my contacts received the typical system-generated message that they should have received after the DHO "hearing"/ambush, advising them that I no longer have access to electronic messaging.

68. BOP staff do not like suspending my email--especially when they are conscious of their own dirty hands and when their dirty hands become a matter of public controversy--because suspending my email causes this system-generated message to go out to my attorneys and to over a half-dozen of my fellow investigative journalists at major national and international news outlets including RT, The Intercept, Info Wars, The DailyWire, Reader-Supported News, Shadowproof Press, and The New American.

69. When I became aware that after more than a month, no sanction had been entered into the system and therefore no system-generated notification went out to my TRULINCS contacts, I composed a written request that the sanctions be entered into the system specifically so my contacts would be so notified and I handed it to agent of the defendants in the case Ms. Rebekka Eisele at my next opportunity thereafter. Attachment 3.

70. On Friday afternoon, January 24th, 2020, I received the DHO's report for incident report number 3338082 (after I notified The Court in my § 2241 case that the report was late), and the arrival of the report signified to me that the sanctions had been entered into the system as well.

71. I did not at the time notice a key discrepency between what was said at the DHO "hearing"/ambush and the resulting report.

72. On Friday morning, January 31st, 2020, commissary delivery came to my unit.

73. I ordered diet soda and other sugar-free and zero-calorie beverages, but no food items, along with eleven (11) one-dollar-($1) postage stamps, pens, headphones, and other items, but I did not receive all the postage stamps I ordered, the pens, or headphones, as well as some other items.

74. I inquired with commissary staff as to the missing items and was told that I am on commissary restriction.

75. I checked the DHO report for incident report number 3338082, believing that the wrong sanction had been mistakingly entered into the system and I was surprised to find that despite what the DHO said at the hearing, he changed his written report so as not to suspend my email but rather to take my commissary.

76. The length of the suspensions also did not match my recollection from the hearing and were ninety (90) days rather than forty-five (45), but again, I am less sure as to my recollection of the length of the suspensions than I am as to which privileges were and were not suspended.

77. If the DHO had told me that he was suspending my commissary and not that he was suspending my email, I would have ended my hunger strike, at least temporarily, on Friday, December 20th, 2019, so as to alert my attorneys so that they could alert the courts as to what's going on here.

78. By the time the alternate DHO entered the sanctions into the system, however, the proverbial cat was already well out of the bag because over a month had passed,   motions had been entered and articles had been published.

79. At that point, suspending my email could no longer contain knowledge of the matter and would in fact have been counterproductive due to the

journalistic inquiries these agents were already receiving and the system-generated notices that would have gone out.

80. The post-hoc change in sanctions from a set which initially delayed my ability to notify the courts should I have left the SHU to a set that instead avoided system-generated suspension notices from being sent to my attorneys and fellow journalists once the courts were already aware of the situation demonstrates that the alternate DHO was not a neutral and detached arbiter, but in cahoots with the defendants in the case and Respondent Lammer to avoid public scrutiny and accountability for their unconstitutional acts.

81. I obviously still cannot use the electronic messaging privileges that I now retain for social communication and I must indeed still be careful about even messaging my attorneys given the wanton and flagrant retaliatory acts carried out with relative if not total impunity by the defendants in the case, their common counsel, and Respondent Lammer in response to my theoretically--Constitutionally-protected petitions to the government for the redress of my grievances and those of my family, readers, and publishers.

82. Thus,' my electronic-messaging privileges do not meaningfully help me litigate, and the suspension of my commissary is in fact far more damaging to my abilities to litigate than suspending my electronic messaging because I can no longer purchase the same supplies I used to.

83. If there is indeed a discrepency between the length of the suspensions as first stated by the alternate DHO and then written by him after his post-hoc amendment(s), then the changes represent further retaliatory conduct.

84. The suspension of my commissary further prevents me from replacing the items that were lost, destroyed, or damaged when agents of the defendants, their common counsel,' and Respondent Lammer confiscated my property from me on Monday, December 9th,' 2019.

85. When moved to the SHU, it generally takes about four (4) weeks for a prisoner at the FCI Terre Haute CMU SHU to receive up to a cubic foot (1 ft$^3$) of his legal work.

86. For instance, I was placed in the SHU on Monday, December 9th, 2019, and I did not receive my legal work until more than four (4) weeks later on Tuesday, January 7th, 2020--the morning of an attorney-call that agents of the defendants, their counsel, and Respondent Lammer delayed for weeks--and they would have made me wait longer if they weren't concerned I'd complain to my lawyer about being separated from my legal work.

87. I am thus concerned that I was removed from the SHU so that these agents can now place me back in the SHU, supposedly under the "hunger-strike protocol," and thereby once again separate me from my legal work while denying me postage stamps to mail the courts for at least another week while I await the next commissary purchase.

88. The fact that these agents took me out of the SHU with no recent blood work, while I am still losing weight, and while I am still limiting myself to the same objectively-inadequate five (5) meals per week proves that there was never any circumstance sufficient to justify their forced medical treatments without consent, their choice to confine me in the SHU, and the conditions to which they subjected me therein.

89. Due to the commissary restriction, I am still unable to serve my filings in any of my cases since I must conserve photocopy supplies.

90. I am continuing my hunger strike at its previous level from before my removal from the SHU because I remain subject to the ongoing retaliation against my litigation and other First-Amendment--protected activities carried out by the defendants in the case, their common counsel, and Respondent Lammer, as evidenced by the ongoing sanctions resulting from my valid good-faith quoting of statutes as required to commence litigation carried out by these parties in privity so as to dissuade, deter, obstruct, and punish me for litigating against them by sabotaging my direct appeal (unsuccessfully, for now), preempting my filings, placing me in solitary confinement in filthy and atrocious conditions, trying to transfer me, harrassing me, my wife, my family, my readers and supporters, and my publishers, confiscating, destroying, and otherwise unlawfully depriving me of my property, returning me to a much worse cell after giving my old cell away twice so as to deprive me of it when they have not done the same to others who went to the SHU after engaging in violent acts wherein people were actually physically hurt and required outside medical help to rebreak and set bones, and outright refusing to preserve evidence of their misdeeds absent a court order for which I should never have had to move in the first place.

I declare under the penalty of perjury under the laws of The United States that the foregoing is true and correct. Executed on Friday, January 31st, 2020.

by: _____

Martin S. Gottesfeld

Attachment 1

# SUBPART E -- HUNGER STRIKES, INMATE

## § 549.60 Purpose and scope.

The Bureau of Prisons provides guidelines for the medical and administrative management of inmates who engage in hunger strikes. It is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual inmates, and to ensure that procedures are pursued to preserve life.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

## § 549.61 Definition.

As defined in this rule, an inmate is on a hunger strike:

(a) When he or she communicates that fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours; or

(b) When staff observe the inmate to be refraining from eating for a period in excess of 72 hours. When staff consider it prudent to do so, a referral for medical evaluation may be made without waiting 72 hours.

45 FR 23365, Apr. 4, 1980.

## § 549.62 Initial referral.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(a) Staff shall refer an inmate who is observed to be on a hunger strike to medical or mental health staff for evaluation and, when appropriate, for treatment.

(b) Medical staff ordinarily shall place the inmate in a medically appropriate locked room for close monitoring.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

## § 549.63 Initial medical evaluation and management.

(a) Medical staff shall ordinarily perform the following procedures upon initial referral of an inmate on a hunger strike:

(1) Measure and record height and weight;

(2) Take and record vital signs;

(3) Urinalysis;

(4) Psychological and/or psychiatric evaluation;

(5) General medical evaluation;

(6) Radiographs as clinically indicated;

(7) Laboratory studies as clinically indicated.

(b) Medical staff shall take and record weight and vital signs at least once every 24 hours while the inmate is on a hunger strike. Other procedures identified in paragraph (a) of this section shall be repeated as medically indicated.

(c) When valid medical reasons exist, the physician may modify, discontinue, or expand any of the medical procedures described in paragraphs (a) and (b) of this section.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(d) When medical staff consider it medically mandatory, an inmate on a hunger strike will be transferred to a Medical Referral Center or to another Bureau institution considered medically appropriate, or to a community hospital.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

## § 549.64 Food/liquid intake/utput.

(a) Staff shall prepare and deliver to the inmate's room three meals per day or as otherwise authorized by the physician.

