UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2020 MAR 20  PM 2: 45

```
┌─────────────────────────────┐
│ Martin S. Gottesfeld, pro se,│
│         Plaintiff,           │
│        - against -           │
│   Hugh J. Hurwitz, et al.    │
└─────────────────────────────┘
```

Case No.: **18-cv-10836-PGG-GWG**

## CLAIM FOR MANDATORY JUDICIAL NOTICE (FED. R. EVID. 201(c)(2))

Plaintiff Martin S. Gottesfeld (herein the "plaintiff"), acting pro se, hereby moves The Honorable Court to take mandatory judicial notice pursuant to Fed. R. Evid. 201(c)(2), 28 U.S.C. § 1746(1), Fed. R. Evid. 901(b)(1), Fed. R. Evid. 401, Fed. R. Evid 402, and Fed. R. Evid. 1003 of the herewith-provided Exhibit 1 hereto, Declaration of Martin S. Gottesfeld (Thursday, March 12th, 2020); Exhibit 2 hereto, electronic messages from Martin S. Gottesfeld to Mr. Brandon C. Sample, Esq., Attorney-at-Law; and Exhibit 3 hereto, Martin S. Gottesfeld, electronic message to attorneys, journalists, and family members.

The aforementioned documents and the facts contained therein are not open to reasonable dispute and are relevant evidence supporting the plaintiff's instant claims of ongoing multi-jurisdictional violations of his First, Fifth, and Sixth Amendment rights by the instant defendants and their parties in privity.

The plaintiff also asks The Court to take judicial notice of the legislative fact that the defendants are housing him peculiarly far away from his home Circuit and therefore from the location of his appellate attorneys. The plaintiff is therefore, by the defendants' unconstitutional design, far more dependent than other prisoners on electronic messages for timely communication with his appellate attorneys.

Respectfully filed in accordance with the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988), by mailing to The Court in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and U.S.P.S. tracking

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/2/20

number 9114 9023 0722 4792 9868 67, handed to Ms. Jamie Wheeler of the FCI
Terre Haute CMU unit team while acting in her official capacity as an agent of
the defendants on Thursday, March 12th, 2020, or the first opportunity
thereafter,

by: _____

Martin S. Gottesfeld, pro se
Reg. No.: 12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Exhibit 1

## Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1), Fed. R. Evid. 201(c)(2), Fed. R. Evid. 901(b)(1), Fed. R. Evid. 401, Fed. R. Evid. 402, and Fed. R. Evid. 1003 on this eleventh (12th) day of March, 2020:

1. My name is Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al.; 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

2. It was originally my intent to preserve my attorney-client privilege to the electronic messages contained in Exhibit 2 hereto, but since the defendants in the case already violated my attorney-client privilege and read them--and then shared them throughout the DOJ--I now hereby waive my attorney-client privilege to the electronic messages in Exhibit 2 hereto in order to file them as evidence, publicly.

3. I am intentionally making this notice and the exhibits hereto, including Exhibit 2 hereto, public filings and I would object to any effort to seal them and request a hearing prior to any such order to seal them.

4. I have personal knowledge of each of the electronic messages contained in Exhibit 2 hereto, as contemplated and required by Fed. R. Evid. 901(b)(1), and each is a true copy, as contemplated and required by Fed. R. Evid. 1003, of an electronic message that I tried to send to Mr. Brandon Sample, Esq., Attorney-At-Law (herein "Attorney Sample").

5. I sent each message in Exhibit 2 hereto within minutes of when so indicated therein, i.e. "I sent you this message at approximately..."

6. Attorney Sample is my retained appellate counsel for my pending direct appeals. Please see United States v. Gottesfeld, 18-1669 (1st Cir. January 16, 2020) (Notice of Appearance filed by Brandon C. Sample).

7. I also hope to retain Attorney Sample to represent me in other litigation, against the Federal Bureau of Prisons and its agents.

8. I sent each of the messages found in Exhibit 2 hereto in support of either my direct appeals and/or to solicit civil representation from Attorney Sample and his firm, and this is manifest in each of the messages themselves.

9. I never received any notification signed by Warden Brian Lammer, as is required by 28 C.F.R. § 540.13, that any of the messages contained in Exhibit 2 hereto was rejected, or explaining why it was rejected and providing me any avenue to appeal.

10. Yet, I noticed for the first time yesterday that each of the messages in Exhibit 2 hereto was in my "Rejected Messages" list with an annotation of "security, discipline, and good order."

11. The messages in Exhibit 2 hereto do not violate any policy of the defendants' and are Constitutionally protected and time-sensitive.

12. If not for my pending federal litigation, I would likely now again be in solitary confinement and facing further retaliatory disciplinary action by the defendants in the case for, inter alia, daring to endorse the GOP-primary opponent of disgraced former U.S. Attorney General Jefferson Beauregard Sessions and quoting President Trump. Please see Gottesfeld v. Lammer, 2:20-

cv-00012-JRS-MJD, ECF No. 21 (S.D. Ind. February 21, 2020) at 11-14 § C
(claiming mootness). (I further note that in that case I did in fact exhaust
the available administrative remedies and that this other case sprang up from
the same defendants' unconstitutional retaliation against my Constitutionally-
protected activities. Id. ECF No. 21-1 at 23 (February 21, 2020).)

13. The defendants' unconstitutional, arbitrary, and capricious
censorship of the messages in Exhibit 2 hereto demonstrate why I am unable to
communicate socially from inside the FCI Terre Haute communications-management
unit (CMU) and my reasonable fears that I will be brutally punished and also
denied earned good-conduct time based upon the defendants' disapproval of my
protected speech, including now, my speech to my attorneys.

14. I believe that the messages contained in Exhibit 2 hereto were
blocked at the behest of agent of the defendants in the case Ms. Katherine
Siereveld, who covers up for, inter alia, the botched DOJ Operation Fast and
Furious and who should therefore be a person of interest for the U.S. Senate
Judiciary Committee and The White House Legal Office to speak with in regards
to uncovering the truth of what happened in that failed operation. Please see,
Attkisson v. Holder, 925 F.3d 606, 628 (4th Cir. 2019) (Wynn, J., concurring
in part, dissenting in part); then instant docket entry (D.E.) 78 at 43-70;
D.E. 84 at 6-17, and D.E. 69 at 6-13.

15. At mail call today, agent of the defendants in the case Ms. Jamie
Wheeler handed me a written threat signed illegibly by an unknown individual,
warning me of future disciplinary action based on the contents of my writing
to Attorney Sample.

16. The written threat wasn't ascribed to the warden and didn't note any
ability to appeal the rejections of my correspondence to Attorney Sample.

17. Based upon my training and experience as a CMU prisoner, I ascribe
the non--policy-based threat to Ms. Katherine Siereveld and I believe that she
did not print her name thereon because she knows that what she is doing is
invalid and unconstitutional, and she doesn't want it attributed to her.

18. It has come to my attention that the electronic message depicted in
the case in docket entry 49 at 3-4 was never received by any of its
addressees.

19. The electronic message depicted in docket entry 49 is protected
speech pursuant to Procunier v. Martinez and there was no valid reason to
block it. Please cf. also Michael Volpe, Inside The 'Black Site' Federal
Prison Where An Insurance Scammer Was Allegedly Killed By A Jihadi, The Daily
Caller (February 5th, 2020).

20. Tomorrow, after mail call, I will try sending Exhibit 3 hereto as an
electronic message and protected speech. My wife will be able to update The
Court as to whether or not it is received by its addressees.

I declare under the penalty of perjury under the laws of The United
States that the foregoing is true and correct. Executed on Thursday, March 12,
2020.

by: _____
    Martin S. Gottesfeld

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-02-13: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 02/13/2020 08:56:41 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I am still in what the CMU calls "gen. pop."

I again sent you legal mail today, in an envelope bearing U.S.P.S. tracking number 9114 9023 0722 4293 0820 37.

Among other things, I wish to discuss retaining your firm to litigate the following matter in particular, among many similar matters:

Today, I received a BP-A0328, "STAMPS, NEGOTIABLE INSTRUMENT & OTHER RETURNED TO SENDER" form. It is dated six (6) days ago, on Friday, February 7th, 2020. I believe that the mail in question contained documents from my S.D.N.Y. case and I know that it was not sent by your office. I am unable to communicate with the sender due to circumstances that I have thoroughly documented in the federal-court record and that are also now well-documented (thanks to the sender) by a growing number of national media outlets, including The Daily Caller, Info Wars, CRTV, The DailyWire, Newsmax TV, The Kuhner Report, Reader Supported News, MintPress News, and Consortium News.

