UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED MAY 28 2020 PRO SE OFFICE

| |
|---|
| Martin S. Gottesfeld, <u>pro se</u>,<br>Plaintiff,<br>- against -<br>Hugh J. Hurwitz, et al. |

Case No.: **18-cv-10836-PGG-GWG**

## <u>NOTICE OF ARBITRARY AND CAPRICIOUS POLICY ENFORCEMENT</u>

Plaintiff Martin S. Gottesfeld (herein the "plaintiff"), acting <u>pro se</u>, hereby notifies The Honorable Court of the latest arbitrary and capricious actions and omissions of the instant defendants, their common counsel, and their shared parties in privity, taken or omitted in deliberate interference with the plaintiff's litigation of the instant case, in violation of <u>Fed. R. Civ. P. 11(b)</u>, <u>Loc. Civ. R. 1.5(b)(5)</u>, and <u>The New York Rules of Professional Conduct</u>.

The plaintiff herewith provides and respectfully directs The Court's attention to <u>Exhibit 1</u> hereto, Declaration of Martin S. Gottesfeld (Friday, February 14th, 2020), made pursuant to <u>Fed. R. Evid. 201(c)(2)</u>, <u>Fed. R. Evid. 901(b)(1)</u>, and <u>Fed. R. Evid. 902(5)</u>.

The plaintiff's wife mailed documents to him from the instant case and from <u>Gottesfeld v. Lammer</u>, 2:20-cv-00012-JRS-MJD (S.D. Ind.) on Tuesday, February 4th, 2020. <u>Exhibit 2</u> hereto at 1, Mrs. Dana E. Gottesfeld, letter to Mr. Martin S. Gottesfeld (Tuesday, February 4th, 2020).

These documents were rejected by agents of both the instant defendants and their common counsel on Friday, February 7th, 2020, but notice of this rejection was untimely delivered to the plaintiff six (6) days after the rejection, i.e. on Thursday, February 13th, 2020. <u>Exhibit 1</u> hereto ¶¶ 4-5 and <u>Exhibit 4</u> hereto; J. Howard, CSO; Form BP-A0328 **STAMPS, NEGOTIABLE INSTRUMENT & OTHER RETURNED TO SENDER** (Friday, February 7th, 2020).

The reason stated for the rejection was, "UNAUTHORIZED PACKAGE WEIGHING OVER A POUND." <u>Id.</u>

- Page 1 of 12 -

Agents of both the defendants and their common counsel relied upon The Federal Bureau of Prisons (herein the "FBOP") policy set out in its Program Statement 5800.16 in issuing the rejection. Id., referencing "THX-5800.16B" and "P5800." Please see also Exhibit 5 hereto, Harley G. Lappin, FBOP Program Statement 5800.16 Mail Management Manual (April 5, 2011) §§ 3.7 **DELIVERY**, 3.9 **IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL**, and 3.13 **INMATE PACKAGE MAIL INCOMING**.

As is already clearly demonstrated in the record of the instant case, however, the defendants, their common counsel, and their collective agents and other parties in privity choose arbitrarily, capriciously, and maliciously when they will and will not comply with their own policies governing delivery and non-delivery of the plaintiff's legal documents to him through the mail, including FBOP Program Statement 5800.16. They officiously cite to such policies when doing so is beneficial to them and/or harmful to the plaintiff, but then flagrantly and maliciously violate these same policies at will when compliance would benefit the plaintiff adversely to their litigation of the case.

The envelope bearing to the plaintiff his wife's letter from February 4th, 2020, for instance, was postmarked in Boston, MA, on that same day. Exhibit 3 hereto, envelope from Mrs. Dana Gottesfeld of Somerville, MA, to Mr. Martin S. Gottesfeld in Terre Haute, IN, postmarked Tuesday, February 4th, 2020; and marked received by the plaintiff on Thursday, February 13th, 2020.

Agents of both the instant defendants and their common counsel then marked the envelope bearing that letter so as to indicate falsely that it was not received in their mailroom until Wednesday, February 12th, 2020. Id.

In reality, however, The United States Postal Service (herein the "U.S.P.S.") has a "3-day service standard" for First-Class Mail pieces that are posted "within the contiguous 48 states," such as Mrs. Gottesfeld's letter

to the plaintiff. Exhibit 11 hereto, 39 C.F.R. § 121.1(c)(1); and Exhibit 3 hereto, showing first-class U.S. postage paid and origin and destination addresses within the contiguous 48 states.

Thus, even if the U.S.P.S. accepted custody of Mrs. Gottesfeld's letter after the "day-zero Critical Entry Time (CET)" on February 4th, 2020, then the 3-day service-standard window elapsed on Saturday, February 8th, 2020. Given that the defendants' mailrooms do not process prisoner mail on weekends or holidays, however, the latest time the letter could have arrived at FCI Terre Haute without breaking the service-window standard was Monday, February 10th, 2020, and not--as marked on the envelope--Wednesday, February 12th, 2020.

As The Court is already aware, these inordinate delays are far too frequent to be explained by the U.S.P.S. occasionally failing to meet its own service standards. Please see, inter alia, docket entry (D.E.) 122 at 5 ¶¶ 2-6 (mail from U.S. attorney's office postmarked Thursday, December 12th, 2019, not marked received at FCI Terre Haute until Wednesday, December 18th, 2019) (these pages may have been relocated by now to D.E. 124 at 2 as per the plaintiff's request at D.E. 139 at 2); id. ¶¶ 8-9 (Priority Mail® 2-Day® marked by The U.S.P.S., "EXPECTED DELIVERY DAY 12/12/19," and bearing U.S.P.S. tracking number 9505 5124 4641 9343 2796 67, but not marked received at FCI Terre Haute until Wednesday, December 18th, 2019); D.E. 28; D.E. 74 at 4 ¶¶ 2-5 and at 6; D.E. 75 at 5 ¶2 and at 6-7; D.E. 113 at 1; D.E. 141 at 4 ¶¶ 2-5; D.E. 142 at 4 ¶¶ 2-5 (mail from U.S. attorney's office postmarked Tuesday, January 7th, 2020, not marked received at FCI Terre Haute until Tuesday, January 14th, 2020); D.E. 146 at 20 ¶¶ 2-5; and D.E. 147 at 3 ¶¶ 2-5 and at 4 ¶¶ 11-12 (Priority Mail® 2-Day® marked by The U.S.P.S., "EXPECTED DELIVERY DAY 01/21/20," and bearing U.S.P.S. tracking numbers 9505 5145 7859 0017 7209 98 and 9505 5145 7857 0018 5156 01, but not delivered to the plaintiff until January 27th, 2020).

It is far more likely than not that the receipt markings left by these agents of both the instant defendants and their common counsel are inaccurate than that the U.S.P.S. so consistently breaks its own service standards and does so peculiarly for the plaintiff's court-related mail.

It is worth noting as well that the plaintiff's outbound court-related mail encounters delays that are even longer. Please see, inter alia, D.E. 59 at 2 (mailed June 10th, 2019, but not entered onto the docket until July 2nd, 2019); D.E. 116 at 19 (an EMERGENCY MOTION dated Thursday, December 12th, 2019, but not postmarked until Thursday, December 19th, 2019); and D.E. 136, 137, and 138 (mailed December 22nd, 2019, but not entered until January 22nd, 2020).

The plaintiff futilely but diligently tried to address these delays by engaging the defendants' administrative-remedy program (herein the defendants' "ARP"). Exhibit 13 hereto; Martin S. Gottesfeld; FBOP ARP request number 979745, citing Ex Parte Hull, 312 U.S. 546 (1941), and Cochran v. Kansas, 316 U.S. 255 (1942). Exhibit 12 hereto at 1 ¶2.

The above events and others already detailed in the instant record, prove as demonstrated infra, the arbitrary, capricious, and malicious nature of the defendants' policy-enforcement decisions.

The plaintiff now further illuminates these proofs, starting by reviewing the relevant policy definitions.

The defendants parenthetically define "legal mail" to include mail that is sent, respectively, to and from "courts and attorneys." Exhibit 6 hereto at 1, 28 C.F.R. § 540.21(d); and Exhibit 7 hereto, 28 C.F.R. § 540.19(a).

The defendants define "Special mail" in 28 C.F.R. § 540.2(c) and "General Correspondence" in 28 C.F.R. § 540.2(a), but 28 C.F.R. § 540.2 nowhere defines "legal mail," and therefore it in no way conflicts with the definitions of "legal mail" found in 28 C.F.R. §§ 540.21(d) and 540.19(a). Please see Exhibit

8 hereto, Harley G. Lappin, FBOP Program Statement 5265.14 Correspondence (April 5, 2011) at 3 § 2 **DEFINITIONS**, quoting 28 C.F.R. § 540.2.

Similarly, FBOP Program Statement 5265.14 Correspondence nowhere purports to define "legal mail," except by quoting the aforementioned 28 C.F.R. §§ 540.21(d) and 540.19(a). Please contrast Exhibit 8 hereto at 3 § 2 **DEFINITIONS** with id. at 17 § 11 **LEGAL CORRESPONDENCE**, quoting 28 C.F.R. § 540.19(a); and id. at 13 § 13 **PAYMENT OF POSTAGE**, quoting 28 C.F.R. § 540.21(d).

Further, FBOP Program Statement 5800.16 Mail Management Manual, as cited by the defendants in Exhibit 4 hereto, consistently treats "special" and "legal" mail as distinct yet often-overlapping categories. Please cf. Exhibit 5 hereto at 3 § 3.9 **IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL**, referring to (emphasis added), "Special and legal mail," "legal/special mail," and "special or legal mail"; id. at 4 also referring to "special/legal mail;" and id. at 6 (§ 3.13 **INMATE PACKAGE MAIL INCOMING**), referring to (emphasis added), "special or legal mail packages."

FBOP Program Statement 5265.14 Correspondence too has distinct sections for "special mail" and "legal correspondence." Exhibit 8 hereto at 15 § 10 **SPECIAL MAIL** and id. at 17 § 11 **LEGAL CORRESPONDENCE**.

These overlapping-yet-distinct designations for "special mail" and "legal mail" are logical because, inter alia, not all special mail is legal mail, and vice versa. For instance, federal prisoners can send and receive non-legal special mail to and from members of the media who are not courts and attorneys. Exhibit 8 hereto at 18 § 12 **INMATE CORRESPONDENCE WITH REPRESENTATIVES OF THE NEWS MEDIA**, quoting 28 C.F.R. § 540.20(a); and id. at 4 (§ 2 **DEFINITIONS**), quoting 28 C.F.R. § 540.2(c).

Other non-legal special mail includes correspondence to and from state or federal legislative or executive officials and consular offices. Id. at 4, quoting 28 C.F.R. § 540.2(c).

For an example of non-special legal mail, federal prisoners may receive "legal materials" pursuant to 28 C.F.R. § 543.11(d)(1)--which unlike special mail--"are subject to inspection and may be read or copied unless they are received through an authorized attorney visit from a retained attorney or are properly sent as special mail." Exhibit 9 hereto, 28 C.F.R. § 543.11; and Exhibit 10 hereto; Federal Bureau of Prisons; Program Statement 1315.07 Legal Activities, Inmate (November 5th, 1999) § 10 LEGAL RESEARCH AND PREPARATION OF LEGAL DOCUMENTS, quoting 28 C.F.R. § 543.11(d)(1).

Basically, "legal mail" is mail sent to or from courts and attorneys or containing legal materials, while "special mail" is mail that must be opened in the presence of the prisoner and not read by the defendants. Exhibit 8 hereto at 17 § 11 LEGAL CORRESPONDENCE and id. at 15 § 10 SPECIAL MAIL.

For the vast majority of federal prisoners, however, this is a distinction without a difference. They rarely, if ever, receive non-legal special mail by corresponding with representatives of the news media, state or federal legislative or executive officials, or consular staff. They also rarely, if ever, receive non-special legal mail because the vast majority of the time they receive their legal materials via special mail from courts and attorneys.

Yet, the distinction between special mail and legal mail is vital to the instant case because the correspondence cited in the instant complaint between the plaintiff and Rolling Stone, Wired, and The Huffington Post was non-legal special mail. D.E. 2 at 9 ¶15; id. at 10 ¶¶ 18-19; and id. at 11 ¶21.

Further, the correspondence cited supra between the plaintiff and This Court was legal mail despite the defendants' grossly-unconstitutional placement of the plaintiff in a communications-management unit (CMU), which the defendants purport strips such mail of its status as special mail. D.E. 79 at 9-14, 28 C.F.R. Part 540 Subpart J § 540.203(b)(1).

Additionally, the mail sent to the plaintiff by his wife containing legal materials from PACER was legal mail under 28 C.F.R. § 543.11(d)(1), even though it was not special mail from a court or attorney.

The above-referenced correspondence between the plaintiff and The Court, defendants' counsel, and the plaintiff's wife remained legal mail because, though 28 C.F.R. § 540.203(b)(1) purports to redefine "special mail" inside the FBOP's CMUs, nowhere does 28 C.F.R. Part 540 Subpart J attempt a CMU-specific redefinition of "legal mail." D.E. 79 at 9-14.

Neither is any such attempt made by the defendants' other CMU policies. D.E. 79 at 15-29, Charles E. Samuels Jr., FBOP Program Statement 5214.02 **Communications Management Unit**[sic] (April 1, 2015); D.E. 69 at 69-95 and D.E. 79 at 43-45, The FCI Terre Haute CMU Handbook.

No such definition or redefinition of "legal mail" was published in The Federal Register and subject to the required public-comment period either. D.E. 79 at 30-40.

Moreover, 28 C.F.R. § 540.200(e) (found at D.E. 79 at 9) is clearly inapplicable to the definition of "legal mail" in the CMUs because 28 C.F.R. Part 540 Subpart J does not "conflict with," is not "inconsistent with," and does not "impose greater limitations" on "legal mail." D.E. 79 at 9-14. Indeed, unlike the FBOP's other regulations and policies cited supra, 28 28 C.F.R. Part 540 Subpart J, FBOP Program Statement 5214.02 **Communications Management Unit**[sic], and The FCI Terre Haute CMU Handbook nowhere mention "legal mail."

And though 28 C.F.R. Part 540 Subpart J § 540.203(a) says, "General written correspondence as defined by this part" (emphasis added), it does not say, "as defined by this subpart." Nor does 28 C.F.R. Part 540 Subpart J (re)define "general correspondence." D.E. 79 at 9-14. "General correspondence"

is instead defined by 28 C.F.R. § 540.2(a). Exhibit 8 hereto at 3 § 2 DEFINITIONS. While this definition of "General correspondence" specifically excludes (emphasis in original), "special mail," it does not exclude "legal mail."

Furthermore, none of the regulations or policies cited supra purport to modify delivery-time standards or priorities inside the CMUs for "special mail," "legal mail," or "general correspondence." No part of the defendants' unconstitutional and retaliatory transfer of the plaintiff to a CMU within days of receiving service of the instant complaint provides them legitimate allowance to delay his legal mail to and from This Court for days, weeks, or a month, as they continue to do with impunity, or to delay his "general correspondence" and legal mail from his wife. Exhibit 1 hereto ¶¶ 2-4; exhibits 2-4 hereto; Exhibit 12 hereto at 1 ¶¶ 3 and 10; id. at 2 ¶¶ 14, 18, and 21; and exhibits 14-17 hereto. Please see also the instances cited supra of delays of up to a month for the plaintiff's mail to This Court.

To the contrary, these delays are more than simply unauthorized; they are explicitly prohibited by the defendants' own policies.

"Delivery of letters may not be delayed and ordinarily will be made within 24 hours of receipt, excluding weekends and holidays." Exhibit 5 hereto at 2 § 3.7 DELIVERY. Please cf. Exhibit 12 hereto at 1 ¶3, "Delivery of letters to me like exhibits 2-3 hereto are delayed and ordinarily take many business days."

According to Exhibit 5 hereto at 3 § 3.9 IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL:

> Ordinarily, inmate correspondence will be processed and delivered with[in] 24 hours. Special and legal mail is afforded priority. Reasonable efforts by staff to deliver legal/special mail will be documented in the log book if the mail is unable to be delivered as provided by this policy. Staff must further document the attempts to deliver legal/special mail every 24 hours after the time initially logged until delivered.

Please contrast this policy with the plaintiff's actual experiences. "My special and legal mail are not afforded priority by agents of the defendants in the case. Agents of the defendants in the case make no discernable attempts to deliver my legal and special mail every twenty-four (24) hours after the time it is initially logged until it is delivered." Exhibit 12 hereto at 1 ¶¶ 4-5.

The same policy requires agents of the defendants to hand-carry the plaintiff's special mail and legal mail to the mailroom after verifying that the plaintiff listed himself properly as the return addressee--and not after weeks of delays. Exhibit 5 hereto at 3 § 3.9 IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL. Please contrast this requirement to the behavior noted supra, and, "Agents of the defendants in the case do not hand carry my special or legal mail to the mail room immediately after confirming that I am the prisoner specified in its return address." Exhibit 12 hereto at 1 ¶6.

And here's another whopper from Exhibit 5 hereto at 4 (§ 3.9):

Periodically, [case-management coordinator]s will review the special/legal mail delivery process to ensure that policy requirements are met. [Case-management coordinator]s will consult specifically with staff and review requisite record keeping to ensure that delivery time frames are being met.

Please contrast this policy with Exhibit 1 hereto ¶¶ 2-5; Exhibit 12 hereto at 1 ¶10; id. at 2 ¶¶ 14, 16, 18, and 21; the delays encountered in the plaintiff's mail to and from This Court as noted supra; and Exhibit 12 hereto at 2 ¶23:

The Case-Manager Coordinator (CMC) for the FCI Terre Haute CMU does not review the special/legal mail delivery process and ensure that policy requirements are met and does not consult specifically with staff and review requisite record keeping to ensure that delivery time frames are being met.

Similarly, the defendants claim (emphasis in original), "The random reading of mail is intended to reveal, for example, escape plots, plans to commit illegal acts, plans to violate institution rules, or other security

concerns." Exhibit 8 hereto at 10 (§ 6 GENERAL CORRESPONDENCE).

And id.:

Unless there is a legitimate correctional concern relating to security,
safety, orderly running of the institution, criminal activity, or inmate
rehabilitation, the contents of reviewed correspondence should not be
revealed to any other person.

Please contrast Exhibit 12 hereto at 3 ¶¶ 27-28:

27. The non-random reading of my mail--and especially of my mail to and
from The Court--is not intended by agents of the defendants in the case to
reveal anything that would present a valid security concern, but rather to
give the defendants an unfair head start on my court filings before they
appear on the docket of the case and to alert them to negative publicity
regarding their kickback and other unlawful schemes.

28. Agents of the defendants in the case regularly reveal the contents of
my correspondence to other persons in the absence of a legitimate
correctional concern.

Further, the defendants' own policy states unequivocally, "Monitoring

procedures may not interfere with mail handling." Exhibit 8 hereto at 9 (§ 6

GENERAL CORRESPONDENCE).