(b) Staff shall provide the inmate an adequate supply of drinking water. Other beverages shall also be offered.

(c) Staff shall remove any commissary food items and private food supplies of the inmate while the inmate is on a hunger strike. An inmate may not make commissary food purchases while under hunger strike management.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

## § 549.65 Refusal to accept treatment.

(a) When, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately, the physician shall give consideration to forced medical treatment of the inmate.

(b) Prior to medical treatment being administered against the inmate's will, staff shall make reasonable efforts to convince the inmate to voluntarily accept treatment. Medical risks faced by the inmate if treatment is not accepted shall also be explained to the inmate. Staff shall document

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

their treatment efforts in the medical record of the inmate.

(c) When, after reasonable efforts, or in an emergency preventing such efforts, a medical necessity for immediate treatment of a life or health threatening situation exists, the physician may order that treatment be administered without the consent of the inmate. Staff shall document their treatment efforts in the medical record of the inmate.

(d) Staff shall continue clinical and laboratory monitoring as necessary until the inmate's life or permanent health is no longer threatened.

(e) Staff shall continue medical, psychiatric and/or psychological follow-up as long as necessary.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

## § 549.66 Release from treatment.

Only the physician may order that an inmate be released from hunger strike evaluation and treatment. This order shall be documented in the medical record of the inmate.

[45 FR 23365, Apr. 4, 1980; 59 FR 31883, June 20, 1994]

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Attachment 2

OPI: **HSD/HSS**
NUMBER: **P5562.05**
DATE: **7/29/2005**
SUBJECT: **Hunger Strikes**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

OPI:   HSD/HSS

NUMBER:   P5562.05

DATE:   7/29/2005

SUBJECT:   Hunger Strikes

1.   [<u>PURPOSE AND SCOPE</u> §549.60.   **The Bureau of Prisons provides guidelines for the medical and administrative management of inmates who engage in hunger strikes.   It is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual inmates, and to ensure that procedures are pursued to preserve life.**]

2.   **SUMMARY OF CHANGES.**   Section 6 has been expanded to include

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro

pretrial and holdover inmates and ICE detainees.

Section 9 identifies Health Services staff and Food Service staff as those who may offer alternative beverages and nutritional supplements, if authorized by the physician.   This section also indicates food and toothpaste may be left in the inmate's cell.

Section 10 describes procedures for notifying the Regional Counsel when an inmate refuses treatment and the initiation of involuntary treatment.

3.     **PROGRAM OBJECTIVES.**     The expected results of this program are:

a.     The health and welfare of any inmate on a hunger strike will be monitored.

b.     Food and beverages will be offered to inmates regularly.

c.     When an inmate's life or health is threatened, involuntary medical treatment will be administered.

[**Bracketed Bold - Rules**]

Regular Type - Implementing Information

d.     Every incident of an inmate on a hunger strike will be properly reviewed, documented, and reported.

4.     **DIRECTIVES AFFECTED**

a.     **Directive Rescinded**

P5562.04   Hunger Strikes, Inmate (6/20/94)

b.     **Directives Referenced**

P5566.05   Use of Force and Application of Restraints on Inmates (7/25/96)

P6031.01   Patient Care (1/15/05)

P6090.01   Health Information Management (1/15/05)

c.     Rules cited in this Program Statement are contained in

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

28 CFR § 549.60-66.

5.   **STANDARDS REFERENCED**

a.   American Correctional Association 4th

Edition Standards for

Adult Correctional Institutions: 4-4257 and 4-4397 **(M)**

b.   American Correctional Association 4th

Edition Standards for

Adult Local Detention Facilities: 4-ALDF-4D-15 **(M)** and

4-ALDF-2A-52

6. [DEFINITION §549.61.   **As defined in this rule, an inmate is on a hunger strike:**

   a.   **When he or she communicates that fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours; or**

   b.   **When staff observe the inmate to be refraining from eating for a period in excess of 72 hours.   When staff consider it prudent to do so, a referral for medical evaluation may be made without waiting 72 hours.]**

A hunger strike may be announced by the inmate, or observed by staff, even though the inmate may be taking liquids.

#   At times, an inmate may not actually engage in a hunger strike, but merely make a bid to gain attention.

Other types of inmates (not on inpatient status in a Bureau of Prisons Medical Referral Center or hospitalized in the community) who should be monitored according to this policy include:

#   Inmates who are observed to be unable to eat or drink by virtue of mental illness or acute medical conditions.   Although not intentionally on a hunger

strike, these inmates are either unwilling or unable to eat or drink sufficiently to prevent complications.

**3**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

\#   Inmates with metabolic disorders or certain other illnesses, who deviate from normal eating habits or intake of fluid, could experience an immediate, significant hazard to their health and well-being.

In any case, it is also recognized that after long-term deprivation of food and shorter term deprivation of fluid, serious irreversible changes can occur, and sudden death can occur.

Procedures required in this Program Statement apply to pretrial and holdover inmates and ICE detainees.

### 7. [INITIAL REFERRAL   §549.62

**a.   Staff shall refer an inmate who is observed to be on a hunger strike to medical or mental health staff for evaluation and, when appropriate, for treatment.]**

Each Warden shall establish referral arrangements for the institution.   In addition, staff may consult Health Services anytime they observe an inmate refraining from consuming food and/or liquids prior to 72 hours.

**[b.   Medical staff ordinarily shall place the inmate in a medically appropriate locked room for close monitoring.]**

Ordinarily, placement in the medically appropriate room is a determination the institution physician makes.   This room will be a single cell observation room (i.e., dry cell or cell with water shut-off capabilities), where no other inmate contact is possible (i.e., other inmates can't pass food or liquid items to the

inmate on hunger strike status).

Inmates in Administrative Detention or Disciplinary Segregation may be retained in this status and remain in the SHU unless the physician determines movement to other quarters is medically necessary.

The Warden is to determine the type of observation for hunger strike inmates (e.g. continuous, 15 minute checks, routine).

\#   Under no circumstances will inmate companions be used to



© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

monitor hunger strike inmates.

8. [**INITIAL MEDICAL EVALUATION AND MANAGEMENT** §549.63

a.     Medical staff shall ordinarily perform the following procedures upon initial referral of an inmate on a hunger strike:

(1)   Measure and record height and weight; (2)    Take and record vital signs;

(3)   Urinalysis;

(4)   Psychological and/or psychiatric evaluation; (5)    General medical evaluation;

(6)   Radiographs as clinically indicated;

(7)   Laboratory studies as clinically indicated.]

If an inmate refuses the initial medical evaluation, a signed Refusal of Treatment form (BP-A358) must be obtained and also documented in the Progress Notes (SF-600) of the Inmate's Health Record.   (Refer to the Program Statement on Patient Care)

[b.   Medical staff shall take and record weight and vital signs at least once every 24 hours while the inmate is on a hunger strike.   Other procedures identified in paragraph (a) of this section shall be repeated as medically indicated.

c.   When valid medical reasons exist, the physician may modify, discontinue, or expand any of the medical procedures described in paragraphs (a) and (b) of this section.

d.     When medical staff consider it medically mandatory, an inmate on a hunger strike will be transferred to a Medical Referral Center or to another Bureau institution considered medically appropriate, or to a community hospital.]

The decision to transfer an inmate on a hunger strike for medical reasons should only be made after consultation with a physician.

#   The inmate should be admitted to a community hospital if his medical condition warrants continuous enteral (oral) or intravenous support.

**5**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

\#   Local institutions need not transfer an inmate on a hunger strike to a Medical Referral Center (MRC) unless an MRC's specific services are required.

\#   Mentally ill inmates who do not eat or drink for more than 30 days, regardless of the apparent reason, should be referred to an MRC for evaluation and treatment of the underlying mental illness.

   e.   Medical staff shall record in the appropriate section of the inmate's Health Record, entries for all the medical procedures described in this section.   (Refer to the Program Statement on Health Information Management.)