According to the BP-A0328 form, the mailroom here treated this mail as a package because it weighed more than a pound.

I note that I am unable to refer the sender to BOP Program Statement 5800.16 Sec. 3.13. Therefore, I am unable, pursuant thereto, to advise the sender to write "Authorized by Bureau Policy" on the outside of any such mailings exceeding one pound (or even close to that line), and also to write, in addition to "Authorized by Bureau Policy," and on a separate line therefrom, "Authorized by Bureau Policy: Program Statement 1315.07 Ch. 10, quoting 28 C.F.R. Secs. 543.11(d) and 541.11(d)(1)".

I am unable to advise the sender to exclude from any mailings marked in this manner cover letters, manifests, or any other content(s) that do not appear on PACER, and that pursuant to 28 C.F.R. Sec. 543.11(d), the top page in any such mailing must contain my name and my case heading, as do the first page of any of my motions. I do not believe the PACER header in and of itself unambiguously qualifies as my "case caption." In contrast, I am sure that the first page of each of my motions, notices, and letters to a judge contains my "case caption," as contemplated by 28 C.F.R. Sec. 543.11(d), because it contains each of the following four (4) elements: (1) my name, (2) the name(s) of the opposing party/parties, (3) the case number, and (4) the identity of the particular court in which the case is filed.

I am unable to advise the sender that pursuant to Program Statement 5800.16 Sec. 3.13, theoretically any such packages will be separated from other packages and opened in my presence. As per 28 C.F.R. Sec. 543.11(d), it appears that unlike legal mail, legal packages may be sent from non-attorneys and non-courts. The regulations and program statements treat legal packages as distinct from special mail and legal mail (the distinction appears to be one between "mail" and "packages").

I am preparing a notice filing for my S.D.N.Y. case regarding this incident and noting the arbitrary and capricious semi-adherence to program statement 5800.16 among CMU staff. They, for instance, flagrantly violate mandatory timing requirements for their marshaling of special and legal mail between myself and The United States Postal Service--to the point where The Honorable U.S. District Court Judge Paul G. Gardephe has taken to ordering The Clerk of his Court to send to me time-sensitive case documents using certified mail--but yet they are notably officious when it comes to denying me case documents sent from the outside. In a previous incident, they confiscated something that was sent by The Clerk of Judge Gardephe's court in an envelope marked "OFFICIAL BUSINESS," "LEGAL MAIL," "CONFIDENTIAL," and "DOCKET SERVICES." A separate notice filing should be on its way to The Court describing this earlier incident as well.

Regards,

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------


Martin S. Gottesfeld, defendant-appellant in United States v. Gottesfeld (1st Cir.)
I sent you this message at approximately 8:56 P.M. on Thursday, February 13th, 2020.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: RE: RE: CORRECTION to 2020-02-13
DATE: 02/19/2020 09:53:12 AM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You, sir, are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

Your stamp has been effective thus far, but I've seen mail properly stamped that was opened, read, and digitally preserved here based upon thinly-contrived excuses. No stamp is truly safe here--especially if there is no litigation resulting from violation of attorney-client privilege.

That being said, I only wish that everybody who tries to mail me legal documents was aware of what I enumerated in my messages to you from the thirteenth and fourteenth of this month.

You should also have received a very important electronic message from me dated yesterday, February 18th, 2020. If that message is yet to turn up, then very foul play is afoot.

Regards,


Martin S. Gottesfeld, defendant-appellant in United States v. Gottesfeld
I sent you this message at approximately 9:54 A.M. on Wednesday, February 19th, 2020.
-----Sample, Brandon C on 2/19/2020 8:18 AM wrote:

>

I have a standardized stamp that I use which covers the requirements for all incoming correspondence to be treated as special mail..

Brandon

Sent 2/18/20 at 1:04PM EST

MARTIN GOTTESFELD on 2/18/2020 7:50:17 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I realized I have a typo in my message from yesterday. The second item to write on any such mailings pursuant to BOP Program Statement 5800.16 Sec. 3.13 should be, "Authorized by Bureau Policy: Program Statement 1315.07 Sec. 10, quoting 28 C.F.R. Secs. 543.11(d) and 543.11(d)(1)", i.e. "Sec. 10" instead of "Ch. 10" and "531.11(d)(1)" instead of "541.11(d)(1)".

Thanks,


Martin S. Gottesfeld, defendant-appellant in United States v. Gottesfeld
I sent you this message at approximately 7:59 A.M. on Friday, February 14th, 2020.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-02: PRIVILEGED ATTORNEY-CLIENT MESSAGE #1
DATE: 03/02/2020 07:57:57 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before
The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged communication and
conversation.

I am still in what the CMU mislabels as "gen. pop."

I thought it might be useful to send along an example of the type of protected political speech that I am unable to mail directly to
my wife and my other publishers because of the tortuous and unconstitutional interference of Warden Brian Lammer. I wrote it
using the same mark-up to which I and my publishers were accustomed prior to my retaliatory and involuntary placement here
outside of true general population.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message, part 1 of 3, at approximately 7:57 P.M. on Monday, March 2nd, 2020.

Headline: Hillary Isn't Locked Up, So Vote #NotSessions in GOP Primary
Tagline: Man Who Fought to Save Girl from Gov't Endorses #NotSessions

[Embed: featured image of Jeff Sessions as a nut-cracker--style wind-up toy soldier with "Deep State" embroidered on his
uniform and a "Hillary/Stormy 2020" bumper sticker affixed to him; attribution as appropriate; no caption]

What's the difference between Jeff Sessions and Stormy Daniels? Answer: Sessions really did screw the president.

And now--after Sessions cowered in the face of a thinly-veiled coup attempt--he hasn't recused himself from the race for his old
U.S. senate seat. It would be fabulous this time, though, for Sessions to step aside. The deep state and its press agents are
already frothing at the mouth at [start link to article at liberal outlet about this. If a better one cannot be found, there is The Hill;
February 19ish, 2020; by Jordain Carney; Trump looms as flashpoint in Alabama Senate Battle (Page 1 headline); Can
Sessions win back his old seat? (page 12 headline)]the prospect that President Trump will have to campaign in [leave the
capitalization here as it's a state nickname:]The Heart of Dixie[end link] with Sessions down the ballot.

The more appropriate time for Sessions to run for his old seat would've been in Alabama's December 12th, 2017, special
election, in which Democrat Doug Jones bested Roy Moore. Back then, Sessions could've resigned somewhat gracefully as
U.S. attorney general. President Trump then could've picked his replacement in time to leash, curb, and clean-up after Robert
Mueller before the crazy train known as the "Russian-interference investigation" got so far from the station.

As Moore faltered under allegations of sexual misconduct with children, Alabama and the GOP clearly needed Sessions back
home in order to stop an embarrassing Democratic upset and to maintain a slim 2-vote majority in the Senate.[Fact-check that
during the December 12th, 2017, special election, the GOP had a 2-vote senate majority] The whole nation, moreover, needed
Sessions to subdue the crack-pot Russian-conspiracy theorists and their puppet masters at the DOJ, or to step aside for
someone more capable. Instead, Sessions's half-measures let the DNC elect its first U.S. senator from Alabama in [insert
number] years and enabled a traitorous 2-year $[insert dollar figure, I think it was around 25]-million coup attempt against a duly
-elected president.

So, if anyone from the Trump administration should be permanently disqualified from holding high office, it's Jefferson
Beauregard Sessions. On his watch, the Clintons and their posse got away with their shenanigans scot-free. It's now been over
a year since President Trump fired Attorney General Sessions, yet we're still cleaning up the mess that Sessions left behind in

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

the Justice Department.

[Embed: picture of Bill Clinton and Hillary Clinton cackling (the one Western Journal used for the above-the-law article would be perfect); attribution as appropriate; caption: Cackling all the way: Bill and Hillary Clinton may approve of Jeff Sessions's actions and inactions as U.S. attorney general.]

Indeed, it's fair to say that Sessions is the worst attorney general in U.S. history. Thanks to the drive-by deep-state media mob, however, there was little publicity exposing his most shameful temerities and derelictions of duty.