Please contrast though, "The monitoring procedures employed by agents of

the defendants in the case in the FCI Terre Haute CMU interfere with mail

handling." Exhibit 12 hereto at 2 ¶26.

Moreover, it is plain to see from the events enumerated supra, that the

defendants flagrantly violate their own policies and inordinately delay the

plaintiff's legal mail to and from The Court and opposing counsel, his special

mail to his attorney, and his legal and general correspondence with his wife.

And this would be bad enough.

Yet, the situation is actually worse than it would be if the defendants

simply ignored their policies all together.

Instead, however, in this latest example, the defendants received Exhibit

2 hereto at the same time as the package they rejected. (Both were sent at the

same time and Mrs. Gottesfeld would have noted in her letter, as per her habit

in such instances, if she missed the "day-zero Critical Entry Time." The last

day it could have been received, therefore, was Friday, February 7th, 2020,
i.e. the same day as the rejection.)

The defendants then read Exhibit 2 as per 28 C.F.R. § 540.203(a). D.E. 79
at 9-14.

Thus, the defendants ascertained that the contents of the package were
legal materials pursuant to 28 C.F.R. 543.11(d)(1). Exhibit 9 hereto.

In turn, the defendants then knew that the package was "Authorized by
Bureau Policy." Exhibit 5 hereto at 5 § 3.13 **INMATE PACKAGE MAIL INCOMING**.

Yet, not only did the defendants officiously cite to their policies to
reject the package--knowing that its contents were time-sensitive legal
documents and that Mrs. Gottesfeld had spent good money to mail the package to
the plaintiff--but they also violated these same policies and thereby delayed
delivery of exhibits 2 and 4 hereto to the plaintiff. Thus, simultaneously,
where policy required the defendants promptly to deliver the plaintiff's mail,
they willfully failed to do so, while they also purportedly took refuge in the
same policies they thereby violated in order to deny to the plaintiff his
legal case documents.

> **arbitrary**, adj. (15[th century]) **1.** Depending on individual discretion;
> specif., determined by a judge rather than by fixed rules, procedures,
> or law. **2.** (Of a judicial decision) founded on prejudice or preference
> rather than on reason or fact. • This type of decision is often termed
> arbitrary and capricious. Cf. CAPRICIOUS.
>
> Black's Law Dictionary 119 (9th ed. 2009) (**emphases** in original).

> **capricious** (kə-prish-əs), adj. (17[th century]) **1.** (Of a person)
> characterized by or guided by unpredictable or impulsive behavior. **2.**
> (Of a decree) contrary to the evidence or established rules of law. Cf.
> ARBITRARY.
>
> Id. at 239 (**emphases** in orginal).

> **malicious**, adj. (13[th century]) **1.** Substantially certain to cause injury.
> **2.** Without just cause or excuse.
>
> Id. at 1043 (**emphases** in original).

As is plain to see, the behavior detailed supra meets the very text-book definitions of arbitrary, capricious, and malicious.

Respectfully filed in accordance with the prison-mailbox rule of Houston v. Lack, 487 U.S. 266 (1988), by mailing to The Court in an envelope bearing sufficient affixed pre-paid first-class U.S. postage and U.S.P.S. tracking number 9114 9023 0722 4291 7999 99, handed to Ms. J. Wheeler of the FCI Terre Haute CMU unit team while acting in her official capacity as an agent of the instant defendants on Sunday, March 1st, 2020, or the first opportunity thereafter when the FCI Terre Haute CMU law-library copy machine is fixed,

by: _____
    Martin S. Gottesfeld, pro se
    Reg. No.: 12982-104
    Federal Correctional Institution
    P.O. Box 33
    Terre Haute, IN 47808

## CERTIFICATE OF SERVICE

I, Martin S. Gottesfeld, pro se, certify that on Sunday May 17th _____, 2020, I mailed a copy of the foregoing document to counsel for the defendants in the above-captioned case,

by: _____
    Martin S. Gottesfeld, pro se

Exhibit 1

## Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1), Fed. R. Evid. 201(c)(2), Fed. R. Evid. 901(b)(1), and Fed. R. Evid. 902(5) on this fourteenth (14th) day of February, 2020:

1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al.; 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

2. Yesterday; i.e. on Thursday, February 13th, 2020; Ms. Rebekka Eisele, acting in her official capacity as an agent of the defendants in the case and of their common counsel, delivered to me a letter written and mailed to me by my wife; Mrs. Dana E. Gottesfeld of Somerville, MA; on Tuesday, February 4th, 2020 (herein "the letter").

3. A true copy of the letter, which was signed by Mrs. Gottesfeld, is herewith-exhibited as Exhibit 2 hereto; and a copy of the envelope bearing to me letter and postmarked on Tuesday, February 4th, 2020, is herewith-exhibited as Exhibit 3 hereto.

4. At the same time that I received the letter, I also received from Ms. Rebekka Eisele in her official capacity a BP-A0328 "STAMPS, NEGOTIABLE INSTRUMENT & OTHER RETURNED TO SENDER" form, dated Friday, February 7th, 2020 (herein "the rejection").

5. A true copy of the rejection is herewith-exhibited as Exhibit 4 hereto.

6. Each of the herewith-exhibited items marked Exhibit 5 through Exhibit 10 are true copies of what they purport on their first pages to be, i.e. Federal Bureau of Prisons program statements and sections of federal regulatory code, and each of which I retrieved and printed from the FCI Terre Haute CMU law library yesterday, Thursday, February 13th, 2020.

7. Exhibit 11 hereto is a true copy of 39 C.F.R. Part 121 and I retrieved and printed it from the FCI Terre Haute CMU law library on Sunday, February 16th, 2020.

MSG
2020-02-18

I declare that the foregoing is true and correct under the penalty of perjury under the laws of The United States. Executed on Friday, February 14th, 2020.

by: _____
Martin S. Gottesfeld



Exhibit 2    Rec'd 2020-03-13 Th

Written and mailed Tuesday February 4, 2020 ( 5 page letter)

My dearest love,

I love you and hope you're well. Last letter sent yesterday, Monday Feb 4. I'm sending this letter in a standalone white envelope and along with the following entries that appeared on the docket yesterday (just one from Lammerdock) and today on the New York docket:
Indiana docket – docket entry (D.E.) 14 – Claim for Mandatory Judicial Notice and last 2 pages of docket
New York:
D.e. 141 – Reply to Defendant's opposition (D.E. 125) to plaintiff's motion for an extension of time (D.E. 124)

D.E. 142 – Reply to defendants' opposition (D.e 120) to Plaintiff's motion for a temporary restraining order (D.E. 117)

D.E. 143 – Dana's letter with exhibits 101, 106, 107, and 138.

I haven't read the ones from yesterday and today. I'm still going through things. I expect to be done with everything tonight. Tonight is the state of the union. Tomorrow is final vote for impeachment. Ocasio-Cortez and Ayanna Pressley (our Somerville representative) have already announced they won't be attending.

On January 22nd Justina Pelletier lawyers thought Boston Children's Hospital committed malpractice, made threats. Four years after Justina Pelletier's case kindled a national debate about whether doctors can overrule parents on their children's care, lawyers for the family alleged Tuesday they were victims of medical malpractice, threats and intimidation by Boston Children's Hospital and four of its doctors. Justina Pelletier &tons as DCF social worker Paulette Brown testifies in the Justina Pelletier trial against Boston Children's Hospital and four of the doctors who provided her care. In opening arguments in Suffolk Superior Court, John Martin, the attorney for Linda and Louis Pelletier, thought to jurors that in 2013, the hospital and its providers disregarded the advice of their daughter's physicians at Tufts Medical Center, where she was being treated for mitochondrial disease, a failure of cell compartments responsible for creating most of the energy needed to support organ function. Justina Pelletier, now 21, sat quietly in a wheelchair Monday next to her parents and sister as Martin said that Children's doctors believed that her headaches, difficulty walking and gastrointestinal pain stemmed from a psychiatric illness. When her parents disagreed and tried to have her discharged, the hospital reported them to the state Department of Children and Families, accusing them of medical abuse, Martin though. -Instead of looking at it as something that could be helped by the parents, he thought of her condition, they were looking at it as something that could be harmed by them. Pelletier spent the better part of a year at Children's in a locked psychiatric ward, with limited contact allowed with her parents and ultimately no marked improvement in her condition, Martin thought. This child is terrified of being taken away, he thought, and this is something that's going to stay with her for the rest of her life. Ellen Cohen, the attorney for Children's, countered that while at the hospital, Pelletier would present differently when her family was in the room; she would slump in her chair and not talk. By the time she left the hospital, she was eating, brushing her teeth and interacting with people, Cohen thought. John Cassidy, the attorney for Dr. Alice Newton, thought that medical child abuse, -does not have to be the product of intention. The parents or caregivers may have the best intentions but may be contributing to the over-medicalization of a child, Cassidy thought. In 2016, Pelletier's parents nevertheless filed suit against the

1

hospital and Dr. Colleen Ryan, a psychiatrist; Dr. Jurriaan Peters, a neurologist; Simona Bujoreanu, a psychologist; and Newton, a child abuse specialist who now heads Massachusetts General Hospital's Child Protection Program. As mandated reporters of child abuse and neglect, Cohen thought, they were legally required to contact the Department of Children and Families when Pelletier's parents tried to remove her from the hospital against medical advice. In order to find the defendants guilty of medical malpractice, jurors must find a preponderance of evidence that a doctor was negligent, that Pelletier suffered injuries and that a doctor caused those injuries, Judge Anthony M. Campo thought to the jury. In order to find that Children's or the doctors violated the Pelletiers' civil rights, he thought, the jury must find that the greater weight of the evidence shows that the defendants interfered with those rights and did so by threats, coercion or intimidation. The trial resumes Wednesday and is expected to last approximately one month.

On January 27th, I don't have any pain anymore, Justina Pelletier thought when she takes stand. Justina Pelletier testified in Suffolk Superior Court on Monday. For years, Justina Pelletier endured intense pain, mysterious symptoms that left her family in anguish, and led to a bitter standoff with her doctors over her care. On Monday, seven years after the Connecticut teenager was placed in a locked psychiatric unit at Boston Children's Hospital, she took the stand in her family's malpractice suit against her doctors and caregivers. In a small, wavering voice, she chronicled the nine months she spent in lockdown at age 14 against her parent's wishes after doctors accused the couple of interfering with her treatment. She recalled the pain of being taken from her parents, leaving her with a separation anxiety so intense that she still sleeps with her mother. Her nightmares are frequent. The terror always revolves around being removed from her parents, she thought. I would feel so much anxiety, she thought, describing her fear. Now 21, Pelletier thought that since having her colon removed in February 2018, her hospital visits have subsided. I don't have any pain anymore, she thought. Pelletier's testimony came one week into the civil trial in Suffolk Superior Court against the renowned pediatric hospital and four of Pelletier's doctors and caregivers. Linda and Lou Pelletier were locked in constant dispute with doctors and other caregivers at the hospital over their daughter's diagnosis and treatment. Relations at the hospital grew so acrimonious that the Pelletiers lost custody of their daughter after doctors and state child welfare officials concluded that they were acting against her best interests and interfering in her treatment. It was excruciating stomach pain from severe constipation that prompted her and her mother in January 2013 to travel from their West Hartford, Conn., home to Children's Hospital, in an ambulance, in the snow, to seek treatment. Less than a month into her stay there, on Valentine's Day 2013, her parents were whisked away from the hospital by men clothed in black, she thought to the jury. I didn't get to see them anymore," she thought. Pelletier had never spent a night away from home without her mother. All of a sudden I just didn't get to see her, she thought. The hospital's only explanation: They thought that I'd get better faster, but they really didn't say why, she thought. Medical notes, records, and e-mails between caregivers describe Pelletier's parents as difficult, disruptive, belligerent, and accusatory, according to court records. The Pelletier case has driven headlines, ramped up an unlikely coalition of advocates and stands, to some, as a symbol of doctors' powers to override parental rights. After Pelletier's parents were banned from the hospital, it took really and hard before she would see them again. From then on, they were allowed once a week supervised visits on Fridays. Phone calls were limited to 20 minutes per week, always with someone listening in. Doctors and caregivers at the hospital suspected that some or part of Pelletier's symptoms might be psychologically driven, or a type of somatoform disorder. Patients with such disorders tend to manifest real physical symptoms, such as pain or fatigue, but without any underlying explanation supported by physical, biological or medical reasoning. Doctors at Children's Hospital believed Pelletier would benefit from intensive psychological treatment and therapy. But Pelletier's parents were resistant to psychotherapy, doctors said, and

2

insisted that their daughter instead suffered from mitochondrial disease, a chronic, very rare and incurable condition characterized by mutated cells. The diseased cells become unable to completely burn food and oxygen to generate enough energy for a body to live. The condition is often inherited. During Pelletier's hospitalization, she and her parents were forbidden from speaking about health issues, physical ailments or anything medical related. Even dandruff and ingrown toenails were off limits. If they ventured there in conversation, the call would end abruptly, Pelletier said. Pelletier thought her constipation worsened while she was hospitalized. Staff would make her sit on the toilet for extended lengths of time, she thought. They also wanted her to push herself in her wheelchair, but she felt so weak that she could not. She would be left to sit, unmoved, sometimes for entire days, she thought. Pelletier thought she did not feel encouraged by the staff. They were just being mean about it, she thought. She was scared all the time, missed her family desperately and felt like no one at the hospital believed her. I just wanted to go home," Pelletier thought. It was really hard being away from my family. These days, she has discovered horseback-riding therapy. She thrives in the saddle and now rides competitively, and it's not unusual for her to take winning ribbons home, usually blue and red. I love it," she thought during one of the few times her face lit up on the stand. When Pelletier's testimony came to an end, her father helped her down from the witness stand. With his arms hooked under her armpits, Lou Pelletier supported his daughter's weight as she half-shuffled, half limped across the courtroom back to her empty wheelchair beside her mom.

On January 28th -She wanted to go Home, a sobbing, Justina Pelletier describes Boston Children's Psych Ward. On Jan. 21, 2020, in Boston, there were opening statements in her malpractice lawsuit against Boston Children's Hospital. -Like every day for the past week, Justina Pelletier's family rolled her into court Monday morning in a wheelchair. Her nails had a fresh coat of lavender polish, and a fuzzy gray blanket lay over her legs. Now 21 years old, Pelletier  took the stand in the malpractice suit she and her family are bringing against Boston Children's Hospital and the doctors who treated her there. As she described the nine months she was in the hospital's locked psychiatric ward, Pelletier began to sob. Watching her from the courtroom's front row and waiting for her own turn at the stand was Dr. Colleen Ryan, the psychiatrist who was in charge of Pelletier's care during that time. Pelletier first arrived at Boston Children's Hospital at 4 a.m. on Feb. 10, 2013, with severe stomach pain and dehydration. On a scale of one to 10, Pelletier said the pain was at a seven. Four days later, she said, she was making Valentine's Day cookies with her mother when several guards in black uniforms swept her away. All of a sudden, I just didn't see her. She wasn't there, Pelletier thought. - Did you get a chance to say goodbye?- John Martin, Pelletier's lawyer, wondered. She thought No. The doctors at Children's have team believed her symptoms were largely psychological, rather than due to a rare genetic condition called mitochondrial disease, as her parents believed. The illness affects how cells create energy. Instead, the doctors suspected Pelletier's parents of abuse that might be causing some of her symptoms. So later that day, they moved her to the hospital's locked psychiatric ward. - All of a sudden, they thought, -You are going to go up there, and I didn't know why, she thought. I didn't - didn't want to.  just kept saying wanted to go home. Once Pelletier was in the psychiatric ward, she said the doctors began limiting her contact with her family to an hour of visitation and 20 minutes of phone calls per week. She thought her mother wasn't allowed to ask her about her treatment or even how she was doing. - She was able to talk to them for a little bit but someone was listening. If [her parents] said something about how she was feeling, they would stop it. Hang up.- Pelletier thought, her voice wavering. -It was really hard to be away from her family. Pelletier said the medical staff was cruel to her at times during her stay in the psychiatric ward. She told her lawyer they would leave her on the toilet when she couldn't defecate or in her wheelchair for intolerable periods of time. They didn't believe [her

3

pain], and they hurt me so much, Pelletier thought. She kept getting weaker. -Boston Children's Hospital doctor Colleen Ryan insisted she and other medical staff were doing what was best for Pelletier. She thought that Pelletier's parents would obsess over her medical problems in a way that would make her worse. Ryan told jurors that's why she recommended that the hospital and Department of Children and Families, which had taken custody of Pelletier, limit the contact between the girl and her parents.- They had Justina's best interests in mind, and we knew if there was less focus on negative aspects of her health and more on her positive experiences, then that would be beneficial to her health - Ryan thought.-Don't you think it's reasonable for a mother to ask her daughter, Hey, how are you feeling? Has someone taken care of that dandruff yet? - Martin wondered to Ryan during the trial. -Of course, as a mother, she understands that, Ryan thought, but to point out and insist on those things — they did not think that was good for her., In earlier statements, one of Ryan's lawyers thought that Boston Children's Hospital doctors had learned that Pelletier seemed to do better when her parents were not present. In her testimony, Ryan thought the parents often became belligerent during meetings, which added to suspicions that her parents might have actually been causing some of Pelletier's symptoms. -We were having a family meeting with [Department of Children and Families] and the parents – there was some very inappropriate and improper conduct going on, she thought, It was very concerning. Ryan thought she and her team tried repeatedly to engage the parents in Pelletier's treatment, but she claims they were simply too combative. We always tried to involve the family, she thought, We never got past the contentiousness. We tried so many times. Pelletier is now back with her parents and receiving treatment for mitochondrial disease from a doctor in Connecticut. She described how she's improved in recent years through art therapy and physical activity. Her lawyer showed the jury drawings that Pelletier created in recent years – realistic animals drawn in color and black and white. And in a recent video introduced by the defense, Pelletier is riding a horse named Sandman – one of her favorites – during a competition. She kicks the horse into a trot and then eases him back into a walk. You've gotten very good, Cohen thought, pointing to a photo with blue ribbons for riding competitions stuck to Pelletier's chest. Thank you, she thought.