9.   [**FOOD/LIQUID INTAKE/OUTPUT** §549.64

   a.   **Staff shall prepare and deliver to the inmate's room three meals per day or as otherwise authorized by the physician.**]

   A verbal offer of a meal will not suffice.   Food from the food tray may be left in the inmate's cell.   Ordinarily, when the food tray is left in the inmate's cell, perishable food items will not be left for more than two hours.

   [**b.**   **Staff shall provide the inmate an adequate supply of drinking water.   Other beverages shall also be offered.**

   **c.**   **Staff shall remove any commissary food items and private food supplies of the inmate while the inmate is on a hunger strike.   An inmate may not make commissary food purchases while under hunger strike management.**]

An inmate under hunger strike management may still purchase

non-food items, such as stamps, from the commissary.   The inmate

is allowed to have toothpaste in the dry cell.

   d.   All food and water intake and output will be monitored and recorded as needed or to the extent possible.   The Warden shall make this determination after consultation with the physician. This procedure is to continue until ended by a physician.

\#   This means a dry cell must be available for housing hunger strike inmates.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Health Services and Food Service staff may offer alternative beverages, including liquid nutritional supplements, if authorized by the physicians.   Any beverages other than drinking water must be documented (e.g. BP-S292) and that information relayed to Health Services staff.   Acceptance of liquids alone should not be documented as accepting a meal.

10. [**REFUSAL TO ACCEPT TREATMENT** §549.65

   a.   **When, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately, the physician shall give consideration to involuntary medical treatment of the inmate.]**

The decision to force treatment upon the inmate is a medical decision, preferably by a written physician's order, with potential legal implications.

When it appears to medical staff that the inmate's condition is deteriorating to the extent that intervention may soon be required, the Regional Counsel must be notified so any legal issues may be addressed.   Although legal counsel has been notified, medical staff should not suspend or delay involuntary treatment if the physician is convinced to a reasonable medical certainty that there is an immediate threat to the inmate's life, or permanent damage to the inmate's health.

Regional Counsel will determine whether it is appropriate to contact the local U.S. Attorney's Office.

#   In the case of potential involuntary treatment of a pretrial inmate, institution legal staff or the

Regional Counsel must be notified that intervention may be required, in order to determine whether the court should be notified.

#   In all such situations, the Regional Counsel will inform the Regional Director.

[b.   **Prior to medical treatment being administered against the inmate's will, staff shall make reasonable efforts to convince the inmate to voluntarily accept treatment.   Medical risks faced by the inmate if treatment is not accepted shall also be**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

explained to the inmate.   Staff shall document their treatment efforts in the medical record of the inmate.

   c.   When, after reasonable efforts, or in an emergency preventing such efforts, a medical necessity for immediate treatment of a life or health threatening situation exists, the physician may order that treatment be administered without the consent of the inmate.   Staff shall document their treatment efforts in the medical record of the inmates.]

Written reports of such treatment shall be submitted to the Medical Director and Regional Director.   The Warden shall provide prompt notification and any involuntary treatment under this Program Statement to the sentencing judge, with an explanation of the background of and the reasons for the treatment.   The outcome of the hunger strike and the treatment administered shall also be reported.

When a physician orders involuntary medical treatment, to include placing a nasogastric tube for feeding, and the inmate refuses to comply, as with any other use-of-force, these events should be videotaped.

All staff involved in the use of force shall wear appropriate protective clothing as outlined in the Use of Force Program Statement.

Only the physician may order involuntary medical treatment.

#   Normally, this is to consist of a nasogastric tube for feeding.

#   If unsuccessful or medically inappropriate, then intravenous fluids and hyperalimentations intravenously may be necessary.

#   As a last report, gastrostomy and tube feeding through the stomach may be required, however, review by the appropriate court should first be sought before attempting this treatment.

#  Simple IVs may be performed in the institution,

however, hyperalimentations or gastrostomy tube feeding

must be performed in a hospital or an MRC (see Clinical

**8**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Treatment Guidelines or Medical Management of Inmates).

**[d.   Staff shall continue clinical and laboratory monitoring as necessary until the inmate's life or permanent health is no longer threatened.]**

Normally, treatment must continue until adequate oral intake of food and liquid is achieved.  Medical monitoring for severe or life-threatening complications of malnutrition may continue, at the physician's discretion, beyond the point at which the inmate resumes adequate oral intake.

**[e.      Staff shall continue medical, psychiatric and/or psychological follow-up as long as necessary.]**

11. [RELEASE FROM TREATMENT §549.66.   Only the physician may order that an inmate be released from hunger strike evaluation and treatment.   This order shall be documented in the medical record of the inmate.]

Documentation is to be made in the Progress Notes section of the

Inmate's Health Record.

12.   **MEDICAL JUDGMENT**.  None of the procedures or guidelines in this Program Statement are meant to limit or override the exercise of sound medical judgment by the physician responsible for medical care.

#   Each case must be evaluated on its own merits and individual circumstances.

#   Treatment is to be given and documented in accordance with accepted medical practice.

/s/

Harley G. Lappin

Director


Director

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Attachment 3

To: CMU Unit Team

From: Martin S. Gottesfeld (Reg. #: 12982-104)

Date: Wednesday, January 22nd, 2020

Subject: Status of sanctions from Incident Report 3338082

Solicitous Unit Team,

I hope you are well.

On Friday, December 20th, 2019, the attendic DHO told me he sanctioned me for Incident Report 3338082. I filed Gottesfeld v. Lammes, 2:20-cv-00012-JRS-MJD (S.D. Ind.), challenging his determination.

The sanctions announced by the DHO; i.e. 45 days loss of electronic messaging and phone, 27 days forfeited GCT, and a $50 fine; do not appear to have been entered into the system and I have not received written findings from the DHO. Without them being entered into the system, my TRULINCS contacts received no notifications that my electronic-messaging privileges have been revoked and they may be continuing to try to contact me electronically through CORRLINKS.

May I please inquire as to the status of these sanctions? Without them being entered into the system, my TRULINCS contacts received no notifications that my electronic-messaging privileges have been revoked and they may be continuing to try to contact me electronically through CORRLINKS.

May I also please get a photocopy of this cop-out for my records?

Thanks,

Martin S. Gottesfeld, pro se

— Page 1 of 1 —

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| Martin S. Gottesfeld, pro se,<br>Plaintiff<br>- against -<br>Hugh J. Hurwitz, et al.,<br>Defendants |

Case No.: <u>18-cv-10836-PGG-GWG</u>

## <u>MOTION FOR SANCTIONS (FED. R. CIV. P. 11(c) AND</u>
## <u>LOC. CIV. R. 1.5(b)(5))</u>

Plaintiff Martin S. Gottesfeld (herein "plaintiff"), acting <u>pro se</u>, hereby moves The Honorable Court for an order sanctioning the defendants' counsel, Assistant United States Attorney Alexander J. Hogan (herein "Assistant United States Attorney Hogan"), by:

1) suspending Assistant United States Attorney Hogan's privilege to practice before The Honorable Court for nine (9) months;

2) requiring Assistant United States Attorney Hogan to reimburse the plaintiff for the unnecessary expenses thus far incurred by the relevant misconduct, estimated currently at five hundred dollars ($500);

3) ordering Assistant United States Attorney Hogan immediately to make all required disclosures in the instant case;

4) ordering Assistant United States Attorney Hogan immediately to take responsibility for the sanctioned misconduct and to set straight the record of the instant case;

5) requiring Assistant United States Attorney Hogan to include a copy of The Court's order of sanctions with all future notices of appearance he thereafter files in The Southern District of New York; and

6) referring the misconduct to the relevant complaint committee pursuant to <u>Local Civil Rule (Loc. Civ. R.) 1.5(f)</u>.

The plaintiff brings this motion for sanctions and requests the above

remedies pursuant to the below-detailed itemized violations of The Federal Rules of Civil Procedure (Fed. R. Civ. P.) 11(c)(1), 11(c)(2), 11(c)(5), 11(b)(1), 11(b)(2), 11(b)(3), 11(b)(4), 5(b)(1), and 5(b)(2)(C); Loc. Civ. R. 1.5(b)(5) and 1.5(f); and either The New York Rules of Professional Conduct (N.Y. R. Prof. Cond.) 1.1(a) and 1.3(a), or N.Y. R. Prof. Cond. 1.16(a), 3.1(a), 3.1(b)(2), 3.2, 3.3(a)(1), 3.3(a)(2), 3.4(a)(1), 3.4(a)(3), 3.4(a)(4), 3.4(a)(6), and 8.4(c), or all of the above N.Y. R. Prof. Cond.