When the GOP still controlled the House in 2017, for example, [start link either to the article/video in Trump's 2018-04-22 5:22 A.M. tweet or to the case of Am. Oversight v. United States DOJ, 2019 U.S. Dist. LEXIS 126583 (D.D.C. July 30, 2019) (the relevant part is at pages 2-3 Sec. I. Background), or to a reputable article about the letter]20 members of the House Judiciary Committee sent Sessions a letter[end link] about Mueller's 1-sided "investigation." They demanded that Sessions hire a second special counsel to investigate Hillary Clinton, Loretta Lynch, and James Comey. Sessions took no discernable action.

The Keebler Elf of Washington, D.C.--as Sessions is known--might as well have been hiding in his tree house.

[Embed: picture of Sessions as the Keebler Elf, preferably from the point-of-view outside the tree house as the Elf closes the door to the tree house or the Elf peeking out from the tree house with his hand on the door knob, ready to close it at the first sign of trouble; attribution as appropriate; caption: Do Alabamans really want "The Keebler Elf of Washington, D.C." to represent them again in the U.S. Senate?]

The "Russian-interference" hoax then dogged President Trump and the GOP all throughout 2018, with obvious overtones foreshadowing the coming closed-door impeachment charade. Sessions was basically silent and launched no counter-narrative about the rigged 2016 DNC primary, the Steele Dossier, the tarmac meeting between Loretta Lynch and Bill Clinton, FusionGPS, pay-to-play at the Clinton State Department, Comey and Lynch's [start link to an article about how Lynch ordered Comey not to use the word "investigation":]unvestigation[end link] into Hillary's private email server, Hunter Biden's role in Ukraine, the $675,000 that Clinton-ally Terry McAulliff[spelling?] supposedly "donated" to Andrew McCabe's wife for her failed <i>state senate</i> campaign, [start link to McCabe's GoFundMe a Gold Mine... for Investigators at FreeMartyG.com:]the potential hush-money payments to McCabe's subsequent $550,000 GoFundMe campaign[end link], and the Strzok-Page text messages that implicate Obama.

Perhaps no attorney general ever before inherited so many slam-dunk investigations. Yet, from that gold mine Sessions secured not a single indictment.

One almost has to question if Sessions was blackmailed.

In any event though, [start link to my Western Journal article on the Clintons:]the Clintons were effectively above the law[end link] so long as Sessions remained the attorney general. Other dirty democrats were untouchable too, it seems.

President Trump, meanwhile, took to Twitter to protest Sessions's inactions. He tried for months, but it was no use.

[Embed: video slideshow #1 (description in part 3); no attribution; no caption]

The Democrats, in contrast, faced no such obstruction within their party. During the 2018 midterm elections, they shrewdly took advantage of the Mueller "investigation" and the prospect that a simple majority in the House of Representatives would give them control of its sole power of impeachment. Nobody knows how many House seats Sessions cost the GOP and the president's legislative agenda.

We do know that hours after the midterm elections, President Trump fired Sessions.

Once confirmed, Attorney General William Barr quickly distinguished himself. He didn't hesitate to state the obvious: [Start link to Barr's speech on YouTube, or if the speech itself isn't available, to a reputable write-up:]the Obama DOJ spied on the Trump campaign for political reasons[End link]. Barr then designated U.S. Attorney John Durham to investigate the origins of the whole "Russian-interference" farce.

[Embed: video of Barr saying that the DOJ "spied" (or "was spying" or whatever he said) on the Trump campaign; no caption]

Such investigations, however, take time. We're now years behind where we could be if Sessions acted.

TRULINCS 12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-02: PRIVILEGED ATTORNEY-CLIENT MESSAGE #2
DATE: 03/02/2020 07:58:03 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my pending direct appeals (docket numbers 19-1107, et al.), currently pending
before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation
and message.

If I wasn't facing unconstitutional reprisal from the DOJ for my protected speech, then I'd license this article under the latest
Creative Commons no-derivatives commercial-use-permitted by-attribution share-alike license and pitch it first to The Western
Journal and give them 24 hours; then, I'd send it over to Info Wars, Red State, WND, and FreeMartyG.com as well.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message, part 2 of 3, at approximately 7:57 P.M. on Monday, March 2nd, 2020.

Here is part 2 of the manuscript:

Of course, President Trump took a big risk on Sessions. Nominating him for attorney general was controversial. His
confirmation was contentious. President Trump spent considerable political capital seeing it through.

Given what happened, would President Trump again trust Sessions?

Would you?

[Embed: video slideshow #2 (description in part 3); no caption]

At first though, like many, [start link to my WND article, named something like Why the FBI Threatened My Wife Over a
YouTube Clip (the article has a picture of Sessions being sworn in at the bottom)]I believed in Sessions[end link]. In fact, I was
elated when I first heard in late 2016 that Trump selected him to be attorney general.

You see, about three and a half years earlier, some folks from Harvard-affiliated Boston Children's Hospital and their nanny-
state allies in the Commonwealth of Massachusetts crippled and nearly killed a teenage girl named Justina Pelletier. They
tortured Justina for 16 months.

When her parents tried to speak with their local Fox affiliate, a Massachusetts judge put them under a "gag order," banning
them from speaking to journalists.

The Pelletiers went to the FBI and begged special agents to save their little girl. The feds wouldn't touch Harvard's children's
hospital as long as Obama--a Harvard alumnus--was in the White House and Loretta Lynch--[for fact-check: "alumnus" is the
Latin masculine singular noun and "alumna" is the feminine singular form][fact-check that Lynch went to Harvard and the dates
she was AG/acting AG, and, if appropriate, add/substitute Holder:]a Harvard alumna--was the attorney general. The Democrat
governor of Massachusetts at the time was Deval Patrick, who is a [fact-check on the Chicago part]Chicago native, Harvard
alum, and friend of Obama.

Justina seemed doomed.

With time running out, Justina's father risked prison and broke the judge's "gag order." He told Fox News and others that
Justina's life was in danger.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

[Embed: Either Lou on The Kelly File or on WGBH Greater Boston, queued to the beginning of the interview; no caption]

You can read about how I fought to save Justina's life without harming a soul and how I held Boston Children's Hospital and its Harvard allies accountable during their largest annual online fundraiser. The story has been widely reported at [start links to individual articles (where there is one author, link on the whole clause, i.e. "The Daily Mail by Hannah Parry"; where there are two authors, link on each name); for each author/publication take their first article:]National Review by Michelle Malkin, Rolling Stone by David Kushner, The Huffington Post by Ryan Grim, ShadowProof Press by Kevin Gosztola, The Daily Mail by Hannah Parry, Red State by Jim Jimitis, The DailyWire by Aaron Bandler and Frank Camp, The New American by Alex Newman and C. Mitchell Shaw, and The Daily Caller by Ian [insert surname] and Michael Volpe[end links].

You also might have seen our stories together on Michelle Malkin Investigates on CRTV in 2017 (or in November 2019 at [start link to MMI]Michelle's new home on NewmaxTV[end link]), or on [I would give Western Journal the option of not including the link to Info Wars if that is their preference, otherwise link to the shorter clip from the first David Knight segment:]Info Wars[end link] or [link to the interview on YouTube:]AMericA with Eric Bolling[end link].

When gagging the Pelletiers under the threat of prison didn't work and Justina didn't suffer quietly enough for Harvard and Boston Children's Hospital to preserve their precious reputations, the university and its allies in the Obama DOJ tried to convince my jury that my defense of Justina's life risked the lives of others. They failed then too. [Link to post-trial DailyWire article]My jury didn't buy it.[end link] (Facts notwithstanding, the DOJ's deep-state media mob still ran full steam ahead with the fake-news story that Harvard and Boston Children's Hospital were the victims and not Justina.)

To make a long story short, the university's crooked federal judges railroaded me through a political show trial and sentenced me to 10 years in federal prison for daring to save Justina's life. They wouldn't let me tell my jurors about the legal principle of the defense of others even though I should have had that right. (One of the jurors wanted to nullify, but trial judge Nathaniel Matheson Gorton bullied her out of it.)

[Embed: Michelle's trailer video, if available, if not then pick something appropriate to this place in the story]

When Trump picked Sessions for attorney general in late 2016, I heard the announcement on the radio. Back then, the Obama administration was holding me in solitary confinement where Jeffrey Epstein later died, i.e. the infamous 9-South "special-housing unit," or "SHU," of the federal Metropolitan Correctional Center (MCC) New York. I was over a month into a hunger strike that I waged for 100 days in order to demand that federal law-enforcement take action for Justina and other childhood survivors of similar abuses.