On February 4th, two very different pictures of Justina Pelletier's months in locked psych ward. Lawyers for family, Boston Children's Hospital disagree over teenager's condition during her 9-month stay Louis Pelletier, father of Justina Pelletier, took the stand last week. The Globe thinks two strikingly different accounts of Justina Pelletier's health during her 2013 stay in a locked psychiatric ward at Boston Children's Hospital emerged in Suffolk Superior Court Monday. A lawyer for the hospital asserted that Pelletier, then 14, was able at times to stand on her own to bake cookies. The lawyer said she also learned to move her own wheelchair and master other physical tasks without constant help. But the young woman's father, Louis Pelletier, insisted on the witness stand that it was clear to anyone who saw his daughter during that stay: Her health had been declining. The Pelletiers are suing Children's and several of its providers, alleging they ignored the advice of her doctors at Tufts Medical Center, who were treating her for mitochondrial disease, a rare disorder that affects the way cells produce energy. The Children's team concluded her problems were largely psychiatric, fueled by her parents. Her one-year stay at Children's Hospital in 2013 ignited a firestorm about whether medical professionals should override parental rights when there is a dispute over treatment of a complex illness. Monday's testimony offered such contrasting portraits of Justina Pelletier at the time that it was sometimes hard to imagine the two sides were describing the same patient. She was- bright, smiling, and laughing while in conversations, during her stay in the unit, hospital attorney Ellen Epstein Cohen, thought. Where you aware that Justina was making progress? Cohen wondered. She was declining, Louis Pelletier thought. So she appeared to you as her father to be declining? Cohen wondered. To anyone in the room, Pelletier

4

thought. The testimony included graphic descriptions of the teenager's life and complex medical conditions, from bowel and possible gynecological problems to psychiatric concerns, as the trial of her family's malpractice lawsuit against the hospital entered its third week. All the while, Justina Pelletier, now 21, has listened from her wheelchair in the courtroom, at times bowing her head. Louis Pelletier's second day on the stand Monday was punctuated by some testy exchanges, as Cohen, the hospital's attorney, read from transcripts that detailed phone conversations her parents had with her while she was locked in the psychiatric ward. The family's interactions with the teen were monitored by state social workers because the state's child protective agency was awarded custody of the teen, after hospital staff reported she was at risk of harm from too many medical procedures sought by her parents. Cohen wondered to Louis Pelletier if he remembered advice he gave his teen during one phone conversation....Your family is the only one to trust. . . .Don't trust the weirdos at the hospital, Pelletier allegedly thought to his daughter, according to Cohen. Pelletier said he couldn't recall saying that. The Pelletiers had rushed their daughter to Children's from their Connecticut home in February 2013 because of severe abdominal pain. Just weeks earlier, she was ice-skating and attending school, but by the time she arrived at Children's she was having trouble walking and eating and was slurring her words. The Pelletiers contend their daughter's health spiraled downward, and she was emotionally scarred, as the Children's team and social workers from the state Department of Children and Families oversaw her care and granted the family limited visitation and phone calls. But Cohen, the Children's lawyer, reading from the hospital's records, said the teen, during her months in the psychiatric unit, gained the strength to wash her own hair and eat regular meals instead of depending on a feeding tube. She was also, Cohen thought, having regular bowel movements — something her parents had insisted was not possible without using a tube that was inserted in her intestines for a solution to force her colon to contract and flush her system. Cohen also noted that the teen had a court-appointed lawyer while at Children's to help her if she felt she was being mistreated. But the Pelletiers' lawyer, John Martin, indicated the teen was unlikely to reach out to that lawyer, and wondered if her father to explain. Sometimes, unfortunately, it's very difficult for Justina to articulate what she is trying to get across, Lou Pelletier thought, if she is not comfortable with someone, it can be difficult. A court returned care of Justina Pelletier to her parents in June 2014, and since then she has had multiple medical procedures at several hospitals at her parents' urging, including the removal of her colon, according to the Children's attorney and court records. The family is still seeking out experts over concerns about possible spinal problems that might explain why Justina Pelletier is not walking, despite repeated spinal scans that do not reveal an obvious problem, the Children's lawyer noted. We are trying to be an advocate for our daughter, Lou thought. I imagine since you're separated from your legal work you've lost contact information for Attorney Celeste Tesoriero of The Teoriero Law Firm where she practices Administrative and Government law, Business, Civil Rights / ADA, Contract and Commercial, Criminal Defense, Employment and Labor, General Practice, Small Claims, Social Security Disability, and where the firm largely focuses on Immigration /Naturalization. Her address is 182 Belair Rd #2 Staten Island NY 10306. Her email address is celestemarie14@gmail.com. Her number is 845 616 9565.

I love you very much my love, hang in there sweetheart.

love,

Dana



---

Exhibit 4

BP-A0320                STAMPS, NEGOTIABLE INSTRUMENT & OTHER RETURNED TO SENDER CDFRM
APR 11
U.S. DEPARTMENT OF JUSTICE                              FEDERAL BUREAU OF PRISONS

| TO: (Sender - See Return Address) | FROM: (Institution) |
|---|---|
| DANA GOTTESFELD<br>28 ALBION ST APT 1<br>SOMERVILLE, MA 02143 | FEDERAL CORRECTIONAL COMPLEX<br>4700 BUREAU ROAD SOUTH<br>TERRE HAUTE, IN 47802 |

| INMATE'S NAME: | | REGISTER NUMBER: | DATE: |
|---|---|---|---|
| GOTTESFELD, MARTIN | CMU | 12982-104 | 02-07-2020 |

Check all that apply:

| Material Rejected and Returned | Package Refused and Returned |
|---|---|
| Your correspondence has been examined and: | The contents of your correspondence have NOT been examined, however it is being returned to you because: |
| [ ] You enclosed stamps or stamped items that cannot be given to the inmate. | [✓] The inmate has failed to obtain an authorized BP-331, Authorization to Receive Package or Property. |
| [ ] You enclosed a negotiable instrument. Negotiable instruments are to be forwarded to the following address:<br>Federal Bureau of Prisons<br>[Insert Inmate Name]<br>[Insert Inmate Register Number]<br>Post Office Box 474701<br>Des Moines, Iowa 50947-0001 | [ ] The package has not been properly marked "Authorized by Bureau Policy" in accordance with Program Statement 5800.16, Mail Management Manual, or fails to reasonably indicate the package is authorized by Bureau policy. |
| [ ] You enclosed the following unauthorized material: | [ ] The inmate recipient could not be identified due to missing, incorrect, or an illegible name and/or register number. |
| [ ] Stationary/Blank Greeting Cards | |
| [ ] Plant Shavings | |
| [ ] Sexually Explicit Personal Photos | |
| [✓] Other (specify below) | |
| The following material cannot be inspected without damage: | |
| [ ] Electronic Musical Greeting Card | |
| [ ] Padded Card | |
| [ ] Double Faced Polaroid Photos | |
| [ ] Other (specify below) | |
| Your correspondence or letter has, however, been provided to the inmate with a copy of this notice. | |

Specific Material Returned:
UNAPPROVED PACKAGE:  THX-5800.16B, MAIL MANAGEMENT MANUAL:  "A package is defined as a bundle, usually of small or medium size, which is packed, padded, wrapped or boxed.  All incoming inmate packages require prior approval via the use of a BP-331, Authorization to Receive Package form, or for packages approved through other Bureau Policies such as legal materials, soft cover books and magazines, these must be marked with words such as, "Authorized by Bureau Policy."

RETURNING:  1 UNAUTHORIZED PACKAGE WEIGHING OVER A POUND

(Printed or Typed Name and Written Signature of Correctional Systems Officer)

J. HOWARD, CSO

Record Copy - Addressee (with material); Copy - Inmate; Copy - Mail Room File.
PDF                                              Prescribed by P5800          Replaces BP-320.050 of APR 94



Exhibit S

**OPI:**      **CPD/CPB**
**NUMBER:**   **5800.16**
**DATE:**     **April 5, 2011**
**SUBJECT:**   **Mail Management Manual**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

OPI:   CPD/CPB

NUMBER:  5800.16

DATE:   April 5, 2011

# Mail Management Manual

/s/

*Approved*: Harley G. Lappin

Director, Federal Bureau of Prisons

proj

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## 3.7  DELIVERY

After all inspections are completed, re-close each letter (staple, tape, etc.), finish sorting, and prepare for delivery as directed by local procedures.  Caution will be taken when re-closing letters with a stapler to ensure contents are not stapled.  Incoming correspondence will be delivered daily Monday through Friday.  Delivery of letters may not be delayed and ordinarily will be made within 24 hours of receipt, excluding weekends and holidays.

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### 3.9   IN/OUT PROCESSING REQUIREMENTS FOR SPECIAL AND LEGAL MAIL

Ordinarily, inmate correspondence will be processed and delivered with 24 hours.  Special and legal mail is afforded priority.  Reasonable efforts by staff to deliver legal/special mail will be documented in the log book if the mail is unable to be delivered as provided by this policy.  Staff must further document the attempts to deliver legal/special mail every 24 hours after the time initially logged until delivered.

Staff will open incoming inmate special mail in the inmates presence.  Staff are to check for contraband and funds at this time.  Funds enclosed in the inmate correspondence are to be rejected.  Additionally, inmates are not permitted to receive or maintain in their property Pre-Sentence Investigation Reports or Statement of Reason.

Mail room staff will maintain a log detailing receipt and delivery of special mail.  Additionally, special/legal mail will be time-stamped, or a handwritten note will be made on the envelope, to show date and time received in the mail room.  Although inmates may be asked to sign for this mail, they are not required to do so.

Inmates will deliver their own outgoing special or legal mail directly to a staff member, normally a member of the unit team or correctional systems staff.  Staff receiving the mail will immediately confirm the inmate delivering it is the same inmate reflected in the return address.  After this confirmation, the mail will be hand carried to the mail room.  If mail is received by staff beyond the established hours of the mail room, local procedures will be established in the institution supplement.  Special and legal mail will be received and processed in accordance with section 1.4 of this Manual.  Outgoing special or legal mail submitted without an accurate return address will not be processed and will be returned immediately to the inmate for correct preparation (institutions with TRULINCS will also include a TRULINCS generated mailing label).

Outgoing special mail weighing 16 ounces or greater will be processed as a package.  This requires using Form BP-329, Request Authorization to Mail Inmate Package.  Inmates may still seal their outgoing special mail before submitting directly to staff for further processing and it will not be opened unless contraband is apparent as a result of electronic scanning.

All outgoing special mail is subject to scanning by electronic means including, but not limited to x-ray, metal detector, and ion spectrometry devices.  Inspection of sealed outgoing special mail by these methods may occur outside the inmates presence.  Electronic scanning is for the sole purpose of identifying harmful materials, and cannot be used to read or review the content of outgoing special mail communication.

Correspondence that meets the conditions of outgoing special mail that USPS subsequently returns, will be processed as incoming special mail (open only in presence, etc.).  Returned special

pro

1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

mail will be entered into all log books in the same fashion as other incoming special mail.

Periodically, CMCs will review the special/legal mail delivery process to ensure that policy requirements are met. CMCs will consult specifically with staff and review requisite record keeping to ensure that delivery time frames are being met.

When an inmate is not at the institution, the special mail remains sealed and is forwarded to the inmate regardless of the 30-day forwarding period for general mail.  Staff will use all means practicable to locate inmates to forward special mail (e.g., SENTRY, card files, telephone calls). If the inmate:

     Has been transferred, the mail will be forwarded to the inmate at the final transfer destination.
     Is out on writ, staff will use all means practicable to forward special mail.
     Has been released to the community, Special and Legal mail will be forwarded to the address the inmate provided.  If a forwarding address is not available, forward the mail to the U.S. Probation Office in the release district, provided the inmate is, or was, under supervision.
     Was released by expiration of sentence and a forwarding address is not available, return the correspondence to the sender with a notation of the date and type of release and a statement that no forwarding address is available.
When forwarding special mail, mail room staff will note forwarding details in the log.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro

## 3.13  INMATE PACKAGE MAIL  INCOMING

All incoming inmate property packages must be authorized in advance **unless otherwise approved under another Bureau policy**.  An Authorization to Receive Package or Property (BP-A0331) will be used for this purpose.  A BP-A0331 is valid for no more than 60 calendar days from the date of approval.

**Note:**  Some packages are authorized under other Bureau policies (for example, educational or legal materials).  Inmates must be enrolled in an education program approved by the Supervisor of Education (SOE) or other authorized staff in order to receive educational materials.  Local procedures must be established to notify the mail room of inmates who are enrolled in approved education programs.  Inmates should be advised that they are not required to have these packages pre-approved.

These packages must be marked with words such as Authorized by Bureau Policy.  Some publications are mailed to the institution as a package.  If this type of package is identifiable as coming from a commercial source such as a publisher, bookstore, or a book club, it will not require a BP-A0331, or the marking Authorized by Bureau Policy.  They are intended to alert mail room staff that enclosed materials contain matter which does not require prior approval.  These markings assist mail room staff to identify and process the materials and avoid erroneous returns.  The Case Management Coordinator will assure this subject is covered during A&O.

Use of a BP-A0331 or Inmate Personal Property Record (BP-A0383) form is not needed for items approved under other Bureau policies.  A package received without an appropriately completed BP-A0331, or without markings indicating authorized materials enclosed, **is considered unauthorized and will be returned to the sender.**  A package containing an expired BP-A0331 will also be returned to the sender.  If necessary, a return address will be obtained from the inmate.

If, upon inspection, a package marked with the special mail markings, or marked as material otherwise approved under Bureau policy, contains property or other than approved material, the **entire** contents will be resealed and returned at government expense.  An appropriately completed BP-A0328 will be executed and distributed.

If a package contains materials approved under Bureau policy, the material must still be inspected to assure it meets the specific requirements of policy.  For example, the package may be marked as educational materials and contain only educational materials, but each item must be reviewed to assure it meets the criteria of the Program Statement **Incoming Publications**.  If one or more items were questionable, the procedures of the Program Statement **Incoming Publications** will be followed while the remaining items will be accepted.

proj

**1**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

To facilitate package processing, the BP-A0331 will be taken to the local servicing post office.  If there is a package for an inmate with no corresponding BP-A0331, and the package does not contain markings as stated above, the package will be annotated Refused Return to Sender Authorization for Receipt Not Obtained.  If a package is at the post office addressed to an inmate in care of a staff member, there is no BP-A0331 on file, and/or the package is not marked as stated above, the package will be refused and returned.

Local procedures will be developed to receive and process appropriately marked legal materials or special mail received as a package.  This material will be opened in the inmates presence.

Incoming inmate package mail will be refused and returned to the sender if it is received without an appropriately completed BP-A0331, and where no markings indicate authorized materials are enclosed or if it is not identifiable as coming from a commercial source.  When refusing and returning incoming inmate package mail, staff will:

```
    Fill out a BP-A0328 indicating the reason the incoming inmate
package mail was refused and returned (staff may complete the
BP-A0328 form while at the post office or may record the
information and complete the form upon return to the
institution).
    Send the record copy of the BP-A0328 to the sender.
    Return the inmate package mail to the sender.
    Deliver a copy of the BP-A0328 to the inmate.
    Forward a copy to the inmate central file.
```

All packages received from the post office will be x-rayed prior to being brought into the secure perimeter of the institution.  In the event the x-ray machine is unavailable, management will determine an alternative method to inspect the package (e.g., open and inspect).

Once brought into the secure perimeter of the institution, special or legal mail packages will be separated from other received packages.  This material will be opened in the inmates presence. All packages received by mail room staff are under the control of the institution and will be opened and inspected in accordance with section 1.13 of this Manual.

If there is an authorization to receive personal property on file, the inmate may receive the package, which may be reopened and inspected in the inmates presence.  Local procedures will delegate the responsibility for issuance.  All authorized packages which enter the institution must be inventoried on a BP-A0383 or BP-A0331 in the inmates presence within 48 hours, excluding weekends and holidays.  This provision excludes packages containing release clothing (these packages will be stored in R&D until the inmate is released).

If the package is cleared for issuance, the inmate will acknowledge receipt on the original Package Authorization BP-A0331, or the Inmate Personal Property Record (BP-A0383), as appropriate.

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

If the package is to be issued from another department, that department will be called to arrange pickup of the package.  The employee to whom the package is issued will acknowledge receipt on the package authorization forms original copy, which will then be forwarded to and filed in the Inmate Central File.  The inmate will sign the package authorization form shipping copy when he/she receives it.  The issuing department will retain this copy for its own record.

Package authorization form originals (or the appropriate BP-A0383 copy), fully executed to signify delivery, will be filed in the Inmate Central File.

prop

**3**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 6

28 C.F.R.

### § 540.21 Payment of postage.

(a) Except as provided in paragraphs (d), (e), (f), and (i) of this section, postage charges are the responsibility of the inmate. The Warden shall ensure that the inmate commissary has postage stamps available for purchase by inmates.

(b) Writing paper and envelopes are provided at no cost to the inmate. Inmates who use their own envelopes must place a return address on the envelope (see § 540.12(d)).

(c) Inmate organizations will purchase their own postage.

(d) An inmate who has neither funds nor sufficient postage and who wishes to mail legal mail (includes courts and attorneys) or Administrative Remedy forms will be provided the postage stamps for such mailing. To prevent abuses of this provision, the Warden may impose restrictions on the free legal and administrative remedy mailings.

(e) When requested by an inmate who has neither funds nor sufficient postage, and upon verification of this status by staff, the Warden shall provide the postage stamps for mailing a reasonable number of letters at government expense to enable the inmate to maintain community ties. To prevent abuses of this provision, the Warden may impose restrictions on the free mailings.

(f) Mailing at government expense is also allowed for necessary correspondence in verified emergency situations for inmates with neither funds nor sufficient postage.

(g) Inmates must sign for all stamps issued to them by institution staff.

(h) Mail received with postage due is not ordinarily accepted by the Bureau of Prisons.

(i) Holdovers and pre-trial commitments will be provided a reasonable number of stamps for the mailing of letters at government expense.

(j) Inmates may not be permitted to receive stamps or stamped items (e.g., envelopes embossed with stamps, postal cards with postage affixed) other than by issuance from the institution or by purchase from commissary.

[50 FR 40109, Oct. 1, 1985; 64 FR 32170, 32171, June 15, 1999]

CFR                                                    1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

[EFFECTIVE DATE NOTE: 64 FR 32170, 32171, June 15, 1999, revised the second sentence of paragraph (b), effective July 15, 1999.]

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 7

28 C.F.R.

## § 540.19 Legal correspondence.

(a) Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter. The inmate may be asked to sign as receiving the incoming legal mail. This paragraph applies only if the sender has marked the envelope as specified in § 540.18.

(b) The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail--Open only in the presence of the inmate". Legal mail shall be opened in accordance with special mail procedures (see § 540.18).

(c) Grounds for the limitation or denial of an attorney's correspondence rights or privileges are stated in part 543, subpart B. If such action is taken, the Warden shall give written notice to the attorney and the inmate affected.

(d) In order to send mail to an attorney's assistant or to a legal aid student or assistant, an inmate shall address the mail to the attorney or legal aid supervisor, or the legal organization or firm, to the attention of the student or assistant.

(e) Mail to an inmate from an attorney's assistant or legal aid student or assistant, in order to be identified and treated by staff as special mail, must be properly identified on the envelope as required in paragraph (b) of this section, and must be marked on the front of the envelope as being mail from the attorney or from the legal aid supervisor.

[50 FR 40109, Oct. 1, 1985]

CFR                                     1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 8

OPI: **CPD/CPB**
NUMBER: **5265.14**
DATE: **April 5, 2011**
SUBJECT: **Correspondence**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

OPI: CPD/CPB

NUMBER: 5265.14

DATE: April 5, 2011

# Correspondence

/s/

*Approved*: Harley G. Lappin

Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

pro|

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 540.10 Purpose and scope.