In support of this motion, the plaintiff herewith provides Exhibit 1 hereto, Martin S. Gottesfeld, Declaration In Support of Motion For Sanctions (Monday, November 25th, 2019); Exhibit 2 hereto, photocopied envelopes of privileged correspondence that was unlawfully and preemptively opened and digitally preserved outside of the plaintiff's presence prior to delivery to the plaintiff; and Exhibit 3 hereto, proof of service of this motion and the exhibits hereto upon Assistant United States Attorney Hogan, effective on Monday, November 25th, 2019, pursuant to the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988) and Fed. R. Civ. P. 5(b)(2)(C), 5(b)(2)(B)(ii) and 11(c)(2).

The plaintiff hereby moves The Honorable Court pursuant to Federal Rule of Evidence 201(c)(2) to take mandatory judicial notice of Exhibit 1 hereto, Exhibit 2 hereto, and Exhibit 3 hereto.

As The Court is no doubt aware, Loc. Civ. R. 1.5(b)(5) makes violations of The New York State Rules of Professional Conduct actionable in the district under Fed. R. Civ. P. 11(c). "Indeed, Civil Rule 1.5 of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds those practicing before this court to the New York State Lawyer's Code of Professional Responsibility, as adopted by the State's Appellate Divisions." Richards v. City of New York, 2000 U.S. Dist. LEXIS 907, 97 Civ. 7990 (MBM)

(S.D.N.Y. February 3, 2000) at *12-14. "[S]ee also Local Civ. Rule 1.5(b)(5) (violations of the New York State Rules of Professional Conduct are grounds for discipline, including suspension)." United States v. Parse, 789 F.3d 83, 89 (2d Cir. 2015) (emphasis in original).

Assistant United States Attorney Hogan, as counsel for the instant defendants, had "an ethical obligation to 'disclose to the tribunal controlling legal authorit[ies] known to [him,] the lawyer[,] to be directly adverse to the position of the [defendants, his] client[s]." Mayes v. 490 Habitat, Inc., 2019 U.S. Dist. LEXIS 35270, 18-CV-1427 (SJF) (GRB) (S.D.N.Y. March 4, 2019) at *8 n. 5 (alterations[] added), conferring Vill. of Freeport v. Barella, 814 F.3d 594, 609, n. 60 (2d Cir. 2016) and quoting N.Y. R. Prof. Cond. 3.3(a)(2).

Yet, Assistant United States Attorney Hogan failed to disclose various controlling legal authorities that he either knew or should have known to be adverse to his clients' positions. Please see Exhibit 1 hereto at 1 ¶¶ 4-7 and at 2 ¶¶ 18-22.

Assistant United States Attorney Hogan omitted these controlling legal authorities even while he responded to filings that should have prompted him to disclose them. For example, D.E. 59 at 1 states:

> [T]he defendants unexpectedly filed dozens of unreported decisions. As such, the process of distinguishing the instant case from those provided by the defendants as unreported is slow and manual, since published, well-accepted, and binding precedential decisions will not bear citation to the plethora of unreported decisions provided by the defendants.
> The plaintiff wishes to state explicitly that he believes the defendants' motion to dismiss is meritless and he does look forward to filing his response.
> Given the difficulties and delays enumerated in the materials referenced above...

Assistant United States Attorney Hogan, in filing D.E. 61 in response to the above, made no such disclosure of the above-referenced directly-adverse

"published, well-accepted, and binding precedential decisions" despite the plaintiff's citation to the resultant "difficulties and delays" that Assistant United States Attorney Hogan knew or should have known arose from his continued failure to disclose them and the explicit allegation that the arguments Assistant United States Attorney Hogan proffered in D.E. 51 and D.E. 52 are "meritless."

For one example, Assistant United States Attorney Hogan argued inter alia in D.E. 52 at 28 that Sandin v. Conner, 515 U.S. 472 (1995) applies to the instant case while he withheld that The United States Court of Appeals for The Second Circuit decided directly to the contrary. "Sandin does not apply to pretrial detainees." Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (collecting cases).

Assistant United States Attorney Hogan nonetheless argued that under Sandin, the length of the plaintiff's pre-trial administrative detention--some eighty-one (81) consecutive days--was in and of itself insufficient to trigger a Due Process liberty interest. D.E. 52 at 28.

Assistant United States Attorney Hogan thus ran afoul of Fed. R. Civ. P. 11(b)(2) by misapplying Sandin while withholding the adverse decision in Benjamin because his legal contention to apply Sandin to a pre-trial detainee was unwarranted by existing law and supported only by frivolous arguments. Fed. R. Civ. P. 11(b) states in part:

> By presenting to the court a pleading, written motion, or other paper--- whether by signing, filing, submitting, or later advocating it---an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:... (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

Assistant United States Attorney Hogan made no such argument--frivolous or otherwise--"for extending" Sandin nor for "modifying" or "reversing" the

the directly-adverse holding in <u>Benjamin</u>. His argument to apply <u>Sandin</u> without abrogating <u>Benjamin</u> was thus frivolous. Please see <u>Black's Law Dictionary 739 (9th ed. 2009)</u> (**bold** and <u>emphasis</u> in original, alteration[] added):

> **frivolous**, <u>adj.</u> (15[th century]) Lacking a legal basis or legal merit; not serious; not reasonably purposeful <a frivolous claim>.

Assistant United States Attorney Hogan therein also violated <u>N.Y. R. Prof. Cond. 3.1(a)</u>, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous." <u>Mena v. Heath</u>, 2016 U.S. Dist. LEXIS 71655, 11cv3681-ALC-FM (S.D.N.Y. May 31, 2016) at *40 quoting <u>N.Y. R. Prof. Cond. 3.1(a)</u> (from <u>N.Y. Comp. Codes R. & Regs. tit. 22, § 1200 (2013)</u>).

In misrepresenting <u>Sandin</u> in <u>D.E. 52</u> while also omitting <u>Benjamin</u>, Assistant United States Attorney Hogan similarly violated <u>N.Y. R. Prof. Cond. 1.16(a)</u> because he misrepresented the law in an inaccurate, dishonest, and deceitful manner and made no "good faith argument for an extension, modification, or reversal of existing law." <u>Lightray Imaging Inc. v. Tarek Invs. Ltd. (In re Peak Hotels & Resorts Grp. Ltd.)</u>, 2019 U.S. Dist. LEXIS 55978, District Court Appeal No.: 18 Civ. 384 (ER) (S.D.N.Y. March 31, 2019) at *11 n. 2 quoting <u>N.Y. R. Prof. Cond. 1.16(a)(2)</u>.

Ignorance and incompetence are no excuses for Assistant United States Attorney Hogan because of his obligations under <u>N.Y. R. Prof. Cond. 1.1(a) and 1.3(a)</u>. "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." <u>In re Harmon</u>, 2010 Bankr. LEXIS 3345, Case No.: 10-74390-ast, Chapter 13 (E.D.N.Y. September 22, 2010) quoting <u>N.Y. R. Prof. Cond. 1.1(a)</u>. "A lawyer shall act with reasonable diligence and promptness in representing a client." <u>Id. quoting N.Y. R. Prof.</u>

Cond. 1.3(a).

Any argument that Assistant United States Attorney Hogan did not violate Fed. R. Civ. P. 11(b)(2) and N.Y. R. Prof. Cond. 1.16(a), 3.1(a), 3.3(a)(1), 3.3(a)(2), and 8.4(c) is thus a stipulation that he instead violated N.Y. R. Prof. Cond. 1.1(a) and 1.3(a). Yet either way, The Court must sanction Assistant United States Attorney Hogan or risk encouraging additional such misconduct in the future. Moreover, Assistant United States Attorney Hogan unfairly prejudiced the plaintiff through the above misconduct by delaying the adjudication of the instant case and forcing the plaintiff to work needlessly to refute frivolous arguments that Assistant United States Attorney Hogan knew or should have known to be meritless in the first place, i.e. even before he filed them. Please see Exhibit 1 hereto at 2 ¶¶ 10-12.