I hoped Sessions would finally help Justina and I achieve some justice for what we've been through. You see, Justina was targeted over her rare-disease diagnosis by a [check spelling of names and nations of origin for Peters and Bujoureanu:]Dutch-born neurologist named Jurriaan Peters (who was 7 months or so out of medical training) and a Czechoslovakian-born psychologist named Simona Bujoureanu (who had a federal grant to study a competing diagnosis). Sessions has a grandchild with a rare disease. I hoped that what happened to Justina at Boston Children's Hospital hit close to home for him.

You see, Justina is far from alone in suffering this horrible abuse. Unfortunately, it's actually quite a common phenomenon in the rare-disease community.

After Justina finally went home, 32 U.S. Congressman co-sponsored [start link to Justina's Law:]<i>Justina's Law</i>[end link], including then-Representative and now-Secretary of State Mike Pompeo. Sadly <i>Justina's Law</i> never passed.

This is not to say that existing federal laws can't be used to protect these kids. They absolutely can. We just need an attorney general willing to prioritize America's children above reputation-obsessed Harvard doctors. Sessions, however, was not such an attorney general.

You see, early into the Trump administration, A U.S. congressman and a U.S. senator wrote separate letters to Sessions about Justina and me. Sessions didn't respond to either of them. He refused to meet with the congressman.

Michelle Malkin and Rolling Stone also inquired for comment with Sessions's office. He did not respond to them either.

A member of the White House legal department was tasked to compose a memo on our cases. Yet I still never heard from Sessions.

[Embed: meme of Sessions as a crash-test dummy in a car that says "U.S. Justice Department" about to hit a crimson-colored

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------

wall labeled "Harvard"]

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-02: PRIVILEGED ATTORNEY-CLIENT MESSAGE #3
DATE: 03/02/2020 07:58:15 PM


PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I should note that I cannot endorse any of the particular candidates by name because I am unable to vet them. But I would be comfortable endorsing "Mr. #NotSessions," as opposed to a named candidate.

The "endorsement Tweet" mentioned inline below would say, if I could do so without suffering unconstitutional reprisal: "I enthusiastically endorse GOP-candidate Mr. #NotSessions for U.S. senate in the March 31st, 2020, Alabama primary runoff election. Of course, the single most-important thing to know about Mr. #NotSessions in this race is that--unlike his opponent--he is: #NotSessions." --Martin "Marty G" Gottesfeld from a semi-secret DOJ black-site prison [link to article if possible]

Video slideshow #1 would consist of @realDonaldTrump tweets about Sessions. Hopefully there's already such a clip on YouTube that could be embedded to save time. If not, a new one could be set to background music of the first movement of Beethoven's 9th.

I note that I have access to a print edition of "President Trump's Tweets 2018: A Historical Archive of President Trump's Tweets" by Anthony T. Michalisko. The softcover book, however, gives no indication of what timezone is used to render these, so the below might not be in Eastern Time.

I further note that at the time Trump posted many of the tweets below, it was commonly referred to as "the public waterboarding of Jeff Sessions." I did not coin the term and it is in fact in the common lexicon among the body politic. I, therefore, merely quote it as a matter of public interest and controversy.

My version of video slideshow #1 would consist of the following @realDonaldTrump tweets about Sessions (in ISO date format and 12-hour U.S.-time format):
2018-02-21 6:40 A.M.: Why didn't Obama stop Russian interference? Ask Sessions
2018-02-28 6:34 A.M.: Why is Sessions tasking Obama-holdover to probe FISA-abuse when he can't convene a grand jury?
2018-04-22 5:22 A.M.: GOP lawmakers asking Sessions to investigate Comey and Clinton, "Good luck" with that request!
2018-05-30 5:46 A.M., 5:47 A.M., and 5:47 A.M. (2 tweets at 5:47 A.M.): Gowdy on Sessions, "Why didn't you tell me..."
2018-05-30 8:21 P.M.: diGenova, Jeff Sessions's recusal was "an unforced betrayal"
2018-06-05 4:31 A.M.: "all because Jeff Sessions didn't tell me..."
2018-08-01 6:24 A.M.: "Attorney General Jeff Sessions should stop this rigged..."
2018-08-11 11:54 A.M.: "Our A.G. is scared stiff and missing in action..."
2018-08-20 7:36 A.M.: "Will Bruce Ohr... ever be fired from the Jeff Sessions 'Justice'..."
2018-08-24 3:17 A.M., 3:28 A.M., and 4:10 A.M.: "Jeff, this is great" why don't you investigate Hillary's emails?
2018-08-25 5:36 A.M.: "Jeff Sessions... doesn't what is happening beneath his command position."
2018-09-11 4:41 A.M.: Lou Dobbs, "ERIC Holder could be running the Justice Department right now..."
2018-11-07 11:44 A.M.: Whitaker to take over
2018-12-03 7:48 A.M.: Roger Stone, "I will never testify against Trump."
2018-12-07 8:18 A.M. and 8:18 A.M. (two in same minute): Barr to take over
2018-12-16 12:29 P.M. and 12:37 P.M.: "Jeff Sessions should be ashamed of himself"

There's 22 tweets for slideshow #1, at 30 seconds of screen time each, it would be an 11-minute clip. At 20 seconds each, it would be 7:20 (more or less screen time may be appropriate depending). The short title would be: @realDonaldTrump "Publicly Waterboards" Jeff Sessions (Beethoven's 9th); the long title/description would be: Highlights of the tweets by @realDonaldTrump mentioning (former) U.S. Attorney General Jefferson Beauregard Sessions

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

The same thing goes for video slideshow #2, i.e. hopefully there is already something that could be embedded, but if not, I'd set it to music from Trump's campaign rallies (possibly The Rolling Stones: You Can't Always Get What You Want or AC/DC) and it would consist of the following @realDonaldTrump tweets:
2018-03-28 2:52 A.M.: 2nd Am. needs "more Republicans in 2018"
2018-05-17 6:35 A.M.: Phony Witch Hunt... wrongfully impacts the Mid-Term...
2018-05-29 4:00 A.M.: "... Russia Witch Hunt, will be MEDDLING with the mid-term elections..."
2018-06-22 3:54 A.M. and 4:00 A.M.: "So we need to elect more R's"
2018-06-24 5:08 P.M.: "Need More Republicans to WIN in November"
2018-06-30 12:17 P.M. and 12:26 P.M.: Need more Republicans
2018-07-21 3:40 P.M. and 3:50 P.M.: Democrats, "want this Witch Hunt to drag out to..."
2018-09-03 11:25 A.M. and 11:39 A.M.: 2 GOP Congressman indicted without time to clear their names, "Good job Jeff"
2018-09-15 3:08 P.M.: Mueller to hurt GOP in midterms

That's 12 tweets for slideshow #2, at 30 seconds of screen time each, that would be a 6-minute clip, or with 20 seconds of screen time each, a 4-minute clip (might fit a shorter contemporary song better). The short title would be: @realDonaldTrump re: Jeff Sessions & 2018 Mid-Terms; the long title/description would be: Did (former) U.S. Attorney General Jefferson Beauregard Sessions hurt the GOP in the 2018 mid-term elections?

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message, part 3 of 3, at approximately 7:58 P.M. on Monday, March 2nd, 2020.

Here is part 3 of the manuscript:

Eventually, my wife politely called Sessions at home. He got angry and hung up on her.

At every juncture, Sessions could have helped Justina and me and other kids like his own grandchild. Yet he did nothing.

Justina has now been denied justice at every turn, except when I intervened to save her life.

Now, as I'm writing this on March 1st, 2020, I don't know which GOP candidate will go head-to-head against Sessions for the nomination. There are 2 other strong primary candidates. Sessions enjoys a small lead in the polls, but he's far from the 50-percent needed to clinch the GOP nomination on Super Tuesday.

So, Alabama will hold a primary runoff election on March 31st between Mr. Sessions and Mr. #NotSessions (the viable candidates all happen to be male). You can find your local polling location [start link to a site that helps people find their polling locations in Alabama:]here[end link].

Already, though, I know the most important fact about the other GOP candidate, whoever he turns out to be. He is [start link to the endorsement Tweet]#NotSessions[end link].

And whoever turns out to be Mr. #NotSessions in the March 31st, 2020, Alabama runoff, he has my endorsement.