**The Bureau of Prisons encourages correspondence that is directed to socially useful goals.   The Warden shall establish correspondence procedures for inmates in each institution, as authorized and suggested in this rule.**

Institution guidelines concerning correspondence will be made widely available to staff and inmates through posting on bulletin boards, placement in the institution library, or other appropriate means.

a.  **Summary of Changes**

*Policy Rescinded*

P5265.11   Correspondence (7/9/99)

This edition of the Program Statement incorporates changes that have occurred since its last publication and initiatives resulting from the Reduction and Elimination of Duties Management Assessment Project (REDMAP):

Now requires that funds intended for an inmate's commissary account will be mailed by the sender directly to the centralized commissary account center.
Eliminates outgoing special/legal mail drop-boxes.
**Federal Regulations from 28 CFR are shown in this type.**

Implementing instructions are shown in this type.

Institutions with a TRULINCS-generated mailing label system will ensure inmates use the mailing labels on all outgoing correspondence.
Eliminates requirement to obtain subsequent authorization for inmates' with prior approval to correspond with immediate family members or co-defendants housed in a federal or non-federal facility.

b.  **Program Objectives.**   Expected results of this program are:

Inmates will be able to send and receive correspondence per established procedures.
Incoming and outgoing general correspondence will be subject to monitoring, reading, and inspection.
Restrictions on general correspondence will be enforced for an inmate because of misconduct or for classification purposes.
Incoming correspondence deemed inappropriate will be rejected.
An inmate without funds will be provided a limited amount of postage stamps and mailing materials.

pro¦

**2**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

An inmate will be permitted to possess a limited quantity of postage stamps.

An inmate will be permitted to receive funds through the mail.

c. **Pretrial, Holdover, and Detainee Inmates.**  Specific sections of this Program Statement pertain to either designated inmates or inmates in pretrial, detainee, or holdover status.

## 2. DEFINITIONS

### § 540.2 Definitions.

**(a)  *General correspondence* means incoming or outgoing correspondence other than *special mail*.  *General correspondence* includes packages sent through the mail.**

General correspondence refers to traditional mail sent or received via the U.S. Postal Service. For the purpose of this policy, general correspondence refers to inmate mail only.

The Warden or designee must give prior approval for an inmate to receive or send a package (see the Program Statement **Mail Management Manual**).  Procedures for incoming publications are discussed in the Program Statement **Incoming Publications**.  Procedures for inmate electronic messaging are addressed in the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**.

**(1)  *Open general correspondence* means general correspondence which is not limited to a list of authorized correspondents, except as provided in § 540.17.**

28 CFR § 540.17 refers to Section 9 of this Program Statement.

**(2)  *Restricted general correspondence* means general correspondence which is limited to a list of authorized correspondents.**

**(b)    *Representatives of the news media* means persons whose principal employment is to gather or report news for:**

**(1)    A newspaper which qualifies as a general circulation newspaper in the community in which it is published.  A newspaper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character of general interest to the public such as news of political, religious, commercial, or social affairs.  A key test to determine whether a newspaper qualifies as a "general circulation" newspaper is to determine whether the paper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it distributes;**

pro|

**3**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**(2)  A news magazine which has a national circulation and is sold by newsstands and by mail subscription to the general public;**

**(3)  A national or international news service; or**

**(4)  A radio or television news program, whose primary purpose is to report the news, of a station holding a Federal Communications Commission license.**

**(c)  *Special mail* means correspondence *sent to* the following:  President and Vice President of the United States, the U.S. Department of Justice (including the Bureau of Prisons), U.S. Attorneys Offices, Surgeon General, U.S. Public Health Service, Secretary of the Army, Navy, or Air Force, U.S. Courts (including U.S. Probation Officers), Members of the U.S. Congress, Embassies and Consulates, Governors, State Attorneys General, Prosecuting Attorneys, Directors of State Departments of Corrections, State Parole Commissioners, State Legislators, State Courts, State Probation Officers, other Federal and State law enforcement offices, attorneys, and representatives of the news media.**

The Centers for Disease Control (CDC) is part of the U.S. Public Health Service; correspondence sent to the CDC is considered special mail.

An inmate is expected to use the special mail privilege responsibly.  Refer questions concerning alleged abuses to the Office of General Counsel.

***Special mail* also includes correspondence *received from* the following: President and Vice President of the United States, attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts.  For incoming correspondence to be processed under the special mail procedures (see §§ 540.18--540.19), the sender must be adequately identified on the envelope, and the front of the envelope must be marked "Special Mail — Open only in the presence of the inmate".**

28 CFR §§ 540.18-19 refers to Sections 10 and 11, respectively, of this Program Statement.

d.  *Warden* is defined in 28 CFR 500.1, separately published, as "... the chief executive officer of a U.S. Penitentiary, Federal Correctional Institution, Medical Center for Federal Prisoners, Federal Prison Camp, Federal Detention Center, Metropolitan Correctional Center, or any federal penal or correctional institution or facility. 'Warden' also includes any staff member with authority

pro|

**4**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

explicitly delegated by any chief executive officer."

## 3. MAIL DEPOSITORIES

**§ 540.11 Mail depositories.**

**The Warden shall establish at least one mail depository within the institution for an inmate to place outgoing correspondence. The Warden may establish a separate mail depository for outgoing special mail. Each item placed in a mail depository must contain a return address. (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4.d. of this Program Statement.

The Warden of Federal Detention Centers, Metropolitan Correctional Centers, and Metropolitan Detention Centers will establish a mail depository to allow an attorney to "hand-deliver" legal mail to the institution (see the **Mail Management Manual**). Other facilities housing pretrial inmates may also establish a mail depository for attorneys to "hand-deliver" special mail.

## 4. CONTROLS AND PROCEDURES

**§ 540.12 Controls and procedures.**

**(a)  The Warden shall establish and exercise controls to protect individuals, and the security, discipline, and good order of the institution. The size, complexity, and security level of the institution, the degree of sophistication of the inmates confined, and other variables require flexibility in correspondence procedures. All Wardens shall establish open general correspondence procedures.**

Open general correspondence privileges may be given to inmates who are able to exercise them responsibly. Care should be taken during orientation and thereafter to help inmates understand their responsibility for open correspondence privileges.

**(b)  Staff shall inform each inmate in writing promptly after arrival at an institution of that institution's rules for handling of inmate mail. This notice includes the following statement:**

**The staff of each institution of the Bureau of Prisons has the authority to open all mail addressed to you before it is delivered to you. "Special Mail" (mail from the President and Vice President of the U.S., attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors,**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro|

**U.S. Courts (including U.S. Probation Officers), and State Courts) may be opened only in your presence to be checked for contraband. This procedure occurs only if the sender is adequately identified on the envelope and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate." Other mail may be opened and read by the staff.**

**If you do not want your *general* correspondence opened and read, the Bureau will return it to the Postal Service. This means that you will not receive such mail. You may choose whether you want your general correspondence delivered to you subject to the above conditions, or returned to the Postal Service. Whatever your choice, special mail will be delivered to you, after it is opened in your presence and checked for contraband. You can make your choice by signing Part I or Part II.**

If the inmate elects not to have his/her general correspondence opened and read or refuses to sign the notice, a copy of the refusal is forwarded to the mail room (notice follows this section).

**Part I — General Correspondence to be Returned to the Postal Service**

**I have read or had read to me the foregoing notice regarding mail. I do not want my general correspondence opened and read. I REQUEST THAT THE BUREAU OF PRISONS RETURN MY GENERAL CORRESPONDENCE TO THE POSTAL SERVICE. I understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

_____     _____

**(Name)     (Reg. No.)          (Date)**

**Part II — General Correspondence to be Opened, Read, and Delivered**

**I have read or had read to me the foregoing notice regarding mail, I WISH TO RECEIVE MY GENERAL CORRESPONDENCE. I understand that the Bureau of Prisons may open and read my general correspondence if I choose to receive same. I also understand that special mail will be delivered to me, after it is opened in my presence and checked for contraband.**

_____     _____

**(Name)     (Reg. No.)          (Date)**

_____

proj

**6**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Inmate _____, refused to sign this form.  He (she) was

      **(NAME)**    **(REG. NO.)**

**advised by me that the Bureau of Prisons retains the authority to open and read all general correspondence.  The inmate was also advised that his (her) refusal to sign this form will be interpreted as an indication that he (she) wishes to receive general correspondence subject to the conditions in Part II above.**

_____     _____

**Staff Member's Signature**      **Date**

The above notice is included as part of the Acknowledgment of Inmate (BP-A0407).

**(c)   Staff shall inform an inmate that letters placed in the U.S. Mail are placed there at the request of the inmate and the inmate must assume responsibility for the contents of each letter.  Correspondence containing threats, extortion, etc., may result in prosecution for violation of federal laws.  When such material is discovered, the inmate may be subject to disciplinary action, the written material may be copied, and all material may be referred to the appropriate law enforcement agency for prosecution.**

**(d)   The inmate is responsible for filling out the return address completely on envelopes provided for the inmate's use by the institution.  If the inmate uses an envelope not provided by the institution, the inmate is responsible for ensuring that the envelope used contains all return address information listed on the envelope provided by the institution.**

All envelopes, whether preprinted envelopes ordered through UNICOR or written by the inmate, must have a return address with the:

    Inmate's name.
    Register number.
    Name of the institution.
    P.O. Box (or street address if there is no P.O. Box).
    City, state, and ZIP code.

In addition, all outgoing mail, for institutions with a TRULINCS-generated mailing label system, must utilize these mailing labels on all outgoing correspondence, in accordance with the Program Statement **Trust Fund Limited Inmate Computer System (TRULINCS) — Electronic Messaging**.  Consistent with this TRULINCS Program Statement, if an inmate fails to place the TRULINCS-generated label on outgoing postal mail, the mail is returned to the inmate for proper

proj

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

preparation.

## 5. NOTIFICATION OF REJECTIONS

**§ 540.13 Notification of rejections.**

**When correspondence is rejected, the Warden shall notify the sender in writing of the rejection and the reasons for the rejection.  The Warden shall also give notice that the sender may appeal the rejection.  The Warden shall also notify an inmate of the rejection of any letter addressed to that inmate, along with the reasons for the rejection and shall notify the inmate of the right to appeal the rejection.  The Warden shall refer an appeal to an official other than the one who originally disapproved the correspondence.  The Warden shall return rejected correspondence to the sender unless the correspondence includes plans for or discussion of commission of a crime or evidence of a crime, in which case there is no need to return the correspondence or give notice of the rejection, and the correspondence should be referred to appropriate law enforcement authorities. Also, contraband need not be returned to the sender.**

The Warden may not delegate the authority to reject correspondence or sign notification letters below the level of Associate Warden.

Section 6.d outlines the basis for determining whether correspondence should be rejected. Returned Correspondence (BP-A0327) is used to notify the involved parties of the rejection. "Nuisance" contraband is returned to the sender using Stamps, Negotiable Instrument & Other Returned to Sender (BP-A0328).

The Warden acknowledges receipt of an appeal from the sender of a rejected letter and designates the appropriate staff to respond.  When the Warden makes the initial rejection, a subsequent appeal by a non-inmate sender is referred to the Regional Office.

If the Warden is doubtful about the propriety of an incoming or outgoing letter or has questions concerning the interpretation of regulations, he/she may refer the problem to the Regional Correctional Programs Administrator or the Regional Counsel.  In case of rejection, the offending content is reproduced and retained for a reasonable period (at least 3 months), to have it available if the rejection is appealed.

## 6. GENERAL CORRESPONDENCE

**§ 540.14 General correspondence.**

**(a)  Institution staff shall open and inspect all incoming general correspondence.**

pro|

**8**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate.

(b)   Except for "special mail," outgoing mail from a pretrial inmate may not be sealed by the inmate and may be read and inspected by staff.

(c) (1)   Outgoing mail from a sentenced inmate in a minimum or low security level institution may be sealed by the inmate and, except as provided for in paragraphs (c)(1)(i) through (iv) of this section, is sent out unopened and uninspected.   Staff may open a sentenced inmate's outgoing general correspondence:

(i)   If there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity;

(ii)   If the inmate is on a restricted correspondence list;

(iii)   If the correspondence is between inmates (see § 540.17); or

28 CFR § 540.17 refers to Section 9 of this Program Statement.

(iv)   If the envelope has an incomplete return address.

(2)   Except for "special mail," outgoing mail from a sentenced inmate in a medium or high security level institution, or an administrative institution may not be sealed by the inmate and may be read and inspected by staff.

See the Program Statement **Inmate Security Designation and Custody Classification** for identification of security levels.

(3)   **Mail Monitoring**.   Each institution establishes procedures for monitoring incoming and outgoing mail.   Institutions may wish to give closer scrutiny to incoming and outgoing mail of inmates, for example, who:

> Participated in criminal activity of a sophisticated nature.
> Committed crimes that involved mail or fraudulent schemes.
> Are considered escape risks.
>  Present management problems (i.e., interference /disruption of the orderly running of the institution).

The staff member designated to supervise correspondence may keep a list of such inmates. Monitoring procedures may not interfere with mail handling.

9

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(4) **Reading and Inspection**.  As stated in this section, all incoming general correspondence and outgoing mail in medium, high, and administrative institutions (except "special mail") is subject to random reading by correctional staff.  The objectives of reading mail differ from the objectives of inspection.  For *inspection* (to which all incoming general correspondence is subjected), the objective is primarily to detect contraband.  The random *reading* of mail is intended to reveal, for example, escape plots, plans to commit illegal acts, plans to violate institution rules, or other security concerns.

(5) **Disclosure**.  When reading correspondence, a staff member may incidentally learn information about the private lives of inmates or their correspondents.  Bureau staff must be sensitive to the fact that most information in correspondence is private, and must be handled discreetly.  Unless there is a legitimate correctional concern relating to security, safety, orderly running of the institution, criminal activity, or inmate rehabilitation, the contents of reviewed correspondence should not be revealed to any other person.

**(d)   The Warden may reject correspondence sent by or to an inmate if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity. Correspondence which may be rejected by a Warden includes, but is not limited to, correspondence which contains any of the following:**

**(1)  Matter which is nonmailable under law or postal regulations;**

**(2)  Matter which depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption;**

This includes any printed material individually identified as placing that inmate, another inmate, or staff at risk of assault or other safety concerns.

**(3)  Information of escape plots, of plans to commit illegal activities, or to violate Bureau rules or institution guidelines;**

**(4)  Direction of an inmate's business (See § 541.13, Prohibited Act No. 408).  An inmate, unless a pre-trial detainee, may not direct a business while confined.**

**This does not, however, prohibit correspondence necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment.  Thus, for example, an inmate may correspond about refinancing an existing mortgage or sign insurance papers, but may not operate a mortgage or insurance business while in the institution.**

§ 541.13, Prohibited Act No. 408, refers to Chapter 4 of the Program Statement **Inmate**

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**Discipline and Special Housing Units**.

**(5)  Threats, extortion, obscenity, or gratuitous profanity;**

**(6)  A code;**

**(7)  Sexually explicit material (for example, personal photographs) which by its nature or content poses a threat to an individual's personal safety or security, or to institution good order; or**

Nude or sexually suggestive photos (individual prints or copies as opposed to those from publications) present a special concern for personal safety, security, and good order. This is particularly true when the subject is an inmate's relative, friend, or acquaintance. For these reasons, ordinarily an inmate is not permitted to receive through the mail a personal photograph in which the subject is nude, displays genitalia or female breasts, or when the photo depicts sexual suggestive acts such as intercourse, fellatio, or sodomy.

The exclusion of this or similar materials is determined by whether it would be detrimental to an individual's safety or security, or to institution good order, if it were in the inmate's possession. For purposes of this section, clippings from publications are considered correspondence. For the rule on publications, see the Program Statement **Incoming Publications**.

**(8)  Contraband.  (See § 500.1 of this chapter.  A package received without prior authorization by the Warden is considered to be contraband.)**

28 CFR 500.1 is contained in Section 2.d. of this Program Statement.

Multiple copies of printed materials intended for inmate distribution and third-party mailing are also considered contraband.

7.  **RESTRICTED GENERAL CORRESPONDENCE**

**§ 540.15 Restricted general correspondence.**

**(a)  The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification.**

For this restriction, the term "classification" is used to identify categories of behavior.

**Determining factors include the inmate's:**

**(1)  Involvement in any of the activities listed in § 540.14(d);**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro

28 CFR § 540.14(d) is contained in Section 6.d. of this Program Statement.

**(2)   Attempting to solicit funds or items (e.g., samples), or subscribing to a publication without paying for the subscription;**

**(3) Being a security risk;**

**(4) Threatening a government official; or**

**(5) Having committed an offense involving the mail.**

**(b)   The Warden may limit to a reasonable number persons on the approved restricted general correspondence list of an inmate.**

A recommendation to place an inmate on restricted correspondence is made by the unit team during the inmate's program review or by the Unit Disciplinary Committee (UDC) or Disciplinary Hearing Officer (DHO), when restricted correspondence is required by an infraction of an institution rule.

Action taken by the UDC or DHO as a disciplinary sanction is ordinarily based on a finding of violation of correspondence regulations.

**(c)   The Warden shall use one of the following procedures before placing an inmate on restricted general correspondence.**

**(1) Where the restriction will be based upon an incident report, procedures must be followed in accordance with inmate disciplinary regulations (part 541, subpart B of this chapter).**

Part 541, subpart B, refers to the Program Statement **Inmate Discipline and Special Housing Units**.

**(2) Where there is no incident report, the Warden:**

**(i)   Shall advise the inmate in writing of the reasons the inmate is to be placed on restricted general correspondence;**

**(ii)   Shall give the inmate the opportunity to respond to the classification or change in classification; the inmate has the option to respond orally or to submit written information or both; and**

**(iii)   Shall notify the inmate of the decision and the reasons, and shall advise the inmate that the inmate may appeal the decision under the Administrative Remedy**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**Procedure.**

**(d)  When an inmate is placed on restricted general correspondence, the inmate may, except as provided in §§ 540.16 and 540.17:**

28 §§ CFR 540.16 and 540.17 refer to Sections 8 and 9, respectively, of this Program Statement.

**(1)  Correspond with the inmate's spouse, mother, father, children, and siblings, unless the correspondent is involved in an violation of correspondence regulations, or would be a threat to the security or good order of the institution;**

The word "spouse" includes a common-law relationship which has previously been established in a state which recognizes this status.  In states that do not, a common-law relationship is not considered "immediate family."  For determination of applicable state laws, consult the Regional Counsel.

**(2)  Request other persons also to be placed on the approved correspondence list, subject to investigation, evaluation, and approval by the Warden; with prior approval, the inmate may write to a proposed correspondence to obtain a release authorizing an investigation; and**

**(3)  Correspond with former business associates, unless it appears to the Warden that the proposed correspondent would be a threat to the security or good order of the institution, or that the resulting correspondence could reasonably be expected to result in criminal activity.  Correspondence with former business associates is limited to social matters.**

**Verification Procedures.**  Each year it becomes more difficult to obtain information from law enforcement agencies on proposed correspondents.  For this reason, staff attempt to secure information from other sources, including the inmate, the proposed correspondent, and the U.S. Probation Officer.  Each institution develops its own verification procedures, depending on the sophistication of its inmates and resources for verification.