Throughout this delay, the plaintiff continued to be harmed by the intervening actions of Assistant United States Attorney Hogan and his clients. Exhibit 1 hereto at 3 ¶¶ 18-33. The plaintiff is thus entitled to relief.

Assistant United States Attorney Hogan also violated the above rules by failing to cite Allah v. Milling, 876 F.3d 48 (2d Cir. 2017), in which The United States Court of Appeals for The Second Circuit found; without reliance on the length, atypicality, or harshness of confinement; that the placement of a pre-trial detainee in administrative segregation violated the detainee's Due Process rights.

Assistant United States Attorney Hogan further argued, inter alia, that the conditions of confinement detailed in the instant complaint "do not amount to atypically harsh conditions." D.E. 52 at 29. Yet, he withheld the directly-contradictory holdings of The United States Court of Appeals for The Second Circuit in Corselli v. Coughlin, 842 F.2d 23 (2d Cir. 1988); Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999); Gaston v. Coughlin, 249 F.3d 156 (2d

Cir. 2001); and Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004).

Perhaps most telling of all, however, Assistant United States Attorney Hogan omitted citation to Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000), wherein The United States Court of Appeals for The Second Circuit upheld This Court's prior explicit rejection of many of the same losing and now-frivolous arguments that Assistant United States Attorney Hogan proffered on behalf of the instant defendants, including that "Plaintiff's Constitutional Rights Were Not Violated." D.E. 52 at 27.

Assistant United States Attorney Hogan, inter alia, also falsely and frivolously averred that the plaintiff moved for an extension "without further elaboration on what he was unable to receive that [was] preventing him from filing his opposition." D.E. 86. Yet, the plaintiff had previously filed exactly such a list. D.E. 81 at 5. Please see also Exhibit 1 hereto at 1 ¶ 8.

Assistant United States Attorney Hogan thus made a false factual contention that could never have evidentiary support and he thereby violated Fed. R. Civ. P. 11(b)(3), which requires, "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

Assistant United States Attorney Hogan's multiple false claims similarly violated N.Y. R. Prof. Cond. 3.3(a)(1), "A lawyer shall not knowingly make a false statement of fact to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc., 2019 U.S. Dist. LEXIS 76812, 17 Civ 1 (NRB) (S.D.N.Y. May 6, 1999) at *5 n. 2 quoting N.Y. R. Prof. Cond. 3.3(a)(1).

The bogus denial proffered by Assistant United States Attorney Hogan

against the irrefutable fact that the plaintiff had previously provided an
explicit list of "what he was unable to receive that [was] preventing him from
filing his opposition" broke Fed. R. Civ. P. 11(b)(4) as well, which requires,
"denials of factual contentions are warranted on the evidence or, if
specifically so identified, are reasonably based on belief or a lack of
information."

Assistant United States Attorney Hogan broke N.Y. R. Prof. Cond. 8.4(c)
too. "A lawyer or law firm shall not... engage in conduct involving
dishonesty, fraud, deceit or misrepresentation." Bacote v. Riverbay Corp.,
2017 U.S. Dist. LEXIS 35098, 16 Civ. 1599 (GHW) (AJP) (S.D.N.Y. March 10,
2017) at *26 quoting N.Y. R. Prof. Cond. 8.4(c).

It is further worth noting that Assistant United States Attorney Hogan
claimed falsely in D.E. 88 that the plaintiff had violated The Court's
scheduling order. In reality though, agents of Assistant United States
Attorney Hogan had delayed the mailing of the plaintiff's motions for
extensions, which were nonetheless timely due to the prison-mailbox rule
arising from the Supreme Court decision of Houston v. Lack, 487 U.S. 266
(1988). Exhibit 1 at 2 ¶ 9. Assistant United States Attorney Hogan, however,
omitted citation to Houston v. Lack in D.E. 88 even though--or perhaps
precisely because--as a legal authority, Houston v. Lack is binding and
directly adverse to his assertions therein.

Assistant United States Attorney Hogan's omission of Houston v. Lack from
D.E. 88 is another violation of either N.Y. R. Prof. Cond. 1.16(a)(2), 3.1(a),
3.3(a)(1), 3.3(a)(2), and 8.4(c); as well as Fed. R. Civ. P. 11(b)(2) and
11(b)(3); or of N.Y. R. Prof. Cond. 1.1(a) and 1.3(a). Please see Exhibit 1
hereto at 2 ¶ 9.

Before Assistant United States Attorney Hogan violated Fed. R. Civ. P.

11(b)(2) and 11(b)(3) and N.Y. R. Prof. Cond. 3.3(a)(1) and 8.4(c) with his dishonest and deceitful misrepresentations about the plaintiff's timely and properly-annotated motions for extensions--the filings of which were only necessitated by the actions and omissions of Assistant United States Attorney Hogan, his clients, and their collective agents--Assistant United States Attorney Hogan already broke these same rules when he filed D.E. 52-1 and D.E. 52-2. Please see the plaintiff's November 18th, 2019, memorandum of law in opposition to the defendants' motion to dismiss at pages 63-64 and 73. The eight-(8)-day gap between D.E. 52-1, as therein dated, and D.E. 52-2, as therein dated, is evidence of the dishonest and deceitful misrepresentation that Assistant United States Attorney Hogan tried to perpetrate upon This Court. Given Exhibit 17 to the plaintiff's memorandum in opposition to the motion to dismiss, why else would D.E. 52-2 have been dated eight (8) days before D.E. 52-1? No matter the answer, Assistant United States Attorney Hogan presented D.E. 52-1 to This Court along with the unequivocal misrepresentation therein that D.E. 52-2 was "true and correct" on May 16th, 2019. Yet, the aforementioned Exhibit 17 to the plaintiff's memorandum in opposition uneqivocally proves that D.E. 52-2 was neither true nor correct as of eight (8) days earlier on May 8th, 2019.

Assistant United States Attorney Hogan thus violated N.Y. R. Prof. Cond. 3.4(a)(4). "[A] lawyer shall not... knowingly use perjured testimony or false evidence." Otto v. Hearst Communs., Inc., 2019 U.S. Dist. LEXIS 35051, 17-CV-4712 (GHW) (JLC) (S.D.N.Y. February 21, 2019) at *31-32 quoting N.Y. R. Prof. Cond. 3.4(a)(4).

Of course, suborning perjury is also illegal. 18 U.S.C. § 1622. Therefore, Assistant United States Attorney Hogan violated N.Y. R. Prof. Cond. 3.4(a)(6) by filing D.E. 52-1 and D.E. 52-2. "A lawyer shall not... knowingly

engage in other illegal conduct or conduct contrary to these Rules." Geltzer v. Brizinova (In re Brizinova), 565 B.R. 488, 501 (E.D.N.Y. 2017) quoting N.Y. R. Prof. Cond. 3.4(a)(6).

Assistant United States Attorney Hogan is further breaking N.Y. R. Prof. Cond. 3.4(a)(6) by taking part in his clients' unlawful conspiracy to deprive the plaintiff of his civil rights in flagrant violation of 18 U.S.C. § 241 and by unscrupulously defending and hiding said conspiracy. Please see Exhibit 1 hereto at 2 ¶¶ 18-33.

Indeed, Exhibit 2 to the plaintiff's memorandum in opposition shows that on February 3rd, 2019, the plaintiff put the instant case on the front page of The Intercept.

The docket entry text for docket entries 23-26 shows that on February 11th, 2019, all of the defendants and Assistant United States Attorney Hogan were served the instant complaint. Assistant United States Attorney Hogan has claimed otherwise, but given the above-detailed misconduct, the plaintiff trusts the docket as it stands and so should The Honorable Court. Further, Assistant United States Attorney Hogan has never moved to amend the docket, which is the official record. "A docket is a court's official record of what occurs in a case." Leonard v. Lacy, 88 F.3d 181, 185 (2d Cir. 1996).