Wouldn't it be great, after all, if Alabama sent a senator to Washington who finally spearheads some long-overdue accountability for Hillary and some belated justice for Justina and the thousands of other childhood survivors like her? I hope Alabama does exactly that.

No president should ever go through what the deep state did to Donald Trump and his family. And no American child should ever endure what Harvard-affiliated Boston Children's Hospital did to Justina and the Pelletiers, and they especially shouldn't be denied justice afterwards.

[Embed: Justina's interview with Beau the day (after) she went home]

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-02-03: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 03/03/2020 09:46:02 AM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I have the below notes for the 3-part manuscript that I sent yesterday.

Also, an email invite should be sitting in Eric Bolling's Inbox/Junk folder. They finally approved it.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message at approximately 9:47 A.M. on Super Tuesday, March 3rd, 2020.

* I would not change any of the links except as explicitly indicated below in one instance, I'm just not rewriting them every time below;
* I note that "crackpot" is one compound word. My use of "crack-pot" would be better updated accordingly;
* "a Harvard alumna--was the attorney general" would be better written, "a Harvard alumna--was his attorney general";
* "a Chicago native, Harvard alum, and friend of Obama" would read smoother as, "a Chicago native, a Harvard alumnus, and a friend of Obama";
* "My jury didn't buy it. (Facts notwithstanding, the DOJ's deep-state media mob still ran full steam ahead with the fake-news story that Harvard and Boston Children's Hospital were the victims and not Justina.)" would be clearer as, "[Link to post-trial DailyWire article]My jury didn't buy it[end link], but they did find me guilty of costing Justina's tormentors money. (Facts notwithstanding though, the DOJ/Harvard deep-state media mob still ran full steam ahead with the fake-news story in order to fool more people into thinking that Harvard and Boston Children's Hospital were the victims and not Justina and her family.)"
* "Congressman" would be better written uniformly lowercase when it does not proceed a person's name and I note only the following single irregular instance: "32 U.S. Congressman" would be better written, "32 U.S. congressman";
* "There are 2 other strong primary candidates" would be better written to avoid a word-repetition issue with "candidates," as, "He has 2 strong primary opponents";
* "Already, though, I know the most important fact about the other GOP candidate, whoever he turns out to be. He is #NotSessions" would be better written, "Already, though, I know the most-important fact about the other GOP candidate, whoever he turns out to be; namely: he is #NotSessions."

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-04: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 03/04/2020 06:00:01 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message at approximately 6:00 P.M. on Wednesday, March 4th, 2020.

Headline: Doctors Abducting Children?
Tagline: Parents Denied Justice Against Medical Kidnappers

[Embed: featured image of Justina in a wheelchair and preferably in a court or otherwise--visibly-legal setting; attribution as appropriate; no caption]

It's a parent's nightmare: an appointment with Dr. Jekyll turns into an ambush by Mr. Hyde.

Now crippled for life, 14-year-old Justina Pelletier went to Boston Children's Hospital for help with the flu. Once there, she barely survived a medical "kidnapping," as [start link: to Huck's post-release Fox interview with the Pelletiers:]Mike Huckabee [end link] and [start link: National Review: Brutal battle]Michelle Malkin[end link] call it.

[Embed: Huckabee's post-release Fox interview with the Pelletiers; no caption]

Justina had a referral to see her gastroenterologist, but other doctors hijacked her case. They rediagnosed her within hours. Instead of the metabolic disease that runs in her family, they said that she has an obscure psychiatric disorder.

Justina's mother and father Linda and Lou Pelletier resisted. They refused to stop Justina's brain, heart, and pain medications.

Boston Children's Hospital reported Lou and Linda to its [start link to documentation about the close connection between DCF and BCH, possibly the Terry complaint in D. Mass]close allies[end link] at the Massachusetts Department of Children and Families (DCF). The new doctors complained to the government's social-services workers that they knew better than Linda and Lou Pelletier. Failure to follow their brand-new treatment plan, they insisted, was a form of "medical child abuse" against Justina.

Based solely on this "medical child abuse" theory, Massachusetts took emergency custody of Justina before any court hearing. Then, family-court judge Joseph F. Johnston sided with the state and the hospital.

When Fox Connecticut reporter Beau Berman took interest in Justina's story and showed up at the courthouse, Judge Johnston slapped the Pelletiers with a gag order. They were forbidden from speaking to the press under threats of fines and imprisonment.

Boston Children's Hospital locked Justina in its psych ward with children who were truly dangerous to themselves and others. The hospital also reduced and tightly monitored her communications with the outside world.

Justina returned home crippled more than 2 birthdays (16 months) later. She is back to being treated for her original diagnosis. Like a combat veteran though, she now has post-traumatic stress disorder and recurring nightmares of being taken from her family.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

[Embed: photo of Lou carrying Justina back into their home; attribution as appropriate; caption: Justina was crippled when she returned home in June 2014 at age 16; she still cannot walk today.]

Parents and children suffer similar abductions at hospitals elsewhere in America and abroad. Thanks to gag orders and other coercive measures though, the public rarely hears about these cases. So, they happen more than one might think and they're especially frequent at large, well-funded teaching hospitals.

For its part, Boston Children's is the primary pediatric teaching hospital for Harvard Medical School. Harvard's endowment is [check endowment values:]$36 billion. Boston Children's Hospital has an additional $2 billion in assets and it receives hundreds of millions of dollars of annual federal funding--more than any other pediatric research facility.

These endowments and federal funds depend on stellar reputations. Once doctors make a high-profile accusation to social services, as they did in Justina's case, Boston Children's Hospital can seem shy about admitting potential mistakes. In contrast, Harvard and Boston Children's Hospital can seem aggressive about throwing their weight around, so to speak.

In a similar case a few years later, a newborn in the U.K. named Charlie Gard was held at [check name:]Great Ormand Street Hospital. Like Justina, he had a rare mitochondrial disease (pronounced <i>might-toe-conn-dree-uhl</i> disease).

Once the hospital concluded that Gard's condition was hopeless, administrators stopped his parents from taking him elsewhere for experimental therapy. Doctors at [check name again:]Great Ormand claimed that further treatment would only prolong Charlie's suffering. The U.K. government agreed. His parents' wishes to the contrary made no difference.

[Embed: picture of Charlie Gard; attribution as appropriate; caption: Deprived of a chance at life? Doctors at [check name:] Great Ormand St. Hospital refused Charlie Gard (pictured) potentially--life-saving treatment from competing doctors.]

Pope Francis and President Trump offered to help find treatment for Gard too, but still the hospital and the government wouldn't let his parents take him elsewhere. A GoFundMe campaign quickly amassed $[insert dollar figure (I know the GFM was in pounds, I'd get the dollar value from an article from the time of the GoFundMe because the currency-exchange rate will have changed since then)] million.

It's not hard to imagine the impact on Great Ormand Street Hospital's reputation if Gard had been treated elsewhere and lived despite the hopeless prognosis of its doctors to the contrary. [Fact check and remove if this cannot be substantiated, but I do remember this from PCCF:]In fact, specialized experts later traveled to the hospital and examined Gard. [Start link to relevant and reputable article:]The experts declared that they might have been able to help him, if they had gotten to him sooner (or if he had been taken to them).[End link]

[Check name:]Great Ormand Street Hospital pulled the plug on Charlie Gard a short time later. His parents announced they'd use the money that they'd raised hoping to treat him in order to fund research into his condition and thereby help future patients.

[Embed: tweet by @realDonaldTrump about if there's anything the U.S. can do for Charlie, we're happy to do it; attribution: @realDonaldTrump/Twitter (2017); no caption]

As Charlie's saga reached the public conscience in 2017, Justina's lawsuit against Boston Children's Hospital slowly progressed. The case was filed in February 2016, but the trial didn't start in Boston until nearly 4 years later in January 2020.

Suing Harvard in a Boston court is perhaps the epitome of an uphill struggle. As Michelle Malkin noted during a visit to Boston, "The ties between and among influential and wealthy [Harvard] alumni in the realms of health care, politics and the courts are innumerable."

For instance, about a dozen plaintiffs from North Carolina sued Boston Children's Hospital over a pedophile pediatrician named Melvin Levine. He had practiced at Boston Children's Hospital for about 20 years and saw about 5,000 of its patients. During that time, Boston Children's promoted Levine to its chief of ambulatory pediatrics.