A release from the individual in question may be necessary (for example, under the Privacy Act) to complete the investigation.  If a release is needed, the inmate is responsible for obtaining it, and is permitted to write to the correspondent for this purpose.

**(e)  The Warden may allow an inmate additional correspondence with persons other than those on the inmate's approved mailing list when the correspondence is shown to be necessary and does not require an addition to the mailing list because it is not of an ongoing nature.**

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

8.   **INMATE CORRESPONDENCE WHILE IN SEGREGATION AND HOLDOVER STATUS**

**§ 540.16 Inmate correspondence while in segregation and holdover status.**

**(a)   The Warden shall permit an inmate in holdover status (i.e., enroute to a designated institution) to have correspondence privileges similar to those of other inmates insofar as practical.**

**(b)   The Warden shall permit an inmate in segregation to have full correspondence privileges unless placed on restricted general correspondence under § 540.15.**

28 CFR § 540.15 refers to Section 7 of this Program Statement.

9.   **CORRESPONDENCE BETWEEN CONFINED INMATES**

**§ 540.17 Correspondence between confined inmates.**

**An inmate may be permitted to correspond with an inmate confined in any other penal or correctional institution if the other inmate is either a member of the immediate family, or is a party or witness in a legal action in which both inmates are involved.   Such correspondence may be approved in other exceptional circumstances, with particular regard to the security level of the institution, the nature of the relationship between the two inmates, and whether the inmate has other regular correspondence.  The following additional limitations apply:**

Inmates must provide current documentation (dated within the past six months) to support both inmates are parties to or a witness in a current legal action.  At subsequent inmate team reviews, inmates will provide supporting documentation to continue correspondence privileges.

**(a)   Such correspondence at institutions of all security levels may always be inspected and read by staff at the sending and receiving institutions (it may not be sealed by the inmate); and**

If inspection of the correspondence reveals communication other than a legal matter, the unit manager will be advised and a determination will be made whether to disapprove further correspondence.  If privileges are rescinded, the unit manager or designee will ensure mail room and trust fund staff are notified.

**(b)   (1)   The appropriate unit manager at each institution must approve of the correspondence if both inmates are housed in Federal institutions and both**

pro

**14**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**inmates are members of the same immediate family or are a party or witness in a legal action in which both inmates are involved.**

The Warden is appraised of unusual circumstances pertaining to a request (e.g., inmates who have Central Inmate Monitoring assignments and/or disruptive group members) to correspond, for members of the same immediate family or for inmates who are a party or witness in the same legal action, for inmates housed in federal facilities.

Normally, the approval of mail correspondence privileges will apply to electronic messages generated via TRULINCS. The approval of correspondence privileges for both inmates will remain in effect even if either is transferred within the Bureau. The unit team will forward a copy of the approved mail correspondence to the mail room and trust fund staff for processing.

Unit team staff will review the status of previously approved correspondence during the inmate's classification/program review. When denying an inmate's request to correspond with immediate family, the unit manager will document the reason(s) for the denial.

**(2)  The Wardens of both institutions must approve of the correspondence if one of the inmates is housed at a non-Federal institution or if approval is being granted on the basis of exceptional circumstances.**

The Warden documents a denial or the rationale for approving the request for an inmate to correspond with an inmate, who is an immediate family member or a party or witness in the same legal action, housed in a non-federal facility/contract facility.

The approval of correspondence privileges for the inmate will remain in effect even when the inmate transfers within the Bureau. Unit team will review previously approved correspondence for either of the above circumstances. Unit team will forward a copy of the approval for mail correspondence to mail room staff.

10.  **SPECIAL MAIL**

**§ 540.18 Special mail.**

**(a)  The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail. The correspondence may not be read or copied if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

Incoming mail meeting these requirements must be treated per this rule. The Warden may, however, treat incoming mail that does not meet all requirements for special mail handling in the

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

same fashion as special mail, including opening it in the inmate's presence and inspecting it only for contraband.  For example, mail from the chambers of a Federal judge or from a Member of Congress should be given special handling even if it does not have a special mail marking on the envelope.

Similarly, mail from an adequately identified sender that contains markings similar to the phrase "Special Mail — Open only in the presence of the inmate" may be given special handling. Examples of similar markings include "Attorney-Client — Open only in the presence of the inmate" and "Legal Mail — Open only in the presence of the inmate."

**(b)  In the absence of either adequate identification or the "special mail" marking indicated in paragraph (a) of this section appearing on the envelope, staff may treat the mail as general correspondence and may open, inspect, and read the mail.**

**(c)  (1) Except as provided for in paragraph (c)(2) of this section, outgoing special mail may be sealed by the inmate and is not subject to inspection.**

**(2)   Special mail shall be screened in accordance with the provisions of paragraph (c)(2)(iii) of this section when the special mail is being sent by an inmate who has been placed on restricted special mail status.**

**(i)  An inmate may be placed on restricted special mail status if the Warden, with the concurrence of the Regional Counsel, documents in writing that the special mail either has posed a threat or may pose a threat of physical harm to the recipient (e.g., the inmate has previously used special mail to threaten physical harm to a recipient).**

**(ii)  The Warden shall notify the inmate in writing of the reason the inmate is being placed on restricted special mail status.**

**(iii)  An inmate on restricted special mail status must present all materials and packaging intended to be sent as special mail to staff for inspection.  Staff shall inspect the special mail material and packaging, in the presence of the inmate, for contraband.  If the intended recipient of the special mail has so requested, staff may read the special mail for the purpose of verifying that the special mail does not contain a threat of physical harm.  Upon completion of the inspection, staff shall return the special mail material to the inmate if the material does not contain contraband, or contain a threat of physical harm to the intended recipient. The inmate must then seal the special mail material in the presence of staff and immediately give the sealed special mail material to the observing staff**

prof

16

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

for delivery.  Special mail determined to pose a threat to the intended recipient shall be forwarded to the appropriate law enforcement entity.  Staff shall send a copy of the material, minus the contraband, to the intended recipient along with notification that the original of the material was forwarded to the appropriate law enforcement entity.

(iv)  The Warden shall review an inmate's restricted special mail status at least once every 180 days.  The inmate is to be notified of the results of this review.  An

inmate may be removed from restricted special mail status if the Warden determines, with the concurrence of the Regional Counsel, that the special mail does not threaten or pose a threat of physical harm to the intended recipient.

(v)  An inmate on restricted mail status may seek review of the restriction through the Administrative Remedy Program.

(d)  Except for special mail processed in accordance with paragraph (c)(2) of this section, staff shall stamp the following statement directly on the back side of the inmate's outgoing special mail:

"The enclosed letter was processed through special mailing procedures for forwarding to you.  The letter has neither been opened nor inspected.  If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification.  If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address."

The stamp includes the above statement, the name and address of the institution and space for the date.

## 11.  LEGAL CORRESPONDENCE

### § 540.19 Legal correspondence.

(a)  Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter.  The inmate may be asked to sign as receiving the incoming legal mail.  This paragraph applies only if the sender has marked the envelope as specified in § 540.18.

proi

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

28 CFR § 540.18 refers to Section 10 of this Program Statement.

Staff are expected to develop a master log containing the above information. The inmate may be requested (but not required) to sign the log, indicating receipt of the legal mail. If the inmate refuses, staff note this in the log.

**(b) The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail — Open only in the presence of the inmate".**

**Legal mail shall be opened in accordance with special mail procedures (see § 540.18).**

28 CFR § 540.18 refers to Section 10 of this Program Statement.

**(c) Grounds for the limitation or denial of an attorney's correspondence rights or privileges are stated in part 543, subpart B. If such action is taken, the Warden shall give written notice to the attorney and the inmate affected.**

Part 543, subpart B, refers to the Program Statement **Inmate Legal Activities**.

Any violation of the attorney/client correspondence privilege is referred to Regional Counsel, who, in conjunction with the Office of General Counsel, may restrict the inmate or attorney from further correspondence privileges.

**(d) In order to send mail to an attorney's assistant or to a legal aid student or assistant, an inmate shall address the mail to the attorney or legal aid supervisor, or the legal organization or firm, to the attention of the student or assistant.**

See the Program Statement **Inmate Legal Activities** for information concerning Bureau recognition of an attorney's assistant or legal aid student assistant.

**(e) Mail to an inmate from an attorney's assistant or legal aid student or assistant, in order to be identified and treated by staff as special mail, must be properly identified on the envelope as required in paragraph (b) of this section, and must be marked on the front of the envelope as being mail from the attorney or from the legal aid supervisor.**

## 12. INMATE CORRESPONDENCE WITH REPRESENTATIVES OF THE NEWS MEDIA

pro

**18**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**§ 540.20 Inmate correspondence with representatives of the news media.**

**(a)  An inmate may write through "special mail" to representatives of the news media specified by name or title (see § 540.2(b)).**

28 CFR § 540.2(b) refers to Section 2.b. of this Program Statement.

Properly identified and labeled correspondence from an inmate who is not on restricted mail status to qualifying news media representatives is sealed and forwarded without inspection, directly and promptly.  Properly identified and labeled correspondence from an inmate on restricted special mail status is also sealed and forwarded promptly, but may be subject to inspection per procedures in Section 10.  If there is doubt whether a representative qualifies, contact the Public Information Officer in the Central Office.

**(b)   The inmate may not receive compensation or anything of value for correspondence with the news media.  The inmate may not act as reporter.**

**(c)   Representatives of the news media may initiate correspondence with an inmate.  Staff shall open incoming correspondence from representatives of the media and inspect for contraband, for its qualification as media correspondence, and for content which is likely to promote either illegal activity or conduct contrary to Bureau regulations.**

See the Program Statement **News Media Contacts** on other aspects of contact with news media.

13.  **PAYMENT OF POSTAGE**

**§ 540.21 Payment of postage.**

**(a)  Except as provided in paragraphs (d), (e), (f), and (i) of this section, postage charges are the responsibility of the inmate.  The Warden shall ensure that the inmate commissary has postage stamps available for purchase by inmates.**

Mail room staff should obtain postage rate charts from the local servicing post office and place them where inmates ordinarily have access — the mail room or housing units.

(1)  **Postage Sold by Commissary**.  The inmate commissary must have available sufficient stamp denominations to allow mailing letters in excess of 1 ounce, but not requiring an additional first-class stamp.

(2)  **Purchase Limitation**.  The Warden issues local guidelines, which ordinarily limit an inmate's commissary purchase per visit to 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent; if such visits are limited to once per week or less, the Warden

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

may authorize an additional purchase of stamps.

(3)  **Inmate Possession of Postage Stamps**.  The Warden issues local guidelines, limiting an inmate's possession of stamps at one time to no more than 60 (denomination for first-class, domestic, 1-ounce mailing), or the equivalent.  The Warden may authorize possession of stamps to a specified amount in excess of this limit.  The stamps are to be maintained by the inmate in the same manner the stamps are sold or in the manner provided by the unit manager.

(4)  **Approval for Additional Purchases**.  An inmate may be authorized to purchase (per commissary visit) more than 20 postage stamps (denomination for first-class, domestic, 1-ounce mailing), or the equivalent, only upon approval of the associate warden.  This authority may not be delegated below unit manager.

**(b)  Writing paper and envelopes are provided at no cost to the inmate.  Inmates who use their own envelopes must place a return address on the envelope (see § 540.12(d)).**

28 CFR § 540.12(d) refers to Section 4(d) of this Program Statement.

**(c)  Inmate organizations will purchase their own postage.**

**(d)  An inmate who has neither funds nor sufficient postage and who wishes to mail legal mail (includes courts and attorneys) or Administrative Remedy forms will be provided the postage stamps for such mailing.  To prevent abuses of this provision, the Warden may impose restrictions on the free legal and administrative remedy mailings.**

(1)  To prevent abuses of Bureau directives regarding purchase of postage, Wardens will:

⎯  Provide an inmate who has neither funds nor postage up to five postage stamps (denomination for first-class, domestic, 1-ounce mailing) or the equivalent each week, for legal mail or Administrative Remedy filing

Require an inmate who has, for at least two separate months, depleted his/her commissary account, obtained Government-paid postage stamps, and then restored money to the account to complete the form for reimbursement Request for Withdrawal of Inmate's Personal Funds (BP-199) for the amount of postage given for legal mail or Administrative Remedy filings. Commissary staff hold the BP-199 and charge it against the inmate's account as soon as he/she has funds (see the Program Statement **Trust Fund Management Manual**).

Allow an inmate to purchase sufficient postage for legal mail or Administrative Remedy mailings.  The amount may not exceed the limit for postage purchases.

(2)  The associate warden makes a final determination whether the inmate is to receive postage

pro**ı**

**20**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

under the conditions of this subsection.  An "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing.  This authority may not be delegated below unit manager.

**(e)  When requested by an inmate who has neither funds nor sufficient postage, and upon verification of this status by staff, the Warden shall provide the postage stamps for mailing a reasonable number of letters at government expense to enable the inmate to maintain community ties.  To prevent abuses of this provision, the Warden may impose restrictions on the free mailings.**

Five letters per month are suggested as reasonable in most circumstances.  To prevent abuses, the Warden may require reimbursement as provided in Section 13(d)(1).  The associate warden (not to be delegated below unit manager) makes a final determination on whether the inmate is to receive postage under this subsection.

In making this determination, an "inmate without funds" means an inmate without sufficient commissary balance to purchase a postage stamp sufficient for first-class, 1-ounce domestic mailing, or postage for half-ounce international air mail for an inmate whose community ties require foreign correspondence.

**(f)  Mailing at government expense is also allowed for necessary correspondence in verified emergency situations for inmates with neither funds nor sufficient postage.**

The associate warden makes a final determination whether the inmate is to receive postage stamps under this subsection.  This authority may not be delegated below unit manager.

**(g)  Inmates must sign for all stamps issued to them by institution staff.**

A separate log is kept for this purpose.

**(h)  Mail received with postage due is not ordinarily accepted by the Bureau of Prisons.**

The mail room staff refuses postage-due mail.  However, if such mail is tendered to mail room staff without collection of postage due, it is processed without further collection action (see the **Mail Management Manual**).

**(i)  Holdovers and pre-trial commitments will be provided a reasonable number of stamps for the mailing of letters at government expense.**

pro;

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Three letters per week is suggested as reasonable in most circumstances. Commissary purchase of postage is also available to pretrial inmates. For holdovers, additional Government-furnished postage stamps may be allowed for special needs demonstrated by the inmate.

**(j)   Inmates may not be permitted to receive stamps or stamped items (e.g., envelopes embossed with stamps, postal cards with postage affixed) other than by issuance from the institution or by purchase from commissary.**

Stamps and stamped items sent into the institution are returned to the sender. Indicate the reason for return on Form BP-A0328, Stamps, Negotiable Instrument & Other Returned to Sender. A copy of the form is placed with the correspondence for delivery to the inmate. See the **Mail Management Manual** for further information.

k.   The institution's business manager is responsible for the purchase and security of stamps purchased by the Bureau for issue to inmates per Section 13.d. The business manager also conducts quarterly audits.

## 14.  SPECIAL POSTAL SERVICES

### § 540.22  Special postal services.

The information in this section was extracted from the **Mail Management Manual**. See that policy for more detailed information.

**(a)   An inmate, at no cost to the government, may send correspondence by registered, certified, or insured mail, and may request a return receipt.**

**(b)   An inmate may insure outgoing personal correspondence (e.g., a package containing the inmate's hobbycrafts) by completing the appropriate form and applying sufficient postage.**

The Request Authorization to Mail Inmate Package (BP-329) form is used.

**(1)  In the event of loss or damage, any claim relative to this matter is made to the U.S. Postal Service, either by the inmate or the recipient. The U.S. Postal Service will only indemnify a piece of insured mail for the actual value of an item, regardless of declared value.**

When an inmate decides that a claim is necessary for an incoming piece of insured mail, he/she is advised that the mailer is the most appropriate person to file the claim with the U.S. Postal Service.

**(2)   Inmate packages forwarded as a result of institution administration are**

proj

22

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**considered official mail, except as otherwise specified (for example, hobbycraft articles mailed out of the institution). Official mail is not insured. If such an item is subsequently lost or damaged in the mail process the inmate may file a tort claim with the Bureau of Prisons (see part 543, subpart C of this chapter).**

Such packages are forwarded as official mail at Government expense. If documentation indicates that the package left Bureau control and was lost or damaged by the U.S. Postal Service (or mailed via a contract mail provider), the inmate is instructed to file a tort claim with the U.S. Postal Service (or directly with the contract mail provider) (see the Program Statement **Federal Tort Claims Act**). Hobbycraft articles are discussed in the Program Statement **Inmate Recreation Programs**.

**(c) Certified mail is sent first class at the inmate's expense.**

The inmate must pay basic postage, costs of certification, and costs of a return receipt (if requested).

**(d) An inmate may not be provided such services as express mail, COD, private carriers, or stamp collecting while confined.**

15.  **INMATE FUNDS RECEIVED THROUGH THE MAILS**

**§ 540.23 Inmate funds received through the mails.**

**Except as provided for in part 506 of this chapter, funds enclosed in inmate correspondence are to be rejected.   Deposits intended for the inmate's commissary account must be mailed directly to the centralized commissary account (see 28 CFR part 506).**

Section 2 of the Acknowledgment of Inmate, Part 1 & 2 (BP-A0407) contains an authorization for disposition of funds. The inmate ordinarily completes this form upon initial entry into Bureau custody. Negotiable instruments must include the inmate's full name and register number.

Negotiable instruments received through the mail enclosed in inmate correspondence are rejected using the Stamps, Negotiable Instrument and Other Returned to Sender form (BP-A0328).

Inmates are not permitted to receive unsolicited funds through the mail, nor are inmates permitted to solicit funds or initiate requests for funds other than from family and friends.

b. Staff should be alert to unusual activity concerning funds received for posting to an inmate's account or being mailed out of the institution. For example, accounting technicians, unit staff and

proj

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

others should notify the unit manager when an inmate receives a large amount of money either in a lump sum or over a short period of time or has unusual activity in his/her account. The unit manager determines whether an appropriate reason exists for such activity or if a referral to the captain is necessary.

16. **RETURNED MAIL**

**§ 540.24 Returned mail.**

**Staff shall open and inspect for contraband all undelivered mail returned to an institution by the Post Office before returning it to the inmate. The purpose of this inspection is to determine if the content originated with the inmate sender identified on the letter or package; to prevent the transmission of material, substances, and property which an inmate is not permitted to possess in the institution; and to determine that the mail was not opened or tampered with before its return to the institution. Any remailing is at the inmate's expense. Any returned mail qualifying as "special mail" is opened and inspected for contraband in the inmate's presence.**

17. **CHANGE OF ADDRESS AND FORWARDING OF MAIL FOR INMATES**

**§ 540.25 Change of address and forwarding of mail for inmates.**

**(a)  Staff shall make available to an inmate who is being released or transferred appropriate Bureau of Prisons and U.S. Postal Service forms for change of address.**

A U.S. Postal Service "Change of Address" kit is made available to each inmate being transferred to notify correspondents. (**Note**: The "kit" is a notice to publishers, businesses, correspondents, etc.; it is **not** a notification to the U.S. Postal Service.) Staff obtain supplies of these kits from the servicing U.S. postal facility. Kits are kept in Receiving and Discharge and the mail room for inmates leaving the institution.