Four (4) days after service, as shown in D.E. 13, the defendants and Assistant United States Attorney Hogan unlawfully moved the plaintiff to the SHU at MDC Brooklyn and designated him to a "communications-management unit," or "CMU," with no prior administrative hearings or written administrative orders. Exhibit 1 hereto at 4 ¶¶ 32-33. This violated the same federal regulations noted in the instant case as well as the plaintiff's Due Process rights. 28 C.F.R. §§ 541.25(a) and 541.26. Aref v. Lynch, 833 F.3d 242 (D.C.

Cir. 2016).

Through the above unlawful actions, Assistant United States Attorney Hogan and his clients needlessly delayed and added expense to the instant litigation. They continued their obstruction for the malicious purpose of harassing and injuring the plaintiff, his family, and his team even after the plaintiff's explicit notification in D.E. 59 at 1 and other pleadings. Assistant United States Attorney Hogan is thus violating on an ongoing basis Fed. R. Civ. P. 11(b)(1) and N.Y. R. Prof. Cond. 1.16(a)(1), 3.1(b)(2), and 3.2.

Assistant United States Attorney Hogan is bringing the above untrue, frivolous, and deceitful claims for the "improper purpose" of "harass[ing], caus[ing] unnecessary delay, or needlessly increas[ing] the cost of litigation." Fed. R. Civ. P. 11(b)(1).

"A lawyer shall not accept employment on behalf of a person if the lawyer knows or reasonably should know that such person wishes to: (1) bring a legal action, conduct a defense, or assert a position in a matter, or otherwise have steps taken for such person, merely for the purpose of harassing or maliciously injuring any person." Lightray Imaging Inc. at *11 n. 2 quoting N.Y. R. Prof. Cond. 1.16(a). "[I]n representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the resolution of litigation, in violation of Rule 3.2, or serves merely to harass or maliciously injure another" person. Brizinova at 499 quoting N.Y. R. Prof. Cond. 3.1(b)(2).

These violations call into question whether Assistant United States Attorney Hogan is meeting his obligations under N.Y. R. Prof. Cond. 3.4(a)(1) and 3.4(a)(3). "[A] lawyer shall not... suppress any evidence that the lawyer

or the client has a legal obligation to produce." Otto at *31 quoting N.Y. R. Prof. Cond. 3.4(a)(1). Similarly, Assistant United States Attorney may not "conceal or knowingly fail to disclose that which the lawyer is required by law to reveal." Id. quoting N.Y. R. Prof. Cond. 3.4(a)(3). Please see also the plaintiff's previously-filed CLAIM FOR MANDATORY JUDICIAL NOTICE, FREV 201(c)(2), BY AFFIDAVIT, Request for Admission number 28, wherein the instant defendants admitted that they have in their custody and control further documents validating the plaintiff's claims.

The plaintiff hereby moves The Honorable Court to rebuke the above misconduct by Assistant United States Attorney Hogan and to issue a six-(6)-point order as above described. The plaintiff asks that Assistant United States Attorney Hogan lose the same amount of time from his pursuits--nine (9) months--that his misconduct took from the plaintiff. Please see Exhibit 1 at 3 ¶ 28. This is a modest sanction given that in addition to the plaintiff's lost publications and needless work and delay, Assistant United States Attorney Hogan's misconduct knowingly led to the plaintiff unnecessarily and unlawfully spending February 15th, 2019, through March 31st, 2019, in solitary and small-group confinement.

Should The Honorable Court wish to see receipts validating the costs incurred, then the plaintiff can certainly provide them. The plaintiff believes that five hundred dollars ($500) is a low estimate and that an assiduous tally would result in an exact figure that is considerably higher.

Assistant United States Attorney Hogan should, of course, take responsibility for the above misconduct, set straight the record of the instant case, and make any required disclosures absent any explicit mandate by The Honorable Court. By issuing such an order, therefore, The Court would

merely help assure the correction of that which never should have gone awry in the first place.

Requiring Assistant United States Attorney Hogan to include a copy of The Court's order of sanctions with all future notices of appearance he files in The Southern District of New York is a prudent and necessary means of ensuring his future compliance with This Court's rules, indepedent of his own voluntary choices. By ensuring that all future judicial officers in the district before whom Assistant United States Attorney Hogan later appears and all relevant litigating parties learn of the misconduct in this case, This Court would deter future misconduct and help ensure that fair notice is given to judicial officers and opposition counsel so that they can be on guard against it.

Finally, referral of this misconduct pursuant to Loc. Civ. R. 1.5(f) is surely prudent. This Court lacks the authority to do all that the grievance committee can do. Given the instant events, further investigations of Assistant United States Attorney Hogan's conduct in other cases before other judicial officers in the district are prudent. Such investigations are for the committee to conduct, but it may only do so upon referral.

The Court and the unrepresented incarcerated plaintiff rely on sworn assistant United States attorneys, including Assistant United States Attorney Hogan, to play their vital role in the proper administration of justice. They must not be allowed to stray or the nation suffers as a whole. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all... As such, he is in a peculiar and very definite manner a servant of the law." Berger v. United States, 295 U.S. 78, 88 (1935) (internal quotation marks and citation omitted).

"The United States wins its point whenever justice is done its citizens

in the courts." Brady v. Maryland, 373 U.S. 83 (1963). The United States would surely lose its point should Assistant United States Attorney Hogan continue the above misconduct.

Moreover, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954). There would be no justice, apparent or otherwise, if such misconduct is tolerated openly.

The plaintiff notes Exhibit 1 hereto at 4 ¶¶36-37 and his rights under Castro v. United States, 540 U.S. 375 (2003).

Respectfully mailed and filed pursuant to the prison-mailbox rule of Houston v. Lack on Thursday, December 19th, 2019, or the first opportunity thereafter in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and U.S. Postal Service tracking number 9114 9023 0722 4291 7997 15, handed to Ms. J. Wheeler of the FCI Terre Haute CMU Unit Team, acting in her official capacity as an agent of the defendants and of Assistant United States Attorney Hogan,

by: _____

Martin S. Gottesfeld, pro se
Federal Registration Number: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

U.S.P.S, Tracking # 9114 9023 0722 4291 7997 15

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, pro se, hereby certify that on Monday, November 25th, 2019, I mailed a copy of the foregoing document to counsel for the defendants in the above-captioned case pursuant to Houston v. Lack, 487 U.S. 266 (1988) and Fed. R. Civ. P. 11(c)(2), Fed. R. Civ. P. 5(b)(1) and 5(b)(2)(C), by handing said copy in an envelope bearing sufficient affixed pre-paid first-class U.S. postage to Ms. J. Wheeler of the FCI Terre Haute CMU unit team for mailing in her official capacity as an agent of the defendants and their counsel in the above-captioned case,

by _____

Martin S. Gottesfeld, pro se

<u>Declaration In Support of Motion For Sanctions:</u>

I, Martin S. Gottesfeld, hereby affirm that the following is true and accurate to the best of my knowledge, information, and belief on this 25th day of November, 2019, and pursuant to 28 U.S.C. § 1746(1) I hereby declare that the following is true and correct under penalty of perjury under the laws of the United States:

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al., 18-cv-10836-PGG-GWG (hereafter "the case"), currently pending before The Honorable United States District Court for The Southern District of New York (hereafter "The Court").

2. Counsel for the defendants in the case is Assistant United States Attorney Alexander J. Hogan (herein also "Assistant United States Attorney Hogan").

3. Like all assistant United States attorneys, Assistant United States Attorney Hogan is a sworn public official and an officer of The Court.

4. Assistant United States Attorney Hogan       filed as docket entry (D.E.) fifty-one (51) in the case a motion to dismiss along with D.E. fifty-two (52), a memorandum of law in support thereof (hereafter collectively also the "motion to dismiss").