[For fact-check: there is a quote from a survivor who is an architect from Roslindale, MA, in one of the articles about the earlier suit that attorney Carmen Durso brought on behalf of Boston survivors about this:]Survivors in Boston believe that Levine was shuffled to UNC Medical Center to dodge complaints. [Start link to NYT or similar story:]He shot himself in the head[end link] the day after a few dozen former Boston Children's Hospital patients sued him for sexual abuse and sexual assault.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------------

Levine's victims in North Carolina hadn't known the circumstances of his move to UNC Medical Center. When they found out, about a dozen of them sued Boston Children's Hospital. They claimed that Levine was only able to move to their state and abuse them because Boston Children's Hospital failed in its obligation to report Levine to the police.

The suit--unlike Levine's career--was short lived. Massachusetts Superior Court Judge Merita A. Hopkins threw it out of court long before trial. Prior to becoming a judge though, Hopkins was the city attorney for Boston. And before that, in the 1980s, she was part of the now-disgraced Boston FBI [check exact name:]Organized Crime Taskforce that "handled" James "Whitey" Bulger. She later married James Ring, the head of that taskforce.

[Embed: picture of Hopkins, if available; attribution as appropriate; caption: Former Boston City Attorney and Massachusetts Superior Court Judge Merita A. Hopkins dismissed a lawsuit filed by over a dozen victims of a Boston Children's Hospital pedophile pediatrician.]

As previously stated, Boston Children's Hospital brings in hundreds of millions of dollars of federal funding to the city that Hopkins represented and to the state which made her a judge.

There is also the Boston media.

Perhaps the largest press outlet in New England is The Boston Globe. In 2013, as Justina languished in the Boston Children's Hospital psych ward, the Globe was purchased by the owner of The Boston Redsox, [check name:]John Henry.

It's fair to say that Henry takes a personal interest in Boston Children's Hospital. For every homerun hit by the Redsox, the team donates $500 to Boston Children's Hospital.

[Embed: picture of Henry in a Redsox setting with a BCH logo or possibly with a check for BCH, or that otherwise depicts him with both the Redsox and BCH; attribution as appropriate; caption: John Henry owns both The Boston Redsox and The Boston Globe.]

The Globe now dotes on Boston Children's Hospital without disclosing any conflicts of interest. Moreover, many facts that are unfavorable to Harvard and its hospitals are simply omitted from the Globe's coverage of cases like Justina's. Other media outlets in Boston demonstrate a similar tendency.

Not all of the Boston press is one-sided, however. In particular, Boston 25 News--the largest local television news outlet in the area--has provided balanced coverage of Justina's case and [start link to a clip about U.S. v. Gottesfeld on Boston 25:]related matters[end link].

[For fact-check, this statistic appears in one of Beau's FOIA requests to the CT governor:]It's also worth noting that Justina's story was the most-viewed in the history of the Fox Connecticut website. The aforementioned Fox Connecticut anchor Beau Berman won back-to-back Edward R. Murrow awards for his scathing coverage in [start link:]2013[end link] and [start link:]2014 [end link].

When Justina was finally released, she gave Berman the below interview about what she went through.

[Embed: Justina w/ Beau; no caption]

Yet, justice seems to have eluded Justina and her parents. Last month, a Boston jury heard their civil suit and found for the hometown hospital and its doctors over the out-of-state Pelletier family.

In returning its verdict, of course, the jury validated the multi-billion-dollar Harvard hospital that symbolizes to many Bostonians the very best aspects of their city, i.e. the elite academic and medical institutions that are crucial to its economy and to its character. How are an out-of-state child and her parents ever supposed to compete and convince twelve Bostonians that Harvard doesn't know best, one might wonder.

So, while Boston Children's Hospital and is apparent allies in the media take a victory lap, parents outside Massachusetts might think twice about taking a pilgrimage to the "medical Mecca" of Boston. Like Justina and her family, as well as Levine's victims, they might not find the Dr. Jekyll they were expecting. Instead, they may walk into an ambush with Mr. Hyde, only to find afterwards that there's no justice for them in Massachusetts courts.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

"We are very disappointed with the jury's decision today," the Pelletiers announced after the trial. "It was especially hurtful for Justina. However, we are a very strong and close family, and our love for each other will sustain us. Our goal now is to work passionately across the nation to ensure no family will have to endure the sufferings that we have gone through."

Back when Justina was discharged, 32 U.S. congressman, including then-Representative and now-Secretary of State Mike Pompeo, co-sponsored *Justina's Law*. It never passed.

If revived, *Justina's Law* would prohibit the use of Medicaid funding for medical experiments on wards of the state who don't stand to benefit directly from such research. Estimates of the federal dollars spent on Justina's case run into the millions.

"Is anyone in Washington, D.C., listening?"

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

---------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-05: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 03/05/2020 10:29:18 AM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

It was good to meet you yesterday.
I wish to note that I would apply the below changes to the Doctors Abducting Children? manuscript that I sent yesterday. I will also provide these changes incorporated in a completely-retyped version in 2 electronic messages that I will send later today.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message at approximately 10:30 A.M. on Thursday, March 5th, 2020.

* "Parents and children suffer similar abductions..." would be more objectively written, "Parents and children face similar abductions...";
* after, "recurring nightmares of being taken from her family.", it would be clearer to add this sentence: "Justina and her family sued Boston Children's Hospital and 4 of its practitioners, claiming negligence, gross negligence, medical malpractice, and civil-rights violations."
* "Thanks to gag orders and other coercive measures though..." would be more objectively written, "Due in large part to gag orders and other coercive measures though...";
* "Once the hospital concluded that Gard's condition" can be written instead, "Once the hospital concluded that Charlie's condition" [Please check that it's "Charlie" and not "Charley" too] (this is the first of many such places where "Gard" can instead be written "Charlie" because I now realize my earlier choice to refer to him impersonally by surname is silly so long as a I refer to Justina by first name);
* "... if Gard had been treated elsewhere..." can be written instead, "... if Charlie had been treated elsewhere..."
* "In fact, specialized experts later traveled to the hospital and examined Gard." can be better written due to word repetition, "In fact, specialized experts later traveled to the hospital and examined him."
* then, "they might have been able to help him,..." could be better written, "they might have been able to help Charlie,...";
* "His parents announced they'd use the money that they'd raised hoping to treat him in order to fund research into his condition and thereby help future patients." can be more clearly written, "His parents announced that they'd instead use the money they'd raised hoping to treat him in order to fund research into his condition, and thereby help future patients.";
* "... promoted Levine to its chief of pediatrics." would be more clearly written, "... promoted Levine to chief of ambulatory pediatrics.";
* "As previously stated, Boston Children's Hospital brings in hundreds of millions of dollars of federal funding to the city that Hopkins represented and to the state which made her a judge." would be more clearly written, "As stated previously, Boston Children's Hospital brings hundreds of millions of dollars of federal funding into the city and state, and Hopkins represented that same city as its official attorney before that state made her one of its judges."
* "... without disclosing any conflicts of interest." could be more conservatively written, "... without disclosing possible conflicts of interest.";
* "In returning its verdict, of course, the jury validated the multi-billion-dollar Harvard hospital that symbolizes to many Bostonians the very best aspects of their city, i.e. the elite academic and medical institutions that are crucial to its economy and to its character. How are an out-of-state child and her parents ever supposed to compete and convince twelve Bostonians that Harvard doesn't know best, one might wonder." can be more clearly and better written, "In returning its verdict, of course, the jury validated the multi-billion-dollar Harvard hospital. Boston Children's Hospital and Harvard, after all, symbolize to many Bostonians the very best aspects of their city, i.e. the elite academic and medical institutions that are crucial to its economy and to its character. How were an out-of-state child and her parents supposed to compete in a Boston courtroom and convince twelve Bostonians that Harvard didn't know best, one might wonder."

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

* "... only to find afterwards..." would be better written due to word repetition, "... only to discover afterwards..."
* "If revived..." would be better written, "If revived and enacted..."; and
* "'Is anyone in Washington, D.C., listening?'" would be better written, "As Michelle Malkin asked a couple years ago, 'Is anyone in Washington, D.C., listening?'"

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-05: PRIVILEGED ATTORNEY-CLIENT MESSAGE #2
DATE: 03/05/2020 01:05:01 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I was surprised about the visit today. I hope that everything is all right. This is my 2nd of 3 electronic messages today.

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message at approximately 1:05 P.M. on Thursday, March 5th, 2020.