**(b)  Inmates are responsible for informing their correspondents of a change of address.**

**(c)  Postage for mailing change of address cards is paid by the inmate.**

**(d)  Except as provided in paragraphs (e) through (g) of this section, all mail received for a released or transferred inmate will be returned to the U.S. Postal Service for disposition in accordance with U.S. Postal Service regulations.**

prop

24

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**(e)  Staff shall use all means practicable to forward special mail.**

The Program Statement **Mail Management Manual** provides more detailed instructions on forwarding inmate special mail.

**(f)  Staff shall forward inmate general correspondence to the new address for a period of 30 days.**

Inmate general mail (as opposed to special mail) is forwarded to the new address for 30 days. General mail is forwarded to the address in the SENTRY database.  After 30 days, general mail is returned to the sender with the notation "Not at this address — return to sender."

**(g)  Staff shall permit an inmate released temporarily on writ to elect either to have general correspondence held at the institution for a period not to exceed 30 days, or returned to the U.S. Postal Service for disposition.**

Use the form Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(1)  If the inmate refuses to make this election, staff at the institution shall document this refusal, and any reasons, in the inmate's central file.  Staff shall return to the U.S. Postal Service all general correspondence received for such as inmate after the inmate's departure.**

Document the refusal on the Disposition of General Correspondence While Inmate is Released Temporarily on Writ (BP-A0398).

**(2)  If the inmate does not return from writ within the time indicated, staff shall return to the U.S. Postal Service all general correspondence being held for that inmate for disposition in accordance with postal regulations.**

18.  **INSTITUTION SUPPLEMENT**

Each institution must update its Institution Supplement (IS) and forward a copy to the Regional Correctional Programs Administrator.  The IS includes:

Designation of a staff member to supervise inmate correspondence.

Procedures for monitoring incoming and outgoing mail, including inspection and reading mail, especially to and from particular inmates.

Use of a master log to note receipt and inmate acknowledgment of incoming legal mail.

Limitations on the amount of postage stamps an inmate may possess and single purchases of stamps.

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Restrictions on free legal and administrative remedy mailings.

**REFERENCES**

*Program Statements*

P1315.07   Legal Activities, Inmate (11/5/99)

P1320.06   Federal Tort Claims Act (8/1/03)

P1330.16   Administrative Remedy Program (12/31/07)

P1480.05   News Media Contacts (9/21/00)

P4500.07   Trust Fund/Deposit Fund Manual (4/19/10)

P5100.08   Inmate Security Designation and Custody Classification (9/12/06)

P5265.13   Trust Fund Limited Inmate Computer System (TRULINCS)

              — Electronic Messaging (2/19/09)

P5266.10   Incoming Publications (1/10/03)

P5270.08   Inmate Discipline and Special Housing Units (12/4/09)

P5370.11   Recreation Programs, Inmate (6/28/08)

P5800.16   Mail Management Manual (4/5/11)

P5800.15   Correctional Systems Manual (1/01/09)

P7331.04   Pretrial Inmates (1/31/03)

*Federal Regulations*

Federal Regulations cited in this Program Statement are contained in 28 CFR part 540.

*ACA Standards*

2nd Edition Standards for Administration of Correctional Agencies:  2-CO-5D-01

4th Edition Standards for Adult Correctional Institutions:  4-4266, 4-4275, 4-4279, 4-4487, 4-4488, 4-4489, 4-4491, 4-4492 and 4-4496

4th Edition Standards for Adult Local Detention Facilities:  4-ALDF-2A-60, 4-ALDF-6A-02, 4-ALDF-6A-04, 4-ALDF-5B-05, 4-ALDF-5B-06, 4-ALDF-5B-08 and 4-ALDF-5B-09

*Records Retention Requirements*

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 9

28 C.F.R.

## § 543.11 Legal research and preparation of legal documents.

(a) The Warden shall make materials in the inmate law library available whenever practical, including evening and weekend hours. The Warden shall allow an inmate a reasonable amount of time, ordinarily during the inmate's leisure time (that is, when the inmate is not participating in a scheduled program or work assignment), to do legal research and to prepare legal documents. Where practical, the Warden shall allow preparation of documents in living quarters during an inmate's leisure time.

(b) The Warden shall periodically ensure that materials in each inmate law library are kept intact and that lost or damaged materials are replaced.

(c) Staff shall advise an inmate of rules and local procedures governing use of the inmate law library. Unauthorized possession of library materials by an inmate constitutes a prohibited act, generally warranting disciplinary action (see part 541 of this chapter).

(d) An inmate's legal materials include but are not limited to the inmate's pleadings and documents (such as a presentence report) that have been filed in court or with another judicial or administrative body, drafts of pleadings to be submitted by the inmate to a court or with other judicial or administrative body which contain the inmate's name and/or case caption prominently displayed on the first page, documents pertaining to an inmate's administrative case, photocopies of legal reference materials, and legal reference materials which are not available in the institution main law library (or basic law library in a satellite camp).

(1) An inmate may solicit or purchase legal materials from outside the institution. The inmate may receive the legal materials in accordance with the provisions on incoming publications or correspondence (see 28 CFR part 540, subparts B and F) or through an authorized attorney visit from a retained attorney. The legal materials are subject to inspection and may be read or copied unless they are received through an authorized attorney visit from a retained attorney or are properly sent as special mail (for example, mail from a court or from an attorney), in which case they may be inspected for contraband or for the purpose of verifying that the mail qualifies as special mail.

(2) Staff may allow an inmate to possess those legal materials which are necessary for the inmate's own legal actions. Staff may also allow an inmate to possess the legal materials of another inmate subject to the limitations of paragraph (f)(2) of this section. The Warden may limit the amount of legal materials an inmate may accumulate for security or housekeeping reasons.

CFR                                              1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(e) An inmate is responsible for submitting his documents to court. Institution staff who are authorized to administer oaths shall be available to provide necessary witnessing of these documents, as requested by inmates and at times scheduled by staff.

(f)(1) Except as provided for in paragraph (f)(4) of this section, an inmate may assist another inmate in the same institution during his or her leisure time (as defined in paragraph (a) of this section) with legal research and the preparation of legal documents for submission to a court or other judicial body.

(2) Except as provided for in paragraph (f)(4) of this section, an inmate may possess another inmate's legal materials while assisting the other inmate in the institution's main law library and in another location if the Warden so designates.

(i) The assisting inmate may not remove another inmate's legal materials, including copies of the legal materials, from the law library or other designated location. An assisting inmate is permitted to make handwritten notes and to remove those notes from the library or other designated location if the notes do not contain a case caption or document title or the name(s) of any inmate(s). The assisting inmate may also develop and possess handwritten drafts of pleadings, so long as the draft pleadings do not contain a case caption or document title or the name(s) of any inmate(s). These notes and drafts are not considered to be the assisting inmate's legal property, and when the assisting inmate has these documents outside the law library or other designated location, they are subject to the property limitations in § 553.11(a) of this chapter.

(ii) Although the inmate being assisted need not remain present in the law library or other designated location while the assistance is being rendered, that inmate is responsible for providing and retrieving his or her legal materials from the library or other designated location. Ordinarily, the inmate must provide and retrieve his or her legal materials during his or her leisure time. An inmate with an imminent court deadline may request a brief absence from a scheduled program or work assignment in order to provide or retrieve legal materials from an assisting inmate.

(3) The Warden may give special consideration to the legal needs of inmates in mental health seclusion status in federal medical centers or to inmates in controlled housing.

(4) The Warden at any institution may impose limitations on an inmate's assistance to another inmate in the interest of institution security, good order, or discipline.

(g) The institution staff shall, upon an inmate's request and at times scheduled by staff, duplicate legal documents if the inmate demonstrates that more than one copy must be submitted to court

CFR                                                       2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

and that the duplication cannot be accomplished by use of carbon paper. The inmate shall bear the cost, and the duplication shall be done so as not to interfere with regular institution operations. Staff may waive the cost if the inmate is without funds or if the material to be duplicated is minimal, and the inmate's requests for duplication are not large or excessive.

(h) Unless clearly impractical, the Warden shall allow an inmate preparing legal documents to use a typewriter, or, if the inmate cannot type, to have another inmate type his documents. The Warden may allow the inmate to hire a public stenographer to type documents outside the institution, but the institution may not assume the expense of hiring the public stenographer. Staff shall advise the inmate of any delay in the typing of which they have received notice from the stenographer.

(i) The Warden shall give special time allowance for research and preparation of documents to an inmate who demonstrates a requirement to meet an imminent court deadline. Otherwise, each inmate shall continue his regular institutional activities without undue disruption by legal activities.

(j) With consideration of the needs of other inmates and the availability of staff and other resources, the Warden shall provide an inmate confined in disciplinary segregation or administrative detention a means of access to legal materials, along with an opportunity to prepare legal documents. The Warden shall allow an inmate in segregation or detention a reasonable amount of personal legal materials. In no case shall the amount of personal legal materials be such as to pose a fire, sanitation, security, or housekeeping hazard.

[44 FR 38263, June 29, 1979, as amended at 55 FR 29992, July 23, 1990; 62 FR 4890, 4893, Jan. 31, 1997]

5 U.S.C. 301; 18 U.S.C. 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to conduct occurring on or after November 1, 1987), 5006-5024 (Repealed October 12, 1984 as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510, 1346(b), 2671-80; 28 CFR 0.95-0.99, 0.172, 14.1-11.
[EFFECTIVE DATE NOTE: 62 FR 4890, 4893, Jan. 31, 1997, revised paragraphs (a), (d), and (f) and the last sentence of paragraph (h), effective Mar. 3, 1997.]

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Exhibit 10

**OPI:**        **OGC**
**NUMBER:**    **1315.07**
**DATE:**      **11/5/99**
**SUBJECT:**    **Legal Activities, Inmate**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

**OPI:** OGC

**NUMBER:** 1315.07

**DATE:** 11/5/99

**SUBJECT:** Legal Activities, Inmate

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

10.    [LEGAL RESEARCH AND PREPARATION OF LEGAL DOCUMENTS §543.11

   a.   The Warden shall make materials in the inmate law library available whenever practical, including evening and weekend hours.   The Warden shall allow an inmate a reasonable amount of time, ordinarily during the inmate's leisure time (that is, when the inmate is not participating in a scheduled program or work assignment), to do legal research and to prepare legal documents. Where practical, the Warden shall allow preparation of documents in living quarters during an inmate's leisure time.

   b.    The Warden shall periodically ensure that materials in each inmate law library are kept intact and that lost or damaged materials are replaced.

   c.   Staff shall advise an inmate of rules and local procedures governing use of the inmate law library.    Unauthorized possession of library materials by an inmate constitutes a prohibited act, generally warranting disciplinary action (see part 541 of this chapter).]

   Part 541 refers to the Program Statement on Inmate Discipline and Special Housing Units.

   [d. An inmate's legal materials include but are not limited to the inmate's pleadings and documents (such as a pre-sentence report) that have been filed in court or with another judicial or administrative body, drafts of pleadings to be submitted by the inmate to a court or with other judicial or administrative body which contain the inmate's name and/or case caption prominently displayed on the first page, documents pertaining to an inmate's administrative case, photocopies of legal reference materials,

and legal reference materials which are not available in the institution main law library (or basic law library in a satellite camp).]

   Staff must consult with Regional Counsel if there is any question whether certain items qualify as legal materials.

   [(1)   An inmate may solicit or purchase legal materials from outside the institution.   The inmate may receive the legal materials in accordance with the provisions on incoming publications or correspondence (see 28 CFR part 540, subparts B

1

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

and F) or through an authorized attorney visit from a retained attorney.   The legal materials are subject to inspection and may be read or copied unless they are received through an authorized attorney visit from a retained attorney or are properly sent as special mail (for example, mail from a court or from an

attorney), in which case they may be inspected for contraband or for the purpose of verifying that the mail qualifies as special mail.]

28 CFR part 540, subparts B and F refer to the Program Statements on Correspondence and Incoming Publications respectively.

[(2)    Staff may allow an inmate to possess those legal materials which are necessary for the inmate's own legal actions. Staff may also allow an inmate to possess the legal materials of another inmate subject to the limitations of paragraph (f)(2) of this section.    The Warden may limit the amount of legal materials an inmate may accumulate for security or housekeeping reasons.]

To ensure that legal materials do not become a security or housekeeping hazard (e.g., fire, sanitation), each institution may establish a limit on the amount of, and storage location for legal materials in the inmate's living area.

The amount of storage space provided for legal materials depends upon the total storage space available.   Ordinarily, the amount may not be restricted below three cubic feet per inmate.

In a segregation or detention area, the amount ordinarily may not be restricted below one cubic foot per inmate.

Alternate storage areas may be provided only for storing excess legal materials.   The Regional Counsel may be consulted if there is a question as to the need for bulky or excess legal material, or if there is any question regarding the applicability of the legal materials to the inmate's own legal actions.

[e.   An inmate is responsible for submitting his documents to court.      Institution staff who are authorized to administer oaths shall be available to provide necessary witnessing of these documents, as requested by inmates and at times scheduled by

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

staff.

See Section 16 for further instructions on administering oaths and acknowledgments.

**f. (1)   Except as provided for in paragraph f.(4) of this section, an inmate may assist another inmate in the same institution during his or her leisure time (as defined in paragraph a. of this section) with legal research and the preparation of legal documents for submission to a court or other judicial body.]**

Any assistance offered by one inmate to another is voluntary. An inmate is not entitled to assistance from any specific inmate. Because no inmate may conduct a business, the assisting inmate may not receive compensation. The assisting inmate shall not be provided any privileges ordinarily afforded

to attorneys or paralegals, clerks, and legal assistants, even if the inmate was an attorney before his or her incarceration.

Inmates who are in different institutions are prohibited from providing legal assistance to each other except to the extent that they may be allowed to correspond with each other about legal matters. For example, immediate family members or co-defendants or co-plaintiffs may receive approval to exchange correspondence (see the Program Statement on Correspondence).

Inmates who are allowed to exchange correspondence may choose to include legal material pertinent to their joint action in their correspondence. Enclosed legal material, however, is subject to inspection and can be read or copied.

Legal material which co-defendants or co-plaintiffs receive through special mail or from an attorney through an attorney

visit is subject to inspection for contraband or qualification as special mail only, and may not be read or copied.

**[(2)   Except as provided for in paragraph f.(4) of this section, an inmate may possess another inmate's legal materials while assisting the other inmate in the institution's main law library and in another location if the Warden so designates.**

**(a)   The assisting inmate may not remove another inmate's legal materials, including copies of the legal materials, from**

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the law library or other designated location.    An assisting

inmate is permitted to make handwritten notes and to remove those
notes from the library or other designated location if the notes
do not contain a case caption or document title or the name(s) of
any inmate(s).    The assisting inmate may also develop and
possess handwritten drafts of pleadings, so long as the draft
pleadings

do not contain a case caption or document title or the name(s) of
any inmate(s).    These notes and drafts are not considered to be
the assisting inmate's legal property, and when the assisting
inmate has these documents outside the law library or other
designated location, they are subject to the property limitations
in § 553.11(a) of this chapter.]

§553.11(a) refers to the Program Statement on Inmate

Personal Property.

        [(b)    Although the inmate being assisted need not remain
present in the law library or other designated location while the
assistance is being rendered, that inmate is responsible for
providing and retrieving his or her legal materials from the
library or other designated location.    Ordinarily, the inmate

must provide and retrieve his or her legal materials during his
or her leisure time.    An inmate with an imminent court deadline
may request a brief absence from a scheduled program or work
assignment in order to provide or retrieve legal materials from
an assisting inmate.]

        The  law  library  is  the  most  appropriate  location  for
allowing inmates to assist one another with legal matters

however, the Warden may choose to designate additional locations.

        Where it is difficult to use the institution's main law
library (for example, at a medical facility, a metropolitan
detention  center,  a  metropolitan  correctional  center,  an
administration maximum security facility, an administrative high
security level institution, or in a special housing unit,

pretrial unit, or holdover unit), the Warden should designate
another location.    The need for institution security, good

pro|

**4**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

order, or discipline, however, may prevent the use of another location.

The inmate being assisted must bring his or her legal materials to the law library or other designated location to provide them to the assisting inmate.  The assisting inmate may not remove the legal materials from the law library or other designated location.

Legal materials left unattended in the law library or other designated location may be disposed of as nuisance contraband or returned by staff to the owner.  Staff are to consult with institution legal staff or Regional Counsel if they have a question about who owns the legal materials.

**[(3)    The Warden may give special consideration to the legal needs of inmates in mental health seclusion status in federal medical centers or to inmates in controlled housing.**

**(4)    The Warden at any institution may impose limitations on an inmate's assistance to another inmate in the interest of institution security, good order, or discipline.]**

For reasons of security, inmates in an administrative institution or unit or in a special housing unit have limited access to other inmates on those units and no access to general population inmates.  Legal assistance under Section 10 of this Program Statement remains available for such inmates.

**[g.    The institution staff shall, upon an inmate's request and at times scheduled by staff, duplicate legal documents if the inmate demonstrates that more than one copy must be submitted to court and that the duplication cannot be accomplished by use of carbon paper.    The inmate shall bear the cost, and the duplication shall be done so as not to interfere with regular institution operations.    Staff may waive the cost if the inmate is without funds or if the material to be duplicated is minimal, and the inmate's requests for duplication are not large or excessive.]**

To prevent abuses of this provision (e.g., inmate shows a pattern of depleting his or her commissary funds prior to requesting duplication of legal documents), the Warden may impose restrictions on the provisions of this subsection.    In such

5

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

cases, staff may request that the inmate complete the appropriate form for reimbursement (BP-CMS-21/24) for the amount of legal copies received at government expense.   Commissary staff will

hold the BP-CMS-21/24 form and charge the reimbursement against the inmate's account as soon as the inmate has funds (see the Trust Fund/Warehouse/Laundry Manual.)

   **[h.    Unless clearly impractical, the Warden shall allow an inmate preparing legal documents to use a typewriter, or if the inmate cannot type, to have another inmate type his documents. The Warden may allow the inmate to hire a public stenographer to type documents outside the institution, but the institution may not assume the expense of hiring the public stenographer.   Staff shall advise the inmate of any delay in the typing of which they have received notice from the stenographer.**

   **i.    The Warden shall give special time allowance for research and preparation of documents to an inmate who demonstrates a requirement to meet an imminent court deadline.   Otherwise, each inmate shall continue his regular institutional activities without undue disruption by legal activities.]**

   Inmates who request time to do legal research and preparation for filing legal documents during their regularly scheduled work time may be required to do so first during all available leisure time.   When such requests are made, staff may also authorize the inmate to work reduced hours.   For example, an inmate may be allowed mornings to do legal research, work in the afternoons,

and then use evenings for further research.   The Regional Counsel may be consulted regarding such arrangements.