5. Assistant United States Attorney Hogan intentionally, or incompetently, or both intentionally and incompetently withheld from the motion to dismiss controlling legal authorities that are directly adverse to the position of his clients and that were either known to him or that should have been known to him and that he had a duty to discover prior to filing, specifically including, but in no way limited to the following: Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001); Corselli v. Coughlin, 842 F.2d 23 (2d Cir. 1988); Allah v. Milling, 876 F.3d 48 (2d Cir. 2017); Tellier v. Fields, 280 F.3d 69 (2d Cir. 2000); Gaston v. Coughlin, 249 F.3d 156 (2d Cir. 2001); Palmer v. Richards, 364 F.3d 60 (2d Cir. 2004); Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999); Fed. R. Crim. P. 18 and 46(h)(1); and Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001).

6. At the same time that Assistant United States Attorney Hogan withheld from the motion to dismiss the above directly-adverse and controlling legal authorities, Assistant United States Attorney Hogan frivolously and meritlessly misapplied the inapplicable Supreme Court decision of Sandin v. Conner, 515 U.S. 472 (1995), despite the explicit and binding admonishment by The United States Court of Appeals for The Second Circuit that "Sandin does not apply to pretrial detainees." Please see D.E. 52 at 28 ("1. Confinement in the SHU") and please cf. Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (collecting cases) ("Sandin does not apply to pretrial detainees").

7. In misapplying Sandin while omitting Benjamin, Assistant United States Attorney Hogan made no "good faith argument for an extension, modification, or reversal of" the existing law that "Sandin does not apply to pretrial detainees," but he instead dishonestly, deceitfully, and inaccurately misrepresented the law as if Sandin does apply to pre-trial detainees and The Second Circuit never ruled otherwise.

8. Assistant United States Attorney Hogan filed D.E. 86 in the case, wherein he claimed falsely that I moved for an extension "without further elaboration on what" I "was unable to receive that" was "preventing" me "from

filing" my "opposition," when in reality I had filed exactly such a list in D.E. 81 at 5. Please see D.E. 86 and please cf. D.E. 81 at 5.

9. Assistant United States Attorney Hogan filed D.E. 88 in the case, wherein he falsely averred that I violated The Court's scheduling order when I had not done so. Please see D.E. 88 and please cf. Houston v. Lack, 487 U.S. 266 (1988) and my Thursday, November 21st, 2019, letter-reply to D.E. 88 addressed to The Honorable United States District Court Judge Paul G. Gardephe.

10. I was forced to deplete substantial financial resources to refute the frivolous and meritless arguments that Assistant United States Attorney Hogan proferred. These financial resources were required to purchase typewriter ribbons, typewriter eraser ribbons, TRULINCS fees, U.S. postage, stationey, and photocopies that I estimate cost me five hundred dollars ($500).

11. The frivolous and meritless arguments were employed by Assistant United States Attorney Hogan to needlessly delay and add expense to my litigation of the case.

12. By the time this declaration is filed with The Court, more than six (6) months will have elapsed since Assistant United States Attorney Hogan filed the motion to dismiss and this entire period of delay is attributable to the frivolous arguments he put forth therein.

13. Assistant United States Attorney Hogan requested permission on March 21st, 2019, to provide information ex parte to The Court in D.E. 19 at 1 n. 2.

14. The Court granted permission to Assistant United States Attorney Hogan in D.E. 20, entered on March 21st, 2019, to file the above-requested information ex parte; however nowhere did The Court authorize Assistant United States Attorney Hogan to submit anything entirely off the record.

15. Assistant United States Attorney Hogan nonetheless submitted a March 21st, 2019, letter to The Court that was entirely outside the record of the case.

16. Assistant United States Attorney Hogan referred in the past tense to "the Government's March 21, 2019[,] ex parte submission to [T]he Court" when he filed D.E. 27.

17. The docket report for the case shows no possible docket entry numbers for any ex parte submission between D.E. 20 at D.E. 27, therefore Assistant United States Attorney Hogan submitted the information entirely off the record.

18. On August 19th, 2016, The United States Court of Appeals for The District of Columbia Circuit decided Aref v. Lynch, 833 F.3d 242 (D.C. Cir. 2016) and therein held that the defendants in the case cannot lawfully transfer prisoners without prior due process to communications-management units (herein also "CMUs").

19. The holding in Aref also applies to agents and attorneys of the defendants in the case.

20. In violation of Aref, the defendants in the case and Assistant United States Attorney Hogan transferred me to CMU with no prior administrative hearings and without providing to me beforehand any written administrative orders, just like they continued to deprive me of the required due process

before they placed me in the SHUs at MDC Brooklyn and FTC Oklahoma and just as the defendants in the case had done by placing me in the SHU at MCC New York.

21. I had never once been found responsible for a single inmate disciplinary infraction before the defendants in the case put me in any SHU or CMU.

22. By designating me to a CMU with no prior due process in violation of Aref, Assistant United States Attorney Hogan and his clients in the case have denied me direct access to New York State case law, rules of procedure, and rules of professional conduct that would otherwise easily be available to me in a regular institution law library.

23. The only way for me to lookup New York State case law, rules of procedure, and rules of professional conduct is to look for references thereto in the federal court decisions that are included in the LexisNexus® subscription that is available to CMU inmates and this is an incomplete, indirect, menial, time-consuming, and difficult-to-use manner of access that often results in out-of-date and incomplete information.

24. Assistant United States Attorney Hogan and his clients in the case have also illegitimately gained access to my privileged legal correspondence by designating me to a CMU as ever since this designation was made my privileged correspondence has for the first time been regularly opened, digitized, and preserved for Assistant United States Attorney Hogan's review outside my presence.

25. Assistant United States Attorney Hogan and his clients in the case have illegitimately and preemptively read privileged legal correspondence prior to its delivery to me, including the contents of every envelope represented in Exhibit 2 to this filing, despite explicit markings from U.S. courts that include, "CONFIDENTIAL," "LEGAL MAIL," and "LEGAL MAIL - open only in the presence of inmate;" and explicit markings by licensed attorneys that include, "Attorney-Client Privileged Material Open in Presence of Inmate Only" and "LEGAL MAIL CONFIDENTIAL & PRIVILEGED."

26. Four (4) days after Assistant United States Attorney Hogan and his clients in the case were served the complaint in the case, they moved me to the SHU at MDC Brooklyn and I was told I was designated to a CMU.

27. Since being moved to the SHU at MDC Brooklyn I have published only a couple of articles and I have not published anything at all since April, 2019, due to the unlawful retaliation carried out by Assistant United States Attorney Hogan and his clients in the case.

28. I have thus lost nine (9) months and counting of publication.

29. Assistant United States Attorney Hogan is prejudicing my pending direct appeal before The First Circuit by participating in the above conduct.

30. By placing me in a CMU, Assistant United States Attorney Hogan and his clients are denying me use of AlphaSmart technology that is widely available to inmates elsewhere for word processing. This is one way in which the conduct of Assistant United States Attorney Hogan and his clients prejudices me in my litigation of all of my cases.

31. The above-summarized conduct is being carried out by clients of Assistant United States Attorney Hogan and their collective agents to unduly

delay my litigation of the case and other cases, needlessly incur expense in the litigation of the case, and maliciously injure myself, my family, and my team while prejudicing our petitions for the vindication of our Constitutional rights.

32. Before I was placed in a CMU I was not allowed to attend any relevant administrative hearings, and so far as I know, no such administrative hearings were held.

33. Before I was placed in a CMU I was not provided any relevant written administrative orders.

34. I am serving this filing and all of its accompanying exhibits on Assistant United States Attorney Hogan on Monday, November 25th, 2019, pursuant to the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988)-- the application of which Assistant United States Attorney Hogan has never contested and therefore has waived--as well as Fed. R. Civ. P. 11(c)(2), Fed. R. Civ. P. 5(b)(1) and 5(b)(2)(C), and Fed. R. Civ. P. 6(d), on Monday, November 25th, 2019, by handing a copy of said filing and all of its accompanying exhibits in an envelope bearing sufficient affixed pre-paid first-class U.S. postage to Ms. J. Wheeler of the FCI Terre Haute CMU unit team at the next opportunity for mailing in her official capacity as an agent of both the defendants in the case and Assistant United States Attorney Hogan.