Headline: Doctors Abducting Children?
Tagline: Parents Denied Justice Against Medical Kidnappers

[Embed: featured image of Justina in a wheelchair and preferably in a court or otherwise--visibly-legal setting; attribution as appropriate; no caption]

It's a parent's nightmare: an appointment with Dr. Jekyll turns into an ambush by Mr. Hyde.

Now crippled for life, 14-year-old Justina Pelletier went to Boston Children's Hospital for help with the flu. Once there, she barely survived a medical "kidnapping," as [start link: to Huck's post-release Fox interview with the Pelletiers:]Mike Huckabee [end link] and [start link to National Review: Brutal Battle:]Michelle Malkin[end link] call it.

[Embed: Huckabee's post-release Fox interview with the Pelletiers; no caption]

Justina had a referral to see her gastroenterologist, but other doctors hijacked her case. They rediagnosed her within hours. Instead of the metabolic disease that runs in her family, they said that she has an obscure psychiatric disorder.

Justina's mother and father Linda and Lou Pelletier resisted. They refused to stop Justina's brain, heart, and pain medications.

Boston Children's Hospital reported Lou and Linda to its [start link to documentation about the close connection between DCF and BCH, possibly the Terry complaint in D. Mass.]close allies[end link] at the Massachusetts Department of Children and Families (DCF). The new doctors complained to the government's social-services workers that they knew better than Linda and Lou Pelletier. Failure to follow their brand-new treatment plan, they insisted, was a form of "medical child abuse" against Justina.

Based solely on this "medical child abuse" theory, Massachusetts took emergency custody of Justina before any court hearing. Then, family-court judge Joseph F. Johnston sided with the state and the hospital.

When Fox Connecticut reporter Beau Berman took interest in Justina's story and showed up at the courthouse, Judge Johnston slapped the Pelletiers with a gag order. They were forbidden from speaking to the press under threats of fines and imprisonment.

Boston Children's Hospital locked Justina in its psych ward with children who were truly dangerous to themselves and others. The hospital also reduced and tightly monitored her communications with the outside world.

Justina returned home crippled more than 2 birthdays (16 months) later. She is back to being treated for her original diagnosis.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Like a combat veteran though, she now has post-traumatic stress disorder and recurring nightmares of being taken from her family. Justina and her parents sued Boston Children's Hospital and 4 of its practitioners, claiming negligence, gross negligence, medical malpractice, and civil-rights violations.

[Embed: photo of Lou carrying Justina back into their home; attribution as appropriate; caption: Justina was crippled when she returned home in June 2014 at age 16; she still cannot walk today.]

Parents and children face similar abductions at hospitals elsewhere in America and abroad. Due in large part to gag orders and other coercive measures though, the public rarely hears about these cases. So, they happen more than one might think and they're especially frequent at large, well-funded teaching hospitals.

For its part, Boston Children's is the primary pediatric teaching hospital for Harvard Medical School. Harvard's endowment is [check endowment values:]$36 billion. Boston Children's Hospital has an additional $2 billion in assets and it receives hundreds of millions of dollars of annual federal funding--more than any other pediatric research facility.

These endowments and federal funds depend on stellar reputations. Once doctors make a high-profile accusation to social services, as they did in Justina's case, Boston Children's Hospital can seem shy about admitting potential mistakes. In contrast, Harvard and Boston Children's Hospital can seem aggressive about throwing their weight around, so to speak.

In a similar case a few years later, a newborn in the U.K. named [check spelling of first name:]Charlie Gard was held at [check name of hospital:]Great Ormand Street Hospital. Like Justina, he had a rare mitochondrial disease (pronounced <i>might-toe-conn-dree-uhl</i> disease).

Once the hospital concluded that Charlie's condition was hopeless, administrators stopped his parents from taking him elsewhere for experimental therapy. Doctors at [check name:]Great Ormand claimed that further treatments would only prolong Charlie's suffering. The U.K. government agreed. His parents' wishes to the contrary made no difference.

[Embed: picture of Charlie Gard; attribution as appropriate; caption: Deprived of a chance at life? Doctors at [check name:] Great Ormand St. Hospital refused Charlie Gard (pictured) potentially-life-saving treatment from competing doctors.]

Pope Francis and President Trump offered to help find treatment for Charlie too, but still the hospital and the government wouldn't let his parents take him elsewhere. A GoFundMe campaign quickly amassed $[insert dollar figure (I know the GFM was in pounds, I'd get the dollar figure from an article from the time of the GoFundMe because the currency-exchange rate will have changed since then)] million.

It's not hard to imagine the impact on Great Ormand Street Hospital's reputation if Charlie had been treated elsewhere and lived despite the hopeless prognosis of its doctors to the contrary. [Fact check and remove if this cannot be substantiated, but I do remember this from PCCF:]In fact, specialized experts later traveled to the hospital and examined him. [Start link to relevant and reputable article:]The experts declared that they might have been able to help Charlie[end link], if they had gotten to him sooner (or if he had been taken to them).

[Check name:]Great Ormand Street Hospital pulled the plug on Charlie Gard a short time later.

Charlie's parents announced that they'd use the money they'd raised hoping to treat him in order to fund research into his condition, and thereby help future patients.

[Embed: 2017-07-03 7:00 A.M. tweet by @realDonaldTrump, "If we can help little #CharlieGard, as per our friends in the U.K. and the Pope, we would be delighted to do so."; attribution: Twitter/@realDonaldTrump (2017); no caption]

The Trump administration is now backing regulations to give patients in the United States and their families the [start link to an article on "Right to try":]right to try[end link] experimental therapies.

As Charlie's saga reached the public conscience in 2017, Justina's lawsuit against Boston Children's Hospital slowly progressed. The case was filed in February 2016, but the trial didn't start in Boston until nearly 4 years later in January 2020.

Suing Harvard in a Boston court is perhaps the epitome of an uphill struggle. As Michelle Malkin noted during a visit to Boston, "The ties between and among influential and wealthy [Harvard] alumni in the realms of health care, politics and the courts are innumerable."

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: 12982104
TO: Sample, Brandon C
SUBJECT: 2020-03-05: PRIVILEGED ATTORNEY-CLIENT MESSAGE #3
DATE: 03/05/2020 01:05:05 PM

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

This is my 3rd of 3 electronic messages to you today. I also sent you legal mail in a white envelope.

The following additional changes are incorporated in the retyped version:
* instead of "Justina and her family sued Boston Children's..." this version works around word repetition of "family" by saying, "Justina and her parents sued Boston Children's...";
* the word "instead" is removed for readability in "His parents announced that they'd use the money they'd raised..." and there is now a paragraph break before the sentence;
* The addition of a paragraph about "right to try" regulations;
* The linked-on text changed for the announcement by the mito experts that they possibly could have done something for Charlie;
* "His parents announced..." now reads "Charlie's parents announced...";
* "... he saw about 5,000 of its patients." is now "... he saw about 5,000 patients there.";
* the adjective "federal" has been added before Medicaid; and
* The ending now says, "The question remains, as Michelle Malkin asked a couple of years ago, 'Is anyone in Washington, D.C., listening?'"

Regards,


Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)
I sent you this message at approximately 1:05 P.M. on Thursday, March 5th, 2020.

For instance, about a dozen plaintiff's from North Carolina sued Boston Children's Hospital over a pedophile pediatrician named Melvin Levine. He had practiced at Boston Children's Hospital for about 20 years and he saw about 5,000 patients there. During that time, Boston Children's promoted Levine to chief of ambulatory pediatrics.

[For fact-check: there is a quote about this from a survivor who is an architect from Roslindale, MA, in one of the articles about the earlier suit that attorney Carmen Durso brought on behalf of Boston survivors about this:]Survivors in Boston believe that Levine was shuffled to UNC Medical Center to dodge complaints. [Start link to NYT or similar story:]He shot himself in the head [end link] the day after a few dozen former Boston Children's Hospital patients sued him for sexual abuse and sexual assault.

Levine's victims in North Carolina hadn't known the circumstances of his move to UNC Medical Center. When they found out, about a dozen of them sued Boston Children's Hospital. They claimed that Levine was only able to move to their state and abuse them because Boston Children's Hospital failed in its obligation to report Levine to the police.