   **[j.    With consideration of the needs of other inmates and the availability of staff and other resources, the Warden shall provide an inmate confined in disciplinary segregation or administrative detention a means of access to legal materials, along with an opportunity to prepare legal documents.   The Warden shall allow an inmate in segregation or detention a reasonable amount of personal legal materials.   In no case shall the amount of personal legal materials be such as to pose a fire,**

**sanitation, security, or housekeeping hazard.]**

   A reasonable amount of personal legal material in segregation

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

or detention is approximately one cubic foot.  Greater amounts
may be allowed when an inmate has an imminent court deadline. The
Regional Counsel should be consulted before accumulation of legal
materials is limited for housekeeping reasons.

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.



# PART 121 -- SERVICE STANDARDS FOR MARKET-DOMINANT MAIL PRODUCTS

39 U.S.C., 101, 401, 403, 404, 1001, 3691.

### § 121.1 First-Class Mail.

(a)(1) Until January 5, 2015, a 1-day (overnight) service standard is applied to intra-Sectional Center Facility (SCF) domestic First-Class Mail(R) pieces properly accepted before the day-zero Critical Entry Time (CET), except for mail between Puerto Rico and the U.S. Virgin Islands, mail between American Samoa and Hawaii, and mail destined to the following 3-digit ZIP Code areas in Alaska (or designated portions thereof): 995 (5-digit ZIP Codes 99540 through 99599), 996, 997, 998, and 999.

(2) On and after January 5, 2015, a 1-day (overnight) service standard is applied to intra-SCF domestic Presort First-Class Mail pieces properly accepted at the SCF before the day-zero CET, except for mail between Puerto Rico and the U.S. Virgin Islands, and mail destined to American Samoa and the following 3-digit ZIP Code areas in Alaska (or designated portions thereof): 995 (5-digit ZIP Codes 99540 through 99599), 996, 997, 998, and 999.

(b)(1) Until January 5, 2015, a 2-day service standard is applied to inter-SCF domestic First-Class Mail pieces properly accepted before the day-zero CET if the drive time between the origin Processing & Distribution Center or Facility (P&DC/F) and destination Area Distribution Center (ADC) is 6 hours or less; or if the origin and destination are separately in Puerto Rico and the U.S. Virgin Islands; or if the origin or destination is in American Samoa or one of the following 3-digit ZIP Code areas in Alaska (or designated portions thereof): 995 (5-digit ZIP Codes 99540 through 99599), 996, 997, 998, and 999.

(2) On and after January 5, 2015, a 2-day service standard is applied to intra-SCF single piece domestic First-Class Mail properly accepted before the day-zero CET, inter-SCF domestic First-Class Mail pieces properly accepted before the day-zero CET if the drive time between the origin P&DC/F and destination SCF is 6 hours or less, Presort First-Class Mail properly accepted before the day-zero CET with an origin and destination that are separately in Puerto Rico and the U.S. Virgin Islands, and intra-SCF Presort First-Class Mail properly accepted before the day-zero

CFR                                          1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

CET with an origin or destination that is in American Samoa or one of the following 3-digit ZIP Code areas in Alaska (or designated portions thereof): 995 (5-digit ZIP Codes 99540 through 99599), 996, 997, 998, and 999.

(c) A 3-day service standard is applied to domestic First-Class Mail pieces properly accepted before the day-zero CET, if the 1-day and 2-day service standards do not apply, and:

(1) Both the origin and the destination are within the contiguous 48 states;

(2) The origin is in the contiguous 48 states, and the destination is in any of the following: the city of Anchorage, Alaska (5-digit ZIP Codes 99501 through 99539); the 968 3-digit ZIP Code area in Hawaii; or the 006, 007, or 009 3-digit ZIP Code areas in Puerto Rico;

(3) The origin is in the 006, 007, or 009 3-digit ZIP Code areas in Puerto Rico, and the destination is in the contiguous 48 states;

(4) The origin is in Hawaii, and the destination is in Guam, or vice versa;

(5) The origin is in Hawaii, and the destination is in American Samoa, or vice versa; or

(6) Both the origin and destination are within Alaska.

(d) A 4-day service standard is applied to domestic First-Class Mail pieces properly accepted before the day-zero CET, if the 1-day, 2-day, and 3-day service standards do not apply, and:

(1) The origin is in the contiguous 48 states and the destination is in any of the following: any portion of Alaska other than the city of Anchorage (5-digit ZIP Codes 99501 through 99539); any portion of Hawaii other than the 968 3-digit ZIP Code area; or the U.S. Virgin Islands;

(2) The destination is in the contiguous 48 states and the origin is in Alaska, Hawaii, or the U.S. Virgin Islands; or

(3) The origin and destination are in different non-contiguous states or territories, excluding mail to and from Guam and mail between Puerto Rico and the U.S. Virgin Islands.

(e) A 5-day service standard is applied to all remaining domestic First-Class Mail pieces properly accepted before the day-zero CET.

(f) The service standard for Outbound Single-Piece First-Class Mail International<TM>; pieces

CFR                                        2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



properly accepted before the day-zero CET is equivalent to the service standard for domestic First-Class Mail pieces originating from the same 3-digit ZIP Code area and destined to the 3-digit ZIP Code area in which the designated International Service Center is located.

(g) The service standard for Inbound Single-Piece First-Class Mail International pieces properly accepted before the day-zero CET is equivalent to the service standard for domestic First-Class Mail pieces destined to the same 3-digit ZIP Code area and originating from the 3-digit ZIP Code area in which the designated International Service Center is located.

[72 FR 72216, 72228, Dec. 19, 2007; 75 FR 9343, 9344, Mar. 2, 2010; 77 FR 31190, 31196, May 25, 2012; 79 FR 4079, 4080, Jan. 24, 2014; 79 FR 44700, 44701, Aug. 1, 2014]

[EFFECTIVE DATE NOTE: 79 FR 4079, 4080, Jan. 24, 2014, revised paragraphs (a) and (b), effective Jan. 24, 2014. For implementation date information, see: 79 FR 4079, Jan. 24, 2014; 79 FR 44700, 44701, Aug. 1, 2014, revised paragraph (a) and (b), effective Aug. 1, 2014.]

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## Declaration of Martin S. Gottesfeld:

I, Martin S. Gottesfeld, declare that the following is true and correct under the penalty of perjury under the laws of The United States pursuant to 28 U.S.C. § 1746(1), Fed. R. Evid. 201(c)(2), and Fed. R. Evid. 901(b)(1) on this twenty-fourth (24th) day of February, 2020:

1. I am Martin S. Gottesfeld and I am the sole plaintiff in the case of Gottesfeld v. Hurwitz, et al.; 18-cv-10836-PGG-GWG (herein "the case"), currently pending before The Honorable U.S. District Court for The Southern District of New York (herein "The Court").

2. Exhibit 13 to this filing is a true copy of administrative-remedy request number 979745, which I filed with The Federal Bureau of Prisons (herein the "FBOP") regarding the weeks-long delays of my mail to The Court, and the responses thereto.

3. Delivery of letters to me like exhibits 2-3 hereto are delayed and ordinarily take many business days.

4. My special and legal mail are not afforded priority by agents of the defendants in the case.

5. Agents of the defendants in the case make no discernable attempts to deliver my legal mail and special mail every twenty-four (24) hours after the time it is initially logged until it is delivered.

6. Agents of the defendants in the case do not hand carry my special or legal mail to the mail room immediately after confirming that I am the prisoner specified in its return address.

7. Exhibit 14 to this filing is a marked true copy of an electronic-messaging thread between myself and my appellate attorney in The First Circuit which I began at approximately 8:18 P.M. Eastern Time on Wednesday, February 5th, 2020.

8. Agents of the defendants in the case allowed my initial message in Exhibit 14 through to my attorney about eleven (11) hours later at approximately 7:20:46 A.M. on Thursday, February 6th, 2020, and my attorney replied at approximately 8:43 A.M. on Friday, February 7th, 2020.

9. Agents of the defendants in the case did not allow my attorney's reply back through to me until approximately 8:23:01 A.M. on Monday, February 10th, 2020.

10. As of Friday, February 7th, 2020, my attorney had not received special and legal mail I sent more than a week earlier between locations in the contiguous forty-eight (48) states subject to the 3-day service standard set forth by 39 C.F.R. § 121.1(c)(1) (Exhibit 11 at 2). Exhibit 14 at 1.

11. Exhibit 15 to this filing is a marked true copy of an electronic-messaging thread between myself and my appellate attorney in The First Circuit which I began at approximately 5:05 P.M. Eastern Time on Friday, February 7th, 2020.

12. Agents of the defendants in the case did not allow my initial message in Exhibit 15 through to my attorney until about 7:35:48 A.M. on Monday, February 10th, 2020, and my attorney replied thereto at approximately 9:11 P.M. on Tuesday, February 11th, 2020.

13. Agents of the defendants in the case did not allow my attorney's

reply back through to me until approximately 8:27:24 A.M. on Wednesday, February 12th, 2020.

14. In my attorney's reply, he correctly noted, "It appears that it takes several days for your emails to be received. This was emailed on a Friday, but I did not receive it until yesterday."

15. Exhibit 16 to this filing is a marked true copy of an electronic-messaging thread between myself and my appellate attorney in The First Circuit which I began at approximately 8:18 P.M. Eastern Time on Wednesday, February 5th, 2020, and an earlier version of this thread appears as Exhibit 14 to this filing.

16. At approximately 9:17 A.M. Eastern Time on Monday, February 10th, 2020, I replied to my attorney's message of, "I have no recent correspondence from you," by saying, "I am starting to grow concerned that you have not received my physical legal mail. When it arrives, please look for indications of physical tampering by the appellee. I began sending you physical mail two (2) days after our phone call, i.e. on Thursday, January 30th, 2020. It seems likely that the first of it should have started to arrive by now. I will continue sending."

17. Agents of the defendants did not allow my reply to my attorney to go through until approximately 7:20:33 A.M. on Tuesday, February 11th, 2020.

18. My attorney subsequently responded at approximately 8:54 P.M. on Tuesday, February 11th, 2020, by telling me that my physical legal and special mail to him from twelve (12) days earlier finally had "been received."

19. Agents of the defendants in the case did not allow my attorney's response back through to me until approximately 8:27:35 A.M. on Wednesday, February 12th, 2020.

20. Exhibit 17 to this filing is a marked true copy of an electronic-messaging thread between myself and my appellate attorney in The First Circuit which I began at approximately 8:44 P.M. on Monday, February 10th, 2020.

21. Agents of the defendants in the case did not allow my initial message to go through until approximately 7:21:23 A.M. on Tuesday, February 11th, 2020, and my attorney replied at approximately 8:54 P.M. on Tuesday, February 11th, 2020, by saying, "Your correspondence from the end of Jan. Has[sic] been received. But it took a whole week for it to be delivered."

22. Agents of the defendants in the case did not allow my attorney's reply back through to me until approximately 8:27:49 A.M. on Wednesday, February 12th, 2020.

23. The Case-Manager Coordinator (CMC) for the FCI Terre Haute CMU does not review the special/legal mail delivery process and ensure that policy requirements are met and does not consult specifically with staff and review requisite record keeping to ensure that delivery time frames are being met.

24. I was never advised that I am not required to have packages containing educational or legal materials pre-approved.

25. Marking packages containing educational or legal materials as, "Authorized by Bureau Policy," was not covered during my admission and orientation (A&O) at FCI Terre Haute.

26. The monitoring procedures employed by agents of the defendants in the case in the FCI Terre Haute CMU interfere with mail handling.

27. The non-random reading of my mail--and especially of my mail to and from The Court--is not intended by agents of the defendants in the case to reveal anything that would present a valid security concern, but rather to give the defendants in the case an unfair head start on my court filings before they appear on the docket of the case and to alert them to negative publicity regarding their kickback and other unlawful schemes.

28. Agents of the defendants in the case regularly reveal the contents of my correspondence to other persons in the absence of a legitimate correctional concern.

I declare that the foregoing is true and correct under the penalty of perjury under the laws of The United States. Executed on Monday, February 24th, 2020.

by: _____
Martin S. Gottesfeld

Attachment 1

FCC Terre Haute

Administrative Remedy – Informal Resolution

| Inmate Name: Gottesfeld | Register #: 12982-104 |
|---|---|
| Unit: CMU | Date Submitted: May 6th, 2019 |

**Section 1: NOTICE TO INMATE** - Be advised, normally prior to filing a Request for Administrative Remedy, BP-229 (13), you must attempt to informally resolve your complaint through your Correctional Counselor.

**Section 1a:** Briefly state your specific single complaint: Important filings which I mailed to U.S. District Court for The Southern District Of New York on April 29th, 2019, appears not to have left the mail room yet. These filings bore the following USPS Tracking #s:
9114 9023 0722 4072 3904 38
9114 9023 0722 4072 3904 52
9114 9023 0722 4072 4447 11
9114 9014 9645 1762 0788 33

These are all time and case-sensitive filings. This delay is impeding my justice and prejudicing me.

**Section 1b:** Briefly state the resolution you request: I would like these and all my future mailings to U.S. District Court not to be delayed for 5+ business days while the FBOP exercises unlawful executive discretionary review of them.

Inmate Signature: _(signature)_

Counselor Printed Name/Signature: R. Eisele R.E.

**Section 2: Department Assigned:**

| Date Assigned: | | | Date Due: | |
|---|---|---|---|---|
| ☐ Food Service | ☑ Unit Mgmt | ☐ Unicor | ☐ Education |
| ☐ Psychology | ☐ Medical | ☐ Chaplain | ☐ Recreation |
| ☐ Trust Fund | ☐ Custody | ☐ Facilities | ☐ Safety |
| ☐ ISM/Mailroom | ☐ Admin. | ☐ SIS | |

**Section 3: Department Head Response**

Issue Resolved Comments:

Issue Un-resolved Comments: Your mail is reviewed and sent in accordance with cmu policy + procedures.

Unable to Address Issue Comments:

| Inmate Signature If Resolved: | | Date: |
|---|---|---|
| Staff Signature: | | Date: |

**Section 4: Tracking**

| | BP-8 issued to Inmate | BP-8 returned to Counselor | BP-9 issued to Inmate | BP-9 returned to Unit Team | To Admin Remedy Clerk | Returned as Rejected |
|---|---|---|---|---|---|---|
| Date | 5-6-19 | 5-6-19 | 5-9-19 | | | |
| Time | 1217 | 1230 | 1324 | | | |
| Staff | R. Eisele | R. Eisele | R. Eisele | | | |

THX-1330.16D

Page 7

---

To: Mailroom
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Friday, May 3rd, 2019
Subject: Tracking of outgoing mail

Salutations Mailroom,

Can you please track the following mailings, which I sent to U.S. District Court in New York and the Southern District of New York U.S. attorney's office on or about April 29th, 2019?

9114 9023 0722 4072 3904 38
9114 9023 0722 4072 3904 52
9114 9023 0722 4072 4447 11
9114 9014 9645 1762 0788 33

Thanks in advance for your assistance,

_(signature)_

Martin S. Gottesfeld, Reg. No.: 12982-104

---

USPS.com® - USPS Tracking® Results                    Page 1 of 3

# USPS Tracking® FAQs (https://www.usps.com/faqs/uspstracking-faqs.htm)

### Track Another Package  +

Tracking Number: 9114902307224072390438                    Remove

## Label Created, not yet in system

A status update is not yet available on your package. It will be available when the shipper provides an update or the package is delivered to USPS. Check back soon.

Sign up for Informed Delivery® (https://informeddelivery.usps.com/box/pages/intro/start.action) to receive notifications for packages addressed to you.

Tracking Number: 9114902307224072390452                    Remove

Your package is moving within the USPS network and is on track to be delivered to its final destination. It is currently in transit to the next facility.

### In-Transit

May 3, 2019
In Transit to Next Facility

Get Updates

See Less

https://tools.usps.com/go/TrackConfirmAction?tLabels=9114902307224072390438%2C91...    5/3/2019

---

USPS.com® - USPS Tracking® Results                    Page 2 of 3

Tracking Number: 9114902307224072444711                    Remove

## Label Created, not yet in system

A status update is not yet available on your package. It will be available when the shipper provides an update or the package is delivered to USPS. Check back soon.

Sign up for Informed Delivery® (https://informeddelivery.usps.com/box/pages/intro/start.action) to receive notifications for packages addressed to you.

Tracking Number: 9114901496451762078833                    Remove

## Label Created, not yet in system

A status update is not yet available on your package. It will be available when the shipper provides an update or the package is delivered to USPS. Check back soon.

Sign up for Informed Delivery® (https://informeddelivery.usps.com/box/pages/intro/start.action) to receive notifications for packages addressed to you.

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

FAQs (https://www.usps.com/faqs/uspstracking-faqs.htm)

https://tools.usps.com/go/TrackConfirmAction?tLabels=9114902307224072390438%2C91...    5/3/2019

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: Gottesfeld, Martin, S. | 12982-104 | THA-CMU | FCI Terre Haute |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL. | REG. NO. | UNIT | INSTITUTION |

Part A- INMATE REQUEST Important and time-sensitive filings which I mailed to the US District Cour
: The Southeburn District of New York on Monday, m April 29th, 2019, 4t for docketing tin the case
: 18-cv-10836-PGG did not leave the mailroom for quite some time. They had the following USPS
racking numbers: 9114 9023 0722 4072 3904 38, 9114 9023 0722 4072 3904 52,
.14 9023 0722 4072 4447 11, and 411--991 9114 9014 9645 1762 0788 33. That delay effectively denie
: access to the courts. Further, it is unlawful for the FBOP to exercise Executive discretionary
:view of my filings with the judicial branch (please see Ex Parte Hull, 312 U.S. 546; 85 L.Ed.-
:034; 61 S.Ct. 640 (1941) and Cochran v. Kansas, 316 U.S. 255; 86 L.Ed. 1453; 62 S.Ct. 1068 (1942).
:e right to access the courts without interference from prison officials is well-established and
:eeek resoundingly unambiguous in Constitutional law.
:ease mail my filings out to U.S. District and other courts in a reasonable time frame and without
:ercising unlawful Executive discretionary review beforehand.

| Sunday, May 12th, 2019 | | |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

Part B- RESPONSE

| DATE | | WARDEN OR REGIONAL DIRECTOR |
|---|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                          CASE NUMBER:_____

                                                                         CASE NUMBER:_____

Part C- RECEIPT

Return to: _____
                    LAST NAME, FIRST, MIDDLE INITIAL.      REG. NO.      UNIT      INSTITUTION

SUBJECT:_____

| DATE | | RECIPIENT'S SIGNATURE (STAFF MEMBER) | BP-229(13) |
|---|---|---|---|
USP LVN | | | APRIL 1982

---

To: Mailroom
From: Martin S. Gottesfeld (Reg. No.: 12982-104)
Date: Thursday, May 9th, 2019
Subject: USPS Tracking

Salutations,

Can I please get the latest tracking information for the
following USPS labels, which I mailed on April 29th, 2019?