35. I shall thereafter, in the absence of a sufficient response by Assistant United States Attorney Hogan, file this filing and all of its accompanying exhibits with The Court pursuant to Fed. R. Civ. P. 11(c)(2) and (6)(d) on or after Thursday, December 19th, 2019, by handing a copy of said filing and all of its exhibits in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and United States Postal Service tracking number 9114 9023 0722 4291 7997 15 to Ms. J. Wheeler of the FCI Terre Haute CMU unit team at the first opportunity on or after said date for mailing to The Court in her official capacity as an agent of the defendants pursuant to the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988).

36. By so service and later filing this motion and its accompanying exhibits I do not stipulate to any action or actions that may prejudice my rights or have any adverse effect on my litigation of the instant case, including that I do not stipulate to any withdrawal or other adjudication of the motion to dismiss that results in its dismissal without prejudice to the claims brought therein by Assistant United States Attorney Hogan.

37. Based on my experience in the FCI Terre Haute CMU, it is unlikely that agents of Assistant United States Attorney Hogan and his clients will allow me to attend any hearing telephonically unless The Court specifically orders the FCI Terre Haute CMU unit team to allow me access to each hearing on an individual-hearing basis.

I hereby declare that the foregoing is true and correct under penalty of perjury under the laws of the United States. Executed on Monday, November 25th, 2019.

Martin S. Gottesfeld





CLERK OF COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
U.S. COURTHOUSE

OFFICIAL BUSINESS

THIS MAIL, DESIGNATED AS
AS SPECIAL/LEGAL MAIL, AS
DEFINED BY BOP PS 5265.11
CORRESPONDENCE

CONFIDENTIAL

Martin S Gottesfeld
ID No. 12982-104
FCI Terre Haute
P.O Box 33
Terre Haute, IN 47808

LEGAL MAIL

DOCKET SERVICE

4780BSCC33  BC50

Open in Presence of Inmate Only

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S. 5800.16

Virginia G. Vile, Esq.
2689 230th Avenue

Martin Gottesfeld
Reg. No. 12982-104
MDC Brooklyn
P.O. BOX 329002
BROOKLYN, NY  11232

11232-900202

---

UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF MASSACHUSETTS
JOHN J. MOAKLEY COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MA 02210

OFFICIAL BUSINESS

$ 000.50⁰

203

11232289002

---

Virginia G. Vile, Esq.
2689 230th Avenue
St. Croix Falls, WI 54024

Attorney-Client Privileged Mail
Open in Presence of Inmate Only

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S. 5800.16

203

Martin Gottesfeld
Reg. No. 12982-104
MDC Brooklyn
P.O. BOX 329002
BROOKLYN, NY  11232

11232-900202

---

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Fl., New York, New York 10020

$ 000.50⁰

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S. 5800.16

Marty Gottesfeld, 12982-104
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232

204

11232-900202

---

MICHAEL A. SULLIVAN, ESQ.
CLERK OF THE COURT
WORCESTER SUPERIOR COURT
2XX TRADE CENTER – 2ND FLOOR
WORCES, MA 01653

$ 000.50⁰

4780CS9999

---

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
THE DANIEL PATRICK MOYNIHAN UNITED STATES COURTHOUSE
500 PEARL STREET - NEW YORK, NY 10007-1312

$00.50⁰

DOCKET SERVICES

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S. 5800.16

204

Martin S Gottesfeld
Metropolitan Detention Center
ID No. 12982-104
P.O. Box 329002
Brooklyn, NY 11232

11232289002

---

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
THE DANIEL PATRICK MOYNIHAN UNITED STATES COURTHOUSE
500 PEARL STREET - NEW YORK, NY 10007-1312

$00.50⁰

204

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S. 5800.16

Martin S. Gottesfeld
Reg. No. 12982-104
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232

11232-900202







CLERK OF COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
U.S. COURTHOUSE - 500 PEARL STREET
NEW YORK, NY 10007

OFFICIAL BUSINESS

DOCKET SERVICES

CERTIFIED MAIL

7019 0140 0000 4707 0631

Rec'd F 2019-08-02 opened
MSG

LEGAL MAIL

Martin S Gottesfeld
ID No. 12982-104
FCI Terre Haute
P.O Box 33
Terre Haute, IN 47808

D04-041L

CONFIDENTIAL

47808$0033 B050

---

Virginia G. Villa, Esq.
2609 230th Avenue
St. Croix Falls, WI 54024

Attorney-Client Privileged Mail
Open In Presence of Inmate Only

THIS MAIL DOES NOT MEET LEGAL
MAIL REQUIREMENTS
PER BOP P.S 5800.16

SAINT PAUL MN 550
05 MAR 2019 PM 1 L

203

Martin Gottesfeld
Reg. No. 12982-104
MDC Brooklyn
P.O. BOX 329002
BROOKLYN, NY 11232

11232-900202

---

AFTER FIVE DAYS RETURN TO
MICHAEL A. SULLIVAN, ESQ.
CLERK OF THE COURTS
MIDDLESEX SUPERIOR COURT
200 TRADE CENTER - 2ND FLOOR
WOBURN, MA 01801

US POSTAGE
ZIP 01801 $ 000.50
02 4W
0000345073 JUL 02 2019

Rec'd M 2019-07-05
opened

D

47808$9999

---

OFFICE OF THE CLERK
UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY - SUITE 2500
BOSTON, MASSACHUSETTS 02210

OFFICIAL BUSINESS

BOSTON
MA 021
29 MAY '19
PM 2 L

ZIP 02210
02 4W

Rec'd - Already Opened -
Tue 2019-06-04
MSG

D

47808-003333

---

CLERK'S OFFICE
UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 2500
BOSTON, MA 02210

OFFICIAL BUSINESS

BOSTON
MA 021
05 MAR '19
PM 2 L

US POSTAGE
ZIP 02210 $ 000.50
02 4W
0000354155 MAR 05 2019

203

11232-900202

---

CLERK'S OFFICE
UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 2500
BOSTON, MA 02210

OFFICIAL BUSINESS

US POSTAGE
ZIP 02210 $ 000.50
02 4W
0000354155 FEB 26 20

203

11232$9002 B099

---

CLERK'S OFFICE
UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 2500
BOSTON, MA 02210

OFFICIAL BUSINESS

BOSTON
MA 021
27 FEB '19
PM 10 L

US POSTAGE
ZIP 02210 $ 000.50
02 4W
0000354155 FEB 27 2019

203

11232-900202

---

CLERK'S OFFICE
UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 2500
BOSTON, MA 02210

OFFICIAL BUSINESS

US POSTAGE
ZIP 02210 $ 000.50
02 4W
0000354155 FEB 26 20

203

11232$9002 B099

CLERK
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
U.S. COURTHOUSE, 500 PEARL ST.
NEW YORK, NY 10007

CONFIDENTIAL

LEGAL MAIL

Martin S Gottesfeld
ID No. 12982-104
FCI Terre Haute
P.O Box 33
Terre Haute, IN 47808

Received Date 2021-05-28

U.S. Department of Justice

Martin Gottesfeld
Register No.: 12982-104
FCI Terre Haute
Federal Correctional Institution
P.O. Box 33
Terre Haute IN 47808

86 Chambers Street
New York, NY 10007-1928
Office of Records

FOREVER USA

PURPLE HEART™

FOREVER USA

PURPLE HEART™

**NAME:** Martin S. Gottesfeld
**NUMBER:** Reg. No. 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

◇12982-104◇
U S Attorneys Office
Southern District of NY
1 Saint Andrews PLZ
NEW YORK, NY 10007
United States

Monday, November 25th, 2019, Houston v. Lack, 487 U.S. 266 (1988)

Exhibit 3

Gottesfeld
12982-104
orrectional Institution
33
te, IN 47808

PURPLE HEART
2014
FOREVER USA

PURPLE HEART
2014
FOREVER USA

PURPLE HEART
2014
FOREVER USA

PURPLE HEART
2014
FOREVER USA

PURPLE HEART
2014

ED STATES
AL SERVICE®

PS TRACKING #

23 0722 4291 7997 15

Label 400 Jan. 2013
7690-16-000-7948

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

Friday, January 31st, 2020, Houston v. Lack, 487 U.S. 266 (1988)

RECEIVED
FEB 12 2020
PRO SE OFFICE

USMP3
SDNY