The suit--unlike Levine's career--was short lived. Massachusetts Superior Court Judge Merita A. Hopkins threw it out of court long before trial. Prior to becoming a judge though, Hopkins was the city attorney for Boston. And before that, in the 1980s, she was part of the now-disgraced Boston FBI [check exact name:]Organized Crime Taskforce that "handled" James "Whitey" Bulger. She later married James Ring, the head of that taskforce.

[Embed: picture of Hopkins, if available; attribution as appropriate; caption: Former Boston City Attorney and Massachusetts Superior Court Judge Merita A. Hopkins dismissed a lawsuit filed by over a dozen victims of a Boston Children's Hospital pedophile pediatrician.]

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------------------------

As previously stated, Boston Children's Hospital brings hundreds of millions of dollars of federal funding into the city and state, and Hopkins represented that same city as its official attorney before that state made her one of its judges.

There is also the Boston media.

Perhaps the largest press outlet in New England is The Boston Globe. In 2013, as Justina languished in the Boston Children's Hospital psych ward, the Globe was purchased by the owner of The Boston Redsox, [check name:]John Henry.

It's fair to say that Henry takes a personal interest in Boston Children's Hospital. For every homerun hit by the Redsox, the team donates $500 to Boston Children's Hospital.

[Embed: picture of Henry in a Redsox setting with a BCH logo or possibly with a check for BCH, or that otherwise depicts him with both the Redsox and BCH; attribution as appropriate; caption: John Henry owns both The Boston Redsox and The Boston Globe.]

The Globe now dotes on Boston Children's Hospital without disclosing possible conflicts of interest. Moreover, many facts that are unfavorable to Harvard and its hospitals are simply omitted from the Globe's coverage of cases like Justina's. Other media outlets in Boston demonstrate a similar tendency.

Not all of the Boston press is one-sided, however. In particular, Boston 25 News--the largest local television news outlet in the area--has provided balanced coverage of Justina's case and [start link to a clip about U.S. v. Gottesfeld on Boston 25:]related matters[end link].

[For fact-check, this statistic appears in one of Beau's FOIA requests to the CT governor:]It's also worth noting that Justina's story was the most-viewed in the history of the Fox Connecticut website. The aforementioned Fox Connecticut anchor Beau Berman won back-to-back Edward R. Murrow awards for his scathing coverage in [start link:]2013[end link] and [start link:]2014 [end link].

When Justina was finally released, she gave Berman the below interview about what she went through.

[Embed: Justina with Beau; no caption]

Yet, justice seems to have eluded Justina and her parents. Last month, a Boston jury heard their civil suit and found for the hometown hospital and its doctors over the out-of-state Pelletier family.

In returning its verdict, of course, the jury validated the multi-billion-dollar Harvard hospital. Boston Children's Hospital and Harvard, after all, symbolize to many Bostonians the very best aspects of their city, i.e. the elite academic and medical institutions that are crucial to its economy and to its character. How were an out-of-state child and her parents supposed to compete in a Boston courtroom and convince twelve Bostonians that Harvard didn't know best, one might wonder.

So, while Boston Children's Hospital and its apparent allies in the media take a victory lap, parents outside Massachusetts might think twice about taking a pilgrimage to the "medical Mecca" of Boston. Like Justina and her family, as well as Levine's victims, they might not find the Dr. Jekyll they were expecting. Instead, they might walk into an ambush with Mr. Hyde, only to discover afterwards that there's no justice for them in Massachusetts courts.

"We are very disappointed with the jury's decision today," the Pelletiers announced after the trial. "It was especially hurtful for Justina. However, we are a very strong and close family, and our love for each other will sustain us. Our goal now is to work passionately across the nation to ensure no family will have to endure the sufferings that we have gone through."

Back when Justina was discharged, 32 U.S. congressmen, including then-Representative and now-Secretary of State Mike Pompeo, co-sponsored [start link to list of co-sponsors:]<i>Justina's Law</i>[end link]. It never passed.

If revived and enacted, however, <i>Justina's Law</i> would prohibit the use of federal Medicaid funding for medical experiments on wards of the state who don't stand to benefit directly from such research. Estimates of the federal dollars spent on Justina's case run into the millions.

The question remains, as Michelle Malkin asked a couple of years ago, "Is anyone in Washington, D.C., listening?"

From: Martin S. Gottesfeld (Reg. No.: 12982-104)

To: Mr. Kelen McBreen; Ms. Michelle Malkin; Mrs. Dana Gottesfeld; Mr. Brandon C. Sample, Esq.; Mr. Ryan Grim; Mr. Frank Camp; Mr. Kevin Gosztola; Mr. John Kiriakou; Ms. Elmira Petrovskaya; Ms. Meredith Wright; Mr. Alex Newman; Mr. Carey Mitchell Shaw; Ms. Lori Fortin; Mr. Benjamin Brown, Esq.; Mr. Greg Brown; and Mr. Ian Thornton

Date: Friday, March 13th, 2020

Subject: Operations Fast & Furious and Polar Pen

Salutations Mr. Kelen McBreen; Ms. Michelle Malkin; Mrs. Dana Gottesfeld; Mr. Brandon C. Sample, Esq.; Mr. Ryan Grim; Mr. Frank Camp; Mr. Kevin Gosztola; Mr. John Kiriakou; Ms. Elmira Petrovskaya; Ms. Meredith Wright; Mr. Alex Newman; Mr. Carey Mitchell Shaw; Ms. Lori Fortin; Mr. Benjamin Brown, Esq.; Mr. Greg Brown; and Mr. Ian Thornton:

Operation Fast and Furious continues today.

The incriminating evidence--enough to convict dozens of high-profile Obama-administration officials--is likely in the emails of DOJ fixer Katherine Siereveld. The question is, can Attorney General Barr get to it?

There's also Operation Polar Pen, the DOJ's somewhat-successful but since-discredited plan to flip Alaska blue by falsely convicting Senator Ted Stevens and others in time to pave the way for the passage of ObamaCare. As part of that operation, the DOJ spared its star witness Bill Allen from charges of exploiting child prostitutes in exchange for his perjured testimony. The judge held three federal prosecutors in contempt of court, but no one did a day in jail for securing a bogus guilty finding against a Republican U.S. senator.

Nor did the DOJ ever get to the bottom of Polar Pen. Once again, however, key evidence is likely waiting in Katherine Siereveld's files.

And Siereveld is not alone. She has help from dozens of dangerously-- high-powered Obama-holdover henchmen. These are people unaccustomed to their power being checked. Their handlers rarely tell them "no." After all, the information they control is leverageable against many of the Democratic Party's most-senior officials.

As President Trump experienced personally too with the FISA program, the deep state's worst offenders are quick to claim "national security." It's their go-to guise, allowing them to shield in secrecy their unconstitutional acts that they might otherwise be too shy to try in the open. Siereveld and her crew abuse the Bush-era banner of "counter-terrorism" with all of the apparent disdain one might expect them to show for a Rent-a-Wreck. Most of them work out of a small office in Martinsburg, West Virginia.

Their paychecks come from The Federal Bureau of Prisons, i.e. the same government bureaucracy responsible for the deaths of Whitey Bulger, Jeffrey Epstein, and many others who were inconvenient to dirty Democrats. They think they are above the Constitution. And for a long time, they've effectively been right.

In 2016, The U.S. Court of Appeals declared that what they've been doing is unconstitutional. It didn't even register as a speed bump. If anything, they're emboldened. They're used to bullying people into silence--or worse.

They've threatened me over the contents of my court filings. Now, they're

threatening me over my political endorsements of GOP candidates and the contents of my messages to my lawyer. That's their level of unchecked disloyalty to the First Amendment and Due Process.

My father designed reactors for American nuclear submarines, high-speed steam catapults for our aircraft carriers, and helped land Americans on the moon and return them safely to Earth. I defended Justina Pelletier when they would have let her die. They are unamerican and anti-American.

And they're now laughing at the Trump administration as they continue piling the dirt higher on the bodies they buried for the Obama administration.

Read The CMU Series.

Demand answers.

Your country and your Constitution are depending on you.

Regards,
/s/ Martin S. Gottesfeld
Martin S. Gottesfeld; defendant-appellant; United States v. Gottesfeld; 19-1107, et al. (1st Cir.)

ottesfeld
2982-104
rectional Institution

, IN 47808





⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

Thursday, March 12th, 2020; <u>Houston v. Lack</u>, 487 U.S. 266 (1988)



RECEIVED
SDNY PRO SE OFFICE
2020 MAR 20  PM 2: 45