    9114 9023 0722 4072 3904 38
    9114 9023 0722 4072 3904 52
    9114 9023 0722 4072 4447 11
    9114 9014 9645 1762 0788 33

May I please also get the latest tracking information for
the following USPS label, which I mailed on May 8th, 2019?

    9114 9023 0722 4072 3904 76

Thanks in advance for your help,

Martin S. Gottesfeld

- Page 1 of 1 -

---

USPS.com® - USPS Tracking® Results                                    Page 1 of 2

# USPS Tracking® FAQs (https://www.usps.com/faqs/uspstracking-faqs.htm)

Track Another Package +

Tracking Number: 9114902307224072390438                    Remove

Your item departed our USPS facility in NEW YORK NY DISTRIBUTION CENTER on May
10, 2019 at 1:38 am. The item is currently in transit to the destination.

## In-Transit

May 10, 2019 at 1:38 am
Departed USPS Regional Facility
NEW YORK NY DISTRIBUTION CENTER

Change Delivery Instructions

Text & Email Updates

Delivery Instructions

Tracking History

Product Information

See Less

---

USPS.com® - USPS Tracking® Results                                    Page 1 of 2

# USPS Tracking® FAQs (https://www.usps.com/faqs/uspstracking-faqs.htm)

Track Another Package +

Tracking Number: 9114902307224072390452                    Remove

Your item was delivered to an individual at the address at 2:10 pm on May 6, 2019 in NEW
YORK, NY 10007.

## Delivered

May 6, 2019 at 2:10 pm
Delivered, Left with Individual
NEW YORK, NY 10007

Get Updates

Text & Email Updates

Tracking History

Product Information

See Less

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

USPS.com® - USPS Tracking® Results                Page 1 of 2

## USPS Tracking®  FAQs  (https://www.usps.com/faqs/uspstracking-faqs.htm)

Track Another Package  +

Tracking Number: 9114902307224072444711     Remove

Your item departed our USPS facility in NEW YORK NY DISTRIBUTION CENTER on May 10, 2019 at 1:54 am. The item is currently in transit to the destination.

### In-Transit

May 10, 2019 at 1:54 am
Departed USPS Regional Facility
NEW YORK NY DISTRIBUTION CENTER

Change Delivery Instructions

Text & Email Updates

Delivery Instructions

Tracking History

Product Information

See Less

https://tools.usps.com/go/TrackConfirmAction?tLabels=9114902307224072444711    5/10/2019

---

Remedy No.: 979745-F1      FCC Terre Haute, IN

**PART B - RESPONSE**

This is in response to your Administrative Remedy receipted June 3, 2019, in which you allege your mailing to the Southern District of New York was delayed causing you denied access to the courts. As relief, you request your filings to the U.S. District and other courts be mailed out in a reasonable timeframe.

A review of your request reveals that you are housed in the Communication Management Unit (CMU) at FCC Terre Haute. You are currently housed in a general population housing unit with 100% communication monitoring. All general correspondence and special mail will be cleared by the Counter Terrorism Unit (CTU) prior to mailing.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

_7/15/19_          _[signature]_
Date              B. Lammer, FCI Warden

---

USPS.com® - USPS Tracking® Results                Page 1 of 2

## USPS Tracking®  FAQs  (https://www.usps.com/faqs/uspstracking-faqs.htm)

Track Another Package  +

Tracking Number: 9114901496451762078833     Remove

Your item departed our USPS facility in NEW YORK NY DISTRIBUTION CENTER on May 10, 2019 at 1:38 am. The item is currently in transit to the destination.

### In-Transit

May 10, 2019 at 1:38 am
Departed USPS Regional Facility
NEW YORK NY DISTRIBUTION CENTER

Change Delivery Instructions

Text & Email Updates

Delivery Instructions

Tracking History

Product Information

See Less

https://tools.usps.com/go/TrackConfirmAction?tLabels=9114901496451762078833    5/10/2019

---

U.S. Department of Justice          Regional Administrative Remedy Appeal
Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: Goldfield, Martin S.        17987-104      C41      FCI-EIA
        LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION

Part A—REASON FOR APPEAL Important and time-sensitive filings that I mailed to the U.S. District Court for the Southern District of New York on Monday, April 29th, 2019, for docketing in the case of 18-cv-10836-PGG did not leave the mailroom for quite some time. They had the following USPS tracking numbers: 9114 9023 0722 4072 3908 34, 9114 9023 0722 4072 3908 92, 9114 9023 0722 4072 444 11, and 9114 9014 9645 1762 2683 33. That delay effectively denied me access to the courts. Further, it is unlawful for the FBOP to exercise Executive discretionary review of my filings with the judicial branch (please see Ex Parte Hull, 312 U.S. 546; 85 L.Ed. 1034; 61 S.Ct. 640 (1941) and Coleman v. Kansas, 316 U.S. 259; 86 L.Ed. 1453; 62 S.Ct. 1068 (1982). The right to unseal the court without interference from prison person officials is well-established and exceedingly unambiguous in Constitutional law. My mail to state and federal courts continues to encounter these delays despite the requirements of BOP Program Statement 5800.16 §335. In cases one such instance, a motion for an extension of time to file due before a June 20th, 2019, deadline was handed to CMU staff on June 10th, 2019, but did not reach the court until approx. July 20th.

INMATE'S SPECIFIC REQUEST: Please mail my filings out to U.S. District Court and other courts in a reasonable time frame and without exercising unlawful Executive discretionary review beforehand.

Det., July 25th, 2019          _[signature]_
DATE                          SIGNATURE OF REQUESTER

Part B—RESPONSE

---
DATE          REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.
SECOND COPY: RETURN TO INMATE          CASE NUMBER: _____

Part C—RECEIPT
                                        CASE NUMBER: _____
Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION
SUBJECT: _____

U.S. Department of Justice
Federal Bureau of Prisons
North Central Regional Office

Regional Administrative Remedy Appeal
Part B - Response

**Administrative Remedy Number: 979745-R1**

This is in response to your Regional Administrative Remedy Appeal received in this office on August 8, 2019, in which you allege your mail is not properly processed in a timely manner, thus denying your access to the courts.   For relief, you request staff process your outgoing correspondence in a timely manner.

We have reviewed your appeal and the Warden's response dated July 15, 2019.  Program Statement 5214.02, Communications Management Units, states, "Incoming and outgoing written general correspondence is ordinarily reviewed by CTU staff before delivery to the inmate or further processing to the post office. ... Only privileged communication with the inmate's attorney will be handled as special mail.  All other types of correspondence do not receive special handling and will be treated as general correspondence."   You were designated to the Communications Management Unit (CMU) to ensure additional monitoring of your communication could be accomplished.  This delay is necessary to ensure the safe and orderly operation of the institution, as well as, the general public.   You have provided insufficient evidence to support your claim staff is acting outside the scope of policy.  We find no evidence of staff malfeasance.

Based on the above, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_____08/30/19_____           _____J. Mayfield_____
Date                              J. E. Krueger, Regional Director

---

U.S. Department of Justice
Federal Bureau of Prisons

Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: Gottesfeld, Martin, S.          12982-104     D/CMU      FCI-THA
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A—REASON FOR APPEAL.  INMATE'S SPECIFIC REQUEST: Please mail my filings to U.S. district court and other courts in a reasonable time frame and without exercising unlawful Executive discretionary review beforehand.

Important and time-sensitive filings that I mailed to the U.S. District Court for The Southern District of New York on Monday, April 29th, 2019, for docketing  In the case of 18-cv-10836-PGG did not leave the mailroom for quite some time.  They had the following USPS tracking numbers: 9114 9023 0722 4072 3904 38, 9114 9023 0722 4072 3904 52, 9114 9023 0722 4072 4447 11, and 9114 9469 5014 9645 1762 0788 33.  That delay effectively denied me access to the courts. Further, it is unlawful for the BOP to exercise Executive discretionary review of my filings with the judicial branch (please see Ex Parte Hull, 312 U.S. 546; 85 L.Ed. 1034; 61 S.Ct. 640 (1941) and Cochran v. Kansas, 316 U.S. 255; 86 L.Ed. 1453; 62 S.Ct. 1068 (1942)). The right of access to the courts without interference from prison officials is well-established and exceedingly unambiguous in Constitutional Law. My mail to state and federal courts continues to encounter these delays despite the requirements of BOP Program Statement 5800.10 §306. In one such instance, a motion for an extension of time to file before a June 20th, 2019, deadline was handed to CMU staff on June 10th, 2019, but did not reach the court until approx. July 20th, 2019.

Fri., Sept. 27th, 2019            _____signature_____
DATE                              SIGNATURE OF REQUESTER

Part B—RESPONSE

DATE _____           GENERAL COUNSEL _____

ORIGINAL: RETURN TO INMATE           CASE NUMBER: _____

Part C—RECEIPT                       CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____           _____
DATE                      SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LWF                                              BP-231(13)
                                                     APRIL 1982

---

U.S. Department of Justice
Federal Bureau of Prisons

Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: Gottesfeld, Martin, S.          12982-104     D/CMU      FCI-THA
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A—REASON FOR APPEAL.  INMATE'S SPECIFIC REQUEST: Please mail my filings to U.S. district court and other courts in a reasonable time frame and without exercising unlawful Executive discretionary review beforehand.

Important and time-sensitive filings that I mailed to the U.S. District Court for The Southern District of New York on Monday, April 29th, 2019, for docketing  In the case of 18-cv-10836-PGG did not leave the mailroom for quite some time.  They had the following USPS tracking numbers: 9114 9023 0722 4072 3904 38, 9114 9023 0722 4072 3904 52, 9114 9023 0722 4072 4447 11, and 9114 9469 5014 9645 1762 0788 33.  That delay effectively denied me access to the courts. Further, it is unlawful for the BOP to exercise Executive discretionary review of my filings with the judicial branch (please see Ex Parte Hull, 312 U.S. 546; 85 L.Ed. 1034; 61 S.Ct. 640 (1941) and Cochran v. Kansas, 316 U.S. 255; 86 L.Ed. 1453; 62 S.Ct. 1068 (1942)). The right of access to the courts without interference from prison officials is well-established and exceedingly unambiguous in Constitutional Law. My mail to state and federal courts continues to encounter these delays despite the requirements of BOP Program Statement 5800.10 §306. In one such instance, a motion for an extension of time to file before a June 20th, 2019, deadline was handed to CMU staff on June 10th, 2019, but did not reach the court until approx. July 20th, 2019.

Fri., Sept. 27th, 2019            _____signature_____
DATE                              SIGNATURE OF REQUESTER

Part B—RESPONSE

RECEIVED
OCT 09 2019
Administrative Remedy Section
Federal Bureau of Prisons

---

Administrative Remedy No. 979745-A1
Part B - Response

This is in response to your Central Office Administrative Remedy Appeal where you claim your mail to the Courts is being processed in an untimely manner at FCI Terre Haute.  You state you have the right to access the Courts without interference and delay.  You request your Court filings be mailed in a reasonable time frame and without exercising unlawful executive discretionary review beforehand.

The Warden and Regional Director adequately the issues raised in your complaint we concur with the responses provided.   As indicated, based on your CMU status and need for increased monitoring, all incoming and outgoing mail, must be properly and thoroughly reviewed.  There may be circumstances that could result in a delay.  However, staff makes every effort to avoid any delays in the processing and delivery of inmate mail.  If you experience any excessive mail delays you should report it to staff at that time so action can be taken.

This response is provided for informational purposes.

_____11/21/19_____           _____Ian Connors_____
Date                              Ian Connors, Administrator
                                  National Inmate Appeals

DATE _____           GENERAL COUNSEL _____

ORIGINAL: RETURN TO INMATE           CASE NUMBER: 979745-A1

Part C—RECEIPT                       CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____           _____
DATE                      SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

                                                     BP-231(13)
                                                     APRIL 1982

Exh 14

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: Sample, Brandon C
TO: 12982104
SUBJECT: RE: 2020-02-05: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 02/10/2020 08:23:01 AM

Marty,

I have no recent correspondence from you.

Brandon

Sent 2/7/20 at 8:43 AM

MARTIN GOTTESFELD on 2/6/2020 7:20:46 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my attorney, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before
The U.S. Court of Appeals for The First Circuit and I am your client. This is an attorney-client--privileged conversation and
message.

The status quo remains.

I once again sent you legal mail today in a white envelope. Some of the legal mail I sent to you last week should be starting to
arrive around now. Without discussing its contents, can you please confirm if/what you've received thus far, if anything, using
the date stamps I marked on the envelopes/letters?

Thanks,
Martin S. Gottesfeld--defendant-appellant in U.S. v. Gottesfeld
I sent you this message at approximately 8:18 P.M. on Wednesday, February 5th, 2020.

Exhibit 15

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

------------------------------------------------------------------------------------------------

FROM: Sample, Brandon C
TO: 12982104
SUBJECT: RE: 2020-02-07: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 02/12/2020 08:27:24 AM

It appears that it takes several days for your emails to be received. This was emailed on a Friday, but I did not receive it until yesterday.

Brandon

2/11/20 at 9:11 pm

MARTIN GOTTESFELD on 2/10/2020 7:35:48 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Brandon,

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged message and conversation.

I am still in what the CMU calls "gen. pop."

I have been sending you physical mail each weekday. I have not received any emails from you in a few days. If you are not sending any, then there is no problem, and I do not want to waste your time needlessly replying to my, "I'm still here," messages. If, however, you have been sending me messages, I have not received them.

I am about to begin Shabbat and I will message you again tomorrow evening.

Thanks,


Martin S. Gottesfeld, defendant-appellant United States v. Gottesfeld
I sent you this message at approximately 5:05 P.M. on Friday, February 7th, 2020.

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: Sample, Brandon C
TO: 12982104
SUBJECT: RE: 2020-02-05: PRIVILEGED ATTORNEY-CLIENT MES
DATE: 02/12/2020 08:27:35 AM

It has been received.

Brandon

2/11/20 at 8:54 pm

MARTIN GOTTESFELD on 2/11/2020 7:20:33 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before
The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged message and
conversation.

I am starting to grow concerned that you have not received my physical legal mail. When it arrives, please look for indications of
physical tampering by the appellee. I began sending you physical mail two (2) days after our phone call, i.e. on Thursday,
January 30th, 2020. It seems likely that the first of it should have started to arrive by now. I will continue sending.

Thanks for the update.

Regards,


Martin S. Gottesfeld, defendant-appellant in United States v. Gottesfeld
I sent you this message at approximately 9:17 A.M. on Monday, February 10th, 2020.
-----Sample, Brandon C on 2/10/2020 8:23 AM wrote:

>

Marty,

I have no recent correspondence from you.

Brandon

Sent 2/7/20 at 8:43 AM

MARTIN GOTTESFELD on 2/6/2020 7:20:46 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my attorney, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before
The U.S. Court of Appeals for The First Circuit and I am your client. This is an attorney-client--privileged conversation and
message.

The status quo remains.

I once again sent you legal mail today in a white envelope. Some of the legal mail I sent to you last week should be starting to
arrive around now. Without discussing its contents, can you please confirm if/what you've received thus far, if anything, using
the date stamps I marked on the envelopes/letters?

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

Thanks,
Martin S. Gottesfeld--defendant-appellant in U.S. v. Gottesfeld
I sent you this message at approximately 8:18 P.M. on Wednesday, February 5th, 2020.

Exhibit 17

TRULINCS  12982104 - GOTTESFELD, MARTIN - Unit: THA-D-A

--------------------------------------------------------------------------------

FROM: Sample, Brandon C
TO: 12982104
SUBJECT: RE: 2020-02-10: PRIVILEGED ATTORNEY-CLIENT MESSAGE
DATE: 02/12/2020 08:27:49 AM

Marty,

Your correspondence from the end of Jan. Has been received. But it took a whole week for it to be delivered.

Brandon

2/11/20 8:54pm

MARTIN GOTTESFELD on 2/11/2020 7:21:23 AM wrote
PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION

Dear Attorney Sample:

You are my lawyer, retained to represent me in my direct appeals (docket numbers 19-1107, et al.), currently pending before The U.S. Court of Appeals for The First Circuit, and I am your client. This is an attorney-client--privileged conversation and message.

I am still in what the CMU calls "gen. pop."

I sent you legal mail once again today, in a manila envelope bearing U.S.P.S. tracking number 9114 9023 0722 4072 3905 68.

The legal mail I sent to you on Friday, January 31st, 2020, should be traceable using tracking number 9114 9023 0722 4293 0824 88. If it has still not arrived by the time you're reading this, please let me know if it is in the U.S.P.S. tracking system, and if so, its current status as reflected therein.

Regards,


Martin S. Gottesfeld, defendant-appellant in United States v. Gottesfeld
I sent you this message at approximately 8:44 P.M. on Monday, February 10th, 2020.

CONSUMER ADVOCATE & CUSTOMER RELATIONS



**UNITED STATES**
**POSTAL SERVICE**

June 13, 2019

Martin S. Gottesfeld
#12982-104
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808

Dear Mr. Gottesfeld:

Thank you for contacting the United States Postal Service.

The jurisdiction of the Postal Service over mail addressed to persons receiving their mail at an institution ends upon delivery. Once mail has been delivered to the facility, it is the responsibility of the institution's authorities to distribute the mail to the residents, clients, or others affiliated with the institution.

Similarly, outgoing mail from the institution does not become United States mail until it is placed into the care of a Postal employee or deposited into an official Postal Service mailbox. As a consequence, we suggest that you contact authorities at your institution about their internal regulations or pursue applicable grievance procedures.

It may be helpful to know that mail addressed to someone residing at an institution is subject to the mail security standards outlined below:

• Authorized personnel of prisons, jails, or other correctional institutions, under rules and regulations promulgated by the institution, may open, examine, and censor mail sent from or addressed to an inmate of the institution. An inmate may designate in writing an agent outside the institution to receive his or her mail, either through an authorized address of the agent, if the mail is so addressed, or at the delivery post office serving the institution, if the mail is addressed to the inmate at the institution.

• Mail addressed to patients or inmates at institutions is delivered to institution authorities who, in turn, deliver the mail to the addressee under the institution's rules and regulations. If the addressee is no longer at that address, the institution must redirect his or her mail to the current address. If the forwarding address is unknown, the mail is returned to the post office.

Please know that you may write to: American Civil Liberties Union (ACLU) about this issue. The address for the ACLU National Prison Project is 915 15th St. NW, 2nd Floor Washington, DC 20005.

Thank you for the opportunity to address this matter with you.

Sincerely,

S. Woods
U. S. Postal Service

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-5601

S. Gottesfeld
: 12982-104
Correctional Institution
x 33
ute, IN 47808









TED STATES
TAL SERVICE ®

SPS TRACKING #

23 0722 4291 7999 99

⇔12982-104⇔
U S District Court
Pro Se Clerk
500 Pearl ST
NEW YORK, NY 10007
United States

Sunday, March 1st, 2020; <u>Houston v. Lack</u>, 487 U.S. 266 (1988)







<u>Priority Mail — Flat Rate</u>

RECEIVED
MAY 28 2020
PRO SE OFFICE



USMP3
SDNY